**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRITA PARSI ) | |
| ) | |
| and ) | |
| ) | |
| NATIONAL IRANIAN AMERICAN COUNCIL ) | |
| ) | |
| ) | **Civil No.: 08 CV 00705 (JDB)** |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DAIOLESLAM SEID HASSAN, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S MOTION TO DISMISS COMPLAINT OR IN THE
ALTERNATIVE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Comes now the Defendant, Seid Hassan Daioleslam,[1] (hereinafter "Daioleslam" or

"Defendant") and respectfully moves this Honorable Court, pursuant to FED. R. CIV. P 12(b)(6),

to dismiss this case. In the alternative, Defendant moves this Honorable Court to grant the

Defendant summary judgment pursuant to FED. R. CIV. P. 56(b).

The case should be dismissed pursuant to FED. R. CIV. P 12(b)(6) because the Plaintiffs

fail to state a claim upon which recovery by a public figure such as each of the Plaintiffs from a

media defendant such as Daioleslam, could be granted.

In the alternative, this Court should enter summary judgment in favor of the Defendant,

---

[1] This is Defendant's proper name. Defendant sometimes publishes in Farsi under the name
Hassan Dai.

pursuant to FED. R. CIV. P. 56(b), because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant relies upon the accompanying memorandum of points and authorities, statement of undisputed material facts, and the entire record in this case.

Pursuant to Rule 12-I(e) and (k), a memorandum of law, statement of undisputed facts and proposed order consistent with this motion are attached.

Respectfully submitted,


_/s/ Jeffrey B. O'Toole_____

Jeffrey B. O'Toole (D.C. Bar No.244509)(otoole@otrons.com)
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Ave., NW, #200
Washington, DC 20036
(202) 775-1550 (telephone)
(202) 775-0008 (facsimile)

Counsel for Defendant


July 8, 2008

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of this Motion, Memorandum of Points and Authorities and Statement of Material Fact as to Which There is No Genuine Issue was served upon counsel for the plaintiffs, Afshin Pishevar, on this 8th day of July, 2008 by email to ap@pishevarlegal.com and by regular mail to 600 East Jefferson Street, Suite 316, Rockville, MD, 20852.


_/s/ Jeffrey B. O'Toole_____

Jeffrey B. O'Toole

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** | ) |
| | ) |
| **and** | ) |
| | ) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) |
| | ) |
| | ) **Civil No.: 08 CV 00705)** |
| | ) **(JDB)** |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DAIOLESLAM SEID HASSAN,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**STATEMENT OF MATERIAL FACT**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

1.    Trita Parsi (hereinafter "Parsi") is the President of the National Iranian American Council (hereinafter " NIAC").

2.    NIAC is a non-profit organization dedicated to promoting Iranian American involvement in American civic life and relying on the public for financial and human resource support.  NIAC refers to itself on its website as an Iranian American Voice in Washington, D.C. and states as part of its mission statement that it advances the interests of the Iranian American Community on civic, cultural and political issues.

3.    NIAC also facilitates direct political action of the citizenry to attempt to influence public affairs.  NIAC tracks legislation concerning Iran, alerts its

1

members as to what legislation is pending that might effect Iran, and suggests

ways in which its members may effect such legislation.  NIAC has model

letters which suggest what its members may write to Congressmen and

Senators to effect such legislation.

4.    NIAC is a public figure plaintiff in this action.

5.    As president of NIAC, Parsi is also a public figure plaintiff in this action.

6.    Parsi is an expert in Iranian foreign policy and in U.S. – Iran relations.  He is a

published scholar and the author of *Treacherous Alliance – The Secret*

*Dealings of Israel, Iran and the United States*, (Yale University Press 2007).

He has authored scholarly articles on Middle East Affairs published in, among

other places, the Financial Times, Jane's Intelligence Review, the Globalist,

the Jerusalem Post, The Forward, BitterLemons and the Daily Star.

7.    As to both the intent expressed and the actions taken and contemplated by

NIAC and Parsi indicate that they each intend and do play a role of especial

prominence in public affairs effecting Middle Eastern-U.S. policy.

8.    Seid Hassan Daioleslam (hereinafter "Daioleslam") is a Media Defendant.

9.    Daioleslam has written numerous articles, both on his own website and in

Farsi and English language journals, has participated in television and radio

broadcasts and has appeared on Voice of America as a guest.

10.    Prior to his involvement with NIAC, Parsi founded the group, Iranians for

International Cooperation (IIC).  IIC, while Parsi was still President of the

group, identified itself as "an Iranian lobby" and indicated that its main

objective was to safeguard Iran and Iran's interests.

11.    Parsi received a proposal for talks, the so called "grand bargain," from an unidentified Iranian government official both in 2003, and 2006.

12.    NIAC has a paid fellowship program which helps place fellows in a Congressional office for the summer.

13.    The word "lobby" does not, in of itself, hold a defamatory meaning.

14.    Association with Iran, does not in of itself, injure a person's or organization's reputation, standing in the community or lower him or it in the estimation of the community.

15.    There are widely divergent opinions about the best way to approach U.S.-Iranian relations and the U.S. foreign policy towards Iran.

16.    Defendant has never stated that the NIAC is an illegal organization, or that it should be registered as a lobby under federal law.

17.    Defendant has never identified Trita Parsi as the Swiss ambassador.

18.    Defendant's beliefs about NIAC and Parsi's advocacy on behalf of Iran are also expressed by other authors, including some Iranian journalists and government official.

Respectfully submitted,

_____/s/ Jeffrey B O'Toole_____
Jeffrey B. O'Toole
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Ave., NW, #200
Washington, DC 20036
(202) 775-1550
Counsel for Defendant

CERTIFICATE OF SERVICE

This is to certify that a copy of this Motion, Memorandum of Points and Authorities and Statement of Material Fact as to Which There is No Genuine Issue was served upon counsel for the plaintiffs, Afshin Pishevar, on this 8th day of July, 2008 by email to ap@pishevarlegal.com and by regular mail to 600 East Jefferson Street, Suite 316, Rockville, MD, 20852.

_____ */s/* Jeffrey B. O'Toole_____

Jeffrey B. O'Toole

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** | ) |
| | ) |
|    **and** | ) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) |
| | ) |
| | )   **Civil No.: 08 CV 00705 (JDB)** |
|        **Plaintiffs,** | ) |
| | ) |
|   **v.** | ) |
| | ) |
| **DAIOLESLAM SEID HASSAN,** | ) |
| | ) |
| | ) |
|      **Defendant.** | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
COMPLAINT OR IN THE ALTERNATIVE DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

    The plaintiffs, Trita Parsi ("Parsi"), a well-known public figure, and the National Iranian

American Council ("NIAC" and together with Parsi, "Plaintiffs") seek damages from media

Defendant Seid Hassan Daioleslam ("Daioleslam" or "Defendant") for his opinion that Plaintiffs

engage in lobbying and work with Iran.  Plaintiffs have asserted claims for defamation and false

light.

    The Complaint should be dismissed in its entirety pursuant to FED. R. CIV. P 12(b)(6),

because Plaintiffs have failed to state a claim and the law does not permit the imposition of

liability against a media defendant in these circumstances.  In the alternative, this Court should

enter summary judgment in favor of the Defendant, pursuant to FED. R. CIV. P.  56(a) because

there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter

1

of law.

## FACTS

1.      Daioleslam is a media person providing content for the website Iranianlobby.com. Plaintiffs' May 2, 2008 Complaint, ¶ 5.  Daioleslam also provides reports to television, radio, personal appearances, and other media outlets.  *Id.*, ¶ 6.

NIAC is an organization that depends on public financial and human resource support. *Id.,* ¶ 42.  Parsi founded and is President of the NIAC.

Trita Parsi is an Iranian-American scholar who made the text of a secret letter seeking negotiations from Iran to the United States available for an article published in the June 2006 issue of The American Prospect.  Parsi has stated publicly that the letter represented the views of the highest levels of the Iranian government. "They may have had someone in the middle who helped them put the framework for negotiations on paper, but the important point is that the Iranians approved the framework, and the Swiss gave the document to the U.S. at Iran's request," Parsi said.

Parsi is a well known public figure who was an aide to Congressman Bob Ney.  Parsi published the book TREACHEROUS ALLIANCE: THE SECRET DEALINGS OF ISRAEL, IRAN, AND THE UNITED STATES (Yale University Press) in which he exploited, among other things, his insider connections to the inner workings of the Iranian government and used that access to write his book.

## I.    LEGAL STANDARDS FOR REQUESTED RELIEF

### A.  The Law Has a Preference for the Speedy Resolution of Defamation Cases.

On account of "the importance of protecting a free and vigorous press," it has been held that "speedy resolution of cases involving free speech is desirable;" consequently, "defamation actions should be disposed of at the earliest possible stage of the proceedings if the facts as alleged are insufficient as a matter of law to support a judgment for the plaintiff" *Dorsey v. Nat'l Enquirer Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992) (*quoting Good Government Group of Seal Beach, Inc. v. Superior Court*, 586 P.2d 572, 578 (Cal. 1978)).

### A.    Legal Standard for a Motion to Dismiss Under FED. R. CIV. P 12(b)(6).

The Court may dismiss a claim under FED. R. CIV. P 12(b)(6) for failure to state a claim upon which relief can be granted.  While a complaint does not require detailed factual allegations, a plaintiff's obligation to state the grounds of his or her right to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal citations omitted). And although the Court must "construe the complaint liberally in the plaintiff's favor, *Id.,*  the Court need not accept as true inferences that are not supported by the complaint or "legal conclusion cast as factual allegations." *Fraternal Order of Police v. Gates*, ___ F.Supp. 2d. ____., 2008 WL 2396182, *14 (D.D.C. 2008).

### A.    Legal Standard for a Summary Judgment.

Summary judgment is appropriately granted when "there is an absence of evidence supporting an essential element of the nonmoving party's case." *Quetel Corp. v. Columbia Communications Int'l, Inc.*, 787 F. Supp. 1, 2 (D.D.C. 1992).  Summary judgment is especially

3

appropriate in the defamation context because protracted litigation can have a chilling effect upon the exercise of First Amendment rights. *See, e.g., Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors."); *Lauderback v. American Broadcasting Cos.*, 741 F.2d 193, 198 (8th Cir. 1984).

## ARGUMENT

## INTRODUCTION

This case is based upon statements that are designed to open debate on public issues. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing the country's profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open).

To establish liability in this matter, Plaintiffs bear the burden of proving: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) that either the statement was actionable as a matter of law irrespective of special harm or its publication caused the plaintiff special harm." *Klayman v. Segal,* 783 A.2d 607, 613 n. 4 (D.C.2001)(quotations omitted). With respect to the last factor, the Supreme Court long ago eliminated the common-law rule of "liability without fault" in defamation cases brought against the media. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). As a result, all "public figures" must prove that the publisher acted with "actual malice," *id.*, that is, with subjective "awareness of probable falsity," *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968) (quotation omitted). *See also Foretich v. CBS, Inc.*,

4

619 A.2d 48, 59 (D.C. 1993).

Finally, summary judgment may be warranted even as to such elusive elements as a defendant's motive or intent where, as here, "'the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997) (citations omitted).

## II.    THE PLAINTIFFS CANNOT SHOW THAT THE DEFENDANT MADE FALSE AND DEFAMATORY STATEMENT ABOUT EITHER PLAINTIFF

### A.   Standard for the Burden of Proof

#### 1.    <u>Plaintiffs are Public Figures.</u>

Plaintiffs are public figures.  The law draws a distinction between private parties and public figures in the arena of defamation because public officials and public figures subject themselves to public scrutiny as a consequence of their involvement in public affairs. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 343-344 (1974).  Public figures also "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.*  "[A] court . . . analyzing whether a given plaintiff is a public figure must look at the facts, taken as a whole, through the eyes of a reasonable person."  W*aldbaum v. Fairchild Publications, Inc***.,** 627 F.2d 1287, 1293 (D.C. Cir., 1980).  In deciding whether a plaintiff is a public figure, "the touchstone [is] . . . whether an individual has 'assumed [a] role [ ] of especial prominence in the affairs of society . . . that invite[s] attention and comment.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1289 (D.C. Cir. 2003)(ftnt. omitted).

The National Iranian American Council's (NAIC) entire existence is predicated on its ability to assume a role of especial prominence in the affairs of society, namely to promote

the Iranian American community interests in broader societal affairs.

By Plaintiffs' own words, it is a non-profit "dedicated to promoting Iranian American involvement in American civic life and relying on the public for financial and human resource support." Complaint at p, 3, ¶ 10. The organization's website touts the organization as "An Iranian American Voice in Washington, D.C." (*See Exhibit 1,* NIAC Mission Statement*)*, and states as part of its mission statement that it "advances the interests of the Iranian American Community on civic, cultural and political issues." *(See Exhibit 1).* NIAC also facilitates direct political action of the citizenry to attempt to influence public affairs. (*See e.g. Exhibit 2,* excerpts from the Political Engagement Center section of the NIAC website, setting forth links to send correspondence to Senators and Congressmen and allowing members to set up an Action Alert that allows members to receive e-mails when their "involvement may make a critical difference.")

Plaintiff Parsi is also a public figure, as both the President of NIAC and a noted and vocal commentator on Middle Eastern affairs. With a background as director for two U.S.-based Iranian organizations, Dr. Trita Parsi's role in NIAC and status as a public figure are also contained in the NIAC website

> [ Dr. Parsi] possesses a rich set of leadership skills and vision that will guide NIAC towards its goals.
>
> Trita Parsi has worked for the Swedish Permanent Mission to the UN in New York where he served in the Security Council handling affairs for Afghanistan, Iraq, Tajikistan and Western Sahara, and the General Assembly's Third Committee addressing human rights in Iran, Afghanistan, Myanmar and Iraq. He has also served as a foreign policy advisor to Congressman Bob Ney (R-OH).
>
> His expertise is Iranian foreign policy and US-Iran relations. His book, *Treacherous Alliance - The Secret Dealings of Israel, Iran and the United States,* (Yale University Press 2007), is based on more than 130 interviews that

6

Dr. Parsi has conducted - in his personal capacity - in Israel, Iran and the United States with senior officials from all three countries.

Dr. Parsi's articles on Middle East affairs have been published in the Financial Times, Jane's Intelligence Review, the Globalist, the Jerusalem Post, The Forward, BitterLemons and the Daily Star.

*(See Exhibit 3, Dr.* Trita Parsi Bio Page).

Given both the intent expressed and the actions taken and contemplated by

NIAC and Parsi indicates that they each intend and do play a role of especial

prominence in public affairs affecting Middle Eastern- US policy[1].

---

1 This is further supported by a list of the accomplishments listed on the NIAC website located at http://www.niacouncil.org/index.php?option=com_content&task=view&id=1076&Itemid=170. NIAC is regularly quoted in numerous media outlets as an authority on affairs related to the Iranian-American community, including US-Iran relations; and is celebrated as the largest Iranian American grassroots organization, with members in 44 states.

NIAC is a household name on Capitol Hill and has emerged as a trusted source on US-Iran relations and the Iranian-American viewpoint. NIAC often teams up with groups like the New America Foundation and Amnesty International to discuss issues like the deteriorating human rights situation inside Iran and the Iranian nuclear file.

Some of NIAC's individual successes are as follows:

-- NIAC regularly hosts briefings on Capitol Hill for Congressional Staffers on areas of interest to the Iranian-American community. Some of our latest briefings have focused on Iran's parliamentary elections, the National Intelligence Estimate (NIE) report on Iran, and Iran's role in Iraq.

-- NIAC has been on the forefront of the debate on US foreign policy with Iran, pushing for direct, diplomatic negotiations, and urging against war.

-- In 2003, NIAC challenged and won against Monster.com, a major US company discriminating against Iranian-Americans by keeping them from competing fairly in the job market.

-- In January 2005, NIAC successfully compelled the National Geographic Society to correct their 8th edition maps to read "Persian Gulf" instead of "Arabian Gulf."

-- NIAC forced an apology from MSNBC's Don Imus for a derogatory comment he made in 2004 about an Iranian airliner crash that killed 43 passengers.

**2. Defendant is a Media Defendant.**

Daioleslam is a media defendant. "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. *The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.*" *Lovell v. City of Griffin, Ga.,* 303 U.S. 444,452 (1938)(emphasis added). *See also*, e.g. *Metastrom, Inc. v. Garnter Group, Inc.*, 28 F.Supp.2ed 665 (D.C. Cir. 1998)(holding that information disseminated by company via medium such as e-mail subscription service and a website qualified defendant as a member of the mass media.

Daioleslam clearly falls within this definition of a media defendant. Daioleslam has written numerous articles, both on his own website and in Farsi and English language journals, has participated in television and radio broadcasts and has appeared on Voice of America as a guest.

**3. Burden of Proof for a Public Figure Seeking to Recover Against a Media Defendant.**

When a public figure plaintiff seeks to recover damages from a media defendant for alleged defamatory statements, the plaintiff may recover only if he shows *clear and convincing*

---

-- NIAC worked with writer/director Wayne Kramer and Weinstein Company to make changes to the screenplay for *Crossing Over* (2007). The film, which features an all-star cast, originally depicted Iranian Americans committing an "honor killing." Had the script not changed, the movie would have had similar affects for the Iranian-American community as the film, *Not Without My Daughter* (1991).

(*See* NIAC Factbook , http://www.niacouncil.org/index.php?option=com_content&task=view&id=1076&Itemid=170*).

*evidence* that the defendant acted with actual malice. *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986)*; New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Moreover, in the case of a public figure, the Plaintiff bears the burden of proof of proving that a statement involving matters of public concern is false. *White v. Fraternal Order of Police*, 707 F.Supp. 579 , 590-591 (D.D.C. 1989).

**B.  All The Statements Are Substantially True**

Defendant would first note that, as set forth above, it is Plaintiffs' burden to prove the falsity of the statements made against them.  In that regard, the Plaintiffs have not stated a claim upon which relief can be granted.  Plaintiffs have made a blanket allegation that statements complained of are false.  However, they have not stated in what way each of the allegations are false.  For example, with respect to the allegation contained in paragraph 17E, the Plaintiff Parsi does not allege that the statement about the relationship between him and Siamack Namazi is false, nor in what way the characterization of NIAC as a lobby is false.  While the Plaintiffs summarily state that all the statements are false, the Court need not accept their labels and conclusions, and a formulaic recitation of the falsity of the statement as true.  *See Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal citations omitted).   Because the Plaintiff has not met the burden of even alleging how the statements are false, the Court should dismiss the complaint for failure to state a claim upon which relief should be granted pursuant to FED. R. CIV. P 12(b)(6).

With respect to summary judgment, judgment for media defendants is required where, as here, reports complained of are substantially true.  *White v. Fraternal Order of Police,* 909 F.2d 512, 17 Media L. Rep. (BNA) 2137 (D.C. Cir. 1990), reh'g denied, (Sept. 19, 1990).  This

9

defense may be established by demonstrating that the statements in question are "substantially true." *Lohrenz v. Donnelly,* 223 F.Supp.2d 25, 59 (D.D.C.2002). "Substantially true" means that the "gist" of the statement is true or that the statement is substantially true, as it would be understood by its intended audience. *Moss,* 580 A.2d at 1023.

The statements complained of regarding Parsi and NIAC's lobbying activity[2] are substantially true. Defendant has opined that Plaintiffs are important players in a lobby enterprise, lobbying on behalf of actions which are in line with the wishes and interests of the Iranian government. The term "lobbying" is defined as "[a]ll attempts including personal solicitation to induce legislators to vote in a certain way or to introduce legislation. It includes scrutiny of all pending bills which affects one's interest or the interests of one's clients, with a view towards influencing the passage or defeat of such legislation." BLACK'S LAW DICTIONARY 938 (6th ed. 1990). NIAC hosts, as part of its website, a "Political Engagement Center" which lists all the current legislation affecting Iran and supplies its members with Current Action Alerts, which allow the members to contact members of Congress and the Senate to influence their votes on such legislation. *See Exhibit 2.* Exhibits 2 and 6 demonstrate other examples of NIAC's attempts to influence legislators to vote on issues that affect Iran. These documents all demonstrates the actions of NIAC and Plaintiff Parsi on NIAC's behalf constitute a grassroots effort to induce legislators to vote a certain way on legislation.

It is true that the manner in which NIAC, and by extension Plaintiff Parsi as the President

---

2 Specifically, these would include the allegations complained on in paragraphs 17A, 17C, 17D, 17F, 17G, 17H, 17I, 17J, 36A and 36B, all of which allude to Parsi and NIAC's lobbying for the Iranian interests. To the extent that the other complained of statements are not included in this footnote, Defendant maintains that they are true, but acknowledge that the issue of their veracity may not be conducive to summary judgment prior to discovery. However, such other statements are subject to dismissal or summary judgment on other grounds, which are addressed hereafter.

of NIAC seeks to have such legislators vote is in accord with the needs, interests and wishes of the Iranian regime.

For example, a member of the Iranian regime indicated last year that influencing western opinion, including demonstrations against the war and opposition of the public opinion against sanctions against Iran is "a winning card in the hand of our policy makers."  (*See Exhibit 4).* Both opposition to war in Iran and opposition to sanctions are advocated by NIAC and Parsi specifically. (*See Exhibit 5).*  There are more direct examples of the connection between the wishes and interests of the Iranian regime and Parsi. For example, in an interview with Plaintiff Parsi published in the Iranian government-owned newspaper Aftab published on December 28, 2006, the article underscored Parsi's efforts on the behalf of the Iranian regime.  The interview was decorated with Parsi's picture and was titled "Iranian Lobby Becomes Active?" (See *Ex.* 7). In the introduction to this interview, it is stated:

> (Translation): "The conflict between Iran and the West on Iran's nuclear file has entered a critical state.  The government must now utilize all the possible resources to defend the national interest.  In this, we have not paid enough attention to the potentially significant influence of the Iranian American society in moderating the extremist policies of the White House.   In comparison of this untouched potential to the influence of the Jewish lobby in directing the policies of Washington in supporting Israel, we see the difference between what is and what could be."

Yet another example is the fact that several Iranian pro-government publications ran articles after Defendant's first article regarding Plaintiffs was published.  These rebuttal articles alleged that Defendant as part of a Jewish conspiracy working through another organization. One of these articles referred to Defendant's article as an attack on the "Iranian lobby." *(See Exhibits 8-12.)* Another publication indicates that Ambassador Faramarze Fathnejad, in a September 19, 2006 meeting with the organization in Theran called "The Association of Iranophile."

11

According to that publication, Ambassador Fathnejad praised Trita Parsi and urged that the group be more supportive of Parsi.  The Ambassador also emphasized  "the importance of relation with Iranian organizations in the U.S. and specially pointed to NIAC and his young leader who is a consultant to CNN and has been very successful in his efforts"  *See Exhibit 15.*

Furthermore, even prior to his involvement with NIAC, Plaintiff Parsi founded the group Iranians for International Cooperation (IIC).  IIC, while Parsi was still President of the group, *identified itself* as "an Iranian lobby" and indicated that its "main objective [was] to safeguard Iran and Iran's interests."  (*See Exhibit 13).*

In some cases, the Plaintiffs' own website belies the alleged falsity of Defendant's statements.  For example, Plaintiffs allege that the statement set forth in paragraph 17F is false and defamatory.[3]  Taken in context however, this statement is demonstrably true.  This statement followed immediately the following line in the article ". . .Trita Parsi, in response to a direct question asking whether his group lobbies the US congress declared: 'Our group does not do any lobbying at all.  We do not contact the Congressmen to support or oppose a bill.'"  *See Complaint,* Exhibit 3.  As set forth in *Exhibits 2 and 5 (a),* a major activity of NIAC is encouraging its members to contact Congressmen and Senators on specific legislation.  The group even gives suggested language that its members may use in contacting lawmakers regarding specific legislation.  *See Exhibit 5(a).*  Therefore, Plaintiff's admission (in the form of NIAC's own website) shows that Parsi's statement that NIAC does not contact Congressmen to

---

[3] "Reality exposes the falsehood of Parsi's claim. NIAC has strived to penetrate the US political systems as per the 1999 roadmap by Namazi and Parsi.  NIAC's actions lucidly reveal the nature of the organization."

support or oppose bills is not accurate.  This is done with the express purpose of attempting to induce legislators to vote a certain way on a bill, i.e. lobbying.[4]  *See Exhibit 6.*

   While the Plaintiffs may quibble over the semantics of whether they are identified as a group engaging in lobbying activity promoting an agenda in line with the Iranian regime's interest and praised by pro-Iranian regime partisans or an organization that seeks to influence legislation that supports an agenda that coincidentally overlaps with the Iranian regimes interests, the statements cited by the Plaintiffs are substantially true.  *See e.g. Copeland-Jackson v. Oslin*, --- F.Supp.2d ----, 2008 WL 2211938 (D.D.C 2008)(defamation case dismissed for failure to state a claim where a Plaintiff convicted of two counts of  "gross sexual imposition" of two boys aged 13 and 14 was referred to as a "convicted pedophile."  Plaintiff complained, *inter alia*, that he did not meet the DSM-IV definition of a person suffering from pedophilia. .  The court held that the "gist" of the statement was substantially true and therefore the technical accuracy of the term was irrelevant.).

   The Plaintiffs have not met their burden to show that the alleged defamatory statements are untrue, except for a blanket assertion that the allegations are untrue.  Specifically, the Plaintiffs have not indicated in what way the specific statements cited are false, although it is their burden to show the falsity of such statements.

### C.    Plaintiffs Have Not Identified Defamatory Statements.

   The question of whether a statement is "capable of conveying a defamatory meaning" is a question of law for the court to determine as a threshold matter. *See, e.g., White*, 909 F.2d at

---

[4] A distinction should be made here between a "lobbyist," who is required under federal law to register and a "lobbying enterprise" or a "lobby", which is a group attempts to influence legislative action.  Defendant's allegations regarding Plaintiffs have always identified the Plaintiffs as the latter and not the former.

13

518; *Tavoulareas v. Piro*, 817 F.2d 762, 779-80 (D.C. Cir.) *(en banc), cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); RODNEY A. SMOLLA, Law of Defamation § 4.08 n. 132 (1993) ("Smolla"); Restatement § 614.

 A statement is defamatory only "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *See, e.g., Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.Cir.1966) (en banc); *Vereen v. Clayborne*, 623 A.2d 1190, 1195 n. 3 (D.C.1993). "But an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear. 'odious, infamous, or ridiculous.'" *Bennett v. U.S. Chess Federation*, 468 F.Supp.2d 79, 89 (D.D.C. 2006).

When assessing defamation by implication, that is defamation stemming from the implication of words, not the literal statements, the Court must assess (a) whether a communication is capable of bearing a particular meaning, and (b) whether that meaning is defamatory. *See e.g. White v. Fraternal Order of Police*, 707 F.Supp. 579, 589 (D.D.C. 1989).

In this case, the Defendant has not made statements that would injure either plaintiff in his trade, profession or community standard or lower him in the estimation of the community. With respect to the statements made in paragraphs 17.A, 17.D, and 17.I, it is difficult to see how a group whose aim is to foster understanding between Iran and the United states (*See Exhibit 1*) can complain that those allegations of close associations of the Plaintiffs with Iran will somehow lower each of them in the estimation of the community.  Moreover, the characterization of both NIAC and Plaintiff Parsi of action on behalf of Iran as defamatory is puzzling, given that the NIAC website itself includes calls to action on behalf of Iran urging diplomacy with Iran (*See Exhibit 2,* Current Action Alerts) and articles that urging against sanctions for Iran.  With respect to Plaintiff Parsi, whose predecessor organization, the IIC, identified as one of its main

14

objectives, the safeguard of Iran and its interest (*See Exhibit 8*)*,* it is even more mystifying how he could now indicate that alleging advocacy on behalf of Iran is defamatory.

     A.     **Many of the Complained of Statements are Opinions.**

     Many of the complained statements are simply the opinion of the Defendant and therefore not actionable. *White v. Fraternal Order of Police*, 707 F.Supp. 579, 591 (D.D.C. 1989). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 340. Whether a statement is opinion or fact is a question of law which the Court must decide. *White v. Fraternal Order of Police*, 707 F.Supp at 591.

     The proper test in this jurisdiction to test whether a statement constitutes a privileged opinion is a four part analysis:

>      First, courts should 'analyze the common usage or meaning of the specific language of the challenged statement itself.' [ ]Second, courts should 'consider the statements verifiability-is the statement capable of being objectively characterized as true or false?' [ ] Third, courts should 'consider the full context of the statement ... inasmuch as other, unchallenged language surrounding the allegedly [ ]defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content.' *Id.* Fourth, courts should "consider the broader context or setting in which the statement appears."
>
>      *Id.,* (citations omitted).

     Plaintiff Parsi indicated that the Defendant published false and defamatory statements "indicating that Parsi is a member of a subversive and illegal[5] Iranian lobby colluding with the Islamic Republic of Iran and engaging in disingenuous conduct." *See* Complaint, ¶ 13.

