**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** ) | |
| ) | |
| **and** ) | |
| ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** ) | |
| ) | |
| ) | **Civil No.: 08 CV 00705 (JDB)** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DAIOLESLAM SEID HASSAN,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT'S MOTION TO DISMISS COMPLAINT OR IN THE ALTERNATIVE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Seid Hassan Daioleslam,[1] (hereinafter "Daioleslam" or "Defendant") and respectfully moves this Honorable Court, pursuant to FED. R. CIV. P 12(b)(6), to dismiss this case. In the alternative, Defendant moves this Honorable Court to grant the Defendant summary judgment pursuant to FED. R. CIV. P. 56(b).

The case should be dismissed pursuant to FED. R. CIV. P 12(b)(6) because the Plaintiffs fail to state a claim upon which recovery by a public figure such as each of the Plaintiffs from a media defendant such as Daioleslam, could be granted.

In the alternative, this Court should enter summary judgment in favor of the Defendant,

---

[1] This is Defendant's proper name. Defendant sometimes publishes in Farsi under the name Hassan Dai.

pursuant to FED. R. CIV. P. 56(b), because there is no genuine issue as to any material fact and

Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant relies upon the accompanying memorandum of

points and authorities, statement of undisputed material facts, and the entire record in this case.

Pursuant to Rule 12-I(e) and (k), a memorandum of law, statement of undisputed facts

and proposed order consistent with this motion are attached.

Respectfully submitted,


    /s/ Jeffrey B. O'Toole_____

Jeffrey B. O'Toole (D.C. Bar No.244509)(otoole@otrons.com)
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Ave., NW, #200
Washington, DC 20036
(202) 775-1550 (telephone)
(202) 775-0008 (facsimile)

Counsel for Defendant


July 8, 2008

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of this Motion, Memorandum of Points and Authorities and
Statement of Material Fact as to Which There is No Genuine Issue was served upon counsel for
the plaintiffs, Afshin Pishevar, on this 8th day of July, 2008 by email to ap@pishevarlegal.com
and by regular mail to 600 East Jefferson Street, Suite 316, Rockville, MD, 20852.


    /s/ Jeffrey B. O'Toole_____

Jeffrey B. O'Toole

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** | ) |
| | ) |
| and | ) |
| | ) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) |
| | ) |
| | ) **Civil No.: 08 CV 00705)** |
| | ) **(JDB)** |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) |
| | ) |
| **DAIOLESLAM SEID HASSAN,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**STATEMENT OF MATERIAL FACT**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

1.  Trita Parsi (hereinafter "Parsi") is the President of the National Iranian
    American Council (hereinafter " NIAC").

2.  NIAC is a non-profit organization dedicated to promoting Iranian American
    involvement in American civic life and relying on the public for financial and
    human resource support.  NIAC refers to itself on its website as an Iranian
    American Voice in Washington, D.C. and states as part of its mission
    statement that it advances the interests of the Iranian American Community on
    civic, cultural and political issues.

3.  NIAC also facilitates direct political action of the citizenry to attempt to
    influence public affairs.  NIAC tracks legislation concerning Iran, alerts its

members as to what legislation is pending that might effect Iran, and suggests

ways in which its members may effect such legislation.  NIAC has model

letters which suggest what its members may write to Congressmen and

Senators to effect such legislation.

4.    NIAC is a public figure plaintiff in this action.

5.    As president of NIAC, Parsi is also a public figure plaintiff in this action.

6.    Parsi is an expert in Iranian foreign policy and in U.S. – Iran relations.  He is a

published scholar and the author of *Treacherous Alliance – The Secret*

*Dealings of Israel, Iran and the United States*, (Yale University Press 2007).

He has authored scholarly articles on Middle East Affairs published in, among

other places, the Financial Times, Jane's Intelligence Review, the Globalist,

the Jerusalem Post, The Forward, BitterLemons and the Daily Star.

7.    As to both the intent expressed and the actions taken and contemplated by

NIAC and Parsi indicate that they each intend and do play a role of especial

prominence in public affairs effecting Middle Eastern-U.S. policy.

8.    Seid Hassan Daioleslam (hereinafter "Daioleslam") is a Media Defendant.

9.    Daioleslam has written numerous articles, both on his own website and in

Farsi and English language journals, has participated in television and radio

broadcasts and has appeared on Voice of America as a guest.

10.    Prior to his involvement with NIAC, Parsi founded the group, Iranians for

International Cooperation (IIC).  IIC, while Parsi was still President of the

group, identified itself as "an Iranian lobby" and indicated that its main

objective was to safeguard Iran and Iran's interests.

11.     Parsi received a proposal for talks, the so called "grand bargain," from an
        unidentified Iranian government official both in 2003, and 2006.

12.     NIAC has a paid fellowship program which helps place fellows in a
        Congressional office for the summer.

13.     The word "lobby" does not, in of itself, hold a defamatory meaning.

14.     Association with Iran, does not in of itself, injure a person's or organization's
        reputation, standing in the community or lower him or it in the estimation of
        the community.

15.     There are widely divergent opinions about the best way to approach U.S.-
        Iranian relations and the U.S. foreign policy towards Iran.

16.     Defendant has never stated that the NIAC is an illegal organization, or that it
        should be registered as a lobby under federal law.

17.     Defendant has never identified Trita Parsi as the Swiss ambassador.

18.     Defendant's beliefs about NIAC and Parsi's advocacy on behalf of Iran are
        also expressed by other authors, including some Iranian journalists and
        government official.

                                Respectfully submitted,

                                   */s/* Jeffrey B O'Toole_____
                                Jeffrey B. O'Toole
                                O'Toole, Rothwell, Nassau & Steinbach
                                1350 Connecticut Ave., NW, #200
                                Washington, DC 20036
                                (202) 775-1550
                                Counsel for Defendant

## CERTIFICATE OF SERVICE

     This is to certify that a copy of this Motion, Memorandum of Points and Authorities and Statement of Material Fact as to Which There is No Genuine Issue was served upon counsel for the plaintiffs, Afshin Pishevar, on this 8th day of July, 2008 by email to ap@pishevarlegal.com and by regular mail to 600 East Jefferson Street, Suite 316, Rockville, MD, 20852.


                               */s/* Jeffrey B. O'Toole

                                 Jeffrey B. O'Toole

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** | ) |
| | ) |
|    **and** | ) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) |
| | ) |
| | )   **Civil No.: 08 CV 00705 (JDB)** |
|       **Plaintiffs,** | ) |
| | ) |
|   **v.** | ) |
| | ) |
| **DAIOLESLAM SEID HASSAN,** | ) |
| | ) |
| | ) |
|     **Defendant.** | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
COMPLAINT OR IN THE ALTERNATIVE DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

The plaintiffs, Trita Parsi ("Parsi"), a well-known public figure, and the National Iranian American Council ("NIAC" and together with Parsi, "Plaintiffs") seek damages from media Defendant Seid Hassan Daioleslam ("Daioleslam" or "Defendant") for his opinion that Plaintiffs engage in lobbying and work with Iran.  Plaintiffs have asserted claims for defamation and false light.

