**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI, Ph.D.

and

NATIONAL IRANIAN AMERICAN COUNCIL ("NIAC")

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT OR IN THE ALTERNATIVE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs, Trita Parsi and the National Iranian American Council ("NIAC"), have been repeatedly and persistently defamed by the Defendant, Seid Hassan Daioleslam. The Defendant has engaged in a campaign to convince the public that the Plaintiffs are agents of the Islamic Republic of Iran, engaged in elicit activities on behalf of that regime. The Defendant has made statements, presented as fact, explicitly claiming such a relationship exists between the Plaintiffs and the government of Iran. These statements are entirely false and have caused irreparable harm to the Plaintiffs in the Iranian-American community, which overwhelmingly disapproves of the Iranian regime. The Defendant knew that his statements were false; or in the alternative he published them with reckless disregarded to the truth.

## BACKGROUND AND SUMMARY

1. Founded in early 2002, the National Iranian-American Council is a non-partisan, non-political, non-sectarian, and non-profit organization dedicated to promoting Iranian-American

participation in American civic life. Dr. Trita Parsi is the President of this organization. *See* Exhibit F.[1] Defendant has recklessly accused NIAC and Dr. Trita Parsi of being agents of the Islamic Republic of Iran. Iran is designated by the United States as a sponsor of terrorism. *See* Exhibit E. Nothing could be as defamatory to NIAC as being accused of being an actual (not metaphorical) **agent** of the Islamic Republic of Iran. Not only would such action be criminal (see pg. 8, *infra*), but it would be tremendously scandalous and unpopular in the Iranian-American Community. This Community is NIAC's constituency, its grass routs, its source of memberships and revenue. This Community is NIAC's best source of donations. It would be absurdly illogical for NIAC or Dr. Parsi to be agents of the Islamic Republic.

2. Defendant's agenda-driven motivation is to destroy the reputation of NIAC and Dr. Parsi. This is self-evident from the organizations and publications he is associated with, e.g. the MKO (An Organization designated in the past as a Terrorist Organization by the D.O.S.) *See* also Parsi Affidavit. Therefore, *inter alia*, Defendant has the motivation to falsify allegation against me as well as disguise his pure agenda-driven allegations as "opinion." The fact that Defendant attempts to disguise and conceal his action and even his identity is *consciousness of* his *guilty* state of mind. Furthermore, the fact that he has disregarded basic procedures of (for a *self-*professed "journalist") simple fact finding even in the *lay* sense, indicates that Defendant has absolutely no regard for the truth, but that he is simply on a mission wherein the agenda is to destroy the reputation of anyone who is against his end-goal (no diplomatic solution to the conflict with Iran). Coupled together, his (i) motive and (ii) his singular failure to follow even the most basic fact-finding procedures are more than sufficient to lead a reasonable juror to conclude that this amounts to "reckless disregard for the truth."

[1] Personally, Dr. Parsi is not Muslim; rather, he is a member of a small, ancient monotheistic, religious minority (Zoroastrianism) which pre-dates the 3 major mono-theistic religions of the world.

3. To make Defendant's malice even more obvious, Defendant was placed on actual notice of his falsity, *inter alia*, when Plaintiff served him with a detailed *cease and desist* letter well in advance of taking legal action. *See* Exhibit D. He knew or should have known what he was publishing was false; he had absolute notice and actual knowledge of this falsity; certainly after he was served with *legal notice* by plaintiff. Despite this heightened duty to be more scrupulous and to check his facts and allegations with more scrutiny, the Defendant instead published more defamation with more intensity, with even more brazenly reckless disregard for the truth.

**I. <u>The Plaintiffs alleged sufficient material facts to show genuine issues thereby overcoming the Defendant's Motion to Dismiss</u>**

4. In order to survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the Plaintiffs need only allege a "plausible entitlement to relief by setting forth any set of facts consistent with the allegations." <u>Di Lella v. Univ. of Dist. of Columbia</u>, --- F. Supp. 2d ----, 2008 WL 2966260 at *3 (D.D.C. 2008). The Plaintiffs need not "plead all elements of [their] *prima facie* case in the complaint." <u>Id.</u> In addition, the Court must construe the complaint liberally in favor of the Plaintiffs and "assume all the allegations in the complaint are true (even if doubtful in fact)," giving the Plaintiffs "the benefit of all reasonable inferences derived from the facts alleged." <u>Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.</u>, 525 F.3d 8, 17 (D.C. Cir. 2008).

5. The Plaintiffs have alleged a sufficient factual basis for recovery under a theory of defamation, so the above-captioned matter should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). A plaintiff must allege four elements to establish a cause of action for defamation:

> [First,] that the defendant made a false and defamatory statement concerning the plaintiff; [second,] that the defendant published the statement without privilege to a third party; [third,] that the defendant's fault in publishing the statement amounted to at least negligence; and [fourth,] either that the

> statement was actionable as a matter of law irrespective or special harm or that its publication caused the plaintiff special harm.

Blodgett v. University Club, 930 A.2d 210, 222 (D.C. 2007) (quoting Oparaugo v. Watts, 884 A.2d 63 (D.C. 2005)). The following facts were, *inter alia*, alleged in the Complaint. The Defendant made false and defamatory statements about the Plaintiffs—specific examples of such statements were provided. (Compl. ¶¶ 13-15, 17, 20, 34-38.) The statements were published to a third party—to the public, in fact. (Compl. ¶¶ 16, 39.) The Defendant's degree of fault rises at least to that of negligence. (Compl. ¶¶ 21-22.) Finally, the statements were either actionable as a matter of law or caused special harm to the Plaintiffs. (Compl. ¶¶ 23-24, 41-43.)

## II. The Defendant's Motion for Summary Judgment should be denied since material questions of fact are in dispute, or in the alternative because material questions of fact cannot be resolved before discovery

### A. Legal Standard for Summary Judgment

6. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A court must "view[] the evidence in the light most favorable to the nonmoving party." Byers v. Burleson, 713 F.2d 856, 859 (D.C. Cir. 1983) (vacating grant of summary judgment when, after drawing all reasonable inferences in favor of the nonmoving party, there existed a genuine dispute of material fact to be resolved at trial); see Popham, Haik, Schnobrich, Kaufman & Doty, Ltd. v. Newcomb Securities Co., 751 F.2d 1262, 1263 (D.C. Cir. 1985) (noting that "[a]ny doubt is to be resolved against the moving party"). If the nonmoving party "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court may deny the motion, order a continuance for, *inter*

*alia*, further discovery, or "issue any other just order." Fed. R. Civ. P. 56(f); see Celotex Corp. v. Catrett, 477 U.S. at 326 (stating that "[a]ny potential problem with . . . premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery" (footnote omitted)).

7. As stated in the accompanying Affidavit of A.P. Pishevar Regarding Need for Discovery, discovery has not yet commenced in the above-captioned action. (Aff. of A.P. Pishevar Regarding Need for Disc. ¶ 4.) While some material facts that are in dispute—such as the falsity of the Defendant's statements—can be attested to in an affidavit by Plaintiff Parsi, other material facts cannot be effectively ascertained prior to the commencement of discovery, and this Court should allow discovery to be completed before these facts are ruled upon. (Id.) See Khan v. Parsons Global Services, Ltd., 428 F.3d 1079, 1087-88 (D.C. Cir. 2005) (reversing grant of summary judgment and remanding to allow parties to conduct discovery before ruling on motion for summary judgment when the defendant filed the motion before filing an answer and the plaintiffs had not been given an opportunity to conduct any discovery).

**B. Legal Test for Defamation**

As more fully developed *supra*, Part I, the test for defamation is:

> [First,] that the defendant made a false and defamatory statement concerning the plaintiff; [second,] that the defendant published the statement without privilege to a third party; [third,] that the defendant's fault in publishing the statement amounted to at least negligence; and [fourth,] either that the statement was actionable as a matter of law irrespective or special harm or that its publication caused the plaintiff special harm.

Blodgett v. University Club, 930 A.2d 210, 222 (D.C. 2007).

**C. There are material facts still in dispute**

**1. The falsity of the Defendant's statements is a disputed material fact**

8. In a defamation action, if there is a factual dispute regarding the falsity of the statements, then a court should not find, as a matter of law, that the statements are substantially true unless "no reasonable juror could find them to be false." Moldea v. New York Times Co., 15 F.3d 1137, 1143, 1148 (D.C. Cir. 1994) (remanding and vacating a District Court grant of summary judgment where the substantial truth of the allegedly defamatory statements was at issue). Particularly where "the truth or falsity of multiple statements" are at issue, "it is the jury's province to determine whether the publication should be sufficiently false" to be considered defamatory. Id. at 1150.

9. The Defendant has written many false statements about the Plaintiffs, calling the Plaintiffs, *inter alia*, "the Mullahs'[2] lobby," "the Ayatollahs' Lobby," "key players in the lobby enterprise of Tehran's ayatollahs in the United States," and "an active and disguised Washington-based lobbying enterprise for the Iranian theocratic regime." (Pls.' Exs. A, B; Aff. of Trita Parsi ¶ 21.) As is apparent from even a quick perusal of the Defendant's website,[3] these statements are made repeatedly and professed as though they are statements of fact—not opinions, as the Defendant contends. (Mem. in Support of Def.'s Mot. to Dismiss Compl. or in the Alternative Def.'s Mot. for Sum. J., at 15–19). The Defendant contends that these statements are true. (Aff. of Seid Hassan Daioleslam, ¶ 13 ("I . . . still do believe [the statements regarding the Plaintiffs] to be true.").) The Plaintiffs contend they are false. (Aff. of Trita Parsi, ¶ 21.)

**2. There is a dispute regarding the facts establishing the Defendant's requisite degree of fault, or in the alternative these facts cannot be properly ascertained prior to the commencement of discovery**

10. While the Defendant has asserted his belief in the truth of his statements, he "cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the

[2] The terms "Mullah" and "Ayatollah" refer to the theocratic rulers of the Islamic Republic of Iran.
[3] http://english.iranianlobby.com

statements were true." St. Amant v. Thompson, 88 S. Ct. 1323, 1326 (1968). The good faith of the Defendant is a question of fact to be determined based on the circumstances surrounding the publication, including but not limited to whether the story is "fabricated by the defendant, is the product of his imagination," or where there are "obvious reasons to doubt the veracity of" the basis for the story. Id.

11. As detailed in the accompanying Affidavit of Trita Parsi, the Defendant's allegations are based upon statements that were "cherry picked" with complete disregard for the countless criticisms Plaintiff Parsi has leveled against the oppressive Iranian regime—both in his individual capacity and as president of NIAC. (See Aff. of Trita Parsi ¶ 15 (listing and extensively quoting criticisms the Plaintiffs have leveled against the Islamic Republic of Iran for, *inter alia*, human rights abuses).) Not only has the Defendant failed to provide any basis for his inflammatory statements about the Plaintiffs' alleged ties to that oppressive regime, the Defendant has altogether ignored their existence and explicitly stated that the Plaintiffs have not made such criticisms. (See, e.g., Ayatollah's Lobby in Washington, Pls.' Ex. A (stating that "Parsi paints a rosy picture of the human rights situation in Iran" and that Plaintiff Parsi "refrain[s] from condemnation of the torture, mass executions, rapes of women in prison, and stoning").) In fact, Plaintiffs' criticisms of the regime were made in the very same sources to which the Defendant quotes for his support. (Aff. of Trita Parsi ¶ 15.a.) This selective memory about the Plaintiff and willful blindness of the truth is powerful evidence of *actual malice*.

12. As a self-fancied "investigative journalist," it would be irresponsible to the point of beyond recklessness for the Defendant not to at least discuss the evidence opposing the thesis of his articles, when that evidence was known to the Defendant. Whether the Defendant was aware of these statements is a fact that will become apparent through the discovery process, but many

of these statements were made in the same publications—and even the same articles—as statements used by the Defendant as a basis for his "analysis." (Aff. of Afshin Pishevar Regarding Need for Disc. ¶¶ 6-7.) The extent to which the Plaintiffs have been openly critical of the Iranian regime should have given the Defendant "obvious reasons to doubt the veracity" of the basis for his statements, one of the factors to consider. See St. Amant v. Thompson, 88 S. Ct. at 1326.

**III. The Defendant's statements are defamatory**

**D. Defamation *per se***

13. "One who publishes a slander that imputes to another conduct constituting a criminal offense is subject to liability to the other without proof of special harm if the offense imputed is of a type which, if committed . . . would be . . . punishable by imprisonment in a state or federal institution . . . or regarded by public opinion as involving moral turpitude." Restatement (Second) of Torts § 571. Cf. Roper v. Great Atlantic & Pacific Tea Co., 164 A.2d 478 (D.C. App. 1960) (finding that statements by a store manager that a minor had stuffed her pockets with candy constituted slander *per se*). If a U.S. person—whether an individual or another legal entity—wishes to act as an "agent of a foreign principal" and engage in "political activities," the person must register with the Attorney General as such, or face fines of up to $10,000 and up to five years imprisonment. Foreign Agents Registration Act, 22 U.S.C. §§ 611–619. "Foreign principal" encompasses foreign governments, foreign political parties, and any non-U.S. organization or person. Id. § 611(b). The term "agent of a foreign principal" is defined as:

> . . . any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or

> subsidized in whole or in major part by a foreign principal, and who directly or through any other person--
> (i) engages within the United States in political activities for or in the interests of such foreign principal;
> (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;
> (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or
> (iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States[.]

