IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRITA PARSI<br><br>and<br><br>NATIONAL IRANIAN AMERICAN COUNCIL<br>Plaintiffs,<br><br>v.<br><br><br>DAIOLESLAM SEID HASSAN,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil No.
08 CV 00705
(JDB)

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR EMERGENCY PROTECTIVE ORDER

Defendant Daioleslam Seid Hassan[1] ("Daioleslam"), by and through his attorneys, hereby oppose plaintiffs' Motion for Emergency Protective Order Seeking to Prohibit the Defendant from Disclosing Any and All Information Gained Through Discovery From Plaintiffs With Parties Outside of Litigation" ("Plaintiffs' Motion"). As with plaintiffs' previous attempts to obtain a broad protective order in this case, this motion should be denied. Not only did plaintiffs fail to meet and confer before filing the motion as required by Local Rule 7(m), but the relief requested is totally unjustified: plaintiffs have not established and cannot establish any conceivable "good cause" for prohibiting disclosure of non-confidential documents produced in

---

[1] Plaintiffs have incorrectly named defendant. His correct name is Hassan Daioleslam. He also publishes under and is know in the Iranian-American community as Hassan Dai.

discovery in this case, including, for example, correspondence with members of Congress and other government officials. That is especially so where the disclosure of these documents is occurring in the context of a vigorous debate in the press about an issue of significant public concern in which plaintiffs themselves are participating vociferously. The request in this motion, as with previous similar motions, betrays plaintiffs' true interest in this litigation: to skew public debate in its favor by intimidating and silencing its critics. Indeed, plaintiffs are now even attacking defense counsel personally for furnishing totally appropriate and correct legal advice, casually asserting that defense counsel violated Rules 3.6 and 4.2 of the District of Columbia Rules of Professional Conduct. Those assertions, like the request for a broad protective order, are baseless and should be rejected.

## BACKGROUND

At 9:20 PM Friday, October 30, counsel for plaintiffs sent a draft of the present motion to defense counsel stating that unless they were contacted within two hours, the motion would be filed. (Ex. 1). At 10:52 PM, counsel for Daioleslam responded, reminding plaintiffs that the email attached to the motion, which defense counsel previously had requested be returned and deleted, was intended as a privileged attorney-client communication to Daioleslam.[2] (Ex. 2). Defense counsel also requested that plaintiffs refrain from filing the motion until the parties had a chance to discuss it on Monday morning, November 2. (Ex. 2). Without responding, plaintiffs filed the "emergency" motion sometime late Saturday night. The motion seeks a broad-based protective order prohibiting disclosure of all discovery material, which, in this case, includes

---

[2] Although defense counsel intended to communicate with his client, the communication was misdirected through computer error to plaintiff Parsi and, perhaps Siamak Namazi. For that reason, the communication was not in fact an attorney-client communication protected by the attorney-client privilege. Plaintiffs' suggestion that the misdirected email resulted in any subject matter waiver of privilege is therefore misguided. Moreover, if the communication had been privileged, plaintiffs' counsel's use of the document, notwithstanding the prompt and repeated requests of defense counsel that the email be deleted would raise substantial questions under the guidance provided by both the ABA Committee on Ethics and Professional Responsibility and the DC Bar Legal Ethics Committee. *See* ABA, Formal Opinion 92-368; DC LEC Opinion 256. (Exs. 31, 32).

2

communications to and from members of Congress or other government officials. The only asserted basis for the motion is the underlying email Mr. Kapshandy intended to send to his client, furnishing appropriate and correct legal advice on whether a particular document was covered by the narrow confidentiality orders in this case.

This is plaintiffs' third attempt to obtain a blanket protective order. Plaintiffs requested such a protective order at the initial status conference in March 2009 and again filed a motion for such an order on June 5, 2009, which was withdrawn on July 8, 2009. Following plaintiffs' unsuccessful attempts to obtain a broad protective order prohibiting the disclosure of all discovery material, the parties entered into a very narrow confidentiality agreement specifically limited to protecting membership lists and personal information. (Ex. B to Plaintiffs' Motion).

On October 9, 2009, plaintiffs requested a protective order limiting disclosure of five emails to the White House scheduling a meeting with an Iranian economist. The Court denied the request on October 22, 2009. The parties subsequently agreed that the emails may be disclosed if the economist's name was redacted and replaced with: "IRANIAN ECONOMIST." Joint Status Report of October 28, 2009. These two agreements are the only confidentiality agreements governing discovery in this case. There is no gag order in place.

