IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL          Civ. No.: 08 CV 00705 (JDB)

Plaintiffs,

v.

SEID HASSAN DAIOLESLAM,

Defendant.

## PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSTION TO PLAINTIFFS' MOTION FOR AN EMERGENCY PROTECTIVE ORDER

Plaintiffs Trita Parsi and the National Iranian American Council, by and through their attorney, hereby reply to and oppose Defendant's Opposition to Plaintiffs' Motion for a Protective Order, seeking to prohibit Defendant from actively disseminating to Parties outside of litigation any and all information gained through discovery.

### INTRODUCTION

The principal issue before the court is: Whether Defendant's Counsel violated Rule 3.6 of the D.C. Rules of Professional Conduct by directing and aiding his client in maliciously spinning and then spreading discovery material to *various* members of the press - thereby making extrajudicial statements and creating a serious and imminent threat of material prejudice to the proceeding.  The Defendant attempts to mask its inappropriate conduct by propping up the issue as a "First Amendment" one. Just as one has no right to yell "fire" in a crowded theater, in

1

litigation, a judge has a right to control his case. Yet, Defendant's Opposition Memorandum delves headfirst into series after series of irrelevant issues supported by even more irrelevant exhibits numbering roughly 1,000 pages. Defendant starts with the totally false allegation that Plaintiffs' Counsel failed to comply with the applicable conferral rules, and then he makes a perplexing argument (among others) that the Plaintiffs are a "lobbying" group.

It is clear that Defendant's off-point and irrelevant tangents are an attempt to muddle and confuse a narrow set of issues before the Court. Their efforts are so extreme that after twenty-two pages, and after throwing everything except the kitchen sink at the Plaintiffs, the Defendant barely manages to address the *relevant* allegation contained in Plaintiffs' Motion for a Protective Order. This belies the fact the Defendant has no real defense to Plaintiffs' simple yet true contention that Defendant's counsel breached the ethical rules governing extrajudicial statements by directing/ordering the piping of discovery to a reporter.

That *relevant* issue prompted the Court to issue an interim order precluding dissemination of discovery material outside this litigation. Defendant, in his Opposition, takes the Plaintiffs and the Court on a "wild goose chase" before managing to slightly and ineffectually touch upon the pertinent and applicable issues.

Consequently, Defendant states in his Opposition that the relevant e-mail from his counsel was "appropriate and legal advice" and that the information disseminated was "public" in addition to arguing that the Plaintiffs are "casually" asserting their allegations. Yet Defendant clearly misrepresents the relevant e-mail. It was neither appropriate nor legal advice. Rather, opposing counsel is expressly directing the dissemination of discovery/evidence in our case to be pumped out to a reporter. He is not just saying it "may" be disseminated. Opposing counsel is spinning the evidence and making arguments as to how the evidence shall be analyzed and shall

be disseminated.  Furthermore, (for purposes of rule 3.6 of the D.C. R. of Professional Responsibility) it is completely irrelevant whether the discovery material was public or not when the extrajudicial statement was made. Plainly, opposing counsel is seeking to try this case in the press.

Likewise, the Court and the Defendant can be assured that the Plaintiffs would never "casually" assert that an attorney was breaching rule 3.6 of the D.C. Rules of Professional Conduct. This statement in Defendant's Opposition shows his failure to grasp the seriousness of the matter and belies his cavalier attitude towards adhering to the Rules of this Court, and to behaving in good faith in the litigation before this Court.

Unfortunately, this is a pattern of behavior that Defendant has clearly displayed in the past; a pattern of behavior that forced the Plaintiffs to file this suit in order to protect their rights against being defamed. A pattern of behavior that shows Defendant's counsel has emulated, and taken on his client's "alter ego," in direct violation of the Rules that he must adhere to as an officer of the Court.

Moreover, despite Defendant's subterfuge (and repeated attempts) to minimize, deflect and to paint himself as a "*victim*" of Plaintiffs' lawsuit and subsequent Motion, it is his and his counsel's own wrongdoing that are solely to blame for the Motion *sub judice*. Indeed, prior to becoming aware of Mr. Kapshandy's outrageous conduct, Plaintiffs were busy, in good faith, fulfilling a promise to deliver to Defendant's counsel discovery material by Friday October 30th, as shown by an earlier e-mail Plaintiffs' counsel sent to the opposing counsel. (*See* Exhibit E). This good faith production has continued nonetheless on Plaintiffs' part. However, due to Mr. Kapshandy's communication, Plaintiffs' counsel has been forced to deal with this unexpected and astonishing development.

