IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRITA PARSI ) | |
| ) | |
| and ) | |
| ) | |
| NATIONAL IRANIAN AMERICAN COUNCIL ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 08 CV 00705 (JDB) |
| ) | |
| DAIOLESLAM SEID HASSAN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR RECONSIDERATION**

More than one and a half years ago, Defendant requested from Plaintiffs Trita Parsi ("Parsi") and the National Iranian American Council ("NIAC") documents relating to NIAC's lobbying and advocacy activities[1] and communications with current and former members. These requests seek documents that are directly relevant to this suit—a defamation suit where NIAC alleges that statements Defendant made about its lobbying activities are defamatory. NIAC has employed various tactics and made several excuses over the past year and a half to avoid or delay such production including: (1) denying that such documents existed: (2) forcing Defendant to first locate and subpoena Babak Talebi ("Talebi") and then go to the Court twice to order Talebi to comply with the subpoena; (3) producing very limited and altered calendar files on December 28; (4) producing incomplete calendar records on March 21 in lieu of the

---

[1] Prior to the fall of 2009, NIAC denied in its tax returns that it engaged in any lobbying.

1

"complete, unaltered" set promised; and (5) producing only 1% of a cache of 8,000 recently discovered Talebi emails based upon inconsistent criteria. Having been given at least three opportunities to provide reasonable explanations for its discovery lapses, Plaintiffs now lash out at the Court's procedure as "manifestly unjust" and blame Defendant for using "McCarthy like" tactics and forcing NIAC to alter the documents it produced. As will be detailed with the specific facts that follow, Plaintiffs have no one to blame but themselves; the Court has been more than patient with their dilatory tactics.

## I. HISTORY

A brief review of this tortuous path is needed in order to understand how NIAC got itself in this position.[2]

### A. The Talebi Emails

Even though Babak Talebi was a founder of NIAC in 2002 and has acted as NIAC's Community Outreach Director, NIAC insisted it did not control him or his documents and so forced Defendant to locate and subpoena him. On February 19, 2009, a subpoena was issued. (Attached as Ex. B). The Court will recall that Talebi was so uncooperative that two separate

---

[2] Rather than burden the record with numerous attachments, Defendant will refer to the numerous prior filings on these issues and the attachments to such:
  Defendant's March 4, 2010 Memorandum
  Plaintiffs' March 4, 2010 Memorandum
  Court's March 5, 2010 Order
  Defendant's June 2, 2010 Memorandum
  Plaintiff's June 2, 2010 Memorandum
  Court's June 3, 2010 Transcript of Hearing
  Plaintiffs' June 10, 2010 Objections to Proposed Form of Order
  Court's July 1, 2010 Order
  Plaintiffs' July 15, 2010 Memorandum in Support of Motion to Reconsider  ("MTR")
  Plaintiff's July 16, 2010 Motion to Stay
Defendant attaches to this response only materials not previously filed.

orders were entered on August 20, 2009 and September 17, 2009 compelling him to respond.[3] When Talebi finally did show up at Sidley's offices on October 9, 2009, it was with a new laptop; he claimed that his old one broke and he tossed it out. (See, Defendant's 3/4/10 Memo). When Defendant asked him to produce his Gmail account, NIAC's counsel jumped in to represent him and said it would take over the search.[4] On December 21, 2009, NIAC's counsel produced 122 emails from Talebi's Gmail account notwithstanding that Talebi had complained that there were "a TON of emails" in his account. (Attached as Ex. A).

Recall, Talebi had been involved with NIAC since 2002 and had a NIAC email address; prior to December 21, 2009, NIAC had produced less than 100 emails to or from that address. Defendant pressed NIAC that it was not reasonable to claim that all of his emails were only on the discarded laptop but must be on an enterprise server somewhere. On March 4, Defendant brought this to the Court's attention and on March 5 the Court ordered NIAC to search its servers for Talebi emails. On April 9, NIAC suddenly discovered about 8,000 Talebi emails on a NIAC server. (Ex. 2 to Def's 6/2/10 Memo). Twelve days later, on April 23, NIAC produced only 89 of these Talebi emails from his NIAC account, most of which had been produced before. (Ex. 4 to Def's 6/2/10 Memo).

When Defendant asked how NIAC determined that 99% of Talebi's emails were not discoverable, NIAC claimed that the server was not "recently" discovered, but was recently

---

[3] Incredibly, NIAC now attempts to rewrite this history and claims that it searched Talebi's personal computer (MTR, p, 10). In fact, Defendant was forced to search Talebi's laptop itself.

