```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


   TRITA PARSI and                  .
   NATIONAL IRANIAN AMERICAN        .
   COUNCIL,                         .
                                    .  CA No. 08-0705 (JDB)
           Plaintiffs,              .
                                    .
      v.                            .  Washington, D.C.
                                    .  Thursday, September 16, 2010
   DAIOLESLAM SEID HASSAN,          .  9:07 a.m.
                                    .
           Defendant.               .

   . . . . . . . . . . . . . . .

                         STATUS CONFERENCE
                 BEFORE THE HONORABLE JOHN D. BATES
                    UNITED STATES DISTRICT JUDGE


    APPEARANCES:

   For the Plaintiffs:        ADRIAN NELSON, ESQ.
                              AFSHIN PISHEVAR, ESQ


   For the Defendant:         TIMOTHY KAPSHANDY, ESQ.
                              PETER JENSEN, ESQ.
                              H.L. ROGERS, ESQ.


   Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                              Official Court Reporter
                              U.S. Courthouse, Room 6714
                              333 Constitution Avenue, NW
                              Washington, D.C. 20001
                              202-354-3186
```

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

```
 1                       P R O C E E D I N G S
 2              THE DEPUTY CLERK:  Your Honor, we have civil action
 3    08-705, Trita Parsi, et al. versus Daioleslam Seid Hassan.  I
 4    will ask that counsel please approach the lectern, identify
 5    yourself and those at your respective tables, starting with the
 6    plaintiff.
 7              MR. NELSON:  Good morning, Your Honor.  Adrian Nelson
 8    on behalf of the plaintiffs.  Along with me is Dr. Trita Parsi,
 9    one of the plaintiffs in this case, and Afshin Pishevar, counsel
10    for NIAC.
11              THE COURT:  Good morning.
12              MR. ROGERS:  Good morning, Your Honor.  H.L. Rogers
13    for the defendant.  At the table with me as well are Tom Ross
14    and Eric Galvez, also for the defendant.
15              THE COURT:  Good morning to all of you.  So I ask with
16    some hesitation, where are we?
17              MR. ROGERS:  Would you like me to approach?
18              THE COURT:  Whoever wants to come up to the
19    microphone, give me a little review.
20              MR. ROGERS:  So where we are in discovery is we've
21    taken to date eight depositions.  And for the defendants we have
22    eight depositions yet to be taken:  Aikat and Morse, who are
23    plaintiffs' two remaining experts that we haven't deposed;
24    Parsi, one of the plaintiffs; Safavi, a board member for NIAC;
25    Talebi, also associated with NIAC; Patrick Disney, also
```

1    associated with NIAC; Talwar; Elwood.  And those are the eight
2    that are remaining.  Elwood was a PR consultant for NIAC.
3        Plaintiffs have not offered dates for Aikat, Safavi, Parsi,
4    Talebi or Disney yet, and part of that is a delay with imaging
5    that's being done by PWC.
6            THE COURT:  Where does that stand?
7            MR. ROGERS:  We spoke with them.  They say a couple
8    more weeks until their analysis is complete.  There's been some
9    delay in that the plaintiffs arrived with seven or eight
10   computers and a laptop instead of the server as ordered, and so
11   that's made the process a little more complicated than planned
12   for PWC, as they're trying to put everything back together and
13   be able to compare it and do the analysis that they've been
14   ordered to do.
15           THE COURT:  As far as you know, PWC has access to all
16   the material they need to have access to to do the analysis?
17           MR. ROGERS:  That is our understanding, and they
18   should be done within a couple weeks.  Also in conjunction with
19   that or related to that, at the time when plaintiffs produced
20   those computers to PWC, they told us that Parsi's computer had
21   recently been stolen, his laptop, and that he hadn't replaced
22   it.  That added an extra wrinkle.
23       We've issued interrogatories and a document request of
24   plaintiffs, because they told us there was a police report.
25   Those come due next week.  It's important that we get responses

