UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


TRITA PARSI and                    .
NATIONAL IRANIAN AMERICAN          .
COUNCIL,                           .
                                   .  CA No. 08-0705 (JDB)
          Plaintiffs,              .
                                   .
     v.                            .  Washington, D.C.
                                   .  Friday, December 17, 2010
DAIOLESLAM SEID HASSAN,            .  9:14 a.m.
                                   .
          Defendant.               .

. . . . . . . . . . . . . . .

STATUS CONFERENCE
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        ADRIAN NELSON, ESQ.
                           AFSHIN PISHEVAR, ESQ


For the Defendant:         TIMOTHY KAPSHANDY, ESQ.
                           PETER JENSEN, ESQ.
                           ERIC GALVEZ, ESQ.


Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                           Official Court Reporter
                           U.S. Courthouse, Room 6714
                           333 Constitution Avenue, NW
                           Washington, D.C. 20001
                           202-354-3186


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

1

2          THE DEPUTY CLERK:  Your Honor, we have civil action

3  08-705, Trita Parsi et al. versus Daioleslam Hassan.  We have

4  Mr. Afshin Pishevar and Mr. Adrian Nelson, II, representing the

5  plaintiffs, and we have Mr. Eric Galvez, Mr. Timothy Kapshandy,

6  and Mr. Peter Jensen representing the defendant.

7          THE COURT:  All right.  Good morning, everyone.  I

8  guess I'll let you bring me up to speed as to where we are after

9  our last telephone conference, which was only about three weeks

10  ago I think, and the order I issued resolving some problems or

11  issues between the parties and some -- some of which I haven't

12  heard further from you on.  A little surprising that after the

13  discussion about a proposed order for a preservation of

14  materials, I never really received anything.  But where are we?

15          MR. KAPSHANDY:  May I proceed, Your Honor?  I think we

16  probably have the longest list.

17          THE COURT:  Go ahead.  The longest list.

18          MR. KAPSHANDY:  There's good news and bad news, and

19  both lists I think it would behoove the Court to be updated on.

20  I would agree both parties have been working hard to get a lot

21  of discovery, particularly depositions done in the last few

22  weeks, before the discovery cutoff of yesterday.  And I can

23  update the Court on that and then update the Court on some

24  things that simply weren't able to be done.

25          The plaintiff, Trita Parsi, was deposed about a week and a

1    half ago over the course of two days, and there are a few issues

2    remaining open there which I'll get to in a moment.  The

3    plaintiffs deposed the defendant this week in Chicago over the

4    course of two days.

5         The defendant deposed the plaintiff's economic expert,

6    Professor Morse from the University of Baltimore, I believe,

7    last week.  Babak Talebi, who was a NIAC founder and board

8    member for a while, was deposed down in Tampa, Florida several

9    weeks ago.  The deposition of former legislative director Emily

10   Blout was completed after the production of the new calendar

11   records --

12             THE COURT:  What's her name?

13             MR. KAPSHANDY:  Emily Blout, B-L-O-U-T.  The next

14   legislative director, Patrick Disney, was deposed several weeks

15   ago in New York City.  By my recollection, and counsel can

16   correct me if I'm wrong, those are the depositions that were

17   able to be done in the recent weeks.  There are several that

18   were not able to be done or completed.

19             THE COURT:  And the only one of the ones that were

20   addressed in the November 29 order that you haven't referred to

21   would be the deposition of the Internet futurist.

22             MR. KAPSHANDY:  Right.  Counsel did provide dates on

23   which he was available, as ordered, about a week and a half ago.

24   Unfortunately, most of those were dates on which there were

25   other depositions scheduled, or today, for example.  Counsel has

 1   agreed, obviously with the permission of the Court, to complete

 2   his deposition sometime in January, and they are to get us dates

 3   he's available in January in North Carolina.

 4        There were a couple of other depositions that we've been

 5   trying to get scheduled.  One of them the Court may recall is a

 6   board member by the name of Narimon Safavi, S-A-F-A-V-I, whom

 7   defendant has been requesting over the course of the last five

 8   months or so.  He lives in Chicago, about two miles from our

 9   office in Chicago.  We had requested that it be done in

10   coordination with the deposition of the defendant, which was

11   done in Chicago also.  It shouldn't take too long.  Requested

12   that repeatedly.

13        Last night at about 7:40 p.m. I got an e-mail from

14   plaintiff's counsel saying that they would represent him but

15   they won't produce him without him being subpoenaed because

16   there was some concern about defendant not paying Mr. Talebi's

17   costs, which is unclear to me because they produced him

18   voluntarily.  At great expense we traveled to Tampa and shipped

19   many boxes down there to do his deposition.  Even offered to

20   give him a parking voucher.  So I'm not quite sure why they

21   won't produce their own board member, and we would request that

22   he be produced for a deposition in Chicago by the end of the

23   year.  I can do it on any day but December 24.

24        The other deposition that wasn't able to be scheduled is a

25   gentleman by the name of Puneet Talwar, who is with the

1    currently National Security Council, who was formerly a staffer

2    for Senator Biden.  He had been subpoenaed some time ago.

3    Justice Department has stepped in to represent him.  Defense

4    counsel and Justice Department did work out arrangements for his

5    deposition.  He's very busy, obviously.  And defendant had

6    agreed with Justice Department to a deposition of an hour and a

7    half, one hour per side or 30 minutes per side.  It shouldn't

8    really, frankly, take that long.

9         But plaintiff's counsel had been -- suggested to reach out

10   also to Justice Department.  And I don't know if they have or

11   not.  But they weren't in agreement with those conditions, and

12   because of Mr. Talwar's schedule and their inability to reach an

13   agreement with the Justice Department, that's not been able to

14   be completed.

15        There's just one other, on the defense side, minor issue,

16   which counsel have agreed to, but just so the Court is aware.

17   Colonel Gardiner, their Iran expert, after his deposition

18   provided a list of eight congressmen that he couldn't recall at

19   his deposition, and plaintiff's counsel has agreed to a

20   deposition by phone of up to 30 minutes to ask him questions now

21   that he can recall the name of the congressmen that he couldn't

22   recall at his deposition.  Frankly, I don't think it'll take

23   that long.

