IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **TRITA PARSI**<br><br>and<br><br>**NATIONAL IRANIAN AMERICAN COUNCIL**<br><br>Plaintiffs,<br><br>v.<br><br>**DAIOLESLAM SEID HASSAN**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 08 CV 00705 (JDB)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S REPORT REGARDING
STATUS OF DISCOVERY**

Defendant, Daioleslam Seid Hassan, pursuant to the Court's Order at the December 17, 2011 status conference to file a joint report of discovery hereby files this report regarding status of discovery.[1]

---

[1] The parties were ordered to prepare a joint report regarding status of discovery. On February 9, Defendant's counsel sent a draft of this report to counsel for the Plaintiffs. (Ex. Q). Not having heard from Plaintiffs' counsel as of noon on February 11, Defendant's counsel notified Plaintiffs' counsel that he would file this report on behalf of Defendant only. (Ex. R). At 12:16 PM CST February 11, Plaintiffs' counsel sent an email detailing objections to Defendant's draft and responding to some of Defendant's requests of January 3. (Ex. S). Two minutes later, Plaintiffs' counsel sent another email, which stated: "We need a day or two to meet with our client . . . we expect Defendant to work toward a joint filing." (Ex. U). As agreeing to Plaintiffs' counsel request to wait until they met with their client would have meant missing the February 11 deadline, Defendant sought Court involvement in addressing the situation. The Court gave the parties until February 15 to file a joint report or separate reports. As Defendant believes the parties would be in the same situation the afternoon of February 15, Defendant files this status report only on his behalf.

Discovery Activities Before Latest Discovery Cutoff of February 4, 2011

On January 3, 2011, Defendant's counsel sent to Plaintiffs' counsel a list of outstanding discovery issues. (Ex. A). On Friday, January 7, Plaintiffs' counsel suggested a call on Monday, January 10. (Ex. B). Defendant's counsel responded that he was able to do a call on January 11 before Plaintiffs' counsel went to Europe, and Plaintiffs' counsel responded that January 11 would be "great." (Ex. B). At 10:13 AM on January 11, Defense counsel emailed that he was free all day but got no response or call. (Ex. B). On January 12, Defendant's counsel reiterated Defendant's requests for items in the January 3 list and specifically requested dates for the deposition of Mr. Safavi and completion of Mr. Gardiner's deposition. (Ex. C). Defendant next heard from Plaintiff on January 25 when Plaintiffs' counsel called to discuss Defendant's prior request (which was made repeatedly through much of 2010) to reach agreement on a date, if any, for discovery supplementation.[2] Plaintiffs' counsel stated that he was planning on discussing the list of outstanding discovery with his client on January 26 and would get back to Defendant after that meeting. On January 31, Plaintiffs' counsel called Defendant's counsel to discuss the January 3 list. The Parties were only able to resolve some of the issues on the list (Ex. A); for most of the items on the list, however, Plaintiffs' counsel stated that he needed to consult with his client and would get back to Defendant on February 1.

As for the supplementation of discovery after the initial production of May 2009, the Parties agreed that there would be no need to supplement the May 2009 discovery responses except to the extent already specifically undertaken subsequent to May 2009.[3] Also, Plaintiffs

---

[2] Plaintiffs' counsel did email on January 19, that he had just returned from Europe and promised to respond the next day to Defendants request about a proposed confidentiality agreement for documents responsive to the Pugwash subpoena. (Ex. T). Plaintiff did not respond as promised. On February 11, Plaintiff agreed to the confidentiality agreement Pugwash requested, but apparently objected to the scope of the subpoena. (Ex. S). See, *infra*, p. 9.

[3] Plaintiffs' email of February 11 indicates that there may be a misunderstanding about this agreement. It was not meant to be a complete bar to discovery after May 2009 (*e.g.*, all the discovery regarding discovery fraud and abuse or many other specific requests which the Plaintiffs have, in fact, answered after May 2009). If such is Plaintiffs' understanding, then the parties have no agreement regarding supplementation of responses made in May 2009.

agreed to send the litigation hold notice Defendant had requested and which had been promised in Plaintiffs' email of December 16. On January 31, 2011, Plaintiffs sent Defendant an October 15, 2009 email from Trita Parsi, purportedly the written litigation hold. (Ex. H). Previously, however, NIAC's witness on its computers and discovery, David Elliott, had testified on October 5, 2009 that the written litigation hold was emailed to all staff at least a month before his deposition, and thus the October 15, 2009 email could not have been the litigation hold instituted at the inception of the lawsuit in March 2008. (Elliott Trans, pp. 66-70, attached as Ex. I). Defendant immediately re-requested the original litigation hold referenced in Mr. Elliott's deposition. (Ex. J). On February 4, Plaintiffs responded that the October 15, 2009 email was the only written copy of the litigation hold. (Ex. N).[4] On February 11, Plaintiffs responded that Mr. Elliott's recollection was possibly faulty and that "this level of detail is unnecessary." (Ex. S).

