**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 08 CV 00705 (JDB)** |
| | ) |
| **DAIOLESLAM SEID HASSAN** | ) |
| | ) |
| **Defendant.** | ) |

**PLAINTIFFS' STATUS REPORT REGARDING DISCOVERY**

COME NOW the Plaintiffs, Dr. Trita Parsi and the National Iranian American Council

("NIAC") (collectively "Plaintiffs"), by and through their counsel, Afshin Pishevar and Pishevar

& Associates, P.C., and submit this Status Report Regarding Discovery and states as follows:

## I.      INTRODUCTION

In late January 2011, the defendant provided NIAC with a seven (7) page "Discovery Issues"

chart (the "Chart") detailing the defendant's view regarding the outstanding discovery issues in

the case.  During the week of January 24, 2011, both counsel traded phone calls in attempt to

first discuss the Chart.  Ultimately on January 31, 2011, counsel for both parties had their first

substantive discussion regarding the Chart.  (*See* Attached Exhibit 1)  This initial discussion

between the parties was followed by several conversations between NIAC and its counsel

regarding the Chart, as well as an additional conversation with the defendant's counsel regarding

the Chart.

As the court is aware, the parties were asked to jointly file, by February 11, 2011, a report

regarding the status of discovery.  Defendant emailed a draft of the report to Plaintiff after 6 pm

on February 9, 2011, indicating that he'd like to file the joint report early on the afternoon of

February 11th.  (*See* Attached  Exhibit 2) The very next day, on February 10, 2011, Plaintiffs'

counsel prepared a detailed response to what Plaintiff viewed as a self-serving draft Joint Status

Report for discussion with NIAC.  On the morning of February 11, 2011, Plaintiff's counsel

obtained feedback from NIAC regarding the draft Joint Status Report.

While Plaintiffs and their counsel were discussing the draft Joint Report, Defendant's

counsel sent an email at 12:03 p.m. decrying the fact that he hadn't heard from Defendant's

counsel.  (*See* Attached Exhibit 3)  At 1:16 p.m., Plaintiffs provided their comments regarding

the Defendant's draft Joint Status Report.  At 1:18 p.m. Plaintiffs' counsel sent a follow-up email

to Defendant's counsel explaining that Plaintiff's counsel had "needed" a day to review the draft

Joint Report, discuss it with NIAC, and prepare comments.  Further, in its 1:18 pm. email,

Plaintiffs' counsel indicated NIAC's hope that the parties could file a Joint Report once

modifications were made.[1]

At approximately 1:20 pm, immediately thereafter, Mr. Nelson telephoned Mr. Kapshandy.

Very exercised, Mr. Kapshandy admitted that he was anxious to file because he had a funeral to

attend.  However, at no prior time had Mr. Kapshandy advised Plaintiffs' counsel of his filing

time constraint.[2]  In fact, Mr. Kapshandy admitted that he was just learning of the funeral he

needed to attend.   Nonetheless, Mr. Kapshandy expected NIAC to know of a filing time

---

[1]The statements at the end of footnote 1 to Defendant's Joint Report simply are not true.  Defendant states that based upon its receipt of Ex. U from Plaintiff's counsel it sought court involvement.  However, Mr. Kapshandy , defendant's lead counsel, knows that Ex. U contains a typographical error – the word "need" should have read "needed."  Plaintiff's counsel was simply explaining in Ex. U that the one-day period of time Plaintiff's counsel took to review the draft Joint Status Report was "needed" to give NIAC and counsel time to formulate their comments.  Defendant's interpretation of Ex. U is contrary to common sense, given a court-imposed deadline was in place, and contrary to the parties conversation on February 11, 2011.  Defendant is seizing upon a typo to create a fictitious set of facts in its favor.

constraint he, himself, claimed he wasn't aware of on February 9th when sent the draft Joint Status Report.

Mr. Kapshandy made it clear that given his time constraints and the nature of Plaintiffs' concerns about the draft Joint Status Report that there were two options – option #1: the parties would have to file separately or option #2: the parties get the permission of the court to file by Friday, February 18, 2011, since Mr. Kapshandy would be out of the office, and unavailable, on Monday, February 14, 2011. As the court is aware, the parties were given until February 15, 2011, to either file joint or separately.

