## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRITA PARSI | ) |
| and | ) |
| NATIONAL IRANIAN AMERICAN COUNCIL | ) |
| Plaintiffs, | ) |
| v. | )    **Civil No. 08 CV 00705 (JDB)** |
| DAIOLESLAM SEID HASSAN, | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION TO EXCLUDE
## THE TESTIMONY OF JOEL MORSE

Defendant Seid Hassan Daioleslam hereby moves to exclude the testimony of Plaintiffs'

damages expert, Joel Morse.  Although Morse purports to estimate economic loss suffered as a

result of the Defendant's allegedly defamatory conduct, his proposed testimony does no such

thing.  His damages calculations are unreliable, wholly untethered from the facts of this case, and

would confuse rather than assist the trier of fact.  His testimony, therefore, should be excluded.

## INTRODUCTION

The flaws in Morse's proposed testimony are manifest throughout his four-and-a-half-

page report.  Morse purports to calculate damages ranging from $614,946 to $2,051,348 for

NIAC's so-called "lost surplus"—which he equates to lost profits for a non-profit organization—

but he never actually opines on a particular damages amount.  To generate his grab bag of twelve

possible figures, Morse begins with NIAC's actual "surplus" in 2007.   Extrapolating from that single, unprecedentedly high year, he then posits that NIAC's surplus would have grown at 5, 10, 15, or 20 percent annually but for the allegedly defamatory conduct and that damages would have lasted through 2010, 2011, or 2012.   He concedes, however, that he offers no opinion about what growth rate NIAC would have actually enjoyed and that he is not opining on the time period of damages.   He has simply chosen a few arbitrary inputs and "done the math"—nothing more and nothing less.   That is not a damages methodology; yet even in "doing the math," Morse commits fundamental errors, all of which serve to inflate damages.

With respect to the materials considered, moreover, Morse admits an exceptional level of bias that only adds to the unreliability of his proposed opinions.   He concedes, for example, that he only looked at materials sent to him by the Plaintiffs and, in fact, was explicitly instructed by Trita Parsi ("Parsi") not to "try to figure me out on your own and start reading about me all over the news."   Deposition of Joel N. Morse, Dec. 8, 2010 ("Morse Dep.") (Ex. B), at 146.   And, even among the materials that Morse did receive, he ignored confounding evidence by assuming that any and all harm to Plaintiffs began on January 1, 2008 and was caused by Daioleslam, despite ample evidence in those documents that there were unrelated causes for NIAC's decrease in "surplus."   Morse's response to questioning on this issue at his deposition was to defend his methods by drawing a perplexing analogy to the doctrine of joint and several liability in lead paint cases—a doctrine that has no application in or connection to the context of defamation where the First Amendment "actual malice" standard applies.

Additional errors abound.   Morse reports, for instance, that NIAC Board minutes reflect a drop in "typical membership rolls" from 2,000 – 3,000 to 1,200 current members.   But Morse never actually looked at NIAC's Board minutes, which do not corroborate his assumption.

Morse also concedes that his model assumes that two grants totaling about $250,000 were discontinued after 2007 for reasons attributable to Daioleslam.  Informed that the grants were actually halted for reasons entirely unconnected to Daioleslam, Morse admitted that his damages estimates—which are based on a significant drop in "surplus" between 2007 and 2008—would not have been nearly as high if he had not attributed the lost grants to the Defendant.

This is not a close question.  Morse's proposed testimony is unreliable under all relevant metrics and would not assist the jury.  Accordingly, it should be excluded.

## **ARGUMENT**

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The Rule invokes *Daubert*'s twin requirements of reliability and relevance. *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993).  To that end, expert testimony must rest on "more than subjective belief or unsupported speculation" to be reliable, *Daubert*, 509 U.S. at 590, and may be excluded if "there is simply too great an analytical gap between the data and the opinion proffered," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). These requirements ensure that "an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Rule 702 "imposes a special obligation upon a trial judge" to police these policies and to serve as a gatekeeper against expert testimony that does not meet the requisite standards.  *Id*. at

147.  In doing so, district courts must "resist the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves."  *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993) (citation and alterations omitted).

