Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3                          - - -

4

TRITA PARSI and NATIONAL       :

5

IRANIAN AMERICAN COUNCIL       :

6

              Plaintiffs       :

7

              V.               :    Civil No.:

8

DAIOLESLAM SEID HASSAN,        :    08 CV 00705 (JDB)

9

              Defendant        :    Page 1-217

10

11

                          - - -

12              Wednesday, December 8, 2010
                          - - -

13

14              Deposition of Joel N. Morse, Ph.D. was

15    taken at the Law Offices of Murphy & Shaffer, LLC, 36

16    South Charles Street, Suite 1400, Baltimore, Maryland

17    21201 commencing at 1:15 p.m. before Sherry L.

18    Brooks, Professional Court Reporter and Notary

19    Public, in and for the State of Maryland.

20

21                          * * *

22

EXHIBIT
B
ALL-STATE LEGAL®

Page 2

```
 1  APPEARANCES:
 2
 3  PISHEVAR & ASSOCIATES, PC
    BY:  A.P. PISHEVAR, ESQUIRE
 4  Jefferson Plaza, Suite 316
    600 East Jefferson Street
 5  Rockville, MD  20852
    (301) 279-8773
 6  (301) 279-7347 (Fax)
    Representing the Plaintiffs
 7
 8  SIDLEY AUSTIN, LLP
    BY:  TIMOTHY E. KAPSHANDY, ESQUIRE
 9     JOSHUA J. FOUGERE, ESQUIRE
    One South Dearborn
10  Chicago, IL  60603
    (312) 853-7643
11  (312) 835-7036 (Fax)
    E-mail:  Tkapshandy@sidley.com
12            Jfougere@sidley.com
    Representing the Defendant
13
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1              I N D E X
 2                - - -
 3
 4  Testimony of:  Joel N. Morse, Ph.D.          Page
 5
 6  By Mr. Kapshandy                     5
 7
 8  EXHIBITS   DESCRIPTION                      PAGE
 9   1   Subpoena and Joel N. Morse Report       7
10   2A  Collection of E-mails                   8
11   2B  Collection of E-mails                   8
12   3   Joel N. Morse Curriculum Vitae - 3/15/09  12
13   3A  Joel N. Morse, Updated Curriculum Vitae  14
14   3B  Joel N. Morse, Curriculum Vitae - UB Website 15
15   4   Joel N. Morse Testimony History         16
16   5   Letter Dated 5/9/10 to Patrick Parsa    19
17   5A  Table A-NIAC Financial Summary         107
18   6   Litigation Support Course               20
19   7   2002-2009 Surplus Diagram              107
20   8   E-mail Dated 9/12/10 to T. Kapshandy   160
21   9   NIAC Annual Board of Directors Mtg. Minutes 185
22   10  Minutes of NIAC Board Meeting - 2/22/08  188
```

Page 4

```
 1  EXHIBITS CONTINUED:
 2
 3  EXHIBITS   DESCRIPTION                     PAGE
 4   11  A Message from the President - 12/6/10   192
 5   12  Letter Dated 7/21/08 to Ros-Lehtinen    178
 6   13  NIAC Board of Directors Meeting Minutes  180
 7   14  Letter Dated 11/1/10 to Ramin Ahmadi    194
 8   15  Posting from NIAC's Website from Reza Aslan 194
 9   16  E-mail Dated 4/25/08 to Behzad Gohari    197
10
11
12
13  (Exhibits 1 through 2A and 2B retained by counsel.)
14  (Exhibits 3 through 16 attached to the deposition.)
15
16
17
18
19
20
21
22
```

Page 5

```
 1              P R O C E E D I N G S
 2               *   *   *   *   *
 3              JOEL N. MORSE, PH.D.
 4  was called for examination by counsel and, after
 5  having been duly sworn by the Notary, was examined
 6  and testified as follows:
 7        EXAMINATION BY COUNSEL FOR DEFENDANT
 8        BY MR. KAPSHANDY:
 9     Q.  Good afternoon, Professor Morse.
10     A.  Good afternoon.
11     Q.  May I refer to you as professor?  Is that
12  okay?  What's your preference?
13     A.  The first name is fine, Joel.
14     Q.  I prefer to keep it formal.  We've barely
15  met, but you can call me whatever you want.  That's
16  fine with me.
17        Just some preliminaries, and I understand
18  you've done this a lot before, but as you understand,
19  the reporter just swore you in.
20        And I'm going to be asking you some
21  questions about the report you did in this case and
22  the materials you provided, and, of course, all of
```

2 (Pages 2 to 5)

Page 6

1  that will be under oath, so it's important for you to
2  be accurate to make sure you understand the question.
3      Also, we need to be careful to make a good
4  record and not have the reporter here angry with us,
5  to not speak over each other, so I'll try and let you
6  finish and I'd ask that you do the same.
7      If at any time you have any questions, you
8  need to take a break, we'll be glad to accommodate
9  you, and other than that, I am ready to proceed.
10     Do you have any questions?
11     A.  No.
12     Q.  For the record, could you please state
13  your full name?
14     A.  Joel N. Morse.
15     MR. KAPSHANDY:  Now, what I'd like to do
16  preliminarily here is mark some of the stuff that
17  you've provided to us, and we'll get that into the
18  record and then we'll be able to refer to them by
19  exhibit numbers.  And I brought plenty of copies here
20  for everybody.
21     I think what I'll do, just for convenience
22  sake, is I'll mark what we'll call Exhibit 1, a

Page 7

1  collection -- it's a composite of materials that was
2  sent to us initially by Mr. Pishevar's office.
3      I'm going to mark some other materials
4  that came subsequently, and I don't know if this is
5  how you organized this or just how they organized
6  them, but so we're all on the same page, Exhibit 1 is
7  the subpoena that was sent to you, as well as your
8  report.
9      And it's got Tabs 1 through 5 which are a
10  collection of E-mails and tax returns and financial
11  information, and I'm going to hand that to you and
12  ask you to take a look at it.
13     And if there's anything inaccurate about
14  my description -- I know subsequently there were
15  other things that were produced, and we'll mark those
16  later, but just confirm, if you can, that that
17  appears to be the materials that were provided to us
18  in response to the subpoena.
19     (Exhibit Number 1 was marked for
20  identification and was retained by counsel.)
21     THE WITNESS:  Yes.
22     BY MR. KAPSHANDY:

Page 8

1      Q.  Alright.  Now, why don't you keep that
2  there in front of you, and then we'll refer to it by
3  the numbers.  I know you brought your own file.  I'm
4  going to ask you when we're done with all of this
5  just to make sure we've got everything to compare
6  them.
7      MR. KAPSHANDY:  Let me hand you what we'll
8  mark as Exhibits 2A and 2B, some more composite
9  exhibits, which are a collection of E-mails which are
10  tabbed with blue separating sheets from 1 to 168, and
11  they actually have a tab number, which may be a file
12  number that makes sense to you, called JM-0168.
13     (Exhibit Numbers 2A and 2B were marked for
14  identification and were retained by counsel.)
15     BY MR. KAPSHANDY:
16     Q.  The first one is JM-001, which I believe
17  corresponded to an electronic file from which these
18  were printed, but I'm going to ask you to take a look
19  at those and maybe you can enlighten us on my
20  description.
21     Those came a few weeks later from
22  plaintiff's counsel.  I understand it took you a

Page 9

1  little bit of time to kind of recollect those,
2  compile those.
3      A.  These do appear to be the E-mails I
4  transferred.  There were about 200 of them, and so I
5  can't confirm that every single one is here, but it
6  would be likely that it's a precise process.
7      Q.  And we'll go through some of those, and I
8  think actually you'll find that some are already part
9  of Exhibit 1.
10     They were sent to us kind of in part by
11  E-mail and that became a problem, and then they were
12  put on CD.  And I think plaintiff's counsel and I
13  have worked to eliminate duplicates and make sure we
14  got the complete set,
15     And I know you have your file here.  I
16  won't ask you necessarily to go through all of them,
17  but maybe it will become apparent that we're missing
18  some, and I'll certainly ask for those.
19     Let me ask this about Exhibits 2A and B,
20  though:  Are the tab numbers which, I believe,
21  corresponded to electronic file numbers as they were
22  produced to us something that you created?  Was that

3 (Pages 6 to 9)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 10

1   your indexing system?
2       A.   No.  I had no indexing system.
3       Q.   How is it that you produced these to the
4   plaintiff's counsel to send us?  You just sent them
5   in --
6       A.   I had received E-mails from NIAC in
7   particular from Trita Parsi.  I did a search on his
8   E-mail address and his name that yielded the full set
9   of E-mails.
10          I then laboriously opened up each one and
11  forwarded that to Patrick Parsa.  That's why it took
12  so long because I had no technology to transmit a
13  bunch at once, so it was one by one.
14      Q.   And then you E-mailed them one by one to
15  plaintiff's counsel?
16      A.   Yes.
17      Q.   Okay.  That helps.
18      A.   To make it even more confusing, I didn't
19  understand exactly how they were going to collect and
20  collate and transmit to you, so what I did for the
21  first few days was, every time I had a few minutes,
22  I'd send ten or 15, and then I'd go on with my other

Page 11

1   work and then the next day I'd send a few more.
2           And then Patrick Parsa called me and said:
3   "We're having trouble keeping track of all of this.
4   Can you do it more as a bunch?"  And so then I began
5   to send maybe 50 at once, until finally, it was all
6   done.  I never produced any CDs or any index numbers
7   myself.
8       Q.   Okay.  Well, that helps.  I understand you
9   brought some materials with you, and I take it you
10  didn't bring any of those E-mails?  Or did you print
11  some of them out and bring them with you?
12      A.   I only brought the ones that I actually
13  originally at the time of my report printed and
14  looked at carefully.  I did not bring the whole
15  repetitive series because, in fact, to me, that added
16  no value to my work, although it did help me
17  understand the context.
18      Q.   Do I understand from that that some of
19  these were sent to you after the report was prepared?
20      A.   No.  I think that they were all passed to
21  me prior to my report, but they looked to me as a
22  non-specialist in Persian.  They often looked alike.

Page 12

1       Q.   Well, we'll get into that specifically.
2   I'm trying generally to figure out if you had them
3   all when you wrote your report?
4       A.   I did.
5       Q.   Okay.  Let me mark a few more things, and
6   then we'll ask you if there's anything that we
7   missed.
8           MR. KAPSHANDY:  I'm going to hand you what
9   we'll mark as your Deposition Exhibit Number 3.
10          (Exhibit Number 3 was marked for
11  identification and was attached to the deposition.)
12          BY MR. KAPSHANDY:
13      Q.   It's a copy of your curriculum vitae,
14  which is dated March 15, 2009 that was produced to
15  us, I'm not sure by you or by plaintiff's counsel.
16  I'll first ask you to confirm that this is
17  a copy of your curriculum vitae?
18      A.   It is, and it's a bit dated.  And I have
19  with me -- this orange folder is not case-related.
20  Everything else here is -- the orange and the black
21  folder are not case-related.  Everything else is my
22  file for the case.

Page 13

1           I have with me one dated about a year and
2   a half later, if you'd like to see that.
3       Q.   I'd appreciate that, because, in fact, if
4   you turn further in Exhibit 3, most of it is dated
5   from 2008, so I think --
6       A.   Right.  I must not have updated the footer
7   on all the pages.
8       Q.   Can we get a copy?  And we'll even mark it
9   now and make copies.
10      A.   Sure.  Let me make sure the footer is
11  updated.  It's funny.  This has the same technical
12  problem.  The footer on the first page differs from
13  the footer on the latter pages, but it is -- but I
14  printed this within the last couple of days.  I just
15  didn't pay attention to the footers.
16          It wouldn't change except for perhaps a
17  couple of different committee assignments and one or
18  two publications, but certainly --
19      Q.   That's what I was going to ask you.
20          MR. KAPSHANDY:  Let me mark as Exhibit 3A
21  the updated CV that you just handed me, and we'll get
22  some copies.

4 (Pages 10 to 13)

1195219f-2dbf-4708-b7f6-a7b604561495

1
2          (Exhibit Number 3A was marked for
3   identification and was attached to the deposition.)
4          BY MR. KAPSHANDY:
5      Q.   Since the publications are in reverse
6   order, there's one from 2010 on Credit Derivatives;
7   another one from 2009 on Changes in Liquidity of
8   Closed-End Country Funds after the Introduction of
9   World Equity Benchmarks, which appear to be the new
10  publications.
11         Are those the ones you were referring to?
12     A.   Yes.
13     Q.   What are the committee appointments that
14  might be different from the one that we marked as
15  Exhibit 3?
16     A.   I'm Chairman of the Committee on Promotion
17  and Tenure.  I forget whether that was on the older
18  exhibit.  I was on what was called the Ad Hoc
19  Committee on Promotion and Tenure.
20         And those would be the only changes that I
21  can think of in the committee assignments.  My title
22  and role remain the same.  There may have been

1   updates in seminars attended or webinars attended or
2   conference presentations.
3      Q.   Well, we can compare that at our leisure.
4          MR. KAPSHANDY:  Let me hand you one other
5   variation of your curriculum vitae, which comes from,
6   I believe, the University of Baltimore website.
7          We'll mark as Exhibit 3B something that's
8   posted there and was pulled down in May of this year.
9          (Exhibit Number 3B was marked for
10  identification and was attached to the deposition.)
11         BY MR. KAPSHANDY:
12     Q.   It's a slightly different format.
13     A.   Yes.  The university -- we're in the
14  process of automatically updating this website via
15  technology called Digital Measures.
16         That's not in place yet, so whatever is up
17  in place on the university's website is not in any
18  way created by me.  It's created by some of our
19  clerks or secretaries, and it may or may not be
20  up-to-date or even accurate, but it's most likely not
21  up-to-date.
22     Q.   Right.  At least this is dated May of

1   2010.
2      A.   Well, the website download date is,
3   obviously, your work and true, but what I mean is, I
4   never look at this.
5      Q.   But you would agree that it comes from the
6   University of Baltimore's website?
7      A.   Yes.  They have a page for every faculty
8   member for students who want to look around and see
9   what we're like.
10     Q.   And this one has your picture, too, so
11  they can see what a nice guy you are, so that's
12  helpful.
13         We're also -- as you know, in federal
14  court, you're required to provide a list of cases
15  over the last several years.
16         MR. KAPSHANDY:  I'm going to hand what you
17  we'll mark as Exhibit 4.  I believe this is what was
18  produced to us by plaintiff's counsel from you in
19  response to the requirement, and it's kind of a
20  two-part list.
21         (Exhibit Number 4 was marked for
22  identification and was attached to the deposition.)

1          BY MR. KAPSHANDY:
2      Q.   I'd ask you to take a look at that and
3   confirm if we do have that correct.
4          MR. PISHEVAR:  There is a 3, a 3A, and a
5   3B?
6          MR. KAPSHANDY:  yes.
7          THE WITNESS:  Yes.  This is what I
8   provided.  I forgot what date I gave it to them
9   because there may have been a few testimonies since
10  then.
11         BY MR. KAPSHANDY:
12     Q.   Yes.  The report is dated May 9, and this
13  seems to cut off in May.
14     A.   Yes.  This is certainly up-to-date as of
15  transmission.
16     Q.   Yes.  Is there anything you can think of,
17  as you sit here today, that you've testified in since
18  May of this year?
19     A.   I know I testified for the defense in the
20  matter of Antonio -- he called himself Fugham (sic),
21  but we spell it F-U-L-G-H-A-M versus the Housing
22  Authority of Baltimore City, and I was retained by

Page 18

1    the Housing Authority of Baltimore City.
2         That was in the Circuit Court for
3    Baltimore City, and that was probably in October.
4    Q.    What type of case, personal injury?
5    A.    That was a lead paint case, lead exposure.
6    Q.    What was the injury claimed?
7    A.    The claim was reduced educational
8    attainment and sequelae of lead exposure perhaps
9    about 15 milligrams of lead per deciliter was the
10   point at which I did some analysis.
11        Have I answered sufficiently about that?
12   Q.    Was it a deposition or trial?
13   A.    Trial.
14   Q.    Was there a deposition also or just a
15   trial?
16   A.    There was not, I believe, a deposition.
17   Q.    And state court, I presume?
18   A.    Yes.
19   Q.    What other cases after that one since May?
20   A.    I can't remember any others.  There may
21   have been some over the summer one or two, but
22   without my own list in front of me, I'm not able to

Page 19

1    speak to that.
2    Q.    Have you actually updated the list?
3    A.    I have, yes.
4    Q.    Maybe what you could do is E-mail it to
5    counsel afterwards and get us an update copy, and we
6    won't make you play memory games.  That's fine with
7    us.
8    A.    I'll make a note to do that.  Now that I'm
9    writing this down, I'm going to put our start time.
10   Was it about 1:15 that we started?
11        MR. KAPSHANDY:  Let's go off the record.
12        (Discussion held off the record.)
13        MR. KAPSHANDY:  Let me hand you what we'll
14   mark as Exhibit 5, which is a copy of the report you
15   did in this case dated May 9, 2010, which is part of
16   the materials we've marked as Composite Exhibit 1,
17   but since we'll be referring to it a lot, we'll make
18   it a separate exhibit, if that's okay.
19        (Exhibit Number 5 was marked for
20   identification and was attached to the deposition.)
21        BY MR. KAPSHANDY:
22   Q.    And I'll ask you to confirm that that is

Page 20

1    the report that you did in this case for the Pishevar
2    Law Firm?
3    A.    Yes, it is.
4    Q.    Alright.  Why don't you just put that
5    aside?
6         MR. KAPSHANDY:  And we will mark as your
7    Deposition Exhibit 6 an article by you and another
8    person, Lawrie Gardner, which more accurately is a
9    course description and some materials related to a
10   course entitled, "A Litigation Support Course in the
11   Finance and Accounting Curriculum at the University
12   of Baltimore," which is one of the articles on your
13   curriculum vitae.
14        (Exhibit Number 6 was marked for
15   identification and was attached to the deposition.)
16        BY MR. KAPSHANDY:
17   Q.    And I'd first just simply ask you to
18   confirm that this document, Exhibit 6, is a
19   publication of yours, however you want to describe
20   it?
21   A.    Yes, it is.
22   Q.    And is my description fairly accurate?

Page 21

1    A.    Yes.
2    Q.    And if we can put that aside.  I may have
3    some questions on that later.
4    A.    There was a second article attached in
5    that staple.
6    Q.    How does that work?  Is that part of the
7    course materials or is that a separate article?
8    A.    The top article -- maybe I didn't pay
9    perfect attention to your description, so let me say
10   it again my way.
11        This was an article published in, I think,
12   FMA Online, and FMA is the acronym for Financial
13   Management Association, which is a national
14   association.  This was an article published.  Its
15   subject was a course in litigation support.  This was
16   not actually part of any course materials.
17        And the second piece stapled here, again,
18   has nothing to do with any course.  It's about a
19   rather exciting and sophisticated business
20   intelligence software application called Hyperion
21   Strategic Finance.
22   Q.    Yes.  I see those perhaps were

6 (Pages 18 to 21)

Page 22

1  inappropriately stapled and then there's yet a third
2  document that is probably not related to either of
3  the first two.
4      A.   Right.  That third document is not for me.
5  That's from Oracle.com.  One of your people must have
6  looked up Hyperion Strategic Finance and attached it.
7      Q.   Let's do this if everyone is in agreement.
8  Let's pull off that article that's written by you and
9  mark Exhibit 6 as simply the course materials.  Is
10 that okay with you?
11     A.   It's not course materials.
12     Q.   How do you want to describe it?
13     A.   It's an article in FMA Online.  It happens
14 to describe the course, but it's not -- it was not
15 handed out in the course.
16     Q.   I got you, because it looks like it was
17 typed up and maybe even printed from a PDF.  It's not
18 like an HTML or computer font that you typically find
19 online, but you say it comes from something online?
20     A.   Well, it's an article I submitted to a
21 publication called FMA Online.  That's its formal
22 title, because the Financial Management Association

Page 23

1  has three or four publication outlets.
2          One is a printed journal in traditional
3  format.  This is one that's not printed.  It's
4  online, but I submit to them and they were the ones
5  that repackaged it and formatted it and did whatever
6  they did in terms of font choice.
7      Q.   Well, let me ask you this:  Is this
8  related to a course that you actually taught?
9      A.   Yes, it is.  I did teach that course.
10     Q.   A brick and mortar or an online course?
11     A.   This was a brick and mortar course.  We
12 call it Onground.
13     Q.   And if I understand the title, it relates
14 to litigation support, including, in particular,
15 testimony and personal injury cases, correct?
16     A.   That was the bulk of it, but it was not
17 restricted to personal injury.  We did have a
18 business valuation case in there and we had a
19 discussion of lost profits cases which are similar to
20 the instant litigation.
21     Q.   What materials were used for the course?
22 Will we find them all in the references section of

Page 24

1  this document?
2      A.   I forget.  Let's see.  no.
3      A.   No.  The reference list had nothing to do
4  with the set of course materials because the
5  reference list serves to place what I wrote with
6  Lawrie Gardner, who is a professor at Anne Arundel
7  Community College, and she was in the course -- she
8  took the course.
9          The reference list is merely to cite or
10 set the article I created in the literature, so it's
11 a typical reference list as you'd see, say, in a law
12 journal.
13         The course materials were a book and
14 handouts, and I think we may have had a speaker or
15 two from the law community and a lot of lecturing by
16 me just from my head.
17     Q.   When was the course?
18     A.   I've taught it quite a few times.  The
19 last time I've taught it was probably in the fall of
20 '08.  I've sort of backed away from teaching it
21 because I'm one of the few people that has what's
22 called AQ, academic qualification, to allow me to

Page 25

1  teach at the graduate level in our MBA program in
2  financial economics.
3          And I'm needed there, so I haven't really
4  been released back into this course lately.
5      Q.   In particular, obviously, we're interested
6  in the materials here related to lost profits, as
7  you've just described.
8          Do you have course materials or can you
9  tell us what references you used for the teaching of
10 the lost profits section of the course?
11     A.   In this semester, I used the book that's
12 cited on the bottom of page 3.  That book was called,
13 "Computing Economic Loss in Cases of Wrongful Death,"
14 by King and Smith.  That's the only textbook I
15 assigned.
16         Page 4 of this article refers to the
17 business valuation project.
18         Now, when you value a business, you
19 forecast profits.  That's the basis on which you
20 create the present value that the business
21 represents, and I used the case of a company in the
22 food industry in New York City.

7 (Pages 22 to 25)

1195219f-2dbf-4708-b7f6-a7b604561495

1        I think they had a very specialized
2   product that they imported cocoa or something like
3   that.  It was a redacted copy of material I actually
4   used when I consulted for a rather prominent firm up
5   in New York, Gair, Gair, Conason and something or
6   other back perhaps six or seven years ago.
7        It was a case I worked on, and I redacted
8   all the names and I used that as a chance for the
9   students to look at profits in a set of financial
10  statements which were very incomplete and messy, just
11  like real like -- well, in this case it wasn't
12  incomplete and messy.
13       In that case, it was typical that you
14  didn't have everything that you needed, and I asked
15  them to deal with that unstructured task of
16  forecasting a profit stream and creating from that a
17  profit stream, a dignified estimate of the value of
18  that company and how that value had been damaged or
19  lessened by a tortious event, so there was no
20  textbook.  It was just my own files.
21       Q.   Was it a tortious event or was it an
22  assumed hypothetical tortious event?

1        A.   No.  It was actually a real case.  The
2   tortious event was either an auto accident or medical
3   malpractice where the principal's ability to conduct
4   the business changed radically, and I worked on --
5   there was no salary in that case.
6        The claim was that the business had
7   changed in value, and that's what I worked on and it
8   was a lost profits case brought forth through the
9   window of a change in the value of the owned asset.
10       Q.   In particular, the physical impairment of
11  the principal was what impacted the profits or the
12  revenue stream?
13       A.   Yes.
14       Q.   Do you have those materials that you used
15  for the course?  Was there anything written or handed
16  out?
17       A.   Well, I certainly don't have them with me.
18  It's possible I have them in my university office.
19       Q.   If you do, could we put that on the list
20  with the updated case list?  If you could send that,
21  I'd appreciate that.
22       A.   Sure.  Now, I have to say I'm not sure --

1   university offices are small if you're in a state
2   institution, so I may have thrown it away, but I'll
3   certainly give it the old college try.
4        Q.   Well, while we're on the resume and the
5   curriculum vitae, there's a lot of fairly
6   sophisticated economic articles on here.
7        Other than the one we've marked as Exhibit
8   6, are there any on here that you can point to that
9   relate to the calculation of lost profits from some
10  sort of event or tortious event to a particular
11  business?
12       A.   Well, there's one that I think took that
13  category.  So what I still have in front of me is the
14  second article.
15       Q.   Okay.  I don't need to mark the second
16  article, unless that's one you're going to refer to
17  in response to my question, Beyond Spreadsheets and
18  Silos, Enriching Financial Planning?
19       A.   Right, so the question is, did I refer to
20  that in the course of --
21       Q.   No.  I had asked you are there other
22  articles besides Exhibit 6?

1        A.   No.  I'm not going to refer to this one in
2   answering your question.  I'm going to look in my own
3   CV to get the title.  The second page -- well, your
4   copy that you marked actually misses page 2, so maybe
5   you're all missing page 2.  We should refer to my new
6   copy.
7        Q.   We marked that as Exhibit 3A, I believe.
8        A.   That has a page 2.
9        Q.   Well, I'll let you see if you can find it.
10       A.   So you're missing on the one you have all
11  the -- my job history, so on the new exhibit --
12       Q.   Which is Exhibit 3A?
13       A.   Page 3, the fourth one down is called
14  Valuing Private Equity-The Case of Huntsman Chemical,
15  H-U-N-T-S-M-A-N.  The journal is underlined.  The
16  journal is called, Academy of Taiwan Business
17  Management Review, Volume 3, Number 2, August 2007.
18       That article is about valuing non-traded
19  equity.  By non-traded equity, I mean a corporation
20  which is not publicly listed, whose shares are not
21  publicly listed.
22       That's work I often do in a forensic

8 (Pages 26 to 29)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 30

1    context.  As a matter of fact, I just recently
2    completed the valuation of the Legacy Hotel, a rather
3    lush facility in Rockville, Maryland, and that's in
4    front of the United States District Bankruptcy Court
5    in Greenbelt, and my report was submitted.
6         But anyway, again, I link very tightly
7    lost profits and business valuation changes because
8    they're part and parcel of the same discussion.
9    Q.    In that article on page 3 of your CV, was
10   there some sort of intervention or tort or something
11   that impacted the profits or were you simply, as I
12   understand it, evaluating a nonpublicly-traded
13   company?
14   A.    I was simply doing the latter, evaluating
15   a nonpublicly-traded company, and the context was a
16   merger and acquisition history.  There actually was
17   some buying and selling of Huntsman Chemical over the
18   years.
19   Q.    And that's not anything that one does with
20   a not-for-profit?  By definition, people don't buy
21   and sell those, right?
22   A.    There are mergers and acquisitions in the

Page 31

1    nonprofit area.  I guess buy and sell may not be the
2    correct term, but sometimes organizations do cease to
3    function independently and join together or the
4    reverse.  There can be a spinoff.
5    Q.    Can they actually merge because they don't
6    have shareholders or simply they get dissolved and
7    the assets are bought by another entity?
8    A.    It could be all of those things, but
9    you're correct certainly, Mr. Kapshandy.  There are
10   no shares in such ventures.
11        But another example that springs to mind
12   in this discussion is a case I worked on in
13   approximately the time frame that I worked on this
14   case that brings us here together.
15        This was a case of the Shriners in
16   Virginia, and it was a case of lost revenue and
17   surplus and accumulation due to a libelist or an
18   alleged libelist sort of event.
19        And that's where I began to see that the
20   Shriners had various temples, and they all shared
21   sometimes the same back office, but then they had
22   corporate forms, nonprofit corporate forms.

Page 32

1         From time to time, different units of the
2    Shriners seemed to grow upward or downward, and
3    that's what I had in mind when I made my statements.
4    Q.    Well, there's several things here.  I was
5    asking you about how the for-profit company that
6    wasn't subject to any sort of tortious interference
7    or event compared to evaluating a not-for-profit.
8         And you have now mentioned another case
9    involving the Shriners in Virginia?
10   A.    Yes.
11   Q.    Was that a case involved in litigation?
12   A.    Yes.
13   Q.    Because you mentioned it was somehow
14   impacted by a libelist event?
15   A.    Yes.
16   Q.    And is that case still pending?
17   A.    You know, I submitted a report and then I
18   fielded several heated calls, you know, where
19   everybody had settlement conferences and they were
20   all asking me questions by phone.  I have not been
21   told whether it's still an open matter.  In fact,
22   cases often settle and I'm not told for years.

Page 33

1    Q.    Who retained you in that case?
2    A.    That was a law firm in Washington, DC
3    called Baker and Simmons.
4    Q.    On behalf of whom?  Which party?
5    A.    I was on behalf of the plaintiff.
6    Q.    And who was the plaintiff?
7    A.    It was one of the units of the Shriners.
8    They have these very exotic names in the claim.  I
9    wasn't able to memorize it, you know, the 13th Temple
10   -- it's too complicated to memorize the formal name.
11   I called them the Shriners.
12   Q.    Who was the defendant?
13   A.    The defendant was another Shriner who had
14   made statements and conducted policies that impacted
15   the revenue of the nonprofit part of the Shriners
16   that retained me.
17   Q.    Where was that case filed?  Do you know?
18   A.    In Richmond, Virginia, so it was whatever
19   they called -- it wasn't the Court of Appeals, but
20   whatever the highest state court was.
21   Q.    Did you give testimony in that case?
22   A.    So far, I have not.

9 (Pages 30 to 33)

Page 34

1    Q.    Do you know who the defendant's lawyer
2    was?
3    A.    I don't remember.  It might be on
4    something I have in my office.  Should I put that on
5    the list to look up?
6    Q.    Sure, if you can.
7         Do you know the actual names of the
8    parties in the case?  I know they're all Shriners to
9    you, but how did you -- were they named in the case
10   to kind of keep them separate?
11   A.    The party that retained me was a
12   Virginia-based Shriners organization that had three
13   or four or five temples, as they called them, under
14   its purview.
15        The defendant was somebody higher up in
16   the Shriner chain who represented another
17   organization but who was sued both personally and as
18   an official of the broader, I think, national Shriner
19   organization.  That's all I can say from memory.
20        And believe me, if you saw the case
21   caption, you wouldn't know much more.
22   Q.    Were they separate incorporated entities?

Page 35

1    A.    Yes.
2    Q.    And they were not-for-profits, I take it?
3    A.    That's correct.
4    Q.    Other than the articles you've mentioned
5    or that particular case, are there any other cases,
6    articles, relating to the calculation of lost surplus
7    in a not-for-profit and also lost profit in the case
8    of a for-profit?
9    A.    Well, all my work whether it's in the
10   classroom or on the internet where I do a lot of
11   teaching or in my economic research or in my forensic
12   and consulting work -- and consulting is also
13   non-forensic -- what I do is I forecast future cash
14   flows and I assess the proper present value using an
15   input from myself, which is the discount rate, which
16   is risk adjusted.
17        So in this list of articles, typically
18   faculty research at an AACSB accredited business
19   school has to be cutting edge.  It can't be on the
20   topics that are essentially solved problems.
21        The work I do in consulting is not cutting
22   edge in the sense of academic research, so everything

Page 36

1    I do involves cash flows and reduction to present
2    value, but there are no articles on a topic like this
3    because it simply wouldn't be published, nor would it
4    get me any credit as a professor.
5         That completes my answer with respect to
6    publications on the CV Exhibit 3A.  I'll now turn
7    toward what I think was the second part of your
8    question, which was other cases.
9    Q.    Right.
10   A.    The one that stands out was clearly a lost
11   profits case.  That case -- I think it is on the
12   exhibit.  It was Mervis Diamonds or Mervis Diamond
13   Corporation versus CHC, Inc. or it may have been
14   Congressional Hotel Corporation, Inc.
15        That case was tried.  I did testify for a
16   couple days in front of Judge Robert Rubin,
17   R-U-B-I-N, up in Montgomery County Circuit Court.
18        And we won that case, and the judge said
19   on the record -- and this is unusual -- that Dr.
20   Morse was the most cogent witness on lost profits and
21   financial affairs that I've ever seen in my whole
22   career.

Page 37

1         So to me, that's a signature course, and
2    it was about lost profits and the lost profits
3    amounted to about $4 million.
4    Q.    Have you heard about or read the Court of
5    Appeals' decision in that case?
6    A.    I'm trying to think.  I know I've heard
7    something about it.  I believe it was affirmed -- the
8    first case was sent for a second trial.  I was in the
9    second trial, not the first.
10        In the second trial, that judgment must
11   have been affirmed if it was appealed because that
12   party is now in bankruptcy proceedings against CHC or
13   Congressional, which is Ronnie Cohen's company, and
14   that's the context in bankruptcy where I valued the
15   Legacy Hotel and forecasted its profits and took a
16   present value and all that sort of stuff.
17        So it must have been upheld in the sense
18   that they're now working on discharging the
19   bankruptcy of CHC.
20   Q.    You testified in the second trial or the
21   first trial?
22   A.    I testified in the second Mervis Diamond

10 (Pages 34 to 37)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 38

1  trial against CHC.  I was not involved in the first
2  trial.
3    Q.   Okay.  And now I interrupted.  Were there
4  other cases you wanted to mention?  And that was lost
5  profits in a for-profit situation, not a
6  not-for-profit?
7    A.   Yes, sir.  I consulted but didn't testify
8  in a case -- I was on the defense -- for a case where
9  there were allegations of lost profits in a dental
10  practice somewhere in the Rockville, Maryland area.
11  And the case name was -- had the word, Hekemian in
12  it, H-E-K-E-M-I-A-N, and one of the parties was
13  McKane, M-C-K-A-N-E.
14       I guess I had a case in Washington, DC for
15  a law firm called -- it might be on -- may I refer to
16  my testimony list?
17       Yes.  The case was a lost profits case,
18  Sumner, S-U-M-N-E-R, versus the Washington Convention
19  Center, Superior Court of the District of Columbia.
20    Q.   Is that on your list you're referring to?
21    A.   Yes, it is.  That was a lost profits case.
22    Q.   And that involved actual testimony?

Page 39

1    A.   Yes.
2    Q.   Where is it?  I'm not seeing it on the
3  list.
4    A.   The second up from the bottom.
5    Q.   I see it now.  Thank you very much.  And
6  what about Hekemian?  Did that result in testimony?
7    A.   No, it didn't.  That settled.
8    Q.   Okay.  Any others?  I mean, Sumner says
9  lost profits, so we can figure that out, but I see --
10  and Mervis you mentioned.
11    A.   The one called Scheffenacker, which I
12  think is on here -- it says summer of 2008.  It's
13  around the middle of the page you're looking at.
14    Q.   Right.  It says medical mal?
15    A.   It was a commercial case.  Medical
16  malpractice was what brought the case to court.  My
17  work was -- gosh, I must have reviewed 500 pages of
18  files.
19       My work had to do with an analysis -- I
20  was on the defense for that, and my work had to do
21  with lost profits of a sophisticated real and large
22  real estate operation.

Page 40

1       And I was retained by the Wharton, Levin,
2  Ehrmantraut firm in Annapolis, and I guess I was also
3  retained by Baxter, Baker, Sidle & Conn here in
4  Baltimore.
5    Q.   Can you say that again?  You were retained
6  by the defendant and they were represented by whom?
7    A.   The first law firm involved was Baxter,
8  Baker, Sidle, S-I-D-L-E, and Conn, C-O-N-N.
9       After a year or two, that litigation -- or
10  that case was sent over to a different law firm in
11  Annapolis:  Wharton, W-H-A-R-T-O-N, Levin, L-E-V-I-N,
12  Ehrmantraut, E-H-R-M-A-N-T-R-A-U-T.
13    Q.   And you did a report in that case?
14    A.   Yes, I did.
15    Q.   And you testified?
16    A.   And I testified.  I think that was in a
17  hearing, rather than a trial, but there was former
18  testimony.  Am I still -- I'm still answering what
19  litigation has to do with either valuation or lost
20  profits?
21    Q.   Well, lost profits or lost surplus, as you
22  call it, in a not-for-profit.  I think we covered all

Page 41

1  of the latters (sic) who are on lost profit cases.
2    A.   Well, I don't know where this one would
3  fit.  I'm currently working on a case in the -- I
4  think it's the U.S. District Court for the District
5  of Columbia where I'm valuing -- well, I'm working on
6  the profitability of a medical practice that was a
7  rather prominent one that was Al Gore's pediatrician,
8  and they called themselves the Pediatricians of the
9  Democratic Party.
10    Q.   I'm confused.  Does Al Gore still see a
11  pediatrician?
12    A.   No, his children, and when he was younger,
13  he went.
14    Q.   I got you.
15    A.   I'm evaluating the partnership profits to
16  assess what the buyout value should be for one of the
17  partners who was killed, and that buyout value has to
18  do with the estate and their claim, but again, it's a
19  -- what I work on is profits.
20       I have not testified on that one.  I
21  suspect I will be deposed in the next couple of
22  weeks.

11 (Pages 38 to 41)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 42

1    Q.   Have you done a report in that case?
2    A.   I have a draft of a report.  I haven't
3  submitted it yet.  I probably will in a few days.
4       I'm also working in New York for Gair,
5  Gair, Conason -- those names I spelled before -- on a
6  huge case that involves the analysis of a
7  profitability of a hedge fund, a very big hedge fund,
8  or sometimes it would be called a fund of funds.
9       The business that I'm analyzing is
10 actually in Dallas, Texas, and I went out in
11 September and I met with the principals.
12      And I'm analyzing the lost profits due to
13 the death of their rainmaker and their lead partner,
14 whose name was Tommy Taylor, but that -- I have not
15 created a report in that one yet, and there's nothing
16 that's in the public record yet.  That's all I can
17 think of.
18   Q.   What about Tri-County Industries versus
19 the District of Columbia?  That was one that I saw
20 listed somewhere.
21   A.   What year was that one, '05 or something?
22   Q.   Yes, around 2000.  It's maybe before this,

Page 43

1  but I've seen it reported.
2    A.   Okay.  Yes.  I remember.  That was a case
3  -- that was about a $10 million case.  The City of
4  Washington granted and then withdrew a permit for
5  soil remediation.  Soil remediation is when there's
6  gasoline spill or leakage, and the soil is
7  contaminated and there are ways of getting it back
8  into a more healthy format.
9       One of the ways involves just digging it
10 out and replacing it, and another way uses bacteria,
11 but I did a complete analysis of the business affairs
12 of the company that was going to have built some
13 large commercial facility on that location.
14      That's all I can remember about that case.
15 I mean, I worked for Tri-County, but I don't quite
16 remember the exact kind of factory or --
17      MR. KAPSHANDY:  Hang on a second.  Let's
18 go off the record.
19      (A break was taken.)
20      BY MR. KAPSHANDY:
21   Q.   Please go ahead and continue.
22   A.   Well, I think I finished, unless you want

Page 44

1  to press me a little bit more about Tri-County.  I
2  remember a few more details, but not exactly.  It was
3  about ten years ago.  Do you want a few more details?
4    Q.   Well, I was going to ask you:  Are you
5  aware that that opinion -- the District Court's trial
6  opinion was reversed as to inappropriately admitting
7  your damages calculations in --
8    A.   No.  I didn't know that.
9    Q.   And I was going to ask you the same thing
10 about Mervis Diamond.  Were you aware that after you
11 testified that the trial court's decision, which was
12 somewhat complimentary of you, as you pointed out,
13 was reversed in part and in particular because the
14 damages calculation used incorrect dates for
15 calculating the lost profits?
16      Is that news to you?
17   A.   That's news to me.
18   Q.   You might want to revisit your curriculum
19 vitae and look at it.
20   A.   But why, then, would it be in bankruptcy
21 court now?  Mervis is collecting -- or attempting to
22 collect $4 million.  How could that be if the damage

Page 45

1  calculation --
2    Q.   First of all, I was just asking if you
3  were aware of it?
4    A.   No, I'm not.
5    Q.   And secondly, I believe, if I stated it
6  accurately, that it reversed in part, i.e., the part
7  where the lost profits was calculated.
8       There were other claims for attorney's
9  fees and things like that that I believe may have
10 been the result of the subsequent proceedings that
11 you're referring to.  It's fairly complicated.
12      But my question is whether you heard the
13 outcome of the decision to admit the damages
14 calculation?  And that's news to you.
15   A.   No, I did not, because, as I say, I've
16 been hired to collect the damages.  I assume that
17 they went forward and were not reversed.
18   Q.   Let me ask you this while we're at it -- I
19 know you've brought your own file here today, and
20 without asking you to go through page by page, we've
21 marked what we believe is everything that you've
22 produced relating to this case we're here to talk

12 (Pages 42 to 45)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 46

1   about today.
2         Is there anything else that you have in
3   your file that's been sent to you that you're relying
4   upon that we haven't yet marked and made a part of
5   this record?
6      A.   No.  I have not been sent anything by the
7   lawyers since I rendered my report.  I have not
8   looked into any new articles or cases since rendering
9   my report.
10     Q.   I don't know if you want to look at your
11  file, if you can tell from what we've marked here
12  already.  Does it appear that we have everything or
13  is there anything that you've brought with you here
14  today as part of your file that has not yet been
15  provided or produced to us?
16     A.   I believe what happened is I FedExed to
17  the Pishevar Firm everything I had, and they copied
18  to you -- or maybe I sent it to Kinko's myself or
19  maybe I xeroxed it myself -- I don't know -- but
20  whatever I have, you have.
21        I have not added -- I've not gone through
22  every page of what you've got in the middle of the

Page 47

1   table.
2      Q.   Maybe what we could do at a break, if you
3   don't mind, if I could thumb through what you've
4   brought, I can probably tell pretty quickly and --
5      A.   Yes.
6      Q.   Also, while I'm at it, with regard to the
7   Shriners case, which is currently in litigation, is
8   that report confidential or is that something you can
9   provide or not?
10     A.   I couldn't provide it unless you got
11  permission from Baker and Simmons.
12     Q.   And you've not testified there --
13     A.   That's correct.
14     Q.   -- and you're not sure if you will?
15     A.   I don't know where the case stands.
16     Q.   Okay.  Let's talk now specifically about
17  how you got involved here in this case, the case of
18  NIAC versus Daioleslam?
19     A.   There was one other case that involved
20  profits.
21     Q.   Yes.  Please complete, by all means.
22     A.   It's a large case against Exxon.  It

Page 48

1   involves a gasoline spill.  I have been deposed.  The
2   case is Garliss, G-A-R-L-I-S-S, versus Exxon.  And
3   I'm retained by Peter Angelos and I've analyzed the
4   business affairs and lost profits of a company called
5   High Point Home Builders.  I probably will testify in
6   February.
7      Q.   And what was the nature of the
8   interference?  You say it was a spill?
9      A.   Yes.
10     Q.   And who's representing the defendant?
11     A.   I think it's -- it was Venable and there's
12  been some switching of law firms, but I don't know
13  whether Venable is still on it or -- there's
14  co-counsel from all over the country on this case and
15  it's a huge case.
16     Q.   What's the nature of the claim --
17  dollarwise, how big? -- for High Point?
18     A.   Well, the High Point lost profits are in
19  the range -- am I allowed to say this?  I'm not sure
20  I'm allowed to answer a question like that without
21  permission from the attorneys.
22     Q.   You've done a report in the case?

Page 49

1      A.   I've done a report, yes.
2      Q.   Do you know if it's been produced in the
3   case?
4      A.   It's been produced to counterparty.
5      Q.   Just in order of magnitude I'm getting at.
6   Is it $100,000 or $100 million?
7         MR. PISHEVAR:  If it's subject to a
8   confidentiality -- I think that's what he's referring
9   to --
10        THE WITNESS:  I don't want to answer that.
11        BY MR. KAPSHANDY:
12     Q.   That's fair.  What court is it pending in,
13  if you know, Professor?
14     A.   It's pending in the Circuit Court for
15  Baltimore County, I believe.
16     Q.   That makes sense.
17     A.   I guess it's part of 20 or 30 suits, and
18  that's why the whole thing is a very large case.
19     Q.   There's more than one plaintiff?
20     A.   There are a bunch of suits being conducted
21  simultaneously.  I don't think they're a class
22  action.

13 (Pages 46 to 49)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 50

1    Q.   You're only involved for High Point Home
2  Builders?
3    A.   Correct.
4    Q.   Alright.  Does that complete the list of
5  lost profits cases?
6    A.   That's all I can think of.  In general,
7  that's sort of something as a business professor that
8  I'm considered qualified to do, and the word gets
9  around, but I can't remember all the, you know,
10  different cases.
11        I've done quite a few business valuations,
12  which, as I say, always involved profits or the
13  calculation of profits.
14    Q.   Other than the Tri-County and the Mervis
15  Diamond case, are you aware of other courts that have
16  excluded your profits -- lost profits models or
17  calculations?
18    A.   Well, even those are news to me today.
19  I'm not aware of anything.  No one has ever
20  complained about my work by calling me and saying it
21  wasn't acceptable.
22    Q.   I'm sure the Court of Appeals doesn't call

Page 51

1  you up.  They talk to the lower court judge.
2    A.   No attorney has called me up and made me
3  aware of anything.
4    Q.   Let's talk about how you got involved in
5  this case here, the NIAC versus Daioleslam.  Can
6  you first of all, tell us how that came about?
7    A.   A member of Mr. Pishevar's firm called me.
8  I think it might have been Patrick Parsa, and how
9  they got my name actually isn't completely clear, but
10  it was word-of-mouth.  It certain wasn't because of
11  any advertising or anything.
12        I suspect that some law firm in Washington
13  said I would be good at this kind of work.  It may
14  have been another expert such as Tom Borzillery or
15  Richard Edelman who referred me.  It might have been
16  Chris Rosenthal at Ellin & Tucker who referred me.
17        It might have been one of the professors
18  at Hopkins.  I don't know.
19    Q.   Well, in any event, they asked you to, I
20  take it, evaluate a possible claim for damages by the
21  plaintiff, correct?
22    A.   Yes.

Page 52

1    Q.   And when was that -- do you recall? -- if
2  you can tell from your reports or anything, knowing
3  that your report was dated May 9, 2010?
4    A.   I don't know.  I know that there was a
5  meeting in March, so it was, obviously, before March,
6  so I suspect that my first contact was in late 2009
7  or early 2010, but I don't remember.
8    Q.   And do you have a written fee agreement
9  with them?  How does that work?  Is it verbal?
10    A.   I have -- I don't know where it is in here
11  -- a fixed fee arrangement and there was a letter
12  describing that somewhere.
13    Q.   Actually, you mention in your report that
14  your fee assignment is $5,000, if we look at page 2.
15  Does that sound right?
16    A.   Yes, and $2500 if I testify.  An
17  additional $2500 if I were to testify.
18    Q.   At trial, I take it?
19    A.   Yes.
20    Q.   And have you been paid that $5,000 so far?
21    A.   Yes.
22    Q.   Did you keep any time log or record of how

Page 53

1  much time you put into your analysis and work and
2  report in this case?
3    A.   No.  With a fixed fee arrangement, I would
4  have no reason to.
5    Q.   Now, sometimes you work on an hourly
6  basis, correct?
7    A.   Normally, I do, yes.
8    Q.   How did that come about in this case?  Do
9  you know?
10    A.   Because -- I guess I wasn't sure that a
11  nonprofit -- most of my cases are for the defense and
12  most of my cases involve payers that are insurance
13  carriers, and those are well funded groups
14  experienced in dealing with experts.
15        And the credit risk is not zero, but it's
16  not substantial, and my typical arrangement would be
17  my standard billing rate.
18        In cases with small organizations, I will
19  sometimes offer a fixed fee arrangement just so that
20  all parties know in advance what their budget is.
21  And when that happens, I require the payment in
22  advance and that's what was provided to me in this

14  (Pages 50 to 53)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 54

1   matter.
2       Q.   Well, with regard to your time here today,
3   you're charging the defendant on an hourly basis,
4   right?
5       A.   Yes.
6       Q.   And how much is that again?
7       A.   It's my standard rate, which I've had for
8   three or four years, which is $375 an hour.
9       Q.   For testimony?
10      A.   It's everything, except travel time, which
11  is $250, but I've charged that for three or four
12  years to both plaintiff and defendant, and I make no
13  distinction between conversations on the phone or
14  deposition or trial or analysis or report writing.
15      Q.   Now, what percentage of your income, let's
16  say, in 2009 was derived from your consulting
17  practice outside of what you do at the university?
18      A.   About half.
19      Q.   And how long has it been that way?
20      A.   I don't know.
21      Q.   2008, similar?
22      A.   Probably.

Page 55

1       Q.   Let's talk now specifically about the
2   methodology you employed here, because you describe
3   it in your report, and I'm going to have some
4   questions about it.
5            In the case of a for-profit corporation,
6   as we've been discussing, the standard means of
7   calculating the loss is -- to some event is lost
8   profits that would have come in had some event not
9   occurred.  Is that fair?
10           That's what you did in some of these other
11  cases where there was a broken lease or gasoline
12  spill?
13      A.   Yes.
14      Q.   Your metric is what we call profits in the
15  lost profits, but for that event, correct?
16      A.   Yes.
17      Q.   Now, not-for-profits -- let me start over.
18           Not-for-profits are, by definition,
19  different because they don't make profits, right?
20      A.   Correct.
21      Q.   They, in fact, by various laws, including
22  tax laws, are not permitted to make a profit and

Page 56

1   accumulate income and they're prohibited from certain
2   things that for-profits can do, correct?
3           MR. PISHEVAR:  Objection.  He's not a
4   legal expert.
5           THE WITNESS:  Well, they do create
6   something which is very much like profit, which is an
7   annual surplus or an annual increase in assets, and
8   they are allowed to accumulate assets from a series
9   of annual surpluses if those are devoted to the
10  charter or purpose of the entity.
11          BY MR. KAPSHANDY:
12      Q.   Right, but let me ask it this way:  Have
13  you published any peer-reviewed articles on the use
14  of this surplus as a means for calculating the damage
15  to a not-for-profit by any sort of intervention,
16  tortious or otherwise?
17      A.   No, I haven't.
18      Q.   Are there any published industry standards
19  out there setting forth a methodology which utilizes
20  the end-of-year surplus as a measure -- recognized
21  measure of damages for not-for-profits in the case of
22  some sort of interference?

Page 57

1       A.   Repeat that question, please.
2           MR. KAPSHANDY:  Maybe she can read it
3   back.  That's not going to happen in a million years.
4           (The reporter read back the requested
5   testimony.)
6           THE WITNESS:  I'm not aware of any.
7           BY MR. KAPSHANDY:
8       Q.   I mean, there aren't any cited in your
9   report.  That's why I asked.  And frequently, in the
10  case of, for example, not-for-profits, there are
11  standards from organizations like accountants'
12  organizations that actually publish standards on how
13  you do accounting and measure various metrics that
14  you can tell how good or bad a company is doing,
15  correct?
16      A.   I'm not sure that there are accounting
17  firms that publish articles on lost profits that
18  arise from an alleged tort.  There are auditing
19  procedures and things like that.
20      Q.   Right.  And there are industry standards
21  published by GAAP and all sorts of other accounting
22  groups that guide persons who are using these metrics

15 (Pages 54 to 57)

Page 58

1  to measure companies so that everybody knows what
2  you're talking about when you're using a term such as
3  profits and fixed costs and variable costs and
4  whether it's accrual or cash.
5       And that's more complicated than we need
6  to get into today, but what I'm asking because,
7  again, I think you've answered, is, with regard for
8  not-for-profits, there is no such standard that sets
9  forth how one measures the, shall we call it,
10 profitability or, what have you, of a not-for-profit?
11      I mean, they're not cited in your report.
12 As you sit here today, can you think of any sort of
13 published standards by any industry groups that
14 measure this sort of metric in not-for-profits, the
15 surplus measure that you use?
16      A.   The Financial Accounting Standards Board
17 and the APB, Accounting Principles Board, have
18 standards that apply to nonprofit entities.
19      I am not aware of any that address this
20 issue raised in your question, which is, whether
21 surplus is a measure to be used in certain ways, but
22 surely there are compendia that deal with the proper

Page 59

1  calculation of income and expenses, and the
2  difference is, by common sense, surplus.
3       Q.   The methodology that you, in particular,
4  employ and you've described here -- and we'll get
5  into it in some detail -- and I'm talking in
6  particular about the measurement of the effect of an
7  intervention, not the measurement of the surplus,
8  which is just simple math done on December 31st.
9       Do you understand the difference?
10      A.   Yes.
11      Q.   That methodology for determining the
12 impact of some sort of event, be it tortious or
13 otherwise, is -- are there any known published error
14 rates for that methodology?
15      A.   Error rates?
16      Q.   Right.
17      A.   Please explain what you mean by "error
18 rates".
19      Q.   For many models where you're projecting
20 something, sometimes you'll say it's plus or minus 10
21 percent, 5 percent, 20 percent.
22      With regard to the projections that you're

Page 60

1  talking about, and we'll talk about here some in some
2  detail, my question is:  Are there any published
3  error rates for this methodology?  Has it even been
4  validated through any sort of empirical testing?
5       A.   Well, I brought with me a book I use, and
6  I should have -- when you said did I have anything
7  that was new, I forgot that I had this.  I put this
8  in my bag yesterday.
9       This is a book I used to teach a graduate
10 MBA course called, "Finance 640 Corporate Finance,"
11 and I put a few markers on pages that I use for
12 teaching in which I believe applicable to a case like
13 this and my work in this case.
14      It doesn't really matter whether it's a
15 nonprofit or a profit entity.
16      What we're trying to do is see whether
17 some measure of interest is on a proforma basis
18 related to other measures in either an income
19 statement or a balance sheet.
20      And the methods of extrapolation can be
21 regression analysis or extrapolation of percentage
22 changes or it can be, as in this case, a sensitivity

Page 61

1  analysis that looks at how the change in the
2  performance measure is affected by drivers of that
3  performance measure.
4       So the methodology is standard corporate
5  finance, whether it's a corporation or not.  We have
6  income statements, balance sheets, and it is a
7  standard method to make as an assumption that the
8  ratios among the elements of those two kinds of
9  financial statements remains constant.
10      That doesn't mean it always does, but
11 that's a standard forecasting technique.  One looks
12 at the results and decides whether or not they are
13 useful.
14      Q.   Okay.  My question was:  Are there any
15 known published error rates for the methodology, in
16 particular, as applied to this metric we're calling a
17 surplus where there is some intervention -- and we'll
18 talk about that defamation case, in particular --
19 where one can learn what the reliability is of that
20 methodology when you take the input that you've
21 listed in your report -- and we'll discuss that in
22 detail -- and looked at some sort of projection to

16 (Pages 58 to 61)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 62

1  say that's plus or minus, you know, 50 percent, plus
2  or minus 5 percent?
3        What I'm getting at is, based upon the
4  methodology you used in this case and not about
5  general accounting and financial standards used for
6  for-profit companies but in the case here of a
7  not-for-profit and, in particular, the metric of a
8  surplus, are you aware of any known or published
9  error rates for the methodology when it's properly
10 applied?
11       And then we'll talk about the methodology.
12    A.   Well, that's a question I can't answer
13 because I don't think there are published articles on
14 error rates for anything even remotely connected to
15 what you've described.
16       There are not articles on a corporate
17 setting.  There are not articles on a nonprofit
18 setting.  There are not articles on a government
19 setting.  There simply are no articles on error
20 rates.
21       Error rates are addressed by -- and I've
22 tabbed the pages -- sensitivity analysis where you

Page 63

1  say, in a given analysis, how sensitive is the
2  outcome to changes in the drivers?
3        And so nobody would publish an article on
4  error rates because there's no one situation that's
5  repeated.
6     Q.   Well, that's kind of what I was getting
7  at.  Has there been any sort of validation testing of
8  the methodology where in a controlled sort of
9  circumstance somebody said, Here's, you know, what
10 the model projects based upon the input and here is
11 what we know happens in reality?
12       There's various ways you could validate a
13 methodology like this, right?  Or maybe not.
14    A.   I'll use as an example software I've
15 recently obtained for the university, which is called
16 Adaptive Planning.  It's a large-scale extremely
17 expensive business intelligence program.
18       You input costs, personnel, expenses.  You
19 input estimates of sales.  And for a large
20 corporation, this can become an immense database, and
21 it's called a relational database.
22       If you model the company and the real

Page 64

1  world subsequently matches those inputs, the model is
2  validated because reality -- the change in the
3  capital of the company, the change in the accumulated
4  wealth of the company or the entity -- and this,
5  incidentally, is not just for companies.
6        I'm attending a seminar or webinar
7  tomorrow hosted by Adaptive Planning on the subject
8  of nonprofit use of this software.
9        But if the inputs from the real world do
10 not change, are not perturbed, the model performs
11 well.  When the model doesn't accurately reflect the
12 emerging events of the company, it's because the
13 assumptions were not correct, not because the
14 methodology wasn't correct.
15    Q.   Right.  There's two possible reasons it
16 can go wrong or maybe more.  One could be maybe the
17 model doesn't account for enough variables, it might
18 be that the assumptions that were put into the model
19 are wrong, or maybe there was some sort of unforeseen
20 confounding factor, we'll call it, that might have
21 impacted actual data versus what the model projects,
22 correct?

Page 65

1     A.   Yes.
2     Q.   Now, as you point out, it doesn't
3  necessarily mean that the model is bad, but it may
4  mean, for example, it was applied inappropriately
5  such as incorrect assumptions or input into it,
6  correct?
7     A.   Yes.
8     Q.   Or it might mean, for example, that there
9  were confounding factors that could have also
10 affected the actual results that weren't accounted
11 for, which is kind of another way of saying what I
12 just said, but it's a specific type of error,
13 correct?
14    A.   Right.  A confounding factor might impact
15 the relation posited between headcount or number of
16 persons working for an entity and the eventual salary
17 and benefits budget.
18       For example, if ten people got the Swine
19 Flu and ten temps had to be hired, the original world
20 would have changed and the salary line for the
21 completed year would change.
22    Q.   What I'd like to do now here with regard

17 (Pages 62 to 65)

1195219f-2dbf-4708-b7f6-a7b604561495

1  to this case is discuss specifically what you
2  reviewed and how you put this into your methodology
3  and how that then leads us to your conclusions.
4        And I appreciate what you've set forth
5  here.  I think it explains a lot in detail, and I'm
6  not going to ask about every single point, but I am
7  going to try and clarify some of the things.
8        For example, the first section at the
9  bottom, the page after the Mervis Diamond case, if
10 you want to turn to what we've marked as Exhibit 5, I
11 believe it is, your report, if you want to take a
12 clean copy of it.  There's a section entitled,
13 "Materials Reviewed?"
14    A.  Yes.
15    Q.  And I believe, as you've told us earlier,
16 this states everything that you've reviewed with
17 regard to the case, correct?
18    A.  Yes.
19    Q.  Now, my question is:  In your methodology
20 -- we'll call it the Professor Morse Not-For-Profit
21 Methodology -- where does one find the rules for what
22 you review and what you don't review?

1    A.  There are no rules.  You just gather as
2  much as you can and see if it's relevant, so
3  typically, you would ask for the financial statements
4  and you would ask for deposition testimonies and you
5  would ask for a meeting with the principals.
6    Q.  That's the sort of thing I was going to
7  ask you.  Have you reviewed discovery in this case,
8  like a dozen or so depositions that have been taken,
9  or any of the written documents that have been
10 produced by the parties in the case?
11    A.  If they're not listed here, I have not
12 been provided with that.
13    Q.  What about -- materials from the defendant
14 such as -- I see you've read the complaint, but what
15 about the defendant's motion to dismiss or his
16 contentions in the case?  Have you reviewed his side
17 of the story?
18    A.  No.  I ask in general in all cases for
19 what I call, in my non-lawyerly way, pleadings, and I
20 typically put those in a blue folder, and I have the
21 blue folder here.
22        Let me just see if anything was added.

1  No.  All I have is the complaint.
2    Q.  Well, let me cut right to the quick:  I
3  take it you're not here to express any opinions or
4  evaluate whether the statements are true or
5  defamatory?  For the purposes of your model, you're
6  just assuming that they are?  Or maybe not.  I don't
7  want to put words in your mouth.
8        MR. PISHEVAR:  Objection.
9        THE WITNESS:  I am assuming that after
10 years of growth that NIAC's growth was arrested and
11 that happened contemporaneously with events that
12 bring forth this lawsuit.
13        I'm not a fact witness, though, and I
14 don't have an opinion on the issues in the complaint.
15        BY MR. KAPSHANDY:
16    Q.  You said something there I want to follow
17 up on.  Are you saying that because there are
18 financial results that happened after the defendant
19 started publishing statements which you assume to be
20 defamatory, therefore, there's a relationship?
21        MR. PISHEVAR:  Objection.
22        THE WITNESS:  Yes.

1        BY MR. KAPSHANDY:
2    Q.  Okay.  What is it?  I mean, if statements
3  are not defamatory, how is it then that the result
4  could be -- have been caused by the nondefamatory
5  statements?
6        MR. PISHEVAR:  Objection.
7        BY MR. KAPSHANDY:
8    Q.  Do you see my problem?
9    A.  I see your problem.  I am assuming -- and
10 I guess the emotional way to react is to review the
11 E-mails.
12        The E-mails talk of defamation, and,
13 again, I use that word.  And my interviews with a
14 couple of people that are in the file and mentioned
15 by me talk of interference with revenue-raising
16 activities.
17        I am assuming that it is interference with
18 NIAC's operations and purpose and image and
19 reputation that caused the change in the financials
20 to which I opine.
21    Q.  Okay.  That's fair.  Now, let me ask it
22 this way:  Are you aware of any statistical basis,

18 (Pages 66 to 69)

1  other than this temporal relationship -- and, again,
2  I'm speaking statistical, not qualitative, and we'll
3  talk about that later.
4          Are you aware of any statistical basis,
5  other than this temporal relationship in which NIAC's
6  results seem to have gone down after the defendant
7  started publishing statements which you assume are
8  defamatory?
9          MR. PISHEVAR:  Objection.
10         THE WITNESS:  Well, in answering, I want
11  to make sure that the record shows that I will speak
12  on the qualitative, and I reserve the right if I've
13  misunderstood your question to --
14         BY MR. KAPSHANDY:
15     Q.   We'll get to that, and I understand your
16  clarification.  We're on the same page.
17         I'm just asking you about any quantitative
18  statistical basis, other than this temporal
19  relationship, that we should know about that you
20  utilized to come to the conclusion that the
21  defendant's statements impacted the results that
22  you've talked about?

1          MR. PISHEVAR:  Objection.
2          THE WITNESS:  I must ask for help in my
3  answer.  Is the statement relayed to me, say, in an
4  interview that there would have been an event such as
5  one at a college campus that generated new members --
6  is that what you would call quantitative or
7  qualitative?
8          Because it might be quantitative in the
9  sense that a certain dollar amount might have been
10  failed to transfer.
11         BY MR. KAPSHANDY:
12     Q.   But that's not a number that you put into
13  your model that gives an output at the end, is it,
14  with your model?
15     A.   I see what you're saying, so in that
16  sense, I'll say there is not a statistical event that
17  relates to my measure of damages.
18     Q.   Now, while we're on the subject of
19  temporality, I think you state in here in your report
20  -- and we might have to skip ahead a bit.
21         If you look at summary of my opinion on
22  the second page --

1      A.   Yes.
2      Q.   -- you conclude that 2008 is the first
3  full year of interference by the defendant, correct?
4      A.   Yes.
5      Q.   And the question I have for you, in
6  particular, with regard to the temporality issue is:
7  On what basis -- published, quantitative, scientific
8  data do you support your assumption that damages in a
9  defamation case aren't realized until a year after
10  the statements are first made?
11         MR. PISHEVAR:  Objection.
12         BY MR. KAPSHANDY:
13     Q.   I mean, is there something you can point
14  us to in the literature?
15     A.   I think my sentence doesn't say that there
16  were no damages in the year 2007 but simply that to
17  be conservative I'm only looking for full years
18  subsequent.
19     Q.   Well, I'm really confused then.  Because
20  if we turn to Table A in the report, 2007, actually,
21  is a record year which you, in fact, use as kind of a
22  model and basis for extrapolating forward, correct,

1  the $704,000 revenue figure and the $258,000 surplus
2  figure?
3      A.   I've lost touch with the question.
4      Q.   Well, I mean -- correct me if I'm wrong.
5          I've read the report many times.  If I
6  look at the damages estimates, you do not in your
7  conclusions or in Table A attribute any damages in
8  2007 to the defendant's conduct?
9      A.   That's correct.
10     Q.   Because, in fact, if you look at, again,
11  on Table A, the accomplishments compared to the
12  basis, you're using 2007 accomplishments compared to
13  2002 measures expressed as ratios, and then you give
14  those for revenue and surplus together.
15         So that's kind of your basis, 2002 to
16  2007.  And it's at the end of 2007 when they
17  calculate the surplus, correct?
18     A.   Yes.
19     Q.   Now, the question I have for you, again,
20  is -- and let's take the same -- case of Tiger
21  Woods.
22         What basis do you have published,

1195219f-2dbf-4708-b7f6-a7b604561495

Page 74

1  scientific, even anecdotal that an impact of some
2  adverse publicity on someone in the community is not
3  realized for a year until after the event becomes
4  public?
5        And you realize, of course, the defendant
6  began publishing in early 2007 throughout the entire
7  year of 2007 about NIAC?
8     A.   I'm not a fan of partial-year analyses.
9  In other cases, I've often skipped the first year.
10       For example, in an auto accident case, if
11 it happened in November of 2010, I might opine that
12 damages for simplicity of exposition begin in 2011.
13       Because normally the data we look at is
14 presented at the end of a year, and I don't have
15 month-by-month data, and I didn't receive it in this
16 case.
17       And the anecdotes obtained by talking to
18 the principals and to the parties I mention in my
19 report and in my file -- the anecdotes give me the
20 impression of an accumulation of reputational damage,
21 not a one-on-one or week-by-week or day-by-day or
22 single-event causal relationship.

Page 75

1     Q.   Well, let's just stay with Table A.  Had
2  you taken either 2006 or 2008, it would have
3  dramatically reduced the growth rate that you used
4  for all of those categories, would it not?
5     A.   Let's first ask me perhaps one year at a
6  time.
7     Q.   Sure.  Well, you're saying you used 2007
8  to be conservative because it was partially affected,
9  even though the defendant wrote the entire year many
10 articles about NIAC, right?  You used 2007, you're
11 now saying, to be conservative?
12    A.   Yes.
13    Q.   But had you used 2006 or 2008, you would
14 have had a much lower growth rate just doing the
15 math, right?
16    A.   Yes.
17    Q.   Did you read any of the defendant's
18 articles? because I don't see them in here.
19    A.   I did not.
20    Q.   Do you have any idea how many people even
21 have viewed or visited the defendant's website or
22 publications, in particular, compared to, say, how

Page 76

1  other people have written similar things about NIAC?
2     A.   All I remember was that Mr. Trita Parsi
3  told me that some of the allegations appeared on
4  television networks in this country and in Iran, but
5  I wouldn't have any way of verifying the number of
6  viewers of a television show.
7        I wouldn't have any way of knowing the
8  number of hits or eyeballs on the website of
9  defendant.
10    Q.   Let me ask you this:  In your model, what
11 did you do to account for confounding of the final
12 outcome by the statements of other persons, other
13 than the defendant, who have made statements similar
14 to his about NIAC being either a lobbyist or an agent
15 or a representative of the country of Iran?
16    A.   I have not been provided with information
17 of statements like those of Daioleslam, and so I
18 can't answer that question.  I can't deal with the
19 confounding issue.
20       I wasn't given knowledge of that by NIAC,
21 but it would be reasonable to conclude that if
22 Daioleslam is -- Mr. Daioleslam -- and correct me if

Page 77

1  I'm pronouncing that incorrectly --
2     Q.   That's fine.  That's perfect.
3     A.   -- if he is considered an opinion leader,
4  it may be that the statements of others follow
5  approximately from his statements, but that would be
6  a legal opinion, and that wouldn't be my role here.
7     Q.   Well, I believe you just said you didn't
8  take those into account and you're not, I take it,
9  going to be testifying that all of the other people
10 who have published things are following Mr.
11 Daioleslam's lead, right?
12    A.   Well, I don't know whether there will be a
13 trial, but if there were, I would assume that the
14 attorneys and the principals would bring me
15 up-to-date on questions like this, and they would ask
16 me whether I had an opinion on whether there was a
17 herding, H-E-R-D-I-N-G, effect.
18    Q.   Well, let's just say -- unfortunately, we
19 can't predict the future, and I'm here to learn what
20 your opinions are today.
21       And as I understand it, as of today, you
22 have not in your model taken in account any

20 (Pages 74 to 77)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 78

1   adjustments for any confounding that might have been
2   caused to the final annual surplus effect, other than
3   attributing them all to Mr. Daioleslam, correct?
4       A.   That's correct.
5       Q.   Now, let me ask you this:  Are you aware
6   that as early as 2000 persons such as Kenneth
7   Timmerman, who publishes for Newsmax --
8       A.   Who?
9       Q.   -- Kenneth Timmerman who writes in
10  Newsmax.com --
11      A.   Newsmax?
12      Q.   Yes.  He actually ran for Senate in this
13  state.
14      A.   Okay.
15      Q.   -- presumably, a little more widely known
16  than Hassan Daioleslam, called Trita Parsi, the head
17  of a pro-regime advocacy group?
18          Were you aware of that?
19      A.   No, I'm not aware.
20      Q.   And I think -- we'll go through a number
21  of these in your materials, and I'm not going to go
22  through all of them, by any means, but let's just

Page 79

1   group them.
2           Are you aware -- do you have any idea how
3   many persons on either English-speaking publications
4   or Farsi-speaking publications made similar
5   statements about Trita Parsi or NIAC before the
6   defendant wrote a single word about NIAC in 2007?
7       A.   No.  I have no knowledge of that.
8       Q.   Now, back to the report -- I jumped ahead
9   to Table A -- if we could go back to page 2, please.
10          Under the summary of opinion -- again,
11  we're a little bit off of your methodology or what
12  your assumptions or input were.  I'm going to get
13  back to some of those later, but I just want to
14  clarify what you're not testifying to because it's
15  here in the report, and that kind of helps us know
16  what we don't have to deal with.
17          I understand in your testimony, in your
18  report, in your opinion here today, you do not have
19  an opinion as to the exact number of years through
20  which damages will persist, correct?  That's one?
21      A.   Yes.
22      Q.   Nor do you have an opinion as to what

Page 80

1   growth rate NIAC would have enjoyed absent the events
2   described in the complaint, correct?
3       A.   Correct.
4       Q.   And that's why in your Table A, if we look
5   at it, you give various hypotheticals from 5 percent
6   to 20 percent, correct?
7       A.   Yes.
8       Q.   But you're not stating, to a reasonable
9   degree of scientific economic certainty, that any of
10  those are the growth rate that they would have had
11  for any number of years, are you?
12          MR. PISHEVAR: Objection.
13          THE WITNESS:  That's correct.
14          BY MR. KAPSHANDY:
15      Q.   Now, back to page 2, please, and again,
16  back to other confounding factors that might have
17  impacted the event or conclusion, the output of your
18  model, did NIAC or Trita Parsi give you any of Trita
19  Parsi's publications back as far as 1999 where he
20  described himself as a lobbyist for the benefit of
21  Iran?
22      A.   No.  I have not seen such material.

Page 81

1           MR. PISHEVAR: Objection.
2           BY MR. KAPSHANDY:
3       Q.   Again, with regard to the methodology for
4   what was reviewed, I understand what you reviewed,
5   but, again, my question is:  In your Professor Morse
6   methodology, do you rely upon the client to give you
7   just what he thinks is helpful to the case or do you
8   say, Wait a minute; what's the other side of the
9   story; I need to look at everything?
10          How does it work in your methodology?
11      A.   Well, in a typical case, I would ask the
12  principals or the attorneys for the principals what
13  they think the damage is and what they think caused
14  it, and, yes, when I am offered materials that
15  disagree with that thesis, I am interested.
16          In this case, I basically said, Tell me
17  what I should read, because I wasn't a knowledgeable
18  person about Iranian affairs and I wasn't able to
19  formulate questions about years prior to the tort.
20          I wasn't aware, as I wrote in my report,
21  of the existence of depositions, and I've had no
22  contact with the law firm since then, other than to

21 (Pages 78 to 81)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 82

1   comply with your discovery requests.
2       Q.   Have you -- did you read an article in
3   early 2007, again, by Kenneth Timmerman entitled --
4   the title pretty much tells you it all about Trita
5   Parsi and NIAC -- "The Mullah's Voice" in FrontPage
6   Magazine?
7       A.   No, I have not.
8       Q.   Now, did you do any sort of internet
9   research to determine what other persons -- I know
10  you said you didn't read the defendant's publications
11  -- but what other persons, besides the defendant,
12  have been saying about NIAC or Trita Parsi and its
13  relationship to the Iranian Regime?
14      A.   The only effort I made in that regard was
15  to attend for about three hours an event at my
16  university's law school where there were -- it was
17  hosted by a fellow who is an adjunct professor with
18  us, Morad Eghbal, E-G-H-B-A-L, and there were four
19  speakers who were, according to the organizers,
20  Iranian experts.
21      And I sat with a couple of them after the
22  event, and I said:  "I'm doing some work with NIAC

Page 83

1   and I have met Trita Parsi.  What do you think of the
2   fellow?"  And they said:  "Oh, he's a fine fellow."
3       There was no pulling back.  Nothing that
4   would make me say, gosh, I should go to the internet
5   and see if this fellow is not how he has presented
6   himself to me.
7       So for that reason, there was no smoking
8   gun that made me say, Gosh, maybe it's part of my job
9   to see if Trita Parsi is a voice of the Regime.
10      I wouldn't really be qualified to opine as
11  an expert on Persian politics.
12      Q.   Right, but -- and we'll get to some of
13  these in Exhibits 2A and 2B.
14      Didn't you happen to notice any of the
15  articles written by persons such as Jeffrey Goldberg,
16  Jonah Goldberg, Kenneth Timmerman, Lopez and --
17      MR. PISHEVAR:  This is asked and answered.
18      BY MR. KAPSHANDY:
19      Q.   And we'll go through them -- Eli Lake?
20      Did you read any of those articles?
21      A.   How do you spell Lake?
22      Q.   Eli Lake, L-A-K-E.

Page 84

1       A.   No, I did not.
2       Q.   Let's go, again, back to materials removed
3   at the top of the page.  You note that you reviewed
4   tax returns through 2008 --
5       A.   Yes.
6       Q.   -- not 2009?  Are you aware those had been
7   filed?
8       A.   I wasn't given those, but I was given the
9   financial statements through 2009.  I was not given
10  '09.
11      Q.   The summary reports you were given through
12  2002 through 2008, and they're in Exhibit 1, as well
13  as 2009, correct?
14      A.   What do you mean by summary reports?
15      Q.   Sure.  Let me hand them to you so there's
16  no confusion.  It was a spreadsheet that was
17  horizontal.
18      We'll find it at the end of Tab 2 and the
19  beginning of Tab 3 some balance sheet and profit and
20  loss statements which I'm referring to as kind of
21  summary --
22      A.   That's the word that I didn't understand.

Page 85

1   In my listing at the top of page 2, I've called those
2   simply NIAC financial statements.
3       Q.   Right, and I think we're talking about the
4   same thing.
5       A.   We are.
6       Q.   And unfortunately, they're divided up in
7   kind of an arbitrary manner in that binder because
8   that's the way they were kind of scanned by
9   plaintiff's counsel.
10      And I've simply put the tabs in there, but
11  if you look at also the beginning of the next tab, I
12  think you'll find the financials for 2009, correct?
13      A.   Yes.
14      Q.   And the question I have for you is:  Are
15  you aware of and did you -- the existence of --
16  strike that.
17      Are you aware of the existence of and did
18  you review any actual electronic financial data from
19  QuickBooks which NIAC does keep so you can see the
20  numbers behind those summary numbers?
21      A.   No.
22      Q.   Now, in your model, where you look at

22 (Pages 82 to 85)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 86

1   expenses -- and if we turn to Table A --
2       A.   Do you want me to keep this page marked?
3       Q.   You might want to.  I'll give you a
4   Post-it -- it's particularly 2009.  We might need to
5   refer to it.  And actually, I'm glad you mentioned
6   that.
7            On Table A where you have total revenue,
8   for 2009, you maybe left a figure out there because
9   it's in Exhibit 1, and I just wanted to make sure if,
10  in fact, maybe you want to add that for completeness
11  sake.
12           Do you see where the blank is for 2009
13  there's no total revenue figure?
14      A.   Oh, I thought you meant -- you're not
15  talking about program service revenue?
16      Q.   Well, you don't put in any of them --
17      A.   Any of those, right.
18      Q.   And frankly, I'm glad you mentioned the
19  subcategories.  There's been some inconsistencies as
20  to whether things are counted as membership or
21  program service revenue over the years, so I seem to
22  deduce from your report that you're looking mostly at

Page 87

1   the total revenue figure because you can't imply too
2   much in the various subcategories because of that
3   inconsistency, correct?
4       A.   I was not provided with precise details
5   about how they allocated revenue.  That's my answer.
6       Q.   I mean, contributions just dropped to zero
7   after 2004.  That doesn't make any sense.  They start
8   calling them program service revenue, correct?
9       A.   Yes.
10      Q.   So I think what you're saying is mainly it
11  behooves us to focus on total revenue and not the
12  subcategories?
13      A.   Yes.  Well, the -- it might behoove us to
14  look at the subcategories if you pose questions that
15  relate to subcategories.
16      Q.   Well, if they were consistent, because
17  some years we'll see, for example, contributions
18  $130,000 -- none of that for program service revenue
19  or event revenue in 2003.
20           We don't know if their methodology was --
21      A.   We don't know, but we don't know whether
22  there were programs in those years.  I just took the

Page 88

1   language on the Form 990.
2       Q.   Right, and that's all you can do, but the
3   question I had is with regard to 2008, at least total
4   revenue.
5            We have that figure in Exhibit 1 behind
6   Tab 3, and all I'm suggesting is maybe it should be
7   put in the chart so we can follow along.
8       A.   Well, what figure are you suggesting that
9   I don't have?
10      Q.   How about $953,580 total income or
11  revenue?
12      A.   Now, this is for '09 and --
13      Q.   Because, frankly, you came up with a
14  surplus figure somehow.  Do you see what my problem
15  is?  You have a surplus.  You have assets, but you
16  don't put in the expenses and the revenue, so how do
17  you get the surplus?
18           And I think it comes from Exhibit 1.  I
19  just want to make sure that you do it for us and it's
20  not me.  Do you have or need a calculator?
21      A.   I think I have one here.
22      Q.   You might want to keep it handy.  I trust

Page 89

1   your math more than mine.
2       A.   So what is your question?
3       Q.   Okay.  Let me state it another way.  The
4   annual surplus for 2009 is $230,061, right?
5       A.   Right.
6       Q.   And that for all of the other years was
7   calculated taking total revenue minus expenses,
8   correct?
9       A.   Yes.
10      Q.   So the question is -- and maybe we'll take
11  a nice clean copy of Exhibit 5 and let you write it
12  in so we know how you got that figure for us.
13           You have it right there in front of you.
14  Once you're sure about the math, write those figures
15  in, because I think they come from the summary
16  financial reports of 2009 that you're looking at in
17  Exhibit 1, correct?
18      A.   This is where you want me to write?
19      Q.   If you write, yes, on Table A of Exhibit 5
20  -- make sure we're all on the same page.
21      A.   Okay.  So you want me to go looking for
22  contributions and -- or do you want me to do it just

23 (Pages 86 to 89)

1195219f-2dbf-4708-b7f6-a7b604561495

1  as net income?  What is exactly your request?
2      Q.   I want you to tell us how you got annual
3  surplus of $230,000.  For all of the other years, it
4  was calculated using total revenue minus expenses,
5  right?
6      A.   Yes.
7      Q.   So if you could just put those figures in
8  because you had to have them --
9          MR. PISHEVAR:  I would object to
10 instructing a witness to write things and draw
11 things.  This is an oral deposition where you ask
12 questions.
13         MR. KAPSHANDY:  We can make another copy
14 and he can write it in.  That's fair.  I appreciate
15 that.  I don't want to have him obliterating the
16 original report.
17         BY MR. KAPSHANDY:
18     Q.   So don't write on that.  Why don't you
19 tell us what they are?  And we'll get a copy and mark
20 an updated or corrected version of Exhibit 5.
21     A.   I believe what you're really asking me is,
22 where did I get that figure of $230,061.  Is that the

1  question?
2      Q.   Correct.  And if you want to point to the
3  numbers on the 2009 financials in Exhibit 1 -- I
4  think I know how you did it, but we need to hear it
5  coming out of your mouth.
6      A.   The difference between $230,061 and the
7  net income figure of $174,261, which appears in the
8  page you've tabbed, is $55,800.
9          Now, that's an expense for legal expenses
10 that I reference somewhere on the cell note for cell
11 I-13, which is on the page afterwards.
12         And I wrote:  "I do not yet have the Form
13 990 tax return.  In addition, I have increased the
14 surplus by the $55,800 legal expense."
15         In other words, I was told by counsel that
16 there were expenses of that amount and I added those.
17     Q.   In fact, you'll see them on Exhibit 1, if
18 you look in the right place, just above promotional
19 or professional fees.  In that is $55,800 in legal
20 fees, correct?
21     A.   This page?
22     Q.   It's the short page, page 2, of the profit

1  and loss statement for 2009.
2      A.   Legal fees, I see $27,381.
3      Q.   You must be looking at the wrong year.
4  Look at 2009.
5      A.   This says January through October of 2009.
6      Q.   That's October.  You need to look at
7  December so we have a complete year.
8      A.   This is January through December.
9      Q.   Now, turn one more page.
10     A.   I see the $55,800, yes.
11     Q.   Okay.  So just so we're clear, on Table A,
12 you used for total revenue, $953,580 or 581, correct?
13     A.   You mean, where I have a blank?
14     Q.   Right.
15     A.   In '09?
16     Q.   Right.
17     A.   I didn't use -- I didn't use anything
18 because it's blank.
19     Q.   Well, how did you come up with the surplus
20 figure using the same math that you used for 2002
21 through 2008 without having revenue and expenses?
22     A.   Because the year -- I wrote I have --

1  let's see --
2      Q.   Look, Professor, I'm not trying to trick
3  you.  The math works out exactly to $230,061.  If you
4  take the total income of $953,581, subtract the net
5  income figure of $174,261 --
6      A.   Yes.  You get 174 and you add --
7      Q.   -- add back in $55,800 and, viola, it
8  comes out exactly as you did for every other year.
9      A.   Right.  I didn't write it down because I
10 was told that things were in progress and I just took
11 the bottom line of 174, and I was told there were
12 legal expenses and I added those.
13     Q.   Well --
14     A.   In other words, they wouldn't have been
15 incurred had there not been a lawsuit.
16     Q.   Well, I understand why you're taking out
17 the legal expenses.  You're erring on the safe side
18 to be conservative.
19         My only question is, again:  Can you point
20 to me any other figures that you would have used to
21 come up with the $230,061 for the annual surplus,
22 other than those that I just mentioned from the 2009

1195219f-2dbf-4708-b7f6-a7b604561495

Page 94

```
 1  financials?
 2      A.   No.
 3      Q.   And I think what we'll do at a break is,
 4  we'll make a copy of your Table A and we'll write
 5  those in because, trust me, in two weeks, nobody will
 6  be able to figure this out if we read the transcript
 7  and --
 8      A.   Right.  You just want me to write in
 9  income minus expenses?
10      Q.   Right, and you can even footnote that you
11  excluded the $55,000, so we'll all be able to
12  recreate it.
13      A.   Right.
14      Q.   Let me ask you a few more things while we
15  have Table A in front of us, and then we'll take a
16  short break, if that's okay with you.
17           In your expense category here, do you make
18  any attempt whatsoever to distinguish between fixed
19  and variable cost?
20      A.   No, I don't.
21      Q.   And turning to total revenue between 2007
22  and 2008 where we see a dropoff of about $100,000 --
```

Page 95

```
 1  do you see that? -- actually, $113,000?
 2      A.   Yes -- wait, you're looking at the annual
 3  surplus or revenue?
 4      Q.   No, total revenue.
 5      A.   Got it.  I'm there.
 6      Q.   And let's face it, the annual surplus is
 7  directly dependent upon total revenue, correct?
 8      A.   Yes, so you're looking at 704 versus 590?
 9      Q.   Right.
10      A.   Okay, gotcha.
11      Q.   Now, did Trita Parsi or anybody at NIAC
12  happen to tell you that one of the reasons their
13  revenue declined so dramatically is that they had to
14  return a $50,000 grant to the Eurasia Foundation
15  because of conflicts of interest?
16      A.   I was not told that.
17           MR. PISHEVAR:  Objection.
18           BY MR. KAPSHANDY:
19      Q.   And that's a $50,000 swing from two years.
20  If you put the $50,000 which they got in 2007 and
21  returned in 2008, that makes $100,000 swing in total,
22  correct?
```

Page 96

```
 1      A.   Yes.
 2      Q.   Now, were you also aware that something
 3  else happened in 2007 that didn't happen in 2008 --
 4  in particular, did anybody at NIAC tell you that a
 5  grant that had totaled $200,000 from the National
 6  Endowment for Democracy was terminated because of
 7  Iranian government restrictions on NIAC continuing
 8  the project?
 9      A.   What year are you saying that occurred?
10      Q.   The funding ended in 2007.  They got no
11  more money from that project after 2008 began.
12      A.   I was not told that.
13      Q.   And over a two-year period, from 2006 to
14  2007, that was nearly $200,000 in funding.
15      A.   That's a statement you're making?
16      Q.   Yes.
17      A.   I wouldn't have knowledge.
18      Q.   And you're telling us you weren't aware of
19  that?
20      A.   No, but my reaction to these questions is
21  that that was the nature of my assignment, was to say
22  that there were terminations of profitable
```

Page 97

```
 1  relationships due to the tort that brings forth the
 2  litigation.  I don't know the foreign substance of
 3  each event.
 4      Q.   Well, I guess then what you're saying is
 5  that your model presumes that the termination of the
 6  National Endowment for Democracy funding of $200,000,
 7  the return of the Eurasia Foundation grant of
 8  $50,000, are related to the intervention which we're
 9  calling the conduct of Hassan Daioleslam, right?
10           MR. PISHEVAR:  Objection.
11           THE WITNESS:  I'm not going to say that
12  I'm making that assumption because this is the first
13  time I've heard of those particular grants.  I would
14  have to have asked Trita Parsi about those two
15  consequences.
16           BY MR. KAPSHANDY:
17      Q.   Well, I thought you told us earlier that,
18  in fact, the temporal relationship -- the entire, in
19  fact, decline in revenue under your model you're not
20  attributing to any sort of confounding factors from
21  either other persons or termination by the Federal
22  Government of grants unless it's related to the
```

25 (Pages 94 to 97)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 98

1  defendant, correct?
2      A.   Yes, but now you've brought up two very
3  specific grants, and I have not had a conversation
4  with the client on anything that specific.
5      Q.   If there would be testimony that the
6  $200,000 National Endowment for Democracy Project
7  which ended in June of 2006 and the Eurasia
8  Foundation Project which was terminated by
9  allegations of conflict of interest written by a Mr.
10 Michael Rubin, again, in 2007, were not related to
11 Hassan Daioleslam's writings, then since your model
12 presumes that, you would not be able to conclude that
13 the damages that you've listed here under damages
14 estimates are related to Mr. Daioleslam's writings,
15 would you?
16     MR. PISHEVAR:  Objection.
17     THE WITNESS:  I'm confused about the
18 stories you've told me.  Are you saying that 2007 did
19 or did not include the National Association (sic) for
20 Democracy grant and the Eurasia grant?
21     Because you've said that the National
22 Association (sic) for Democracy grant ended in '06,

Page 99

1  but you're asking me how it affected total revenue in
2  2007?
3      BY MR. KAPSHANDY:
4      Q.   Let me do them one at a time because
5  they're a little bit confusing.
6      Assume there's testimony that in 2007 NIAC
7  received a grant of $50,000 from the Eurasia
8  Foundation, which is funded by the Federal
9  Government, and that they had to return that in 2008
10 because of allegations of conflict of interest; in
11 other words, they were lobbying against that funding,
12 and written by somebody by the name of Michael Rubin.
13     MR. PISHEVAR:  Objection.
14     THE WITNESS:  For that particular event,
15 it would lower total revenue for 2006 -- excuse me --
16 for 2007 and raise it -- well, it wouldn't raise it
17 for 2008 because, obviously, that return is reflected
18 under expenses, I would assume.
19     BY MR. KAPSHANDY:
20     Q.   It would lower the expenses, perhaps.
21     A.   Well, they received money in '07 in the
22 amount of $50,000.  That's what you've told me.

Page 100

1      Q.   Part of that, right, is from the Eurasia
2  Foundation.
3      A.   Okay.  And so in 2008, we'll assume that
4  the return of that was an expense.
5      Q.   Exactly.
6      A.   And so are you asking me to assume that
7  the $50,000 never came in in the first place exactly?
8      Q.   No.  I'm just asking you in your model
9  which, as I understand it, attributes all of the --
10     A.   Decline in 2008 to the tortious
11 allegation?
12     Q.   Right.  If it were found to be the case
13 that, in fact, NIAC returned funding for something
14 not related to Mr. Daioleslam but, in fact, to
15 allegations of conflicts of interest which, in fact,
16 resulted in NIAC returning the funding, that it would
17 not be appropriate to utilize either that revenue
18 figure for 2007 or the expense figure for 2008 in
19 your modeling?
20     A.   That's correct.
21     Q.   And you don't know anything about that
22 because today is the first time you're hearing about

Page 101

1  that, right?
2      A.   That's right.  I do not know whether the
3  way you've characterized this is unrelated to the
4  matters that bring us forth today or whether it's, in
5  fact, a consequence of the Daioleslam actions.
6      Q.   Now, let me ask a simpler question about
7  funds received from the National Endowment for
8  Democracy, again, coming from the Federal Government
9  received in 2006 and 2007, in the amount of nearly
10 $200,000 over those two years -- ceased coming in for
11 the calendar year 2008 because of political decisions
12 by the Islamic Republic of Iran which precluded NIAC
13 from doing the project in Iran.
14     Might that explain some of the drop-off in
15 revenue from 2007 to 2008?
16     A.   It would, but, again, I'm not competent to
17 understand whether the change in the policy or the
18 funding and the project in Iran was related to
19 defendant's actions.
20     Q.   Right.  And let me ask the same question I
21 just asked about the Eurasia Foundation.
22     If it were the case that the decision by

26 (Pages 98 to 101)

Page 102

1 the Islamic Republic of Iran to not permit NIAC to do
2 the project, the NGO project it was known as, and had
3 not Hassan Daioleslam's writings resulted in the
4 project being terminated, again, your projections
5 based upon revenue would not be appropriate, at least
6 to the extent you attribute it solely to Hassan
7 Daioleslam?
8       MR. PISHEVAR:  Objection.
9       THE WITNESS:  Right.  It would be a matter
10 for a trier of fact to determine whether those
11 actions by the Republic of Iran had to do with the
12 fallout and the blow back of the Daioleslam actions.
13      BY MR. KAPSHANDY:
14      Q.   Let's assume that there's testimony in
15 this case by the person that headed up the NGO
16 project, that it was not possible to continue with
17 that because of the Iranian government's decisions by
18 June of 2006, which is more than a half year before
19 the defendant started writing anything about NIAC.
20 Just assume that.
21      Is there any possible way the defendant's
22 writings which he hadn't even written yet could have

Page 103

1 been responsible for the termination of the project
2 in June of 2007?
3      A.   You just said there was a decision in June
4 of '06.
5      Q.   I'm sorry.  Thank you for correcting me.
6 I probably need to restate that so the record is
7 clear.
8      A.   Okay.
9      Q.   Would it seem just from a common sense
10 point of view that if there's testimony in this case
11 that -- from the project director that the government
12 of Iran prevented it from going forward by June of
13 2006 that there's any way the defendant's writings
14 which began --
15      A.   You said '06 again.
16      Q.   I meant '06 -- any way that the
17 government's decision in June of '06 could have been
18 caused by the defendant's writings which began in
19 January of '07?
20      MR. PISHEVAR:  Objection.
21      THE WITNESS:  When you write something,
22 it's not always the first time you've said it.  For

Page 104

1 example, Cramer on CNBC, it's often known that when
2 he recommends a stock, that has been circulated on
3 his website or through conversation.
4      So if you're going to restrict
5 communications of Daioleslam only to what you call
6 writings --
7      BY MR. KAPSHANDY:
8      Q.   Let's say anything he's every written,
9 said -- and let's assume that the Islamic Republic of
10 Iran would never listen to him.
11      Let's assume that he had never said it
12 verbally or in writing before January of 2007, is
13 there any common sense way, unless you suspend the
14 law of post hoc ergo propter hoc, that the Islamic
15 Republic of Iran in June of 2006 could have ended
16 this project based upon what the defendant had said,
17 written, or even thought?
18      MR. PISHEVAR:  Objection.
19      THE WITNESS:  No.
20      BY MR. KAPSHANDY:
21      Q.   It's just common sense, right?
22      A.   Assuming that Daioleslam's only vehicle of

Page 105

1 communication was what you've discovered in writing.
2 This may have been brewing, is what I'm saying.
3      Q.   Well, let me ask you this from what you've
4 read about this case or --
5      A.   May I -- it's probably not a standard
6 operating procedure, but I need a little help
7 clarifying one thing.
8      If you say there was a decision on the NGO
9 project in 2006, does NGO mean non-governmental
10 organization?
11      Q.   Exactly.
12      A.   Okay.  And are you saying then a cash flow
13 that began in '06 evaporated in '07?
14      A.   Money was still being received in '07, and
15 if you had the actual subfinancials -- you have the
16 summaries right there, but if you had the
17 subfinancials -- and I might even be able to show
18 them to you -- for the income received from the NGO
19 project, that would reflect income still coming in in
20 2007 because, as the project director said, you got
21 to use it or lose it, even though the project was
22 over.

27 (Pages 102 to 105)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 106

1    A.   So I've asked -- and thank you for the
2    clarification because I may want to give that some
3    thought.
4         You were saying a decision in June of '06
5    didn't immediately change the cash in.
6    Q.   Yes.  And if I could clarify even further,
7    we're talking about two decisions.  There's a
8    decision by the government of Iran to take action
9    that makes the project impossible to go forward with,
10   but then there's a second decision by the United
11   States Government, in particular, the National
12   Endowment for Democracy, in 2007 to finally give up
13   because, let's just characterize them as maybe a
14   little bit more hopeful.
15        MR. PISHEVAR:  Objection.
16        THE WITNESS:  Okay.  Thank you.  These
17   were cessations of income.  This was not a refund.
18        BY MR. KAPSHANDY:
19   Q.   Right.  In the case of National Endowment
20   for Democracy, you've got in your revenue figures
21   nearly $200,000 spread out over a couple of years
22   that just stopped all of a sudden in 2008.

Page 107

1         I mean, nobody told you that, but assuming
2    that the financials show that, that's something that
3    you've not considered in terms of attribution of the
4    final damages to Mr. Daioleslam, correct?
5    A.   That's correct.
6    Q.   Unless one can somehow connect up the
7    National Endowment for Democracy's decision to Mr.
8    Daioleslam's writings, correct?
9    A.   Yes.
10        MR. KAPSHANDY:  Why don't we take a break
11   now?  This is probably a good time to take a break.
12        (Discussion held off the record.)
13        (Exhibit Numbers 5A and 7 were marked for
14   identification and were attached to the deposition.)
15        BY MR. KAPSHANDY:
16   Q.   While we were off the record, Professor,
17   we marked after you have filled in the revenue and
18   expense figures for the year 2009 as Exhibit 5A,
19   Table A with your handwritten notations.
20        And I'll just simply ask you to confirm
21   that Exhibit 5A is accurately described by me?
22   A.   Yes.

Page 108

1    Q.   And what I'd like to show you now, what
2    we'll mark as your Deposition Exhibit 7, is a chart,
3    prepared not by you, so the record is clear, but by
4    the defendant to graphically depict the surplus and
5    the revenue figures in your Table A, Financial
6    Summary.
7         And I've asked you to take a look at that
8    off the record -- and I don't know about you, but a
9    picture certainly helps me a lot more than numbers --
10   and ask you to confirm that, in fact, the numbers
11   have been correctly entered into this Exhibit 7?
12   A.   Yes.
13   Q.   I take it you sometimes use graphical
14   depictions of numbers because it's sometimes easier
15   for people to follow, too?  It's something that's
16   done regularly and is standard practice in your
17   profession?
18   A.   It's standard practice.  I happen
19   personally to just be fine looking at numbers.  I'm
20   not a graph guy, but I'm happy to work with you.
21   Q.   Thank you.  I appreciate it.  Now, before
22   the break, we were talking about confounding factors,

Page 109

1    and what I'd like to do now, if you want to -- let's
2    stay with Exhibit 1 that's in front of you.
3         And then we're going to proceed with
4    Exhibits 2A and B, and I'm not going to do all of
5    them, by any means, but I'll ask you to take a look
6    at some of those just to see what use you made of
7    them.
8         Before we get into them specifically,
9    though, why don't you tell us in your own words what
10   you did with the 150 to 200, for the most part,
11   E-mails with attachments that were sent to you by
12   Trita Parsi in your methodology for coming up with
13   these calculations?
14   A.   After I read the ones that I printed and
15   put in my file, I continued to read, but my
16   interpretation was that they were all about the same.
17   Q.   The same in what manner?  They were all in
18   a --
19   A.   They were all tense and they were all
20   E-mails that made me uncomfortable to read and I
21   would imagine made the subject, Mr. Parsi,
22   uncomfortable to know about.

28 (Pages 106 to 109)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 110

1    Q.   Did you make any effort to determine if
2  the origin of these statements or thoughts were
3  Hassan Daioleslam?
4    A.   That crossed my mind, but the names --
5  again, I'm not a speaker of Farsi, and I was not able
6  to make any progress on that thought.
7    Q.   Well, let's start with the ones that are
8  in English.
9    A.   Well, the names are difficult for me.
10   Q.   I got you.  Well, first of all, a number
11 of those E-mails that were sent to you are in Farsi
12 or at least a transliterated version known as
13 Finglish where you use Roman characters to
14 approximate the phonetic equivalent in Farsi
15 characters.
16      Did you see any stuff like that?
17   A.   I saw stuff that -- I didn't know that
18 word -- whatever that word --
19   Q.   Finglish.
20   A.   Finglish, yes.  That's an interesting
21 concept.  I didn't know that word.  All I knew was
22 that there were some that weren't in English.  I

Page 111

1  didn't make an attempt to distinguish Farsi from
2  pigeon-Farsi, by which I mean no disrespect, but a
3  colloquial version of Farsi or emerged language.
4    Q.   And I take it you didn't make any use of
5  that quantitatively or qualitatively in doing your
6  model in that case, and I'm speaking of those things
7  that were in a foreign language?
8    A.   That's correct.
9    Q.   Now, some of them were in English, and
10 we'll get to those, but before we do, if you take
11 Exhibit 1, behind Tab 2 there's several things I want
12 to ask you about, including some handwritten notes
13 that may as well be a foreign language also.
14      I presume they're yours, but maybe you can
15 help us.
16   A.   So I'm in Tab 2 which begins with NIAC
17 rejects --
18   Q.   Right.  And if you go in about ten pages
19 or so, it's upside down for some reason and it's
20 dated 3/3/10.
21   A.   Okay.  I see -- this is what we're looking
22 at?

Page 112

1    Q.   You've gone a little bit --
2    A.   Too far?
3    Q.   No.  You're fine.  You're exactly where we
4  want to be.  There's a couple of notes dated 2/13/10
5  and 2/17/10.  Do I read that correctly?
6    A.   Yes.
7    Q.   And are these your notes?
8    A.   Yes.
9    Q.   And are these contemporaneous with some
10 sort of interview of somebody?
11   A.   Well, let's start with the one on the
12 right because that's the simplest for me to remember.
13 I wrote UB event, so I wrote that in the upper right.
14 It's a little more bold than the rest of the
15 handwriting.  The date was February 17th, 2010.
16      There was a speaker named Kasemi,
17 K-A-S-E-M-I, Mousavi, M-O-U-S-A-V-I, and what I wrote
18 was that he had good things to say about NIAC and
19 Trita Parsi.  This was after the event which was
20 about three hours long.
21   Q.   And this is what you told us about
22 earlier?

Page 113

1    A.   Yes.  I did describe it earlier in less
2  detail.  Then there was a woman in --
3    Q.   Who sponsored that event?  Do you know?
4    A.   It was the University of Baltimore and it
5  wasn't the law school.  I'm in the business school.
6  It wasn't the law school, but it might have been one
7  of those centers for comparative law that was funded
8  by Steven -- a well-to-do attorney around here --
9  Steven somebody or it may have been one of the
10 international societies.
11      I can't answer that, but it was a
12 university event.  I mean, there were 120 people in
13 the auditorium and it was not the business school
14 auditorium.  It was the moot courtroom in the law
15 school.
16      There was someone named Lelia who was on
17 the program, and that program might be somewhere in
18 this file because I thought I tried to keep it.
19   Q.   And Lelia said something about NIAC?
20   A.   She simply cut me off and turned away when
21 I mentioned NIAC.
22   Q.   Well, did you consider that a positive

29 (Pages 110 to 113)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 114

1   reaction?
2       A.   I considered that a perplexing reaction.
3       Q.   Okay.  Got you.
4       A.   Yes.  I guess it wasn't positive.
5       Q.   Did she happen to mention that whatever
6   her reaction was was caused by Hassan Daioleslam?
7       A.   No.  She walked away.  There were no
8   words.
9       Q.   There was another person?
10      A.   Eghbal, E-G-H-B-A-L, and his first name is
11  Morad, M-O-R-A-D.  He was from the university, and
12  all I wrote here was he mentioned Trita Parsi.
13          I guess I asked him if he ever heard of
14  the guy, and he said, yes, and he didn't express any
15  positive or negative motion there, and that's why my
16  note simply says mentioned.  There was no description
17  of Trita Parsi.
18      Q.   Okay.  Well, I can follow that.  What
19  about the one that says 2/13/10 to the left of that?
20      A.   Well, that was before -- I mean, the date
21  of the New York Times was a couple days before the
22  event.  I wrote Evgeny, E-V-G-E-N-Y, Morozov,

Page 115

1   M-O-R-O-Z-O-V, Institute for the Study of Diplomacy.
2   And then I wrote blog, B-L-O-G, equal Foraz
3   (phonetic), and then I can't read my own writing for
4   the last name.
5           I must have run into something in the New
6   York Times that intrigued me but I never went back
7   to.
8       Q.   Well, obviously, that doesn't enter into
9   your estimate in any manner.
10      A.   Correct.
11      Q.   Why don't you start with the first thing
12  there behind Tab 2, the article entitled, "NIAC
13  Rejects Representative Kirk's Accusation?"
14          And I take it, this comes from NIAC or its
15  website and Trita Parsi sent it to you?
16      A.   It's hard to -- it's not clear that this
17  is in an E-mail format, so it's hard to know how I
18  got it.
19      Q.   Well, it says written by NIAC staff at the
20  top, right?
21      A.   See, that's sort of obscured, but now I
22  see that half of the letters are cut off at the

Page 116

1   bottom.  It's written by NIAC staff, so I think it's
2   safe to assume that somehow that was embedded in the
3   E-mails that got -- the few that got --
4       Q.   And assuming that was disseminated by NIAC
5   in some matter either by mail or its website, the
6   first paragraph states that:  "Representative Mark
7   Kirk, now Senator Kirk from Illinois, called NIAC
8   Regime sympathizer."  Do you see that?
9       A.   Yes.
10      Q.   Now, obviously, NIAC has their own point
11  of view on this, but when you got this, did you go
12  and find Representative Kirk's statement and see what
13  he said about NIAC?
14      A.   That would be beyond the scope of my
15  assignment.  No, I did not.
16      Q.   Well, let's put it this way:  If a United
17  States congressman or senator calls you a Regime
18  sympathizer, you would have to agree that that might
19  have some impact on your reputation in this
20  community, would it not?
21      A.   Yes.
22      Q.   And for the purpose of your model, you're

Page 117

1   assuming that Hassan Daioleslam is somehow behind
2   this?
3       A.   Yes.
4       Q.   In what manner?  I mean, do you have
5   anything specific, other than it's bad and it must
6   have come from Hassan?  What I'm trying to get at is,
7   how do you attribute this to Hassan Daioleslam?
8       A.   We've talked before today about the
9   confounding issue.  I did not offer when being
10  retained by the Pishevar Law Firm to be an expert on
11  libel and allied events.
12          I was retained to give a financial
13  analysis that would represent a view of damages if
14  the issues described in the complaint were true.
15          I did not make an effort -- if I'm doing a
16  lead paint case and the issue is -- or the claim by
17  plaintiff -- and I'm typically defense -- if the
18  claim by plaintiff is that there was lead in the
19  paint and a child ingested the paint, I don't try to
20  ascertain whether the child actually lived at the
21  named address.
22          I don't do independent analysis of the

30 (Pages 114 to 117)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 118

1  blood levels or chelation, so in the same vain -- I
2  didn't mean to get long-winded there.
3      In the same vain in this case, it wouldn't
4  be within my expertise to say where the negative
5  feeling about NIAC began whether it was exclusively
6  with Daioleslam or whether there was some independent
7  confounding event or whether there was some event
8  before the writings in 2007.
9      I haven't done a text analysis or a
10 political analysis.
11     Q.   Okay.  Well, let's look at a few more.
12 Why don't we take our Volume 1 of the E-mails, and
13 that's going to be Exhibit 2A, and then we'll get to
14 2B.
15     Why don't you take Volume 1 and you'll see
16 that the blue sheets are tabbed with file numbers
17 that were put there by plaintiff's counsel, but it's
18 very helpful to help us navigate this composite
19 exhibit.
20     Let's just start with the first one,
21 JM-001.  There's an article -- if you turn to the
22 second page there -- because I think the first page

Page 119

1  is the transmission from Trita Parsi to you --
2      A.   Right.
3      Q.   -- and it says, Matt Ygliasas.  And it
4  looks like it's from November 2009, and that appears
5  to be the E-mail that was referred to in the previous
6  page from Nick Baumann to Trita Parsi in November of
7  2009, if you match up the URLs.
8      A.   Yes.
9      Q.   Now, if you read the article at the bottom
10 -- first of all, did you just look at the E-mail from
11 Trita Parsi that -- or did you actually go to the
12 website and get this article?
13     A.   Are you actually asking whether the text
14 of the article was pasted by Parsi into the E-mail's
15 body?
16     Q.   Yes.  And I can tell you that the date at
17 the bottom happens to be the date that all of these
18 were produced and printed, so that may not help us.
19 It's all August 25th, 2010.
20     A.   I suspect this was embedded in the E-mail.
21     Q.   In any event, there's a link to it?
22     A.   Yes.

Page 120

1      Q.   And my question is:  When you read the
2  bottom of the Ygliasas article, he refers to a smear
3  campaign against Parsi in which Michael Goldfarb and
4  Jeffrey Goldberg, according to my information by a
5  larger set of right-winged pundants and reporters,
6  are attempting to paint Parsi as a tool of the
7  Iranian government."
8      Do you see that?
9      A.   Yes.
10     Q.   Now, what, if anything, led you in your
11 methodology to qualitatively or in any other manner
12 attribute these statements from these other
13 individuals to Hassan Daioleslam?
14     A.   When I got this flood of E-mails from
15 Trita Parsi, at some point I wrote back, stop, but he
16 kept sending them.
17     In other words, I made no conclusions
18 about the relative contribution of Goldfarb and
19 Goldberg and Daioleslam.
20     And the names of other potential
21 perpetrators of this libel which you're making me
22 aware of in this deposition -- none of these other

Page 121

1  names came up when I had discussions with the people
2  that my record shows I interviewed.
3      Q.   But you'd agree, if you look at this
4  article, there's no mention of Hassan Daioleslam?
5      A.   That's correct.
6      Q.   Do you know who Jeffrey Goldberg is?
7      A.   Never heard of him.
8      Q.   Let's turn to JM-003.
9      A.   I'm there.
10     Q.   It's transmitting a program by NIAC, the
11 U.S., and Iran, November 4, 2009, and there's an
12 E-mail from somebody by the name of Firooz
13 Afiattalab, A-F-I-A-T-T-A-L-A-B, F-I-R-O-O-Z.
14     And an apparent response to this
15 invitation, Firooz responds to Trita Parsi, if you
16 read the last several sentences of his E-mail:  "Get
17 your hands out of Iran.  Nobody believes your caring
18 about human rights in Iran.  What you tried to do is
19 deviate the people movement.  That's it."
20     Now, did I read that part of his response
21 correctly?
22     MR. PISHEVAR:  Objection.

31 (Pages 118 to 121)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 122

1    THE WITNESS: You read the last couple of
2  sentences. You didn't read the whole piece.
3    BY MR. KAPSHANDY:
4  Q.  Right. And I --
5  A.  You read it right.
6  Q.  And again, is there anything from this
7  E-mail or elsewhere that leads you to believe in your
8  methodology that it's Hassan Daioleslam that caused
9  this Firooz person to come to the opinion that he
10 expresses to Trita Parsi?
11 A.  Well, the address is NIAC News, not Trita
12 Parsi.
13 Q.  Thank you.
14 A.  But as to your question, the direct link
15 with Daioleslam is not clear from this context, but
16 let me repeat the context of my receipt of these
17 E-mails.
18    Trita Parsi told me -- and I'm not using
19 the word Mister, because, as I told you before we
20 began the deposition, I'm a first-name guy, and I
21 welcome you to call me by my first name and I might
22 call you by your first name, so I'll call Trita by

Page 123

1  his first name.
2    The sense I got from Mr. -- now I'm using
3  Mister. I'll go formal.
4    Mr. Parsi gave me the sense that he felt
5  and his organization felt under siege. His
6  attestation to me was that they were under siege
7  because of a whole slew of events, indeed, a cascade
8  of events that began with actions, not necessarily
9  writing, of Daioleslam.
10    And that's the sense in which I read all
11 these E-mails superficially. I got the sense that
12 here is an organization that does feel under siege.
13    Whether it's their fault, whether they're
14 an agent of the Iranian government, I wouldn't know,
15 and whether that's a bad thing or a good thing, I
16 wouldn't know.
17 Q.  You said they were under the impression
18 that they were under siege because of, not only the
19 writings, but the actions of Hassan Daioleslam?
20 A.  No. I didn't say it that affirmatively.
21 What I said was -- you have used in today's
22 deposition the word writings of Daioleslam, but when

Page 124

1  I was brought into this case, the language wasn't
2  necessarily exclusively writings.
3    It was something more general or vague
4  like actions or defamation or libel. I'm not aware,
5  to this day, whether the claim is that Daioleslam
6  only wrote or whether he also networked and
7  telephoned and E-mailed, stuff like that. I don't
8  know.
9  Q.  Okay. You have no specific examples that
10 you're here -- and you're not prepared to speak
11 today?
12 A.  That's correct. I have no examples.
13 Q.  Okay. Well, then let's just kind of
14 continue with some others of these because I want to
15 see what use you made of them in your methodology.
16    I understand you're not here to opine
17 whether he's engaged in some sort of actions which
18 may or may not be part of this case.
19    Turn, if you could, to JM005 -- well,
20 first of all, turn to 004 --
21 A.  I'm there.
22 Q.  -- which Trita Parsi sent to you on

Page 125

1  February 4, but what he transmits is a November 10,
2  2009 E-mail to him from somebody with the E-mail
3  address of Rmoini2000@aol.com?
4  A.  Yes.
5  Q.  And the person apparently has a position
6  at the Persian Cultural Foundation in San Mateo,
7  California. Did you see that?
8  A.  Yes.
9  Q.  Now, do you know what it was that this
10 person transmitted? There's an E-mail -- or not an
11 E-mail.
12    There's an URL link in there to some
13 article on Iranian Americans.com. Do you see that?
14 A.  I see it.
15 Q.  Do you know what that article is?
16 A.  No.
17 Q.  I mean, so what, if any, use did you use
18 of this in your methodology?
19 A.  I did not use it.
20 Q.  Are you aware that if you go to that link,
21 it's Senator Kyl's quote which we saw earlier where
22 he calls NIAC the --

32 (Pages 122 to 125)

Page 126

1     MR. PISHEVAR: Objection.
2    BY MR. KAPSHANDY:
3    Q.  -- Regime sympathizers?
4    A.  No. I'm not aware of that.
5    Q.  And we talked about that earlier and
6 what's behind that, so let's move on.
7     Here's one, 006, JM006. And again, this
8 came in in the flurry of February 4th from Trita
9 Parsi, and he's transmitting to you an E-mail from
10 David Elliott, who's at NIAC, regarding
11 Iranianlobby.com.
12     Do you see that?
13    A.  Yes.
14    Q.  Have you gone to that link?
15    A.  No. If you'll notice, it's in Farsi.
16    Q.  Pardon?
17    A.  It appears to be in Farsi.
18    Q.  That was my next question. It's in Farsi,
19 so it wouldn't have been something you used in doing
20 your opinion or analysis?
21    A.  That's correct.
22    Q.  Let's turn to JM008.

Page 127

1    A.  Okay.
2    Q.  And, again, it comes to you in February
3 10, but it's transmitting an E-mail from Arsalan
4 Barmand of November 2, 2009, and it includes an
5 article entitled, "Trita Parsi is a Terrible Iran
6 Flack, F-L-A-C-K."
7     Do you see that?
8    A.  I see it.
9    Q.  Again, not terribly complimentary, you
10 would agree?
11    A.  Well, it says if, so if it's --
12    Q.  Right, and I'm talking about the title.
13 If the title says somebody is an Iran flack, that's
14 not terribly complimentary, correct?
15    A.  Well, he's saying he's not a good flack.
16    Q.  Yes. If he's aspiring to be a flack and
17 he's a bad one, I guess it's not complimentary
18 either, is it?
19     But as you point out, again, the reference
20 here is to -- and if you go to the link -- an article
21 referencing Michael Goldfarb and Jeffrey Goldberg
22 again, correct?

Page 128

1    A.  I can't confirm that.
2    Q.  I mean, is there anything in the E-mail or
3 the article referencing Hassan Daioleslam?
4    A.  There is not.
5    Q.  I'm trying to skip through some of these.
6 Let's turn to JM0013.
7    A.  I'm up to 11. I'm on 13.
8    Q.  Now, again, this was sent to you from
9 Trita Parsi on February 10, but he's transmitting an
10 October 22 and October 16 E-mail exchange he had with
11 somebody by the name of Abbas Hamian in Miami,
12 Florida, correct?
13    A.  Correct.
14    Q.  And, apparently, in response to a
15 fundraiser from Trita Parsi, it requests for funds of
16 October 16th, 2009.
17     Mr. Hamian writes: "Anybody who lobbies
18 for a murderous and terror-sponsor state like the
19 government of Iran is a traitor and not an American.
20 I have made one donation to NIAC for $50 and now
21 regret doing that.
22     Your organization is supporting an

Page 129

1 outlawed Regime that treats its opponents worse than
2 Hitler, Stalin, or (inaudible).
3     I will do everything I can to expose NIAC
4 for what it is, a supporter of terrorists and
5 murderers. Shame on you, Dr. Parsi."
6     First of all, did I read that correctly?
7    A.  Yes, you did.
8    Q.  Now, secondly, is there anything in this
9 communication from Mr. Hamian that indicates that
10 Hassan Daioleslam is behind this or the source of his
11 information is Hassan Daioleslam?
12    MR. PISHEVAR: Objection. This is an
13 economic expert. I really don't know why you're
14 asking him this question.
15    MR. KAPSHANDY: I understand that. I'm
16 wondering how he uses this qualitative information in
17 his methodology.
18    BY MR. KAPSHANDY:
19    Q.  We're not going to go through all of them,
20 but there are quite a few. What I'm wondering is
21 when you see there's -- these are not complimentary
22 statements, correct?

33 (Pages 126 to 129)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 130

1      A.   That's correct.
2      Q.   And there's no direct reference in these
3  to the defendant.  So my question is:  How do you use
4  this in your methodology to say that all of the
5  changes in the surplus over the period from 2007 to
6  2008 and maybe more are related to Hassan
7  Daioleslam's conduct?
8      A.   Well, because we're up to Exhibit 13 with
9  the predecessor initials JM, I just want to state for
10 the record that the transmission from Parsi to Morse
11 is to an address I don't actually use.
12          My official address is
13 Jnmorse@verizon.net.  I do not use, ever,
14 Jnmorse@gmail.com, but I use the technological
15 protocols of G-mail to manage the J. N. Morse
16 account, so I just want the record to show that.
17     Q.   But you're not saying you didn't get this?
18 you did get this?
19     A.   I did get it.
20     Q.   And my question is:  Under your
21 methodology, what use do you make of this in
22 attributing the damages that you're opining to Hassan

Page 131

1  Daioleslam?
2      A.   The contact with NIAC described the reason
3  for the litigation as a cascade of events -- cascade
4  is my economist's word, not NIAC's word -- a cascade
5  of events that had as their seminal event something
6  done by the defendant.
7          And then Parsi, who is quite an effective
8  communicator, wanted to drive home to me the point
9  that whatever events began with the defendant's
10 actions led to a whole stream of events and
11 perceptions that affected fundraisers, membership,
12 outright grants, spontaneous contributions, and all
13 other forms of income that I may not have named.
14         And he sent me these E-mails not because I
15 said, What do they think of you in the New York Times
16 or what do they think of you in Iran or what do they
17 think of you inside the Beltway.
18         He just wanted to show me, I presume --
19 and you'll note that these are transmissions after
20 midnight -- that things are rough for Parsi and NIAC,
21 and it's not my role to determine where that
22 roughness started or whether it's even deserved.

Page 132

1          So I didn't make any use of this, except I
2  understood that the motivation of plaintiff is to get
3  out from under this kind of onslaught or at least to
4  be compensated for the financial implications of this
5  kind of onslaught.
6      Q.   And, again, I think, as we've discussed
7  earlier, if there were other persons out there
8  writing similar things even before January 2007 when
9  the defendant first wrote about NIAC, you've made no
10 effort to determine whether any of those other
11 persons, be it Michael Rubin, Kenneth Timmerman,
12 Claire Lopez, or even stuff in the Iranian official
13 press were the basis of any of these people's
14 conclusions that they have expressed in these E-mails
15 that Trita Parsi gave to you.
16         That wasn't your mandate, was it?
17     A.   That's correct.
18     Q.   Okay.  Just a few more.  Why don't you
19 turn to JM0017?
20     A.   Okay.
21     Q.   And again, this was sent to you by Trita
22 Parsi on February 4, 2010 transmitting an E-mail to

Page 133

1  Parsi from Rebecca Cann, C-A-N-N, of October 19, 2009
2  where she initially states that she was a supporter
3  and would like to help.
4          But then in the second paragraph, she
5  states:  "However, in recent months, I am getting a
6  lot of rumors that you are lobbying for IRI.  A
7  cousin of mine told me that you were in the dinner
8  given by Ahmadinejad in New York.  Is this true?
9          He also claims that in your meeting with
10 Secretary of State Hillary Clinton you defended
11 Ahmadinejad.  Is this true?  Do you have a transcript
12 of the conversation with her?
13         Would you let me know what you think of
14 these allegations?  I really don't want to believe
15 these allegations, and I am trying to sort them out."
16         First of all, did I read that paragraph
17 correctly?
18     A.   Yes, you did.
19     Q.   Now, in this, she appears to cite,
20 specifically, sources other than Hassan Daioleslam
21 which have given her cause for concern about NIAC and
22 Parsi, does she not?

34 (Pages 130 to 133)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 134

1   A.   Yes.
2   Q.   And did Trita Parsi tell you if he
3   responded to this woman and send that response to
4   you?
5   A.   He didn't tell me, but it looks like a
6   Dear Rebecca comes from T. Parsi@niaccounsel.org.
7   Q.   But that's before. That seems to be the
8   E-mail that triggered her response.
9   A.   Oh, you're absolutely correct.
10  Q.   So my question is: Is there a response to
11  the October 19th E-mail?
12  A.   Well, there isn't in the tab you called
13  JM017. As to whether there is somewhere in that
14  stream of E-mails, I didn't feel it was relevant to
15  search 200 E-mails by date for transmissions to
16  Rebecca Cann.
17  Q.   Why don't you turn to JM0024? Now, again
18  in response to this October 15th, 2009 request for
19  funds called the 2010 Truth Campaign of Mr. Jalil
20  Bahar, B-A-H-A-R, J-A-L-I-L, he writes: "Dear Trita,
21  I'm aware of your success on comprising with the
22  thieves and murderers rolling around since so-called

Page 135

1   NIAC has been established.
2        I am for arms struggle to topple the
3   Regime of gangsters in Iran, so I have not any common
4   ground with any group such as NIAC Council.
5        Please try to understand me because I am
6   tired and sick of the games played by countries whom
7   do not care for a violation of human rights and
8   killing of innocent people throughout Iran for the
9   past 30 years.
10        Most of NGO is following suit, the
11  political lines and strategies of big powers, plus
12  subversive policy of Israel. I regret that I cannot
13  help."
14        Did I read that correctly?
15  A.   Yes.
16  Q.   Okay. Now, Mr. Bahar seems to have a
17  strong policy difference with Mr. Parsi about what
18  should be done about Iran as he expresses here, does
19  he not?
20  A.   Yes.
21       MR. PISHEVAR: Objection.
22       BY MR. KAPSHANDY:

Page 136

1   Q.   And you're aware that NIAC is against
2   Regime change?
3   A.   No, I'm not aware of that.
4   Q.   Okay. Well, if -- assume that's the case
5   -- somebody is for Regime change in Iran, including
6   violent struggle, that person is not going to be a
7   supporter or friend of NIAC, would they?
8        MR. PISHEVAR: Objection.
9        THE WITNESS: That's quite a leap. That's
10  not a fair question.
11       BY MR. KAPSHANDY:
12  Q.   Let me ask it this way: What in your
13  methodology did you do to determine whether people
14  who refused to give money did so on the basis of
15  policy differences as opposed to something that they
16  had heard or learned from Hassan Daioleslam?
17       MR. PISHEVAR: Objection.
18       THE WITNESS: I did not attempt to make a
19  distinction or bifurcate, but this E-mail does refer
20  to the last 30 years. You read that into the record.
21       So to the extent that correspondence are
22  disagreeing about policy, NIAC's growth from the

Page 137

1   early years to the much larger dollar amounts in the
2   later years existed in the same climate as you've now
3   referred to as policy issues.
4        In other words, there's nothing --
5   whatever success NIAC had occurred even when there
6   may have been people out there whose differences on
7   policy issues were in existence.
8        BY MR. KAPSHANDY:
9   Q.   Right. But this gentleman specifically
10  cites the policy differences and not anything that
11  Hassan Daioleslam has said to him for not
12  contributing to NIAC, correct?
13       MR. PISHEVAR: Objection.
14       THE WITNESS: Right, but to whatever
15  extent people out in the blogosphere have policy
16  differences or don't like the government of Iran, the
17  only thing that's new is the actions of either the
18  senator you mentioned or of Daioleslam.
19       The idea of a policy difference is not
20  something specific to 2006 or 7 or 8 or 9. That
21  might have gone back for decades. And despite that,
22  NIAC prospered.

35 (Pages 134 to 137)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 138

1    BY MR. KAPSHANDY:
2    Q.   Again, there are many of them here in
3  Farsi, so you didn't make any use of those in
4  rendering your opinion, correct?
5    A.   Correct.
6    Q.   Now, if you turn to Tab JM0038.
7    A.   Okay.  I'm at 38.
8    Q.   Now, again, on February 3rd, 2010, Trita
9  Parsi sends to you an E-mail that a Victor Howard
10 sent to him on August 31, 2009.  Do you see that?
11   A.   Yes.
12   Q.   Now, Mr. Howard writes him:  "Mr. Parsi,
13 you have been getting lots of coverage lately on the
14 internet accusing you of being a mouthpiece for the
15 Islamic Republic, so I decided to do some research on
16 you.  It seems like there is truth to the
17 allegations.  I hope you will decide to come clean."
18       Did I read that correctly?
19       MR. PISHEVAR:  Objection.
20       THE WITNESS:  Yes, you did.
21       BY MR. KAPSHANDY:
22   Q.   Does he mention in there anywhere that the

Page 139

1  source of his information is Hassan Daioleslam as
2  opposed to some of these other names that we've been
3  discussing?
4    A.   He didn't mention any other names, and you
5  can't conclude by an E-mail this vague that he isn't
6  referring to the defendant.
7    Q.   You can't conclude, one way or the other?
8    A.   Correct.
9    Q.   So you didn't make any use of this in your
10 methodology either supportive or refuting?
11   A.   The word wouldn't be methodology.  The
12 word would be analysis because E-mails don't speak to
13 a defining methodology.  The methodology is standard
14 extrapolation and forecasting of financial
15 statements.  There's no known E-mail methodology.
16   Q.   But in your report you state:  "With
17 respect to the interviews -- and I assume you did the
18 same thing with the E-mails -- exact financial
19 quantification is not possible.  However, in my
20 professional opinion, these experiences in
21 information support my Table A estimates."
22       Now, my question is, again:  What use, if

Page 140

1  any, do you make of the E-mails in your methodology
2  or analysis, whether they support or refute the
3  damages calculations, I mean, particularly when they
4  don't mention the defendant?
5    A.   The interviews and the E-mails support
6  Parsi's statement to myself that there was a chain of
7  events or a cascade of events, as I've called it,
8  that led to diminished revenue and increased costs,
9  that increase being to some extent legal costs and
10 security costs and increased marketing costs.
11   Q.   Okay.  Well, let's kind of blow through
12 these.  Jump ahead to JM0042.
13   A.   Okay.  I'm there.
14   Q.   And here is an E-mail transmitted to you
15 on February 3, 2010, subject:  Free Iran, sending an
16 E-mail of September 27, 2009 from Ahmad Hekmat,
17 A-H-M-A-D, H-E-K-M-A-T, that apparently worked its
18 way to somebody at NIAC.  At least Trita Parsi saw
19 fit to send it to you, correct?
20   A.   Yes.
21   Q.   And the very first paragraph this
22 gentleman writes:  "Below is an E-mail from an

Page 141

1  attorney friend of mine.  She works in Washington, DC
2  and has extensive experience in Congressional
3  lobbying.  I asked her about resources to identify
4  any grants or funds that has been distributed to any
5  Iranian individual and/or organization."
6        MR. PISHEVAR:  Objection.
7        BY MR. KAPSHANDY:
8    Q.   And it goes on, and at the end he states:
9  "Today, there is zero tolerance against those who
10 support the Islamic Mafia in Iran.  There is zero
11 tolerance against those who stand against Iran and
12 Iranians.  Down with the Islamic Republic.  God bless
13 Iran."
14       And this person seems to cite independent
15 sources other than Hassan Daioleslam for her
16 conclusions, does she not --
17       MR. PISHEVAR:  Objection.
18       BY MR. KAPSHANDY:
19   Q.   -- or does he not?
20   A.   As a professor, I certainly would not
21 accept for a term paper the phrase "searched the
22 database and found lots of good information regarding

36 (Pages 138 to 141)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 142

1   the questionable organizations", and then have you
2   characterize it to me in this deposition as whatever
3   you just said.
4         This sounds like somebody who is
5   prejudiced against the legitimate government of a
6   nation and who's not describing in any proper detail
7   the citations that they summarize by "lots of good
8   information." This would be garbage.
9   Q.   Well, I don't think the person --
10        MR. PISHEVAR: Argumentative.
11        BY MR. KAPSHANDY:
12   Q.   My question is: There's nothing in here
13   that suggests that this person is citing Hassan
14   Daioleslam in coming to her conclusions about the
15   statement she makes about Trita Parsi and NIAC, does
16   he (sic)?
17   A.   The quote, "good information" could have
18   included Daioleslam.
19   Q.   Or it could not?  You can't tell, can you?
20   A.   I cannot tell.
21   Q.   Why don't we turn to JM004 --
22   A.   I'm there.

Page 143

1   Q.   -- which is: "Rise of the Iran lobby" by
2   Claire Lopez.
3   A.   Yes.
4   Q.   This is a name I mentioned earlier in the
5   deposition. Do you recall her name?
6   A.   Yes.
7   Q.   Have you read her article?
8   A.   Yes. I think maybe I -- this might have
9   been something I found. I forget whether this was
10   transmitted or not.
11   Q.   And you're aware that she's a former CIA
12   agent and cites a number of sources for her
13   conclusions in here, including some by Hassan
14   Daioleslam, correct?
15   A.   Yes.
16   Q.   And she cites others for her conclusions
17   also, does she not?
18   A.   Yes. It's a long article.
19   Q.   Now, my question for you is: In your
20   calculations and methodology, you do not make any
21   adjustment for any confounding effect that might have
22   been caused by this article by Claire Lopez separate

Page 144

1   from any damages you attribute to Hassan Daioleslam,
2   do you?
3   A.   That's correct, and I'll go back briefly
4   to my analog with the lead paint cases.
5         If there's an event and if liability is
6   considered by the trier of fact and a suit is brought
7   against paint manufacturers and landlords and lead
8   paint inspectors, when I calculate damages that might
9   flow from lead exposure to a child, I do not try to
10   say a certain percentage was due to the paint
11   manufacturer and a certain percentage was due to the
12   landlord and a certain percentage was due to improper
13   inspection, so I'm not really getting into this issue
14   of whether joint and several liability is in play.
15   Q.   That was going to be my next question,
16   because in personal injury toxic tort cases -- and I
17   know you're not a lawyer, but you mentioned the term
18   -- there's a concept known as joint and several
19   liability for the injury, even if others may have
20   contributed to that injury, correct?
21        MR. PISHEVAR: Objection.
22        THE WITNESS: Yes.

Page 145

1         BY MR. KAPSHANDY:
2   Q.   And I know, again, you're not a lawyer,
3   but you're not suggesting for a moment, are you, that
4   there's joint and several liability for speech under
5   the First Amendment of the United States
6   Constitution, are you?
7   A.   No, I'm not.
8         MR. PISHEVAR: Objection.
9         THE WITNESS: I'm just saying that I'm not
10   in the habit of parsing out liability.
11        BY MR. KAPSHANDY:
12   Q.   That's fair, and I appreciate that. And
13   some of these like -- if you turn to, for example,
14   JM0059, involved the transmission of Claire Lopez's
15   article and then which Trita Parsi, in turn, then
16   sends to you again.
17        MR. PISHEVAR: Same objections.
18        BY MR. KAPSHANDY:
19   Q.   Do you see JM0059, Professor?
20   A.   Yes.
21   Q.   And if you look at some of the links that
22   this person cites and asks Trita Parsi if he can

37 (Pages 142 to 145)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 146

1  defend himself, she, in fact, cites the Lopez
2  article?
3      A.   Yes.
4      Q.   So, again, I take it your answer would be
5  the same as before when I asked you what attempts
6  you've made to distinguish any damages flowing from
7  the Lopez article as opposed to Hassan Daioleslam's
8  own statements?  The answer would be the same?
9          MR. PISHEVAR:  Asked and answered.
10         THE WITNESS:  Yes.
11         BY MR. KAPSHANDY:
12     Q.   Now, why don't you turn to JM0067?
13     A.   One second.  You've referred me to Morse
14  0059, and I just wanted, before we move on, to note
15  Parsi to Morse where he's asking me, "Don't try to
16  figure me out on your own and start reading about me
17  all over the news."
18         This confirms what I've been saying, which
19  is that I'm not here to adjudicate or to opine on Mr.
20  Parsi, and here's a specific instruction from him
21  asking me not to.
22         I apologize for the interruption.  Where

Page 147

1  do you want me to turn now?
2      Q.   JM0067 --
3      A.   Okay.
4      Q.   -- which is, again, an E-mail transmitted
5  to you on February 3, 2010, but the E-mail being sent
6  to you is from an Ali Zinat, Z-I-N-A-T of July 26th,
7  2009 -- Ali, A-L-I.
8      A.   Yes.
9      Q.   And it relates to a Mr. Babak Talebi, whom
10  the record will reflect, and perhaps you know, was a
11  founder of NIAC and his -- was at one point in
12  time the director of community outreach.
13         First of all, my question is:  Did you
14  know about Babak Talebi's relationship with NIAC?
15     A.   No.
16     Q.   Now, this person appears to be
17  transmitting information that somehow got to Trita
18  Parsi about Babak Talebi.
19         And he states:  "Babak Talebi is a member
20  of NIAC, Islamic Republic-funded organization.  He is
21  a dozd, D-O-Z-D.  He collects money from people to
22  put in his own pocket.

Page 148

1          If you are attending his protest, please
2  understand that he is a supporter of the IR and is
3  funded by them to organize protests outside of Iran.
4          The reason he asks for no flags is because
5  he does not want a Regime change.  He wants to bring
6  people together and take advantage of the media to
7  benefit the IR.  If there is no flags, he will tell
8  the media these people are here to support Mousavi
9  and IR.
10         If there is flags, the media will notice
11  that people want change in Regime.  And since he is
12  being paid for this, he wouldn't want to lose his
13  paycheck.  If the Regime is gone, who would pay for
14  this reptile's food."
15         And this idiot, Shrin, chimes in:  "Ever
16  since I was in college, Babak Talebi was a strong
17  supporter of the Regime.  He is evil and disgusting."
18         Now, first of all, this person seems to be
19  relating some personal information he has about Babak
20  Talebi, not at all citing Hassan Daioleslam, correct?
21         MR. PISHEVAR:  Objection.
22         THE WITNESS:  It sounds like rank

Page 149

1  speculation.
2          BY MR. KAPSHANDY:
3      Q.   Yes.  We don't know the reliability of it
4  for sure, correct?
5      A.   Correct.
6      Q.   But my question is:  He appears to be
7  citing some personal experience, and not Hassan
8  Daioleslam?
9      A.   That's correct, but again, this type of
10  extremely emotional E-mail could have been a
11  consequence of an action of a prior party such as
12  Daioleslam.
13     Q.   Jump ahead, if you could, to JM0086.
14     A.   Okay.
15     Q.   And on February 3rd, 2010, Trita Parsi
16  sends you a November 2008 -- November 22, 2008 E-mail
17  from Shiva, S-H-I-V-A, Sarram, S-A-R-R-AM, regarding
18  Gateway Pundit Blog, P-U-N-D-I-T, B-L-O-G, correct?
19     A.   Yes.
20     Q.   Would a statement:  "I think you'd better
21  figure out" -- and then there's a URL to something
22  called Gateway Pundit Blog spot, correct?

38 (Pages 146 to 149)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 150

1      A.   Yes.
2      Q.   Do you see where I'm referring to?
3      A.   Yes.  I turned to the next page.
4      Q.   Actually, I was going to ask you about the
5  next page, too.  There's a cartoon in Farsi, which
6  has been cut and pasted into an article on this blog
7  showing, even if you don't speak Farsi, Iotola Komani
8  is a puppeteer for a puppet with Trita Parsi's head
9  on it.  Do you see that?
10     A.   I have to hold it up.  Are you referring
11 to this at the top?  Which picture are you asking me
12 to look at, where my finger is?
13     Q.   Right, where there's a puppeteer and a
14 puppet.
15     A.   Yes.
16     Q.   I'll ask you:  Do you know who those
17 characters are?
18     A.   Well, Komani might be the bearded fellow.
19 It's indistinguishable really -- the other face is a
20 rather general face.  I've met Trita Parsi, but I
21 couldn't say this is unambiguous.
22     Q.   Well, if you read underneath, it says the

Page 151

1  cartoon is from the Iran-free press.  And the cartoon
2  Iotola Kamani (phonetic), not Komani, says to Trita
3  Parsi -- and it translates it into English -- "Go
4  tell them that human rights, the Islamic version, is
5  better."
6          Do you see that?
7      A.   Yes.
8      Q.   Which one would, I think, agree is not
9  terribly complimentary of Trita Parsi, is it?
10     A.   Well, what you just read doesn't refer to
11 Trita Parsi.
12     Q.   Well, let's assume that that picture is
13 Trita Parsi, okay, the puppet?
14     A.   Yes.
15     Q.   And if that translation correctly is, "Go
16 tell them that human rights, the Islamic version, is
17 better," that's not terribly complimentary?
18          I mean, frankly, a picture of Trita Parsi
19 as a puppet and Iotola as a puppeteer is not terribly
20 complimentary, is it?
21     A.   That's correct.
22     Q.   Now, again, do you have any reason to

Page 152

1  believe that Hassan Daioleslam wrote or published or
2  did anything to cause this journal to publish this
3  cartoon, which actually comes from an Iranian
4  publication?
5      A.   Well, in fact, the prior page -- the note
6  from Shiva to Trita says:  "Who writes that blog?  Do
7  you know?"  So they don't know, and I don't know and
8  also --
9      Q.   Well, in fact, that was my next question.
10 Trita Parsi says he has no idea who is behind this,
11 correct?
12     A.   Correct -- well, I don't see his answer.
13 I see the question.  I don't see Parsi saying what
14 you just said.
15     Q.   Well, someone asked him, "Who writes that
16 blog?  Do you know?"  Parsi says, "No idea."
17     A.   I haven't seen the no idea.
18     Q.   It appears that it's --
19     A.   Yes, above it.  Above the original
20 message, I see it now.
21     Q.   Okay.  Let's keep jumping ahead.  Why
22 don't you turn to 0088?

Page 153

1          MR. PISHEVAR:  I'm going to put a
2  continuing objection to all of these E-mails.
3          THE WITNESS:  Okay.  I'm on 88.
4          BY MR. KAPSHANDY:
5      Q.   Which, again, was sent to you on February
6  3, 2010, Subject:  Timmerman/Newsmax, suspect group
7  asks Obama to stop pressuring Iran.
8          And Parsi sends to you a November 17, 2008
9  E-mail from someone named Reza Shirazi,
10 S-H-I-R-A-Z-I, R-E-Z-A, transmitting an article by
11 Kenneth Timmerman in Newsmax to a bunch of people,
12 including Trita Parsi, correct?
13     A.   Yes.
14     Q.   Now, again, this article makes no mention
15 whatsoever of Hassan Daioleslam, and, in fact,
16 specifically relates comments and opinions about NIAC
17 by this Kenneth Timmerman, correct?
18     A.   That's correct.
19     Q.   Now, when I asked you earlier, you hadn't
20 heard of Kenneth Timmerman or Newsmax, as I recall,
21 correct?
22     A.   Yes.

39 (Pages 150 to 153)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 154

1    Q.   So my question is:  In your methodology,
2  what use do you make of, even on a qualitative basis,
3  statements by persons such as Kenneth Timmerman which
4  are very unflattering about what NIAC is doing to
5  further the interests of Iran?
6    A.   Sir, you keep misusing the word
7  methodology.  And I have to object.
8      If we were in a corporate context and I
9  was using the percentage of sales method, which is
10  one of the forms of proforma analysis, and we opined
11  that Microsoft had earned, let's say, $1 a share in
12  1999, and we assume that it would be growing by 10
13  percent in sales and, therefore, one guess at its
14  earnings per share might be, absent the presence of
15  leverage, 10 percent or a greater earnings per share
16  increase, if you do assume the preference of
17  leverage, it would not be in my methodology if
18  somebody said, are you factoring in excessive costs
19  for the development of the Xbox which might have
20  happened at around that part of the decade.
21      That wouldn't be a methodology question.
22  That would be some sort of application of facts or a

Page 155

1  search for facts, but the methodology would stand
2  independent of any gossip on Xbox.
3      So in the present litigation, you keep
4  referring to my reaction to these E-mails as if they
5  interact with my methodology.  There's not the
6  slightest connection.
7      These might be facts or allegations or
8  crazed remarks that affect Mr. Parsi's moods and
9  affect the reason for litigation, but they don't
10  change the fact that what I've opined to in my table
11  is, essentially, an extrapolation of pure numbers
12  without attribution to Daioleslam or people who may
13  copy him or people who may predate him.
14    Q.   Well, you're the one in your qualitative
15  section that says, "These experiences and this
16  information supports my Table A estimates."
17      And my question is:  How do you take
18  something like that which makes no mention of
19  Daioleslam and say that supports my damages estimate
20  which attributes all of NIAC's loss to Hassan
21  Daioleslam?
22    A.   But I haven't referred in the sentence you

Page 156

1  read to my methodology.  I'm incorporating that as a
2  factual -- or a set of circumstances that support the
3  idea from the complaint and from my retention that
4  something happened to change the growth of NIAC
5  viewed through the window of revenues, expenses, and
6  surplus.
7      So it's not -- you're asking a question
8  about a relationship to a methodology, and I'd rather
9  not have my methodology, which is plain vanilla,
10  confounded with these factual questions.
11      And as to whether my report actually says
12  that all the damage is due to one defendant, my
13  report just says that there was a path of progress in
14  the financial affairs of NIAC, which has been
15  interrupted.
16      But I haven't gone so far as to say that I
17  know all the causes and all of the defaming parties
18  or the truth of this wild allegation that there's a
19  connection with the Regime.  That wouldn't be
20  something that my report includes either.
21    Q.   Got you.  You know what, let's just do one
22  last one of these in Volume 2.  Do you want to put

Page 157

1  aside Volume 1 and take out Volume 2?
2      It is Tab 0128.  I think most of these are
3  in the same vain, but I wanted to ask you something
4  about this one in particular, JM0128.
5    A.   You have them physically pretabbed.  We
6  have to search.
7    Q.   It's about a third of the way in.
8    A.   Okay.  I'm there.
9    Q.   It starts off Dear Maz, M-A-Z -- do you
10  see that --
11    A.   Yes.
12    Q.   -- from someone by the name of Zolal,
13  Z-O-L-A-L.  Do you see that?
14    A.   Yes.
15    Q.   Now, somehow Trita Parsi got this and
16  forwarded it to you, I guess, for you to consider in
17  a qualitative manner.
18      And if you turn to the last paragraph,
19  you'll see where Zolal writes:  "Trita Parsi has had
20  an extensive record of lobbying for the Regime.
21  After coming to the U.S. from Sweden, he worked as an
22  intern for Representative Bob Ney where the

40 (Pages 154 to 157)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 158

1  blueprints of NIAC were set.
2        On the other hand, I have known Dokhi
3  Fassihian and her mother for 17 years. Dokhi's
4  mother was my Farsi teacher in the early '90s.
5        So you know, the mother was thrown out of
6  our Farsi school headed by Mrs. Hajian after nearly
7  ten years because her relations with Iran's
8  intelligence ministry were revealed, and it turned
9  out she had gathered information from many families
10  and given it to the Regime."
11       Did I read that correctly?
12    A.  Yes.
13    Q.  Now, here this person, Zolal, seems to be
14  relating to personal and independent knowledge about
15  a woman that we know to be a NIAC Board member, Ms.
16  Fassihian. Do you see that?
17    A.  Yes.
18       MR. PISHEVAR: Objection.
19       BY MR. KAPSHANDY:
20    Q.  Now, I guess just to speed things up, I
21  take it your answer is the same with how you utilize
22  information like that from these E-mails, even in a

Page 159

1  qualitative manner in doing your damages calculation?
2    A.  I could say same, but I'll repeat
3  slightly. The E-mails arrived in a flood. They all
4  have the character of assuming or asserting that
5  Parsi and NIAC have some connection with the Regime
6  in Iran.
7        I'm not sure whether that's good or bad.
8  I'm not sure whether it relates to my work in this
9  case. These just arrived. I kept them. I was asked
10  to provide them.
11       They do establish that there was clearly a
12  climate promulgated by gosh knows whom that made it
13  difficult for NIAC to continue its functioning, and
14  that's the only sense in which I rely on these.
15    Q.  Did you make any effort to contact any of
16  these people who had E-mailed NIAC to find out what
17  the basis was of their conclusions?
18       MR. PISHEVAR: Objection.
19       THE WITNESS: No. Not only would that be
20  improper. I think it might actually frighten them to
21  have somebody they don't even know contact them.
22       I doubt if these people even know that

Page 160

1  their comments and E-mail addresses have been made
2  part of the public record. I think that would be --
3  I would be accused of harassment.
4       BY MR. KAPSHANDY:
5    Q.  Well, so you just took what they said at
6  face value or you weren't interested in the basis?
7       MR. PISHEVAR: Objection.
8       THE WITNESS: I really didn't take it at
9  face value that -- the remarks seemed to not even
10  approach face value.
11       The remarks seemed crazed and opinionated,
12  and I wouldn't mind having a drink with these people,
13  but I certainly wouldn't initiate the drink.
14       MR. KAPSHANDY: Well, let me hand you what
15  we'll mark as Exhibit 8.
16       (Exhibit Number 8 was marked for
17  identification and was attached to the deposition.)
18       BY MR. KAPSHANDY:
19    Q.  And just as an example, what might happen
20  if one had done something like this, and which I will
21  represent is not anything that was produced to you by
22  Trita Parsi but, in fact, is an E-mail sent to me in

Page 161

1  response to my request to speak to a Professor Anari,
2  A-N-A-R-I, at Texas A&M University as to the basis
3  for his request to be removed from NIAC's mailing
4  list.
5    A.  Is there a question?
6    Q.  First, why don't you just take a look at
7  it? I won't read the whole E-mail he sent into the
8  record because it's a bit lengthy.
9       Have you had a chance to look at it?
10    A.  Yes, I have.
11    Q.  And I know you didn't do this, nor did --
12  have you seen this before, but wouldn't this suggest
13  that had one gone to the trouble of perhaps
14  contacting some of these individuals to see what the
15  basis was of their conclusions, you might have gotten
16  information such as, I came to these conclusions
17  independently and long before Mr. Dai published a
18  number of articles about NIAC, correct?
19    A.  Yes.
20       MR. KAPSHANDY: Let me -- let's go off the
21  record. Can I take a short break and wrap up and
22  maybe just speed this up? I'm going to mark a few

41 (Pages 158 to 161)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 162

1  more things and blow through them.
2        (A break was taken.)
3        MR. PISHEVAR:  Have you produced this
4  Exhibit 8 to us before today?
5        MR. KAPSHANDY:  No.  I'm producing it to
6  you today.
7        THE WITNESS:  This deposition has been a
8  little bit unusual in that Mr. Kapshandy has made
9  remarks that could be construed as personal.
10       Earlier in the deposition, he made a point
11 of telling me, unbeknownst to me, that some testimony
12 I have made in previous cases may have been accepted
13 by the court but struck for reasons that might have
14 nothing to do with my own performance by higher
15 courts who have heard arguments based on legal
16 reasoning.
17       Now, he has implied into the record that
18 maybe I was remiss in my professional duties or my
19 standard of care because I didn't invade the privacy,
20 as he has, of correspondents whose E-mails were never
21 meant for public consumption.
22       And I just want to say that this is -- my

Page 163

1  failure to do so is in no way a failure.  As a matter
2  of fact, I believe I would be in deep trouble with my
3  own university if I were to have contacted people who
4  had no knowledge that their personal remarks were
5  transmitted to me, and that's all I wanted to have
6  show on the record.
7        BY MR. KAPSHANDY:
8     Q.   Well, did you, for example, ask -- and if
9  you were concerned about contacting these people
10 directly about the bases of their opinions which are
11 being used by NIAC as exhibits in this case to
12 support their defamation claim that perhaps they
13 might contact these people to ask the questions that
14 you were somewhat hesitant about asking them
15 directly?
16    A.   You mean, did I ask NIAC or NIAC's counsel
17 to --
18    Q.   Or their lawyers to contact these people
19 to see, Gee, is it really the case that this person's
20 opinions about NIAC are to be attributed by me in my
21 report to Hassan Daioleslam?
22    A.   Well, I did ask for the names of people

Page 164

1  that I could speak to, and those are somewhere in the
2  record.
3     Q.   Good, I wanted to get to that, so that's
4  fair.
5     A.   I did not do what you're suggesting, which
6  was to call the Pishevar Law Firm and say, can you
7  invade the privacy of people who may -- if they think
8  that this is -- that I'm an agent of the Regime or of
9  the government -- I don't know why they use the word
10 Regime -- I think they would find any query from me,
11 whether it came directly or through Pishevar,
12 threatening, and I think that would be a violation of
13 my role as a professor.
14    Q.   You did mention some interviews of several
15 people in the report, and I wanted to ask you about
16 those, so why don't we just get to those.
17       And there's some notes in your report in
18 Volume 1 that, I think, may relate to that, so maybe
19 you can help us with that.  You can put aside Exhibit
20 2. Here is Exhibit 1.
21       MR. PISHEVAR:  Before we go away from the
22 exhibit, are you going to produce this to us in

Page 165

1  native format?
2        MR. KAPSHANDY:  No.
3        MR. PISHEVAR:  Why not?  I see a font that
4  has been converted.
5        MR. KAPSHANDY:  It's an E-mail that was
6  sent to me, counsel, in response to a request for an
7  interview, okay?
8        MR. PISHEVAR:  It's an exhibit now.  It's
9  a piece of evidence and it's discovery.  You've
10 produced it to me now.
11       MR. KAPSHANDY:  And you have it.
12       MR. PISHEVAR:  I thought you were going to
13 give us everything in native format.
14       MR. KAPSHANDY:  We can discuss this later.
15       MR. PISHEVAR:  So there's no agreement to
16 produce things in native format?
17       MR. KAPSHANDY:  From my files, E-mails
18 people have sent to me, absolutely not.
19       MR. PISHEVAR:  It looks to be altered.
20 There's symbols in the middle of your paragraph.
21       MR. KAPSHANDY:  Take it up with the court
22 if you think that that's inappropriate.  Right now, I

42 (Pages 162 to 165)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 166

1   just want to finish this deposition, okay?  Your
2   objection is noted.
3          MR. PISHEVAR:  It's either discovery or it
4   isn't, and apparently you're a witness now.  I'd like
5   some dates for your deposition.
6          MR. KAPSHANDY:  Take it up with the court.
7          BY MR. KAPSHANDY:
8      Q.   Okay, are you ready, Professor?  I wanted
9   to ask you about these interviews that you mention on
10  the last page of your report, page 5.
11     A.   Yes.  Should I turn to my report?
12     Q.   Yes.  Have that and have Exhibit 1 handy,
13  also.
14     A.   My report has disappeared off this table.
15  Maybe you put it back in the pile.
16     Q.   Turn to page 5 of that, please.
17     A.   Yes.
18     Q.   Now, you mention four interviews in here,
19  correct?
20     A.   Yes.
21     Q.   Navid, N-A-V-I-D, Hazeghi, H-A-Z-E-G-H-I,
22  correct?

Page 167

1      A.   Yes.
2      Q.   Date not recorded, correct?
3      A.   That's correct.
4      Q.   Now, did you make any notes of that
5   interview?
6      A.   Probably, if I did, they would be
7   somewhere in this pile of papers.
8      Q.   Why don't you take a look? because it's
9   kind of hard to read your writing.
10     A.   This is a note on Soheila, S-O-H-E-I-L-A,
11  Hosseini, H-O-S-S-E-I-N-I.  Normally, I'm rather
12  organized in my files, but this file has passed
13  through many hands.  I no longer know exactly how the
14  people who xeroxed it put it back together.
15     Q.   Who has had the file besides you?  I
16  thought you did the copying.
17     A.   I don't remember.  I thought -- that's
18  right.  Maybe I did, so then maybe --
19     Q.   So you're blaming yourself?
20     A.   Yes, I'm blaming myself.
21     Q.   You better be careful about what you say.
22     A.   Now, I found notes for Navid, and these

Page 168

1   are notes for -- so I found three sets of notes --
2   which one did you ask me to find?
3      Q.   The first one -- you found Navid?
4      A.   Yes.
5      Q.   Where do we find that in here?  What does
6   that look like?
7      A.   It's a yellow piece of paper.  Navid would
8   be on the upper right.
9      Q.   This is behind Tab 2 and it's handwritten.
10  It's white, obviously, in our copy, and it does say
11  Navid on the upper right.
12     A.   Yes.
13     Q.   Now, maybe you could transcribe this for
14  us into English because your handwriting is as bad as
15  mine.
16          I understand you can't tell from this what
17  the date is, but can you tell us anything about what
18  he told you?
19     A.   It says 7:40 p.m.  It's my fault that I
20  didn't write the date down.  I was probably standing
21  somewhere using a cell phone or something.
22          He worked for a French bank.  I believe it

Page 169

1   was Soceite Generale, S-O-C-E-I-T-E, G-E-N-E-R-A-L-E,
2   and he worked in structured finance and he has a
3   degree from New York University.  He moved here from
4   Paris.  He lived in New York for four years.  He's
5   been a NIAC member for two years.
6          He said there was an event scheduled at
7   Columbia University and he wanted to invite a person
8   named Sharokh, S-H-A-R-O-K-H, who was apparently a
9   male dancer -- or -- well, a dancer -- I say male,
10  but I'm not sure I got that right.
11          He spoke to the manager for this dancer
12  and -- now, I'm not reading directly because my notes
13  are not -- he was speaking too fast, and I was
14  writing too slowly, but the point I remember from
15  this interview was that Sharokh was unwilling,
16  according to Sharokh's manager, to come to the
17  Columbia event because they didn't want an
18  association with NIAC.
19          And the statement at the very bottom of
20  the page is that "many Iranians are staying away from
21  an association with NIAC."
22     Q.   Who was that quote from?

43 (Pages 166 to 169)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 170

1    A.   That's from the person named on page 5,
2  Navid Hazeghi, Soceite Generale banker.  Obviously, a
3  person of some considerable education and
4  sophistication.
5    Q.   And could you read what he said again in
6  quotes at the bottom?
7    A.   "Many something or other" -- I can't read
8  the second word -- "many Iranians are staying away
9  from" -- and the implication is from NIAC events.
10    Q.   Did he specifically state that these
11  people were staying away from this because of Hassan
12  Daioleslam?
13    A.   No, but when I contacted each of these
14  people, I did say:  "I'm a professor of finance in
15  the financial economics at the University of
16  Baltimore, and I'm not acting in my capacity of
17  professor.  I'm acting as a consultant in litigation
18  brought by NIAC against a man named Daioleslam."
19        And that was the predecessor to people
20  deciding whether or not they wanted to talk to me, so
21  he did not say specifically they were staying away
22  because of defendant's actions, but that was the

Page 171

1  context of the questioning.
2    Q.   Well, it's interesting because -- first of
3  all, I take it all four of these people were
4  hand-selected for you by Trita Parsi, right?
5    A.   Yes.
6    Q.   You didn't randomly select them, like, for
7  example, from any of the E-mails that they've
8  produced in this case?
9    A.   That's correct.  I felt that that would
10  not be considered reasonable action by my employer.
11    Q.   Well, did you ask them to give you a
12  random selection or -- what do you think the chances
13  are they just gave you a selection of people that
14  might confirm their case?
15        MR. PISHEVAR:  Objection.
16        BY MR. KAPSHANDY:
17    Q.   Did you do anything to prevent that?
18    A.   I didn't do anything to prevent that, no.
19    Q.   Now, for example, this Soheila Hosseini --
20  you interviewed her on 2/24/10, correct?
21    A.   I show 3/3/10.
22    Q.   Because your report says 2/24/10.  That's

Page 172

1  one of my questions, not that it's a big deal, but
2  probably your notes are more reliable than your
3  report.
4    A.   I might have gotten the Persian names
5  mixed up because my handwritten notes show 3/3, 5:20
6  p.m. Soheila Hosseini, yes.
7    Q.   And that's the one we have upside down in
8  the binder for some reason?
9    A.   Yes.
10    Q.   And what, if anything, do you know about
11  her relationship to a large NIAC donor by the name of
12  Hossein Hosseini, who has given over $10,000 to NIAC
13  and is on the Board or has been on the Board?
14    A.   Repeat the name of the one you're asking
15  me whether I knew the relationship?
16    Q.   Do you happen to know if -- what, if any,
17  her relationship is to Hossein Hosseini, a large
18  donor, i.e., more than $10,000, and a NIAC Board
19  member?
20    A.   Well, the last name is the same.  I don't
21  know whether in Farsi you treat last names as we do.
22  In other words, there might be the implication that

Page 173

1  -- being a sister or a spouse.
2    Q.   Well, is it in your notes that she's
3  related to a Board member?
4    A.   No.
5    Q.   Trita Parsi didn't say anything to you
6  about that?
7    A.   No.
8    Q.   And again, what if anything, do you know
9  about her --
10    A.   I see why I got the 2/24 wrong because
11  there's a note at the top right saying Parsi E-mailed
12  2/24, so it must have been on 2/24 that he initiated
13  or granted permission for me to talk to this person.
14        And I wrote down inadvertently the initial
15  permission rather than the actual speaking date.
16  That explains that error.
17    Q.   And again, if, in fact, she were related
18  to a Board member and large donor, what, if anything,
19  would you make of her likelihood to say anything not
20  helpful to NIAC's case?
21    A.   I certainly admit the possibility of bias.
22  I was not attempting to do -- to be the trier of fact

44 (Pages 170 to 173)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 174

1  and to find out whether a defamation or a libel
2  actually occurred.  I just wanted to hear the
3  mechanics of events and fundraising.
4      Q.   And then the last one -- well, there's a
5  couple more.  There's 3/4/10, Forough, F-R-O-U-G-H,
6  Parvazian-Yazdani, P-A-R-V-A-Z-I-A-N, Y-A-Z-D-A-N-I.
7      A.   Okay.  I have found notes that relate to
8  Forough.  I didn't remember the question.
9      Q.   Are those in -- there's no question yet.
10          I was just asking to you get oriented.
11  Are those notes in the Exhibit 1?  Were they
12  produced?
13      A.   Yes.
14      Q.   Okay.  They're written on a G-mail
15  printout, correct?
16      A.   Yes.
17      Q.   Why don't you just work from your notes
18  while I'm looking for it?  What, if anything, do you
19  know about Forough Parvazian-Yazdani?
20      A.   I have her cell phone number.  She resides
21  in McLean, Virginia.  I wrote, upon calling that cell
22  phone number, she's a member of NIAC.  She mentioned

Page 175

1  that Dr. Lotfi, L-O-T-F-I -- and this is not
2  explained in my notes, but my memory is that there
3  was years ago a situation where at a fundraiser it
4  was sufficiently popular and attended that they turn
5  people away.
6          She also said that there was a fundraiser
7  at her house in 2005, at which $55,000 was raised for
8  NIAC.
9      Q.   When?
10      A.   In 2005.  At the bottom, I write, "Culture
11  - apathetic or fearful, re:  Politics since 1979.
12          In other words, she was saying to me that
13  the whole issue of Iranian/American life is to either
14  withdraw and be apathetic or to be fearful of
15  participation and open remarks, so that was a context
16  she was referring me to consider.
17          Now, in my second page of notes, I
18  actually do specify 6:10 to 6:30 p.m.  There's a
19  mention which I don't recall about satellite TV, but
20  I think that was something we talked about earlier in
21  this deposition where some of the remarks of parties,
22  possibly defendant, with respect to NIAC were put on

Page 176

1  satellite TV, but there I'm speculating because I
2  didn't specify.
3          She described or she stated to me that
4  there was an event called the Iranian Medical Society
5  -- it was to have occurred on March 12th, 2010 -- and
6  that that society didn't want NIAC to attend or
7  advertise in the flyer, and that was an example she
8  felt of a prejudice against NIAC.
9      Q.   Now, are you aware or did Trita Parsi tell
10  you that the Yazdani family are large donors to NIAC;
11  in fact, approximately $4,000, including $1,000 in
12  2008?
13          MR. PISHEVAR:  Objection.
14          THE WITNESS:  I don't have any note of
15  that.
16  BY MR. KAPSHANDY:
17      Q.   I mean, let's assume that they are fairly
18  large donors.  Do you think they would be willing in
19  response to this request from Trita Parsi to speak
20  with you to give you information that might not help
21  their lawsuit?
22          MR. PISHEVAR:  Objection.

Page 177

1          THE WITNESS:  I think I said this.  Let me
2  say it in a slightly more articulate way.  I haven't
3  been trying to call these people to see whether or
4  not defamation occurred.
5          I called these people because when I met
6  with -- at NIAC with the attorneys and with Trita
7  Parsi, I was a little bit overwhelmed by all of the
8  description of events and college outreach and things
9  like that where inflows of funds could occur.
10         So my purpose in calling these people was
11  to get a little more sense of how events or
12  contributions were impacted.
13         Yes, there clearly could have been a bias
14  towards NIAC, but I wasn't really looking for
15  knowledge of liability.  I was looking for some sense
16  of how an Iranian/American association, of which
17  there probably are about ten, raised funds.
18  BY MR. KAPSHANDY:
19      Q.   Well, we'll talk about some of these
20  later.  I'm just interested in what you did to
21  eliminate bias, and I understand you've answered
22  that.

45 (Pages 174 to 177)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 178

1        There's one other under particular
2   anecdotes that I wanted to ask you about, and then
3   we'll talk about membership statistics.
4        MR. KAPSHANDY:  First, let's take a break.
5        (A break was taken.)
6        MR. KAPSHANDY:  Professor, let me hand you
7   what we'll mark as Exhibit 12 to your deposition,
8   which is a 21 July 2008 letter from Lord Corbett of
9   Castle Vale, member of Parliament to Honorable Ileana
10  Ros-Lehtinen -- that's R-O-S, L-E-H-T-I-N-E-N,
11  Ranking member Foreign Affairs Committee, United
12  States House of Representatives.
13       (Exhibit Number 12 was marked for
14  identification and was attached to the deposition.)
15       BY MR. KAPSHANDY:
16   Q.   And I won't ask you what I've asked many,
17  many times about whether you've seen this or how you
18  used it in your methodology, and take as much time as
19  you want to read it.
20       My question for you is:  Just from a
21  common sense point of view, wouldn't one think that a
22  letter from a member of Parliament to the United

Page 179

1   States Congress calling Trita Parsi a well-known
2   lobbyist for the Iranian Regime be something that
3   could impact one's reputation?
4        MR. PISHEVAR:  Objection.
5        THE WITNESS:  I've read it.
6        MR. PISHEVAR:  Same objection.
7        THE WITNESS:  The letter is signed by a
8   Lord whose title is Chairman of the British
9   Parliamentary Committee for Iran Freedom, and it's
10  copied to about 20 or 30 people, more Lords and
11  Ladies and Barons and Baronesses than I've socialized
12  with in some years.
13       And the number of people on the copy list
14  makes me think, because it goes beyond the U.S.
15  Congress -- makes me think that this letter is part
16  of some larger discussion whose context I can't
17  really interpret.
18       And I find it a little hard to understand
19  your question, but I'll do my best, given that
20  background, and that is that this is not a letter
21  that would make people feel warm and cozy about NIAC
22  and Trita Parsi.

Page 180

1        BY MR. KAPSHANDY:
2    Q.   That's fair.  Let's move on.  I want to
3   really speed things up.
4        MR. KAPSHANDY:  Turning now to the
5   fundraising and damages, let me hand you what we'll
6   mark as Deposition Exhibit 13 which are meetings
7   minutes from the Board of Directors, which are at
8   some point in time in 2009.  I'd like you to take a
9   look at those as well as counsel.
10       (Exhibit Number 13 was marked for
11  identification and was attached to the deposition.)
12       BY MR. KAPSHANDY:
13   Q.   Because I note in your report there's a
14  footnote that the source of information -- and this
15  is -- in particular, Footnote 4 relates various
16  membership information.  And it says:  "This
17  information appears in the Board's minutes."
18       And my question for you is:  Did you
19  personally review any of the Board's minutes or is
20  that relayed to you by Trita Parsi?
21   A.   I believe that was stated to me by Kevin
22  Cowl in a meeting -- the only meeting that I had at

Page 181

1   NIAC, and then -- Kevin Cowl was the financial
2   officer of NIAC or the controller.
3        And I guess I said, can you confirm that,
4   and Trita said do we have the notes.  That's the way
5   this arose.  It was really recounted to me.
6    Q.   And that --
7    A.   As to whether I've seen these minutes, I
8   can't remember whether it's part of my file or not.
9    Q.   Well, so the membership statistics where
10  he says:  "Typical membership roles of 2,000 to 3,000
11  were dropped to 1200 current members" -- and then you
12  have Footnote 4, this information appears in the
13  Board minutes -- I think what you're saying is they
14  didn't necessarily give you the Board minutes, but
15  they said that that was the source of that
16  information or what?
17   A.   Yes.  And, of course, the footnote
18  incorporates the second sentence that you didn't
19  read, which talks about the increase in the number of
20  non-current members.
21   Q.   So just so we're clear, you didn't get any
22  Board meeting minutes like what I just showed you as

46 (Pages 178 to 181)

1195219f-2dbf-4708-b7f6-a7b604561495

1  Exhibit 13?
2      A.  Well, I'm not sure.  It doesn't look
3  familiar, but it's been quite a while since I've
4  written my report, and so I'd rather not say that I
5  do remember it or that I don't, unless you think it's
6  important for me to --
7      Q.  Well, yes, because they're not in the
8  materials you've produced.
9      A.  If they're not in what I've produced, then
10 I did not see it.
11     Q.  But in your report, we have this general
12 reference in Footnote 4, but no specific reference,
13 and there's lots of Board minutes.
14     A.  I do not recognize that because I guess I
15 would recognize the State Department or Mariam
16 Borghey, B-O-R-G-H-E-Y.
17     Q.  Now, if you turn to the bottom, if you
18 could, of page 2 and the top of page 3 --
19     A.  Of this exhibit?
20     Q.  Yes.  Take a look at that because I'd --
21     A.  Where it says, meeting with Kerry's
22 office?

1      Q.  No.  It says update membership.
2      A.  Yes, I've got it.  I think you directed me
3  to the bottom and then the top of the next page.
4      Q.  Yes.  They make a couple of points here,
5  and the first is that -- this is in December of 2008
6  -- while they experienced a record 80 percent
7  refusing, they state:  "The motivation given was
8  overwhelmingly because of a financial downturn.  Many
9  of our members have lost their jobs."
10         First of all, did I read that correctly?
11     A.  Yes.
12     Q.  Did Trita Parsi or Kevin Cowl or anybody
13 at NIAC tell that you their Board minutes reflected
14 that fact?
15         MR. PISHEVAR:  Objection.
16         THE WITNESS:  No.
17         BY MR. KAPSHANDY:
18     Q.  But then they go on to state that:
19 "November yielded donations from 227 people, a
20 response rate of 2.58 percent, well above the .5
21 percent industry average."
22         Did they happen to tell you that?

1          MR. PISHEVAR:  Objection.
2          THE WITNESS:  They did not, but I do
3  recall -- or I do want to point your attention to my
4  own report where I say I reference some articles on
5  charitable giving in '08 and the macroeconomic
6  scenario that you're referring to.
7          BY MR. KAPSHANDY:
8      Q.  Right, but what's a better statistical
9  basis for NIAC's membership information than their
10 own data from their Board minutes, right?
11         MR. PISHEVAR:  Objection.
12         THE WITNESS:  That's not a question.
13         BY MR. KAPSHANDY:
14     Q.  Wouldn't NIAC's own data from their Board
15 meeting minutes be a better indicator of the actual
16 donation rates and the reasons people are giving for
17 not donating than some general report on charities in
18 general?
19     A.  Yes.
20     Q.  Okay.  And I think -- if you turn to your
21 report, I want you to, again, refer to under the
22 membership numbers which you cite for Footnote 4 some

1  annual membership figures.
2          We're on page 4 of your report under
3  membership statistics.  Do you see that?
4      A.  Yes.
5      Q.  Now, did you understand from what somebody
6  at NIAC told you, be it Trita Parsi or Kevin Cowl,
7  that at some point in time, membership roles were
8  typically 2,000 to 3,000 and then dropped to 1200?
9          Where did that come from?
10     A.  That came from my interview.
11         MR. KAPSHANDY:  Let me hand you what we'll
12 mark as your Deposition Exhibit Number 9.
13         (Exhibit Number 9 was marked for
14 identification and was attached to the deposition.)
15         BY MR. KAPSHANDY:
16     Q.  These are Board meeting minutes of October
17 27, 2007, Washington, DC.  And first of all, I'll ask
18 you to tell us if you were provided these by NIAC?
19     A.  No.  I have not seen this.
20     Q.  And I won't ask you to read it all.  It's
21 fairly lengthy and it involves a lot of stuff, but
22 there is some information on membership data.

47 (Pages 182 to 185)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 186

1    A.   The second page.
2    Q.   Thank you.  And under the third order of
3  business, review of financials and membership report,
4  the minutes state: "Trita initiated the review by
5  summarizing NIAC's year in comparative terms
6  reflecting on 2005-2007 year-to-date revenues and the
7  rising trend from" -- strike that whole question.
8        At the very bottom of page 2, under the
9  third order of business, it states: "Trita reviewed
10  the membership trends. 1,034 in 2005 increased to
11  1307 in 2006 and 1680, as of today, citing these
12  figures is absolutely unacceptable."
13    MR. PISHEVAR:  Objection.
14    BY MR. KAPSHANDY:
15    Q.   First of all, did I read that correctly?
16    A.   Yes.
17    Q.   And at least, according to these Board
18  meeting minutes, if one believes them to be truthful
19  and accurate, as of October 27, 2007, the membership
20  data reported by Trita Parsi, the president of NIAC,
21  in no way confirms the figures given to him by you
22  for your report of 2,000 to 3,000 members?

Page 187

1    A.   To him by you or by him to me?
2    Q.   Thank you for correcting the order of the
3  pronouns.  I think you understand what I'm saying.
4    MR. PISHEVAR:  Objection.
5    THE WITNESS:  I think I do, but maybe it's
6  best if you, not I, state it.
7    BY MR. KAPSHANDY:
8    Q.   Sure.  Is there anything in these data
9  that Trita Parsi reported in Exhibit 9 to the Board
10  about membership figures that at all confirm the
11  statement he gave to you at about the time you were
12  preparing your report that typical memberships of
13  2,000 to 3,000 dropped to 1200 current Board members?
14    MR. PISHEVAR:  Objection.
15    THE WITNESS:  Well, this is a set of
16  minutes from 2007.  I spoke to him in 2009 or 2010,
17  and he may have been referring to prevailing levels
18  subsequent to those minutes.
19    BY MR. KAPSHANDY:
20    Q.   Well, let's stay with the data reported in
21  the minutes.  For 2005, 2006, 2007, nearly a year
22  into the alleged defamation by the defendant, while

Page 188

1  Trita Parsi believes they're totally unacceptable,
2  the trend certainly is upward over this time period,
3  is it not?
4    A.   Yes.
5    MR. KAPSHANDY:  Now, let me hand you what
6  we will mark as your deposition Exhibit 10.
7      (Exhibit Number 10 was marked for
8  identification and was attached to the deposition.)
9    BY MR. KAPSHANDY:
10    Q.   These are from February 22, 2008.  And
11  first of all, just for the record, confirm that you
12  did not receive these from NIAC?
13    A.   I did not.
14    Q.   And at the bottom of page 1, what, if
15  anything, does Trita Parsi report to the Board in
16  February of 2008 about the number of Board -- or
17  number of NIAC members?
18    A.   He reports that it has risen to
19  approximately 2,000 members, and then it's a little
20  confusing, because the next line says current members
21  1,068, which is a different number from 2,000.
22    Q.   Well, that's one question I have, and I'm

Page 189

1  glad you raised that.  Did you ask him how they count
2  members?  Do they count people on a mailing list?  Do
3  they count people who have paid their dues or what?
4    A.   I didn't ask him, but from common sense,
5  which you've invoked from time to time in the last
6  half hour, I would think that a member would be
7  someone who is current, not just someone who has
8  received a mailing.
9        And while we were shuffling these papers,
10  I did look back on my minutes of my meeting at NIAC,
11  which was on March 15th or March -- pardon me --
12  18th, 2010, and deep in those notes I see the quote
13  on which I relied in my report.
14        It says: "Board meeting, 28 percent not
15  current now" -- well, basically I've written in
16  handwriting what I've put in my footnote and in that
17  paragraph, to which you referred, but to the left of
18  my narrative, it says 2008.
19        So I believe that that was Kevin Cowl
20  speaking, not Trita Parsi, because I have his name
21  here on this page, and both those pieces of
22  information refer to 2008.

48 (Pages 186 to 189)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 190

1    So that means the Board minutes from '07
2 wouldn't be directly relevant to the footnote you're
3 asking me about, but at least now we know where I got
4 it -- it was Cowl -- and what year it referred to.
5    And I then apologize for the interruption,
6 and I'm back on the exhibit you've handed me, Number
7 10. And my answer was that I would assume members
8 are people who have paid, not who have merely
9 received a letter or an E-mail.
10    Q.   And it's your belief that when he was
11 talking to you about typical membership roles of
12 2,000 to 3,000, he was referring to 2008?
13    A.   That's what I wrote down.
14    Q.   I mean --
15    A.   No.  He was referring to -- I believe they
16 were referring to Board -- well, it's not clear.
17    I wrote 2008, Board meeting, so Kevin Cowl
18 must have been quoting information that was shared at
19 a Board meeting in 2008, and there may have been many
20 Board meetings in 2008.  You've shown me only one for
21 the beginning of 2008.
22    Q.   Well, in any event, if you take the 2008

Page 191

1 figures that are reported to the Board, along with
2 the figures from the 2007 meeting minutes from 2005,
3 2006, and 2007, the trend is upward through at least
4 February of 2008, is it not?
5    A.   That's not clear, because you yourself saw
6 the ambiguity at the bottom of page 1.
7    If you use the Number 2,000, your
8 statement is correct, but if you use the word current
9 members, which is pointed out here as 1,068 and 900
10 or so expired, then the 2007 numbers which peaked
11 around 1600 dropped significantly to 1,068.
12    Q.   Well, do you happen to know if the figures
13 in 2005, 6, and 7 are counted on a comparable basis?
14    A.   I don't know.
15    MR. KAPSHANDY:  Off the record.
16    (Discussion held off the record.)
17    MR. KAPSHANDY:  Let me hand you what we
18 will mark as your Deposition Exhibit 11, which is a
19 December 6th, 2010 message from the president taken
20 from NIAC's website this week, and I would just
21 direct your attention to the last paragraph which
22 makes a statement about membership.

Page 192

1    (Exhibit Number 11 was marked for
2 identification and was attached to the deposition.)
3    BY MR. KAPSHANDY:
4    Q.   First of all, I think there's no way you
5 could have or would have checked this NIAC website
6 before your deposition here this week, but I guess
7 you haven't checked their website for what they state
8 about membership, either present or overtime?
9    A.   That's correct.
10    Q.   And if one can believe what's posted on
11 the NIAC website as of December 2010, they report
12 that currently membership stands at close to 4,000
13 paid members and then 43,000 plus active supporters,
14 however they measure that.
15    But my question for you is:  At least,
16 according to NIAC, in December of this year, they're
17 reporting 4,000 paid members, correct?
18    A.   Yes.
19    Q.   And again, if we put that in the line with
20 the information from years 2005, 6, 7, and 8 -- and
21 now we have 2010 -- that would certainly indicate an
22 upward trend throughout this time period, correct?

Page 193

1    A.   Yes.
2    Q.   And have you seen any documents, Board
3 meeting minutes, anything from NIAC, indicating at
4 any time during the period 2007 to 2008 when the
5 defendant began the allegedly defamatory conduct --
6 that would substantiate that claims dropped during --
7 or membership -- paid membership dropped during that
8 time period, 2007 to 2008?
9    MR. PISHEVAR:  Objection.
10    THE WITNESS:  Would you read back that
11 question, please?
12    (The reporter read back the requested
13 testimony.)
14    THE WITNESS:  Thank you.
15    No.  I have nothing, other than my
16 handwritten notes of my meeting on March 18th.
17    MR. KAPSHANDY:  Have I filled in the gaps
18 in our exhibits?  Are we complete on numbers?
19    MR. PISHEVAR:  Yes.
20    MR. KAPSHANDY:  Thank you, for those of
21 you who are keeping track.
22    BY MR. KAPSHANDY:

49 (Pages 190 to 193)

1195219f-2dbf-4708-b7f6-a7b604561495

1    Q.   Let me hand you a couple at a time maybe
2  to speed things up just a little, Professor.
3        MR. KAPSHANDY:  Exhibits 14 and 15 we'll
4  mark for your deposition.
5        (Exhibit Numbers 14 and 15 were marked for
6  identification and attached to the deposition.)
7        BY MR. KAPSHANDY:
8    Q.   These are related communications from NIAC
9  or NIAC Board members about fundraising in this year
10  2010.
11       And the first one, for the record, is an
12  E-mail dated November 1, 2010 from Trita Parsi to, in
13  this case, somebody named Raminahmadi@juno.com
14  entitled, Subject:  You did it again.
15       And Exhibit 15 is a posting from NIAC's
16  website from a Board member by the name of Reza Aslan
17  relating to recent fundraising also in 2010.
18       First of all, I take it you've not seen
19  these before today?
20   A.   That is correct.
21   Q.   Now, let's assume that these documents
22  from NIAC and from their website are accurate.  The

1  one letter dated November 1 indicates that their
2  fundraising goal of $50,000 was exceeded by 360
3  percent; in other words, $180,160, correct?
4    A.   Which one are you referring to?
5    Q.   The letter, Exhibit 14.
6    A.   Yes.
7        MR. PISHEVAR:  May we have this letter in
8  native format, please?  Otherwise, there's some
9  irregularities there, too.
10       MR. KAPSHANDY:  Your objection is noted.
11       MR. PISHEVAR:  Hello.
12       BY MR. KAPSHANDY:
13   Q.   Exhibit 15 relates to another fundraiser
14  -- maybe the same one.  It's hard to tell -- of
15  $50,000 and signed by Reza Aslan, NIAC Board member,
16  so we can presume it's authentic.
17       MR. PISHEVAR:  Do you have a copy of that
18  for me?
19       THE WITNESS:  Is that -- the picture at
20  the top, is that --
21       BY MR. KAPSHANDY:
22   Q.   It would appear to be.  This is a document

1  emanating from NIAC.  And, again, it relates to
2  another $50,000 fundraiser.
3    A.   I'm sorry.  Did you pause?  That's the
4  question that's out there?  I was reading and I may
5  not have --
6    Q.   Sure.  I'll ask another question.
7        At least in the first paragraph, according
8  to Board member, Reza Aslan, he notes that in just
9  ten days, you've helped us reach our goal of raising
10  $50,000 to support NIAC's campaign to prevent war.
11  Do you see that?
12   A.   Yes.
13   Q.   At least, if it's not the same fundraiser
14  it indicates that another fundraiser they easily met
15  their goal of $50,000 in only ten days, correct?
16   A.   Just as an aside, I've used the word
17  fundraiser to mean a physical event rather than a
18  mailing.
19       I'm not sure here whether that means a
20  physical event or perhaps just a mailing with
21  associated phone calls, but given my confusion there
22  -- and it's a minor one -- I would agree with you

1  that either one or two fundraising type situations
2  are being reviewed here as successful in the year
3  2010.
4        MR. KAPSHANDY:  Let me hand you another
5  one just for completeness, a similar E-mail.  We'll
6  mark this as Exhibit Number 16.
7        (Exhibit Number 16 was marked for
8  identification and was attached to the deposition.)
9        BY MR. KAPSHANDY:
10   Q.   This is dated April 25, 2008 from Trita
11  Parsi to somebody named Gohari Behzad (sic) --
12   A.   Or Behzad Gohari.
13   Q.   -- carbon copying a number of people,
14  including Babak Talebi, in response to his E-mail to
15  them of April 24, 2008 where Mr. Gohari of the Gohari
16  Law Firm seems to be offering help to NIAC to counter
17  some of the allegations that are being made against
18  NIAC, in particular, being an agent for the Islamic
19  Republic of Iran.
20       MR. PISHEVAR:  Is this something we
21  produced?
22       MR. KAPSHANDY:  Yes.  It's part of your

50 (Pages 194 to 197)

Page 198

1  Talebi production, I believe.  It's hard to keep them
2  straight, counsel -- I agree -- but my recollection
3  where it comes from.  It was copied to Babak Talebi.
4      BY MR. KAPSHANDY:
5      Q.   And you'll see at the top Trita Parsi
6  responds to him -- and this is in 2008, April --
7  "Dear Behzad, we would be delighted to meet and hear
8  your suggestions.  Would also like to bring Shadee
9  and Babak from our office who work on this.
10      Getting the outside perspective is very
11  important to us.  Equally important is to share the
12  inside perspective with you.
13      The reality that in spite of all the
14  accusations and defamation spread by certain
15  elements, NIAC has never raised as much money or
16  attracted as many members as in the past few months."
17      First of all, did I read correctly Mr.
18  Parsi's response to Behzad?
19      A.   Yes, you did.
20      Q.   And certainly, there's nothing in this
21  that would indicate in the middle, at least April of
22  2008, that as a result of what they call defamation

Page 199

1  that NIAC has been losing members, does it?  In fact
2  it, indicates that they've been attracting more,
3  correct?
4      A.   Yes, but you didn't read the last sentence
5  which says, "but things can always been improved."
6      Q.   That's true, pretty much of anything,
7  isn't it?
8      A.   Yes, sir.
9      Q.   But I'm talking about the numbers.
10  There's nothing in here to indicate that their
11  members have decreased, in fact, quite the contrary,
12  according to Trita Parsi, correct?
13      A.   That's correct.
14      Q.   And they didn't provide this to you?
15      A.   No.  I have not seen this, nor do I
16  recognize the name Behzad Gohari.
17      Q.   Well, I'm talking about Trita Parsi's
18  response to Behzad.  Presumably, Trita knew what he
19  was talking about when he wrote this.
20      A.   Right -- no.  I mean, I would have
21  remembered the name Gohari or something.
22      Q.   Right.  I gotcha.  And with regard to

Page 200

1  money, as opposed to members, Mr. Parsi goes on to
2  state that "NIAC has never raised as much money as in
3  the past few months," correct?
4      A.   That's correct.
5      Q.   Just a couple more.  If you could turn to
6  Exhibit A of your report, please -- Table A of your
7  report, which is Exhibit 5?
8      A.   Table A, yes.
9      Q.   And in particular, directing your
10  attention to the damage estimates year by year, now,
11  I understand from your previous testimony that you're
12  not expressing an opinion as to which growth rate or
13  how many years NIAC could expect to be experiencing
14  alleged damages from alleged defamation.
15      But my question has to do with the 5
16  percent -- well, the 2009 one, okay?
17      A.   Um-hum.
18      Q.   I understand for 2009, if you read all the
19  way across, you've used the actual surplus, as we
20  discussed up above, rather than the projected surplus
21  from your model, correct?
22      A.   Well, it's a tiny bit more complex.  I

Page 201

1  wrote -- and this was not produced, because I wrote
2  it in preparing this morning for this.
3      I wrote:  "Note, C25" -- and C25 doesn't
4  -- they're not the -- the row and column headings
5  don't appear on what was printed, but in the actual
6  Excel spreadsheet, C25 is the $49,879 figure that I
7  think you're referring to in the 2009 row.
8      And what I wrote was -- this comes from a
9  negative -- what I literally wrote is minus $230,061
10  plus $284,450 minus $4,511, so -- and I characterized
11  that in verbal terms as what they did get in 2009,
12  what they would have gotten, an adjustment for legal
13  expenses they would not have incurred.
14      So the word actual took that -- I mean, I
15  wanted to amplify that slightly.  In other words,
16  they did get about $230,000, but they would have
17  gotten more, and the amount more at of 5 percent
18  growth rate would have been about 50,000 bucks.
19      And so I think that brings up a principle
20  that's been in my mind as we looked at the last four
21  exhibits where you're basically making the case that
22  things as of '08 weren't so bad, and, in fact, by

51 (Pages 198 to 201)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 202

1  2010 are looking very good.
2       The nature of a report such as mine is
3  slightly more general.  It's not negated by the
4  presence of success by some metric.  It's trying to
5  say that things could have been better, and that's
6  why I pointed out that last sentence in the 2008
7  E-mail from Parsi to Gohari.
8       Q.   Well, that's always true.  Things could
9  have been better.  You could have increased, instead
10 of it 50 percent a year, 100 percent a year.
11 Everybody would like that, right?
12      A.   Yes.
13      Q.   But my question is -- and let's just focus
14 on the 5 percent column, because first of all, I
15 understand you're not giving an opinion that their
16 growth rate should have been 5 percent.  That's just
17 what you assumed in that column, correct?
18      A.   That's correct.  I'm trying to be an Idiot
19 Savant, I-D-I-O-T, S-A-V-A-N-T, which is from the
20 French.
21      I'm trying to help the trier of fact or a
22 jury who might say, Well, I've listened to all of

Page 203

1  this testimony and they would have grown at 5 or 10
2  or 15 or 20.  Those are reasonable growth rates for a
3  jury to consider, and I've done the math.
4       Q.   Right.  You've done the math, but you're
5  not saying, to a reasonable degree of scientific
6  certainty, that their growth rate would have been 5
7  percent per year?
8       A.   That's correct.
9       Q.   It's just a hypothetical, correct?
10      A.   Correct.
11      Q.   And if so, just so we read the column
12 correctly under 5 percent, for 2008, 2010, 2011,
13 2012, these estimates are what your model projects
14 for damages, assuming a 5 percent growth rate, and
15 the -- I'm trying to figure out how best to explain
16 this.
17      Why don't you do it in your own words?
18 Tell us, except for 2009, the manner in which you
19 calculated the hypothetical damages for 2008, 2010,
20 2011, and 2012 from the surplus figure that we see
21 over on the far right side, and, particularly,
22 starting with the $258,000 actual surplus that they

Page 204

1  report for 2008.
2       Because what we know is in 2008 -- excuse
3  me -- in 2008, they had an actual surplus of $4511,
4  correct?
5       A.   Yes.
6       Q.   And what you're saying with your model,
7  assuming a 5 percent growth rate, is that the surplus
8  that your model predicts for 2008 would be $266,394,
9  correct?
10      A.   Yes.
11      Q.   And that's basically by taking the data
12 from 2002 to 2007 and extrapolating that forward,
13 correct?
14      A.   Well, not in quite such a precise form.  I
15 have said in the row that talked about ratios that
16 surplus, for example, increased by a factor of 8.89
17 between 2002 and 2007.
18      And that that is equivalent on a
19 compounded basis to a 55 percent growth rate, but I
20 haven't used it, as you know, because you showed the
21 range of 5 percent through 20 percent.
22      I haven't been so bullish or perhaps

Page 205

1  speculative to have used 55 percent as a growth rate,
2  so what I'm objecting to and trying to recharacterize
3  slightly is the sense of what you say, sir, is right,
4  but not the numerics.
5       I haven't used literally the growth rate
6  of surplus between 2002 and 2007 to get to that
7  number that you're asking me about and those numbers
8  that you're asking me about in the 5 percent column.
9       What I did was assume that given my
10 observation of the 55 percent growth rate that if I
11 take 5 percent as an assumption that the 2008 row
12 would be the 2007 experience multiplied by 1.05 and
13 the 2009 would be what I just narrated from today's
14 -- this morning's notes and then 2010 would be, if
15 you did the math, 1.05 raised to the second power,
16 which is 1.11 or something, times the 2007 number,
17 and 2011 would be 1.05 raised to the third power
18 times the surplus base in 2007, and 2012 would be
19 1.05 raised to the fourth power on top of or as a
20 growth on the surplus base of 2007.
21      And then the cumulative columns just below
22 -- just look at '08, '09, and 2010 as a sum and then

52 (Pages 202 to 205)

Page 206

1  2008, 2009, 2010, and 2011 as a sum for the four-year
2  row, and then the last year, which I call five-year
3  cumulative damages, that would be the sums of 2008,
4  2009, 2010, 2011, and 2012.
5      Q.   Right, just to maybe -- let me summarize
6  to get the figures we see under the damages estimate
7  under 5 percent growth rate.
8          You took the $258,005 surplus from 2007
9  and you increased that 5 percent per year
10 cumulatively for each of the years except for 2009,
11 where you give actuals, correct?
12     A.   Well, I don't want that characterization
13 of 2009 as actuals.  2009 is including actuals.  It's
14 really that calculation that I said before, $230,061
15 with a minus sign in front of it, plus $284,450 minus
16 the legal expenses of $4,511.
17         For example, if you look at the column
18 called 5 percent and the growth rate for -- and the
19 year 2008, you see the Number $266,394.
20         Now, you might have prepared -- you're,
21 obviously, very well prepared for this.  You might,
22 have multiplied $258,005 by 1.05 and you don't get

Page 207

1  that number.  You get about $270,000, but the
2  difference is that you subtract or I did subtract the
3  4511 (sic).
4      Q.   Which was their actual?
5      A.   Which was some note that somebody gave --
6  or I saw in maybe one of the balance sheet or income
7  statement pile for legal expenses.  I either saw it
8  or I was told.
9      Q.   I see what you're saying, but that's
10 negligible.  For the purpose of my question, what I
11 want to do is ask you about, you know, 2008, 2010,
12 2011, 2012 projected, assuming a 5 percent increase
13 in growth.  And the basis for that is the annual
14 surplus we see for 2007, correct?
15     A.   Yes.
16     Q.   And if one were to have done that for
17 2009, what would your figure be in there for 2009
18 that would be based upon this assumption of a 5
19 percent growth rate for the damages?
20     A.   Okay.  I think that's $284,450 from my
21 little note here, but let's check that.
22     Q.   It seems right.  Somewhere half between

Page 208

1  266 and 298.
2      A.   Correct.  I'm going to take 1.05 and I'm
3  going to raise it -- this is not a business
4  calculator, just a scientific calculator -- I'm going
5  to raise it to the second power, so essentially I've
6  added an exponent.
7          So now I'll multiply 1.1025 times the 2007
8  figure, which is $258,005, and I get the figure I
9  just read from my notes of $284,450.  That doesn't
10 appear in the '09 row because of the adjustments of
11 the legal expenses and --
12     Q.   Well, and actually, as you pointed out,
13 they had a much higher surplus than one would have
14 gotten using the assumed 5 percent growth rate,
15 correct?
16     A.   Well --
17     Q.   Let me state it another way.  Your model
18 using the 5 percent assumed growth rate --
19     A.   You're going back to what we penciled in
20 before, the 230?
21     Q.   Yes.  Let me just finish.  Your model
22 using the 5 percent growth rate would have projected

Page 209

1  in 2009 damages of approximately $284,000 when
2  compared to the actual surplus that NIAC received,
3  one shows actual damages of only $49,879, assuming
4  all of the damages related to whatever Hassan has
5  said or done?
6      A.   Yes.
7          MR. KAPSHANDY:  Why don't we just go off
8  the record.  I just want to check my notes, and I
9  think we're just about done, okay?
10         THE WITNESS:  Yes.
11         (A break was taken.)
12         BY MR. KAPSHANDY:
13     Q.   Just to wrap up here on this same line of
14 questioning with the projections under the assumed 5
15 percent growth rate, just to be clear, the $49,000
16 for 2009 comes from taking the 284,000 that you
17 project from a 5 percent --
18     A.   Literally, $284,450.
19     Q.   When, in fact, they had a surplus of -- we
20 know now -- $230,000, so you report the $49,879,
21 correct?
22     A.   Well, included in that result is the

53 (Pages 206 to 209)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 210

1    $4,511 of legal expenses.
2        Q.   Right, but aside from that adjustment, you
3    took the actual surplus that they had?
4        A.   Yes.
5        Q.   And, obviously, you don't want to claim as
6    damages a figure of $284,000 dollars in, shall we
7    call it, annual surplus they would have received but
8    for Hassan's conduct, when, in fact, they had a
9    surplus of $230,000, correct?
10       A.   That's correct, and so I wrote on the
11   right that I've adjusted my 2009 actuals.
12       Q.   Now, my question is going forward for
13   2010, 2011, and 2012 where you put in these figures
14   of roughly $300,000 a year.  Those figures
15   necessarily assume that there is no actual surplus,
16   correct?
17       A.   That's correct, because I didn't have any
18   late data.
19       Q.   And I guess to be fair to you -- and you
20   were straight up about that right at the very front
21   about the summary of your opinion -- you don't have
22   an opinion on what their damages would be in 2010 or

Page 211

1    11 or 12, do you?
2        A.   Is that the exact wording I used or was I
3    a little more careful?
4        Q.   "I do not opine to a particular growth
5    rate that NIAC would have enjoyed, nor do I opine on
6    the exact number of years through which damages will
7    persist."
8        A.   That's different from what you said.
9        Q.   Well, you're not opining on the exact
10   number of years for which damages will persist, are
11   you?
12       A.   That's correct.
13       Q.   And just to be clear, I won't
14   mischaracterize.  I'll read exactly your words: "Nor
15   do you opine to a particular growth rate that NIAC
16   would have enjoyed absent the events described in the
17   complaint," correct?
18       A.   That's correct, but where -- may I jump in
19   or do you want to finish?
20       Q.   First of all, that's the opinion you gave
21   in your summary of --
22       A.   I hold to that.  What I'm -- what I want

Page 212

1    to be very careful about in terms of wording is that
2    as the litigation proceeds or if it proceeds and
3    actual 2010 results come in, surely, they will
4    mitigate.
5            I just don't know how to quantify that
6    because I have opined on a path from '07 forward on a
7    but-for basis.  I have not opined on the current
8    situation absent -- or including the alleged tort.
9        Q.   And good point.  In fact, if NIAC's
10   surplus is over $298,673 for 2010, in fact, their
11   damages will be zero?
12       A.   That's correct.
13       Q.   And in fact, just to give a very specific
14   example, did you check your -- their website this
15   week to see that they got a $440,000 contribution
16   from the Parsa Community Foundation and that their
17   revenues are well in excess of what they were even
18   for 2009?
19       A.   I did not check the website.  I was told
20   there was a grant and I was actually told some
21   details about it just yesterday, but I don't think I
22   remember -- I didn't write it down or anything like

Page 213

1    that, but I'm aware that there was something big.
2        Q.   And in any event, the point could be,
3    depending on how big the grants are and how frugal
4    they are with their expenses, that figure could well
5    be zero or even a negative figure for 2010, correct?
6        A.   Yes.
7        Q.   Although, a negative figure wouldn't make
8    sense unless they're willing to pay the defendant
9    back some money.
10           MR. KAPSHANDY:  I appreciate your time.
11   That's all I have.  I appreciate your cooperation and
12   candor, and I think that's all.  Thank you very much.
13           THE REPORTER:  Reading and signing?
14           MR. PISHEVAR:  Yes.
15           THE REPORTER:  Would you like a copy, Mr.
16   Pishevar?
17           MR. PISHEVAR:  A copy, yes, please.  As
18   with the other ones, the transcript not the exhibits.
19   I already have the exhibits.
20           (Deposition concluded at 6:50 p.m.)
21
22

54 (Pages 210 to 213)

1195219f-2dbf-4708-b7f6-a7b604561495

Page 214

1    CERTIFICATE
2        I hereby certify that the witness was duly
3  sworn by me and that the deposition is a true record
4  of the testimony given by the witness.
5
6        _____
7        Sherry L. Brooks, Court Reporter
8
9  (The foregoing certification of this transcript does
10  not apply to any reproduction of the same by any
11  means, unless under the direct control and/or
12  supervision of the certifying shorthand reporter.)
13
14
15
16
17
18
19
20
21
22

Page 216

1        - - - - - - - - -
2        E R R A T A
3        - - - - - - - - -
4
    PAGE    LINE        CHANGE
5    _____
6    _____
7    _____
8    _____
9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    SIGNATURE _____ DATE _____

Page 215

1      INSTRUCTIONS TO WITNESS
2        Please read your deposition over carefully
3  and make any necessary corrections.  You should state
4  the reason in the appropriate space on the errata
5  sheet for any corrections that are made.
6        After doing so, please sign the errata
7  sheet and date it.
8        You are signing same subject to the
9  changes you have noted on the errata sheet, which
10  will be attached to your deposition.
11        It is imperative that you return the
12  original errata sheet to the deposing attorney within
13  thirty (30) days of receipt of the deposition
14  transcript by you.  If you fail to do so, the
15  deposition transcript may be deemed to be accurate
16  and may be used in court.
17
18
19
20
21
22

Page 217

1      ACKNOWLEDGMENT OF DEPONENT
2        I, _____, do hereby certify
3  that I have read the foregoing pages ___ to ___ and
4  that the same is a correct transcription of the
5  answers given by me to the questions therein
6  propounded, except for the corrections or changes in
7  form or substance, if any, noted in the attached
8  Errata Sheet.
9        _____
10  DATE            SIGNATURE
11
12  Subscribed and sworn to before me this _____ day
13  of _____, 2010.
14
15  My commission expires:  June 1, 2011
16
17  _____
18  Notary Public
19
20
21
22

                    55 (Pages 214 to 217)

**A**

AACSB 35:18
Abbas 128:11
ability 27:3
able 6:18 18:22
  33:9 81:18 94:6
  94:11 98:12
  105:17 110:5
absent 80:1 154:14
  211:16 212:8
absolutely 134:9
  165:18 186:12
academic 24:22
  35:22
Academy 29:16
accept 141:21
acceptable 50:21
accepted 162:12
accident 27:2 74:10
accommodate 6:8
accomplishments
  73:11,12
account 64:17
  76:11 77:8,22
  130:16
accountants 57:11
accounted 65:10
accounting 20:8
  57:13,16,21 58:16
  58:17 62:5
accredited 35:18
accrual 58:4
accumulate 56:1,8
accumulated 64:3
accumulation
  31:17 74:20
accurate 6:2 15:20
  20:22 186:19
  194:22 215:15
accurately 20:8
  45:6 64:11 107:21
Accusation 115:13
accusations 198:14
accused 160:3
accusing 138:14
ACKNOWLED...
  217:1

acquisition 30:16
acquisitions 30:22
acronym 21:12
acting 170:16,17
action 49:22 106:8
  149:11 171:10
actions 101:5,19
  102:11,12 123:8
  123:19 124:4,17
  131:10 137:17
  170:22
active 192:13
activities 69:16
actual 34:7 38:22
  64:21 65:10 85:18
  105:15 173:15
  184:15 200:19
  201:5,14 203:22
  204:3 207:4 209:2
  209:3 210:3,15
  212:3
actuals 206:11,13
  206:13 210:11
Ad 14:18
Adaptive 63:16
  64:7
add 86:10 93:6,7
added 11:15 46:21
  67:22 91:16 93:12
  208:6
addition 91:13
additional 52:17
address 10:8 58:19
  117:21 122:11
  125:3 130:11,12
addressed 62:21
addresses 160:1
adjudicate 146:19
adjunct 82:17
adjusted 35:16
  210:11
adjustment 143:21
  201:12 210:2
adjustments 78:1
  208:10
admit 45:13 173:21
admitting 44:6

advance 53:20,22
advantage 148:6
adverse 74:2
advertise 176:7
advertising 51:11
advocacy 78:17
affairs 36:21 43:11
  48:4 81:18 156:14
  178:11
affect 155:8,9
affirmatively
  123:20
affirmed 37:7,11
Afiattalab 121:13
afternoon 5:9,10
agent 76:14 123:14
  143:12 164:8
  197:18
ago 26:6 44:3 175:3
agree 16:5 116:18
  121:3 127:10
  151:8 196:22
  198:2
agreement 22:7
  52:8 165:15
ahead 43:21 71:20
  79:8 140:12
  149:13 152:21
Ahmad 140:16
Ahmadi 4:7
Ahmadinejad
  133:8,11
Al 41:7,10
Ali 147:6,7
alike 11:22
allegation 100:11
  156:18
allegations 38:9
  76:3 98:9 99:10
  100:15 133:14,15
  138:17 155:7
  197:17
alleged 31:18 57:18
  187:22 200:14,14
  212:8
allegedly 193:5
allied 117:11

allocated 87:5
allow 24:22
allowed 48:19,20
  56:8
Alright 8:1 20:4
  50:4
altered 165:19
ambiguity 191:6
Amendment 145:5
American 1:5
  128:19
Americans.com
  125:13
amount 71:9 91:16
  99:22 101:9
  201:17
amounted 37:3
amounts 137:1
amplify 201:15
analog 144:4
analyses 74:8
analysis 18:10
  39:19 42:6 43:11
  53:1 54:14 60:21
  61:1 62:22 63:1
  117:13,22 118:9
  118:10 126:20
  139:12 140:2
  154:10
analyzed 48:3
analyzing 42:9,12
Anari 161:1
and/or 141:5
  214:11
anecdotal 74:1
anecdotes 74:17,19
  178:2
Angelos 48:3
angry 6:4
Annapolis 40:2,11
Anne 24:6
annual 3:21 56:7,7
  56:9 78:2 89:4
  90:2 93:21 95:2,6
  185:1 207:13
  210:7
answer 36:5 48:20

49:10 62:12 71:3
  76:18 87:5 113:11
  146:4,8 152:12
  158:21 190:7
answered 18:11
  58:7 83:17 146:9
  177:21
answering 29:2
  40:18 70:10
answers 217:5
Antonio 17:20
anybody 95:11
  96:4 128:17
  183:12
anyway 30:6
apathetic 175:11
  175:14
APB 58:17
apologize 146:22
  190:5
apparent 9:17
  121:14
apparently 125:5
  128:14 140:17
  166:4 169:8
appealed 37:11
Appeals 33:19 37:5
  50:22
appear 9:3 14:9
  46:12 195:22
  201:5 208:10
APPEARANCES
  2:1
appeared 76:3
appears 7:17 91:7
  119:4 126:17
  133:19 147:16
  149:6 152:18
  180:17 181:12
applicable 60:12
application 21:20
  154:22
applied 61:16
  62:10 65:4
apply 58:18 214:10
appointments
  14:13

appreciate 13:3
27:21 66:4 90:14
108:21 145:12
213:10,11
approach 160:10
appropriate 100:17
102:5 215:4
approximate
110:14
approximately
31:13 77:5 176:11
188:19 209:1
April 197:10,15
198:6,21
AQ 24:22
arbitrary 85:7
area 31:1 38:10
Argumentative
142:10
arguments 162:15
arms 135:2
arose 181:5
arrangement 52:11
53:3,16,19
arrested 68:10
arrived 159:3,9
Arsalan 127:3
article 20:7 21:4,7
21:8,11,14 22:8
22:13,20 24:10
25:16 28:14,16
29:18 30:9 63:3
82:2 115:12
118:21 119:9,12
119:14 120:2
121:4 125:13,15
127:5,20 128:3
143:7,18,22
145:15 146:2,7
150:6 153:10,14
articles 20:12 28:6
28:22 35:4,6,17
36:2 46:8 56:13
57:17 62:13,16,17
62:18,19 75:10,18
83:15,20 161:18
184:4

articulate 177:2
Arundel 24:6
ascertain 117:20
aside 20:5 21:2
157:1 164:19
196:16 210:2
asked 26:14 28:21
51:19 57:9 83:17
97:14 101:21
106:1 108:7
114:13 141:3
146:5,9 152:15
153:19 159:9
178:16
asking 5:20 32:5,20
45:2,20 58:6
70:17 90:21 99:1
100:6,8 119:13
129:14 146:15,21
150:11 156:7
163:14 172:14
174:10 190:3
205:7,8
asks 145:22 148:4
153:7
Aslan 194:16
195:15 196:8
Aslan194 4:8
aspiring 127:16
asserting 159:4
assess 35:14 41:16
asset 27:9
assets 31:7 56:7,8
88:15
assigned 25:15
assignment 52:14
96:21 116:15
assignments 13:17
14:21
associated 196:21
ASSOCIATES 2:3
association 21:13
21:14 22:22 98:19
98:22 169:18,21
177:16
assume 45:16
68:19 70:7 77:13

99:6,18 100:3,6
102:14,20 104:9
104:11 116:2
136:4 139:17
151:12 154:12,16
176:17 190:7
194:21 205:9
210:15
assumed 26:22
202:17 208:14,18
209:14
assuming 68:6,9
69:9,17 104:22
107:1 116:4 117:1
159:4 203:14
204:7 207:12
209:3
assumption 61:7
72:8 97:12 205:11
207:18
assumptions 64:13
64:18 65:5 79:12
attached 4:14
12:11 14:3 15:10
16:22 19:20 20:15
21:4 22:6 107:14
160:17 178:14
180:11 185:14
188:8 192:2 194:6
197:8 215:10
217:7
attachments
109:11
attainment 18:8
attempt 94:18
111:1 136:18
attempting 44:21
120:6 173:22
attempts 146:5
attend 82:15 176:6
attended 15:1,1
175:4
attending 64:6
148:1
attention 13:15
21:9 184:3 191:21
200:10

attestation 123:6
attorney 51:2
113:8 141:1
215:12
attorneys 48:21
77:14 81:12 177:6
attorney's 45:8
attracted 198:16
attracting 199:2
attribute 73:7
102:6 117:7
120:12 144:1
attributed 163:20
attributes 100:9
155:20
attributing 78:3
97:20 130:22
attribution 107:3
155:12
auditing 57:18
auditorium 113:13
113:14
August 29:17
119:19 138:10
AUSTIN 2:8
authentic 195:16
Authority 17:22
18:1
auto 27:2 74:10
automatically
15:14
average 183:21
aware 44:5,10 45:3
50:15,19 51:3
57:6 58:19 62:8
69:22 70:4 78:5
78:18,19 79:2
81:20 84:6 85:15
85:17 96:2,18
120:22 124:4
125:20 126:4
134:21 136:1,3
143:11 176:9
213:1
A&M 161:2
A-F-I-A-T-T-A-...
121:13

A-H-M-A-D
140:17
A-L-I 147:7
A-NIAC 3:17
A-N-A-R-I 161:2
A.P 2:3

**B**

B 9:19 109:4
Babak 147:9,14,18
147:19 148:16,19
197:14 198:3,9
back 25:4 26:6
31:21 43:7 57:3,4
79:8,9,13 80:15
80:16,19 83:3
84:2 93:7 102:12
115:6 120:15
137:21 144:3
166:15 167:14
189:10 190:6
193:10,12 208:19
213:9
backed 24:20
background
179:20
bacteria 43:10
bad 57:14 65:3
117:5 123:15
127:17 159:7
168:14 201:22
bag 60:8
Bahar 134:20
135:16
Baker 33:3 40:3,8
47:11
balance 60:19 61:6
84:19 207:6
Baltimore 1:16
15:6 17:22 18:1,3
20:12 40:4 49:15
113:4 170:16
Baltimore's 16:6
bank 168:22
banker 170:2
bankruptcy 30:4
37:12,14,19 44:20

**barely** 5:14
**Barmand** 127:4
**Baronesses** 179:11
**Barons** 179:11
**base** 205:18,20
**based** 62:3 63:10
102:5 104:16
162:15 207:18
**bases** 163:10
**basically** 81:16
189:15 201:21
204:11
**basis** 25:19 53:6
54:3 60:17 69:22
70:4,18 72:7,22
73:12,15,22
132:13 136:14
154:2 159:17
160:6 161:2,15
184:9 191:13
204:19 207:13
212:7
**Baumann** 119:6
**Baxter** 40:3,7
**bearded** 150:18
**began** 11:4 31:19
74:6 96:11 103:14
103:18 105:13
118:5 122:20
123:8 131:9 193:5
**beginning** 84:19
85:11 190:21
**begins** 111:16
**behalf** 33:4,5
**behoove** 87:13
**behooves** 87:11
**Behzad** 4:9 197:11
197:12 198:7,18
199:16,18
**belief** 190:10
**believe** 8:16 9:20
15:6 16:17 18:16
29:7 34:20 37:7
45:5,9,21 46:16
49:15 60:12 66:11
66:15 77:7 90:21
122:7 133:14

152:1 163:2
168:22 180:21
189:19 190:15
192:10 198:1
**believes** 121:17
186:18 188:1
**Beltway** 131:17
**Benchmarks** 14:9
**benefit** 80:20 148:7
**benefits** 65:17
**best** 179:19 187:6
203:15
**better** 149:20 151:5
151:17 167:21
184:8,15 202:5,9
**beyond** 28:17
116:14 179:14
**bias** 173:21 177:13
177:21
**bifurcate** 136:19
**big** 42:7 48:17
135:11 172:1
213:1,3
**billing** 53:17
**binder** 85:7 172:8
**bit** 9:1 12:18 44:1
71:20 79:11 99:5
106:14 112:1
161:8 162:8 177:7
200:22
**black** 12:20
**blaming** 167:19,20
**blank** 86:12 92:13
92:18
**bless** 141:12
**blog** 115:2 149:18
149:22 150:6
152:6,16
**blogosphere**
137:15
**blood** 118:1
**blow** 102:12 140:11
162:1
**blue** 8:10 67:20,21
118:16
**blueprints** 158:1
**Board** 3:21,22 4:6

58:16,17 158:15
172:13,13,18
173:3,18 180:7
181:13,14,22
182:13 183:13
184:10,14 185:16
186:17 187:9,13
188:15,16 189:14
190:1,16,17,19,20
191:1 193:2 194:9
194:16 195:15
196:8
**Board's** 180:17,19
**Bob** 157:22
**body** 119:15
**bold** 112:14
**book** 24:13 25:11
25:12 60:5,9
**Borghey** 182:16
**Borzillery** 51:14
**bottom** 25:12 39:4
66:9 93:11 116:1
119:9,17 120:2
169:19 170:6
175:10 182:17
183:3 186:8
188:14 191:6
**bought** 31:7
**break** 6:8 43:19
47:2 94:3,16
107:10,11 108:22
161:21 162:2
178:4,5 209:11
**brewing** 105:2
**brick** 23:10,11
**briefly** 144:3
**bring** 11:10,11,14
68:12 77:14 101:4
148:5 198:8
**brings** 31:14 97:1
201:19
**British** 179:8
**broader** 34:18
**broken** 55:11
**Brooks** 1:18 214:7
**brought** 6:19 8:3
11:9,12 27:8

39:16 45:19 46:13
47:4 60:5 98:2
124:1 144:6
170:18
**bucks** 201:18
**budget** 53:20 65:17
**Builders** 48:5 50:2
**built** 43:12
**bulk** 23:16
**bullish** 204:22
**bunch** 10:13 11:4
49:20 153:11
**business** 21:19
23:18 25:17,18,20
27:4,6 28:11
29:16 30:7 35:18
42:9 43:11 48:4
50:7,11 63:17
113:5,13 186:3,9
208:3
**but-for** 212:7
**buy** 30:20 31:1
**buying** 30:17
**buyout** 41:16,17
**B-A-H-A-R** 134:20
**B-L-O-G** 115:2
149:18
**B-O-R-G-H-E-Y**
182:16

## C

**C** 5:1
**calculate** 73:17
144:8
**calculated** 45:7
89:7 90:4 203:19
**calculating** 44:15
55:7 56:14
**calculation** 28:9
35:6 44:14 45:1
45:14 50:13 59:1
159:1 206:14
**calculations** 44:7
50:17 109:13
140:3 143:20
**calculator** 88:20
208:4,4

**calendar** 101:11
**California** 125:7
**call** 5:15 6:22 23:12
40:22 50:22 55:14
58:9 64:20 66:20
67:19 71:6 104:5
122:21,22,22
164:6 177:3
198:22 206:2
210:7
**called** 5:4 8:12 11:2
14:18 15:15 17:20
21:20 22:21 24:22
25:12 29:13,16
33:3,11,19 34:13
38:15 39:11 41:8
42:8 48:4 51:2,7
60:10 63:15,21
78:16 85:1 116:7
134:12,19 140:7
149:22 176:4
177:5 206:18
**calling** 50:20 61:16
87:8 97:9 174:21
177:10 179:1
**calls** 32:18 116:17
125:22 196:21
**campaign** 120:3
134:19 196:10
**campus** 71:5
**candor** 213:12
**Cann** 133:1 134:16
**capacity** 170:16
**capital** 64:3
**caption** 34:21
**carbon** 197:13
**care** 135:7 162:19
**career** 36:22
**careful** 6:3 167:21
211:3 212:1
**carefully** 11:14
215:2
**caring** 121:17
**carriers** 137:13
**cartoon** 150:5
151:1,1 152:3
**cascade** 123:7

131:3,3,4 140:7
**case** 5:21 12:22
  18:4,5 19:15 20:1
  23:18 25:21 26:7
  26:11,13 27:1,5,8
  27:20 29:14 31:12
  31:14,15,16 32:8
  32:11,16 33:1,17
  33:21 34:8,9,20
  35:5,7 36:11,11
  36:15,18 37:5,8
  38:8,8,11,14,17
  38:17,21 39:15,16
  40:10,13 41:3
  42:1,6 43:2,3,14
  45:22 47:7,15,17
  47:17,19,22 48:2
  48:14,15,22 49:3
  49:18 50:15 51:5
  51:5 53:2,8 55:5
  56:21 57:10 60:12
  60:13,22 61:18
  62:4,6 66:1,9,17
  67:7,10,16 72:9
  73:20 74:10,16
  81:7,11,16 100:12
  101:22 102:15
  103:10 105:4
  106:19 111:6
  117:16 118:3
  124:1,18 136:4
  159:9 163:11,19
  171:8,14 173:20
  194:13 201:21
**cases** 16:14 18:19
  23:15,19 25:13
  32:22 35:5 36:8
  38:4 41:1 46:8
  50:5,10 53:11,12
  53:18 55:11 67:18
  74:9 144:4,16
  162:12
**case-related** 12:19
  12:21
**cash** 35:13 36:1
  58:4 105:12 106:5
**Castle** 178:9

**categories** 75:4
**category** 28:13
  94:17
**causal** 74:22
**cause** 133:21 152:2
**caused** 69:4,19
  78:2 81:13 103:18
  114:6 122:8
  143:22
**causes** 156:17
**CD** 9:12
**CDs** 11:6
**cease** 31:2
**ceased** 101:10
**cell** 91:10,10
  168:21 174:20,21
**Center** 38:19
**centers** 113:7
**certain** 51:10 56:1
  58:21 71:9 144:10
  144:11,12 198:14
**certainly** 9:18
  13:18 17:14 27:17
  28:3 31:9 108:9
  141:20 160:13
  173:21 188:2
  192:21 198:20
**certainty** 80:9
  203:6
**CERTIFICATE**
  214:1
**certification** 214:9
**certify** 214:2 217:2
**certifying** 214:12
**cessations** 106:17
**chain** 34:16 140:6
**Chairman** 14:16
  179:8
**chance** 26:8 161:9
**chances** 171:12
**change** 13:16 27:9
  61:1 64:2,3,10
  65:21 69:19
  101:17 106:5
  136:2,5 148:5,11
  155:10 156:4
  216:4

**changed** 27:4,7
  65:20
**changes** 14:7,20
  30:7 60:22 63:2
  130:5 215:9 217:6
**character** 159:4
**characterization**
  206:12
**characterize**
  106:13 142:2
**characterized**
  101:3 201:10
**characters** 110:13
  110:15 150:17
**charged** 54:11
**charging** 54:3
**charitable** 184:5
**charities** 184:17
**Charles** 1:16
**chart** 88:7 108:2
**charter** 56:10
**CHC** 36:13 37:12
  37:19 38:1
**check** 207:21 209:8
  212:14,19
**checked** 192:5,7
**chelation** 118:1
**Chemical** 29:14
  30:17
**Chicago** 2:10
**child** 117:19,20
  144:9
**children** 41:12
**chimes** 148:15
**choice** 23:6
**Chris** 51:16
**CIA** 143:11
**Circuit** 18:2 36:17
  49:14
**circulated** 104:2
**circumstance** 63:9
**circumstances**
  156:2
**citations** 142:7
**cite** 24:9 133:19
  141:14 184:22
**cited** 25:12 57:8

58:11
**cites** 137:10 143:12
  143:16 145:22
  146:1
**citing** 142:13
  148:20 149:7
  186:11
**City** 17:22 18:1,3
  25:22 43:3
**Civil** 1:7
**claim** 18:7 27:6
  33:8 41:18 48:16
  51:20 117:16,18
  124:5 163:12
  210:5
**claimed** 18:6
**claims** 45:8 133:9
  193:6
**Claire** 132:12
  143:2,22 145:14
**clarification** 70:16
  106:2
**clarify** 66:7 79:14
  106:6
**clarifying** 105:7
**class** 49:21
**classroom** 35:10
**clean** 66:12 89:11
  138:17
**clear** 51:9 92:11
  103:7 108:3
  115:16 122:15
  181:21 190:16
  191:5 209:15
  211:13
**clearly** 36:10
  159:11 177:13
**clerks** 15:19
**client** 81:6 98:4
**climate** 137:2
  159:12
**Clinton** 133:10
**close** 192:12
**Closed-End** 14:8
**CNBC** 104:1
**cocoa** 26:2
**cogent** 36:20

**Cohen's** 37:13
**collate** 10:20
**collect** 10:19 44:22
  45:16
**collecting** 44:21
**collection** 3:10,11
  7:1,10 8:9
**collects** 147:21
**college** 24:7 28:3
  71:5 148:16 177:8
**colloquial** 111:3
**Columbia** 1:2
  38:19 41:5 42:19
  169:7,17
**column** 201:4
  202:14,17 203:11
  205:8 206:17
**columns** 205:21
**come** 53:8 55:8
  70:20 89:15 92:19
  93:21 117:6 122:9
  138:17 169:16
  185:9 212:3
**comes** 15:5 16:5
  22:19 88:18 93:8
  115:14 127:2
  134:6 152:3 198:3
  201:8 209:16
**coming** 91:5 101:8
  101:10 105:19
  109:12 142:14
  157:21
**commencing** 1:17
**comments** 153:16
  160:1
**commercial** 39:15
  43:13
**commission** 217:15
**committee** 13:17
  14:13,16,19,21
  178:11 179:9
**common** 59:2
  103:9 104:13,21
  135:3 178:21
  189:4
**communication**
  105:1 129:9

communications 104:5 194:8
communicator 131:8
community 24:7,15 74:2 116:20 147:12 212:16
companies 58:1 62:6 64:5
company 25:21 26:18 30:13,15 32:5 37:13 43:12 48:4 57:14 63:22 64:3,4,12
comparable 191:13
comparative 113:7 186:5
compare 8:5 15:3
compared 32:7 73:11,12 75:22 209:2
compendia 58:22
compensated 132:4
competent 101:16
compile 9:2
complained 50:20
complaint 67:14 68:1,14 80:2 117:14 156:3 211:17
complete 9:14 43:11 47:21 50:4 92:7 193:18
completed 30:2 65:21
completely 51:9
completeness 86:10 197:5
completes 36:5
complex 200:22
complicated 33:10 45:11 58:5
complimentary 44:12 127:9,14,17 129:21 151:9,17 151:20
comply 82:1

composite 7:1 8:8 19:16 118:18
compounded 204:19
comprising 134:21
computer 22:18
Computing 25:13
Conason 26:5 42:5
concept 110:21 144:18
concern 133:21
concerned 163:9
conclude 72:2 76:21 98:12 139:5 139:7
concluded 213:20
conclusion 70:20 80:17
conclusions 66:3 73:7 120:17 132:14 141:16 142:14 143:13,16 159:17 161:15,16
conduct 27:3 73:8 97:9 130:7 193:5 210:8
conducted 33:14 49:20
conference 15:2
conferences 32:19
confidential 47:8
confidentiality 49:8
confirm 7:16 9:5 12:16 17:3 19:22 20:18 107:20 108:10 128:1 171:14 181:3 187:10 188:11
confirms 146:18 186:21
conflict 98:9 99:10
conflicts 95:15 100:15
confounded 156:10
confounding 64:20 65:9,14 76:11,19

78:1 80:16 97:20 108:22 117:9 118:7 143:21
confused 41:10 72:19 98:17
confusing 10:18 99:5 188:20
confusion 84:16 196:21
Congress 179:1,15
Congressional 36:14 37:13 141:2
congressman 116:17
Conn 40:3,8
connect 107:6
connected 62:14
connection 155:6 156:19 159:5
consequence 101:5 149:11
consequences 97:15
conservative 72:17 75:8,11 93:18
consider 113:22 157:16 175:16 203:3
considerable 170:3
considered 50:8 77:3 107:3 114:2 144:6 171:10
consistent 87:16
constant 61:9
Constitution 145:6
construed 162:9
consultant 170:17
consulted 26:4 38:7
consulting 35:12 35:12,21 54:16
consumption 162:21
contact 52:6 81:22 131:2 159:15,21 163:13,18
contacted 163:3 170:13

contacting 161:14 163:9
contaminated 43:7
contemporaneous 112:9
contemporaneou... 68:11
contentions 67:16
context 11:17 30:1 30:15 37:14 122:15,16 154:8 171:1 175:15 179:16
continue 43:21 102:16 124:14 159:13
continued 4:1 109:15
continuing 96:7 153:2
contrary 199:11
contributed 144:20
contributing 137:12
contribution 120:18 212:15
contributions 87:6 87:17 89:22 131:12 177:12
control 214:11
controlled 63:8
controller 181:2
convenience 6:21
Convention 38:18
conversation 98:3 104:3 133:12
conversations 54:13
converted 165:4
cooperation 213:11
copied 46:17 179:10 198:3
copies 6:19 13:9,22
copy 12:13,17 13:8 19:5,14 26:3 29:4 29:6 66:12 89:11 90:13,19 94:4

155:13 168:10 179:13 195:17 213:15,17
copying 167:16 197:13
Corbett 178:8
corporate 31:22,22 60:10 61:4 62:16 154:8
corporation 29:19 36:13,14 55:5 61:5 63:20
correct 17:3 23:15 31:2,9 35:3 47:13 50:3 51:21 53:6 55:15,20 56:2 57:15 64:13,14,22 65:6,13 66:17 72:3,22 73:4,9,17 76:22 78:3,4 79:20 80:2,3,6,13 84:13 85:12 87:3 87:8 89:8,17 91:2 91:20 92:12 95:7 95:22 98:1 100:20 107:4,5,8 111:8 115:10 121:5 124:12 126:21 127:14,22 128:12 128:13 129:22 130:1 132:17 134:9 137:12 138:4,5 139:8 140:19 143:14 144:3,20 148:20 149:4,5,9,18,22 151:21 152:11,12 153:12,17,18,21 161:18 166:19,22 167:2,3 171:9,20 174:15 191:8 192:9,17,22 194:20 195:3 196:15 199:3,12 199:13 200:3,4,21 202:17,18 203:8,9 203:10 204:4,9,13

206:11 207:14
208:2,15 209:21
210:9,10,16,17
211:12,17,18
212:12 213:5
217:4
**corrected** 90:20
**correcting** 103:5
187:2
**corrections** 215:3,5
217:6
**correctly** 108:11
112:5 121:21
129:6 133:17
135:14 138:18
151:15 158:11
183:10 186:15
198:17 203:12
**corresponded** 8:17
9:21
**correspondence**
136:21
**correspondents**
162:20
**cost** 94:19
**costs** 58:3,3 63:18
140:8,9,10,10
154:18
**Council** 1:5 135:4
**counsel** 4:13 5:4,7
7:20 8:14,22 9:12
10:4,15 12:15
16:18 19:5 85:9
91:15 118:17
163:16 165:6
180:9 198:2
**count** 189:1,2,3
**counted** 86:20
191:13
**counter** 197:16
**counterparty** 49:4
**countries** 135:6
**country** 14:8 48:14
76:4,15
**County** 36:17
49:15
**couple** 13:14,17

36:16 41:21 69:14
82:21 106:21
112:4 114:21
122:1 174:5 183:4
194:1 200:5
**course** 3:18 5:22
20:9,10,10 21:7
21:15,16,18 22:9
22:11,14,15 23:8
23:9,10,11,21
24:4,7,8,13,17
25:4,8,10 27:15
28:20 37:1 60:10
74:5 181:17
**court** 1:1,18 16:14
18:2,17 30:4
33:19,20 36:17
37:4 38:19 39:16
41:4 44:21 49:12
49:14 50:22 51:1
162:13 165:21
166:6 214:7
215:16
**courtroom** 113:14
**courts** 50:15
162:15
**court's** 44:5,11
**cousin** 133:7
**coverage** 138:13
**covered** 40:22
**Cowl** 180:22 181:1
183:12 185:6
189:19 190:4,11
**cozy** 179:21
**co-counsel** 48:14
**Cramer** 104:1
**crazed** 155:8
160:11
**create** 25:20 56:5
**created** 9:22 15:18
15:18 24:10 42:15
**creating** 26:16
**credit** 14:6 36:4
53:15
**crossed** 110:4
**Cultural** 125:6
**Culture** 175:10

**cumulative** 205:21
206:3
**cumulatively**
206:10
**current** 181:11
187:13 188:20
189:7,15 191:8
212:7
**currently** 41:3 47:7
192:12
**curriculum** 3:12,13
3:14 12:13,17
15:5 20:11,13
28:5 44:18
**cut** 17:13 68:2
113:20 115:22
150:6
**cutting** 35:19,21
**CV** 1:8 13:21 29:3
30:9 36:6
**C-A-N-N** 133:1
**C-O-N-N** 40:8
**C25** 201:3,3,6

---

## D

**D** 3:1 5:1
**Dai** 161:17
**Daioleslam** 1:8
47:18 51:5 76:17
76:22,22 78:3,16
97:9 100:14 101:5
102:7,12 104:5
107:4 110:3 114:6
117:1,7 118:6
120:13,19 121:4
122:8,15 123:9,19
123:22 124:5
128:3 129:10,11
131:1 133:20
136:16 137:11,18
139:1 141:15
142:14,18 143:14
144:1 148:20
149:8,12 152:1
153:15 155:12,19
155:21 163:21
170:12,18

**Daioleslam's** 77:11
98:11,14 102:3
104:22 107:8
130:7 146:7
**Dallas** 42:10
**damage** 44:22
56:14 74:20 81:13
156:12 200:10
**damaged** 26:18
**damages** 44:7,14
45:13,16 51:20
56:21 71:17 72:8
72:16 73:6,7
74:12 79:20 98:13
98:13 107:4
117:13 130:22
140:3 144:1,8
146:6 155:19
159:1 180:5
200:14 203:14,19
206:3,6 207:19
209:1,3,4 210:6
210:22 211:6,10
212:11
**dancer** 169:9,9,11
**data** 64:21 72:8
74:13,15 85:18
184:10,14 185:22
186:20 187:8,20
204:11 210:18
**database** 63:20,21
141:22
**date** 16:2 17:8
112:15 114:20
119:16,17 134:15
167:2 168:17,20
173:15 215:7
216:22 217:10
**dated** 3:16,20 4:5,7
4:9 12:14,18 13:1
13:4 15:22 17:12
19:15 52:3 111:20
112:4 194:12
195:1 197:10
**dates** 44:14 166:5
**David** 126:10
**day** 11:1 124:5

217:12
**days** 10:21 13:14
36:16 42:3 114:21
196:9,15 215:13
**day-by-day** 74:21
**DC** 33:2 38:14
141:1 185:17
**deal** 26:15 58:22
76:18 79:16 172:1
**dealing** 53:14
**Dear** 134:6,20
157:9 198:7
**Dearborn** 2:9
**death** 25:13 42:13
**decade** 154:20
**decades** 137:21
**December** 1:12
59:8 92:7,8 183:5
191:19 192:11,16
**decide** 138:17
**decided** 138:15
**decides** 61:12
**deciding** 170:20
**deciliter** 18:9
**decision** 37:5 44:11
45:13 101:22
103:3,17 105:8
106:4,8,10 107:7
**decisions** 101:11
102:17 106:7
**decline** 97:19
100:10
**declined** 95:13
**decreased** 199:11
**deduce** 86:22
**deemed** 215:15
**deep** 163:2 189:12
**defamation** 61:18
69:12 72:9 124:4
163:12 174:1
177:4 187:22
198:14,22 200:14
**defamatory** 68:5
68:20 69:3 70:8
193:5
**defaming** 156:17
**defend** 146:1

**defendant** 1:9 2:12 5:7 33:12,13 34:15 40:6 48:10 54:3,12 67:13 68:18 70:6 72:3 74:5 75:9 76:9,13 79:6 82:11 98:1 102:19 104:16 108:4 130:3 131:6 132:9 139:6 140:4 156:12 175:22 187:22 193:5 213:8
**defendant's** 34:1 67:15 70:21 73:8 75:17,21 82:10 101:19 102:21 103:13,18 131:9 170:22
**defended** 133:10
**defense** 17:19 38:8 39:20 53:11 117:17
**defining** 139:13
**definition** 30:20 55:18
**degree** 80:9 169:3 203:5
**delighted** 198:7
**Democracy** 96:6 97:6 98:6,20,22 101:8 106:12,20
**Democracy's** 107:7
**Democratic** 41:9
**dental** 38:9
**Department** 182:15
**dependent** 95:7
**depending** 213:3
**depict** 108:4
**depictions** 108:14
**DEPONENT** 217:1
**deposed** 41:21 48:1
**deposing** 215:12
**deposition** 1:14 4:14 12:9,11 14:3 15:10 16:22 18:12

18:14,16 19:20 20:7,15 54:14 67:4 90:11 107:14 108:2 120:22 122:20 123:22 142:2 143:5 160:17 162:7,10 166:1,5 175:21 178:7,14 180:6,11 185:12,14 188:6,8 191:18 192:2,6 194:4,6 197:8 213:20 214:3 215:2,10,13,15
**depositions** 67:8 81:21
**Derivatives** 14:6
**derived** 54:16
**describe** 20:19 22:12,14 55:2 113:1
**described** 25:7 59:4 62:15 80:2 80:20 107:21 117:14 131:2 176:3 211:16
**describing** 52:12 142:6
**description** 3:8 4:3 7:14 8:20 20:9,22 21:9 114:16 177:8
**deserved** 131:22
**despite** 137:21
**detail** 59:5 60:2 61:22 66:5 113:2 142:6
**details** 44:2,3 87:4 212:21
**determine** 82:9 102:10 110:1 131:21 132:10 136:13
**determining** 59:11
**development** 154:19
**deviate** 121:19
**devoted** 56:9

**Diagram** 3:19
**Diamond** 36:12 37:22 44:10 50:15 66:9
**Diamonds** 36:12
**difference** 59:2,9 91:6 135:17 137:19 207:2
**differences** 136:15 137:6,10,16
**different** 13:17 14:14 15:12 32:1 40:10 50:10 55:19 188:21 211:8
**differs** 13:12
**difficult** 110:9 159:13
**digging** 43:9
**Digital** 15:15
**dignified** 26:17
**diminished** 140:8
**dinner** 133:7
**Diplomacy** 115:1
**direct** 122:14 130:2 191:21 214:11
**directed** 183:2
**directing** 200:9
**directly** 95:7 163:10,15 164:11 169:12 190:2
**director** 103:11 105:20 147:12
**Directors** 3:21 4:6 180:7
**disagree** 81:15
**disagreeing** 136:22
**disappeared** 166:14
**discharging** 37:18
**discount** 35:15
**discovered** 105:1
**discovery** 67:7 82:1 165:9 166:3
**discuss** 61:21 66:1 165:14
**discussed** 132:6 200:20

**discussing** 55:6 139:3
**discussion** 19:12 23:19 30:8 31:12 107:12 179:16 191:16
**discussions** 121:1
**disgusting** 148:17
**dismiss** 67:15
**disrespect** 111:2
**disseminated** 116:4
**dissolved** 31:6
**distinction** 54:13 136:19
**distinguish** 94:18 111:1 146:6
**distributed** 141:4
**District** 1:1,2 30:4 38:19 41:4,4 42:19 44:5
**divided** 85:6
**document** 20:18 22:2,4 24:1 195:22
**documents** 67:9 193:2 194:21
**doing** 30:14 57:14 75:14 82:22 101:13 111:5 117:15 126:19 128:21 154:4 159:1 215:6
**Dokhi** 158:2
**Dokhi's** 158:3
**dollar** 71:9 137:1
**dollars** 210:6
**dollarwise** 48:17
**donating** 184:17
**donation** 128:20 184:16
**donations** 183:19
**donor** 172:11,18 173:18
**donors** 176:10,18
**doubt** 159:22
**download** 16:2
**downturn** 183:8

**downward** 32:2
**dozd** 147:21
**dozen** 67:8
**Dr** 36:19 129:5 175:1
**draft** 42:2
**dramatically** 75:3 95:13
**draw** 90:10
**drink** 160:12,13
**drive** 131:8
**drivers** 61:2 63:2
**dropoff** 94:22
**dropped** 87:6 181:11 185:8 187:13 191:11 193:6,7
**drop-off** 101:14
**due** 31:17 42:12 97:1 144:10,11,12 156:12
**dues** 189:3
**duly** 5:5 214:2
**duplicates** 9:13
**duties** 162:18
**D-O-Z-D** 147:21

**E**

**E** 2:8 3:1 5:1,1 216:2
**earlier** 66:15 97:17 112:22 113:1 125:21 126:5 132:7 143:4 153:19 162:10 175:20
**early** 52:7 74:6 78:6 82:3 137:1 158:4
**earned** 154:11
**earnings** 154:14,15
**easier** 108:14
**easily** 196:14
**East** 2:4
**economic** 25:13 28:6 35:11 80:9 129:13

economics 25:2
  170:15
economist's 131:4
Edelman 51:15
edge 35:19,22
education 170:3
educational 18:7
effect 59:6 77:17
  78:2 143:21
effective 131:7
effort 82:14 110:1
  117:15 132:10
  159:15
Eghbal 82:18
  114:10
Ehrmantraut 40:2
  40:12
either 22:2 27:2
  40:19 60:18 75:2
  76:14 79:3 97:21
  100:17 116:5
  127:18 137:17
  139:10 156:20
  166:3 175:13
  192:8 197:1 207:7
electronic 8:17
  9:21 85:18
elements 61:8
  198:15
Eli 83:19,22
eliminate 9:13
  177:21
Ellin 51:16
Elliott 126:10
emanating 196:1
embedded 116:2
  119:20
emerged 111:3
emerging 64:12
emotional 69:10
  149:10
empirical 60:4
employ 59:4
employed 55:2
employer 171:10
ended 96:10 98:7
  98:22 104:15

Endowment 96:6
  97:6 98:6 101:7
  106:12,19 107:7
end-of-year 56:20
engaged 124:17
English 110:8,22
  111:9 151:3
  168:14
English-speaking
  79:3
enjoyed 80:1 211:5
  211:16
enlighten 8:19
Enriching 28:18
enter 115:8
entered 108:11
entire 74:6 75:9
  97:18
entities 34:22 58:18
entitled 20:10
  66:12 82:3 115:12
  127:5 194:14
entity 31:7 56:10
  60:15 64:4 65:16
equal 115:2
Equally 198:11
equity 14:9 29:19
  29:19
Equity-The 29:14
equivalent 110:14
  204:18
ergo 104:14
errata 215:4,6,9,12
  217:8
erring 93:17
error 59:13,15,17
  60:3 61:15 62:9
  62:14,19,21 63:4
  65:12 173:16
ESQUIRE 2:3,8,9
essentially 35:20
  155:11 208:5
establish 159:11
established 135:1
estate 39:22 41:18
estimate 26:17
  115:9 155:19

206:6
estimates 63:19
  73:6 98:14 139:21
  155:16 200:10
  203:13
Eurasia 95:14 97:7
  98:7,20 99:7
  100:1 101:21
evaluate 51:20 68:4
evaluating 30:12
  30:14 32:7 41:15
evaporated 105:13
event 26:19,21,22
  27:2 28:10,10
  31:18 32:7,14
  51:19 55:7,8,15
  59:12 71:4,16
  74:3 80:17 82:15
  82:22 87:19 97:3
  99:14 112:13,19
  113:3,12 114:22
  118:7,7 119:21
  131:5 144:5 169:6
  169:17 176:4
  190:22 196:17,20
  213:2
events 64:12 68:11
  80:1 117:11 123:7
  123:8 131:3,5,9
  131:10 140:7,7
  170:9 174:3 177:8
  177:11 211:16
eventual 65:16
everybody 6:20
  32:19 58:1 202:11
Evgeny 114:22
evidence 165:9
evil 148:17
exact 43:16 79:19
  139:18 211:2,6,9
exactly 10:19 44:2
  90:1 93:3,8 100:5
  100:7 105:11
  112:3 167:13
  211:14
examination 5:4,7
examined 5:5

example 31:11
  57:10 63:14 65:4
  65:8,18 66:8
  74:10 87:17 104:1
  145:13 160:19
  163:8 171:7,19
  176:7 204:16
  206:17 212:14
examples 124:9,12
exceeded 195:2
Excel 201:6
excess 212:17
excessive 154:18
exchange 128:10
exciting 21:19
excluded 50:16
  94:11
exclusively 118:5
  124:2
excuse 99:15 204:2
exhibit 6:19,22 7:6
  7:19 8:13 9:9
  12:9,10 13:4,20
  14:2,15,18 15:7,9
  16:17,21 19:14,16
  19:18,19 20:7,14
  20:18 22:9 28:7
  28:22 29:7,11,12
  36:6,12 66:10
  84:12 86:9 88:5
  88:18 89:11,17,19
  90:20 91:3,17
  107:13,18,21
  108:2,11 109:2
  111:11 118:13,19
  130:8 160:15,16
  162:4 164:19,20
  164:22 165:8
  166:12 174:11
  178:7,13 180:6,10
  182:1,19 185:12
  185:13 187:9
  188:6,7 190:6
  191:18 192:1
  194:5,15 195:5,13
  197:6,7 200:6,7
exhibits 3:8 4:1,3

4:13,14 8:8,9 9:19
  83:13 109:4
  163:11 193:18
  194:3 201:21
  213:18,19
existed 137:2
existence 81:21
  85:15,17 137:7
exotic 33:8
expect 200:13
expense 91:9,14
  94:17 100:4,18
  107:18
expenses 59:1
  63:18 86:1 88:16
  89:7 90:4 91:9,16
  92:21 93:12,17
  94:9 99:18,20
  156:5 201:13
  206:16 207:7
  208:11 210:1
  213:4
expensive 63:17
experience 141:2
  149:7 205:12
experienced 53:14
  183:6
experiences 139:20
  155:15
experiencing
  200:13
expert 51:14 56:4
  83:11 117:10
  129:13
expertise 118:4
experts 53:14
  82:20
expired 191:10
expires 217:15
explain 59:17
  101:14 203:15
explained 175:2
explains 66:5
  173:16
exponent 208:6
expose 129:3
exposition 74:12

**exposure** 18:5,8
   144:9
**express** 68:3
   114:14
**expressed** 73:13
   132:14
**expresses** 122:10
   135:18
**expressing** 200:12
**extensive** 141:2
   157:20
**extent** 102:6
   136:21 137:15
   140:9
**extrapolating**
   72:22 204:12
**extrapolation**
   60:20,21 139:14
   155:11
**extremely** 63:16
   149:10
**Exxon** 47:22 48:2
**eyeballs** 76:8
**E-G-H-B-A-L**
   82:18 114:10
**E-H-R-M-A-N-T...**
   40:12
**E-mail** 2:11 3:20
   4:9 9:11 10:8
   19:4 115:17 119:5
   119:10,20 121:12
   121:16 122:7
   125:2,2,10,11
   126:9 127:3 128:2
   128:10 132:22
   134:8,11 136:19
   138:9 139:5,15
   140:14,16,22
   147:4,5 149:10,16
   153:9 160:1,22
   161:7 165:5 190:9
   194:12 197:5,14
   202:7
**E-mailed** 10:14
   124:7 159:16
   173:11
**E-mails** 3:10,11

7:10 8:9 9:3 10:6
   10:9 11:10 69:11
   69:12 109:11,20
   110:11 116:3
   118:12 120:14
   122:17 123:11
   131:14 132:14
   134:14,15 139:12
   139:18 140:1,5
   153:2 155:4
   158:22 159:3
   162:20 165:17
   171:7
**E-mail's** 119:14
**E-V-G-E-N-Y**
   114:22

**F**
**face** 95:6 150:19,20
   160:6,9,10
**facility** 30:3 43:13
**fact** 11:15 13:3
   30:1 32:21 55:21
   68:13 72:21 73:10
   86:10 91:17 97:18
   97:19 100:13,14
   100:15 101:5
   102:10 108:10
   144:6 146:1 152:5
   152:9 153:15
   155:10 160:22
   163:2 173:17,22
   176:11 183:14
   199:1,11 201:22
   202:21 209:19
   210:8 212:9,10,13
**factor** 64:20 65:14
   204:16
**factoring** 154:18
**factors** 65:9 80:16
   97:20 108:22
**factory** 43:16
**facts** 154:22 155:1
   155:7
**factual** 156:2,10
**faculty** 16:7 35:18
**fail** 215:14

**failed** 71:10
**failure** 163:1,1
**fair** 49:12 55:9
   69:21 90:14
   136:10 145:12
   164:4 180:2
   210:19
**fairly** 20:22 28:5
   45:11 176:17
   185:21
**fall** 24:19
**fallout** 102:12
**familiar** 182:3
**families** 158:9
**family** 176:10
**fan** 74:8
**far** 33:22 52:20
   80:19 112:2
   156:16 203:21
**Farsi** 110:5,11,14
   111:1,3 126:15,17
   126:18 138:3
   150:5,7 158:4,6
   172:21
**Farsi-speaking**
   79:4
**Fassihian** 158:3,16
**fast** 169:13
**fault** 123:13 168:19
**Fax** 2:6,11
**fearful** 175:11,14
**February** 48:6
   112:15 125:1
   126:8 127:2 128:9
   132:22 138:8
   140:15 147:5
   149:15 153:5
   188:10,16 191:4
**federal** 16:13 97:21
   99:8 101:8
**FedExed** 46:16
**fee** 52:8,11,14 53:3
   53:19
**feel** 123:12 134:14
   179:21
**feeling** 118:5
**fees** 45:9 91:19,20

92:2
**fellow** 82:17 83:2,2
   83:5 150:18
**felt** 123:4,5 171:9
   176:8
**fielded** 32:18
**figure** 12:2 39:9
   73:1,2 86:8,13
   87:1 88:5,8,14
   89:12 90:22 91:7
   92:20 93:5 94:6
   100:18,18 146:16
   149:21 201:6
   203:15,20 207:17
   208:8,8 210:6
   213:4,5,7
**figures** 89:14 90:7
   93:20 106:20
   107:18 108:5
   185:1 186:12,21
   187:10 191:1,2,12
   206:6 210:13,14
**file** 8:3,11,17 9:15
   9:21 12:22 45:19
   46:3,11,14 69:14
   74:19 109:15
   113:18 118:16
   167:12,15 181:8
**filed** 33:17 84:7
**files** 26:20 39:18
   165:17 167:12
**filled** 107:17
   193:17
**final** 76:11 78:2
   107:4
**finally** 11:5 106:12
**finance** 20:11
   21:21 22:6 60:10
   60:10 61:5 169:2
   170:14
**financial** 3:17 7:10
   21:12 22:22 25:2
   26:9 28:18 36:21
   58:16 61:9 62:5
   67:3 68:18 84:9
   85:2,18 89:16
   108:5 117:12

132:4 139:14,18
   156:14 170:15
   181:1 183:8
**financials** 69:19
   85:12 91:3 94:1
   107:2 186:3
**find** 9:8 22:18
   23:22 29:9 66:21
   84:18 85:12
   116:12 159:16
   164:10 168:2,5
   174:1 179:18
**fine** 5:13,16 19:6
   77:2 83:2 108:19
   112:3
**finger** 150:12
**Finglish** 110:13,19
   110:20
**finish** 6:6 166:1
   208:21 211:19
**finished** 43:22
**firm** 20:2 26:4 33:2
   38:15 40:2,7,10
   46:17 51:7,12
   81:22 117:10
   164:6 197:16
**firms** 48:12 57:17
**Firooz** 121:12,15
   122:9
**first** 5:13 8:16
   10:21 12:16 13:12
   20:17 22:3 37:8,9
   37:21 38:1 40:7
   45:2 51:6 52:6
   66:8 72:2,10 74:9
   75:5 97:12 100:7
   100:22 103:22
   110:10 114:10
   115:11 116:6
   118:20,22 119:10
   122:21,22 123:1
   124:20 129:6
   132:9 133:16
   140:21 145:5
   147:13 148:18
   161:6 168:3 171:2
   178:4 183:5,10

185:17 186:15
188:11 192:4
194:11,18 196:7
198:17 202:14
211:20
**first-name** 122:20
**fit** 41:3 140:19
**five** 34:13
**five-year** 206:2
**fixed** 52:11 53:3,19
58:3 94:18
**flack** 127:6,13,15
127:16
**flags** 148:4,7,10
**flood** 120:14 159:3
**Florida** 128:12
**flow** 105:12 144:9
**flowing** 146:6
**flows** 35:14 36:1
**Flu** 65:19
**flurry** 126:8
**flyer** 176:7
**FMA** 21:12,12
22:13,21
**focus** 87:11 202:13
**folder** 12:19,21
67:20,21
**follow** 68:16 77:4
88:7 108:15
114:18
**following** 77:10
135:10
**follows** 5:6
**font** 22:18 23:6
165:3
**food** 25:22 148:14
**footer** 13:6,10,12
13:13
**footers** 13:15
**footnote** 94:10
180:14,15 181:12
181:17 182:12
184:22 189:16
190:2
**Foraz** 115:2
**forecast** 25:19
35:13

**forecasted** 37:15
**forecasting** 26:16
61:11 139:14
**foregoing** 214:9
217:3
**foreign** 97:2 111:7
111:13 178:11
**forensic** 29:22
35:11
**forget** 14:17 24:2
143:9
**forgot** 17:8 60:7
**form** 88:1 91:12
204:14 217:7
**formal** 5:14 22:21
33:10 123:3
**format** 15:12 23:3
43:8 115:17 165:1
165:13,16 195:8
**formatted** 23:5
**former** 40:17
143:11
**forms** 31:22,22
131:13 154:10
**formulate** 81:19
**Forough** 174:5,8
174:19
**forth** 27:8 56:19
58:9 66:4 68:12
97:1 101:4
**forward** 45:17
72:22 103:12
106:9 204:12
210:12 212:6
**forwarded** 10:11
157:16
**for-profit** 32:5 35:8
38:5 55:5 62:6
**for-profits** 56:2
**FOUGERE** 2:9
**found** 100:12
141:22 143:9
167:22 168:1,3
174:7
**Foundation** 95:14
97:7 98:8 99:8
100:2 101:21

125:6 212:16
**founder** 147:11
**four** 23:1 34:13
54:8,11 82:18
166:18 169:4
171:3 201:20
**fourth** 29:13
205:19
**four-year** 206:1
**frame** 31:13
**frankly** 86:18
88:13 151:18
**Free** 140:15
**Freedom** 179:9
**French** 168:22
202:20
**frequently** 57:9
**friend** 136:7 141:1
**frighten** 159:20
**front** 8:2 18:22
28:13 30:4 36:16
89:13 94:15 109:2
206:15 210:20
**FrontPage** 82:5
**frugal** 213:3
**Fugham** 17:20
**full** 6:13 10:8 72:3
72:17
**function** 31:3
**functioning** 159:13
**fund** 42:7,7,8
**funded** 53:13 99:8
113:7 148:3
**funding** 96:10,14
97:6 99:11 100:13
100:16 101:18
**fundraiser** 128:15
175:3,6 195:13
196:2,13,14,17
**fundraisers** 131:11
**fundraising** 174:3
180:5 194:9,17
195:2 197:1
**funds** 14:8 42:8
101:7 128:15
134:19 141:4
177:9,17

**funny** 13:11
**further** 13:4 106:6
154:5
**future** 35:13 77:19
**F-I-R-O-O-Z**
121:13
**F-L-A-C-K** 127:6
**F-R-O-U-G-H**
174:5
**F-U-L-G-H-A-M**
17:21

---

**G**

**G** 5:1
**GAAP** 57:21
**Gair** 26:5,5 42:4,5
**games** 19:6 135:6
**gangsters** 135:3
**gaps** 193:17
**garbage** 142:8
**Gardner** 20:8 24:6
**Garliss** 48:2
**gasoline** 43:6 48:1
55:11
**Gateway** 149:18,22
**gather** 67:1
**gathered** 158:9
**Gee** 163:19
**general** 50:6 62:5
67:18 124:3
150:20 182:11
184:17,18 202:3
**Generale** 169:1
170:2
**generally** 12:2
**generated** 71:5
**gentleman** 137:9
140:22
**getting** 43:7 49:5
62:3 63:6 133:5
138:13 144:13
198:10
**give** 28:3 33:21
73:13 74:19 80:5
80:18 81:6 86:3
106:2,12 117:12
136:14 165:13

171:11 176:20
181:14 206:11
212:13
**given** 63:1 76:20
84:8,8,9,11 133:8
133:21 158:10
172:12 179:19
183:7 186:21
196:21 205:9
214:4 217:5
**gives** 71:13
**giving** 184:5,16
202:15
**glad** 6:8 86:5,18
189:1
**go** 9:7,16 10:22
19:11 43:18,21
45:20 64:16 78:20
78:21 79:9 83:4
83:19 84:2 89:21
106:9 111:18
116:11 119:11
123:3 125:20
127:20 129:19
144:3 151:3,15
161:20 164:21
183:18 209:7
**goal** 195:2 196:9,15
**God** 141:12
**goes** 141:8 179:14
200:1
**Gohari** 4:9 197:11
197:12,15,15
199:16,21 202:7
**going** 5:20 7:3,11
8:4,18 10:19 12:8
13:19 16:16 19:9
28:16 29:1,2
43:12 44:4,9 55:3
57:3 66:6,7 67:6
77:9 78:21 79:12
97:11 103:12
104:4 109:3,4
118:13 129:19
136:6 144:15
150:4 153:1
161:22 164:22

165:12 208:2,3,4
208:19 210:12
**Goldberg** 83:15,16
120:4,19 121:6
127:21
**Goldfarb** 120:3,18
127:21
**good** 5:9,10 6:3
51:13 57:14
107:11 112:18
123:15 127:15
141:22 142:7,17
159:7 164:3 202:1
212:9
**Gore** 41:10
**Gore's** 41:7
**gosh** 39:17 83:4,8
159:12
**gossip** 155:2
**gotcha** 95:10
199:22
**gotten** 161:15
172:4 201:12,17
208:14
**government** 62:18
96:7 97:22 99:9
101:8 103:11
106:8,11 120:7
123:14 128:19
137:16 142:5
164:9
**government's**
102:17 103:17
**graduate** 25:1 60:9
**grant** 95:14 96:5
97:7 98:20,20,22
99:7 212:20
**granted** 43:4
173:13
**grants** 97:13,22
98:3 131:12 141:4
213:3
**graph** 108:20
**graphical** 108:13
**graphically** 108:4
**greater** 154:15
**Greenbelt** 30:5

**ground** 135:4
**group** 78:17 79:1
135:4 153:6
**groups** 53:13 57:22
58:13
**grow** 32:2
**growing** 154:12
**grown** 203:1
**growth** 68:10,10
75:3,14 80:1,10
136:22 156:4
200:12 201:18
202:16 203:2,6,14
204:7,19 205:1,5
205:10,20 206:7
206:18 207:13,19
208:14,18,22
209:15 211:4,15
**guess** 31:1 38:14
40:2 49:17 53:10
69:10 97:4 114:4
114:13 127:17
154:13 157:16
158:20 181:3
182:14 192:6
210:19
**guide** 57:22
**gun** 83:8
**guy** 16:11 108:20
114:14 122:20
**G-A-R-L-I-S-S**
48:2
**G-E-N-E-R-A-L-E**
169:1
**G-mail** 130:15
174:14

---
**H**
---

**habit** 145:10
**Hajian** 158:6
**half** 13:2 54:18
102:18 115:22
189:6 207:22
**Hamian** 128:11,17
129:9
**hand** 7:11 8:7 12:8
15:4 16:16 19:13

84:15 158:2
160:14 178:6
180:5 185:11
188:5 191:17
194:1 197:4
**handed** 13:21
22:15 27:15 190:6
**handouts** 24:14
**hands** 121:17
167:13
**handwriting**
112:15 168:14
189:16
**handwritten**
107:19 111:12
168:9 172:5
193:16
**handy** 88:22
166:12
**hand-selected**
171:4
**Hang** 43:17
**happen** 57:3 83:14
95:12 96:3 108:18
114:5 160:19
172:16 183:22
191:12
**happened** 46:16
68:11,18 74:11
96:3 154:20 156:4
**happens** 22:13
53:21 63:11
119:17
**happy** 108:20
**harassment** 160:3
**hard** 115:16,17
167:9 179:18
195:14 198:1
**Hassan** 1:8 78:16
97:9 98:11 102:3
102:6 110:3 114:6
117:1,6,7 120:13
121:4 122:8
123:19 128:3
129:10,11 130:6
130:22 133:20
136:16 137:11

139:1 141:15
142:13 143:13
144:1 146:7
148:20 149:7
152:1 153:15
155:20 163:21
170:11 209:4
**Hassan's** 210:8
**Hazeghi** 166:21
170:2
**head** 24:16 78:16
150:8
**headcount** 65:15
**headed** 102:15
158:6
**headings** 201:4
**healthy** 43:8
**hear** 91:4 174:2
198:7
**heard** 37:4,6 45:12
97:13 114:13
121:7 136:16
153:20 162:15
**hearing** 40:17
100:22
**heated** 32:18
**hedge** 42:7,7
**Hekemian** 38:11
39:6
**Hekmat** 140:16
**held** 19:12 107:12
191:16
**Hello** 195:11
**help** 11:16 71:2
105:6 111:15
118:18 119:18
133:3 135:13
164:19 176:20
197:16 202:21
**helped** 196:9
**helpful** 16:12 81:7
118:18 173:20
**helps** 10:17 11:8
79:15 108:9
**herding** 77:17
**hesitant** 163:14
**High** 48:5,17,18

50:1
**higher** 34:15
162:14 208:13
**highest** 33:20
**Hillary** 133:10
**hired** 45:16 65:19
**history** 3:15 29:11
30:16
**Hitler** 129:2
**hits** 76:8
**hoc** 14:18 104:14
104:14
**hold** 150:10 211:22
**home** 48:5 50:1
131:8
**Honorable** 178:9
**hope** 138:17
**hopeful** 106:14
**Hopkins** 51:18
**horizontal** 84:17
**Hossein** 172:12,17
**Hosseini** 167:11
171:19 172:6,12
172:17
**hosted** 64:7 82:17
**Hotel** 30:2 36:14
37:15
**hour** 54:8 189:6
**hourly** 53:5 54:3
**hours** 82:15 112:20
**house** 175:7 178:12
**Housing** 17:21 18:1
**Howard** 138:9,12
**HTML** 22:18
**huge** 42:6 48:15
**human** 121:19
135:7 151:4,16
**Huntsman** 29:14
30:17
**Hyperion** 21:20
22:6
**hypothetical** 26:22
203:9,19
**hypotheticals** 80:5
**H-A-Z-E-G-H-I**
166:21
**H-E-K-E-M-I-A-N**

38:12
H-E-K-M-A-T
140:17
H-E-R-D-I-N-G
77:17
H-O-S-S-E-I-N-I
167:11
H-U-N-T-S-M-A...
29:15

**I**
**idea** 75:20 79:2
137:19 152:10,16
152:17 156:3
**identification** 7:20
8:14 12:11 14:3
15:10 16:22 19:20
20:15 107:14
160:17 178:14
180:11 185:14
188:8 192:2 194:6
197:8
**identify** 141:3
**idiot** 148:15 202:18
**IL** 2:10
**Ileana** 178:9
**Illinois** 116:7
**image** 69:18
**imagine** 109:21
**immediately** 106:5
**immense** 63:20
**impact** 59:12 65:14
74:1 116:19 179:3
**impacted** 27:11
30:11 32:14 33:14
64:21 70:21 80:17
177:12
**impairment** 27:10
**imperative** 215:11
**implication** 170:9
172:22
**implications** 132:4
**implied** 162:17
**imply** 87:1
**important** 6:1
182:6 198:11,11
**imported** 26:2

**impossible** 106:9
**impression** 74:20
123:17
**improper** 144:12
159:20
**improved** 199:5
**inaccurate** 7:13
**inadvertently**
173:14
**inappropriate**
165:22
**inappropriately**
22:1 44:6 65:4
**inaudible** 129:2
**incidentally** 64:5
**include** 98:19
**included** 142:18
209:22
**includes** 127:4
156:20
**including** 23:14
55:21 111:12
136:5 143:13
153:12 176:11
197:14 206:13
212:8
**income** 54:15 56:1
59:1 60:18 61:6
88:10 90:1 91:7
93:4,5 94:9
105:18,19 106:17
131:13 207:6
**incomplete** 26:10
26:12
**inconsistencies**
86:19
**inconsistency** 87:3
**incorporated** 34:22
**incorporates**
181:18
**incorporating**
156:1
**incorrect** 44:14
65:5
**incorrectly** 77:1
**increase** 56:7 140:9
154:16 181:19

207:12
**increased** 91:13
140:8,10 186:10
202:9 204:16
206:9
**incurred** 93:15
201:13
**independent**
117:22 118:6
141:14 155:2
158:14
**independently** 31:3
161:17
**index** 11:6
**indexing** 10:1,2
**indicate** 192:21
198:21 199:10
**indicates** 129:9
195:1 196:14
199:2
**indicating** 193:3
**indicator** 184:15
**indistinguishable**
150:19
**individual** 141:5
**individuals** 120:13
161:14
**Industries** 42:18
**industry** 25:22
56:18 57:20 58:13
183:21
**inflows** 177:9
**information** 7:11
76:16 120:4
129:11,16 139:1
139:21 141:22
142:8,17 147:17
148:19 155:16
158:9,22 161:16
176:20 180:14,16
180:17 181:12,16
184:9 185:22
189:22 190:18
192:20
**ingested** 117:19
**initial** 173:14
**initially** 7:2 133:2

**initials** 130:9
**initiate** 160:13
**initiated** 173:12
186:4
**injury** 18:4,6 23:15
23:17 144:16,19
144:20
**innocent** 135:8
**input** 35:15 61:20
63:10,18,19 65:5
79:12
**inputs** 64:1,9
**inside** 131:17
198:12
**inspection** 144:13
**inspectors** 144:8
**instant** 23:20
**Institute** 115:1
**institution** 28:2
**instructing** 90:10
**instruction** 146:20
**INSTRUCTIONS**
215:1
**insurance** 53:12
**intelligence** 21:20
63:17 158:8
**interact** 155:5
**interest** 60:17
95:15 98:9 99:10
100:15
**interested** 25:5
81:15 160:6
177:20
**interesting** 110:20
171:2
**interests** 154:5
**interference** 32:6
48:8 56:22 69:15
69:17 72:3
**intern** 157:22
**international**
113:10
**internet** 35:10 82:8
83:4 138:14
**interpret** 179:17
**interpretation**
109:16

**interrupted** 38:3
156:15
**interruption**
146:22 190:5
**intervention** 30:10
56:15 59:7 61:17
97:8
**interview** 71:4
112:10 165:7
167:5 169:15
185:10
**interviewed** 121:2
171:20
**interviews** 69:13
139:17 140:5
164:14 166:9,18
**intrigued** 115:6
**Introduction** 14:8
**invade** 162:19
164:7
**invitation** 121:15
**invite** 169:7
**invoked** 189:5
**involve** 53:12
**involved** 32:11
38:1,22 40:7
47:17,19 50:1,12
51:4 145:14
**involves** 36:1 42:6
43:9 48:1 185:21
**involving** 32:9
**Iotola** 150:7 151:2
151:19
**IR** 148:2,7,9
**Iran** 76:4,15 80:21
101:12,13,18
102:1,11 103:12
104:10,15 106:8
121:11,17,18
127:5,13 128:19
131:16 135:3,8,18
136:5 137:16
140:15 141:10,11
141:13 143:1
148:3 153:7 154:5
159:6 179:9
197:19

82:13,20 96:7
102:17 120:7
123:14 125:13
132:12 141:5
152:3 176:4 179:2
**Iranianlobby.com**
126:11
**Iranians** 141:12
169:20 170:8
**Iranian/American**
175:13 177:16
**Iran's** 158:7
**Iran-free** 151:1
**IRI** 133:6
**irregularities** 195:9
**Islamic** 101:12
102:1 104:9,14
138:15 141:10,12
147:20 151:4,16
197:18
**Israel** 135:12
**issue** 58:20 72:6
76:19 117:9,16
144:13 175:13
**issues** 68:14 117:14
137:3,7
**I-D-I-O-T** 202:19
**I-13** 91:11
**i.e** 45:6 172:18

_____

**J**

**J** 2:9 130:15
**Jalil** 134:19
**January** 92:5,8
103:19 104:12
132:8
**JDB** 1:8
**Jefferson** 2:4,4
**Jeffrey** 83:15 120:4
121:6 127:21
**Jfougere@sidley...**
2:12
**JM** 130:9
**JM-001** 8:16
118:21
**JM-003** 121:8
**JM-0168** 8:12

**JM0013** 128:6
**JM0017** 132:19
**JM0024** 134:17
**JM0038** 138:6
**JM004** 142:21
**JM0042** 140:12
**JM005** 124:19
**JM0059** 145:14,19
**JM006** 126:7
**JM0067** 146:12
147:2
**JM008** 126:22
**JM0086** 149:13
**JM0128** 157:4
**JM017** 134:13
**Jnmorse@gmail....**
130:14
**Jnmorse@verizo...**
130:13
**job** 29:11 83:8
**jobs** 183:9
**Joel** 1:14 3:4,9,12
3:13,14,15 5:3,13
6:14
**join** 31:3
**joint** 144:14,18
145:4
**Jonah** 83:16
**JOSHUA** 2:9
**journal** 23:2 24:12
29:15,16 152:2
**judge** 36:16,18
51:1
**judgment** 37:10
**July** 147:6 178:8
**jump** 140:12
149:13 211:18
**jumped** 79:8
**jumping** 152:21
**June** 98:7 102:18
103:2,3,12,17
104:15 106:4
217:15
**jury** 202:22 203:3
**J-A-L-I-L** 134:20

_____

**K**

**Kamani** 151:2
**Kapshandy** 2:8 3:6
3:20 5:8 6:15
7:22 8:7,15 12:8
12:12 13:20 14:4
15:4,11 16:16
17:1,6,11 19:11
19:13,21 20:6,16
31:9 43:17,20
49:11 56:11 57:2
57:7 68:15 69:1,7
70:14 71:11 72:12
80:14 81:2 83:18
90:13,17 95:18
97:16 99:3,19
102:13 104:7,20
106:18 107:10,15
122:3 126:2
129:15,18 135:22
136:11 137:8
138:1,21 141:7,18
142:11 145:1,11
145:18 146:11
149:2 153:4
158:19 160:4,14
160:18 161:20
162:5,8 163:7
165:2,5,11,14,17
165:21 166:6,7
171:16 176:16
177:18 178:4,6,15
180:1,4,12 183:17
184:7,13 185:11
185:15 186:14
187:7,19 188:5,9
191:15,17 192:3
193:17,20,22
194:3,7 195:10,12
195:21 197:4,9,22
198:4 209:7,12
213:10
**Kasemi** 112:16
**keep** 5:14 8:1 34:10
52:22 85:19 86:2
88:22 113:18
152:21 154:6
155:3 198:1

**keeping** 11:3
193:21
**Kenneth** 78:6,9
82:3 83:16 132:11
153:11,17,20
154:3
**kept** 120:16 159:9
**Kerry's** 182:21
**Kevin** 180:21 181:1
183:12 185:6
189:19 190:17
**killed** 41:17
**killing** 135:8
**kind** 9:1,10 16:19
34:10 43:16 51:13
63:6 65:11 72:21
73:15 79:15 84:20
85:7,8 124:13
132:3,5 140:11
167:9
**kinds** 61:8
**King** 25:14
**Kinko's** 46:18
**Kirk** 116:7,7
**Kirk's** 115:13
116:12
**knew** 110:21
172:15 199:18
**know** 7:4,14 8:3
9:15 16:13 17:19
32:17,18 33:9,17
34:1,7,8,21 37:6
41:2 44:8 45:19
46:10,19 47:15
48:12 49:2,13
50:9 51:18 52:4,4
52:10 53:9,20
54:20 62:1 63:9
63:11 70:19 77:12
79:15 82:9 87:20
87:21,21 89:12
91:4 97:2 100:21
101:2 108:8
109:22 110:17,21
113:3 115:17
121:6 123:14,16
124:8 125:9,15

129:13 133:13
144:17 145:2
147:10,14 149:3
150:16 152:7,7,7
152:16 156:17,21
158:5,15 159:21
159:22 161:11
164:9 167:13
172:10,16,21
173:8 174:19
190:3 191:12,14
204:2,20 207:11
209:20 212:5
**knowing** 52:2 76:7
**knowledge** 76:20
79:7 96:17 158:14
163:4 177:15
**knowledgeable**
81:17
**known** 59:13 61:15
62:8 78:15 102:2
104:1 110:12
139:15 144:18
158:2
**knows** 58:1 159:12
**Komani** 150:7,18
151:2
**Kyl's** 125:21
**K-A-S-E-M-I**
112:17

_____

**L**

**L** 1:17 214:7
**laboriously** 10:10
**Ladies** 179:11
**Lake** 83:19,21,22
**landlord** 144:12
**landlords** 144:7
**language** 88:1
111:3,7,13 124:1
**large** 39:21 43:13
47:22 49:18 63:19
172:11,17 173:18
176:10,18
**larger** 120:5 137:1
179:16
**large-scale** 63:16

**late** 52:6 210:18
**lately** 25:4 138:13
**latters** 41:1
**law** 1:15 20:2 24:11
24:15 33:2 38:15
40:7,10 48:12
51:12 81:22 82:16
104:14 113:5,6,7
113:14 117:10
164:6 197:16
**Lawrie** 20:8 24:6
**laws** 55:21,22
**lawsuit** 68:12 93:15
176:21
**lawyer** 34:1 144:17
145:2
**lawyers** 46:7
163:18
**lead** 18:5,5,8,9
42:13 77:11
117:16,18 144:4,7
144:9
**leader** 77:3
**leads** 66:3 122:7
**leakage** 43:6
**leap** 136:9
**learn** 61:19 77:19
**learned** 136:16
**lease** 55:11
**lecturing** 24:15
**led** 120:10 131:10
140:8
**left** 86:8 114:19
189:17
**Legacy** 30:2 37:15
**legal** 56:4 77:6 91:9
91:14,19 92:2
93:12,17 140:9
162:15 201:12
206:16 207:7
208:11 210:1
**legitimate** 142:5
**leisure** 15:3
**Lelia** 113:16,19
**lengthy** 161:8
185:21
**lessened** 26:19

**letter** 3:16 4:5,7
52:11 178:8,22
179:7,15,20 190:9
195:1,5,7
**letters** 115:22
**let's** 19:11 22:7,8
24:2 43:17 47:16
51:4 54:15 55:1
73:20 75:1,5
77:18 78:22 84:2
93:1 95:6 102:14
104:8,9,11 106:13
109:1 110:7
112:11 116:16
118:11,20 121:8
124:13 126:6,22
128:6 140:11
151:12 152:21
154:11 156:21
161:20 176:17
178:4 180:2
187:20 194:21
202:13 207:21
**level** 25:1
**levels** 118:1 187:17
**leverage** 154:15,17
**Levin** 40:1,11
**liability** 144:5,14
144:19 145:4,10
177:15
**libel** 117:11 120:21
124:4 174:1
**libelist** 31:17,18
32:14
**life** 175:13
**likelihood** 173:19
**line** 65:20 93:11
188:20 192:19
209:13 216:4
**lines** 135:11
**link** 30:6 119:21
122:14 125:12,20
126:14 127:20
**links** 145:21
**Liquidity** 14:7
**list** 16:14,20 18:22
19:2 24:3,5,9,11

27:19,20 34:5
35:17 38:16,20
39:3 50:4 161:4
179:13 189:2
**listed** 29:20,21
42:20 61:21 67:11
98:13
**listen** 104:10
**listened** 202:22
**listing** 85:1
**literally** 201:9
205:5 209:18
**literature** 24:10
72:14
**litigation** 3:18
20:10 21:15 23:14
23:20 32:11 40:9
40:19 47:7 97:2
131:3 155:3,9
170:17 212:2
**little** 9:1 44:1 78:15
79:11 99:5 105:6
106:14 112:1,14
162:8 177:7,11
179:18 188:19
194:2 207:21
211:3
**lived** 117:20 169:4
**LLC** 1:15
**LLP** 2:8
**lobbies** 128:17
**lobby** 143:1
**lobbying** 99:11
133:6 141:3
157:20
**lobbyist** 76:14
80:20 179:2
**location** 43:13
**log** 52:22
**long** 10:12 54:19
112:20 143:18
161:17
**longer** 167:13
**long-winded** 118:2
**look** 7:12 8:18 16:4
16:8 17:2 26:9
29:2 34:5 44:19

46:10 52:14 71:21
73:6,10 74:13
80:4 81:9 85:11
85:22 87:14 91:18
92:4,6 93:2 108:7
109:5 118:11
119:10 121:3
145:21 150:12
161:6,9 167:8
168:6 180:9 182:2
182:20 189:10
205:22 206:17
**looked** 11:14,21,22
22:6 46:8 61:22
201:20
**looking** 39:13
72:17 86:22 89:16
89:21 92:3 95:2,8
108:19 111:21
174:18 177:14,15
202:1
**looks** 22:16 61:1,11
119:4 134:5
165:19
**Lopez** 83:16 132:12
143:2,22 146:1,7
**Lopez's** 145:14
**Lord** 178:8 179:8
**Lords** 179:10
**lose** 105:21 148:12
**losing** 199:1
**loss** 25:13 55:7
84:20 92:1 155:20
**lost** 23:19 25:6,10
27:8 28:9 30:7
31:16 35:6,7
36:10,20 37:2,2
38:4,9,17,21 39:9
39:21 40:19,21,21
41:1 42:12 44:15
45:7 48:4,18 50:5
50:16 55:7,15
57:17 73:3 183:9
**lot** 5:18 19:17
24:15 28:5 35:10
66:5 108:9 133:6
185:21

**Lotfi** 175:1
**lots** 138:13 141:22
142:7 182:13
**lower** 51:1 75:14
99:15,20
**lush** 30:3
**L-A-K-E** 83:22
**L-E-H-T-I-N-E-N**
178:10
**L-E-V-I-N** 40:11
**L-O-T-F-I** 175:1

**M**

**macroeconomic**
184:5
**Mafia** 141:10
**Magazine** 82:6
**magnitude** 49:5
**mail** 116:5
**mailing** 161:3
189:2,8 196:18,20
**making** 96:15
97:12 120:21
201:21
**mal** 39:14
**male** 169:9,9
**malpractice** 27:3
39:16
**man** 170:18
**manage** 130:15
**Management** 21:13
22:22 29:17
**manager** 169:11,16
**mandate** 132:16
**manner** 85:7
109:17 115:9
117:4 120:11
157:17 159:1
203:18
**manufacturer**
144:11
**manufacturers**
144:7
**March** 12:14 52:5
52:5 176:5 189:11
189:11 193:16
**Mariam** 182:15

mark 6:16,22 7:3
7:15 8:8 12:5,9
13:8,20 15:7
16:17 19:14 20:6
22:9 28:15 90:19
108:2 116:6
160:15 161:22
178:7 180:6
185:12 188:6
191:18 194:4
197:6
marked 7:19 8:13
12:10 14:2,14
15:9 16:21 19:16
19:19 20:14 28:7
29:4,7 45:21 46:4
46:11 66:10 86:2
107:13,17 160:16
178:13 180:10
185:13 188:7
192:1 194:5 197:7
markers 60:11
marketing 140:10
Maryland 1:16,19
30:3 38:10
match 119:7
matches 64:1
Mateo 125:6
material 26:3
80:22
materials 5:22 7:1
7:3,17 11:9 19:16
20:9 21:7,16 22:9
22:11 23:21 24:4
24:13 25:6,8
27:14 66:13 67:13
78:21 81:14 84:2
182:8
math 59:8 75:15
89:1,14 92:20
93:3 203:3,4
205:15
Matt 119:3
matter 17:20 30:1
32:21 54:1 60:14
102:9 116:5 163:1
matters 101:4

Maz 157:9
MBA 25:1 60:10
McKane 38:13
McLean 174:21
MD 2:5
mean 16:3 29:19
39:8 43:15 57:8
58:11 59:17 61:10
65:3,4,8 69:2
72:13 73:4 84:14
87:6 92:13 105:9
107:1 111:2
113:12 114:20
117:4 118:2
125:17 128:2
140:3 151:18
163:16 176:17
190:14 196:17
199:20 201:14
means 47:21 55:6
56:14 78:22 109:5
190:1 196:19
214:11
meant 86:14
103:16 162:21
measure 56:20,21
57:13 58:1,14,15
58:21 60:17 61:2
61:3 71:17 192:14
measurement 59:6
59:7
measures 15:15
58:9 60:18 73:13
mechanics 174:3
media 148:6,8,10
medical 27:2 39:14
39:15 41:6 176:4
meet 198:7
meeting 3:22 4:6
52:5 67:5 133:9
180:22,22 181:22
182:21 184:15
185:16 186:18
189:10,14 190:17
190:19 191:2
193:3,16
meetings 180:6

190:20
member 16:8 51:7
147:19 158:15
169:5 172:19
173:3,18 174:22
178:9,11,22 189:6
194:16 195:15
196:8
members 71:5
181:11,20 183:9
186:22 187:13
188:17,19,20
189:2 190:7 191:9
192:13,17 194:9
198:16 199:1,11
200:1
membership 86:20
131:11 178:3
180:16 181:9,10
183:1 184:9,22
185:1,3,7,22
186:3,10,19
187:10 190:11
191:22 192:8,12
193:7,7
memberships
187:12
memorize 33:9,10
memory 19:6 34:19
175:2
mention 38:4 52:13
74:18 114:5 121:4
138:22 139:4
140:4 153:14
155:18 164:14
166:9,18 175:19
mentioned 32:8,13
35:4 39:10 69:14
86:5,18 93:22
113:21 114:12,16
137:18 143:4
144:17 174:22
merely 24:9 190:8
merge 31:5
merger 30:16
mergers 30:22
Mervis 36:12,12

37:22 39:10 44:10
44:21 50:14 66:9
message 4:4 152:20
191:19
messy 26:10,12
met 5:15 42:11
83:1 150:20 177:5
196:14
method 61:7 154:9
methodology 55:2
56:19 59:3,11,14
60:3 61:4,15,20
62:4,9,11 63:8,13
64:14 66:2,19,21
79:11 81:3,6,10
87:20 109:12
120:11 122:8
124:15 125:18
129:17 130:4,21
136:13 139:10,11
139:13,13,15
140:1 143:20
154:1,7,17,21
155:1,5 156:1,8,9
178:18
methods 60:20
metric 55:14 58:14
61:16 62:7 202:4
metrics 57:13,22
Miami 128:11
Michael 98:10
99:12 120:3
127:21 132:11
Microsoft 154:11
middle 39:13 46:22
165:20 198:21
midnight 131:20
milligrams 18:9
million 37:3 43:3
44:22 49:6 57:3
mind 31:11 32:3
47:3 110:4 160:12
201:20
mine 89:1 133:7
141:1 168:15
202:2
ministry 158:8

minor 196:22
minus 59:20 62:1,2
89:7 90:4 94:9
201:9,10 206:15
206:15
minute 81:8
minutes 3:22 4:6
10:21 180:7,17,19
181:7,13,14,22
182:13 183:13
184:10,15 185:16
186:4,18 187:16
187:18,21 189:10
190:1 191:2 193:3
Minutes185 3:21
mischaracterize
211:14
missed 12:7
misses 29:4
missing 9:17 29:5
29:10
Mister 122:19
123:3
misunderstood
70:13
misusing 154:6
mitigate 212:4
mixed 172:5
model 63:10,22
64:1,10,11,17,18
64:21 65:3 68:5
71:13,14 72:22
76:10 77:22 80:18
85:22 97:5,19
98:11 100:8 111:6
116:22 200:21
203:13 204:6,8
208:17,21
modeling 100:19
models 50:16 59:19
moment 145:3
money 96:11 99:21
105:14 136:14
147:21 198:15
200:1,2 213:9
Montgomery 36:17
months 133:5

**month-by-month** 74:15
**moods** 155:8
**moot** 113:14
**Morad** 82:18
114:11
**morning** 201:2
**morning's** 205:14
**Morozov** 114:22
**Morse** 1:14 3:4,9
3:12,13,14,15 5:3
5:9 6:14 36:20
66:20 81:5 130:10
130:15 146:13,15
**mortar** 23:10,11
**mother** 158:3,4,5
**motion** 67:15
114:15
**motivation** 132:2
183:7
**Mousavi** 112:17
148:8
**mouth** 68:7 91:5
**mouthpiece** 138:14
**move** 126:6 146:14
180:2
**moved** 169:3
**movement** 121:19
**Mtg** 3:21
**Mullah's** 82:5
**multiplied** 205:12
206:22
**multiply** 208:7
**murderers** 129:5
134:22
**murderous** 128:18
**Murphy** 1:15
**M-A-Z** 157:9
**M-C-K-A-N-E**
38:13
**M-O-R-A-D**
114:11
**M-O-R-O-Z-O-V**
115:1
**M-O-U-S-A-V-I**
112:17

**N**

**N** 1:14 3:1,4,9,12
3:13,14,15 5:1,3
6:14 130:15
**name** 5:13 6:13
10:8 33:10 38:11
42:14 51:9 99:12
114:10 115:4
121:12 122:21,22
123:1 128:11
143:4,5 157:12
172:11,14,20
189:20 194:16
199:16,21
**named** 34:9 112:16
113:16 117:21
131:13 153:9
169:8 170:1,18
194:13 197:11
**names** 26:8 33:8
34:7 42:5 110:4,9
120:20 121:1
139:2,4 163:22
172:4,21
**narrated** 205:13
**narrative** 189:18
**nation** 142:6
**national** 1:4 21:13
34:18 96:5 97:6
98:6,19,21 101:7
106:11,19 107:7
**native** 165:1,13,16
195:8
**nature** 48:7,16
96:21 202:2
**Navid** 166:21
167:22 168:3,7,11
170:2
**navigate** 118:18
**nearly** 96:14 101:9
106:21 158:6
187:21
**necessarily** 9:16
65:3 123:8 124:2
181:14 210:15
**necessary** 215:3
**need** 6:3,8 28:15

58:5 81:9 86:4
88:20 91:4 92:6
103:6 105:6
**needed** 25:3 26:14
**negated** 202:3
**negative** 114:15
118:4 201:9 213:5
213:7
**negligible** 207:10
**net** 90:1 91:7 93:4
**networked** 124:6
**networks** 76:4
**never** 11:6 16:4
100:7 104:10,11
115:6 121:7
162:20 198:15
200:2
**new** 14:9 25:22
26:5 29:5,11 42:4
46:8 60:7 71:5
114:21 115:5
131:15 133:8
137:17 169:3,4
**news** 44:16,17
45:14 50:18
122:11 146:17
**Newsmax** 78:7,11
153:11,20
**Newsmax.com**
78:10
**Ney** 157:22
**NGO** 102:2,15
105:8,9,18 135:10
**NIAC** 3:21,22 4:6
10:6 47:18 51:5
74:7 75:10 76:1
76:14,20 79:5,6
80:1,18 82:5,12
82:22 85:2,19
95:11 96:4,7 99:6
100:13,16 101:12
102:1,19 111:16
112:18 113:19,21
115:12,14,19
116:1,4,7,10,13
118:5 121:10
122:11 125:22

126:10 128:20
129:3 131:2,20
132:9 133:21
135:1,4 136:1,7
137:5,12,22
140:18 142:15
147:11,14,20
153:16 154:4
156:4,14 158:1,15
159:5,13,16
161:18 163:11,16
163:20 169:5,8
169:21 170:9,18
172:11,12,18
174:22 175:8,22
176:6,8,10 177:6
177:14 179:21
181:1,2 183:13
185:6,18 186:20
188:12,17 189:10
192:5,11,16 193:3
194:8,9,22 195:15
196:1 197:16,18
198:15 199:1
200:2,13 209:2
211:5,15
**NIAC's** 4:8 68:10
69:18 70:5 131:4
136:22 155:20
161:3 163:16
173:20 184:9,14
186:5 191:20
194:15 196:10
212:9
**nice** 16:11 89:11
**Nick** 119:6
**nondefamatory**
69:4
**nonprofit** 31:1,22
33:15 53:11 58:18
60:15 62:17 64:8
**nonpublicly-trad...**
30:12,15
**non-current**
181:20
**non-forensic** 35:13
**non-governmental**

105:9
**non-lawyerly** 67:19
**non-specialist**
11:22
**non-traded** 29:18
29:19
**normally** 53:7
74:13 167:11
**Notary** 1:18 5:5
217:18
**notations** 107:19
**note** 19:8 84:3
91:10 114:16
131:19 146:14
152:5 167:10
173:11 176:14
180:13 201:3
207:5,21
**noted** 166:2 195:10
215:9 217:7
**notes** 111:12 112:4
112:7 164:17
167:4,22 168:1,1
169:12 172:2,5
173:2 174:7,11,17
175:2,17 181:4
189:12 193:16
196:8 205:14
208:9 209:8
**notice** 83:14 126:15
148:10
**not-for-profit**
30:20 32:7 35:7
38:6 40:22 56:15
58:10 62:7 66:20
**not-for-profits**
35:2 55:17,18
56:21 57:10 58:8
58:14
**November** 74:11
119:4,6 121:11
125:1 127:4
149:16,16 153:8
183:19 194:12
195:1
**number** 7:19 8:11
8:12 12:9,10 14:2

15:9 16:21 19:19
20:14 29:17 65:15
71:12 76:5,8
78:20 79:19 80:11
110:10 143:12
160:16 161:18
174:20,22 178:13
179:13 180:10
181:19 185:12,13
188:7,16,17,21
190:6 191:7 192:1
197:6,7,13 205:7
205:16 206:19
207:1 211:6,10
**numbers** 6:19 8:3
8:13 9:20,21 11:6
85:20,20 91:3
107:13 108:9,10
108:14,19 118:16
155:11 184:22
191:10 193:18
194:5 199:9 205:7
**numerics** 205:4
**N-A-V-I-D** 166:21

---

**O**

**O** 5:1
**oath** 6:1
**Obama** 153:7
**object** 90:9 154:7
**objecting** 205:2
**objection** 56:3 68:8
68:21 69:6 70:9
71:1 72:11 80:12
81:1 95:17 97:10
98:16 99:13 102:8
103:20 104:18
106:15 121:22
126:1 129:12
135:21 136:8,17
137:13 138:19
141:6,17 144:21
145:8 148:21
153:2 158:18
159:18 160:7
166:2 171:15
176:13,22 179:4,6

183:15 184:1,11
186:13 187:4,14
193:9 195:10
**objections** 145:17
**obliterating** 90:15
**obscured** 115:21
**observation** 205:10
**obtained** 63:15
74:17
**obviously** 16:3 25:5
52:5 99:17 115:8
116:10 168:10
170:2 206:21
210:5
**occur** 177:9
**occurred** 55:9 96:9
137:5 174:2 176:5
177:4
**October** 18:3 92:5
92:6 128:10,10,16
133:1 134:11,18
185:16 186:19
**offer** 53:19 117:9
**offered** 81:14
**offering** 197:16
**office** 7:2 27:18
31:21 34:4 182:22
198:9
**officer** 181:2
**offices** 1:15 28:1
**official** 34:18
130:12 132:12
**Oh** 83:2 86:14
134:9
**okay** 5:12 10:17
11:8 12:5 19:18
22:10 28:15 38:3
39:8 43:2 47:16
61:14 69:2,21
78:14 89:3,21
92:11 94:16 95:10
100:3 103:8
105:12 106:16
111:21 114:3,18
118:11 124:9,13
127:1 132:18,20
135:16 136:4

138:7 140:11,13
147:3 149:14
151:13 152:21
153:3 157:8 165:7
166:1,8 174:7,14
184:20 200:16
207:20 209:9
**old** 28:3
**older** 14:17
**once** 10:13 11:5
89:14
**ones** 11:12 14:11
23:4 109:14 110:7
213:18
**one's** 179:3
**one-on-one** 74:21
**Onground** 23:12
**online** 21:12 22:13
22:19,19,21 23:4
23:10
**onslaught** 132:3,5
**open** 32:21 175:15
**opened** 10:10
**operating** 105:6
**operation** 39:22
**operations** 69:18
**opine** 69:20 74:11
83:10 124:16
146:19 211:4,5,15
**opined** 154:10
155:10 212:6,7
**opining** 130:22
211:9
**opinion** 44:5,6
68:14 71:21 77:3
77:6,16 79:10,18
79:19,22 122:9
126:20 138:4
139:20 200:12
202:15 210:21,22
211:20
**opinionated** 160:11
**opinions** 68:3
77:20 153:16
163:10,20
**opponents** 129:1
**opposed** 136:15

139:2 146:7 200:1
**Oracle.com** 22:5
**oral** 90:11
**orange** 12:19,20
**order** 14:6 49:5
186:2,9 187:2
**organization** 34:12
34:17,19 105:10
123:5,12 128:22
141:5 147:20
**organizations** 31:2
53:18 57:11,12
142:1
**organize** 148:3
**organized** 7:5,5
167:12
**organizers** 82:19
**oriented** 174:10
**origin** 110:2
**original** 65:19
90:16 152:19
215:12
**originally** 11:13
**outcome** 45:13
63:2 76:12
**outlawed** 129:1
**outlets** 23:1
**output** 71:13 80:17
**outreach** 147:12
177:8
**outright** 131:12
**outside** 54:17 148:3
198:10
**overtime** 192:8
**overwhelmed**
177:7
**overwhelmingly**
183:8
**owned** 27:9

---

**P**

**P** 5:1
**page** 1:9 3:4,8 4:3
7:6 13:12 16:7
25:12,16 29:3,4,5
29:8,13 30:9
39:13 45:20,20

46:22 52:14 66:9
70:16 71:22 79:9
80:15 84:3 85:1
86:2 89:20 91:8
91:11,21,22,22
92:9 118:22,22
119:6 150:3,5
152:5 166:10,10
166:16 169:20
170:1 175:17
182:18,18 183:3
185:2 186:1,8
188:14 189:21
191:6 216:4
**pages** 13:7,13
39:17 60:11 62:22
111:18 217:3
**paid** 52:20 148:12
189:3 190:8
192:13,17 193:7
**paint** 18:5 117:16
117:19,19 120:6
144:4,7,8,10
**paper** 141:21 168:7
**papers** 167:7 189:9
**paragraph** 116:6
133:4,16 140:21
157:18 165:20
189:17 191:21
196:7
**parcel** 30:8
**pardon** 126:16
189:11
**Paris** 169:4
**Parliament** 178:9
178:22
**Parliamentary**
179:9
**Parsa** 3:16 10:11
11:2 51:8 212:16
**Parsi** 1:4 10:7 76:2
78:16 79:5 80:18
82:5,12 83:1,9
95:11 97:14
109:12,21 112:19
114:12,17 115:15
119:1,6,11,14

120:3,6,15 121:15
122:10,12,18
123:4 124:22
126:9 127:5 128:9
128:15 129:5
130:10 131:7,20
132:15,22 133:1
133:22 134:2
135:17 138:9,12
140:18 142:15
145:15,22 146:15
146:20 147:18
149:15 150:20
151:3,9,11,13,18
152:10,13,16
153:8,12 157:15
157:19 159:5
160:22 171:4
173:5,11 176:9,19
177:7 179:1,22
180:20 183:12
185:6 186:20
187:9 188:1,15
189:20 194:12
197:11 198:5
199:12 200:1
202:7
**parsing** 145:10
**Parsi's** 80:19 140:6
150:8 155:8
198:18 199:17
**Parsi@niaccoun...**
134:6
**part** 9:8,10 19:15
21:6,16 30:8
33:15 36:7 44:13
45:6,6 46:4,14
49:17 83:8 100:1
109:10 121:20
124:18 154:20
160:2 179:15
181:8 197:22
**partially** 75:8
**partial-year** 74:8
**participation**
175:15
**particular** 10:7

23:14 25:5 27:10
28:10 35:5 44:13
59:3,6 61:16,18
62:7 72:6 75:22
96:4 97:13 99:14
106:11 157:4
178:1 180:15
197:18 200:9
211:4,15
**particularly** 86:4
140:3 203:21
**parties** 34:8 38:12
53:20 67:10 74:18
156:17 175:21
**partner** 42:13
**partners** 41:17
**partnership** 41:15
**party** 33:4 34:11
37:12 41:9 149:11
**Parvazian-Yazd...**
174:6,19
**passed** 11:20
167:12
**pasted** 119:14
150:6
**path** 156:13 212:6
**Patrick** 3:16 10:11
11:2 51:8
**pause** 196:3
**pay** 13:15 21:8
148:13 213:8
**paycheck** 148:13
**payers** 53:12
**payment** 53:21
**PC** 2:3
**PDF** 22:17
**peaked** 191:10
**pediatrician** 41:7
41:11
**Pediatricians** 41:8
**peer-reviewed**
56:13
**penciled** 208:19
**pending** 32:16
49:12,14
**people** 22:5 24:21
30:20 65:18 69:14

75:20 76:1 77:9
108:15 113:12
121:1,19 135:8
136:13 137:6,15
147:21 148:6,8,11
153:11 155:12,13
159:16,22 160:12
163:3,9,13,18,22
164:7,15 165:18
167:14 170:11,14
170:19 171:3,13
175:5 177:3,5,10
179:10,13,21
183:19 184:16
189:2,3 190:8
197:13
**people's** 132:13
**percent** 59:21,21
59:21 62:1,2 80:5
80:6 154:13,15
183:6,20,21
189:14 195:3
200:16 201:17
202:10,10,14,16
203:7,12,14 204:7
204:19,21,21
205:1,8,10,11
206:7,9,18 207:12
207:19 208:14,18
208:22 209:15,17
**percentage** 54:15
60:21 144:10,11
144:12 154:9
**perceptions** 131:11
**perfect** 21:9 77:2
**performance** 61:2
61:3 162:14
**performs** 64:10
**period** 96:13 130:5
188:2 192:22
193:4,8
**permission** 47:11
48:21 173:13,15
**permit** 43:4 102:1
**permitted** 55:22
**perpetrators**
120:21

**perplexing** 114:2
**Persian** 11:22
83:11 125:6 172:4
**persist** 79:20 211:7
211:10
**person** 20:8 81:18
102:15 114:9
122:9 125:5,10
136:6 141:14
142:9,13 145:22
147:16 148:18
158:13 169:7
170:1,3 173:13
**personal** 18:4
23:15,17 144:16
148:19 149:7
158:14 162:9
163:4
**personally** 34:17
108:19 180:19
**personnel** 63:18
**persons** 57:22
65:16 76:12 78:6
79:3 82:9,11
83:15 97:21 132:7
132:11 154:3
**person's** 163:19
**perspective** 198:10
198:12
**perturbed** 64:10
**Peter** 48:3
**phone** 32:20 54:13
168:21 174:20,22
196:21
**phonetic** 110:14
115:3 151:2
**phrase** 141:21
**physical** 27:10
196:17,20
**physically** 157:5
**Ph.D** 1:14 3:4 5:3
**picture** 16:10 108:9
150:11 151:12,18
195:19
**piece** 21:17 122:2
165:9 168:7
**pieces** 189:21

**pigeon-Farsi** 111:2
**pile** 166:15 167:7
207:7
**Pishevar** 2:3,3 17:4
20:1 46:17 49:7
56:3 68:8,21 69:6
70:9 71:1 72:11
80:12 81:1 83:17
90:9 95:17 97:10
98:16 99:13 102:8
103:20 104:18
106:15 117:10
121:22 126:1
129:12 135:21
136:8,17 137:13
138:19 141:6,17
142:10 144:21
145:8,17 146:9
148:21 153:1
158:18 159:18
160:7 162:3 164:6
164:11,21 165:3,8
165:12,15,19
166:3 171:15
176:13,22 179:4,6
183:15 184:1,11
186:13 187:4,14
193:9,19 195:7,11
195:17 197:20
213:14,16,17
**Pishevar's** 7:2 51:7
**place** 15:16,17 24:5
91:18 100:7
**plain** 156:9
**plaintiff** 33:5,6
49:19 51:21 54:12
117:17,18 132:2
**Plaintiffs** 1:6 2:6
**plaintiff's** 8:22
9:12 10:4,15
12:15 16:18 85:9
118:17
**Planning** 28:18
63:16 64:7
**play** 19:6 144:14
**played** 135:6
**Plaza** 2:4

pleadings 67:19
please 6:12 43:21
  47:21 57:1 59:17
  79:9 80:15 135:5
  148:1 166:16
  193:11 195:8
  200:6 213:17
  215:2,6
plenty 6:19
plus 59:20 62:1,1
  135:11 192:13
  201:10 206:15
pocket 147:22
point 18:10 28:8
  48:5,17,18 50:1
  65:2 66:6 72:13
  91:2 93:19 103:10
  116:10 120:15
  127:19 131:8
  147:11 162:10
  169:14 178:21
  180:8 184:3 185:7
  212:9 213:2
pointed 44:12
  191:9 202:6
  208:12
points 183:4
policies 33:14
policy 101:17
  135:12,17 136:15
  136:22 137:3,7,10
  137:15,19
political 101:11
  118:10 135:11
politics 83:11
  175:11
popular 175:4
pose 87:14
posited 65:15
position 125:5
positive 113:22
  114:4,15
possibility 173:21
possible 27:18
  51:20 64:15
  102:16,21 139:19
possibly 175:22

post 104:14
posted 15:8 192:10
posting 4:8 194:15
Post-it 86:4
potential 120:20
power 205:15,17
  205:19 208:5
powers 135:11
practice 38:10 41:6
  54:17 108:16,18
precise 9:6 87:4
  204:14
precluded 101:12
predate 155:13
predecessor 130:9
  170:19
predict 77:19
predicts 204:8
prefer 5:14
preference 5:12
  154:16
prejudice 176:8
prejudiced 142:5
preliminaries 5:17
preliminarily 6:16
prepared 11:19
  108:3 124:10
  206:20,21
preparing 187:12
  201:2
presence 154:14
  202:4
present 25:20
  35:14 36:1 37:16
  155:3 192:8
presentations 15:2
presented 74:14
  83:5
president 4:4
  186:20 191:19
press 44:1 132:13
  151:1
pressuring 153:7
presumably 78:15
  199:18
presume 18:17
  111:14 131:18

195:16
presumes 97:5
  98:12
pretabbed 157:5
pretty 47:4 82:4
  199:6
prevailing 187:17
prevent 171:17,18
  196:10
prevented 103:12
previous 119:5
  162:12 200:11
principal 27:11
principals 42:11
  67:5 74:18 77:14
  81:12,12
principal's 27:3
principle 201:19
Principles 58:17
print 11:10
printed 8:18 11:13
  13:14 22:17 23:2
  23:3 109:14
  119:18 201:5
printout 174:15
prior 11:21 81:19
  149:11 152:5
privacy 162:19
  164:7
Private 29:14
probably 18:3 22:2
  24:19 42:3 47:4
  48:5 54:22 103:6
  105:5 107:11
  167:6 168:20
  172:2 177:17
problem 9:11
  13:12 69:8,9
  88:14
problems 35:20
procedure 105:6
procedures 57:19
proceed 6:9 109:3
proceedings 37:12
  45:10
proceeds 212:2,2
process 9:6 15:14

produce 164:22
  165:16
produced 7:15 9:22
  10:3 11:6 12:14
  16:18 45:22 46:15
  49:2,4 67:10
  119:18 160:21
  162:3 165:10
  171:8 174:12
  182:8,9 197:21
  201:1
producing 162:5
product 26:2
production 198:1
profession 108:17
professional 1:18
  91:19 139:20
  162:18
professor 5:9,11
  24:6 36:4 49:13
  50:7 66:20 81:5
  82:17 93:2 107:16
  141:20 145:19
  161:1 164:13
  166:8 170:14,17
  178:6 194:2
professors 51:17
profit 26:16,17
  35:7 41:1 55:22
  56:6 60:15 84:19
  91:22
profitability 41:6
  42:7 58:10
profitable 96:22
profits 23:19 25:6
  25:10,19 26:9
  27:8,11 28:9 30:7
  30:11 36:11,20
  37:2,2,15 38:5,9
  38:17,21 39:9,21
  40:20,21 41:15,19
  42:12 44:15 45:7
  47:20 48:4,18
  50:5,12,13,16,16
  55:8,14,15,19
  57:17 58:3
proforma 60:17

154:10
program 25:1
  63:17 86:15,21
  87:8,18 113:17,17
  121:10
programs 87:22
progress 93:10
  110:6 156:13
prohibited 56:1
project 25:17 96:8
  96:11 98:6,8
  101:13,18 102:2,2
  102:4,16 103:1,11
  104:16 105:9,19
  105:20,21 106:9
  209:17
projected 200:20
  207:12 208:22
projecting 59:19
projection 61:22
projections 59:22
  102:4 209:14
projects 63:10
  64:21 203:13
prominent 26:4
  41:7
Promotion 14:16
  14:19
promotional 91:18
promulgated
  159:12
pronouncing 77:1
pronouns 187:3
proper 35:14 58:22
  142:6
properly 62:9
propounded 217:6
propter 104:14
prospered 137:22
protest 148:1
protests 148:3
protocols 130:15
provide 16:14 47:9
  47:10 159:10
  199:14
provided 5:22 6:17
  7:17 17:8 46:15

53:22 67:12 76:16
87:4 185:18
**pro-regime** 78:17
**public** 1:19 42:16
74:4 160:2 162:21
217:18
**publication** 20:19
22:21 23:1 152:4
**publications** 13:18
14:5,10 36:6
75:22 79:3,4
80:19 82:10
**publicity** 74:2
**publicly** 29:20,21
**publish** 57:12,17
63:3 152:2
**published** 21:11,14
36:3 56:13,18
57:21 58:13 59:13
60:2 61:15 62:8
62:13 72:7 73:22
77:10 152:1
161:17
**publishes** 78:7
**publishing** 68:19
70:7 74:6
**pull** 22:8
**pulled** 15:8
**pulling** 83:3
**pundants** 120:5
**Pundit** 149:18,22
**puppet** 150:8,14
151:13,19
**puppeteer** 150:8,13
151:19
**pure** 155:11
**purpose** 56:10
69:18 116:22
177:10 207:10
**purposes** 68:5
**purview** 34:14
**put** 9:12 19:9 20:4
21:2 27:19 34:4
53:1 60:7,11
64:18 66:2 67:20
68:7 71:12 85:10
86:16 88:7,16

90:7 95:20 109:15
116:16 118:17
147:22 153:1
156:22 164:19
166:15 167:14
175:22 189:16
192:19 210:13
**P-A-R-V-A-Z-I-...**
174:6
**P-U-N-D-I-T**
149:18
**p.m** 1:17 168:19
172:6 175:18
213:20

---

**Q**

**qualification** 24:22
**qualified** 50:8
83:10
**qualitative** 70:2,12
71:7 129:16 154:2
155:14 157:17
159:1
**qualitatively** 111:5
120:11
**quantification**
139:19
**quantify** 212:5
**quantitative** 70:17
71:6,8 72:7
**quantitatively**
111:5
**query** 164:10
**question** 6:2 28:17
28:19 29:2 36:8
45:12 48:20 57:1
58:20 60:2 61:14
62:12 66:19 70:13
72:5 73:3,19
76:18 81:5 85:14
88:3 89:2,10 91:1
93:19 101:6,20
120:1 122:14
126:18 129:14
130:3,20 134:10
136:10 139:22
142:12 143:19

144:15 147:13
149:6 152:9,13
154:1,21 155:17
156:7 161:5 174:8
174:9 178:20
179:19 180:18
184:12 186:7
188:22 192:15
193:11 196:4,6
200:15 202:13
207:10 210:12
**questionable** 142:1
**questioning** 171:1
209:14
**questions** 5:21 6:7
6:10 21:3 32:20
55:4 77:15 81:19
87:14 90:12 96:20
156:10 163:13
172:1 217:5
**quick** 68:2
**QuickBooks** 85:19
**quickly** 47:4
**quite** 24:18 43:15
50:11 129:20
131:7 136:9 182:3
199:11 204:14
**quote** 125:21
142:17 169:22
189:12
**quotes** 170:6
**quoting** 190:18

---

**R**

**R** 5:1 216:2,2
**radically** 27:4
**rainmaker** 42:13
**raise** 99:16,16
208:3,5
**raised** 58:20 175:7
177:17 189:1
198:15 200:2
205:15,17,19
**raising** 196:9
**Ramin** 4:7
**Raminahmadi@...**
194:13

**ran** 78:12
**random** 171:12
**randomly** 171:6
**range** 48:19 204:21
**rank** 148:22
**Ranking** 178:11
**rate** 35:15 53:17
54:7 75:3,14 80:1
80:10 183:20
200:12 201:18
202:16 203:6,14
204:7,19 205:1,5
205:10 206:7,18
207:19 208:14,18
208:22 209:15
211:5,15
**rates** 59:14,15,18
60:3 61:15 62:9
62:14,20,21 63:4
184:16 203:2
**ratios** 61:8 73:13
204:15
**reach** 196:9
**react** 69:10
**reaction** 96:20
114:1,2,6 155:4
**read** 37:4 57:2,4
67:14 73:5 75:17
81:17 82:2,10
83:20 94:6 105:4
109:14,15,20
112:5 115:3 119:9
120:1 121:16,20
122:1,2,5 123:10
129:6 133:16
135:14 136:20
138:18 143:7
150:22 151:10
156:1 158:11
161:7 167:9 170:5
170:7 178:19
179:5 181:19
183:10 185:20
186:15 193:10,12
198:17 199:4
200:18 203:11
208:9 211:14

215:2 217:3
**reading** 146:16
169:12 196:4
213:13
**ready** 6:9 166:8
**real** 26:11 27:1
39:21,22 63:22
64:9
**reality** 63:11 64:2
198:13
**realize** 74:5
**realized** 72:9 74:3
**really** 25:3 60:14
72:19 83:10 90:21
129:13 133:14
144:13 150:19
160:8 163:19
177:14 179:17
180:3 181:5
206:14
**reason** 53:4 83:7
111:19 131:2
148:4 151:22
155:9 172:8 215:4
**reasonable** 76:21
80:8 171:10 203:2
203:5
**reasoning** 162:16
**reasons** 64:15
95:12 162:13
184:16
**Rebecca** 133:1
134:6,16
**recall** 52:1 143:5
153:20 175:19
184:3
**receipt** 122:16
215:13
**receive** 74:15
188:12
**received** 10:6 99:7
99:21 101:7,9
105:14,18 189:8
190:9 209:2 210:7
**recharacterize**
205:2
**recognize** 182:14

182:15 199:16
**recognized** 56:20
**recollect** 9:1
**recollection** 198:2
**recommends** 104:2
**record** 6:4,12,18
  19:11,12 36:19
  42:16 43:18 46:5
  52:22 70:11 72:21
  103:6 107:12,16
  108:3,8 121:2
  130:10,16 136:20
  147:10 157:20
  160:2 161:8,21
  162:17 163:6
  164:2 183:6
  188:11 191:15,16
  194:11 209:8
  214:3
**recorded** 167:2
**recounted** 181:5
**recreate** 94:12
**redacted** 26:3,7
**reduced** 18:7 75:3
**reduction** 36:1
**refer** 5:11 6:18 8:2
  28:16,19 29:1,5
  38:15 86:5 136:19
  151:10 184:21
  189:22
**reference** 24:3,5,9
  24:11 91:10
  127:19 130:2
  182:12,12 184:4
**references** 23:22
  25:9
**referencing** 127:21
  128:3
**referred** 51:15,16
  119:5 137:3
  146:13 155:22
  189:17 190:4
**referring** 14:11
  19:17 38:20 45:11
  49:8 84:20 139:6
  150:2,10 155:4
  175:16 184:6

187:17 190:12,15
  190:16 195:4
  201:7
**refers** 25:16 120:2
**reflect** 64:11
  105:19 147:10
**reflected** 99:17
  183:13
**reflecting** 186:6
**refund** 106:17
**refused** 136:14
**refusing** 183:7
**refute** 140:2
**refuting** 139:10
**regard** 47:6 54:2
  58:7 59:22 65:22
  66:17 72:6 81:3
  82:14 88:3 199:22
**regarding** 126:10
  141:22 149:17
**Regime** 82:13 83:9
  116:8,17 126:3
  129:1 135:3 136:2
  136:5 148:5,11,13
  148:17 156:19
  157:20 158:10
  159:5 164:8,10
  179:2
**regression** 60:21
**regret** 128:21
  135:12
**regularly** 108:16
**rejects** 111:17
  115:13
**relate** 28:9 87:15
  164:18 174:7
**related** 20:9 22:2
  23:8 25:6 60:18
  97:8,22 98:10,14
  100:14 101:18
  130:6 173:3,17
  194:8 209:4
**relates** 23:13 71:17
  147:9 153:16
  159:8 180:15
  195:13 196:1
**relating** 35:6 45:22

148:19 158:14
  194:17
**relation** 65:15
**relational** 63:21
**relations** 158:7
**relationship** 68:20
  70:1,5,19 74:22
  82:13 97:18
  147:14 156:8
  172:11,15,17
**relationships** 97:1
**relative** 120:18
**relayed** 71:3
  180:20
**released** 25:4
**relevant** 67:2
  134:14 190:2
**reliability** 61:19
  149:3
**reliable** 172:2
**relied** 189:13
**rely** 81:6 159:14
**relying** 46:3
**remain** 14:22
**remains** 61:9
**remarks** 155:8
  160:9,11 162:9
  163:4 175:15,21
**remediation** 43:5,5
**remember** 18:20
  34:3 43:2,14,16
  44:2 50:9 52:7
  76:2 112:12
  167:17 169:14
  174:8 181:8 182:5
  212:22
**remembered**
  199:21
**remiss** 162:18
**remotely** 62:14
**removed** 84:2
  161:3
**rendered** 46:7
**rendering** 46:8
  138:4
**repackaged** 23:5
**repeat** 57:1 122:16

159:2 172:14
**repeated** 63:5
**repetitive** 11:15
**replacing** 43:10
**report** 3:9 5:21 7:8
  11:13,19,21 12:3
  17:12 19:14 20:1
  30:5 32:17 40:13
  42:1,2,15 46:7,9
  47:8 48:22 49:1
  52:3,13 53:2
  54:14 55:3 57:9
  58:11 61:21 66:11
  71:19 72:20 73:5
  74:19 79:8,15,18
  81:20 86:22 90:16
  139:16 156:11,13
  156:20 163:21
  164:15,17 166:10
  166:11,14 171:22
  172:3 180:13
  182:4,11 184:4,17
  184:21 185:2
  186:3,22 187:12
  188:15 189:13
  192:11 200:6,7
  202:2 204:1
  209:20
**reported** 43:1
  186:20 187:9,20
  191:1
**reporter** 1:18 5:19
  6:4 57:4 193:12
  213:13,15 214:7
  214:12
**reporters** 120:5
**reporting** 192:17
**reports** 52:2 84:11
  84:14 89:16
  188:18
**represent** 117:13
  160:21
**representative**
  76:15 115:13
  116:6,12 157:22
**Representatives**
  178:12

**represented** 34:16
  40:6
**representing** 2:6
  2:12 48:10
**represents** 25:21
**reproduction**
  214:10
**reptile's** 148:14
**Republic** 101:12
  102:1,11 104:9,15
  138:15 141:12
  197:19
**Republic-funded**
  147:20
**reputation** 69:19
  116:19 179:3
**reputational** 74:20
**request** 90:1
  134:18 161:1,3
  165:6 176:19
**requested** 57:4
  193:12
**requests** 82:1
  128:15
**require** 53:21
**required** 16:14
**requirement** 16:19
**research** 35:11,18
  35:22 82:9 138:15
**reserve** 70:12
**resides** 174:20
**resources** 141:3
**respect** 36:5 139:17
  175:22
**responded** 134:3
**responds** 121:15
  198:6
**response** 7:18
  16:19 28:17
  121:14,20 128:14
  134:3,8,10,18
  161:1 165:6
  176:19 183:20
  197:14 198:18
  199:18
**responsible** 103:1
**rest** 112:14

restate 103:6
restrict 104:4
restricted 23:17
restrictions 96:7
result 39:6 45:10
  69:3 198:22
  209:22
resulted 100:16
  102:3
results 61:12 65:10
  68:18 70:6,21
  212:3
resume 28:4
retained 4:13 7:20
  8:14 17:22 33:1
  33:16 34:11 40:1
  40:3,5 48:3
  117:10,12
retention 156:3
return 91:13 95:14
  97:7 99:9,17
  100:4 215:11
returned 95:21
  100:13
returning 100:16
returns 7:10 84:4
revealed 158:8
revenue 27:12
  31:16 33:15 73:1
  73:14 86:7,13,15
  86:21 87:1,5,8,11
  87:18,19 88:4,11
  88:16 89:7 90:4
  92:12,21 94:21
  95:3,4,7,13 97:19
  99:1,15 100:17
  101:15 102:5
  106:20 107:17
  108:5 140:8
revenues 156:5
  186:6 212:17
revenue-raising
  69:15
reverse 14:5 31:4
reversed 44:6,13
  45:6,17
review 29:17 66:22

66:22 69:10 85:18
  180:19 186:3,4
reviewed 39:17
  66:2,13,16 67:7
  67:16 81:4,4 84:3
  186:9 197:2
revisit 44:18
Reza 4:8 153:9
  194:16 195:15
  196:8
Richard 51:15
Richmond 33:18
right 13:6 15:22
  22:4 28:19 30:21
  36:9 39:14 52:15
  54:4 55:19 56:12
  57:20 59:16 63:13
  64:15 65:14 68:2
  70:12 75:10,15
  77:11 83:12 85:3
  86:17 88:2 89:4,5
  89:13 90:5 91:18
  92:14,16 93:9
  94:8,10,13 95:9
  97:9 100:1,12
  101:1,2,20 102:9
  104:21 105:16
  106:19 111:18
  112:12,13 115:20
  119:2 122:4,5
  127:12 137:9,14
  150:13 165:22
  167:18 168:8,11
  169:10 171:4
  173:11 184:8,10
  199:20,22 202:11
  203:4,21 205:3
  206:5 207:22
  210:2,11,20
rights 121:18 135:7
  151:4,16
right-winged 120:5
Rise 143:1
risen 188:18
rising 186:7
risk 35:16 53:15
Rmoini2000@ao...

125:3
Robert 36:16
Rockville 2:5 30:3
  38:10
role 14:22 77:6
  131:21 164:13
roles 181:10 185:7
  190:11
rolling 134:22
Roman 110:13
Ronnie 37:13
Rosenthal 51:16
Ros-Lehtinen 4:5
  178:10
rough 131:20
roughly 210:14
roughness 131:22
row 201:4,7 204:15
  205:11 206:2
  208:10
Rubin 36:16 98:10
  99:12 132:11
rules 66:21 67:1
rumors 133:6
run 115:5
R-E-Z-A 153:10
R-O-S 178:10
R-U-B-I-N 36:17

**S**

S 5:1
safe 93:17 116:2
sake 6:22 86:11
salary 27:5 65:16
  65:20
sales 63:19 154:9
  154:13
San 125:6
Sarram 149:17
sat 82:21
satellite 175:19
  176:1
Savant 202:19
saw 34:20 42:19
  110:17 125:21
  140:18 191:5
  207:6,7

saying 50:20 65:11
  68:17 71:15 75:7
  75:11 82:12 87:10
  96:9 97:4 98:18
  105:2,12 106:4
  127:15 130:17
  145:9 146:18
  152:13 173:11
  175:12 181:13
  187:3 203:5 204:6
  207:9
says 39:8,12,14
  92:5 114:16,19
  115:19 119:3
  127:11,13 150:22
  151:2 152:6,10,16
  155:15 156:11,13
  168:19 171:22
  180:16 181:10
  182:21 183:1
  188:20 189:14,18
  199:5
scanned 85:8
scenario 184:6
scheduled 169:6
Scheffenacker
  39:11
school 35:19 82:16
  113:5,5,6,13,15
  158:6
scientific 72:7 74:1
  80:9 203:5 208:4
scope 116:14
search 10:7 134:15
  155:1 157:6
searched 141:21
second 21:4,17
  28:14,15 29:3
  36:7 37:8,9,10,20
  37:22 39:4 43:17
  71:22 106:10
  118:22 133:4
  146:13 170:8
  175:17 181:18
  186:1 205:15
  208:5
secondly 45:5

129:8
secretaries 15:19
Secretary 133:10
section 23:22 25:10
  66:8,12 155:15
security 140:10
see 13:2 16:8,11
  21:22 24:2,11
  29:9 31:19 39:5,9
  41:10 60:16 67:2
  67:14,22 69:8,9
  71:15 75:18 83:5
  83:9 85:19 86:12
  87:17 88:14 91:17
  92:2,10 93:1
  94:22 95:1 109:6
  110:16 111:21
  115:21,22 116:8
  116:12 118:15
  120:8 124:15
  125:7,13,14
  126:12 127:7,8
  129:21 138:10
  145:19 150:2,9
  151:6 152:12,13
  152:13,20 157:10
  157:13,19 158:16
  161:14 163:19
  165:3 173:10
  177:3 182:10
  185:3 189:12
  196:11 198:5
  203:20 206:6,19
  207:9,14 212:15
seeing 39:2
seen 36:21 43:1
  80:22 152:17
  161:12 178:17
  181:7 185:19
  193:2 194:18
  199:15
SEID 1:8
select 171:6
selection 171:12,13
sell 30:21 31:1
selling 30:17
semester 25:11

seminal 131:5
seminar 64:6
seminars 15:1
Senate 78:12
senator 116:7,17
   125:21 137:18
send 10:4,22 11:1,5
   27:20 134:3
   140:19
sending 120:16
   140:15
sends 138:9 145:16
   149:16 153:8
sense 8:12 35:22
   37:17 49:16 59:2
   71:9,16 87:7
   103:9 104:13,21
   123:2,4,10,11
   159:14 177:11,15
   178:21 189:4
   205:3 213:8
sensitive 63:1
sensitivity 60:22
   62:22
sent 7:2,7 9:10 10:4
   11:19 37:8 40:10
   46:3,6,18 109:11
   110:11 115:15
   124:22 128:8
   131:14 132:21
   138:10 147:5
   153:5 160:22
   161:7 165:6,18
sentence 72:15
   155:22 181:18
   199:4 202:6
sentences 121:16
   122:2
separate 19:18
   21:7 34:10,22
   143:22
separating 8:10
September 42:11
   140:16
sequelae 18:8
series 11:15 56:8
serves 24:5

service 86:15,21
   87:8,18
set 9:14 10:8 24:4
   24:10 26:9 66:4
   120:5 156:2 158:1
   187:15
sets 58:8 168:1
setting 56:19 62:17
   62:18,19
settle 32:22
settled 39:7
settlement 32:19
seven 26:6
Shadee 198:8
Shaffer 1:15
Shame 129:5
share 154:11,14,15
   198:11
shared 31:20
   190:18
shareholders 31:6
shares 29:20 31:10
Sharokh 169:8,15
Sharokh's 169:16
sheet 60:19 84:19
   207:6 215:5,7,9
   215:12 217:8
sheets 8:10 61:6
   118:16
Sherry 1:17 214:7
Shirazi 153:9
Shiva 149:17 152:6
short 91:22 94:16
   161:21
shorthand 214:12
show 76:6 105:17
   107:2 108:1
   130:16 131:18
   163:6 171:21
   172:5
showed 181:22
   204:20
showing 150:7
shown 190:20
shows 70:11 121:2
   209:3
Shrin 148:15

Shriner 33:13
   34:16,18
Shriners 31:15,20
   32:2,9 33:7,11,15
   34:8,12 47:7
shuffling 189:9
sic 17:20 41:1
   98:19,22 142:16
   197:11 207:3
sick 135:6
side 67:16 81:8
   93:17 203:21
Sidle 40:3,8
SIDLEY 2:8
siege 123:5,6,12,18
sign 206:15 215:6
signature 37:1
   216:22 217:10
signed 179:7
   195:15
significantly
   191:11
signing 213:13
   215:8
Silos 28:18
similar 23:19 54:21
   76:1,13 79:4
   132:8 197:5
Simmons 33:3
   47:11
simple 59:8
simpler 101:6
simplest 112:12
simplicity 74:12
simply 20:17 22:9
   30:11,14 31:6
   36:3 62:19 72:16
   85:2,10 107:20
   113:20 114:16
simultaneously
   49:21
single 9:5 66:6 79:6
single-event 74:22
sir 38:7 154:6
   199:8 205:3
sister 173:1
sit 17:17 58:12

situation 38:5 63:4
   175:3 212:8
situations 197:1
six 26:6
skip 71:20 128:5
skipped 74:9
slew 123:7
slightest 155:6
slightly 15:12
   159:3 177:2
   201:15 202:3
   205:3
slowly 169:14
small 28:1 53:18
smear 120:2
Smith 25:14
smoking 83:7
Soceite 169:1 170:2
socialized 179:11
societies 113:10
society 176:4,6
software 21:20
   63:14 64:8
Soheila 167:10
   171:19 172:6
soil 43:5,5,6
solely 102:6
solved 35:20
somebody 34:15
   63:9 99:12 112:10
   113:9 121:12
   125:2 127:13
   128:11 136:5
   140:18 142:4
   154:18 159:21
   185:5 194:13
   197:11 207:5
somewhat 44:12
   163:14
sophisticated 21:19
   28:6 39:21
sophistication
   170:4
sorry 103:5 196:3
sort 24:20 28:10
   30:10 31:18 32:6
   37:16 50:7 56:15

56:22 58:12,14
   59:12 60:4 61:22
   63:7,8 64:19 67:6
   82:8 97:20 112:10
   115:21 124:17
   133:15 154:22
sorts 57:21
sound 52:15
sounds 142:4
   148:22
source 129:10
   139:1 180:14
   181:15
sources 133:20
   141:15 143:12
South 1:16 2:9
so-called 134:22
space 215:4
speak 6:5 19:1
   70:11 124:10
   139:12 150:7
   161:1 164:1
   176:19
speaker 24:14
   110:5 112:16
speakers 82:19
speaking 70:2
   111:6 169:13
   173:15 189:20
specialized 26:1
specific 65:12 98:3
   98:4 117:5 124:9
   137:20 146:20
   182:12 212:13
specifically 12:1
   47:16 55:1 66:1
   109:8 133:20
   137:9 153:16
   170:10,21
specify 175:18
   176:2
speculating 176:1
speculation 149:1
speculative 205:1
speech 145:4
speed 158:20
   161:22 180:3

194:2
**spell** 17:21 83:21
**spelled** 42:5
**spill** 43:6 48:1,8
  55:12
**spinoff** 31:4
**spite** 198:13
**spoke** 169:11
  187:16
**sponsored** 113:3
**spontaneous**
  131:12
**spot** 149:22
**spouse** 173:1
**spread** 106:21
  198:14
**spreadsheet** 84:16
  201:6
**Spreadsheets** 28:17
**springs** 31:11
**staff** 115:19 116:1
**Stalin** 129:2
**stand** 141:11 155:1
**standard** 53:17
  54:7 55:6 58:8
  61:4,7,11 105:5
  108:16,18 139:13
  162:19
**standards** 56:18
  57:11,12,20 58:13
  58:16,18 62:5
**standing** 168:20
**stands** 36:10 47:15
  192:12
**staple** 21:5
**stapled** 21:17 22:1
**start** 19:9 55:17
  87:7 110:7 112:11
  115:11 118:20
  146:16
**started** 19:10 68:19
  70:7 102:19
  131:22
**starting** 203:22
**starts** 157:9
**state** 1:19 6:12
  18:17 28:1 33:20

71:19 78:13 89:3
128:18 130:9
133:10 139:16
170:10 182:15
183:7,18 186:4
187:6 192:7 200:2
208:17 215:3
**stated** 45:5 176:3
  180:21
**statement** 60:19
  71:3 92:1 96:15
  116:12 140:6
  142:15 149:20
  169:19 187:11
  191:8,22 207:7
**statements** 26:10
  32:3 33:14 61:6,9
  67:3 68:4,19 69:2
  69:5 70:7,21
  72:10 76:12,13,17
  77:4,5 79:5 84:9
  84:20 85:2 110:2
  120:12 129:22
  139:15 146:8
  154:3
**states** 1:1 30:4
  66:16 106:11
  116:6,17 133:2,5
  141:8 145:5
  147:19 178:12
  179:1 186:9
**stating** 80:8
**statistical** 69:22
  70:2,4,18 71:16
  184:8
**statistics** 178:3
  181:9 185:3
**stay** 75:1 109:2
  187:20
**staying** 169:20
  170:8,11,21
**Steven** 113:8,9
**stock** 104:2
**stop** 120:15 153:7
**stopped** 106:22
**stories** 98:18
**story** 67:17 81:9

**straight** 198:2
  210:20
**Strategic** 21:21
  22:6
**strategies** 135:11
**stream** 26:16,17
  27:12 131:10
  134:14
**Street** 1:16 2:4
**strike** 85:16 186:7
**strong** 135:17
  148:16
**struck** 162:13
**structured** 169:2
**struggle** 135:2
  136:6
**students** 16:8 26:9
**Study** 115:1
**stuff** 6:16 37:16
  110:16,17 124:7
  132:12 185:21
**subcategories**
  86:19 87:2,12,14
  87:15
**subfinancials**
  105:15,17
**subject** 21:15 32:6
  49:7 64:7 71:18
  109:21 140:15
  153:6 194:14
  215:8
**submit** 23:4
**submitted** 22:20
  30:5 32:17 42:3
**subpoena** 3:9 7:7
  7:18
**Subscribed** 217:12
**subsequent** 45:10
  72:18 187:18
**subsequently** 7:4
  7:14 64:1
**substance** 97:2
  217:7
**substantial** 53:16
**substantiate** 193:6
**subtract** 93:4 207:2
  207:2

**subversive** 135:12
**success** 134:21
  137:5 202:4
**successful** 197:2
**sudden** 106:22
**sued** 34:17
**sufficiently** 18:11
  175:4
**suggest** 161:12
**suggesting** 88:6,8
  145:3 164:5
**suggestions** 198:8
**suggests** 142:13
**suit** 135:10 144:6
**Suite** 1:16 2:4
**suits** 49:17,20
**sum** 205:22 206:1
**summaries** 105:16
**summarize** 142:7
  206:5
**summarizing** 186:5
**summary** 3:17
  71:21 79:10 84:11
  84:14,21 85:20
  89:15 108:6
  210:21 211:21
**summer** 18:21
  39:12
**Sumner** 38:18 39:8
**sums** 206:3
**superficially**
  123:11
**Superior** 38:19
**supervision** 214:12
**support** 3:18 20:10
  21:15 23:14 72:8
  139:21 140:2,5
  141:10 148:8
  156:2 163:12
  196:10
**supporter** 129:4
  133:2 136:7 148:2
  148:17
**supporters** 192:13
**supporting** 128:22
**supportive** 139:10
**supports** 155:16,19

**sure** 6:2 8:5 9:13
  12:15 13:10,10
  27:22,22 34:6
  47:14 48:19 50:22
  53:10 57:16 70:11
  75:7 84:15 86:9
  88:19 89:14,20
  149:4 159:7,8
  169:10 182:2
  187:8 196:6,19
**surely** 58:22 212:3
**surplus** 3:19 31:17
  35:6 40:21 56:7
  56:14,20 58:15,21
  59:2,7 61:17 62:8
  73:1,14,17 78:2
  88:14,15,17 89:4
  90:3 91:14 92:19
  93:21 95:3,6
  108:4 130:5 156:6
  200:19,20 203:20
  203:22 204:3,7,16
  205:6,18,20 206:8
  207:14 208:13
  209:2,19 210:3,7
  210:9,15 212:10
**surpluses** 56:9
**suspect** 41:21
  51:12 52:6 119:20
  153:6
**suspend** 104:13
**Sweden** 157:21
**Swine** 65:18
**swing** 95:19,21
**switching** 48:12
**swore** 5:19
**sworn** 5:5 214:3
  217:12
**symbols** 165:20
**sympathizer** 116:8
  116:18
**sympathizers**
  126:3
**system** 10:1,2
**S-A-R-R-AM**
  149:17
**S-A-V-A-N-T**

202:19
**S-H-A-R-O-K-H**
169:8
**S-H-I-R-A-Z-I**
153:10
**S-H-I-V-A** 149:17
**S-I-D-L-E** 40:8
**S-O-C-E-I-T-E**
169:1
**S-O-H-E-I-L-A**
167:10
**S-U-M-N-E-R**
38:18

_____

**T**

**T** 3:20 134:6 216:2
**tab** 8:11 9:20 84:18
   84:19 85:11 88:6
   111:11,16 115:12
   134:12 138:6
   157:2 168:9
**tabbed** 8:10 62:22
   91:8 118:16
**table** 3:17 47:1
   72:20 73:7,11
   75:1 79:9 80:4
   86:1,7 89:19
   92:11 94:4,15
   107:19 108:5
   139:21 155:10,16
   166:14 200:6,8
**tabs** 7:9 85:10
**Taiwan** 29:16
**take** 6:8 7:12 8:18
   11:9 17:2 35:2
   51:20 52:18 61:20
   66:11 68:3 73:20
   77:8,8 89:10 93:4
   94:15 106:8
   107:10,11 108:7
   108:13 109:5
   111:4,10 115:14
   118:12,15 146:4
   148:6 155:17
   157:1 158:21
   160:8 161:6,21
   165:21 166:6

167:8 171:3 178:4
   178:18 180:8
   182:20 190:22
   194:18 205:11
   208:2
**taken** 1:15 43:19
   67:8 75:2 77:22
   162:2 178:5
   191:19 209:11
**Talebi** 147:9,18,19
   148:16,20 197:14
   198:1,3
**Talebi's** 147:14
**talk** 45:22 47:16
   51:1,4 55:1 60:1
   61:18 62:11 69:12
   69:15 70:3 170:20
   173:13 177:19
   178:3
**talked** 70:22 117:8
   126:5 175:20
   204:15
**talking** 58:2 59:5
   60:1 74:17 85:3
   86:15 106:7
   108:22 127:12
   190:11 199:9,17
   199:19
**talks** 181:19
**task** 26:15
**taught** 23:8 24:18
   24:19
**tax** 7:10 55:22 84:4
   91:13
**Taylor** 42:14
**teach** 23:9 25:1
   60:9
**teacher** 158:4
**teaching** 24:20
   25:9 35:11 60:12
**technical** 13:11
**technique** 61:11
**technological**
   130:14
**technology** 10:12
   15:15
**telephoned** 124:7

**television** 76:4,6
**tell** 25:9 46:11 47:4
   51:6 52:2 57:14
   81:16 90:2,19
   95:12 96:4 109:9
   119:16 134:2,5
   142:19,20 148:7
   151:4,16 168:16
   168:17 176:9
   183:13,22 185:18
   195:14 203:18
**telling** 96:18
   162:11
**tells** 82:4
**Temple** 33:9
**temples** 31:20
   34:13
**temporal** 70:1,5,18
   97:18
**temporality** 71:19
   72:6
**temps** 65:19
**ten** 10:22 44:3
   65:18,19 111:18
   158:7 177:17
   196:9,15
**tense** 109:19
**Tenure** 14:17,19
**term** 31:2 58:2
   141:21 144:17
**terminated** 96:6
   98:8 102:4
**termination** 97:5
   97:21 103:1
**terminations** 96:22
**terms** 23:6 107:3
   186:5 201:11
   212:1
**Terrible** 127:5
**terribly** 127:9,14
   151:9,17,19
**terrorists** 129:4
**terror-sponsor**
   128:18
**testified** 5:6 17:17
   17:19 37:20,22
   40:15,16 41:20

44:11 47:12
**testify** 36:15 38:7
   48:5 52:16,17
**testifying** 77:9
   79:14
**testimonies** 17:9
   67:4
**testimony** 3:4,15
   23:15 33:21 38:16
   38:22 39:6 40:18
   54:9 57:5 79:17
   98:5 99:6 102:14
   103:10 162:11
   193:13 200:11
   203:1 214:4
**testing** 60:4 63:7
**Texas** 42:10 161:2
**text** 118:9 119:13
**textbook** 25:14
   26:20
**thank** 39:5 103:5
   106:1,16 108:21
   122:13 186:2
   187:2 193:14,20
   213:12
**thesis** 81:15
**thieves** 134:22
**thing** 44:9 49:18
   67:6 85:4 105:7
   115:11 123:15,15
   137:17 139:18
**things** 7:15 12:5
   31:8 32:4 45:9
   56:2 57:19 66:7
   76:1 77:10 86:20
   90:10,11 93:10
   94:14 111:6,11
   112:18 131:20
   132:8 158:20
   162:1 165:16
   177:8 180:3 194:2
   199:5 201:22
   202:5,8
**think** 6:21 9:8,12
   11:20 13:5 14:21
   17:16 21:11 24:14
   26:1 28:12 34:18

36:7,11 37:6
   39:12 40:16,22
   41:4 42:17 43:22
   48:11 49:8,21
   50:6 51:8 58:7,12
   62:13 66:5 71:19
   72:15 78:20 81:13
   81:13 83:1 85:3
   85:12 87:10 88:18
   88:21 89:15 91:4
   94:3 116:1 118:22
   131:15,16,17
   132:6 133:13
   142:9 143:8
   149:20 151:8
   157:2 159:20
   160:2 164:7,10,12
   164:18 165:22
   171:12 175:20
   176:18 177:1
   178:21 179:14,15
   181:13 182:5
   183:2 184:20
   187:3,5 189:6
   192:4 201:7,19
   207:20 209:9
   212:21 213:12
**thinks** 81:7
**third** 22:1,4 157:7
   186:2,9 205:17
**thirty** 215:13
**thought** 86:14
   97:17 104:17
   106:3 110:6
   113:18 165:12
   167:16,17
**thoughts** 110:2
**threatening** 164:12
**three** 23:1 34:12
   54:8,11 82:15
   112:20 168:1
**thrown** 28:2 158:5
**thumb** 47:3
**Tiger** 73:20
**tightly** 30:6
**time** 6:7 9:1 10:21
   11:13 19:9 24:19

52:22 53:1 54:2
54:10 75:6 97:13
99:4 100:22
103:22 107:11
147:12 178:18
180:8 185:7
187:11 188:2
189:5,5 192:22
193:4,8 194:1
213:10
**times** 24:18 73:5
114:21 115:6
131:15 178:17
205:16,18 208:7
**Timmerman** 78:7
78:9 82:3 83:16
132:11 153:11,17
153:20 154:3
**Timmerman/Ne...**
153:6
**TIMOTHY** 2:8
**tiny** 200:22
**tired** 135:6
**title** 14:21 22:22
23:13 29:3 82:4
127:12,13 179:8
**Tkapshandy@si...**
2:11
**today** 17:17 45:19
46:1,14 50:18
54:2 58:6,12
77:20,21 79:18
100:22 101:4
117:8 124:11
141:9 162:4,6
186:11 194:19
**today's** 123:21
205:13
**told** 32:21,22 66:15
76:3 91:15 93:10
93:11 95:16 96:12
97:17 98:18 99:22
107:1 112:21
122:18,19 133:7
168:18 185:6
207:8 212:19,20
**tolerance** 141:9,11

**Tom** 51:14
**Tommy** 42:14
**tomorrow** 64:7
**tool** 120:6
**top** 21:8 84:3 85:1
115:20 150:11
173:11 182:18
183:3 195:20
198:5 205:19
**topic** 36:2
**topics** 35:20
**topple** 135:2
**tort** 30:10 57:18
81:19 97:1 144:16
212:8
**tortious** 26:19,21
26:22 27:2 28:10
32:6 56:16 59:12
100:10
**total** 86:7,13 87:1
87:11 88:3,10
89:7 90:4 92:12
93:4 94:21 95:4,7
95:21 99:1,15
**totaled** 96:5
**totally** 188:1
**touch** 73:3
**toxic** 144:16
**track** 11:3 193:21
**traditional** 23:2
**traitor** 128:19
**transcribe** 168:13
**transcript** 94:6
133:11 213:18
214:9 215:14,15
**transcription** 217:4
**transfer** 71:10
**transferred** 9:4
**translates** 151:3
**translation** 151:15
**transliterated**
110:12
**transmission** 17:15
119:1 130:10
145:14
**transmissions**
131:19 134:15

**transmit** 10:12,20
**transmits** 125:1
**transmitted** 125:10
140:14 143:10
147:4 163:5
**transmitting**
121:10 126:9
127:3 128:9
132:22 147:17
153:10
**travel** 54:10
**treat** 172:21
**treats** 129:1
**trend** 186:7 188:2
191:3 192:22
**trends** 186:10
**trial** 18:12,13,15
37:8,9,10,20,21
38:1,2 40:17 44:5
44:11 52:18 54:14
77:13
**trick** 93:2
**tried** 36:15 113:18
121:18
**trier** 102:10 144:6
173:22 202:21
**triggered** 134:8
**Trita** 1:4 10:7 76:2
78:16 79:5 80:18
80:18 82:4,12
83:1,9 95:11
97:14 109:12
112:19 114:12,17
115:15 119:1,6,11
120:15 121:15
122:10,11,18,22
124:22 126:8
127:5 128:9,15
132:15,21 134:2
134:20 138:8
140:18 142:15
145:15,22 147:17
149:15 150:8,20
151:2,9,11,13,18
152:6,10 153:12
157:15,19 160:22
171:4 173:5 176:9

176:19 177:6
179:1,22 180:20
181:4 183:12
185:6 186:4,9,20
187:9 188:1,15
189:20 194:12
197:10 198:5
199:12,17,18
**Tri-County** 42:18
43:15 44:1 50:14
**trouble** 11:3
161:13 163:2
**true** 16:3 68:4
117:14 133:8,11
199:6 202:8 214:3
**trust** 88:22 94:5
**truth** 134:19
138:16 156:18
**truthful** 186:18
**try** 6:5 28:3 66:7
117:19 135:5
144:9 146:15
**trying** 12:2 37:6
60:16 93:2 117:6
128:5 133:15
177:3 202:4,18,21
203:15 205:2
**Tucker** 51:16
**turn** 13:4 36:6
66:10 72:20 86:1
92:9 118:21 121:8
124:19,20 126:22
128:6 132:19
134:17 138:6
142:21 145:13,15
146:12 147:1
152:22 157:18
166:11,16 175:4
182:17 184:20
200:5
**turned** 113:20
150:3 158:8
**turning** 94:21
180:4
**TV** 175:19 176:1
**two** 13:18 18:21
22:3 24:15 40:9

61:8 64:15 94:5
95:19 97:14 98:2
101:10 106:7
169:5 197:1
**two-part** 16:20
**two-year** 96:13
**type** 18:4 65:12
149:9 197:1
**typed** 22:17
**typical** 24:11 26:13
53:16 81:11
181:10 187:12
190:11
**typically** 22:18
35:17 67:3,20
117:17 185:8

---

**U**

**UB** 3:14 112:13
**Um-hum** 200:17
**unacceptable**
186:12 188:1
**unambiguous**
150:21
**unbeknownst**
162:11
**uncomfortable**
109:20,22
**underlined** 29:15
**underneath** 150:22
**understand** 5:17
5:18 6:2 8:22
10:19 11:8,17,18
23:13 30:12 59:9
70:15 77:21 79:17
81:4 84:22 93:16
100:9 101:17
124:16 129:15
135:5 148:2
168:16 177:21
179:18 185:5
187:3 200:11,18
202:15
**understood** 132:2
**unflattering** 154:4
**unforeseen** 64:19
**unfortunately**

77:18 85:6
**United** 1:1 30:4
　106:10 116:16
　145:5 178:11,22
**units** 32:1 33:7
**university** 15:6,13
　16:6 20:11 27:18
　28:1 54:17 63:15
　113:4,12 114:11
　161:2 163:3 169:3
　169:7 170:15
**university's** 15:17
　82:16
**unrelated** 101:3
**unstructured** 26:15
**unusual** 36:19
　162:8
**unwilling** 169:15
**update** 19:5 183:1
**updated** 3:13 13:6
　13:11,21 19:2
　27:20 90:20
**updates** 15:1
**updating** 15:14
**upheld** 37:17
**upper** 112:13 168:8
　168:11
**upside** 111:19
　172:7
**upward** 32:2 188:2
　191:3 192:22
**up-to-date** 15:20
　15:21 17:14 77:15
**URL** 125:12 149:21
**URLs** 119:7
**use** 56:13 58:15
　60:5,11 63:14
　64:8 69:13 72:21
　92:17,17 105:21
　108:13 109:6
　110:13 111:4
　124:15 125:17,17
　125:19 130:3,11
　130:13,14,21
　132:1 138:3 139:9
　139:22 154:2
　164:9 191:7,8

**useful** 61:13
**uses** 43:10 129:16
**utilize** 100:17
　158:21
**utilized** 70:20
**utilizes** 56:19
**U.S** 41:4 121:11
　157:21 179:14

---
**V**
---

**V** 1:7
**vague** 124:3 139:5
**vain** 118:1,3 157:3
**Vale** 178:9
**validate** 63:12
**validated** 60:4 64:2
**validation** 63:7
**valuation** 23:18
　25:17 30:2,7
　40:19
**valuations** 50:11
**value** 11:16 25:18
　25:20 26:17,18
　27:7,9 35:14 36:2
　37:16 41:16,17
　160:6,9,10
**valued** 37:14
**valuing** 29:14,18
　41:5
**vanilla** 156:9
**variable** 58:3 94:19
**variables** 64:17
**variation** 15:5
**various** 31:20
　55:21 57:13 63:12
　80:5 87:2 180:15
**vehicle** 104:22
**Venable** 48:11,13
**ventures** 31:10
**verbal** 52:9 201:11
**verbally** 104:12
**verifying** 76:5
**version** 90:20
　110:12 111:3
　151:4,16
**versus** 17:21 36:13
　38:18 42:18 47:18

48:2 51:5 64:21
　95:8
**Victor** 138:9
**view** 103:10 116:11
　117:13 178:21
**viewed** 75:21 156:5
**viewers** 76:6
**viola** 93:7
**violation** 135:7
　164:12
**violent** 136:6
**Virginia** 31:16 32:9
　33:18 174:21
**Virginia-based**
　34:12
**visited** 75:21
**vitae** 3:12,13,14
　12:13,17 15:5
　20:13 28:5 44:19
**voice** 82:5 83:9
**Volume** 29:17
　118:12,15 156:22
　157:1,1 164:18

---
**W**
---

**wait** 81:8 95:2
**walked** 114:7
**want** 5:15 16:8
　20:19 22:12 43:22
　44:3,18 46:10
　49:10 66:10,11
　68:7,16 70:10
　79:13 86:2,3,10
　88:19,22 89:18,21
　89:22 90:2,15
　91:2 94:8 106:2
　109:1 111:11
　112:4 124:14
　130:9,16 133:14
　147:1 148:5,11,12
　156:22 162:22
　166:1 169:17
　176:6 178:19
　180:2 184:3,21
　206:12 207:11
　209:8 210:5
　211:19,22

**wanted** 38:4 86:9
　131:8,18 146:14
　157:3 163:5 164:3
　164:15 166:8
　169:7 170:20
　174:2 178:2
　201:15
**wants** 148:5
**war** 196:10
**warm** 179:21
**Washington** 33:2
　38:14,18 43:4
　51:12 141:1
　185:17
**wasn't** 26:11 32:6
　33:9,19 50:21
　51:10 53:10 64:14
　76:20 81:17,18,20
　84:8 113:5,6
　114:4 124:1
　132:16 177:14
**way** 15:18 21:10
　43:10 54:19 56:12
　65:11 67:19 69:10
　69:22 76:5,7 85:8
　89:3 101:3 102:21
　103:13,16 104:13
　116:16 136:12
　139:7 140:18
　157:7 163:1 177:2
　181:4 186:21
　192:4 200:19
　208:17
**ways** 43:7,9 58:21
　63:12
**wealth** 64:4
**webinar** 64:6
**webinars** 15:1
**website** 4:8 15:6,14
　15:17 16:2,6
　75:21 76:8 104:3
　115:15 116:5
　119:12 191:20
　192:5,7,11 194:16
　194:22 212:14,19
**Website15** 3:14
**Wednesday** 1:12

**week** 191:20 192:6
　212:15
**weeks** 8:21 41:22
　94:5
**week-by-week**
　74:21
**welcome** 122:21
**well-known** 179:1
**well-to-do** 113:8
**went** 41:13 42:10
　45:17 115:6
**weren't** 65:10
　96:18 110:22
　160:6 201:22
**we'll** 6:8,17,18,22
　7:15 8:2,7 9:7
　12:1,6,9 13:8,21
　15:7 16:17 19:13
　19:17,17 59:4
　60:1 61:17,21
　62:11 64:20 66:20
　70:2,15 78:20
　83:12,19 84:18
　87:17 89:10 90:19
　94:3,4,4,11,15
　100:3 108:2
　111:10 118:13
　160:15 177:19
　178:3,7 180:5
　185:11 194:3
　197:5
**we're** 7:6 8:4 9:17
　11:3 15:13 16:9
　16:13 25:5 28:4
　45:18,22 60:16
　61:16 70:16 71:18
　79:11 85:3 89:20
　92:11 97:8 106:7
　109:3 111:21
　129:19 130:8
　181:21 185:2
　209:9
**we've** 5:14 8:5
　19:16 28:7 45:20
　46:11 55:6 66:10
　117:8 132:6 139:2
**Wharton** 40:1,11

**whatsoever** 94:18
  153:15
**white** 168:10
**widely** 78:15
**wild** 156:18
**willing** 176:18
  213:8
**window** 27:9 156:5
**withdraw** 175:14
**withdrew** 43:4
**witness** 7:21 17:7
  36:20 49:10 56:5
  57:6 68:9,13,22
  70:10 71:2 80:13
  90:10 97:11 98:17
  99:14 102:9
  103:21 104:19
  106:16 122:1
  136:9,18 137:14
  138:20 144:22
  145:9 146:10
  148:22 153:3
  159:19 160:8
  162:7 166:4
  176:14 177:1
  179:5,7 183:16
  184:2,12 187:5,15
  193:10,14 195:19
  209:10 214:2,4
  215:1
**woman** 113:2 134:3
  158:15
**won** 36:18
**wondering** 129:16
  129:20
**Woods** 73:21
**word** 38:11 50:8
  69:13 79:6 84:22
  110:18,18,21
  122:19 123:22
  131:4,4 139:11,12
  154:6 164:9 170:8
  191:8 196:16
  201:14
**wording** 211:2
  212:1
**words** 68:7 91:15

93:14 99:11 109:9
  114:8 120:17
  137:4 172:22
  175:12 195:3
  201:15 203:17
  211:14
**word-of-mouth**
  51:10
**work** 11:1,16 16:3
  21:6 29:22 35:9
  35:12,21 39:17,19
  39:20 41:19 50:20
  51:13 52:9 53:1,5
  60:13 81:10 82:22
  108:20 159:8
  174:17 198:9
**worked** 9:13 26:7
  27:4,7 31:12,13
  43:15 140:17
  157:21 168:22
  169:2
**working** 37:18 41:3
  41:5 42:4 65:16
**works** 93:3 141:1
**world** 14:9 64:1,9
  65:19
**worse** 129:1
**wouldn't** 13:16
  34:21 36:3 76:5,7
  77:6 83:10 93:14
  96:17 99:16 118:3
  123:14,16 126:19
  139:11 148:12
  154:21 156:19
  160:12,13 161:12
  178:21 184:14
  190:2 213:7
**wrap** 161:21
  209:13
**write** 89:11,14,18
  89:19 90:10,14,18
  93:9 94:4,8
  103:21 168:20
  175:10 212:22
**writes** 78:9 128:17
  134:20 138:12
  140:22 152:6,15

157:19
**writing** 19:9 54:14
  102:19 104:12
  105:1 115:3 123:9
  132:8 167:9
  169:14
**writings** 98:11,14
  102:3,22 103:13
  103:18 104:6
  107:8 118:8
  123:19,22 124:2
**written** 22:8 27:15
  52:8 67:9 76:1
  83:15 98:9 99:12
  102:22 104:8,17
  115:19 116:1
  174:14 182:4
  189:15
**wrong** 64:16,19
  73:4 92:3 173:10
**Wrongful** 25:13
**wrote** 12:3 24:5
  75:9 79:6 81:20
  91:12 92:22
  112:13,13,17
  114:12,22 115:2
  120:15 124:6
  132:9 152:1
  173:14 174:21
  190:13,17 199:19
  201:1,1,3,8,9
  210:10

**W-H-A-R-T-O-N**
  40:11

_____

**X**

**X** 3:1
**Xbox** 154:19 155:2
**xeroxed** 46:19
  167:14

_____

**Y**

**Yazdani** 176:10
**year** 13:1 15:8
  17:18 40:9 42:21
  65:21 72:3,9,16
  72:21 74:3,7,9,14
  75:5,9 92:3,7,22

93:8 96:9 101:11
  102:18 107:18
  186:5 187:21
  190:4 192:16
  194:9 197:2
  200:10,10 202:10
  202:10 203:7
  206:2,9,19 210:14
**years** 16:15 26:6
  30:18 32:22 44:3
  54:8,12 57:3
  68:10 72:17 79:19
  80:11 81:19 86:21
  87:17,22 89:6
  90:3 95:19 101:10
  106:21 135:9
  136:20 137:1,2
  158:3,7 169:4,5
  175:3 179:12
  192:20 200:13
  206:10 211:6,10
**year-to-date** 186:6
**yellow** 168:7
**yesterday** 60:8
  212:21
**Ygliasas** 119:3
  120:2
**yielded** 10:8 183:19
**York** 25:22 26:5
  42:4 114:21 115:6
  131:15 133:8
  169:3,4
**younger** 41:12
**Y-A-Z-D-A-N-I**
  174:6

_____

**Z**

**zero** 53:15 87:6
  141:9,10 212:11
  213:5
**Zinat** 147:6
**Zolal** 157:12,19
  158:13
**Z-I-N-A-T** 147:6
**Z-O-L-A-L** 157:13

_____

**$**

**$1** 154:11

**$1,000** 176:11
**$10** 43:3
**$10,000** 172:12,18
**$100** 49:6
**$100,000** 49:6
  94:22 95:21
**$113,000** 95:1
**$130,000** 87:18
**$174,261** 91:7 93:5
**$180,160** 195:3
**$200,000** 96:5,14
  97:6 98:6 101:10
  106:21
**$230,000** 90:3
  201:16 209:20
  210:9
**$230,061** 89:4
  90:22 91:6 93:3
  93:21 201:9
  206:14
**$250** 54:11
**$2500** 52:16,17
**$258,000** 73:1
  203:22
**$258,005** 206:8,22
  208:8
**$266,394** 204:8
  206:19
**$27,381** 92:2
**$270,000** 207:1
**$284,000** 209:1
  210:6
**$284,450** 201:10
  206:15 207:20
  208:9 209:18
**$298,673** 212:10
**$300,000** 210:14
**$375** 54:8
**$4** 37:3 44:22
**$4,000** 176:11
**$4,511** 201:10
  206:16 210:1
**$440,000** 212:15
**$4511** 204:3
**$49,000** 209:15
**$49,879** 201:6
  209:3,20

**$5,000** 52:14,20
**$50** 128:20
**$50,000** 95:14,19
  95:20 97:8 99:7
  99:22 100:7 195:2
  195:15 196:2,10
  196:15
**$55,000** 94:11
  175:7
**$55,800** 91:8,14,19
  92:10 93:7
**$704,000** 73:1
**$953,580** 88:10
  92:12
**$953,581** 93:4

**0**
**004** 124:20
**0059** 146:14
**006** 126:7
**00705** 1:8
**0088** 152:22
**0128** 157:2
**05** 42:21
**06** 98:22 103:4,15
  103:16,17 105:13
  106:4
**07** 99:21 103:19
  105:13,14 190:1
  212:6
**08** 1:8 24:20 184:5
  201:22 205:22
**09** 84:10 88:12
  92:15 205:22
  208:10

**1**
**1** 3:9 4:13 6:22 7:6
  7:9,19 8:10 9:9
  19:16 84:12 86:9
  88:5,18 89:17
  91:3,17 109:2
  111:11 118:12,15
  157:1 164:18,20
  166:12 174:11
  188:14 191:6
  194:12 195:1
  217:15

**1,034** 186:10
**1,068** 188:21 191:9
  191:11
**1-217** 1:9
**1.05** 205:12,15,17
  205:19 206:22
  208:2
**1.1025** 208:7
**1.11** 205:16
**1:15** 1:17 19:10
**10** 3:22 59:20 125:1
  127:3 128:9
  154:12,15 188:6,7
  190:7 203:1
**100** 202:10
**107** 3:17,19
**11** 4:4 128:7 191:18
  192:1 211:1
**11/1/10** 4:7
**12** 3:12 4:5 178:7
  178:13 211:1
**12th** 176:5
**12/6/10** 4:4
**120** 113:12
**1200** 181:11 185:8
  187:13
**13** 4:6 128:7 130:8
  180:6,10 182:1
**13th** 33:9
**1307** 186:11
**14** 3:13 4:7 194:3,5
  195:5
**1400** 1:16
**15** 4:8 10:22 12:14
  18:9 194:3,5,15
  195:13 203:2
**15th** 134:18 189:11
**150** 109:10
**16** 3:15 4:9,14
  128:10 197:6,7
**16th** 128:16
**160** 3:20
**1600** 191:11
**168** 8:10
**1680** 186:11
**17** 153:8 158:3
**17th** 112:15

**174** 93:6,11
**178** 4:5
**18th** 189:12 193:16
**180** 4:6
**188** 3:22
**19** 3:16 133:1
**19th** 134:11
**192** 4:4
**194** 4:7
**197** 4:9
**1979** 175:11
**1999** 80:19 154:12

**2**
**2** 29:4,5,8,17 52:14
  79:9 80:15 84:18
  85:1 91:22 111:11
  111:16 115:12
  127:4 156:22
  157:1 164:20
  168:9 182:18
  186:8
**2A** 3:10 4:13 8:8,13
  9:19 83:13 109:4
  118:13
**2B** 3:11 4:13 8:8,13
  83:13 118:14
**2,000** 181:10 185:8
  186:22 187:13
  188:19,21 190:12
  191:7
**2.58** 183:20
**2/13/10** 112:4
  114:19
**2/17/10** 112:5
**2/22/08** 3:22
**2/24** 173:10,12,12
**2/24/10** 171:20,22
**20** 3:18 49:17 59:21
  80:6 179:10 203:2
  204:21
**200** 9:4 109:10
  134:15
**2000** 42:22 78:6
**2002** 73:13,15
  84:12 92:20
  204:12,17 205:6

**2002-2009** 3:19
**2003** 87:19
**2004** 87:7
**2005** 175:7,10
  186:10 187:21
  191:2,13 192:20
**2005-2007** 186:6
**2006** 75:2,13 96:13
  98:7 99:15 101:9
  102:18 103:13
  104:15 105:9
  137:20 186:11
  187:21 191:3
**2007** 29:17 72:16
  72:20 73:8,12,16
  73:16 74:6,7 75:7
  75:10 79:6 82:3
  94:21 95:20 96:3
  96:10,14 98:10,18
  99:2,6,16 100:18
  101:9,15 103:2
  104:12 105:20
  106:12 118:8
  130:5 132:8
  185:17 186:19
  187:16,21 191:2,3
  191:10 193:4,8
  204:12,17 205:6
  205:12,16,18,20
  206:8 207:14
  208:7
**2008** 13:5 39:12
  54:21 72:2 75:2
  75:13 84:4,12
  88:3 92:21 94:22
  95:21 96:3,11
  99:9,17 100:3,10
  100:18 101:11,15
  106:22 130:6
  149:16,16 153:8
  176:12 178:8
  183:5 188:10,16
  189:18,22 190:12
  190:17,19,20,21
  190:22 191:4
  193:4,8 197:10,15
  198:6,22 202:6

**203**:12,19 204:1,2
  204:3,8 205:11
  206:1,3,19 207:11
**2009** 12:14 14:7
  52:6 54:16 84:6,9
  84:13 85:12 86:4
  86:8,12 89:4,16
  91:3 92:1,4,5
  93:22 107:18
  119:4,7 121:11
  125:2 127:4
  128:16 133:1
  134:18 138:10
  140:16 147:7
  180:8 187:16
  200:16,18 201:7
  201:11 203:18
  205:13 206:1,4,10
  206:13,13 207:17
  207:17 209:1,16
  210:11 212:18
**2010** 1:12 14:6 16:1
  19:15 52:3,7
  74:11 112:15
  119:19 132:22
  134:19 138:8
  140:15 147:5
  149:15 153:6
  176:5 187:16
  189:12 191:19
  192:11,21 194:10
  194:12,17 197:3
  202:1 203:12,19
  205:14,22 206:1,4
  207:11 210:13,22
  212:3,10 213:5
  217:13
**2011** 74:12 203:12
  203:20 205:17
  206:1,4 207:12
  210:13 217:15
**2012** 203:13,20
  205:18 206:4
  207:12 210:13
**20852** 2:5
**21** 178:8
**21201** 1:17

**22** 128:10 149:16
188:10
**227** 183:19
**230** 208:20
**24** 197:15
**25** 197:10
**25th** 119:19
**26th** 147:6
**266** 208:1
**27** 140:16 185:17
186:19
**279-7347** 2:6
**279-8773** 2:5
**28** 189:14
**284,000** 209:16
**298** 208:1

**3**

**3** 3:12 4:14 12:9,10
13:4 14:15 17:4
25:12 29:13,17
30:9 84:19 88:6
140:15 147:5
153:6 182:18
**3A** 3:13 13:20 14:2
17:4 29:7,12 36:6
**3B** 3:14 15:7,9 17:5
**3rd** 138:8 149:15
**3,000** 181:10 185:8
186:22 187:13
190:12
**3/15/09** 3:12
**3/3** 172:5
**3/3/10** 111:20
171:21
**3/4/10** 174:5
**30** 49:17 135:9
136:20 179:10
215:13
**301** 2:5,6
**31** 138:10
**31st** 59:8
**312** 2:10,11
**316** 2:4
**36** 1:15
**360** 195:2
**38** 138:7

**4**

**4** 3:15 16:17,21
25:16 121:11
125:1 132:22
180:15 181:12
182:12 184:22
185:2
**4th** 126:8
**4,000** 192:12,17
**4/25/08** 4:9
**43,000** 192:13
**4511** 207:3

**5**

**5** 3:6,16 7:9 19:14
19:19 59:21 62:2
66:10 80:5 89:11
89:19 90:20
166:10,16 170:1
183:20 200:7,15
201:17 202:14,16
203:1,6,12,14
204:7,21 205:8,11
206:7,9,18 207:12
207:18 208:14,18
208:22 209:14,17
**5A** 3:17 107:13,18
107:21
**5/9/10** 3:16
**5:20** 172:5
**50** 11:5 62:1 202:10
**50,000** 201:18
**500** 39:17
**55** 204:19 205:1,10
**581** 92:12
**590** 95:8

**6**

**6** 3:18 20:7,14,18
22:9 28:8,22
191:13 192:20
**6th** 191:19
**6:10** 175:18
**6:30** 175:18
**6:50** 213:20
**600** 2:4
**60603** 2:10

**640** 60:10

**7**

**7** 3:9,19 107:13
108:2,11 137:20
191:13 192:20
**7/21/08** 4:5
**7:40** 168:19
**704** 95:8

**8**

**8** 1:12 3:10,11,20
137:20 160:15,16
162:4 192:20
**8.89** 204:16
**80** 183:6
**835-7036** 2:11
**853-7643** 2:10
**88** 153:3

**9**

**9** 3:21 17:12 19:15
52:3 137:20
185:12,13 187:9
**9/12/10** 3:20
**90s** 158:4
**900** 191:9
**990** 88:1 91:13