

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3    --------------------------------- )

 4    TRITA PARSI and                   )

 5    NATIONAL IRANIAN AMERICAN COUNCIL, )

 6                    Plaintiffs,    ) CASE NUMBER

 7            v.                     ) 08 CV 00705

 8    DAIOLESLAM SEID HASSAN,           )    (JDB)

 9                    Defendant.     )

10    --------------------------------- )

11

12        Deposition of DEBASHIS AIKAT, Ph.D., a witness

13    herein, called for examination by counsel for

14    Defendant in the above-entitled matter, pursuant to

15    notice, the witness being duly sworn by BESS A.

16    AVERY, RMR, a Notary Public in and for the State of

17    North Carolina, taken at The Umstead Hotel and Spa,

18    100 Woodland Pond Drive, Cary, North Carolina 27513,

19    commencing at 8:43 a.m., Wednesday, January 5,

20    2011, and the proceedings being taken down by

21    Stenotype by BESS A. AVERY, RMR, and transcribed

22    under her direction.
```

Page 2

```
 1            A P P E A R A N C E S
 2     ON BEHALF OF THE PLAINTIFF:
 3       ADRIAN V. NELSON, II, ESQUIRE
 4       PISHEVAR & ASSOCIATES, P.C.
 5       Jefferson Plaza, Suite 316
 6       Rockville, Maryland 20852
 7       (301) 279-8773
 8       ANELSON@PISHEVARLEGAL.COM
 9
10     ON BEHALF OF THE DEFENDANT:
11       TIMOTHY E. KAPSHANDY, ESQUIRE
12       ERIC GALVEZ, ESQUIRE
13       SIDLEY AUSTIN LLP
14       One South Dearborn
15       Chicago, Illinois 60603
16       (312) 853-7643
17       TKAPSHANDY@SIDLEY.COM
18
19
20
21
22
```

Page 4

```
 1              - - -
 2            E X H I B I T S
 3     (Exhibits attached to transcript.)
 4   Aikat Deposition Exhibits            Page
 5   1    Notice of Deposition . . . . . . . . . . . . 10
 6   2    Invoice to Pishevar & Associates . . . . . . 15
 7   3    Report of Debashis Aikat June 1, 2010 . . . 20
 8   4    May 17, 2010 letter to Debashis Aikat  . . . 22
 9        from Adrian Nelson
10   5    June 2, 2010 letter from Debashis Aikat  . . 23
11        to Adrian Nelson
12   6    Plaintiffs' Notice of Filing . . . . . . . . 23
13        Supplemental Expert Witness Disclosure
14   7    Bio of Professor Debashis Aikat, Ph.D. . . . 39
15   8    Link entitled "Doing Research in . . . . . . 44
16        Cyberspace"
17   9    June 25, 2008 article entitled Iran's  . . . 134
18        Oil Mafia
19   11   Invoice-Part 2 of Debashis Aikat . . . . . . 147
20   10   August 6, 2008 article entitled, Iranian . . 148
21        regime's web of influence
22
```

Page 3

```
 1              I N D E X
 2   Witness:                    Page
 3     Debashis Aikat, Ph.D.
 4     Examination by Mr. Kapshandy . . . . . . . . 6
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 5

```
 1            E X H I B I T S
 2     (Exhibits attached to transcript.)
 3   Aikat Deposition Exhibits            Page
 4   12   A list from the main page of the . . . . . . 153
 5        defendant's website, Iranianlobby.com
 6   15   Affidavit from Lord Corbett of Castle  . . . 162
 7        Vale
 8   14   Article by defendant from  . . . . . . . . . 168
 9        Iranian-Americans.com entitled NIAC and
10        Trita Parsi's Internal Documents 1997 to
11        2001.
12   13   posting pulled off of Iranian  . . . . . . . 181
13        Americans.com dated December 10, 2009
14   16   Article entitled: Iran-Americans: The  . . . 217
15        bridge between two nations
16   17   October 16, 2000 article from  . . . . . . . 219
17        WorldNetDaily reprinted on June 18, 2010
18
19
20
21
22
```

2 (Pages 2 to 5)

Page 6

1      PROCEEDINGS
2  Thereupon,
3          DEBASHIS AIKAT, Ph.D.,
4  was called as a witness by counsel for Defendant,
5  and, having been duly sworn by the Notary Public,
6      was examined and testified as follows:
7  EXAMINATION BY COUNSEL FOR THE DEFENDANT
8  BY MR. KAPSHANDY:
9      Q   Good morning, Professor.  First of all,
10  before we get into the substance of this procedure
11  here today, I'd like to explain a few things because
12  I know you've not done this before.  As you notice,
13  the reporter, who is authorized to do this,
14  administered an oath to you to tell the truth under
15  penalty of perjury just as if you were testifying in
16  a federal court proceeding.  So it's important for
17  you to answer truthfully and accurately and as
18  carefully as you can.  If at any time you don't
19  understand any of my questions, please let me know
20  and I'll be glad to clarify because it's important
21  that your answers are taken down accurately.
22      Another thing to keep in mind is that you

Page 7

1  need to answer verbally as opposed to nodding your
2  head, like you are doing now, as we do in normal
3  everyday conversation because she cannot take that
4  down.
5      Is that understood?
6      (Witness nodded head.)
7      THE WITNESS:  And I just wanted to add
8  that --
9  BY MR. KAPSHANDY:
10      Q   You need to say "yes."
11      A   Yes.
12      Q   The other thing is I will ask you
13  questions, and you need to wait for me to finish
14  because she can only take one of us down at a time.
15  And I'll try and let you complete your answers so
16  that I don't cut you off.  If at any time your
17  answer is not complete, please tell me, and I'll let
18  you finish.  And I'd ask that you do the same, so
19  the record is clear, wait for me to finish my
20  questions.
21      Do you understand that?
22      A   Yes.

Page 8

1      Q   If at any time you need a break or have
2  any questions, please let us know.  We'll be glad to
3  accommodate you.
4      Also during the course of the proceeding
5  the attorney who is here for the Plaintiffs,
6  Mr. Nelson, may make objections.  Since we are not
7  in court and there's no judge to rule on those, you
8  will be required to answer anyway.  So that's
9  somewhat unusual, but if he objects that's not
10  unusual, but you should understand that he's making
11  a record and the judge will decide those objections
12  later.
13      Do you understand that?
14      A   Yes.
15      Q   Now, before we proceed do you have any
16  questions? because I was asking you something
17  earlier and you seemed to have something to say.
18      A   No.  I just wanted to welcome you all to
19  North Carolina.
20      Q   Oh, thank you.  I'm glad to be anywhere
21  where the temperature is above freezing.
22      A   We delivered good weather for you.

Page 9

1      Q   It's very beautiful here, and I appreciate
2  your hospitality, and, also, you coming in here on
3  your vacation to answer some questions.  And,
4  hopefully, we won't be too long today.  I understand
5  that you don't have any commitments today, but we
6  hopefully won't take the whole day and we can be out
7  of here, maybe, by early afternoon.
8      A   Thank you for taking the trouble to
9  outline everything for me.
10      Q   Let me ask this.  I understand you've
11  never testified before in a deposition.  Have you
12  ever testified before in any other court proceeding?
13      A   No.
14      Q   Okay.  Before we get into the substance of
15  everything, I understand you've brought, or at least
16  reviewed some things, and brought some things for us
17  here this morning, but can you please state and
18  spell, for the record, your complete name and give
19  us your address.
20      A   Would you like my home address or my
21  university address?
22      Q   Both, please.

3  (Pages 6 to 9)

Page 10

1      A   Okay.
2      Q   First start with your name and how you
3  spell it, and I understand it's an unusual name, so
4  be sure and spell it for the court reporter.
5      A   My name is Debashis Aikat,
6  D-E-B-A-S-H-I-S. May last name is Aikat, A-I-K-A-T.
7  And I go by "Deb." My university address is
8  University of North Carolina School of Journalism
9  and Mass Communication, Chapel Hill, North Carolina
10  27516. I live at 1000 Camden Lane, C-A-M-D-E-N
11  L-A-N-E, Chapel Hill, North Carolina 275 16.
12      Q   Let me hand you what we'll mark as your
13  Deposition Exhibit 1, which I will represent for the
14  record is a notice of deposition with an attached
15  list of items that the defendant requested.
16          (Aikat Deposition Exhibit Number 1 was
17          marked for identification.)
18  BY MR. KAPSHANDY:
19      Q   And, first of all, I'll ask you if you've
20  seen this before.
21      A   Yeah, I read it.
22      Q   And when did you get that?

Page 11

1      A   I think I got that three days ago.
2      Q   Now, before we started here we went over
3  the items on page 3, what you were requested to
4  bring. And if you could turn to that, please, I
5  just wanted to for the record.
6          MR. NELSON: Tim, we just wanted to just
7  note for the record that today is actually Wednesday
8  January 5th.
9          MR. KAPSHANDY: Let me see if I have a
10  corrected copy of that.
11          MR. NELSON: Okay.
12          MR. KAPSHANDY: Yeah, I do not, so.
13          MR. NELSON: Okay.
14          THE WITNESS: And my --
15          MR. KAPSHANDY: Excuse me, let me just
16  finish, Professor. As counsel pointed out, the date
17  of the deposition is correct but the day is
18  incorrect, but in any event, turning your attention
19  to the list of items that were requested, as I
20  understand before we started here, Professor, that
21  with the exception of Item 8, invoices for your
22  services in this matter, you don't have any written

Page 12

1  materials which are responsive to this request.
2          THE WITNESS: Yes, mm-hmm.
3  BY MR. KAPSHANDY:
4      Q   And we will go through these one by one.
5  And I also understand that, hopefully with the
6  assistance of counsel, that we may be able to get a
7  copy of that invoice that you sent to the Plaintiffs
8  before we are done here today, but in any event
9  we'll get it after the deposition.
10      A   Yeah, mm-hmm.
11      Q   Do you recall as you are sitting here
12  today what was the date of that invoice or roughly
13  when you sent it to counsel?
14      A   June 1st, 2006 -- 2010, I'm sorry.
15      Q   And you billed plaintiffs at the rate of
16  $400 per hour?
17      A   Yes, sir.
18      Q   And do you recall the total amount of the
19  invoice?
20      A   I think there were two invoices, one -- I
21  think it was a total of 17 hours.
22      Q   Seventeen hours over two invoices?

Page 13

1      A   Yes, it was divided over two invoices.
2      Q   And, if we do the math correctly, at
3  $6,800?
4      A   I think that would be right.
5      Q   That sounds right? Now, what period of
6  time did these cover? You mentioned one dated
7  June 1. Was there another one before that or after
8  June 1?
9      A   Well, I think it related to the report
10  which you have in front of you, and so it relates to
11  the report. It was just a procedural thing to
12  divide it into two, but it relates to the report.
13      Q   Right, I understand that. The report is
14  dated June 1.
15      A   Yes, sir, and it was -- thanks for
16  reminding me -- I wrote my, I filed my invoice on
17  that date, yes.
18      Q   So the day you signed the report you sent
19  them an invoice?
20      A   Yes.
21      Q   My question is: The second invoice, was
22  it before then or after June 1?

4  (Pages 10 to 13)

**Page 14**

1   A   No, I think -- let me explain this.

2   There was one invoice and it was 17 hours.
3   Later I was advised to divide it into two invoices
4   just for procedural and accounting purposes. It had
5   nothing to do with the number of hours, it had
6   nothing to do with the date, it was just that I had
7   given an invoice and I was requested to file two,
8   two of it for accounting convenience.

9   Q   And did you later break it up into two?

10   A   Yeah, I mean, as I told you, 12 plus 5, I
11   think.

12   MR. NELSON: Counsel, I think that I
13   realized that I have a copy of the invoice here so.

14   MR. KAPSHANDY: One of them or two of
15   them?

16   THE WITNESS: I think you have the first
17   one, which is as good.

18   MR. NELSON: I have one. I think I have
19   the first one.

20   THE WITNESS: Yeah, which is as good
21   because I was paid that amount.

22   MR. KAPSHANDY: We'll wait for counsel and

**Page 15**

1   his assistance. It may speed things up. We'll take
2   a look at that.

3   (Document tendered to Mr. Kapshandy.)

4   MR. KAPSHANDY: Thank you. Can we mark
5   this copy?

6   MR. NELSON: Sure.

7   (Aikat Deposition Exhibit Number 2 was
8   marked for identification.)

9   BY MR. KAPSHANDY:

10   Q   Let me hand you, Professor, what we'll
11   mark as your Deposition Exhibit 2 which counsel has
12   just handed us. It's an invoice dated June 1 for 17
13   hours, as you point out, from you to Pishevar &
14   Associates, and ask you if that is the first invoice
15   that you sent to them?

16   A   Yes, sir.

17   Q   And you later broke that up into two parts
18   for some reason?

19   A   It was just, as I said, for accounting
20   convenience.

21   Q   Right. I understand, but this was not the
22   one that was broken up because it does have two

**Page 16**

1   separate categories --

2   A   Yeah, I think those categories are
3   similar. As I said, so it's -- this is the invoice
4   and I was paid for this.

5   Q   And, for the record, it reflects eight
6   hours for research and nine hours for writing the
7   report. Correct?

8   A   Yes, sir.

9   Q   And does that accurately reflect the --

10   A   Yes, sir.

11   Q   I know you are anxious to get done with
12   this, but --

13   A   No, I'm not.

14   Q   No, no, please let me finish the question.
15   That's three in a row where --

16   A   Okay. I'm sorry.

17   Q   -- and it's, I know, difficult, and I have
18   that problem also, but for the reporter to take this
19   down accurately let me stop talking and then you can
20   answer.

21   So just to repeat, does the breakdown of
22   --

**Page 17**

1   A   Go ahead, it's difficult to read it.

2   Q   Does the breakdown of eight hours for
3   research and nine hours of writing accurately
4   reflect what you did in preparing the report in this
5   case?

6   A   Yes.

7   Q   Thank you. Now, back to Exhibit 1, page
8   3, on the list of materials requested, if you can
9   take that in front of you, under Number 1 it
10   requests any documents reviewed by you in preparing
11   your expert report in this matter.

12   And I understand that no physical
13   documents were reviewed by you other than the ones
14   on the website which you mention in your report.
15   Correct?

16   A   Yes.

17   Q   And we'll get to those. I just want to
18   ask you right now as we go through all of these, do
19   you have any physical documents that meet any of
20   these requests. And same for Number 2, did you
21   receive any documents or communications from NIAC,
22   its staff or interns, officers or board members

5 (Pages 14 to 17)

Page 18

1 including Trita Parsi?
2    A   No, as I said, I don't even know Trita
3 Parsi.
4    Q   That was my next question. Have you ever
5 met with or spoken with Trita Parsi?
6    A   No.
7    Q   In Number 3 it requests documents relating
8 to communication between you and counsel for NIAC or
9 Trita Parsi, who we understand to be Pishevar &
10 Associates.
11        Are there any physical documents from them
12 or to them other than this invoice that we've marked
13 as Exhibit 2?
14    A   Are you on item -- which item are you on,
15 sir?
16    Q   Number 3.
17    A   My answer would be no, apart from
18 Exhibit 2.
19    Q   And the same thing for Number 4 which is
20 very similar, but it's documents between you and
21 NIAC's counsel or Trita Parsi's counsel?
22    A   Yes.

Page 19

1    Q   And Number 5 asks for documents cited in
2 your expert report and that you are relying upon in
3 support of your opinions in this case, and other
4 than those which are referenced in your report, I
5 understand you have none. Correct?
6    A   Yes.
7    Q   And same for Number 6, any documents
8 reflecting sources or papers received by you from
9 NIAC, staff interns, board members including Trita
10 Parsi, the answer is you have received no physical
11 documents from them. Correct?
12    A   Yes.
13    Q   And as far as Number 7, I understand
14 you've never testified before in any state or
15 federal proceeding so there's nothing responsive to
16 Number 7. Correct?
17    A   Yes.
18    Q   Okay. Let's put aside Exhibit Number 1, I
19 think. That takes care of that.
20    A   Thank you.
21    Q   For the record let's mark as Exhibit
22 Number 3, your report in this matter.

Page 20

1    A   Do you want me to return this to you?
2    Q   Let's keep them right here in the middle
3 of the table, and we'll give them to the reporter
4 when we are done and she will make that part of the
5 record and then you'll get an opportunity to look at
6 the transcript and make any corrections,
7 particularly in spelling, and those will be attached
8 to that as part of your deposition.
9        (Aikat Deposition Exhibit Number 3 was
10        marked for identification.)
11 BY MR. KAPSHANDY:
12    Q   What I will hand you, for the record, is
13 your Deposition Exhibit 3 which is the June 1st
14 report that you prepared in this case as produced to
15 us. And I just ask you to first confirm for the
16 record that that is your report, with also the
17 attached resume or curriculum vitae.
18    A   Yes.
19        MR. NELSON: Tim, before we go too far, I
20 just -- I'm not sure whether the Professor is just
21 kind of misremembering. In my file I have a copy of
22 two communications between the Professor and our

Page 21

1 office which are probably responsive to your request
2 that we probably should just go ahead and mark. The
3 first one is kind of outlining the scope of his
4 retention.
5        (Document tendered to Mr. Kapshandy.)
6        MR. NELSON: And the second one is, I
7 think, a cover letter that came with an invoice. So
8 I think those are probably two things.
9        MR. KAPSHANDY: Okay.
10        (Document tendered to Mr. Kapshandy.)
11        MR. NELSON: And if we could mark those on
12 the back of the exhibit and make copies and then
13 actually mark the real thing, I can keep those for
14 my file.
15        MR. KAPSHANDY: They appear to be
16 originals, maybe at a break we can get a copy here.
17        MR. NELSON: Right. Or if you have a
18 paperclip, maybe we could just put an exhibit
19 sticker on a piece of paper and put it on top.
20        MR. KAPSHANDY: Yeah, that's what I was
21 thinking. Let's try that.
22 BY MR. KAPSHANDY:

6 (Pages 18 to 21)

Page 22

1    Q   Professor, let me hand you what we'll mark
2  as your Deposition Exhibit 4, which counsel has just
3  provided to us, a May 17, 2010 letter, purportedly
4  sent to you by e-mail from Adrian Nelson of the
5  Pishevar law firm, a two-page document, we'll get
6  copies later, but just ask you to confirm that you
7  received that letter from counsel for the Plaintiffs
8  on or about May 17 of 2010.
9        (Aikat Deposition Exhibit Number 4 was
10       marked for identification.)
11      THE WITNESS: Yes.  Do you want me to hand
12  it to him?
13      MR. NELSON: No, I've seen it.
14      MR. KAPSHANDY: Just put it right here in
15  the middle.  I may have some questions about that,
16  and we'll get copies later.
17      And, for the record, let me hand you what
18  we'll mark as your Deposition Exhibit 5 which is a
19  June 2 cover letter from you to Mr. Nelson regarding
20  your invoice and some other matters.  And just ask
21  you to confirm that Exhibit 5 is a letter that you
22  sent to counsel for Plaintiffs.

Page 23

1        (Aikat Deposition Exhibit Number 5 was
2        marked for identification.)
3        THE WITNESS: Yes.
4        MR. KAPSHANDY: Can we go off the record a
5  second.
6        (Discussion off record.)
7  BY MR. KAPSHANDY:
8    Q   Okay.  Professor, while we are getting
9  Exhibits 4 and 5 copied, let me hand you what we'll
10  mark as your Deposition Exhibit Number 6.  Let me
11  hand you this one -- I think I gave you the wrong
12  one, yeah -- the Notice of Filing of Supplemental
13  Expert Witness Disclosure in this case filed by
14  counsel for Plaintiffs on May 17, 2010.
15       (Aikat Deposition Exhibit Number 6 was
16       marked for identification.)
17  BY MR. KAPSHANDY:
18    Q   And I ask you, first of all, have you ever
19  seen this document before?
20    A   No.
21    Q   Now, are you able to tell us when you were
22  first approached by counsel for Plaintiffs and

Page 24

1  retained in this matter?
2    A   I think it would be early May, early May
3  of 2010.
4    Q   And you are looking at your report now.
5  I'm wondering, is there --
6    A   Yes, sir.  On page 2, if you look at the
7  last two paragraphs --
8    Q   Right.
9    A   -- the last Part 1 that begins with,
10  "Detailed reading."  If you read the last sentence
11  it says, "This reading and review was conducted over
12  a period of over three weeks, May 8, 2010 through
13  June 1, 2010."
14      Let me show this to you.
15    Q   Right, I see where you are referring to.
16    A   Yes, sir, and this is -- so, you know, to
17  your question, I think around that time I was asked
18  to serve.
19    Q   And just, maybe, further clarify and
20  reflect on that question, I'm going to hand you what
21  we previously marked as Exhibit 4 which is the
22  letter from Mr. Nelson to you, dated May 17.

Page 25

1    A   Yes, sir.
2    Q   And that starts off by saying, "This
3  letter serves to confirm your agreement to serve as
4  an expert witness for the plaintiffs in the
5  above-referenced matter."
6        And without going further, does that,
7  again, help put this into a time frame as to roughly
8  when you were retained and started working on this?
9    A   Yes.  This letter is dated May 17, 2010,
10  so this is basically a letter that confirmed the
11  retention, the spirit and the scope of the retention
12  agreement.
13    Q   And keep that Exhibit 5 -- or Exhibit 4 --
14  there in front of you.  I'm also going to hand you
15  Exhibit 5 which is the June 2 transmittal letter
16  that we've previously identified.  And just to help
17  us get an appreciation for your methodology and
18  procedure, are we to understand from Exhibit 4 that
19  those posed the questions to you, the mandate, as it
20  were, for your work in this case?
21    A   Yes, and I outline and restate that in the
22  page 2 of my report.

7 (Pages 22 to 25)

Page 26

1    Q   All right. And they seem to match up
2  exactly, so it would appear that your mandate for
3  your work in this case is, comes from and is
4  reflected in Exhibit 4. Correct?
5    A   Yes, sir.
6    Q   Now, Exhibit 5, which is your June 2
7  transmittal letter, in the second paragraph you
8  state, "I know you did not ask me to explain my work
9  hours. However, in the spirit of full disclosure
10 and for your consideration, I wish to clarify
11 because your May 17 letter of appointment advised me
12 to seek your 'prior approval' about additional
13 hours."
14   First of all, did I read that correctly?
15   A   Yes.
16   Q   And if we turn to, back to Exhibit 4 which
17 is the May 17 letter, do we understand that your
18 mandate and scope of your work was limited to ten
19 hours, or at least you were required to get prior
20 approval before exceeding ten hours?
21   A   I think that's stated there, yes.
22   Q   And, in fact, if we look at your June 2nd

Page 27

1  letter, you ended up putting in 17 hours without
2  prior approval. Because of the holiday you weren't
3  able to get in touch with Plaintiff's counsel.
4  Correct?
5    A   Yes, sir.
6    Q   And since June 1 have you put in any
7  additional time, research work, in this case not
8  reflected in the June 1 or June 2 invoice?
9    A   In preparation for this deposition today,
10 yes.
11   Q   And when was that and how many hours?
12   A   I was told in mid December about the June,
13 so it would be about 26 hours.
14   Q   So sometime in December you were told you
15 would be deposed. Correct?
16   A   Well, they checked what day would be
17 convenient for you and would be convenient for me,
18 so, yes.
19   Q   Sir, are you aware that the Defendants
20 have been requesting your deposition in this case
21 since June of last year?
22   A   June of last year?

Page 28

1    Q   2010.
2    A   No, I was not aware.
3    Q   When was the first -- you were aware that
4  your deposition had been requested in this case?
5    A   I think it would be sometime, maybe, in
6  November.
7    Q   Do you have any e-mail or other --
8    A   No, I think --
9    Q   How did that happen?
10   A   If I recall things right, I think in
11 November I got a call from Mr. Parsa saying that I
12 may be invited for a deposition and they were
13 wondering about my availability because of my
14 teaching and research commitments.
15   Q   Do you recall anything prior to that?
16   A   No, I do not recall prior to, but, you
17 know, when Exhibit 4 was issued to me I think the
18 whole thing related to the fact that at some point I
19 may be invited to depose.
20   Q   Right, but my question was specific
21 requests for dates for your deposition.
22   A   No.

Page 29

1    Q   Now, sometime after you got this telephone
2  call from Mr. Parsa you did approximately 26 hours
3  more worth of work?
4    A   Yes.
5    Q   Have you invoiced Mr. Parsa or his firm
6  for that yet?
7    A   Not yet because I was waiting for how many
8  hours I spend this morning and last night.
9    Q   Well, let me ask then. Did you meet with
10 counsel for the Plaintiffs at any time, either
11 November, December or since then, in preparing for
12 your deposition here?
13   A   No, except I met Mr. Nelson briefly this
14 morning for breakfast.
15   Q   Did you have any communications with
16 Mr. Nelson or Mr. Pishevar or Mr. Parsa other than
17 the request for a date and this breakfast meeting?
18   A   No, it was, as I said, Mr. Parsa called.
19   Q   Were there any communications, conferences
20 not in person other than this meeting this morning?
21   A   No. And this morning we just met for
22 breakfast because I hadn't met Mr. Nelson.

