IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| MERVIS DIAMOND COPORATION | : | |
|---|---|---|
| Plaintiff, | : | |
| | : | Case No. 259919-V |
| v. | : | |
| | : | |
| CONGRESSIONAL HOTEL CORPORATION | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

This commercial lease dispute was tried to the court on March 30, March 31, and
April 1, 2, 3, and 6, 2009. The court has carefully considered all of the evidence adduced
at trial, including the credibility of the parties and their witnesses. "The trier of fact may
believe or disbelieve, accredit or disregard, any evidence introduced." *Great Coastal
Express, Inc. v. Schruefer*, 34 Md. App. 706, 725 (1977). This same standard applies to
fact and expert witnesses. *See Walker v. Grow*, 170 Md. App. 255, 275 (2006). "The
finder of fact properly may assign no weight and no credibility to a particular witness's
testimony." *Bereano v. State Ethics Commission*, 403 Md. 716, 747 (2008). The court's
findings of fact and conclusions of law are set forth below.

### I. Background

On July 6, 2004, Mervis Diamond Corporation ("Mervis") signed a ten year
commercial lease (the "Lease") with Congressional Hotel Corporation ("CHC") for
approximately 3,282 square feet of retail space located at 1775 Rockville Pike, the main
artery in Rockville, Maryland. Mervis considered the new location to be ideal and
uniquely suited to its diamond business.

The Lease estimated that Mervis would take possession on February 1, 2005. The demised premises are attached to a hotel owned by CHC and are a portion of an approximately 8,000 square foot retail space formerly occupied by Storehouse Furniture.

Before Mervis could occupy the premises, CHC was to perform certain construction work. In brief, CHC was to erect a demising wall to reduce the size of the former Storehouse Furniture space and create what is known in commercial real estate circles as a "warm, lit, shell." The full scope of CHC's work is defined in Exhibit B to the Lease (the "Landlord's Work")[1] Thereafter, Mervis was to build out the space with certain finishes (the "Tenant's Work") in order to create a functioning retail location for its diamond sales. During Lease negotiations, CHC had estimated, internally, that it would need sixty days from the date Storehouse Furniture vacated the building to deliver the premises to Mervis.[2]

The lease of the prior tenant, Storehouse Furniture, expired on December 31, 2004. Mervis obtained a building permit from the City of Rockville on January 24, 2005, to perform the Tenant's Work under the Lease. However, as of February 1, 2005, the estimated delivery date of the premises, CHC had not obtained a building permit from the City of Rockville to commence its work under the Lease.

On February 12, 2005, Mervis notified CHC of its decision on the type of HVAC system to be installed under Exhibit B of the Lease.[3] As of February 12, 2005, the court finds that there were no impediments preventing CHC from commencing the Landlord's

---

[1] Plaintiff's Trial Exhibit 2.

[2] Plaintiff's Trial Exhibit 3.

[3] Plaintiff's Trial Exhibit 4.

2

Work.[4] CHC obtained a building permit to perform its work under the Lease on February 15, 2005, but it did not even begin the Landlord's Work.[5]

When CHC did not respond to Mervis's inquiries about when CHC would begin its work under the Lease, Mervis filed suit in this court on March 16, 2005, for specific performance and breach of contract. (DE # 1). Along with the complaint, Mervis filed a motion for a temporary restraining order to prevent CHC from demolishing the building. (DE # 2). Mervis alleged that CHC did not intend to honor the Lease and instead, was planning to demolish or substantially alter the building in order to construct a condominium development at the site. In exchange for Mervis withdrawing its request for a temporary restraining order, the parties entered into a standstill agreement, which precluded CHC from demolishing or substantially altering the premises (but allowed CHC to perform the Landlord's Work under the Lease) pending a hearing on Mervis's request for a preliminary injunction. (DE # 10).

The court held a preliminary injunction hearing on May 17, 2005. As of that time, CHC still had not commenced its work under the Lease. By Order dated May 17, 2005, the court enjoined CHC from performing any work on the property other than the Landlord's Work under its Lease with Mervis. (DE # 33).

On October 11, 2005, CHC notified Mervis that it intended to cancel the Lease due, allegedly, to parking problems at the site. The first trial in the case began on June 12, 2006. As of that time, CHC still had not commenced the Landlord's Work under the Lease. The first trial lasted from June 12 until June 16, 2006. On September 29, 2006,

---

[4] CHC's project manager acknowledged that limited demolition and site preparation may be started even before a building permit is issued.

[5] Plaintiff's Trial Exhibit 5.

3

the circuit court issued a written order concluding that CHC had breached the Lease. ( DE # 240). The court also entered a judgment, ordering CHC to specifically perform its obligations under the Lease and awarding Mervis over $2 million in damages for lost profits. Some three months later, on December 19, 2006, the circuit court entered a judgment in favor of Mervis for attorneys' fees, under a fee shifting provision in the lease, as a consequence of the earlier judgment. (DE # 256). Both judgments were appealed to the Court of Special Appeals. (DE # 243, DE # 259).

In a fifty-five page unreported opinion, issued on December 12, 2007, the Court of Special Appeals reversed the judgment with respect to lost profits, concluding that the circuit court had committed an error of law by using the date CHC was to *commence* its work as the beginning date for calculating lost profits. The Court of Special Appeals concluded that the correct date to be used for calculating lost profits was the date CHC should have *completed* its work under the Lease. The Court of Special Appeals could not affirm the judgment for lost profits because: "[W]e have not been directed to any evidence in the record indicating that CHC could have reasonably completed the Landlord's work on or before March 15, 2005." Slip Op. at 17. As a consequence, the appellate court said: "[W]e cannot determine, on review, whether the circuit court was clearly erroneous in its findings." Slip Op. at 17. The case was remanded to the circuit court for further proceedings. *Congressional Hotel Corporation v. Mervis Diamond Corporation*, No. 1848, September Term, 2006 (filed December 12, 2007).

Pertinent to the current proceedings, the Court of Special Appeals concluded that the circuit court had erred in the first trial by using the commencement date of the Landlord's Work as the date of CHC's breach and thus the period from which lost profits

4

would be calculated. According to the intermediate appellate court, CHC's duty to perform under the Lease, and any corresponding breach of that duty, would run from the date CHC failed to complete the Landlord's Work. The circuit court on remand was specifically instructed to determine "the date of actual breach." Slip. Op. at 18.[6]

The Court of Special Appeals denied Mervis's motion for reconsideration. (De # 277). The Court of Appeals denied CHC's petition for writ of certiorari. (DE # 287).

