
Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3                        - - -
 4
    TRITA PARSI and NATIONAL      :
 5
    IRANIAN AMERICAN COUNCIL      :
 6
              Plaintiffs          :
 7
              V.                  :  Civil No.:
 8
    DAIOLESLAM SEID HASSAN,       :  08 CV 00705 (JDB)
 9
              Defendant           :  Page 1-217
10
11
                        - - -
12           Wednesday, December 8, 2010
                        - - -
13
14         Deposition of Joel N. Morse, Ph.D. was
15  taken at the Law Offices of Murphy & Shaffer, LLC, 36
16  South Charles Street, Suite 1400, Baltimore, Maryland
17  21201 commencing at 1:15 p.m. before Sherry L.
18  Brooks, Professional Court Reporter and Notary
19  Public, in and for the State of Maryland.
20
21                        * * *
22
```



```
 1   APPEARANCES:

 2

 3   PISHEVAR & ASSOCIATES, PC
     BY:  A.P. PISHEVAR, ESQUIRE
 4   Jefferson Plaza, Suite 316
     600 East Jefferson Street
 5   Rockville, MD  20852
     (301) 279-8773
 6   (301) 279-7347 (Fax)
     Representing the Plaintiffs
 7

 8   SIDLEY AUSTIN, LLP
     BY:  TIMOTHY E. KAPSHANDY, ESQUIRE
 9        JOSHUA J. FOUGERE, ESQUIRE
     One South Dearborn
10   Chicago, IL  60603
     (312) 853-7643
11   (312) 835-7036 (Fax)
     E-mail:  Tkapshandy@sidley.com
12            Jfougere@sidley.com
     Representing the Defendant
13

14

15

16

17

18

19

20

21

22
```

COPY

1   M-O-R-O-Z-O-V, Institute for the Study of Diplomacy.
2   And then I wrote blog, B-L-O-G, equal Foraz
3   (phonetic), and then I can't read my own writing for
4   the last name.
5           I must have run into something in the New
6   York Times that intrigued me but I never went back
7   to.
8       Q.   Well, obviously, that doesn't enter into
9   your estimate in any manner.
10      A.   Correct.
11      Q.   Why don't you start with the first thing
12  there behind Tab 2, the article entitled, "NIAC
13  Rejects Representative Kirk's Accusation?"
14          And I take it, this comes from NIAC or its
15  website and Trita Parsi sent it to you?
16      A.   It's hard to -- it's not clear that this
17  is in an E-mail format, so it's hard to know how I
18  got it.
19      Q.   Well, it says written by NIAC staff at the
20  top, right?
21      A.   See, that's sort of obscured, but now I
22  see that half of the letters are cut off at the

Page 116

1    bottom.  It's written by NIAC staff, so I think it's
2    safe to assume that somehow that was embedded in the
3    E-mails that got -- the few that got --
4         Q.   And assuming that was disseminated by NIAC
5    in some matter either by mail or its website, the
6    first paragraph states that:  "Representative Mark
7    Kirk, now Senator Kirk from Illinois, called NIAC
8    Regime sympathizer."  Do you see that?
9         A.   Yes.
10        Q.   Now, obviously, NIAC has their own point
11   of view on this, but when you got this, did you go
12   and find Representative Kirk's statement and see what
13   he said about NIAC?
14        A.   That would be beyond the scope of my
15   assignment.  No, I did not.
16        Q.   Well, let's put it this way:  If a United
17   States congressman or senator calls you a Regime
18   sympathizer, you would have to agree that that might
19   have some impact on your reputation in this
20   community, would it not?
21        A.   Yes.
22        Q.   And for the purpose of your model, you're

1   assuming that Hassan Daioleslam is somehow behind
2   this?
3        A.   Yes.
4        Q.   In what manner?  I mean, do you have
5   anything specific, other than it's bad and it must
6   have come from Hassan?  What I'm trying to get at is,
7   how do you attribute this to Hassan Daioleslam?
8        A.   We've talked before today about the
9   confounding issue.  I did not offer when being
10  retained by the Pishevar Law Firm to be an expert on
11  libel and allied events.
12           I was retained to give a financial
13  analysis that would represent a view of damages if
14  the issues described in the complaint were true.
15           I did not make an effort -- if I'm doing a
16  lead paint case and the issue is -- or the claim by
17  plaintiff -- and I'm typically defense -- if the
18  claim by plaintiff is that there was lead in the
19  paint and a child ingested the paint, I don't try to
20  ascertain whether the child actually lived at the
21  named address.
22           I don't do independent analysis of the

Page 118

