IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRITA PARSI** ) <br> ) <br> **and** ) <br> ) <br> **NATIONAL IRANIAN AMERICAN COUNCIL** ) <br> ) <br>         **Plaintiffs,** ) <br> ) <br>         **v.** ) <br> ) <br> **DAIOLESLAM SEID HASSAN,** ) <br> ) <br>         **Defendant.** ) <br> ) | **Civil No. 08 CV 00705 (JDB)** |

### DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF THE MOTION TO EXCLUDE THE TESTIMONY OF JOEL MORSE

Defendant Seid Hassan Daioleslam respectfully submits this reply memorandum in response to Plaintiffs' opposition to the motion to exclude the testimony of Joel Morse. Plaintiffs' opposition is wholly without merit. It ignores many of Defendant's critiques of Morse's proposed testimony and does not meaningfully respond to those that it does attempt to address. Instead, Plaintiffs rely on sweeping, unsupported statements that have no basis in the law or in the record of this case. The reasons provided in Defendant's original motion to exclude Morse's testimony remain sound, and accordingly, the motion should be granted.

### ARGUMENT

Plaintiffs' arguments can be divided into two categories: general and specific. First, Plaintiffs set forth several points that purport to support Morse's testimony generally. In that regard, much of their opposition boils down to two contentions: (1) because Morse has relevant academic credentials, whatever he says should be trusted and, at the very least, should be left for

the jury's consideration, not the Court's, and (2) Defendant cannot object to Morse's testimony because he did not name an expert of his own. In Plaintiffs' words:

> [A] determination [about the correctness of Morse's conclusions] is better left for a jury and not the Defendant. Dr. Morse's reputation and scholarly background leave no doubt that he is qualified to assist the jury in determining the amount of damages in this case. Defendant seems to question Dr. Morse's expert opinion on the grounds that he reaches an incorrect conclusion from Defendant's viewpoint. Defendant had the opportunity to make such an argument via its own expert witness. However, Defendant failed or chose not to designate any expert witnesses. As such, Defendant should not be permitted to stand in the shoes of its non-existent expert witness and attempt to attack Dr. Morse's expert opinion. Moreover, the defendant should be precluded from attempting to hijack what is cleary [sic] a decision for the jury to make . . . .

Pls.' Opp. 5-6. *See also, e.g.*, *id.* at 6 ("Again, the defendant, who is not qualified to do so, is making an argument that should have be made, if at all, by the expert witness Defendant failed or chose not to designate."); *id.* at 8 ("Again, the defendant, a non-expert, makes this argument since Defendant did not designate any experts.").

Plaintiffs provide no support for either contention because there is none. With respect to the first, Defendant has never challenged Morse's academic credentials. Nevertheless, it is perfectly clear that *Daubert* and Fed. R. Evid. 702 require more than a simple resumé check; a trial court must also assess the proposed testimony. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Indeed, Plaintiffs themselves admit this. Pls.' Opp. 12 ("[T]he court . . . should review not only the underlying model used by the expert and the rationale supporting the expert's choice of that model, but also the reasonableness of applying the model to the facts of the specific case."). As such, Morse's academic credentials cannot shield his opinion from the rigorous review required by *Daubert*.

Plaintiffs' attempt to fault Defendant for not hiring his own expert is equally unavailing. The burden to prove damages is on Plaintiffs, not Defendant, and the burden of satisfying Rule 702 is on the proponent. Neither *Daubert* nor Rule 702 command that a party hire its own expert as a prerequisite to filing a motion to exclude expert testimony.

Finally, Plaintiffs make the fall back plea that "[s]hould some of Dr. Morse's data be inconsistent, trial courts have determined that challenging the data is best left to the trial process and not used to qualify an expert." Pls.' Opp. 8-9. In support, Plaintiffs cite only out-of-circuit authority. This is not surprising because the law in this Circuit is clear: District courts must "resist the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993) (citation and alterations omitted). Of course, with no substantive response to Defendant's criticisms, the "shorthand remark that the jury will give [Morse's testimony] the weight it deserves" is precisely the ruling that Plaintiffs seek. The Court should heed *Joy*'s admonition. Where, as here, an expert's proposed testimony suffers from numerous fundamental flaws, *Daubert* and Rule 702 require that it be excluded.