---

[5] Defendant has never stated that NIAC was an illegal lobby. Indeed, none of the sixteen quotations complained of by the Plaintiffs states that NIAC engages in illegal activity.

With respect to the allegation that Defendant has characterized NIAC as a "subversive" lobby, Plaintiffs seems to allude to the Defendants statements regarding the NIAC's youth programs targeting "unwary" Iranian American youth,[6] and characterizing Parsi's spin on Iran as a victim as "admirable,"[7]

With respect to the allegation that Defendant has indicated that Plaintiffs colluded with the Islamic Republic of Iran, Plaintiffs seems to be alluding to Defendant's statements regarding the "smokescreen" Parsi was called upon to create regarding Iran's 2003 and 2006 offers of talks[8], the statements questioning the motives of NIAC lobby, [9] questioning the motives behind an Iranian official transmitting the so called "grand bargain" document to Parsi's group, [10] and characterizing NIAC as an effective tool of the Iranian lobbying web.[11]

However, all of these statements, while they contain facts that are protected because they are true also include opinions, which are likewise protected. For example, the characterization of the youth being targeted for training by NIAC is an opinion. The same holds true for Daioleslam's characterization of NIAC's spin on Iran's position as victim, the indication that Parsi was being called upon to create a "smokescreen," the questioning of the motives of NIAC's actions and the characterization of NIAC as and "effective node" in the Iranian lobbying web.

First the specific words used are commonly used as characterizations, not facts. "While the characterization of challenged statements as opinion does not confer an automatic and complete defense to defamation, 'allowance must be made for imaginative expression or the

---

[6]  *See* ¶ 18D of the Complaint.
[7]  *See* ¶18E of the Complaint.
8  *See* ¶17B of the Complaint.
[9] *See* ¶ 18A of the Complaint.
[10] *See* ¶ 18B and C of the Complaint
[11]  *See* ¶ 36B of the Complaint.

16

rhetorical hyperbole which has traditionally added much to the discourse of our Nation.'"

*Novecon, Ltd. V. Bulgarian-American Enterprise*, 977 F.Supp 45, 52 (D.D.C. 1997)(citations omitted)(internal quotations omitted). The words "unwary" and "effective" are adjectives that are used to describe facts, not facts in of themselves.  Likewise, the word "smokescreen" is commonly used to describe the quality of an action or a course of action.  Lastly, the use of rhetorical questions, like those regarding the motives of NIAC, would commonly be understood to be expressive of an opinion of the writer, rather than stating a fact and are invitations to engage in public debate.

Secondly, these characterizations are not independently verifiable as being true or false. It cannot be said that these characterizations "imply a demonstrably false fact," which would take the statements out of the realm of opinion protected by the First Amendment. *Lane v . Random House, Inc.*, 985 F.Supp. 141, 151 (D.D.C. 1995)(finding that defendant was only expressing a point of view about the Kennedy assassination when it labeled a Kennedy conspiracy theorist as "Guilty of Misleading the American Public.").

 It is not demonstrably false that the Iranian American youth may be viewed by some as "unwary."  The term "unwary" means "not alert: easily fooled or surprised."  WEBSTER'S NEW COLLEGIATE DICTIONARY 1284. (1975). Whether or not any person is easily fooled or surprises is a subjective evaluation, not susceptible to being objectively disprovable.  Moreover, an ascertainment of the wariness of an undefined population, i.e. those Iranian American youth at which NIAC programs are directed, is impossible.  Even if it was ascertainable in some way, the evaluation of that population as "wary" would not be objectively supportable.  The same could be said for the characterization of Parsi's involvement in the "grand bargain" talks as a "smokescreen" and the description of NIAC's efforts, i.e. their lobbying, as an effective node for

17

pro-Iranian advocacy or lobbying in the United States.

One could argue whether the motives behind an action are to create a smokescreen, and without indicating that the writer has special knowledge of motive, the reasonable reader would understand it to be the writer's interpretation of motive. Likewise, to indicate that the actions of NIAC and Parsi efforts are effective advocacy on Theran's behalf is the writer's view of those actions as effectively benefiting the Iranian regime and does not imply facts that are demonstrably false.

Neither is it demonstrably false that NIAC's portrayal of the Iranian regime could be viewed as casting the government as a victim and that this portrayal amounts to admirable spin. This statement simply sets forth a point of view that indicates that one person views how NIAC portrays the Iranian government is tantamount to characterizing them as victims. As a point of view, it is not susceptible to being factually disproven.

With respect to the questions posed regarding Parsi and by extension, NIAC's motives behind its many activities and involvement in the so called "grand bargain" talks, the rhetorical questions posed by Defendant regarding Parsi and NIAC's activities do not imply any facts at all, demonstrably false or otherwise. Such rhetorical questions simply imply what Defendant believes Plaintiffs' motives to be.

Addressing the third and fourth prong of the test, as already laid out above, the Defendant certainly writes his commentary in the hopes of persuading the reader that his interpretation is correct. However, the complained of statements set forth in this section do not in any way would influence the average reader's readiness to infer that a particular statement has factual content. In fact, as set forth, both in the context of the articles themselves and the context of where such articles appear, the statements are clearly Diaioleslam's analysis of the situations

18

about which he writes and an effort to persuade readers that his interpretation is correct. His website itself describes Daioleslam as "an independent Iran Analyst and writer. He is well published in Farsi and English**.** He has appeared as an expert guest in the Voice of America-TV as well as other Persian media.

http://english.iranianlobby.com/page1.php?id=7&bakhsh=ARTICLES. The description of the author as a analyst and activist provide the context for his articles as his analysis and advocacy, i.e. his analysis of the situation based on the facts that he has presented.

Because the statements discussed in this section cannot be said to imply demonstrably false facts, those statements must be treated as protected opinion and are not defamatory as a matter of law.

## II.    PLAINTIFFS HAVE NOT AND CANNOT DEMONSTRATE THAT DEFENDANT ACTED WITH REQUISITE FAULT TO ESTABLISH DEFAMATION.

### A.    Standard for Demonstrating Fault in this Case.

As indicated above, the Plaintiffs are public figures, and the Defendant is a media defendant. Plaintiffs who are public figures may recover for defamation only if they show *clear and convincing evidence* that the Defendant acted with actual malice. *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986)*; New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

### B.    Plaintiffs Have Not Shown Daioleslam Acted With Actual Malice.

The actual-malice standard requires Plaintiffs to prove that the Defendant made the statements with knowledge of their falsity or with reckless disregard of the truth. *New York Times*, 376 U.S. at 279-80, 84 S.Ct. 710; *Gertz,* 418 U.S. at 342, 94 S.Ct. 2997. Reckless

disregard of a statement's truth is a subjective standard, *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); it is not measured by whether a reasonably prudent man would have published [ ] or would have investigated before publishing, but by whether the defendant in fact entertained serious doubts as to the truth of [its] publication, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see also Gertz,* 418 U.S. at 331, 94 S.Ct. 2997 (recognizing that a defendant acts with reckless disregard when he displays a high degree of awareness of probable falsity).

While a defendant's failure to investigate, without more, does not establish a reckless disregard of the truth, the purposeful avoidance of the truth is in a different category and may be sufficient to establish actual malice. *Harte-Hanks,* 491 U.S. at 692, 109 S.Ct. 2678;*Perk v. Reader's Digest Ass'n, Inc.,* 931 F.2d 408, 411 (6th Cir.1991).

Thus, to satisfy actual malice standard for defamation of a public figure, a plaintiff must show, by clear and convincing evidence, that when the defendants published the alleged defamations they were subjectively aware that it was highly probable that the story was: (1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that defendants had obvious reasons to doubt. *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003).

**1. The statements made were not fabricated, as Daioleslam properly relied upon other news outlets that Daioleslam had no reason to doubt and the statements made were not so inherently improbable that only a reckless person would have put them in circulation.**

Given the public's desire for timely and informative news, courts have consistently recognized that a news organization must be permitted to rely on and republish information

received from other reputable news organizations. The court credited with first doing so was the

Supreme Court of Florida in *Layne v. Tribune Co.*, 146 So. 234 (Fl 1933).  In Layne, the plaintiff

was named in a Prohibition-era wire service report saying that he was in the company of a "dry"

Congressman trying to sneak booze into his Congressional office. *Id.* at 235-36. The plaintiff

sued his hometown paper in Florida for libel *per se* because it carried the report without checking

its accuracy.

In affirming an order of dismissal, the Florida Supreme Court noted that local newspapers

must frequently gather information from a number of outside sources in order to provide the

public with coverage of current events. *Layne*, 146 So. at 238.

> The mere reiteration in a daily newspaper, of an actually false, but
> apparently authentic news dispatch, received by a newspaper
> publisher from a generally recognized reliable source of daily
> news, such as some reputable news service agency engaged in
> collecting and reporting the news, cannot through publication
> alone be deemed  *per se*  to amount to an actionable libel by
> endorsement . . . .

Layne, 146 So. at 238.

This principle has become known as the "wire service defense," although as courts have

recognized, characterizing this principle as a "defense" is a misnomer. Reliance on a reputable

news service is not a defense to liability, but rather a fact that negates an element of the

plaintiff's affirmative case: the showing of fault by the defendant. [B]y saying that the wire-

service defense is available, what is really being said is that, under the circumstances, a local

news organization's standard of care does not include the requirement to independently verify

the accuracy of a news release, *i.e.*, the organization is under no duty to independently verify the

accuracy of the release. *Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738, 741 (Mich. Ct. App.

1996), aff'd, 586 N.W.2d 85 (Mich. 1998).

21

Thus, when a media organization receives a wire service release, it has a "duty to read the release to ensure that the face of the story itself does not contain any inconsistencies," as well as a "duty to refrain from publishing the news story if the news organization knows the story is false or if the release itself contains unexplained inconsistencies." *Brown v. Courier Herald Publishing Co.*, 700 F. Supp. 534, 537 (S.D. Ga. 1988). The media organization "does not have a duty, however, to independently verify the accuracy of the wire service release." *Id.; see also Kendrick*, 659 A.2d at 824; *McKinney v. Avery Journal, Inc.* , 393 S.E.2d 295, 297 (N.C. Ct. App. 1990); *Van Straten v. Milwaukee Journal Newspaper-Publisher,* 447 N.W.2d 105, 112 (Wis. Ct. App. 1989); *Howe*, 555 N.W.2d at 741.

In the years since *Layne,* no court has rejected the rationale underlying the wire service defense. To the contrary, it has been expanded. While the wire service defense was originally developed for newspapers who served as conduits for national wire service reports, it has since been extended to shield other media defendants – including television broadcasters – that rely on other news organizations. *See, e.g., Med. Lab. Consultants v. American Broadcasting Cos.* , 931 F. Supp. 1487, 1492 (D. Ariz. 1996) (local ABC affiliate); *Auvil v. CBS "60 Minutes"*, 800 F. Supp. 928, 931 (E.D. Wash. 1992) (local CBS affiliate).

Although never squarely presented with the "wire service defense," the District of Columbia Court of Appeals accepted the doctrine for all practical purposes in *Kendrick v. Fox Television*, 659 A.2d 814 (D.C. 1995). In *Kendrick*, WTTG Fox 5 reported, based on an AP news report, that the plaintiff, the owner of an apartment building, "may have tipped off drug dealers about a raid on the apartments." 659 A.2d at 817-18.  Kendrick argued that the media defendants were negligent because, *inter alia*, they failed to contact him prior to the broadcast and ignored problems concerning the veracity of the Deputy Police Chief. *Id*. at 821.

22

The *Kendrick* court stated that "it is well established that a news organization can reasonably rely on information received from other reputable news organizations, such as the Associated Press." *Kendrick*, 659 A.2d at 824 n.24 (*citing Nelson v. Associated Press, Inc*., 667 F. Supp. 1468, 1476-80 (S.D. Fla. 1987)). Doing so, the court noted, would not violate the standard of care owed to private figure plaintiffs, which obligates publishers "to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others . . . *i.e*., . . . to make a reasonable investigation as to the truth." 659 A.2d at 822 (*quoting Moss*, 580 A.2d at 1025-26).

Although the wire service defense had not been raised on appeal, the District of Columbia Court of Appeals noted with approval that "the trial court correctly held as a matter of law that Fox television was not negligent in failing to conduct an independent inquiry before reporting the story taken from the Associated Press." *Kendrick*, 659 A.2d at 824 n.24.

Indeed, we are aware of no jurisdiction that has rejected the wire service defense. Nor has any court that found the wire service defense applicable ever held that a media defendant nevertheless is liable for republication of a wire service report. *See* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS §7.3.1 (3d ed. 1999) ("Research has disclosed no case in which a court has held that the exception applies and the republisher has therefore in fact been held liable for republication of a wire service article for failure further to investigate.").

It is clear that allowing a media organization to rely on the wire services is critical to the gathering and dissemination of news; no media organization could assume the burden of verifying every news item reported to it by established news gathering agencies and continue to satisfy the demands of modern society for up-to-the-minute news and information. *See, e.g.,*

23

*Howe*, 555 N.W.2d at 741; *Layne*, 146 So. at 239.

As one court has noted: The reason for the defense makes sense. . . . [M]odern newspapers could not exist without a similar privilege. After all "[n]o newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all." *Nelson,* 667 F. Supp. at 1476-77 (quoting *Layne*, 146 So. at 239). Courts typically conduct a two-stage inquiry to determine whether summary judgment should be granted in these circumstances.

The first inquiry is whether the allegedly defamatory statement was taken "without substantial change" from "a reputable news-gathering agency." *Howe,* 555 N.W.2d at 740; see also *Brown*, 700 F. Supp. at 537; *Nelson,* 667 F. Supp. at 1478.

The second inquiry is whether the media organization actually knew that the wire service report was false or there is something unusual in the wire service report that should have put the publisher on notice that the report was probably false. *Howe*, 555 N.W.2d at 741; *Brown*, 700 F. Supp. at 537; *Nelson,* 667 F. Supp. at 1479. As the court noted in *Howe*, "[t]o require a local news organization to independently verify the accuracy of every wire-service release that the local organization has no reason to believe is inaccurate and is received from a reputable news-gathering agency would be to impose an obligation to conform to a standard of conduct greater than that of a reasonable man under like circumstances." 555 N.W.2d at 741.

The straightforward application of these principles to the facts of this case require its dismissal. First, it cannot be disputed that Daioleslam aired "without substantial change" the reports he cited to concerning Plaintiffs' activities. In all material respects the Daioleslam

24

broadcast was identical to the cited reports.

Second, there is nothing in the wire service report that would have struck a news professional as facially implausible, such that it should be questioned or disbelieved. To begin with, it came from well known providers of information.

Nor is there anything improbable in the report itself; to the contrary, the facts were directly attributed to well known scholars, lending a further indicia of credibility to the report. In fact, Plaintiffs' claim is not that the cited report should have set off alarms, but rather Plaintiffs are taking the ostrich approach and ignoring the cited reports.

The inference is inescapable that requiring verification of wire service stories prior to publication would impose a heavy burden on the media's ability to disseminate newsworthy material. *Appleby*, 478 N.E.2d at 725. Indeed, the very crux of the wire service defense is that news organizations that republish reports from reputable news agencies are not negligent, as a matter of law, even if the reports contain erroneous information and the defendant did not take steps to independently verify the information. *See, e.g., O'Brien*, 735 F. Supp. at 225 (noting that "the purpose of relying on AP news accounts" is to obviate the need for independent investigation); Nelson, 667 F. Supp. at 1480 ("[T]he question is not whether the Defendants have to rely on the AP, but whether they have a right to."); *Brown*, 700 F. Supp. at 537; Howe, 555 N.W.2d at 741; *McKinney,* 393 S.E.2d at 297; *Van Straten*, 447 N.W.2d at 112.

To require that Daioleslam independently verify the accuracy of every scholar published work that appears accurate on its face would hold Daioleslam to a standard, not of ordinary care, but of extraordinary care. This is not the law in the District of Columbia or anywhere else.

In this case, as set forth in Exhibits 7 through 16, Daioleslam properly relied on reputable news and scholarly and primary sources, such as fact pages from the IIC website, for his

25

underlying facts. The subsequent analysis based on those facts was not undertaken with malice

or with reckless disregard for the truth, as is evidenced by Daioleslam's affidavit.

> **2.      Even to the extent that such statements are not protected by the "reprinting" privilege because they are not substantially identical, the Plaintiffs cannot demonstrate the requisite fault.**

Assuming *arguendo* that some of the statements complained of the in the Complaint are not

are not protected by the "reprinting" privilege because they are not substantially identical, the

Plaintiffs still cannot demonstrate the requisite fault.  This is because the statements that

Daioleslam made which are complained of in the complaint were not made by him with

knowledge of their falsity.  Indeed, Daioleslam does not acknowledge that such statements are

false, much less that he knew they were false when he made such statements.  Moreover, as set

forth above, Daioleslam did not act with actual malice, because he researched his analysis and

based his commentary on that research and his own knowledge, thus demonstrating that he did

not act with reckless disregard for the truth.  *See e.g.  Liberty Lobby, Inc. v. Rees, et. al.*, 852

F.2d 595 (D.C. Cir. 1988)(affirming the trial court's summary judgment in favor of the defendant

where the defendant's statements were based on documented evidence, even where the

characterization of such evidence perhaps went 'beyond journalistic exaggeration or

embellishment. The Court found that "[t]he test for the reckless disregard of the truth is not

whether a reasonably prudent person would have published the statement, but rather, whether

there is "sufficient evidence to permit the conclusion that the defendant in fact entertained

serious doubts as to the truth of his publication."  *Id.* at 302-303*).

Here, beyond conclusory statements that mimic the legal element of fault, Plaintiffs have

failed to state any facts upon which relief for defamation can be granted, Plaintiffs have not

indicated anything that demonstrates that the Defendant either knew or had serious doubts about

the truth of his publication.  Therefore, even without the protection afforded by a strict application of the reprinting theory, the Defendant is entitled to summary judgment, because Plaintiffs have failed to allege facts which support actual malice on the part of the Defendant.

The Plaintiffs complain of statements that are either demonstrably true, are opinion, or are not defamatory.  In addition, the Plaintiffs have failed to allege facts which entitle them to relief because they have failed to allege any facts that support their allegation that Defendant knew his publications to be false or had serious doubts about the truth of his publication. Accordingly, judgment should be entered in favor of Daioleslam on Plaintiffs' defamation claims.

### III. PLAINTIFFS' FALSE LIGHT CLAIMS MUST LIKEWISE BE DISMISSED.

In addition to asserting claims for defamation, Parsi alleges that Daioleslam is liable for false light. Regardless of how Parsi styles his causes of action, however, dismissal of his defamation claims against Daioleslam necessitates the dismissal of Parsi's remaining claims. As with his defamation claims, Parsi must, at a minimum, show that Daioleslam was negligent in order to recover under his other theories of liability. *See, e.g., Washington v. Smith*, 893 F. Supp. 60, 64-65 (D.D.C. 1995), aff'd, 80 F.3d 555 (D.C. Cir. 1996).

In false light invasion of privacy action involving public figure plaintiff and media defendant: (1) only statements that are provable as false are actionable; (2) plaintiff has burden of proving falsity of each statement; and (3) plaintiff must prove with convincing clarity that offending statement was made with actual malice, *i.e.* that false statement was made intentionally or with reckless disregard as to whether it was false. Restatement (Second) of Torts § 652E. *Howard v. Antilla*, 294 F.3d 244 (1st Cir. 2002).

As the United States Court of Appeals for the District of Columbia has stated, "a plaintiff

may not use related causes of action [including a false light] to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994). The same privileges and defenses applicable to libel claims may be invoked to defend against related claims arising out of the same set of facts, including false light claims. *White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990); Moldea, 22 F.3d at 319-20.

As discussed above, the wire service defense is merely a definition of ordinary care in regard to the use of wire service news stories. *See, e.g., Brown v. Courier Herald Publ'g*, 700 F. Supp. 534, 537 (S.D. Ga. 1988). Thus, the wire service defense is not limited to defamation claims. Where the wire service defense shields a media organization from defamation, courts have invariably held that it also shields the defendant from related tort claims. *See, e.g., Med. Lab. Consultants v. Am. Broad. Cos.*, 931 F. Supp. 1487, 1492 (D. Ariz. 1996) (dismissing intrusion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, public disclosure of private facts, and false light claims); O'Brien, 735 F. Supp. at 225 (dismissing false light claims).

## IV.    THE ALLEGATION IN PARAGRAPH 18C DOES NOT CONCERN EITHER PARSI OR NIAC AND THEREFORE SHOULD BE STRICKEN FROM THE COMPLAINT.

Paragraph 18C of the Complaint cites the following statement as a allegedly defamatory statement related to Parsi:

> Obviously, the Swiss ambassador[12] did not intent to put at risk such a historical event by turning to Bob Ney's group.  He was surely instructed by his Iranian contacts to do so.

While the complaint includes Parsi in brackets after the words "the Swiss

---

[12]  In the Complaint, after the words "Swiss Ambassador" the Plaintiff has inserted the word "Parsi" in brackets.  The text set forth in the quote is the original, unedited text of Defendant's statement.

ambassador," to indicate that the article identifies Trita Parsi as the Swiss ambassador,

the article clearly identifies Tom Guldiman, as the Swiss ambassador.  Therefore, this

statement is neither about nor concerning Parsi or NIAC, and should be stricken from the

complaint.

     **WHEREFORE**, the Defendant respectfully requests that this Honorable Court grant this

motion and dismiss this action, or in the alternative, grant summary judgment against the

Defendant.

Respectfully submitted,

   */s/* Jeffrey B. O'Toole_____

Jeffrey B. O'Toole
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Ave., NW, #200
Washington, DC 20036
(202) 775-1550
Counsel for Defendant

<u>CERTIFICATE OF SERVICE</u>

     This is to certify that a copy of this Motion, Memorandum of Points and Authorities and Statement of Material Fact as to Which There is No Genuine Issue was served upon counsel for the plaintiffs, Afshin Pishevar, on this 8th day of July, 2008 by email to ap@pishevarlegal.com and by regular mail to 600 East Jefferson Street, Suite 316, Rockville, MD, 20852.

   */s/* Jeffrey B. O'Toole_____

Jeffrey B. O'Toole

## AFFIDAVIT OF SEID HASSAN DAIOLESLAM

Seid Hassan Daioleslam states as follows under penalty of perjury:

1.      I am an analyst and investigative journalist.  I am Iranian and have focused my work on Iran and Iran –United States relations.  I publish articles on my website, as well as many other web-based media. I have also appeared on Voice of America and several television shows as an analyst on issues related.

2.      During the 1990's, I lived in Europe and my activities were focused on the Human Rights and advocating on behalf of the political prisoners in Iran.

3.      In 2001, I moved to the United States and focused on Iran's political analysis and research. The outcome of this work has been largely published by major Farsi websites as well as English media.

4.      I have researched and written extensively on the subject of Trita Parsi, the National Iranian American Council (NIAC) and the group Iranians for International Cooperation (IIC), which Trita Parsi founded before the inception of NIAC.

5.      In 2002, the IIC became inactive and some of its founders founded NIAC. Based on my research, including review of other media and scholarly works, it is my sincere belief that NIAC and Parsi act as an what I term "an Iranian lobby," meaning that they act to attempt to influence U.S. policy and legislation regarding Iran in a way that is in accordance with the wishes, interest and needs of the Iranian regime.  I do not believe that their stance is issue neutral, but rather takes a stance that is line with the interests of the Iranian regime.

6.      I base my beliefs regarding the connection between Parsi and the Iranian government, and by extension NIAC, on, among other things, the following sources and research:

(a) After my first English article was published in April 2007 on the subject of NIAC, Trita Parsi and their lobbying role, a coordinated campaign was launched by several Iranian pro-government press in support of Parsi and NIAC.  The articles are attached as Exhibits 5-7, and exhibit 15 to the motion.  One of them, referred to NIAC as the Iranian lobby.

(b) In an interview with Trita Parsi published in the major pro-government-newspaper Aftab published on December 28, 2006, an article in which it underscored Parsi's efforts on the behalf of the Iranian regime.  The interview was decorated with Parsi's picture and was titled "Iranian Lobby Becomes Active?" (See *Ex.* 7).

1

(c) Parsi's connection with Siamak Namazi, as demonstrated in part by their collaboration and joint presentation of a paper on the bridge between two nations, which appears as Exhibit 14 to the motion.  As demonstrated by the documents in Exhibit 17, Namazi, through the companies of which he is a managing director (and owner along with other family members) and their affiliates, has ties to the governmental Qeshm Authority, as well as numerous other governmental and quasi governmental entities with in roads into the Iranian government.

(d) The admission by Parsi that he was the point man for Bob Ney to manage the "Grand Bargain". (Steve Clemons, Feb. 17, 2007: http://www.huffingtonpost.com/steve-clemons/what-did-rove-do-with-200_b_41472.html)

(e) The admission by Parsi that he was trusted by the high level officials of the Iranian government once more with a fresh copy of the secrete proposal "grand-bargain" document in 2006, as reported by Gareth Porter in 2006.  The article is attached as Exhibit 18.

I have no reason to doubt these sources, nor, given my analysis of the overall   works of NIAC and Parsi, do I believe them to be fabricated or improbable. This is not an exhaustive list of my research in this area.

7.    I base my belief that Parsi, and by extension NIAC are taking positions favorable to the Iranian regime, rather than being issue neutral. Furthermore, they have promoted an agenda, identical to the interest and wishes of the Iranian regime, under the disguise of being anti-war and anti-sanctions.    I base my opinion partly on the following examples:

(a) The close cooperation between Parsi and NIAC with individuals who are part of or very close to the Iranian regime (such as what was mentioned in 6 (c,d,e,f) is a strong indication of aligned agendas.

(b) In an interview with Trita Parsi published in the major pro-government-newspaper Aftab on December 28, 2006, Parsi's efforts on the behalf of the Iranian regime were underscored.  The interview was decorated with Parsi's picture and was titled "Iranian Lobby Becomes Active?" (See Ex. 7).  This article implied that NIAC, is a "resource" for the government and compared NIAC's actives to that of "unofficial diplomacy":

(Translation): "The conflict between Iran and the West on Iran's nuclear file has entered a critical state.  The government must now utilize all the possible resources to defend the national interest.  In this, we have not paid enough attention to the potentially significant influence of the Iranian American society in moderating the extremist policies of the White House. In comparison of this untouched potential to the influence of the Jewish lobby in directing the policies of Washington in supporting Israel, we see

H.D

the difference between what is and what could be. The role of unofficial diplomacy has been correctly underlined by experts."

(c) Ambassador Faramarze Fathnejad, in a September 19, 2006 meeting with the organization in Theran called "The Association of Iranophile" praised Trita Parsi and urged that the group be more supportive of Parsi. The Ambassador also emphasized "the importance of relation with Iranian organizations in the U.S. and specially pointed to NIAC and his young leader who is a consultant to CNN and has been very successful in his efforts" *See Exhibit 15.*

(d) Parsi advocates that "Sooner or later, Iran and the U.S. must learn how to share the region." [The Huffington Post, April 22, 2008 http://www.huffingtonpost.com/trita-parsi/can-the-us-and-iran-share_b_97670.html].

I have no reason to doubt these sources, nor, given my analysis of the overall    works of NIAC and Parsi, do I believe them to be fabricated or improbable.    This is not an exhaustive list of my research in this area.

8.    I base my belief that Defendant Parsi, and by extension NIAC engage in lobbying activities, that is that they advocate a specific position, attempt to influence legislative action on specific issues and track legislation relating to    Iran on the following sources and information:

(a) the NIAC website has a section called the "Political Engagement Center" which encourages members to contact their representatives with specific messages[1]  It also offers a News and Alerts section, stating that by using this service, members can "[g]et an alert when your involvement can make a critical difference."

(b)The *Washington Post* reported on June 25, 2006:
"The NIAC helped persuade a dozen conservative House members to sign a letter to President Bush earlier this month calling for unconditional negotiations with Iran's regime." Iran on the Potomac." *Washington Post* http://www.washingtonpost.com/wp-dyn/content/article/2006/06/23/AR2006062301345_pf.html(June 25, 2006).

(c)NIAC has held numerous lobbying training workshops for its members including some by professional lobbyists.  The following from an e-mail broadcast by Trita Parsi in October 2002, in the beginning of NIAC's activity: "

---

[1] For example: Congress: "Tell your representative to say "no" to Iran war resolution  Smart Alert: .Ask your Senators to support diplomacy with Iran" http://capwiz.com/niacouncil/issues/ and "Rebuke Clinton for threatening to "totally obliterate" Iran  Contact her campaign headquarters today!"

TOP LOBBYISTS TO GIVE PRESENTATION ON LOBBYING AT NIAC POWER DINNER IN WASHINGTON"
http://web.payk.net/mailingLists/iran-news/html/2002/msg00572.html. See Exhibit 20.