The Complaint should be dismissed in its entirety pursuant to FED. R. CIV. P 12(b)(6), because Plaintiffs have failed to state a claim and the law does not permit the imposition of liability against a media defendant in these circumstances.  In the alternative, this Court should enter summary judgment in favor of the Defendant, pursuant to FED. R. CIV. P.  56(a) because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter

1

of law.

## FACTS

1.      Daioleslam is a media person providing content for the website Iranianlobby.com. Plaintiffs' May 2, 2008 Complaint, ¶ 5.  Daioleslam also provides reports to television, radio, personal appearances, and other media outlets.  *Id.*, ¶ 6.

NIAC is an organization that depends on public financial and human resource support. *Id.,* ¶ 42.  Parsi founded and is President of the NIAC.

Trita Parsi is an Iranian-American scholar who made the text of a secret letter seeking negotiations from Iran to the United States available for an article published in the June 2006 issue of The American Prospect.  Parsi has stated publicly that the letter represented the views of the highest levels of the Iranian government. "They may have had someone in the middle who helped them put the framework for negotiations on paper, but the important point is that the Iranians approved the framework, and the Swiss gave the document to the U.S. at Iran's request," Parsi said.

Parsi is a well known public figure who was an aide to Congressman Bob Ney.  Parsi published the book TREACHEROUS ALLIANCE: THE SECRET DEALINGS OF ISRAEL, IRAN, AND THE UNITED STATES (Yale University Press) in which he exploited, among other things, his insider connections to the inner workings of the Iranian government and used that access to write his book.

I.       **LEGAL STANDARDS FOR REQUESTED RELIEF**

     **A.  The Law Has a Preference for the Speedy Resolution of Defamation Cases.**

On account of "the importance of protecting a free and vigorous press," it has been held that "speedy resolution of cases involving free speech is desirable;" consequently, "defamation actions should be disposed of at the earliest possible stage of the proceedings if the facts as alleged are insufficient as a matter of law to support a judgment for the plaintiff'" *Dorsey v. Nat'l Enquirer Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992) (*quoting Good Government Group of Seal Beach, Inc. v. Superior Court*, 586 P.2d 572, 578 (Cal. 1978)).

     **A.       Legal Standard for a Motion to Dismiss Under FED. R. CIV. P 12(b)(6).**

The Court may dismiss a claim under FED. R. CIV. P 12(b)(6) for failure to state a claim upon which relief can be granted.  While a complaint does not require detailed factual allegations, a plaintiff's obligation to state the grounds of his or her right to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal citations omitted). And although the Court must "construe the complaint liberally in the plaintiff's favor, *Id.,*  the Court need not accept as true inferences that are not supported by the complaint or "legal conclusion cast as factual allegations." *Fraternal Order of Police v. Gates*, ___ F.Supp. 2d. ____., 2008 WL 2396182, *14 (D.D.C. 2008).

     **A.       Legal Standard for a Summary Judgment.**

Summary judgment is appropriately granted when "there is an absence of evidence supporting an essential element of the nonmoving party's case." *Quetel Corp. v. Columbia Communications Int'l, Inc.*, 787 F. Supp. 1, 2 (D.D.C. 1992).  Summary judgment is especially

3

appropriate in the defamation context because protracted litigation can have a chilling effect upon the exercise of First Amendment rights. *See, e.g., Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors."); *Lauderback v. American Broadcasting Cos.*, 741 F.2d 193, 198 (8th Cir. 1984).

## ARGUMENT

## INTRODUCTION

This case is based upon statements that are designed to open debate on public issues. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing the country's profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open).

To establish liability in this matter, Plaintiffs bear the burden of proving: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) that either the statement was actionable as a matter of law irrespective of special harm or its publication caused the plaintiff special harm." *Klayman v. Segal,* 783 A.2d 607, 613 n. 4 (D.C.2001)(quotations omitted). With respect to the last factor, the Supreme Court long ago eliminated the common-law rule of "liability without fault" in defamation cases brought against the media. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). As a result, all "public figures" must prove that the publisher acted with "actual malice," *id.*, that is, with subjective "awareness of probable falsity," *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968) (quotation omitted). *See also Foretich v. CBS, Inc.*,

4

619 A.2d 48, 59 (D.C. 1993).

Finally, summary judgment may be warranted even as to such elusive elements as a defendant's motive or intent where, as here, "'the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997) (citations omitted).

## II.   THE PLAINTIFFS CANNOT SHOW THAT THE DEFENDANT MADE FALSE AND DEFAMATORY STATEMENT ABOUT EITHER PLAINTIFF

### A.   Standard for the Burden of Proof

1.   **Plaintiffs are Public Figures.**

Plaintiffs are public figures.  The law draws a distinction between private parties and public figures in the arena of defamation because public officials and public figures subject themselves to public scrutiny as a consequence of their involvement in public affairs. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 343-344 (1974).  Public figures also "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.*   "[A] court . . . analyzing whether a given plaintiff is a public figure must look at the facts, taken as a whole, through the eyes of a reasonable person."  W*aldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1293 (D.C. Cir., 1980).  In deciding whether a plaintiff is a public figure, "the touchstone [is] . . . whether an individual has 'assumed [a] role [ ] of especial prominence in the affairs of society . . . that invite[s] attention and comment.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1289 (D.C. Cir. 2003)(ftnt. omitted).

The National Iranian American Council's (NAIC) entire existence is predicated on its ability to assume a role of especial prominence in the affairs of society, namely to promote

the Iranian American community interests in broader societal affairs.

By Plaintiffs' own words, it is a non-profit "dedicated to promoting Iranian American involvement in American civic life and relying on the public for financial and human resource support."  Complaint at p, 3, ¶ 10.  The organization's website touts the organization as "An Iranian American Voice in Washington, D.C." (*See Exhibit 1,* NIAC Mission Statement*)*, and states as part of its mission statement that it "advances the interests of the Iranian American Community on civic, cultural and political issues."  *(See Exhibit 1).*   NIAC also facilitates direct political action of the citizenry to attempt to influence public affairs. (*See e.g. Exhibit 2,* excerpts from the Political Engagement Center section of the NIAC website, setting forth links to send correspondence to Senators and Congressmen and allowing members to set up an Action Alert that allows members to receive e-mails when their "involvement may make a critical difference.")