Id. § 611(c). "Political activities" means

> any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party[.]

Id. § 611(o).

14. The Defendant has repeatedly asserted that the Plaintiffs are engaged in political activities for the Iranian regime—or at the very least with persons within Iran whose interests are aligned with that regime. (E.g., Aff. of Seid Hassan Daioleslam ¶ 11; Pls.' Ex. B.) This would place the Plaintiffs' activities squarely and firmly within the Foreign Agents Registration Act definition of an "agent of a foreign principal engaged in political activities." Since this offense is punishable by up to five years imprisonment, 22 U.S.C. § 618(a), the Defendant has accused the Plaintiffs of an offense which would qualify those statements as defamation *per se*, precluding the need for a showing of special damages. Washburn v. Lavoie, 357 F. Supp. 2d 210, 214 (D.D.C. 2004).

**E. Defamatory statements other than *per se***

15.   "A statement is defamatory if it tends to injure the plaintiff in his trade, profession, or community standing." Washburn, 357 F. Supp. 2d at 215.  "Courts are charged with the responsibility of determining whether a challenged statement is capable of conveying a defamatory meaning." White, 909 F.2d at 518.  However, a court "may only rule as a matter of law when the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." Washburn, 357 F. Supp. 2d at 215 (quoting White, 909 F.2d at 518).

16.   The Defendant's statements have caused numerous injuries to the Plaintiffs, particularly hampering the ability of the Plaintiffs to carry out their work as advocates for the Iranian-American community.  (Aff. of Trita Parsi ¶¶ 8–14.)  The statements have also hurt the Plaintiffs' credibility with U.S. government officials, and undermined the ability of Plaintiff NIAC to fundraise in the Iranian-American community.  (Id.)  These statements are certainly capable of defamatory meaning—both facially and as evidenced by the effect they have had upon the Plaintiffs' reputation, trade, profession, and community standing.

**IV.   The defamatory statements were published by the Defendant as statements of fact not opinions, as he now contends**

17.   Whether a statement is an "assertion of fact" or consists of an "expression of opinion" is to be determined as a matter of law.  White v. Fraternal Order of Police, 707 F. Supp. 579, 591 (D.D.C. 1989) (citing Ollman v. Evans, 750 F.2d 920 (D.C. Cir. 1984).  The test for whether a statement consists of an opinion is a "totality of the circumstances" test, though there is a four-part analysis to aid courts in making that determination.  Id.  First, the Court should look to the "common usage or meaning of the specific language" in the statement.  Id.  Next, the court should address whether the statement is objectively verifiable—i.e., "capable of being

objectively characterized as true or false." Id. Third, the statement should be viewed in its "full context" since other content surrounding the statement may "influence the average reader's readiness to infer that a particular statement has factual content." Id. at 591–92. Finally, the court should look to the "broader context or setting in which the statement appears." Id. at 592.

18.  In order to assist in the discussion of this test, the following is a representative, but far from exhaustive, list of defamatory statements made by the Defendant which would qualify as "assertions of fact" under the Ollman test.

- "[NIAC is] an active and disguised Washington-based *lobbying* enterprise for the *Iranian theocratic regime*.  NIAC is an effective node of Tehran's comprehensive lobbying web." (Iran's Oil Mafia, Pls.' Ex. B.) (emphasis added)

- "Trita Parsi and NIAC . . . have worked hard to improve the image of Tehran's rulers and pale Tehran unfriendly actions by the West." (Ayatollah's Lobby in Washington, Pls.' Ex. A.)

- "NIAC and Trita Parsi[] are key players in the lobby enterprise of Tehran's ayatollahs in the United States."  (Id.)

19.  First, the common usage and meaning of each of these statements indicates its factual nature.  The Defendant consistently uses forms of the verb "to be" to describe the Plaintiffs.  The verb "to be" is defined as meaning "[t]o have existence, truth, or actuality." Webster Comprehensive Dictionary, Encyclopedic Edition vol. 1, 122 (1984). Thus, the ordinary and plain meaning of these statements, relying on the verb "to be," is that their substance has truth.

20.  Second, each of these statements are objectively verifiable.  Namely, the Plaintiffs have denied the factual nature of these statements and have supplied evidence to support their position.  (See Aff. of Trita Parsi.)  For example, the Defendant states that the Plaintiffs have attempted to "improve the image" if the Iranian regime.  (Ayatollah's Lobby in Washington, Pls.' Ex. A.)  However, Plaintiff Parsi has, on numerous occasions, both personally and on behalf of NIAC, indicated his *condemnation* of the Iranian regime. (See, e.g., Aff. of Trita Parsi ¶ 15(c).)

21. Third, the content surrounding the statements would suggest to a reader that the statements in question are statements of fact, rather than opinion. The Defendant claims to be a member of the mass media, and presents his articles as works of investigatory journalism. (Aff. of Seid Hassan Daioleslam ¶ 1.) This style of writing suggests that he is supplying his readers with facts uncovered during investigation.

22. Finally, the broader context of the statements demonstrates that they are factual in nature. The Defendant holds himself out as an expert in Iranian issues, indicating a special knowledge of facts relating thereto. (Did NIAC Defraud the National Endowment for Democracy, sidebar, Pls.' Ex. C; Aff. of Seid Hassan Daioleslam ¶¶ 1-4.) The totality of circumstances surrounding the publication of the Defendant's defamatory statements indicates that they are statements of fact, rather than statements of opinion. The totality of circumstances surrounding the publication of the Defendant's defamatory statements indicate that they are Defamatory Statement of the worst kind of all – statements made with actual *Malice*, statements uttered to destroy a fine non-profit organization and a good man's reputation simply because of the defendant's hidden, politically driven agenda.

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Dismiss the Complaint or in the Alternative Defendant's Motion for Summary Judgment should be Denied.

Respectfully submitted,
*PISHEVAR & ASSOCIATES, P.C.*
/S/
Afshin Pishevar, Esq. - Bar No. 451015
ap@pishevarlegal.com
600 East Jefferson Street
Jefferson Plaza, Suite 316
Rockville, Maryland 20852
301-279-8773

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**<u>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT OR IN THE ALTERNATIVE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

COMES NOW the Plaintiffs, Dr. Trita Parsi and the National Iranian American Council ("NIAC"), by and through their counsel, Afshin Pishevar and Pishevar & Associates, P.C., and submits this Opposition to Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment. In support thereof they state the following and submit the attached Memorandum of Law in Opposition to Defendant's Motion to Dismiss Complaint in the Alternative Defendant's Motion for Summary Judgment.

1. The Plaintiffs filed a Complaint in the above-captioned matter stating that the Defendant, Seid Hassan Daioleslam defamed the Plaintiffs. In response, the Defendant has filed Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment ("Defendant's Motion").

2.    The Defendant has filed a Motion to Dismiss the Complaint, alleging that the Plaintiffs have failed to state a claim upon which relief can be granted. (Def.'s Mot. to Dismiss Compl. or in the Alternative Def.'s Mot. for Summ. J. [hereinafter Def.'s Mot.].)

3.    The Plaintiffs have alleged the four required elements for a defamation cause of action. (Compl. ¶¶ 13-17, 20-24, 34-39, 41-43.) Therefore the Defendant's Motion to Dismiss the Complaint should be denied.

4.    The Defendant has filed a Motion, in the Alternative, for Summary Judgment. (Def.'s Mot.) In support thereof, the Defendant has filed a Statement of Material Fact as to Which There is no Genuine Dispute. The Plaintiffs dispute numerous facts contained in that list, including, *inter alia*, numbers 4-5, 8, 10, 11, 14, 16, 18.

5.    The Plaintiffs further dispute numerous facts asserted or assumed in the Defendant's Memorandum in Support of Defendant's Motion ("Defendant's Memo."), including, inter alia, the following:

      A.    The truth or falsity of the Defendant's defamatory statements;

      B.    The facts establishing the Defendant's requisite degree of fault;

      C.    Whether association with the Iranian regime conveys a defamatory meaning;

      D.    The harm to the Plaintiffs as a result of the Defendant's defamatory statements.

6.    The disputed facts are material to the Plaintiffs' claims and, on a motion of summary judgment must be viewed in the light most favorable to the nonmoving party, the Plaintiffs. As such, the Defendant's Motion for Summary Judgment should be denied.

7.    The Defendant has filed the Defendant's Motion in lieu of filing an Answer, and discovery has not yet commenced. Should the Court find that the Plaintiffs have not demonstrated sufficient facts to oppose the Defendant's Motion for Summary Judgment,

the Court should deny the Defendant's Motion and allow the Plaintiffs time to conduct discovery. (Aff. Afshin Pishevar Regarding Need for Disc.)

WHEREFORE the Plaintiffs respectfully request that this Honorable Court grant the following relief:

A. Deny the Defendant's Motion to Dismiss the Complaint;

B. Deny the Defendant's Motion in the Alternative for Summary Judgment; and

C. Such other relief as this Court deems just and proper.

Respectfully submitted,
*PISHEVAR & ASSOCIATES, P.C.*

Afshin Pishevar, Esq.
Bar No. 451015
ap@pishevarlegal.com

600 East Jefferson Street
Jefferson Plaza, Suite 316
Rockville, Maryland 20852
301-279-8773

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing, as well as the memorandum, exhibits, and proposed order, was served on this 8th day of August, 2008. This document was filed electronically and thereby served on all counsel of record.

/s/

A.P. Pishevar, Esquire

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**ORDER DENYING DEFENDANT'S MOTION**

Upon consideration of the Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment, and any opposition thereto, it his hereby ORDERED:

Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment is DENIED.

It is so ORDERED.

_______________________________
Judge, United States District Court for the District of Columbia

*Copies to*:
A.P. Pishevar
600 East Jefferson Street, Suite 316
Rockville, MD 20852

Jeffrey B. O'Toole
1350 Connecticut Avenue NW, Suite 200
Washington, DC 20036

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**ORDER DENYING DEFENDANT'S MOTION**

Upon consideration of the Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment, and any opposition thereto, it his hereby ORDERED:

Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment is DENIED.

It is so ORDERED.

______________________________
Judge, United States District Court for the District of Columbia

*Copies to*:
A.P. Pishevar
600 East Jefferson Street, Suite 316
Rockville, MD 20852

Jeffrey B. O'Toole
1350 Connecticut Avenue NW, Suite 200
Washington, DC 20036

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**AFFIDAVIT OF TRITA PARSI**

I, Dr. Trita Parsi, an adult competent to testify to the facts contained herein, upon personal knowledge and belief, swear according to law and under penalty of perjury and say:

1. The statements herein are made both as an individual and in my capacity as President of the National Iranian American Council (NIAC).
2. Neither NIAC nor I are agents of the Iranian regime—nor do we lobby on behalf of the Iranian government or for its interests.
3. NIAC receives its funds from private Iranian-American donors as well as prominent US foundations such as the National Endowment for Democracy, the Rockefeller Brothers Fund, the Ploughshares Fund, the Open Society Institute, and is in no way funded by the Iranian government or any of its proxies or surrogates.
4. Neither NIAC nor I "work with" the Iranian government, or its proxies or surrogates—our purpose is to advocate on behalf of the Iranian-American community in the U.S.

5. The interview to which the Defendant refers on page 11 of his Motion to Dismiss, titled "Iranian Lobby Becomes Active?" was *not* an interview I gave to Iranian newspaper, *Aftab*—the interview was given to the U.S. government-funded Radio Free Europe (see http://www.rferl.org/content/Article/1073703.html) and reprinted without permission by *Aftab*. Likewise, the quoted "introduction" was added by the editors of *Aftab*, was not included as part of the original interview given to RFE, and does not reflect my or NIAC's opinions, beliefs, or goals.

6. Neither NIAC nor I have any control over erroneous statements made in Persian-language news publications like *Aftab*.

7. Iranians for International Cooperation (IIC) was a distinct organization, with a different focus than that of NIAC, and it is therefore irrelevant to the discussion of this case. Nevertheless, the Defendant distorts that organization's purpose as well. The quote used by the Defendant is incorrectly quoted and taken out of context, and was in fact using the term "Iran" to mean "the Iranian people," as is evident from reading the entirety of Exhibit 13 provided by the Defendant. The correct quote should contain "Iranian's [sic] interests" rather than "Iran's interests." As stated the same exhibit, IIC was formed "in order to protect the socio-economic and political aspirations of the Iranian people on one hand, and to promote the historical and contemporary cultural and scientific contributions of people of Iranian heritage worldwide." It was not formed to promote the interests of the Iranian *regime*.