The parties in this case are public figures who frequently appear in the media, issue press releases, post on their own and others' websites, and publish on issues relating to U.S.-Iran relations.[3] An issue to be decided in this case is the truth of Daioleslam's statements about plaintiffs and whether such statements are constitutionally privileged under *New York Times v.*

---

[3] The very day of the November 2 status conference, plaintiff Trita Parsi gave a statement to the *Huffington Post* that defendant Daioleslam "was able to use the help he was provided by neoconservative circles in town to spread so many lies and spread them as extensively as he has." http://www.huffingtonpost.com/2009/11/02naic-and-j-street-progres_n_343008.html. (For this and other examples of NIAC publicity on this suit, *see* Exs. 10-13). On the same day, defendant NIAC issued a press release making various accusations against Daioleslam and used the lawsuit to solicit funds for its "fight the smears" campaign.
http://www.niacouncil.org/index.php?option=com_content&task=view&id=1538

*Sullivan,* 376 U.S. 254 (1964). Until then, there is no dispute that both parties' First Amendment rights are not suspended by NIAC's filing of this lawsuit against one of its critics.

In recent weeks a reporter from the *Washington Times* contacted and interviewed both parties at length[4] about, among other things, NIAC's lobbying, a central issue in this case. Daioleslam has responded to plaintiffs' public accusations that he is "spread[ing] so many lies" on this subject, *see supra* note 3, and supported his own statements with nonconfidential discovery in this case including some of the many hundreds of emails from NIAC to Congressmen and executive branch officials (examples attached as Exs. 3, 15, 18), as well as documents evidencing payments from foreign sources (Ex. 4). None of these documents was covered by either of the two limited confidentiality agreements governing the parties' conduct in this case.[5]

On October 29, Daioleslam sent an email to his counsel seeking legal advice. He asked whether the confidentiality agreements prohibited him from releasing a series of 2005 emails between Trita Parsi and ████████████████████ regarding a meeting with a ████████████ In 1999, Namazi co-authored with Parsi an article presented in Cyprus on a lobbying strategy for ending sanctions against Iran and countering the American Israel Public Affairs Committee ("AIPAC"). (Ex. 5). Embedded in Daioleslam's email to his counsel was Parsi's 2005 email from his John-Hopkins University ("JHU") email address where Parsi was a student in 2005. (Ex. 6). Defense counsel attempted to reply to his client with the requested advice. Mr. Kapshandy's response indicated that disclosure of the email was not prohibited by the confidentiality agreements and commented that the emails evidenced lobbying

---

[4] Parsi admits to one interview of nearly three hours. (Affidavit to Plaintiffs' Motion).
[5] Plaintiff has similarly publicly disclosed materials produced by defendant. (*See* Exs. C and D to Plaintiffs' Motion).

and were done with an email account belonging to the National Endowment for Democracy

("NED"). The email from defense counsel ended with the following legend:

> This e-mail is sent by a law firm and may contain information that is
> privileged or confidential.
> If you are not the intended recipient, please delete the e-mail and any
> attachments and notify us
> immediately.

(Ex. A to Plaintiffs' Motion).

Defense counsel then received a computer-generated email indicating that one of the

email addresses to which his reply had been directed was invalid. (Ex. 7). Only then did

defense counsel realize that his reply intended for Daioleslam had been misdirected through

some automatic process in the computer email program to Parsi's 2005 JHU email address that

was embedded in Daioleslam's email. Defense counsel immediately attempted to recall the

email that went to Parsi's 2005 JHU address. The JHU email server generated an ambiguous

message ("Message Recall Failure Recall"), suggesting that the message may not have been

recalled. (Ex. 8). So Mr. Kapshandy also replied with a message notifying any recipient of the

email intended for Daioleslam that it had been sent inadvertently and requesting that the email be

deleted. (Ex. 8).

At 9:20 PM Friday, October 30, when Mr. Pishevar sent a draft of plaintiffs' emergency

motion, defense counsel learned that his email intended for Daioleslam had been received at

Parsi's old JHU email account, that it had not been deleted in accordance with his previous

request, and that the email had been forwarded to others as well. (Ex. 1). Approximately 90

minutes later, defense counsel specifically notified Mr. Pishevar that the October 29 email that

Parsi had received was not intended for Parsi, but was a misdirected communication intended for

Daioleslam and requested that the email be deleted in accordance with the guidance provided in

D.C. Bar Legal Ethics Committee Opinion 256. Defense counsel also requested that Mr.

Pishevar refrain from filing the motion until the parties had a chance to confer first thing Monday morning. (Ex. 2). Defense counsel also left messages on cell phones for both plaintiffs' attorneys.