Nevertheless, the Defendant tries to portray himself as a surprised *victim* of Plaintiffs' filing; such an allegation is misleading and baseless. The only individuals who were *surprised* here were the Plaintiffs and their counsel, who upon learning of Defendant's behavior, acted reasonably, zealously and in good faith with all sides in order to resolve the urgent matter - preferably amicably or through a filing with the Court if necessary. The email in question was not an attorney-client communication protected by the attorney client privilege and thus could be shared by Plaintiffs. Indeed, the Defendant admits to this in his Opposition Motion. (*See* Defendant's Opposition p.2)  Yet, paradoxically, Defendant then claims, citing D.C. Bar Legal Ethics Committee Opinion 256 that the email should have been deleted. (See Defendant's Opposition pg. 5) The relevant Opinion cited by Defendant's deals with inadvertent confidential communications sent *between* opposing attorneys - not communications between an attorney and two lay persons, which, as Defendant concedes, is not confidential. (*See* Defendant's Opposition pg. 2). Moreover, the confidentiality statement contained on the email was listed at the bottom of the message, not at the top. So the person receiving it had no notice that is was *potentially* confidential information until they completely finished reading it. (*See* Defendant's Opposition pg. 5). As Opinion 256 unambiguously states, if one has to read it to realize it is confidential the item is not privileged and the receiving party may read it and *use* it. Furthermore, as Opinion 256 stated, this is a presumptive "waiver" in the District of Columbia.

Plaintiffs did not want to file the Motion asking the Court to prohibit Defendant from third party disclosures. Yet Plaintiffs were presented with no choice, especially after Defendant's counsel refused to come to an amicable agreement when they were confronted with clear evidence (in Mr. Kapshandy's email), that Defendant's counsel was advising his client on how to maliciously spin and distort discovery material to further sully Plaintiffs' reputation in the

public's eyes. Defense counsel's behavior is even more perplexing because we have a confidentiality agreement. Indeed, the relevant email from Mr. Kapshandy to Defendant wasn't even about how to defend the suit, but an effort to link Plaintiff Parsi and a Mr. Namazi to the (alleged) improper usage of a National Endowment for Democracy email account. Mr. Kapshandy then directs and orchestrates his plan to share this information with the Washington Times. This is not a defense of his client, but rather an attempt to smear the Plaintiff in order to *deter* the Plaintiff from protecting his rights and an effort to vex and embarrass the Plaintiff into submission. This plainly is nothing but an extrajudicial statement in violation of Rule 3.6 of the D.C. Rules of Professional Conduct.

These are serious allegations that Plaintiffs do not take lightly. It is clear that the Court does not either given its order of November 2, 2009, that temporarily prohibited the dissemination of discovery material by *all parties* - an order that was supported by Plaintiffs – but opposed by Defendant. Indeed, it becomes increasingly clear that the Plaintiffs are willing to play by the rules, while the Defendants is desperately trying to circumvent them.

Finally, despite Defendant's false allegation, the Plaintiffs and their attorneys have *never* shared and distorted discovery material gained from the Defendant with members of the press; indeed that is the very reason why the Plaintiffs *supported*, (and the Defendant *opposed*) a *mutual* ban on the dissemination of discovery material per the Court's order of November 2, 2009. The only time Plaintiff Trita Parsi spoke with the reporter referenced in Mr. Kapshandy's email, was when he was summoned to their office on October 29, 2009, and was told by Mr. Eli Lake that they were planning on publishing a story about him using discovery *gained* from the Defendant. (*See* Affidavit of Trita Parsi attached to Plaintiffs' Motion for Protective Order). And

the only time Plaintiffs utilized discovery material were the two attachments to their original

motion, which is clearly not outside this litigation.