[4] The Court will recall that NIAC's NGO coordinator, Mohammad Mansouri, had a coincidentally identical experience, i.e., Defendant was forced to locate and subpoena him, only to find out that his computer was broken and discarded and then have NIAC's counsel jump in to represent him when it was time to produce his emails from his Gmail account.

searched with the agreed search terms (Ex. E to MTR) even though that server had supposedly been searched using the same search terms long before. (Ex. 7 to Def's 6/2/10 Memo). In response to Defendant's specific inquiry as to how it winnowed out 99% of Talebi's emails, NIAC stated in its 4/21/10 letter: "The defendant seems to fail to understand that Mr. Talebi did community work." (Ex. 7 to Def's 6/2/10 Memo).

Defendant therefore again called upon the Court for assistance on June 3. At that hearing, the Court pointed out that NIAC never disputed Defendant's contention that Talebi's "community work" was discoverable. (Tr., p. 15). On July 1, accordingly, NIAC was ordered to produce the Talebi emails without withholding any under the "community work" exception. (7/1/10 Court Order). On July 15, NIAC filed this motion to reconsider, claiming that it never filtered out "community work" emails but rather used the agreed search terms to narrow the emails and then determined whether those were "responsive"—without stating what criteria were used. (MTR, p. 6). Recall, Defendant's document requests called for emails to current and former NIAC members. (See Ex. E to NIAC's 6/2/10 Memo). NIAC now makes the statement that the "community work" exception "may explain why so few emails were responsive." (MTR, p. 10). On July 16, NIAC filed a motion to stay the July 1 order claiming that the emails may also be subject to attorney-client and work product privileges and there was insufficient time since the July 1 order to review all the emails. (7/16/10 Motion to Stay). Interestingly, NIAC had no problem reviewing the same 8,000 emails between its discovery of the same on April 9 and when it produced only 89 on April 23, a shorter period than it now claims is too short.

In short, after one and a half years of chasing the Talebi emails and numerous inconsistent explanations, the Court's order to produce these remains unfulfilled.

### B. <u>Outlook Calendar Records</u>

Until the deposition of David Elliott on October 5, 2009, NIAC denied that there were any calendar records of meetings with governmental officials.[5]  (See Def's 3/4/10 Memo).  And, as of the deposition of NIAC's Legislative Director, Emily Blout, on December 8, NIAC had refused to produce such records.  (Id.)  On December 9, Defendant requested that NIAC immediately produce those calendar records. (Ex. A to MTR).  On December 28, NIAC produced native "pst" format calendar files for three employees (Parsi, Blout, and Patrick Disney) but none before 2009.  (See Def's 3/4/10 Memo).  Approximately 400 entries were produced for the three employees and some of these were altered December 25-27 before they were produced:

|  | Entries Produced | Number Altered |
|---|---|---|
| Parsi | 63 | 42 |
| Disney | 344 | 25 |
| Blout | 35 | 11 |
| TOTAL | 412 | 78 |

Of the 344 Disney entries produced, 80 were for holidays such as Groundhog Day, Valentine's Day, and Flag Day. An excerpt from actual files follows:

---

[5] NIAC's recently produced calendars indicate that it may have another system called "SF" for tracking notes of meetings with legislators.  However, NIAC refuses to produce such a system or even explain what it is and why it is not producing such notes.



On December 31, Defendant brought these deficiencies to NIAC's attention, to which NIAC replied this was mere harassment.  (Exs. A, B to Def's 3/4/10 Memo).  In response to yet another request for the calendar records, NIAC simultaneously blamed Defendant for not being persistent enough and for harassing NIAC.  (Ex. D to Def's 3/4/10 Memo).  On March 4, Defendant sought Court assistance and requested a forensic image be ordered.  (Def's 3/4/10 Memo).  At the March 5 conference, in a effort to stave off the forensic image, NIAC promised to produce "complete, unaltered" calendar records.  NIAC was also ordered to produce Blout for another deposition.  (3/5/10 Order).

On April 2, NIAC asked Defendant in what format he desired the calendars; Defendant responded twice in writing that he preferred native "pst" files as were produced December 28.