1    to those in the time that they've been given, because it's
2    important to the analysis that's being done as far as what's
3    happened with these Outlook records that PWC is analyzing.
4             THE COURT:  Okay.  So in your view there are eight
5    depositions.  Some of those are going to await the completion of
6    the forensic analysis.  The forensic analysis is ongoing with a
7    few wrinkles, will finish in, you hope, a few weeks, and in the
8    meantime there are some interrogatories that have been posed for
9    which you are awaiting responses.
10            MR. ROGERS:  Correct.
11            THE COURT:  All right.
12            MR. ROGERS:  There are a couple of document requests
13   that are outstanding, really quickly.  One is the 2009 tax
14   returns for Parsi and NIAC, which we've requested several times
15   and have not been able to get a response on.  Another is a set
16   of weekly agendas that were done by NIAC that came up in
17   depositions.  We were told those weren't produced because they
18   didn't match up with the search terms that we had been using on
19   both sides.  However, the one we inadvertently received from the
20   Talebi production that came four days late did have several
21   search terms in it.  So we've requested those weekly agendas and
22   are awaiting a response on that.
23      There's also a Salesforce software that came up in the
24   deposition that was used -- our understanding from the
25   deposition, used to set up and track meetings with members on

1    the Hill.  Also responsive to our requests, we're also waiting
2    on responses from plaintiffs on that, as far as how we -- when
3    we will receive those.
4              THE COURT:  All right.  Let me hear from Mr. Nelson.
5              MR. NELSON:  Good morning again, Your Honor.
6              THE COURT:  Good morning.
7              MR. NELSON:  Regarding what was stated by Mr. Rogers,
8    in terms of depositions, we anticipate possibly six to 10
9    additional depositions that will be taken by the plaintiffs, and
10   we are certain that we will be taking the depositions of Clare
11   Lopez, Michael Rubin, and Ken Timmerman.  There are five or six
12   other names that we're still trying to determine whether or not
13   it would be of value to take their depositions at this time, but
14   we don't anticipate taking more than 10 depositions in total.
15             THE COURT:  Have you taken any yet?
16             MR. NELSON:  I'm sorry?
17             THE COURT:  Has the plaintiff taken any depositions
18   yet?
19             MR. NELSON:  We have not because of the various issues
20   going on with trying to get documents from these witnesses.  We'
21   appear to have been stonewalled by a lot of these witnesses in
22   terms of them producing documents, saying that they have nothing
23   to produce.
24             THE COURT:  These are third-party depositions, or are
25   they --

1        MR. NELSON:  They're third-party witnesses.

2        THE COURT:  They're all third party?

3        MR. NELSON:  And they've been subpoenaed and the
4   response generally is that we have nothing to produce, or
5   they've produced a lot of information that was just pulled off
6   of the Internet and sent to us, articles that are readily
7   available to everyone.  So we really haven't received anything
8   that we found to be fruitful from these people.

9        Regarding the imaging that was done by PWC, I do want to
10  just go back and correct a statement that was made.  Relating to
11  the imaging, when we had our conference call with the
12  technicians from PWC, we indicated to them at that time that
13  NIAC did not have a server.  NIAC does not have a server.  And
14  the statement continues to be made that they do have a server.
15  They do not have a server.  What was produced were the seven to
16  eight stand-alone computers and laptops that the organization
17  uses.  We had previously advised --

18        THE COURT:  So there's no connectivity between the
19  laptops?

20        MR. NELSON:  That's my understanding.

21        THE COURT:  Go ahead.

22        MR. NELSON:  We had previously advised the defendant
23  that Mr. Parsi's computer was stolen on a trip that he took back
24  during the spring, I believe, to Europe.  We did indicate that
25  he did file a report when he was overseas, and they asked for

1    that report, and I guess they didn't feel that we were going to
2    produce it so they did a document request, but we have no
3    problems producing the report to indicate that his laptop was
4    stolen.
5            THE COURT:  Where was he?
6            MR. PARSI:  I was in Oslo, Norway.
7            THE COURT:  Thank you.
8            MR. NELSON:  With respect to the computer, we're not
9    quite certain why the defendant continues to request to have
10   access to any replacement laptop that Dr. Parsi may have had.
11   That laptop would not contain anything that would relate to the
12   issue of Mr. Talebi's e-mails or the Outlook calendar for the
13   period of time that we've been dealing with under the Court's
14   order.
15           THE COURT:  As long as there's no connectivity, you
16   may be right, but I'm going to let that play out between the
17   parties based on additional information you can share with each
18   other.
19           MR. NELSON:  Okay.  Dr. Parsi wanted me to correct
20   myself that there is connectivity between the computers, but
21   they did get the computer, PWC, that connects the other
22   computers to one another, and that was provided to PWC.
23           THE COURT:  So it's a computer that connects, not --
24   still without a server.
25           MR. NELSON:  That's my understanding.  He's our