24        Plaintiff's counsel last night also indicated that they

25   still want to depose three witnesses:  Clare Lopez, Kenneth

```
 1    Timmerman, and Michael Rubin, who are Iran experts who have
 2    written on NIAC.  For some reason that perhaps they can explain,
 3    because I'm not privy to those communications, although they
 4    subpoenaed them many months ago, they've not been able to get
 5    those scheduled.  That's it on depositions.
 6        With regard to some of the other issues that were
 7    discussed, the Court will recall the Salesforce database.  The
 8    parties were ordered to work together to agree to somehow
 9    provide defendant access to that database, which is a database,
10    which the Court may recall at the September 16 hearing was
11    informed -- and I want to quote exactly so there's no
12    misunderstanding -- they had used "for a very short period of
13    time.  We did experiment with this for a time."  That was
14    September 16.
15        After that, we deposed a number of witnesses, including the
16    plaintiff, Babak Talebi, Patrick Disney, all of whom testified
17    that that database was used to manage member information over a
18    period of four years.  At Mr. Parsi's deposition and off the
19    record also we've been informed that for some reason the data
20    had been transferred or there was some confusion as to whether
21    another database is overlaid over it.  And one of two things
22    happened.  Either data was lost or is no longer accessible, or
23    maybe it still is.  If it's the latter, we still have not been
24    provided -- we've asked repeatedly for password information and
25    login information to access that.
```

```
 1          Last night at 7:40, as part of this e-mail from plaintiff's
 2     counsel, I was also informed that Salesforce apparently made a
 3     mistake and apparently there is some way to get the meeting
 4     notes out of that for a very short period of time like one week,
 5     but they're having trouble doing that.  It's unfortunate.  This
 6     database of members was requested back in February of 2009.
 7     Here we are now, 7:30 the night of the discovery cutoff, being
 8     told that they're still working on getting this.
 9          This is information we could have been and should have been
10     asking about at these depositions, because a key issue in the
11     case is how many members did they have, how many are paying,
12     when did they leave, because it's related to damages, it's
13     related to a lot of claims the plaintiff has made about how many
14     people in the Iranian American community they represent.
15          It's unfortunate, and we don't know if and when we're going
16     to get that information, that it's come to this, that many
17     representations have been made that turn out to perhaps have
18     been inaccurate, and now we're learning that perhaps they can
19     find this data, and if they can't, it's been lost.
20          THE COURT:  But only one week's worth of data?
21          MR. KAPSHANDY:  Well, they said it's going to be made
22     available to them for one week, but they can't get all data for
23     some reason because it's not kept.  It's still unclear in our
24     mind.  And we have interviewed the company, Heller Consulting,
25     that did this project, that whether another database was laid
```

1    over it, in which case it should all be there, or whether it was

2    migrated.  And this would have been done in December of last

3    year and January of this year, well after the litigation hold.

4    And if as a part of that process information was lost which had

5    been requested in January of '09, that's very troubling.  But we

6    haven't seen it.  We don't know.

7        Again, we would request password and login so we can see

8    exactly what they see.  There shouldn't be anything confidential

9    or privileged -- it might be confidential and would be subject

10   to a confidentiality agreement we have, but there shouldn't be

11   anything privileged in the actual membership data, which we have

12   hard copies of one that they did print out in 2007, from

13   Salesforce, shows information such as when people joined,

14   whether they're paying, whether they're active, whether they've

15   withdrawn.  And it's unfortunate, but that's where we are in the

16   Salesforce database.

17        THE COURT:  So your request with respect to the

18   Salesforce database is that I order that the plaintiff provide

19   password and login information to enable you and any expert that

20   you're using to get into that actual membership data.

21        MR. KAPSHANDY:  And just so we're clear and so we

22   aren't parsing definitions, as one did with the server -- and

23   we'll get to that in a moment -- whether it's on Convio or

24   Common Ground or whether they want to call it a CPU or a

25   computer or Salesforce, the member database.  We'll just refer

1   to it generically because in the past, as we'll see with the

2   server, when we asked for the server, they say, well, it's a

3   shared drive and it's duplicates so we're not going to give it

4   to you.

5        That probably brings us to an update on the imaging and the

6   shared server, which is a bit troubling.  As the Court may

7   recall from the September 16 hearing and the subsequent

8   telephone conference on July 1, and after a motion for

9   reconsideration plaintiffs were ordered to produce the server on

10  which the Outlook PST files could be found so that the defendant

11  could image those and try and figure out what wasn't produced in

12  either of the first two productions, PWC did provide a report --

13  and one issue we could address, and I know the Court was

14  interested in the results of that, although we've not reached an

15  agreement as to how to present that to the Court, or whether the

16  Court is interested in the PWC report -- but the process, the

17  Court may recall, was that on August 18, instead of showing up

18  with a server, plaintiff showed up with eight computers, saying

19  these are the Outlook files that we've been ordered to produce.

20       The line we were given about Dr. Parsi's computer was this

21  is the computer on which you will find the Outlook files which

22  he's been ordered to produce.  And subsequent to that, because

23  that wasn't quite what had been ordered or what we understood

24  was to be produced, we sent an interrogatory request asking is

25  that the computer that Dr. Parsi regularly has used since this

1  case, the last two and a half years.

2       The written interrogatory response was that was the

3  computer he's used for about 18 months, which takes us back

4  basically to January of 2009.  This was in August that they

5  answered that.  As part of the imaging, entries were located

6  that indicated that a company by the name of Progressive Office

7  did some work on the network, and this was mentioned at the

8  conference call, and did a network survey, which reflected a

9  couple things that were very troubling.

10      First of all, the network survey reflected that there were

11  four computers attached to that network that were not produced

12  for the imaging.  If the intent was to produce something in lieu

13  of a server that was a surrogate for the server, four computers

14  were not produced.  What's even more troubling, however, though,

15  is that the computer that -- and these can be matched up by

16  serial number -- that the plaintiffs produced, purportedly was

17  Dr. Parsi's computer that he's used for the last year and a

18  half, was not connected to the network when Progressive Office

19  did this work in January of this year and December of last year.

20      At his deposition, and this was brought to Trita Parsi's

21  attention, and his response was, well, maybe they didn't do a

22  very good job.  Maybe they owe us some money back, they didn't

23  do their job very well.