Regarding the remaining items in Defendant's January 3 list, Plaintiffs responded on February 4 that they would respond by February 11 or, alternatively, by objecting to Defendant's requests. (Ex. N). On the afternoon of February 11, Plaintiffs had provided responses to some of the requests (Ex. S), but not others as set forth below.

Server/PCs/Forensic Imaging

At Trita Parsi's deposition, Defendant requested the serial numbers of the computer Parsi was using and the one on which the Talebi emails were discovered. At the close of the December 17 hearing, Plaintiffs provided to Defendant a list of each of NIAC's computers and the individual users at the time computers were produced to PwC on August 18, 2010 for imaging (attached as Ex. D). At the December 17, 2010 hearing, Plaintiffs represented to the

---

[4] Plaintiffs also stated that NIAC "originally communicated the litigation hold in this case orally." (Ex. N). However, Elliott previously testified that the hold was communicated orally "after the electronic notification." (Elliott Trans, pp. 66-70, attached as Ex. I).

Court that Plaintiffs' computer consultant, Progressive Office, produced to Defendant an inaccurate list of computers in NIAC's offices in December 2009 and that the five computers that were not produced for imaging August 18, 2010 were only used by interns. (Dec. 17 Trans., p. 19). The computer inventory and correspondence produced by Progressive Office is attached as Ex. E. During their January 31, 2011 call, Plaintiffs' counsel also said that he was not able to address the technical issues raised on pp. 4-5 of Ex. A and would need to involve Plaintiffs' computer consultant suggesting a call on February 3, 2011. On February 4, Plaintiffs' counsel reported that the computer consultant was not available. On February 11, Plaintiffs responded that Progressive Office's report was not "complete or accurate" and that even if their consultant had been available, they do not believe the issue would have been resolved. (Ex. S). NIAC's attack on the credibility of their own computer consultant certainly raises questions, and with good reason. If the inventory the consultant attested to (Ex. E) is true, this means: (1) the computer NIAC tendered for imaging as Parsi's was *not* connected to the NIAC network in December 2009; (2) one of the machines NIAC refused to produce for imaging claiming it was only an intern's machine was named "niac-emily" (NIAC's Legislative Director was Emily Blout); and (3) the machine NIAC produced for imaging as Emily Blout's was no longer in its possession on December 17, 2010 when NIAC tendered a list of all computers it possessed.

Salesforce Membership Database

Regarding the Salesforce membership information, Plaintiffs informed the Court (Trans., p. 21) that on December 16 it had managed to download 196 meeting note entries from the database. However, as Defendant pointed out at the December 17 hearing (Trans., p. 22), Defendant's Second Request for Production, No. 3 (Ex. F) explicitly requested *all* membership documents and lists, not just meeting notes. During their January 31, 2011 conference call,

4

Plaintiffs' counsel stated that NIAC had been able to download the entire Salesforce database with notes and would let Defendant know the status and form of production on February 1, 2011. On February 4, Plaintiffs emailed that they would produce the Salesforce membership database by February 8.  (Ex. N).  On the afternoon of February 11, Plaintiffs promised to provide the Salesforce membership database by the close of business.  (Ex. 2).  As of noon, February 14, 2011, Plaintiffs had not produced the Salesforce membership database or the meeting notes from the database.

Depositions

At the December 16, 2010 status conference, Plaintiffs promised to produce NIAC board member, Narimon Safavi, for a deposition in Chicago where he lives (Trans, pp. 39-40).  On January 3 and 12, Defendant requested dates for his deposition.  (Exs. A and C).  On January 31, Plaintiffs' counsel stated that he would work on getting dates.  On February 4, Plaintiffs' counsel emailed that they would try to get dates for both Safavi and Gardiner after the discovery cutoff. (Ex. N).  On the afternoon of February 11, Plaintiffs had not provided dates for Gardiner, but did provide dates for Safavi the week of February 21.  (Ex. S).