Shortly thereafter, on Friday, February 11, 2011, at 2:40 p.m. Plaintiffs' counsel, by email, asked defendant's counsel to advise whether the parties would be filing jointly or not. (*See* Exhibit 4) At 4:58 pm. on Sunday, February 13, 2011, Mr. Kapshandy replied by email:

> Adrian, given the vast differences and your admission that it would have to contain two sets of facts, I am afraid we'll be in the same position Tuesday afternoon. You are welcome to make revisions to our draft or start a joint report from scratch but I am not optimistic that we will iron out all matters on Tuesday in time to file.
>
> ***
>
> So, if you would like to revise our draft or do your own, please get that to us by noon Monday. If you do not, we will plan to file separate status reports.

*See* Exhibit 4.

The parties are filing separate status reports regarding discovery.

---

[2]In his February 9, 2011, email Mr. Kapshandy had vaguely stated that he'd like to file in the early afternoon. Apparently, early afternoon arrived at 12:03 p.m. when Mr. Kapshandy sent his email indicating that he

## II.    STATUS OF DISCOVERY ISSUES

### A.  Discovery supplementation

During the parties' recent discussions, NIAC proposed to the defendant that the parties agree to a supplementation cut-off date.   (Defendant previously had raised the idea of a supplementation cut-off date.)  The parties have agreed that supplementation of discovery would be cut-off as of the parties' last production in May 2009.

After this agreement was reached, the defendant has now attempted to redefine the nature of the parties' agreement regarding supplementation writing on February 13, 2010:

> When we agreed to relieve the parties of supplementing their May 2009 discovery responses, that meant generally and was not meant to bar specific requests for any documents after May 2009 . . . If your understanding of the supplementation agreement is that no documents after May 2009 are discoverable, then there is a misunderstanding and we'll need to discuss a date certain for cutting off supplementation as we had been requesting most of 2010.

(*See* Attached Exhibit 5)

Defendant's clarification is typical of the "misunderstandings" that have permeated discovery.[3]

### B.  Depositions

1.  Aikat Deposition

---

would be filing a "status report on behalf of defendant only."  *See* Exhibit 3.
    [3]For example, in December 2009, defendant's counsel requested Outlook calendar entries relating to meetings with government officials.  When such Outlook calendar entries were provided, Defendant complained that NIAC had modified the Outlook calendars in a nefarious manner.  As a result, NIAC was subjected to the ongoing forensic imaging demands of the defendant.

By agreement of the parties, Dr. Aikat, NIAC's journalism expert, was deposed on January 5, 2011.

2.  Talwar Deposition

By agreement of the parties, Mr. Talwar, a U.S. government National Security Council official, was deposed on February 1, 2011.[4]

3.  Safavi Deposition

On February 11, 2011, NIAC offered the defendant a number of dates for the deposition he desires to take of NIAC Board Member Safavi.[5]   The defendant is in the process of determining which of three (3) dates offered in February works best for Defendant.

4.  Lopez, Rubin and Timmerman Depositions

Originally, NIAC intended to depose Ms. Lopez, Mr. Rubin, and Mr. Timmerman, each of whom appear to have played a role in the publication of some of defendant's allegedly defamatory statements.  To that end, Ms. Lopez's counsel said she would not be available until some time in October 2010.  However, to avoid cumulous testimony, NIAC decided to focus its deposition activity to Mr. Rubin and Mr. Timmerman, who, upon information and belief, are believed to have personal knowledge about more relevant information for use at trial.

---

[4]Upon information and belief, in its Status Report the defendant implies that once NIAC dropped impliedly unfounded objections to Puneet Talwar's deposition, the Talwar deposition took place.  Apparently the defendant does not believe that NIAC had a right to raise concerns about deposition scheduling and format in light of the very restrictive scheduling and deposition format requirements imposed upon the parties by the U.S. Department of Justice before it would allow its client, National Security Council official Talwar, to give deposition testimony.   (*See* Attached Exhibits 6-9)

Unfortunately, the unavailability of Mr. Rubin and Mr. Timmerman for deposition has resulted in the need for NIAC to depose Ms. Lopez.