Morse's proposed testimony falls well short of what is permissible.  It is neither reliable nor relevant—each of which is, alone, a sufficient ground for exclusion—and it will not assist the trier of fact.

## I. MORSE'S PROPOSED TESTIMONY IS NOT RELIABLE

*Daubert* outlines four factors relevant to the reliability inquiry: (1) whether the expert's technique or theory can be or has been tested, (2) whether the technique or theory has been subject to peer review and publication, (3) the known or potential rate of error of the technique or theory when applied, and (4) whether the technique or theory has been generally accepted in the scientific community.  *See Daubert*, 509 U.S. at 592-94.  Those factors are neither exhaustive nor necessarily applicable to all cases, *Kumho*, 526 U.S. at 149-52, and other factors may include "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion [and w]hether the expert has adequately accounted for obvious alternative explanations."  Fed. R. Evid. 702 advisory committee's notes ("Advisory Comm. Notes").

Under Rule 702, the reliability requirement applies both to the expert's methodology itself and to the application of that methodology to the facts of the case.  Fed. R. Evid. 702; *see also* Advisory Comm. Notes ("If the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably.").  Morse's proposed testimony is not reliable in either way.

### A.      Morse's Methodology Is Not Reliable

Morse's methodology for calculating lost surplus is, in his own words, "plain vanilla." Morse Dep. at 156.  For supposed simplicity, he begins his damages period on January 1, 2008 despite the fact that the Defendant began writing in early 2007.  That allows him to use NIAC's 2007 "surplus" of $258,005, by far its largest ever and over twice as large as the previous year's, as his starting point.  Expert Report of Joel N. Morse, May 9, 2010 ("Morse Report") (Ex. A), at Table A.  Morse then applies annual growth rates of 5, 10, 15, and 20 percent to that figure through as late as 2012.  The resulting amounts represent his estimates of what NIAC's annual surplus would have been but for the Defendant's allegedly defamatory conduct ("but-for surplus").  Because NIAC has recorded actual surplus in 2008 ($4,511) and in 2009 ($230,061), Morse then subtracts those amounts from his estimates of but-for surplus.  For 2010, 2011, and 2012, however, Morse ignores the reality of 2009 and assumes that actual surplus will revert back to $4,511 per year.  The following chart, based on figures using a five percent growth rate from Table A of his report, illustrates Morse's approach:

|  | But-For Surplus | –   Actual Surplus   = | Damages |
|---|---|---|---|
| 2008 | $270,905 | $4,511 | $266,394 |
| 2009 | $284,451 | $230,061 + $4,511 | $49,879 |
| 2010 | $298,673 | $0[1] | $298,673 |
| 2011 | $313,607 | $4,511 | $309,096 |
| 2012 | $329,287 | $4,511 | $324,776 |
| 3-Year Total |  |  | $614,946 |
| 4-Year Total |  |  | $924,041 |
| 5-Year Total |  |  | $1,248,818 |

Note: But-For Surplus is equal to $258,005, the 2007 actual surplus, grown at 5 percent annually.

This model yields twelve possible damages amounts, ranging from just over $600,000 to north of $2 million, depending on the length of the damages period and the annual growth rate.

---

[1] The $4,511 appears to have been mistakenly included in 2009 instead of 2010.

At the end of his report, Morse sprinkles in some qualitative "analysis" which he contends supports the calculations described above.

This "methodology" is not sufficiently reliable to survive *Daubert* and its progeny.  To begin, Morse admits that it fails to satisfy several established factors:  The model has no known error rates, Morse has not published any papers on the topic, and there are no industry standards for the so-called "lost surplus" methodology to calculate lost profits for a non-profit entity.  *See* Morse Dep. at 56-59, 61-63; *Daubert*, 509 U.S. at 592-94.  *See also* Morse Dep. at 66-67 ("Q.  Now, my question is: In your methodology – we'll call it the Professor Morse Not-For-Profit Methodology – where does one find the rules for what you review and what you don't review?  A.  There are no rules.")

Moving to the specifics of Morse's model, numerous errors confirm its unreliability.