8  (Pages 26 to 29)

Page 30

1    Q   And what work, if any-- strike that.
2         What work did you do that amounted to 26
3    hours since December 2010 in preparing for your
4    deposition here?
5    A   It was divided into two things.  One,
6    reviewing the report that I had written over the
7    summer; and, second, going back to page 2 of my
8    report where you have two websites listed,
9    iranianlobby.com which is a website where the
10   defendant has been publishing articles.  And I went
11   to the English version of the website and another
12   website, which is PAIC, Progressive American-Iranian
13   Committee.  The website address is
14   iranian-americans.com.  So I revisited those two
15   websites and reviewed the documents.
16   Q   Over what period of time did you do that?
17   A   It would be over the break because I still
18   remember my classes ending around mid December.
19   Q   Did you keep a record or log of what hours
20   you did on what days and what you reviewed for that?
21   A   Yeah, mm-hmm.
22   Q   And where is that?

Page 31

1    A   Well, it's a log in terms of just keeping
2    a record on my calendar.
3    Q   And when you send them out an invoice it
4    will be similar to the one we've marked as
5    Exhibit 2, just reflecting what days you did and
6    what hours?
7    A   Yes, Mr. Kapshandy, yes.
8    Q   In terms of substance, did you review
9    anything different than you reviewed prior to your
10   June I report, or were you simply refreshing what
11   you previously had reviewed?
12   A   One was I was refreshing, and there has
13   been some new content.
14   Q   Okay.  So, obviously, the things that
15   hadn't been posted by June I of 2010 on either of
16   those websites you would have been reviewing for the
17   first time.  Correct?
18   A   Yes.
19   Q   Other than the new materials posted on
20   those websites, did you review anything toward that
21   26 hours other than what you had reviewed previously
22   in preparing your report on June I?

Page 32

1    A   No.
2    Q   Okay.  As you sit here is there anything
3    else you can think of that you've reviewed in
4    preparing your opinions in this case?
5    A   No.
6    Q   Is there anything else that you need to
7    review in order to give the opinions that you've
8    given in this case?
9    A   There is one.
10   Q   And what is that?
11   A   And, as you know, Mr. Kapshandy, a lot of
12   the documents are in Farsi or in languages that I do
13   not know so I could not and I did not review those
14   document.  And I do not know any Farsi, so an
15   English translation would help me no better.  But
16   that was beyond what I thought, but since you asked
17   I just answered your question.
18   Q   Well, I was going to ask you that, and I
19   appreciate your raising that.
20        Did you at any point in time when you
21   noticed that the Defendant had cited articles in
22   Farsi in support of his opinions request counsel to

Page 33

1    provide translations of those to you in a language
2    that you could understand?
3    A   No, I did not.  And I state that on page 3
4    where I mention that:  My report was restricted to
5    analyses of English language documents.  I mention
6    this because while researching this issue, I
7    discovered several articles, documents, online
8    resources and other media resources, such as online
9    videos in Farsi and different languages other than
10   English.  Due to my lack of knowledge in Farsi and
11   related Persian languages, I did not review those
12   items for this report.  End of quote from my report.
13   Q   Yeah, my question was, though, did you,
14   and having said here this morning that you would
15   like to review those before completing your opinions
16   in this case, request of either the Plaintiffs or
17   their counsel to have those translated?
18   A   No.
19   Q   Are you aware that those articles have
20   been translated into English and some of them made
21   exhibits in this case already?
22   A   No.

9  (Pages 30 to 33)

Page 34

1    Q   Anything else that you can think of as you
2  sit here today that you would like to review before
3  completing your opinions in this case?
4    A   No.
5    Q   Have you read the Defendant's two day
6  deposition in this case?
7    A   No.
8    Q   Have you ever read the deposition of Trita
9  Parsi in this case?
10   A   No. I think I was given a copy of the
11 Complaint. Are you referring to that?
12   Q   No, that's a different document, but thank
13 you for raising that.
14   A   No. The answer to your first question is
15 no.
16   Q   Okay. Now, you do mention the Complaint,
17 which isn't mentioned in your report, I don't
18 believe, and it's not been mentioned previously in
19 response to our questions about materials that were
20 provided to you.
21       Did you get a copy of the Complaint in
22 this case?

Page 35

1    A   Yeah.
2    Q   And from whom and when?
3    A   It was from the attorneys, Pishevar &
4  Associates.
5    Q   Sometime, I take it, in May 2010 before
6  you wrote your report?
7    A   Yes.
8    Q   And what use, if any, did you make of that
9  Complaint in preparing your opinions in this case?
10   A   No use, because, as you can well recall,
11 that in May I was asked to file -- asked to review
12 these documents, and I really took a scholarly
13 approach to it, and so I just read the documents for
14 my reading pleasure, the Complaint for my reading
15 pleasure, because I had done my review even before
16 the Complaint -- I got to see the Complaint or I got
17 time to read it.
18   Q   Just, again, for completeness -- now, I
19 want to make sure we have got everything -- other
20 than the Complaint that you just mentioned, were you
21 provided any other materials either by the
22 Plaintiffs or their counsel in preparing your report

Page 36

1  in this case?
2    A   As I mentioned to you, I was provided a
3  copy of the opinion memo.
4    Q   What opinion memo?
5    A   The judge's opinion memo.
6    Q   Would that be the one denying the
7  Defendant's motion for summary judgment?
8    A   It was -- I think you are right. What I
9  took off from that document was he used the word
10 "discovery." So, yes, maybe we both are referring
11 to the same document. It was a copy of the judge's
12 opinion memo.
13   Q   Because the judge has done many opinions
14 in this case already, and I just wanted to be sure
15 --
16   A   It was an opinion memo dated sometime in
17 February 2008.
18   Q   Perhaps February 2009? Does that sound
19 correct?
20   A   Maybe. Thanks for correcting me.
21   Q   The case was filed in March 2008, if that
22 helps, so there wouldn't have been any opinions in

Page 37

1  February 2008.
2    A   I got my dates all wrong. I thought the
3  Complaint was filed in 2007. Anyway, maybe it's
4  just a date. Yeah, you are right.
5    Q   What use, if any, did you make of the
6  judge's February 2009 opinion in this case?
7    A   None. Again, I read it for my reading
8  pleasure.
9    Q   Did you happen to notice where he
10 mentioned in his opinion that it would have been
11 nice to have translations of the Farsi articles upon
12 which the Defendant was relying?
13   A   Yes, I did.
14   Q   When you saw, that didn't you say to
15 yourself, Gee, it might be nice to have those
16 translated into English so I know everything that
17 the Defendant was relying upon?
18   A   Yes and no. Yes, just, I just might when
19 I read it, but there's only a limited amount of time
20 I was given to review documents, and I think I had
21 enough to review to come to the conclusion as
22 outlined in my report. So the answer to your

10   (Pages 34 to 37)

Page 38

1   question, that part of your question, is no.
2       Q   Okay. Well, when you say you were only
3   given a limited amount of time, you are referring to
4   the Exhibit 4 mandate where you were limited to ten
5   hours without prior approval?
6       A   Yeah. And, sir, I wanted to add that I do
7   not do this for a living, I have research and
8   teaching commitments, and I'm doing this as a public
9   service. So whenever somebody calls me to serve on
10  a committee or do something, I'm limited by my prior
11  commitments to the particular assignment.
12      Q   I appreciate your raising that. That was
13  one of my questions I was going to ask you, and that
14  is: Have you ever before given an opinion in a
15  defamation case as to the defendant's conduct?
16      A   No.
17      Q   Let me -- let's continue with your
18  personal background, I want to get into this stuff
19  later, but let me hand you what we'll mark as your
20  Deposition Exhibit 7, a collection of materials that
21  I pulled off of the website at the University of
22  North Carolina. And there are three pages in this

Page 39

1   exhibit which appear to give in a little shorter
2   format background information on you personally and
3   professionally, similar to what's in Exhibit 3, but
4   like I say, in a more abbreviated format.
5           (Aikat Deposition Exhibit Number 7 was
6       marked for identification.)
7   BY MR. KAPSHANDY:
8       Q   I'd ask you first to confirm that these
9   come from the University of North Carolina website
10  and they, in fact, do refer to you, Deb Aikat?
11      A   Yeah, and some of these documents are now
12  outdated. The bio that you have, including my
13  picture, the bio that you have that I attached to my
14  report are more updated.
15      Q   Well, these were pulled off of the website
16  in May of 2010. Your report is dated June of 2010.
17  I'm just wondering, other than you obviously look
18  much younger in the pictures, what substantively is
19  out of date here in Exhibit 7?
20      A   Well, the content of it. Like, if you
21  look at the first page of Exhibit 7, it mentions
22  course numbers that have changed. So while you may

Page 40

1   have pulled it up on the net, which is fine, the
2   website may not have been updated. So that doesn't
3   have to affect you. It still is true on the date it
4   was written and it still is true today.
5       Q   That was my next question. As of at least
6   May 2010 that accurately reflected your resume or
7   curriculum vitae, at least in summary form.
8   Correct?
9       A   (No verbal response.)
10      Q   Correct?
11      A   Yes.
12      Q   Except I would point out for the record
13  the third page, which is a very nice caricature of
14  you, that you don't appear to have pointed ears as
15  the Mr. Spock caricature, which I take it that's
16  actually done by one of your relatives?
17      A   My brother.
18      Q   Your brother. And it is quite good.
19          Why is it that you, I'm kind of curious,
20  have this kind of Spock-like caricature of you
21  posted there on the website?
22      A   That caricature was done almost 18 years

Page 41

1   ago. And, like all caricatures, it's a fun on a
2   personality, and I have a lot of undergraduate
3   students and I did it -- this website was initially
4   designed for them and, you know, it's showing that
5   you are a person. That's it, and I don't think -- I
6   would not read too much into that.
7       Q   Well, one thing I noticed that was quite
8   interesting about your resume references is that you
9   refer to yourself as an "Internet futurist."
10  Correct?
11      A   No, that would not be correct. The
12  University of North Carolina at Chapel Hill -- could
13  you, please, refer to Exhibit --
14      Q   3, the full report?
15      A   Exhibit 3, the full report, and refer to
16  page 3 of my vitae.
17      Q   Right.
18      A   Are you with me? My academic appointment
19  is for an associate professor, that's who I am. And
20  you referred to me as "Professor" and that is what I
21  am.
22          THE WITNESS: Yeah, thank you, Eric.

11 (Pages 38 to 41)

Page 42

1    If you go to the next page -- you are on
2  the right page, sir. If you go to the page prior to
3  that and if you look at the last, what, three
4  paragraphs, "The Media Futurist Faculty Position."
5    MR. KAPSHANDY: Right.
6    THE WITNESS: "In September 1994 the UNC
7  School of Journalism launched a search for a 'Media
8  Futurist' faculty position to expand its curricular
9  offerings and research."
10    And basically I am a faculty member and so
11  my title is Associate Professor and Media Futurist.
12  So my role in my school is that of a professor.
13  BY MR. KAPSHANDY:
14    Q  Well, if you turn to the page before that
15  --
16    A  Yes, sir.
17    Q  -- there's a nice picture of you under UNC
18  School of Journalism and Mass Communication. The
19  very first sentence refers to you, "Associate
20  Professor Debashis "Deb" Aikat is the Media
21  Futurist" in capital letters, "in the School of
22  Journalism and Mass Communication at the University

Page 43

1  of North Carolina at Chapel Hill."
2    This is where I got this idea. What I
3  wanted to ask you is: How is it that you are
4  referred to as a "Media Futurist" there at the
5  university?
6    A  I just answered your question.
7    Q  Well, you mentioned in September of '94
8  they launched a search for a "media futurist." And
9  I take it they found you?
10    A  There was a national search and I was
11  selected from that search, yes.
12    Q  I'm not trying to make a big deal out of
13  it. The only thing I was wondering is if the nice
14  caricature of you comparing you to Dr. Spock was
15  somehow a reference to the Media Futurist title that
16  you have?
17    A  No, it's unrelated. It's unrelated. I
18  have a simple assignment as a professor in the
19  School of Journalism and Mass Communication, and
20  that's what it is.
21    Q  Let me hand you another exhibit, what
22  we'll mark as your Deposition Exhibit 8 which also

Page 44

1  comes from one of your links that follows from the
2  University of North Carolina website, and ask you if
3  you've ever seen this before.
4    (Aikat Deposition Exhibit Number 8 was
5    marked for identification.)
6    THE WITNESS: Yes, mm-hmm.
7  BY MR. KAPSHANDY:
8    Q  What is this?
9    A  This is a link. Again, again, let me
10  reiterate that these are outdated web pages that you
11  are showing me. These pages were made more than 12
12  years ago, and so it reflects some of the research
13  interests, some of my current research projects --
14    Q  But --
15    A  -- and my teaching interests.
16    Q  But at least as of May 2010 when these
17  were printed these were posted on the university
18  website?
19    A  Yeah, as you know, that on the website
20  there could be a lot of old content and new content.
21  And so what I wish to put on record is this content
22  that you see before you is 12 years old.

Page 45

1    Q  Well, do you have any control of whether
2  the university maintains outdated stuff on the
3  website? Can you call them and say, Hey, that's out
4  of date; please take it down?
5    A  I mean there is nothing wrong with this
6  content, it's just, it has just not been updated,
7  and in some cases they are on old servers and
8  archives that cannot be updated.
9    Q  Well, let's put those aside.
10    There came a point in time in May of 2010
11  where you were contacted by Plaintiff's counsel in
12  this case. Correct?
13    A  Yes.
14    Q  And we've referenced already Exhibit 4
15  where they gave you this mandate to work on this
16  case. And the first question I have for you is what
17  were you asked to do in May of 2010? Is it pretty
18  much reflected in the Exhibit 4?
19    A  Yes.
20    Q  Now, not having done this before, did you
21  refer to any -- strike that.
22    Have you published any peer-reviewed

12 (Pages 42 to 45)

Page 46

1  articles on your methodology here for addressing,
2  you know, the question of the Defendant's conduct in
3  a defamation case before?
4      A   I not only have published articles
5  relating to this kind of method, I also used what is
6  the industry standard or journalistic standard in
7  doing this. Please be aware that this method
8  involved reading and reviewing those documents as a
9  reader would, so there is -- the answer to your
10  question is, yes, that I used a well established
11  research method. But the other answer to your
12  question is the well established research method is
13  as you and I would read it just like a lay reader
14  would, any document, because, as I understand, these
15  documents were written for the common people.
16      Q   I don't think you quite understood my
17  question. I understand you've written in your
18  curriculum vitae a number of peer-reviewed articles.
19  Correct?
20      A   Yes, but I also have presented conference
21  papers.
22      Q   I'm simply asking about peer-reviewed

Page 47

1  articles right now.
2      A   They are peer-reviewed too.
3      Q   With regard to peer-reviewed articles, are
4  there any that you can point to me in your resume
5  that address the question of the methodology that a
6  journalist applies in evaluating whether a
7  journalist has complied with the standards governing
8  a defendant's conduct in a defamation case involving
9  public figures? Because I can't find them. If you
10  could point them out to me, I'd appreciate it.
11      A   Well, I think that is too specific for me
12  to write a research article on, and the answer to
13  your question would be no, because nobody would have
14  written an exact article in those exacting
15  standards.
16          And the reason is that this, the articles
17  that I was asked to review, were available for
18  public consumption, they were available free. And I
19  read and reviewed it according to established
20  journalistic practices.
21      Q   Well, we are going to get into, in great
22  specificity, your methodology and what you were

Page 48

1  asked to review. But, just to be clear, as we
2  understand from your mandate, you were not asked to
3  evaluate the truth or falsity of the Defendant's
4  writings, in particular, as to whether NIAC and
5  Trita Parsi were lobbyists for the Islamic Republic
6  of Iran, were you?
7      A   Let me answer the question at two levels.
8  First, the three things that I was asked to do was,
9  one, the general standard of care and compliance,
10  whether and to what extent you see evidence of
11  willful blindness, whether the Defendant has a duty
12  to allow Plaintiffs an opportunity to respond, so
13  this was my mandate.
14          And you asked me about truth. The
15  Defendant claims in his website that it was a search
16  for truth. So, you know, the general perception of
17  a reader, of any reader, and for myself, was this
18  person was evaluating the truth or, at least,
19  presenting the truth, so I had that at the back of
20  my mind because, you know, when somebody says that
21  they are talking about washing powder, you expect to
22  read about washing powder. In this case the

Page 49

1  Defendant had on these two websites
2  iranianlobby.com, iranian-americans.com "In Search
3  of Truth," the phrase, right on the top of every
4  page.
5          So it is -- somebody would be missing the
6  point if they were not evaluating the truth of those
7  statements. But, yes, you are right that I was
8  given a mandate to look at the general standard of
9  care and compliance within the journalism community
10  as it applies to those persons, and you have that,
11  and whether and to what extent you see evidence of
12  willful blindness, whether the Defendant had a duty
13  to allow the Plaintiffs an opportunity to respond,
14  yes.
15      Q   Okay. I'm not quite sure you answered the
16  question. My question was, and I'm trying to speed
17  things up here today, and I need to know whether
18  you, Professor Aikat, have evaluated the question
19  and are prepared to testify to a reasonable degree
20  of certainty that it's either true or false as to
21  whether Trita Parsi is a lobbyist for the Islamic
22  Republic of Iran?

13 (Pages 46 to 49)

Page 50

1    A   Could you, please, repeat your question.
2    Q   Sure. My question is: Are you,
3 Professor Aikat, as an expert witness, prepared to
4 testify in this case to a reasonable degree of
5 certainty on the question as to whether Trita Parsi
6 and NIAC act as lobbyists for the Islamic Republic
7 of Iran?
8    A   No.
9    Q   I just wanted to put that aside --
10   A   Yes.
11   Q   -- because that involves thousands of
12 documents --
13   A   I'm glad you did.
14   Q   -- and I wanted to focus in on what you
15 are opining on --
16   A   Yes.
17   Q   -- and I wanted to put that to the side.
18   A   Thank you.
19   Q   So that we're all clear, you are not
20 prepared to express an opinion as to the truth or
21 falsity of what the Defendant has written. Correct?
22   A   And I was not asked to.

Page 51

1    Q   I understand that, if we read Exhibit 4,
2 that limits your mandate. Correct?
3    A   Yeah, I was not asked to.
4    Q   Let me ask you this. Are you familiar
5 with the New York Times versus Sullivan case that --
6    A   Yes.
7    Q   -- the Supreme Court issued in 1964, I
8 believe. Correct?
9    A   Yes.
10   Q   And you understand that sets forth the
11 standard for a defendant in a defamation case under
12 the First Amendment to the United States
13 Constitution. Correct?
14   A   Yes.
15   Q   And you understand that the United States
16 Supreme Court puts forth the standard in defamation
17 cases under the First Amendment involving public
18 figures known as "actual malice." Correct?
19   A   Yes.
20   Q   And, again, I just, with regard to the
21 previous question, I want to make sure we understand
22 what you are addressing and what you are not

Page 52

1 addressing. And I understand you've not read the
2 Defendant's deposition, but I just want to be clear.
3    You are not evaluating the question as to
4 whether the Defendant personally knew what he wrote
5 was false or whether he had serious doubts about the
6 truth of what he wrote, are you?
7    A   Would you repeat your question. It was --
8    Q   I sincerely doubt it. Let's have her read
9 it back because I want to make sure that we get it
10 correct.
11   A   Yes, yes, I just wanted to be clear in
12 terms of your point because it was so cogently said,
13 and I wanted to address all parts.
14      MR. KAPSHANDY: Could you please read that
15 back.
16      (The record was read aloud as follows:
17      "QUESTION: And, again, I just, with
18      regard to the previous question, I want
19      to make sure we understand what you are
20      addressing and what you are not
21      addressing. And I understand you've not
22      read the Defendant's deposition, but I

Page 53

1      just want to be clear. You are not
2      evaluating the question as to whether the
3      Defendant personally knew what he wrote
4      was false or whether he had serious
5      doubts about the truth of what he wrote,
6      are you?")
7    THE WITNESS: No.
8 BY MR. KAPSHANDY:
9    Q   Thank you. That will speed things up.
10   A   You are welcome.
11   Q   And, again, back to the questions that you
12 were mandated to address which were very nicely set
13 out for us in Exhibit 4 and in your report, in
14 Exhibit 3, I now wanted to ask you some questions
15 about the methodology that you employed in applying
16 those questions.
17      Now, I understand that you read the
18 Defendant's articles posted on his website.
19 Correct?
20   A   Yes.
21   Q   Did you read all of the references that he
22 cited including hot links and footnotes that are

14  (Pages 50 to 53)

1  referenced on his website?
2      A   I have read through some of the articles
3  and I went to some of the links, but I did not read
4  every element of his linked content because of the
5  limited time, but, you know -- yeah, that would be a
6  correct way to say that.
7      Q   How did you decide which ones to read and
8  which ones not to read, other than the Farsi ones,
9  obviously, which you couldn't read?
10     A   Well, I read all the English documents.
11  But you asked me in the earlier question whether I
12  read the linked documents.
13     Q   Right.
14     A   My answer to your question is I did not go
15  through and parse every linked document. I read the
16  main article. So just to clarify for your and my
17  benefit, the Defendant writes an article in which
18  the Defendant may refer to one or two links as
19  support or as to, say, that, Hey, this is why it's
20  happening, and I read through some of the important
21  links --
22     Q   Right, again --

1      A   -- but not all of them.
2      Q   And my question was: In your
3  methodologies how do you determine which of those to
4  read and which ones not to read other than you were
5  limited to ten hours?
6      A   As I outlined, my methodology is -- the
7  method specifically is what you read, what defendant
8  has to say. As you will appreciate that the sources
9  and references or links are used to support or not
10  to support that argument. So I read the content of
11  the articles.
12     Q   The Defendant's articles or the linked
13  articles?
14     A   The Defendant's articles. The linked
15  articles were just references to some sources like
16  an internal document or something like that.
17     Q   In Paragraph 3 of your report, page 1, you
18  make reference to Federal Rule of Evidence 702.
19         Do you see that?
20     A   Yes.
21     Q   Have you read that Rule?
22     A   I'm not a lawyer, I just skimmed through

1  it in terms of, you know, what was involved.
2      Q   Well, how did you get that reference and
3  the reference to Federal Rule of Civil Procedure 26
4  (a)(2)(A) and (B)?
5      A   I think, you know, if you look at expert
6  witness, the role of expert witness, the role of --
7  you know, rules of evidence, those are some of the
8  bylaws that are there.
9      Q   I understand that because I'm a lawyer.
10  My question is: You, as a journalist, I take it you
11  don't refer to the Federal Rules of Evidence
12  regularly, how did you come across Federal Rule of
13  Evidence 702?
14     A   It's there, it's online. You can go to
15  the library and look it up. I mean what do you mean
16  by -- yes, I looked it up.
17     Q   Well, I know that, I'm a lawyer. And
18  there are actually dozens. I would suspect maybe
19  more than a hundred rules of evidence, depending on
20  how you count them.
21         How did you determine that Federal Rule of
22  Evidence 702 was something that was relevant to what

1  you are doing here today?
2      A   I think the whole spirit of the Federal
3  Rule of Evidence is the witness comes in as an
4  independent person and also presents that
5  independence and that commitment and a little bit of
6  their expertise and background in terms of -- you
7  know, I think I was referring to the spirit of it in
8  the sense that what I came off from reviewing those
9  things is to understand what is involved here, like
10  what is the Rules of Evidence.
11     Q   Okay. Well, Rule 702 applies in
12  particular to expert witnesses --
13     A   Yes --
14     Q   -- did you know that?
15     A   -- uh-huh.
16     Q   I mean, what I'm getting at is what use
17  did you make of it other than you mentioned it
18  mentions the spirit of something?
19     A   Well, Mr. Kapshandy, please try to
20  understand this. Let's address this question.
21         As you pointed out, I haven't done this
22  expert witness before, so when I was assigned to do

Page 58

1   this I spent way more time trying to understand and
2   appreciate the process, and in doing so I made a
3   quick review of those rules and that's why I cite
4   it.
5       Q   Okay.  Well, you got to the right one, and
6   I'm glad you did, and I was going to ask you:  Did
7   you happen to notice that the rule requires the
8   Court to assess the reliability of expert
9   testimony?
10      A   Yeah, by all means.
11      Q   And --
12      A   And that's why I attached my vitae, and I
13  state that:  Read Appendix 1 for my short bio, just
14  in case the judge does not have time to read my long
15  one which details my background, professional
16  experience, and research interests.  Read Appendix 3
17  for a more detailed version of my CV.
18      Q   Okay.  Well, one of the things that the
19  Court will be needing to address is the reliability
20  of your methodology.  And one of the questions I
21  have for you is:  As you sit here today, can you
22  point to us any published error rates for a person

Page 59

1   who comes along and wants to do exactly what you do,
2   which is to evaluate a defendant's conduct in a
3   defamation case and come up with a conclusion one
4   way or the other?
5       A   The only error rate, according to
6   research, relates to if some illiterate person is
7   reading something.  Other than that, just like
8   reading, it should be, if the communication is
9   correct, it should be, it should be a complete
10  communication.  And if an individual's research
11  indicates that an illiterate person reads documents,
12  that is why you have federal guidelines of helping
13  people to fill forms because they may not know how
14  to read or things like that.  But other than that,
15  there are no error rates on this.  This is a
16  foolproof procedure, if I may add.
17      Q   Well, that's one thing the Court will have
18  to address.  And he'll need to understand what your
19  methodology is.  So the question is, is if another
20  professional journalist comes along and wants to
21  apply the Professor Deb Aikat methodology for
22  determining whether the Defendant met the standard

Page 60

1   or not, they have to apply the same rules and,
2   hopefully, with some reliability would come to the
3   same conclusion.  And it would be up to the
4   Plaintiffs to establish what that methodology is and
5   how reliable it is.
6           And my question for you is:  I know you
7   can say it's foolproof, but how does one measure the
8   methodology as to whether it's 90 percent accurate
9   or 50 percent accurate or 20 percent accurate as to
10  whether the Defendant complied with these standards
11  for a defamation defendant in a public figure case?
12      A   The method is very simple.  It is to read
13  and view.  When you read and view a document it is a
14  procedure, and it's a foolproof method, because when
15  you are reading something it's either there or not
16  there.  For example, look at Point 3 that is asked
17  to find whether the Defendant had a duty to allow
18  the Plaintiff an opportunity to respond to his
19  assertions against them.  The Defendant has,
20  maintains a blog, and in that blog there is no
21  opportunity for anyone, not a reader, not as a
22  reporter, to place a comment.  So, simply, it's

Page 61

1   either there or not there.  There is no error rate
2   in this method.
3       Q   Okay.  I'm glad you mentioned that
4   because, it's jumping ahead a little bit, but did
5   you happen to notice in looking at the Defendant's
6   website that there is an opportunity at the bottom
7   for anybody to post a comment?
8       A   In the period that I read and reviewed the
9   material on these two websites there is no feature
10  for comments in the parts, in the parts where he
11  writes about the articles and articles that I
12  reviewed.
13      Q   Are you not aware that, in fact, prior to
14  your issuing the report that not only was there an
15  opportunity but he did post comments by people,
16  including somebody by the name of Ali Mostashari.
17  Did you happen to notice that?
18      A   No, it wasn't there.  It may have been
19  hidden.  I did not see it.  And I behaved like an
20  average reader, and it was not there.
21      Q   Well, we'll come back to that.  Let me ask
22  you this.  Are you aware -- well, strike that.