## II. CHC's Contention That Mervis's Lawsuit Was Premature

At the second trial, consonant with the mandate of the Court of Special Appeals, Mervis argued that CHC's breach of the Lease for damages purposes commenced on April 15, 2005, (i.e., the date by which Mervis contended that CHC should have completed the Landlord's Work). This date, of course, is after the date on which Mervis filed its original complaint.

CHC argued on summary judgment, as well as under Rule 2-519, that Mervis's claim for lost profits must be dismissed on the ground that the original lawsuit was filed prematurely. CHC contends that, despite this court having been directed by the Court of Special Appeals to determine the date of the breach, no lost profits can be awarded because Mervis's claim for breach of contract was filed before it accrued. CHC reasons that because there could be no breach of the Lease until CHC unreasonably failed to complete the Landlord's work, which had not yet occurred on, March 16, 2005, the date suit was filed. In other words, because the claim for money damages arising out of a

---

[6] The Court of Special Appeals expressly rejected CHC's arguments that specific performance was not warranted because it had made diligent, good faith efforts to deliver possession. The appellate court held that the circuit court's findings to the contrary were not clearly erroneous. Slip Op. at 26, 30. The Court of Special Appeals also affirmed the circuit court's finding that CHC was not relieved from liability under § 2.04 of the Lease, on account of the alleged parking problem, was not clearly erroneous. Slip. Op. at 25-26.

5

breach of contract had not accrued when Mervis first filed its lawsuit, CHC contends that the claim now must be dismissed. The court disagrees.

Mervis's original complaint was filed on March 16, 2005. The complaint recited that Mervis and CHC executed the Lease on July 6, 2004. (Complaint, ¶ 5). Under the Lease, CHC was obligated to perform the Landlord's Work before delivering possession to Mervis. (Complaint, ¶ 6). The Lease provided that the estimated completion date for the Landlord's Work was February 1, 2005. (Complaint, ¶ 7). The complaint goes on to specifically allege that CHC had "failed and refused to proceed in good faith *to commence and complete* the landlord's Work as required under the Lease." (Complaint, ¶ 8)(emphasis added). Mervis then averred that as a result of CHC's "refusal to perform the Landlord's Work, the Landlord's Work has not been completed." (Complaint, ¶ 9). Finally, because the Landlord's Work had not been completed, Mervis alleged that CHC "failed and refused to tender possession of the Property to Mervis." (Complaint, ¶ 10).

On these facts, Mervis pleaded two separate causes of action. Count I set forth a legal claim, alleging that CHC had breached the Lease "by refusing to proceed in good faith *to commence and promptly complete* the landlord's Work . . . " (Complaint, ¶ 3)(emphasis added). Count II pleaded an equitable claim, requesting the court to enter a decree of specific performance requiring CHC "to promptly and properly complete all the Landlord's work and deliver possession of the Property to Mervis." (Complaint, ¶ 19). Manifestly, Mervis was asking the circuit court to order CHC to commence the Landlord's Work so that it could be completed and Mervis could occupy the premises.

As noted above, Mervis requested a temporary restraining order on March 16, 2005, because it feared that CHC would demolish the premises during the pendency of

6

the litigation, thereby depriving it forever of its ability to obtain possession. The circuit

court did not rule on this motion because, on April 4, 2005, the parties entered into a

standstill agreement, preserving the *statue quo ante* until the court could hear Mervis's

request for a preliminary injunction. On that date, the parties appeared in the circuit

court, which accepted the standstill agreement, and set a preliminary injunction hearing

for May 17, 2005. The preliminary injunction order was signed by the circuit court on

May 17, 2005 and docketed by the Clerk on May 19, 2005.

It is certainly true that, under the decision by the Court of Special Appeals in this

case, Mervis's legal claim for lost profits had not accrued by March 16, 2005, the date on

which the original complaint was filed. In that sense, the legal claim in Count I was filed

prematurely because no money judgment could have been entered on the date the suit

was filed. *Southern Four, Inc. v. Parker, P.A.*, 81 Md. App. 85, 91 (1989)("While is

should not be necessary, we specifically state the obvious, and hold that a judgment

cannot be rendered until such time as its underlying prerequisite, i.e., a cause of action,

exists.")(footnote omitted), citing *Phelps v. Herro*, 215 Md. 223, 227-28 (1957). In

Phelps, the Court of Appeals held that "the doctrine of anticipatory breach of a contract

has no application to money contracts, pure and simple, where one party has fully

performed his undertaking, and all that remains for the opposite party to do is to pay a

certain sum of money at a certain time or times . . . ." *Id.* at 231. *But see Hoyt v. Horst*,

201 A.2d 118, 124-25 (N.H. 1964).

In this case, by contrast, Mervis's equitable claim certainly was ripe for judicial

review because Mervis's expressly alleged that CHC had failed even to commence the

Landlord's Work, that it feared CHC would demolish the building and that it also was

7

being harmed by CHC's delay in commencing performance. By its complaint and two motions for pre-trial injunctions, Mervis unquestionably sought to force CHC to begin to perform its contractual obligations. Insofar as the court can discern, at no time prior to or during the first trial (or on direct appeal) did CHC seek dismissal of the damage claim in the original complaint on the ground that it was filed prematurely, even though it was always CHC's position that it needed a reasonable time (four months in its view), after being notified of the tenant's decision on the HVAC system, to perform the Landlord's Work.[7]

A claim for specific performance sounds in equity, not law, and is initiated by the filing of a complaint stating facts upon which equitable relief is sought and a prayer for that relief. Maryland Rule 2-303(b); Maryland Rule 2-305. *See Horst v. Kraft*, 247 Md. 455, 459 (1967)(requirements for pleading a claim for specific performance); *see also* J. Perillo, *Calamari & Perillo on Contracts* § 16.2 (5th ed. 2003). The original complaint not only set forth a legally sufficient cause of action for specific performance but also included a specific prayer for equitable relief.