```
 1   blood levels or chelation, so in the same vain -- I
 2   didn't mean to get long-winded there.
 3           In the same vain in this case, it wouldn't
 4   be within my expertise to say where the negative
 5   feeling about NIAC began whether it was exclusively
 6   with Daioleslam or whether there was some independent
 7   confounding event or whether there was some event
 8   before the writings in 2007.
 9           I haven't done a text analysis or a
10   political analysis.
11      Q.   Okay.  Well, let's look at a few more.
12   Why don't we take out Volume 1 of the E-mails, and
13   that's going to be Exhibit 2A, and then we'll get to
14   2B.
15           Why don't you take Volume 1 and you'll see
16   that the blue sheets are tabbed with file numbers
17   that were put there by plaintiff's counsel, but it's
18   very helpful to help us navigate this composite
19   exhibit.
20           Let's just start with the first one,
21   JM-001.  There's an article -- if you turn to the
22   second page there -- because I think the first page
```

1   outlawed Regime that treats its opponents worse than

2   Hitler, Stalin, or (inaudible).

3          I will do everything I can to expose NIAC

4   for what it is, a supporter of terrorists and

5   murderers.  Shame on you, Dr. Parsi."

6          First of all, did I read that correctly?

7   A.   Yes, you did.

8   Q.   Now, secondly, is there anything in this

9   communication from Mr. Hamian that indicates that

10  Hassan Daioleslam is behind this or the source of his

11  information is Hassan Daioleslam?

12         MR. PISHEVAR:  Objection.  This is an

13  economic expert.  I really don't know why you're

14  asking him this question.

15         MR. KAPSHANDY:  I understand that.  I'm

16  wondering how he uses this qualitative information in

17  his methodology.

18         BY MR. KAPSHANDY:

19  Q.   We're not going to go through all of them,

20  but there are quite a few.  What I'm wondering is

21  when you see there's -- these are not complimentary

22  statements, correct?

Page 130

1  A. That's correct.

2  Q. And there's no direct reference in these
3  to the defendant. So my question is: How do you use
4  this in your methodology to say that all of the
5  changes in the surplus over the period from 2007 to
6  2008 and maybe more are related to Hassan
7  Daioleslam's conduct?

8  A. Well, because we're up to Exhibit 13 with
9  the predecessor initials JM, I just want to state for
10 the record that the transmission from Parsi to Morse
11 is to an address I don't actually use.

12      My official address is
13 Jnmorse@verizon.net. I do not use, ever,
14 Jnmorse@gmail.com, but I use the technological
15 protocols of G-mail to manage the J. N. Morse
16 account, so I just want the record to show that.

17 Q. But you're not saying you didn't get this?
18 you did get this?

19 A. I did get it.

20 Q. And my question is: Under your
21 methodology, what use do you make of this in
22 attributing the damages that you're opining to Hassan

1   Daioleslam?

2        A.    The contact with NIAC described the reason
3   for the litigation as a cascade of events -- cascade
4   is my economist's word, not NIAC's word -- a cascade
5   of events that had as their seminal event something
6   done by the defendant.

7              And then Parsi, who is quite an effective
8   communicator, wanted to drive home to me the point
9   that whatever events began with the defendant's
10  actions led to a whole stream of events and
11  perceptions that affected fundraisers, membership,
12  outright grants, spontaneous contributions, and all
13  other forms of income that I may not have named.

14             And he sent me these E-mails not because I
15  said, What do they think of you in the New York Times
16  or what do they think of you in Iran or what do they
17  think of you inside the Beltway.

18             He just wanted to show me, I presume --
19  and you'll note that these are transmissions after
20  midnight -- that things are rough for Parsi and NIAC,
21  and it's not my role to determine where that
22  roughness started or whether it's even deserved.

Page 132

```
 1             So I didn't make any use of this, except I
 2   understood that the motivation of plaintiff is to get
 3   out from under this kind of onslaught or at least to
 4   be compensated for the financial implications of this
 5   kind of onslaught.
 6        Q.   And, again, I think, as we've discussed
 7   earlier, if there were other persons out there
 8   writing similar things even before January 2007 when
 9   the defendant first wrote about NIAC, you've made no
10   effort to determine whether any of those other
11   persons, be it Michael Rubin, Kenneth Timmerman,
12   Claire Lopez, or even stuff in the Iranian official
13   press were the basis of any of these people's
14   conclusions that they have expressed in these E-mails
15   that Trita Parsi gave to you.
16             That wasn't your mandate, was it?
17        A.   That's correct.
18        Q.   Okay.  Just a few more.  Why don't you
19   turn to JM0017?
20        A.   Okay.
21        Q.   And again, this was sent to you by Trita
22   Parsi on February 4, 2010 transmitting an E-mail to
```

1  early years to the much larger dollar amounts in the
2  later years existed in the same climate as you've now
3  referred to as policy issues.
4           In other words, there's nothing --
5  whatever success NIAC had occurred even when there
6  may have been people out there whose differences on
7  policy issues were in existence.
8           BY MR. KAPSHANDY:
9     Q.   Right.  But this gentleman specifically
10 cites the policy differences and not anything that
11 Hassan Daioleslam has said to him for not
12 contributing to NIAC, correct?
13          MR. PISHEVAR:  Objection.
14          THE WITNESS:  Right, but to whatever
15 extent people out in the blogosphere have policy
16 differences or don't like the government of Iran, the
17 only thing that's new is the actions of either the
18 senator you mentioned or of Daioleslam.
19          The idea of a policy difference is not
20 something specific to 2006 or 7 or 8 or 9.  That
21 might have gone back for decades.  And despite that,
22 NIAC prospered.

Page 138

```
 1            BY MR. KAPSHANDY:
 2       Q.   Again, there are many of them here in
 3   Farsi, so you didn't make any use of those in
 4   rendering your opinion, correct?
 5       A.   Correct.
 6       Q.   Now, if you turn to Tab JM0038.
 7       A.   Okay.  I'm at 38.
 8       Q.   Now, again, on February 3rd, 2010, Trita
 9   Parsi sends to you an E-mail that a Victor Howard
10   sent to him on August 31, 2009.  Do you see that?
11       A.   Yes.
12       Q.   Now, Mr. Howard writes him:  "Mr. Parsi,
13   you have been getting lots of coverage lately on the
14   internet accusing you of being a mouthpiece for the
15   Islamic Republic, so I decided to do some research on
16   you.  It seems like there is truth to the
17   allegations.  I hope you will decide to come clean."
18            Did I read that correctly?
19            MR. PISHEVAR:  Objection.
20            THE WITNESS:  Yes, you did.
21            BY MR. KAPSHANDY:
22       Q.   Does he mention in there anywhere that the
```