In addition to these more general (meritless) arguments in support of Morse's testimony, Plaintiffs also attempt to respond to some of Defendant's specific attacks. These responses are also baseless, as explained below.

## I.     MORSE'S PROPOSED TESTIMONY IS NOT RELIABLE

In his motion, Defendant set forth a number of reasons why Morse's proposed methodology is not sufficiently reliable and why he did not reliably apply that methodology to the facts of this case. Each is considered in turn, along with Plaintiffs' responses or lack thereof.

### A. Morse's Methodology Is Not Reliable

Morse's methodology is unreliable for at least six reasons.[1]

1. Morse uses completely arbitrary and speculative growth rates of 5, 10, 15, and 20 percent to calculate damages. Def.'s Mot. 6-7. Plaintiffs reply, first, that Morse does not opine as to the proper growth rate because he "approached his role as an expert witness as more of a guide whose job it is to advise the jury against the possibility that they would have unreasonably chosen some growth rate like 50% or more." Plfs.' Opp. 6. That is not a defense of the plainly speculative and arbitrary growth rates. If all Morse sought to do was to provide a premature warning to the jury not to pick a growth rate that is too high, then his testimony should have been limited to saying "Do not use a growth rate of 50% or more." But that is not what he did; rather, his report assumes that the rate *should be* 5, 10, 15, or 20 percent because he uses those figures to calculate the alleged damages. These rates have no basis whatsoever (other than the apparent prerequisite that they be less than 50%), and the testimony is therefore unreliable.

Later, Plaintiffs add that Morse's failure to use any statistical analysis to estimate NIAC's but-for growth rate is permissible because he "references . . . actual facts from Plaintiff's prior financial reports showing prior growth levels." *Id.* at 8. That is true but irrelevant. Morse indeed wrote that NIAC had grown at "nearly identical rates (55-56%) over the period 2002-2007." Def.'s Mot., Ex. A (Morse Report), p. 3. But the only connection that Morse draws between those rates and his opinion that NIAC would have grown at rates of 5, 10, 15, or 20 percent going forward is to say that the but-for rates are smaller and thus "conservative." By that

---

[1] In their opposition, Plaintiffs, for the first time, refer to Morse's methodology as the "before and after method." Pls.' Opp. 3-4. They again provide no support for this supposed methodology and why it is a reliable or tested methodology used in the relevant field. See *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993).

criteria, 1 percent or 49 percent would also do. This is speculation, not expert analysis, and Morse's proposed growth rates are thus unreliable.[2]

2. Morse extends his damages calculations over a speculative and unsupported time period of three, four, or five years. Def.'s Mot. 7. Plaintiffs respond that "Morse provides ample support for his analysis on why he selected the years that damages would apply. The number of years is based on expert opinion of how long the effects of a defamation damages would impact the level of donations to NIAC." Pls.' Opp. 9. That is simply false. Neither Morse nor Plaintiffs have ever provided *any* support, let alone "ample" support, for the idea that damages will last three, four, or five years. In fact, Morse specifically disclaimed: "I do not opine here on the exact number of years through which damages will persist . . . ." Def.'s Mot., Ex. A (Morse Report), p. 2.

3. Morse's decision to avoid a partial year analysis lacks evidentiary support and is biased and unreliable. Def.'s Mot. 7-8. Plaintiffs reply that "Morse's decision to not use partial year analysis is supported by a reference to an auto tort liability case. Even though the cases are different, what is applied is the methodology used to base his expert decision on, not the same set of facts." Pls.' Opp. 9. This is conclusory and nonsensical. It also completely avoids Morse's failure to explain how it was that NIAC's largest surplus ever coincided with the first nine months of Defendant's writings.