9.  I have never stated that NIAC and Parsi are funded by the Iranian regime. Neither have I stated that they are an illegal organization, or that they should have registered as lobbyists. Instead, I have indicated that they lobby, that is that they advocate a specific position and attempt to influence legislative action on specific issues, and at the same time they told their members and the population at large that they do not take position on issues and their only motive was to empower the Iranian-Americans. I believe that it is the responsibility of an investigative reporter to point this discrepancy.

I have no reason to doubt these I believe them to be fabricated or improbable. This is not an exhaustive list of my research in this area.

10.  I base my belief that Parsi and NIAC act disingenuously or in a disguised fashion on the fact that the pro-regime stances adopted by Parsi and NIAC are not neutral as they claim. I believe that while Parsi and NIAC claim not to be pro-Iranian regime, the positions that they take on U.S. policy and specific legislation are supportive of that regime. I base that belief on the sources already cited.

11.  I base my belief that Iranian government official called on Parsi to be involved in the so called Grand Bargain in both 2003 and 2006 based, in part, on articles by Gareth Porter appearing on May 24, 2003 and May 25, 2006 in InterPress Service News Agency website and Antiwar.com respectively. I have no reason to doubt these sources, nor, given my analysis of the overall works of NIAC and Parsi, do I believe them to be fabricated or improbable. This is not an exhaustive list of my research in this area.

12.  I base my belief that NIAC has now formally implemented a paid trainee program and is actively in search for Iranian American youth on NIAC's own website publication, located at _____
**http://www.niacouncil.org/index.php?option=com_content&task=view&id=356&Ite mid=29**
This describes the paid trainee program targeted at Iranian American youth. This is included as Exhibit 16.

13.  Additionally, I never made any of the statements listed in the Plaintiffs' complaint knowing that they were false. I based the statements on research and believed, and still do believe, them to be true. I made such statements in an attempt to, based on my knowledge and research, lend my commentary to the debate regarding U.S. policy towards Iran, which I think is of vital public concern. That

H.D

4

commentary includes my analysis, based on by knowledge and   research, of ways actors in the debate as it exists are either wrong and/or have spun their position.

I do solemnly declare and affirm under the penalties of perjury that the contents of the foregoing are true and correct.

_____          7. 7. 2008
Seid Hassan Daioleslam                    _____
                                          Date





EXHIBIT

1

Home

An Iranian American
Voice in Washington DC!

Home ▸ About ▸ Mission and Vision

**NIAC Newsletter**

your email
○ HTML  ◉ Text
[ Subscribe ]

**Top Stories**

- Background on Persepolis Artifact Case
- Slavin on Iran, Identity, and Influence
- The Impact of Electoral Trends on Iran's Security Policies
- Update: Is a New Congressional Resolution Declaring War with Iran?

**NIAC in the News**

- NIAC in the News: Ahmadinejad Faces Intra-Party Challenge
- NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions
- NIAC photo essay in Iranian.com: Good people, good work
- What Do Google and Saddam Have in Common?
- NIAC in the News: Time for a fresh approach with Iran

**US-Iran News**

- Slavin on Iran, Identity, and Influence
- Update: Is a New Congressional Resolution Declaring War with Iran?
- US Conference of Mayors to Consider Iran Resolution
- Set Reasonable Expectations but Talk to Iran, Committee Witnesses Argue
- Gallup poll confirms majority of Americans

## MISSION STATEMENT

### Vision

Advancing the interests of the Iranian-American Community

### Mission

- <u>Advocacy</u>: We advance the interests of the Iranian American Community on civic, cultural and political issues
- <u>Education</u>: We supply the resources, knowledge and tools to enable civic participation and informed decision making.
- <u>Community Building</u>: We provide the infrastructure for bridge-building across the network of Iranian American organizations and the peoples of America and Iran

### Core Values

- <u>Integrity</u> We take our responsibility to the Iranian American community seriously. We will stand and defend our principles. Integrity is fundamentally interwoven in our core philosophy, advocacy and actions.
- <u>Pride</u> We celebrate our rich heritage and our contributions to American life to set an example for future Iranian Americans.
- <u>Transparency</u> We are transparent in sharing objectives, sources of funding and positions on issues that count.
- <u>Leadership</u> We lead by example and inspire future leaders by delivering tangible results for our community.

**< Prev**          **Next >**

[ Back ]

**Donate to NIAC!**

Enter Amount:

$ 50.00

[ Donate ]

**Join NIAC!**



**NIAC Factbook**



**Scholarships**

**Iranian-American Scholarships**



*favor diplomacy with Iran*

© 2008 NIAC - National Iranian American Council
c/o 1411 K St NW Ste 600, Washington DC 20005
Tel: 202-386-6325 Fax: 202-386-6409

**NIAC Events**

**US Iran Media**



**Anti-Discrimination**



**IraNexus**



**SBA**



**Irancensus**



**Register to Vote!**





EXHIBIT
2

An Iranian American
Voice in Washington DC!

Home

## NIAC Newsletter

your email

☉ HTML ○ Text

Subscribe

### Latest News

↳ Event: NIAC and NAF to Hold US-Iran Conference on Capitol Hill February 14
↳ Lee Introduces Sweeping Iran Diplomacy Bill
↳ Mass Rally in DC Calls for New Strategy in Iraq, No War in Iran
↳ Lantos Call for More Iran Sanctions at Hearing

### Login

Username:

Password:

☐ Remember me

Login

Lost Password?
No account yet? Register

### Syndicate



Home • Elected Officials • Candidates & Elections • Legislation • Media Guide

Legislative Alerts and Updates  •  Current Legislation  •  Key Votes  •  Capitol Hill Basics

**Issues and Legislation**

### Current Action Alerts

Congress:
- Tell your representative to say "no" to Iran war resolution

Smart Alert:
- Ask your Senators to support diplomacy with Iran

See All Legislative Alerts and Updates

### Current Legislation

Congress:
- **S.1977** 'A bill to provide for sustained United States leadership in a cooperative global effort to prevent nuclear terrorism, reduce global nuclear arsenals, stop the spread of nuclear weapons and related material and technology, and support the responsible and peaceful use of nuclear technology.
- **S.1752** 'A bill to establish the policy of the United States with respect to deployment of missile defense systems capable of defending allies of the United States against ballistic missile attack.
- **S.1547** 'An original bill to authorize appropriations for fiscal year 2008 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.
- **S.1534** 'A bill to hold the current regime in Iran accountable for its human rights record and to support a transition to democracy in Iran.
- **S.1430** 'A bill to authorize State and local governments to direct divestiture from, and prevent investment in, companies with investments of $20,000,000 or more in Iran's energy sector, and for other purposes.
- **S.1234** 'A bill to strengthen the liability of parent companies for violations of sanctions by foreign entities, and for other purposes.
- **S.970** 'A bill to impose sanctions on Iran and on other countries for assisting Iran in developing a nuclear program, and for other purposes.
- **S.759** 'A bill to prohibit the use of funds for military operations in Iran.
- **S.527** 'A bill to make amendments to the Iran, North Korea, and Syria Nonproliferation Act.
- **S.387** 'A bill to prohibit the sale by the Department of Defense of parts for F-14 fighter aircraft.
- **S.RES.580** 'A resolution expressing the sense of the Senate on preventing Iran from acquiring a nuclear weapons capability.
- **S.RES.356** 'A resolution affirming that any offensive military action taken against Iran must be explicitly approved by Congress before such action may be initiated.
- **S.RES.39** 'A resolution expressing the sense of the Senate on the need for approval by the Congress before any offensive military action by the United States against another nation.
- **S.J.RES.23** 'A joint resolution clarifying that the use of force against Iran is not authorized by the Authorization for the Use of Military Force Against Iraq, any resolution previously adopted, or any other provision of law.
- **S.CON.RES.19** 'A concurrent resolution expressing the sense of Congress on the nuclear program of Iran.

  **S.CON.RES.13** 'A concurrent resolution expressing the sense of Congress

### Donate to NIAC!

Enter Amount:

$ 50.00

Donate

### Join NIAC!



### US Iran Media



### Anti-Discrimination



### IraNexus

- that the President should not initiate military action against Iran without first obtaining authorization from Congress.
- **H.R.5056** Encourage appointment of high level envoy to Iran to improve diplomatic relations.
- **H.R.3674** 'To address the impending humanitarian crisis and security breakdown as a result of the mass influx of Iraqi refugees into neighboring countries, and the growing internally displaced population in Iraq, by increasing directed accountable assistance to these populations and their host countries, increasing border security, and facilitating the resettlement of Iraqis at risk.
- **H.R.3653** 'To hold the current regime in Iran accountable for its human rights record and to support a transition to democracy in Iran.
- **H.R.3390** 'To impose sanctions on Iran and on other countries for assisting Iran in developing a nuclear program, and for other purposes.
- **H.R.3222** 'Making appropriations for the Department of Defense for the fiscal year ending September 30, 2008, and for other purposes.
- **H.R.2880** 'To amend the Iran Sanctions Act of 1996 to enhance United States diplomatic efforts with respect to Iran by expanding economic sanctions against Iran to include the importation of refined petroleum.
- **H.R.2764** 'Making appropriations for the Department of State, foreign operations, and related programs for the fiscal year ending September 30, 2008, and for other purposes.
- **H.R.2347** A bill to authorize State and local governments to direct divestiture from, and prevent investment in, companies with investments of $20,000,000 or more in Iran's energy sector, companies that sell arms to the Government of Iran, and financial institutions that extend $20,000,000 or more in credit to the Government of Iran for 45 days or more, and for other purposes.
- **H.R.1585** 'To authorize appropriations for fiscal year 2008 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.
- **H.R.1441** 'A bill to strengthen controls on the export of surplus parts for F-14 fighter aircraft.
- **H.R.1400** Label IRGC as terrist group, sanction business that do work in Iran.
- **H.R.1357** To require divestiture of current investments in Iran, to prohibit future investments in Iran, and to require disclosure to investors of information relating to such investments.
- **H.R.1324** 'To urge the Secretary of State to designate the Quds Force, a unit of Iran"s Islamic Revolutionary Guards Corps, as a foreign terrorist organization.
- **H.R.957** 'To amend the Iran Sanctions Act of 1996 to expand and clarify the entities against which sanctions may be imposed.
- **H.R.770** 'To prohibit the use of funds to carry out any covert action for the purpose of causing regime change in Iran or to carry out any military action against Iran in the absence of an imminent threat, in accordance with international law and constitutional and statutory requirements for congressional authorization.
- **H.R.394** 'To provide for payment of certain claims against the Government of Iran.
- **H.RES.738** 'Expressing the sense of the House of Representatives regarding the Government of Syria"s continued interference in the internal affairs of Lebanon.
- **H.RES.690** 'Expressing grave concern of the House of Representatives for Iran and Syria's continued and systematic violations of UN Resolutions 1701 and 1559.
- **H.RES.435** 'Expressing concern relating to the threatening behavior of the Iranian regime and its leader Mahmoud Ahmadinejad, and the activities of terrorist organizations sponsored by that regime in Latin America.
- **H.RES.163** 'Urging the collective judgment of both Congress and the President regarding the use of military force by the United States.
- **H.J.RES.95** Expressing Congress' disapproval of the proposed 123 agreement for nuclear cooperation between the United States and the Russian Federation.
- **H.J.RES.14** 'Concerning the use of military force by the United States against Iran.
- **H.CON.RES.362** Impose further sanction to increase international and regional pressure on Iran.
- **H.CON.RES.257** 'Expressing concern regarding arms transfers to Iran and Syria by the Russian Federation and entities in the Russian Federation and urging the President of the United States to implement sanctions against such entities found to be in violation of United States law prohibiting arms transfers to Iran and Syria.
- **H.CON.RES.203** 'Condemning the persecution of labor rights advocates in Iran.
- **H.CON.RES.188** 'Condemning the attack on the AMIA Jewish Community Center in Buenos Aires, Argentina, in July 1994, and for other purposes.
- **H.CON.RES.33** 'Expressing the sense of Congress that the President should not initiate military action against Iran without first obtaining authorization from Congress.
- **H.CON.RES.21** 'Calling on the United Nations Security Council to charge Iranian leader Mahmoud Ahmadinejad with violating the 1948 Convention on the Prevention and Punishment of the Crime of Genocide and United Nations Charter because of his calls for the destruction of the State of Israel.

See **All Current Legislation**



**SBA**



niac 8(a)
Support Project

**Irancensus**



Strength in Numbers

**Register to Vote!**



Register To VOTE

**Key Votes**

U.S. House:

- <u>Expressing the concern of Congress over Irans development of the means to produce nuclear weapons</u>
- <u>Expressing the sympathy of the House of Representatives for the victims of the devastating earthquake that occurred on December 26, 2003 in Bam, Iran</u>

See <u>All Key Votes</u>          Enter ZIP Code to see
how your reps voted  _____  

  **Capitol Hill Basics**
Tips about communicating with Members and general information
about Hill staffers, the legislative process and more.

✉ **Tell A Friend**

powered by **Capitol Advantage** ©2008
Copyright © 2008 National Iranian American Council
1411 K St. Suite 600
Washington, DC 20005
(202) 386-6325 Direct
(202) 386-6409 Fax



**An Iranian American Voice in Washington DC!**

Home

## NIAC Newsletter

your email

○ HTML ○ Text

[Subscribe]

### Latest News

- **Event: NIAC and NAF to Hold US-Iran Conference on Capitol Hill February 14**
- Lee Introduces Sweeping Iran Diplomacy Bill
- Mass Rally in DC Calls for New Strategy in Iraq, No War in Iran
- Lantos Call for More Iran Sanctions at Hearing

### Login

Username:

Password:

☐ Remember me

[Login]

**Lost Password?**
No account yet? **Register**

### Syndicate

RSS 0.91
RSS 1.0
RSS 2.0
ATOM 0.3
OPML SHARE IT!

---

**Home • Elected Officials • Candidates & Elections • Legislation • Media Guide**

### Take Action!

**Tell your representative to say "no" to Iran war resolution**
Does Your Representative Support War With Iran?

**Rebuke Clinton for threatening to "totally obliterate" Iran**
Contact her campaign headquarters today!

**Ask your Senators to support diplomacy with Iran**

### Find Your Elected Officials

**Elected Officials**

Enter your ZIP Code and click "Go" or **click here** for other searches.

Zip Code [____]

**Issues and Legislation**

Important issues, recent votes, current legislation, and more. **Click here.**

**Election and Candidates**

For election results, enter your ZIP Code or **search by state.**

Zip Code [____]

**Media Guide**

---

### Donate to NIAC!

Enter Amount:

$50.00

[Donate]

**Join NIAC!**

**US Iran Media**

**Anti-Discrimination**

**IraNexus**



Enter your ZIP Code and click "Go" or **click here** for other searches.

Copyright © 2008 National Iranian
American Council
1411 K St. Suite 600
Washington, DC 20005
(202) 386-6325 Direct
(202) 386-6409 Fax



Zip Code 

| Stay informed | Spread the word | Congress today |
|---|---|---|
| ■ **NIAC News & Alerts** Get an alert when your involvement can make a critical difference. ■ **Alert feed** Get our alerts in your RSS feed reader. ■ **NIAC's Congressional Voting Report Service** Stay in touch with how your Congressman votes every week. | ■ **Spread the Word about NIAC** Reach out to your friends and family ■ **Add NIAC Action Alerts to Your Website** These web stickers make it simple to add NIAC content to your personal or your organization's website. | July 1, 2008 ■ **Today's House Schedule** ■ **Today's Senate Schedule** ■ **Committee Hearings Search** Search the House and Senate current committee schedules. |

powered by **Capitol Advantage** ©2008

**SBA**



**Irancensus**



**Register to Vote!**






**An Iranian American**
**Voice in Washington DC!**

Home ▸ About Us ▸ main ▸ DR. TRITA PARSI, President

## NIAC Newsletter

your email

◉ HTML  ○ Text

[ Subscribe ]

### Top Stories

- **Background on Persepolis Artifact Case**
- **Slavin on Iran, Identity, and Influence**
- **The Impact of Electoral Trends on Iran's Security Policies**
- **Update: Is a New Congressional Resolution Declaring War with Iran?**

### NIAC in the News

- **NIAC in the News: Ahmadinejad Faces Intra-Party Challenge**
- **NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions**
- **NIAC photo essay in Iranian.com: Good people, good work**
- **What Do Google and Saddam Have in Common?**
- **NIAC in the News: Time for a fresh approach with Iran**

### US-Iran News

- **Slavin on Iran, Identity, and Influence**
- **Update: Is a New Congressional Resolution Declaring War with Iran?**
- **US Conference of Mayors to Consider Iran Resolution**
- **Set Reasonable Expectations but Talk to Iran, Committee Witnesses Argue**
- **Gallup poll confirms majority of Americans**

## DR. TRITA PARSI, President

NIAC

Jul 09, 2007



With a background as director for two U.S.-based Iranian organizations, Dr. Trita Parsi possesses a rich set of leadership skills and vision that will guide NIAC towards its goals.

Trita Parsi has worked for the Swedish Permanent Mission to the UN in New York where he served in the Security Council handling affairs for Afghanistan, Iraq, Tajikistan and Western Sahara, and the General Assembly's Third Committee addressing human rights in Iran, Afghanistan, Myanmar and Iraq. He has also served as a foreign policy advisor to Congressman Bob Ney (R-OH).

His expertise is Iranian foreign policy and US-Iran relations. His book, Treacherous Alliance - The Secret Dealings of Israel, Iran and the United States, (Yale University Press 2007), is based on more than 130 interviews that Dr. Parsi has conducted - in his personal capacity - in Israel, Iran and the United States with senior officials from all three countries.

Dr. Parsi's articles on Middle East affairs have been published in the Financial Times, Jane's Intelligence Review, the Globalist, the Jerusalem Post, The Forward, BitterLemons and the Daily Star.

As a Middle East expert, he is a frequent commentator on US-Iranian relations and Middle Eastern affairs, and has appeared on BBC World News, PBS NewsHour with Jim Lehrer, CNN, Al Jazeera, C-Span, NPR, ABC, and MSNBC.

Dr. Parsi was born in Iran and grew up in Sweden. He earned a Master's degree in international relations at Uppsala University, a second Master's degree in economics at Stockholm School of Economics and a PhD in international relations at Johns Hopkins University's SAIS. His personal website is www.tritaparsi.com.

< Prev          Next >

### Donate to NIAC!

Enter Amount:

$ 50.00

[ Donate ]

### Join NIAC!



### NIAC Factbook



### Scholarships

**Iranian-American Scholarships**



EXHIBIT

4

امنیت ملی و سیاست خارجی

اگر امنیت ملی هر کشوری به وضعیت، استحکام، قدمت و بیان های ساختارهای داخلی آن کشور منتهی نمی شود بلکه ماهیت و چگونگی تحولات و تعاملات منطقه ای و بین المللی آن کشور می تواند باعث تقویت آن شود.



دیگر امنیت ملی هر کشوری به وضعیت، استحکام، قدمت و بیان های ساختارهای داخلی آن کشور منتهی نمی شود بلکه ماهیت و چگونگی تحولات و تعاملات منطقه ای و بین المللی آن کشور می تواند باعث تقویت آن شود . به عبارتی امنیت ملی هر کشوری به امنیت منطقه ای و بین المللی ربط وثیقی پیدا کرده است.

دیگر آن که حفظ و گسترش امنیت ملی خود تا اندازه زیادی به چگونگی پی ریزی و اقدام معطوف به نتیجه در سیاست خارجی بستگی دارد. سیاست خارجی بدون در نظر گرفتن امنیت ملی صرفا می تواند سرزنان نگرزی باشد که آخر آن را همه می دانند. واقعیت این است که امروزه دولت ها با چالش های نوینی مواجه شده اند که توفیق در آنها مستلزم فراست سیاسی و درک چهره جدید قدرت و امنیت است. گویا اینکه دولت ها دیگر نمی توانند ثروت بیندند و اطاعت بخرند. مشروعیت آنها به طرز می نظری با کارآمدی پیوند خورده است.

البته مشروعیت نیز خود دچار تحول مفهومی شده، دیگر مشروعیت، فقط شروط اطاعت و فرمانبرداری داخلی نیست. شرایط اصلی مشروعیت مقبولیت نزد جامعه بین الملل است. به هر حال مشروعیت نیز خود یکی از عوامل گرانسنگ تقویه امنیت ملی است که جنبه بین المللی آن در حوزه سیاسی خارجی هر کشور فرار می گیرد.

کسب چهره و پرستیز امروزه دیگر نه برای شهروندان خود بلکه نزد شهروندان جامعه جهانی کسب مشروعیت و مقبولیت است. خاطره «مصطفی العقامه کارگردان معروف عرب و سازنده فیلم های مشروعی چون «محمد رسول الله...» و «عمرمختار» در این زمینه عبرت آمیز و غم انگیز است. العقاد می گوید: «هنگامی که فیلم عمرمختار را در یکی از جشنواره شاف سینماهای امریکا به نمایش درآوردهر، برای اولین بار، دیدم که یک امریکایی برای یک عرب دست می زند.»

این برداشت شهروندان عرب با امریکایی از مردم خاورمیانه جدا از ریشه های تاریخی و فرهنگی به نوع نگاه برساخته آنها از دولت هایشان است. اینجا است که نظر یک شهروند زاینی با امریکایی در مورد یک دولت تاثیر بسیاری در مقبولیت و مشروعیت آن دولت در جامعه بین المللی به طور روندای دارد.

شاید این مقوله ارتباط میان مشروعیت امنیت ملی و سیاست خارجی، باشد که بسیاری سخن از جامعه مدنی جهانی دارند. جامعه ای که در آن جهان امور به هم تنیده شده که فرد، شرکت های چندملیتی و غیره عوامل خاطر گذار در حوزه سیاست، قدرت و امنیت هستند.

با این سخنان حوزه ارتباط میان امنیت ملی، سیاست خارجی، حوزه ای مکمل مشروعیت و مقبولیت می شود، به عبارتی اگر کشوری برای حفظ امنیت ملی خویش، در لحاظ امنیت اجتماعی، سیاست خارجی بر مبنای عقلانیت و توجه به حوزه نرم داشته باشد شم در سطح داخلی و هم جامعه بین المللی توانایی کسب اعتبار، پرستیز و مهم تر از آن مشروعیت و مقبولیت را داراست.

**● امنیت ملی و سیاست خارجی در ایران**

در منظر رئالیسی سیاست خارجی کشوری موفق و کارآمد ظاهر می شود که بتواند در قبال تهدیدات نظامی خارجی که استقلال و تمامیت ارضی کشور را به خطر می اندازد خوب عمل کند، ولی شئوش های جدید مطالعات امنیتی مانند مکتب کینهاگال اگرچه امنیت ملی را مرکز ثقل (گرانیگاه) مطالعات خود لحاظ کرده ولی معتقد است که دولت ها اگر نتوانند امنیه به زندگی را در بین شهروندان تامین و تضمین کند، در لحاظ امنیت اجتماعی، اقتصادی، عمومی، فافد کارآمدی باشد، امنیت اقتصادی و زیست محیطی را تامین نماید، فافد هر گونه امنیت ملی است.

همین مکتب کینهاگال که نمایده اصلی آن برفسور باری بوزان است، معتقد است که امنیت دیگر آن مفهوم ستی اسب که در چارچوب، مدل وسختاراییهای بود، از دست داده و امروزه امنیت چندبحک شده است. بوزان معتقد است که امنیت ملی و امنیت بین المللی به وسیله امنیت منطقه ای مبنا و مفهوم می یابد.

پس سیاست خارجی مناسب هر کشوری با توجه به منظر کنه‌گاه سیاستی است که به امنیت چندبعدی توجه ویژه و همچنین برای کسب امنیت ملی خویش نگاه ویژه‌ای به امنیت منطقه‌ای خود داشته باشد. سیاست خارجی از آن جهت بایستی به امنیت نگاه چندبعدی داشته باشد که مثلاً تهدیدات اقتصادی منافرت و تهدیدات نظامی است، تهدیدات اقتصادی خارجی ممکن است از جانب اقتصاد جهانی صورت بگیرد، چرا که هیچ کشوری به تنهایی توان مقابله با اقتصاد جهانی را ندارد و تصمیمات آنها، هر چند هم غیرصمیمانه باشند، امنیت اجتماعی را متاثر می‌سازد.

بازیگران اقتصادی بین‌المللی ممکن است تصمیم بگیرند که توان یک دولت را در زمینه تامین مایحتاج نیروهای نظامی و تهیه نیازهای اولیه مردمش تحت تاثیر قرار دهد، بدین وسیله به امنیت اجتماعی و ثبات رژیم حاکم صدمه وارد کنند. اینجاست که عقلانیت در سیاست خارجی بایستی وارد صحنه شود و با توجه به امنیت چندبعدی، امنیت ملی و مقبولیت تا حد زیادی بحران وارده را مدیریت کند. در همه کشورها، هر چند که تهدیدات اقتصادی و زیست محیطی مهم ترین مساله امنیتی آنان در قرن بیست و یکم به شمار می‌آید، اما آنان فکر می‌کنند که تهدیدات نظامی خارجی مهم ترین معضل است.

به عقیده رهبران این کشورها ارتباط مستقیمی بین امنیت اجتماعی و مشروعیت با امنیت ملی وجود ندارد، ولی امروزه مشروعیت موثرترین عامل در امنیت ملی هر کشوری است. یکی دیگر از ابعاد سیاست خارجی پویا برای ترفیع امنیت ملی توجه معطوف به حوزه نرم است.

سیاست خارجی جمهوری اسلامی ایران اگرچه توانسته افکار عمومی در خاورمیانه و امریکای لاتین را به خود جلب کند ولی افکار عمومی غرب که تاثیر عمده ای بر حوزه سیاستگذاری خارجی دارد را نتوانسته به خوبی جذب کند.

افکار عمومی در کشورهای عرب خاورمیانه فاقد هر گونه تاثیرگذاری در حوزه تصمیم گیری رهبرانشان است ولی تلاش برای جلب افکار عمومی عرب به وسیله توجه به نرم افزار سیاست خارجی می‌تواند در ترفیع امنیت ملی کشور مفید ظاهر شود. مثلاً تظاهرات ضدجنگ و یا مخالفت افکار عمومی و احزاب با تحریم های اقتصادی علیه ایران خود یک کارت برنده در دست مجریان سیاست خارجی است.

اینجاست که همین افکار عمومی جامعه مدنی جهانی هستند که تا حد زیادی امنیت بین الملل را تعریف و مشخص می کنند. نگاه دیگر سیاست خارجی پویا و موفق توجه به امنیت منطقه ای است. تا زمانی که امنیت در عراق و افغانستان با خلیج فارس امنیت ایجابی نباشد، ما نمی توانیم از امنیت ملی صحبت کنیم.

تظاهرات ضدجنگ و یا مخالفت افکار عمومی و احزاب با تحریم های اقتصادی علیه ایران خود یک کارت برنده در دست مجریان سیاست خارجی است.

اینجاست که همین افکار عمومی جامعه مدنی جهانی هستند که تا حد زیادی امنیت بین الملل را تعریف و مشخص می کنند. نگاه دیگر سیاست خارجی پویا و موفق توجه به امنیت منطقه ای است. تا زمانی که امنیت در عراق و افغانستان با خلیج فارس امنیت ایجابی نباشد، ما نمی توانیم از امنیت ملی صحبت کنیم.

گسترش تروریسم در عراق و یا ناامنی قاچاق مواد مخدر از افغانستان و یا حضور نیروهای خارجی در خلیج فارس تاثیر زیادی بر مقابله امنیت ملی کشور می تواند داشته باشد. در سطح منطقه ای همان طور که تامین‌یت می گوید، مذاکره، چانه زنی با بازیگران منطقه ای و تعامل و مذاکره مستقیم با کشورهای دگ نفوذ در منطقه خود تامین کننده امنیت منطقه ای و سبمی امنیت ملی است.

این راهکار خود سیاست خارجی پویا و موفق و کارآمدی را می طلبد که به دور از گزگزینه نسل، مذاکره و چانه زنی را برای کاهش مشکلات در صدر برنامه خود قرار دهد. پس نقش سیاست خارجی برای ارتقای هم امنیت ملی و هم امنیت اجتماعی و امنیت منطقه ای در حد بالایی از اسناددادها برسند. اگرجه امروزه آنقدر اهمیت دارد که به پیشنهادانش در مقابل آلمان در اتحادیه اروپا مشروع و مورد احترام است. پس دنیای امروز، دنیای عقلانیت، کارآمدی و تخصص است؛ دسپایی که کارگزاران برای امنیت ملی خویش بایستی قواعد بازی را به وسیله سیاست خارجی و دیپلماسی پویا به خوبی وارد باشند.