Plaintiff Parsi is also a public figure, as both the President of NIAC and a noted and vocal commentator on Middle Eastern affairs.  With a background as director for two U.S.-based Iranian organizations, Dr. Trita Parsi's role in NIAC and status as a public figure are also contained in the NIAC website

> [ Dr. Parsi] possesses a rich set of leadership skills and vision that will guide NIAC towards its goals.
>
> Trita Parsi has worked for the Swedish Permanent Mission to the UN in New York where he served in the Security Council handling affairs for Afghanistan, Iraq, Tajikistan and Western Sahara, and the General Assembly's Third Committee addressing human rights in Iran, Afghanistan, Myanmar and Iraq. He has also served as a foreign policy advisor to Congressman Bob Ney (R-OH).
>
> His expertise is Iranian foreign policy and US-Iran relations. His book, *Treacherous Alliance - The Secret Dealings of Israel, Iran and the United States,* (Yale University Press 2007), is based on more than 130 interviews that

6

Dr. Parsi has conducted - in his personal capacity - in Israel, Iran and the United States with senior officials from all three countries.

Dr. Parsi's articles on Middle East affairs have been published in the Financial Times, Jane's Intelligence Review, the Globalist, the Jerusalem Post, The Forward, BitterLemons and the Daily Star.

*(See Exhibit 3, Dr.* Trita Parsi Bio Page).

Given both the intent expressed and the actions taken and contemplated by

NIAC and Parsi indicates that they each intend and do play a role of especial

prominence in public affairs affecting Middle Eastern- US policy[1].

---

1 This is further supported by a list of the accomplishments listed on the NIAC website located at http://www.niacouncil.org/index.php?option=com_content&task=view&id=1076&Itemid=170. NIAC is regularly quoted in numerous media outlets as an authority on affairs related to the Iranian-American community, including US-Iran relations; and is celebrated as the largest Iranian American grassroots organization, with members in 44 states.

NIAC is a household name on Capitol Hill and has emerged as a trusted source on US-Iran relations and the Iranian-American viewpoint. NIAC often teams up with groups like the New America Foundation and Amnesty International to discuss issues like the deteriorating human rights situation inside Iran and the Iranian nuclear file.

Some of NIAC's individual successes are as follows:

-- NIAC regularly hosts briefings on Capitol Hill for Congressional Staffers on areas of interest to the Iranian-American community. Some of our latest briefings have focused on Iran's parliamentary elections, the National Intelligence Estimate (NIE) report on Iran, and Iran's role in Iraq.

-- NIAC has been on the forefront of the debate on US foreign policy with Iran, pushing for direct, diplomatic negotiations, and urging against war.

-- In 2003, NIAC challenged and won against Monster.com, a major US company discriminating against Iranian-Americans by keeping them from competing fairly in the job market.

-- In January 2005, NIAC successfully compelled the National Geographic Society to correct their 8th edition maps to read "Persian Gulf" instead of "Arabian Gulf."

-- NIAC forced an apology from MSNBC's Don Imus for a derogatory comment he made in 2004 about an Iranian airliner crash that killed 43 passengers.

7

**2.  Defendant is a Media Defendant.**

Daioleslam is a media defendant. "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. *The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.*"  *Lovell v. City of Griffin, Ga.,* 303 U.S. 444,452 (1938)(emphasis added).  *See also*, e.g. *Metastrom, Inc. v. Garnter Group, Inc.*, 28 F.Supp.2ed 665 (D.C. Cir. 1998)(holding that information disseminated by company via medium such as e-mail subscription service and a website qualified defendant as a member of the mass media.

Daioleslam clearly falls within this definition of a media defendant.  Daioleslam has written numerous articles, both on his own website and in Farsi and English language journals, has participated in television and radio broadcasts and has appeared on Voice of America as a guest.

**3.  Burden of Proof for a Public Figure Seeking to Recover Against a Media Defendant.**

When a public figure plaintiff seeks to recover damages from a media defendant for alleged defamatory statements, the plaintiff may recover only if he shows *clear and convincing*

---

-- NIAC worked with writer/director Wayne Kramer and Weinstein Company to make changes to the screenplay for *Crossing Over* (2007). The film, which features an all-star cast, originally depicted Iranian Americans committing an "honor killing." Had the script not changed, the movie would have had similar affects for the Iranian-American community as the film, *Not Without My Daughter* (1991).

(*See* NIAC Factbook ,
http://www.niacouncil.org/index.php?option=com_content&task=view&id=1076&Itemid=170*)*.

*evidence* that the defendant acted with actual malice. *Anderson v. Liberty Lobby,* 477 U.S. 242

(1986)*; New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686

(1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Moreover, in the case of a public figure, the Plaintiff bears the burden of proof of proving

that a statement involving matters of public concern is false.  *White v. Fraternal Order of Police*,

707 F.Supp. 579 , 590-591 (D.D.C. 1989).

### B.  All The Statements Are Substantially True

Defendant would first note that, as set forth above, it is Plaintiffs' burden to prove the

falsity of the statements made against them.  In that regard, the Plaintiffs have not stated a claim

upon which relief can be granted.  Plaintiffs have made a blanket allegation that statements

complained of are false.  However, they have not stated in what way each of the allegations are

false.  For example, with respect to the allegation contained in paragraph 17E, the Plaintiff Parsi

does not allege that the statement about the relationship between him and Siamack Namazi is

false, nor in what way the characterization of NIAC as a lobby is false.  While the Plaintiffs

summarily state that all the statements are false, the Court need not accept their labels and

conclusions, and a formulaic recitation of the falsity of the statement as true.  *See Bell Atl. Corp.*

*v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal citations omitted).   Because the Plaintiff

has not met the burden of even alleging how the statements are false, the Court should dismiss

the complaint for failure to state a claim upon which relief should be granted pursuant to FED. R.

CIV. P 12(b)(6).

With respect to summary judgment, judgment for media defendants is required where, as

here, reports complained of are substantially true.  *White v. Fraternal Order of Police,* 909 F.2d

512, 17 Media L. Rep. (BNA) 2137 (D.C. Cir. 1990), reh'g denied, (Sept. 19, 1990).  This

defense may be established by demonstrating that the statements in question are "substantially true." *Lohrenz v. Donnelly,* 223 F.Supp.2d 25, 59 (D.D.C.2002). "Substantially true" means that the "gist" of the statement is true or that the statement is substantially true, as it would be understood by its intended audience. *Moss,* 580 A.2d at 1023.