8. The Defendant's false allegations that I work on behalf of the oppressive Iranian regime have hurt my reputation in the Iranian-American community—a community which overwhelmingly disapproves of the government of the Islamic Republic of Iran.

9.  The Defendant's false allegations that I work on behalf of the Iranian regime have also caused me personal anguish and caused some of my personal and professional relationships with Iranian Americans to become strained.

10. The Defendant's false allegations that I work on behalf of the Iranian regime has hurt my relations with colleagues in Washington's academic and policy circles.

11. It should be noted that my own family has been victimized by the Iranian regime, including my father who was imprisoned by the Islamic Republic.

12. The Defendant's false allegations that NIAC is a lobby for the oppressive Iranian regime have hurt NIAC's reputation in the Iranian-American community—a reputation that is vital if the organization is to carry out its goals of advocating the interests of Iranian Americans.

13. The Defendant's false allegations that NIAC is a lobby for the oppressive Iranian regime have hurt NIAC's credibility on Capitol Hill and among U.S. decision-makers.

14. The Defendant's false allegations that NIAC is a lobby for the oppressive Iranian regime have directly hurt NIAC's financial standing by undermining the organization's ability to raise funds in the Iranian-American community.

15. The Defendant has recklessly or intentionally avoided discovering the falsity of his accusations, and has instead cherry-picked some of my statements and taken them out of context to support his conspiracy. He has ignored statements or articles – or segments of articles – that contradicts his conspiracy. For instance, the Defendant has among other things:

   a.  Willfully ignored a segment of the interview I gave to Radio Free Europe, which he otherwise refers to, in which I criticize the Iranian government for provoking

the U.S.: "Diplomacy is falling victim to an endless cycle of provocations right now and those provocations obviously come from both sides. I think from the Iranian side it's been extremely provocative to [hold] this conference regarding the Holocaust in Tehran."

b. Willfully ignored an op-ed I wrote for the Philadelphia Inquirer on February 27, 2008 in which I urged the U.S. to "put the deteriorating human rights situation in Iran on the table in its discussions with Tehran."

c. Willfully ignored an analysis I wrote for the Inter Press Services on May 23, 2007, where I condemn the Iranian authorities for their human rights violations:

> "In recent weeks, the Iranian intelligence services have imprisoned Dr. Haleh Esfandiari, a 67-year-old grandmother visiting her ailing 93-year-old mother in Iran. Denying her access to her lawyer -- Nobel laureate Shirin Ebadi -- or visits by her family, these forces seems to calculate that the inhumane treatment of Esfandiari will cause a backlash in the U.S. against Iran and derail any diplomatic opening. As the head of the Middle East Programme at the Woodrow Wilson International Centre for Scholars in Washington, her arrest was poised to receive significant media attention.
>
> These elements in Iran have also arrested Dr. Kian Tajbakhsh, a consultant for the Open Society Institute's programmes in Iran. A prominent social scientist, Tajbakhsh and the Open Society Institute's work in Iran was fully transparent and approved by the Iranian authorities.
>
> His subsequent arrest -- only three days after Dr. Esfandiari was sent to the notorious Evin prison -- under the pretext of having worked to foment a "velvet revolution" in Iran carries no credibility. Tajbakhsh's activities centred around health and urban policy issues, most recently on AIDS prevention and drug addiction in Iran. Much like Esfandiari, his work helped open up Iran to the outside world -- an activity that clearly threatens the Iranian status quo forces.
>
> Furthermore, in another effort apparently aimed at poisoning the political atmosphere right before historic talks take place between the U.S. and Iran, hardliners in Iran have cracked down on "inappropriately dressed" women and men breaching the country's strict Islamic dress code, arresting hundreds and warning thousands more. Some youth have reportedly been

> beaten up on the streets, in what has been described as a flashback to the early days of the revolution when religious zeal was at its height.

d. Willfully ignored an interview I gave to the Associated Press on Oct 20, 2007

criticizing the Iranian government's clamp down on civil society:

> Mounting tensions between the U.S. and Iran over nuclear weapons programs and the Iraq war likely led to targeting Iranian-Americans to shift the attention of Iranians away from international criticism, scholars said. "The Iranian government is using that as a pretext," said Trita Parsi, president of the National Iranian American Council. "Whenever the tensions between Iran and the U.S. increase, that gives the government an opportunity to clamp down."

e. Willfully ignored an op-ed I wrote in the Financial Times on Jan 2, 2005

criticizing the EU for sacrificing the human rights situation in Iran:

> While the world has focused on discussions over Tehran's nuclear capability, human rights in Iran have suffered severe setbacks. By, in effect, "de-linking" advances in this area from the economic incentives aimed at ensuring Tehran suspends uranium enrichment, the European Union has sacrificed the Iranian people's rights in order to secure a nuclear deal. This moral failure makes it even more important for Washington to join the talks and put human rights at the top of the agenda. US involvement in the talks will provide the international community with the security guarantees it needs, while ensuring no deal is struck that would be detrimental to Iran's faltering democratisation.

f. Willfully ignored an article I wrote for OpenDemocracy on October 28, 2005,

condemning Iranian President Ahmadinejad's comments on Israel:

> Ahmadinejad's comments are irresponsible and repulsive, but there is little to suggest that they reflect a deliberate policy shift. Rather, the historic pattern of the Israeli-Iranian rivalry indicates that the former Tehran mayor committed yet another *faux pas* in the international arena. Again, the ineptitude of Tehran has proven to be the primary source of Iran's many problems.

g. Willfully ignored an article I wrote for Inter Press services on June 4, 2008

blaming Tehran for lack of parliamentary dialogue with the U.S:

> Tehran bears overwhelming responsibility for the failure to initiate a parliamentarian dialogue between the two countries [U.S].

h. Willfully ignored a conference NIAC organized on Capitol Hill on July 26, 2007, sponsored by Amnesty International, on the plight of human rights in Iran.

i. Willfully ignored numerous statements and quotes by myself and NIAC condemning the Iranian government for its human rights violations.

**16.** NIAC was not founded by Congressman Bob Ney, Roy Coffee and David DeStefano for the purpose of normalizing US-Iran relations, as the defendant has falsely alleged.

**17.** NIAC is a nonprofit corporation, taxed under 501(c)(3) of the Internal Revenue Code.

**18.** I am not registered with the U.S. Attorney General as an agent of a foreign principal pursuant to 22 U.S.C. § 611 et seq.

**19.** NIAC is not registered with the U.S. Attorney General as an agent of a foreign principal pursuant to 22 U.S.C. § 611 et seq.

**20.** The Defendant is currently or has previously been associated with organizations and publications such as the Mujahedin-E Khalq Organization ("MKO")—a designated terrorist organization—whose shared goal is to encourage war with Iran, promote sanctions, and prevent diplomatic negotiation with Iran. Because I advocate the increased use of diplomacy with Iran—a position opposite to that of the MKO and the Defendant—the Defendant's goal is to destroy the reputations and credibility of NIAC and myself and remove us as impediments to achieving his foreign policy goals.

**21.** The following statements, *inter alia*, made by the Defendant in the sources indicated, are false:

(1) "NIAC and Trita Parsi[] are key players in the lobby enterprise of Tehran's ayatollahs in the United States." (Ayatollah's Lobby in Washington, Ex. A. to Pls.' Opp'n to Def.'s Mot. to Dismiss)

(2) "Trita Parsi and NIAC . . . have worked hard to improve the image of Tehran's rulers and pale Tehran unfriendly actions by the West." (Id.)

(3) "[NIAC is] an active and disguised Washington-based lobbying enterprise for the Iranian theocratic regime." (Iran's Oil Mafia, Ex. B. to Pls.' Opp'n to Def.'s Mot. to Dismiss)

(4) "NIAC is an effective node of Tehran's comprehensive US lobbying web." (Id.)

(5) "NIAC and its major figures, such as . . . Trita Parsi, are effective nodes of Tehran's efforts to manipulate US policy toward self-serving ends." (Id.)

(6) "NIAC . . . has three distinct but related goals: [] to block resources to NGOs not controlled by the [Iranian] government, [] to provide resources to their showcase NGOs, [] and to funnel the American taxpayers' money to the Iranian lobby in the US to benefit Tehran's goals." (Did NIAC Defraud the National Endowment for Democracy, Ex. C. to Pls.' Opp'n to Def.'s Mot. to Dismiss)

I do solemnly declare and affirm under the penalties of perjury that the contents of the foregoing are true and correct.

Dr. Trita Parsi

August 8, 2008
Date

PLAINTIFF'S
EXHIBIT
A

**In Search of Truth**
**Reports on Mullahs's lobby in US**
**Editor: Hassan Daioleslam**

**ARTICLES**

- Iranian regime's web of influence A money trail Hassan Dai
- Did the NIAC Defraud the National Endowment for Democracy and Congress Hassan Dai
- Flirting with the Mullahs Mohammad Parvin and Hassan Daioleslam Hassan Dai
- The Iranian Web of Influence in the United States Hassan Dai
- Pro-Ayatollahs Disinformation and Manipulation Campaign by Washington Think Tankers Hassan Dai
- Iran's 2003 Grand Bargain Offer: Secrets, Lies, and Manipulation Hassan Dai
- Iran's Oil Mafia: Penetrating the US Political System Hassan Dai
- The Iranian Lobby and the Israeli Decoy Hassan Dai

**Ayatollahs' Lobby In Washington Offering Human Rights as a Negotiating Item**

[ARTICLES] [25 Jun 2008]
Hassan Dai
Source: [www.iranianlobby.com]

The National Iranian American Council (NIAC) and its president Trita Parsi plan to organize a panel in the US House of Representatives on July 26th, 2007, titled "Human Rights in Iran and US Foreign Policy Options" [1]. According to the published agenda, representatives from Amnesty International and Human Rights Watch will participate. The sponsors of the program (NIAC and Trita Parsi) are key players in the lobby enterprise of Tehran's ayatollahs in the United States. The Iranian regime's violations of human rights have reached unprecedented levels. Its barbaric suppression of women, workers, students and dissidents, and the stoning of a man after 11 years of imprisonment, have been the subject of broad international condemnation. The reason Iran's lobby is organizing the program is twofold:

1- To present "human rights" as a negotiating item on the "engagement" table with hopes to have human rights entities argue for Tehran-friendly rapprochement, easing of sanctions and tolerance of a nuclear Iran. In a nut shell, the lobby's message is that the more West pressures the regime, the more violent it becomes, hence, lift the pressure.
2- To uphold the Ayatollahs' friends and inner circles in control of international reaction to Tehran's human rights abuses.

The Iranian regime's lobby has continuously tried to justify the Iran's clerical behavior and especially its record of human rights violations, by arguing that its causes are external factors and US coercive policies. If the Iranian American scholars are arrested, blame the US administration for allocating funds for Iranian activists. If Ahmadinejad has embarked on a policy of total repression inside the country and antagonism abroad, the blame is on US administration for the famous axis of evil speech and not supporting Khatami.

Ahmadinejad held the Holocaust conference and declared that "Israel should be wiped off the map", Trita Parsi and his cohorts not only did not condemn this anti-Iranian and anti-humanity act, but launched a campaign directed by Siamak Namazi (Parsi's main partner in Tehran) to blame the fault on "neocon" media which intentionally misinterpreted Ahmadinejad's declarations [2].

The lobby's PR tactic on human rights issue in Iran is best presented in Trita Parsi's own declarations. In 2005, he called for linking improvement of the human rights situation in Iran to guarantee of security to the mullahs and the lifting of sanctions [3].

> *"While the world has focused on discussions over Tehran's nuclear capability, human rights in Iran have suffered severe setbacks..... With the rest of the world distracted by the nuclear issue, anti-democratic forces in Iran have clamped down on the Iranian democracy*

* An Iranian Embassy in Boston Hassan Dai
* Return from Paradise in the Left Lane Hassan Dai
* Congressman Kucinich Must Find a Better Role Model than Bob Ney Hassan Dai
* NIE and Iranian internal politics Hassan Dai
* Where in the World is the Moderate Ayatollah? Hassan Dai
* Ayatollahs' Lobby In Washington Offering Human Rights as a Negotiating Item Hassan Dai

**more ...**

> *movement....... For Tehran, a nuclear arsenal is only really useful as a deterrent against possible US aggression. Iran does not need a nuclear deterrent against any other Middle Eastern country. .... Only security guarantees from the US, as part of a broader political arrangement, can convince Iran to agree to lasting compromises in the nuclear area."*

The mullahs' message in this article is clear: If the west does not guarantee their uninterrupted rule ("security") by providing ample financial resources (elimination of sanctions) and allowing an unimpeded path to super power status through development of nuclear capabilities, the regime will continue to suppress, kill and torture the Iranian people.

Binding accountability for Iran's barbaric suppression of the population to nuclear issues and Iran's meddling in Iraq per the demands of their US lobby, does the bidding of the ruling ayatollahs. The participation of international human rights organizations in this charade would be a grave mistake.

**NIAC, Trita Parsi and The Iranian Regime**

Officially founded in 2002, NIAC is one of the Iranian regime's Lobby arms in the US. In a recent article I wrote about NIAC and its effective role as a lobby node for Tehran's rulers [4,5].