Notwithstanding defense counsel's prompt response and request to confer, plaintiffs filed the motion and attached the email that they knew was an inadvertently disclosed communication intended to be solely between attorney and client for the purpose of responding to an appropriate request for legal advice. In fact, when they sent the draft motion at 9:20 PM, they knew the email was intended as an attorney-client communication. (*See* Plaintiffs' Motion, p. 5). Although the email clearly reflected appropriate and accurate legal advice in response to a responsible effort to obtain such advice before disclosing a discovery document, plaintiffs' "emergency" motion attempts to use the unexceptional fact that defendant intended to disclose a discovery document to a reporter who had been interviewing both sides as an excuse to seek by way of a third request for a protective order the very relief the filing of this meritless lawsuit was intended to secure in the first place: the silencing of a principal critic of NIAC.

Plaintiffs' motion fails on two principal grounds: (1) plaintiffs failed to make a good faith effort to meet and confer with defense counsel prior to filing the present motion as required by local rule 7(m) and Federal Rule of Civil Procedure 26; and (2) plaintiffs have made no showing sufficient to justify a broad-based protective order precluding the dissemination of non-privileged and non-confidential facts concerning a matter of public interest. Further, defense counsel's accidental transmission to an opposing party of a short piece of accurate and appropriate legal advice intended for his client violates no ethical rule or legal norm and is completely irrelevant to the motion. Finally, plaintiffs' request for a default judgment is unjustified.

## ARGUMENT

## I.   THE MOTION SHOULD BE SUMMARILY DENIED GIVEN PLAINTIFFS' FAILURE TO MEET AND CONFER WITH DEFENSE COUNSEL IN GOOD FAITH PRIOR TO FILING THE  PRESENT MOTION, AS REQUIRED BY LOCAL RULE 7(M) AND FEDERAL RULE OF CIVIL PROCEDURE 26(C)(1).

The first defense counsel learned of the substance of this motion was at 9:20 PM on

Friday, October 30, when Mr. Afshin Pishevar emailed a draft motion stating that "We will be

filing it within 2 hours if we don't hear from you."[6]  Plaintiffs obviously did not expect a

response to a draft motion transmitted near bedtime on a Friday night with a two-hour response

deadline and were transparently attempting to evade the meet-and-confer requirement.   They

were wrong.  Approximately 90 minutes later, at 10:52, Peter Jensen of Sidley Austin LLP called

the cell phones of both of plaintiffs' counsel, left messages, and sent them both emails requesting

an opportunity to discuss the motion first thing Monday morning, November 2, as Mr. Rogers

was on an international flight.  (Ex. 2).  Rather than complying with the explicit requirements of

Local Rule 7(m) and Fed. R. Civ. P. 26(c)(1) by  making a good faith effort to meet and confer

with opposing counsel as invited by their 9:20 PM email and Mr. Jensen's request to talk on

Monday morning, counsel for plaintiffs filed the motion late on Friday night.  No effort was even

made to arrange a time to speak over the weekend, which could not possibly have prejudiced

plaintiffs' interests in any way.  This "emergency" motion was an abusive filing made in bad

faith and in blatant violation of plaintiffs' obligations under the Local Rules and the Federal

Rules of Civil Procedure.  For this reason alone the motion should be summarily denied.  *See*

Fed.R.Civ.P. 26(c)(1) (noting that a "motion [for a protective order] must include a certification

that the movant has *in good faith conferred or attempted to confer* with other affected parties in

---

[6] About 4:30 PM, Mr. Pishevar and Mr. Parsa  had called Mr. HL Rogers of Sidley Austin LLP requesting that he agree to the entry of a broad confidentiality order covering all discovery in the case based upon extrajudicial statements and communications with their client.  They refused to agree to send  a draft motion for defendant's review at that time and only later changed their position, sending a draft at 9:20 PM.

an effort to resolve the dispute without court action") (emphasis added); D.C. Dist. Ct. R. 7(m)

("Before filing any nondispositive motion in a civil action, counsel *shall discuss the anticipated*

*motion with opposing counsel*, either in person or by telephone, *in a good faith effort* to

determine whether there is any opposition to the relief sought and, if there is opposition, to

narrow the areas of disagreement.") (emphasis added).  It is unclear how Mr. Pishevar could

even have certified that the motion was opposed, as he never spoke to any defense counsel after

the draft motion was sent.  Under no circumstances would an email sent after 9 p.m. on a Friday

evening demanding a response within two hours have satisfied these important obligations.  But

Mr. Pishevar's conduct here was worse than that: when defense counsel responded within the

two hour window demanded and agreed to meet-and-confer regarding the motion, neither Mr.

Pishevar nor his colleagues even responded.  They simply filed the motion.  No meet-and-confer

ever occurred prior to filing or indeed prior to the November 2 status conference.  Summary

denial of the motion is the appropriate sanction for such abusive and uncivil litigation tactics.