## ARGUMENTS

**I.      PLAINTIFFS COUNSEL FULLY COMPLIED WITH AND WENT BEYOND
THE REQUIREMENTS OF LOCAL RULE 7M AND THE FEDERAL RULES
OF CIVIL PROCEDURE 26(c)( 1) IN CONFERRING WITH DEFENDANTS
IN GOOD FAITH BEFORE THE MOTION WAS FILED.**

Defendant asserts in his Opposition that Plaintiffs never substantially conferred with

them before the Motion was filed. Plaintiffs in fact did confer in detail, and it was quite clear an

agreement was not possible. Defendant's allegation is false and shows the fact that Defendant's

counsel has to resort to weak procedural arguments in an effort to oppose Plaintiffs' Motion.

The truth is that Plaintiffs counsel spoke with Defendant's attorneys by phone more than 8 hours

*before* the Motion was filed. The conversation covered all bases, including the substantive

content of the Motion and a desire to come to an agreement precluding the need for a filing. We

even exchanged emails and considered Defendant's arguments regarding Opinion 256 prior to

filing. Undersigned counsel had thoroughly reviewed Opinion 256 prior to Defendant's email.

Undersigned counsel did not file its Motion lightly. We even called and discussed these issue

with the Bar Ethics Hotline.

Specifically, on Friday, October 30th 2009, more than 9 hours *before* the motion was

filed; several calls were placed to Defendant's counsels in-order to satisfy Local Rule 7(m) and

the related Federal Rules of Civil Procedure requirements regarding conferral. Calls were placed

to several of Defendant's counsels including: Mr. HL Rogers, Mr. Berenson, Mr. Jensen and Mr.

Kapshandy. At each juncture Plaintiffs' counsel was confronted with their voicemails or

respective secretaries.

Hoping to speak with opposing counsel, Plaintiffs' counsel left an extensive message with Mr. Kapshandy's secretary explaining to her the subject matter of Plaintiffs' Motion, its content, and the desire for Plaintiffs to speak with Mr. Kapshandy in order to come to agreement precluding the need for a filing. This call was placed between 2 or 3 in the afternoon.

About an hour later, Mr. Kapshandy's secretary returned Plaintiffs' call stating only that he was "aware" of our message but "unavailable." Accordingly, Mr. Kapshandy never returned Plaintiffs' call despite the urgent nature of the message. Furthermore, this was around 3pm in the afternoon, more than 6 hours *before* the false allegation that Defendant "*first*" heard of the substantive content of the Plaintiffs' Motion. (*See* Defendant's Opposition, p. 6).

Still undeterred, Plaintiffs' counsel continued to call Defendant's counsel. Finally, at around 4:30pm, Plaintiffs' counsel, Mr. Patrick Parsa was able to speak with Defendant's counsel, Mr. HL Rogers about their Motion. After explaining to Mr. Rogers the *full substance* of the Motion, including providing him the *exact* provisions of the Rules that Mr. Kapshandy had violated; Mr. Rogers nevertheless refused to consent to an agreement.

Defendant, in his Opposition, briefly alludes to this phone call in a *footnote* on page 7 a footnote they seemed to hope would escape the Court's attention. However, more importantly, the footnote's language on its face indeed substantially contradicts every allegation the Defendant makes about *when* he first had substantive knowledge of the Motion. It states that:

> "[a]bout 4:30 PM, Mr. Pishevar and Mr. Parsa had called Mr. HL Rogers of Sidley Austin LLP requesting that he [Mr. Rogers] agree to the entry of a broad confidentiality order covering all discovery in the case based on extrajudicial statements and communications with their client."

(*See* Defendant's Opposition p. 7).

This phone call is referenced in an email that was sent from Plaintiffs' to Defendant's counsel later that evening – an email that is only *partially* quoted in Defendant's Opposition - but that is attached in full as an attachment to this Reply. (*See* Exhibit F) Further, it is also supported by a sworn affidavit of a witness who overheard the conversation at Plaintiffs counsel's offices. (*See* Affidavit of Mr. Farrokh Mohammadi.)

Accordingly, Defendant's counsel had full knowledge of Plaintiffs' Motion, and summarily rejected a compromise offer when Mr. HL Rogers spoke with Mr. Parsa at 4:30 pm on October 30, 2009. At this point, Plaintiffs had fully satisfied the rules regarding referral under Rule 7(m) and the Federal Rules of Civil Procedure.

Despite this setback, Plaintiffs' counsel still wished to avoid filing the Motion, and so promised to send Defendant's counsel a version for their review later in the evening. (*See* Exhibit G). Finally, at roughly 9pm on Friday October 30th, the Motion was completed, at which point it was *immediately* sent to Defendant's counsel for their review. Moreover, Mr. Pishevar provided the personal cell phone numbers for himself and his associate if the Defendant's counsel decided to change their mind and call back. (*See* Exhibit F.)