6

(Ex. 1 to Def's 6/2/10 Memo). On April 21, NIAC inexplicably produced not the native "pst" files requested, but rather created an entirely new Excel ("xls") document into which portions of the native Outlook calendar files had been copied. (See Def's 6/2/10 Memo). Notably missing from the "complete, unaltered" calendar records were:

> 1. The "Date Modified" field which would reflect which entries had been altered and when (as with the December 28 production);
>
> 2. All of Trita Parsi's entries from April 18 to September 18, 2006 (see, pp. 13-14, infra).
>
> 3. Several entries that were on the December 28 calendars, including:
>
>    a. December 25 meeting with Puneet Talwar (of the NSC):
>    b. June 3 meeting with Jillian Burns (State Dept.),
>    c. December 25 meeting with Erik Belfrage (a Swedish banker); and
>    d. January 23 meeting with Sen. McConnell.

(See, Ex. 6 to Def's 6/2/10 Memo). When Defendant pointed out these deficiencies, NIAC wrote that it "believes that there are a number of benign explanations"; NIAC also tried to backtrack and claimed that the parties never agreed to produce the calendars in native format. (Ex. 7 to Def's 6/2/10 Memo).

Again, Court intervention was required, and at the June 3 hearing, NIAC had the temerity to declare: "We've provided them in the format that our client thinks is most appropriate." (June 3 Tr., p. 11). After the hearing, NIAC filed yet another brief. (6/10/10 Objections to Proposed Form of Order). Rather than providing the promised "benign explanations," NIAC complained that the simultaneous briefing ordered by the Court in preparation for the June 3 hearing was prejudicial and defense counsel's recitation of the above facts was unverified hearsay in violation of FRE 801(c). (NIAC's 6/10/10 Memo, pp. 2-3). On July 1, the Court ordered a forensic image and certain tests to determine if discoverable entries were omitted or altered at unusual times

(such as on Christmas weekend months after the event and by someone other than the calendar owner). (7/1/10 Order).

On July 16, having at least a third opportunity to provide an innocent explanation, NIAC filed yet another brief claiming that the July 1 order was a "manifest injustice" because of the simultaneous briefing and that counsel's arguments were inadmissible hearsay. In particular, NIAC objected to counsel's argument that during the five month gap in Parsi's calendar Parsi had had communications with Iran's UN Ambassador Zarif about attempts to influence Congressmen if not the White House. (MTR, p. 8). Defense counsel, however, was directly quoting an August 23, 2006 email from Parsi to Iran's Ambassador Zarif produced by NIAC and whose authenticity is not disputed:

> "Hope all is well and that you are back from Tehran. Would love to get a chance to see the proposal or to understand more what it entails. If it is substantial, then certainly members of Congress may find it a reasonable offer, even if the White House doesn't."

(Attached as Ex. C). NIAC even went on to claim that such hearsay allegations were "McCarthy like." (MTR, p. 8). NIAC also argued that "manifest injustice" would result as it admitted for the first time that it did alter the calendars but did so because Defendant requested it to only produce entries of governmental meetings. (MTR, p. 9).

## II. THE COURT'S JULY 1 ORDER WAS WELL-FOUNDED AND NIAC'S NEW ASSERTIONS ONLY RAISE MORE QUESTIONS ABOUT ITS DISCOVERY COMPLIANCE

### A. The Calendars

Plaintiffs allege that "manifest injustice" would result from the Court's order but fail to specify how. Instead, they blame the Defendant for making Plaintiffs alter the records before

they were produced. This totally misses the point and ignores the numerous deficiencies detailed above:

- Only 412 records were produced for only 3 NIAC employees and 80 of those were for irrelevant holidays.
- Two-thirds of Parsi's entries were edited on December 25-27.
- One-third of Blout's were modified on December 26, six months after she left NIAC.
- No records were produced prior to 2009.
- No records were produced for other NIAC employees even though calendar records existed for at least four others.
- No records were produced for Talebi even though some of the December 28 produced entries indicate he had made some entries.

NIAC's claim that these alterations were all Defendant's fault because Defendant only wanted meetings with governmental officials does not hold water:

1. If that were true, ALL of the entries should reflect a "Date Modified" of December 25-27; in fact, only SOME of the entries were altered on those days.
2. It does not explain why 80 of the entries (20%) that NIAC included were totally irrelevant holidays.

NIAC's characterization of Parsi's Christmas weekend calendar modifications as a "good faith" and time-consuming endeavor because Defendant needed them December 28 (MTR, p. 5 and Ex. C, para. 4) is comical. The only reason Plaintiffs were in this predicament is that they initially denied these existed and refused to produce them for many months. The fact that Parsi spent

three days in the office over the Christmas weekend to modify SOME of the entries would appear suspicious to most observers.