1   technical guy.
2           THE COURT:  I know, and I don't need to know all the
3   technical details.  You'll be discussing and working out or
4   fighting over those details, I am sure.
5           MR. NELSON:  Okay.  So that's the issue with PWC.
6   With respect to the document requests that they've talked about,
7   one of the ongoing issues is the issue of the 2009 tax returns
8   that they indicate they've requested.  We have also requested
9   tax returns from the defendant.  And their position is that
10  those documents are not relevant.  And so it's our position that
11  to the extent they're relevant to Dr. Parsi, they're equally
12  relevant in this case to the defendant.  And they've indicated
13  that they will not produce those tax returns.
14          THE COURT:  Sometimes tax returns are more relevant in
15  a case like this from the defendant, because some financial
16  information is relevant to potential damages claims.
17          MR. NELSON:  That's why we believe it's relevant.
18          THE COURT:  I'm not sure that it makes sense for me to
19  piecemeal grab onto things that are thrown out and start making
20  rulings.  I think that you all still have to cooperatively, I
21  hope, civilly, I insist, and constructively and professionally,
22  I insist, work on these issues in hopes of resolving most or all
23  of them without having to bring them to my attention for
24  resolution.  And I'm going to leave it that way and let you
25  continue to work on them.

1              MR. NELSON:  The other two issues --
2              THE COURT:  But I appreciate being advised of some
3     potential issues out there.
4              MR. NELSON:  Just to complete the loop here, the other
5     two issues that were raised were a Salesforce, what they're
6     calling software, and also weekly agendas.  At the time that
7     they became aware of something that they were interested in,
8     they identified to us and asked us whether or not there was a
9     software program that NIAC was using with the name SF.  And at
10    that time we asked our client about it and they were not aware
11    of anything in the form of software that they used by the name
12    of SF.
13         When we took a deposition, or they took a deposition, one
14    of the witnesses began to talk about something called
15    Salesforce.  And Salesforce is sort of an online membership
16    database that NIAC was using for a period of time, a very short
17    period of time, that they experimented with.  Once we became
18    aware of the true name of this online service, which is not a
19    software, Salesforce, we did ask our client about that, and they
20    recalled, yeah, we did experiment with this for a time.
21         What the defendants are most interested in is finding out
22    about notes that may have been maintained in the Salesforce
23    database.  It is our understanding from our client that there
24    was an attempt to put some notes in that particular online
25    database, but it was sporadic, it was not consistent, and it was

1  discontinued because it was too cumbersome by them.

2       At some point in their operations, they went from trying to
3  use this database to another form of management software, and
4  information was transferred.  The company that transferred the
5  information did not transfer everything, including any meeting
6  notes section.  So we are happy to provide the name of the
7  company that maintains the Salesforce online program and/or the
8  company that did the transfer, but our client does not have
9  access to any of that information as we understand it.

10          THE COURT:  All right.  Well, I think this too falls
11 in the category of communicate with each other and see where you
12 wind up.

13          MR. NELSON:  And just so that we're clear for the
14 record, I'm doing my best to articulate what I understand my
15 clients have told me.  He is the technical expert for NIAC.  And
16 so I'm going to reserve the right that he can correct me if I've
17 said anything wrong once we continue to talk with the defendant
18 about this.  I don't want to be bound by my statements that I
19 may have misstated something, but that's the essence of what was
20 going on with Salesforce.

21          THE COURT:  Well, I understand your reservation, but
22 we all operate in a world where we make representations, and you
23 need to be making representations that you have already checked
24 with your client to make sure that they're accurate when you're
25 dealing with these discovery issues with the other side.  Don't