24      We need to get to the bottom of that to find out.  One of

25  the things we'd requested, the Court will recall, at the

1    telephonic status conference, was access to registry

2    information, user habit information on the computer, to find out

3    when those files were put on there, when they were loaded on

4    there, and how it was that these computer experts that came in

5    to audit and survey their network, purportedly to fix this

6    problem of his computer dropping off the network, couldn't even

7    find his computer.

8         I don't want to get into some of the other discovery

9    issues.  Those are just a part of them, and as we discussed

10   before --

11        THE COURT:  The label "discovery issues" is a

12   troubling term.

13        MR. KAPSHANDY:  Right.

14        THE COURT:  From past conversations, my understanding

15   is that there's an intent on the part of the defendants to file

16   a motion that I'll call in the nature of a sanctions type

17   motion.

18        MR. KAPSHANDY:  Right.

19        THE COURT:  That's one kind of discovery issue.

20   Another kind of discovery issue is schedule this deposition,

21   order the production of this information.  So let's

22   differentiate between the two categories.

23        MR. KAPSHANDY:  Right.  And to cut to the chase on

24   that, there are a number of sanction-related discovery issues

25   that, as we foreshadowed, fall into the category of these two

1    that I've discussed with regard to the server and the Salesforce

2    database, the weekly agendas, the Talebi e-mails, of which 2,500

3    out of 8,000 were produced.  And as the Court suggested, as the

4    Court knows from the Stanley case and the D'Onofrio case, these

5    can become side issues in trials to themselves, especially when

6    substantial sanctions are at issue.

7         And in response to that, the Court suggested that the

8    parties might benefit from some mediation at Your Honor's

9    behest.  And discussing that with our client, although this is a

10   case that involves more principle than money, and sometimes

11   difficult to mediate, our client and we believe that, given the

12   difficulties in communications between the parties, would be

13   something that would certainly be worth a try.  We can

14   probably -- I see a number of ways that this case could end as

15   far as an end game.  There are sanctions motions, there are

16   motions to strike damages -- I'll get to that in a minute --

17   summary judgment, there will be a Daubert motion most definitely

18   on the plaintiff's economist.

19        But let me just address one thing I mentioned, which was a

20   motion to strike damages.  At Trita Parsi's deposition, he was

21   asked, and plaintiffs promised to provide before the close of

22   discovery, what he was claiming for pecuniary loss, for damages.

23   In his complaint he alleges mental anguish, lost income.  As of

24   today and at his deposition, where it was promised, not only do

25   we not know what he's claiming for pecuniary loss, but a very

1    important question was asked that has not been answered,

2    because -- the question was asked, what does he intend to do

3    with this claim if he's awarded any damages, because his

4    personal attorney fees are being paid for by NIAC, which is a

5    publicly supported, funded, 501(c)(3) not-for-profit.

6        I think plaintiffs are probably intentionally avoiding

7    answering that because they've set a trap for themselves.

8            THE COURT:  What does he intend to do with any

9    recovery?

10           MR. KAPSHANDY:  Right.  Whether he intends to keep it

11   personally or if it goes to NIAC.  And if one thinks about that

12   for a moment, if he intends to keep this, he probably has some

13   issues with the IRS and maybe other laws that govern whether

14   private benefit can be made of funds -- and there are federal

15   government funds as of 2008 that have gone into this entity --

16   to use legal fees to prosecute a personal lawsuit.  Or, if he

17   suggests he might return the funds to NIAC, then there's an

18   issue of champerty, which is, last we checked, illegal in both

19   Maryland and D.C.  Lawsuits cannot be bought and sold and

20   supported by someone other than the person.  And --

21           THE COURT:  I don't understand what you mean.

22           MR. KAPSHANDY:  Well, if NIAC funds are being used to

23   prosecute a lawsuit on behalf of Trita Parsi, which then will

24   inure to the benefit of NIAC, that's the buying and selling of

25   causes of action.

1    THE COURT:  Parsi being the only plaintiff?

2    MR. KAPSHANDY:  Well, and this is the interesting

3    thing, he says he's suing not personally but as president of

4    NIAC.  So one wonders what sort of mental anguish you have only

5    as president of NIAC but not as a person.  I think after two

6    years of requesting this information in discovery and no

7    economic support or expert to support his claim, defendant's

8    position -- and they've had plenty of opportunities to say what

9    his damages are -- to move to strike that.  And as the Court

10   knows, in a constitutional malice case with no special damages,

11   his claim is over.

12   So there are a number of ways one can dispose of this case

13   without spending a whole lot of time and money, and there are a

14   number of ways to get there.  And I think probably the first

15   thing the defendant would be willing to explore is spend the

16   whole day here with Your Honor, Sidley's offices in Chicago,

17   wherever the Court prefers, and work with each other to try and

18   figure out if there's some way we can get this resolved --

19   THE COURT:  But not with me, because I have issues to

20   decide.  So I can't be a mediator.

21   MR. KAPSHANDY:  Right, but some court-appointed

22   mediator or magistrate, whatever the Court suggests.  But there

23   were a number of other issues that were promised at Trita

24   Parsi's deposition, including, for example, things that were a

25   surprise to us.  They were using a narrowed list of search terms

1   that apparently was agreed to unilaterally, but we weren't aware

2   of, that was promised.  They agreed to finally produce, after

3   two years, the litigation hold that they were operating under.

4   Last night it supposedly was attached to the e-mail that

5   Mr. Nelson sent, but it apparently fell off.  But if we get it,

6   here we are the day after discovery cutoff, we still don't know

7   what sort of litigation hold they've been operating under.

8           THE COURT:  This was the issue that we discussed three

9   weeks ago that a proposed order was going to be prepared on?

10          MR. KAPSHANDY:  Lastly, we did get their agreement to

11  the proposed order I sent to them maybe a week and a half ago.

12          THE COURT:  That too is a litigation hold.

13          MR. KAPSHANDY:  Yes, it's a formal one with the

14  blessing of the Court.  The parties had imposed one upon

15  themselves.  We'd never seen it in writing.  We still haven't.

16  Apparently it was sent last night.  It would have been nice to

17  get it early on so we knew what sort of rules they were

18  operating under.  Now we find out they were using a different

19  list of agreed search terms, which hasn't been provided.

20      So there are several things outstanding from Trita Parsi's

21  deposition.  And maybe the easiest way to dispose of those is as

22  I've suggested.  His refusal to provide what pecuniary damages

23  he is claiming now, three years almost into a lawsuit, two years

24  after discovery, is probably grounds for moving to strike those.

25      With that, I apologize for dumping a whole lot on the

1   table --

2          THE COURT:  With that, let me ask you this question.

3   Briefly, what would your proposal be for where we go from here

4   in terms of managing this case and all the issues that you

5   flagged?  Should I be setting a discovery issue briefing

6   schedule?  Should I be looking at substantive issues?  And I

7   consider striking damages to be a substantive issue as opposed

8   to a discovery issue, even though it arises out of discovery

9   circumstances.  Should I be focusing you, if I can get both

10  parties to agree, on a period of time to attempt to discuss and

11  resolve the case, given all these various issues that you've

12  flagged and possible means, as you put it, to dispose of the

13  case?  What's your suggestion in terms of a rough management

14  plan in the upcoming weeks?

15         MR. KAPSHANDY:  I think the simplest way to narrow

16  several of the issues is a motion to strike Trita Parsi's

17  damages, and perhaps even a Daubert motion for the expert who

18  supposedly supports NIAC's damages, because that gets rid of

19  both claims.  It's a lot simpler than summary judgment, which

20  the defendant believes there's an adequate basis for now that

21  he's been deposed for two days.

22      The sanctions motion is the messiest, and unfortunately,

23  even if the plaintiff prevails in a dispositive manner, is

24  looking at a situation where we may not be able to avoid that,

25  at least in part, when the issue of cost comes up, because the

1    imaging process was very expensive, and the defendant believes,

2    per the Court's July 1 order, clearly substantiates that

3    information was not only not produced, some deleted and some

4    altered.  Those are serious issues, which one would like to

5    avoid a full trial on that, but even if we dispose of the case

6    in a quicker manner, we may eventually have to deal with that

7    when cost comes up.

8              THE COURT:  All right.

9              MR. KAPSHANDY:  Thank you, Your Honor.

10             THE COURT:  Good morning, Mr. Nelson.

11             MR. NELSON:  Good morning, Your Honor.  I think I will

12   start sort of --

13             THE COURT:  I've stopped taking notes, by the way,

14   because there are too many things to take notes on.  I'll just

15   use the transcript.

16             MR. NELSON:  Great.  I think I'll start with some of

17   the issues that were raised toward the end of Mr. Kapshandy's

18   presentation of the status of the case, particularly with

19   respect to the order that you asked the parties to fashion,

20   which was kind of a status quo hold order.  That was drafted by

21   the defendant and it was presented to us and we agreed upon

22   that.  So that's a non-issue and that can be entered by the

23   Court today.

24        With regard to Dr. Parsi's deposition, I think it's a

25   misstatement to say that it is clear that NIAC was working from

1    a different, shorter list of search terms, and that Dr. Parsi

2    testified to that.  What he testified to was that he thought

3    that they had used a shorter list of search terms.

4         Since his deposition, we've had a chance to revisit that

5    issue.  And it is our understanding that the search terms --

6    that the extensive list was the list that was used to conduct

7    discovery.  So there is not a narrower list that would cause a

8    problem if that had been used.  So we see that as a non-issue.

9         I'd also like to discuss some of the representations that

10   were made about the computer situation.

11             THE COURT:  Which of the two computer situations?

12             MR. NELSON:  I'm talking about --

13             THE COURT:  The server situation or the membership

14   database?

15             MR. NELSON:  Let's start with what we called a shared

16   drive as opposed to a server.  As you know, that's been a

17   continuing issue in this case, that the defendants want to

18   represent the computer system as having had a server.  Based

19   upon our understanding and what's been reviewed by a consultant

20   that we used, it is not a server, it is a shared drive, and we

21   continue to maintain that point.

22        Regarding the computers that were provided for imaging, to

23   be factual, the defendants asked us to make sure that we were

24   providing computers for particular individuals in the office,

25   and they sent a list of names, asking us whether or not those

1    individuals, their computers were being provided.  Because we

2    did not have a server, to provide the whole server, we provided

3    the computers for the individuals.

4         Now, Mr. Kapshandy has said that a consultant that we used

5    had a list of computers and those serial numbers do not match up

6    with other serial numbers.  We believe that the vendor that we

7    used had an incomplete and inaccurate list of serial numbers.

8    We have prepared a list, which we are happy to provide to the

9    defendant, of all the computers that existed, with their serial

10   number and the name of each individual that was using that

11   computer at the time.  Because I think that some of the

12   representations about computers that were not provided are not

13   accurate.

14        So I think that if they get this list they can then compare

15   this list to the list that was provided to them by the forensic

16   imaging to determine whether in fact there were any computers

17   that were not imaged which they think may contain information on

18   them.

19        For instance, there were five computers that were not

20   provided to PWC for imaging.  Those five computers that were not

21   provided were computers that were used by interns who work in

22   the office of NIAC.  They're not individuals who are on the

23   staff of NIAC, but they're interns that work there and the

24   computer is used by interns.  Those names were not included, the

25   names of interns, on the list that was provided to us.

1    Therefore, those computers were not provided to PWC for imaging.

2         So I'm hopeful that once they receive this list and they

3    can check it against what PWC gave them, they'll be able to

4    determine that we gave them all of the computers that would be

5    relevant for the purposes of imaging, to accomplish what the

6    Court wanted to accomplish via the order that was issued on July

7    1st.

8         With respect to the Salesforce, what I want to make clear

9    is that Salesforce has advised us that our -- well, NIAC's

10   account can be accessed for a week, because they're opening up a

11   week for us to be able to access that account.  And what we've

12   been attempting to do is to export meeting notes --

13        THE COURT:  What do you mean, they're opening up a

14   week?  You mean only the information relating to one week of

15   time?

16        MR. NELSON:  No.  We have a week's period to try to

17   get this accomplished.

18        THE COURT:  Okay.

19        MR. NELSON:  And I think to step back even further,

20   the request that we received from the defendants was for meeting

21   notes from Salesforce.  And what we've attempted to do is have

22   that information exported.  We represented in court that the

23   Salesforce was only used for a short period of time.  We were

24   talking about its use for inputting meeting notes, because that

25   was what the request was, it was for meeting notes.  So when I

1    made the statement in court the last time we were here that it

2    was only used for a short period of time, we were talking about

3    a tool within Salesforce where they used it to keep track of

4    meeting notes.

5          We stand by that representation.  It was used for a short

6    period of time to try to track meeting notes.  We've attempted

7    to export that information, and what we were advised by the

8    technical experts of Salesforce is that they have a filter on

9    their system that if you request information that's more than a

10   year old, it will not allow you to download that information.

11         Working with their technical representatives, they removed

12   the filter and now we've been able, as of late last night, to

13   export the meeting notes that they've requested.  If my

14   recollection is correct, it was approximately 196 entries?  190

15   entries.  It was a very small number of entries because they

16   didn't use this online tool very long to import meeting notes.

17         We have not had a chance to review it to make sure that

18   there's no privilege reasons or other reasons that particular

19   entries should not be turned over.  But as soon as we review the

20   approximate 196 or so meeting note entries, we'll be happy to

21   turn those over.  It's a different issue if they're now claiming

22   that they're entitled to database information regarding our

23   membership.  That is proprietary information.

24              THE COURT:  What is the form of the -- as you

25   understand it, what is the form of the discovery request with

1    respect to this database material?  Is it through an

2    interrogatory?  Through a document request?

3             MR. NELSON:  I'm not aware of an interrogatory or

4    document request that related to this particular membership

5    information.

6             THE COURT:  You think it came up at a deposition?

7             MR. NELSON:  I know the issue of the meeting notes

8    definitely came up at --

9             THE COURT:  Mr. Kapshandy may be able to clarify.

10            MR. KAPSHANDY:  Document request No. 3, served in this

11   case in February of 2009, requests all information relating to

12   membership, data, numbers, in whatever form stored, be it

13   document, database, whatever.  It's document request No. 3.

14            THE COURT:  So that's what your -- that's the genesis

15   of the request for this information.

16            MR. KAPSHANDY:  Right.  And we became aware of it when

17   we saw calendar entries that said how to enter meeting notes

18   into SF.  And then they said we don't know what SF is.  Then

19   when we said, well, how about Salesforce, they go, oh, yeah, we

20   did use that for a short period of time.

21       We don't need them to reinterpret our two-year-old document

22   request for all information relating to membership.  That's a

23   key issue in this case; has their membership been impaired.

24   We're not limiting this just to some meeting notes.  That's what

25   triggered the existence of the database that they'd kind of

1    forgotten about.

2          MR. NELSON:  We've already provided membership

3    information, and it was subject to confidentiality.  So this

4    information, even if it is responsive to a document request, is

5    duplicative, because we've provided membership information to

6    them, and we entered into a confidentiality agreement relating

7    to that.

8          THE COURT:  Let me hold for a moment.  The concept of

9    duplicative doesn't work that easily in a discovery context.  If

10   a party to a case has two databases of membership and the

11   discovery request is for all membership information, you can't

12   say we'll give you this database but the other database is

13   duplicative.  Maybe it is exactly the same, maybe it isn't.  You

14   can't just say we're going to choose what to give you if they've

15   requested all the data with respect to membership.  But that's

16   just a small point on this discovery morass that you all find

17   yourselves in.

18         MR. NELSON:  Thank you, Your Honor.

19      The other thing that I want to raise is with respect to

20   the -- I think the general representations that were made by

21   Mr. Kapshandy regarding the completed depositions is accurate.

22   Regarding the uncompleted depositions, we did provide the

23   defendant with a range of dates for our journalism expert.  They

24   responded to that, and last night we sent them an actual

25   confirmed date that they had proposed, and our expert is now

1    available.  And I believe that date is January 5.  So there is a

2    set date for the deposition of our journalism expert, Professor

3    Aikat.

4         Also, with respect to the issue of Mr. Safavi and his

5    deposition, our concern is that we produced, for instance, a

6    Mr. Talebi for his deposition.  When he asked to be compensated

7    for certain of his expenses, the position was taken, well,

8    NIAC's attorneys produced you voluntarily.  You were not asked

9    to give testimony here pursuant to a subpoena.  So our position

10   is that we could voluntarily produce him, or --

11             THE COURT:  He's a board member?

12             MR. NELSON:  He was a former board member.

13             THE COURT:  Former board member.

14             MR. NELSON:  Or they can subpoena him.  Because if we

15   voluntarily produce him, then we stand in the position of them

16   saying, well, you voluntarily produced him, we don't have to

17   compensate him pursuant to a subpoena.  That's the situation we

18   find ourselves in.  We don't mind producing him, but we feel

19   that when we do volunteer witnesses, then we get this reaction.

20   So that's the nature of that.

21        With respect to Mr. Talwar, there was a very narrow,

22   narrow, narrow window when he was available, and the NSC, as it

23   is, was very restrictive on when he could meet, the times, et

24   cetera.  I'm sure we'll be able to work out a date on that, but

25   that was a very, very restrictive situation.

1        With respect to the other three, Lopez, Rubin and

2    Timmerman, we had been advised for some time that one of those

3    three, I believe it was Mr. Rubin, was represented by counsel

4    who withdrew.  We haven't been able to get either Rubin or

5    Timmerman under subpoena.  And they are people who are very

6    closely aligned with the defendant in this case, who has

7    testified in his deposition that he's been in contact with them,

8    that with respect to one of his side organizations, the

9    Progressive American Iranian Council, when we tried to submit

10   them a subpoena, they asked for additional time to review it

11   with their attorney.  He was in contact with them and advised

12   them on how they should respond to our subpoena, and then they

13   responded to us saying we will not cooperate.

14       So there's a lot more going on here than just we're not

15   making diligent efforts to try to get these people under

16   subpoena.  We believe that these people are trying to avoid

17   service on these subpoenas, and we're requesting a little more

18   time to try to get them under subpoena.

19       The last issue I would request the Court to consider is

20   that as we look at all of our concerns and their concerns about

21   forensic imaging and scanning, et cetera, during the deposition

22   of Mr. -- we call him "Dai" for easier pronunciation of his

23   name, the defendant -- he testified during his deposition just

24   two days ago that he had reviewed drafts of Dr. Parsi's book.

25       Now, that is proprietary information that we're not aware

1    that we ever turned over to them.  We're not aware that they

2    produced it to us in discovery.  He also mentioned a particular

3    e-mail that he had reviewed that we don't recall having turned

4    over, and we're not sure that they turned it over.  And we're

5    questioning how did he get access to drafts of Dr. Parsi's book,

6    which is proprietary information.

7         We have a concern about what was going on with this

8    forensic imaging via PWC.  When we gave them computers, they

9    were supposed to be only imaging a very narrow area of

10   information, and now we hear that the defendant has had access

11   to information that we have no legitimate understanding as to

12   how he got access to this.

13        So this has been our concern as we've gone through this

14   process, that some information may be misused.  We're not saying

15   that's the case.  We've asked the defendant to respond to our

16   concern.  So we want to reserve our right to raise this as an

17   issue because it's very troubling to us in this case, and

18   explains somewhat our reticence about turning over information

19   to the defendants through PWC as it relates to additional

20   forensic imaging.

21             THE COURT:  You haven't mentioned what you think is a

22   wise management course for this court to embark upon in this

23   case, with myriad discovery problems and myriad difficulties

24   between the parties and their counsel.  Indeed, I would call it

25   a situation that no one should be proud of in terms of how this

```
1    case has been conducted.
2         So what's your suggestion with respect to the management
3    that I should now embark upon with respect to this case?
4              MR. NELSON:  Your Honor, I believe that the cleanest
5    way to deal with this is for us to resolve all the outstanding
6    discovery issues.  And then once all the --
7              THE COURT:  Us to resolve.  Who is the "us" that
8    you're referring to?
9              MR. NELSON:  Well --
10             THE COURT:  I haven't seen the "you" be very
11   successful in resolving such issues so far.
12             MR. NELSON:  Well, in my experience, whenever the
13   Court is involved in providing deadlines and providing
14   consequences if deadlines are not met, the parties tend to play
15   better together.
16             THE COURT:  Deadlines such as a scheduled status call
17   at 9:00 on December 17, which leads to e-mail communications and
18   productions at 7:30 the prior evening.  You mean that kind of a
19   deadline that helps the discovery process?
20             MR. NELSON:  Well, deadlines that would allow us to
21   say that if certain issues are not resolved by the particular
22   date set by the Court, then there will be consequences as it
23   relates to the case going forward.  I think we need to resolve
24   the discovery issues --
25             THE COURT:  It's a sad comment -- I'm not saying that
```

1   you're wrong, but it is a sad comment that such scolding tactics

2   and holding a club over the heads of parties and their counsel

3   is necessary in order for things to be accomplished in a case in

4   a civil, professional, and constructive manner.  Go ahead.

5          MR. NELSON:  Well, it is a sad comment.  I think that

6   the parties have worked more constructively together since our

7   last telephone conference, but I will say that it seems as

8   though, whether it's something that we've heard in the court or

9   we've read, that we have very different interpretations of what

10  we hear and read.  And that has been the biggest issue in this

11  case.  It's been a communication issue.  It's unfortunate but

12  it's the reality of this particular case.

13         THE COURT:  All right.  So your suggestion is that the

14  "us" resolve discovery issues.  And they're pretty broad.

15  You're including issues relating to the, I'll call it server --

16  I know that's not a term that you necessarily agree with, but

17  just for a shorthand reference -- and the membership database.

18  Those are pretty big issues of dispute between the parties.  Are

19  those the issues that you think are discovery issues that can be

20  resolved without serious court intervention?

21         MR. NELSON:  I do believe as I stand here that --

22  Mr. Kapshandy mentioned the fact that the Court hasn't been

23  privy to the report that was prepared by PWC.  We had someone

24  look at that for us.  And their interpretation of that report is

25  different than Mr. Kapshandy's interpretation of the report.

1    And their interpretation is that there really is nothing that

2    was identified in that report that would demonstrate that

3    anything improper was done by NIAC.

4        So I think there needs to be some type of mechanism whereby

5    someone other than the parties and someone other than PWC

6    reviews that report and comes up with an interpretation as to

7    what that report says.  Because I will tell you that --

8            THE COURT:  Wait a minute.  Wait a minute.  An

9    interpretation of what that report says, for what purpose?

10           MR. NELSON:  Because that report is probably going to

11   be the basis -- a large basis of any sanctions motion that the

12   defendant wants to bring.

13           THE COURT:  Okay.  They'll have their interpretation

14   based on whatever expert or whoever they want to use for that

15   interpretation, and you'll have your interpretation based on

16   whatever expert or whatever you want to use for that

17   interpretation, and then I'll have to resolve it.  Are you

18   asking me to appoint a court-appointed expert to resolve that

19   issue in the abstract?

20           MR. NELSON:  No.  What I'm saying is that we have

21   already passed by the deadlines for experts in this case.  We

22   acknowledged -- we designated our experts.

23           THE COURT:  But those are experts with respect to the

24   merits issues in the case for trial proceedings.  That's not, I

25   don't think, a deadline that controls the ability of a party to

1    file a sanctions motion based on information technology related

2    disputes that includes someone interpreting a report that's been

3    done for purposes of imposing sanctions.  I don't think that the

4    scheduling order originally in the case would actually have

5    contemplated that.

6              MR. NELSON:  What I was going to say is that as it

7    relates to any type of motion, whether it's discovery-related or

8    sanctions-related, regarding the PWC report, we want to make

9    sure that we have an opportunity to present an expert who can

10   interpret that report, because we've lost confidence that PWC is

11   actually standing in a neutral role as it relates to the imaging

12   they've done.

13             THE COURT:  All right.  So your suggestion is that the

14   parties work to resolve outstanding discovery matters, for how

15   long a period of time?

16             MR. NELSON:  Well, we're anxious to get this resolved,

17   and so certainly two to three months, but not more than three

18   months.

19             THE COURT:  All right.  So the parties work on

20   resolving -- things just go forward with the parties working

21   together and things being brought to the Court?  I'm not really

22   sure what you're anticipating happening over this two- to

23   three-month period.

24             MR. NELSON:  What I'm thinking --

25             THE COURT:  I can see how the remaining depositions

1    may well work out during that period, but what's going to make

2    the disagreements on the server and database issues get resolved

3    during that period?

4         MR. NELSON:  Well, I think probably what I would

5    suggest is a two-month window in which the parties with their

6    various consultants try to resolve these issues relating to the

7    PWC forensic imaging, and if they're not resolved within two

8    months, then either side may file a motion within the next

9    month -- so that would take us to a total of three months --

10   where they raise any final discovery issues so they can be

11   briefed by the parties and decided by a magistrate, who would

12   look at what the issues are relating to the PWC imaging and any

13   other discovery issues that still are outstanding, so that --

14        THE COURT:  Including sanctions issues?

15        MR. NELSON:  If they're related to discovery.

16        THE COURT:  Go ahead.

17        MR. NELSON:  And then they would be resolved so that

18   we can then determine whether or not the case is going forward.

19        THE COURT:  Whether the case will go forward?  Or do

20   you mean --

21        MR. NELSON:  Because I'm hearing from the other side

22   that they anticipate that there could be sanctions motions that

23   would result in the final disposition of the case.

24        THE COURT:  I'm not sure they actually said that, but

25   I wouldn't be surprised if they do feel that.  And what about

1    any attempt to, I'll call it mediate this matter?

2                MR. NELSON:  We're certainly open to that.

3                THE COURT:  When do you think a constructive time for

4    such an effort would be?

5                MR. NELSON:  Maybe immediately at the end of the

6    two-month period that I spoke about.

7                THE COURT:  A lot of costs that are going to be

8    incurred by the parties in the meantime, perhaps with some

9    clarity added, perhaps without much clarity added.  But that's

10   when you think it would be best?

11               MR. NELSON:  That's when I think it would be best.

12               THE COURT:  All right.  Very briefly, Mr. Kapshandy.

13               MR. KAPSHANDY:  Sure.  Just to respond to one new

14   thing that was a very serious matter, and one thing on the

15   server.  With regard to the server, one can understand how we go

16   down this road of thinking that they have a server.  On June

17   3rd, NIAC's counsel stated, "The server that defendant continues

18   to try to say was recently discovered was already searched based

19   upon search terms that were agreed upon by parties.  E-mails

20   were provided a long time ago from that server."  That's page

21   13.

22         Their assistant policy director who was tendered as the IT

23   person stated that electronic documents were stored on the

24   server.  Mr. Disney testified that e-mails and Outlook files

25   were placed onto the shared server.  Mr. Talebi stated that they

 1     had a proxy server that connected all of the computers and

 2     shared documents.

 3         After they said that there was no server, three times, and

 4     the Court tried to correct them, after that we requested they

 5     clarify that comment.  The Court had admonished them to be very

 6     careful about terminology.  You can understand how we go down

 7     these roads.

 8         Let me respond to the charges about PWC somehow violating

 9     this Court's order or defense counsel.  Last night as I was

10     getting on a plane I did get an e-mail where they made

11     accusations that apparently drafts of Trita Parsi's books were

12     in the defendant's hands, as well as an e-mail from another

13     lawyer, but it was a board member of NIAC -- Ali Golchin is his

14     name -- cautioning Trita Parsi not to make accusations about the

15     defendant because they were defamatory.

16         They asked where these came from and suggested that somehow

17     PWC has been pilfering.  In fact, that e-mail was produced by

18     NIAC as part of the Talebi e-mails, for some reason -- I don't

19     know.  It's an e-mail between Ali Golchin and Trita Parsi --

20     this summer.  If they knew what their discovery was, they

21     perhaps wouldn't make these accusations so carelessly.

22             THE COURT:  Let me ask a question.  Is it within the

23     scope of the discovery request that the defendant has made?

24             MR. KAPSHANDY:  Oh, clearly it should have been

25     produced well before the Talebi data dump of 2,500 e-mails.

```
 1          With regard to Trita Parsi's drafts of his book, those were
 2     provided in May of 2009 by the plaintiff.  Several things that
 3     are troubling about that, that one, they don't know that they've
 4     produced them, or that they would make these accusations against
 5     PWC and opposing counsel so flippantly.  But the notion that
 6     they would think that drafts of his book where he discusses
 7     interaction with the Iranian ambassador about a peace proposal
 8     known as the Grand Bargain are somehow proprietary and therefore
 9     shouldn't have been produced is shocking.
10          But that's kind of the approach they've taken to this.  As
11     the Court knows from the membership database, they believe that,
12     well, if we find out about it and they give us something, that's
13     good, even though all membership data is requested.  And that's
14     kind of where we've got to.
15          And just to wrap up, I don't think discussing discovery for
16     two months is going to advance anything other than the calendar.
17     We've got some outstanding discovery issues, for example the
18     shared server sanctions, we can discuss.  We're going to be
19     asking for substantial costs.  I don't know how that gets
20     resolved unless they're in principle willing to pay for the
21     imaging.  So that's just another waste of two months.  I think
22     we need to proceed in a more focused manner with the discovery
23     that we agree is not finished and then see where we are.  And I
24     think our client is willing to mediate this anytime in the next
25     couple months, to avoid going through all these further
```

1    discovery and other dispositive issues.

2            THE COURT:  At whatever point, what kind of mediation

3    do you think would be best, referring you to a magistrate judge?

4            MR. KAPSHANDY:  I think it would be helpful to have a

5    federal court judge, if not an Article III judge if there's

6    another Article III judge that's willing to deal with these --

7            THE COURT:  Our judges are pretty busy these days --

8            MR. KAPSHANDY:  Yeah, I understand.

9            THE COURT:  -- including our magistrate judges, but

10   part of their responsibilities includes --

11           MR. KAPSHANDY:  Unless the Court thinks there's

12   anything personal involved here.  There's absolutely no personal

13   disputes between counsel or the parties.  It's heated, and we

14   certainly disagree as a matter of strategy and substance, but we

15   do respect each other and treat each other civilly.  It's not a

16   personal issue.  But as the Court notes, it's difficult to find

17   things on which we agree without a little bit of help.  And it's

18   been very expensive and it's gone on for three years and we need

19   to find an end game.

20           THE COURT:  All right.  I think what I'm going to do,

21   I'm going to have to craft an order that does this, I'm going to

22   let you work on discovery issues for a shorter period of time

23   than has been suggested by the plaintiff, not with the

24   expectation that you're going to work out all these discovery

25   matters, because I don't think you are, but that it's going to

1   clear up the battlefield a little bit by getting some of this

2   stuff taken care of.

3        And at the conclusion of that period -- which will be

4   probably, given the holidays, it'll be probably the end of

5   January that we're talking about -- I'm going to have the

6   parties identify for me every outstanding discovery issue that

7   they believe exists.  And it may be that what I will do is take

8   some or all of those issues and attempt to resolve them through

9   a lengthy session with you where I will sit down with you and

10  hear from you and resolve those, but with minimal briefing

11  involved.

12       But I'll have to be selective as to what those issues are.

13  I don't think I can just say that for every outstanding

14  discovery issue.  I think some of these are likely to be a

15  little more intractable than would lend themselves to resolution

16  through a lengthy session with me.

17       And at that point we'll have a simpler set of disputes,

18  some of which will be in the nature of sanctions that won't have

19  been resolved.  We'll also have some better focused, because

20  discovery will be completed, or virtually completed, better

21  focused more substantive issues, such as the damages claim issue

22  that was mentioned earlier, that are ready for briefing.  But at

23  that point I would be inclined to send you to a magistrate judge

24  to make a concerted effort to resolve the matter before you get

25  into that expensive briefing, which may include as well

1    additional expensive discovery efforts on the server and

2    database matters.

3         I'm going to have to piece this together in a time frame

4    that makes sense so that we're not talking about another year.

5    But that's sort of the way I see it.  It's not that different in

6    some ways from what the plaintiff is suggesting.  But I want to

7    be realistic about this.  I know there are some issues that are

8    not going to be resolved between the parties, in the nature of

9    some difficult discovery problems and some sanctions-related

10   matters that also have a discovery base to them.

11        And some of those are going to be expensive to resolve and

12   some of those could be dispositive.  I can envision an attempt

13   at a dispositive sanctions motion that would include the

14   sanction of dismissal of the case.  But I'm thinking that that

15   should be held until after you attempt to resolve the case

16   through a mediation effort that, quite frankly, I don't have a

17   lot of confidence will be successful, unless there's a much

18   greater willingness to compromise and try to reach constructive

19   resolutions than I've seen in this case to date.  And unless

20   there is less of the principle that is driving things for both

21   sides than each side has expressed, I'm not optimistic.

22        But I also think that you should be given the opportunity

23   to try that, because you've got some pretty contentious,

24   expensive briefing that lies ahead on some issues.  And if you

25   can resolve the case short of that, then it's probably to

1   everyone's benefit.

2        So I'll come up with a schedule, but it's basically going

3   to have four parts.  Allowing you to resolve some discovery

4   matters, taking on some discovery matters with you for my

5   resolution, a mediation effort, and then, if that's

6   unsuccessful, briefing on remaining issues, some of which may be

7   discovery-related, sanctions-related, others of which will be

8   merits-related.

9        So that's the four-part approach that I have in mind and

10  that I will come up with a scheduling order for.  Anything

11  further that you wish to say at this point, Mr. Nelson?

12           MR. NELSON:  In terms of crafting your scheduling

13  order, with respect to the first part of it in terms of the

14  parties working alone to resolve discovery, if you're thinking

15  of an approximate month time frame through the end of January, I

16  would just request if you could add an additional week to that

17  time period.  I'm going to be in Europe for a week and I won't

18  be available to participate in any --

19           THE COURT:  You're asking that it go through early

20  February?

21           MR. NELSON:  Yes, sir.

22           THE COURT:  All right.  Anything else?

23           MR. NELSON:  No, Your Honor.

24           THE COURT:  Mr. Kapshandy?

25           MR. KAPSHANDY:  Perhaps if counsel has a copy of the

1    form of order I sent last week that they agreed to last night,

2    we could leave that with the Court, formalizing the discovery

3    litigation hold.

4            THE COURT:  If not, you can just e-mail it to me.

5            MR. KAPSHANDY:  Lastly, with regard to Narimon Safavi,

6    the current board member, if we could have -- we're willing -- I

7    don't know what costs we're talking.  It's a $2.50 subway ride

8    to our office.  He's purportedly a diamond merchant.  I don't

9    know if he needs a per diem.  Whatever that is, we'll be glad to

10   pay that too.  I just think it's unnecessary to force us to

11   subpoena him.  I would expect they could produce him.

12           THE COURT:  It seems to me -- I'll make an observation

13   on that.  I'm not sure I have enough information to make a firm

14   ruling.  But it seems to me that with a former board member and

15   with the minimal nature of the likely cost, if the deposition is

16   taking place at a location of his convenience, that you ought to

17   be able to come to a preagreement in order for a voluntary

18   production rather than have to go through a subpoena process.

19   That's my suggestion.

20           MR. KAPSHANDY:  I understand he's a current board

21   member?  Is he former now?

22       Yeah, Babak Talebi was former.  So he's currently.

23           THE COURT:  Then there's even more of a reason.

24           MR. NELSON:  It's Christmas and I think we can make

25   that a gift.

1          THE COURT:  Gift to whom?

2          MR. NELSON:  A gift to the Court.

3          THE COURT:  Thank you very much.  I don't take gifts.

4    I have to report them if I take them.  We'll have to call it

5    something other than a gift.  I'm not saying don't do it, we're

6    just going to have to call it something other than a gift.

7       All right.  I will also set a status call -- no, I'm not

8    going to -- yes, I'm going to set a status call, because what

9    it's going to probably be is this period of time, let's say it

10   goes into early February, and then shortly after that an

11   identification of discovery matters, and then I'll set a session

12   with me that will be a longer session to resolve certain of

13   those discovery matters.  So I'm not going to set another status

14   call at this time because I think the next time we're together

15   with this envisioned schedule will be actually to resolve some

16   matters that you've identified.  All right?

17         MR. KAPSHANDY:  Thank you, Your Honor.

18         MR. NELSON:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20      (Proceedings adjourned at 10:16 a.m.)

21

22

23

24

25

* * * * * *

CERTIFICATE

          I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.

          _____
          BRYAN A. WAYNE