Plaintiffs claimed they were having difficulty in subpoenaing Michael Rubin, Kenneth Timmerman and Claire Lopez to appear for depositions:  "We believe these people are trying to avoid service on these subpoenas." (Trans., p. 25).  As of August 4, 2010, however, Ms. Lopez, through her counsel, had offered to appear any time after early October without requiring a subpoena.  (Ex. G).  As of December 22, Lopez's counsel had not heard from Plaintiffs.  (Ex. G). On February 4, Plaintiffs' counsel emailed Defendant requesting that these three witnesses be deposed after the discovery cutoff.  (Ex. N).  Defendant responded that he disputed Plaintiffs'

diligence but would not object as long as Plaintiffs failure to depose these witnesses did not inhibit Defendant's ability to move for summary judgment. (Ex. O).

The deposition of Puneet Talwar, under subpoena from Defendant, occurred February 1, 2011 after Plaintiffs dropped their objections raised in November. (Ex. P). The deposition of Debashi Aikat, Plaintiffs' media futurist/journalism expert, took place on January 5, 2011 in Raleigh, North Carolina per Plaintiffs' offer on December 16, 2010.

As for the follow-up items requested at Parsi's deposition on December 1-2, 2010 (Ex. A, p. 6), Plaintiffs reported on February 4 (Ex. N) that they would produce these by February 11, 2011. As for Parsi's notes of interviews with Iranian officials detailed in his book, *Treacherous Alliance*, Plaintiffs related on February 4, 2011 that Parsi would state under oath that he no longer had any such notes as of the date the lawsuit was filed and the litigation hold instituted. (Ex. N). As of February 11, 2011, Plaintiffs had not responded to the requests for the remaining items requested at his deposition although they did state they were not objecting to producing Parsi for further deposition on these after-produced items.[5]

As for the items requested at Mr. Disney's deposition on November 17, 2010 (Ex. A, p. 4), on February 4 Plaintiffs promised to produce by February 11 the CLIPI and intern research memos. (Ex. N). With regard to the law firm memos and packet from legal experts, Plaintiffs promised to produce those or withhold as privileged by February 11. NIAC stated nothing with regard to the continued internal emails/memos Disney described at his deposition (p. 167). On the afternoon of February 11, Plaintiffs responded that the documents were given to Plaintiffs' counsel and reviewed by them after May 2009 and that as such they are under no duty to supplement, withdrawing even their offer of February 4 regarding the intern research and CLIPI materials. (Ex. S). Thus, according to NIAC, after Mr. Disney's July 23, 2008 memo that NIAC

---

[5] Plaintiffs did respond by saying that "Defendant is seeking a complex legal opinion from Dr. Parsi." (Ex. S). Defendant maintains that this is not an accurate representation of the seven items sought. (Ex. A, p. 6).

was in violation of the LDA (attached as Ex. V), either none of the subsequent research on whether NIAC was in violation of lobbying laws was done until at least June 2009, nearly a year later or it was done prior to May 2009 but not previously produced as required.  Defendant's position is that Plaintiffs should not be able to argue that they had subsequent research or advice disputing Disney's July 2008 memo unless they produce all such research and advice.

The materials promised at Prof. Morse's deposition (including current list of testimony required by Rule 26) had not been produced as of February 4, 2011 although Plaintiffs did promise to make their best efforts to produce these by February 11, 2011.  (Ex. N).  As of February 14, 2011, these had not been produced.

In their supplemental Rule 26 disclosure of January 31, 2011, Plaintiffs listed for the first time as a witness, Jamal Abdi, NIAC's current Policy Director.  Defendant asked when it was learned that Abdi had relevant information and that he be produced for a deposition.  (Ex. O).  Plaintiffs have not responded to these requests.  Plaintiffs had also removed a number of witnesses from their Rule 26 disclosure (*e.g.*, Richter, Molavi, Firoozbakht, Jazayeri) subsequent to a discussion with Defendant on August 12, 2010 that these persons would not be called; two witnesses Defendant understood were also not be called (Cirincione and Lynch) were not similarly removed from the witness list.  Defendant asked if NIAC now intended to call them and, if that was the case, stated he would need to depose them.  (Ex. O).  As of February 11, 2011, Plaintiffs had not responded with regard to Abdi.  Regarding Lynch and Cirincione, Plaintiffs responded that it was Defendant's burden to demonstrate why it [he] should now be permitted to depose these individuals . . . ."  (Ex. S).

PwC Imaging

Defendant has requested Plaintiffs reimburse him for the costs of the Court-ordered imaging of NIAC's server for unproduced, altered, and deleted calendar entries. Defendant also had asked Plaintiffs for permission to review user habit and registry information on the hard drives that were produced (to determine when the machines were used and by whom), but as of February 14 Plaintiffs had not responded to these requests. Given Plaintiffs' representation that their vendor had produced an inaccurate list of computers in response to Defendant's subpoena, Defendant believes this information is crucial to determining exactly who used which computer and when. Finally, Defendant requested Plaintiffs' consent in providing PwC's report to the Court. Plaintiffs would not agree to any of these requests except that they stated they would "agree upon a procedure for such report being providing [sic], as well as a procedure for either side to provide any rebuttal to the PwC report." (Ex. S). Defendant has no objection to Plaintiffs filing a report but would ask that PwC's report be filed immediately and without further negotiations over some ill-described "procedure." The PwC report was prepared months ago pursuant to the Court's order and Plaintiffs present no valid reason for keeping it from the Court.

Talebi Emails

After being told by the Court (July 1, 2010 Order) that they could not withhold the 8,000 unproduced Talebi emails on the basis that these related to "community work," Plaintiffs produced 2,500 "Talebi emails" on August 24, 2010.[6] On August 24, 2010, Defendant sent two interrogatories requesting: (1) on what basis these were not produced previously (as they all contained at least one agreed search term and NIAC had stated that the server on which they had

---

[6] Plaintiffs did serve about 350 Talebi emails late Friday evening, August 20, 2010 per the Court's deadline. However, the file size of the 2,500 emails quickly overcame the limitations of Defense counsel's email server so the remaining 2,150 emails were not received until August 24 on a CD.

8

been located had been searched twice); and (2) on what basis the remaining 5,500 were being withheld. (Plaintiff's Response of September 24, 2010 attached at Ex. K). On September 24, 2010, Defendant pointed out that Plaintiff's response to Interrogatory No. 1 was evasive and that NIAC's response to Interrogatory No. 2 (*i.e.*, that none of the remaining 5,500 unproduced Talebi emails contained any search terms) could not possibly be true as "Talebi" was a search term and requested Plaintiff to answer the two questions posed. As of noon February 11, 2011, Plaintiff has not further answered these.

Plaintiffs also disagree with Defendant's request that Plaintiffs be ordered to pay for Defendant's costs in obtaining the order to produce the Talebi emails. Similarly, Plaintiffs refuse to reimburse Defendant for the costs of obtaining NIAC emails from other third-parties such as Puneet Talwar, Children of Persia, CNAPI, Flynn and Hillary Leverett, and Prof. Morse (NIAC's own economist/damages expert).

Pugwash Subpoena

Defendant has subpoenaed Pugwash, an organization that Trita Parsi has testified invited him to international meetings with current and former governmental officials, including Iranian officials. According to Parsi, Pugwash paid for his travel expenses for these trips/meetings. Plaintiffs have produced no communications with Pugwash. In response to Defendant's subpoena, Pugwash's counsel has agreed to produce documents relating to Trita Parsi if the parties will agree to abide by a confidentiality agreement. (Ex. M). On February 11, however, Plaintiffs agreed to the confidentiality agreement, but apparently objected to the scope of the subpoena. (Ex. S). Defendant maintains that Plaintiffs' objections are untimely under FRCP 45 and that all Pugwash documents subpoenaed be produced.

Follow-up Request from Daioleslam's Deposition

On February 4, 2011, Plaintiffs requested that "Dai produce all of the materials he agreed to produce over both days of his deposition, including, but not limited to any records relating to the civil (or criminal) penalty he paid during the time he was doing business in France." (Ex. N). Defendant responded on February 7, 2011 that while Plaintiff had served no request to produce such records and that such was not discoverable, he would attempt to locate and produce such records. (Ex. O). Plaintiffs reserved the right to depose Defendant on these materials. (Ex. S).

Respectfully submitted,

               /s/
Timothy E. Kapshandy (Illinois Bar No. 6180926, admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
hrogers@sidley.com

***Attorneys for Defendant Daioleslam Seid Hassan***

## CERTIFICATE OF SERVICE

  I, Timothy E. Kapshandy, an attorney hereby certify that on February 14, 2011, I caused the foregoing Defendant's Report Regarding Status of Discovery, to be served upon the foregoing counsel via U.S.Mail, proper postage prepaid from One South Dearborn Street, Chicago, Illinois, and by email:

A.P. Pishevar (D.C. Bar No. 451015)
Adrian Nelson
Jefferson Plaza, Suite 316
600 East Jefferson Street
Rockville, Maryland 20850
(301) 279-8773
AP@pishevarlegal.com

                  /s/
                 Timothy E. Kapshandy

February 14, 2011