In both 2010 and since the parties' last status conference, NIAC has made several attempts to serve both Mr. Rubin and Mr. Timmerman with no success.  Mr. Rubin's counsel has refused to accept service of a subpoena on behalf of his client.  And the private process server retained by NIAC to serve a subpoena upon Mr. Timmerman has been unsuccessful despite several attempts.  (*See* Attached Exhibit 10)

NIAC is in the process of retaining a different process server in the hope that it will yield a different result.

Notwithstanding the foregoing, Defendant has taken the position that NIAC has not been diligent in its efforts to secure the deposition testimony of Ms. Lopez, Mr. Rubin, and Mr. Timmerman.

5. Morse Follow-Up Deposition

NIAC does not object to this limited thirty (30) minute follow up deposition.

6. Parsi Follow-up Deposition

To the extent that there are additional materials produced by Dr. Parsi in follow-up to his December 2010 deposition, Dr. Parsi has agreed to make himself available for no more than one (1) hour to allow the defendant to explore the newly propounded discovery materials.[6]

7. Daioleslam Follow-Up Deposition

---

[5]Specifically, defendant proposed the following dates for Mr. Safavi's deposition: February 22, 23, or 24, 2010, after 3 pm in Chicago or February 25, 28, March 1 or 2 at a mutually agreeable time in Washington, DC.

[6]In the defendant's draft Status Report, it accused NIAC of "refusing" to make Dr. Parsi available.  NIAC strenuously disputes this assertion.

Like in the case of Dr. Parsi, the defendant, during his deposition, agreed to produce certain documents about which he testified, including, but not limited to, court records regarding a purportedly civil, not criminal, fine for some form of business fraud.  As of last week, Defendant has been lukewarm about its commitment to produce the promised documents.

NIAC reserves it right, as permitted by the Court, to conduct a follow-up deposition with the defendant just as Defendant has claimed such right as it relates to Dr. Parsi.

## C.  Server/Forensic Imaging/PCs

On December 17, 2010, as the parties were leaving the status hearing NIAC provided the Defendant with a list of serial numbers of each of NIAC's computers and the name of the individual user for each NIAC computer.  This was necessary because the defendant, based upon an unauthorized, inaccurate, incomplete list of NIAC computers it has obtained from a NIAC vendor, was claiming that NIAC had failed to provide all NIAC computers covered under the Court's July 1 Order ordering forensic imaging.

Notwithstanding the provision of the above-referenced information, Defendant complains that NIAC was unable to arrange at time for its e-discovery consultant to explain to the defendant why NIAC did not believe it was obligated to provide any more of its computers to PWC for forensic imaging.  From its Joint Status Report, it appears that the defendant is assuming that Progressive Office is the e-discovery consultant previously referenced by the plaintiffs.  They are not.  NIAC's e-discovery consultant is Marc Hershfeld, Esquire. Progressive Office is simply a vendor that was hired by NIAC to determine why Dr. Parsi could not print from his computer, nothing more nefarious, nothing less.  The server/network

conspiracy the defendant continues to posit is simply a fiction of the defendant's own making, a fiction that cannot continue in good-faith.

Furthermore, NIAC is not attacking the credibility of Progressive Office.  It is simply saying that the list of computers the defendant obtained from Progressive Office is inaccurate as it lists some computers more than once and misstates some computer serial numbers.

Thus, it is NIAC's conclusion at the end of the day that a conversation between its e-discovery consultant and defendant would have been fruitless given the defendant's unwavering position on server/network fiction to date.

**D.  Salesforce Membership Database**

NIAC's former Salesforce membership database is an issue that continues to be raised by the defendant.  For context, it bears emphasizing that much earlier in the discovery process NIAC produced its membership database (and other accounts information) to the defendant albeit in a different format[7]

Defendant only began to demand the Salesforce version of NIAC's membership database when its demands for NIAC's Salesforce meeting notes were produced.  More specifically, as a result of what was to be limited forensic imaging by PWC the defendant began demanding that NIAC produce "meeting notes" associated with an SF program and/or software, the existence of which was indicated by PWC's forensic imaging.  Once NIAC determined that the defendant's reference to SF was actually a reference to SalesForce NIAC advised the defendant, as it advised the Court on December 17, that NIAC's use of SalesForce for the purpose of maintaining a

---

[7]In connection with NIAC's earlier production of its membership information, the parties entered into a Confidentiality Agreement.

record of meeting notes had been extremely limited.   The veracity of NIAC's position is supported by the fact that only 196 meeting notes entries were discovered once NIAC was able to access its SalesForce database, which it no longer used nor had access to.

Only when it became clear that NIAC only recorded 196 meeting notes entries using Salesforce did defendant change its focus from obtaining NIAC's SalesForce meeting notes to a demand for NIAC's entire Salesforce membership database even though this information had been provided much earlier in the discovery process.   Notwithstanding what NIAC believes is the duplicative nature of the SalesForce membership database information that defendant is demanding, Plaintiff provided the SalesForce membership information, subject to the parties' existing Confidentiality Agreement, on February 15, 2011. (*See* Attached Exhibit 11)

**E.  Talebi Emails**

Once the defendant files its motion for costs, NIAC will address the defendant's unreasonable belief that NIAC should pay for the cost of discovery relating to Mr. Talebi's emails.   At this point, the Court simply needs to know that NIAC will not consent to paying for the cost of discovery relating to Mr. Talebi's emails.

**F.  NIAC's Supplemental Rule 26 Disclosures**

The defendant, in its draft Status Report, complained about the fact that NIAC supplemented its Rule 26 Disclosures on February 11, the last day of the most recent discovery period.   What an ironic complaint given the fact that on December 16, 2010, both the last day of the discovery period up to that point and the day before the parties status conference, the defendant supplemented its own Rule 26 Disclosures.

More importantly, in its draft Status Report the defendant appeared to be crying foul as it relates to Defendants' supplementation.  Defendant appears to be of the mistaken belief that that NIAC identified three new potential witnesses in its Supplemental Rule 26 Disclosures, including a Ms. Lynch, a Mr. Cirincione, and Mr. Abdi.  However, both Ms. Lynch and Mr. Circione were on NIAC's original Rule 26 Statement, and upon information and belief Mr. Abdi was not employed by NIAC at the time its initial Rule 26 disclosures were made

**G.  The PWC Report**

NIAC will consent to PWC's forensic imaging report being provided to the Court once the parties agree upon a procedure for such report being providing to the Court, as well as a procedure for either side to provide any rebuttal to the PWC if allowed by the Court.

Further, NIAC does not believe that there is a legal basis in the PWC Report upon which to order NIAC to pay for the forensic imaging requested by the defendant.  Notwithstanding the forgoing, the defendant has failed to provide NIAC with a figure for the imaging the defendant wanted.

**H.  Pugwash Subpoena**

The defendant subpoenaed documents from the Pugwash Conference, a conference that Dr. Parsi attended, purportedly based upon testimony by Dr. Parsi that the Pugwash Conference paid for his travel expenses, not the Iranian government as has been speculated by the defendant.  The Pugwash Conference's legal representation is requiring both the defendant and NIAC to enter into a confidentiality agreement before the Conference will produce the documents subpoenaed by the defendant.  NIAC has advised the defendant that it is willing to agree to the

confidentiality agreement if the documents sought from the Conference are limited to documents relating to Dr. Parsi's travel expenses.

## III. CONCLUSION

NIAC believes that it has acted in good-faith as it relates to resolving the parties' ongoing discovery disputes.  Further, NIAC reserves it right to object to any of the assertions, claims, and relief set forth by the defendant in its Status Report regarding discovery.

Respectfully submitted,
/s/

_____
A.P. Pishevar (D.C. Bar No. 451015)
PISHEVAR & ASSOCIATES, P.C.
600 East Jefferson Street, Suite 316
Rockville, MD 20852
301-279–8773/301-279–7347(F)
Counsel for the Plaintiffs