*First*, Morse admittedly offers no statistical analysis or estimate of the growth rate of NIAC's but-for surplus.  *See* Morse Dep. at 79-80; Morse Report at 2 ("I [do not] opine to a particular rate of growth that NIAC would have enjoyed, absent the events described in the Complaint.").  Rather, he uses completely arbitrary figures from 5 to 20 percent and provides no opinion on which is most appropriate.  He couches this approach as "conservative" because his growth rates are lower than the average annual growth rate of 55% from 2002-2007, despite simultaneously observing that high initial growth rates for start-up businesses are "not sustainable."  Morse Report at 3.  At his deposition, Morse elaborated: "I'm trying to be an Idiot Savant. . . .  I'm trying to help the trier of fact or a jury who might say, Well, I've listened to all of this testimony and [NIAC] would have grown at 5 or 10 or 15 or 20.  Those are reasonable growth rates for a jury to consider, and I've done the math."  Morse Dep. at 202-203.

That approach is mistaken.  Juries are not in the business of projecting company growth rates from scratch.  That is the domain of experts, who typically do so through statistical analysis rather than arbitrarily picking rates from five to twenty in increments of five.  Put differently, there is no foreseeable "evidence," apart from expert testimony, that would allow a jury to reasonably conclude that Morse's growth rates (or any other growth rates) yield an appropriate estimate of NIAC's surplus had the allegedly defamatory events not occurred.  Morse's use of arbitrary growth rates without ever opining on one, therefore, is unreliable.  *See also Joy*, 999 F.2d at 567-70 (excluding damages expert whose estimate of future earnings was based on "wholly speculative" assumptions).

*Second*, Morse "do[es] not opine on the exact number of years through which damages will persist."  Morse Report at 2; *see also* Morse Dep. at 79-80.  Indeed, he has no basis whatsoever to have chosen three through five years as the potentially relevant time frame.  He does not, for example, cite any research on the lasting effects of defamation against an organization or individuals.  Nor does he even attempt to grapple with the fact that in 2009, the second year of alleged damages, NIAC's "surplus" surged by *five thousand percent* over the prior year's amount, at least suggesting that any damages would be very short-lived.  Again, his methodology is pure guesswork and, as such, is unreliable.

*Third*, Morse's decisions to use 2007 as the baseline for his calculations and to start his damages period on January 1, 2008 are without any evidentiary support, biased, and unreliable.  At his deposition, Morse explained that he is "not a fan of partial-year analyses" and that he did not account for damages in 2007 in order to be conservative.  Morse Dep. at 74-75.  Not only is that sheer speculation, it is also wrong.  Indeed, consider just how *not* conservative that assumption likely is.  By using 2007 as the basis for but-for surplus estimates and 2008 as the

basis for actual surplus estimates, Morse allows himself to capitalize on 2007's unprecedentedly large surplus amount in calculating but-for surplus while only subtracting off 2008's miniscule surplus amount for all but one year going forward.  Moreover, by calculating but-for surplus based on the full-year 2007 figure, Morse implicitly assumes that all of 2007 surplus was unaffected by the allegedly defamatory conduct.  But Morse never contends (nor does he provide any basis for contending) that there is a lag time of nearly a year between allegedly defamatory conduct and the suffering of damages.  If, therefore, much of the 2007 surplus was realized *after* Daioleslam began publishing—a highly likely proposition given that the first publication was in January—it would drastically undercut a core assumption from Morse's model because the figure from which he extrapolates but-for surplus would include post-publication surplus and thus would be artificially high.  Morse's failure to confront this issue or to explain why his assumptions remain valid in the face of this critique adds to his unreliability.

*Fourth*, Morse's estimates of actual surplus for 2010 through 2012 are unreliably low. As the above chart demonstrates, Morse has assumed that actual surplus in those years will be $4,511, the amount of surplus in 2008.  Although actual surplus surged by over *fifty* times, to $230,061, in 2009, Morse's model assumes that it will drop back to the 2008 amount over the following three years.  That defies logic and blinks reality.

Asked about this at his deposition, Morse explained "I just don't know how to quantify [actuals] because I have opined . . . on a but-for basis.  I have not opined on the current situation . . . including the alleged tort."  Morse Dep. at 212.  But that is precisely what a proper damages analysis requires—a reliable expert opinion on *both* the but-for figures *and* the actual figures going forward.  *See, e.g.*, Robert E. Hall & Victoria A. Lazear, *Reference Guide on Estimation of Economic Losses in Damages Awards*, *in* Reference Manual on Scientific Evidence 277, 280-81,

300-305 (Federal Judicial Center ed., 2000) ("FJC Manual") (explaining that a standard damages study includes "projected earnings after trial, had the harmful event not occurred" less "projected earnings after the trial").  Although any damages analysis would obviously benefit from an update when actual results become available,[2] that is not a substitute for unrealistically presuming that actual results will be minimal until proven otherwise.  The proper course is to reasonably estimate actual figures alongside the estimates of but-for figures.  Morse's failure to do so—especially in the face of 2009's actual surplus—grossly inflates damages in Plaintiffs' favor and adds to the unreliability of his methodology.[3]

*Fifth*, Morse does not apply a discount rate in order to discount his future estimates to present-day values.  The need to account for the time-value of money, however, is Damages 101.  *See, e.g.*, FJC Manual at 280-81, 300-301 (explaining that "the essential features of a [damages] study [include] . . . the application of financial discounting to future losses").  Indeed, Morse himself alluded to this at his deposition when he explained that his consulting work in lost profits analysis "involves cash flows *and reduction to present value*."  Morse Dep. at 35-36 (emphasis added).  Yet his calculations here fail to discount the alleged damages to their present value.  This omission again inflates his estimates in Plaintiffs' favor and adds to Morse's unreliability.

*Sixth*, Morse's assumption that NIAC's but-for surplus can be generated by extrapolating from one isolated year is improper, overly simplistic, and based upon unrealistic assumptions.  Morse provides no support for the appropriateness of basing an entire damages model on projections from a single figure, and this, too, illustrates the unreliability of his methodology.

---

[2] Morse reserves the right to supplement his calculations when actual numbers become available and acknowledges that they will likely mitigate damages and could even mean that damages are $0 in a given year.  Morse Dep. at 210-12.  But Morse never suggests that he will also adjust his preposterous assumptions for 2011 and 2012 actual surplus even after 2010 results are reported, *id.* at 212-213, because that is not part of his methodology.
[3] It grossly inflates damages because, as the Table above shows, actual surplus is subtracted from but-for surplus to calculate damages.  As such, a smaller actual surplus estimate means that the damages estimate will be higher.

*See* Advisory Comm. Notes ("[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" is an appropriate consideration under Rule 702); *cf. Celebrity Cruises v. Essef Corp.*, 434 F. Supp. 2d 169, 183-86 (S.D.N.Y. 2006) (excluding expert's lost profit estimate because it was based solely on the company's profit projection).

At bottom, Morse's "methodology" is not a damages methodology at all; it simply carries out some basic arithmetic that could be done on any store-bought calculator.  *See* Morse Dep. at 202-203 ("I'm trying to be an Idiot Savant . . . [who has] done the math.").  He has begun with a wholly speculative starting point of 2007 "surplus," applied arbitrary annual growth rates over an arbitrary period of time, and totaled the results.  Yet even in such a simplistic model, he has made fundamental mistakes, all of which serve to benefit the Plaintiffs.  That is not indicative of a reliable methodology capable of withstanding *Daubert*, and his proposed testimony, therefore, should be excluded.

**B.     Morse Did Not Reliably Apply His "Methodology" to the Facts Of This Case**

In addition to being reliable in itself, a methodology must be applied reliably to the facts of the case.  Indeed, Morse acknowledged as much at his deposition.  *See* Morse Dep. at 64-65.  Despite that recognition, however, Morse fails to reliably apply his "methodology" to the facts here.

1.     Morse Fails to Account For Confounding Evidence

Morse's most fundamental error is that he makes no attempt to assess true damages by accounting for confounding evidence.  In fact, although his report states that he was assigned to "evaluate the lost revenue *due to the events described in the Complaint*," Morse Report at 2 (emphasis added), he then proceeds to do no such thing.  The complaint only alleges specific acts

of defamation *by Daioleslam*.  Morse, however, fails to isolate alleged damages by Daioleslam.  This is evident in at least two respects.

*First*, Morse ignores reasons why NIAC's revenues and donations decreased from 2007 to 2008—the start of the alleged damages period and the foundation for Morse's calculations—which have nothing to do with Daioleslam.  Several grants, for example, were returned or terminated for reasons entirely unrelated to the Defendant.  A $50,000 grant from the Eurasia Foundation, received in 2007, was returned in 2008 due to a conflict of interest.  That counts for a $100,000 swing across the two years which Morse's model wrongly attributes to the Defendant.  *See* Morse Dep. at 95-100; *see also*, *e.g.*, *id.* at Ex. 9 (Ex. C) at 2, 7.  Similarly, the National Endowment for Democracy provided roughly $200,000 in funding between 2006 and 2007 but subsequently terminated the funding due to Iranian government restrictions.  Again, Morse fails to account for the fact that the funding terminated for reasons unrelated to Daioleslam, as his model assumes.  Morse Dep. at 96, 101-102, 106-107; *see also*, *e.g.*, Ex. D.[4]

And that is not to mention the obvious reason why individuals would have stopped contributing to NIAC beginning in 2008—the prevailing macroeconomic conditions.  In his report, Morse shrugs off this concern by consulting two articles finding that overall charitable giving fell by only two percent nationwide in 2008.  That was apparently sufficient for him to conclude that the economic downturn did not affect his analysis, writing "[t]hus, I believe that my estimates stand."  Morse Report at 3.  At his deposition, however, Morse admitted that NIAC-specific documents would have been a more reliable source than countrywide reports about general charitable giving.  Morse Dep. at 183-84.  Such documents directly refute his

---

[4] The fact that Morse was unaware of these grant terminations is not surprising because he was not given any material by NIAC that would have allowed him to make such an assessment.  NIAC merely provided him with summary financial statements.  Morse Dep. at 85 ("Q.  Are you aware of the existence of and did you review any actual electronic financial data from QuickBooks which NIAC does keep so you can see the numbers behind those summary numbers?  A.  No.").

contention.  NIAC Board minutes, for example, indicate that the motivation for individuals

choosing not to donate or pay membership dues in late 2008 and early 2009 was

"overwhelmingly because of the economic downturn.  Many of our members have lost their

jobs."  *Id.* at Ex. 13 (Ex. E).  Notably, the motivation was not overwhelmingly, let alone entirely,

due to the Defendant, as Morse's model assumes.

        *Second*, in addition to his failure to consider other causes for the drop in revenues (and

thus surplus), Morse fails to account for the fact that Daioleslam was not the only person

speaking out against Parsi and NIAC.  Such evidence, however, was pervasive in the documents

that Morse claims to have received and reviewed.  Shown a document referring to a

Congressman calling NIAC a "Regime Sympathizer," for instance, Morse testified that his model

"assum[es] that Hassan Daioleslam was somehow behind [it]."  Morse Dep. at 115-17; Ex. F.[5]

Similarly, Morse responded to a document describing a "smear campaign" by Michael Goldfarb

and Jeffrey Goldberg but not mentioning Daioleslam by admitting, "I made no conclusions about

the relative contribution [to the alleged libel] of Goldfarb and Goldberg and Daioleslam."  *Id.* at

119-20; Ex. G.  Later asked "if there were . . . persons out there [other than Daioleslam] writing

similar things even before January 2007 when the defendant first wrote about NIAC, you've

made no effort to determine whether any of those other persons . . . were the basis of any of these

people's conclusions [reflecting negative views about NIAC and Parsi].  That wasn't your

mandate, was it?", Morse answered "[t]hat's correct."  *Id.* at 132.[6]  *See also id.* at 131 ("[I]t's not

my role to determine where th[e] roughness [for NIAC and Parsi] started."); *id.* at 178-79, Ex. 12

---

[5] The full quote is: "Q. Well, let's put it this way: If a United States congressman or senator calls you a Regime sympathizer, you would have to agree that that might have some impact on your reputation in this community, would it not?  A.  Yes.  Q. And for the purpose of your model, you're assuming that Hassan Daioleslam is somehow behind this?  A. Yes."  Morse Dep. at 116-17.

[6] Morse's only effort to determine what people other than Daioleslam were saying about NIAC and Parsi was to attend a three-hour event in Baltimore and ask a few questions about Trita Parsi.  When no one "pull[ed] back" at the mention of Parsi's name, Morse figured that there was no reason to inquire further.  Morse Dep. at 82-83.

(Ex. H) (reviewing a letter from a member of Parliament to a United States Congresswoman calling Parsi a well-known lobbyist for the Iranian Regime).

This blind-to-reality approach is improper and completely unreliable.  As the FJC Manual succinctly puts it: "If a damages analysis includes the effects not caused by the defendant, it is a defective analysis.  It has not followed the standard format for damages, which, by its nature, isolates the effects of the harmful act on the plaintiff."  FJC Manual at 307.  *See also* Advisory Comm. Notes (listing "[w]hether the expert has adequately accounted for obvious alternative explanations" as an appropriate consideration for whether to exclude expert testimony).  For these reasons, in *Robertson v. McCloskey*, the court excluded expert testimony because "when calculating the amount of plaintiff's damages, [the expert] simply *assumed* that plaintiff's future earning capacity had been damaged and that the alleged libels in this lawsuit caused that harm." 680 F. Supp. 414, 415 (D.D.C. 1988) (emphasis in original).  Morse's testimony suffers from the same flaw and should receive the same treatment—exclusion.

At his deposition, Morse failed to provide a persuasive response to these problems. Indeed, he readily admitted that he did not look into any confounding evidence.  *E.g.*, Morse Dep. at 76 ("I can't deal with the confounding issue."); *id.* at 77-78 ("Q. . . .  [A]s I understand it . . . , you have not in your model taken in account any adjustments for any confounding [factors] that might have . . . caused . . . the final annual surplus effect, other than attributing them all to Mr. Daioleslam, correct?  A. That's correct."); *id.* at 101 ("I'm not competent to understand whether the change in the policy or the funding and the project in Iran was related to defendant's actions.").  Morse even went so far as to state that that his methodology was not applied to the facts at all.  Presented with emails revealing that Daioleslam was not entirely responsible for all harm to NIAC and Parsi, Morse testified:

> [The emails would pertain to] some sort of application of facts or a search for facts. . . .  There's not the slightest connection [to my methodology].  [W]hat I've opined to in my table is, essentially, an extrapolation of pure numbers without attribution to Daioleslam or people who may copy him or people who may predate him. . . .  I'd rather not have my methodology, which is plain vanilla, confounded with these factual questions.

*Id.* at 154-56.  How those statements square with Morse's promise that "I have read the Complaint, and herein respond to the financial implications *of the facts and allegations* contained in it," Morse Report at 2, is unclear.[7]

The purported connection, it seems, comes from Morse's attempt to defend his failure to confront confounding evidence.  In particular, he referred to Hassan as "the opinion leader" who started "a cascade of events" that brought about all harm suffered by NIAC and Parsi.  Morse Dep. at 76-77, 131.  Morse intimated that by taking this view and ignoring all confounding evidence he was merely assuming that the factual allegations in the complaint were true.  *See, e.g.*, *id.* at 117 ("I was retained to give a financial analysis that would represent a view of damages if the issues described in the complaint were true.").

That is wrong.  The complaint never labels Hassan an "opinion leader" and never alleges that any and all harm flowing to NIAC after 2007 is due entirely to Hassan's allegedly defamatory conduct.  Nor is such a contention reasonably inferable from the allegations the complaint does make.  Nothing therein refers to him as a leader of any sort or as the genesis for all harm to befall NIAC and Parsi.  Indeed, such an allegation would not be even remotely supportable on the facts of this case.  Thus, Morse's claim that by ignoring confounding evidence he was just following the complaint merely ensures a pre-ordained conclusion.

In short, Morse does not reliably apply his methodology to the facts of this case by isolating only the harm caused by the Defendant.  This approach, again, inflates damages in

---

[7] Equally perplexing was Morse's statement that Parsi had directly instructed him, "Don't try to figure me out on your own and start reading about me all over the news."  Morse Dep. at 146.

Plaintiffs' favor.  Morse offers no good reason for proceeding in this manner, and his proposed

testimony, therefore, should be excluded as unreliable.

>2.    Morse Merely Did What He Was Told in Applying His Methodology to
>the Facts of this Case

Related to his failure to confront confounding evidence is Morse's admission that, in

forming *his* expert opinion, he blindly followed Plaintiffs' instructions.  By doing exactly as he

was told and never doing any research on his own, he was effectively reduced to a puppet

dressed as an economist.  This is evident from several aspects of his opinion, including:

- Mr. Parsi told Morse what to consider and what not to consider, and Morse never looked elsewhere.  *See, e.g.*, Morse Dep. at 81 ("In this case, I basically said, Tell me what I should read . . . ."); *id.* at 146 (reporting that Parsi told him "Don't try to figure me out on your own and start reading about me all over the news.").  For example, Morse interviewed individuals and reported that "in my professional opinion, . . . information [from the interviews] supports my TABLE A estimates."  Morse Report at 5.  Morse admitted, however, that his interviewees were hand-selected for him by Parsi, Morse Dep. at 171, and that there was "certainly . . . the possibility of bias," *id.* at 173. Likewise, Parsi withheld from Morse materials that plainly contradicted Plaintiffs' case and Morse's opinion.  *See, e.g.*, *id.* at 194-95 (testifying that he had not seen Exhibit 14) & Ex. 14 (Ex. I) (NIAC document reporting that a fundraising goal was exceeded by 360 percent); *id.* at 198-99 (testifying that he had not been given Exhibit 16) & Ex. 16 (Ex. J) (email from Parsi sharing "the reality that in spite of all the accusations and defamation spread by certain elements, NIAC has never raised as much money or attracted as many members as in the past few months").

- What is more, the information given to Morse by Plaintiffs was often inaccurate, but Morse did not question it.  Morse's report, for instance, contains two sentences about decreases in membership statistics and cites the NIAC's Board minutes.  Yet Morse never asked for or reviewed any of NIAC's Board minutes himself, Morse Dep. at 180-81, and the minutes make clear that what the Plaintiffs told him was both misleading and often false.  *See id.* at 180-94.  *See also* Ex. C at 2 (showing annual membership figures from 2005 to 2007 as rising to a peak of 1,680); *id.* at Ex. 11 (Ex. K) (showing that membership has continued to rise and stood at nearly 4,000 in December 2010).

- Morse never reviewed the Defendant's side of the story, never reviewed any depositions in this case, and never read any of the Defendant's articles.  Morse Dep. at 67-68, 75-76.

The upshot of this willful blindness is that by disregarding critical facts, Morse once again fails

to apply his methodology to the facts in a reliable way.

## II.     MORSE'S PROPOSED TESTIMONY WILL CONFUSE RATHER THAN ASSIST THE TRIER OF FACT

Fundamentally, in addition to being reliable, expert testimony must also assist the trier of fact.  Fed. R. Evid. 702.  *Daubert* instructs that this helpfulness requirement "goes primarily to relevance."  *Daubert*, 509 U.S. at 591.  To be relevant, expert testimony must "fit" the facts of the case, which "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id.* at 591-92.

Morse's proposed testimony will not assist the trier of fact.  Although this reality pervades the entirety of his opinion, it is perhaps most evident in his failure to opine on NIAC's growth rate but for the allegedly defamatory conduct or on the length of damages.  As explained above, Morse testified at his deposition that "I'm trying to help the trier of fact or a jury who might say, Well, I've listened to all of this testimony and they would have grown at 5 or 10 or 15 or 20.  Those are reasonable growth rates for a jury to consider, and I've done the math."  Morse Dep. at 202-203.

Not only is that statement methodologically wrong, *see supra*, it also incorrectly promises "to help the trier of fact."  Indeed, it is emphatically *not* helpful to present the jury with a slew of faulty and inflated potential damages numbers, tell them "I've done the math," and leave it up to them to decide the rest.  Although "doing the math" might be a proper subject for expert testimony in some instances, it is not so here because the math contains errors and there is no basis for the premises of the math.  And the potential risk to the Defendant is obvious: the jury will latch onto those figures because they have no other baseline and an expert with relevant academic credentials has presented them.  The risk of confusion and bias grossly outweighs the potential usefulness of the (flawed) calculations.

At his deposition, Morse provided yet another reason to find that his testimony would be unhelpful and confusing when he sought to rationalize his methodology by drawing an analogy to lead paint cases.  In a perplexing attempt to explain why he ignored evidence that Daioleslam was not responsible for all harm to befall Parsi and NIAC, he testified:

> I'll go back briefly to my analog with the lead paint cases. If there's an event and if liability is considered by the trier of fact and a suit is brought against paint manufacturers and landlords and lead paint inspectors, when I calculate damages that might flow from lead exposure to a child, I do not try to say a certain percentage was due to the paint manufacturer and a certain percentage was due to the landlord and a certain percentage was due to improper inspection, so I'm not really getting into this issue of whether joint and several liability is in play.

Morse Dep. at 144.  Pressed on his statement, Morse conceded that he was not suggesting joint and several liability applies to defamation cases.  The analogy was apt, he testified, because he was "just saying that [he is] not in the habit of parsing out liability."  *Id.* at 145.  Parsing out harm, however, is the *sine qua non* of a proper damages analysis.  *See* FJC Manual at 307. Morse's attempt to justify his opinion with this bizarre analogy further demonstrates that his proposed testimony risks confusing rather than helping the jury because he cannot even provide a cogent explanation for the (unreliable) methods that he used.  His testimony should be excluded.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant requests this Court to exclude the proposed testimony of Plaintiffs' expert witness Joel Morse.

|                           |                                                        |
|---------------------------|--------------------------------------------------------|
|                           | _____/s/_____      |
|                           | Timothy E. Kapshandy (Illinois Bar No. 6180926,         |
|                           | admitted *pro hac vice*)                                |
|                           | Bradford A. Berenson (D.C. Bar No. 441981)              |
|                           | HL Rogers (D.C. Bar No. 974462)                         |
|                           | Peter G. Jensen (D.C. Bar No. 982599)                   |
|                           | SIDLEY AUSTIN LLP                                       |
| Dated: March 25, 2011     | 1501 K Street, N.W.                                     |
|                           | Washington, D.C.  20005                                 |
|                           | (202) 736-8000                                          |
|                           | tkapshandy@sidley.com                                   |
|                           |                                                        |
|                           | Attorneys for Defendant                                 |
|                           | Seid Hassan Daioleslam                                  |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **TRITA PARSI** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 08 CV 00705 (JDB)** |
| | ) | |
| **DAIOLESLAM SEID HASSAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 25, 2011, I served, via email, Defendant's Motion to Exclude the

Testimony of Joel Morse to:

> Afshin Pishevar
> Adrian Nelson
> 600 East Jefferson Street
> Suite 316
> Rockville, Maryland 20852
> (301) 279-8773
> ap@pishevarlegal.com
> anelson@pishevarlegal.com

Dated: March 25, 2011

_____/s/_____
Timothy E. Kapshandy (Illinois Bar No. 6180926,
admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tkapshandy@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRITA PARSI | ) |
| | ) |
| and | ) |
| | ) |
| NATIONAL IRANIAN AMERICAN COUNCIL | ) |
| | |
| Plaintiffs, | ) |
| | ) |
| v. | )          Civil No. 08 CV 00705 (JDB) |
| | ) |
| DAIOLESLAM SEID HASSAN, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PROPOSED ORDER**

Upon consideration of Defendant Daioleslam's Motion, it is hereby:

ORDERED this _____ day of _____, 2011 that Defendant's motion to exclude the testimony of Joel Morse is GRANTED;

SO ORDERED.

_____

Judge John D. Bates
United States District Judge