16  (Pages 58 to 61)

Page 62

1  We'll come back to that later?
2          MR. NELSON: Are you going to a new area?
3          MR. KAPSHANDY: Not quite, let me just
4  finish up on this and I think it will be a good time
5  for a break.
6  BY MR. KAPSHANDY:
7      Q   But other than, as I believe you
8  previously mentioned, being literate -- obviously an
9  illiterate person can't engage in this procedure --
10  there's nothing more specific to your methodology
11  other than what you've described to us here today
12  and in your report in terms of applying with, you
13  know, reasonable reliability the Professor Aikat
14  methodology as to whether a journalist has met his
15  obligations under the standard in a public figure
16  defamation case?
17      A   This is not a Professor Aikat method. In
18  fact, methodology is the science of method. So this
19  is not a Professor Aikat method. This is not my, my
20  method or my grandfather's method. This is a method
21  that is an industry standard of evaluating and
22  assessing anybody who puts information.

Page 63

1          MR. KAPSHANDY: Okay. Why don't we go off
2  the record now and take a break. It's a good time
3  for a break. I think a couple of us need to take a
4  break. Take about ten minutes and we'll resume.
5  Okay?
6          THE WITNESS: Thank you.
7      (A recess was taken -- 10:04 to 10:15 a.m.)
8          MR. KAPSHANDY: Back on the record,
9  please.
10  BY MR. KAPSHANDY:
11      Q   Professor, while we were off the record I
12  received an e-mail from Mr. Nelson's colleague,
13  Patrick Parsa, sending an invoice dated July 14,
14  2010 for five hours in the amount of $2,000. And
15  we'll try and get a copy of that printed and we'll
16  mark it as an exhibit, if not here today,
17  afterwards.
18          But the question I have for you is, even
19  though it reflects an additional five hours worth of
20  work, as I understand from your previous testimony,
21  you broke the 17 hours originally invoiced up into
22  two separate invoices of 12 hours and 5 hours.

Page 64

1  Correct?
2      A   Yes.
3      Q   And it doesn't reflect any additional work
4  that we already described in Exhibit 2. You just
5  re-billed it?
6      A   Yes.
7      Q   Okay. Back to your report now, Exhibit 3,
8  which we've been discussing. If we could turn to
9  page 2, please.
10      A   Yes.
11      Q   The first paragraph you mention that your
12  teaching and research work focuses on social media,
13  global communication, interactive media, and the
14  future of communication. Correct?
15      A   Yes.
16      Q   And you state, As a former journalist," in
17  the next sentence. My question is for you: When
18  did you stop becoming a journalist? I take it at
19  one point in time you were a journalist, and when
20  you used the word "former" that means you no longer
21  are. Correct?
22          MR. NELSON: I'm going to object, assumes

Page 65

1  facts not in evidence.
2  BY MR. KAPSHANDY:
3      Q   Go ahead and answer.
4      A   In 1992 I left my job with the Telegraph
5  newspaper and the BBC World Service to begin my
6  Ph.D. studies, and so, just to be truthful, I
7  mentioned "as a former journalist," but you can
8  never be not a journalist because I'm always
9  teaching my students to be one. But my profession
10  now is a college professor and so that is why I
11  mentioned as a former journalist.
12      Q   I take it there was a point in time. You
13  say you mentioned that you wrote for the Telegraph?
14      A   The Telegraph newspaper.
15      Q   And where is that published?
16      A   The Telegraph newspaper is published in
17  India. It's an English language newspaper.
18      Q   And how long did you do that?
19      A   I did that from 1984 to 1992.
20      Q   And then you began work on your Ph.D.?
21      A   Yes. And if you see my vitae, it mentions
22  my work in the BBC. I was a stringer, which is a

17 (Pages 62 to 65)

Page 66

1  correspondent for the BBC in India, and BBC as in
2  the British Broadcasting Corporation.
3      Q   Okay. Well, your resume speaks for
4  itself, and we have that as part of the record. I
5  just wanted to get a time period pinned down.
6          But back to your report, Exhibit 3,
7  please, again directing your attention to page 2
8  further on in that paragraph you state: "I consider
9  this report as a publish service." Correct?
10     A   Yes, sir.
11     Q   You mentioned that previously. And my
12  question is: How is it that you charge $400 an hour
13  for your work? I'm trying to understand what you
14  mean by a "public service."
15     A   Public service is, you know, serving the
16  people, anything that you do that is for the benefit
17  of society.
18     Q   You understand my difficulty. I mean, I
19  can understand serving in a soup kitchen or going
20  into the military, but sometimes, you know, it's
21  charity work.
22     A   Yeah, I did not mention charity. I

Page 67

1  mentioned public service.
2      Q   But, again, what I'm trying to get at is,
3  what do you mean by public service that you charge
4  $400 an hour for. Do you see the difficulty I'm
5  having?
6      A   No, there should not be any difficulty.
7  As a professional everybody gets paid according to
8  the hours they devote, and you could do public
9  service for double that money or half that money
10  depending on what kind of work is involved. I am a
11  professional, and in order to devote this kind of
12  work I had to spend time out of my summer hours and
13  I do not get paid during the summer, I'm on a nine
14  month appointment, and so it is industry standard
15  and a standard in academe that faculty members when
16  they are assigned to search for the help of a court
17  of law or for any case that they charge for their
18  time. And, in fact, my colleagues charge a lot
19  higher. The 400 was an amount that I was
20  comfortable with and that is what I have been paid.
21     Q   Let me ask you this. What other sort of
22  public service have you done either as a former

Page 68

1  journalist or as a professor?
2      A   I'm invited to speak nationwide on various
3  topics relating to research and teaching. I also
4  serve on the national, our national association.
5  And so it could be various kind of speaking
6  engagements, various kind of consulting work,
7  anything else that would involve a good use of my
8  expertise.
9      Q   Have you ever served on any government
10  panels?
11     A   I have -- this would have been 14 years
12  ago -- the USIA, the United States Information
13  Agency, wanted me to speak with and share my
14  expertise with a lot of journalists in this country
15  and abroad, and so I was assigned to speak and work
16  with them. This was almost 12 to 14 years ago.
17     Q   And to speak with them about what?
18     A   Speak with them about the changes in
19  journalism and the state of journalism in the United
20  States.
21     Q   Because of your expertise in kind of the
22  role of the Internet in journalism, which I

Page 69

1  understand is most of what you write about?
2      A   No, I write about journalism and mass
3  communication.
4      Q   Well, as either that work or any of the
5  other public service work as you've described it,
6  have you ever charged $400 an hour for that work?
7      A   Yeah, I mean I, you know, if you are
8  working with a corporate entity like testing their
9  cell phone services, they would pay way more than
10  $400, so it's not the amount. It's, basically, what
11  time in the year you are assigned to do, how much
12  time you are devoting, and it is not the amount of
13  how much you are charging, it's basically the work
14  that is involved.
15     Q   But my question was, and I don't know that
16  people consider working for a corporation being a
17  public service, so I was referring to the speaking
18  engagements and, like, the work for USIA, when I
19  asked you have you ever charged any of those groups
20  or government agencies $400 an hour for your public
21  service work?
22     A   Sir, your conclusion that a corporation

18  (Pages 66 to 69)

Page 70

1    cannot do public service is dubious. BellSouth,
2    when it launched its telephone services, it's
3    cellular telephone services, wanted people from the
4    community to test it out. And so that was a public
5    service. So I beg to differ on your conclusion that
6    a corporation cannot charge or cannot do public
7    service. They do public service all the time.
8        Q    Okay. My question, though, is -- let's
9    take them one at a time. In doing any of the work
10   for the government agency, like the USIA, did you
11   charge them --
12       A    Yes, I was paid honorarium, yes.
13       Q    How much were you paid?
14       A    I don't recall, but it could be a thousand
15   dollars.
16       Q    Well, did that amount to $400 an hour?
17       A    That amounted to $500 an hour in 1996. So
18   that was more money. It's not a question of money.
19   And it's a question of how much time you involve.
20   And regardless of whether it's a government entity
21   or corporate entity, as a professional I hope we all
22   take that decision that if there is an amount of

Page 71

1    time involved, you basically say that this is what
2    it will take to work on that project. It's as
3    simple as that. It is public service in the sense
4    that you were serving the people, whether you get
5    paid or not.
6        Q    Well, that's what I was trying to get at.
7    How did you come at the $400 an hour. And, I
8    believe, you just said is that's the amount it would
9    take to get you to work on it?
10       A    Yes, it's the amount you have to devote,
11   yeah, the time that you devote.
12       Q    Now, the next paragraph you state, "For
13   ease of reading and brevity, I will hereinafter,
14   refer to the Plaintiffs (Dr. Trita Parsi and the
15   National Iranian American Council)" as the
16   "Plaintiff," singular?
17       A    Refer to the --
18       Q    And I just wanted to be clear about that.
19   Obviously, there's only one defendant and you refer
20   to the Defendant singularly, but here --
21       A    No, in my version, unless we are reading
22   different, it is -- I would refer to the Plaintiffs.

Page 72

1        Q    But then the end of the sentence says
2    Plaintiff --
3        A    Anyway, I think that's a minor -- I don't
4    know. As "Plaintiffs," that was a word used to
5    define them.
6        Q    Okay.
7        A    I would not read too much into that.
8        Q    And in the next section you raise the
9    questions that you are addressing, and we understand
10   now those came from Plaintiffs' counsel in
11   Exhibit 4. Correct? Verbatim, they are the same.
12           (Witness reviews document.)
13           THE WITNESS: Exhibit, what is the
14   Exhibit 4?
15   BY MR. KAPSHANDY:
16       Q    Exhibit 4 is the May 17 letter to you.
17       A    Yeah.
18       Q    Clarifying to you --
19       A    The reason I ask is the judge, as you
20   know, referred to his memo, referred in his memo
21   that the Defendant's name was not spelled correctly.
22   And I'm starting to wonder if the name of the

Page 73

1    Defendant is spelled correctly in my memo. Is it?
2        Q    It's not, but you took it from the
3    Complaint and we all know who we are talking about
4    so we need not worry about that.
5        A    Okay.
6        Q    My question on the issues that you were
7    requested to address in the next paragraph on page 2
8    coming exactly to the word, in fact, from the
9    mandate given to you in the May 17 letter. Correct?
10   Yes or no.
11       A    Yes.
12       Q    Thank you. Now, the second one raises the
13   concept, in quotes, of "willful blindness."
14   Correct?
15       A    Yes.
16       Q    And other than the letter from counsel of
17   May 14, and I've read your entire report on the
18   journalistic standards, I'm wondering is that a term
19   of art used in journalism that we can find standards
20   for or references to?
21       A    Yeah. And a part of it is reflected in, I
22   think, the ethical codes that I attached, the SPJ.

19 (Pages 70 to 73)

Page 74

1    Q   I said other than that, because those
2    actually break down various journalistic standards.
3    My question for you is the term, "willful
4    blindness," is that something that you can point us
5    to specifically in either the Society for
6    Professional Journalists or any other published
7    standards out there?
8    A   Yeah, there are, there are various -- you
9    know, the journalism community has a lot of
10   scholarship on willful blindness. And even if
11   you -- you do not even have to read the scholarship.
12   If you can understand those two words, one should be
13   able to evaluate it. Journalism is all about
14   simplicity. So when you say willful blindness it
15   means what it is.
16   Q   Well, here's our chance to find out where
17   you get this and what you are referring to and how
18   you are measuring it. And my question is: Can you
19   point to us any published standards from any
20   journalistic societies stating what that is and what
21   the standards are for complying with or not the
22   standard of willful blindness?

Page 75

1    A   Yeah, it's -- the literature in journalism
2    is replete with discussions and research relating to
3    willful blindness, so it is like looking for a
4    citation that defines media law. I mean, it is as
5    common as that, so the definition meaning scope of
6    willful blindness is agreed upon by most
7    journalists.
8    Q   My question, again, is: Can you point us
9    to specific standards, references, articles that not
10   only refer to it but tell one how to determine if
11   somebody has complied with it or not?
12   A   Yeah, there are too many to cite, but --
13   Q   Well, unfortunately, we need to find this
14   out here today in order to learn what your opinions
15   are and how you are measuring the --
16   A   As I mentioned, I used industry standards
17   of willful blindness. And, just to be fair, I
18   attached the SPJ Code, the Society of Professional
19   Journalists Code, that outlines everything including
20   willful blindness, although it doesn't mention
21   willful blindness by the phrase. And so I used the
22   most popular and the common one to define, not only

Page 76

1    this point, but other points.
2    Q   Okay. Well, that's covered in Point 1,
3    and that's fair, and we'll get to that. That's the
4    SPJ standard. Correct?
5    A   Some of the standards -- the whole spirit
6    of the report, you know, is based on journalistic
7    standards.
8    Q   Okay. But I'm not speaking of journal --
9    A   So if you ask me to cite five studies, I
10   think that would be a pointless exercise because the
11   whole field of journalism is replete with
12   conversation -- as I said, it's like trying somebody
13   to cite what is media law. I mean there is a common
14   understanding about what is media law.
15   Q   Well, unfortunately, this is very familiar
16   to you, but for us and for the Court, who has to
17   evaluate your methodology, and I'm speaking now
18   particularly of Paragraph 2, the willful blindness
19   standard. I understand you referred us to the SPJ
20   standard of care, which is Paragraph 1, and we'll
21   get to that.
22         My question for you, again, is

Page 77

1    specifically: If a journalist, another expert,
2    wants to come in and apply the willful blindness
3    standard to the Defendant's conduct in this case,
4    what standards, what authorities does one go to to
5    determine whether he met that or not, other than
6    saying it's replete? You understand the problem?
7    A   I address that question on page 6 of my
8    report. If you go to page 6.
9    Q   Right.
10   A   The first paragraph says, "I analyzed the
11   Defendant's writings." And then the next sentence
12   says, "My analyses indicate that there is ample
13   evidence of 'willful blindness' in the writings of
14   the Defendant as it relates to assertions against
15   the Plaintiffs."
16   Q   Okay. But that --
17   A   And then I explain that in the next three
18   paragraphs. "In their attempt to address
19   controversial matters of public interest, several of
20   the Defendant's writings provide definitive
21   statements that are not," I repeat, "not supported
22   or substantiated by adequate evidence. Such

20  (Pages 74 to 77)

Page 78

1  writings compromise integrity and disrupt the
2  credibility of the Plaintiffs in the mind of the
3  reading public. For good reason, the reading public
4  cannot distinguish the difference between
5  misrepresented context and the truth."
6      "In the absence," next paragraph, "of
7  properly substantiated facts, several writings of
8  the Defendant seem to misrepresent issues and
9  context. For instance, the Defendant critiques the
10  Plaintiff's professional identity and standing with
11  unsubstantiated allegations. A significant number
12  of articles highlights events, actions and
13  'evidence' that are out of context and, therefore,
14  misleading to the reader."
15      And, so in conclusion, "The Defendant's
16  writings, as published and presented for free
17  reading from web sites, and I name the web sites,
18  "make no mention of efforts or requests, if any, to
19  provide a fair and reasonable opportunity for the
20  Plaintiffs to respond to allegations of wrongdoing."
21      So in journalism, if you are not willfully
22  blind, the literature suggests that you make an

Page 79

1  effort to allow the person you are critiquing an
2  opportunity to respond. So that is why in
3  newspapers like New York Times or any other
4  established entity there is a mention that, Hey, we
5  tried to reach that person and that person was not
6  available for comment.
7      Q   Okay. My question, if you recall, was:
8  What are the standards published, wherever they are,
9  for willful blindness and how one determines if the
10  Defendant's conduct met that or not. And you
11  referred us to page 6.
12      First of all, on page 6 you conclude at
13  the very first paragraph that there's ample evidence
14  of willful blindness. And my question for you is
15  how you get from Point A to Point B, which is how
16  did you determine whether the Defendant's conduct
17  met that standard. And you directed us to the next
18  two paragraphs. Correct?
19      A   Yes.
20      Q   The first of those, the second paragraph
21  here on page 6 says that "Several of the Defendant's
22  writings are not supported or substantiated."

Page 80

1  Correct?
2      A   Yes.
3      Q   Well, that's a different thing than
4  willful blindness, and maybe that's a different
5  issue, but how does not supporting, assuming that's
6  the case, statements were adequate evidence equates
7  to willful blindness? I'm having trouble following.
8      A   Well, you should not have any trouble
9  following it. If I state an example. Let's say an
10  established newspaper like, let's say, the Chicago
11  newspaper, you know, writes something on the mayoral
12  election and they say somebody is dubious. I think
13  the newspaper cannot pretend to be blind to the fact
14  that the mayor who has been criticized has an
15  opportunity to respond to that comment, and so it's
16  unsubstantiated fact, so it contributes to the lack
17  of avoiding willful blindness.
18      Q   Well, help me out here. And I'm trying to
19  understand what the difference is between publishing
20  something which is not substantiated by adequate
21  evidence and engaging in willful blindness.
22      Is there a difference or not?

Page 81

1      A   Well, there could be a difference, but
2  both of them are related.
3      Q   And in that paragraph, since we are on it,
4  let's get into it, you mention, "Several of the
5  Defendant's writings provide statements that are not
6  supported by substantiated or adequate evidence."
7      And this is our chance to find out which
8  of those you are referring to. So could you,
9  please, tell us which of the Defendant's statements
10  you believe are not supported or substantiated by
11  adequate evidence.
12      A   Mr. Kapshandy, in my research I read
13  through more than 60 articles and items that the
14  Defendant had written, and all of those articles did
15  not have, I'm sorry to say, were not supported or
16  substantiated by adequate evidence. And I was doing
17  that in the spirit of scholarship, and I was struck
18  by how this person, who I do not know, was
19  criticizing another person without supporting it by
20  adequate evidence so it struck me. And so I read
21  about 60 articles and it did not -- none of those --
22  in fact, I was looking for one -- none of them had

21 (Pages 78 to 81)

Page 82

1  adequate evidence.
2      Q   Okay. Well, I want to be sure we are
3  clear because first you said "Several" of the
4  Defendant's writings were not substantiated by
5  adequate evidence. Now you are saying none of them
6  were?
7      A   Yeah.
8      Q   Okay. That's fair. Then we know what we
9  are dealing with.
10      So you are saying basically everything
11  that he's written is unsubstantiated?
12      A   Sir, I also would like to add, and I'm
13  glad that you asked me that question, please try to
14  understand that on the Web a lot of content is being
15  added after, you know, even the case was filed or
16  whatever. And, you know, I was looking for one
17  article that would have solid evidence, and it did
18  not.
19      Q   Well, you didn't read all of them, did
20  you?
21      A   I told you I read them to look for -- I
22  did two readings of each, the 60 I analyzed. The

Page 83

1  website, as you know, has a lot of, covers a lot of
2  topics beyond Trita Parsi and the Plaintiffs -- so
3  how do you pronounce it, NIAC?
4      Q   Correct.
5      A   NIAC. So, you know, if you ask me which
6  60 articles you looked, I looked at the 60 articles
7  that covered Trita Parsi and NIAC. And so I did not
8  read all of the Defendant's articles, I did not have
9  time for it, but the 60 articles I read did not,
10  none of them were supported or substantiated by
11  adequate evidence.
12      Q   As we sit here today as how do we understand
13  which of the articles and footnotes and hot links
14  that he mentions in his articles you read and which
15  ones you didn't?
16      MR. NELSON: Objection, vague.
17      THE WITNESS: Well, I think this is
18  something that you all have to decide because I went
19  to the website just like, as a common person would,
20  and I searched for, you know, all of the articles
21  that he had written. And there are two ways to do
22  that.

Page 84

1          One is to, the Defendant has a search
2  feature in which you could find through efficient
3  searching any articles that refers to NIAC and Trita
4  Parsi by looking for those search phrases. And that
5  brings you a list of articles. And in looking at
6  those articles, I did not find that they were
7  supported or substantiated by adequate evidence.
8          And, more important, a significant number
9  of the articles highlighted events, actions and
10  evidence that were out of context and, therefore,
11  was misleading to the reader. So earlier you asked
12  me what made you look at some and not look at some,
13  I was fascinated by how can somebody cite something
14  which is totally out of context and misleading to
15  the reader?
16  BY MR. KAPSHANDY:
17      Q   Okay. Try and follow the questions here
18  because I don't want to be here all day, Professor.
19          The question is simply, for us and for the
20  Court, who is trying to determine when you use the
21  word "several" and "such writings" for us to
22  understand which of the citations that the Defendant

Page 85

1  cites in his articles you read and which ones you
2  did not in the 17 hours and, frankly, it was less
3  than that, 8 hours that you did researching the
4  Defendant's conduct in this case?
5      A   Uh-huh, well --
6      Q   Let me ask it this way. Did you take any
7  notes when you were reviewing the website -- I read
8  this article, I didn't read this article? I'm
9  talking about the ones that he cites, because he has
10  cited dozens, in fact, well over a hundred
11  references, hundreds of references, including
12  original NIAC documents.
13      A   Your question has two parts. One you
14  mention that in the limited time I had, please don't
15  refer to my invoice to say how many hours I devoted.
16  I devoted way more time just for my scholarship and
17  academic enhancement to understand what the
18  Defendant was trying to communicate, so it was not
19  only nine hours I spent.
20          I spent the time to read through these
21  articles in trying to find two things. One, is
22  whether this person is providing the care and

22  (Pages 82 to 85)

Page 86

1  compliance of a journalist; the second is the
2  willful blindness; and the third is whether he is
3  giving an opportunity for those he critiques or
4  those he writes about to speak.  And in all of these
5  I spent the time to read through these, and in all
6  of these I did not find the evidence I was looking
7  for.
8      Q   Okay.  My question was: Is there any way
9  for you to tell us as you sit here today under oath
10  which of the references he cites you've read and
11  which ones you didn't?
12     A   That would be too many to list, and I do
13  not have that in my personal recollection.  As you
14  can well imagine, I was asked to analyze these
15  reports and write this report, and that is why I'm
16  referring to the report because that reflects the
17  conclusion I came away from reading those reports.
18     Q   We understand what your conclusion is, the
19  question is your methodology.
20     A   My methodology was absolutely clear, which
21  I have explained to you, which was in reading and
22  analyzing these articles, and after my reading, as I

Page 87

1  mentioned, two readings, the first was a cursory
2  reading just to see the tone and content of the
3  article, whether Trita Parsi is actually mentioned
4  or whether NIAC is actually mentioned.  If it was
5  not, I would reject it because, obviously, it would
6  not interest the case or you.
7      The second would be when I found that
8  there were references to Trita Parsi and NIAC, I
9  read through the article more in depth and I did not
10 find.  And so my answer to your question is there
11 are too many to list.
12     Q   Well, did you take notes as you were
13 reading the articles?
14     A   No, I did not take notes because we have
15 an online system where you could mark using an
16 online system where you could, and I used that
17 online system to mark the parts and then write my
18 report.
19     And, as I said, it was easy because none
20 of these reports that this person writes, that
21 amazed me, had substantiated evidence, so it was
22 easy.  I mean, how do you deal with something that

Page 88

1  is not there?  It was easy.
2      Q   Professor, we understand what your
3  conclusions are.  The question --
4      A   No, you were asking about the method.  I
5  explained the method to you, too.
6      Q   My question is very simple.
7      A   Yes.
8      Q   Are you able to tell us which of his
9  references you read and which you did not? because
10 he has hundreds.  And now you've mentioned that you
11 marked some of them online.  Correct?
12     A   Yeah.
13     Q   Do you have any way to reproduce your
14 marks that you made online?
15     A   No, because those -- those get wiped off
16 after you have moved away from the page, but that is
17 where the strength of method lies because --
18     Q   The strength? -- go ahead.
19     A   The strength of the method is that, if you
20 find substantiated evidence, you would mark them, so
21 since I did not find any, it was a simple task.
22     Q   Well, since you didn't review everything,

Page 89

1  you can't be sure that you've looked at everything.
2  Correct?
3      A   I don't think that's a correct way to say
4  that.  I did not say it.  I said I read through
5  those documents looking for evidence and looking for
6  relevant sources that --
7      Q   Here's the problem I have, Professor --
8      A   -- and I did not find it.
9      Q   When you use the word "those" which is a
10 pronoun and it's not particularly specific, we are
11 having great difficulty understanding which of his
12 articles you reviewed, references in his articles,
13 and which you did not.  And we understand you didn't
14 have time to review all of the references, and there
15 are hundreds.
16     So the problem we are having is in
17 reproducing your methodology and explaining it to
18 the Court to understand, since your report only used
19 pronouns such as "several" of the Defendant's
20 writings are not substantiated, for us to understand
21 what you read and what you didn't.
22     A   The Court is wise enough to realize that

23  (Pages 86 to 89)

Page 90

1  when something is not there it cannot be stated.
2  Most of, and, as I said, all of the articles that I
3  read did not have evidence, so if I did not find
4  evidence, there was nothing to report.
5      Q   But if you didn't read all of the
6  evidence, you can't be certain that you yourself
7  have not been guilty of willful blindness. Correct?
8      A   As I said, a significant number of
9  articles highlighted events. So I reviewed the
10 links and the references, actions and evidence that
11 are out of context and, therefore, misleading to the
12 reader.
13     So, clearly, I had reviewed. And I don't
14 take any of these comments that I've written
15 lightly, because I was working as an independent
16 person trying to evaluate the content of what
17 somebody was writing. And I don't even know these
18 people. So I was a very blind reviewer, if you
19 will, where I don't know the people, and I did not
20 find it. So the Court in its wisdom will find out
21 that, if there is no evidence, that's not there.
22     Q   Can you really conclude to a reasonable

Page 91

1  degree of journalistic certainty that a journalist
2  ignored certain things when you have, in fact, not
3  reviewed everything that he reviewed?
4      A   Your second part of the question is
5  implying that I have not reviewed. I said I
6  reviewed. The first part of your question says:
7  Can somebody by reading a document conclusively
8  conclude --
9      Q   No, I didn't say that at all. Should I
10 restate the question?
11     A   Restate that.
12     Q   The question is: Can you conclude to a
13 reasonable degree of journalistic certainty that a
14 writer has ignored certain things when you, in fact,
15 you yourself, in fact, have not reviewed everything
16 that he relied upon?
17     A   The second part of your question implies
18 something that is a subjective statement that you
19 are writing. I would like you to please restate the
20 statement in two parts where you would mention the
21 first part of your question and you are welcome to
22 ask me the subjective part, but I am not going to

Page 92

1  answer a question that has your objective, your bias
2  incorporated in it. Pardon me for saying that.
3      Q   Let me ask it this way. Is one able to
4  testify to a reasonable degree of journalistic
5  certainty that another journalist has engaged in
6  willful blindness when you have not taken the time
7  to read everything that that person has reviewed and
8  relied upon in reaching his conclusions?
9      A   Could you, please restate your question
10 without the word "you" in it. You start the
11 question with "one," which is a pronoun and then you
12 inject "you" which is a definitive pronoun, which is
13 a definitive indicator of addressing it to me.
14     So I can only answer your question either
15 if you ask the question directly to me or if you
16 state, if you state a statement of fact. Beyond
17 that, I'm not in a position to address or even
18 dignify that question.
19     Q   Can an expert in journalism conclude to a
20 reasonable degree of journalistic certainty that
21 another journalist has engaged in willful blindness
22 when that journalist has not taken the time to

Page 93

1  review and read every single one of the references
2  and sources upon which that journalist has relied in
3  reaching his conclusions?
4      A   Yes and no. The yes part is the
5  journalist, if they have not reviewed the entire
6  documents but they have reviewed half of it, that is
7  enough indication to realize that that person, the
8  writer, has not evaluated it. No, because that
9  refers to how one should go through all of the
10 sources if they have to be absolutely sure.
11     Q   You understand the paradox, do you not?
12     A   That paradox is a reality of writing.
13 It's a reality of writing in any field. So we are
14 not dealing with a paradox that is strange. That is
15 the reality of the field, and that is where the
16 misleading part comes in.
17     Q   Well --
18     A   Which is not something a journalist should
19 be proud of.
20     Q   Well, under the Professor Aikat
21 methodology in applying the willful blindness
22 standard, how far do you read into a reference

24 (Pages 90 to 93)

Page 94

1  before you determine that you don't have to read the
2  whole thing to determine if it supports what the
3  other journalist is citing?
4      A   Sir, I'm not referring to a Professor
5  Aikat or a Joe Schmo method of reference. I think
6  if you have to decide whether some person is
7  addressing and providing adequate evidence, you read
8  through all of it and that is how you decide.
9      Q   All of each and every reference. Correct?
10      A   Yes.
11      Q   Now, the third issue you address, and we
12  can go back to page 2, is: Whether Defendant had a
13  duty to allow Plaintiffs an opportunity to respond
14  to his assertions against them.
15          Do you see that?
16      A   Yes, sir.
17      Q   And I'm on page 3, but I see you are
18  looking at page 7 where, I guess, you answer that
19  question. Correct?
20      A   Yes.
21      Q   Now, staying with page 2, Paragraph
22  Number 3, when you use the word "duty" I want to

Page 95

1  understand what you are referring to there. Is that
2  a legal duty or where does that come from?
3      A   It's both a legal and a professional duty.
4      Q   Well, we understand that came from the
5  letter that the Plaintiff's lawyer sent you on
6  May 17. Correct?
7      A   No, I mean my assessment has nothing to do
8  with the letter of the Plaintiffs. The statement
9  that the Plaintiffs mentioned is quoted on page 7.
10  Whether the Defendant had a duty to allow the
11  Plaintiffs an opportunity to respond to his
12  assertions against them.
13      Q   I understand the question came from the
14  Plaintiffs.
15      A   Yes, sir, yes, sir.
16      Q   And my question for you, since you are
17  answering using the same word as to whether the
18  Defendant had a duty, is where that duty comes from.
19  Is it a legal duty? Because when we read page 7 of
20  your report, you don't appear to cite the source for
21  this duty. And I'm trying to understand what this
22  duty is that you are referring to.

Page 96

1      A   As I mentioned, it's professional and a
2  legal duty for anybody to allow anyone an
3  opportunity to respond to assertions against them.
4      Q   Well, who enforces that duty? You know,
5  if you, like, breach your duty of stopping at stop
6  signs, a local or state police officer might enforce
7  it.
8          Who enforces that duty, assuming one
9  exists, that you are referring to here?
10      A   Well, the duty is enforced on two levels.
11  One is a code of law would establish that because it
12  would say that this person has been acting
13  irresponsibly, and that is why you have laws about
14  libel, defamation and other things. And the other
15  aspect is in terms of journalistic credibility, you
16  know, it's almost a tenet, almost a tenet of
17  journalism, almost a responsibility that somebody
18  should allow the person they are criticizing an
19  opportunity to respond to their criticisms and
20  assertions, especially when there are assertions
21  that question the character and other things.
22      Q   Well, you said the court of law. My

Page 97

1  question is: Who enforces this duty? I just want
2  to understand is there some Internet police or is
3  there some journalism police out there that can
4  apply some sort of penalty to journalists who aren't
5  complying with this duty that you mentioned here in
6  your report?
7          MR. NELSON: Asked and answered.
8          THE WITNESS: Well, I think that question
9  has a very academic answer. We don't live in a
10  police state that we have a police for everything.
11  God forbid. And I hope you also don't agree that we
12  should have a police for everything. So if anybody
13  thinks that somebody has been violated in terms of
14  their rights, we have adequate laws that would take
15  care of it.
16  BY MR. KAPSHANDY:
17      Q   Well, I do agree, and I think we're all
18  thankful for that. But what I'm trying to
19  understand here is, when you, Professor Aikat, use
20  the word "duty" --
21      A   Yes.
22      Q   -- where one looks up this duty and who

25 (Pages 94 to 97)

Page 98

1    enforces it if you don't comply with it?
2         MR. NELSON: Asked and answered.
3         THE WITNESS: The duty is something that
4    is defined when somebody is trying to promulgate and
5    disseminate information. That's an expectation,
6    that's a common expectation. I mean you cannot say
7    that somebody would not, you know, that people would
8    just spew out hate words. I mean, you would say
9    that is their duty.
10        Of course, there is a given understanding
11   in society that when we are in a public space like a
12   website you do not spew criticism without giving
13   anybody an opportunity to project their side,
14   especially when an entity has a professed aim of In
15   Search for Truth which is emboldened on the banner
16   of every page of that website. I mean that is
17   ridiculous. I mean, how can one do this? And as I
18   have said, Mr. Kapshandy, I really looked at it in
19   an independent way, I did not know any of these
20   people, but I was appalled at the absence of
21   contrasting viewpoints, limits, and any ways where
22   other people would contribute. Even, you know, the

Page 99

1    person who is criticized should have had an
2    opportunity to, you know, should have had a voice to
3    say that, Hey, what you said was not right and this
4    is my point of view.
5    BY MR. KAPSHANDY:
6         Q   Okay. In a minute we are going to get
7    into the question as to how, if at all, that duty
8    was complied with.
9         A   Yes.
10        Q   Simply, here we are trying to stick with
11   the question of: Where can one look up that duty
12   and who enforces it?
13        MR. NELSON: Objection --
14        THE WITNESS: We have already --
15        MR. NELSON: Hold on a second.
16        Objection. The question has been asked
17   and answered. The aspect of where you can look up
18   the duty assumes facts not in evidence.
19   BY MR. KAPSHANDY:
20        Q   Maybe there is no place where it's
21   published. I just want to know when you -- because
22   it's not referred to here or on page 7 or anywhere

Page 100

1    in the report --
2         A   Well --
3         Q   Let me finish the question, please,
4    Professor.
5         When a journalist sits down and wants to
6    determine what his duty it to provide an opportunity
7    to respond, where does he look it up and how does he
8    understand what the enforcement sections are?
9         MR. NELSON: You assume that there has to
10   be such a --
11        MR. KAPSHANDY: And maybe there's not.
12   Counsel makes a good point. Maybe there's not.
13   BY MR. KAPSHANDY:
14        Q   I'm just simply, on behalf of our client
15   here where you say he's breached a duty, trying to
16   find out where we find this duty. Okay?
17        A   You don't have to find it. It's there.
18   It's part of being a journalist. It's like, you
19   would say, well, does somebody have a duty to spell
20   words right when they were writing. Who enforces if
21   somebody has misspelled a word? That, if you
22   misspell words every five sentences, that reflects a

Page 101

1    lack of your professional duty in presenting
2    information.
3         Similar to that, and maybe more serious
4    than misspelling, the articles that I reviewed, you
5    know, did not give the person they were criticizing
6    or the person they were, you know, considering the
7    character of any opportunity to respond.
8         Q   Well, we'll get to that in a minute.
9    That's your conclusion.
10        But as you sit here today you can't point
11   us to any legal duties, published duties, anywhere
12   in the journalistic profession that state that a
13   journalist has a duty to allow a subject an
14   opportunity to respond to his assertions against
15   them?
16        A   It is -- it is outlined. For example, if
17   you look at page 12 of my report, it talks about in
18   the Code, "Be Accountable." It says, "Journalists
19   are accountable to their readers, listeners, viewers
20   and each other." And it explains some of these.
21   And one of the things it explains is admit mistakes
22   and correct them properly.

26  (Pages 98 to 101)

Page 102

1    So if I'm mentioning something which is
2 not true, I should admit those mistakes, and abide
3 by the same high standards to which journalists hold
4 others, so a journalist would expect. As I said, I
5 think I've addressed this and I would like to
6 reiterate that in defining the duty of a journalist
7 this is almost a basic requirement.
8    Q   But other than this reference on page 12,
9 you can't seem to find it written anywhere?
10    A   No -- well, it's all over. You just have
11 to research the literature. It is as common as
12 spelling words right.
13    Now, your question is similar, to me,
14 similar to saying, that, Hey, where does a
15 journalist have to spell the words right? But does
16 a journalist have a duty to spell a word right? You
17 could not point out any law. I could not point out
18 any law, but does that mean that it's not a duty?
19    Q   Now, further down you review what you
20 read. And we've discussed that already over that
21 three week period from May 8 to June 1, and I don't
22 want to re-cover that, but I do want to ask you if

Page 103

1 you reviewed all of the documents that NIAC produced
2 to the Defendant in this case?
3    A   No.
4    Q   Did you review all of the documents that
5 the Defendant produced to the Plaintiff in this
6 case?
7    A   No.
8    Q   Did you know that there were thousands of
9 documents that had been produced by both of the
10 sides on this very issue in this case as to the
11 truth or falsity of the Defendant's rights?
12    A   No. And I wanted to repeat that my task
13 in helping you all with this case was the general
14 standard of care and compliance, willful blindness
15 and the Plaintiff's duty to allow an opportunity to
16 respond to assertions.
17    MR. KAPSHANDY: Maybe now is a good time
18 to take another break while my colleague is getting
19 something printed, and we'll move on to another
20 subject. Is that okay with you? Take about ten
21 minutes.
22    THE WITNESS: Okay. Thank you.

Page 104

1    (A recess was taken -- 11:05 to 11:13 a.m.)
2 BY MR. KAPSHANDY:
3    Q   Okay. We are back on the record.
4    You'll want to keep Exhibit 3 there handy
5 in front of you. We are just going to try and go
6 through your report in order. That's the main --
7    A   Don't worry. I'm keeping your record, and
8 I have my personal copy of it. I'm just concerned
9 that you have your numbers in sequence. All the
10 exhibits are here.
11    Q   If you don't mind doing all the
12 secretarial work, appreciate it.
13    A   You are welcome. Everything is in order.
14    Q   Thank you.
15    A   We are missing 6, Exhibit 6. Oh, 6 is on
16 top, pardon me. We've got everything.
17    Q   Great, thank you. Now, turning to page 3
18 of your report, from pages 3 through 5, basically
19 you seem to be addressing the first question on the
20 journalistic standard of care. Correct?
21    A   Yes.
22    Q   And you cite the Society of Professional

Page 105

1 Journalist Code of Ethics. Correct?
2    A   Yes.
3    Q   And, in fact, in the very first bullet
4 point you note that this applies to cyber
5 journalists the same as traditional journalists.
6 Correct?
7    A   Yes.
8    Q   That's actually kind of your area of
9 interest and expertise, is it not, the cyber aspects
10 of journalism compared to what we call the yellow
11 print journalism?
12    A   I have ink in my veins, so I don't
13 classify myself as a cyber journalist. I am a
14 researcher and a scholar and a teacher in journalism
15 and mass communication.
16    Q   And I don't mean to denigrate that at all.
17    A   No, I did not see that as a denigration,
18 but I think you are putting me into a category which
19 I do not belong.
20    Q   And I don't mean to do that. All I'm
21 suggesting is, as you point out here, the cyber
22 journalists are treated no differently than the old

27 (Pages 102 to 105)

Page 106

1  ink-and-paper journalists. And that, frankly, is
2  the trend where most journalists are going these
3  days. Is that fair?
4      A  Yeah.
5      Q  And you are certainly right there on that
6  lead as a media futurist, as you are described.
7  And, again, I don't want to denigrate that, I just
8  want --
9      A  No, but I want to clarify that point. My
10 answer would be no, because I think any scholar in
11 journalism and mass communication, just like any
12 legal scholar, has to understand both the old and
13 the new, and that's what I do. Anybody does it.
14 God forbid if somebody were not to do it, they would
15 be out of date.
16     Q  And the point that you are making here is
17 that the standards for the old journalists applies
18 to the new journalists, correct? At least as you've
19 applied it here in your report.
20     A  It applies to everybody.
21     Q  Right. Thank you.
22         Actually, at the bottom of the page I note

Page 107

1  it kind of interesting that the Code was adopted --
2  this Code of Ethics -- was adopted in 1996. Is that
3  correct?
4      A  Yes, sir, after 70 years, seven decades of
5  discussion. "With its historical origins from the
6  American Society of Newspaper Editors in 1926, the
7  SPJ code was adopted in 1996." So please don't look
8  at only 1996. Please look at how this is an
9  age-old, trusted thing. So it has been through
10 seven decades of discussion and debate even so that
11 that's the official code.
12     Q  Right. I understand that this version
13 that you are citing was adopted in 1996. And it
14 took a long time to get there, correct? You say
15 seven decades.
16     A  Yeah, I mean what I'm trying to
17 highlight -- thanks for asking me that question --
18 is that this was decided and discussed and cogitated
19 upon, so it is not just somebody coming in one
20 afternoon and writing a code, it has gone through
21 the whole rigors of the profession so much so that
22 the American Society of Newspaper Editors which, as

Page 108

1  you know, is a very distinguished body, has been at
2  it through 1926.
3      Q  Prior to 1996 --
4      A  1926, sir.
5      Q  No, prior to 1996 was their any prior
6  version of this code of ethics?
7      A  Yeah, I mean it was an ongoing code. As I
8  mentioned, that the American Society of Newspaper
9  Editors have their ethical code, but this was the
10 major effort to have one simple code that everybody
11 would understand and abide, and that is why it's
12 written in very simple language.
13     Q  Right. But just to be clear, prior to
14 1996 there were other ethical codes out there, or
15 not? I don't know.
16     A  I do not know the answer to your question,
17 but the SPJ, the Society of Professional
18 Journalists, is the code everybody abides by. You
19 were just, or in the earlier part, before the break,
20 you were looking for a standard. Here is a
21 standard.
22     Q  And that's the one you cite in your report

Page 109

1  and, obviously, we are going to talk about it. But
2  my question, as you mentioned, it was adopted in
3  1996, was there a published ethical standard out
4  there from anyone prior to 1996?
5      A  That's an excellent question. I do not
6  want to answer things that I do not know.
7      Q  That's fair. And the next question I have
8  about the SPJ Ethical Code is who enforces that?
9  Let's say you buy one of these. Is there anybody
10 out there that enforces it? Like, for example, if
11 lawyers violate ethical codes, they could lose their
12 license.
13     A  The way journalism was founded in this
14 country that there, just for the freedom of
15 journalism and the freedom of the people who work as
16 journalists there is no license to practice
17 journalism. And I say that with a lot of expertise
18 because I worked as a journalist in a country where
19 you had to get an accreditation pass to practice as
20 a journalist.
21         So that's one of the wealths of this
22 country, and that comes with an understanding that

28 (Pages 106 to 109)

Page 110

1   you would abide by the code. It is not enforceable
2   as a doctor's code or a lawyer's code, because those
3   are professions that can actually harm people in
4   terms of that, so I think -- but the profession of
5   journalism doesn't have an enforcing authority and
6   the government doesn't enforce that.
7       Q    And most likely because of the First
8   Amendment which strongly discourages any sort of
9   governmental restrictions on speech, as you know?
10      A    As you know the First Amendment is a
11  protection of speech as long as it is not false or
12  dubious. I mean you could -- the First Amendment,
13  I'm glad you mentioned that, because Hugo Black, as
14  you will recall, in the '60s mentioned that First
15  Amendment and defamation may work at contrast. But
16  the reality is that the First Amendment fails where
17  somebody is spreading information that is not true,
18  and so, yes, your point is well taken.
19      Q    Thank you. And I appreciate the
20  historical background. What we'll do, though, is I
21  want to go through this assuming that there's some
22  relevance of this to the case, but I don't want to

Page 111

1   spend a whole lot of time on it as to how you apply
2   the SPJ Code of Ethics to the Defendant's conduct
3   here. Okay?
4           Let's turn in particular to page 4. And
5   you've cited certain excerpts that you believe are
6   relevant. And the first one you have is, "Seek
7   truth and report it." Correct?
8       A    Sir, may I explain what is going on here.
9   These are subheadings of the ethical code, and so
10  these are not my words and so that is why I quote
11  sections. So "Seek truth and report it" is an
12  actual word, just like if you were to quote from the
13  Constitution "The pursuit of happiness." These are
14  not my words, these are from the Constitution. So I
15  just want to clarify.
16      Q    Thank you.
17      A    So I am --
18      Q    I'm not suggesting you made this up, but
19  I'm --
20      A    Okay. I wish I did.
21      Q    -- that you -- that was an excerpt that
22  you selected, and you, correctly, put it in quotes

Page 112

1   to show that that's the first one that you are
2   addressing. Correct?
3       A    Yes.
4       Q    And, you know, it seems to be a good one,
5   everyone could agree upon. Seeking truth and
6   reporting it, there's nothing terribly controversial
7   about that.
8       A    The Defendant claims to do that.
9       Q    Well, and I think all journalists want to
10  do that. Correct?
11      A    Yes.
12      Q    And it's certainly a noteworthy and noble
13  standard. And underneath, then, you list, I take it
14  these are certain, shall we say, guidelines or
15  suggestions under seeking truth and reporting it?
16      A    Yes.
17      Q    And the first one is "Test the accuracy of
18  information from all sources and exercise care to
19  avoid inadvertent error. Deliberate distortion is
20  never permissible."
21          Did I read that correctly?
22      A    Yes, sir.

Page 113

1       Q    That's an exact quote from the SPJ code?
2       A    Yes.
3       Q    Now, in applying your analysis of the
4   Defendant's conduct how did you test the accuracy of
5   all of his sources without reading all of his
6   sources?
7       A    As I mentioned, the articles I analyzed I
8   read all of the sources he cites and links to.
9       Q    I thought you had said that you had only
10  read part of them and, even at that, only part of
11  those articles?
12      A    I think we addressed that before the
13  break -- let me repeat what I said.
14          The Defendant has several articles. I did
15  not read all of the articles. I think you thought
16  that I was saying that, no -- I think the articles I
17  analyzed, I read all of the sources that that person
18  refers to. Now, somebody could say that I have a
19  secret source then, of course, I have no way of
20  checking that, but if any of those things -- in
21  fact, this is more of something that becomes very
22  evident.

29 (Pages 110 to 113)

Page 114

1      And please notice the next sentence
2  "Deliberate distortion." And somehow, and I hope I
3  can say this correctly to you, that somehow it seems
4  that this person was resorting to deliberate
5  distortion. And I say that without even knowing the
6  Defendant or the Plaintiff because, if you say
7  somebody is a crook or dubious, you have to say that
8  why this person is dubious. And it seemed that time
9  and time again when I was reading through those
10  articles and also the sources, you know, it seemed
11  like deliberate distortion.
12      Q   Okay. My question is simply --
13      A   And that is why I listed it first, if you
14  are wondering why I picked that quote. I was, in
15  fact upset by it because I was wondering why would
16  somebody do such a thing.
17      Q   Professor, let's just try and focus on the
18  question I'm asking.
19      A   I'm sorry.
20      Q   And the question was: How could you test
21  the accuracy of all of his sources without having
22  read all of his sources?

Page 115

1      A   As I answered your question, I read the
2  sources he links in reference to. You could write a
3  piece without even letting anybody know what your
4  sources are.
5      Q   And the Defendant cites ample sources, in
6  fact, well over a hundred. Correct?
7      A   Well, not all of the stories. In some
8  stories he cites sources, in some stories he does
9  not.
10      Q   Can you point to a single article written
11  by the Defendant where he does not cite at least one
12  source?
13      A   Well, I have to go over the articles I
14  listed, and at this time I --
15      Q   Well, unfortunately, you didn't list any.
16  You said you've read some of them but not all of
17  them.
18      MR. NELSON: Can you be clear in your
19  questioning when you are asking whether or not he's
20  read the article or the sources, because it's
21  becoming vague to me.
22      MR. KAPSHANDY: It's becoming unclear to

Page 116

1  me, too. And I understand the witness to have just
2  have said that he didn't read all of the Defendant's
3  articles. Correct?
4      THE WITNESS: Please try to understand
5  this, and I think I'll clarify if for the benefit of
6  everybody because it's important that we understand
7  the spirit --
8      (Mr. Kapshandy and Mr. Galvez confer
9      off the record.)
10      THE WITNESS: Let me start over again
11  because I hope you all do not have conversations
12  while I'm talking because it is very distracting to
13  me.
14  BY MR. KAPSHANDY:
15      Q   Go ahead.
16      A   I just wanted to mention and clarify
17  something, that the Defendant has on its web sites
18  maybe hundreds and thousands of articles in
19  different languages. I only reviewed articles in
20  English. Out of those articles I concentrated on
21  articles that addressed NIAC and Dr. Trita Parsi.
22  And that was the subset of articles I closely

Page 117

1  analyzed.
2      I read the articles, not only once, but
3  twice. On my second reading, as I mentioned, when I
4  found that it has direct references or assertions
5  against NIAC or Trita Parsi, I went through a
6  re-reading of the articles and I even read and
7  looked at the sources that the Defendant cited, for
8  what it was worth.
9      Q   Just to be clear, have you read every
10  single one of the Defendant's articles on NIAC and
11  Trita Parsi? And I'm not speaking of the references
12  that he cites, just talking about the articles.
13      A   That were on the two web sites?
14      Q   Correct.
15      A   And, as I said, I explained to you the
16  procedure. You could do a search for the words
17  "Trita Parsi, NIAC," and you would get a list of
18  articles, and that was my subset. Now, it was done
19  in June. There have been articles published even
20  later than that. I, of course, did not look at
21  them.
22      Q   What did you do in December when you

30  (Pages 114 to 117)

Page 118

1    looked at his web site?
2        A   I looked at what -- you know, it's
3    interesting that you say that. I think the
4    Defendant has drawn upon documents from some of the
5    cases and he links to them and the Defendant has
6    video in Farsi and things like that. So I was
7    trying to have -- you know, you know how web sites
8    change. I wanted to go back and review whether
9    anything has changed, and I found that nothing has
10   changed.
11       Q   Well, that was my question. So there's
12   nothing that you reviewed in December of last year,
13   2010, that changes the opinions in your report.
14   Correct?
15       A   Yes.
16       Q   Now, let me understand that you believe
17   you read all of the Defendant's articles in English
18   about NIAC or Trita Parsi. How are we to determine
19   which of the references that he cites, and there are
20   hundreds, you read and did not read?
21       A   Could you, please, repeat your question.
22       Q   With regard to the articles that the

Page 119

1    defendant, Hassan Dai, wrote about NIAC or Trita
2    Parsi, all of which you testified you have reviewed,
3    how are we to determine which of the references and
4    hot links in all of those articles you have read
5    completely and which you have not read?
6        MR. NELSON: Objection to the form of the
7    question.
8        THE WITNESS: I think that question is
9    valid, but, as I said, in doing my review I had tags
10   that I put on those articles where I was looking for
11   evidence and substantive facts, and they were not
12   there. So, as I said, and I repeat what I said
13   earlier that since those evidences and substantial
14   facts weren't there, you know, it was easy. It
15   wasn't there.
16       You could cite a source but that may not
17   prove what you are trying to say. I could say that
18   the capital of North Carolina is Chapel Hill while
19   it's Raleigh and cite a source. Does that mean that
20   I'm trying to convey to you the truth just because I
21   have cited a source which may be dubious in itself
22   because this is -- you are looking at one dubious

Page 120

1    article linking to another dubious article.
2    BY MR. KAPSHANDY:
3        Q   That didn't answer my question, but that
4    raises another interesting point which is, then when
5    you went to those articles what did you do, as you
6    state here in Bullet Point Number 1 to test the
7    accuracy of the information from each of those
8    sources? Because, as you just pointed out, you
9    can't trust everything you read on the Internet or a
10   document, even if it's from NIAC itself which he
11   cites many of.
12       So my question is: Once you reviewed that
13   source that he cites, what did you do to
14   independently verify the accuracy of his sources?
15       A   You know, there are two important points
16   here. One is as part of the method that I was
17   doing, I was reading. So, obviously, if the
18   Defendant claims that somebody is an agent of
19   another country or a lobbyist, obviously, the
20   document or the source would state: This is why
21   this person is a lobbyist. And it did not. So,
22   obviously, the test of accuracy, if you are taking

Page 121

1    it and you are evaluating the document, that
2    document fails that test because that accuracy is --
3    if you are saying that Washington, D.C. is the
4    capital of the United States and you have a document
5    that links to Washington, D.C. you have
6    have it confirmed. But some of it may be common
7    knowledge. Washington, D.C. may be a simplistic
8    example, but you get my point.
9        But if you say that somebody, take, for
10   example, somebody is a dubious agent of another
11   country and then you link to a supposed document
12   that doesn't say anything, so that document fails
13   that test of accuracy of information.
14       Q   So what you are saying is if it wasn't
15   supported by a single document then you concluded --
16       A   Document or documents.
17       Q   -- you concluded that that didn't support
18   his conclusions rather than taking them all as a
19   whole?
20       A   Could you, please, repeat your question,
21   I'm sorry.
22       Q   I understand -- sure. I understand from

31  (Pages 118 to 121)

Page 122

1    your previous answer that you evaluated the articles
2    individually and because you didn't see one that
3    says Trita Parsi is a lobbyist for the Iranian
4    regime then you discarded it as not supportive of
5    the Defendant's conclusion rather than taking all of
6    the evidence in its totality as he does in his
7    articles?
8        MR. NELSON: I'm going to object to the
9    form of the question, because, as you stated it, you
10   said that you reviewed the articles. I think you
11   meant the links in the articles, because that's
12   confusing as you stated. "Articles" is used twice.
13       THE WITNESS: Could you, please, repeat
14   your question, sir.
15   BY MR. KAPSHANDY:
16   Q   Certainly. As I understand your
17   application of this criteria under your methodology
18   to test the accuracy and information from all
19   sources is that you looked at each source
20   individually and if it by itself did not support the
21   Defendant's conclusion, you discarded it rather than
22   taking all of the hundreds of sources, be they hot

Page 123

1    links or actual articles he has cited in footnotes
2    together in their totality. Correct?
3        A   No, I exercised more care than that.
4        Q   Well, please tell us, because I believe
5    you said you evaluated each article individually.
6        A   Yeah, I mean if somebody is making a claim
7    that somebody is a foreign agent and stuff like
8    that, you know, nobody should just look at one
9    source. And in some cases the Defendant mentions a
10   lot of details, but they are not relevant, so the
11   accuracy test fails.
12       Q   Okay. Well, how do you determine, for
13   example, if one of these sources is not relevant?
14   And we'll go through a lot of them individually. I
15   want to see how they met the Professor Aikat
16   methodology for testing accuracy.
17       A   It's not a Professor Aikat methodology --
18       Q   -- talking about you here today as you
19   apply it. That's what I'm referring to. I'm not
20   saying you invented it, but as you've applied it
21   here in this case.
22       A   It's as simple as saying that whether you

Page 124

1    have boxes in the basement. Like, I'll give you an
2    example, like, you had all these claims about the
3    Rahm Emanuel in Chicago saying that he had boxes in
4    the basement. And how could we find whether he had
5    boxes in the basement? There were lawyers who went
6    and inspected it.
7        Similarly, when you are saying that this
8    guy is an agent there is a common expectation in the
9    mind of the reader to, having read the article and
10   looked at the sources, to find whether there is
11   convincing evidence, yes or no -- yes or no --
12   whether it gives enough indication beyond reasonable
13   doubt that that person is an agent. So in doing
14   that process I tested accuracy and it fails.
15       Q   Well, did you come across any articles in
16   any language written by persons other than the
17   Defendant that referred to NIAC or Trita Parsi as
18   lobbyists for the Iranian regime?
19       A   No.
20       Q   Really? Did you happen to notice an
21   article in 2000 by Kenneth Timmerman describing NIAC
22   as a pro-regime advocacy group -- strike that --

Page 125

1    IIC, which was run by Trita Parsi, as a pro-regime
2    advocacy group?
3        A   No.
4        MR. NELSON: Objection, form of the
5    question.
6    BY MR. KAPSHANDY:
7        Q   Did you do any research to see how many
8    persons other than Hassan Daioleslam have described
9    NIAC or Trita Parsi as lobbyists, agents for the
10   Islamic Republic of Iran?
11       A   No, I was not asked to do that.
12       Q   Did you review a report by a former CIA
13   agent by the name of Clare Lopez in 2008 --
14       A   No.
15       Q   -- who wrote that Trita Parsi and NIAC are
16   lobbyists for the Islamic Republic of Iran?
17       A   No.
18       Q   Did you read the December 2006 AFTAB
19   article, which is an Iranian government publication,
20   that refers to NIAC as the Iranian lobby and cited
21   by the Defendant in his articles?
22       A   No.

32 (Pages 122 to 125)

Page 126

1    Q   Did you read a September 2006 article in
2  Top Iranian, again, another Iranian government
3  publication, with a quote from Ambassador Fathnejad
4  citing particularly NIAC and Trita Parsi and their
5  importance in representing the interests of Iran?
6    A   No.
7    Q   Did you read any of the communications
8  produced by the Plaintiffs in this case between
9  Trita Parsi and Iranian government officials,
10 including Ambassador Zarif, for a number of years?
11   A   No.
12   Q   You are aware that Defendant in his
13 article cites those NIAC documents in particular?
14   A   And I'm aware of things that are cited,
15 but as I mentioned to you, my charge was to read
16 what the Defendant had written and the tone, the
17 content and what the context of those things, and so
18 that is what I concentrated on and I was asked to
19 concentrate on.
20   Q   Further down one of the standards on page
21 4 that you mention in particular is, "Identify
22 sources whenever feasible.  The public is entitled

Page 127

1  to as much information as possible on sources'
2  reliability."
3       First of all, did I read that correctly?
4    A   Yes, sir.
5    Q   And that, again, comes from the SPJ code.
6  Correct?
7    A   Yes.
8    Q   In any of the Defendant's articles can you
9  point to a single example where he refuses to cite
10 sources or cites unnamed or anonymous sources?
11   A   That would be a question that the
12 Defendant could answer best, but I think when I
13 mentioned identify sources from the ethical code,
14 you know, identify reliable sources.  The public is
15 entitled to as much information as possible on
16 sources' reliability.  I can cite any source on
17 earth, but they may not be reliable, so I'm looking
18 for a reliable source.
19   Q   Well, there's several parts to this.
20   A   Yes.
21   Q   The first part of my question is can you
22 point to anywhere where he cites either anonymous or

Page 128

1  unpublished sources?
2    A   Well, I wanted to tell you two things.  It
3  is not a question of me pointing out where this
4  happens or that happens.  That's a different
5  research project, that's a more detailed research
6  project, but just as you go and look at the web
7  site, the Defendant's writing as presented do not
8  identify and cite reliable sources that contribute
9  to the statement.  As I have specified in an earlier
10 answer to your question, you could cite any source
11 but they may not address the context.
12   Q   Are you saying that when he cites
13 literally dozens of NIAC's own documents, that those
14 aren't reliable sources?
15   A   The context in some cases do not prove the
16 main point and the contention of the Defendant's
17 writings.
18   Q   Well, that's a different question.  My
19 question here was simply:  Are you saying -- and I
20 don't believe you've been able to answer -- as to
21 whether the Defendant in any of his writings about
22 NIAC or Trita Parsi cites unpublished or anonymous

Page 129

1  sources?
2    A   I did not find any.
3    Q   And, as we've discussed before, he, in
4  fact, cites hundreds of sources from web sites and
5  NIAC documents and other articles.  Correct?
6    A   Yes.
7    Q   Now, another SPJ code section that you
8  cite is, "Avoid undercover or other surreptitious
9  methods of gathering information except when
10 traditional open methods will not yield information
11 vital to the public.  Use of such methods should be
12 explained as part of the story."
13      First of all, did I read that correctly?
14   A   Yes.
15   Q   And that comes from the SPJ code.
16 Correct?
17   A   Yes.
18   Q   And you've included it here for some
19 reason.  And the question I had for you is:  Do you
20 have any evidence that Hassan Dai violated that
21 provision of the SPJ code?
22   A   "Avoid undercover or other surreptitious

33  (Pages 126 to 129)

Page 130

1   methods of gathering information." You know, in
2   many ways I felt, by reading through this, that the
3   Defendant was saying things without, without any
4   substantial reason. I mean in some cases he would
5   say a statement but it was not supported. So I'm
6   not sure about the surreptitious method of gathering
7   information, but the use of any method, whether it
8   was surreptitious or undercover, was not explained.
9   An example being an e-mail showed up which was a
10  personal e-mail.
11      Now, in some case the reason I included
12  it, that content of that e-mail was not explained.
13  How did the Defendant obtain a copy of the personal
14  e-mail between, you know, two NIAC officials and
15  their relatives? So that is why I put that in. So
16  it was kind of undercover or surreptitious when you
17  do not explain it.
18      Q   So when the Defendant on his web site
19  refers to "NIAC's internal documents produced in the
20  lawsuit" that doesn't explain to the reader --
21      A   No, I'm not talking about that, that's
22  different.

Page 131

1       Q   How --
2       A   You asked me -- please try to refer to the
3   question that you asked me -- that did you, in your
4   understanding, if I may phrase your question, that
5   you felt that Defendant used some undercover or
6   surreptitious method of gathering information. As I
7   mentioned, I saw copies of e-mail used as sources or
8   other things where the Defendant had not stated how
9   he obtained copies of those personal e-mail. And
10  that qualifies as surreptitious method of gathering
11  information except when traditional open methods
12  will not yield information vital to the public. In
13  this case easily that information could have been
14  obtained in another way. Use of such method should
15  be explained. It was not explained as part of the
16  story.
17      Q   So you are saying that the Defendant's use
18  of NIAC's internal e-mails produced in this
19  litigation were obtained by undercover or
20  surreptitious methods?
21      A   I did not say that. I said that I found
22  some e-mails, copies of e-mails, that seemed to be

Page 132

1   communication that NIAC officials like Trita Parsi
2   and other people had that the Defendant seemed to be
3   referring or reproducing or both in his web site
4   without mentioning the method of how that e-mail was
5   explained. This has nothing to do with the NIAC
6   documents that he published or not published. This
7   e-mail was different.
8       Q   Well, I was just going to mention to you
9   when the Defendant says, "Following a defamation
10  lawsuit brought by NIAC against me in 2008 and
11  during its discovery phase some of NIAC's internal
12  documents relating to its funding by NED had become
13  available," that doesn't tell the reader the method
14  for getting those e-mails?
15      A   That is not a document I'm referring to.
16  Please try to understand. By putting together words
17  in my mouth, it won't help.
18      Q   Look --
19      A   Let me clarify, please. What I'm trying
20  to refer to, that in some of the stories the
21  Defendant made references or cited sources like a
22  personal e-mail. That should have been explained in

Page 133

1   terms of the method of obtaining that e-mail. It
2   has nothing to do with an internal document that you
3   just cited.
4       Q   Let's put those aside because I thought
5   you were talking about those.
6       A   I was wrong.
7       Q   My question again for you is: Can you
8   cite to us a single e-mail that Defendant cites in
9   any of his articles which he obtained by
10  surreptitious methods and he doesn't explain where
11  he got it. Because, frankly, Professor, this is new
12  to me and I --
13      A   I think this question -- I'm unable to
14  answer your question because whether you obtain your
15  document by undercover or surreptitious methods, it
16  is not something I can judge or I can sit in
17  judgment. But, as I said, that it would have been
18  better for the Defendant to be transparent and
19  explain the use of such methods as part of the
20  story. And I'm just referring to the code that it
21  specifies. I'm not referring to the internal
22  documents because I get it that, you know, internal

34  (Pages 130 to 133)

Page 134

1    documents are internal documents that were made
2    available.
3         Q   The next one says, "Support the open
4    exchange of views, even views they find repugnant."
5         First of all, did I read that correctly?
6         A   Yes, sir.
7         Q   And it comes from the SPJ code.  Correct?
8         A   Yes, sir.
9         Q   Now, previously we discussed you believe
10   that the Defendant's web site didn't have any
11   opportunity for persons to post comments.
12        Is that correct?
13        A   Yes, mm-hmm.
14        Q   And even when you went to his web site in
15   December of 2010 you believe that to be the case?
16        A   Yes, for the articles I analyzed.
17        Q   Let's mark as your Deposition Exhibit
18   Number 9.
19        (Aikat Deposition Exhibit Number 9 was
20        marked for identification.)
21        MR. KAPSHANDY:  Let's go off the record a
22   second.

Page 135

1         (Discussion off record.)
2    BY MR. KAPSHANDY:
3         Q   Let me hand you what we'll mark as your
4    Deposition Exhibit Number 9, a June 25, 2008 article
5    by Hassan Daioleslam entitled Iran Oil Mafia and
6    printed off of his web site on June 18, 2010, and
7    simply ask you to turn to the very end of this, or
8    the second to last page -- not the very last page,
9    but the second to last page called page 4 of 5 of
10   this document.
11        Do you happen to notice at the bottom
12   where it says, "Post your comment"? do you see that?
13        A   Yes.
14        Q   Now, I'll hand you another one that we'll
15   mark as your Deposition Exhibit Number 10. First of
16   all, back on Exhibit 9, this is one of the articles
17   you reviewed, was it not, back in, roughly, May of
18   2010 when you wrote your report?
19        MR. NELSON:  Counsel, are you representing
20   that the post-your-comment tab was available when
21   this document was published in 2008 and at the time
22   that he reviewed these articles?

Page 136

1         MR. KAPSHANDY:  At least from 2008, and
2    certainly when this witness claimed to have reviewed
3    them in May of 2010.
4         MR. NELSON:  You are making that
5    representation?
6         MR. KAPSHANDY:  Absolutely.
7         MR. NELSON:  Okay.
8    BY MR. KAPSHANDY:
9         Q   Let me ask you this, Professor.  Is that
10   the first time you noticed on any publication on the
11   Defendant's web site that there was this hot link at
12   the bottom for people to post a comment?
13        A   Yes, and the second thing is the total
14   posted comments says zero.
15        Q   Well, that's an interesting point.  That
16   was my next question.
17        Do you know if anybody at NIAC ever asked
18   to or tried to post on Hassan's web site their view
19   about what he was writing?
20        A   No.
21        Q   Do you know if they were prohibited from
22   doing so?

Page 137

1         A   No, I do not know the answer to that
2    question.
3         Q   In reviewing all of the well over a
4    hundred, if not two hundred, citations in his
5    articles, are you aware that the Defendant cites to
6    NIAC's own web site and its positions on what the
7    Defendant has been writing?
8         A   I wanted to clarify before we begin.  I
9    think you have shared with me the document that
10   talks about Bob Ney.  And, you know, I don't think
11   an article on Bob Ney, the focus of this article on
12   Bob Ney, and if you look at it, Trita Parsi is
13   referred in Paragraphs 4.  Let me count this.  I
14   don't want to mark on your document.  1, 2, 3, 4, 5,
15   okay?
16        Let's go down, "Trita Parsi at the time
17   was a Swedish-Iranian graduate student --
18        THE COURT REPORTER:  I'm sorry.  Can you
19   slow down when you're reading.
20        THE WITNESS:  I'm sorry, I'm sorry.
21        So this is an article, I wanted to point
22   this out to you, I don't think this article was

35  (Pages 134 to 137)

Page 138

1    under the thing that would get to a couple of
2    things, and I wanted to clarify that to you.
3         First of all, the Defendant writes about a
4    lot of people. I'm not interested in Bob Ney. Why?
5    Because, obviously, I was not asked to find out
6    about Bob Ney. Bob Ney is a current federal
7    prisoner and former Ohio congressman. I was a
8    graduate student in Ohio so I am aware of Bob Ney.
9    But this, you know, article, you know, the only
10   reference to Trita Parsi, if you can go down, is in
11   the last paragraph on page 1, "which ended in
12   1997 -- attempted without success to attract Iranian
13   Diaspora."
14        THE COURT REPORTER: I'm sorry. Can you
15   read it slowly.
16        THE WITNESS: I'm sorry.
17        THE COURT REPORTER: If you'll just say it
18   slowly.
19        THE WITNESS: "Trita Parsi and the
20   Regime's Inner Circle," is the last paragraph on
21   page 1. And there the Defendant mentions Trita
22   Parsi, but he mentions Trita Parsi's in one or two

Page 139

1    paragraphs, and then he moves on to other things.
2    So, in other words, you could pick a random article
3    and you could say, Hey, it has a comment feature,
4    there are no comments on it. I honestly think, just
5    for the spirit of a legal case, we need to be more
6    careful in what we are doing. I mean you give me an
7    article on Bob Ney. That is irrelevant in this part
8    --
9    BY MR. KAPSHANDY:
10        Q   Professor, are you aware that this article
11   we've marked as Exhibit 9 is actually quoted
12   verbatim and cited in the Plaintiff's Complaint as a
13   basis of its claim that the Defendant has defamed
14   both NIAC and Trita Parsi and, furthermore, that
15   NIAC and Trita Parsi are referred to on every single
16   page on this article?
17        A   Yeah, I mean I was not aware. I don't
18   have to be aware.
19        Q   Let me ask you this question. In fact, if
20   you turn to the end of the article on page 3, you
21   would note that the Defendant actually cites to
22   NIAC's web site and includes an exact quote, a full

Page 140

1    paragraph, where NIAC states starting with
2    "Mr. Daioleslam's article is full of fiction,
3    misquotations and fabrications."
4         Do you see that?
5         A   Yeah, I see it, yeah.
6         Q   Now, certainly here the Defendant is not
7    only referring to the Plaintiff's web site by the
8    link but he's quoting their position in his article
9    and stating their side of the story, is he not?
10        A   Yeah, mm-hmm.
11        MR. NELSON: Where were you just reading?
12        THE WITNESS: Page 3.
13        MR. KAPSHANDY: Bottom of page 3 where
14   it's an accurate quote.
15        THE WITNESS: This one.
16   BY MR. KAPSHANDY:
17        Q   And he uses italics to set it off and
18   distinguish it from his own text. Correct? If you
19   look at the font for where he quotes, "NIAC cites"
20   --
21        A   It's in italics, yeah.
22        Q   And --

Page 141

1         MR. NELSON: Counsel, then your question
2    is a misstatement because this quote that you just
3    referenced is a clarification that Mr. Daioleslam
4    made after it was determined that his original story
5    was inaccurate, and that's not how you represented
6    the question to the witness.
7         MR. KAPSHANDY: The record speaks for
8    itself.
9         THE WITNESS: I wanted to clarify two
10   things to you. Okay? And I'm glad you pointed this
11   article out. This quote at the end is something
12   that has been put by the Defendant. It was not
13   opening it up to open exchange of views. And
14   although you may show me a comment button, I had
15   even tried to post a comment in one of the web sites
16   and that was deactivated. So, although you may find
17   a post-your-comment link, it may not be active.
18        And the other thing is total posted
19   comments is zero, and, you know, it has been about
20   two years, more than two, two-and-a-half years since
21   this was published and, you know, there must have
22   been more people than zero who would have loved to

36 (Pages 138 to 141)

Page 142

1   comment on this.
2   BY MR. KAPSHANDY:
3       Q   Well, if you've gone to Iranian-American,
4   the PAIC web site, iranian-americans.com to see if
5   anybody has posted comments on Hassan Daioleslam's
6   articles, have you?
7       A   Well, I looked at the articles that
8   related to the -- let me look at this.  I looked at
9   the web site PAIC, which is
10  www.Iranian-Americans.com.  That addresses the NIAC
11  internal documents accessed at the web address
12  www.Iranian-Americans.com/categories/internal.  So
13  this was the web area that I explored.
14      Q   In addition to Iranianlobby?
15      A   -- lobby.com.
16      Q   Yeah.
17      A   So the answer to your question is I did
18  not look at all of the articles on
19  Iranian-Americans.com, so the answer to your
20  question would be no.
21      Q   Thank you.  Now, back to Exhibit 9 which
22  apparently before today you had not noticed that the

Page 143

1   Defendant, not only cites in response to NIAC's
2   assertions that there are misstatements in his
3   article the actual link URL, as one calls it, but
4   quotes verbatim a lengthy citation from the
5   Plaintiff's web site.  Does he not?
6       A   Yes, of course.
7       Q   Do you happen to know if --
8       A   But it is -- please notice this.  This
9   article goes into three pages, right?  And this
10  paragraph, which is an excerpt, is fewer than 600
11  words.  So, you know, I think in this case if the
12  Defendant was doing due diligence as a journalist he
13  should have given NIAC an opportunity to address
14  each and every point, not just dismiss their point
15  of view in one paragraph.
16      Q   And by saying:  To read NIAC's response go
17  to, and he cites the NIAC council.org web site, he's
18  not referring the reader to NIAC's position and he's
19  somehow hiding it?
20      A   No, I think that's a good thing.  But if
21  you wanted to be clearly transparent and NIAC calls
22  your articles, you know, it's full of fiction,

Page 144

1   misquotation and fabrications, it is only fair for
2   the Defendant to respond to those allegations not
3   just only provide a link.
4       Q   You mean the Plaintiff?
5       A   No, the Defendant should have responded to
6   these allegations by the Plaintiff, because if the
7   Plaintiff is saying, or as you pointed out rightly,
8   that the Defendant has published this, it's also the
9   Defendant's duty to clarify why or why not or maybe
10  if it is so why these points -- I mean, in other
11  words, I was also looking, while reading this, I was
12  also looking for a statement from the Defendant in
13  response to these allegations.
14      Q   Have you, in reviewing all of the
15  Defendant's articles about NIAC, happened to count
16  up how many references he has to NIAC's web sites?
17      A   No, I did not.
18      Q   Would it surprise you that it amounts to
19  dozens?
20      A   I cannot tell you what will surprise me.
21  I can only react to what is in front of me.
22      Q   Well, let me ask it this way.  Assuming

Page 145

1   that there are dozens of references to NIAC's web
2   site throughout the articles that Defendant has
3   written about NIAC, it's not your position, is it,
4   that it's very difficult for a reader who wants to
5   get NIAC's side of the story to click on NIAC's web
6   site even directly from the Defendant's article?
7       A   That link is buried below.  It's buried
8   after 3,000 words of content, so, yes, I mean that
9   link is available, but it's kind of hidden in the
10  mesh of things.  If I were to work with the
11  Defendant and say, that, Hey, you should be
12  transparent, I would have expected the Defendant in
13  the spirit of what I outline here to be more
14  transparent and say that these are things that the
15  NIAC objects to the article, they are wrong.  I mean
16  to convince, which seems to be the main point where
17  you say In Search for Truth to kind of address that,
18  and that is not addressed.
19      Q   So by not putting the link up front and
20  only quoting part of the article your testimony is
21  that the Defendant is not in search of the truth?
22      A   No, no, I did not say that.  What I said

37 (Pages 142 to 145)

Page 146

1    was, in reacting to your comment I feel that the
2    link is available but it's buried below.
3        Q    Let me ask this. Have you gone to NIAC's
4    web site to see if they have ever posted direct
5    links to Hassan Daioleslam's articles on their web
6    site?
7        A    No, I was not asked to do that.
8            MR. KAPSHANDY: Why don't we take a break
9    now for lunch.
10    (A luncheon recess was taken - 12:10 to 1:09 p.m.)
11    BY MR. KAPSHANDY:
12        Q    Okay. Back on the record, please.
13            Professor, you understand you are still
14    under oath as you were this morning. Correct?
15        A    Yes.
16        Q    And we'll mark for the record what I've
17    marked as Exhibit Number 11, and just simply have
18    you confirm that this is the July 14th, re-invoice
19    that we discussed previously for five hours in the
20    amount of $2,000.
21            (Aikat Deposition Exhibit Number 11 was
22            marked for identification.)

Page 147

1            THE WITNESS: Yes.
2    BY MR. KAPSHANDY:
3        Q    And I understand you are looking for, or
4    it was sent to us, the other part of that which is
5    for approximately 12 hours. Correct?
6        A    Yes, sir.
7        Q    That's all I had on that. We'll just put
8    that aside and await the rest of it after we are
9    done here today.
10            MR. NELSON: Did you mark something else
11    as Exhibit 10?
12            MR. KAPSHANDY: I did, but if I didn't do
13    it on the record we'll do it right now. Okay.
14            MR. NELSON: I have that marked as
15    Exhibit 9.
16            MR. KAPSHANDY: Exhibit 9, for the record,
17    is Iran's Oil Mafia.
18            MR. NELSON: Right.
19            MR. KAPSHANDY: And Exhibit 10, and I will
20    mark it right now at your suggestion, is Iranian
21    Regime Web of Influence, 6 August 2008, and printed
22    off of the web site on June 17th, 2010.

Page 148

1            (Aikat Deposition Exhibit Number 10 was
2            marked for identification.)
3    BY MR. KAPSHANDY:
4        Q    I hand this to the Professor to identify.
5    Is that one of the articles that you reviewed on the
6    Defendant's web site as part of your preparation of
7    your report in this case?
8            (Witness reviews document.)
9            THE WITNESS: Excuse me, could you,
10    please, repeat your question.
11    BY MR. KAPSHANDY:
12        Q    Yeah, the question was, first of all, if
13    this was one of the articles by the Defendant about
14    NIAC or Trita Parsi that you reviewed in preparation
15    of your report in this case?
16        A    No, it was not. And I would also like to
17    point out that at the end the comment is also there,
18    "Post your comments", but here, again, you have
19    total posted comments is zero.
20        Q    Well, but one of the questions I had for
21    this is, and perhaps because you hadn't reviewed
22    this before, is it not the case that

Page 149

1    Hassan Daioleslam publishes a lengthy response from
2    Dr. Mostashari, whom he wrote about --
3        A    Yes.
4        Q    -- as being associated with NIAC and then
5    he posts his response to Dr. Mostashari?
6        A    Yeah.
7        Q    You didn't notice that on his web site?
8        A    No, I did not, but --
9            MR. NELSON: Objection, objection. This
10    assumes that this was present on the web site at the
11    time you reviewed it. You don't have any kind of
12    confirmation as to when this was posted.
13            So you may answer, if you are able.
14            THE WITNESS: Yeah, my answer is no, I did
15    not.
16    BY MR. KAPSHANDY:
17        Q    One of the other articles, if you turn
18    back to Exhibit Number 9, which is Iran's Oil Mafia.
19        A    Yes.
20        Q    On the very first page under the creation
21    of NIAC refers to a gentleman by the name of Darius
22    Baghai. Do you see that?

38 (Pages 146 to 149)

Page 150

1   A   Which line do you have?
2   Q   Under "Creation of NIAC."
3   A   Yeah, I'm on that paragraph.
4   Q   Do you see that?
5   A   Can you tell me which line.
6   Q   "Roy Coffee sent a letter to the Dallas
7   Morning News in February 2006 to justify his
8   relationship with the two London-based felons.  Part
9   of the letter discussed the creation of NIAC in
10  2002."
11  A   Yeah.
12  Q   In this letter Coffee describes the events
13  following the meeting of his former classmate,
14  Darius Baghai, who had just returned from Iran with
15  Bob Ney.  Then he goes on to quote that letter
16  verbatim.
17  A   Yes.
18  Q   And my question is do you know who Darius
19  Baghai is?
20  A   No.
21  Q   Did you happen to know that the Defendant
22  after this article was written got a call from

Page 151

1   Darius Baghai and spoke to him for approximately two
2   hours?
3   A   No.
4   Q   You didn't read that in his deposition?
5   A   No.
6   Q   Were you aware that the Defendant
7   invited --
8   A   Whose deposition?  I'm sorry.
9   Q   Defendant's deposition.
10  A   I haven't, as I mentioned earlier this
11  afternoon -- earlier this morning -- I haven't had
12  the opportunity or was not given to read the
13  Defendant's or even the Plaintiff's deposition, if
14  any.
15  Q   Are you aware that the Defendant invited
16  Darius Baghai to prepare a written response to this
17  article which he would post on the web site?
18  A   No.
19  Q   Okay.  And this article, again, was
20  published with 37 references to various web sites.
21  Correct?
22  A   Yes.

Page 152

1   Q   And you are aware that if you go to some
2   of these articles and web sites, they in turn, then,
3   reference other sites and footnotes?
4   A   I'm not sure about these citations in
5   particular, but I understand, yeah, they may well
6   be.
7   Q   And some of those, in fact, refer to
8   PowerPoint presentations by the Defendant some of
9   which are over a hundred pages long.  Did you look
10  at any of those?
11  A   No, I did not look at a PowerPoint
12  presentation you are referring to.
13  Q   Because those, in fact, have other
14  references to documents and web sites.  And you
15  didn't look at any of those?
16  A   I did not look at the PowerPoint
17  presentation and the sources you are referring to as
18  it relates to this document.
19  Q   Let me, while we are on the subject, I'll
20  hand you what we'll mark as your deposition
21  Exhibit 12, and --
22  A   What was 11?

Page 153

1   Q   11 was --
2   A   Oh, 11.
3       (Aikat Deposition Exhibit Number 12 was
4       marked for identification.)
5   BY MR. KAPSHANDY:
6   Q   Now, for the record, Exhibit 12 is a list
7   from the main page of the Defendant's web site,
8   Iranianlobby.com just printed today.  My question
9   for you is:  As you sit here, there's listed 30 to
10  40 articles by the Defendant, many of them on NIAC
11  or Trita Parsi, are you able to tell us which of
12  these you reviewed in preparing your report in this
13  case?
14  A   Could you, please, repeat your question,
15  because I see articles in the left pane and then I
16  see this in the right pane.  Which ones are you
17  referring to?
18  Q   Certainly.  If you go to "Iranianlobby
19  Archive" which starts at the bottom third of the
20  page and continues on to the next page, you will
21  find all of the articles listed individually.  And
22  some of those do repeat those which are on the left

39  (Pages 150 to 153)

Page 154

1 side, correct, but I think you'll find a
2 comprehensive list in the archive, and that's what
3 I'm directing my question to.
4 A   Yeah.  And you are suggesting to me
5 headlines, and the headlines do not -- I mean I
6 cannot recall just from the headlines whether I
7 looked into that article or not.
8 Q   Okay.  I was just were trying to see if
9 that refreshed your recollection as to which you had
10 read them or not.  One of them is kind of
11 interesting, Congressman Kirk's remarks about NIAC.
12 Did you see that article?
13 A   No.
14 Q   Are you aware that a United States
15 Congressman has referred to NIAC as a lobby for the
16 Iranian regime?
17 A   No.
18 Q   One of the comments you made on page 7 of
19 your report that I wanted to ask you about, in the
20 middle of the page, the sentence starts: "Apart
21 from inhibiting differing voices, the Defendant's
22 writings, in effect, degrade in the mind of the

Page 155

1 reader the character and identity of the Plaintiffs
2 and their work."
3       First of all, did I read that correctly?
4 A   Yes.
5 Q   Do you see where I'm reading from?
6 A   Yes.
7 Q   The first part of my question has to do
8 with what did you do to evaluate the Plaintiff's
9 identify and how does one determine if it's
10 degraded?
11 A   Mr. Kapshandy, I think your question is
12 very relevant, but I would like to take two minutes
13 to explain that sentence.  "Apart from inhibiting
14 differing voices," so in my observation I felt that
15 the Defendant's writing was not allowing differing
16 voices.
17       And just for our understanding, I would
18 like to just make it clear.  So what I was referring
19 to is that the Defendant does not allow differing
20 voices to express their opinions on the web site.
21 And as I found on two occasions of examples of
22 documents that you gave me, in fact, now is the

Page 156

1 third with Exhibit 12.  That the Defendant clearly
2 has a posted comments area, but invariably the total
3 posted comments is zero, and so that is what I mean
4 that I did not notice a lot of differing voices.
5 Okay?
6       Let me go to the second part, which is, I
7 think what your question related to.  "The
8 Defendant's writings, in effect, degraded in the
9 mind of the reader the character and identity of the
10 Plaintiffs and their work."  As I mentioned to you,
11 I approached this in a very scholarly way.  I did
12 not know any of these people, but when I completed
13 my first two sessions of even three hours, I came
14 out thinking that, you know, this NIAC and Trita
15 Parsi, whatever he does, he's a very, very bad
16 person.  So that is what I document in my report,
17 that it degraded in the mind of the reader the
18 character and identity of the Plaintiffs and their
19 work.  Did I answer your question?
20 Q   Yeah, what I was getting at, though, is:
21 Do you have any sort of quantitative way to measure
22 how one's character is degraded?  You've not done an

Page 157

1 economic analysis, for example, of how it's affected
2 income or revenue of Trita Parsi or NIAC, have you?
3 A   Well, I was not assigned to do that.
4 Q   Right.
5 A   I was assigned to find out whether the
6 care and the compliance and whether -- so when you
7 read a set of articles -- I mean I think you are
8 seeking a point which I do not have an answer for
9 because I simply did not -- I was not asked to do
10 that.  But, you know, when I read these articles I
11 thought, whoa, this person is talking about a really
12 bad person who does bad work.
13       And how did I come to that understanding?
14 Article after article talks about this person doing
15 bad work.  Although the United States bans lobbying
16 from a specific country, here is a lobbyist, here is
17 somebody who is doing bad.  So there was a whole
18 laundry list almost of things that this person is
19 professed to have done bad.
20       So that is what I document, "in effect,
21 degrade in the mind of the reader and character and
22 identity of the Plaintiffs and their work."  And it

40   (Pages 154 to 157)

Page 158

1  also seemed like the purpose of the writer, in this
2  case the Defendant, was to have a motivated kind of
3  communication to influence the reader to think
4  badly.
5      Q   Okay. My question was: Did you do any
6  sort of quantitative analysis? And as I understand
7  your testimony, you kind of came to the personal
8  conclusion that, if these things were true, these
9  are bad --
10     A   Let me explain the quantitative nature of
11 my analysis which is, as I said, I read 60 articles.
12     Q   Which we don't know which ones they are?
13     A   Yeah, but that's natural because you are
14 looking -- you are looking at a sea of content and I
15 picked a select content. And, you know, out of that
16 it may not be -- I think, just to get to your point,
17 it gave me a bad feeling about that person, not
18 knowing this person.
19     Q   Okay. When somebody like the United
20 States Congressman calls NIAC lobbyists for the
21 Iranian regime, does that tend to degrade your
22 identity, to use your own words?

Page 159

1      A   That question is not relevant here because
2  -- are you asking a statement of fact? I don't know
3  how to answer your question. So you rephrase your
4  question.
5      Q   I thought it was pretty simple, but maybe
6  another way to say it is: You are not saying that
7  the Plaintiffs' character has been degraded only by
8  the Defendant, because you've not looked at what
9  other people have said about them. Correct?
10     A   Yeah, I was only asked to look at the
11 Defendant's writings.
12     Q   And, as you may know, in this case the
13 Plaintiffs have retained an economist to look at
14 economic damages.
15     A   I do not know that.
16     Q   Well, and you're not doing that, I
17 understand, doing an economic analysis of any damage
18 they might have suffered. Correct?
19     A   No, I am not doing that.
20     Q   Nor are you saying that if they suffered
21 any degradation in their identify, it's due solely
22 to what the Defendant has written, because you've

Page 160

1  not looked at what other people have written.
2  Correct?
3      A   Well, let us not put words into my
4  answers. I think -- could you rephrase that
5  question, please.
6      Q   Yeah, let's be real simple about this.
7  You can't say if the Plaintiffs' character has been
8  degraded by other people, for example, statements
9  made by Congressman Kirk on the floor of the United
10 States Congress where he called NIAC lobbyists for
11 the Iranian regime because you haven't read them.
12 That's pretty simple, isn't it?
13     A   That's an irrelevant question, yeah, I
14 mean --
15     Q   Well, let's assume my question is
16 relevant. The question is simply: You can't say
17 whether Congressman Kirk's statements about NIAC
18 have degraded their identity because you've not read
19 them, have you?
20     A   No, no. Let's make this question simple.
21     Q   I get to ask the questions --
22     A   No, no, let's make the question very

Page 161

1  simple. You are adding a "because." That because
2  is not necessary. Let's rephrase that question or
3  can you, please, restate your question.
4      Q   Sure. I'll make it as simple as possible.
5      Because you have not read the statements
6  of other persons about NIAC, such as Congressman
7  Kirk, about NIAC lobbying on behalf of the Iranian
8  regime, you cannot state whether those statements by
9  these persons other than the Defendant have
10 contributed to degrading their identity, can you?
11     A   Can you please restate that question.
12 That question, I could find so many clauses that are
13 not necessary. I would request you, sir, to divide
14 your question into two parts. Those are too many
15 questions -- too many conditions that --
16     Q   I'll make it real simple.
17     A   Yes, sir.
18     Q   If you have not read something, you can't
19 say what effect it had on somebody, can you?
20     A   No.
21     Q   Good. Let me hand you another one we'll
22 mark as your Deposition Exhibit 15.

41 (Pages 158 to 161)

Page 162

1     (Aikat Deposition Exhibit Number 15 was
2         marked for identification.)
3   BY MR. KAPSHANDY:
4     Q   Which, for the record, I'll represent is
5   an affidavit from Lord Corbett of Castle Vale, a
6   Member of Parliament, dated March 24, 2010
7   containing two attachments.
8         And the first question I have for you:
9   Was this document provided to you by counsel for the
10  Plaintiffs?
11    A   Directed to me?
12    Q   Yeah.
13    A   No.
14    Q   I don't want you to look at the whole
15  thing but, it's a lengthy report by the British
16  Parliamentary Committee on Iranian freedom, is one
17  exhibit, but I direct your attention to the very
18  last Exhibit B, which is two pages.
19    A   Could you, please, mention the page
20  number.
21    Q   Turn to the very last two pages.
22    A   Is it 17 and 18?

Page 163

1     Q   The very last two pages of the document.
2     A   The page numbers are at the bottom.
3     Q   Well, if you look at the control numbers
4   at the bottom it's 0018 and 0019.
5     A   Yes, thank you, sir.
6     Q   Those are from a litigation numbering
7   system, if that helps.
8     A   Yeah, so what --
9     Q   Now, I take it you've not seen this letter
10  before?
11    A   I have not.
12    Q   And just assume, to speed things up, that
13  Lord Corbett of Castle Vale is a Member of
14  Parliament and the Chairman of the British
15  Parliamentary Committee on Iranian Freedom.  And he
16  wrote the United States Congress that a couple of
17  agents of the regime by the name of Massoud
18  Khodabandeh and his wife, Anne Khodabandeh, are,
19  along with a well-known lobbyist of the Iranian
20  regime, Trita Parsi, trying to persuade members of
21  Congress in favor of the Iranian regime.
22    A   Mm-hmm.

Page 164

1     Q   Now, assuming this is an authentic letter,
2   would a statement like that from a member of
3   parliament to the United States Congress be the sort
4   of thing in your mind that would have the effect of
5   degrading the character and identity of Trita Parsi?
6     A   No, because, unless I know the context of
7   the comment, the context of the letter, you know,
8   I'm not qualified to comment on it.  And when
9   writing these words I did not mention them lightly,
10  as lightly as you are asking me.  This was done
11  after close examination.
12    Q   Well, let me ask it this way.  Now that
13  you've seen this document, and let's assume for the
14  record that the affidavit given by Lord Corbett of
15  Caslte Vale and the letter that he sent in July of
16  2008 are authentic documents.
17        Would not the fact that a member of
18  parliament took the trouble to write the United
19  States congressman, a ranking member of the Foreign
20  Affairs Committee, to warn them that Trita Parsi is
21  a well-known lobbyist of the Iranian regime be
22  something that would have been important for you to

Page 165

1   review and evaluate in determining the reliability
2   of the statements and the sources that the Defendant
3   was utilizing in this case?
4     A   I don't think so.
5         MR. NELSON:  Objection.  Are you
6   representing that that was cited as a source of one
7   of his articles?
8         MR. KAPSHANDY:  No, the question was
9   simply:  Wouldn't it be important to have a document
10  like this in evaluating the reliability of the
11  Defendant's statements and the sources that he cited
12  in his reports?
13        MR. NELSON:  Well, he reviewed articles
14  and sources, and if that's not a source then it
15  wouldn't have been relevant for him to review it.
16        But you can answer the question if you are
17  able.
18        THE WITNESS:  I wanted to respectfully say
19  that just showing me a piece of letter is not
20  relevant to this discussion because I was assigned
21  to do something and here you have asked me very
22  focused questions about the scope and intent of my

42 (Pages 162 to 165)

Page 166

1   analysis, and I am here as a very independent person
2   trying to analyze all of this.
3       I have no interest in what other people
4   write about other people unless it's assigned to me
5   because I have no finger in this pie. I just want
6   to be independent, just to be of service to people
7   like you.
8   BY MR. KAPSHANDY:
9       Q   Well, wouldn't you want to evaluate all
10  the evidence, including what other persons other
11  than the Defendant have written about NIAC and Trita
12  Parsi and particularly their relationship with the
13  Iranian regime?
14      A   It's not relevant to what I was asked to
15  do, so that question is a needless question.
16      Q   Okay. That's fair. So even if you had
17  this document when you were writing your report,
18  it's your testimony that this sworn statement and
19  this letter from this member of parliament about
20  Trita Parsi and NIAC is irrelevant. Correct?
21      A   I cannot react to a conjecture. You said
22  "if." I'm not here to answer ifs. I'm here to

Page 167

1   answer direct questions.
2       Q   Well, you just said it was irrelevant.
3   I'm trying to determine how, when you look at a
4   document like this, you determine that it's
5   irrelevant and doesn't play into your evaluation as
6   to the reliability of the Defendant's sources --
7       A   I mentioned that if you really doubt it
8   that you read and view it and then you go deeper,
9   that that's what is intended. And so if you just
10  hold me a document which I had less than 2 minutes
11  and 30 seconds to look at, I cannot even tell you
12  what it is. I mean I -- you are asking me to act on
13  a lot of assumptions whether it's reliable, it's
14  done by this person. I need to do some research
15  before I try to find out.
16      Q   Well, that was my next question. Are you
17  saying that it's irrelevant or when you get some
18  evidence like this you really need to dig into it a
19  little more deeply to see how reliable such
20  testimony and letters from members of parliament
21  are?
22      A   Mr. Kapshandy, I said it was irrelevant

Page 168

1   because the task I was assigned to do, that did not
2   seem related to what I was asked to cover. I am not
3   evaluating the merit of the effort that you put into
4   share that document with me.
5       Q   When the Defendant wrote that Trita Parsi
6   established the first lobby group in the U.S. to
7   support the normalization of ties between Iran and
8   the U.S., what did you do to evaluate the
9   reliability of that statement?
10      A   Well, I'm not sure I saw that statement
11  the way you phrased it, so that question -- I don't
12  know where you got that phrase from. It's important
13  for us to realize that I looked at Defendant's web
14  site in which he had various articles and various
15  forms.
16      Q   Let me hand you what we'll mark as your
17  Deposition Exhibit 14.
18          (Aikat Deposition Exhibit Number 14 was
19          marked for identification.)
20  BY MR. KAPSHANDY:
21      Q   Which I'll represent for the record is an
22  article by Defendant from Iranian-Americans.com

Page 169

1   entitled NIAC and Trita Parsi's Internal Documents
2   1997 to 2001. And, first of all, I'll ask you, this
3   is one of the articles that Defendant wrote about
4   Trita Parsi that you evaluated?
5           (Witness reviews document.)
6           THE WITNESS: Could you, please, rephrase
7   your question, or could you please restate your
8   question.
9   BY MR. KAPSHANDY:
10      Q   Yeah. The first question is: Is this one
11  of the articles that you evaluated in reaching your
12  conclusions and preparing your report in this case?
13      A   This is not an article. This is a list of
14  documents or links to documents with written
15  annotations.
16      Q   There's annotations and headings.
17  Correct?
18      A   So it's not an article.
19      Q   Well, whatever you want to call it -- an
20  article, a collection of documents?
21      A   No, no, it's important. It's not what do
22  I want to call it.

43 (Pages 166 to 169)

Page 170

1    Q   Well, in your report, Exhibit 3, you state
2  that you reviewed documents, internal documents
3  accessed at the web site Iranian-Americans.com.
4  Right?
5    A   Mm-hmm.
6    Q   So my question is:  Is what we've marked
7  as Exhibit Number 14 something that you reviewed in
8  preparing your report in this case?
9    A   No, because my review was limited to
10  writings of the Defendant. This is not a writing of
11  the Defendant. There is a very distinct definition
12  in what I was given to analyze and what you are
13  placing before me. What you are placing --
14    Q   When the Defendant writes in his own words
15  in Exhibit 14 "IIC was founded in August 1997 by
16  Trita Parsi" --
17    A   Sir, could you please tell me what page
18  you are on.
19    Q   Page 2 of the document, Exhibit 14.
20    A   Yes, sir.
21    Q   -- "while conducting research on Iran for
22  U.S. Congressmen in Washington, D.C. in 1997 he

Page 171

1  recognized the necessity of establishing a lobbying
2  organization."
3        Those aren't --
4    A   Where are you? I'm sorry, I've lost you.
5    Q   The middle top half of page 2.
6    A   And what is the first?
7    Q   Under "History" where I just read IIC.
8    A   "IIC was founded in August of 1997 by,"
9  yeah, go ahead, sir.
10    Q   Now, those are not their NIAC's words,
11  they are the Defendant's own words. Correct?
12        MR. NELSON:  Objection, calls for
13  speculation, there's no foundation. Counsel is
14  proffering information as a witness here now.
15        THE WITNESS:  Sir, I wanted to
16  respectfully say that this is a list of
17  documentation with annotations or whatever by the
18  author. This is not an article.
19  BY MR. KAPSHANDY:
20    Q   Whether we call it an article or -- look
21  it, I don't want to play semantic games -- whether
22  we call it an article, a piece of paper, a blog,

Page 172

1  something posted on the Internet, I just want to ask
2  you the question --
3    A   I'm sorry.
4    Q   -- please let me finish.
5        Whatever you call it, did you review this
6  item which contains documents and annotations by the
7  Defendant --
8        MR. NELSON:  Objection. There's no
9  foundation for that.
10  BY MR. KAPSHANDY:
11    Q   -- in Exhibit 14? Did you review this at
12  the time?
13        MR. NELSON:  He already answered that.
14        MR. KAPSHANDY:  Well, I don't know what
15  the answer is.
16        MR. NELSON:  He said he did not. The
17  record is clear. And the document you've put
18  before him clearly says the date of the document
19  that you just read is June 1999 by Parsi, quote from
20  the original document which implies that this was
21  written by Parsi and not by the Defendant, so your
22  question is inappropriate.

Page 173

1  BY MR. KAPSHANDY:
2    Q   Did you review this document?
3        MR. NELSON:  Asked and answered.
4        THE WITNESS:  No.
5  BY MR. KAPSHANDY:
6    Q   Why not?
7    A   That's what I'm trying to explain to you.
8  Please try to understand my answer. You may be
9  looking for an answer, I cannot just make it up for
10  you.
11    Q   No, don't try to interpret my mind. My
12  question is very simple: Did you review this
13  document?
14        MR. NELSON:  Asked and answered.
15        THE WITNESS:  My answer is no.
16  BY MR. KAPSHANDY:
17    Q   And in your report on, which is Exhibit 3,
18  where you said that you reviewed information on the
19  web site Iranian-Americans.com by the same author,
20  my question is simply: How do we know what
21  documents on that web site posted there by the
22  Defendant you reviewed and which ones you did not?

44  (Pages 170 to 173)

Page 174

1    A   Are you done with your question?
2    Q   Yes.
3    A   Let me answer your question by saying what
4  I outlined very clearly that, and I mention that in
5  my report, that I analyzed writings, articles by the
6  Defendant. This particular document that you have
7  presented before me, it's not a writing or an
8  article. It's a list of documents.
9    Q   With annotations by the Defendant.
10 Correct?
11       MR. NELSON: Objection. There's no
12 evidence of that.
13       MR. KAPSHANDY: Okay.
14       MR. NELSON: You can't testify to that,
15 Counsel.
16       MR. KAPSHANDY: State proper objections,
17 please, Counsel.
18       MR. NELSON: Form of the question.
19 BY MR. KAPSHANDY:
20   Q   Do you understand that everything in here
21 was not written by Defendant and was written by
22 Trita Parsi?

Page 175

1        MR. NELSON: Calls for speculation.
2  BY MR. KAPSHANDY:
3    Q   Professor, I'm trying to understand your
4  methodology. When you said you reviewed stuff on
5  this web site, I want to understand what you
6  reviewed and what you made of it.
7    A   You know, it's funny that you keep asking
8  me the same question when my answer has not been
9  different. My answer, and I cannot explain it more
10 clearly, I mention in my report --
11   Q   In your report you said you reviewed the
12 internal documents from NIAC.
13   A   No, no.
14   Q   The bottom of page 2.
15   A   Yeah.
16   Q   "While researching this issue I found the
17 web site PAIC, Progressive American-Iranian
18 Committee, that addresses the NIAC internal
19 documents by the same author. The reading and
20 review was done over a period of three weeks May 8,
21 2010 through June 1, 2010."
22   A   Yes.

Page 176

1    Q   I'm not trying to be difficult. My
2  question is: In doing your methodology how does one
3  determine which of the documents and materials on
4  the PAIC web site you reviewed and utilized and
5  which you did not?
6    A   Well, in this case clearly this is not an
7  article or a writing. Just, if you compare to
8  exhibit, other exhibits, it is clearly not an
9  article, so your question does not relate to what my
10 report covered.
11   Q   Okay. So even though you cited the web
12 site, as I understand your methodology, when you
13 looked at this you said this isn't an article so I'm
14 not going to read anything in here. Correct?
15   A   My report also mentioned that my report is
16 restricted to analysis of English language
17 documents.
18   Q   Well, this is all English so let's stick
19 with the question. Okay?
20   A   No, that's fine, but what I'm trying to
21 say is you point out just one part of it, but the
22 first part I said "detailed readings and review of

Page 177

1  articles in English as written and presented on the
2  Defendant's web site." So what is the first point,
3  the independent research for this report was based
4  on, on the Defendant's web site which may be
5  accessed, "this reading and review was conducted,"
6  "While researching this issue I found," so this was
7  not something that was given to me to analyze. I
8  found the web site, whatever, the
9  Iranians-Americans.com, that addresses, so that
10 qualifies -- you know.
11   Q   I think I understand what you are saying,
12 you said you found the web site where a lot of the
13 --
14   A   Yes, sir.
15   Q   Let me finish, please.
16       -- where a lot of the Defendant's
17 materials, whether you call them articles or posts
18 or whatever you want, compilations of documents,
19 were posted by the same author, you say. And even
20 though you say the reading and review was done over
21 a three week period, we are now to understand that
22 you didn't read or make any use of anything posted

45 (Pages 174 to 177)

Page 178

1  on PAIC's web site. Correct?
2      A   The PAIC's web site that, that is a
3  qualifier. Please try to pay attention to that
4  statement. I found the web site, PAIC
5  Progressive-American Committee, and it mentions the
6  website that, so that qualifies the web site,
7  addresses NIAC documents by the same author, so
8  that's a statement of fact, which I do not deny.
9  The reading and review of the web site was done over
10 a period of three weeks, so it's very clear.
11     Q   Okay. My question is real simple.
12     Did you review any of the postings,
13 documents, materials, whatever you want to call
14 them, on the web site PAIC as indicated here on
15 pages 2 and 3 or not? Just yes or no.
16     MR. NELSON: Objection, form of the
17 question.
18     THE WITNESS: No. I mention it, I found
19 the web site that addresses, so I'm making a mention
20 of it in the report. Please, just let us be clear
21 about this, because I don't want you to feel that
22 I'm not answering your question adequately or

Page 179

1  evading it because it is what it is. The
2  independent research for this report was based on, I
3  mentioned here in the first bullet "detailed reading
4  and review of articles in English as written and
5  presented on the Defendant's web site." If I had
6  done detailed reading and review of all the articles
7  on Iranian-American, I would have stated that,
8  wouldn't I? I did not.
9  BY MR. KAPSHANDY:
10     Q   Well, I appreciate the clarification --
11     A   Yes, sir.
12     Q   -- but it's my understanding that you had
13 read --
14     A   No, I think your understanding was
15 incorrect.
16     Q   Let me finish my question, please.
17     My understanding from reading this and
18 your previous testimony was that you had reviewed
19 and relied upon documents and materials on the PAIC
20 web site that were posted there by the Defendant.
21     Now, my next question is: Under your
22 methodology wouldn't it have been of interest to

Page 180

1  look at the actual documents that had been posted
2  there by the Defendant in this case almost every
3  single one of them from Trita Parsi in determining
4  the reliability of his conclusions and his
5  methodology?
6      A   No.
7      Q   So when in Exhibit 14 the Defendant posts
8  on the PAIC web site documents from Trita Parsi
9  where he says that "IIC's main objective is to
10 safeguard Iran's and Iranians' interests" --
11     A   Sir, which page are you on?
12     Q   Page 2 of Exhibit 14 quoting exactly from
13 Trita Parsi's curriculum vitae.
14     A   Which line?
15     Q   A third of the way down under Objectives.
16     A   Objective. I see it, yes, I'm with you,
17 sir.
18     Q   And then on the next page which started
19 this whole line of questioning where he quotes from
20 Trita Parsi's resume, page 3, very top, "established
21 the first lobby group in the U.S. to support the
22 normalization of ties between Iran and the U.S.,"

Page 181

1  this is not information that would have been of
2  interest to you in evaluating the Defendant's
3  conclusions and methodology in this case?
4      A   No.
5      Q   Okay. That's fair. Let's put that aside.
6  Oh, one other thing while we are on Exhibit 14, did
7  you happen to notice when you were looking at this
8  web site, if you go to page 6 or 7, also leaves
9  space for people to post comments, and there's
10 varying comments on both sides of the issue?
11     Did you notice that?
12     A   No.
13     Q   Exhibit 13, we'll mark this as Exhibit 13,
14 again, from the PAIC web site Iranian-Americans web
15 site for you --
16     A   I want to keep the order correct for you.
17 14, so we are done with 14?
18     Q   Yes. We are done.
19     (Aikat Deposition Exhibit Number 13 was
20     marked for identification.)
21     THE WITNESS: We are missing 11.
22     MR. KAPSHANDY: It's the invoice. It

46 (Pages 178 to 181)

Page 182

1    should be in there.
2         THE WITNESS: Oh, I'm sorry.
3         MR. KAPSHANDY: We'll re-collate them when
4    we are all done.
5         THE WITNESS: Yes, you are right. 11 and
6    12. You just gave us 13, right?
7         MR. KAPSHANDY: Right.
8         THE WITNESS: Yes, okay. Okay.
9    BY MR. KAPSHANDY:
10        Q    Okay. Do you have Exhibit 13 in front of
11   you now?
12        A    Yes.
13        Q    And, for the record, I will represent that
14   this is a posting pulled off of
15   Iranian-Americans.com dated December 10, 2009, but
16   printed off of the web site in June of 2010
17   entitled, Trita Parsi's Communications with M. Javad
18   Zarif, Ahmadinejad's Ambassador to the United
19   Nations, and ask you, first of all, was this one of
20   the documents you reviewed in preparing your report
21   in this case?
22        A    No.

Page 183

1         Q    And, again, as with the previous exhibit
2    that we marked as 14, we are to understand that you
3    didn't review these documents and annotations posted
4    by the Defendant on the PAIC web site. Correct?
5         A    Yes.
6         Q    And, again, wouldn't it have been of
7    interest to you in your methodology and evaluating
8    the reliability of the Defendant's sources to read
9    these original communications between Trita Parsi
10   and Iran's ambassador in 2006 and 2007?
11        A    No.
12        Q    In your Professor Aikat methodology where
13   do you draw the line as to how to decide what
14   evidence to review and what evidence not to review,
15   particularly when we are talking here about original
16   documents from the Plaintiff?
17        A    I have already answered that question, but
18   for your benefit and for the third time let me
19   answer that. I was asked to analyze the articles on
20   the Defendant's web site Iranianlobby.com, and
21   that's what I did. So any other web site is not
22   relevant, but I did mention that I found another web

Page 184

1    site. If that threw you off, I'm sorry, but I think
2    I made a very clear statement in my report about
3    what I analyzed.
4         Q    So, again, just to be clear, you didn't
5    independently review editorial comments that were
6    provided to the Defendant by others with experts in
7    Iranian-American relations such as Michael Ruben or
8    Kenneth Timmerman?
9         A    No, I just wanted to make a point that
10   could we take a break in 15 minutes because it's
11   been about an hour.
12        Q    We can take it whenever it's your
13   pleasure.
14        A    No, whenever it's your pleasure. I just
15   wanted to mention by 2:30 if you could take a little
16   break.
17        Q    That's fine.
18        A    But, yes, to answer your question, no.
19        Q    At the bottom of page 4 of your report you
20   cite again to the Society of Professional
21   Journalists code, "Distinguished between advocacy
22   and news reporting analysis and commentary should be

Page 185

1    labeled not" misrepresented -- not "misrepresent
2    fact or context." Correct?
3         A    Yes.
4         Q    And that, again, is from the SPJ code?
5         A    Yes.
6         Q    Now, does anywhere in Hassan's writings,
7    and I understand you've only looked at the ones on
8    Iranianlobby.com, does he purport that he's engaging
9    in news reporting and not doing anything other than
10   advocacy or opinion, if you want to call it?
11        A    I think the problem that I found was the
12   Defendant fails to distinguish between advocacy and
13   news reporting. And, you know, it was kind of such
14   a misrepresentation of context and fact because --
15   and let me take a minute to explain news reporting.
16   News reporting is stating a fact saying that, Hey,
17   somebody got killed in a road accident. That's news
18   reporting, to report what is happening.
19        But to get into the other side, which is
20   advocacy is to say, Hey, this is why it happened.
21   So I think the SPJ, the Society of Professional
22   Journalists, wants to make it clear that when people

47 (Pages 182 to 185)

Page 186

1   are writing articles such as, that we analyzed and
2   that's on our web site, they distinguish between
3   advocacy and news reporting. And one should not
4   pretend as the other. And in my analysis I really
5   found that it was kind of that gray way of doing
6   things where nobody could distinguish what is going
7   on and so it led to, I think, a misrepresentation of
8   the real truth and the fact.
9       Q    Just taking Exhibit 10 for example, if you
10  want to pull it up.
11      A    Exhibit 10, yes, sir.
12      Q    The Iranian Regime's Web of Influence, A
13  Money Trail. Now, do you have it? I have an extra
14  copy if you want.
15      A    Yes, sir, I have it right in front of me.
16      Q    A number of things in here are stated as
17  facts. Correct? Let's take, for example, Building
18  Iran's web of influence in the U.S. the first
19  paragraph on page 1 states: "Atieh Bahar is an
20  influential enterprise in Iran which along with some
21  of the notorious factions of the regime is a partner
22  and/or contractor in major oil, industrial or

Page 187

1   financial projects of the country. Siamak Namazi is
2   the managing director of this company which his
3   family owns." Footnote 2.
4           And if you go to Footnote 2, it footnotes
5   see Iran's Oil Mafia, an article in
6   intellectualconservative.com, which references other
7   documents collected by the Defendant to support that
8   assertion.
9           Now, my question is, when you read this
10  paragraph which purports to be factual, does it not?
11      A    I cannot make a judgment just by reading a
12  paragraph if it purports to be factual.
13      Q    I understand that. My question for you
14  is: In applying your methodology what did you do to
15  evaluate the reliability of the sources that the
16  Defendant cites in Footnote 2 which, in fact, refer
17  to a number of other documents prepared by the
18  Defendant, including a multipage PowerPoint
19  presentation referencing lots of information on
20  Atieh Bahar? How did you evaluate that statement?
21      A    Sir, I think there is -- and I'm glad you
22  raised this, because there is a primary distinction,

Page 188

1   or there's an important distinction between a
2   primary source and a secondary source. Okay? A
3   primary source is, if you want to know the
4   president's health policy, you refer to the
5   president's health policy and you say, Hey, this is
6   what is recommended in the president's health
7   policy.
8           The other way to cite about a health
9   policy is to go to a commentary on the president's
10  health policy. The second is a secondary source and
11  the first is a primary source. That's the basic
12  tenet of any journalism. And if I were to look at
13  this statement you said that it was a statement of
14  fact and it is supported, supposedly, by 2. And
15  what does Footnote 2 refer to, it refers to a second
16  resource. And that's doubtful.
17      Q    Did you look at Footnote 2? I mean did
18  you actually --
19      A    As I said, I did not read this article,
20  but as I am looking at this Footnote 2, as you
21  could, it basically is an article, as you pointed
22  out intellectualconservative.com, which by any

Page 189

1   stretch of the imagination is not a primary source.
2       Q    Are you aware that Footnote 2 is another
3   article by the Defendant which contains dozens of
4   other references, and it was a shorthand way of
5   citing the previous article if the reader took the
6   trouble to go and look at it and then could in turn
7   click on all the other references that he cited in
8   that article?
9           MR. NELSON: Objection to the form of the
10  question, compound, assumes facts not in evidence.
11          THE WITNESS: Could you, please, restate
12  your question.
13          MR. KAPSHANDY: Could you reread it,
14  please.
15          (The record was read aloud as follows:
16          "QUESTION: Are you aware that Footnote 2
17          is another article by the defendant which
18          contains dozens of other references, and
19          it was a shorthand way of citing the
20          previous article if the reader took the
21          trouble to go and look at it and then
22          could in turn click on all the other

48 (Pages 186 to 189)

Page 190

1     references that he cited in that
2     article?"
3          THE WITNESS:  Well, this is a loaded
4  question, and I don't think that I should be
5  answering any of these questions because this
6  question puts a lot of qualifiers in it that are not
7  relevant to my expertise or what I am assigned to do
8  or what I'm here for.  So if you would, please,
9  rephrase that question in much more simpler, direct
10 terms, I would be happy to answer one, two or three
11 questions.  But I simply cannot answer this question
12 the way it is phrased, and I'm sorry.
13 BY MR. KAPSHANDY:
14     Q    Well, Professor, you previously said that
15 none of the references cited by the Defendant
16 support the assertions he is making.  And I wanted
17 to ask you when making that statement in performing
18 your methodology here when you saw Footnote 2 that
19 had a hot link to another article by the Defendant
20 what, if anything, did you do?  I think you've just
21 told us you didn't look at it.  Right?
22          MR. NELSON:  Objection.  He said he didn't

Page 191

1  review this article.
2          THE WITNESS:  I said I didn't review this
3  article, but let's say, if I'm going to play with
4  you and say that I looked at a citation such as you
5  mentioned, sir, I would question this because of the
6  exact nature of the source that I mentioned.
7  Primary source or secondary source.  This is a
8  secondary source, and, therefore, unreliable.
9  BY MR. KAPSHANDY:
10     Q    But if you don't even look at it, you
11 can't tell us what is in it, can you?
12          MR. NELSON:  Objection, calls for
13 speculation.
14          THE WITNESS:  Obviously, this was not an
15 article I looked in.  You are asking me an "if"
16 question.  And, as I said, an if question cannot be
17 properly answered because it's a question about what
18 would happen if.  And I want to be fair to you, I
19 want to be fair to your time.  I mean we could be
20 here all night answering if questions.
21 BY MR. KAPSHANDY:
22     Q    If you turn to Exhibit 12 which is an

Page 192

1  archive of all of the Defendant's articles posted on
2  the web site you will see one listed there entitled
3  Iran's Oil Mafia?
4     A    Where is it listed?
5     Q    Under the archives.
6     A    Is it listed on the page 1, sir?
7     Q    It's about six up from the bottom on page
8  2.
9     A    Yes, I see it, Iran's Oil Mafia
10 Penetrating the U.S. Political System.
11     Q    So you are saying you didn't review that
12 article?
13     A    No.
14     Q    Even though it's cited in the Plaintiffs'
15 Complaint in this case and allegedly is defamatory,
16 you, as part of your methodology in determining
17 whether the Defendant complied with various duties,
18 didn't look at one of the articles they cite in his
19 complaint?
20     A    Yes.
21     Q    Okay.  That will speed things up.
22          Turning to page 5 of your report under the

Page 193

1  section "Act Independently," you cite several other
2  provisions of the SPJ code including, "Avoid
3  conflicts of interest, real or perceived" and three
4  or four others.  "Be weary of sources offering
5  information for favors or money; avoid bidding for
6  news."  And you've obviously included that for some
7  reason.  And my question for you is:  Do you have
8  any evidence that Hassan was paid by any
9  organization, took any money, or is engaged in any
10 conflict of interest which violates the SPJ code?
11     A    I respectfully want to point out that your
12 question has many parts, could you, please divide
13 your question into specific parts so that I can
14 address each aspect in a way that is fair to you and
15 to me.
16     Q    Sure.  Do you have any evidence that he
17 accepted favors or money?
18     A    No.
19     Q    Do you have any evidence that he engaged
20 in conflicts of interest?
21     A    Yes.
22     Q    Other than reading the articles, what

49  (Pages 190 to 193)

Page 194

1  would that be?
2      A   Well, in reading the articles, and if you
3  read his bio, it almost seems like he has a finger
4  in this pie in terms of, you know, trying to
5  critique the NIAC and Parsi.
6      Q   Well, my question was, other than reading
7  his articles, do you have any evidence that he's
8  engaged in any conflicts of interest?
9      A   I do not have evidence, but reading the
10  articles gave me a feeling that there could be a
11  possible conflict of interest, you know, in the mind
12  -- conflict of interest as relating to the Defendant
13  and his motivation to his writings.
14      Q   Well, as an expert in journalism how do
15  you look at somebody's writings and what is your
16  methodology in coming up to a conclusion that
17  somebody is engaging in a conflict of interest just
18  from looking at what they're writing?
19      A   Sir, you do that all the time. If you own
20  shares in a company and you are writing a stock
21  market column, it is expected that you state that,
22  okay, I own shares in the company or something like

Page 195

1  that. That's an example that you and I can
2  understand and relate to.
3          In this context, if you read, you don't
4  have to go very far than to read the bio of the
5  Defendant to realize that he seems to have an
6  interest in trying to influence his readers to have
7  a negative perception or whatever, to have an odd
8  perception, a negative or degrading perception of
9  NIAC and Trita Parsi.
10      Q   I'm having trouble following because
11  pretty much all columnists have a strong interest in
12  having people believe what they write, do they not?
13      A   That's -- you said "all." My answer is
14  no.
15      Q   Well, generally.
16      A   My answer is no.
17      Q   Okay. Give me examples of journalists who
18  don't have an interest in people believing what they
19  write?
20      A   I'm not going to give you an example
21  because that would be referring to people that are
22  out of context, but the preamble of the SPJ code

Page 196

1  that I cite in my report states, "public
2  enlightenment is the forerunner of justice and the
3  foundation of democracy. The duty of the journalist
4  is to further those ends by seeking truth and
5  providing a fair and comprehensive account of events
6  and issues. Conscientious journalists from all
7  media and specialties strive to serve the public
8  with thoroughness and honesty. Professional
9  integrity is the cornerstone of a journalist's
10  credibility."
11          So that is what I meant by a conflict of
12  interest. There is obviously -- you know, you asked
13  me that what method I followed in analyzing this,
14  when you are looking at these articles, you know,
15  any journalist or any reader tries to find the voice
16  of the writer, because that's what they are
17  conveying. And in finding that, I had reasons to
18  believe that just from reading the writings as
19  presented that the Defendant nursed some interest in
20  this.
21      Q   Other than --
22      A   -- which it did not state.

Page 197

1      Q   Other than the Defendant's strong interest
2  in having people believe what he's writing, do you
3  have any other evidence that the Defendant has
4  engaged in conflicts of interest?
5          MR. NELSON: Objection to the form of the
6  question. That's your characterization of his
7  testimony.
8          THE WITNESS: Can you, please, restate
9  your question.
10  BY MR. KAPSHANDY:
11      Q   Other than the Defendant's interest in
12  having people believe what he is writing, can you
13  cite any other evidence that the Defendant engaged
14  in conflicts of interest violating the SPJ code?
15          MR. NELSON: Same objection, form of the
16  question.
17          THE WITNESS: I think you are trying to
18  put together two things. It would be better if you
19  separated because you are asking me to -- so could
20  -- may I request you, respectfully, to rephrase your
21  question, because I think you are trying to draw
22  upon an important point which I want to share with

50 (Pages 194 to 197)

Page 198

1  you, but the way you phrase your question it would
2  be difficult for me to answer truthfully.
3     BY MR. KAPSHANDY:
4        Q   Look. Professor, so far when asking for
5  specific evidence of conflict of interest you've
6  said that the Defendant has a strong interest in
7  getting people to believe what he's written and
8  nothing else. And I'm just asking you for
9  completeness sake --
10       A   I think --
11       Q   Let me finish, please. I'm asking you for
12 completeness sake, other than that, from your own
13 admitted review of only part of his writings, do you
14 have any other evidence that the Defendant has
15 engaged in conflicts of interest violative of SPJ's
16 code of ethics?
17       MR. NELSON: Same objection,
18 mischaracterizes the witness's testimony.
19       THE WITNESS: Could you, please -- I mean
20 I'm having a difficult time tracking your question.
21 I think you are mentioning three things at the same
22 time. If you would, please, mention it in specific

Page 199

1  ways, I will be happy to document what you are
2  looking for.
3     BY MR. KAPSHANDY:
4        Q   Other than your reading of the Defendant's
5  articles, part of them, which you say leads you to
6  conclude because of his strong interest in having
7  people believe his position do you have any specific
8  --
9        A   No, that phrase, I don't know what you are
10 saying. I mean I don't understand your phrase, sir.
11       MR. NELSON: Objection, I'll restate my
12 objection now four times.
13    BY MR. KAPSHANDY:
14       Q   Let me start all over again.
15       What specific evidence do you have that
16 the Defendant has engaged in some sort of conflict
17 of interest violative of the SPJ cold of ethics?
18 I'll give you a chance to start over.
19       A   As I mentioned that the Defendant has in
20 his writings reflected a deep interest, and I'm not
21 making any of these words lightly, a deep interest
22 in degrading NIAC and Parsi. That's the conclusion

Page 200

1  I had after reading the articles.
2        Q   And my question is, using the
3  Professor Aikat methodology, how then do you get to
4  the conclusion from that that the Defendant has
5  engaged in a conflict of interest other than he
6  simply believes what he wrote?
7        A   Believing what you write is not enough. I
8  think in this case the Defendant has authored
9  articles that tries to degrade NIAC and Parsi in a
10 way that reflects a conflict of interest because the
11 Defendant does not state or clarify his interest in
12 this situation as exemplified by my example of
13 somebody owning a stock and recommending that stock.
14       Q   Okay. Well, who is paying the Defendant,
15 who is the person that's giving him this financial
16 gain that's affecting his ability to act objectively
17 --
18       A   Sir, your question --
19       Q   -- by owning a share of stock?
20       A   Your question is irrelevant. I did not
21 mention financial gain, and you are asking me about
22 financial gain.

Page 201

1        Q   Well, you are the one that raised just
2  like owning a share of stock and writing about the
3  company.
4        A   Yeah, but that does not talk about
5  financial gain. I never uttered the word financial
6  gain, so I wanted to respectfully state that your
7  question is something that --
8        Q   So your analogy to use of recommending a
9  stock that one owns or one does have a financial
10 gain if the article is relied upon is not
11 appropriate. Correct?
12       A   No. What I meant was, you have to clarify
13 -- let me give you another example. You are
14 criticizing the school superintendent and the school
15 superintendent happens to be your close friend. I
16 think it's the duty of the writer to say that, Hey,
17 I am criticizing this person but in real life he's
18 my close friend. That is what I was referring to.
19       So I had a very simple thing that I was
20 pointing out, not as complicated as financial gain
21 which I have no knowledge of.
22       Q   Okay. Well, I'll give you another chance.

51 (Pages 198 to 201)

Page 202

1  What is the particular interest, be it personal
2  interest, group or otherwise, that the Defendant is
3  doing the bidding of that he's not disclosed?
4      A   By, I got the feeling, and any reader who
5  is sensibly reading these articles by Defendant
6  would get the feeling, that this Defendant was out
7  to get, get this -- get NIAC and degrade NIAC for
8  their advantage. And the other thing, the conflict
9  of interest, which is something that I do not have
10  any knowledge of but I'm just sharing this in your
11  interest, that if this person is of the same origin,
12  like if he's also an Iranian-American, you know,
13  there is definitely a question of leadership because
14  here is a person who has some following or some
15  existence by own admission of the Defendant and the
16  Defendant is trying to degrade that person. So that
17  reflects upon conflict of interest. I am not going
18  to get into the merits of that conflict of interest.
19         I think the section says act independently
20  and it says avoid conflicts of interest. And in
21  this case where these conflicts of interest could
22  not be avoided and there's another phrase, "real or

Page 203

1  perceived," I think that person should do well to
2  state it.
3      Q   Well, again, my question is, other than
4  having strong disagreements with the positions that
5  are taken by the Plaintiffs, who or what is this
6  outside group that the Defendant is doing the
7  bidding of which is clouding his ability to be
8  objective?
9      A   I cannot answer that question because I
10  did not have enough knowledge from my reading of the
11  reports to say that.
12      Q   Back to Exhibit 10, for example. When you
13  see something written like "Atieh Bahar is an
14  influential enterprise in Iran," can you tell me who
15  Atieh Bahar is after having done all of that
16  research and evaluated the reliability of the
17  Defendant's sources?
18      A   Can you, please, repeat your question.
19      Q   Yeah. When you read an article where the
20  Defendant refers to Atieh Bahar as an influential
21  enterprise in Iran, my question for you is: What
22  did you do to evaluate that? Who is Atieh Bahar?

Page 204

1  Tell us in your own words who is Atieh Bahar?
2      A   As I said, this is, again, an if question.
3  I did not read this article so I am not in a
4  position to answer your question.
5      Q   Well, Atieh Bahar is mentioned in about
6  ten of the articles. So when you see the word Atieh
7  Bahar and its director, Siamak Namazi, what does
8  that tell you in evaluating the reliability of what
9  the Defendant has written about Atieh Bahar?
10      A   I think that question has no relevance
11  here because you are asking me again an if question.
12      Q   No, I'm just asking you what you did when
13  you saw the words, Gee, Atieh Bahar and Siamak
14  Namazi. That seems to have some importance to the
15  Defendant in reaching his conclusion. I better find
16  out who or what those organizations are and what
17  their relationship is with the Iranian regime.
18         MR. NELSON: Objection, no foundation for
19  the question.
20  BY MR. KAPSHANDY:
21      Q   Maybe you didn't do that, as counsel
22  suggests. When you looked at those names, did you

Page 205

1  do anything to figure out what those were and what
2  their connection was to the Iranian regime?
3         MR. NELSON: Objection, no foundation for
4  the question.
5         THE WITNESS: In the articles that I read
6  I did that review which is what led me to the
7  conclusion that is outlined in the report, but you
8  are, again, asking me a question that is based on
9  conjecture and speculation and I'm not in a position
10  to answer that question.
11  BY MR. KAPSHANDY:
12      Q   As you are sitting here today you can't
13  tell us when you read these articles, every single
14  one of them which are cited in the complaint
15  referred to Siamak Namazi and Atieh Bahar, what
16  investigation you did in evaluating what the
17  Defendant was saying about and relying upon when he
18  wrote about these connections with these individuals
19  and organizations?
20      A   I already answered your question.
21      Q   Did you read the article that Trita Parsi
22  co-authored in 1999 with Siamak Namazi about the

52 (Pages 202 to 205)

Page 206

1    need to establish a lobby organization that was
2    presented in Cypress?
3        A   No, I did not.
4        Q   If you were evaluating what the Defendant
5    had written about Trita Parsi's acting as a lobbyist
6    on behalf of Islamic Republic of Iran, wouldn't it
7    have been important to read in the Plaintiff's own
8    words what he had described about the need to set up
9    a lobby organization in 1999?
10       A   Again, I respectfully wish to submit that
11   this is an if question, and I'm not here to answer
12   if questions.
13       Q   Well, it's an actual document cited by the
14   Defendant in one of his articles. Didn't you go to
15   the hot link? It wasn't that hard.
16       A   I'm sorry.
17       Q   Let me finish.
18           MR. NELSON: No foundation. You haven't
19   pointed to what article you are referring to. It's
20   counsel's speculation.
21           MR. KAPSHANDY: And, Counsel, you know
22   that's false.

Page 207

1            MR. NELSON: No, because he's already
2    testified to some of the articles that he's reviewed
3    and some he has not. So you could be referring to
4    an article that he did not review. This is
5    confusing because you are not pointing to any
6    particular articles.
7    BY MR. KAPSHANDY:
8        Q   When in Hassan Daioleslam's writings he
9    refers to a 1999 article by Trita Parsi and Siamak
10   Namazi on the need to set up a lobby organization
11   and it's in Iran's Web of Influence which you do
12   cite, what use did you make of that? Did you not
13   even bother to read the article?
14       A   I did not mention Iran's Web of Influence.
15   I mentioned, and I wanted to do this for your
16   benefit, detailed readings and review of articles in
17   Iranlobby.com. I think you are misquoting me, sir.
18   Please don't do that, because I'm here to help you.
19           I'm not here to answer questions that do
20   not have any basis in what we are trying to do here.
21   I know what you are trying to find out, but that
22   simply is a supposition and I'm not here to suppose

Page 208

1    if or say when things happened.
2        Q   Okay. Well, it is about 2:30, and you
3    requested to take a break, so why don't we take our
4    break and resume in about 10 or 15 minutes.
5        (A recess was taken -- 2:24 to 2:40 p.m.)
6            MR. KAPSHANDY: Back on the record.
7    BY MR. KAPSHANDY:
8        Q   Professor, you understand you are still
9    under oath?
10       A   Yes.
11       Q   And before the break we were talking about
12   a 1999 article that Trita Parsi co-authored with
13   Siamak Namazi, and the question came up as to where
14   the Defendant referred to it. And I would, again,
15   direct your attention to Exhibit 9 that you
16   previously marked in this case. I'll help you get
17   it, if I can reach them.
18           (Document tendered to the witness.)
19   BY MR. KAPSHANDY:
20       Q   I hand you, again, Exhibit 9 which I
21   understand was one of the Defendant's, allegedly,
22   defamatory articles that you did review. And direct

Page 209

1    your attention --
2        A   I did not review this.
3        Q   You previously said that you did.
4        A   I'm sorry, I didn't.
5        Q   Iran's Oil Mafia, which is named in the
6    Defendant's case, as a defamatory article --
7        A   I said I did not review. I don't want you
8    to feel otherwise. You remember you cited that
9    quote?
10       Q   Well, we know you didn't review Exhibit 10
11   which was another allegedly defamatory article.
12       A   I did not review Exhibit 9, and I already
13   answered previously, as your notes will indicate.
14       Q   Well, again, back to the beginning. When
15   you look at Iranianlobby.com in preparing your
16   report to assess the Defendant's methodology as to
17   whether he complied with various standards, don't
18   you think it would have been important to read the
19   Defendant's articles and, in this case, all of the
20   37 references that he cited in this article?
21       A   Again, this is an if question, sir, please
22   --

53 (Pages 206 to 209)

Page 210

1      Q   No, the question is:  Wouldn't it have
2   been important?  I'm not asking you if.  I'm trying
3   to understand as a very interested student who wants
4   to apply the Professor Aikat methodology in
5   determining whether a journalist is violating
6   standards, is how you decide when there's an article
7   posted on the Defendant's web site that's allegedly
8   defamatory, according to your client, how you decide
9   whether to read it or not?
10     A   I -- first of all, you said according to
11  my client.  I do not have a client in here.  What do
12  you mean by that?
13     Q   Well, let's assume that you were paid by
14  the Plaintiffs in this case to address the questions
15  raised in their letter to you of May 17th, 2010.
16     A   I'm not interested who is paying me.  I
17  have a duty here, and I feel committed to both, both
18  -- you know, the spirit of what is going on here.  I
19  don't care who pays what.
20     Q   Okay.  But the point is, even if you are
21  doing it for free, if you are here under oath --
22     A   No, it's not a question of doing it for

Page 211

1   free -- just a minute.
2      Q   Let me finish the question, please, then
3   you can answer.  Okay?
4          Putting aside whether you're paid $400 an
5   hour or doing it free, we are interested in knowing
6   that someone who wants to test the reliability and
7   apply the Professor Aikat methodology to evaluate
8   the Defendant's conduct as to whether he's complied
9   with journalistic standards, when you look at his
10  web site and you see his Exhibit 9, a lengthy
11  article he's written with 37 references calling the
12  Plaintiff a member of Iran's oil mafia, how do you
13  decide in applying your methodology to even look at
14  the Defendant's article or not?
15     A   I think I've already answered this
16  question before.  And, as I said, that one of the
17  things that would strike you in this case is that
18  there is no definite set of documents that you are
19  looking at, unless I'm informed otherwise.  So I was
20  asked to look at Iranianlobby.com, and, as I have
21  mentioned to you, I did, and this was not one of the
22  articles I looked at.

Page 212

1      Q   Okay.  I understand that you didn't look
2   at it.
3          Now, my question is, in applying your
4   methodology when you get a mandate from the
5   Plaintiffs' lawyers asking you to evaluate the
6   Defendant's conduct as to whether he complied with
7   the journalists' standard of care and they cite in
8   their Complaint, which they gave you a copy of, this
9   article, Exhibit 9, Iran's Oil Mafia, how is it that
10  somebody else wanting to apply your very same
11  methodology and come up with similar results
12  presumably can look at an article like this and say:
13  I don't need to look at this in order to reach a
14  conclusion?
15         Do you see what I'm getting at?
16     A   No, I don't think that's a fair question.
17     Q   Well, we are going to have to explain to
18  the Court how it is that you can express an opinion
19  as to whether Defendant's writings comply with
20  journalistic standards of care when you haven't even
21  read one of the major articles that the Plaintiffs
22  cite in their complaint as being defamatory?

Page 213

1      A   There is a very simple answer to that
2   question.
3      Q   I can't wait to hear it.
4      A   If you are dealing with this cite
5   objectively, which I did, I was not under a specific
6   directive that I analyze this article and that
7   article.  I was asked to go to Iranianlobby.com, and
8   I think that reflects the objectivity, the strength,
9   and the independence of the researcher that I was
10  not given a specific mandate in terms of you look at
11  five articles, then we will be done.  So I was asked
12  to go into Iranianlobby.com -- please try to
13  understand this -- and then try to see whether the
14  author or the Defendant was conforming to these
15  three standards.
16         And so what I did was, you know, to be
17  fair to everybody, nobody told me who this Defendant
18  is or who the Plaintiff is except to just give me a
19  rough idea about the web site.  I want you to
20  understand it.  In the earlier question, which I do
21  not appreciate, you are mentioning the fees I am
22  paid which is irrelevant to this situation.  I

54  (Pages 210 to 213)

Page 214

1  explained to you, I took the trouble to explain to
2  you that this, I considered this as an academic
3  project. And if you are going to refer to that, let
4  us address that as a separate question, but I do not
5  appreciate the spirit of your question in referring
6  to words such as "client" and the "rate." We are
7  not discussing rates here. If you are, let's have a
8  separate discussion.
9      Q    Look, I understand the Plaintiffs and
10  their lawyer didn't tell you to ignore Exhibit 9.
11  My question for you is whether --
12     A    It's not a question of ignorance, it's a
13  question of objective analysis.
14     Q    Great. Now --
15     A    Which is a requirement of research.
16     Q    Let's say somebody wants to replicate your
17  methodology and they want to objectively evaluate
18  whether the Defendant is complying with journalistic
19  standards, and he goes to the Defendant's web site
20  and he sees this article entitled Iran's Oil Mafia
21  which discusses NIAC and Trita Parsi on every page
22  and is cited by the Plaintiffs in their complaint as

Page 215

1  a defamatory article. How does somebody applying
2  this methodology say, you know, I don't need to look
3  at that article in order to reach a conclusion?
4  That's all I'm asking.
5      A    Mr. Kapshandy, your question has a very
6  simple answer. Your question assumes that there is
7  one research method to what we are trying to find.
8  I mean there could be five ways, five research
9  methods to investigate the same thing.
10         I used the research method which, as luck
11  would have it, did not go by the directives of the
12  complaint. And I think you should feel happy and
13  proud about this, that I was not biased by any of
14  the complaints. I looked at that cite objectively,
15  I went and looked at those articles, and, you know,
16  I filed my report.
17         I don't think you are alluding to an Aikat
18  method of research makes any sense, because I used
19  the research method that was established, and it
20  tried to be fair and balanced, which was my
21  intention.
22     Q    Well, I think that helps speed things up a

Page 216

1  lot because what we now know for sure is that the
2  articles which we've marked as Exhibits 9 and 10 by
3  the Defendant, which you did not read, you are not
4  in a position to state whether those comply with the
5  journalistic standards that you describe in your
6  report, obviously, not having read them. Correct?
7      A    I answered that earlier.
8      Q    Okay. Great. Staying with -- and I think
9  that will speed things up greatly -- but staying
10  with Exhibit 9, directing your attention just for
11  completeness sake to the article we were referring
12  to previously, could you look at Exhibit 9.
13     A    Can you give me -- Exhibit 9 is right
14  there. All my exhibits are listed here.
15     Q    You may still have it.
16     A    Okay. I'm sorry.
17     Q    No problem.
18     A    Go ahead. It was hiding under that.
19     Q    Referring to the footnotes at the back?
20     A    Mm-hmm.
21     Q    Directing your attention to Footnote 26
22  which, for the record, is entitled Iran-Americans,

Page 217

1  The Bridge Between Two Nations in DAPIA conference
2  Cypress November 1999, I believe you answered this,
3  but just so the record is complete, you did not
4  review that article in rendering your report or
5  opinions in this case?
6      A    Yes.
7      Q    And just for completeness sake, and I'm
8  going to give you one more chance. I'm going to
9  hand you what we'll mark as Exhibit 16 which is that
10  article which is footnoted by the Defendant in
11  Exhibit 9. Just give you another chance and ask you
12  did you review Exhibit 16 in rendering your opinions
13  in this case?
14         (Aikat Deposition Exhibit Number 16 was
15         marked for identification.)
16         THE WITNESS: No, I was not required to.
17  I was not asked to.
18  BY MR. KAPSHANDY:
19     Q    Great. And put the originals back in the
20  file there.
21         MR. NELSON: Do you have a copy of
22  Exhibit 16 for me?

55 (Pages 214 to 217)

Page 218

1          MR. KAPSHANDY:  No, but we can get you one
2    if you want.  Do you want one, Counsel?
3          MR. NELSON:  Please.
4          MR. KAPSHANDY:  Sure.
5          THE WITNESS:  And could I also get a copy
6    of all the exhibits?
7          MR. KAPSHANDY:  You certainly may.
8          THE WITNESS:  Okay.  I can give you my
9    address if you can mail me or --
10          MR. KAPSHANDY:  Counsel will take care of
11    that for you.  Okay.
12          THE WITNESS:  Okay.
13          MR. KAPSHANDY:  It's probably not
14    appropriate for us to communicate with you
15    directly.
16          THE WITNESS:  Well, you could.
17          MR. KAPSHANDY:  As much as I'd like to.
18          THE WITNESS:  You could.  I want to make a
19    statement here, if I'm allowed to.  I saw this as a
20    project which should benefit the case.  I did not
21    care about who was paying me or who was not paying
22    me, fully knowing, like Miss Bessie asked me to take

Page 219

1    an oath, that was my only motivation, to be truthful
2    and honest in what I was trying to do.  And I hope
3    we all appreciate that.
4    BY MR. KAPSHANDY:
5          Q    I think we appreciate your frankness and
6    enthusiasm, and would like to also state for the
7    record that I think your cooperation has been and
8    you have been personally a pleasure to deal with
9    here today.  I just have a few more questions and we
10    are going to get copies of some things that counsel
11    has requested.  So why don't we hand you what I'll
12    mark, just to wrap up here, as Exhibit 17, the
13    article I referred to earlier.
14          (Aikat Deposition Exhibit Number 17 was
15          marked for identification.)
16    BY MR. KAPSHANDY:
17          Q    And just for completeness sake, I'll ask
18    you if you've ever seen this document before which
19    is a 2000 June 18 -- strike that.  It's an
20    October 16, 2000 article from WorldNetDaily
21    reprinted on June 18, 2010, from wnd.com by Kenneth
22    Timmerman.

Page 220

1          A    No, I was not asked to.
2          Q    Directing your attention to page 6 of this
3    article.
4          A    Page 6 of this article?
5          Q    Right.
6          A    Yes.
7          Q    The third full paragraph down, and I
8    referred to this previously, but for completeness
9    sake I'll quote it here where the author, Kenneth
10    Timmerman writes: "Another new pro-regime advocacy
11    group, Iranians for International Cooperation is run
12    by former U.S. Senate intern named Trita Parsi.  Now
13    living in Stockholm, Parsi and his group have been
14    lobbying the expatriate community on behalf of
15    Iranian President Khatami and lobbying the U.S.
16    government to lift sanctions."
17          First of all, did I read that correctly?
18          A    Yes.
19          Q    And assuming that this gentleman, Kenneth
20    Timmerman, had written such in 2010 a full seven
21    years before the Defendant started writing anything
22    about Trita Parsi, what role, if any, do statements

Page 221

1    by others, other than the Defendant, about Parsi
2    acting as a lobbyist on behalf of the Iranian regime
3    play in your methodology in evaluating the
4    Defendant's methodology as a journalist?
5          A    It doesn't.  Again, this is an irrelevant
6    question.  I was asked to analyze A and you are
7    asking me about B.  I think the strength of the
8    method which is a common method of reading articles
9    by a writer disqualifies this article right there,
10    and this question doesn't make any sense because
11    this is a different author and I had no business to
12    read that article.  I was not asked to do that.
13          Q    Did you read any of the articles by
14    Timmerman that the Defendant cites in his articles?
15    Does the name even ring a bell to you?
16          A    No.
17          Q    Okay.  That's fair.
18          MR. KAPSHANDY:  Why don't we go off the
19    record just a second and let me see what we got back
20    from Eric, and we'll be wrapping up here shortly.
21          (Discussion off record.)
22    BY MR. KAPSHANDY:

56  (Pages 218 to 221)

Page 222

1    Q   Professor, again directing your attention
2  to Exhibit 12 which is a list of articles in the
3  archive for In Search of Truth, if you could pull
4  that out.
5    A   Yes.
6    Q   In particular turning to page 2 of the
7  list of articles authored by the Defendant, about
8  eight up from the bottom, there is one called Iran's
9  2003 Grand Bargain Offer:  Secrets, Lies and
10 Manipulation.  Do you see that?
11   A   Yes.
12   Q   Do you recall if that is an article that
13 you evaluated in preparing the report in this case?
14   A   No.
15   Q   Just to be clear, you did not review that
16 one?
17   A   Yes, I did not.
18   Q   And just maybe to help you out, if I
19 suggested that it discusses Trita Parsi's role in
20 transmission of a peace proposal and re-release of
21 it in years 2003 and 2006, that doesn't ring a bell?
22   A   No.

Page 223

1    Q   And, again, what significance, if any, did
2  you make of any of the Defendant's writings where he
3  references Javad Zarif, ambassador to the United
4  Nations from Iran.  Do you recall that name?
5    A   No.
6    Q   What about the name, Karazai?
7    A   I do not recall that name.
8    Q   What about the name of another Iranian
9  official by the name of Mohamadnia, also from the
10 Iranian interest section?
11   A   No.
12   Q   What I'm getting at, when you see these
13 names mentioned in the Defendant's articles
14 associating Trita Parsi with these various officials
15 from the Iranian government, under your methodology
16 what effort, if any, did you make to determine what
17 their connections were with the regime and what
18 business Trita Parsi had dealing with them, if any?
19 I don't want to put words in your mouth again.
20   A   I think that's a speculative question.
21 You know the writer -- please try to understand, you
22 have given in front of me a list of articles.  You

Page 224

1  know, for example, I do not recall reading this
2  article, but the article says Trita Parsi at Rutgers
3  University.
4        Now, what is your assumption when you read
5  an article with that headline that, Hey, it will
6  talk about Trita Parsi at Rutgers University, right?
7  So a lot of these articles, as you know, covers a
8  particular issue.
9        So when I was reading the articles I read
10 the issue, looked at the citations, looked at the
11 references, and then in the 60 articles that I read
12 I came to the conclusion that not one of the
13 articles was relying on a good source.  And as I
14 clarified there could be two kind of sources.  One
15 is a primary source where you are going to the
16 original source of that information.  The second is
17 a secondary source which is not a good idea to do
18 things.  And, as you will notice, a lot of the
19 sources that the Defendant has could be classified
20 as somewhat secondary sources.
21       Now, of course, I can address that in
22 terms of specific things, as I pointed out earlier,

Page 225

1  but I do not recall reading the articles that you
2  are referring to.
3    Q   And then according to that you are not
4  prepared to give any opinions as to whether this
5  article, Iran's 2003 Grand Bargain complies with the
6  standards that you've covered in your report,
7  obviously, having not read it.  Correct?
8    A   Well, as I said in my report, I have
9  analyzed the articles that were found in the web
10 site.  And, clearly, that article wasn't part of
11 that analysis.
12   Q   But my question is, if you've not read the
13 article, you had not prepared and are not prepared
14 to deal with the questions addressed in your report
15 as to whether that article, which you've not read,
16 and the sources cited therein comport with the
17 standards addressed in your report?  I mean it's
18 pretty simple, right?
19   A   My report was based on a set of articles
20 that were on this person's web site.  It was an
21 independent evaluation.  I picked up the article and
22 it was selected on the basis of what was available.

57 (Pages 222 to 225)

Page 226

1  And based on my review I have this report which
2  outlines the care and compliance, or the lack of it,
3  that the Defendant displayed.
4      Q   I'm not talking about the articles you
5  have read. I'm just saying, if you haven't read
6  one, as you just testified you didn't read the 2003
7  Grand Bargain, you are not able to as you sit here
8  under oath today give an opinion as to whether that
9  article that you've not read comports with the
10 standards of your report. Right?
11     A   Yes.
12     MR. KAPSHANDY:  Thank you very much. I
13 think that's all I have.
14     THE WITNESS:  Okay. Thank you.
15     MR. KAPSHANDY:  It's a pleasure, and I
16 appreciate it, and thank you for your hospitality.
17     MR. NELSON:  I don't know if we have to
18 indicate down here, but he'll read and sign.
19     (Whereupon, signature having not been
20 waived, the deposition of DEBASHIS AIKAT, Ph.D., was
21 concluded at 3:07 p.m.)
22

Page 227

1      ACKNOWLEDGMENT OF DEPONENT
2      I, DEBASHIS AIKAT, Ph.D., do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true, correct
5  and complete transcription of the testimony given by
6  me and any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10 _____   _____
       (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

Page 228

1      E R R A T A   S H E E T
2  IN RE:
3  RETURN BY: _____
4  PAGE   LINE      CORRECTION AND REASON
5  ____   ____   _____
6  ____   ____   _____
7  ____   ____   _____
8  ____   ____   _____
9  ____   ____   _____
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18 ____   ____   _____
19 ____   ____   _____
20 ____   ____   _____
21 ____   ____   _____
22   (DATE)          (SIGNATURE)

Page 229

1      E R R A T A   S H E E T   C O N T I N U E D
2  IN RE:
3  RETURN BY: _____
4  PAGE   LINE      CORRECTION AND REASON
5  ____   ____   _____
6  ____   ____   _____
7  ____   ____   _____
8  ____   ____   _____
9  ____   ____   _____
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18 ____   ____   _____
19 ____   ____   _____
20 ____   ____   _____
21 ____   ____   _____
22   (DATE)          (SIGNATURE)

58 (Pages 226 to 229)

```
 1          REPORTER'S CERTIFICATE
 2          I, Bess A. Avery, Registered Merit
     Reporter, Certified Shorthand Reporter, certify;
 3
 4          That the foregoing proceedings were taken
     before me at the time and place therein set forth,
 5   at which time the witness was put under oath by me;
 6
 7          That the testimony of the witness, the
     questions propounded, and all objections and
 8   statements made at the time of the examination were
     recorded stenographically by me and were thereafter
 9   transcribed;
10
11          That the foregoing is a true and correct
     transcript of my shorthand notes so taken.
12
13          I further certify that I am not a relative
     or employee of any attorney of the parties, nor
14   financially interested in the action.
15
16          I declare under penalty of perjury under
     the laws of the State of North Carolina that the
17   foregoing is true and correct.
18
19          Dated this 15th day of January 2011.
     My commission expires:
20   April 20, 2014
21
     _____
     BESS A. AVERY
22   NOTARY PUBLIC IN AND FOR THE STATE OF NORTH CAROLINA
```

59  (Page 230)