Mervis pointedly requested the circuit court in its original complaint to order CHC to "perform the Landlord's Work and deliver possession of the Property to Mervis." (Complaint at p. 5). Manifestly, this prayer asked the circuit court to order CHC both to begin and complete the Landlord's Work under the Lease because, as alleged in the complaint, CHC had not even started the Landlord's Work by March 16, 2005, the date

---

[7] Had CHC timely raised the issue, Mervis could have dismissed Count I of the original complaint without leave of court and refiled it on April 15, 2005. Maryland Rule 2-506(a). CHC's answer was not filed until March 19, 2005. (DE # 16). In any event, it is unlikely that the court would not have approved a dismissal at such an early stage of the proceeding even if CHC had objected. Maryland Rule 2-506(b); *see Colonial Carpets, Inc. v. Carpet Fair, Inc.*, 36 Md. App. 583, 589 & n. 9 (1977). As well, Mervis simply could have amended the complaint as of right before the first trial to change the date of the alleged breach. Maryland Rule 2-341(a) & (c).

8

suit was first filed. It is undisputed that CHC did not begin the Landlord's Work under the Lease until October 2006. Mervis's equitable claim, triable solely to the court, was viable from the outset. The circuit court plainly had jurisdiction to entertain that equitable claim on March 16, 2005, as well as the prayer for injunctive relief. *See Colandrea v. Wilde Lake Community Ass'n*, 361 Md. 371, 395-96 (2000); *Chestnut Real Estate Partnership v. Huber*, 148 Md. App. 190, 206-07 (2002). *Cf. Southern Four, Inc. v. Parker, P.A.*, 81 Md. App. at 91-95 (in an action at law, court may not enter a conditional judgment).

After remand, with leave of court, Maryland Rule 2-341(b), Mervis amended its complaint to conform to the legal theory espoused by the Court of Special Appeals. (DE # 398). Nevertheless, except for the date from which lost profits would be measured, the operative fact pattern remained the same. No new cause of action was stated. CHC suffered no actual prejudice by reason of the amendment because the parties conducted discovery on remand with a view to determining the date by which CHC should have completed the Landlord's Work in accordance with the mandate of the appellate court. *See Prudential Securities, Inc. v. E-Net, Inc.*, 140 Md. App. 194, 230-34 (2001).

In any event, it is clear that the Court of Special Appeals did not vacate the circuit court's September 29, 2006 finding that CHC in fact breached the Lease. *See, e.g., Congressional Hotel Corporation v. Mervis Diamond Corporation*, No. 1848, September Term, 2006 (filed December 12, 2007)("As explained herein, we are vacating the judgment as to the date of the breach and not the court's finding that a breach occurred. Specific performance is the appropriate remedy."), Slip Op. at 1 n. 1; "We shall, therefore vacate the judgment [for lost profits] and remand to the circuit court for further

9

proceedings as to the date of the actual breach." Slip Op. at 18; "Moreover, the court found that CHC did not make a diligent good faith effort to deliver possession, but rather that, because of a desire to develop condominiums, CHC was unreasonably 'invoking the parking problem in order to terminate the Lease.' Those findings are not clearly erroneous." Slip Op. at 30.

The decision by the Court of Special Appeals affirming the circuit court's finding of a breach of the Lease by CHC is the law of the case. This court simply cannot disregard the decision of the appellate court. *See Stokes v. American Airlines, Inc.*, 142 Md. App. 440, 446-47 (2002); *see also Reier v. State Department of Assessments and Taxation*, 397 Md. 2, 20-22 & n 17. (2007).

For all of these reasons, CHC's request to dismiss Mervis's damage claim for lost profits, on the ground that it was filed prematurely, will be denied. The claim was ripe when the action was tried on June 12, 2006, and it is ripe now.

### III. CHC's Contention that Mervis Suffered no Loss of Profits

CHC next argues that Mervis, the named plaintiff in this case, suffered no damages as a result of its breach because Mervis, in fact, never operated a diamond store at the leased premises. The argument has no legal merit.

Mervis on Rockville Pike, LLC ("Pile LLC"), a Delaware limited liability company, was formed on May 29, 2003. According to Ronnie Mervis, the entity was formed when he and Zalmen "Zed" Mervis were considering purchasing a building in Montgomery County to operate a new diamond store. A building was never acquired, and the entity sat largely dormant until shortly before Mervis actually obtained possession of the premises and prepared to open the new Rockville store in October

10

2007. In preparation for that opening, after this court ordered CHC in September 2006 to perform its obligations under the Lease, Pike, LLC obtained a construction loan from BB&T bank for the tenant's build out of the space. Pike, LLC had no assets, so the loan with BB&T was guaranteed by Mervis and collateralized by Mervis's entire diamond inventory. Although Pike, LLC is a taxable entity and also was used by Mervis as an accounting entity to measure performance once the new store was opened, Pike, LLC has never owned the diamonds,[8] carried no insurance[9] on the diamonds and has no employees.[10]

The fundamental problem with CHC's argument is that Mervis is not seeking lost profits for any period during which Pike, LLC actually operated a diamond store in Rockville. To the contrary, Mervis, which had operated successfully in Rockville for ten years before executing the Lease with CHC, is seeking the lost profits that it would have earned had CHC not breached the Lease. In other words, Mervis is seeking only those lost profits that it would have earned from the date CHC defaulted (i.e., should have completed the work), April 15, 2005, until Mervis could have open a store in Rockville, October 15, 2007.

How Mervis chose to open and operate that store is not germane to whether CHC is liable to Mervis for lost profits during the breach period. The fact that, once it had possession of the premises, Mervis elected for its own business reasons to operate the store through another taxpaying entity, Pike, LLC, is legally irrelevant to whether CHC is

---

[8] The court credits the testimony of Ronnie and Zalman Mervis that diamonds were purchased by Mervis and owned by Mervis, not Pike, LLC. *See* Plaintiff's Trial Exhibits 69, 70 & 71.

[9] Plaintiff's Trial Exhibit 65.

[10] Funds were regularly swept from the Pike, LLC account to the Mervis account, for no apparent consideration. Plaintiff's Trial Exhibits 67 & 68.

11

answerable for the harm cause by its breach of the Lease with Mervis. The parties to the Lease are Mervis and CHC, and it was Mervis (not Pike, LLC) which was deprived of an ability to operate a diamond store in Rockville due to CHC's breach of the Lease. If the Commissioner of Internal Revenue believes that Mervis, not Pike, LLC, is the proper tax paying entity for income earned at the Rockville store in 2007 (or thereafter), she may reallocate income and deductions accordingly. I.R.C. § 482. *See generally Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972); *Frink v. Commissioner*, 798 F.2d 106 (4th Cir. 1986). But that possible determination has no bearing on the questions before this court.

IV. By When Should CHC Have Completed the Landlord's Work?

Mervis contended at trial that CHC should have commenced the Landlord's work by February 15, 2005, and completed its work eight weeks later, or by April 15, 2005.[11] Mervis further contended that it would have completed the Tenant's Work in six months, allowing Mervis to open for business at the new Rockville location by October 15, 2005. The Rockville store did not actually open until October 15, 2007. Although this period is 24 months, Mervis's expert calculated lost profits based on a more conservative 23 month period.[12]

To establish the reasonable completion date for the Landlord's Work, Mervis relied primarily on the testimony of D. Joseph Luce, an expert in the areas of commercial

---

[11] The court finds that Mervis actually received the keys and accepted possession on April 16, 2007. Plaintiff's Trial Exhibit 45.

[12] Plaintiff's Trial Exhibit 114. Although the beginning and ending dates assumed in the expert's analysis are different (December 15, 2005 through November 15, 2007), the application of the analysis in the report to the dates actually shown at trial have no material effect on the verity of the calculations.

12

construction and construction scheduling. Mr. Luce described in his testimony, credibly, his visits to the job site, and, in light of the scope of the project, why CHC's schedules (both the initial 2005 schedule and the 2006 schedule that was in fact used by CHC) were out of sequence and unduly protracted.[13] He also testified to the numerous deficiencies in CHC's actual performance of the Landlord's Work in the fall of 2006, including serious understaffing, which delayed the timely completion of the Landlord's Work.[14] The court finds Mr. Luce to be a credible witness and knowledgeable about the construction schedule in this case.

CHC relied on the expert and fact testimony of Bruce Corbett, its project manager for the Landlord's Work under the Lease, and Kirstin Dean, its property manager. The court finds that Ms. Dean has no personal knowledge about the Landlord's Work. What she knows largely is derivative of her conversations with Mr. Corbett and from reading CHC documents. Specifically, regarding the length of time needed to perform the Landlord's Work, Ms. Dean knows only what she was told by Mr. Corbett.

Mr. Corbett prepared two schedules for Landlord's Work, one in 2005 and one in 2006. Both schedules indicated that the work would take approximately four months. Mr. Corbett admitted that he never received permission to commence the Landlord's Work in 2005. He was told to start the Landlord's Work in early October 2006, only after CHC had received the circuit court's adverse decision of September 29, 2006.

Mr. Corbett posited a variety of reasons why CHC's build-out of some 3,200 square feet of commercial space should take four months. He cited, among others, the

---

[13] Plaintiff's Trial Exhibit 13

[14] Plaintiff's Trial Exhibit 27. Among other matters, Mr. Luce testified that CHC did not promptly commence or diligently complete demolition activities. According to Mr. Luce, the demolition should have taken four days; under CHC's management it took more than two weeks.

13

need to perform some work on the non-demised portion of the space (electrical and fire protection) and the delay resulting from debates with Mervis over certain aspects of the architectural drawings.

Mr. Corbett performed the Landlord's Work without a written contract. His firm is essentially an affiliate of CHC. Mr. Corbett testified that the job was adequately staffed. The court finds that Corbett is not a credible witness, is beholden to CHC and remarkably, recanted or purported not to recall, several material portions of his deposition testimony and statements he made in documents.[15] The court instead credits Mr. Luce's testimony and Corbett's own site logs which show that Corbett did not use adequate manpower to complete the job in a reasonable manner.[16] The court, having had the opportunity to evaluate Mr. Corbett's demeanor, body language and tone of voice, and having carefully reviewed his job schedules, does not credit his opinion that four months was a reasonable amount of time to complete the Landlord's Work.

Bases on its consideration of all of the pertinent evidence, the court finds that CHC should have completed the Landlord's Work in sixty days, starting on February 15, 2005 and ending on April 15, 2005.[17]

---

[15] Plaintiff's Trial Exhibit 23.

[16] Plaintiff's Trial Exhibits 59 & 60.

[17] Mr. Corbett testified that limited demolition and work site preparation is allowed even before a permit is issued. He conceded that work could have commenced on February 1, 2005. Nevertheless, in deciding that sixty days was a reasonable amount of time, the court has not allocated to CHC any time prior to the issuance of the building permit by the City of Rockville.

14

## V. Damages for Lost Profits

### A. The Legal Standard for Lost Profits

"Damages for breach of a contract ordinarily are that sum which would place the plaintiff in as good a position as that in which the plaintiff would have been, had the contract been performed." *Beard v. S/E Joint Venture*, 321 Md. 126, 133 (1990). Generally, damages are measured from the date of the breach, *Republic Ins. Co. v. Prince George's County*, 92 Md. App. 528, 533 (1992), must be proven with reasonable certainty and may not be based on speculation or conjecture. *Roebuck v. Steuart*, 76 Md. App. 289, 314 (1988). *See also McKeever v. Realty Corp.*, 183 Md. 216, 226 (1944)(damages are allowed "only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.")

To recover lost profits, a plaintiff must establish three elements: (1) that the defendant's breach caused the loss; (2) that, at the time the contract was executed, the defendant reasonably could have foreseen that his breach would result in lost profits by the plaintiff; and (3) lost profits are proven with reasonable certainty. *See, e.g., M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 345-46 (1958); *John D. Copanos & Sons v. McDade Rigging & Steel Erection Co., Inc.*, 43 Md. App. 204, 206 (1979); *Della Rata, Inc. v. American Better Community Developers, Inc.*, 38 Md. App. 119, 138 (1977).

In this case, Mervis seeks lost profits which it contends it would have earned selling diamonds at the Rockville location had it been seasonably delivered by CHC. In the seminal case of *M & R Contractors*, the Court of Appeals held that certainty in the context of lost profits means reasonable certainty. *M & R Contractors*, 215 Md. at 345-

15

46. The following principles were adopted: "(a) if the fact of damage is proven with certainty, the extent or amount of therefore may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the amount of damage is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits." *Id.* at 348-49.

## B. The Court's Evaluation of Expert Testimony

In Maryland, the admissibility of expert testimony turns on fulfilling the requirements of Maryland Rule 5-702. *Food Lion v. McNeill*, 393 Md. 715, 730-31 (2006); *Rollins v. State*, 392 Md. 455, 498-99 (2006); *CSX Transp., Inc. v. Miller*, 159 Md. App. 123, 183-84, 189 (2004); *Wood v. Toyota Motor Corp.*, 134 Md. App. 512, 519-24 *cert. denied*, 362 Md. 189 (2000). Citation is hardly necessary for the proposition that trial courts enjoy wide discretion in determining whether or not to admit expert testimony. *Buxton v. Buxton*, 363 Md. 634, 650-51 (2001); *Oken v. State*, 327 Md. 628, 659-61 (1992). Of course no expert, no matter how well qualified, may stray beyond the area of his expertise, *In re Yve S.*, 373 Md. 551, 613 (2003), or offer opinion testimony that he is not qualified to give. *Compare I.W. Berman Properties v. Porter Bros., Inc.*, 276 Md. 1, 13-15 (1975) *with Ditto v. Stoneberger*, 145 Md. App. 469, 498-99. (2002). As well, the court does not have the discretion "to make an erroneous ruling that results in the admission of incompetent and unfairly prejudicial expert testimony." *Hall v. State*, 107 Md. App. 684, 695 n. 6 (1996).

16

## C. Quantification of Damages

As of February 1, 2005, Mervis operated three retail locations in: (1) Rockville, Maryland, (2) Tysons Corner, Virginia, and (3) the District of Columbia. The Rockville store, which had been in operation for over ten years closed on February 18, 2005 in anticipation of Mervis taking possession of new Rockville space under the Lease. On June 3, 2006, Mervis opened an additional retail store in Chevy Chase, Maryland.

Ronnie Mervis has been in the diamond business for over thirty years. He testified, credibly, that the average sale of an engagement stone and setting, Mervis's principal business, cost between $12,000 and $13,000, with the diamond accounting for between $8,000 to $10,000 of the total cost of the ring. Historically, it requires between two to three customer visits in order for Mervis employees to make a sale.

The original Rockville store was located at White Flint Mall, and later at the Shulman Rogers building located at 11921 Rockville Pike. Ronnie Mervis testified, credibly, as to the historical sales and profit levels of the Rockville store. For fiscal year ending May 31, 2004, the Rockville store had gross sales of $7.6 million, of which approximately 71% was cost of goods sold, plus another 10% for store specific operating expenses. Ronnie Mervis testified, credibly, that conservatively, the closing of the Rockville store cost Mervis $1.5 million per year in lost profits, or $125,000 per month.[18] CHC's failure to deliver the premises to Mervis left the company without a retail presence on Rockville Pike.

---

[18] In Maryland, a "person experienced in a particular trade or profession may testify to the reasonableness of cost of labor and materials provided by him or her." L. McLain, *Maryland Evidence* § 701:4(b) (2001). *See Easter v. Humphrey*, 208 Md. 232, 235-36 (1955); *Pitt v. State*, 152 Md. App. 442, 465-66 (2003), *aff'd on other grounds*, 390 Md. 687 (2006); *see also Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1174-75 (3d Cir. 1993)(owner with sufficient knowledge may testify as to the lost profits of *his* business).

17

Zed Mervis is the President of the plaintiff. He, like his brother, has been in the diamond business for over thirty years. Zed Mervis testified, credibly, regarding company-wide and store specific costs. According to Zed Mervis, company-wide, or fixed, costs include the cost of the diamonds, advertising, marketing and travel. When the Rockville store closed, Zed Mervis testified that the company did not experience any savings in company-wide costs. Zed Mervis agreed with Ronnie Mervis that the plaintiff lost $125,000 per month in lost profits due to the closing of the Rockville Store. In reaching this conclusion, Zed Mervis made no upwards adjustment for the superiority of the new location over the old location. Like Ronnie Mervis, Zed Mervis testified that although it is likely that some business was "captured" by the other Mervis locations, it is impossible to quantify the amount of any such recapture.

Because Mervis was an actual, well established business in Rockville before the current Lease dispute, it is appropriate to look at Mervis's actual operating history in evaluating its claim for lost profits. *See Macke Company v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 491 (1970)("There is ample authority for the proposition that loss of profits may be projected from past performance."); *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 618 (1955)("If the defendant's breach has prevented the plaintiff from carrying *a well-established business*, the amount of profits thereby prevented is often capable of proof with reasonable certainty. On the basis of its past history, a reasonable prediction can be made as to its future.")(quoting *Restatement (First) of Contracts* § 331, Comment d)(Emphasis in original);[19] *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 476 (1991); *see also Zachir, Ltd. v. Driggs*, 135 Md. App. 403, 428-31 (2000).

---

[19] Comment b to the Restatement (Second) of Contracts § 352 (1981), is similar to the Restatement comment relied on in *Evergreen Amusement*, and provides in relevant part: "If the

18

Joel N. Morse, Ph.D. testified at trial as an expert for the plaintiff. Dr. Morse is Professor of Finance at the Merrick School of Business of the University of Baltimore,[20] where he teaches corporate finance, investment analysis, portfolio management and the use of derivatives, futures and options. Dr. Morse has published widely in peer-reviewed journals and has advised Fortune 500 companies on corporate finance questions. The court finds Dr. Morse to be very experienced not only on the academic side, but, importantly, in the application of theory to actual business operations. Dr. Morse testified in detail and at length as to the methods and models he used to prepare his expert report.[21] The court finds Dr. Morse to be one of the most knowledgeable and cogent experts in corporate finance and economic valuation the court has ever seen testify.

Having considered his trial testimony as a whole, the court finds: (1) that Dr. Morse is qualified to render an expert opinion on the subject matter of lost profits; (2) that the subject matter is one that is appropriate for expert testimony; (3) that Dr. Morse has a sufficient factual basis for his opinions; (4) that Dr. Morse employed proper valuation methodologies; and (5) that Dr. Morse stated his opinions with the requisite degree of certainty. In addition, the court finds Dr. Morse's opinions and explanations of his opinions to be well reasoned and founded upon accepted financial business valuation methodologies and supported by the literature. In short, because of the cogency and clarity of his reasoning, the court fully credits the opinions given by Dr. Morse at trial.

---

breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty. Evidence of past performance will form the basis for a reasonable prediction as to the future."

[20] Plaintiff's Trial Exhibit 113.

[21] Plaintiff's Trial Exhibit 114.

19

*Walker v. Grow*, 170 Md. App. at 275-77. The court agrees with Dr. Morse that his Model 2 is an accurate estimation of Mervis's lost profits resulting from CHC's breach of the Lease.

The court also credits Dr. Morse's opinion that it is impossible to quantify the amount of any sales recapture by the other Mervis stores. Dr. Morse testified that such quantification was possible, in theory, but that the results of any such in this case would have been impossible because the necessary data simply does not exist.

Wendy W. Moe, Ph. D., testified as an expert for the defendant solely on the issue of sales recapture.[22] Dr. Moe is Associate Professor of Marketing at the Robert H. Smith School of Business, University of Maryland. Her area of expertise is e-commerce; specifically, on-line consumer shopping behavior. Her focus is statistics. Dr. Moe's most recent experience in brick and mortar sales was as an employee of the A.C. Nielson Company from 1992 through 1994, performing consumer surveys.

Dr. Moe performed a regression analysis of Mervis data supplied to her in discovery by CHC and opined, based on her use of statistics, that 100% of Mervis sales that would have been made at the Rockville store were "recaptured" by the other Mervis stores. In short, Dr. Moe testified that Mervis lost no profits and opined unequivocally that Mervis did not lose a single dollar by being without a Rockville store for two years.

The court finds that Dr. Moe does not have an adequate factual basis for her opinions. She had no familiarity with the subject matter of retail sales of loose diamonds in brick and motor stores. She either failed to read or simply ignored key published studies regarding the effects of multiple locations (openings and closings) on same store

---

[22] Defendant's Trial Exhibit 250.

20

sales. Other than looking a Mervis's "numbers," Dr. Moe had no familiarity with the company's actual business. Moreover, her criticism of Dr. Morse's use of Tiffany as a guidelines company showed a glaring lack of real world business knowledge.[23] Her lack of familiarity with Tiffany's Form 10-K and the important retail sales and store location data contained therein was striking. Her report, which was amended substantively several times before and during trial, contained numerous errors, as shown on cross-examination, and in the rebuttal testimony of Dr. Morse.

The court also finds that although regression analysis is an accepted statistical tool, it was misapplied by Dr. Moe in this case, and that regression analysis is not a reliable predictor as applied to the facts of this case. The court finds that Dr. Moe's conclusions rest on numerous faulty (and clearly inaccurate) assumptions and the use of flawed data, as was demonstrated amply on cross-examination. For example, Dr. Moe assumed, without any factual support in the record, that any customer willing to travel to Rockville to purchase a diamond would be willing to travel to Tysons Corner. She made no adjustments for time or distance and her assumption is just that, an assumption. She testified, not credibly, that is takes between ten to fifteen minutes to drive from Rockville, Maryland to Tyson's Corner, Virginia. In short, Dr. Moe's opinion that 100% of Mervis's sales were "recaptured" by its other stores will not be credited. *See Wood v. Toyota Motor Corp.*, 134 Md. App. at 519-24. In most respects, Dr. Moe's testimony amounted to little more than a "because I said so" opinion. *See Waldt v. University of Maryland Medical System Corp.*, 181 Md. App. 217, 265-66 (2008).

---

[23] The criticism of using Tiffany by Christopher Rosenthal, CHC's other expert, was similarly misguided.

21

CHC's accounting expert, R. Christopher Rosenthal, agreed with Dr. Moe that "all of the Rockville sales were allocated to the Tyson's and DC stores."[24] The court has carefully considered Mr. Rosenthal's report, as well as his trial testimony, and finds that his opinion is not supported by the facts of the case and, moreover, is not credible. For example, his reliance on the estimates contained in the Carl Marks Advisory Report[25] is unsound. It is plain that the Marks document is a selling tool and does not even purport to be, much less constitute, a financial analysis of the business. The Marks report could not be clearer: "The sole purpose of this Memorandum is to assist the recipient in deciding whether to proceed with further analysis of this opportunity in accordance with the procedures described below." The court finds it to be strange indeed that CHC's accounting financial expert would rely on anything in the Marks report, given that it clearly is a marketing tool and not any sort of cogent financial analysis or evaluation of the business.

The court similarly does not agree with Mr. Rosenthal's criticism of Dr. Morse's use of historical sales data, how Dr. Morse adjusted Mervis historical sales data or Dr. Morse's use of Tiffany as a guideline company as part of his analysis. Mr. Rosenthal simply is wrong; Tiffany is a perfectly acceptable guideline company as long as, which Dr. Morse did, its data is adjusted. The court also rejects Mr. Rosenthal's contention that a better proxy for "lost profits" during the breach period, October 15, 2005 through October 15, 2007, were Mervis sales results in the year and one-half after the end of the breach period, as opposed to the five year preceding the breach. Mr. Rosenthal made no

---

[24] Defendant's Trial Exhibit 282 at p. 12.

[25] Defendant's Trial Exhibit 218.

22

showing of comparability of the post-October 2007 data, which Dr. Morse plainly
showed in using the adjusted, pre-breach data.

### D. No Reduction to Lost Profits for Fixed Costs

Business expenses generally are categorized in two ways: fixed expenses and
variable expenses. Fixed expenses or costs are those that do not fluctuate with changes in
production level or sales volume. They usually include such expenses as rent, insurance,
interest on loans, depreciation, management salaries and advertising. Although fixed
costs do not vary with changes in production or sales volume, they may change over
time. Generally, fixed costs will be incurred even if production or sales volume falls to
zero. Variable costs, by contrast, are those that respond directly and proportionately to
changes in sales activity level or volume. Variably costs usually include items such as
such as raw materials costs, sales commissions, inventory costs, supplies and shipping
costs. *Sloane, Inc. v. Stanley G. House & Associates, Inc.*, 311 Md. 36, 44 n. 4 (1987)
(*quoting* R. Childress & R. Burgess, *Seller's Remedies: The Primacy of UCC 2-708(2)*,
48 N.Y. U. L. Rev. 833, 840-41 (1973)); *see also Autotrol Corp. v. Continental Water
Systems Corp.*, 918 F.2d 689, 693 (7th Cir. 1990); 1 R. Dunn, *Recovery of Damages for
Lost Profits* §§ 6.5, 6.8, 6.13 (6th ed. 2005).

In the context of calculating lost profits: "Fixed expenses or overhead are the
continuous expenses of the business, irrespective of the outlay on a particular contract,
and includes such expenses as executive and clerical salaries, property taxes, general
administrative expenses, etc." *Jetz Service Co., Inc. v. Salina Properties*, 865 P.2d 1051,
1058 (Kan. App. 1993). "Fixed expenses or overhead are not deducted when computing
lost profits." *Id.* This is because such items are not a cost of a plaintiff's performance of

23

its contract with the defendant; consequently, they should not be deducted from the gross profits of the contract the defendant breached. *See Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795, 798-99 (3d Cir. 1967). In contrast, variable expenses, costs directly associated with performance of the contract, are to be deducted from lost profits. This is because they would have been incurred had there not been a breach. *Universal Power Systems, Inc. v. Godfather's Pizza Inc.*, 818 F.2d 673, 674 (8th Cir. 1987).

In arriving at his estimate of lost profits, which he concluded was "zero,"[26] CHC's accounting expert reduced Mervis's gross profit figure not only by those expenses directly attributable to CHC's breach, *i.e.*, the cost of operating the Rockville store (rent, employees salaries, store security), but, on the basis of cost accounting, further reduced the profit figure of the Rockville store by attributing to its operation a percentage of Mervis's enterprise-wide, or fixed costs, such as executive salaries and advertising. The court rejects the calculations of CHC's accounting expert because they are at odds with the facts of this case. Moreover, when applied to the facts proven at trial, the cost deductions taken by CHC's accounting expert are inconsistent with both the reasoning and the holding in *Sloane*, 311 Md. at 43-50.

In that case, speaking through Judge Rodowsky, the Court of Appeals rejected the defendant's contention that the measure of lost profits should be reduced by that portion of the plaintiff's fixed costs attributable, on a cost accounting basis, to the plaintiff's advertising work that was lost because of the defendant's breach of the contract. After an exhaustive review of cases from other jurisdictions, including those discussed on the third edition of Dunn's treatise, the Court of Appeals specifically held: "In our view the cases holding that fixed expenses need not be deducted from gross income to arrive at

---

[26] Defendant's Trial Exhibit 282 at 13.

lost profits properly recoverable are more persuasive. They are also the weight of authority." *Sloan*, 311 Md. at 50 (citing R. Dunn, *Recovery of Damages for Lost Profits* § 6.5, at 290 (3d ed. 1987)). No reduction for fixed costs was appropriate in calculating lost profits because, according to Judge Rodowsky: "Under the applicable damage theory it is immaterial how much of the damage award represents net profit, if any, and how much represented recovery of so much of the contract price as would have been used to offset fixed costs." *Id.* at 52.

The lost profits theory approved in *Sloan* was applied by the Court of Special Appeals in *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 475 (1991). The court's own research, post-*Sloan*, demonstrates that the principles adopted in *Sloan* continue to hold sway as the majority rule. *See, e.g., P.C. Data Centers of Pennsylvania, Inc. v. P.C. Data Centers, Inc.*, 113 F. Supp. 2d 709, 717-19 (M.D. Pa. 2000); *Aon Consulting, Inc. v. Midlands Financial Benefits, Inc.*, 748 N.W.2d 626, 658-60 (Neb. 2008); *Central Security & Alarm Co. v. Precision Security Alarm Corp.*, 918 P.2d 1340, 1347 (N.M. App. 1996); *Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.*, 650 So.2d 801, 804-06 (La. App. 1995); *Jetz Service Co., Inc. v. Salina Properties*, 865 P.2d at 1058. Even if it did not, this court is bound to apply the damage rules established by Maryland's appellate courts in *Sloan* and *Fowler*.

In this case, the court finds that Mervis would have incurred the fixed costs testified to by Ronnie and Zed Mervis and accepted by Dr. Morse, including Mervis's enterprise-wide advertising expense and executive salary expense, even if CHC had fully performed it obligations under the Lease. The court also finds that there were no appreciable fixed cost savings to Mervis as a result of CHC's breach. There is credible

25

evidence to the contrary, because as Ronnie Mervis testified, credibly, Mervis had to

increase it annual advertising expenses in order drive customer appointments and,

eventually, sales to other locations. Hence, it is improper under Maryland law as applied

to the facts proven at trial to deduct from lost profits an allocable share (even if otherwise

proper from an accounting standpoint for an internal management cost-accounting

assessment), to the Rockville Store. Mervis has not avoided these costs by reason of

CHC's failure to perform. *Restatement (Second) of Contracts* § 374(c) (1981). Mervis's

expert correctly deducted Mervis actual expenses directly associated with projected gross

profits from the Rockville location; the actual expenses that would have been incurred in

generating profits had CHC performed the Lease according to its tenor. *See Rozen v.*

*Greenberg*, 165 Md. App. 665, 678-79 (2005). Because CHC's accounting expert

applied an incorrect legal theory to his lost profit calculation regarding cost allocation,

and misconstrued the facts, his opinion in this regard simply is not persuasive; it lacks an

adequate factual basis and does not accurately reflect Mervis's actual business operations.

*Walker v. Grow*, 1790 Md. App. at 275 & 277; s*ee City of Frederick v. Shankle*, 136 Md.

App. 339, 365-66, *aff'd*, 367 Md. 5, 15-16  (2001)(affirming exclusion of expert

testimony which disregarded legal principle clearly set forth in controlling statute).

### E.  CHC's Recapture/Mitigation Argument as a Bar to Lost Profits

As discussed above, the court rejected Dr. Moe's conclusion that Mervis

recaptured 100% of the sales from Rockville at its other locations. Consequently, the

court finds that Mervis suffered lost profits as a result of the closing of the Rockville

store and CHC's failure to timely perform under the Lease. Nonetheless, CHC contends

that because Mervis and Dr. Morse agree there was "some" recapture but failed to

26

quantify the amount of the recapture, then Mervis cannot recover at all for lost profits. In CHC's view, Mervis's failure to quantify the amount of the admitted recapture demonstrates that its claim of the "fact" that it lost profits is incorrect and thus entirely speculative. The court disagrees.

It is well settled that Mervis must prove, by a preponderance of the evidence, the fact that it lost profits due to CHC's breach of the Lease with reasonable certainty. But Mervis is not required to prove the amount of its lost profits resulting from the breach with mathematical precision. *M & R Contractors*, 215 Md. at 348-49; *Driggs*, 135 Md. App. at 427-28. Plainly, the evidence before the court is sufficient to show: (1) the fact of damage; (2) that the damage proceeded from CHC's breach of the Lease; and (3) and an estimation of the amount of damage using well accepted analytical methods. More than this simply is not required. 1 R. Dunn, *Recovery of Damages for Lost Profits* § 5.1 (6th ed. 2005).

Apart from Dr. Moe's discredited hypothesis that Mervis had "zero" lost profits, CHC has pointed to no evidence of record that even suggests there was a reliable way for Mervis to quantify recapture. CHC suggests that Mervis should have extensively surveyed the customers to whom it actually sold diamonds during the breach period to quantify how many went to Mervis stores other than Rockville. The court does not believe that Mervis was required to interrogate its customers to meet is burden of proof of the fact of damages in this case. In any event, neither CHC nor its experts ever explained how Mervis could account for the "lost customer;" that is, a customer who simply never went to any Mervis store because of and during the time that Rockville was closed.

27

Mervis has not failed to meet its burden of proof, production or persuasion with respect to its claim for lost profits.

On the first appeal, the Court of Special Appeals treated this question as one of mitigation of damages. Slip Op., at 27, citing *Hopkins v. Silber*, 141 Md. App. 319, 337 (2001) and *Schlossberg v. Epstein*, 73 Md. App. 415, 421-22 (1998). CHC says that this is erroneous and, at most, was based on the organization of its appellate brief. The court cannot agree.

Specifically in regard to recapture, the Court said: "CHC's second mitigation argument is that customers who would have shopped at the Rockville location simply shopped at one of Mervis's other retail locations in Virginia or the District of Columbia to purchase jewelry." Slip Op. at 30. The Court continued: "At trial, the court heard evidence from Mr. Rudden that certain (or all) sales that the Rockville store would have realized were diverted to other Mervis locations in the District of Columbia and Virginia." Slip Op. at 31. In rejecting this argument on appeal, the Court of Special Appeals concluded that the circuit court did not err in being unpersuaded by CHC's expert at the first trial who opined on this subject.

"[T]he burden of proving that losses could have been avoided by reasonable effort and expense is upon the party who broke the contract." *Sergeant Co. v. Pickett*, 285 Md. 186, 203 (1979), quoting M & R Builders, 125 Md. at 356. Whether the plaintiff took reasonable steps is a question for the fact-finder. *Schlossberg*, 73 Md. App at 422.

To the extent that recapture is, analytically, an issue of mitigation, the court, like my colleague who first heard this case, is unpersuaded and finds that CHC failed to carry its burden of proof on the issue of mitigation of damages. The court also finds that

28

Mervis, by increasing its advertising and attempting to persuade potential customers to visit other Mervis locations, took reasonable steps to minimize the harm a=occasioned by CHC's breach of the Lease.

The appellate court also stated: "It does not appear that the impact of the Chevy Chase opening was considered in awarding damages through September 29, 2006. That issue may be addressed on remand." Slip Op at 30 n. 13. Neither of CHC's experts opined that any particular amount of sales was recaptured by Chevy Chase, or any Mervis branch. CHC was afforded the opportunity to address this issue at the second trial, and to adduce evidence, but, the court finds, failed to do so.

## VI. Prejudgment Interest

Mervis requests prejudgment interest, calculated at the legal rate of 6% simple interest from the date of the breach of the Lease by CHC. *See Maryland National Bank v. Cummins*, 322 Md. 570, 599-600 (1991). "Prejudgment interest comes in two varieties, discretionary and of right. Both versions are 'in the nature of an element of damages.'" *United Cable v. Burch*, 354 Md. 658, 666 (1999) (quoting in part *Maryland State Highway Administration v. Kim*, 353 Md. 313, 327 (1999)). The type sought by Mervis in this case is discretionary. *Crystal v. West & Callahan, Inc.,* 328 Md. 318, 342-43 (1992); *Sloan*, 311 Md. at 53-54..

The court will award Mervis prejudgment interest of 6% commencing from October 1, 2006, which is the first day of the first month following the date on which the circuit court held that CHC had breached the Lease and ordered specific performance, until a final judgment is entered in this case. CHC flatly refused to commence its work under the Lease from the date it first received a building permit, February 15, 2005, until

29

a few days after the circuit court' ruled against it after the first trial on September 29, 2006. At that point, CHC's obligations under the Lease clearly became fixed, and Mervis's legal claim for money damages became "liquidated." Thereafter, CHC deprived Mervis's of the use of capital, for which Mervis, as an element of damages, should be compensated. The court finds Dr. Morse' s Chart 5, Model 2 to be persuasive and, thus applicable.

### Conclusion

In summary, the court concludes that Mervis has demonstrated its entitlement to lost profits for the period October 15, 2005 through October 15, 2007. Mervis is entitled to prejudgment interest of 6% simple interest, commencing from October 1, 2006. Mervis is entitled to reasonable attorneys' fees under the Lease, as the prevailing party. Counsel for Mervis shall submit a propose Judgment within 10 days of the date of this decision.

Counsel for the parties are directed to conduct any necessary discovery regarding Mervis's claim for attorney's fees within 30 days from the date of this decision. Any fee request must comply with the requirements described in *B & P Enterprises v. Overland Equipment Co.*, 133 Md. App. 583, 624-30 (2000) and *Maxima Corp. v. 6933 Arlington Development Limited Partnership*, 100 Md. App. 441, 452-58 (1994). *See also Sloan*, 311 Md. at 52-53; *Long v. Burson*, 182 Md. App. 1, 25-30 (2008). Counsel should contact Chambers with an agreed date for any evidentiary hearing on attorney's fees, said hearing to be scheduled no later than 45 days from the date of this decision.

It is SO ORDERED this 22nd day of April, 2009.

Ronald B. Rubin, Judge

30