4. Morse's estimates of actual surplus from 2010 through 2012 are unreliably low. Def.'s Mot. 8-9. Plaintiffs summarily respond:

---

[2] Plaintiffs also defend the fact that Morse testified to more than one growth rate, relying, in part, on the fact that Microsoft Excel has a "Scenarios" tool. Pls.' Opp. 8. This misunderstands Defendant's critique. Defendant does not object to the idea of proposing alternative scenarios in the abstract. Instead, Defendant objects to the fact that (1) Morse never opines on which is rate is most proper, even if there might be alternatives, and (2) Morse provides no basis for *any* scenario or growth rate—these are not alternatives based, for example, on different factual scenarios that the jury might find but are instead just random figures plucked from nowhere.

> Dr. Morse's analysis was based on the factual financial data that he reviewed and was not speculative and is reasonable under the circumstances. Morse's expert testimony provides a reasonable basis to assist a jury to deciding damages at trial. Dr,. [sic] Morse has not, as Defendant argues, simply "done the math", but has applied rigorous and analytical analysis to the facts of the case and determined in his expert opinion the estimated amount of damages which is what he will testify to in court, therefore, his testimony should be included.

Pls.' Opp. 9. This conclusory statement ignores the inescapable fact that in the very first year (2009), his projected actual surplus differs from the real surplus 50-fold. Remarkably, it also contradicts Morse himself, who was the one (not Defendant) to characterize his testimony as simply "do[ing] the math" rather than "rigorous and analytical analysis." *See* Def.'s Mot., Ex. B (Morse Dep.), pp. 202-203 ("I'm trying to be an Idiot Savant . . . [who has] done the math.").

     5. Morse did not apply a discount rate to bring his damages estimates to present-day values, thereby artificially inflating them. Def.'s Mot. 9. Plaintiffs do not refute this point.

     6. Morse's assumption that NIAC's but-for surplus can be extrapolated from one isolated year is unreliable and unsupported. Def.'s Mot. 9-10. Plaintiffs do not address the substance of this critique and just offer the uncorroborated and conclusory statement that such forecasting "occurs on a regular basis and is used throughout the financial industry when future projections are created and is reliable in this case." The fact that other people might do forecasting with varying degrees of unreliability says nothing about the reliability of Morse's model.

     **B.**    **Morse Did Not Reliably Apply His "Methodology" to the Facts Of This Case**

     1. Morse failed to account for confounding evidence that: (1) demonstrated why NIAC's revenues and thus surplus decreased for reasons unrelated to the Defendant; and (2) the Defendant was not the only person speaking out against Plaintiffs. Def.'s Mot. 10-15. As to the first category of confounding evidence, Plaintiffs largely ignore Defendant's point. They do not, for example, address the return of several hundred thousand dollars in grants for reasons indisputably unrelated to Daioleslam. *Id.* at 11-12. And, their response to the impact of the

6

economic downturn is similarly deficient. First, Plaintiffs repeat that Morse relied on two nationwide reports about non-profit giving in 2008. Pls.' Opp. 3, 7. Defendant agrees but that is precisely the problem with Morse's testimony, not a defense of it: NIAC documents are a more accurate source, those documents refute the nationwide reports, and Morse admitted this. Def.'s Mot. 11-12. Second, Plaintiffs accuse Defendant of "demanding a degree of exactness that the court and Dr. Morse reject as appropriate." Pls.' Opp. 7. This, too, fails to engage the substance of Defendant's point. It is also wrong. Defendant is not "demanding" any degree of exactness. Rather, Defendant is pointing out what Morse readily conceded—that NIAC documents are more reliable than nationwide reports and indicate that Morse's assumption that the economic downturn did not affect NIAC's revenues is inaccurate and thus unreliable.

With respect to the second category of confounding evidence—others speaking out about NIAC and Parsi—Plaintiffs distort Morse's testimony:

> Dr. Morse clearly explains . . . that in his opinion those third parties who spoke out against Plaintiffs were acting as a front for Defendant. . . . Defendant argues that Morse has simply assumed that only the Defendant caused the harm. . . . In fact, Morse clearly states in his deposition that in his opinion he has recognized other contributing parties, however states that Defendant was behind these efforts.

Pls.' Opp. 10. As stated previously, Morse conceded that he did not deal with the confounding issue. Def.'s Mot. 13-14. In fact, Morse specifically testified, "[I]t wouldn't be within my expertise to say where the negative feeling about NIAC began whether it was exclusively with Daioleslam or whether there was some independent confounding event or whether there was some event before the [Defendant's] writings in 2007." Def.'s Mot., Ex. B (Morse Dep.), p. 118.

    2. Morse merely did what he was told in applying his methodology to the facts of this case. Def.'s Mot. 15. Plaintiffs ignore this criticism, for reasons which become clearer in light of Parsi's most recent deposition. *See* Deposition of Dr. Trita Parsi, May 11, 2011 (Ex. A). In

7

particular, Parsi testified that he read Morse's report at the time it was issued in May 2010, wherein Morse related that NIAC told him that current membership had dropped to 1,200 members. *Id.*, p. 18; Def.'s Mot. Ex. A (Morse Report), p. 4. But at the same time in 2010, Parsi was publicly stating to donors and on NIAC's website that NIAC's membership had risen to 3,000 to 4,000 and had 35,000 to 43,000 active supporters. Ex. A, pp. 9-10, 65-68. When the parties and their damages expert cannot even relate accurately and consistently what membership was or whether it increased or decreased after the alleged defamation, the evidence is plainly unreliable.

## II. MORSE'S PROPOSED TESTIMONY WILL CONFUSE RATHER THAN ASSIST THE TRIER OF FACT

Morse's testimony will not assist the trier of fact. His math is wrong and his testimony risks confusing the jury by presenting them with wholly speculative damages estimates. At his deposition, Morse also confusingly analogized the case to joint and several liability in lead paint cases. Plaintiffs ignore both of these issues.

Instead, relying on a law review article and Sixth Circuit case law, they conclusorily exclaim that Morse's testimony will assist the trier of fact because: (1) he has relevant academic credentials; and (2) he has conducted a "deft review of NIAC's financial statements, objective interviews with NIAC donors, and qualitative analysis attested to his Expert Report." Pls.' Opp. 11. Plaintiffs again contradict Morse's own testimony because he admitted that his interviews were not objective. *See* Def.'s Mot., Ex. B (Morse Dep.), p. 173 (admitting that because his interviewees were picked for him by Plaintiffs, there was "certainly . . . the possibility of bias").

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendant's motion, Defendant requests this Court to exclude the proposed testimony of Plaintiffs' expert witness Joel Morse.

8

|  |  |
|---|---|
| Dated: May 20, 2011 | _____/s/_____<br>Timothy E. Kapshandy (Illinois Bar No. 6180926, admitted *pro hac vice*)<br>Bradford A. Berenson (D.C. Bar No. 441981)<br>HL Rogers (D.C. Bar No. 974462)<br>Peter G. Jensen (D.C. Bar No. 982599)<br>SIDLEY AUSTIN LLP<br>1501 K Street, N.W.<br>Washington, D.C.  20005<br>(202) 736-8000<br>tkapshandy@sidley.com<br><br>Attorneys for Defendant<br>Seid Hassan Daioleslam |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **TRITA PARSI** ) | |
| ) | |
| and ) | |
| ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 08 CV 00705 (JDB)** |
| ) | |
| **DAIOLESLAM SEID HASSAN,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## CERTIFICATE OF SERVICE

I certify that on May 20, 2011, I served, via email, Defendant's Reply Memorandum in Support of the Motion to Exclude the Testimony of Joel Morse to:

>Afshin Pishevar
>Adrian Nelson
>600 East Jefferson Street
>Suite 316
>Rockville, Maryland 20852
>(301) 279-8773
>ap@pishevarlegal.com
>anelson@pishevarlegal.com

|  |  |
|---|---|
| Dated: May 20, 2011 | /s/<br>Timothy E. Kapshandy (Illinois Bar No. 6180926, admitted *pro hac vice*)<br>Bradford A. Berenson (D.C. Bar No. 441981)<br>HL Rogers (D.C. Bar No. 974462)<br>Peter G. Jensen (D.C. Bar No. 982599)<br>SIDLEY AUSTIN LLP<br>1501 K Street, N.W.<br>Washington, D.C.  20005<br>(202) 736-8000<br>tkapshandy@sidley.com<br><br>Attorneys for Defendant<br>Seid Hassan Daioleslam |