این کشورها با بهره مندی از سیاست‌خارجی و دیپلماسی‌به ثنهایی‌توانسته اند هم از لحاظ اقتصادی و هم از لحاظ امنیت اجتماعی به حد بالایی از اسناددادها برسند. اگرچه امروزه آنقدر اهمیت دارد که به پیشنهادانش در مقابل آلمان در اتحادیه اروپا مشروع و مورد احترام است.

امروزه کشورها برای جایگاه امنیت ملی خود به دیپلماسی و سیاست خارجی پویا روی آورده اند. مثلاً کشورهای شرقی اروپا با کمترین پیشرفت در حوزه ی اقتصادی و فنی در حوزه بومی دارای پرسستیژ و نگاه ویژه ای در سطح جامعه بین الملل هستند.

| مرجعیت، اجتهاد و مکتب |
|---|

نبی الله ابراهیمی

روزنامه شرق

امنیت ملی و سیاست خارجی
http://www.aftab.ir/articles/politics/iran/c1c1183822467p1.php
Screen clipping taken: 5/11/2008, 7:07 PM

rch keywords.....



EXHIBIT

5A

Home

An Iranian American
Voice in Washington DC!

Home

**NIAC Newsletter**

your email

◉ HTML ◯ Text

Subscribe

**Latest News**

↳ Event: NIAC and NAF to Hold US-Iran Conference on Capitol Hill February 14
↳ Lee Introduces Sweeping Iran Diplomacy Bill
↳ Mass Rally in DC Calls for New Strategy in Iraq, No War in Iran
↳ Lantos Call for More Iran Sanctions at Hearing

**Login**

Username:

Password:

☐ Remember me
Login
Lost Password?
No account yet? Register

**Syndicate**



Home • Elected Officials • Candidates & Elections • Legislation • Media Guide

Legislative Alerts and Updates  •  Current Legislation  •  Key Votes  •  Capitol Hill Basics

**Action Alert**

☷ BOOKMARK 🔖 ✉ ⚙



**Tell your representative to say "no" to Iran war resolution**

Does Your Representative Support War With Iran?

You may be surprised at the answer; there are already over 169 cosponsors of H.Con.Res. 362.

This resolution demands that the president initiate an international effort to impose a land, sea, and air blockade on Iran to prevent it from importing gasoline and to subject all cargo entering or leaving Iran to stringent inspection requirements.

**For such a blockade to be imposed without United Nations authority (which the resolution does not call for) would be considered an act of war. Some congressional sources say the House could vote on the resolution as early as this week.**

Adoption of this resolution would pave the way for such a war and bypass diplomacy. Sensing that the threat of war has once again increased, IAEA Head El Baradei warned yesterday that he would resign if any country attacked Iran.

The immediate effect would be a further increase in oil prices - with gas prices in the US incing closer to $5/gallon and beyond.

_Is your representative a cosponsor?_

_**Email your representative today and ask him or her to oppose this measure for war!**_

**Take Action**

**1  COMPOSE MESSAGE**

**Message Recipients:**

• Your U.S. Senators
• Your U.S. House Representative

**Delivery Method:**

◉ Email
◯ Printed Letter

**Donate to NIAC!**

Enter Amount:

$ 50.00

Donate

**Join NIAC!**



**US Iran Media**



**Anti-Discrimination**



**IraNexus**

**Subject:**

Say "no" to Iran war resolution



**Editable text to House:**
(edit or add your own text - 8850 characters left)

Please don't raise gas prices to $6/gallon.

This is what will happen if the Congress passes H.Con.Res. 362, which demands that President Bush impose a blockade to prevent Iran from importing gasoline and to subject all cargo entering or leaving Iran to stringent inspection requirements.

A blockade, which is universally recognized as an act of war, would destabilize the Strait of Hormuz and drive up oil prices. Even the threat of such a measure, which this resolution represents, will cause us more pain at the pump.

Tip: Cutting-and-pasting? Save as **plain text** first.    spell check ✓

**SBA**



**Editable text to Senate:**
(edit or add your own text - 8932 characters left)

Please don't raise gas prices to $6/gallon.

This is what will happen if the Congress passes S.Res. 580, which demands that President Bush impose a blockade to prevent Iran from importing refined petroleum products.

A blockade, which is universally recognized as an act of war, would destabilize the Strait of Hormuz and drive up oil prices. Even the threat of such a measure, which this resolution represents, will cause us more pain at the pump.

It is ironic that measures of this kind – or the mere threat of

Tip: Cutting-and-pasting? Save as **plain text** first.    spell check ✓

**Irancensus**



**Your Closing:**              **Your Name:**

Sincerely,

**2  SENDER INFORMATION**

This system requires that you provide your name and contact information. This information will not be used for any purpose other than to identify you to the recipient.

**Your Contact Information:**
**Prefix** (**required** by some officials)

Select...

**First***                          **Last***

**Email***

**Address***

**City***

**State/Province***      **ZIP/Postal Code***   **ZIP + 4**

**Phone**

**Organization**

**Register to Vote!**



**Title**

**Street Two**

☑ Remember Me! (<u>what's this?</u>)

☑ **YES! Keep me in the loop by sending me the NIAC Newsletter. I understand that I can unsubscribe at any time.**
A copy of your message will be sent to the e-mail address entered above.

**Preview Message**    **Send Message**
(Please click only once.)

powered by **Capitol Advantage** ©2008
Copyright © 2008 National Iranian American Council
1411 K St. Suite 600
Washington, DC 20005
(202) 386-6325 Direct
(202) 386-6409 Fax





EXHIBIT

5B

Mission and Vision

Leadership Structure

Board

Staff

NIAC Factbook

Financial Records

Our Story

Job Opportunites

FAQ

**An Iranian American
Voice in Washington DC!**

Home ▸ News ▸ US- ...alls for New Strategy in Iraq. No War in Iran

**NIAC Newslett**

**DC Calls for New Strategy in Iraq, No War in Iran**

your email

○ HTML  ○ Text

Subscribe

**Top Stories**

↳ Background on Persepolis Artifact Case
↳ Slavin on Iran, Identity, and Influence
↳ The Impact of Electoral Trends on Iran's Security Policies
↳ Update: Is a New Congressional Resolution Declaring War with Iran?

**NIAC in the News**

↳ NIAC in the News: Ahmadinejad Faces Intra-Party Challenge
↳ NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions
↳ NIAC photo essay in Iranian.com: Good people, good work
↳ What Do Google and Saddam Have in Common?
↳ NIAC in the News: Time for a fresh approach with Iran

**US-Iran News**

↳ Slavin on Iran, Identity, and Influence
↳ Update: Is a New Congressional Resolution Declaring War with Iran?
↳ US Conference of Mayors to Consider Iran Resolution
↳ Set Reasonable Expectations but Talk to Iran, Committee Witnesses Argue
↳ Gallup poll confirms majority of Americans favor diplomacy with Iran

Feb 03, 2007

*Washington DC* - An estimated 100,000 people attended a rally this pats Saturday surrounding the US Capitol to protest President Bush's escalation strategy in Iraq and call for an end to hostilities with Iran. While the threat of war with Iran was not an official component of the rally sponsored by United for Peace and Justice (UFPJ), thousands of demonstrators chanted for the prevention of conflict with Iran and carried signs and banners calling for "Stop the War on Iran."

The Campaign against Sanctions and Military Intervention on Iran (CASMII) carried banners and signs opposing war with Iran.

Among the speakers at the event were several Members of Congress, including Reps. Lynn Woolsey (D-CA) and Maxine Watters (D-CA), the coauthors of legislation that would institute a phased withdrawal from Iraq over six months. Speakers also included war veterans, religious heads, and Hollywood celebrities.

The majority of speakers at the rally fiercely criticized President Bush's plan to address the sectarian violence in Iraq by escalating troop levels there by an additional 21,500.

Several speakers referenced the need for the President to pay closer attention to the bipartisan Iraq Study Group's (ISG) recommendations. The ISG report urges direct talks between the US and Iran and Syria in order to stabilize conditions in Iraq.

About 40 people participated in a counter-protest nearby the Senate office buildings and expressed their backing for the operation in Iraq.

Building on the march's momentum, UFPJ sponsored a lobby day on Congress on Monday, January 29. On the previous day, a National Iranian American Council (NIAC) representative was invited to lead a workshop on Iran and to help provide information and education concerning opportunities to resolve the US-Iran stand-off peacefully for the 1,000 estimated people who planned to visit their congressional representatives.

**Donate to NIAC!**

Enter Amount:

$ 50.00

Donate

**Join NIAC!**



**NIAC Factbook**



niac FACTBOOK

**Scholarships**

**Iranian-American Scholarships**



Case 1:08-cv-00705-JDB    Document 5-3    Filed 07/08/2008    Page 15 of 46

**NIAC Events**

< Prev        Next >

[ Back ]

**US Iran Media**



**Anti-Discrimination**



**IraNexus**



**SBA**



**Irancensus**



**Register to Vote!**



© 2008 NIAC - National Iranian American Council
c/o 1411 K St NW Ste 600, Washington DC 20005
**Tel:** 202-386-6325 **Fax:** 202-386-6409

Case 1:08-cv-00705-JDB    Document 5-3    Filed 07/08/2008    Page 16 of 40

rch keywords.....



EXHIBIT
5C

Congressional Breakfast Series

Legislative Action Center

Anti-Discrimination Center

Fellowship Program

An Iranian American
ice in Washington DC!

Home ▶ Projects ▶ Washington Policy Watch

**NIAC Newsletter**

your email

○ HTML ○ Text
Subscribe

## Washington Policy Watch

### NIAC Decries Rudy Giuliani's Reckless Iran Comments

NIAC
Sep 20, 2007

Contact: Trevor FitzGibbon
Fenton Communications
202-246-5303

*Presidential Candidates should not play politics with US National Security*

Washington DC - NIAC decries Rudy Giuliani's promise of initiating war with Iran over its nuclear program. Giuliani said yesterday in London that if Iran gets "to the point that they become a nuclear power, then we will set them back five years. That is not a threat, that is a promise."

**Iranian-American Eyes and Ears in the Corridors of Power**

NIAC
Apr 06, 2006

**Washington Policy Watch**

The purpose of NIAC's Washington Policy Watch is threefold: to bring transparency to debates on issues affecting Iranian Americans, to allow of our community to react to and affect these debates at an early stage, and to give young Iranian Americans first-hand experience and exposure to the policy world in Washington, DC.

The policy process "inside the beltway"—a common phrase in Washington—can be quite complicated. Ideas and solutions may float around in search of an appropriate problem, rather than the other way around. New policies can be formed months before they are picked up by the media, giving latecomers little opportunity to affect them. Policy speakers often speak one language within the protected circles of the policy world in Washington, and another in front of the cameras.



Policy seminars at think tanks, seldom covered by the press, can often give a taste of policies to come. Unfortunately, Iranian Americans have not had access to policy

**Top Stories**

↳ Background on Persepolis Artifact Case
↳ Slavin on Iran, Identity, and Influence
↳ The Impact of Electoral Trends on Iran's Security Policies
↳ Update: Is a New Congressional Resolution Declaring War with Iran?

**NIAC in the News**

↳ NIAC in the News: Ahmadinejad Faces Intra-Party Challenge
↳ NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions
↳ NIAC photo essay in Iranian.com: Good people, good work
↳ What Do Google and Saddam Have in Common?
↳ NIAC in the News: Time for a fresh approach with Iran

**US-Iran News**

↳ Slavin on Iran, Identity, and Influence
↳ Update: Is a New Congressional Resolution Declaring War with Iran?
↳ US Conference of Mayors to Consider Iran Resolution
↳ Set Reasonable Expectations but Talk to Iran, Committee Witnesses Argue
↳ Gallup poll confirms majority of Americans favor diplomacy with Iran

**Donate to NIAC!**

Enter Amount:

$ 50.00

Donate

**Join NIAC!**



**NIAC Factbook**



**Scholarships**

Iranian-American Scholarships



Case 1:08-cv-00705-JDB    Document 5-3    Filed 07/08/2008    Page 17 of 40

**NIAC Events**

meetings and, as a result, have been unable to affect the formation of new policies at the crucial initial stages. Furthermore, the complexities of the issues, as well as the motives of key political actors, are unknown to the vast majority of Iranian Americans.

NIAC's Washington Policy Watch program aims first to bring transparency to debates on issues most important to Iranian Americans. Second, by covering policy conferences and hearings in Washington DC, NIAC allows Iranian Americans to react to, and influence policy at an early stage. Exposure to these debates and knowledge of the issues by our community makes it more difficult for policy makers to ignore the Iranian-American public.

By sending Iranian-American college and graduate students to cover these events, NIAC meets its third objective and provides our youth with first-hand exposure to Congressional hearings, think tank conferences and policy seminars. Early in their careers, our youth will be afforded practical knowledge and networking opportunities, which will serve them well in their future careers.

NIAC has covered all Congressional hearings and policy conferences in Washington DC that are of relevance to the interest of the Iranian American community since the Fall of 2002. Our published reports on these events are not only read by Iranian Americans, but also by members of the National Security Council, the US State Department, the Department of Defense, Congressional staffers, and members of foreign ministries overseas.

This program gives our Iranian-American interns the invaluable experience of not only attending these hearings and conferences, but also writing for a highly sophisticated audience. In turn, their hard work enhances our community's knowledge of the policy process and further strengthens our ability to affect the outcomes.

[ Back ]

**US Iran Media**



**Anti-Discrimination**



**IraNexus**



**SBA**



**Irancensus**



**Register to Vote!**



© 2008 NIAC - National Iranian American Council
c/o 1411 K St NW Ste 600, Washington DC 20005
Tel: 202-386-6325 Fax: 202-386-6409

Case 1:08-cv-00705-JDB    Document 5-3    Filed 07/08/2008    Page 18 of 40



EXHIBIT
5D

An Iranian American
Voice in Washington DC!

Home ▸ News ▸ Alerts and Announcements ▸ The NIAC Factbook: The Truth about NIAC

**NIAC Newsletter**

your email

◉ HTML  ○ Text
Subscribe

**Top Stories**

↳ Background on Persepolis Artifact Case
↳ Slavin on Iran, Identity, and Influence
↳ The Impact of Electoral Trends on Iran's Security Policies
↳ Update: Is a New Congressional Resolution Declaring War with Iran?

**NIAC in the News**

↳ NIAC in the News: Ahmadinejad Faces Intra-Party Challenge
↳ NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions
↳ NIAC photo essay in Iranian.com: Good people, good work
↳ What Do Google and Saddam Have in Common?
↳ NIAC in the News: Time for a fresh approach with Iran

**US-Iran News**

↳ Slavin on Iran, Identity, and Influence
↳ Update: Is a New Congressional Resolution Declaring War with Iran?
↳ US Conference of Mayors to Consider Iran Resolution
↳ Set Reasonable Expectations but Talk to Iran, Committee Witnesses Argue
↳ Gallup poll confirms majority of Americans favor diplomacy with Iran

**The NIAC Factbook: The Truth about NIAC**

Shadee Malaklou
Apr 03, 2008

### What is NIAC's mission? Has it evolved since the organization's inception?

Since its inception, NIAC's mission has been to promote Iranian-American participation in American civic life. This mission was amended during a February 2008 Board of Directors meeting to reflect NIAC's increased efforts on behalf of Iranian Americans.

NIAC's new mission is threefold: To advance the interests of the Iranian-American community on civic, cultural and political issues; to supply the resources, knowledge and tools to enable civic participation and informed decision making; and to provide the infrastructure for building bridges between Iranian-American organizations and the peoples of America and Iran.

### Who founded NIAC?

NIAC was founded in early 2002 by Alex Patico, Trita Parsi, Babak Talebi, and Farzin Illich as a 501 c (3) non-profit education organization with the express mission to promote Iranian-American civic participation. Trita Parsi and Babak Talebi continue to work for NIAC, as President and Director of Community Relations (respectively). Alex Patico serves on NIAC's Advisory Board.

### Are Iranian Americans the only members of NIAC?

NIAC is an American organization open to everyone, regardless of

**Donate to NIAC!**

Enter Amount:

$ 50.00

Donate

**Join NIAC!**



**NIAC Factbook**



**Scholarships**
**Iranian-American Scholarships**



Case 1:08-cv-00705-JDB   Document 5-3   Filed 07/08/2008   Page 19 of 40

**NIAC Events**

their ethnic, religious and political background. NIAC members, board members and supporters come from all walks of American life. They are joined by the idea that Iranian-Americans have the ability to play a key role in American civil society with the same levels of success and professionalism that they have played in American economic, academic, technological and scientific life.

**US Iran Media**



**Anti-Discrimination**



## Where does NIAC's funding come from?

Approximately 75% of NIAC's funds come from the Iranian-American community, a point of pride for NIAC. NIAC is a true grassroots organization, with members in over 44 states. Over the past five years, the average donation of our membership has ranged from $112 - $160 per person per year.

NIAC receives the remaining 25% of its funds from prominent foundations like the Ploughshares Fund, the Tides Foundation, and the Open Society Institute. In the past, NIAC has also received funding from the National Endowment for Democracy (NED).

NIAC does not receive funds from any government, including the US or the Iranian governments.

As a 501 c (3) non-profit, NIAC's financial records are part of the public record. Also, we are taking a lead in the Iranian-American community to spread a culture of transparency, and have made our tax returns available for download on NIAC's website.

**IraNexus**



**SBA**



## What are some of NIAC's accomplishments?

Since its inception in 2002, NIAC has enjoyed unprecedented success. NIAC is regularly quoted in numerous media outlets as an authority on affairs related to the Iranian-American community, including US-Iran relations; and is celebrated as the largest Iranian American grassroots organization, with members in 44 states.

NIAC is a household name on Capitol Hill and has emerged as a trusted source on US-Iran relations and the Iranian-American viewpoint. NIAC often teams up with groups like the New America Foundation and Amnesty International to discuss issues like the deteriorating human rights situation inside Iran and the Iranian nuclear file.

Some of NIAC's individual successes are as follows:

-- NIAC regularly hosts briefings on Capitol Hill for Congressional Staffers on areas of interest to the Iranian-American community. Some of our latest briefings have focused on Iran's parliamentary

**Irancensus**



**Register to Vote!**



elections, the National Intelligence Estimate (NIE) report on Iran, and Iran's role in Iraq.

-- NIAC has been on the forefront of the debate on US foreign policy with Iran, pushing for direct, diplomatic negotiations, and urging against war.

-- In 2003, NIAC challenged and won against Monster.com, a major US company discriminating against Iranian-Americans by keeping them from competing fairly in the job market.

-- In January 2005, NIAC successfully compelled the National Geographic Society to correct their 8th edition maps to read "Persian Gulf" instead of "Arabian Gulf."

-- NIAC forced an apology from MSNBC's Don Imus for a derogatory comment he made in 2004 about an Iranian airliner crash that killed 43 passengers.

-- NIAC worked with writer/director Wayne Kramer and Weinstein Company to make changes to the screenplay for *Crossing Over* (2007). The film, which features an all-star cast, originally depicted Iranian Americans committing an "honor killing." Had the script not changed, the movie would have had similar affects for the Iranian-American community as the film, *Not Without My Daughter* (1991).

### How does NIAC choose which issues to focus on?

NIAC advocates the interests of the Iranian American community, as defined by Iranian Americans themselves. As a true grass-roots organization, NIAC's membership regularly votes on the organization's stance on various issues, actively shaping the direction of the organization.

NIAC focuses on issues that are on the national agenda, like major legislation passing through Congress or the potential of a US-Iran war; and issues specific to the Iranian-American community, like the mislabeling of the "Persian Gulf" on Google Earth.

### Why is NIAC being defamed by supporters of military confrontation with Iran?

NIAC opposes war with Iran, and has been very successful pushing for diplomacy on Capitol Hill. NIAC's efforts lend Iranian Americans a voice in Washington, D.C.; but like all successful political organizations, it is impossible to be effective without garnering critics.

Case 1:08-cv-00705-JDB    Document 5-3    Filed 07/08/2008    Page 21 of 46

NIAC's critics equate opposition to war with support for the Iranian government. Nothing could be further from the truth. NIAC opposes a US-Iran war because it would be detrimental to US national interest and likely prolong the reign of the current Iranian government.

NIAC's critics include neo-conservatives activists like Kenneth Timmerman and Michael Rubin, two steadfast supporters of war with Iraq. Critics in the Iranian-American community include groups like the terrorist-listed People's Mujahedin of Iran (also known as the MEK or MKO).

NIAC welcomes a debate on how to best deal with the challenge that Iran poses to the United States, but we deplore the practice of resorting to ad hominem attacks and character defamation, rather than addressing the issues in good faith.

**Is NIAC is a lobbying group? If so, for whom does it lobby?**

No, NIAC is not a lobby. NIAC does, however, advocate the interests of the Iranian-American community-as defined by Iranian Americans-on Capitol Hill.

NIAC does not lobby on behalf of the Iranian government or any other government. NIAC's agenda is determined by its membership. The positions NIAC has taken on foreign policy, for example, reflect the view of the vast majority of Iranian Americans, according to a 2007 poll conducted by the University of California at Berkeley.

**Because NIAC opposes a US-Iran war, does it support the Iranian government?**

No, NIAC does not support the Iranian government. Opposition to a US-Iran war does not equate support for the Iranian government. NIAC opposes war because it is not in the national interest of the United States. NIAC believes that war would impose tremendous suffering on the American (and the Iranian) people. NIAC also believes that war with Iran will most likely fuel radial elements inside Iran, and strengthen Iran's current government.

Numerous public opinion polls in the United States have shown tremendous opposition to war and support for diplomacy, including a 2007 poll conducted by the University of California at Berkeley. The vast majority of Iranian Americans wish to see a different future for Iran, and this is why they have made America their new home. However, as they witness developments in Iraq, Iranian Americans tend to believe that prospects for change inside

Iran would be undermined by war.

### Why does NIAC oppose US government funding for organizations inside Iran?

Prominent Iranian pro-democracy and human rights activists-like Nobel Peace Prize winner Shirin Ebadi, investigative journalist Akbar Ganji, Woodrow Wilson scholar Haleh Esfandiari, and Human Rights Watch-have all come out forcefully against any politicized US government funding for organizations inside Iran, because of the additional security risk these funds pose to on-the-ground activists.

NIAC believes that it is critical for the United States to take the concerns and prospective of pro-democracy, human rights activists inside Iran seriously. NIAC has seen-up close-the negative effects of politicized US government funding. For several years, NIAC worked with Iranian NGOs doing non-political capacity building through National Endowment for Democracy (NED) funds; and we witnessed how the atmosphere in which these organizations operated inside Iran became drastically worse due to politicized US funds.

NIAC believes that any effort by the US government to help the Iranian people must be supported by the Iranian people, and must not endanger their lives.

### What is NIAC's position about the human rights situation in Iran?

NIAC is deeply concerned about the human rights situation in Iran, and has made a number of positive contributions to this issue. NIAC has worked on several occasions with legitimate human rights organizations, like Amnesty International and Human Rights Watch, to call attention to human rights abuses in Iran; and on July 26, 2007, NIAC hosted a conference on this very issue (sponsored by Amnesty International) on Capitol Hill in Washington, D.C. NIAC opposes, however, efforts to use Iran's abysmal human rights record as a pretext to start a war with Iran, mindful of the suffering and human rights violations that a war would bring.

### Why is NIAC suing Hassan Daioleslam?

Hassan Daioleslam, who has been identified by former members

of the terrorist-listed People's Mujahedin of Iran (also known as the MEK or MKO) as a member of the organization's executive committee, has published several defamatory articles about NIAC and its President, Trita Parsi.

Daioleslam is opposed to dialogue between the US and Iran. Because NIAC has called for direct, comprehensive talks with Iran, Daioleslam has attempted to silence NIAC by equating opposition to a US-Iran war with lobbying for the Iranian government.

NIAC has tried to engage Daioleslam, but despite our efforts, Daioleslam has continued to bully NIAC through defamation, slander, misquotations, incorrect links and references to figures that played no role in NIAC's inception, operations, or development, forcing NIAC to seek legal recourse.

The MEK/MKO is recognized by the US State Department as a terrorist organization and its extensive human rights violations have been documented by Human Rights Watch.

Additional information on Hassan Daioleslam and Kenneth Timmerman's defamation campaign against NIAC can be found here.

**Next >**

[ Back ]

© 2008 NIAC - National Iranian American Council
c/o 1411 K St NW Ste 600, Washington DC 20005
**Tel:** 202-386-6325 **Fax:** 202-386-6409

EXHIBIT

5E



# National Iranian American Council

## PROMOTING IRANIAN-AMERICAN PARTICIPATION IN AMERICAN CIVIC LIFE

### ·ˇˇˇˇˇˇ· NIAC US-IRAN POLICY MEMO ·ˇˇˇˇˇˇ·

1411 K St NW Ste 600, Washington, DC 20005       202-386-6325       June 2008

web: www.niacouncil.org    |    e-mail: info@niacouncil.org

## WHY TEHRAN WILL REJECT THE NEW INCENTIVE PACKAGE

Iran's likely rejection of the new incentive package to halt the country's nuclear enrichment program has opened a new chapter in Tehran's successive transgression of nuclear demarcations. Even before EU foreign policy and security chief, Javier Solana, could deliver the package to the Iranian Foreign Minister, Tehran had already warned that it would reject any deal requiring a halt to uranium enrichment. In the words of Ali Larijani, the new speaker of the parliament, Iran is allergic to the suspension of its enrichment program.

For those who describe the package as a "generous offer," Iran's decision appears insular, even irrational. However, if the purpose of the deal is to lure Te-hran suspend enrichment, the new package, once again, failed to deliver the most significant incentive for Tehran to change its behavior: the permanent deferment of the U.S. containment strategy. What the Islamic Republic urgently wants is the as-

*For those who describe the package as a "generous offer," Iran's decision appears insular, even irrational. However, if the purpose of the deal is to lure Te-hran suspend enrichment, the new package, once again, failed to deliver the most significant incentive for Tehran to change its behavior: the permanent deferment of the U.S. containment strategy.*

surance that Washington will not pose a threat to its survival, a comprehensive package of incentive that explicates a consistent U.S. policy toward Iran, devoid of economic sanctions and an aggressive program for regime change.

Tehran's reaction to the package is threefold. First off, Tehran has been defying U.S. sanctions for years, acquiring much needed technology for its nuclear program from alterna-

tive markets in Asia. Sanctions will certainly make things harder for Iran, but not necessarily prevent it from developing nuclear technology. Armed with a huge windfall of oil revenue due to record-high oil prices, Tehran will continue to acquire new technology and expand its nuclear program in subversive ways, defying future U.N. sanctions, as it has successfully continued to do since it rejected the first incentive package in 2006.

Rejection of the latest package is backed with the belief that the U.S. is militarily too vulnerable to attack Iran and the Security Council lacks the political will to engage in a military confrontation. For the most part, Tehran views the logic of sanctions primarily as a tactic of psychological warfare that is best tackled with defiance.

The notion of defiance brings us to the second reason why Tehran will reject the package: symbolic politics. The country's

# WHY TEHRAN WILL REJECT THE NEW INCENTIVE PACKAGE

nuclear program is a source of national pride to many Iranians, even to dissidents strongly opposed to the theocratic regime. The idea that Iran should pursue nuclear technology despite foreign pressures is a belief that is shared by many Iranians of diverse political backgrounds. The clerical regime is fully aware of the power of such symbolic politics and continues to capitalize on it by propagating the value of its nuclear project through various civic, educational institutions and media outlets, including popular shows on television. In fact, with an increase of sanctions, Tehran will find more ammunition to bolster its legitimacy among ordinary Iranians, therefore continue with its uranium enrichment capabilities at a faster pace.

But the main reason why Tehran will reject the offer lies with Iran's deep suspicion over U.S. objectives to endorse the incentive package. History serves as a guide here. At the time when the six-nation offer of incentives was rejected by Tehran in 2006, the U.S. State Department allocated $75 million in emergency funds to support oppositional forces outside and inside Iran. The problem with the democracy-promotion program was that it was made public only months before the first incentive package was introduced to Tehran. The regime-change policy cancelled out the incentive package,

*The regime-change policy cancelled out the incentive package, since it promoted programs for the annihilation of the regime while at the same time offering incentives for its survival. Such inconsistencies have made the Iranian regime highly suspicious of Washington's participation in the nuclear talks.*

since it promoted programs for the annihilation of the regime while at the same time offering incentives for its survival. Such inconsistencies have made the Iranian regime highly suspicious of Washington's participation in the nuclear talks.

It is now highly likely that Iran's move will prompt the Security Council and Germany to adopt tougher sanctions. While sanctions will surely hinder Iran's economic growth, such punitive measures aimed at international ostracism will only harden Tehran's posture on the nuclear issue and, in turn, encourage it to charge ahead with its nuclear program. With the rise of a climate of suspicion, the Iranian regime will also move to further limit political activities in the name of unifying the nation against a foreign threat. In reality, the repercussions of the sanctions are multitude, most significantly hindering the growth of the Iranian civil society as the regime gains strength with the increasing centralization of state power as a reaction to the sanctions.

Yet recent tensions over Iran's nuclear program come as Iran's political landscape undergo considerable transformation. As America heads to the polls in November, the newly elected Iranian parliament embraces a new political approach, which appears to be less confrontational in posture though still cautious about West's intentions to halt Iran's nuclear program. Led by the pragmatic Ali Larijani, the revisionist conservatives still want to negotiate with the West over the nuclear issue; however, they are weary of Washington's objective toward Iran.

For some time to come, the political balance in Iran will be indirectly shaped by decisions Washington will make to influence the Security Council. The best way of promoting nuclear non-proliferation and democratization in Iran is by allowing the Iranian civil society to have direct access to the global market. But in order to do so, Washington must first reconsider its policy of sanctions that only helps empowering the Iranian state and weaken Iran's civil society.

*Prof. Babak Rahimi teaches Iranian and Islamic Studies at University of California San Diego. He is currently conducting field research in Iran.*

**EXHIBIT**

tabbies

*5F*



# National Iranian American Council

PROMOTING IRANIAN-AMERICAN PARTICIPATION IN AMERICAN CIVIC LIFE

## ᐧᐧᐧᐧᐧ NIAC US-IRAN POLICY MEMO ᐧᐧᐧᐧᐧ

| 1411 K St NW Ste 600, Washington, DC 20005 | 202-386-6325 | Nov 2007 |

web: www.niacouncil.org    |    e-mail: info@niacouncil.org

## U.S. SANCTIONS ON IRAN: WILL THEY WORK?

The Bush administration's latest unilateral sanctions on Iran are likely to fail. The debate over whether or not these sanctions will work has so far focused on economic considerations. Psychological and political factors, however, are more important.

Historically, Iranian national sentiment soars in the face of foreign pressure. Like the leaders of the past, the current regime can benefit internally from resisting coercion by foreign powers such as the United States.

In the nineteenth century, the Iranian people rejected imperial Britain's bid to impose a monopoly on the Iranian tobacco industry. Led by opposition leaders, the public stopped using tobacco, and in 1892 the Qajar monarch, Nasser-edin Shah, was forced to cancel the tobacco

*Historically, Iranian national sen-timent soars in the face of for-eign pressure. Like the lead-ers of the past, the cur-rent regime can benefit internally from resisting coercion by foreign powers such as the United States.*

concession he had granted to the British.

The flame of national awakening thus kindled led to the Iranian Constitutional Movement at the turn of the twentieth century. The movement aimed primarily at ridding Iran of foreign domination. Its nationalist and religious supporters created the first representative government in Iranian history

to limit arbitrary powers of the Shah in foreign as well as domestic affairs. The failure of the Qajar monarchs to share power with the religious and political opposition brought their dynasty to an end.

By contrast, Reza Khan, a mere colonel in the Iranian Cossack Brigade, shrewdly exploited the frustrated Iranian national will. He first consolidated his power by successful military campaigns against provinces seeking autonomy, strengthened the central government, and declared himself Shah in 1925.

All criticism of his regime aside, he in fact pursued a rational and realistic foreign policy to free Iran from a century of British and Russian domination, setting the foundation for



NATIONAL IRANIAN AMERICAN COUNCIL                                                    2

## U.S. SANCTIONS ON IRAN: WILL THEY WORK?

achieving Iran's territorial integrity and political independence.

But his son, Mohammad Reza Shah, failed to learn from his father's example. Instead of seeking the support of religious and nationalist forces, he waged a campaign of political warfare against the supporters of Prime Minister Mohammad Musaddiq. While the British and American covert operations helped overthrow the Musaddiq government in 1953, the Shah's victory marked his loss of political legitimacy, and eventually sealed his fate.

While Mohammad Reza Shah adamantly refused to share real power even with moderate nationalist opposition forces during the revolutionary crisis in 1978-1979, Ayatollah Ruhollah Khomeini took a different approach, calling on support from nationalist leaders to wrest power from the Shah and establish the Islamic Republic.

Even though Khomeini later suppressed nationalist political forces, still he rode the wave of popular Iranian nationalist feeling in fighting a bloody defensive war against Iraq in 1980-1988, which cost the lives of hundreds of thousands of Iranians—young and old, men and women, religious and secular—who had responded patriotically to the invasion of their country.

*In reaction to foreign coercion, the Iranian sense of national unity overcomes factional strife. It is a transcendental force inspired by a powerful belief of the Iranian people that their national identity is rooted in the continuity and resilience of their culture and civilization despite over two millennia of foreign pressures and invasions, from Alexander of Macedonia to Saddam of Iraq.*

In the face of U.S. pressure and threats of force, Iranian supreme leader Ali Khamenei and President Ahmadinejad insist on Iran's right to continue uranium enrichment for energy on Iranian soil. This does not simply reflect, as so often portrayed, the hard-line stance of Ahmadinejad. Even the moderate and soft-spoken President Mohammad Khatami, who served as Iran's president from 1997 to 2005, warned America and Israel of Iran's retaliatory "fire of hell" in response to any military attack on Iran over the nuclear issue.

In reaction to foreign coercion, the Iranian sense of national unity overcomes factional

strife. It is a transcendental force inspired by a powerful belief of the Iranian people that their national identity is rooted in the continuity and resilience of their culture and civilization despite over two millennia of foreign pressures and invasions, from Alexander of Macedonia to Saddam of Iraq.

Given such profound Iranian cultural, psychological and political realities, America's newly expanded unilateral sanctions are likely to fail, as have all previous sanctions since the United States broke diplomatic relations with Iran in 1980.

Diplomacy, rather than pressure or military action, remains the most realistic option. American and Iranian ambassadors in Baghdad will soon renew discussions on Iraqi security. Yet to resolve the nuclear standoff between the US and Iran, unconditional and direct negotiations at higher levels are essential to avoid a military collision.

*R.K. Ramazani is Professor Emeritus of Government and Foreign Affairs at the University of Virginia. For over a half century, he has written extensively on Iran, including the prize-winning The Foreign Policy of Iran. The author thanks W. Scott Harrop for assistance with this essay. This article first appeared in the Daily Progress.*



An Iranian American
Voice in Washington DC!

Home

**NIAC Newsletter**

your email

HTML  Text
Subscribe

**Latest News**
↳ **Event: NIAC and NAF to Hold US-Iran Conference on Capitol Hill February 14**
↳ **Lee Introduces Sweeping Iran Diplomacy Bill**
↳ **Mass Rally in DC Calls for New Strategy in Iraq, No War in Iran**
↳ **Lantos Call for More Iran Sanctions at Hearing**

**Login**

Username:

Password:

Remember me
Login
Lost Password?
No account yet? Register

**Syndicate**



Home • Elected Officials • Candidates & Elections • Legislation • Media Guide

Legislative Alerts and Updates    Current Legislation    Key Votes    Capitol Hill Basics

**ACTION ALERT**    Enter Your Zip Code:    [    ]  Go!

BOOKMARK

**Ask your Senators to support diplomacy with Iran**

There is new momentum on Capitol Hill to pursue a shift in US policy towards Iran.  Most recently, Senator Feinstein of California added her powerful voice to this debate, **calling for direct, unconditional dialogue** between the US and Iran. (**See video** ). The support of the Iranian American community in California for her position was instrumental in her decision.

For other Senators to follow her lead, it is crucial that they hear from the Iranian-American community.  In order for Senator Feinstein's efforts to succeed, she needs likeminded Senators to stand by her, so that the new administration—whether Democratic or Republican—can have viable options for a new, effective US foreign policy on Iran.

At NIAC's April 8 conference she re-iterated her support **for an alternative** to sanctions and war.  The proposal, recently put forth by former senior American officials and nuclear experts, suggests a multinational fuel enrichment facility inside Iran under extensive international supervision.

Please take a moment to send the letter below to your members of the Senate.  With your input and involvement, your Senators can play an important role in shaping an effective and constructive policy towards Iran.

**TAKE ACTION NOW!**    Enter Your Zip Code:    [    ]  Go!

✉ **Tell A Friend**

**Donate to NIAC!**

Enter Amount:

$ 50.00

Donate

**Join NIAC!**



**US Iran Media**



**Anti-Discrimination**



**IraNexus**

powered by **Capitol Advantage** ©2008



**SBA**



**Irancensus**



**Register to Vote!**



Copyright © 2008 National Iranian American Council
1411 K St. Suite 600
Washington, DC 20005
(202) 386-6325 Direct
(202) 386-6409 Fax

EXHIBIT

7



آفتاب
Aftab News

منجستر قهرمان لیگ برتر انگلستان شد

دوشنبه 23 اردیبهشت 1337

خارجی ‹ آرشیو گفتگو ‹ هسته ای
پنجشنبه 7 دی 1385 ساعت 18:13

تحلیل رئیس شورای آمریکایی‌های ایرانی‌تبار از بحران هسته‌ای

■ لابی ایرانی در آمریکا فعال می‌شود؟



آفتاب: روزگرمایی ایران و غرب بر سر پرونده هسته‌ای با تصویب قطعنامه تحریم در شورای امنیت سازمان ملل متحد و اقدام متقابل مجلس در ملزم ساختن دولت به تجدید نظر در همکاری‌ها با آژانس بین‌المللی انرژی هسته‌ای وارد مرحله خطیری شده است، در چنین شرایطی استفاده از تمامی ابزارهای موجود برای پاسداری از منافع ملی نکته‌ای است که بی‌شک می‌بایست در دستور کار مسئولان دستگاه دیپلماسی قرار بگیرد. در این میان وجود جامعه نسبتا بزرگی از ایرانیان در خاک آمریکا پتانسیل بالقوه‌ای برای تاثیر گذاری و تعدیل سیاست‌های تندروانه کاخ سفید تلقی می‌شود که البته تاکنون چنانکه باید و شاید مورد توجه قرار نگرفته است. اگر این پتانسیل بالقوه و دست نخورده را با میزان تاثیر لابی یهودیه در شکل دادن به سیاست‌های واشینگتن در حمایت از اسرائیل مقایسه کنیم به شکاف ژرفی که میان آنچه هست و آنچه می‌تواند باشد وجود دارد بیشتر پی‌می‌بریم. اینجا از یاد برد که به اعتقاد بیشتر صاحب نظران در جهان امروز استفاده هوشمندانه از «دیپلماسی غیر رسمی» نقش بسیار پراهمیتی در پیشبرد و تحقق اهداف دیپلماسی رسمی دارد، «تریتا پارسی» رئیس شورای آمریکایی‌های ایرانی‌تبار و استاد دانشگاه جانهاپکینز در گفتگویی قطعنامه تصویب شده و روندی که به وجود آورنده یک شرایط باخت-باخت در قبال برنامه هسته‌ای ایران دانسته است. نظر به اهمیت موضوع آفتاب چکیده‌ای از این گفتگو را منتشر می‌کند:

آیا تحریم‌های کنترل‌نشده شورای امنیت، کشورهای غربی را به حل پرونده هسته‌ای ایران نزدیک‌تر کرده‌است؟ در شرایطی که تهران مبارزه‌جو و سرسختانه از همیشه به نظر می‌رسد.

من فکر می‌کنم آنچه اکنون اتفاق افتاده ورود به یک بازی باخت-باخت است که توان طرفین را به جای پیدا کردن راه‌حل و رسیدن به توافق، به این موضوع معطوف می‌کند که چگونه یک ضربه کاری‌تر به طرف مقابل وارد کنند. در این بازی هر طرفی که مقاومت بیشتری به خرج دهد و دیرتر خسته شود شانس بیشتری برای برنده‌شدن

عناوین مرتبط

■ آلمان: نیازی به قطعنامه سوم نیست

■ هند راه خود را انتخاب کرد

■ استقبال چین از توافق ایران و آژانس

■ بحث درباره قطعنامه سوم شهریور آغاز می‌شود

■ پیش بینی تأمین‌ترین دوست ایران!

■ تهران هنوز بسته پیشنهادی را بررسی می کند

سیاست
آفتاب هفته
سیاست خارجی

هسته ای
بین الملل
اقتصاد و صنعت
اجتماعی
مطبوعات و رسانه ها
فرهنگ و اندیشه
هفت هنر
ورزش
علم و فناوری
عکس
پربیننده ترین مطالب
اخبار در سایت شما
سایتهای دیگر
لینک با ما

آگهی

ایمن رایانه پندار





■ پرببننده ترین مطالب
■ اخبار در سایت شما
■ سایتهای دیگر
■ لینک به ما

آگهی

■ هند راه خود را انتخاب کرد

■ استقبال چین از توافق ایران و آژانس

■ بحث درباره قطعنامه سوم شهریور آغاز می‌شود

■ پیش بینی تاپذیرترین دوست ایران!

■ تهران هنوز بسته پیشنهادی را بررسی می کند

---

**عناوین اصلی**

■ مذاکره مستقیم ایران با 1+5 ؟

■ ایران یک گام به جلو برداشته است

■ انسداد دارایی 12 شرکت ایرانی در سوئیس

■ ایران زودتر از 2010 به سلاح اتمی تمی‌رسد!

■ کوشنر همه‌جا به دنبال تحریم ایران

---

جانه‌ئلکینز در گفتگویی قطعنامه تصویب شده را بوجود آورنده یک شرایط باخت- باخت در قبال برنامه هسته‌ای ایران دانسته‌است. نظر به اهمیت موضوع آفتاب چکیده‌ای از این گفتگو را منتشر می‌کند:

**آیا تحریم‌های کنترل‌شده شورای امنیت، کشورهای غربی را به حل پرونده هسته‌ای ایران نزدیک‌تر کرده‌است؟ در شرایطی که تهران مبارزه‌جو و سرسخت‌تر از همیشه به نظر می‌رسد.**

من فکر می‌کنم آنچه اکنون اتفاق افتاده ورود به یک بازی باخت-باخت است که توان طرفین را به جای پیدا کردن راه‌حل و رسیدن به توافق، به این موضوع معطوف می‌کند که چگونه یک ضربه کاری‌تر به طرف مقابل وارد کنند. در این بازی هر طرفی که مقاومت بیشتری به خرج دهد و دیرتر خسته شود شانس بیشتری برای برنده‌شدن دارد. مطمئنا ایران به‌خاطر سرسختی خود مجبور به تحمل فشارهای اقتصادی خواهد شد، ولی فراموش نکید که ایالات متحده نیز در عراق شرایط بسیار دشواری دارد.

این قطعنامه شانس دیپلماتیک مسئله را به طور کامل از بین نبرده، ولی مطمئنا هزینه بازگشت به میز مذاکره را برای طرفین بیشتر کرده‌است.

**پس شما فکر می کنید که این قطعنامه موضوع را پیچیده‌تر کرده است. در این شرایط آیا می توان از موثر بودن تحریم‌های گنجانده شده در آن سخن گفت؟**

من فکر نمی‌کنم که این تحریم‌ها لزوما تاثیر خاصی بر ایران داشته باشند، حتی از جهانی می توان گفت اقدامات یکجانبه ایالات متحده در تحت فشار قراردادن بانکهای طرف معامله با ایران به نوبه خود می‌تواند از تحریم‌های لحاظ شده در قطعنامه 1737 بسیار موثرتر باشد.

**آیا واقعا راه حلی برای این بحران وجود دارد؟**

بله، ولی من فکر نمی‌کنم که جامعه جهانی با این اقدام(تصویب قطعنامه) گام موثری برای حل موضوع برداشته باشد. در شرایط کنونی دیپلماسی قربانی چرخه معیوب تهدیدها و تحریک‌های ایران و آمریکا علیه یکدیگر شده است. درطرف ایران، شاید تحریک‌آمیزترین کاری که می توانست در این شرایط صورت گیرد برگزاری کنفرانس هولوکاست بود که قطعا از هیچطریق نمی‌تواند تاثیر مثبتی بر منافع این کشور بگذارد. در طرف مقابل آمریکایی‌ها نیز همچنان از گفتگو با ایران در مورد عراق سرباز زده و عمدا نقش فوق‌العاده‌ای که ایران می تواند در برقراری ثبات و امنیت در عراق داشته باشد را نادیده می‌گیرند.

---

شود؟آفتاب - لابی ایرانی در آمریکا فعال می
http://www.aftabnews.ir/vdccpoq2biqpp.html
Screen clipping taken: 5/11/2008, 5:39 PM

بسیار موثرتر باشد.

ایران |

**آیا واقعا راه حلی برای این بحران وجود دارد؟**

بله، ولی من فکر نمی‌کنم که جامعه جهانی با این اقدام(تصویب قطعنامه) گام موثری برای حل موضوع برداشته باشد. در شرایط کنونی دیپلماسی قربانی چرخه معیوب تهدیدها و تحریکات ایران و آمریکا علیه یکدیگر شده است.

درطرف ایران، شاید تحریک‌آمیزترین کاری که می توانست در این شرایط صورت گیرد برگزاری کنفرانس هولوکاست بود که قطعا از هیچنظر نمی‌تواند تاثیر مثبتی بر منافع این کشور بگذارد. در طرف مقابل آمریکایی‌ها نیز همچنان از گفتگو با ایران در مورد عراق سرباز زده و عمدا نقش فوق‌العاده‌ای که ایران می تواند در برقراری ثبات و امنیت در عراق داشته باشد را نادیده می‌گیرند.

**با توجه به وضعیت روابط تهران-واشنگتن، می‌توان از احتمال آغاز یک مسیر دیپلماتیک سخن گفت؟**

بله به شرطی که ابتدا دو چیز اتفاق بیافتد؛ اول اینکه غرب به طور آشکار اعلام کند که ایران حق دارد تا تمامی جنبه‌های یک برنامه‌هسته‌ای صلح‌آمیز بهرمند شود و مذاکرات بدون پیش‌شرط را با این کشور را آغاز کند، دوم اینکه ایران بجای دیپلماسی تحریک‌آمیز کنونی یک سیاست خردورزانه در مذاکرات داشته‌باشد.

**در شرایط کنونی اصلا به نظر نمی رسد که ایران بخواهد فعالیت‌های غنی‌سازی (اورانیوم) خود را متوقف سازد. آیا به نظر شما شورای امنیت عکس‌العمل نشان داده و گام بعدی را بر می دارد؟**

ما اکنون داخل یک چرخه افتاده‌ایم. بله اگر تهران قطعنامه را نپذیرد شورای امنیت تا چند ماه دیگر دور دوم تحریم‌ها علیه ایران را اعمال خواهد کرد.

**در داخل ایران صدای کسانی که خواهان قطع همکاری‌های ایران با IAEA و حتی خروج از NPT هستند بلندتر از همیشه به گوش می‌رسد. آیا واقعا ممکن است دولت این کشور نیز قدم در چنین راهی بگذارد؟**

از نظر من احتمال وقوع چنین چیزی کم است. من مطمئنم در داخل ایران عناصر تاثیرگذاری وجود دارند که خطرات پیش گرفتن چنین رویکردی را درک می کنند، هرچند ممکن است در کوتاهمدت بازرسان IAEA با محدودیت‌هایی در دسترسی به تاسیسات هسته‌ای این کشور مواجه شوند اما به طور طبیعی در بلندمدت چنین‌چیزهایی اتفاق نخواهند افتاد.

کد مطلب : 55529

🖨 چاپ    📤 ارسال به‌دیگران    📩



**EXHIBIT**

8

حمله نومحافظه کاران به لابی ایرانی در آمریکا

گروههای نومحافظه کار آمریکایی در حال تلاش برای کاستن از نفوذ گروه شورای ملی ایرانی -
آمریکایی (نایاک) هستند.

به گزارش الف، تلاشهای نومحافظه کاران برای مبارزه با نایاک پس از ماههها انتقاد ضمنی، اینک
وارد مرحله ای جدید شده و این گروه به فعالیت در راستای اهداف جمهوری اسلامی متهم
می شود.

نایاک که به عنوان بزرگترین سازمان ایرانی آمریکایی ایالات متحده محسوب می شود، از
سال 2000 فعالیت خود را آغاز کرده است. این شورا که اعضای آن بیشتر متشکل از افراد
متخصص در حوزه های حرفه ای و علمی هستند، هدف خود را گسترش پیوند میان مردم ایران و
آمریکا و شناساندن فرهنگ ایرانی معرفی کرده است.

سازمان مرکزی این گروه در واشنگتن دی سی قرار دارد. نایاک به صورت غیرانتفاعی اداره
می شود و به عنوان یک سازمان غیرسیاسی ثبت شده است.

همزمان با گسترش فعالیتهای نایاک در سالهای اخیر، انتقادات به فعالیت این مجموعه نیز افزایش
یافته است. این انتقادات از جانب گروههای محافظه کار و نومحافظه کار سیاسی ایالات متحده
مطرح می شود.

در جدیدترین این تلاشها، نشریه نیوکان فرانتپیج با ارائه تصویری خرابکارانه از نایاک، این سازمان
را عامل جمهوری اسلامی ایران در آمریکا معرفی کرده و اهداف آن را نفوذ در سیستم سیاسی
ایالات متحده و ارائه تصویر بهتر از دولت ایران در خارج از ایران ذکر کرده است.

این ارگان نومحافظه کار نتیجه گیری می کند از دهه 90 ایران در پی ایجاد سیستم لابی گری
گسترده ای در ایالات متحده بوده است. دولت ایران منابع مالی و انسانی فراوانی را برای رسیدن
به این هدف تخصیص داده است.

روزنامه قدس - روزنامه صبح ایران
http://www.qudsdaily.com/archive/1386/html/2/1386-02-01/page61.html
Screen clipping taken: 5/11/2008, 7:56 PM


EXHIBIT
9



ک.مطلب: 2980 ,7756 :P.View

**IAPAC و AIPAC علیه NIAC**

(3 توصیه)

بحمن حمری الف

۲۸ فروردین ۱۳۸۶

گروه های نومحافظه کار آمریکایی در حال تلاش برای کاستن از نفوذ گروه شورای ملی ایرانی ـ آمریکایی NIAC هستند. به گزارش "الف"، تلاش های نومحافظه کاران برای مبارزه با "نایاک" پس از ماه ها انتقاد ضمنی، اینک وارد مرحله ای جدید شده و این گروه مستقیما به فعالیت در راستای اهداف جمهوری اسلامی متهم می شود.

نایاک که به عنوان بزرگترین سازمان ایرانی آمریکایی ایالات متحده محسوب می شود، از سال 2000 فعالیت خود را آغاز کرده است. این شورا که اعضای آن عمدتا متشکل از افراد متخصص در حوزه های مختلف حرفه ای و علمی هستند، هدف خود را گسترش پیوند میان مردم ایران و آمریکا و شناساندن فرهنگ ایرانی معرفی کرده است. سازمان مرکزی این گروه در واشینگتن دی سی قرار دارد. نایاک به صورت غیرانتفاعی اداره می شود و به عنوان یک سازمان غیر سیاسی ثبت شده است.

همزمان با گسترش فعالیت های نایاک در سال های اخیر، انتقادات به فعالیت این مجموعه نیز افزایش یافته است. این انتقادات که عمدتا از جانب گروه های محافظه کار و نومحافظه کار عرصه سیاسی ایالات متحده مطرح می شود بر محور ارتباط احتمالی این گروه با دولت ایران متمرکز شده است. تشدید فشارها با نایاک، همزمان با افزایش تبلیغات منفی علیه شورای روابط آمریکایی-اسلامی CAIR که به عنوان بزرگترین سازمان اسلامی آمریکا شناخته می شود، صورت می گیرد.

در جدی ترین این تلاش ها، نشریه نیوکان فرانتیس، ضمن ارائه تصویری خرابکارانه از نایاک، این سازمان را عامل جمهوری اسلامی در آمریکا معرفی کرده و اهداف آن را تقلید و شبیه سازی یک AIPAC ایرانی در آمریکا، ارائه تصویری شهروندی از لابی خود، ممانعت و اشکال تراشی در فعالیت های اپوزیسیون ایرانی در آمریکا، تقوذ در سیستم سیاسی ایالات متحده، تابوشکنی در همکاری با ایران در این ایرانیان مهاجر و ارائه تصویر بهتر از دولت ایران در خارج از ایران عنوان کرده است. این نشریه، حمایت فرامرز فتح نژاد مسئول سابق دفتر حفاظت منافع ایران در آمریکا و عضویت تعدادی از اعضای آن در برخی شرکت های تجاری ایرانی را به عنوان مدرکی بر ادعاهای خود ذکر کرده و نایاک را به تغذیه از منابع نفتی ایران متهم کرده است.

این ارگان شاخه ای از نومحافظه کاران، با اشاره به کمک چندین لابیست آمریکایی ـ باب نی (نماینده سابق کنگره از اوهایو)، روی کافی و دیو دی استفانو ـ و با استناد به پرونده ای که برای باب نی در مورد ارتباط با یک دلال سوری اسلحه در لندن تشکیل شده است، به صورت ضمنی نایاک را سازمانی در چارچوب تلاش های ایران برای انتقال اسلحه توصیف می کند.

این نشریه همچنین اعضای نایاک را متهم کرده است که در پیروی از دستورات تهران درباره ایجاد گروهی رقیب در مقابل ، IAPAC ـ AIPAC ـ شورای اقدام سیاسی ایرانی آمریکایی ـ را تشکیل داده اند.

از اتهامات دیگری که بر نایاک وارد شده است، تلاش برای لغو و جلوگیری از تمدید ILSA ـ قانون تحریم ایران و لیبی ـ است. گزارش مذکور مدعی است نایاک با بارسی به عنوان رابط اصلی جمهوری اسلامی در دوران هاشمی و خاتمی، با نظارت مستقیم رهبر ایران و با همکاری وزارت خانه های اطلاعات و فرهنگ و ارشاد اسلامی، سیاست های نظام را به اجرا می گذارده منتقل می کرده است.

این ارگان نومحافظه کار نتیجه گیری می کند "از دهه 90 ایران در پی ایجاد سیستم لابی گری گرد گسترده ای در ایالات متحده بوده است. دولت ایران منابع مالی و انسانی فراوانی را برای رسیدن به این هدف تخصیص داده است. این لابی متشکل از شبکه ای پیچیده از افراد و سازمان های همپوشان با کادر رهبری آن است که به دولت ایران، ارتباطی مافیایی دارند".

از چهره های شناخته شده NIAC و AIC ـ کمیته ایرانی آمریکایی که قبل از تشکیل نایاک فعالیت می کرد ـ می توان به تریتا بارسی و هوشنگ امیراحمدی اشاره کرد. از بارسی و امیر احمدی در بسیاری از اوقات به "رابط" و در برخی منابع به "دلال" سیاسی ایران و دولت آمریکا در سال های گذشته یاد می شود. اعضای این گروه چندان مورد اعتماد ایران نیستند.

IAPAC و NIAC علیه AIPAC ـ الف
http://www.alef.ir/content/view/7756/.

EXHIBIT
10
tabber

Screen clipping taken: 5/11/2008, 8:03 PM



همزمان با گسترش فعالیت های نایاک در سال های اخیر، انتقادات به فعالیت این مجموعه نیز افزایش یافته است. این انتقادات که عمدتا از جانب گروه های محافظه کار و نومخالفه کار عرصه سیاسی ایالات متحده مطرح می شود بر محور ارتباط احتمالی این گروه با دولت ایران متمرکز شده است. تشدید فشارها بر نایاک همزمان با افزایش تبلیغات منفی علیه شورای روابط آمریکایی-اسلامی CAIR که به عنوان بزرگترین سازمان اسلامی آمریکا شناخته می شود، صورت می گیرد.

در جدی ترین این تلاش ها، نشریه نیوکان فرانتپیج، ضمن ارائه تصویری خرابکارانه از نایاک، این سازمان را عامل جمهوری اسلامی در آمریکا معرفی کرده و اهداف آن را تقلید و شبیه سازی یک AIPAC ایرانی در آمریکا، ارائه تصویری شهروندی از لابی خود، ممانعت و اشکال تراشی در فعالیت های ایوزینیون ایرانی در آمریکا، نفوذ در سیستم سیاسی ایالات متحده، تابوشکنی با ایران در بین ایرانیان مهاجر و ارائه تصویر بهتر از دولت ایران در خارج ذکر کرده است. این نشریه، حمایت فرامرز فتح نژاد مسئول سابق دفتر حفاظت منافع ایران در آمریکا و عضویت تعدادی از اعضای آن در برخی شرکت های تجاری ایرانی را به عنوان مدرکی بر ادعاهای خود ذکر کرده و نایاک را به تغذیه از منابع نفتی نفتی ایران متهم کرده است.

این ارگان شاخه ای از نومحافظه کاران، با اشاره به کمک چندین لابیست آمریکایی - باب نی (نماینده سابق کنگره از اوهایو)، روی کافی و دیو دی استفانو - و با استناد به پرونده ای که برای باب نی در مورد ارتباط با یک دلال سوری اسلحه در لندن تشکیل شده است، به صورت ضمنی نایاک را سازمانی در چارچوب تلاش های ایران برای انتقال اسلحه توصیف می کند.

این نشریه همچنین اعضای نایاک را متهم کرده است که با نیروی از دستورات تهران درباره ایجاد گروهی رقیب در مقابل AIPAC ، IAPAC - شورای اقدام سیاسی ایرانی آمریکایی - را تشکیل داده اند.

این نشریه همچنین اعضای ناباک را متهم کرده است که با پیروی از دستورات تهران درباره ایجاد گروهی رقیب در مقابل AIPAC ، IAPAC - شورای اقدام سیاسی ایرانی آمریکایی - را تشکیل داده اند.

از اتهامات دیگری که بر ناباک وارد شده است، تلاش برای لغو و جلوگیری از تمدید ILSA - قانون تحریم ایران و لیبی - است. گزارش مذکور مدعی است تریتا پارسی به عنوان رابط اصلی جمهوری اسلامی در دوران هاشمی و خاتمی، با نظارت مستقیم رهبر ایران و با همکاری وزارت خانه های اطلاعات و فرهنگ و ارشاد اسلامی، سیاست های نظام را به این گروه منتقل می کرده است.

این لوگان نومحافظه کار نتیجه گیری می کند "از دهه 90 ایران در پی ایجاد سیستم لابی گری گسترده ای در ایالات متحده بوده است. دولت ایران منابع مالی و انسانی فراوانی را برای رسیدن به این هدف تخصیص داده است. این لابی متشکل از شبکه ای پیچیده از افراد و سازمان های همپوشان با کادر رهبری آن است که با دولت ایران، ارتباطی مافیایی دارند".

از چهره های شناخته شده NIAC و AIC - کمیته ایرانی آمریکایی که قبل از تشکیل ناباک فعالیت می کرد - می توان به تریتا پارسی و هوشنگ امیراحمدی اشاره کرد. از پارسی و امیر احمدی در بسیاری از اوقات به 'رابط' و در برخی منابع به 'دلال' سیاسی ایران و دولت آمریکا در سال های گذشته یاد می شود.

...............................

منبع: سایت الف

نظر شما درباره این خبر:

نام:

Fars News Agency : IAPAC و NIAC علیه AIPAC
http://www.farsnews.com/newstext.php?nn=8601280492
Screen clipping taken: 5/11/2008, 8:12 PM

http://www.tebyan.net/index.aspx?pid=40463

EXHIBIT

11



Emammahdi.com

| صفحه ی اصلی |
| مهدویت |
| جهان اسلام |
| بین الملل |
| گوناگون |
| گزارش تصویری |
| اخبار سایت |
| خبرنگاران افتخاری |

اخبار . گوناگون .

AIPAC علیه NIAC و IAPAC- سه شنبه 4 اردیبهشت 1386  1:44:57 PM



گروه های نومحافظه کار آمریکایی در حال تلاش برای کاستن از نفوذ گروه شورای ملی ایرانی - آمریکایی NIAC هستند. به گزارش "الف"، تلاش های نومحافظه کاران برای مبارزه با "نایاک" پس از ماه ها انتقاد ضمنی، اینک وارد مرحله ای جدید شده و این گروه مستقیما به فعالیت در راستای اهداف جمهوری اسلامی متهم می شود.

نایاک که به عنوان بزرگترین سازمان ایرانی آمریکایی ایالات متحده محسوب می شود، از سال 2000 فعالیت خود را آغاز کرده است. این شورا که اعضای آن عمدتا متشکل از افراد متخصص در حوزه های مختلف حرفه ای و علمی هستند هدف خود را گسترش پیوند میان مردم ایران و آمریکا و شناساندن فرهنگ ایرانی معرفی کرده است. سازمان مرکزی این گروه در واشینگتن دی سی قرار دارد. نایاک به صورت غیرانتفاعی اداره می شود و به عنوان یک سازمان غیر سیاسی ثبت شده است.

همزمان با گسترش فعالیت های نایاک در سال های اخیر، انتقادات به فعالیت این مجموعه نیز افزایش یافته است. این انتقادات که عمدتا از جانب گروه های محافظه کار و نومحافظه کار عرصه سیاسی ایالات متحده مطرح می شود بر محور ارتباط احتمالی این گروه با دولت ایران متمرکز شده است. تشدید فشارها بر نایاک، همزمان با افزایش تبلیغات منفی علیه شورای روابط آمریکایی-اسلامی CAIR که به عنوان بزرگترین سازمان اسلامی آمریکا شناخته می شود، صورت می گیرد.

در جدی ترین این تلاش ها، نشریه نیوکان فرانت پیج، ضمن ارائه تصویری خرابکارانه از نایاک، این سازمان را عامل جمهوری اسلامی در آمریکا معرفی کرده و اهداف آن را تقلید و شبیه سازی یک AIPAC ایرانی در آمریکا، ارائه تصویری شهروندی از لابی خود، ممانعت و اشکال تراشی در فعالیت های ایوزیسیون ایرانی در آمریکا، نفوذ در سیستم سیاسی ایالات متحده، تابوشکنی از همکاری با ایران در بین ایرانیان مهاجر و ارائه تصویر بهتر از دولت ایران در خارج ذکر کرده است. این نشریه، حمایت فرامرز فتح نژاد مسئول سابق دفتر حفاظت منافع ایران در آمریکا و عضویت تعدادی از اعضای آن در برخی شرکت های تجاری ایرانی را به عنوان مدرکی بر ادعاهای خود ذکر کرده و نایاک را به تغذیه از منابع نفتی ایران متهم کرده است.

این ارگان شاخه ای از نومحافظه کاران، با اشاره به کمک چندین لابیست آمریکایی - باب نی (نماینده

UNESCO

فرصتی برای

تولید توپ پذا

تسهیلات وی

اعتراض دانش

ازدواج  1386/10/26

راستی عشق چ

بخش اخبار و مقالات مرکز اطلاع رسانی امام مهدی ارواحنا فداه
http://www.emammahdi.com/news/watr.asp?sys=110&subof=1&bakhsh=8&NewsID=857
Screen clipping taken: 5/11/2008, 8:15 PM

EXHIBIT

12

tabbies



AIPAC علیه NIAC

تعداد بازدید : 603          تاریخ : پنج شنبه 1386/3/30

گروه های توصافقله کار آمریکایی، در حال تلاش برای کاستن از نفوذ گروه شهروند ملی ایرانی – آمریکایی NIAC هستند. تلاش های توصافقله کارانه برای مباره با "نایاک" پس از ماه ها انتقاد شدیدی، اینك وارد مرحله ای جدید شده و این گروه مستقیماً به فعالیت در راستای اهداف جمهوری اسلامی متهم می شود.

به گزارش الف، نایاک که به عنوان بزرگترین سازمان ایرانی آمریکایی ایالات متحده محسوب می شود، از سال 2000 فعالیت خود را آغاز کرده است. این شورا که اعضای آن عمدتاً متشکل از افراد متخصص در حوزه های مختلف حرفه ای و علمی هستند هدف خود را گسترش پیوند میان مردم ایران و آمریکا و شناساندن فرهنگ ایرانی معرفی کرده است. سازمان مرکزی این گروه در واشینگتن دی سی قرار دارد.

نایاک به صورت غیرانتفاعی اداره می شود و به عنوان یك سازمان غیر سیاسی ثبت شده است. همزمان با گسترش فعالیت هاینایاک در سال های اخیر، انتقادات به فعالیت این مجموعه نیز افزایش یافته است. این انتقادات که عمدتاً از جانب سازمان های یهودی...



در جدی ترین این تلاش ها، نشریه نیوکان فرانتپیج ضمن ارائه تصویری خیانتبارانه از نایاك، این سازمان را عامل جمهوری اسلامی معرفی کرده و اهداف آن را تلقین وضعیه سازی یك AIPAC ایرانی در آمریکا، ارائه تصویری شهروندیه از ایابی خود، ممانعت و اشكال تراشی در فعالیت های اپوزیسیون ایرانی در آمریكا، نفوذ در سیستم سیاسی ایالات متحده، تابوشكنی در همكاری با ایران در بین ایرانیان مهاجر و ارائه تصویر بهتر از دولت ایران در خارج ذكر كرده است. این نشریه، حمایت فرامرز فتح نژاد سابق، دفتر حمایت منافع ایران در آمریكا و عضویت تعدادی از اعضای آن را برخی شركت های تجاری ایرانی را به عنوان مدركی بر ادعاهای خود ذكر كرده و نایاك را به تجزیه از منابع نفتی ایران متهم كرده است.

این ارگان توصافقله كارانه، با اشاره به كمك جنبش لابیست آمریکایی - یاپی نی (نماینده سابق كنگره از اوكلاهما)، روی كافی و دیو دك استوانه - و با استناد به پرونده ای كه برای یاپ نی در مورد ارتباط با یك دلال سوری اسلحه در لندن تشكیل شده است، به صورت ضمنی نایاك را سازمانی در چارچوب تلاش های ایران برای انقلاب اسلامی توصیف می كند.

این نشریه همچنین اعضای نایاك را متهم كرده است كه با پرروای از دستوران تهران بیتابه ایجاد گروهی رقیب در مقابل AIPAC , IAPAC - شورای اقدام سیاسی ایرانی آمریکایی - را تشكیل داده اند.

از اتهامات دیگری كه بر نایاك وارد شده است، تلاش برای لغو و جلوگیری از تمدید ILSA - قانون تحریم ایران و لیبی - است. گزارش مذكور مدعی است نوتبا پارسی به عنوان رابط اصلی جمهوری اسلامی در تهران فاشتنی و خانفی و با همكاری وزارت اطلاعات و فرهنگ و ارشاد اسلامی، سیاست های نظامرا به این گروه منتقل می كرده است.

این ارگان توصافقله كار سینه گرد می كند "گر دهه 90 ایران در پی ایجاد سیستم لابی كرده گسترده ای در ایابات متحده بوده است. دولت ایران منابع مالی و انسانی فراوانی را برای رسیدن به این هدف تخصیص داده است. این لابی مشكل از شبكه ای پیچیده از افراد و سازمان های هموشان با كادر رهبری آن است كه با دولت ایران، ارتباطی مالیامنی دارند."





IIC Index
http://web.archive.org/web/20020401003101/http://www.iic.org/
Screen clipping taken: 5/7/2008, 7:48 AM

# Frequent Asked Questions

**Q: *How long has IIC existed?***

A: IIC was founded in August 1997 by Trita Parsi, the curent President. While conducting research on Iran for US Congressmen in Washington DC in 1997, he recognized the necessity of establishing a lobbying organization in order to protect the socio-economic and political aspirations of the Iranian people on one hand, and to promote the historical and contemporary cultural and scientific contributions of people of Iranian heritage worldwide, on the other. This consequently led, in collaboration with a large number of intellectuals and experts, to the formation of Iranians for International Cooperation (IIC).

**Q: *What is IIC? Is it a political party or a lobby organization?***

A: IIC is not a political party or even a political organization. We consider ourselves a lobby organization; we use our constitutional rights to influence our elected representatives. But we have no ambition to run for public office! We simply do not consider ourselves an alternative to the regime or to the opposition.

**Q: *But if IIC is a lobby organization, doesn't it become political if it supports politicians?***

A: IIC doesn't support any politicians, political groups or movements! We support ideas, objectives and reforms. And as a non-political group, we don't make politics out of this: If someone presents an idea or, in our opinion, genuinely strives to push for reforms which we agree with, we will support that move-- regardless if the person in question is a former communist, mullah or monarchist. We support the idea or the reform, not the person/group behind it.

**Q: *What does IIC aim to do? Do we really need an Iranian lobby?***

A: Our main objective is to safeguard Iran's and Iranian's interests. Currently, our agenda is topped by the removal of US economic and political sanctions against Iran, and the commencement of an Iran-US dialogue.

Iranians constitute one of the most productive and highly educated ethnic groups in the US. Yet, we are a very small voice in US politics. We simply do not participate in the political processes in this great democracy, and if we do not participate we cannot expect to have our voice heard. Many of the problems Iranians face in the US, and much of the enmity between the US and Iran, could either have been terminated or reduced had we attempted to constitute a political force in the US. For instance, had there been an organized Iranian opposition to the proposed US sanctions back in 1995, chances are that the sanctions either wouldn't have been enacted or that they would have been enacted in a much more lenient form. Now, we missed that train, but we still have the opportunity and the responsibility to help our people out of this situation and to make sure that we never get in such a precarious situation again. Of course a non-political Iranian lobby is needed!

**Q: *Why should we oppose US sanctions and what would an US-Iran dialogue do?***

A: There are several reasons why we should oppose US sanctions:

1. The sanctions do not hit the regime, they hit the people-- our relatives back in Iran-- and make their already hard life even more difficult to endure.

2.    Economic hardship will not lead to any political change in Iran. On the contrary, history has shown us that for the emergence of democracy, a strong middle class is needed. US sanctions effectively prohibit the emergence of a strong middle class-- and thus the emergence of democracy... To make the above point even clearer: Has economic sanctions brought democracy or even change to Libya, Iraq, or North Korea? No, but it has caused widespread starvation. And if we don't act now, we may soon face the same fate as the Iraqi people.

3.    As a result of the US sanctions, we see how our bright students get discriminated against in the US. For instance, with Iranian addresses one can not sign up to give the TOEFL and many other exams. Thus, US sanctions prohibit Iranians' access to the best universities in the world.

4.    Due to the US sanctions, the US opposes Central Asian gas pipelines to reach the Persian Gulf through Iran-- the shortest and cheapest way. The hard currency Iran would make on such pipelines is insignificant. However, the geopolitical and strategic importance Iran would gain by having these pipelines pass its territory are immense, not only for now but for the next 50 to 70 years. Thus, the US sanctions do not only aim to impoverish the Iranian people, but also to weaken the Iranian nation for the next half century-- regardless of what regime reigns in Tehran, be it democratic or theocratic.

5.    Now that we are seeing tremendous change in Iran, US aggression against Iran will be counterproductive. The Iranian people voted for President Khatami to get a more open society. If the sanctions succeed in crippling Iran, we will get the exact opposite: A more closed society where conservative forces' struggle to turn the clock back will be facilitated. We have the power and the responsibility to make sure this does not occur. From the American perspective, US sanctions are not only an excessively costly policy, but undermine US interests in the Middle East, one of the most strategically important regions in the world.

Regarding an US-Iran dialogue, this is simply the only way to put an end to the now 20 year old enmity between these two great nations. Just as the US has urged all of its allies to use dialogue and not violence in order to solve disputes and conflicts, dialogue should be the mean used to solve the disagreements between Iran and the US. Furthermore, just the resumption of talks will mean that half the battle has been won-- Iran will be one step closer to break out of its political and economic isolation.

**Q: How does IIC work?**
**A:**We work by informing our representatives of our opinions on these issue. We petition Congress and the EU Parliament, we meet with politicians, we send editorials to major newspapers, we promote tourism to Iran, we promote sports and cultural exchanges, we fight against discrimination facing Iranians in the US etc. etc.

**Q: What is required of IIC members?**
**A:**Participation is fully voluntarily, although it is preferred that members assist with drafting letters, meet with lawmakers, vote on important issues, participate in debates etc. etc. Everyone participates according to one's abilities.

**Q: How is IIC organized?**
**A:**IIC is lead by the Board of Directors. Our activities are coordinated through our three mailing lists, in which all members can participate.

**Q: What is required to become a member of IIC?**
**A:**To become a member, all you must do is to agree with our charter which you can find on our website. By submitting our online **form** , you sign that you agree with our charter and the processing of your membership request has begun.

**Q: Should I become a member of IIC?**
**A:**If you love Iran, if you wish to see friendly ties between Iran and all nations of the world, if you wish to see a prosperous Iran, and if you wish to make all of the above come true, the answer is very simple:

# Of course you should join IIC!

If you have any other questions, please do not hesitate to contact IIC President Trita Parsi.
Return to IIC Home Page
Pasted from <http://web.archive.org/web/20020605145053/iic.org/html/faq.html>

EXHIBIT

14

# Iran-Americans: The bridge between two nations

**Siamak Namazi & Trita Parsi**

**Paper Presented to DAPIA Conference
Cyprus, November 1999**

> *In general, immigration has throughout history played a big role in joining, founding, growing and expanding civilizations. Immigration is a very valuable human development and one should not look at this development in a derogatory manner...*
>
>                         - President Mohammad Khatami, during his September 1998
>                           address to Iranians abroad in New York

## Introduction

Twenty years ago a group of radical Iranian students stormed the American Embassy and took over the compound. That event, which was the start of the 444 day hostage crisis, was arguably what made many Americans realize that there is an Iran – or at least an "Eye-Ran" – on the world map.

Prior to the hostage crisis, it may have been harder to explain to the average Joe American where Iran was. It would often take a game of name associations to provoke any sort of recognition of the Iranian nation. Ask any Iranian who lived or visited the US back then, and they will readily reveal the list of magic terms that may have had an impact: oil, the Shah, carpets, caviar, Persia, fluffy cats, etc. While the hostage taking may have finally made "Iran" a household name in Anywhere, America, the image that was conjured was far from an desirable or constructive. The new magic vocabulary now included: terrorists, Ayatollah, hostage takers, and the like.

The aim here is not to poke fun at the American ignorance of Iran. The record is not much better on the Iranian side. Perhaps Hollywood has been able to give some more information about the American people and the way the American systems works to a nation such as Iran, but often an Iranian's knowledge of the US is as sophisticated as a Hollywood thriller. Add to that the effects of various political tirades, such as the regular Friday prayer sermon, combined with Madonna clips from MTV, and the level of distortion becomes clearer.

Having said that, the Iranian revolution did have a tremendous impact on raising the understanding between the Iranian and American nations, albeit unintentionally. The emigration of Iranians has generated a substantial, if often unnoticed wealth for both nations: a large group of people who have a good understanding of the two countries.

Iranian-Americans have had an irreversible impact on the people of Iran and America already. They continue to grow in importance as the bridge between two civilizations during troubled times. Today, there is a good chance that if Joe American is young, his first affiliation to the word "Iran" will not be the hostage crisis, Ayatollahs or the Shah. He may very well tell you that he has or had and Iranian-American school mate, co-worker, or neighbor. A similar process is seen on the Iranian side. Iranian-Americans who return to their motherland to visit often report of all the silly notions of America their cousins back home had – silly notions they helped dispel. At a time when few Americans have been able to travel to Iran, it has been the Iranian-Americans who fulfilled the role of cultural ambassadors to Iran. Given their knowledge of both cultures, they are perhaps best suited for this position.

The following paper is dedicated to discussing the role of Iranian-Americans as a formidable force in mending the differences and misperceptions between Iran and the United States. It will be argued that this group has not fulfilled its full potential as a bridge between the said nations for a number of reasons. We will further show that a number of factors are making Iranian-Americans increasingly active as a positive force in reconciling the two civilizations they belong to. A discussion of the potentials of this group that are yet to be fully realized and appreciated is complimented by recommended actions that would help in better developing and harnessing this group's positive role.

## About Iranians in America

Presenting accurate demographic information on Iranians abroad in general is a challenging task. There is a huge discrepancy among the various studies done on this, with various reasons.

For example, the US Census estimates Iranian-Americans to be just over 300 thousand, while folklore estimates widespread among the group itself go up to 4 million and sometimes beyond. In the case of the Census, an issue of definition comes to mind, beyond possible flaws in survey methodology: Who is an Iranian-American? Iran considers nationality to pass by blood[1]. Thus, a child born of at least one Iranian parent in America is considered Iranian by Iran, and American by the United States. Estimates on the high end are also most probably very far from reality. They are based on pure word of mouth figures, and are sometimes exaggerated with ulterior purpose. For example, a number of opposition groups used inflated figures for the number of Iranians who left the country to make the point that the Iranian population is fleeing the clerical establishment. On the other side of the scale, Iranians abroad themselves sometimes use the higher estimates to say that they are representative of a more powerful group in a democratic society where numbers of potential votes matter greatly.

The government of Iran estimates the number of Iranian expatriates at close to 3 million[2]. According to the same source, this population is spread in over 50 countries, but is more concentrated in 20 of them. The predominant majority of Iranians abroad left after the 1979 Revolution.

More specifically, in the case of Iranians in the US, the estimates that the authors feel are most reliable are those calculated by the Iranian Interest Section in Washington, DC. It is that body that has been issuing passports and other official documents for the Iranians in the US, and in terms of sampling has had more access than any other organization to data. Faramarz Fathnezhad, who up to very recently headed the Iranian interest section in Washington for over a decade, was interviewed in Tehran by one of the authors. According to that source, there has been an ongoing study to come up with accurate demographic information for years now. Fathnezhad claims that there are over 200,000 files in the DC interest section. It should be noted that the section maintains one file per family, and so the above number is not of individuals. The estimated average family size for the said files is 3 persons. That means that there are at least 600,000 thousands Iranians residing in the United States.

---

[1] One can obtain Iranian nationality by being born of an Iranian parent or by marrying an Iranian.

[2] Estimates from the Office for Cultural Affairs of Iranians Abroad, Ministry of Culture & Islamic Guidance, Tehran, Iran.

But even these numbers underestimate reality. As Fathnezhad pointed out, not all Iranians in the US have referred to the interest section. Using a trend analysis based on the number of people who have come for the first time, the former head of Iran's interest section in the US believes that there are close to 800,000 Iranians in that country. Adding second generation Americans of Iranian decent, he believes the number could reach up to 1 million.

While no studies were found with exact information on the demographic spread of Iranians in the United States, it is known that the majority of this group is clustered in southern California (Los Angeles, San Diego and Orange County in particular). Other cluster areas include New York, the District of Columbia, Austin and Houston. It is also known that on average, Iranians abroad are more educated and wealthier than the society where they have immigrated.

### The Early Years

Above we describe a very well educated and wealthy immigrant group that is close to a million strong. The immediate question that comes to mind is why such a group is not very visible in the American political landscape? Two trends in particular may help unravel this mystery.

First, it took years for Iranians to accept that they had immigrated to the United States. Most Iranians who left the country after the revolution simply did not believe, at least initially, that this migration was a permanent one. For years many thought that after some time, as the era of revolutionary fervor goes by, they would return to Iran. As such, they treated their host society as a temporary setting and did not start looking at America as permanent home until much later.

Second, a good portion of the Iranians who had left their motherland were not on good terms with the Islamic Republic. Among the very first groups that parted Iran, in fact, were those who had some sort of strong affiliation with the ancien regime or were involved in the active opposition to the current establishment during the early revolutionary period. Others left because they could not tolerate the social, political or cultural atmosphere of the country after the revolution. Yet another group departed Iran because of the war conditions after the Iraqi invasion that resulted in an 8-year war. The point is, the said group was not about to form a lobby group that would benefit the establishment in Tehran, or benefit the Iranian-Americans themselves as a community, nor was it for the most part interested in forming a pressure group against the Islamic Republic.

Nonetheless, we now see a changing pattern whereby Iranian-Americans are becoming increasingly involved and heard in American politics.

### The Politicization Process

Immigration is difficult. Like any new emigrant group, Iranians in the United States needed some time to adjust to their new surroundings, to adapt to a new language and system, to get over a sense of loneliness and estrangement, and to basically build a new home in a foreign land. Thus, with time we see this group get increasingly involved in America's Main Street

politics, particularly the new generation that actually grew up in the US and is fully adapted to that environment.

Three sets of factors in particular acted as a catalyst in making Iranians in America more active in political affairs, a process that is currently gaining in speed and momentum.

The first of these can be broadly lumped into a **"Natural Factors"** category, basically factors that change with the passage of time. This point has been touched on already, but deserves more attention. It took close to twenty years after the first large exodus from Iran – i.e., following the Revolution – for may Iranians abroad to finally accept that they are not in transit awaiting return to their homeland. With time, they began to accept that they are indeed an immigrant population concerned with integrating and succeeding in their new setting. Maturing as an émigré group and learning the political ropes of their host country, Iranians abroad are slowly learning that they can influence policy. After all, two decades had past since they had come to the United States, and most are now naturalized citizens with the power to brandish their voting power in a democratic society. Perhaps more important than the large number of newly naturalized American citizens is the new generation of Iranians born and raised in the United States. Arguably, this new generation of Iranians abroad does not harbor the barriers that handicapped their parents. Unlike their parents, they are not immigrants and do not carry the same emotional burdens that stand in the way of fully adapting to a new country and culture. They have a much better understanding of America than their parents did.

The second broad category revolves around an **"Increase in Communications"** as follows:

a)  *Increased communications between Iranian-Americans and the IRI.*
When discussing Iran after the revolution, historians often refer to a radical period of revolutionary zeal. This zeal and radicalism was in no way limited to the way the Islamic Republic was in its policy towards foreign states. In the words of one government official:

> *The turbulent and crisis-filled years that immediately followed the success of the revolution is regarded as one of the exceptional periods in contemporary world history. Exceptional for several reasons: First of all, the very occurrence of a revolution in the end of the twentieth century is remarkable in itself – and indicative of the depth and magnitude of the cultural, economic and political rift in a society, such that it lead to explosion in this way as a means to reform and balance. Second, until eight years after this event, and during a period when the economic, social and political foundations of the country were influenced by this change, a foreign element, that is a massive military attack, threatened the survival of the nation and the existence of the country. In such exceptional circumstances, there was no opportunity left for attending to anything but defending the territorial integrity and existence of the country. In this complicated situation, which influenced all other matters, naturally there was no opportunity for instituting proper policies that are correct and desirable in relation to Iranians abroad[3].*

---

[3] This is an excerpt from a letter written by Seyyed Mohamad Reza Darbandi, Director General of the Cultural Affairs of Iranians Abroad, Ministry of Culture and Islamic Guidance, to Siamak Namazi in response to an article Namazi had written in CIRA Bulletin criticizing the Iranian government's policy towards its expatriate population.

Regardless of the reasons, relations between the government in Tehran and Iranian expatriates were extremely bad, if not outright hostile in the early periods of post-revolutionary Iran. Iranians abroad were often treated as either traitors affiliated with the Shah's regime or cowards who fled the Iran-Iraq war. An atmosphere of fear and mistrust was created between Iranians abroad and the rulers of their motherland.

However, revolutions mature and so do their policies. Over time, especially after the end of the war with Iraq, as Iran stepped into its "reconstruction" era, there was a noticeable shift in Tehran's attitude and behavior towards its expatriate population. For the Iranian away from home, obtaining necessary paper work from Iran's interest sections and embassies throughout the world became much easier and less frightful of an experience. Under the government of former president Akbar Hashemi Rafsanjani, a number of new solutions allowed greater numbers of Iranians abroad to return to Iran to visit after years of exile. These include a *de facto* acceptance of dual nationality[4], and a provision that allowed expatriate men to buy their national service instead of serving in the armed forces for two years at a price tag of $16,600.

Things have been changing even more during the administration of Mohammad Khatami. For example, Iranians abroad would often have to pay close to $600 to obtain an Iranian passport. It was in 1998 when this absurd practice was changed and the price for an Iranian passport became $48. Moreover, a temporary waiver from the national service has been extended for any Iranian man abroad. Under this new regulation, one can go to Iran and return to his country of residence within 3-months, once per year, without worrying about being subject to the draft laws.

But Khatami's charm offensive against the Iranian expatriate population did not end there. He dedicated a full morning of his time during his landmark visit to New York on occasion of the United Nation's General Assembly session in September 1997 to addressing some 800 Iranian expatriates. One of the more impressive features of this session was the question and answer period which followed the president's speech: the event was broadcast live over the Internet and Iranian expatriates from all around the world were given the opportunity to email in questions and comments live.

Two offices in Tehran are now dedicated to dealing with matters related to Iranians abroad: one in the foreign ministry and the other in the ministry of culture and Islamic guidance. Talking to the officials within these establishments one clearly gets a sense of the new attitude Tehran displays towards its expatriate population. "The policy of the Iranian government is that an Iranian, no matter where s/he is, is Iranian and possesses all the rights of an Iranian citizen," affirms Mr. Mousavi, head of the office of expatriate affairs at the foreign ministry[5]. Mousavi continues to add that this has always been the government's policy, "though perhaps this has not always been reflected in actions by the government's representatives." He admits that over the past three years in particular there is a notable difference in the way Tehran treats its expatriates. Apparently, the government has launched a training program to ensure that its embassies and interest sections have positive dealings with Iranians abroad.

---

[4] Iran does not recognize dual nationality. An Iranian citizen is considered Iranian unless that citizen sets forth a very complicated motion to revoke his or her nationality, something that is in reality not possible. In recent years, given the shear number of Iranians with two passports, the government has adopted a blind-eye policy, though legally dual nationality is still not recognized as valid.

[5] Interview with Siamak Namazi, November 1999.

The comments by the highest official in the Iranian political system prove just how serious Tehran is in respect to this new drive. During a meeting with various Iranian ambassadors to Europe, Supreme Leader Ayatollah Ali Khamenei instructs:

> *You must show the necessary sensitivities in regards to Iranians abroad. You must think and plan in this regards. Do not concern yourselves with whether or not the individual is revolutionary or not, it makes no difference, s/he is Iranian. In your field of work, whenever you see an Iranian has a problem, employ your best efforts in resolving his/her problem.*

While the evolution of the Islamic Republic's attitude and actions towards Iranians abroad has many more intricacies that deserve due attention, the focus of this paper does not allow for that discussion. Regardless, what is important here is the net result of Tehran's charm offensive and improving political image: more and more Iranian-American have been going back to Iran to visit. Increasingly, we see young Iranians who left their motherland at an early age, or were even born in the United States, return to Iran for a rather long period to rediscover their roots and better understand the country and its people.

The impact of the travel back and forth during a time when few other Americans spend time in Iran should not be underestimated. Iranian-Americans are the only real cultural ambassadors that the two nations currently have. They are the ones that answer the complicated questions Iranian people have about the Americans and the Americans have about the Iranians. They are the ones that throughout the years have been quietly bridging the two civilizations.

Moreover, with increasing numbers of Iranian-Americans traveling to Iran, and learning more about the new realities in their motherland, they have shown a greater tendency for engaging in the debate regarding Iran-US relations. Certainly the general euphoria over the recent reform movement in Iran has had a tremendous impact on this process as well.

**b)  *Increased communications between Iranian-Americans and the USG***
The Iranians expatriates' improved political standing is not limited to Tehran. Slowly we are witnessing a strong will from Capitol Hill to hear the views of the Iranian-American community. During the past two decades, the only organized Iranian lobbying efforts have been those of Mujahedin Khalq Organization (MKO), a militant opposition group that the State Department has now recognized as terrorists. Due to the lack of Iranian-Americans' participation and engagement in these processes, many Congressmen have been under the impression that this organization, despite its terrorist listing, was the true representative of the Iranian-American community at times the entire Iranian nation. Certainly increased political participation by Iranian-Americans in a democracy such as the United States could do a lot in the way of ostracizing the MKO; in other words, the MKO capitalized from the fact that up until recently Iranian-Americans were not interested in playing Capital Hill's political game.

Nonetheless, with the recent developments in Iran, an increasing number of Senators and House representatives have become aware of the possibilities of a thaw with Iran and the dissatisfaction of Iranian-Americans with past US policies towards Iran. For instance, quite a few Congressmen have declared their willingness to travel to Tehran and hold talks with the clergy. Yet, mindful of the political strength of anti-Iranian forces in Congress, they feel that they need stronger support from the Iranian-American community, not only as a political

force and ally, but also as an expert group with unique knowledge about Iran, its customs and cultural traits. Unfortunately, Congressmen are not in the habit of initiating contacts with unorganized and timid communities, and Iranian-Americans are not in the habit of contacting their political representatives.

Iranian-Americans' participation in the Iran debate would be highly welcomed by Capitol Hill and Iranian-Americans should capitalize on this unique opportunity to declare their views and preferences. It should be added that there have been some success stories already. For example, prior to the recent listing of the MKO and all its affiliate organizations on the terrorist list, a group of Iranian-Americans had initiated a petition calling for such an act. The petition gathered several hundred signatures in a couple of weeks. Senator Boxer also got a taste of the recent upsurge in the political activity of Iranian-Americans after her offices was flooded with emails, calls and letters following an insensitive comment regarding Iranians.

We can only expect such a trend to grow exponentially at this point and for Iranians in the United States to claim a larger share of that country's mainstream politics. A good manifestation of this pattern is that at least one Iranian-American in running for the next Senate[6] and another for the House[7].

### c) Public Choice & the Politicization of Iranian-Americans

It should also be recognized that the new approach to the Persian Gulf region taken by the Clinton Administration might have caused Iranian-Americans to ascend from their anti-political position. The Clinton Administration has conducted a very tough and at times anti-Iranian policy, increasing rather than decreasing tensions with Iran. Whereas President Bush had been somewhat successful in his dealings with the Iranians, resulting in the release of all American hostages taken by the Hezbollah in Lebanon, through the promise of "Goodwill begets Goodwill", Clinton and his Advisor Martin Indyk chose the path of confrontation and economic sanctions.

The level of aggressive rhetoric between the nations reached top levels, with the State department's vocabulary on Iran being dominated by the terms "pariah", "outlaw", "rouge" and "evil terrorist nation". Former State Department spokesperson Nicholas Burns even referred to Iran as a "perverted place" during a press conference. After a few years of relative calm, Iranian-Americans found themselves on square one: Iranians and Iran were once again pointed out as America's number one enemy and the most evil nation of the world. Those thinking that with the passing away of Ayatollah Khomeini, being Iranian in the US would become a less arduous task were proven wrong.

With the imposition of sanctions things got worse. In 1991, Iran-US trade stood as high as $760 billion, with imports from Iran constituting one third of the trade. Two years later, imports from Iran had decreased to $0.2 billion, while exports to Iran had increased slightly. With Executive orders 12957 and 12959, Iran-US trade was entirely wiped out. This affected many Iranian-Americans who were engaged in the trade between the two nations.

---

[6] Sohrab (Rob) Sobhani.

[7] Maziar Mafi.

Traveling was also made more difficult due to the sanctions, as the Immigration and Naturalization Services' (INS) procedures were toughened. Iranian residing in America were subject to being fingerprinted and have their luggage frisked upon returning from a trip to London, Buenos Aires or Mexico City. Needless to say, many Iranian-Americans felt humiliated and discriminated by the new procedures which affected some of their friends who where not naturalized yet, or their visiting relatives, including respected elderly, arguing that their own government was treating them as terrorists due to their Iranian ancestry. The imposition of sanctions on Iran and the increased level of confrontation between the US and Iran made many Iranian-Americans cognizant of the fact that in the eyes of US law, often no distinction was made between Iranians and the Iranian regime.[8]

Political economists Kaempfer and Lowenberg have studied the creation and activities of interest groups from a public choice perspective. They argue that the ability of individuals to group together for purposes of collective action is determined by the degree to which these groups can overcome free-riding incentives, i.e., there is a threshold. In this context, one could argue that while the emergence of Khatami and the reformist alternative increased incentives for collective action, US sanctions and the hostile position taken by the US government vis-à-vis Iran and Iranian-Americans lowered the threshold.

## Iranian-Americans & the Internet

Another phenomenon, that may not have *caused* Iranian-Americans to get vocal, but certainly has helped in this regard, is the Internet. This innovation has put millions of Iranian-Americans and Iranians in contact with each other and the non-personal and often "identity-less" nature of the Internet has challenged some of the Iranian-American culture's semi-taboo.

For instance, to be labeled "*siyaasi*" (political) may have devastating effects on an Iranian-American's social life and well being. As the political history of Iran has not always been peaceful and characterized as amicable and consensus seeking, Iranians and Iranian-Americans may have bitter memories of politics in general, and political debates in particular. Agreeing to disagree is a concept that has not rooted all to well in the Iranian culture.

Nevertheless, with the Internet, topics that previously were repressed found a way to be aired. The often politically disillusioned Iranian-Americans now tend to discuss politics more than anything else at forums such as soc.culture.iranian. In this sense, the Internet has provided the Iranian-American community with a forum in which they can discuss issues such as their own role in the American society, the importance of their ties with Iran, their feelings regarding the developments in Iran, how they can play a role in the future of Iran, etc., without being ostracized by their peers.

However, the Internet has done much more than just providing the Iranian-American community with a non-personal discussion forum. Due to the spread of the Internet in Iran, Iranian-Americans can today enjoy much closer ties with friends and relatives in their motherland.

Furthermore, the Internet has enabled people outside Iran to get a better understanding of what is going on in the country. News on what is happening in Iran is now easily available on the Internet. This has been no small help in keeping the Iranian-American community politically aware. In addition, the feelings and views of the people in Iran are far better understood now than before, as they can express them themselves directly via the Internet.

This last point should not be underestimated. It goes to underscore the importance of breaking Iran out of its isolation in order to facilitate the democratization process of the country. During the recent demonstrations in Iran, the Internet arguably played a more important role than mainstream media in portraying the student's side of the story, as few Western journalists reported directly from Tehran. The students broadcasted their eyewitness accounts, *with scanned pictures*, directly on the Net, enabling millions of Iranians outside Iran to get a clear picture of what was going on. Forums such as the soc.culture.Iranian and the on-line "webzine", *The Iranian* (www.iranian.com) – and its associated mailing list, *The Iranian Times* – helped distribute these accounts and very soon, websites were set up in which pictures and stories of local Tehrani's were published. The fact that many journalists browse these newsgroups and websites in order to find a scoop stresses the significance of the Internet.

The direct contacts between Iranian-Americans and Iranians in Iran via the Internet have also had some other consequences. The needs, views and thoughts of the people on "the other side" is better understood and communicated without any censorship. Outsiders can today better grasp the *choices* and *alternatives* of the Iranians in Iran. As such, Iranians abroad now have a better ability to monitor what their counterparts back home feel about various issues. This is an important point. One of the psychological factors that stymied the politicization of expatriate community was a fear that their actions would not reflect the wants and needs of the Iranian people. In that sense, the ability to communicate directly and without censor, even in a limited way, does a lot in raising an Iranian-American activist's confidence and "mandate."

The Internet has played an even more important role: it has put active Iranian-Americans in touch by providing them with a forum to "meet," educate, and exchange ideas with another. In fact, the "virtual" Iranian-American community is the most politically active. We have already alluded to the petition to blacklist the MKO and the objection to Senator Baxton's comments, both of which were disseminated via the Internet. But things reach far beyond that and there are numerous activist organizations that owe their nascence and management ability to cyber space. Perhaps one of the best examples is Iranians for International Cooperation (IIC),[9] a US and Web-based advocacy group pursuing improved relations between Iran and the US and the lifting of American sanctions on Iran. Most of IIC's 800 members learned of this organization on-line. Moreover, IIC is able to coordinate the activities of its many chapters throughout the world using the Internet. The group further relies on the Internet to reach out to the media and to policy-makers in Washington.

The potential of the Internet for political advocacy is hard to assess, and any assessment will most likely fail to grasp the entire capacity of this innovation. Perhaps the 80-20 initiative of the Asian-American community goes to underscore this last point, as this group has succeeded in acquiring a membership of over 50,000 Asian-Americans in just a few months. The goal of the 80-20 initiative is similar to that of IIC – to organize its community via the Internet into a political force to be reckoned with.

---

[9] www.iic.org

## Conclusions & Actions

To recap, this paper has so far made the following assertions: Iranian-Americans are a formidable force in helping mend the bridge between Iran and the United States. However, this group role has not been utilized any where close to its potential, however, for several reasons: (1) The I-A's themselves did not accept that they had actually immigrated, up until very recently, and treated their new home like a temporary base (2) A good portion of them were against the IRI, therefore would not do anything to help.

Nonetheless, all that is changing. We see the Iranian-American community increasingly involved and heard in US political scene.

Like any new emigrant group, it takes time to adjust to the new surroundings and to learn the ropes of the host country. With time, as the Iranian immigrants stayed on in the United States, and a new generation actually grew up under the American system, we see this group get increasingly involved in political matters.

Several factors helped this process along, acting as catalysts expediting the politicization process. These include increase in communications, both, between Iranian-Americans and Iran (the government and people), and also between Iranian-Americans and the US government. In addition, in line with the public choice studies by political economists Kaempfer and Lowenberg, the emergence of Khatami and the reformist alternative increased incentives for collective action, as did US sanctions and the hostile position taken by the US government vis-à-vis Iran and Iranian-Americans. Meanwhile, the Internet served as an ideal forum for the furthering this process.

It is important to underline a point here: the increased politicization of this group is to the benefit of both nations they belong to. It will facilitate the bridging of the differences of the two sides. For example, while Iranian-Americans use their influence in the United States to curb discriminatory and derogatory behavior towards Iranians, they also pressure the Iranian government on issues such as developing a freer, more democratic society.

With that in mind, it is appropriate to conclude this paper with a list of recommended actions that would help along this process:

### 1. *Seminars in lobbying for Iranian-American youth and intern opportunities in Washington DC.*
Despite having spent between 20-30 years in the United States, it is apparently still not a sufficiently long period for a community such as the Iranian-American to comprehend the function and role of lobbying at Capitol Hill. In the eyes of many Iranian-Americans, lobbying is not much different from nepotism or "*party-bazi*", and hardly a legitimate and democratic way of exerting influence.

While the new generation of Iranian-Americans has a greater understanding of the American political culture, they still have much to learn. It is import to further this group's understanding of the American political system and the concept of lobbying. The question is how? We suggest that there is no need to re-invent the wheel and that there is much to be learned from the best in the business.

Every year, thousands of college and university students flock to Washington DC to intern at different policy institutions, from the White House, to Capitol Hill, to lobby groups, to CSIS and other actors in the political field.

Established communities such as that of the Jewish-Americans have taken advantage of these floods of future American leaders and politicians. The American Israeli Public Affairs Committee (AIPAC), one of the most powerful lobbies in the US[10], does not only provide Jewish-American youth with numerous intern opportunities, it also facilitates internships for members at other institutions and uses the influx of young political talents to export its pro-Israeli views and values. Numerous seminars are organized by AIPAC for these students, with high-ranking speakers such as US Diplomat Dennis Ross and Congressman Gene Ackerman[11]. The topics of these speeches may vary between "the Middle East process" to "How to succeed as a Jew in a non-Jewish environment".

Most impressive and educational is AIPAC's "Youth Leadership Seminars," which are held annually and offered at highly subsidized rates. They train AIPAC members not only in essential public policy skills such as lobbying, monitoring and responding to the media, etc., but also use the forum to guide members in how to succeed in the American society at large. For example, a prominent Jewish-American teacher tells her fellows just how she got to her position, sharing her knowledge and foresight with the young members of AIPAC.

These seminars serve several purposes. First, it enables AIPAC to meet the best future minds of the Jewish-American community, of whom many may be hired by AIPAC later in their careers. Second, the bonds between the US and Israel, and between the Jewish American community and Israel is strengthened through these events. The students on the other hand get to network, learn more about the political mechanisms of the US, and strengthen their bonds to Israel and its future. In many of these seminars, the lobbying process and its importance is explained to the students, who often through role-play get to put their newly acquired lobbying skills to a test.

Creating similar types of seminars and intern opportunities to Iranian-American youth may not improve Iran-US relations in the short run, but it will help integrate the Iranian-American community into the political life of America. In the long run, a strong and active Iranian-American lobby, partly established through these seminars and by the participants of these programs, may serve to ensure that the US and Iran never find themselves in violent opposition to each other again. Arguably an Iranian-American lobby (which is different from a lobby group purely pursuing the interests of the Islamic Republic of Iran) is needed in order to create a balance between the competing Middle Eastern lobbies. Without it, Iran-bashing may become popular in Congress again.

## 2. *Increased awareness amongst Iranian-Americans and Americans about the effects of sanctions, both at home and in Iran.*

As with many other regimes with poor Human Rights records, concerned citizens in other nations, including Iranian-Americans, have often opted for the sanctions tool to voice their

---

[10] AIPAC was ranked second most influential interest group by Fortune Magazine both in 1997 and 1998. *FORTUNE Magazine*, November 23, 1998.

[11] Gene Ackerman is mostly known to the Iranian-American community for his undivided support to the Mujahedin.

opposition to the objectionable activities of the Iranian regime. Unfortunately, the general view on sanctions is that it is a "one size fit all" solution – that is, sanctions work essentially the same way in Yugoslavia, Cuba, Myanmar and Iran.

Naturally, things are not this simple. Economic sanctions operate by redistributing resources and influence between competing groups within the target nation, resources that are necessary for these groups to exert political influence. In order for sanctions to be effective, they must hit where it hurts, i.e. reduce the abilities of those advocating the objectionable policy while leaving other groups unaffected at a minimum. However, formulating sanctions with such precision is an arduous task, and more often than not, sanctions hit the target nations blindly and reduce the influence and resources of domestic forces working *against* the objectionable policy.

Whether sanctions can or cannot be effective is thus depending on how precise the sanctions can be constructed and the political situation in the target nation. Paradoxically, sanctions are more effective when imposed on other democracies, as these nations have functioning political systems that enables public opinion to influence policies and respond to demands from the international community. Sanctioning nations such as Iraq and Cuba, on the other hand, usually leaves the peoples of these nations in a worse situation while the political elite hardly is affected at all. Yet, sanctions are often utilized as they do give the impression that one is "doing something".

Iran's political system is of course not comparable to that of Iraq's. The problem with sanctioning Iran is that it is hard to see how increased hostility from the US can work to help the forces within Iran seeking improved relations with the international community, the rule of law and civil society. Most analysts agree that while conservative forces have been seeking to isolate Iran from within, the US's efforts to isolate Iran from the outside, via sanctions, have only worked to the benefit of these forces.

Yet, at a first glance, many Iranian-Americans may still believe that confrontation with the Iranian regime as a whole is positive, perhaps even necessary. Since one of the primary functions Iranian-Americans can play in improving relations between Iran and the US is to constitute a political force favoring a constructive approach vis-à-vis Iran, increased awareness regarding the counterproductive aspects of a confrontational sanctions policy is necessary.

**3. The taboo of working for a new approach on Iran must be further legitimized.**
The fear of coming across as a lackey of the Iranian regime is still prohibiting many Iranian-Americans from fully engaging in the debate on the future of Iran-US relations. There continues to be a wall of suspicion between the Iranian-American community and the regime in Iran – and vice versa – although many bricks have been knocked down during the past three years. While this process must continue, it is important to clarify that support for a *rational* approach to Iran is not the same thing as support for the regime in Iran.

In this sense, although the Iranian-American community must be utilized for improving relations between Iran and the US, it is essential that Americans of non-Iranian background also play a highly visible role in these efforts. The presence of these groups will further legitimize this process in the eyes of many Iranian-Americans and make them more inclined to participate in this process.



EXHIBIT

tabbies

15

سه شنبه ٢٨ شهریور ١٣٨٥ - **ملاقات با دکتر فرامرز فتح نژاد مسئول سابق دفتر حفاظت منافع ایران در آمریکا**

روز یکشنبه مورخه ٢٦ / ٦ / ١٣٨٥ ساعت ٣٠ : ١٧ آقای دکتر سید احمد شمس دبیر کل انجمن دوستداران ایران با آقای دکتر فرامرز فتح نژاد مسئول سابق دفتر حفاظت منافع ایران در آمریکا که هم اکنون ریاست دانشگاه مجازی دانشگاه آزاد اسلامی را بر عهده دارد، دیدار و گفتگو کرد.

در ابتدای این ملاقات دکتر شمس توضیحاتی در مورد انجمن و شرح وظایف ، هم چنین اقداماتی را که تا کنون انجام داده است بیان نمود و در ادامه آقای دکتر فتح نژاد ضمن تقدیر از فعالیت های صورت گرفته از سوی انجمن دوستداران ایران اظهار داشت: بایستی در جذب نخبگان و چهره های برجسته علمی کشور تلاش شود تا از پتانسیل و توانمندیهای آنان استفاده گردد و در این خصوص اصراری بر اقامت و بازگشت آنان به کشور صورت نگیرد چرا که گاه با حضور آنها در دیگر کشورها امکان خدمت رسانی به ایران بیشتر وجود دارد، وی حفظ تماس و برقراری ارتباط با ایرانیان مقیم خارج از کشور را امری ضروری شمرد و بر تداوم آن تاکید کرد.

وی افزود : برگزاری تورهای داخل کشور برای ایرانیان نسل سومی که هنوز کشور را ندیده و با آن نزدیک آشنا نیستند از دیگر مواردی است که در برنامه ریزی های ما قرار دارد .

در ادامه آقای دکتر فتح نژاد علاوه بر جامعه ایرانیان ، در ارتباط با تشکل های ایرانیان خارج از کشور نیز تاکید نمود و با اشاره به موفقیت های برخی از آنان از جمله انجمن نایاک (NIAK) اشاره نمود که جوان ایرانی بنام تریتا پارسی که مشاور مطبوعاتی (CNN) می باشد ، مسئولیت آن را برعهده دارد و موفق به جذب ٢ 0 0 / ٠ عضو ایرانی گردید تا در جریان توطئه تغیر نام خلیج فارس با پوشش خبری فراوان تاثیر گذار باشد.

آقای دکتر فتح نژاد بر تدوین قوانین مناسب مربوط به ایرانیان مقیم خارج از کشور توسط کمیته حقوقی کنسولی انجمن، رفع قوانین دست و پاگیر و تدوین مقررات سهل و آسان جهت رفع مشکلات ایرانیان خارج از کشور اشاره نمود .

وی گفت : انجمن دوستداران ایران بایستی به مشکلات حقوقی ایرانیان در خارج از کشور رسـیدگی کنـد. گاه دولت در ایـن زمینه تعلل می کند شما با به چالش کشیدن وزارت خارجه و سفارت خانه های ایران خواسـتار حـل مشـکل جـدی ایرانیـان مقیم خارج از کشور شوید و به عنوان نماینده آن ها مطالباتشان را به دولت تـذکر دهیـد، و در مواقـع ضـروری بـه خـانواده هـا یشان در داخل و خارج سرکشی کنید و از آن ها دلجوئی به عمل آورید.

رئیس دانشگاه مجازی دانشگاه آزاد خاطر نشان کرد : امروز مسئله ایرانیان مقیم خارج از کشور به یک مسـئله ملـی تبدیل شده است و خوشبختانه حساسیت موضوع را تمام مسئولان از هر سلیقه و جناح درک کرده اند.

در ادامه آقای شمس از دکتر فتح نژاد درخواست نمود مسئولیت کمیته امور بین الملل انجمن دوسـتداران ایـران را پذیرفتـه و همراه با تعدادی از اساتید دانشگاه و صاحب نظران آن را فعال نماید ، ارتباط با سازمان های بیـن المللـی ، ارتبـاط بـا تشـکل های ایرانیان مقیم خارج از کشور ، انجام پروژه های تحقیقاتی در مورد ایرانیان مقیم خارج از کـشور و علائـق آن هـا از جملـه وظائف کمیته امور بین الملل انجمن دوستداران ایران است که آقای دکتر فتح نژاد قول دادند به زودی در این خصوص نظر خود را اعلام نمایند.

احتیاج بات ایرانیان در سراسر سرطا ا اخبار در لمزه اطلاعاب ا ان ، دریافت حقوربامه بات ایرانیان  |  تماس با ما

Tel: +98 (21) 8898 6593 - 8898 6594, Fax: +98 (21) 8897 5734 E-Mail: webmaster@Topiranian.com



| About | Actions! | Projects | Join | News | Events | Reports | Home |
|-------|----------|----------|------|------|--------|---------|------|

### Iranian-American Eyes and Ears in the Corridors of Power

$ 50.00    **Donate**



#### *Washington Policy Watch*

The purpose of NIAC's Washington Policy Watch is threefold: to bring transparency to debates on issues affecting Iranian Americans, to allow of our community to react to and affect these debates at an early stage, and to give young Iranian Americans first-hand experience and exposure to the policy world in Washington, DC.

your email

◉ HTML  ○ Text

Join

The policy process "inside the beltway"—a common phrase in Washington—can be quite complicated. Ideas and solutions may float around in search of an appropriate problem, rather than the other way around. New policies can be formed months before they are picked up by the media, giving latecomers little opportunity to affect them. Policy speakers often speak one language within the protected circles of the policy world in Washington, and another in front of the cameras.



Policy seminars at think tanks, seldom covered by the press, can often give a taste of policies to come. Unfortunately, Iranian Americans have not had access to policy meetings and, as a result, have been unable to affect the formation of new policies at the crucial initial stages. Furthermore, the complexities of the issues, as well as the motives of key political actors, are unknown to the vast majority of Iranian Americans.

NIAC's Washington Policy Watch program aims first to bring transparency to debates on issues most important to Iranian Americans. Second, by covering policy conferences and hearings in Washington DC, NIAC allows Iranian Americans to react to, and influence policy at an early stage. Exposure to these debates and knowledge of the issues by our community makes it more difficult for policy makers to ignore the Iranian-American public.

By sending Iranian-American college and graduate students to cover these events, NIAC meets its third objective and provides our youth with first-hand exposure to Congressional hearings, think tank conferences and policy seminars. Early in their careers, our youth will be afforded practical knowledge and networking opportunities, which will serve them well in their future careers.

NIAC has covered all Congressional hearings and policy conferences in Washington DC that are of relevance to the interest of the Iranian American community since the Fall of 2002. Our published reports on these events are not only read by Iranian Americans, but also by

| **NIAC Testimonies** |
|---|
| Name: Marjan Ehsassi |
| How will NIAC serve the Iranian American Community? |
| *As the only non-partisan and non-sectarian organization representing Iranian-Americans, NIAC's position within the NGO community is as unique as its vision: to give a voice to the Iranian-American* |

members of the National Security Council, the US State Department, the Department of Defense, Congressional staffers, and members of foreign ministries overseas.

This program gives our Iranian-American interns the invaluable experience of not only attending these hearings and conferences, but also writing for a highly sophisticated audience. In turn, their hard work enhances our community's knowledge of the policy process and further strengthens our ability to affect the outcomes.

*community. Specifically, we will endeavor to coordinate, educate and motivate Iranian-Americans to take an active role in the American political and social agenda. Never before has an organization attempted to leverage the vast yet largely untapped resources of our community. Only with your support can we realize our mission, and only with your participation can America hear our voice.*



The National Iranian American Council is a non-profit, non-partisan, non-political and non-sectarian organization based in Washington DC



An Iranian American
Voice in Washington DC!

Home    Projects    Fellowship Program    NIAC Public Service and Journalism Fellowship Program

**NIAC Newsletter**

your email

○ HTML ○ Text

Subscribe

### Top Stories
↳ Background on Persepolis Artifact Case
↳ Slavin on Iran, Identity, and Influence
↳ The Impact of Electoral Trends on Iran's Security Policies
↳ Update: Is a New Congressional Resolution Declaring War with Iran?

### NIAC in the News
↳ NIAC in the News: Ahmadinejad Faces Intra-Party Challenge
↳ NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions
↳ NIAC photo essay in Iranian.com: Good people, good work
↳ What Do Google and Saddam Have in Common?
↳ NIAC in the News: Time for a fresh approach with Iran

### US-Iran News
↳ Slavin on Iran, Identity, and Influence
↳ Update: Is a New Congressional Resolution Declaring War with Iran?
↳ US Conference of Mayors to Consider Iran Resolution
↳ Set Reasonable Expectations but Talk to Iran, Committee Witnesses Argue
↳ Gallup poll confirms majority of Americans favor diplomacy with Iran

**NIAC Public Service and Journalism Fellowship Program**

Dec 12, 2007

## Jump-starting the Careers of Iranian-American Youth

### Application Deadline for the 2008 Fellowship is February 1, 2008!

NIAC is accepting applications for its fourth annual Public Service and Journalism Fellowship. The NPSJ fellowship is the first and only initiative designed to grant Iranian-American youth the opportunity to witness first-hand how democracy works in America. The program provides outstanding Iranian-American college students with internships in political and media organizations in Washington, DC through a paid fellowship.

**NIAC is currently accepting applications for the 2008 Summer Fellowship!**

NIAC will help place the 2008 NPSJ fellow in a Congressional office, to fulfill an internship during the months of June to August. The fellowship also includes travel to and from Washington, DC, housing for three months, and a stipend of $500 per month.

College juniors, seniors, and graduate students who are US citizens or legal permanent residents of Iranian descent are eligible to apply. Responsibilities of the fellow include attending committee hearings; working on special projects; researching legislation; general office duties; and other activities that promote first-hand knowledge of the American legislative process.

The selection process is highly competitive; applicants are judged on the basis of their academic credentials, demonstrated interest in community and public service, and the ability to fulfill the needs and expectations of the Congressional office they will be placed in. A background in public policy, political science, economics, international affairs, or journalism is preferred.

**Interested students should submit the following by February 1, 2008:**

- A completed application form
- Three letters of recommendation, two academic and one from an employment supervisor
- Resume
- Current college transcript
- 500-word essay addressing the following question: How

**Donate to NIAC!**

Enter Amount:

$ 50.00

Donate

**Join NIAC!**



**NIAC Factbook**



**Scholarships**
Iranian-American Scholarships



Case 1:08-cv-00705-JDB    Document 5-4    Filed 07/08/2008    Page 20 of 39

**US Iran Media**



NIAC Events

has being Iranian American influenced your decision to pursue a career in public service or journalism?

**Electronically submitted applications are strongly encouraged (email to Shabnam Sahandy).** Physical copies should be sent to:

NIAC
1411 K Street NW, Suite 600
Washington, DC 20005

**Click here for application and instructions.**

**Application deadline is February 1, 2008.** NIAC will select finalists, who will be asked to submit supplemental information to the Congressional office for a final decision. At the end of the fellowship, the fellow will be required to submit to NIAC a summary report on the internship experience.

### 

**Anti-Discrimination**



# SUPPORT NIAC'S PUBLIC SERVICE AND JOURNALISM FELLOWSHIP PROGRAM!

### INVEST IN OUR COMMON FUTURE – INVEST IN OUR YOUTH

**IraNexus**



NIAC's Public Service and Journalism Fellowship Program is the first and only initiative offering Iranian-American youth the invaluable opportunity to work in our nation's decision-making offices. National organizations of other ethnic groups have for years helped their youth access valuable career opportunities. Through its fellowship program, NIAC is proud to offer our community's youth the opportunities they deserve.

As Iranian Americans participate more fully in American civic life, it becomes all the more important for Iranian-American youth to be exposed to the institutions that can broaden their perspectives and networks, strengthen their resumes, and help them become more competitive in the US job market. For the institutions, the interns are a unique opportunity to connect to an important community. For the Iranian-American community, it is an investment in the future.

**SBA**



As a nonprofit organization, NIAC relies on your financial contributions to ensure these opportunities for our community. The estimated cost to secure and coordinate internships, review applications, and provide 9-12 weeks of housing, transportation, and a living stipend is $6,000 per fellow.

*Your tax-deductible financial contribution allows outstanding Iranian-American youth the opportunity to work at:*

**Irancensus**



- Congressional offices
- Agencies of the federal executive branch
- Mass media
- Think tanks

**Make a tax-deductible donation today!**

**Register to Vote!**



[ Back ]

© 2008 NIAC - National Iranian American Council
c/o 1411 K St NW Ste 600, Washington DC 20005
Tel: 202-386-6325 Fax: 202-386-6409



## A Pioneering Approach to Project Development in Iran's Energy Sector

| Home | About us | Our Approach | Services | Our Projects | Our Team | Our Clients | Code Of Conduct | Contact |

**Azar Energy Qeshm**
**Holding Company**
License to engage in energy sector
projects on Qeshm Island



With some of the largest reserves in the world, the oil
and gas industries in Iran offer unparalleled scope for
upstream and downstream activities in the early part
of
the 21st century.
Azar Energy Qeshm is the holding company of a
small
family of companies with a fresh approach to the
challenges of development and implementation of
upstream and downstream projects in Iran.



**Azar Energy Services Co.**
Mainland registered service
company active in the fields of
subcontracting activity to energy
sector entities, including advisory
and training service.

**Iran's Fact Sheet**
Reserves: 133.5 billion barrels - second la

**Subsidarise »**



**Qeshm Energy**
Joint Venture between Azar Energy
and the Qeshm Authority as
an executive arm for the Qeshm
Authority's gas-related projects
on Qeshm Island



© Azar Energy Qeshm



EXHIBIT

17

1 of 1

7/3/2008 4:50 PM



# Siamak Namazi

## From SourceWatch

**Siamak Namazi**, was a Reagan-Fascell Democracy Fellow from November 2005–February 2006 at the National Endowment for Democracy.

"Mr. Siamak Namazi is managing director of Atieh Bahar Consulting, Iran's premier private consulting firm, and serves on the editorial board of Iran Strategic Focus, a monthly publication that features news and analysis of political and economic developments in Iran. He has published numerous articles in major Middle Eastern journals, contributed chapters to several books, and has served as editor of Iran Quarterly Report, Iran Energy Focus, and Iran Focus. Mr. Namazi devoted his fellowship to a comparative study of different models of economic reform and their impact on political development, as well as the role of the private sector in promoting good governance." [1]

"Mr. Namazi comes to Atieh Bahar after several years with one of the leading Competitive Intelligence firms based out of the US. He has worked or studied in the United States, Iran, Egypt and Kenya. He holds a BA in International Relations from Tufts University and an MS in Planning from Rutgers University, where he studied under a Russell Fellowship. Furthermore, Mr. Namazi served a stint as a visiting scholar in the Center for Strategic & International Studies (CSIS) in Washington, DC. He is fluent in English and Persian." [2]

In 2005, he was a Public Policy Scholar at the Woodrow Wilson International Center for Scholars. [3]

He is also a founding member of the Canada-based NGO, the International Association of Iranian Managers. [4]

## Resources and articles

### Related Sourcewatch articles

- Ali Afshari

## References

1. ↑ Former Reagan-Fascell Democracy Fellow's (http://www.ned.org/forum/past.html) , NED, accessed July 24, 2007.
2. ↑ Management (http://www.atiehbahar.com/WhoWeAre/Management.htm) , Atieh Bahar Consulting, accessed July 24, 2007.
3. ↑ Iran After the Presidential Elections: Continuity or Change? (http://www.wilsoncenter.org/index.cfm?event_id=132234&fuseaction=events.event_summary) , Wilson Center, accessed July 24, 2007.
4. ↑ Young Global Leaders (http://www.younggloballeaders.org/scripts/Modules/Addresses/yglsearchAddress.aspx?srh=1&ddlYear=200 , Young Global Leaders, accessed July 24, 2007.

# Blogs that mention this article

- NIAC's Hadi Ghaemi and Dokhi Fassihian held (likely) NED-funded workshop in Tehran in 2004 (http://hoder.com/weblog/archives/017201.shtml)

*Source: Technorati (view all)*

Retrieved from "http://www.sourcewatch.org/index.php?title=Siamak_Namazi"

Category: Iran

- This page was last modified 23:52, 20 June 2008.
- This page has been accessed 904 times.
- Content is available under GNU Free Documentation License 1.2.

7/3/2008 4:53 PM





**Affiliated Companies**

Atieh Bahar is part of the Atieh Group of companies. Our two sister firms – Atieh Associates law firm, and Atieh Roshan human resources consulting – spun off from ABC in 2001. Both are recognized as the leaders in their respective field in the Iranian market.

ABC has also a close relationship with UK-based Menas Associates and has worked with them for close to a decade. ABC assists with the preparation of the monthly *Iran Strategic Focus* (ISF). As of October 2005, ISF merged two previous publications – Iran Energy Focus (IEF) and Iran Focus – which were also authored by Atieh Bahar Consulting's specialist staff.

(*"In the past few years a new news service provider using the name "Iran Focus" has been accessible through the internet. Menas Associates and its publication Iran Focus are in no way related to this news service. The editor of Menas' Iran Focus monthly disassociates his publication from all news carried by this news service provider. Menas Associates takes no responsibility for writings available on the service provider "Iran Focus".*)

Also, some of Atieh Bahar's shareholders have shares in Atieh Dade Pardaz (ADP), and Atieh Gostaran.





**Affiliated Companies**

Atieh Bahar is part of the Atieh Group of companies. Our two sister firms – Atieh Associates law firm, and Atieh Roshan human resources consulting – spun off from ABC in 2001. Both are recognized as the leaders in their respective field in the Iranian market.

ABC has also a close relationship with UK-based Menas Associates and has worked with them for close to a decade. ABC assists with the preparation of the monthly *Iran Strategic Focus (ISF)*. As of October 2005, ISF merged two previous publications – Iran Energy Focus (IEF) and Iran Focus – which were also authored by Atieh Bahar Consulting's specialist staff.

*(In the past few years, a new news service provider using the name "Iran Focus" has been accessible through the internet. Menas Associates and its publication Iran Focus are in no way related to this news service. The editor of Menas' Iran Focus monthly disassociates his publication from all news carried by this news service provider. Menas Associates takes no responsibility for writings available on the service provider "Iran Focus")*

Also, some of Atieh Bahar's shareholders have shares in Atieh Dafinah Partners (ADP) and Azar Energy.



Serving the energy industry across the Middle East



**Pipeline** MAGAZINE

HOME | NEWS | FEATURES | REGULARS | COMPANY FOCUS | MEDIA DETAILS | SUBSCRIBE | CONTACT US

## COMPANY FOCUS >> Iran

This articles was published in Pipeline Magazine (April 2005)

### Contracts worth billions to greet Iran's Norouz

*$Seven Billion Contract Deal with Kuwait and $One Billion MoA with Oman*



*Issue 99 April 2005*

Days before the celebration of Iran's New Year (Norouz), Iran entered into lucrative contracts with Kuwait and Oman, in two different deals.

Iran and Kuwait have signed a deal, which would bring Iran $Seven billion a year for a period of 25 years, said Iran Oil Minister Bijan Namdar Zanganeh.

Under the deal, Iran would start exporting 10 million cubic meters of gas per day (300 million cubic feet), beginning 2007. The gas would be carried from Genaveh (Bushehr province) to Kuwait, where part of it (gas) would be exported through sea and part through Assalouyeh and Genaveh, he said.

On the same day, Zanganeh and Mohammad bin Hamad al Rumhi, Oman's Minister of Oil and Gas signed a Memorandum of Agreement for export of 10 billion cubic meters of gas per year via underwater pipeline from Assalouyeh in south western Bushehr province starting 2008, which Iran officials expect to rise to 70 million cubic meters, by 2012

### Oil Minister announces two new oil and gas field discoveries

Iran Oil Minister Bijan Namdar Zanganeh has announced the discovery of Ramin Oil Field, located some 40 kilometres to the north east of Ahvaz in the south western province of Khuzestan.

The discovered oil layers, situated at a depth of 5,300 metres, have 855 million recoverable barrels of crude oil out of the 5.7 billion bbl total reserves; while the onshore field associated gas reserves stand at 242 billion cubic meters, of which 36 bcm is recoverable, he said.

He valued the oil reserves at $17 billion at a market price of $20/bbl or $25 billion at a market price of $30/bbl.

Zanganeh has also announced the discovery of a non-associated natural gas field, an extension of the South Pars. The offshore field in south eastern Iran, discovered at a depth of 3,430 meters, has 168 billion cm of recoverable gas reserves and 182 million bbl of condensates.

The minister valued the condensates at $8 billion at a market price of $25/bbl.

"All the data related to these two fields have been unified and that these two fields would produce a total of 70,000-80,000 barrels of crude oil as well as 20 million cubic metres of gas and

20,000 barrels of gas liquid per day," he added

### Iran Holds 135th OPEC Meeting

After over 34 years, OPEC meeting was once again held in Isfahan, Iran, four days shy of the Iranians' New Year called the Norouz. OPEC agreed on that date to lift output by 500,000 barrels with immediate effect. This decision will officially raise the group's ceiling to an all-time high of 27.5 million barrels a day.

It is worth taking note, however, that OPEC member-countries are already producing over 700,000 bpd at present and that current production actually exceeds the planned increase. EIA estimates the current eleven OPEC members account for almost 40 per cent of world oil production and about two-thirds of the world's proven oil reserves.



Announcing the output increase, Iran's Oil Minister Bijan Namdar Zanganeh said, "We decided to raise the OPEC production ceiling by 500,000 barrels as of May 1. We also authorised the president of the conference to mull over another 500,000 barrels increase in case of the market need."

"OPEC is trying its best to minimise the market fluctuations. But of course the cartel is not responsible for the entirety of the market conditions," he added.

In a press statement made by Kuwait's Minister of Energy and Oil Shaykh Ahmad Fahd al-Sabah , a week before the meeting, he said there were sufficient oil supplies in the international market. He said that OPEC is committed to protect the market's stability by meeting the demands of the market in all circumstances emphasizing that the organization raised its production three times during 2004.

However, despite the decision to increase output, crude futures traded above $57 a barrel, a day after the OPEC's declaration to increase production. OPEC President Sheikh Ahmad Al-Fahd Al-Sabah thereafter said that members might begin telephone consultations as early as next week to discuss a second production rise if prices do not ease. "If prices continue as they are now, then starting from next week we will start our discussions," he said.

"Still, we think there is enough supply in the market, but even if another 500 (500,000 barrels per day) means oversupply, we will make the decision. This is our part of sharing the responsibility."

### FIPPA's protection to the oil & gas industry

Despite the sanctions Iran is facing and its restrictive 'Buy Back' policy, the country is keen to develop a law that will balance all these.

Albeit massive debates, Foreign Investment Promotion and Protection Act (FIPPA) has been passed to replace Iran's first

law on foreign investment, which dated back in 1950, to further safeguard the interests of foreign investors, with the oil and gas sector comprising the majority of it.

Babak Namazi, Managing Director of Atieh Associates, one of the original figures in the drafting of this law updates Pipeline of its applicability and implications to the oil and gas sector. Namazi is one of the limited private sector participants, called by the Ministry of Economic Affairs and Finance and Organization for Investment, Economic and Technical Assistance of Iran (OIETA), to assist in drafting the executive by-laws of FIPPA.

**Has FIPPA been able to push the safeguards needed by the foreign investors in the oil and gas industry and why?**

As regards the oil and gas industry, most of FIPPA's applicability has been in the downstream sector whereby direct foreign and private investment is authorized. Particularly, those foreign investors being active in the establishment of LNG and GTL projects will be able to enjoy the coverage of FIPPA. This is also true in the joint ventures being established in the petrochemicals area.

It should be noted that upstream oil activity in Iran remains a government monopoly due to legal restrictions. As such, no direct foreign and/or private domestic investment is allowed in such areas. For the most part, foreign companies act as contractors for exploration and development purposes which are not investment activities that can be covered by FIPPA. This is not a short coming of FIPPA, but rather due to the legal restrictions concerning direct foreign investment in the areas of upstream oil and gas activity. FIPPA provides for coverage in all areas that private domestic investment is authorized as well.

**What protection does it give?**

FIPPA primarily provides non commercial risk cover for those investors that qualify under it. This includes guarantees of compensation in case of nationalisation as well as availability and transferability of foreign currency for the benefit of the foreign investor.

There are no specific provisions in FIPPA for protection of investors in the oil and gas industry. Rather, the applicability of FIPPA is general in nature and would cover most foreign investors including those in the oil and gas industry.

**To be covered in this new investment law, is there a process or application that has to be undergone ?**

Foreign investors must apply to the investment authorities in order to obtain an investment license under FIPPA. As such, there is no automatic coverage.

**Do you think of any provision that could be added to further guarantee protection?**

We believe stabilisation provisions such as protecting the foreign investor from detrimental changes in law for a certain period of time would be beneficial. While the earlier drafts of FIPPA provided for such coverages, the final ratified draft excluded these provisions. Moreover, there is very limited applicability of FIPPA in terms of situations dealing with

creeping expropriations or detrimental changes in laws and regulations

HOME | NEWS | FEATURES | REGULARS | COMPANY FOCUS | MEDIA DETAILS | SUBSCRIBE | CONTACT US

© Copyright 2002. Reflex Publishing ME FZ LLC. All rights reserved.
Pipeline Magazine, PO Box 53777, Dubai Media City, Dubai, UAE
Tel: +971 4 3910 830 | Fax: +971 4 390 4570 | E-mail - info@pipelinedubai.com

Iran Proposal to US Offered Peace With Israel          http://antiwar.printthis.clickability.com...les/Iran...

Case 1:08-cv-00705-JDB     Document 5-4     Filed 07/08/2008     Page 33 of...



EXHIBIT

18

PRINT THIS

Click to Print

SAVE THIS | EMAIL THIS | Close

May 25, 2006

# Iran Proposal to US Offered Peace With Israel

by Gareth Porter

Iran offered in 2003 to accept peace with Israel and cut off material assistance to Palestinian armed groups and to pressure them to halt terrorist attacks within Israel's 1967 borders, according to the secret Iranian proposal to the United States.

The two-page proposal for a broad Iran-U.S. agreement covering all the issues separating the two countries, a copy of which was obtained by IPS, was conveyed to the United States in late April or early May 2003. Trita Parsi, a specialist on Iranian foreign policy at Johns Hopkins University School of Advanced International Studies who provided the document to IPS, says he got it from an Iranian official earlier this year but is not at liberty to reveal the source.

The two-page document contradicts the official line of the George W. Bush administration that Iran is committed to the destruction of Israel and the sponsorship of terrorism in the region.

Parsi says the document is a summary of an even more detailed Iranian negotiating proposal, which he learned about in 2003 from the U.S. intermediary who carried it to the State Department on behalf of the Swiss embassy in late April or early May 2003. The intermediary has not yet agreed to be identified, according to Parsi.

The Iranian negotiating proposal indicated clearly that Iran was prepared to give up its role as a supporter of armed groups in the region in return for a larger bargain with the United States. What the Iranians wanted in return, as suggested by the document itself as well as expert observers of Iranian policy, was an end to U.S. hostility and recognition of Iran as a legitimate power in the region.

Before the 2003 proposal, Iran had attacked Arab governments that had supported the Israeli-Palestinian peace process. The negotiating document, however, offered "acceptance of the Arab League Beirut declaration," which it also referred to as the "Saudi initiative, two-states approach."

The March 2002 Beirut declaration represented the Arab League's first official acceptance

of the land-for-peace principle as well as a comprehensive peace with Israel in return for Israel's withdrawal to the territory it had controlled before the 1967 war. Iran's proposed concession on the issue would have aligned its policy with that of Egypt and Saudi Arabia, among others with whom the United States enjoyed intimate relations.

Another concession in the document was a "stop of any material support to Palestinian opposition groups (Hamas, Jihad, etc.) from Iranian territory" along with "pressure on these organizations to stop violent actions against civilians within borders of 1967."

Even more surprising, given the extremely close relationship between Iran and the Lebanon-based Hezbollah Shi'ite organization, the proposal offered to take "action on Hezbollah to become a mere political organization within Lebanon."

The Iranian proposal also offered to accept much tighter controls by the International Atomic Energy Agency (IAEA) in exchange for "full access to peaceful nuclear technology." It offered "full cooperation with IAEA based on Iranian adoption of all relevant instruments (93+2 and all further IAEA protocols)."

That was a reference to protocols that would require Iran to provide IAEA monitors with access to any facility they might request, whether it had been declared by Iran or not. That would have made it much more difficult for Iran to carry out any secret nuclear activities without being detected.

In return for these concessions, which contradicted Iran's public rhetoric about Israel and anti-Israeli forces, the secret Iranian proposal sought U.S. agreement to a list of Iranian aims. The list included a "Halt in U.S. hostile behavior and rectification of status of Iran in the U.S.," as well as the "abolishment of all sanctions."

Also included among Iran's aims was "recognition of Iran's legitimate security interests in the region with according defense capacity." According to a number of Iran specialists, the aim of security and an official acknowledgment of Iran's status as a regional power were central to the Iranian interest in a broad agreement with the United States.

Negotiation of a deal with the United States that would advance Iran's security and fundamental geopolitical political interests in the Persian Gulf region in return for accepting the existence of Israel and other Iranian concessions has long been discussed among senior Iranian national security officials, according to Parsi and other analysts of Iranian national security policy.

An Iranian threat to destroy Israel has been a major propaganda theme of the Bush administration for months. On March 10, Bush said, "The Iranian president has stated his desire to destroy our ally, Israel. So when you start listening to what he has said to their desire to develop a nuclear weapon, then you begin to see an issue of grave national security concern."

But in 2003, Bush refused to allow any response to the Iranian offer to negotiate an agreement that would have accepted the existence of Israel. Flynt Leverett, then the senior specialist on the Middle East on the National Security Council staff, recalled in an interview with IPS that it was "literally a few days" between the receipt of the Iranian proposal and the dispatch of a message to the Swiss ambassador expressing displeasure that he had forwarded it to Washington.

Interest in such a deal is still very much alive in Tehran, despite the U.S. refusal to respond to the 2003 proposal. Turkish international relations professor Mustafa Kibaroglu of Bilkent University writes in the latest issue of *Middle East Journal* that "senior analysts" from Iran told him in July 2005 that "the formal recognition of Israel by Iran may also be possible if essentially a 'grand bargain' can be achieved between the U.S. and Iran."

The proposal's offer to dismantle the main thrust of Iran's Islamic and anti-Israel policy would be strongly opposed by some of the extreme conservatives among the mullahs who engineered the repression of the reformist movement in 2004 and who backed President Mahmoud Ahmadinejad in last year's election.

However, many conservative opponents of the reform movement in Iran have also supported a negotiated deal with the United States that would benefit Iran, according to Paul Pillar, the former national intelligence officer on Iran. "Even some of the hardliners accepted the idea that if you could strike a deal with the devil, you would do it," he said in an interview with IPS last month.

The conservatives were unhappy not with the idea of a deal with the United States but with the fact that it was a supporter of the reform movement of President Mohammad Khatami, who would get the credit for the breakthrough, Pillar said.

Parsi says that the ultimate authority on Iran's foreign policy, Iran's Supreme Leader Ayatollah Ali Khamenei, was "directly involved" in the Iranian proposal, according to the senior Iranian national security officials he interviewed in 2004. Khamenei has aligned himself with the conservatives in opposing the pro-democratic movement.

(Inter Press Service)

**Find this article at:**
http://www.antiwar.com/orig/porter.php?articleid=9040

 Click to Print    SAVE THIS | EMAIL THIS | Close

☐ Check the box to include the list of links referenced in the article.

Copyright 2008 Antiwar.com



The Huffington Post

July 5, 2008

This is the print preview: Back to normal view »



<u>Steve Clemons</u> | <u>BIO</u> | <u>I'M A FAN OF THIS BLOGGER</u>

# What Did Rove Do with 2003 Iranian Negotiations Offer after Bob Ney Sent to Him?

Posted February 17, 2007 | 01:27 PM (EST)

Breaking Politics News



What did Karl Rove do when he learned of the Spring 2003 Iran offer for comprehensive negotiations with the U.S.?

Gareth Porter has an important article out today, "<u>Rove Said to Have Received 2003 Iranian Proposal</u>."

Porter writes:

> Karl Rove, then White House deputy chief of staff for President George W. Bush, received a copy of the secret Iranian proposal for negotiations with the United States from former Republican Congressman Bob Ney in early May 2003, according to an Iranian-American scholar who was then on his Congressional staff.
>
> Ney, who pleaded guilty last year and was sentenced to prison in January for his role in the Jack Abramov lobbying scandal, was named by former aide Trita Parsi as an intermediary who took a copy of the Iranian proposal to the White House.
>
> Parsi is now a specialist on Iranian national security policy and president of the National Iranian-American Council (NIAC), a non-partisan organization that supports a negotiated settlement of the conflict between Iran and the United States.
>
> Parsi revealed that the document was delivered specifically to Rove, in an exclusive interview with IPS. Within two hours of the delivery of the document, according to Parsi, Ney received a phone call from Rove confirming his receipt of the document. Parsi said the proposal was delivered to Rove the same week that the State Department received it by fax, which was on or about May 4, 2003, according to the cover letter accompanying it.
>
> Ney was chosen by Swiss Ambassador in Tehran Tim Guldimann to carry the Iranian proposal to the White House, according to Parsi, because he knew the Ohio Congressman to be the only Farsi-speaking member of Congress and particularly interested in Iran.

The revelation that Trita Parsi made about Congressman Ney's interaction with the White House on the Iran proposal was made at a conference co-sponsored by the New America Foundation and the National Iranian American Council titled <u>US-Iran</u>

Relations: Collision, Stand-Off or Convergence?

The revelation that Rove is involved is huge -- because it further raises the stakes for exactly why then National Security Advisor Condoleezza Rice said that she never "saw the fax" of the Guldimann-couriered Iran offer.

Foreign policy officials confirm to this writer that the fax did make it to National Security Council official Elliot Abrams, who has not admitted seeing the memos sent by Guldimann.

But if Rove also received the proposal through the separate channel of Congressman Bob Ney, it is hard to believe that Rove would have just hidden the matter in a pile of other faxes and not passed the material on to Rice directly -- or at least to White House Chief-of-Staff Andy Card.

As Trita Parsi told Gareth Porter and attendees at the US-Iran conference, noted above, he was the point person for Ney in helping to manage this issue.

There is a copy of the 2003 Iran offer that has been making its way around the internet and has been written about by such writers as the *Washington Post*'s Glenn Kessler, the *Financial Times*' Guy Dinmore, and *USA Today*'s Barbara Slavin.

Each of these journalists, and others, were given by Trita Parsi a copy of the Iran proposal -- which differs in slight ways from the proposal made public last week by Glenn Kessler which is the final draft sent by Guldimann to the US government.

Parsi has admitted to this writer that he was the source for the documents that have been floating around the internet over the last year. He had been saving these materials for publication in his forthcoming book, but decided that it was important to get them into the public because he was afraid that the pace towards a possible US-Iran war was picking up and needed to be informed by other parts of the real diplomatic history.

I will shortly be posting two documents that I have secured from Trita Parsi -- one that came in from Guldimann and the other that he acquired from a Senior Iranian diplomat.

-- *Steve Clemons is Senior Fellow and Director of the American Strategy Program at the New America Foundation and publishes the popular political blog, The Washington Note*

## Comments for this post are now closed

More in Politics...


McCain Flips At Legit Question


Officer Injured Guarding Obama


NY Times Slams Obama For Being "New...

Obama may accept nomination at Invesco Field

Comments for this entry are currently under maintenance but will be restored soon.

◉ Site   ○ Web   [                    ]   [SEARCH]   ask.com

- Copyright © 2008 HuffingtonPost.com, Inc. |
- User Agreement |
- Privacy |



[Date Prev][Date Next][Thread Prev][Thread Next][Date Index][Thread Index]

# TOP LOBBYISTS TO GIVE PRESENTATION ON LOBBYING AT NIAC POWER DINNER IN WASHINGTON

- **To:** "IranForum@xxxxxxxxxxxxxxx" <iran-news@xxxxxxxxxxxxxxx>
- **Subject**: TOP LOBBYISTS TO GIVE PRESENTATION ON LOBBYING AT NIAC POWER DINNER IN WASHINGTON
- **From:** "Trita Parsi" <trita@xxxxxxx>
- Date: Thu, 17 Oct 2002 23:53:33 -0400
- Content-type: multipart/alternative; boundary="----=_NextPart_000_002B_01C27638.66B26A50"
- Importance: Normal

TOP LOBBYISTS TO GIVE PRESENTATION ON LOBBYING AT NIAC POWER DINNER IN WASHINGTON

NIAC is proud to present two of Washington's most experienced lobbyists at the NIAC Power Dinner on October 30 in Washington DC.

**Roy Coffee**, former Chief of Staff for Governor George W. Bush, and **David DiStefano**, former Chief of Staff for Congressman Bob Ney (the only Persian-speaking member of Congress), will discuss the tricks of the trade of lobbying and advise Iranian-Americans on how they can start making their voices heard. As lobbyists with several years of experience in Washington, Coffee and DiStefano are excellent guides for Iranian-Americans who want to start participating in American political life.

Please note: RSVP ONLY!

**Where**: Positano Ristorante, 4940 Fairmont Ave., Bethesda, one block off Old Georgetown Road, (301) 654-1717
**When**: *Wednesday, October 30*

**Time**: 6.30pm to 8.30pm (dinner starts at 6.30, presentation and discussion starts at 7.30)
**Fee**: $30 for non-members, $25 for members and students (only checks and cash accepted)

**Parking**: 2 Hour Street Metered Parking or Public Parking across the street ($5 evenings)

**Menu**: House Salad, Agnolotti (Pasta Shells w/ Cheese and Spinach), and Iced Tea or Coffee

## Sign up today!

NATIONAL IRANIAN AMERICAN COUNCIL

www.niacouncil.org

---

- Prev by Date: **Iranian director hands back award**
- Next by Date: **Interview with Kalhor in NPR**
- Previous by thread: **Iranian director hands back award**
- Next by thread: **Interview with Kalhor in NPR**
- Index(es):
  - **Date**
  - **Thread**

**Main Index | Thread Index**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** | ) |
| | ) |
|    **and** | ) |
| | ) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) |
| | ) |
| | )   **Civil No.: 08 CV 00705 (JDB)** |
|    **Plaintiffs,** | ) |
| | ) |
|   **v.** | ) |
| | ) |
| **DAIOLESLAM SEID HASSAN,** | ) |
| | ) |
| | ) |
|    **Defendant.** | ) |
| | ) |

**ORDER**

Upon consideration of the Defendant's Motion To Dismiss Complaint Or In The Alternative Defendant's Motion For Summary Judgment, the Memoranda of Points and Authorities in Support thereof and in opposition thereto, the entire record herein, and it appearing that the relief should be granted, it is hereby:

**ORDERED,** that the Defendant's Motion to Dismiss for failure to state a claim upon which relief may be granted be, and hereby is, **GRANTED**, and it is

**FURTHER ORDERED,** that the Defendant's Motion for Summary Judgment is also hereby **GRANTED** to the Defendant on all counts of the Complaint.

**SO ORDERED.**

Plaintiffs' counsel:
Afshin Pishevar
600 East Jefferson Street Suite 316
Rockville, MD 20852
ap@pishevarlegal.com

Defendant's counsel:
Jeffrey B. O'Toole
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Ave NW Suite 200
Washington, DC 20036
otoole@otrons.com