　　The statements complained of regarding Parsi and NIAC's lobbying activity[2] are substantially true.  Defendant has opined that Plaintiffs are important players in a lobby enterprise, lobbying on behalf of actions which are in line with the wishes and interests of the Iranian government.  The term "lobbying" is defined as "[a]ll attempts including personal solicitation to induce legislators to vote in a certain way or to introduce legislation.  It includes scrutiny of all pending bills which affects one's interest or the interests of one's clients, with a view towards influencing the passage or defeat of such legislation." BLACK'S LAW DICTIONARY 938 (6th ed. 1990).  NIAC hosts, as part of its website, a "Political Engagement Center" which lists all the current legislation affecting Iran and supplies its members with Current Action Alerts, which allow the members to contact members of Congress and the Senate to influence their votes on such legislation. *See Exhibit 2.*  Exhibits 2 and 6 demonstrate other examples of NIAC's attempts to influence legislators to vote on issues that affect Iran.  These documents all demonstrates the actions of NIAC and Plaintiff Parsi on NIAC's behalf constitute a grassroots effort to induce legislators to vote a certain way on legislation.

　　It is true that the manner in which NIAC, and by extension Plaintiff Parsi as the President

---

2 Specifically, these would include the allegations complained on in paragraphs 17A, 17C, 17D, 17F, 17G, 17H, 17I, 17J, 36A and 36B, all of which allude to Parsi and NIAC's lobbying for the Iranian interests.  To the extent that the other complained of statements are not included in this footnote, Defendant maintains that they are true, but acknowledge that the issue of their veracity may not be conducive to summary judgment prior to discovery.  However, such other statements are subject to dismissal or summary judgment on other grounds, which are addressed hereafter.

of NIAC seeks to have such legislators vote is in accord with the needs, interests and wishes of the Iranian regime.

For example, a member of the Iranian regime indicated last year that influencing western opinion, including demonstrations against the war and opposition of the public opinion against sanctions against Iran is "a winning card in the hand of our policy makers." (*See Exhibit 4*). Both opposition to war in Iran and opposition to sanctions are advocated by NIAC and Parsi specifically. (*See Exhibit 5*). There are more direct examples of the connection between the wishes and interests of the Iranian regime and Parsi. For example, in an interview with Plaintiff Parsi published in the Iranian government-owned newspaper Aftab published on December 28, 2006, the article underscored Parsi's efforts on the behalf of the Iranian regime. The interview was decorated with Parsi's picture and was titled "Iranian Lobby Becomes Active?" (See *Ex*. 7). In the introduction to this interview, it is stated:

> (Translation): "The conflict between Iran and the West on Iran's nuclear file has entered a critical state. The government must now utilize all the possible resources to defend the national interest. In this, we have not paid enough attention to the potentially significant influence of the Iranian American society in moderating the extremist policies of the White House. In comparison of this untouched potential to the influence of the Jewish lobby in directing the policies of Washington in supporting Israel, we see the difference between what is and what could be."

Yet another example is the fact that several Iranian pro-government publications ran articles after Defendant's first article regarding Plaintiffs was published. These rebuttal articles alleged that Defendant as part of a Jewish conspiracy working through another organization. One of these articles referred to Defendant's article as an attack on the "Iranian lobby." *(See Exhibits 8-12.)* Another publication indicates that Ambassador Faramarze Fathnejad, in a September 19, 2006 meeting with the organization in Theran called "The Association of Iranophile."

11

According to that publication, Ambassador Fathnejad praised Trita Parsi and urged that the group be more supportive of Parsi.  The Ambassador also emphasized  "the importance of relation with Iranian organizations in the U.S. and specially pointed to NIAC and his young leader who is a consultant to CNN and has been very successful in his efforts" *See Exhibit 15.*

Furthermore, even prior to his involvement with NIAC, Plaintiff Parsi founded the group Iranians for International Cooperation (IIC).  IIC, while Parsi was still President of the group, *identified itself* as "an Iranian lobby" and indicated that its "main objective [was] to safeguard Iran and Iran's interests."  (*See Exhibit 13).*

In some cases, the Plaintiffs' own website belies the alleged falsity of Defendant's statements.  For example, Plaintiffs allege that the statement set forth in paragraph 17F is false and defamatory.[3]  Taken in context however, this statement is demonstrably true.  This statement followed immediately the following line in the article ". . .Trita Parsi, in response to a direct question asking whether his group lobbies the US congress declared: 'Our group does not do any lobbying at all.  We do not contact the Congressmen to support or oppose a bill.'" *See Complaint,* Exhibit 3.  As set forth in *Exhibits 2 and 5 (a),* a major activity of NIAC is encouraging its members to contact Congressmen and Senators on specific legislation.  The group even gives suggested language that its members may use in contacting lawmakers regarding specific legislation.  *See Exhibit 5(a).*  Therefore, Plaintiff's admission (in the form of NIAC's own website) shows that Parsi's statement that NIAC does not contact Congressmen to

---

[3] "Reality exposes the falsehood of Parsi's claim.  NIAC has strived to penetrate the US political systems as per the 1999 roadmap by Namazi and Parsi.  NIAC's actions lucidly reveal the nature of the organization."

support or oppose bills is not accurate.  This is done with the express purpose of attempting to induce legislators to vote a certain way on a bill, i.e. lobbying.[4]  *See Exhibit 6.*

　　　While the Plaintiffs may quibble over the semantics of whether they are identified as a group engaging in lobbying activity promoting an agenda in line with the Iranian regime's interest and praised by pro-Iranian regime partisans or an organization that seeks to influence legislation that supports an agenda that coincidentally overlaps with the Iranian regimes interests, the statements cited by the Plaintiffs are substantially true.  *See e.g. Copeland-Jackson v. Oslin*, --- F.Supp.2d ----, 2008 WL 2211938 (D.D.C 2008)(defamation case dismissed for failure to state a claim where a Plaintiff convicted of two counts of  "gross sexual imposition" of two boys aged 13 and 14 was referred to as a "convicted pedophile."  Plaintiff complained, *inter alia*, that he did not meet the DSM-IV definition of a person suffering from pedophilia. .  The court held that the "gist" of the statement was substantially true and therefore the technical accuracy of the term was irrelevant.).

　　　The Plaintiffs have not met their burden to show that the alleged defamatory statements are untrue, except for a blanket assertion that the allegations are untrue.  Specifically, the Plaintiffs have not indicated in what way the specific statements cited are false, although it is their burden to show the falsity of such statements.

### C.　　Plaintiffs Have Not Identified Defamatory Statements.

　　　The question of whether a statement is "capable of conveying a defamatory meaning" is a question of law for the court to determine as a threshold matter. *See, e.g., White*, 909 F.2d at

---

[4] A distinction should be made here between a "lobbyist," who is required under federal law to register and a "lobbying enterprise" or a "lobby", which is a group attempts to influence legislative action.  Defendant's allegations regarding Plaintiffs have always identified the Plaintiffs as the latter and not the former.

518; *Tavoulareas v. Piro*, 817 F.2d 762, 779-80 (D.C. Cir.) *(en banc), cert. denied,* 484 U.S.

870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); RODNEY A. SMOLLA, Law of Defamation § 4.08 n.

132 (1993) ("Smolla"); Restatement § 614.

 A statement is defamatory only "if it tends to injure plaintiff in his trade, profession or

community standing, or lower him in the estimation of the community." *See, e.g., Afro-American

Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.Cir.1966) (en banc); *Vereen v. Clayborne*, 623

A.2d 1190, 1195 n. 3 (D.C.1993). "But an allegedly defamatory remark must be more than

unpleasant or offensive; the language must make the plaintiff appear. 'odious, infamous, or

ridiculous.'" *Bennett v. U.S. Chess Federation*, 468 F.Supp.2d 79, 89 (D.D.C. 2006).

When assessing defamation by implication, that is defamation stemming from the

implication of words, not the literal statements, the Court must assess (a) whether a

communication is capable of bearing a particular meaning, and (b) whether that meaning is

defamatory. *See e.g. White v. Fraternal Order of Police*, 707 F.Supp. 579, 589 (D.D.C. 1989).

In this case, the Defendant has not made statements that would injure either plaintiff in

his trade, profession or community standard or lower him in the estimation of the community.

With respect to the statements made in paragraphs 17.A, 17.D, and 17.I, it is difficult to see how

a group whose aim is to foster understanding between Iran and the United states (*See Exhibit 1*)

can complain that those allegations of close associations of the Plaintiffs with Iran will somehow

lower each of them in the estimation of the community.  Moreover, the characterization of both

NIAC and Plaintiff Parsi of action on behalf of Iran as defamatory is puzzling, given that the

NIAC website itself includes calls to action on behalf of Iran urging diplomacy with Iran (*See

Exhibit 2,* Current Action Alerts) and articles that urging against sanctions for Iran.  With respect

to Plaintiff Parsi, whose predecessor organization, the IIC, identified as one of its main

14

objectives, the safeguard of Iran and its interest (*See Exhibit 8)*, it is even more mystifying how he could now indicate that alleging advocacy on behalf of Iran is defamatory.

###   A.    Many of the Complained of Statements are Opinions.

Many of the complained statements are simply the opinion of the Defendant and therefore not actionable.  *White v. Fraternal Order of Police*, 707 F.Supp. 579, 591 (D.D.C. 1989).  "Under the First Amendment there is no such thing as a false idea.  However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."  *Gertz v. Robert Welch, Inc.*, 418 U.S. at 340.  Whether a statement is opinion or fact is a question of law which the Court must decide.  *White v. Fraternal Order of Police*, 707 F.Supp at 591.

The proper test in this jurisdiction to test whether a statement constitutes a privileged opinion is a four part analysis:

> First, courts should 'analyze the common usage or meaning of the specific language of the challenged statement itself.' [ ]Second, courts should 'consider the statements verifiability-is the statement capable of being objectively characterized as true or false?' [ ] Third, courts should 'consider the full context of the statement ... inasmuch as other, unchallenged language surrounding the allegedly [  ]defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content.' *Id.* Fourth, courts should "consider the broader context or setting in which the statement appears."
>
> *Id.,* (citations omitted).

Plaintiff Parsi indicated that the Defendant published false and defamatory statements "indicating that Parsi is a member of a subversive and illegal[5] Iranian lobby colluding with the Islamic Republic of Iran and engaging in disingenuous conduct."  *See* Complaint, ¶ 13.

---

[5] Defendant has never stated that NIAC was an illegal lobby.  Indeed, none of the sixteen quotations complained of by the Plaintiffs states that NIAC engages in illegal activity.

With respect to the allegation that Defendant has characterized NIAC as a "subversive" lobby, Plaintiffs seems to allude to the Defendants statements regarding the NIAC's youth programs targeting "unwary" Iranian American youth,[6] and characterizing Parsi's spin on Iran as a victim as "admirable,"[7]

With respect to the allegation that Defendant has indicated that Plaintiffs colluded with the Islamic Republic of Iran, Plaintiffs seems to be alluding to Defendant's statements regarding the "smokescreen" Parsi was called upon to create regarding Iran's 2003 and 2006 offers of talks[8], the statements questioning the motives of NIAC lobby,[9] questioning the motives behind an Iranian official transmitting the so called "grand bargain" document to Parsi's group,[10] and characterizing NIAC as an effective tool of the Iranian lobbying web.[11]

However, all of these statements, while they contain facts that are protected because they are true also include opinions, which are likewise protected.  For example, the characterization of the youth being targeted for training by NIAC is an opinion.  The same holds true for Daioleslam's characterization of NIAC's spin on Iran's position as victim, the indication that Parsi was being called upon to create a "smokescreen," the questioning of the motives of NIAC's actions and the characterization of NIAC as and "effective node" in the Iranian lobbying web.

First the specific words used are commonly used as characterizations, not facts.  "While the characterization of challenged statements as opinion does not confer an automatic and complete defense to defamation, 'allowance must be made for imaginative expression or the

---

[6]  *See* ¶ 18D of the Complaint.
[7]  *See* ¶18E of the Complaint.
8  *See* ¶17B of the Complaint.
[9] *See* ¶ 18A of the Complaint.
[10] *See* ¶ 18B and C of the Complaint
[11]  *See* ¶ 36B of the Complaint.

rhetorical hyperbole which has traditionally added much to the discourse of our Nation.'"

*Novecon, Ltd. V. Bulgarian-American Enterprise*, 977 F.Supp 45, 52 (D.D.C. 1997)(citations

omitted)(internal quotations omitted). The words "unwary" and "effective" are adjectives that are

used to describe facts, not facts in of themselves.  Likewise, the word "smokescreen" is

commonly used to describe the quality of an action or a course of action.  Lastly, the use of

rhetorical questions, like those regarding the motives of NIAC, would commonly be understood

to be expressive of an opinion of the writer, rather than stating a fact and are invitations to

engage in public debate.

Secondly, these characterizations are not independently verifiable as being true or false.

It cannot be said that these characterizations "imply a demonstrably false fact," which would

take the statements out of the realm of opinion protected by the First Amendment. *Lane v* .

*Random House, Inc.*, 985 F.Supp. 141, 151 (D.D.C. 1995)(finding that defendant was only

expressing a point of view about the Kennedy assassination when it labeled a Kennedy

conspiracy theorist as "Guilty of Misleading the American Public.").

 It is not demonstrably false that the Iranian American youth may be viewed by some as

"unwary."  The term "unwary" means "not alert: easily fooled or surprised."  WEBSTER'S  NEW

COLLEGIATE DICTIONARY 1284. (1975). Whether or not any person is easily fooled or

surprises is a subjective evaluation, not susceptible to being objectively disprovable.  Moreover,

an ascertainment of the wariness of an undefined population, i.e. those Iranian American youth at

which NIAC programs are directed, is impossible.  Even if it was ascertainable in some way, the

evaluation of that population as "wary" would not be objectively supportable.  The same could

be said for the characterization of Parsi's involvement in the "grand bargain" talks as a

"smokescreen" and the description of NIAC's efforts, i.e. their lobbying, as an effective node for

pro-Iranian advocacy or lobbying in the United States.

One could argue whether the motives behind an action are to create a smokescreen, and without indicating that the writer has special knowledge of motive, the reasonable reader would understand it to be the writer's interpretation of motive.  Likewise, to indicate that the actions of NIAC and Parsi efforts are effective advocacy on Theran's behalf is the writer's view of those actions as effectively benefiting the Iranian regime and does not imply facts that are demonstrably false.

Neither is it demonstrably false that NIAC's portrayal of the Iranian regime could be viewed as casting the government as a victim and that this portrayal amounts to admirable spin.  This statement simply sets forth a point of view that indicates that one person views how NIAC portrays the Iranian government is tantamount to characterizing them as victims.  As a point of view, it is not susceptible to being factually disproven.

With respect to the questions posed regarding Parsi and by extension, NIAC's motives behind its many activities and involvement in the so called "grand bargain" talks, the rhetorical questions posed by Defendant regarding Parsi and NIAC's activities do not imply any facts at all, demonstrably false or otherwise.  Such rhetorical questions simply imply what Defendant believes Plaintiffs' motives to be.

Addressing the third and fourth prong of the test, as already laid out above, the Defendant certainly writes his commentary in the hopes of persuading the reader that his interpretation is correct.  However, the complained of statements set forth in this section do not in any way that would influence the average reader's readiness to infer that a particular statement has factual content.  In fact, as set forth, both in the context of the articles themselves and the context of where such articles appear, the statements are clearly Diaioleslam's analysis of the situations

18

about which he writes and an effort to persuade readers that his interpretation is correct.  His

website itself describes Daioleslam as "an independent Iran Analyst and writer. He is well

published in Farsi and English**.** He has appeared as an expert guest in the Voice of America-TV

as well as other Persian media.

http://english.iranianlobby.com/page1.php?id=7&bakhsh=ARTICLES.  The description of the

author as a analyst and activist provide the context for his articles as his analysis and advocacy,

i.e. his analysis of the situation based on the facts that he has presented.

      Because the statements discussed in this section cannot be said to imply demonstrably

false facts, those statements must be treated as protected opinion and are not defamatory as a

matter of law.

## II.     PLAINTIFFS HAVE NOT AND CANNOT DEMONSTRATE THAT DEFENDANT ACTED WITH REQUISITE FAULT TO ESTABLISH DEFAMATION.

### A.     <u>Standard for Demonstrating Fault in this Case.</u>

      As indicated above, the Plaintiffs are public figures, and the Defendant is a media

defendant.   Plaintiffs who are public figures may recover for defamation only if they show *clear

and convincing evidence* that the Defendant acted with actual malice. *Anderson v. Liberty Lobby,*

477 U.S. 242 (1986)*; New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 11

L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d

789 (1974).

### B.     <u>Plaintiffs Have Not Shown Daioleslam Acted With Actual Malice.</u>

      The actual-malice standard requires Plaintiffs to prove that the Defendant made the

statements with knowledge of their falsity or with reckless disregard of the truth. *New York

Times*, 376 U.S. at 279-80, 84 S.Ct. 710; *Gertz,* 418 U.S. at 342, 94 S.Ct. 2997. Reckless

disregard of a statement's truth is a subjective standard, *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); it is not measured by whether a reasonably prudent man would have published [ ] or would have investigated before publishing, but by whether the defendant in fact entertained serious doubts as to the truth of [its] publication, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see also Gertz,* 418 U.S. at 331, 94 S.Ct. 2997 (recognizing that a defendant acts with reckless disregard when he displays a high degree of awareness of probable falsity).

While a defendant's failure to investigate, without more, does not establish a reckless disregard of the truth, the purposeful avoidance of the truth is in a different category and may be sufficient to establish actual malice. *Harte-Hanks,* 491 U.S. at 692, 109 S.Ct. 2678; *Perk v. Reader's Digest Ass'n, Inc.,* 931 F.2d 408, 411 (6th Cir.1991).

Thus, to satisfy actual malice standard for defamation of a public figure, a plaintiff must show, by clear and convincing evidence, that when the defendants published the alleged defamations they were subjectively aware that it was highly probable that the story was: (1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that defendants had obvious reasons to doubt. *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003).

**1. The statements made were not fabricated, as Daioleslam properly relied upon other news outlets that Daioleslam had no reason to doubt and the statements made were not so inherently improbable that only a reckless person would have put them in circulation.**

Given the public's desire for timely and informative news, courts have consistently recognized that a news organization must be permitted to rely on and republish information

20

received from other reputable news organizations. The court credited with first doing so was the

Supreme Court of Florida in *Layne v. Tribune Co.*, 146 So. 234 (Fl 1933).  In Layne, the plaintiff

was named in a Prohibition-era wire service report saying that he was in the company of a "dry"

Congressman trying to sneak booze into his Congressional office. *Id.* at 235-36. The plaintiff

sued his hometown paper in Florida for libel *per se* because it carried the report without checking

its accuracy.

In affirming an order of dismissal, the Florida Supreme Court noted that local newspapers

must frequently gather information from a number of outside sources in order to provide the

public with coverage of current events. *Layne*, 146 So. at 238.

> The mere reiteration in a daily newspaper, of an actually false, but
> apparently authentic news dispatch, received by a newspaper
> publisher from a generally recognized reliable source of daily
> news, such as some reputable news service agency engaged in
> collecting and reporting the news, cannot through publication
> alone be deemed  *per se*  to amount to an actionable libel by
> endorsement . . . .

Layne, 146 So. at 238.

This principle has become known as the "wire service defense," although as courts have

recognized, characterizing this principle as a "defense" is a misnomer. Reliance on a reputable

news service is not a defense to liability, but rather a fact that negates an element of the

plaintiff's affirmative case: the showing of fault by the defendant. [B]y saying that the wire-

service defense is available, what is really being said is that, under the circumstances, a local

news organization's standard of care does not include the requirement to independently verify

the accuracy of a news release, *i.e.*, the organization is under no duty to independently verify the

accuracy of the release. *Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738, 741 (Mich. Ct. App.

1996), aff'd, 586 N.W.2d 85 (Mich. 1998).

21

Thus, when a media organization receives a wire service release, it has a "duty to read the release to ensure that the face of the story itself does not contain any inconsistencies," as well as a "duty to refrain from publishing the news story if the news organization knows the story is false or if the release itself contains unexplained inconsistencies." *Brown v. Courier Herald Publishing Co.*, 700 F. Supp. 534, 537 (S.D. Ga. 1988). The media organization "does not have a duty, however, to independently verify the accuracy of the wire service release." *Id.; see also Kendrick*, 659 A.2d at 824; *McKinney v. Avery Journal, Inc.*, 393 S.E.2d 295, 297 (N.C. Ct. App. 1990); *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 447 N.W.2d 105, 112 (Wis. Ct. App. 1989); *Howe*, 555 N.W.2d at 741.

In the years since *Layne*, no court has rejected the rationale underlying the wire service defense. To the contrary, it has been expanded. While the wire service defense was originally developed for newspapers who served as conduits for national wire service reports, it has since been extended to shield other media defendants – including television broadcasters – that rely on other news organizations. *See, e.g., Med. Lab. Consultants v. American Broadcasting Cos.*, 931 F. Supp. 1487, 1492 (D. Ariz. 1996) (local ABC affiliate); *Auvil v. CBS "60 Minutes"*, 800 F. Supp. 928, 931 (E.D. Wash. 1992) (local CBS affiliate).

Although never squarely presented with the "wire service defense," the District of Columbia Court of Appeals accepted the doctrine for all practical purposes in *Kendrick v. Fox Television*, 659 A.2d 814 (D.C. 1995). In *Kendrick*, WTTG Fox 5 reported, based on an AP news report, that the plaintiff, the owner of an apartment building, "may have tipped off drug dealers about a raid on the apartments." 659 A.2d at 817-18.  Kendrick argued that the media defendants were negligent because, *inter alia*, they failed to contact him prior to the broadcast and ignored problems concerning the veracity of the Deputy Police Chief. *Id.* at 821.

22

The *Kendrick* court stated that "it is well established that a news organization can reasonably rely on information received from other reputable news organizations, such as the Associated Press." *Kendrick*, 659 A.2d at 824 n.24 (*citing Nelson v. Associated Press, Inc*., 667 F. Supp. 1468, 1476-80 (S.D. Fla. 1987)). Doing so, the court noted, would not violate the standard of care owed to private figure plaintiffs, which obligates publishers "to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others . . . *i.e.*, . . . to make a reasonable investigation as to the truth." 659 A.2d at 822 (*quoting Moss*, 580 A.2d at 1025-26).

Although the wire service defense had not been raised on appeal, the District of Columbia Court of Appeals noted with approval that "the trial court correctly held as a matter of law that Fox television was not negligent in failing to conduct an independent inquiry before reporting the story taken from the Associated Press." *Kendrick*, 659 A.2d at 824 n.24.

Indeed, we are aware of no jurisdiction that has rejected the wire service defense. Nor has any court that found the wire service defense applicable ever held that a media defendant nevertheless is liable for republication of a wire service report. *See* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS §7.3.1 (3d ed. 1999) ("Research has disclosed no case in which a court has held that the exception applies and the republisher has therefore in fact been held liable for republication of a wire service article for failure further to investigate.").

It is clear that allowing a media organization to rely on the wire services is critical to the gathering and dissemination of news; no media organization could assume the burden of verifying every news item reported to it by established news gathering agencies and continue to satisfy the demands of modern society for up-to-the-minute news and information. *See, e.g.,*

23

*Howe*, 555 N.W.2d at 741; *Layne*, 146 So. at 239.

As one court has noted: The reason for the defense makes sense. . . . [M]odern newspapers could not exist without a similar privilege. After all "[n]o newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all." *Nelson,* 667 F. Supp. at 1476-77 (quoting *Layne*, 146 So. at 239). Courts typically conduct a two-stage inquiry to determine whether summary judgment should be granted in these circumstances.

The first inquiry is whether the allegedly defamatory statement was taken "without substantial change" from "a reputable news-gathering agency." *Howe,* 555 N.W.2d at 740; see also *Brown*, 700 F. Supp. at 537; *Nelson,* 667 F. Supp. at 1478.

The second inquiry is whether the media organization actually knew that the wire service report was false or there is something unusual in the wire service report that should have put the publisher on notice that the report was probably false. *Howe*, 555 N.W.2d at 741; *Brown*, 700 F. Supp. at 537; *Nelson,* 667 F. Supp. at 1479. As the court noted in *Howe*, "[t]o require a local news organization to independently verify the accuracy of every wire-service release that the local organization has no reason to believe is inaccurate and is received from a reputable news-gathering agency would be to impose an obligation to conform to a standard of conduct greater than that of a reasonable man under like circumstances." 555 N.W.2d at 741.

The straightforward application of these principles to the facts of this case require its dismissal. First, it cannot be disputed that Daioleslam aired "without substantial change" the reports he cited to concerning Plaintiffs' activities. In all material respects the Daioleslam

24

broadcast was identical to the cited reports.

Second, there is nothing in the wire service report that would have struck a news professional as facially implausible, such that it should be questioned or disbelieved. To begin with, it came from well known providers of information.

Nor is there anything improbable in the report itself; to the contrary, the facts were directly attributed to well known scholars, lending a further indicia of credibility to the report. In fact, Plaintiffs' claim is not that the cited report should have set off alarms, but rather Plaintiffs are taking the ostrich approach and ignoring the cited reports.

The inference is inescapable that requiring verification of wire service stories prior to publication would impose a heavy burden on the media's ability to disseminate newsworthy material. *Appleby*, 478 N.E.2d at 725. Indeed, the very crux of the wire service defense is that news organizations that republish reports from reputable news agencies are not negligent, as a matter of law, even if the reports contain erroneous information and the defendant did not take steps to independently verify the information. *See, e.g., O'Brien*, 735 F. Supp. at 225 (noting that "the purpose of relying on AP news accounts" is to obviate the need for independent investigation); Nelson, 667 F. Supp. at 1480 ("[T]he question is not whether the Defendants have to rely on the AP, but whether they have a right to."); *Brown*, 700 F. Supp. at 537; Howe, 555 N.W.2d at 741; *McKinney,* 393 S.E.2d at 297; *Van Straten*, 447 N.W.2d at 112.

To require that Daioleslam independently verify the accuracy of every scholar published work that appears accurate on its face would hold Daioleslam to a standard, not of ordinary care, but of extraordinary care. This is not the law in the District of Columbia or anywhere else.

In this case, as set forth in Exhibits 7 through 16, Daioleslam properly relied on reputable news and scholarly and primary sources, such as fact pages from the IIC website, for his

25

underlying facts. The subsequent analysis based on those facts was not undertaken with malice

or with reckless disregard for the truth, as is evidenced by Daioleslam's affidavit.

> **2.      Even to the extent that such statements are not protected by the "reprinting" privilege because they are not substantially identical, the Plaintiffs cannot demonstrate the requisite fault.**

Assuming *arguendo* that some of the statements complained of the in the Complaint are not

are not protected by the "reprinting" privilege because they are not substantially identical, the

Plaintiffs still cannot demonstrate the requisite fault.  This is because the statements that

Daioleslam made which are complained of in the complaint were not made by him with

knowledge of their falsity.  Indeed, Daioleslam does not acknowledge that such statements are

false, much less that he knew they were false when he made such statements.  Moreover, as set

forth above, Daioleslam did not act with actual malice, because he researched his analysis and

based his commentary on that research and his own knowledge, thus demonstrating that he did

not act with reckless disregard for the truth.  *See e.g.  Liberty Lobby, Inc. v. Rees, et. al.*, 852

F.2d 595 (D.C. Cir. 1988)(affirming the trial court's summary judgment in favor of the defendant

where the defendant's statements were based on documented evidence, even where the

characterization of such evidence perhaps went 'beyond journalistic exaggeration or

embellishment. The Court found that "[t]he test for the reckless disregard of the truth is not

whether a reasonably prudent person would have published the statement, but rather, whether

there is "sufficient evidence to permit the conclusion that the defendant in fact entertained

serious doubts as to the truth of his publication."  *Id.* at 302-303*).

Here, beyond conclusory statements that mimic the legal element of fault, Plaintiffs have

failed to state any facts upon which relief for defamation can be granted, Plaintiffs have not

indicated anything that demonstrates that the Defendant either knew or had serious doubts about

the truth of his publication.  Therefore, even without the protection afforded by a strict

application of the reprinting theory, the Defendant is entitled to summary judgment, because

Plaintiffs have failed to allege facts which support actual malice on the part of the Defendant.

      The Plaintiffs complain of statements that are either demonstrably true, are opinion, or

are not defamatory.  In addition, the Plaintiffs have failed to allege facts which entitle them to

relief because they have failed to allege any facts that support their allegation that Defendant

knew his publications to be false or had serious doubts about the truth of his publication.

Accordingly, judgment should be entered in favor of Daioleslam on Plaintiffs' defamation

claims.

### III. PLAINTIFFS' FALSE LIGHT CLAIMS MUST LIKEWISE BE DISMISSED.

      In addition to asserting claims for defamation, Parsi alleges that Daioleslam is liable for

false light. Regardless of how Parsi styles his causes of action, however, dismissal of his

defamation claims against Daioleslam necessitates the dismissal of Parsi's remaining claims. As

with his defamation claims, Parsi must, at a minimum, show that Daioleslam was negligent in

order to recover under his other theories of liability. *See, e.g., Washington v. Smith*, 893 F. Supp.

60, 64-65 (D.D.C. 1995), aff'd, 80 F.3d 555 (D.C. Cir. 1996).

      In false light invasion of privacy action involving public figure plaintiff and media

defendant: (1) only statements that are provable as false are actionable; (2) plaintiff has burden

of proving falsity of each statement; and (3) plaintiff must prove with convincing clarity that

offending statement was made with actual malice, *i.e.* that false statement was made intentionally

or with reckless disregard as to whether it was false. Restatement (Second) of Torts § 652E.

*Howard v. Antilla*, 294 F.3d 244 (1st Cir. 2002).

      As the United States Court of Appeals for the District of Columbia has stated, "a plaintiff

may not use related causes of action [including a false light] to avoid the constitutional requisites

of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994).

The same privileges and defenses applicable to libel claims may be invoked to defend against

related claims arising out of the same set of facts, including false light claims. *White v. Fraternal*

*Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990); Moldea, 22 F.3d at 319-20.

As discussed above, the wire service defense is merely a definition of ordinary care in

regard to the use of wire service news stories. *See, e.g., Brown v. Courier Herald Publ'g*, 700 F.

Supp. 534, 537 (S.D. Ga. 1988). Thus, the wire service defense is not limited to defamation

claims. Where the wire service defense shields a media organization from defamation, courts

have invariably held that it also shields the defendant from related tort claims. *See, e.g., Med.*

*Lab. Consultants v. Am. Broad. Cos.*, 931 F. Supp. 1487, 1492 (D. Ariz. 1996) (dismissing

intrusion of privacy, intentional infliction of emotional distress, negligent infliction of emotional

distress, public disclosure of private facts, and false light claims); O'Brien, 735 F. Supp. at 225

(dismissing false light claims).

### IV.     THE ALLEGATION IN PARAGRAPH 18C DOES NOT CONCERN EITHER PARSI OR NIAC AND THEREFORE SHOULD BE STRICKEN FROM THE COMPLAINT.

Paragraph 18C of the Complaint cites the following statement as a allegedly defamatory
statement related to Parsi:

> Obviously, the Swiss ambassador[12] did not intent to put at risk such a
> historical event by turning to Bob Ney's group.  He was surely instructed
> by his Iranian contacts to do so.

While the complaint includes Parsi in brackets after the words "the Swiss

---

[12]  In the Complaint, after the words "Swiss Ambassador" the Plaintiff has inserted the word
"Parsi" in brackets.  The text set forth in the quote is the original, unedited text of Defendant's
statement.

ambassador," to indicate that the article identifies Trita Parsi as the Swiss ambassador, the article clearly identifies Tom Guldiman, as the Swiss ambassador.  Therefore, this statement is neither about nor concerning Parsi or NIAC, and should be stricken from the complaint.

  **WHEREFORE**, the Defendant respectfully requests that this Honorable Court grant this motion and dismiss this action, or in the alternative, grant summary judgment against the Defendant.

        Respectfully submitted,

        */s/* Jeffrey B. O'Toole_____

        Jeffrey B. O'Toole
        O'Toole, Rothwell, Nassau & Steinbach
        1350 Connecticut Ave., NW, #200
        Washington, DC 20036
        (202) 775-1550
        Counsel for Defendant

<u>CERTIFICATE OF SERVICE</u>

  This is to certify that a copy of this Motion, Memorandum of Points and Authorities and Statement of Material Fact as to Which There is No Genuine Issue was served upon counsel for the plaintiffs, Afshin Pishevar, on this 8th day of July, 2008 by email to ap@pishevarlegal.com and by regular mail to 600 East Jefferson Street, Suite 316, Rockville, MD, 20852.

        */s/* Jeffrey B. O'Toole_____

        Jeffrey B. O'Toole