In order to better understand the relation between NIAC and Tehran, we should refer to several figures directly involved in its creation. First and foremost, is Bob Ney, a current federal prisoner and former Ohio Congressman. Ney reportedly received bribes from lobbyists and two international arms dealers in a conspiracy to circumvent sanctions to sell US-made airplane parts to Tehran [6-8]. At the time, Trita Parsi was Ney's assistant in Iran-related matters [9]. Then, there are two of Ney's accomplices in his bribery and conspiracy relations with the arms dealers. These two are well-known Washington lobbyists Roy Coffee and Dave DiStefano. Roy Coffee in a letter to the *Dallas Morning News* in February 2006 [10] justifying his relationship with Ney and the arms dealers, discussed their collaboration with Trita Parsi to create an Iranian American lobby in 2002. In this letter, Coffee described the events following the meeting of his former classmate Darius Baghai (who had just returned from Iran) with Bob Ney:

> *"From that meeting, Darius, Dave and I began to work with Trita Parsi, another Iranian-American, to try to form a political action committee of Iranian-Americans to pursue a strategy of normalization of relations between the two countries. The 4 of us worked very hard for about 9 months to form this committee."*

One of the most important figures behind the creation of NIAC is Siamak Namazi who along with his sister and brother, control the *Atieh Bahar* enterprise, a major umbrella firm for several companies in Iran. Atieh's customers include the foreign corporations who wish to do business in Iran and find no option but to bribe officials. Recent fiascos involving Atieh's customers' corrupted dealings with the Iranian regime (such as Norway's *Statoil*[12]. or the CEO of the French oil company *Total SA* [13] )has not changed Namazi's prominent place inside the dominant spheres of power in Tehran. Namazi's enterprise continues to provide networking and computer services for almost all Iranian banks, parliament, and other important institutions. Namazi's groups monitor nearly all Iranian economic and political activities and have access to the country's most sensitive data [14]. One of the Atieh Bahar's affiliated companies, is Azar Energy, which is in partnership with Iranian government in major oil projects and is a part of the Mullah's oil mafia [15].

In 1999, Trita Parsi who was then living in Sweden, and Siamak Namazi, living in Tehran, presented a project in which they explained how to create an Iranian lobby in Washington. This roadmap for creating NIAC and its modus operandi was presented at the invitation and arrangement of Hossein Alikhani at a conference called "Dialogue and Action Amongst the People of Iran and America" (DAPIA)

that he hosted in Cypress in 1999. [16]. Hossein Alikhani is a former felon who in 1992, pled guilty to charges of violating anti-terrorist sanctions [17] and spent some time in US federal prisons. Recently Iran's ayatollahs awarded him the deed for the US embassy complex in Tehran[18] for his pain and suffering in American prisons. The true reason for this very generous $1.0 billion dollar reward should be sought elsewhere.

The roadmap for the lobby in the US is described in the paper [19] titled "*Iranian-Americans: The bridge between two nations*" in DAPIA. This report comprises the manifesto and roadmap of the new Iranian lobby in the US. In this paper, the authors suggest that: "an Iranian-American lobby is needed in order to create a balance between the competing Middle Eastern lobbies. Without it, Iran-bashing may become popular in Congress again." The "competing lobby" is *AIPAC (American Israeli Public Affairs Committee)*. The pillars of the road map are: To give the appearance of a citizen's lobby; To mimic the Jewish lobby in the US; To impede Iranian opposition activities; To infiltrate the US political system; To break the taboo of working with the Iran's cleric rulers for the Iranian Diaspora; To improve the image of the Iran's government abroad.

Once NIAC was created in 2002, on November 25, 2002, Roy Coffee and Distefano organized a lobbying training class for NIAC in a restaurant in Washington DC area.[20,21] On January 29th 2003, Bob Ney organized a fundraising for NIAC [22]. This was at the same time that the two London based felons related to the Iranian government, had hired the Washington lobbyists and were bribing Bob Ney.

On December 28, 2006 the governmental newspaper Aftab in Iran published an interview with Trita Parsi [23]. In his introduction, the editor underlined the role of Parsi's lobby on behalf of the Iranian regime. Next to Parsi's photo, the article's title seems interesting: "*The Iranian Lobby Becomes Active*". The translation of parts of the paper follows:

> *"The conflict between Iran and the West on Iran's nuclear file has entered a critical state. The government must now utilize all the possible resources to defend the national interest. In this, we have not paid enough attention to the potentially significant influence of the Iranian American society in moderating the extremist policies of the White House. In comparison of this untouched potential to the influence of the Jewish lobby in directing the policies of Washington in supporting Israel, we see the difference between what is and what could be. The role of unofficial diplomacy (lobbying) has been correctly underlined by experts"*

On September 19, 2006, the former head of the Iran Interest section in Washington, Ambassador Faramarze Fathnejad thrilled about Trita Parsi and NIAC's efforts underlined "the importance of relation with Iranian organizations in the U.S. and specially pointed to NIAC and his young leader who is a consultant to CNN and has been very successful in his efforts" [24].

To this date Trita Parsi and NIAC have tenaciously followed their declared roadmap and have worked hard to improve the image of Tehran's rulers and pale Tehran unfriendly actions by the West.

**Trita Parsi and the Violations of Human Rights in Iran**

In order to understand the Iranian regime's goal of organizing the "human rights panel" in Washington, we should first examine Trita Parsi's past activities on the issue of human rights in Iran. In this regards, Parsi has meticulously followed his boss, Bob Ney. In his famous speech in June 2001 before the American Iranian Council (AIC), Ney criticized the US government and stressed that Iran "has a

freely elected president and a parliament". Ney promised the launching of a citizen's lobby to educate the American lawmakers about Iran. [25] In 2002 NIAC was founded. In the next several years, Ney relentlessly opposed every single bill criticizing the Iranian regime. He countered such bills by presenting a rival bill. Naturally Trita Parsi's role was to provide the "citizen's support" through sending letters and contacting the lawmakers. NIAC continuously assisted Ney's defense of the Iranian regime [26].

Parsi's efforts have not been limited to helping Bob Ney. For instance, in 2000, the human rights activists protesting Kamal Kharazi's presence in UCLA, disturbed the Iranian foreign minister's speech. While Trita Parsi had always refrained from condemnation of the torture, mass executions, rapes of women in prison, and stoning consistently carried out by Tehran's mullahs, he was outraged by this event and Kharazi's deprivation of his rights. He wrote an article, " The need for genuine human rights activists" [27].

By selectively quoting statements of the U.N. Special Representative for Human Rights in Iran, Parsi paints a rosy picture of the human rights situation in Iran.

> *"...significant progress has become evident in a number of areas and sums up the report with the following words: Overall, progress is certainly being made and, in the Special Representative's view, it is very likely to continue, perhaps even accelerate."*

Parsi then harshly criticizes the human rights groups that protested the speech of the Tehran's Foreign Minister at UCLA:

> *"It is quite disturbing to witness groups that title themselves as Human Rights activists, openly and blatantly opposing the freedom of speech of an individual, no matter how despised he or she may be...... Freedom of expression is a fundamental human right that cannot be denied to anyone-including a person accused of violating other people's human rights or guilty of representing a government that continues to show inadequate respect for these rights. It was therefore a sad spectacle to witness the noisy opposition by these so-called Human Rights groups to Kharrazi's right to free expression at UCLA."*

For Mr. Parsi, "noisy opposition" at the speech of the envoy of an oppressive regime is a "quite disturbing" violation of "fundamental human rights" which "undermines the very idea" of human rights. He refrains from offering similar condemnation of the torture, mass executions, rapes of women in prison, and stoning that is consistently carried out by Tehran's mullahs. Nonviolent verbal protests are, for Parsi, a "sad spectacle" of "intimidation" that we should deplore and denounce, but violent, misogynous, and well-documented oppression should be addressed with "respect and dialogue":

> *"We need to implement and nurture a culture of mutual respect and dialogue, and, once and for all, turn our backs on intimidation, verbal aggression and intolerance."*

# NIAC's sister organization: CASMII: denying the violation of human rights in Iran

In December 2005, Abbas Edalat, a London based computer engineer, along with several pro-regime activists, founded the Campaign Aagainst Sanctions and Military Intervention in Iran (CASMII) [28].

On January 6, 2006, Jon Tirman from MIT, one of Parsi's guests for the July 26th event, hosted a meeting for Edalat to launch CASMII in the US. This new organization was primarily consisted of Mr. Parsi's circle. Six members of CASMII's board and advisory (the majority at the time) belong to NIAC and Mr. Parsi's former organization, Iranians for International Cooperation (IIC). These were M. Ala, S. Mostarshed, A. Patico, M. Navab, J. Fakharzadeh, and D. Pourkessali [29]. Alex Patico, the US coordinator of CASMII, is also listed as one of the NIAC's founders and its treasurer [30]. Indeed, CASMII is NIAC's offspring (2 links) [31,32].

Parallel to Mr. Parsi, his cohorts have engaged in silencing the regime's critics. Two short examples are adequate evidence. One example is included below. In May 2006, one of the anti-war movement's groups released a petition called "Iran: Neither U.S. aggression, nor theocratic repression" [33]. In this petition, there was a mild reference to the Iranian regime's record of human rights violations. CASMII released a statement titled "Opposing Theocratic Repression in Iran or Playing into Hands of US Warmongers?" in which Mr. Parsi's cohorts strongly condemned the petitioners' stance against the Iranian regime:

> *"It is regrettable that your petition caves into US propaganda by devoting more space in its text to condemnation of the Iranian regime, which is to a large extent based on fallacies, inaccuracies and exaggerations, than to opposing the US warmongers. As citizens or residents of western countries, our essential duty is to oppose the aggressive and imperial policies of our own elected governments which we face and can impact rather than present a misleading and condescending picture of the internal situation in Iran and promote our version of "democracy" for a country with a different culture than ours. Rather than joining the bias Western media and condemning Iran for human rights violations... The war crimes and the gross violations of human rights committed by the coalition forces in Iraq and Afghanistan, the human rights issues in Israel, and the Arab client states of the United Sates, as well as the violations of the U.S. Constitution, international renditions, Guantanamo Bay, and torture, will remain our main area of public focus."*

CASMII's chief in the U.S. is Rostam Pourzal who like Edalat and Parsi is a strong advocate of Tehran's rulers. For instance, in the June 2006, a women's rally in Tehran was brutally crashed by the police. The police brutalities were widely reported by international media and human rights organizations. Pourzal came to the regime's rescue and in an article titled: "What Really Happened in Tehran", wrote [35]:

> *"Contrary to dispatches by news services, I learned from an eyewitness whom I infinitely trust that he saw no beating or gassing of the demonstrators. Now I quote from his email directly: I witnessed a few women protesters being asked by some female police officers to walk away. In response the protestors [sic] started screaming hysterically at the officers and accused them of beating them, an accusation which looked unsound. "Why are you beating us?", shouted a woman protestor at a female police officer, who was visibly shaken and became speechless at such an accusation. Small crowds of bystanders would also converge on these places to see what is going on, as it is typical in the Iranian culture. I did not see any expression of sympathy by these bystanders and onlookers for the cause of the protestors. If, for example, equal rights for women are actually not as popular in Iran as we wish, we would be better off facing the facts and asking what we are doing wrong, instead of inventing excuses or blaming the messenger. I was stunned during a recent visit to Iran to find that President Ahmadinejad is quite popular among women from all walks of life."*

Mr. Parsi's cohorts in CASMII are so concerned about protecting the image of Tehran's mullahs on the human rights issues that even Shirin Ebadi the Nobel laureate is not safe from their attacks. After her call to the international community to raise the human rights issue in their negotiations with the Iranian regime, Rostam Pourzal, smeared her in his article titled: "Dancing to Western Music".
NIAC and its sister organizations have rarely raised the issue of human rights in Iran. Nonetheless, like clockwork, those rare occasions parrot several predictable claims, namely that the human rights situation in Iran is improving; that the main reason for human rights violations is pressure from the West or resistance from the victims and the oppressed; and that those who question the regime's brutalities violate the rights of Iran's rulers. Invariably, the recommendations are to increase kindness toward the ayatollahs, to offer more carrots, and to develop pundits of a more Tehran-friendly breed.

**References**

1. http://www.niacouncil.org/index.php?option=com_content&task=view&id=830
2. http://www.iht.com/articles/2006/06/11/news/iran.php
3. Parsi, T., "Reconnecting Iran with Democracy" Financial Times, January 2, 2005.
4. Daioleslam, H., Available from: http://www.frontpagemag.com/Articles/ReadArticle.asp?ID=27787
5. Daioleslam, H., Available from: http://www.intellectualconservative.com/2007/04/25/trita-parsi-bob-ney-and-iran%e2%80%99s-oil-mafia-penetrating-the-us-political-system/#respond
6. http://www.msnbc.msn.com/id/10857676/site/newsweek/
7. http://tpmmuckraker.com/ney.php
8. http://www.sourcewatch.org/index.php?title=Bob_Ney
9. http://www.iranian.com/Opinion/2002/May/Group/
10. http://frontburner.dmagazine.com/archives/013069.html
11. http://www.atiehbahar.com/
12. *Intl. Herald Tribune – Europe,* "Statoil chairman resigns from anti-corruption group board after Iran bribery case," October 20, 2006.
13. PIERRE-ANTOINE SOUCHARD, A. Total CEO held for questioning over company's Iran activities. (March 21st, 2007) available from: http://www.adpdigital.net/
14. http://www.azar-energy.com/
15. http://www.worlddialogue.org/meet4.htm
16. http://www1.umn.edu/humanrts/cases/63-05.html
17. http://www.asianews.ir/main1.asp?a_id=27078
18. available from: http://www.asianews.ir/main1.asp?a_id=27078
19. http://www.niacouncil.org/index.php?option=com_content&task=view&id=64&Itemid=2
20. http://web.payk.net/mailingLists/iran-news/html/2002/msg00572.html
21. http://www.niacouncil.org/index.php?option=com_content&task=view&id=67&Itemid=29
22. http://www.aftabnews.ir/vdccpoq2biqpp.html
23. http://www.topiranian.com/ngo/archives/009103.html
24. http://www.american-iranian.org/pubs/articles/Bob%20Ney%20speech.pdf
25. http://www.niacouncil.org/index.php?option=com_content&task=view&id=49&Itemid=2
26. http://www.iranian.com/News/2000/September/rights.html
27. http://www.campaigniran.org/casmii/
28. http://www.campaigniran.org/casmii/index.php?q=node/70
29. http://www.globalexchange.org/getInvolved/speakers/210.html

30. http://www.niacouncil.org/index.php?option=com_content&task=view&id=647&Itemid=2
31. http://www.niacouncil.org/index.php?option=com_content&task=view&id=683&Itemid=2
32. Znet, may 18.2006, available from: http://www.zmag.org/content/showarticle.cfm?ItemID=10289
33. CASMII, June 11, 2006 available from: [http://www.zmag.org/content/showarticle.cfm?ItemID=10407]
34. MRZine 6.18.06: available from: http://mrzine.monthlyreview.org/pourzal180606.html
35. The Iranians, May 4, 2006 by] [http://www.iranian.com/Pourzal/2006/May/Ebadi/index.html

---

Source: www.iranianlobby.com

---

[Post your comment] [Totalt posted comments 0]

Printable version
Email it to a friend

Iranianlobby_Archive:
All Articles Hassan Dai:

* Iranian regime's web of influence
* Robert Mugabe and the Iranian regime
* How to Deal with the Mullahs
* Confronting Mullahs lobby in court
* Party Animal Iranians Turning Islamic Fanatics: Investigative Reporting de Jour
* Barbarism in Tehran, Patriotism in Hollywood
* Columbia president honored by Iranians
* Did the NIAC Defraud the National Endowment for Democracy and Congress
* Iran's Lobby in the U.S.
* Flirting with the Mullahs
* Negotiation, the path to war with Iran
* The Iranian Web of Influence in the United States
* Pro-Ayatollahs Disinformation and Manipulation Campaign by Washington Think Tankers
* Iran's 2003 Grand Bargain Offer: Secrets, Lies, and Manipulation
* Iran's Oil Mafia: Penetrating the US Political System
* The Iranian Lobby and the Israeli Decoy
* An Iranian Embassy in Boston
* Return from Paradise in the Left Lane
* Congressman Kucinich Must Find a Better Role Model than Bob Ney
* NIE and Iranian internal politics
* Where in the World is the Moderate Ayatollah?

---

hassan.dai@yahoo.com

Iranian lobby 2005 ©



PLAINTIFF'S
EXHIBIT
B

In Search of Truth
Reports on Mullahs's lobby in US
Editor: Hassan Daioleslam

| HOME | ARTICLES | INTERVIEWS | JOURNAL | SEARCH | ARCHIVES | CONTACT | ABOUT US | فارسی | Wednesday 6 August 2008 |
|---|---|---|---|---|---|---|---|---|---|

**Iran's Oil Mafia: Penetrating the US Political System**

[ARTICLES] [25 Jun 2008]
Hassan Dai
Source: [www.iranianlobby.com]

Robert William (Bob) Ney is a current federal prisoner and a former Ohio Congressman from 1995 until November 3, 2006. On October 13, 2006 Ney pled guilty[1] to charges of conspiracy and making false statements in relation to the Jack Abramoff lobbying and bribery scandal. Ney reportedly received bribes from Abramoff, other lobbyists, and two foreign businessmen – a felon and an arms dealer – in exchange for using his position to advance their interests.

Conspicuously missing from this dossier of disservice to the country is Ney's masterful creation of an active and disguised Washington-based lobbying enterprise for the Iranian theocratic regime, The National Iranian-American Council (NIAC). NIAC is an effective node of Tehran's comprehensive US lobbying web. This article will address the creation of NIAC, the motives underlying its formation, NIAC's manifesto, Tehran's role, NIAC's connection to Iran's oil mafia, and NIAC attempts to penetrate the US political system.

**Creation of NIAC**

The main actors behind the creation of the National Iranian-American Council (NIAC) were four non Iranian-Americans: Roy Coffee, Dave DiStefano, Bob Ney and Trita Parsi. Coffee and DiStefano, both Washington lobbyists, were investigated by the Justice Department for arranging a trip for Bob Ney to meet a known felon and a Syrian arms dealer in an effort to circumvent sanctions to sell US-made airplane parts to Tehran.[2]

Roy Coffee sent a letter to the *Dallas Morning News* in February 2006 to justify his relationship with the two London-based felons. Part of the letter discussed the creation of NIAC in 2002. In this letter, Coffee described the events following the meeting of his former classmate Darius Baghai (who had just returned from Iran) with Bob Ney: [3]

> *From that meeting, Darius, Dave and I began to work with Trita Parsi, another Iranian-American, to try to form a political action committee of Iranian-Americans to pursue a strategy of normalization of relations between the two countries. The 4 of us worked very hard for about 9 months to form this committee.*

Trita Parsi at the time was a Swedish-Iranian graduate student in his early twenties with ties to Iran's ambassador in Sweden.[4] He was working part-time as a Congressional aid in Ney's office in Washington on a temporary visa. Parsi was subsequently appointed president of NIAC. Should we believe that one of the most expensive lobbying teams in the US, one of the most corrupt lawmakers in Washington and a Congressional aid in his office, none of them Iranian-American, worked hard for nine months out of their humanitarian concern for the Iranian people?

**The New Lobby**

In the 1990's, the American-Iranian Council (AIC), with backing from multinational oil companies, was a front for the Iran's lobbying efforts in the US. Houshang Amir-Ahmadi served as its president. Amirahmadi has been an active pro-Tehran player in the US since the early 1980s. While residing in the US, he was also a presidential candidate in Iran's elections. He officially collaborated with different Iranian institutions and notably the foreign ministry.[5] In 1999 and 2000 Trita Parsi was closely working with Amirahmadi and was well positioned in the leadership of AIC. [6,7]

In 2001, the pro-Iran lobby in the United States became intensely active to prevent the renewal of the Iran Libya Sanctions Act (ILSA), and to improve US-Iran relations. Despite extraordinary pressure from the lobby, ILSA passed overwhelmingly.

Prior to his imprisonment, Bob Ney, in concert with AIC, was Tehran's dogged warrior in Washington as he relentlessly led Congressional efforts to end ILSA and initiate Tehran-friendly policies. Ney, disappointed and angered by the ILSA vote, began to plan for the next battle of the war.

> *The ILSA vote doesn't look very promising, but that doesn't mean the struggle should stop on this entire issue. It is a matter of education and re-education and people getting together and* ***forming a citizen's lobby*** *to make sure that members of Congress and their offices are educated on this issue.*
>
> – Speech to AIC, June 2001,[8] (Emphasis added).

While Ney was hard at work "forming a citizen's lobby," Trita Parsi claimed that the majority of lawmakers voted against their true wills. In a tone apologetic to Tehran, he expressed his hope that the Iranian regime understood that he and his colleagues had worked hard to prevent this result:

> *Hopefully, Tehran will recognize that an honest attempt was made to defeat or at least weaken the sanctions. The call for a review and Speaker Hastert's pledge to insist on Congressional action based on the review must also be interpreted by Tehran as a step in the right direction.*
>
> – IranAnalysis, July 2001, Peyvand' Iran News. [9]

Their failure to block the renewal of ILSA marked the start of a new era for the pro-Iran lobby in the United States. The lobbyists recognized that they must broadly reach out to Iranian-Americans. Iran became directly involved in creating, organizing and implementing a far-reaching lobbying campaign in the US, fundamentally different in its organization, which targeted the strategic needs of Tehran's rulers. The creation of NIAC as the main executer of this new endeavor had been meticulously planned since the late 1990s. Parsi stepped down from the board of directors of the AIC. An influential US Congressman and a posh Washington lobbyist came to Tehran's help to create NIAC. An unknown Iranian Swedish student was selected to serve as president of this new organization.

Trita Parsi was the regime's trusted man within the new network. Tehran's faith in Parsi was so profound that in 2003 when Iran decided to send a highly secret proposal for negotiations to the White House, Parsi was called on to arrange the delivery of the message through Bob Ney to Karl Rove. Parsi, admitted that "he was the point person for Ney in helping to manage this issue." [10]

**Trita Parsi and the Regime's Inner Circle**

During the eight years of Rafsanjani's presidency, which ended in 1997, the Iranian regime had attempted without success to attract the Iranian Diaspora to its cause. Khatami's presidency recharged Tehran's efforts. With the Supreme Leader's direct involvement, the High Council for Iranian Compatriots Overseas was created in 2000 under the auspices of the Foreign Ministry. The President heads the Council, and the Foreign Minister serves as its deputy director. The Ministry of Intelligence and the Ministry of Culture and Islamic Guidance collaborate to implement the decisions of the council. The objective was to create a network of organizations to infiltrate and seemingly represent the Iranian community abroad, and promote policies favorable to the Iranian government. Tehran anticipated that this strategy would neutralize opposition activities abroad and legitimize the new lobby.

In a very interesting interview in 2006, Sadegh Kharazi, the Iranian diplomat behind the 2003 grand bargain proposal, explained the nature of an Iranian desired lobby in US, which according to him, should not have the Iranian state label on it but the authorities could assist and direct it. During his interview and in order to explain such lobby, he brings the example of Trita Parsi's effort to defend the Persian Gulf name. Kharazi admitted clearly that: "there is actually an existing Iranian lobby in US." [11]

State-sanctioned Iranian newspapers have always promoted Trita Parsi and NIAC. The former head of the Iran interest in Washington, Ambassador Faramarze Fathnejad, was thrilled about Trita Parsi's efforts and NIAC, highlighting[12] "the importance of relations with Iranian organizations in the U.S. and specially pointed to NIAC and his young leader who is a consultant to CNN and has been very successful in his efforts." The Iran Ambassador even claimed 20,000 members for NIAC (while only 150 is claimed by NIAC itself)!

The most interesting element is an editorial by the state controlled news outlet "Aftab" which in 2006 posted an article about the Iranian nuclear issue. Next to Trita Parsi's photo was "The Iranian lobby becomes active" and it explained the role of Iranian American lobby to support the regime's nuclear policy. [13]

But token rhetorical support would not alone turn an inexperienced graduate student and a corrupt Washington politician into a lobbying enterprise. Entities with ample financial resources and direct access to Iran's top leaders had to enter the scene. Understanding the NIAC's activities in the US necessitates familiarity with Trita Parsi's main partner in Iran, Siamak Namazi, one of the most important figures of this new lobbying enterprise and a prominent member of the Iranian oil Mafia.

Namazi, along with his sister Pari and brother Babak, control the Atieh enterprise[14] in Iran and its three sister companies Atieh Roshan, Atieh Bahar and Atieh Associates, as well as numerous other direct and indirect partnerships, including[15] Azar Energy, Menas companies in England, Atieh Dadeh Pardaz, FTZ Corporate services and MES Middle East Strategies. Particularly noteworthy is the fact that Baquer Namazi[16] (the father) is the Chairman of Hamyaran, an umbrella organization for the NGOs in Iran – a man of considerable influence in the internal and foreign affairs of the country.

Atieh claims to be a "... fully private strategic consulting firm that assists companies to better understand the Iranian market, develop business and stay ahead of competition." People familiar with the oil industry in Iran know what this description is code for. In reality, Atieh is notorious for being a conduit for racketeering, bribery and money laundering, mainly for corrupt Iranian rulers. Atieh's customers include the foreign corporations who wish to do business in Iran and find no choice but to bribe officials. One of their fiascos involved Norway's Statoil,[17] a customer of Atieh Bahar.[18] Their bribery of Iranian officials through consultants was exposed by the US Securities and Exchange Commission and the Department of Justice. A number of high officials in the company were fired and the company had to pay tens of millions of dollars in penalties to the US and Norwegian governments for "payments to an Iranian official in 2002 and 2003 in order to induce him to use his influence to obtain the award to Statoil of a contract to develop phases 6, 7 and 8 of the Iranian South Pars gas field."

The most recent debacle of Atieh enterprise was in March of 2007, when the CEO of the French oil company Total SA[19] was charged for bribery of Iranian high officials to secure contracts. Total is one of the major customers of the Namazi's Atieh enterprise and is mainly represented in Iran by Atieh and its affiliate companies. Tens of millions of dollars of bribes were paid by Total through individuals and third party corporations.

Tehran's trust in Namazi is elucidated by the fact that his enterprise provides the network and computer services for almost all Iranian banks, parliament, and other important institutions. Namazi's groups monitor[20] nearly all Iranian economic or political activities and have access to the country's most sensitive data. This is a clear indication of his prominent place inside the inner circle of power in Tehran.

While representing Tehran, Namazi, disguised as a scholar,[21, 22] travels to the US to seemingly pursue academic activities through think-tanks close to the Iranian regime. This link between the Iranian oil Mafia and "scholarly" pursuits in the US is hardly isolated. Three former Iranian deputy foreign ministers currently live in Boston posing as "scholars:" Mohammad Mahallati[23] who was also the Iranian ambassador to the UN in the late 1980s, Farhad Atai and, Abbas Maleki.[24] In addition to his diplomatic past, Maleki has been one of the most important figures within the Iranian oil Mafia.

Trita Parsi and Namazi worked very closely on developing the details of the grand plan of forming an Iranian-

American "Citizen's Lobby" in the US. They traveled to Iran together.[25]  They organized joint conferences and meetings, launched lobbying projects and wrote joint papers.

**The Roadmap**

In 1999, Parsi and Namazi presented a joint paper titled, "Iranian-Americans: The bridge between two nations," at the DAPIA conference organized by the Iranian government in Cypress.[26]  This report comprises the manifesto and roadmap of the new Iranian lobby in the US. In this paper, the authors suggest that: "an Iranian-American lobby is needed in order to create a balance between the competing Middle Eastern lobbies. Without it, Iran-bashing may become popular in Congress again." The "competing lobby" was AIPAC (American Israeli Public Affairs Committee). The pillars of the road map were:

• To have the appearance of a citizen's lobby.
• To mimic the Jewish lobby in the US.
• To impede Iranian opposition activities.
• To infiltrate the US political system.
• To break the taboo of working with Iran's cleric rulers for the Iranian Diaspora
• To improve the image of the Iran's government abroad.

In their report, Namazi and Parsi admitted that the Iranian community by large rejects the clerical regime and there is no hope that this community will help a pro-regime lobby in the US.

> *This group's [Iranian Americans] role has not been utilized anywhere close to its potential, however, for several reasons: A good portion of them were against the IRI [Islamic Republic of Iran], therefore would not do anything to help.*
> *The point is, the said group [Iranian Americans] was not about to form a lobby group that would benefit the establishment in Tehran, or benefit the Iranian-Americans themselves as a community, nor was it for the most part interested in forming a pressure group against the Islamic Republic.*

This was also underlined by Roy Coffee, one of the NIAC's founders:[27]

> *We [NIAC's founders] found that most Iranians do not want to get involved in politics because of their experiences in Iran during and after the revolution. They have come to this country to make a better life for themselves and their children and don't want to get involved.*

The lack of genuine participation from the Iranian-American community in this lobby has been overcome with a sophisticated machine of professional lobbyists and "friendly" circles that favor a rapprochement with the Iranian regime.

**Tehran's Advice: Mimic Jewish Lobby in Washington**

One of the hallmarks of the new lobby was its desire to rival the "Israeli Lobby" in the United States. This aspiration was so strong that an organization[28] was created and called IAPAC (Iranian American Political Action Committee) as compared with AIPAC (American Israeli Public Affairs Committee). Three of IAPAC's board members came from the AIC's leadership.[29]

In their 1999 DAPIA paper, Parsi and Namazi analyzed at length the techniques used by AIPAC, and suggested that the same approach should be taken to create an Iranian lobby in Washington:

> *Creating similar types of seminars and intern opportunities to Iranian-American youth may not improve Iran-US relations in the short run, but it will help integrate the Iranian-American community into the political life of America. In the long run, a strong and active Iranian-American lobby, partly established through these seminars and by the participants of these programs, may serve to ensure that the US and Iran never find themselves in violent opposition to each other again.*

Trita Parsi has been reciting this comparison to the Israeli lobby since the late 1990's, about the time that the High Council was formed. At the beginning his tone was more contentious and resembled the mullah's usual rhetoric. While he has toned down his anti-Israeli remarks in his English communiqués, the governmental newspaper *Aftab* published on December 28, 2006 an interview with Trita Parsi.[30]  In his introduction, the reporter underlined the role of Parsi's lobby on behalf of the Iranian regime. The article's title is interesting: "The Iranian Lobby Becomes Active." Translation:

> *The conflict between Iran and the West on Iran's nuclear file has entered a critical state. The government must now utilize all the possible resources to defend the national interest. In this, we have not paid enough attention to the potentially significant influence of the Iranian American society in moderating the extremist policies of the White House. In comparison of this untouched potential to the influence of the Jewish lobby in directing the policies of Washington in supporting Israel, we see the difference between what is and what could be.*

In coordination with Trita Parsi, Siamak Namazi also started singing the same songs:[31]

> *I propose that we should start showing up to the leadership training seminars and other events organized by the American-Israeli Political Action Committee (AIPAC) for their youth. Not only will this create an opportunity to learn the fine skills of community organization and grassroots lobbying, but it also takes away from AIPAC's ability to spread misinformation about Iran through a deliberate campaign to further its own political agenda.*

**Not Lobbyists?**

As Ney's criminal bribery and lobbying fiasco became more public, NIAC's president Trita Parsi attempted to deny the lobbying nature of NIAC. NIAC was not registered as a lobbying organization, and lobbying activities would have been illegal. Furthermore, being lobbied by a former aid would have added to Ney's already complicated and ugly situation and impede Parsi's career in Washington! Therefore in an interview with *Washington Prism* in 2005, Parsi in response to a direct question asking whether his group lobbies the US congress, declared:[32]

> *Our group does not do any lobbying at all. We do not contact the Congressmen to support or oppose a bill.*

Reality exposes the falsehood of Parsi's claim. NIAC has strived to penetrate the US political system as per the 1999 roadmap by Namazi and Parsi. NIAC's actions lucidly reveal the nature of the organization. The *Washington Post* reported on June 25, 2006:[33]

> *The NIAC helped persuade a dozen conservative House members to sign a letter to President*

*Bush earlier this month calling for unconditional negotiations with Iran's regime.*
The external communications of Parsi and other NIAC leaders shed further light on NIAC's lobbying activities.[34, 35, 36]

Bob Ney, Roy Coffee, and Dave DiStefano arranged numerous workshops, training classes, seminars and speeches in which they themselves and others with experience prepared members and affiliates of NIAC to lobby and influence Congress. Parsi, Namazi and Ney organized public gatherings and discrete and exclusive fundraiser events (with $1,000 plates). They developed training manuals on lobbying.

NIAC itself admits that,[34] "In 2002, Congressman Ney benefited from letters sent by Iranian-Americans through NIAC's Legislative Action Center in support of his resolution on US-Iran relations."

**Infiltrating Congress**

Trita Parsi, Namazi and company fully intended to infiltrate the US Congress. Its methods included both engaging unsuspecting Iranian-Americans working in various Congressional offices and recruiting and placing young Iranian-Americans to serve as interns or pages in these offices by offering room, board and financial incentives. NIAC's website brags of success stories in this venture. The young Iranian-American Press Secretary for Rep. Marcy Kaptur is drafted to help in improving the lobbying skills of NIAC members and affiliates. An Iranian-American student at the University of Minnesota receives a financial scholarship in his senior year and becomes an intern in Senator Norm Coleman's (R-MN) Washington office.[37] Another intern, a graduate of the University of South Florida, is placed in Congressman Jim Davis' (D-FL) Washington, D.C. office. Expanding the operation to penetrate the US political system, NIAC has now formally implemented a paid trainee program and is actively in search for unwary Iranian- American youth.

**Conclusion**

Since the early 1990's, Tehran has embarked on developing a sophisticated lobby enterprise in the United States. Iran's government has devoted significant manpower and financial resources to this cause. This lobbying enterprise consists of a complex, convoluted and intermingled web of entities and organizations with significant overlap of leadership and rank and file, and heavy involvement of the notoriously mafia-like inner circles of the Iranian regime. Disguised as scholars, many of the former Iranian government officials reside in the US and constitute an important piece of the lobbying machine. NIAC and its major figures, such as Bob Ney and Trita Parsi, are effective nodes of Tehran's efforts to manipulate US policy toward self-serving ends.

**Endnotes**

1. http://www.usdoj.gov/opa/pr/2006/September/06_crm_626.html
Kiel, P. "Ney Faces Possible 2 Years Plus in Prison."
http://www.tpmmuckraker.com/archives/001532.php (09-15-2006).
2. Bresnahan, J. "Casino Chips Sealed Ney's Fate."
http://www.citizensforethics.org/press/pressclip-print.php?view=3266 (2006).
3. RE: A LAWYER IN TROUBLE. Front Burner, (February 1, 2006).
http://frontburner.dmagazine.com/archives/013069.html
4. Dialog between Iranian Ambassador and Iranian exiles in Sweden.
http://www.payvand.com/news/00/mar/1050.html (03/13/00).
5. Dariush Sadjadi: http://www.sokhan.info/Farsi/Shabgard.htm
6. "The Iranian Presidential Elections and Its Implications for US-Iran Relations."
http://payvand.com/news/01/jun/1009.html (6/4/01).
7. Javid, J. "Act as a community."
http://www.iranian.com/Opinion/2002/May/Group/ (ed. Iranian, T.) (May 10, 2002).
8. AIC UPDATE - Vol. 2, No. 20.
http://www.american-iranian.org/pubs/aicupdate/05262005.html (May 2005).
9. http://www.payvand.com/news/01/jul/1161.html
10. http://www.huffingtonpost.com/steve-clemons/what-did-rove-do-with-200_b_41472.html
11. http://www.sharghnewspaper.com/850307/html/index.htm
12. http://www.topiranian.com/ngo/archives/009103.html.
13. http://www.aftabnews.ir/vdccpoq2biqpp.html
14. http://www.atiehgroup.com/default.htm.
15. http://www.atiehgroup.com/Relatedcompanies.htm.
16. http://www.wilsoncenter.org/index.cfm?fuseaction=events.event_summary&event_id=152278.
17. "Statoil chairman resigns from anti-corruption group board after Iran bribery case," *Intl. Herald Tribune - Europe* (October 20, 2006).
18. http://www.atiehbahar.com/WhoWeAre/index.htm
19. PIERRE-ANTOINE SOUCHARD, A. "Total CEO held for questioning over company's Iran activities." (March 21st, 2007).
20. http://www.adpdigital.net/content/en/adp/clientList.aspx.
21. http://www.wilsoncenter.org/index.cfm?topic_id=1426&fuseaction=topics.profile&person_id=137618#Education.
22. National Endowment for Democracy.
http://www.ned.org/forum/past.html.
23. Ilex Foundation. http://ilexfoundation.org/.
24. Senoir Researcher. http://bcsia.ksg.harvard.edu/person.cfm?program=STPP&item_id=949
25. Namazi and Parsi pictures in their joint Iran trip are on:
http://www.iranian.com/SiamakNamazi/2000/August/Water/index.html.
26. Namazi, S. & Parsi, T. "Iran-Americans: The bridge between two nations," in DAPIA Conference (Cyprus, November 1999). http://www.geocities.com/tritaparsi/iranamericans.PDF
27. http://frontburner.dmagazine.com/archives/013069.html.
28. http://www.iranianamericanpac.org/.
29. http://www.iranianamericanpac.org/leadership/ov.shtml.
30. "The Iranian Lobby Becomes Active." *Aftab Newspaper* (December 28, 2006).
http://www.aftabnews.ir/vdccpoq2biqpp.html
31. Namazi, S. If Mahdi doesn't come.

http://www.iranian.com/SiamakNamazi/Nov98/Reform/index.html (November 9, 1998).
32. http://www.washingtonprism.org/eng/showarticle.cfm?id=50. Washington Prism (2005).
33. "Iran on the Potomac." *Washington Post* http://www.washingtonpost.com/wp-dyn/content/article/2006/06/23/AR2006062301345_pf.html(June 25, 2006).
34 http://www.niacouncil.org/index.php?option=com_content&task=view&id=67&Itemid=29
35. Dokhi Fasihian: http://www.solh.nu/showarticle.asp?adressID=3017
36. Ali Scotten: http://www.payvand.com/news/03/apr/1028.html

37. http://www.niacouncil.org/index.php?option=com_content&task=view&id=398&Itemid=2.

---

Source: www.iranianlobby.com

---

[Post your comment] [Totalt posted comments 0]

Printable version
Email it to a friend

Iranianlobby_Archive:
All Articles Hassan Dai:

* Iranian regime's web of influence
* Robert Mugabe and the Iranian regime
* How to Deal with the Mullahs
* Confronting Mullahs lobby in court
* Party Animal Iranians Turning Islamic Fanatics: Investigative Reporting de Jour
* Barbarism in Tehran, Patriotism in Hollywood
* Columbia president honored by Iranians
* Did the NIAC Defraud the National Endowment for Democracy and Congress
* Iran's Lobby in the U.S.
* Flirting with the Mullahs
* Negotiation, the path to war with Iran
* The Iranian Web of Influence in the United States
* Pro-Ayatollahs Disinformation and Manipulation Campaign by Washington Think Tankers
* Iran's 2003 Grand Bargain Offer: Secrets, Lies, and Manipulation
* The Iranian Lobby and the Israeli Decoy
* An Iranian Embassy in Boston
* Return from Paradise in the Left Lane
* Congressman Kucinich Must Find a Better Role Model than Bob Ney
* NIE and Iranian internal politics
* Where in the World is the Moderate Ayatollah?
* Ayatollahs' Lobby In Washington Offering Human Rights as a Negotiating Item

---

hassan.dai@yahoo.com

Iranian lobby 2005 ©


American Chronicle | Did NIAC Defraud the National Endowment for... http://www.americanchronicle.com/articles/65425

PLAINTIFF'S
EXHIBIT
C

Grant / proposal writing
International and domestic grants
Foundation and government grants
www.globalgrantwriter.com

هدیه ایرانی
Intimate. Elegant. Unhurried Traditional
Tehran Hammum services
www.juvenexspa.com

The Kiva B4B
Sponsor a Busine
Country. Change
KivaB4B.org

Home | Send Us Info | Shop | Search | Advertise | Subscribe | Help |

Thursday, June 19, 2008

News

World
National
State News
Politics
Business
Technology
Industry
Science
Medicine
Sports
Education
Entertainment
Weather

Opinion

Latest Articles
View Topics
View Authors

Features

Latest Articles
View Topics
View Authors

Community

Town Hall
Join Our List

Other Sections

Affiliates
Advertise
Video

# Did NIAC Defraud the National Endowment for Democracy and Congress?

*Hassan Daioleslam*

June 18, 2008

National Iranian American Council (NIAC) and its president Trita Parsi have arranged to receive congressional appropriated funds from the National Endowment for Democracy (NED) through an expedited process. They have spent these funds on trivial activities aimed at enhancing false-flag Iranian NGOs that were in fact managed and controlled by Iranian Deputy Ministers or high level officials- making a mockery of the term "Non-Governmental". At the same time, NIAC and Trita Parsi have lobbied the congress to stop appropriating other funds meant for dissident democratic movements and NGOs in Iran through non NIAC channels. While NIAC´s actions appear paradoxical, it is a cohesive, targeted and deceptive tactic that has three distinct but related goals:

to block resources to the NGOs not controlled by the government,

to provide resources to their showcase NGOs ,

and to funnel the American taxpayers´ money to the Iranian lobby in the US to benefit Tehran´s goals.

NIAC´s actions with respect to the congressional appropriated funds are suspect of defrauding American taxpayers and deserve nothing short of a full congressional investigation.

**Hassan Daioleslam**

Hassan Daioleslam is an independent writer and Iran Analyst. He is well published and has appeared as an expert guest in the Voice of America-TV as well as other Persian media. Daioleslam has three decades of history of political activism and political scholarly analysis.

author's email

author's web site

view author's other articles

**Join this author's mailing list**

Your Name:

E-mail Address:

Sign up

NIAC obtained NED congressional appropriated funds

National Endowment for Democracy (NED) is a private, non-profit, grant-making organization that receives an annual appropriation from the U.S. Congress through the Department of State.

In 2002 NED, in an unusually expeditious review process, provided a

Ads by Google Iran Chronicle Tehran Hotel Iranian Flag Visa to Iran

get professional installation, set up, and repair
get it now
available at
city
firedog

Wanted
Public Information Officials

Writers Wanted

California Political Daily

1 of 5 1:05 AM

grant to NIAC to "design and implement a two-day media training workshop in Iran for forty staff members from five civic groups..." [1]

It is noteworthy that NIAC's published mission is focused on empowering Iranian Americans in the US civil life, and has no provision on civil life inside Iran. It is baffling why such newly founded organization as its first action item applied for funds to do capacity building in Tehran. The first grant was obtained in less than 4 weeks after NIAC was created. NED requires a two month review process after the application is submitted.

The original grant was renewed at least two more times. These grants are about $200,000 so far. It is also unclear how a startup group, with no track record, can secure a grant from NED in four weeks. At the time, Trita Parsi's only noteworthy credential was founding the Iranian lobby organization, IIC (as Parsi himself had declared*) and being connected to Bob Ney. [2]

NIAC Spent NED's funds to work with Hamyaran

NIAC used NED funds to send two of its members (with non-technical background and experience) to work with de facto Iranian government agency Hamyaran to teach NGO members how to use computer based digital media [3]. The NIAC members conducting the training were Dokhi Fassihian (NIAC executive at the time) and Hadi Ghaemi (NIAC membe):

"Among the NGOs present were BoomIran, an environmental group, the Family Planning Association, a health-based NGO focusing on reproductive health, the Cultural Research Bureau, Hamyaran, a networking and capacity-building NGO, and the Children's Literature Council, a publishing house specializing in children's books." [3]

In fact Hamyaran which organized the workshop is not an NGO but a government initiated false flag agency incepted, initiated, founded and managed by the theocratic regime of Iran. At the time Hamyaran was managed by the Deputy Minister and Under Secretary of Health Hossein Malek- Afzali. Malek-Afzali has held high level governmental positions since 1984. Hamyaran is packed with Iranian government high level officials. Family Planning Association is again headed by Deputy Minister Malek –Afzali [4] and the Iranian high official Safieh Afshari [5]. Two of the other NGOs mentioned, were large-scale established publishing and cultural enterprises controlled by government. These two organizations have sophisticated computer and digital media infrastructures and are not in need of two non-experts to teach them how to use computers. The fifth NGO attending the workshop (BoomIran) is a small organization which shares management with Hamyaran. We will discuss these so-called independent NGOs later in this paper.

It is noteworthy that in addition to the high level management of Hamyaran by the government officials, according to Hamyaran's site, many of their daily activities such as their capacity building workshops are "under the supervision of the Ministry of Interior as part of their nationwide capacity building plan for NGOs".

NIAC's lobby to block US funds to Iranian NGOs through non NIAC channels

NIAC, while requesting and receiving the funds from NED to work with the Iranian NGOs, has lobbied congress to stop direct support for genuine and independent Iranian NGOs through non-NIAC channels. In this endeavor, they have organized petitions, congressional briefings, PR plugs and articles. Trita Parsi, shedding crocodile tears for the hardship of American taxpayers writes:

"Congress is adept at throwing money at a problem. Far better to continue doling out cash on a project than to admit it´s not working. Or is it? After all, bridges are falling. We are facing major challenges in Iraq. Millions are without health insurance. In a time when the budget is increasingly stretched, Congress should reassess its spending — particularly on programs that have done more damage than good. The Iran democracy fund is a prime example of such a program. .... Come September, Congress will be looking for ways to fill in these budgetary potholes without increasing the budget. Where better to look for savings than in the bloated budget of the democracy program, which has hurt the very people it is aimed to assist? ... Not only would this help ensure that no more bridges fall in the American heartland, but it would also ease the burden on the most effective agent for change in Iran — the Iranian people." [6]

"The reality is that there are smart ways to help Iranian civil society and there are incredibly stupid ways. NIAC, through funding from NED, had chosen the former." [7]

Meet Single Persians Online!
IranianPersonals.com
IranianPersonals.com Ads by Google

Hamyaran: Iranian regime´s means to control NGOs

In 1998, in an attempt to divert attention from crack down on the internal dissent, Iranian theocratic rulers created a showcase of several Non Governmental Organizations (NGOs) under one umbrella organization called Hamyaran. Hamyaran, was the outcome of a conference of three sectors. The first sector, according to the conference outcomes report [8] was deputy ministers and representatives of several Iranian ministries and the Iranian parliament. The second sector was Iranian "non-governmental organizations" headed by Malek Afzali, (an influential deputy minister himself!) The third group, according to the report, was International organizations´ representatives (including United Nations). Since no representative names were included in the report, an independent determination of who these representatives were was not possible for this author. This conference of the mostly Iranian government agents decided that a new umbrella NGO, Hamyaran, will manage, coordinate and represent the showcase Iranian NGOs. This left Tehran´s hands open in brutal suppression of other NGOs. Hamyaran is currently headed by Baquer Namazi (the father of Siamak Namazi who was Trita Parsi´s partner in forming the Iranian lobby in the US.) Malek Afzali, remains the key member of Hamyaran management.

In addition to monitoring and controlling the Iran´s NGOs, Hamyaran is charged with channeling all contacts and relations of the NGOs with

the international organizations and the UN. Under the supervision of the government, Hamyaran is also charged with creating communication channels with the Iranians living in the US to utilize them as part of the Iranian lobby.

Hamyaran's report of one of their meeting in the "ministry of foreign affairs" with various government agencies attending is a clear indication of the Iranian government's strategy to use NGOs to recruit the Iranian Diaspora. The meeting was held on March 16th, 2002 to review the "grounds for mutual cooperation in the area of strengthening the ties between the Iranian Expatriates and corresponding agencies in Iran with specific emphasis on the role of NGOs in this process." In this meeting "An overall agreement was reached on the nature of cooperation between the Government Agencies, International Agencies, and concerned Iranian NGOs both domestic and abroad. " According to Hamyaran's report [9] "Workshops on specific topics related to the Iranian Expatriates and the International Conference on the Role of Iranian Expatriates were considered as immediate action plans."

Baqer Namazi, Hamyaran's current leader, in 2003, the height of the brutal suppression of the Iranian civil society, said:

"... At present the new policies of the Foreign Ministry have a more facilitating role and direct cooperation of Iranian NGOs with international counterparts is smoother and easier. We invite government officials to participate, and several have come to do so. The government's professional staff has welcomed such initiatives. ... To come back to the question of the Iranian expatriates, the Foreign Ministry has been encouraging us to reach out to the Iranian experts in the Diaspora, either individually, or in a more institutionalized form such as through Iranians working at the World Bank. So in terms of policy, the trend is becoming more positive, and the regulations are being made easier, there is verbal encouragement, but there are also the banal problems such as getting visas et cetera. But generally the government is positive towards the NGOs networking with the expatriate professional Iranians who are working in Europe and in America" [10]

Conclusion

Congress and the board of National Endowment for Democracy must provide detailed information on how NIAC obtained NED funding in the first grant and in the subsequent applications. They must inquire into how the funds were spent. They must also inquire if NIAC president and members had knowledge of the active management of these NGOs by the Iranian government.

IIC site (active from 1997 to 2002 included the following statements under "Frequently Asked Questions" : Q: How long has IIC existed? A: IIC was founded in August 1997 by Trita Parsi, the present Chairman. While conducting research on Iran for US Congressmen in Washington DC in 1997, he recognized the necessity of establishing a lobbying organization in order to protect the socio-economic and political aspirations of the Iranian people on one hand, and to promote the historical and contemporary cultural and scientific contributions of people of Iranian heritage worldwide, on the other. This consequently led, in collaboration with a large number of intellectuals and experts,

to the formation of Iranians for International Cooperation (IIC). "Q: What is IIC? Is it a political party or a lobby organization? A: IIC is not a political party or even a political organization. We consider ourselves a lobby organization; we use our constitutional rights to influence our elected representatives."

References:

1] http://www.ned.org/grants/02programs/grants-mena.html

2] http://www.tritaparsi.com/biography.htm

3] http://www.niacouncil.org/index.php?option=com_content&task=view&id=598&Itemid

4] http://www.hamyaran.org/productinformation.php?pid=8

5] http://www.fpairi.org/org.htm

6] http://thehill.com/op-eds/fund-bridges-not-failed-policy-2007-09-11.html

7] http://www.huffingtonpost.com/trita-parsi/smells-like-desperation-_b_73575.html

8] http://www.hamyaran.org/fulltext.php?tid=30

9] http://web.archive.org/web/20030402193515/www.iranngos.org/

10] http://programs.ssrc.org/gsc/publications/quarterly10/shaeryham.pdf

PLAINTIFF'S EXHIBIT D

PISHEVAR & ASSOCIA ES, P.C.

ATTORNEYS

600 EAST JEFFERSON STREET
JEFFERSON PLAZA • SUITE 316
ROCKVILLE, MARYLAND 20852
TELEPHONE (301) 279-8773 – FACSIMILE (301) 279-7347
WWW.PISHEVARLEGAL.COM

VIA FACSIMILE/ 202-203-4960

Mr. Danforth Austin, Voice of American Director
Ms. Marie Skiba Lennon, Chief of Staff
Mr. William A. Marsh, Senior Advisor
Voice of America
Office of Public Affairs
330 Independence Avenue, S.W.
Washington, D.C. 20237

June 19, 2007

Re: Roundtable on June 10, 2007
Cease and Desist

Dear Mr. Danforth Austin
Ms. Marie Skiba Lennon
Mr. William A. Marsh

It has come to my attention that, my client, The National Iranian American Council (NIAC), has been the target of several erroneous, maliciously defamatory opinion pieces by Kenneth Timmerman and Hassan Daioleslam. On June 10, 2007 Mr. Daioleslam was permitted by VOA to disseminate and broadcast his false and defamatory accusations to the world. Mr. Daioleslam was a guest on the Roundtable with Voice of America (VOA) host Mr. Bijan Farhoodi on June 10, 2007. On air, VOA host Bijan Farhoodi told its viewers that VOA had contacted Dr. Trita Parsi but had not received any response from him. This is utterly false. VOA made no effort to contact Dr. Parsi directly, even though it had access to Dr. Parsi's contact information. Instead of limiting the discussion to the parties that were partaking in the roundtable, the host insisted that Mr. Daioleslam speak for other organizations he levels accusations against, even though they were neither there to respond to the accusations or to be informed of the program.

The Roundtable on June 10 was, *inter alia*, a violation of VOA's own published journalistic code and legal obligations. VOA is no ordinary news outlet. VOA is government funded and has to, according to its own Journalistic Code, verify sources and have double sources for its reports. Furthermore, VOA's code confirms that it has, "a legal obligation to present a comprehensive description of events, reporting an issue in a reliable unbiased way."

The code further states that in all of its reporting, including call-in shows, "views of a single party must be challenged by the interviewer if alternative opinions are unrepresented." On the contrary, Mr. Farhoodi made significant efforts to present his own understanding of the view of the missing party in the discussion, even though he had access to NIAC's detailed rebuttal of Mr. Daioleslam's false accusations to rely on. Although he briefly mentioned the rebuttal during the program, Mr. Farhoodi did not challenge a single accusation made by Mr. Daioleslam, even though the latter did not present a single piece of evidence to support his spurious claims. Despite the blatant lack of evidence presented, the host permitted him to continue his character assassination without impunity. The host made a mockery of VOA's principle that its "news and programming must be rigorously sourced and verified."

The unprofessional conduct demonstrated on the June 10 program is further exacerbated by the nature of Mr. Daioleslam's accusations; accusing Dr. Parsi on air of engagement in criminal activity, that is, that NIAC and Dr. Parsi are spending money given to them by arms smugglers and neo-Nazis. This is not only outrageous, but also glaring evidence of knowledge and malice. In addition, VOA showed significant bias in the interview by asking questions that served to verify the veracity of Mr. Daioleslam's accusations and the credibility of his persona. Furthermore, the host asked questions that elevated Mr. Daioleslam to the level of an authoritative expert on this area, in spite of his lack of credentials. For instance, VOA host asked Mr. Daioleslam, "To what extent has the Iran lobby been successful?" even though the very existence of such an "Iran Lobby" has never been established by Mr. Daioleslam or by VOA. Further evidence of apparent complicity is the text that was run at the bottom of the screen, which no doubt was prepared well in advance of the program's air date. The details cited, supra, are but a few examples.

In sum, Voice of America gave a political activist parading as an investigative journalist a platform to pursue his character agenda and witch-hunt, all at the expense of the US tax payers. Anyone with even minimal perception and insight would have been able to see from a mile away that Mr. Daioleslam had an "axe to grind." Certainly, VOA Persian is not giving the Iranian public a fair image of American journalism or American values. And certainly, this is not the type of journalism Congress had in mind when they allocated funds to VOA's Persian programming.

We would like to resolve this matter amicably by scheduling a time to meet before the next scheduled Roundtable. However, in the absence of a favorable, timely response, we are prepared to take all steps necessary to preserve and protect the rights of Dr. Parsi and NIAC without further notice to you. Please forward this to your legal department and provide us with the appropriate Federal Tort Claims or other forms to complete and submit.

The statement of facts set forth in this letter is not intended to be, nor shall it be deemed to be, a full and complete statement of the facts in this matter. This letter is not intended to be a complete statement of our rights, and shall not be construed as a waiver of any legal or equitable rights or remedies, all of which are expressly reserved.

Sincerely,

Afshin Pishevar, Esq.

ap/na

Cc: Client;
Kenneth Timmerman; FrontPage;
Hassan Daioleslam
Broadcasting Board of Directors (BBG):
Janice H. Brambilla, Carol Booker,
Janet Stormes, Susan Andross

PLAINTIFF'S EXHIBIT
E

U.S. Department of State
Updated 8:51 EDT - 07 Aug 2008

**America.gov -**

***Telling America's Story***

## PEACE & SECURITY | Creating a more stable world

30 April 2008

# Iran Is Most Significant State Sponsor of Terrorism, Report Says

**Annual list includes Cuba, Iran, North Korea, Sudan and Syria**

Colombian citizens across the world protest against the terrorist group Revolutionary Armed Forces of Colombia. (© AP Images)

**By Merle D. Kellerhals, Jr.**
**Staff Writer**

Washington -- Without state sponsors, terrorist groups would have far greater difficulty finding the funds, weapons and explosives, safe havens and recruits they need to plan and conduct acts of violence against others.

"The United States will continue to insist that these countries end the support they give to terrorist groups," according to the *2007 Country Reports on Terrorism*, released April 30. "State sponsorship of terrorism continued to undermine efforts to eliminate terrorism."

And also worrisome is that some of these countries that provide aid to terrorist groups also have the capability to make nuclear, biological and chemical weapons that could easily get into the hands of terrorists, the annual report says.

Cuba, Iran, North Korea, Sudan and Syria remained on the 2007 state sponsors list, though several of the countries have been working to be removed from the list by cooperating in the international struggle against terrorism, the report states.

"Sudan continued to take significant steps to cooperate in the war on terror," the report said. "Cuba, Iran and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations."

The report said that North Korea has not sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987. "As part of the Six-Party Talks process, the United States reaffirmed its intent to fulfill its commitments regarding the removal of the designation of [North Korea] as a state sponsor of terrorism," the report said, as North Korean officials move toward elimination of nuclear programs from the Korean Peninsula.

A Filipino stands next to a wanted poster of 24 Abu Sayyaf terrorists in the Philippines. (© AP Images)

Of the five countries on the annual list, Iran remains the most significant state sponsor of terrorism.

"A critically important element of Iranian national security strategy is its ability to conduct terrorist operations abroad," the report said. "Iranian leaders believe this capability helps safeguard the regime by deterring United States or Israeli attacks, distracting and weakening the United States, enhancing Iran's regional influence through intimidation, and helping to drive the United States from the Middle East."

And the report says that Hezbollah, a designated foreign terrorist organization, is crucial to carrying out Iran's terrorism strategy.

The report states that designating countries that repeatedly provide support

for acts of international terrorism as state sponsors subjects these countries to four types of sanctions from the United States:

• A ban on arms-related exports and sales.

• Controls over exports of items that could be used for civilian and military purposes. The U.S. Congress must be notified of exports of goods and services that could significantly enhance a country's military capability or support for terrorism.

• A prohibition on economic assistance.

• A series of financial and other restrictions, such as opposition to loans by international financial organizations, exceptions to legal immunity, denying tax credits, denying duty-free status and prohibiting defense-related contracts.

Tell us what you think about this article.

Bookmark with:

Delicious

Digg

reddit

Facebook

StumbleUpon

What's this?

---

This site delivers information about current U.S. foreign policy and about American life and culture. It is produced by the U.S. Department of State's Bureau of International Information Programs. Links to other Internet sites should not be construed as an endorsement of the views contained therein.

rch

:s Home

An Iranian American
Voice in Washington DC!



## DR. TRITA PARSI, President

NIAC

Jul 09, 2007



With a background as director for two U.S.-based Iranian organizations, Dr. Trita Parsi possesses a rich set of leadership skills and vision that will guide NIAC towards its goals.

Trita Parsi has worked for the Swedish Permanent Mission to the UN in New York where he served in the Security Council handling affairs for Afghanistan, Iraq, Tajikistan and Western Sahara, and the General Assembly's Third Committee addressing human rights in Iran, Afghanistan, Myanmar and Iraq. He has also served as a foreign policy advisor to Congressman Bob Ney (R-OH).

His expertise is Iranian foreign policy and US-Iran relations. His book, Treacherous Alliance - The Secret Dealings of Israel, Iran and the United States, (Yale University Press 2007), is based on more than 130 interviews that Dr. Parsi has conducted - in his personal capacity - in Israel, Iran and the United States with senior officials from all three countries.

Dr. Parsi's articles on Middle East affairs have been published in the Financial Times, Jane's Intelligence Review, the Globalist, the Jerusalem Post, The Forward, BitterLemons and the Daily Star.

As a Middle East expert, he is a frequent commentator on US-Iranian relations and Middle Eastern affairs, and has appeared on BBC World News, PBS NewsHour with Jim Lehrer, CNN, Al Jazeera, C-Span, NPR, ABC, and MSNBC.

Dr. Parsi was born in Iran and grew up in Sweden. He earned a Master's degree in international relations at Uppsala University, a second Master's degree in economics at Stockholm School of Economics and a PhD in international relations at Johns Hopkins University's SAIS. His personal website is www.tritaparsi.com.

< Prev Next >


### NIAC Newsletter

your email

HTML Text

Subscribe

### Top Stories

- New Guidelines Highlight Opportunities for Humanitarian Assistance to Iran
- Iran on the Bush Agenda and Beyond
- Iranian American Bar Association Urges Reversal of Florida Law
- The Risk of a US-Iran Proxy War

### NIAC in the News

- NIAC in the News: Ahmadinejad Faces Intra-Party Challenge
- NIAC in the News: Response to Sen. McCain's Call for Additional Sanctions
- NIAC photo essay in Iranian.com: Good people, good work
- What Do Google and Saddam Have in Common?
- NIAC in the News: Time for a fresh approach with Iran

### US-Iran News

- The Risk of a US-Iran Proxy War
- Lawmakers Turn Their Backs on Blockade Resolution
- NIAC Welcomes US Participation in Nuclear Talks
- Iran in Latin America: No More than a Nearby Nuisance, for now
- Burns to Congress: Iran is not 10 feet tall

### NIAC Events

### Donate to NIAC!

Enter Amount:

$50.00

Donate

### Join NIAC!




### NIAC Factbook




### Scholarships

Iranian-American Scholarships



[ Back ]

US Iran Media

Anti-Discrimination

IraNexus

SBA

Irancensus

Register to Vote!

© 2008 NIAC - National Iranian American Council
c/o 1411 K St NW Ste 600, Washington DC 20005
**Tel:** 202-386-6325 **Fax:** 202-386-6409

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**AFFIDAVIT OF AFSHIN PISHEVAR REGARDING NEED FOR DISCOVERY**

I, Afshin Pishevar, of Pishevar & Associates, P.C., an adult competent to testify to the facts contained herein, upon personal knowledge and belief, swear according to law and under penalty of perjury depose and say:

1. I represent the Plaintiffs, Dr. Trita Parsi and the National Iranian American Council, in the above-captioned matter.
2. The above-captioned action is one for defamation against the Defendant, Seid Hassan Daioleslam.
3. The Defendant has not yet filed an Answer to the Complaint.
4. The Plaintiffs have not had an opportunity to conduct discovery on this matter.
5. The Defendant argues that the Plaintiffs are public figures and that, as such, they will need to demonstrate actual malice to prevail against the Defendant.
6. To demonstrate actual malice, the Plaintiffs will need to provide evidence of the Defendant's reckless disregard for falsity, ill will, or bad faith. In order to do so, the

Plaintiffs need to obtain discovery responses from the Defendant regarding his knowledge, mental state, motives, ties to third-party organizations, and other relevant factors.

7. The Plaintiffs need to conduct discovery to ascertain the extent to which the Defendant was aware of Plaintiff Parsi's statements criticizing and condemning the Iranian government.

Further Affiant sayeth not.

Afshin Pishevar, Esq.

8/8/08
Date

*Witness my hand and official seal at* Rockville*, County of* Montgomery*, State of* Maryland *this* 8th *day of* August*, 2008.*

*Notary Public*

*My commission expires*

SERENA R. WOOD
Notary Public-Maryland
Montgomery County
My Commission Expires
July 01, 2010

SERENA R. NOTARY PUBLIC MONTGOMERY CO. MD

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

Civ. No.: **08 CV 00705 (JDB)**

**REQUEST FOR HEARING**

The Plaintiffs hereby request a hearing on the Defendant's Motion to Dismiss Complaint or in the Alternative Defendant's Motion for Summary Judgment.

Respectfully submitted,
*PISHEVAR & ASSOCIATES, P.C.*

/S/

Afshin Pishevar, Esq.
Bar No. 451015
ap@pishevarlegal.com

600 East Jefferson Street
Jefferson Plaza, Suite 316
Rockville, Maryland 20852
301-279-8773