## II.     PLAINTIFFS HAVE MADE NO SHOWING SUFFICIENT TO JUSTIFY A BROAD-BASED PROTECTIVE ORDER PRECLUDING THE DISSEMINATION OF NON-PRIVILEGED AND NON-CONFIDENTIAL FACTS CONCERNING A MATTER OF PUBLIC INTEREST.

Plaintiffs have twice before asked the court to enter a broad-based confidentiality

agreement and one specific confidentiality agreement regarding five emails (concerning NIAC's

arrangement of a meeting between the White House and an Iranian economist).  The first request

was rebuffed at the initial status conference in this case.  The second was withdrawn, and the last

was denied on October 22, 2009.  The parties did agree to two very narrow confidentiality

agreements.  (Ex. B to Plaintiffs' Motion; Oct. 28, 2009 status report).  Other than those, there

are no confidentiality orders in this case precluding the parties from publicly disseminating

discovery materials.  *Both* parties have continued to speak publicly throughout this litigation

about Iran-U.S. policy and the parties' motives behind their respective positions.[7] And *both* parties have publicly released documents produced by the other. (*See* Exs. C and D to Plaintiffs' Motion). There is nothing wrong with that: this lawsuit concerns a matter of intense public interest, as a new presidential administration attempts to formulate a new policy toward Iran: NIAC's role, if any, in lobbying the executive branch and Congress on behalf of the interests and positions of the Iranian regime.

Plaintiffs' latest attempt to secure a blanket protective order prohibiting disclosure of "any and all" discovery in the case merely rehashes the same authorities cited in plaintiffs' prior briefs. The only new reasons given in this motion are: (1) the inadvertently disclosed communication that was intended to be solely between attorney and client for the purpose of providing legal advice; and (2) the fact that both parties were talking to a reporter. These change nothing. There is nothing wrong, legally or otherwise, with a party to a lawsuit seeking legal advice before disclosing a document, or with counsel furnishing the requested advice. Nor is there anything wrong, legally or otherwise, with either party engaging with a reporter covering this matter and furnishing objective facts, such as non-confidential documents produced by the other side.

In fact, many of the emails produced during discovery in this case are public records, and no one could have had any reasonable expectation of privacy with respect to those. Parsi himself acknowledged that fact in the 2005 emails to Namazi that triggered this latest motion, writing:

---

[7] *See* Hassan Daioleslam, *Confronting Mullah's Lobby in Court* (June 25, 2008), http://english.iranianlobby.com/page1. php?id=20&bakhsh= JOURNAL (Ex. 9); *see also* NIACouncil.org, *NIAC Files Defamation Lawsuit against Hassan Daioleslam* (May 14, 2008), http://www.niacouncil.org/index.php?option=com_content&task=view&id=1119&Itemid=59 (Ex. 10); Babak Talebi, *I am always impressed by the ability of so many of you.* (May 27, 2008), http://www.iranian.com/main/albums/good-people-good-work (comment on article) (Ex. 11); Sam Stein, *NIAC and J Street, Progressive Foreign Policy Groups Become Political Targets* (Nov. 2, 2009), http://www.huffingtonpost.com/ 2009/11/02/naic-and-j-streetprogres_n_343008. html?view=print (Ex. 12): NIACounsel.org, *Who's Behind the Smears?* (Nov. 2, 1999), http://www.niacouncil.org/index.php?option=com_content&task=view&id=1538. (Ex. 13).

9



(Ex. 14). Clearly, Parsi knew that emails to and from a federal government email account were subject to public disclosure, and he could have had no reasonable expectation of privacy with respect to any such emails. Additionally, hundreds of the documents produced in discovery are emails to and from Congressmen which were reviewed and cleared by House Counsel when plaintiffs tried to suppress them under the Speech and Debate Clause. Attached as Exs. 3 and 15 are just some examples of the frequent legislative contacts NIAC makes by email.

Plaintiffs' obvious reason for attempting to suppress these documents is that they support Daioleslam's statements that NIAC is lobbying contrary to its charter as a 501(c)(3) organization and Parsi's sworn statements in NIAC's tax returns that NIAC engages in no lobbying or grass roots advocacy. (Exs. 33, 16a-f). Most damning is the admission of NIAC's current Acting Legislative Director (his title was recently changed to Acting Policy Director):

(Ex. 17, emphasis in original). The hundreds of emails with Congressmen and staffers (*see* Exs. 3, 15) as well as other documents regarding lobbying strategy, meetings with Congressmen, and discussions about the same with                                    confirm the NIAC Acting Legislative Director's conclusion. (Attached as Ex. 18 are examples of these).

10

Numerous publications besides Daioleslam's have stated that NIAC is lobbying. *See* Kenneth Timmerman, *The Mullah's Voice*, Frontpage Magazine (Feb. 23, 2007), available at http://97.74.65.51/readArticle.aspx?ARTID=20) (Ex. 19); SMCCDI, *Protest against support of the Islamic regime by some of the US policy makers*, Student Movement Coordination Committee for Democracy in Iran (May 22, 2003), available at http://www.daneshjoo.org/article/publish/article_2399.shtml (Ex.20); Clare Lopez, *Rise of the 'Iran Lobby,'* Center for Security Policy Occasional Paper Series (Feb. 25, 2009), available at http://www.analyst-network.com/articles/117/RiseoftheIranLobbyTeheransfrontgroupsmoveonandintotheObamaAdministration.pdf (Ex. 21); Nick Baumann, *Neocon Smear on "Iran's Man in DC?,"* Mother Jones (Nov. 2, 2009), available at http://www.motherjones.com/mojo/2009/11/trita-parsi-iran-man-in-washington) (Ex. 22); Official translation of Sept. 19, 2006 Top Iranian article (Ex. 23); and Official translation of Aftab article (Ex. 24). And, one article on www.iranian.com, arranged by NIAC for favorable publicity and showing nearly two dozen pictures of NIAC offices and staff, states about Parsi: "I've known Trita since he wrote a piece for iranian.com about ten years ago about being a one-man lobbyist in Congress." http://www.iranian.com/main/image/29890:

11



There he is. I've "known"
Trita since he wrote a piece
for iranian.com about 10
years ago about being a
one-man lobbyist in Congress.

Documents plaintiffs produced in this case also confirm that this suit was filed as a

hardball political tactic to intimidate and silence Daioleslam. As Parsi explained to the NIAC

Board in 2007, litigation was necessary because, unlike other targets of NIAC's "cease and

desist" campaign, Daioleslam had not backed down:



(2007 Board Meeting Minutes, Ex. 25).    At the 2008 Board meeting:

12



(2008 Board Meeting, Ex. 26).  In short, the documents produced in discovery show through

Parsi's own words that this suit was filed to get Daioleslam to "fold" or "cease and desist" from

his public criticism of NIAC.  Lastly, in a June 2008 email to Parsi, fellow NIAC board member

█████████  noted the need to  █████████████  even using federal government

resources through the National Endowment for Democracy to do so:



(Ex. 27).  Daioleslam did not fold, however, and now through discovery has documents in

NIAC's own words that confirm his previous statements.

Over the last five months, plaintiffs have attempted to tie Daioleslam's hands with repeated requests for confidentiality orders and meritless efforts to assert non-existent privileges to keep the status of discovery in limbo (including even emails to government officials, claiming that they were Parsi's "proprietary" information that he had the right to publish or that were subject to the Speech and Debate Clause of Article I of the Constitution). During this period, Daioleslam has not published any of these discovery materials on his website, used them in his talks, or shared them with other writers. However, once the two limited confidentiality agreements were finalized, Daioleslam (who is an investigative writer well-known in the Iranian-American community) began to release nonconfidential documents to support his conclusions and defend himself against public accusations by plaintiffs that he was lying about their activities.

NIAC's efforts to intimidate its critics and those who aid them through vexatious litigation extends even to defense counsel in this case. After the November 2 status conference, in the hallway outside the courtroom, counsel for plaintiffs threatened to sue Daioleslam's current counsel and law firm in the present action based upon the email at issue in this motion, in which counsel attempted to provide legal advice to Daioleslam concerning whether or not a particular series of documents was covered by the two confidentiality agreements. Based upon defense counsel's accurate advice to his client, plaintiffs' counsel claimed defense counsel had "committed a tort," consisting of allegedly masterminding and orchestrating a campaign to defame Parsi and NIAC.

Like the present lawsuit, the allegation against defense counsel is baseless. Sidley Austin LLP has had no prior involvement with NIAC and substituted into this lawsuit on a pro bono basis to defend Daioleslam's First Amendment rights on October 29, 2008, long after both the

14

case and motion to dismiss had been filed and even longer after this battle between the parties began in 2007. Such threats can only be designed to try to silence and intimidate counsel along with the defendant and to drive a wedge between attorney and client. It is part of a pattern of behavior by NIAC to abuse the legal process in an effort to intimidate and silence those who have dared to criticize it. Others who have been subjected to this strategy include, *inter alia,* Voice of America, the Chairman of the Department of Business at Connecticut State University, ██████████████████████████████ (Exs. 28a, 28b,  29, 30, 34).

While other critics did, in fact, cave as desired, Daioleslam did not, and he was rewarded with this lawsuit. The use of litigation to effect such prior restraints of criticism is highly disfavored. *See generally Tavoulareas v. Piro,* 759 F.2d 90, 104 (D.C. Cir. 1985) ("Due to the possibly overwhelming expense of even a successfully defended defamation action, the threat of litigation itself may cause potential defendants to steer far wider of the unlawful zone and act as self-censors." (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279, (1964))), *vacated in part on other grounds,* 763 F. 2d 1472 (D.C. Cir. 1985); *see also Walker v. Tyler,* No. 3:95CV587, 1996 WL 34463488, *4 (E.D. Va. Jan. 4, 1996) (citing *James v. Haynes,* 178 S.E. 18, 23 (1935)) ("The heightened burden that public officials carry arises out of the need to secure for general citizens the qualified privilege to criticize their representatives and public officials and to provide comments on matters of public concern without the ominous and silencing threat of a defamation lawsuit looming over such commentary."). Daioleslam should not be precluded from releasing plaintiffs' own documents – objective facts from plaintiffs' own files – that support his claims and refute plaintiffs' accusations that he lies about them because plaintiffs have chosen to sue him for damages. The entire point of the suit is to muzzle him; to use interim confidentiality orders in litigation plaintiffs themselves initiated to accomplish that objective is

15

simply insupportable. As discussed above, plaintiffs continue to speak about and issue press releases about this litigation. (Exs. 10-13). At the same time they are speaking regularly and publicly about the litigation, plaintiffs request this Court to tie the hands of Daioleslam so he cannot use NIAC's documents to and from public officials to defend himself.

Plaintiffs' third attempt to squelch Daioleslam suffers from the same flaw as the previous attempts. Plaintiffs cannot 'show[] [any alleged injury] with specificity.' *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994). Indeed, even plaintiffs' legal discussion, which appears to be copied word-for-word from the defendant's previous filing, supports *Daioleslam's* position, not theirs. *See, e.g., id.* at 786-87 ("The burden of justifying the confidentiality of *each and every document* sought to be covered by a protective order remains on the party seeking the order.") (emphasis added); *id.* at 787 ("[P]rivacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny."); *In re Halkin*, 598 F.2d 176, 193 (D.C. Cir. 1979) ('[T]he courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.' (quoting 8 Wright & Miller, *Federal Practice and Procedure* § 2075 at 265 (1970)); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning," do not support a good cause showing.). Plaintiffs cannot cite any specific examples of injury from disclosure of any discovery material. Indeed, Parsi told the *Huffington Post*, "I just know most people when they look at the facts will think that [Daioleslam's claims are] complete nonsense." (Ex. 12). To tell reporters that the specific facts when they come out will vindicate him while asking this Court to suppress the facts in non-confidential documents is disingenuous at best.

III.   **DEFENSE COUNSEL'S ACCIDENTAL TRANSMISSION TO AN OPPOSING PARTY OF A SHORT PIECE OF LEGAL ADVICE INTENDED FOR HIS CLIENT VIOLATES NO ETHICAL RULE OR NORM.**

    A.   **Defense Counsel's Inadvertent Communication Intended for its Client Did Not Violate D.C. R. Prof. Conduct 3.6.**

Plaintiffs assert that defense counsel violated Rule 3.6 of the D.C. Rules of Professional

Conduct. (Plaintiffs' Motion, p. 5). This is sheer nonsense. Rule 3.6 states:

> A lawyer engaged in a case being tried to a judge or jury shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding.

D.C. R. Prof. Cond. 3.6. Plaintiffs' argument fails for two reasons. Mr. Kapshandy made no

public statement at all here, much less an "extrajudicial statement." Defense counsel

inadvertently sent an email intended for its client, which was meant to be privileged and remain

confidential, to plaintiff Parsi. In fact, until Mr. Pishevar attached the email to his motion –

despite numerous requests that it be returned/deleted – no one outside of the parties in this case

was aware of it (except perhaps Siamak Namazi, to whom the email was also misdirected).

Moreover, this was not an extrajudicial statement which defense counsel "[knew] or reasonably

should [have known]" would be disseminated to the media. The three-line message was not sent

to the reporter; nor was it ever intended to be.

Even if there had been an extrajudicial statement by Mr. Kapshandy, it could never have

created a "serious or imminent threat of material prejudice to the proceeding." The statement

relayed legal advice concerning whether a document was protected by existing agreement and

briefly summarizing its contents. It was accurate and appropriate. It was not inflammatory or

outrageous. It was never intended for public view. And neither the inadvertent disclosure to

plaintiff Parsi nor the transmission to a reporter of an email exchange from a federal government

account that Parsi acknowledged was subject to disclosure under the FOIA regarding evidence of

17

lobbying – a topic that could excite only the most avid of policy wonks – is likely to prejudice a jury pool. *See United States v. Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002) (holding that even if the pre-trial publicity "includes some expressions of opinions on newspaper editorial pages or the Internet that were specifically designed to inflame or persuade readers," it is problematic only where it is so pervasive as to "taint" the proceedings). Where pre-trial publicity is "factual, rather than inflammatory," it is unlikely to cause harm to the trial proceedings. *Id.* The underlying communication at issue here is an email between plaintiff Parsi and Siamak Namazi, a principal with the Iranian consulting firm, Atieh Bahar, about a meeting with a government official – a *fact* in these proceedings. The release of such an email that plaintiff acknowledged was subject to disclosure under the FOIA could not be "materially prejudicial to the proceedings." Nor could any lawyer authorizing its release ever reasonably have believed it would be. Such a thing is of no interest whatsoever to the vast majority of people, and it merely relates a fact emerging from plaintiffs' own files.

Finally, the value of injecting such a fact into the public debate from a First Amendment perspective would weigh decisively against any finding of a violation of Rule 3.6 in any event. *Wachsman v. Disciplinary Counsel Supreme Court*, No. C-2-90-335, 1991 U.S. Dist. LEXIS 20899, at *28-29 (S.D. Ohio Sept. 30, 1991) (considering a sister rule 3.6). "[F]or the benefit of the public, a court must be extremely careful to protect attorney communications in connection with civil litigation" because the litigation "may involve significant social issues which should not be hidden from the public." *Id.* Indeed, the purpose of the rule is to balance the right to a fair trial with litigants' "right to present their side of a dispute to the public, and the public...interest in receiving information about matters that are in litigation." D.C. R. Prof. Cond. 3.6, cmt. 1. "Often a lawyer involved in the litigation is in the best position to assist in

furthering these legitimate objectives." *Id.; see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1043 (1991) ("An attorney's duties do not begin inside the courtroom door….[A]n attorney may take reasonable steps to defend a client's reputation … especially in the face of a prosecution deemed unjust or commenced with improper motives…. including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.") (interpreting a sister rule in a criminal case). The underlying speech at issue here – a communication between Parsi and Namazi that is evidence that plaintiffs may have improperly used government resources to influence government officials – is of serious public interest. This is especially the case, where, as discussed above, plaintiffs are publicly commenting on the lawsuit and stating that the ultimate release of the facts will prove Daioleslam is lying. And given the current political saliency of U.S.-Iran relations and the bona fides of parties who seek to influence government policy on this subject, the value of adding factual information to the public debate is high. To muzzle Daioleslam and his counsel under Rule 3.6 while plaintiffs continually speak to the media would subvert the purpose of the rule and unfairly make policy debate on this subject a one-way street.

The Supreme Court has held that there is an appropriate procedural mechanism to address the concerns of a party in a defamation case who wants to prevent another from disclosing information obtained in discovery – a protective order. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). As discussed *supra,* this Court has twice denied plaintiffs' requests for a blanket protective order. Absent a protective order, plaintiffs have no basis in law for silencing disfavored speech. Defense counsel could not find a single case in which an attorney had been disciplined for or even accused of violating D.C. Bar Rule 3.6 for disclosing discovery documents where no protective order was in place. This court should not permit plaintiffs to

invoke an ethical rule in a thinly veiled attempt to obtain a blanket protective order that the Court has twice denied in this case.

**B.    Defense Counsel's Inadvertent, Brief, and Harmless Communication Plainly Intended for its Client Did Not Violate D.C. R. Prof. Conduct 4.2.**

Defense counsel's inadvertent communication to plaintiff Parsi does not violate D.C. Rule 4.2 prohibiting communications with a represented party, and plaintiffs' assertion to the contrary partakes of the same abusive mindset as all the other claims made in its motion. First, the e-mail was intended for counsel's client and sent to a person represented by counsel only by mistake. Every effort was then made to ensure that it was not read or retained by the opposing party or its counsel.

In *Orlowski v. Dominick's Finer Foods*, 937 F. Supp. 723, 726 (N.D. Ill. 1996), the court held that there was no violation of a similar rule under similar circumstances. There, plaintiff's counsel sent a letter to potential class members in a sex discrimination class action suit— unknowingly including some who were current managers of the defendant company. The letter described the lawsuit and requested that those with information pertaining to the defendant's discriminatory practices contact plaintiffs' counsel. *Id.* As a result, some of the defendants' managers then contacted plaintiffs' counsel. *Id.* The court found that the contact with defendants' managers was inadvertent. *Id* at 731. Defendants then moved for a protective order and claimed that plaintiffs' counsel violated the Northern District of Illinois' Rule of Professional Conduct 4.2, which generally prohibits a lawyer from communicating on the subject matter of the representation with a party the lawyer knows to be represented by another lawyer. *Id* at 726. The court rejected this allegation and noted that "counsel's contact with some current managers was inadvertent, and neither constitutes an ethical violation, nor warrants sanctions." *Id* at 731.

So, too, here. Defense counsel inadvertently sent an email to plaintiff Parsi that was plainly not intended for Parsi, but Daioleslam. Defense counsel immediately (and repeatedly) attempted to recall the communication and requested that any recipients delete the email. (Ex. 8). This was not an intended communication where the attorney incorrectly thought the communication would be appropriate, repeatedly contacted a represented party, and received additional information from that represented party. *See generally Faison v. Thornton*, 863 F. Supp. 1204, 1214 (D. Nev. 1992) (showing such acts even if "mistakenly or innocently" thought to be "permissible" are a violation of Nevada's version of Rule 4.2). Rather, this was a simple, unique mistake, similar to the facts in *Orlowski*. Indeed, the facts here are even more benign than in *Orlowski*, in that there was no intent to communicate with Parsi at all, there was no solicitation of information from him, the communication was clearly not intended for the him, and counsel *did not receive any information* from him. *See e.g.*, ABA Model. R. Prof. Conduct 4.2, Cmt. 1 (stating that the ABA rule was in part intended to protect against "uncounseled disclosure of information relating to the representation") and D.C. R. Prof. Conduct 4.2, Cmt. 6 (stating a prohibition on seeking information that is otherwise protected even if the contact is otherwise allowed). In fact, as soon as defense counsel realized his error, he attempted to recall the message and additionally sent a follow-up notice to the JHU email server that this was an inadvertent email. (Ex. 8) Thus, just as in *Orlowski*, there was no violation of the rules of professional conduct here. Plaintiffs' contrary assertion is totally unjustified.

## IV.   PLAINTIFFS' REQUEST FOR A DEFAULT JUDGMENT IS UNJUSTIFIED.

Finally, plaintiffs' request for the drastic sanction of a default judgment is unsupported by any authorities and, for all of the reasons just discussed, is similarly unjustified. Because courts favor disposition on the merits, a default judgment is a "sanction of last resort, to be used only

21

when less onerous methods…will be ineffective or obviously futile." *Webb v. D.C.*, 146 F.3d 964, 971 (D.C. Cir. 1998) (internal quotation marks omitted); *see also Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988) ("Before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses."). Therefore, the "drastic" sanction of default judgment is appropriate only in three narrow circumstances: where misconduct "so prejudiced" a party that "it would be unfair to require him to proceed any further in the case;" where misconduct placed an "intolerable burden on [the] court;" or where a party's behavior was so "disrespectful" that deterrence is warranted. *Webb*, 146 F.3d at 971; *accord Shea v. Donohoe Constr. Co.*, 795 F.2d 1071 (D.C. Cir. 1986). The facts here do not establish any arguable violation of any ethical rule or other improper conduct by defense counsel and do not come close to establishing grounds for a default judgment. For these reasons, plaintiffs' request for a default judgment should be denied.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests the Court deny Plaintiffs' emergency motion for a protective order and all other just and proper relief.

Respectfully submitted,

_____ /s/ _____
Bradford A. Berenson (D.C. Bar No. 441981)
Timothy E. Kapshandy (Illinois Bar No. 6180926,
admitted *pro hac vice*)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
hrogers@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

Dated: November 6, 2009

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRITA PARSI                                          )
                                                     )
and                                                  )
                                                     )
NATIONAL IRANIAN AMERICAN COUNCIL                    )
      Plaintiffs,                               )
                                                     )
              v.                            )   Civil No. 08 CV 00705 (JDB)
                                                     )
DAIOLESLAM SEID HASSAN,                              )
      Defendant.                                )
                                                     )
                                                     )
                                                     )

## CERTIFICATE OF SERVICE

I certify that on November 6, 2009, I served, via email, Defendant's Response in Opposition to Plaintiffs' Motion for a Protective Order:

        Afshin Pishevar
        600 East Jefferson Street
        Suite 316
        Rockville, Maryland 20852
        (301) 279-8773
        ap@pishevarlegal.com

_____ /s/ _____
Bradford A. Berenson (D.C. Bar No. 441981)
Timothy E. Kapshandy (Illinois Bar No. 6180926,
admitted *pro hac vice*)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
hrogers@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

Dated: November 6, 2009