About two hours later, Defendant's counsel called and left a message stating that they (*once again*) could not agree to the Motion (mirroring what Mr. Rogers had said almost *8 hours before*) and *again* expressing their desire that we not file.

By now, Plaintiffs' counsel had *twice* informed Defendant's counsel of the substantive areas of their Motion and requested that a separate agreement be reached. *Twice* Defendant's counsel had rejected any offer of compromise. After returning Mr. Jensen's phone call, which led yet to another voicemail, Plaintiffs finally decided to file their Motion in hopes of stopping any further dissemination and distortion of discovery material by Defendant's counsel – and only

after Plaintiffs' counsel had satisfied the requirements for conferral *twice* under Local Rule 7(m) and the FRCP 26(c)(1).

Plaintiffs also went out of their way to accommodate the Defendant by furnishing a hardcopy before the filing. Defendant's counsel was notified at 5:34 pm on Friday evening that they would be receiving a copy of the Motion prior to it being filed, via e-mail. (*See* Exhibit G). This is contrary to Defendant's false assertion that they were sandbagged at 9:20pm by an unexpected copy of the Motion and a prompt demand to consent to it. Indeed, Plaintiffs' counsel, after informing Mr. Rogers of the full substance of the Motion at 4:30pm, was under no-obligation to send Defendant a copy of the Motion. Yet, in a good-faith desire to come to a separate agreement precluding further dissemination of discovery materials, Plaintiffs did so. Once that again was rejected, Plaintiffs were left with no option but to file.

Consequently, Plaintiffs' counsel's actions more than satisfied the Federal Rules of Civil Procedural regarding conferral. *See* Fed.R.Civ.P (26)(c)(1) (noting that a "motion [for a protective order] must include a certification that the movant has in *good faith conferred* or attempted to *confer* with other affected parties in an effort to resolve the dispute without court action") (emphasis added); D.C. Dist. Ct. R. 7(m) ("Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel, either in person or by *telephone*, in a good faith effort to determine whether there is any opposition to the relief sought  and if there is opposition, to narrow the areas of disagreement") (emphasis added). Plaintiffs counsel, by contacting defense counsel twice by telephone and by later sending a hardcopy of the Motion fully complied with both of these rules.

**II.     PLAINTIFFS HAVE MADE A SUFFICENT SHOWING TO JUSTIFY A
NEED FOR A PROTECTIVE ORDER PRECLUDING THE MALICIOUS
AND UNETHICAL DISSEMINATION OF DISCOVERY MATERIAL BY
DEFENDANT TO THE PRESS AND OTHERS.**

As Plaintiffs' original Motion points out, more than sufficient good cause under Rule

26(c) has been established for the issuance of a protective order prohibiting the Defendant from

disclosing discovery material to the press. As was stated in the Plaintiffs' Motion, Mr.

Kapshandy's unethical and malicious email evidences the specific injury that has been and will

continue to be inflicted on the Plaintiffs per the requirement in the In *Re Halkin* decision, unless

a protective order is issued. *In re Halkin*, 598 F.2d 176, 193 (D.C. Cir. 1979) These are not

"broad allegations of harm", but a very specific demonstration of injury. (quoting *Cipollone v.

Liggett Group*, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986), cert. denied, 484 U.S. 976 (1987)

(citations omitted)). Indeed, the Plaintiffs often receive threats of violence and death whenever

Defendant defames them.

Plaintiffs respect the right of free speech, and indeed try to foster it. Plaintiffs also

concede that they are a public entity open to fair and honest criticism. Yet what they do not

concede to is that they can be made the target of defamatory remarks with impunity. Such a

balance is clearly supported by the *Pansy* decision "where courts balance the harm to the party

seeking protection"…and the importance of disclosure to the public. *Pansy*, 23 F.3d at 787

(*quoting Arthur R. Miller*, Confidentiality, Protective Orders and Public Access to the Courts,

105 Harv. L.Rev. 427, 432-33 (1991)).

To be sure, Defendant argues that *both* parties have continued to speak publicly

throughout this litigation about Iran-U.S. policy and that *both* have released documents produced

in discovery obtained from the other. Yet, Defendant's only reference to the discovery that Plaintiffs have disseminated (from him) is the two attachments that were included in Plaintiffs' most recent Motion. (*See* Defendant's Opposition pg. 9.) Trying to compare the actions of the Defendant as being equal to the Plaintiffs' is a futile endeavor. Plaintiffs have discussed Iran-U.S. relations during the suit - indeed that is the purpose of their organization. Yet they *never released* and had their counsel *coach* them on how to distort discovery material before it was fed to the press. Something that Defense counsel has done in violation of the D.C. Rules of Conduct. (*See* Exhibit A to Plaintiffs' original Motion).

It is now probable, if not certain, that Ms. Kapshandy and his associates have been providing a constant pipeline of discovery material to various sources in the press, in addition to personally instructing them on how to spin it. Indeed, the Plaintiffs know for certain that discovery material has been fed to the Farsi (or Iranian) press as well. This is behavior that is in bad-faith and in violation of rule 3.6 of the D.C. Rules of Professional Conduct as pointed out in Plaintiffs original Motion.

Good cause exists for a protective order when a party to litigation blatantly flaunts the rules of ethics by making extrajudicial statements using discovery. This is noted in the commentary to Rule 3.6 of the D.C. Rules of Professional Conduct that states "publicity should not be allowed to influence the fair administration of justice. *See* also *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720 (1991) (the Supreme Court, considering extrajudicial pretrial statements, held that the standard is "substantially likely to prejudice").

Nevertheless, the Defendant continually evades the point when he states there is nothing wrong legally or otherwise with a party to lawsuit seeking legal advice before disclosing a document, or with counsel furnishing that advice. (*See* Defendant's Opposition. p.9). To the

contrary, there is something very wrong *legally* and *otherwise* when a party to a lawsuit uses

discover material given to him in good faith, (*regardless of whether it is public or not*), to make

extrajudicial statements to a reporter that is designed to clearly prejudice the Plaintiffs in the eyes

of the public in violation of Rule 3.6 of the D.C. Rules of Professional Conduct. The discovery

material is merely a tool that Defendant's counsel has abused to reach his end of defaming the

Plaintiffs, a tool that should now be taken away with a protective order prohibiting the

dissemination of discovery to outside parties.

**III.    DEFENDANT'S ALLEGATION THAT PLAINTIFFS ARE A LOBBYIST
         GROUP IS IRRELEVANT TO THE MOTION AT HAND.**

Defendant again tries to paint himself as the "victim" by claiming that the whole point of

the Plaintiffs' Motion was to muzzle their critics. Defendant then continues on another irrelevant

and off-point argument by dedicating the next several pages to an effort to prove that Plaintiffs

are indeed "lobbying." This sideshow approach to advocacy is more than transparent and is  the

basic reason behind Plaintiffs Motion of October 30, 2009, and the Court's order of November 2,

2009. Both were in response to Mr. Kapshandy's behavior of coaching a newspaper reporter on

how to spin discovery material not whether Plaintiffs were lobbying.

Furthermore, Defendant's assertion that Plaintiffs are violating lobbying laws is also

patently false. The "damning" admission from NIAC's current Acting Legislative Director that

Defendant references (*See* Defendant's Opposition p. 10) was obtained when he was only 6

weeks into his job, and at the time, was asked a complex legal question, without any legal

training. As a result, he supplied an erroneous assessment of NIAC's advocacy activity. This has

been shown in subsequent discovery material, but which is nonetheless irrelevant to the issue at

hand. Further, it is very telling that Defendant has to rely on simple mistakes of NIAC's

employees to try to prove their false allegation. Yet, in his effort, Defendant cites countless pages

of exhibits and e-mails all the while failing, yet again, to address the serious allegation that Mr.

Kapshandy violated Rule 3.6 and as a consequence, Rule 4.2 of the D.C. Professional Rules of

Responsibility.

**IV.    IT IS IRRELEVANT WHETHER THE DISCOVERY MATERIAL WAS PUBLIC OR PRIVATE BECAUSE DEFENSE COUNSEL'S COMMUNICATION TO THE PRESS WAS UNETHICAL IN DIRECT VIOLATION OF D.C. R. OF PROFESSIONAL RESPONSIBILITY 3.6.**

Defense counsel continues to point out that since the information was not confidential or

protected by a protective order that it may be shared with outside parties. Yet Defendant misses

the point; it is one thing for Defendant to receive and use the information for his defense, but it is

a whole other issue when Defendant's counsel is personally involved in formulating how to

maliciously distort and spread the material, inter alia, in a false light, to newspapers and others.

The issue isn't whether the information is public or not, but rather whether Mr. Kapshandy

violated the rules of ethics by spreading and distorting discovery and as a consequence making

extrajudicial statements prejudicing the Plaintiffs in violation of Rule 3.6.

There is a line that Rule 3.6 draws and a balance it tries to impose regarding speech and

extrajudicial statements. Defendant's counsel's actions clearly crossed that line when he made

his extrajudicial statements. Again, the discovery material was merely the means by which Mr.

Kapshandy was able to reach his ends. A means that now must solely be used for the purpose it

was intended for, namely advancing the party's interests in the litigation and not outside of it.

V.   **PLAINTIFFS HAVE A LEGAL RIGHT TO DEFEND THEMSELVES AGAINST DEFENDANT AND HIS COUNSEL'S DEFEMATORY AND UNETHICAL ACTIONS.**

To further confuse the relevant issue at hand, Defendant plunges headfirst into an unrelated topic arguing that he and others have been the victim NIAC's cease and desist orders in the past, and that Defendant somehow heroically stood up to Plaintiffs and was sued as a result.

The truth is that NIAC never went out of its way to initially target Defendant. NIAC, from its inception, has been a non-partisan political group dedicating to increasing Iranian-American participation in the civil process. Counter to Defendant's baseless allegations, it has never has received *direction* or *funds* from the Islamic Republic of Iran much less lobbied for them, as Plaintiffs' clearly state on their website. (*See* Exhibit H). Nevertheless, this has not stopped various groups including Defendant from launching unprovoked and defamatory attacks against NIAC in an effort to besmirch its reputation. Indeed, the reality is that the Defendant was the catalyst for many others to start propagating lies about NIAC, including, Ken Timmerman, Clare Lopez, and Michael Rubin, all of whom Defendant references in his Opposition as being unfairly attacked by Plaintiffs. (*See* Defendant's Opposition pg. 11)

As a consequence, when the line from debate to defamation is crossed - Plaintiffs have responded defensively with cease and desist letters among other legal tools, to protect their good name. Indeed Courts have noted that the use of cease and desist letters are normal in such situations. *See Breaking the Chain Foundation, Inc v. Capitol Educational* 589 F. Supp. 2d 25 D.D.C., (2008). Indeed, the it has become evident from Defendant's own emails that Plaintiffs had to be attacked and destroyed due to Defendant's perception of NIAC's ever-growing influence. (*See* Exhibits C and D to Plaintiffs' original motion.) It is blatantly clear who the aggressor is in this instance, and it is not the Plaintiffs.

Defendant's attacks have already caused much harm to Plaintiffs' reputation. For example, Dr. Parsi and his family members constantly receive death threats whenever people like Defendant make their false allegations. As such, the victim here isn't the Defendant, as he would have the Court believe, but the Plaintiffs, who have for long suffered the unprovoked and unjustified attacks upon their staff, members, and organization by the Defendant.

Plaintiffs have another serious reason for wishing to prohibit the Defendant from spreading discovery material in violation of Rule 3.6 of the D.C. Ethics Rules. Defendant has been identified as a former member of a recognized and violent terrorist group called the "MEK" or Mujahadin-e Klaq. Moreover, Plaintiffs have received confirmation that the Defendant has been sharing discovery material with this group as well. As such, any further distortion and spreading of discovery material by his counsel could potentially place NIAC's members, employees and donors at risk of violence and further intimidation. (*See* Exhibits I and J). It should also be noted that the MKO has been recognized by the U.S. Department of State as a terrorist group and has been recognized by the organization 'Human Rights Watch" as committing human rights abuses inside their camps. (*See* Exhibit K).

## VI.   DEFENSE COUNSEL'S UNSOLICITED COMMUNICATION TO A OPPOSING PARTY REPRESENTED BY COUNSEL IS A VIOLATION OF RULE 4.2 OF THE D.C. R. OF PROFESSIONAL CONDUCT.

In their Opposition Motion, Defense counsel cites only to an Illinois case, *Orlowski v. Dominick's Finer Foods*, 937 F. Supp. 723, 726 (ND.Ill. 1996) and a "Nevada version" of Rule 4.2 where the respective Courts found that incidental contact with an opposing party is not a violation of rule 4.2. (*See* Defendant's Opposition pg. 20 & 21).  Yet Defense counsel fails to provide primary authority from D.C. cases or codes. Indeed, D.C. cases have long held that it is unethical to make direct contact with the opposing party without consent from opposing counsel.

*Herron v. Veneman* 305 F.Supp.2d 64  (D.D.C.,2004) (stating in relevant part "[i]t is generally unethical for a lawyer to make direct contact with an opposing party without consent of opposing counsel"); *See also Cobell v. Norton*, 213 F.R.D. 33  (D.D.C.,2003). Accordingly, Defense Counsel should be held liable for communicating with Plaintiffs regardless of whether it was intentional or not.

**VII.   DEFENDANT'S COMMUNICATION WAS AN EXTRAJUDICIAL STATEMENT DESIGNED TO MALICIOUSLY SPIN DISCOVERY MATERIAL TO THE PRESS IN DIRECT VIOLATION OF RULE 3.6 OF D.C. R. OF PROFESSIONAL RESPONSIBILITY.**

In Section III of their Opposition Motion, and only after several irrelevant issues and exhibits, Defendant claims, with a straight face, that Mr. Kapshandy made "no public/extrajudicial statement" and that the relevant e-mail from him was *intended* for his client as "legal advice." He continues to claim that this was *not* an extrajudicial statement which Defense counsel should have know would be disseminated to the media, nor that it was ever intended to be. Instead of starting their Opposition Motion with these arguments, which finally address the subject matter of Plaintiffs' Motion, Defendant waits until the seventeenth page of his Opposition to do so. It is clear why.

Despite Defendant's contention, Mr. Kapshandy's email is plainly telling its recipient how to distort/spread discovery material to a newspaper. The point and purpose of the e-mail was to convey this message to Mr. Eli Lake of the Washington Times. (*See* Exhibit A to Plaintiffs' original Motion.) Frankly, if there exists an e-mail that evidences the *intent* of one side in a litigation to spread discovery material directly to the press, thereby meeting the extrajudicial requirements of Rule 3.6, this would be it.  Defense counsel then regurgitates their earlier

argument that the email was intended to be privileged - an argument that *they* themselves *dismiss* in the second page of their Opposition. (*See* Defendant's Opposition pg. 2)

Defense counsel continues to put the proverbial foot in their own mouths by then contradicting their assertion that discovery material "wasn't sent to a reporter" by stating that an "inadvertent disclosure to a reporter" is not likely to prejudice a jury pool. (*See* Defendant's Opposition pg 17). It is clear that the Defendant is caught in a web of lies of its own making. One minute Defendant is denying Mr. Kapshandy's email was meant to be sent to the media (implicitly acknowledging the unethical and wrongfulness of the behavior) and the next he is denying that dissemination to a reporter would prejudice a jury pool. (*Id*. pg. 17).

Defendant then repeats his false allegation that Mr. Kapshandy's e-mail did not create a serious or imminent threat of material prejudice to the proceeding. This statement is patently false. Plaintiffs are the target of hostile emails and phone calls from misguided members of general public whenever Defendant defames them. It is a tactic that the Defendant's counsel is now using to further taint the jury pool. Mr. Kapshandy's conduct creates an imminent threat of material prejudice to the proceedings – in direct violation of rule 3.6 of the D.C. Rules of Professional Responsibility.

In *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720 (1991) the Court determined that the test for making an ethical versus an unethical extrajudicial pre-trial statement, is whether the statement is "substantially likely to prejudice" the proceeding. And not whether there existed a protective order when the statements were made, as Defendant wrongfully contends (*See* Defendant's Opposition p.19).

Moreover, it is true that public officials should be open to qualified criticism. *James v. Haynes*, 178 S.E. 18, 23 (1935). However, public officials are not open to intentional and

malicious falsehoods and statements uttered to defame and harm their reputation. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

## VIII.  DEFENDANT'S COUNSEL IS PERSONALLY LIABLE FOR VIOLATING RULE 3.6 OF THE D.C. RULES OF PROFESSIONAL CONDUCT.

Mr. Kapshandy communication, which is not a privileged statement, opens him up to the possibility of another suit. It has been established that such communication to the press are not privileged and an attorney can be held accountable for them. In *Adams v. Peck*, the Court stated that there is an absolute immunity for defamatory statements uttered in the course of trial or contained in pleadings, affidavits, depositions, and other documents directly related to the case. *Adams v. Peck*, 288 Md. 1 (Md. 1980). The Court extended the scope of such absolute immunity to a defamatory statement published in a document which is prepared for possible use in connection with a pending judicial proceeding but which has not been filed in that proceeding. *Id.* However, the Court in *Adams did not* extend such absolute immunity to statements intentionally made to the press. *Id.*

In *West Inv. Co. v. Moorhead*, the Court explicitly stated that such absolute privilege will not attach to counsel's extrajudicial publications, related to the litigation, which are made outside the purview of the judicial proceeding. *West Inv. Co. v. Moorhead*, 120 Cal.App.2d 837, 262 P.2d 322 (1953). Thus, Mr. Kapshandy's statements to the press are not be protected by an absolute immunity, as statements in proceedings and documents pertaining to the trial would be.

Accordingly, after the November 2, 2009 status conference, Plaintiffs' counsel put Mr. Kapshandy on notice that he may be liable for his extrajudicial statements and to cease and desist from this conduct. However, as a result, Plaintiffs' counsel and his clients were personally threatened by Defendant's counsel, Mr. Berenson, with *extrajudicial* threats or in Mr. Berenson

own words, "there are other avenues we could pursue to make you *sorry.*" Cleary, it is

Defendant's counsel who is making the threats and abusing the legal process.

## IX.   DEFENSE COUNSEL'S UNETHICAL BEHAVIOR NECESSITATIES THE ENTERING OF A DEFAULT JUDGMENT AS A PROPER REMEDY.

Further, despite Defendant's assertions to the contrary, a default judgment is a proper and

just remedy in such an instance. In *Webb v. District of Columbia*, the Court stated in relevant

part, "[a] district court may order sanctions, including a default judgment, for misconduct either

pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, which authorizes a court to

assess a sanction for violation of a discovery order, or pursuant to the court's inherent power to

"protect [its] integrity and prevent abuses of the judicial process." *Webb v. District of Columbia,*

146 F.3d 964 (C.A.D.C.1998) (citing *Shepherd,* 62 F.3d at 1474). Thus, a Court may enter a

default judgment to protect its integrity and prevent abuses of the judicial process. Intentionally

disseminating defamatory statements in order to taint and manipulate the jury pool is egregious,

unethical behavior and a clear abuse of the judicial process. As a result, Plaintiffs' strongly

believe that this Court, pursuant to its inherent power as stated in Federal Rules of Civil

Procedure 37(b)(2), is able to and should enter a default judgment in favor of Plaintiffs as a result

of Defense counsel's actions.

Indeed, Defendant, in his Opposition to Plaintiffs' Motion for Emergency Protective

Order, provides only a one sided description of the criterion for entering a default judgment. (*See*

Defendants' Opposition pg. 22). It has been established in D.C. appellate courts that, "[w]hile we

do not require a district court, in making this judgment, to exhaust lesser sanctions before turning

to default, *see, e.g., Shepherd,* 62 F.3d at 1479, we do require that the court explain its reason for

issuing a default judgment rather than a lesser sanction." *Webb* at 971. Thus, a Court with its

inherent powers *need not exhaust lesser sanctions* before turning to a default judgment where appropiate. This rule, coupled with the fact that opposing counsel intentionally disseminated and distorted discovery material (in violation of the D.C. Rules) and apparently intended to continue doing so with impunity leads Plaintiffs to respectfully request a default judgment as an appropriate remedy amongst the other they have requested.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant Plaintiffs' Emergency Motion for a Protective Order and all other just and proper relief deemed appropriate by this Court.

By:   _____/s/_____
Afshin Pishevar (D.C. Bar No. #451015)

_____/s/_____
Patrick Parsa (D.C. Bar No. 988054)
PISHEVAR & ASSOCIATES, P.C.
600 East Jefferson, Suite 316
Rockville, MD 20852
Phone: (301) 279-8773
Fax:    (301) 279-7347

Attorneys for the Plaintiffs