When, at the March 5 Court conference, Defendant requested a forensic image, the Court gave NIAC a second chance and NIAC promised to produce "complete, unaltered" calendar records. Now, Plaintiff tries to blame defendant claiming that "Defendant changed its position and demanded that all calendars be provided." (MTR, Ex. C, para. 7). Notwithstanding its promise at the March 5 conference, NIAC produced non-native calendars that omitted the "Date Modified" field. This manner of producing the calendars had the effect of obscuring what entries were edited, when, and by whom. Close inspection of the Excel calendars produced March 21 show:

- Five months' of Parsi's entries during a crucial period were omitted.
- Other entries were omitted including a January 23 meeting with Sen. McConnell, a June 3 meeting with a State Department official, a December 25 meeting with a Swedish banker, and a December 25 meeting with an NSC official.

These deficiencies were pointed out in detail to NIAC on May 5. (Ex. 6 to Def's 6/1/10 Memo). Rather than respond substantively in its June 2 brief or at the June 3 hearing or even in its June 10 objection to the form of order, NIAC merely complained that these were unverified hearsay and that the simultaneous briefing was prejudicial.

In its July 15 Motion to Reconsider, NIAC provides three explanations so inconsistent and bizarre that FRCP 11 might be implicated:

1. No meeting with Puneet Talwar occurred on December 25.

2. NIAC was not aware such a meeting was listed on the calendars.

3. If the meeting was listed it was not intentionally removed.

All NIAC had to do to become "aware" of this entry was to look at the December 28, 2009 Parsi calendar it produced:



Note, the December 25, 2009 Erik Belfrage meeting is also shown here.  Neither of these entries was in the "complete, unaltered" calendars produced April 21, 2010.  Even if the meeting did not occur for some reason, the Federal Rules of Civil Procedure do not permit a party to alter evidence before producing discoverable documents.  Even more incredible than its assertion that it was "unaware" of the "Puneet at NSC" entry is NIAC's assertion that "it was not intentionally

11

removed."  (MTR, p. 8; Parsi Affidavit, Ex. C to MTR, para. 12).  How can it attest to the circumstances of the removal of something it did not know was there?

Moreover, NIAC makes no attempt to explain why the next entry was omitted from the "complete, unaltered" calendars:



Note, all three of the above entries were modified on December 25, 2009.  Nor, did NIAC include this next entry in the "complete, unaltered" calendars:




     In none of NIAC's filings or at the hearing does it make any attempt to explain the omission of five months' of Parsi's calendars.  This gap occurred during a period when he publicly released a 2003 Iran proposal known as the Grand Bargain and just before Ahmadinejad's visit to New York in 2006.

http://www.antiwar.com/orig/porter.php?articleid=9040  The omission in Parsi's calendar is clear in this section from his 2006 calendar:

| | | | | |
|---|---|---|---|---|
| Hamid Moghaddam | 4/6/2006 | 2:00:00 PM | 4/6/2006 | 3:00:00 PM |

13

| | | | | |
|---|---|---|---|---|
| Baha | 4/6/2006 | 12:00:00 PM | 4/6/2006 | 1:30:00 PM |
| Participant Access Code: 112277 | 4/8/2006 | 5:00:00 PM | 4/8/2006 | 5:30:00 PM |
| Sariolghalam  614- 499-0962 | 4/9/2006 | 6:00:00 PM | 4/9/2006 | 6:30:00 PM |
| Marshal Berger | 4/12/2006 | 12:15:00 PM | 4/12/2006 | 1:15:00 PM |
| Speech - Georgetown! | 4/16/2006 | 5:00:00 PM | 4/16/2006 | 7:00:00 PM |
| Den 22 april fyller tolo ar | 4/18/2006 | 8:30:00 PM | 4/18/2006 | 9:00:00 PM |
| Interview with situation room and anderson cooper 360 | 9/18/2006 | 3:00:00 PM | 9/18/2006 | 3:30:00 PM |
| Spoke to Chrissy Watson 906 8156 USA Today | 9/19/2006 | 3:30:00 PM | 9/19/2006 | 4:00:00 PM |
| NPR | 9/19/2006 | 11:00:00 AM | 9/19/2006 | 12:30:00 PM |
| Ambassador Roberto Toscano's visit to Washington | 9/19/2006 | 8:30:00 PM | 9/19/2006 | 11:00:00 PM |
| Sam Gardiner - CAP | 9/20/2006 | 12:00:00 PM | 9/20/2006 | 2:30:00 PM |
| New York A-N | 9/21/2006 | 3:30:00 PM | 9/21/2006 | 10:00:00 PM |
| Atrium Hall located in Adele H. Stamp Student Union at UMD. Let me know if you wish to go there together. | 9/22/2006 | 7:00:00 PM | 9/22/2006 | 9:30:00 PM |
| Bank? | 9/22/2006 | 1:30:00 PM | 9/22/2006 | 2:30:00 PM |
| roshanak | 9/22/2006 | 3:30:00 PM | 9/22/2006 | 4:30:00 PM |

The five-month gap is obvious. Interestingly, the reference to "New York A-N" on September 21, 2006 coincides with President Ahmadinejad's visit to New York. (Parsi frequently refers to Ahmadinejad in his emails as "A-N".) Having no substantive response, NIAC instead lashes out at the Court accusing it of "manifest injustice" and Defendant's counsel for employing "McCarty like" tactics.

After one and a half years of such runarounds and still not having complete copies of the calendars, the Court was more than justified in ordering a forensic image to get to the bottom of these questions about edited and omitted calendar entries.  NIAC cites no authority for its proposition that irrefutable admissible evidence is required to order a forensic image.  Instead, NIAC attempts to shift the blame to Defendant claiming that the alterations were caused by Defendant's requests.  But, reserving judgment and giving NIAC yet another chance, the Court held in its July 1 order that Defendant will have to bear the cost of the imaging unless it believes that discoverable evidence was withheld or improperly edited.  Moreover, the Court's order specifically instructed PWC to examine the hard drive for certain types of edits that would *prima facie* be suspicious:

- Edits after the date of the event, in particular December 25-27.
- Deletions made after an event and by whom.
- Whether any edits or deletions were made after Defendant requested the calendars on December 9 and done by someone other than the calendar owner.
- Whether any entries were omitted from the December 28 or March 21 productions.

Calendar entries are edited all the time and NIAC has had plenty of opportunities to come forward with innocent explanations.  Wholesale edits and deletions of entries after the events, done on Christmas weekend, and done on the calendars of other persons are suspect.  The Court's order does not punish NIAC for producing what Defendant requested.  The order does have the possibility of shifting the cost of this imaging to NIAC if it is found that records were

inappropriately deleted or edited. That is not manifestly unjust. Any party that alters evidence without an innocent explanation should justly expect such consequences.

###    B.    Talebi Emails

NIAC's claim that "manifest injustice" would result were it not allowed to withhold Talebi's "community work" emails is questionable. NIAC now merely claims that Talebi's community work "may explain why so few emails were responsive" to defendant's discovery requests. It appears that NIAC is now claiming that only 1% of Talebi's 8,000 emails on the NIAC server were produced because 99% of the documents did not contain any of the agreed search terms. (MTR, p. 10). That is not credible as all of Talebi's emails sent from his NIAC email account contain at least TWO of the agreed search terms: "NIAC" and "Talebi." (Examples attached as Ex. D). Moreover, the agreed search terms (MTR, Ex. E) also contain "Parsi" and "National Iranian American Council." Ironically, NIAC produced more emails from Talebi's Gmail account (122) that he was not supposed to use for NIAC business than they did from his NIAC account (89). Recall, per Defendant's Second Request for Production, NIAC was to produce all emails to current or former NIAC members. (Attached as Ex. E to NIAC's 6/2/10 Memorandum). To claim without evidence, as NIAC does, that 99% of Talebi's emails are somehow not discoverable under either of these standards is hard to believe.

One further point bears mention. Having lost its argument that Talebi's "community work" emails were not discoverable, NIAC's Motion to Reconsider shifts tack and simultaneously claims that it did not withhold "community work" emails and that Talebi's community work "may" explain why 99% of his emails were withheld. (MTR, p. 10). After two hearings and three briefs, NIAC should be able to *actually* explain why these were not produced

instead of offering *possible* explanations.  Secondly, it is inexcusable that NIAC failed to mention at the June 3 hearing or in its June 10 objections to the proposed order that it was not withholding community work emails.  Why does it first raise this on July 15?  It is even harder to fathom how NIAC can simultaneously argue that it did not withhold any "community work" emails but that producing Talebi's community work emails would be a "manifest injustice."  In any event, there is an easy resolution to this matter – NIAC should immediately produce the 7900 withheld emails *in camera* to see if any contain "NIAC" or "Talebi" or are to current or former NIAC members.

### C. **Counsel's Role**

The delays and inconsistent explanations given by NIAC perhaps result from counsel not fulfilling its obligation to familiarize itself with NIAC's IT systems and ensuring that all sources of discoverable information were properly searched in the first place:

> Counsel must communicate with the client, identify all sources of relevant information, and become fully familiar with [the] client's document retention policies, as well as [the] client's data retention architecture." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).  Nash failed in his obligation to locate and produce all relevant documents in a timely manner.

*In re A & M Florida Properties II,LLC,* 2010 WL 1418861, p. 6 (Bankr. S.D.N.Y. Apr. 7, 2010) (alterations in original) (copy attached as Ex. E).   The fact that at this late date counsel can only give possible explanations as to why 99% of Talebi's emails were not produced and submits such inconsistent affidavits as Ex. C to its MTR are strong indications as to where this process went awry.  *In re A&M Florida Properties* is eerily similar to the adventure here.  While the court there did not dismiss the case or impose an adverse inference instruction as sanctions (the evidence was finally produced, not destroyed), the court did impose stiff monetary sanctions.

### D. NIAC's Pattern of Behavior

NIAC's pattern of stonewalling, denying, ignoring, and then forcing court intervention is not limited to these two instances. As discussed above, NIAC utilized with its NGO project manager, Mohammad Mansouri, the same tactic it employed with Talebi. NIAC similarly denied that it controlled Mansouri and forced NIAC to subpoena him, only to jump in after he was subpoenaed and then reviewed his documents for production (claiming that most were lost when he tossed his computer).

As the Court will recall from Defendant's June 2 Memorandum (Ex. 6), NIAC had been claiming that emails from the Alliance for Justice ("AFJ") to Babak Talebi were privileged. Prior to the June 3 hearing, NIAC withdrew its claim of privilege and the parties informed the court that that issue was no longer in need of Court intervention. However, to date and in spite of several requests for these documents, NIAC has refused to produce them.

As discussed above, NIAC's recently produced calendars reflect a system designated "SF" for tracking meeting notes. Such has not been produced. NIAC has neither responded to requests for such nor explained why such was not produced.

Although plaintiffs have produced NIAC's and Parsi's tax returns for 2002-2008, they now refuse to produce the returns for 2009. Such are clearly discoverable. Plaintiffs' expert economist was provided NIAC's tax returns.

From these as well as the calendar and Talebi examples, one could conclude that NIAC has intentionally adopted a strategy to withhold damaging, discoverable evidence unless and until ordered by the Court to produce such. And, even then, NIAC persists in its recalcitrance.

18

Such conduct needlessly increases litigation expenses and the FRCP give district courts ample authority to shift these costs to the offending party to discourage such behavior.

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Reconsider should be denied.  Plaintiffs put forth nothing new except for more imaginative, inconsistent excuses.  Given the new excuses provided therein for not producing the Talebi emails, NIAC should now be required to produce *in camera* the 7900 withheld Talebi emails for a determination as to whether its new claims that such were not withheld under the "community service" exception and contain none of the agreed search terms is truthful.  If not, the Court should impose on Plaintiffs the costs of Defendant's bringing its March 5 and June 3 motions and opposing NIAC's June 14 Motion to Reconsider.

Respectfully submitted,

_____/s/_____
Timothy E. Kapshandy (Illinois Bar No. 06180926, admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
hrogers@sidley.com


Attorneys for Defendant
Seid Hassan Daioleslam

Dated: July 22, 2010

**CERTIFICATE OF SERVICE**

  I certify that today, July 22, 2010, I served the foregoing Defendant's Response to Plaintiffs' Motion for Reconsideration on the following via email:

   Afshin Pishevar
   600 East Jefferson Street
   Suite 316
   Rockville, Maryland 20852
   (301) 279-8773
   ap@pishevarlegal.com

              Respectfully submitted,

              _____/s/_____
              Timothy E. Kapshandy (Illinois Bar No.
              06180926, admitted *pro hac vice*)
              Bradford A. Berenson (D.C. Bar No. 441981)
              HL Rogers (D.C. Bar No. 974462)
              SIDLEY AUSTIN LLP
              1501 K Street, N.W.
              Washington, D.C.  20005
              (202) 736-8000
              hrogers@sidley.com

              Attorneys for Defendant
              Seid Hassan Daioleslam

Dated: July 22, 2010