1   go throwing out what you think may be the situation without
2   double-checking, so that you're sure that you're having
3   accurate, well-founded discussions.  Otherwise, everybody's time
4   is just going to be wasted.
5           MR. NELSON:  Certainly, Your Honor.  We have had
6   discussions about this, and I just want to make sure that I've
7   restated what was told to me accurately.
8           THE COURT:  All right.  Anything else, Mr. Nelson?
9           MR. NELSON:  The last thing is, again, I think there
10  needs to be more conversation on both sides about the issue of
11  the weekly agendas, whether or not to the extent that there are
12  weekly agendas they're responsive, but we're certainly willing
13  to continue the conversation about the weekly agendas.
14          THE COURT:  All right.  Thank you.  It sounds to me
15  like there are a lot of discovery issues that are still
16  percolating, but I hope that some progress is being made with
17  respect to discovery.  I ask you to continue working and to do
18  so diligently to resolve those issues and to move the discovery
19  process forward so that it can be completed in a reasonable
20  period of time, but so that it can also be completed with full,
21  appropriate discovery being made by each side.
22       The only thing that I would contemplate doing right now is
23  just setting a new cutoff for discovery.  I don't see any
24  request before me from either side to do something more than
25  that, but if you have such a request, please make it.

1        MR. NELSON:  Your Honor, obviously, we are in favor of
2    the continuation of discovery and setting a new discovery
3    cutoff.  However, we do believe that the discovery that
4    continues from this point should be limited to third-party
5    subpoenas for information, as well as completing depositions,
6    but we think now that the time for issuing --
7        THE COURT:  The forensic activity is still going on.
8    You can't say that that's not going to run its course and
9    whatever may come out of that.
10       MR. NELSON:  Right.  What I was going to say is we
11   don't believe that there should be any additional written
12   requests for document production because the time for doing that
13   we think has long past.  But our position is that we should just
14   complete the depositions and whatever flows out from the
15   imaging.
16       THE COURT:  What I'm going to do is caution everybody
17   not to embark upon new discovery, but discovery that is meant to
18   clarify or pursue things already in the works.  If it takes the
19   form of written requests, then so be it, as long as they are
20   timely.  And I will explain what I mean by timely.  How long,
21   Mr. Nelson, do you think -- when do you think I should -- what
22   date do you think I should identify as a new cutoff for
23   discovery?
24       MR. NELSON:  I would suggest roughly December 16.
25       THE COURT:  All right.  That's a rough date, three

1	months from now.
2	     And Mr. Rogers. I'm sure you've been referred to that way
3	many times before.
4	          MR. ROGERS: Unfortunately, yes. We agree sometime in
5	the first or second week of December seems like a reasonable
6	time with the depositions that we have outstanding. If we can
7	get dates from plaintiffs, we can do those depositions rather
8	quickly once the forensic work has been done.
9	          THE COURT: All right. And I'll go ahead and set a
10	new cutoff. What day of the week is December 16?
11	          THE DEPUTY CLERK: That's a Thursday, Your Honor.
12	          THE COURT: Of December 16, and perhaps we should get
13	together on December 17 for another status call. Will that date
14	work, Mr. Bradley?
15	          THE DEPUTY CLERK: Yes, it will, Your Honor.
16	          THE COURT: What time?
17	          THE DEPUTY CLERK: We can do it at 9:00.
18	          THE COURT: 9:00 on the 17th of December. In the
19	meantime, understand that written discovery, which I think
20	Mr. Nelson is making a decent point on, we shouldn't be
21	embarking upon new discovery at this point, and written
22	discovery certainly should be undertaken with great caution.
23	     With respect to timeliness, no written discovery can be
24	initiated unless there is ample opportunity to respond to that
25	discovery before discovery cutoff.

1        All right.  With that, Mr. Nelson, anything further?
2              MR. NELSON:  No, Your Honor.
3              THE COURT:  Mr. Rogers?
4              MR. ROGERS:  No, Your Honor.
5              THE COURT:  All right.  I wish you luck.  I ask you to
6    work together, understanding that you have different
7    perspectives, you have different interests to represent for your
8    respective clients.  But as attorneys your job is to help this
9    process work smoothly, and I ask you to put your best efforts
10   into that, and hope that I don't hear from you, and we'll see
11   you again on December 17, but somehow I'm not going to place any
12   bets on that.
13             MR. NELSON:  Your Honor, just so the record is clear,
14   when I made the statement about the depositions we desired to
15   take, obviously that included we wanted to take the defendant's
16   deposition, not just third-party witnesses, but I want to be
17   clear on that point.
18             THE COURT:  Yeah.  I didn't necessarily assume that
19   all of the six to 10 depositions that you identified were
20   third-party, although you were identifying some document issues
21   with respect to third-party depositions.
22             MR. NELSON:  Thank you, Your Honor.
23             THE COURT:  All right.
24         All right.  Thank you all.
25            (Proceedings adjourned at 9:27 a.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE