UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                          |   |                        |
|------------------------------------------|---|------------------------|
| TRITA PARSI and                          | . |                        |
| NATIONAL IRANIAN AMERICAN                | . |                        |
| COUNCIL,                                 | . |                        |
|                                          | . | CA No. 08-0705 (JDB)   |
|     Plaintiffs,      | . |                        |
|                                          | . |                        |
|   v.                           | . | Washington, D.C.       |
|                                          | . | Friday, March 4, 2011  |
| DAIOLESLAM SEID HASSAN,                  | . | 10:00 a.m.             |
|                                          | . |                        |
|     Defendant.       | . |                        |

. . . . . . . . . . . . . .

DISCOVERY HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          ADRIAN NELSON II, ESQ.
                             AFSHIN PISHEVAR, ESQ

For the Defendant:           TIMOTHY KAPSHANDY, ESQ.
                             PETER JENSEN, ESQ.
                             ERIC GALVEZ, ESQ.

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             Official Court Reporter
                             U.S. Courthouse, Room 6714
                             333 Constitution Avenue, NW
                             Washington, D.C. 20001
                             202-354-3186

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have civil action 08-705, Trita Parsi et al. versus Daioleslam Seid Hassan.  We have Mr. Afshin Pishevar and Mr. Adrian Nelson II representing the plaintiffs, and we have Mr. Peter Jensen, Mr. Timothy Kapshandy, and Mr. Eric Galvez representing the defendant, who is present also.

THE COURT:  All right.  Good morning, everyone.  I see that you've worked out all your discovery problems and we can get on with this case without being bogged down with those issues.  I see no laughter in the courtroom, and that's perhaps the last light moment that we'll have this morning in any event.  And even that wasn't very light.

So you filed your status reports dealing with discovery and identified many lingering issues, some of which are contained, supported, demonstrated, or otherwise revealed by the numerous boxes on the table in front of the defendant's counsel.

I see eight things that were identified in these reports.  Hopefully you're not going to tell me that there are 14 other things as well.  Hopefully also you're going to tell me that one or two of these, or more, if I really get optimistic, don't really need my attention or have been resolved.  But the issues, not necessarily in the order that I intend to address them here this morning, but the issues include the question over the server and other computers that haven't yet been subjected to

1    forensic imaging, the Salesforce membership database issue,

2    maybe that's resolved, questions relating to depositions, either

3    depositions that need still to be taken or follow-ups on

4    requests made at depositions.  There's also a couple of subpoena

5    matters that may be included in that category.

6         We have some issues relating to the PWC report, lingering

7    issues with respect to the Talebi e-mails, some issues relating

8    to a subpoena to Pugwash, questions relating to the discovery

9    supplementation cutoff date, if that's the right terminology,

10   and then some issues relating to additional witnesses who have

11   been identified who may or may not be called.

12        That's sort of the lineup of things that I'm expecting to

13   have discussion on to a greater or lesser extent here this

14   morning.  I'll ask each side a simple question, whether --

15   two-part question, whether I can cross anything off that list

16   and whether you think anything needs to be added to that list

17   with respect to the discovery issues and disputes that we're

18   here this morning on.

19        First on behalf of the plaintiffs, an answer to that

20   question.

21             MR. NELSON:  Good morning, Your Honor.  Adrian Nelson

22   on behalf of the plaintiffs.

23             THE COURT:  Good morning, Mr. Nelson.

24             MR. NELSON:  With respect to the eight things that you

25   identified, I believe that No. 8, the additional witnesses, I

1   think that's been resolved.  There were several additional

2   witnesses that the defendant wanted to depose, and we've decided

3   that in our case in chief we will not call those individuals.

4   So I believe that issue has been resolved.

5           THE COURT:  And that's the only one of the eight that

6   you think doesn't need any further discussion today?

7           MR. NELSON:  I believe so.  We tend to believe that

8   the issue relating to Salesforce has been resolved, but I'm

9   certain that the other side does not feel that way.  I think

10  that's probably the only certain one and there's a possible one

11  with respect to Salesforce.

12          THE COURT:  All right.  Mr. Kapshandy, what's your

13  view on the proper list?

14          MR. KAPSHANDY:  I think that's an accurate list, and I

15  would just ask for clarification on the new witnesses.  On

16  January 31 NIAC included one new person on that list, their

17  current legislative director, whose name is Jamal Abdi.  If he's

18  included in these witnesses, then I would agree entirely.  Is

19  that correct?

20          MR. NELSON:  That's correct.

21          MR. KAPSHANDY:  And the other two people informed me

22  that they do not intend to testify, so I would agree with

23  counsel's representation.  I think there's nothing else to be

24  added other than since the filings we have received some

25  membership information, and I'll be glad to discuss those in any

1    amount of detail the Court wants at the appropriate time as we

2    go through the materials.

3              THE COURT:  All right.  And what about with respect to

4    the Salesforce?  That's still a live issue as far as you're

5    concerned?

6              MR. KAPSHANDY:  That's what we got Wednesday --

7              THE COURT:  Just give me your yes or no.  I don't want

8    to delve into it first necessarily.

9              MR. KAPSHANDY:  The Salesforce and membership database

10   information is probably one of the two big issues, along with

11   the computer not being produced issue, and the Pugwash subpoena,

12   and the Talebi e-mails.  Those are, if we want to prioritize,

13   what we would like to spend --

14             THE COURT:  We're going to try to deal with all these.

15   And, look, I'm sure that this could take four hours if you or I

16   allow it to, or it could take a half an hour if I just make

17   decisions without hearing anything further from you.  I'm

18   prepared to let you give me a little bit of additional

19   information on these issues so that we can reach the fair and

20   proper resolution.  But I'm not prepared to spend four hours

21   doing it.  So you're going to need to be efficient and focused

22   as we proceed.

23         I'll ask one other preliminary question.  Mr. Kapshandy, do

24   you believe that it would be best to deal with these issues one

25   by one?  In other words, pick issue one, let's say the server

1    and computers, and deal with that and hear everything from you

2    and from the plaintiffs and resolve it, and then move on to the

3    next, or should I just hear everything you want to say on

4    everything and everything plaintiffs want to say on everything,

5    and then go ahead and make my rulings?

6              MR. KAPSHANDY:  I believe the second approach would be

7    better, because there's a pattern and some of the remedies we're

8    asking for deal with these in groups of things.

9              THE COURT:  All right.  We'll go ahead and do it that

10   way.  If I feel that I need to jump in and resolve something in

11   the middle, I'll do that, but I'll go ahead then and hear first

12   from you and then from Mr. Nelson, because I think you have more

13   issues.  It's not that Mr. Nelson doesn't have a couple.  There

14   are a couple of issues on that side.  And we will proceed in

15   that way unless Mr. Nelson thinks that that's going to be

16   grossly inefficient.

17             MR. NELSON:  Well, I just think that the plaintiff

18   should be heard on this, how we proceed, and I believe that it

19   would be better to deal with each issue discretely.

20             THE COURT:  You guys can't agree on anything, can you?

21   Not even the process that we're going to take here this morning.

22             MR. NELSON:  I just believe that for the sake of

23   making sure that all of the statements remain consistent on each

24   issue, and we don't have to keep going back and addressing

25   things that may have been misstated regarding other issues,

```
 1    it'll be less confusing to deal with each issue discretely.  But

 2    that's our position.

 3            THE COURT:  I don't know which is going to be the most

 4    efficient, and by efficient I don't mean take the least amount

 5    of time, although that's part of it, but I really mean primarily

 6    efficiency in terms of reaching the right resolutions.

 7        Let's start out by hearing from Mr. Kapshandy, and if I

 8    want to stop at some point and say, let me hear where Mr. Nelson

 9    and the plaintiffs are on that issue before we go on, I will do

10    so.

11            MR. KAPSHANDY:  Thank you, Your Honor.  As I

12    mentioned, I think the four priority issues to focus on -- and

13    we're not here to do discovery for another two years; we've been

14    doing discovery for two years already.  The case is now on its

15    third-year anniversary -- is to focus on what I believe are the

16    four most prudent ones to focus on, and frankly we've been after

17    for the last couple of years.

18        The membership database being one, the issue as to --

19            THE COURT:  Which are the four, so I know -- which are

20    the four issues?

21            MR. KAPSHANDY:  Sure.  The server computer switcheroo,

22    which relates to the database and the calendars, but we'll just

23    call that the computer issues; the Pugwash subpoena, which is

24    frankly pretty straightforward and maybe we can knock that off;

25    and then the issue of the litigation hold, and maybe we can make
```

1     the fifth one being the lobbying memos.

2               THE COURT:  Lobbying memos?

3               MR. KAPSHANDY:  Yes.  After Patrick Disney's

4     deposition --

5               THE COURT:  That's part of the deposition follow-up.

6               MR. KAPSHANDY:  Deposition follow-up.  And this is a

7     pretty focused issue, if we could start with that.  As the Court

8     may recall, in 2008, Patrick Disney, who was the assistant

9     legislative director, wrote an internal memo basically

10    concluding that NIAC was violating lobbying laws.  And at his

11    deposition he described a number of things that they did

12    subsequent to that, such as CLIPI research, legal research,

13    internal e-mails and follow-up.  And they publicly stated that

14    they've subsequently had legal advice that their conduct was in

15    compliance with the law.

16        And that's all fine and good, and we've asked for that

17    repeatedly in general discovery, at his deposition, after his

18    deposition.  This was promised to us on February 4.  And then

19    NIAC pulled that back -- they also promised a privilege log.

20    They were going to withhold some of that.  We have received none

21    of those, nor a privilege log.  And their basis for withholding

22    this now is the parties have agreed that no document has to be

23    produced after basically May of 2009 when we did the initial

24    production in this case.

25        We can talk about that supplementation issue separately.

1    There's an easy way to resolve this question, and that is --

2              THE COURT:  I want -- okay.  Go ahead.

3              MR. KAPSHANDY:  If they want to put on evidence that

4    they have legal advice that their conduct is in compliance with

5    laws, be it IRS or Lobbying Disclosure Act or Foreign Agent

6    Registration Act, they need to produce it.  Otherwise, they

7    should be barred from introducing that evidence.

8              THE COURT:  That's normally what the law requires.

9    This comes up a lot in patent cases, quite frankly, and there's

10   a lot of law that's developed.  And indeed I think I've written

11   one or two opinions on the subject, and generally that is the

12   case.

13             MR. KAPSHANDY:  And if it's a matter of

14   attorney-client privilege, they can't have it both ways.  They

15   can't say trust us, this is what the advice says, but you can't

16   look at it.

17             THE COURT:  Right.

18             MR. KAPSHANDY:  And this is where we get into the

19   problem of the discovery supplementation.  All of 2009, the

20   defendant kept requesting the plaintiff to an agreed date for

21   supplementation, because we get into an infinite regress --

22             THE COURT:  What does supplementation mean?  I don't

23   understand really what this concept is.

24             MR. KAPSHANDY:  In March of 2009 the parties sent

25   discovery requests, which were fairly focused, but have governed

most of the discovery in the case.  And with a lot of review on both sides of computers and documents, produced documents and answers in May of 2009.  Since then, there have been lots of follow-up discovery requests, particularly on the discovery fraud and abuse issue and the computers and that sort of thing. And specific things have been requested, like the calendars and those sorts of things.

However, we have a problem with the initial answers that were provided in May of 2009, and that is, time has gone on, a lot.  And discoverable evidence has been created in that interim on both sides.  They have about 10 computers they would have to look through, our client has one and his own files.

THE COURT:  Wait a minute.  You say has been created. The information on the computers isn't information that's been created since May of 2009 for the most part, it's just information that hasn't been attained from those computers yet. When you say created, you mean what?

MR. KAPSHANDY:  Well, the defendant's written more articles they may claim are defamatory, and his communications with people.  They've engaged in more conduct.  So we've struggled as to how to deal with this infinite regress, because it takes time to collect all that, and by the time you've collected it, then you've got more time to look for and --

THE COURT:  Undoubtedly.

MR. KAPSHANDY:  So all of 2009 we kept saying, look,

1    we need an agreed date.  It can be May of 2009, it can be the

2    end of 2009.  We've actually reviewed all of his files through

3    the end of 2009.  But agree to a finite date, and then that

4    would take care of the supplementation of the answers that were

5    provided in May of 2009.

6            THE COURT:  On those initial discovery requests.

7            MR. KAPSHANDY:  Right.  On the initial --

8            THE COURT:  Because I take it from your perspective it

9    would not take care of, for example, discovery that you've

10   engaged in into the conduct of discovery?

11           MR. KAPSHANDY:  Right.  Because all of that happened

12   afterwards.

13           THE COURT:  Right.

14           MR. KAPSHANDY:  And then when it became apparent, when

15   we had confirmed this in writing, that we were talking about

16   supplementation of the then-existing answers, and NIAC then

17   pulled back the offer for the, shall we call it lobbying

18   research documents, claiming those were all created after May of

19   2009 -- which is a little bit hard to believe when the initial

20   memo was created in the summer of 2008, meaning it was such an

21   important issue they didn't get the subsequent advice for at

22   least another year -- that made it clear to us that we weren't

23   on the same page as to what we were talking about in terms of

24   supplementation.

25       That was a specific request that had been repeatedly

1    requested.  It had been mentioned at Disney's deposition.

2    They're raising it as an affirmative defense.  So unfortunately,

3    it's one of these situations where the parties thought they had

4    an agreement, and in fact they don't.  So we still don't know

5    how we're going to deal with that supplementation issue.

6              THE COURT:  "We" don't, meaning you and they don't?

7              MR. KAPSHANDY:  Right.

8              THE COURT:  How do you think it should be dealt with?

9              MR. KAPSHANDY:  Well, if materials had been

10   specifically requested afterwards -- and there were a number of

11   discovery requests relating to the Talebi e-mails and the

12   computers and things like that, and they've requested things of

13   the defendant like a proceeding he had in France -- that's fine,

14   but -- those should be accepted.  What we're not asking is that

15   the parties go back and systematically review all of their

16   computers and all of their files to see if any documents that

17   have been created after May of 2009 are discoverable, because

18   that would be a huge task, for them certainly, and for our

19   client also.

20       But if there are specific requests, we shouldn't use that

21   as a shield to say, oh, wait a minute, we don't have to give you

22   anything after May of 2009.  Otherwise, we're going to have to

23   go to the --

24              THE COURT:  Right.  But normally, if a party -- in a

25   simpler case with less electronic discovery at issue, if a party

1   responds to discovery and then subsequently, well after that

2   time, finds another responsive document from the earlier time

3   period, the party, under the law and under the rules, has some

4   obligation with respect to producing that material.

5          MR. KAPSHANDY:  Right.

6          THE COURT:  Are you suggesting some change to that?

7          MR. KAPSHANDY:  Well, maybe I'm not being clear.  If

8   documents which are responsive but didn't even exist prior to

9   the original answers have come into existence -- and there are

10  particular ones here that are very important, some that they

11  want to raise as an affirmative defense -- our argument would be

12  that that should be produced.  Now, the question is do the

13  parties have to go back and systematically re-review computers

14  and files for anything that might be discoverable in response to

15  the previous request.

16         THE COURT:  That isn't a question of a

17  production-related cutoff or supplementation date.  That's a

18  question of a task or obligation-related date.  Do either of the

19  parties need to continue to review their existing materials,

20  whether they're electronic or otherwise, on a month-to-month or

21  whatever basis, to make sure they've produced everything?  And

22  common sense tells you, no.  There has to be an end to that

23  process.

24         MR. KAPSHANDY:  Right.  And that's what we thought we

25  were agreeing to.  But then there are particular requests, like

1    for example, the calendars, which were produced in I think

2    December of '09, and then again in May of 2010, clearly were

3    specifically requested and included things that had happened

4    after May of 2009.  But the plaintiffs seem to be of the view

5    that this not having to re-review old files is a hard and fast

6    discovery cutoff for any documents after May of 2009.  And

7    that's where we were ships passing in the dark.

8        It's our view that clearly these things that are

9    specifically requested are not cut off under this shield of a

10   May 2009 date.  And the conduct between the parties has clearly

11   indicated that many things have been produced --

12           THE COURT:  I was going to say, hasn't each side

13   produced some things after that date, that were created after

14   that date?

15           MR. KAPSHANDY:  Absolutely.  Many things.  So with

16   regard to the Disney memos, we would simply say don't use that

17   as a shield, produce those or produce a privilege log, and then

18   maybe we'll have to address the privilege issue if they've not

19   waived it by trying to use it as a defense.

20           THE COURT:  So from your perspective, what do I need

21   to resolve on this supplementation date?  What kind of

22   specificity do the parties need in order to operate without

23   further disputes with respect to that?

24           MR. KAPSHANDY:  I thought the way you just expressed

25   it was exactly what we had understood, and if you can remember

```
1    what it was, that would be fantastic.
2             THE COURT:  That's what he's for.  I'm pointing to
3    you, Bryan.
4             MR. KAPSHANDY:  We don't have to systematically review
5    everything to update the answers that were filed in May, but
6    things that have been specifically requested or discussed
7    regarding conduct or requests that occurred after May of 2009
8    may not be shielded from discovery just because that conduct or
9    those requests were after May of 2009.
10            THE COURT:  And then, as that plays out with respect
11   to the Disney deposition and the attorney-client issue, what do
12   you suggest that the Court needs to rule with respect to that?
13   Because I don't have a specific attorney-client issue before me.
14            MR. KAPSHANDY:  No.  Well, they promised to produce
15   the documents on February 4, until they pulled them back, except
16   to the extent they said some legal research might be put on a
17   privilege memo.  We've not seen that, so we can't address that
18   either.  But ask them to produce the documents and/or a
19   privilege log so then we can address that issue.  They had
20   promised it.
21            THE COURT:  And I think -- I'll hear from Mr. Nelson
22   obviously on that, but it seems to me that I can do that.
23   That's pretty straightforward, because all that is is a means to
24   get the issue joined and ripe.  I can observe, but it's only a
25   general observation -- not specific to the facts and legal
```

1   arguments presented to me, because that hasn't happened yet --

2   but I can make a general observation that, yes, in these kinds

3   of circumstances, as I said before, there is a body of case law

4   that discusses the ability of a party to rely on attorney-client

5   privilege and the advice of attorneys and yet say that that

6   can't be probed in discovery.

7        And the general proposition, which I've certainly joined in

8   expressing, is that you can't have it both ways.  You can't

9   assert the advice of counsel as a defense in a claim and yet at

10  the same time say, sorry, there's no right to explore that

11  advice of counsel in discovery or in the presentation of

12  evidence in the case.  All right.

13       MR. KAPSHANDY:  Can I do one more easy one before we

14  get to the hard ones, and maybe we'll do a hybrid approach of

15  what we've suggested here.

16       THE COURT:  All right.  Do one more, quote-unquote,

17  easy one.

18       MR. KAPSHANDY:  Pugwash.  Pugwash is an organization

19  that we've learned has paid for Trita Parsi to go over to Europe

20  and meet with governmental officials, including governmental

21  officials from Iran.  They produced no documents related to that

22  except for a few invitations from NIAC to governmental officials

23  here to participate in some of these, what are called also Track

24  Two negotiations.

25       Accordingly, last November we subpoenaed Pugwash, who is

1    agreeable to producing documents related to the meetings that he

2    went to.  No objections were filed pursuant to Rule 45 by the

3    plaintiffs, and --

4          THE COURT:  Except they want to do so pursuant to a

5    confidentiality --

6          MR. KAPSHANDY:  Confidentiality, which we've agreed

7    to, but they won't agree to, and now they're trying to say --

8    they've retrospectively objected, it appears, that they'll only

9    sign that if Pugwash produces only Trita Parsi's travel

10   documents.  And that wasn't what was requested.  We're

11   requesting who's there, what the meeting's about, agenda, any

12   communications, documents related to those meetings.  That seems

13   pretty straightforward.  With that, I'll --

14         THE COURT:  All right.  Why don't I hear from

15   Mr. Nelson on that range of issues that we've discussed, which

16   would be the supplementation date, more generally, the Pugwash

17   subpoena, and the Disney deposition, including the impact of the

18   supplementation cutoff date on that question, but also including

19   this attorney-client issue.

20         MR. NELSON:  Your Honor, with respect to the discovery

21   supplementation issue, I think what we will see as we continue

22   to discuss the issues here this morning is that we seem to find

23   ourselves in a never-ending sinkhole with respect to discovery,

24   that when things are produced, they require additional

25   production.  There's always more, and they're never satisfied.

1        Now, in this particular instance with respect to the

2    discovery supplementation issue, I do think it's interesting

3    that the other side would say that, to the Court, we understood

4    discovery supplementation just as you said it, but couldn't

5    explain what was just proposed.

6        That's what we've been experiencing in this case, is that a

7    statement is made, and then later on, when we try to work with

8    that statement, well, that's not what I said.  I don't think

9    that the other side really understood what they meant by

10   supplementation when we agreed what was going to take place.

11       On the issue of supplementation, it's interesting that

12   they're talking about whether or not we should be able to put

13   forward an affirmative defense.  We're not the defendants in

14   this case; we're the plaintiffs in this case.  We may have a

15   theory of our case and it may relate to a theory of our case,

16   but there's no affirmative defense that's at issue here.

17       When you point to the issue of the calendars being

18   produced, the calendars were produced because there was an issue

19   about alleged fraud on the part of NIAC, that they were saying

20   that something was done improperly.  And we have to distinguish

21   between regular discovery and things that were produced because

22   of the defendant's clear intention to try to file some type of

23   motion for sanctions, et cetera, and try to have this case

24   resolved.

25       So there's a clear distinction between things that relate

1    to the allegations of discovery fraud and abuse, et cetera,

2    versus the actual discovery in this case.

3        One of the things that we have been dealing with, and I

4    specifically tie it to Mr. Disney's testimony, is if a witness

5    makes a statement in a deposition, the other side never

6    contemplates that there's a possibility that the witness's

7    memory was faulty.  Mr. Disney said the following, therefore,

8    that must be the factual scenario.  Mr. Disney's memory may be

9    faulty.  We'll have to explore that when we get to trial.

10           THE COURT:  That may be.  That's always true with

11   witnesses, but that's often --

12           MR. NELSON:  So the issue is that if Mr. Disney says

13   something was created at a particular time frame, then it must

14   have been created at that time frame, and therefore when we say

15   actually it wasn't that time frame, the documents would show

16   otherwise, well, we're hiding, we're lying, we're being

17   fraudulent.

18           THE COURT:  Not if the documents are produced, there's

19   no hiding and no lying.

20           MR. NELSON:  But our agreement with respect to

21   discovery supplementation, as I understood our agreement, was

22   that anything that was produced in the last production as of May

23   2009, that was the cutoff, and that the parties --

24           THE COURT:  Cutoff for what?

25           MR. NELSON:  First of all, there would not be an

1   expectation that the parties would go and review their documents

2   and electronic documents going forward.

3        THE COURT:  But if you uncovered, yourselves, in your

4   preparation for this case a smoking-gun document, we all know

5   what that means, something very important to the outcome of the

6   trial, that was dated --

7        MR. NELSON:  June 2009?

8        THE COURT:  No.  I'm going to give you another example

9   first.  You discovered it after May 2009, but it's a document

10   that was dated prior to May of 2009.  Under your understanding

11   of this supplementation cutoff, do you have an obligation to

12   produce that?

13        MR. NELSON:  Yes, we do.

14        THE COURT:  And if you come across a document or your

15   clients produce a document that is requested in discovery that

16   was something produced in the course of events after May of

17   2009, you think that doesn't have to be produced?

18        MR. NELSON:  That's correct.

19        THE COURT:  You think it's that kind of bright line.

20   Is Mr. Kapshandy right that a lot of the discovery that has

21   taken place, or at least some of the discovery that has taken

22   place has involved the production of information post May 2009?

23        MR. NELSON:  I would disagree with that.  The majority

24   of the information that was produced -- large amounts of

25   information were produced prior to May of 2009.

```
 1              THE COURT:  That's fine.  But has some been produced
 2    that is information post May of 2009?
 3              MR. NELSON:  And it generally has been information
 4    that's been produced in response to a deposition or in response
 5    to an allegation that something was being withheld.  So it goes
 6    to the discovery fraud and abuse defense that they're setting
 7    up.
 8         The Court has seemed to allow them to kind of probe issues
 9    relating to whether or not NIAC has been forthcoming in their
10    discovery.  And we've had an obligation in that probing to
11    produce some things.  But there has not been a wholesale
12    production of information unrelated to their latitude that's
13    been given to kind of probe these discovery issues.
14              THE COURT:  So what you would suggest is that I
15    confirm your understanding, which is the discovery
16    supplementation cutoff date of May 2009 means that no materials
17    post May 2009 need be produced other than those that relate to
18    the defendant's exploration of discovery abuses or related
19    issues arising out of this litigation?  Is that what your
20    understanding is?
21              MR. NELSON:  That's correct, because we recognize that
22    that's a two-edged sword, that if we were to discover something
23    after May of 2009 that was beneficial to our case, we're
24    basically saying that we're going to be barred from producing
25    that for trial.
```

1          THE COURT:  So the events that are relevant to this

2    case in terms of your putting on your case ultimately, which is

3    what you hope to wind up doing in a trial, the events relevant

4    to this case and to the evidence that you put on will stop prior

5    to May 2009?  You won't be putting on anything relating to

6    conduct that occurred post May of 2009?

7          MR. NELSON:  Well, I did listen to what the Court said

8    about cases that you've reviewed relating to privilege issues

9    based on the advice of counsel.  It's clear from the documents

10   that we have in our possession that NIAC did undergo a process

11   to try to understand better what the lobbying rules were that --

12         THE COURT:  After this case was filed?

13         MR. NELSON:  After the case was filed.  And if the

14   Court is saying that our witnesses were not --

15         THE COURT:  Well, what you did after this case was

16   filed can't be relied on as an advice of counsel.  I'm not sure

17   that I would even admit that testimony.  The fact that you went

18   to counsel after these events and got counsel to give you some

19   imprimatur of clearance, why should I admit that?  I don't need

20   some lawyers to come in and tell me after the events, after the

21   litigation is filed, that they've done a review and that this is

22   not defamatory or is otherwise okay.  Why should I listen to

23   that?  Why is that admissible?

24         MR. NELSON:  I'm not saying it is or it is not, and I

25   don't think it's in our best interest to take a position at this

point.  But I understand your reasoning, and I think that's
maybe one of the discussions that we've had off-line with the
other side as to, you know, you're continuing to probe these
issues that are after the alleged defamatory statements were
made, and really they go to the operations of NIAC post
defamatory statements.  I don't know if they would really be
relevant or admissible in this case.

        THE COURT:  All right.  Well, address anything further
on the Disney issue and on the Pugwash issue.

        MR. NELSON:  The issue on the Pugwash is again sort of
a pattern that we think exists.  We were contacted and advised
that they had submitted a subpoena to the Pugwash conference
organizers.  They asked whether or not we would join in a joint
confidentiality agreement at the request of the conference
organizers.

        THE COURT:  We're calling that Pugwash?

        MR. NELSON:  Correct.  What was advised to us is that
Dr. Parsi had testified during his deposition that when he
attended the Pugwash conference his travel was paid for by the
Pugwash organizers.  The line of questioning really was trying
to elicit whether or not Dr. Parsi had actually come to the
conference at the invitation of Pugwash, or really as a
representative of the Iranian Republic.  That was the
implication in the deposition, that he may or may not be
truthful about on whose behalf he attended the conference.

1      Based upon that information, it's our position that if they

2 want the information relating to Pugwash on the issue of travel

3 and who sponsored him to come there, we have no problem in

4 agreeing to the confidentiality agreement as it relates to the

5 travel issue.  But really, that's not really what they're after.

6 And they make statements and then say, well, we've always been

7 interested in the following.  Well, that's not what you said to

8 us.

9      THE COURT:  What is it that Pugwash has and is

10 prepared to produce that goes beyond travel-related information?

11      MR. NELSON:  We haven't had any conversations with the

12 Pugwash organizers.  What we've been told and what we're hearing

13 now is that it relates to materials that were submitted,

14 itinerary, conference I guess presentations and things like

15 that, which --

16      THE COURT:  Why is this a big deal?  Either for them

17 to get or for you to resist?

18      MR. NELSON:  Because, again, the pattern in this case

19 is anything you agree to, it creates another issue.  And it

20 just, the hole keeps getting bigger and bigger so that when it's

21 turned over, the next thing will be, we need to redepose

22 Dr. Parsi because now we've gotten schedules and they're

23 inconsistent with his testimony and we need to redepose him.

24 That's how this case has progressed.

25      THE COURT:  All right.  What else?

1          MR. NELSON:  That's it, Your Honor.

2          THE COURT:  Anything further on the Disney issues?

3          MR. NELSON:  No.

4          THE COURT:  All right.  Mr. Kapshandy.

5          MR. KAPSHANDY:  Let me say, Your Honor, the scope of

6    the subpoena is governed by the subpoena and not what Mr. Parsi

7    said at his deposition.  And we specifically requested what was

8    requested in the subpoena, which is all communications and

9    materials related to these meetings.  So it was pretty

10   straightforward and focused.

11       With regard to the hard and fast cutoff, the problem NIAC

12   has is, in fact, for example, their damages expert's been

13   provided information through 2010, 2011 about their economics,

14   and they've also, in their new amended Rule 26 disclosure

15   claiming --

16          THE COURT:  Let's separate out damages and liability,

17   because it seems to me the plaintiff would be putting on

18   information in its case that extended beyond a cutoff date of

19   May 2009 --

20          MR. KAPSHANDY:  If he wants to cut it off then, that's

21   fine.  But at the same time, what they have on their Rule 26

22   disclosure, but they won't turn over, is all of the legal bills

23   from this lawsuit which they're claiming as damages.  And again,

24   it's you can't have your cake and eat it, too.  It wasn't one of

25   our top four issues, but it's something they either have to turn

1    over, like the Disney legal research memos, if they're going to

2    talk about them and ask for them as damages or claim that our

3    conduct is in compliance with the law because of this research

4    or not.

5        And all of those are things specifically that we've been

6    dealing with since May 2009 that involve issues of maybe

7    privilege or waiver.  But it was never contemplated that when

8    you don't have to go back through and look at all your computers

9    again after May of 2009, these things that we have been

10   discussing for the last year and a half are all of a sudden off

11   the table.

12           THE COURT:  All right.  I think you're going to see an

13   order from me that on the Disney attorney-client issue is along

14   the lines of what I already indicated when Mr. Kapshandy was

15   first up at the lectern.  And I understand the perspective that

16   sort of enough is enough, and every time there's more discovery

17   in this case it raises more issues, and there's a never-ending

18   stream.  And I'm somewhat sensitive to that and appreciative of

19   that.  But it does seem to me that in the Pugwash setting, I'm

20   probably going to allow that, and in the Disney setting, I'm

21   probably going to allow that.

22       I'm more concerned, in terms of what I've just heard, with

23   being able to come up with some sensible order that both sides

24   will live by in terms of this supplementation cutoff date,

25   because it's merging a lot of different issues.  It's merging

1    the obligation to go back and reexamine materials to determine

2    whether there's anything further that needs to be produced.  It

3    also involves obligations with respect to things that the

4    plaintiffs affirmatively will want to present at trial, for

5    instance damages.  Certainly that's going beyond May of 2009 and

6    is therefore fair game for discovery.  And it also involves some

7    other things that are post May 2009 involving the discovery with

8    respect to the discovery, at least, if not some other issues.

9        I don't think this is going to be easy to come up with a

10   rule or language that each side is going to understand and be

11   able to live with -- I don't really care if you can live with

12   it; I care if you can abide by it and it's clear enough.  But

13   I'll do my best to come up with language that can govern things

14   and let things move on to conclusion.

15       All right.  Next issues, Mr. Kapshandy.

16           MR. KAPSHANDY:  Maybe I could suggest a couple more

17   easy ones.

18           THE COURT:  I'm always happy to deal with these easy

19   ones.

20           MR. KAPSHANDY:  And scratch them off.  One is the PWC

21   report, and the other is a Daubert motion we mentioned the last

22   time with regard to one of the experts.  And timing-wise, I

23   don't know how the Court wants to deal with that.  We have one

24   ready to be filed today and can leave courtesy copies, with

25   regard to the economist, and that will take care of special

damages for NIAC itself.

Obviously, the plaintiffs aren't going to agree to that. We haven't been able to sign a Rule 7 meet and confer. And I don't know if the Court views that as necessary for a disputed motion like that. And if not, we can file that today, and we have others for the other experts coming in the next month or so.

THE COURT: With respect to what I will consider really in the nature of a motion *in limine* that is to exclude certain evidence, specifically experts here, I don't expect you to be able to agree on that if you're seeking to exclude one of their experts. Rarely do the two sides reach agreement on such an issue. So the fact that you've at least advised them that you're going to file such a motion, and they have not come up with a solution to any problem that you've identified, means that I guess I'm going to be receiving such motions.

MR. KAPSHANDY: Right. And we have courtesy copies, we'll file it today, whatever the Court's pleasure.

THE COURT: Now, with respect to the PWC report, I thought that the submission of the PWC report issue really related more to sanctions requests than it did to expert testimony and Daubert challenges.

MR. KAPSHANDY: Right. And I think we'll eventually be discussing some specific sanctions with regard to some of the issues we're talking about. The question is that report was

```
1    done last year.  It's been out there, it was per the Court's

2    order.  Obviously, there will be a subsequent motion for

3    sanctions related to that in particular.  Actually, there's some

4    more relief that might be necessary.

5         So the question is does the Court want the report as is?

6    They want an opportunity obviously to respond.  They've seen it

7    for the last four or five --

8              THE COURT:  I don't understand.  Do I want it as is.

9    What does that mean?

10             MR. KAPSHANDY:  Filed as part of the record.  Since

11   the Court had ordered the imaging to be done, it was --

12             THE COURT:  Well, you don't file discovery just to

13   file discovery.  I only quote-unquote want it or, more

14   relevantly, need it if there's something presented to me for

15   resolution.

16             MR. KAPSHANDY:  Right.

17             THE COURT:  You don't -- please don't lodge all the

18   discovery materials, those boxes being only a small part of

19   them, with the Court.  And even the PWC report, notwithstanding

20   my past involvement in it being done, that isn't something that

21   should be lodged with the Court except for a reason.  If it's

22   relevant to an expert motion under Daubert or otherwise, then

23   you need to give me what I need to resolve the motion.  Or if

24   it's relevant to sanctions, then you need to give me what I need

25   to have to resolve the motion.  Other than that, I don't expect
```

1    it to be lodged with the Court at this time.

2         MR. KAPSHANDY:  We'll do that in conjunction with the

3    request for appropriate relief.  The next two, and probably the

4    two most difficult and important issues are the membership

5    database and the computer server issue, which kind of relates to

6    the PWC issue, which we'll get back to.

7         THE COURT:  My understanding with respect to the

8    server and computer issue, and there's a lot of history here,

9    but there was an order back in July of 2010 on production of the

10   server.  That's never been provided to PWC.  And then there are

11   the questions of the computers.  Four computers that apparently

12   were never connected to the NIAC network were -- I'm not sure

13   that they were even produced to PWC for imaging.  And then there

14   have been a couple of -- and one of those may have been

15   something that Emily Blout used.  And then there were two other

16   computers that have since been identified.  And there's a

17   question of whether those four computers were only used by the

18   interns or were used by others as well.  There's also Parsi's

19   laptop.

20        And I guess what you are asking for, based on all of that

21   history, is that the shared server be produced, and as well,

22   even if it is produced, if it exists, that the six computers

23   that have not yet been produced be provided for forensic

24   imaging.  I take it that the laptop would also be included in

25   that group, although I'm not sure.  You're after some

1    explanation with respect to where the computer used at one time

2    by Blout or even by another individual, who is it, Moghtader?

3            MR. KAPSHANDY:  Right.  It appears to have

4    disappeared.

5            THE COURT:  Where it is.  And then you want the hard

6    drives returned, but I think mainly to further analyze who used

7    various computers.  And then you want to know more about the

8    8,000 Talebi e-mails and questions relating to the server on

9    which they were located.  Does that sort of sum it up?

10           MR. KAPSHANDY:  That's much better than I could have

11   done.  I've actually had to do a program to keep track of all of

12   these.  And with the Court's permission, it's an illustrative

13   exhibit that kind of helps --

14           THE COURT:  I have a program.  It's sitting over

15   there.  (Referring to law clerk.)

16           MR. KAPSHANDY:  If I might, if it would help, because

17   we'll be talking about numbers, to follow along.  I don't know

18   if the Court will permit an illustrative exhibit.  That's a very

19   fair summary of what's happened, and that's what I'm using to

20   follow --

21           THE COURT:  Let's try to keep it simple without that,

22   in terms of, okay, so that's what you would like.  And

23   certainly -- well, you tell me what you think the response is,

24   and I don't mean putting words in Mr. Nelson's mouth, but from

25   the history thus far, if I were to issue an order saying produce

the server -- and I'm not going to explain anything about -- we

all know what we're talking about when I say produce the

server -- what are they going to do?  They're going to just say

there is no server?

MR. KAPSHANDY:  Possibly, in which case we would have

maybe a sanction issue for failure to preserve electronically

stored information.  Because we know for the discovery process

what was done by all the people who testified is they moved

stuff on to the shared server, the shared drive, whatever you

want to call it, where it was later reviewed by the lawyers,

although that's -- one of the problems is determinations of

responsiveness and privilege seem to be made on an ad hoc basis

by these individuals.

But the most troubling part is of course the machine that

was produced as Trita Parsi's machine wasn't connected to that

network in December of 2009.  Mr. Kushner, who did that survey,

and he's here available if need be, he gave us an affidavit, and

in fact even informs us that before he did that survey, there

was a question from Mr. Cowl, the chief executive officer, as to

whether all the machines were properly connected.  Mr. Cowl said

I don't think you're finding all the machines.  So they went

around and checked all the connections.

Before he did -- and this is in -- the survey's attached to

our status memo, a survey which showed all the machines that

were connected to that server or that network.  There were 10 of

them.  And the one that they produced in August purportedly as
the machine that Trita Parsi used was not connected.  Now, at
his deposition Trita Parsi comes up with the story that, well,
his computer kept falling off the network, and now in their
status memo they say that he was having printing problems.

Mr. Kushner has given an affidavit, he's here prepared to
testify.  That's not why he came.  If that machine were there,
he and Kevin Cowl would have found it.  So there's obviously
some suspicion that there's something funny going on, with not
only not just producing the server, but then the machine that
was produced as a surrogate for the server may not in fact have
been a machine that Trita Parsi has used, not since 2009, as
he's said in interrogatory answers, but also raises a question,
what was he using before that for a desktop when the lawsuit was
filed in March of 2008?

The other problem, as the Court points out, is the machines
that supposedly were intern machines have names of Emily, the
legislative director, and one of the machines that was produced
for imaging is now gone.  These sorts of, shall we call them
unfortunate disappearances, whether it's sloppiness or something
more nefarious, are quite troublesome.

THE COURT:  All right.  So you've got the situation
that you've got.

MR. KAPSHANDY:  Right.

THE COURT:  And you're seeking a court order at this

1    time saying to the plaintiffs, do X, Y, and Z?

2             MR. KAPSHANDY:  Right.  I think to make it most

3    focused, if we could get back the images that were already taken

4    of the eight or so machines that were produced, particularly the

5    Parsi desktop, to analyze that to see when he used it, when his

6    profile was installed, et cetera.  It would be nice to find out

7    what happened to the server, if they still have it, and if that

8    could be produced so it could be imaged.  The same thing for --

9    I don't know that we'd want all the machines, but the one called

10   policy director and Emily, who is the legislative director, that

11   they claim were intern machines.

12        Now, maybe the answer will be, that machine that he claimed

13   to be using was not actually in use, and his profile was added

14   after the imaging was ordered, which would be an outright fraud

15   on the parties in the court.  And frankly, if those machines

16   they say were only intern machines were actually being used by

17   the legislative director and the policy director, that would be

18   a further basis for maybe just simply saying this is a basis for

19   substantial sanctions and we're going to get rid of the case.

20   In any event, it's not the sort of behavior that can be

21   countenanced.

22             THE COURT:  That may be, but I'm not all that

23   inclined -- I can see how maybe a little of this will go on, but

24   I'm not all that inclined to, at this point, based on the

25   materials provided to me, to be issuing an order that in effect

is almost a set of interrogatories from the Court in order to
get answers that you think may be useful in terms of a sanctions
motion.  I want to be careful that that's not what the primary
purpose here is.

My goal is to be able to issue an order based on the
positions of the parties that requires the conclusion of certain
discovery and certain materials to be produced.  And then what
happens will be what happens, combined with what has already
happened.  And if one side or the other thinks that's a ground
for sanctions, then you'll move for sanctions.  But I'm not
really inclined to be issuing what really amounts more to a set
of interrogatory questions from the Court.

MR. KAPSHANDY:  I'm just telling you where we're
headed.  I would -- the imaging is very expensive -- rather not
have to deal with another six set of machines that have to be
analyzed and imaged.  At the same time, I tend to agree, if we
keep this too focused, the problem we have right now is because
when they were doing the imaging the first time, PWC wanted this
information.  They wanted to get user habit information,
registry information, and NIAC refused to agree to that.  So
that is why I'm trying to keep it focused as to why we want it.

We, because of this information, are led to believe that
maybe the machines weren't being used by the people they so
claimed, and want to be clear that we can do that.  Maybe the
other approach would be to just permit broader forensic imaging

```
 1   instead of trying to -- maybe we're too cute in trying to keep
 2   it too focused, and just say you can have them back, you can
 3   image the server and the other machines that weren't produced.
 4            THE COURT:  All right.
 5            MR. KAPSHANDY:  I'm sure they would object to that.
 6   So that's the server issue.  Maybe we should put that aside and
 7   we come to the membership database and boxes over there, or
 8   whatever the Court's pleasure.
 9            THE COURT:  Is the membership database intertwined
10   with the server issue, or do you think they're totally distinct?
11            MR. KAPSHANDY:  They're distinct.
12            THE COURT:  All right.  Let me hear from Mr. Nelson on
13   the server issue, server/computer issue.
14            MR. NELSON:  Your Honor, let me begin by trying to put
15   this in a little context here.  I think that we need to be
16   reminded how the forensic imaging came into existence, and if
17   you go back to the July 1 order, the reason why forensic imaging
18   was ordered by the Court was because there was concern that some
19   calendar information had been improperly changed.  And that was
20   the purpose of the forensic imaging.
21        It seems to be difficult for the other side to understand
22   that NIAC is a very small organization.  Even though we are the
23   corporate entity and the defendant is the individual, we're
24   really the individual and he's the corporate entity, because of
25   the resources that his counsel have available to them.
```

1        Now, they seem to not understand that this small

2   organization doesn't have a technical person who's always

3   available to handle how their systems are running, working,

4   et cetera.  So it's kind of an ivory tower mentality that we've

5   been dealing with, that we don't understand that different

6   people could use the same computer.  We don't understand that

7   even though a computer has one label on it, somebody else could

8   have been using it.  Well, small organizations do that all the

9   time.

10           THE COURT:  But let's assume that's the case.  If a

11   computer were used, for example, by an intern and by Emily

12   Blout, that is a computer that probably the defendants have more

13   interest in than a computer that was only used by an intern.

14           MR. NELSON:  But the computers were provided to them

15   based upon the order, which called for a server.  We maintain

16   and will continue to maintain that NIAC has a shared-drive

17   system, and the shared-drive system was with respect to

18   calendars.  The PST files that related to those calendars were

19   available for PWC to image, which they did.

20        Now, what we don't understand is how can you make the

21   argument that we didn't agree to allow additional user

22   information to be taken off of the various hard drives when PWC

23   had them.  If that was covered by the order, they should have

24   just done it.  They didn't need our permission to go and get

25   user information.  But the reason why they asked our permission

1    to do it is because it wasn't covered by the order.

2        Again, we keep digging, we keep digging because we want

3    more information so we can support our various motions that we

4    want to file to try to have this case thrown out.  So if they

5    thought they had a right to get that user registry information

6    when they had the hard drives, they should have gotten it, and

7    they shouldn't have to come to the Court and say, well, they

8    wouldn't let us get it.  You had the order.  If the order was

9    clear, follow the order.

10        Now, we don't understand why they think they're entitled to

11   all these additional computers.  We provided them the computers

12   that we said would amount to a server, because they use

13   individual CPUs and there was a shared drive with respect to

14   calendars.  I'm at a loss as to what additional information they

15   think they're entitled to.  I mean, they even want Mr. Parsi's

16   laptop that was purchased after all of this took place, when his

17   laptop was stolen.  It was after any of the relevant time

18   period.  They still want that.

19            THE COURT:  When was the laptop purchased?

20            MR. PARSI:  The laptop was purchased in Oslo when I

21   was there during the time in which my other laptop was stolen.

22   The hotel had to go and buy me a new laptop.

23            THE COURT:  I don't have a date.  What's the date?

24            MR. PARSI:  It was on the 6th or 7th of May 2010.  I

25   was invited by the Norwegian foreign minister to give a lecture.

1          MR. NELSON:  And again, even in that instance, we were

2     asked to provide police reports, because obviously we were not

3     being truthful that his laptop was stolen.  We provided the

4     police reports.  Now there's some argument as to why that's

5     still relevant, that they should get his new laptop from May of

6     2010.

7          So, Your Honor, we really don't have anything to hide here.

8     There's nothing nefarious going on.  It's a small organization.

9     Their operations are disrupted when these types of things take

10    place.  We understand that we filed the suit, but at some point

11    the line has to be drawn.

12          THE COURT:  I'm sure both sides are scratching their

13    heads on occasion about the costs, troubles, interferences, et

14    cetera, that this suit has caused.

15          MR. NELSON:  And we also would state that although

16    this is not, as I understand it, an evidentiary hearing today,

17    we do have some concerns and challenges that would relate to

18    this affidavit that was provided by Mr. Kushner, that was in

19    essence testified to or representations were made by

20    Mr. Kapshandy about what was done and wasn't done.  We don't

21    believe that the affidavit is accurate.  But if there's an

22    evidentiary hearing, we can deal with that issue.

23          THE COURT:  All right.  I'm not anticipating a

24    quote-unquote evidentiary hearing this morning.  All right.

25    Thank you, Mr. Nelson.

1      Mr. Kapshandy, what further do you want to say on this

2  issue?

3          MR. KAPSHANDY:  No, Your Honor.

4          THE COURT:  All right.  What's next?

5          MR. KAPSHANDY:  The membership database.

6          THE COURT:  All right.

7          MR. KAPSHANDY:  And the Court will recall from our

8  status memo that this is something that has been requested for

9  two years.  And during the course of the review of the calendars

10  we saw reference to entries to something called an SF, later

11  learned to be known as a Salesforce database.  So requested

12  that.  And at the two status hearings held before this, in

13  September and December, were informed that that was only used

14  for a very limited period of time on an experimental basis.  And

15  then the plaintiffs clarified, they meant only the meeting notes

16  part of that, but the database for member tracking information

17  had been used for a longer period of time.

18      At the hearing we made clear, and I believe the Court did

19  also, and subsequent in our January 3 letter we reiterated our

20  request for all membership information.  And NIAC did produce in

21  the February discovery --

22          THE COURT:  This is the February 15 production?

23          MR. KAPSHANDY:  Pardon?

24          THE COURT:  This is the February 15 production that

25  you're talking about they produced?

1      MR. KAPSHANDY:  Yes.  In response to that request,

2  they produced an Excel file, and I printed out here just a few

3  pages of 171,000 entries, and it goes across about 20 fields or

4  so.  These are just the first 10 pages.  And it goes down the

5  side about 172,000 entries.  But it doesn't have any names in

6  it.  The names are all coded.  Who coded it?  A lot of it is

7  coded.  And I then wrote Mr. Nelson saying this doesn't appear

8  to be a membership database, and we can't read it if it is.  And

9  then on February 22 -- no, February 22 I wrote him and explained

10  that.

11      On Wednesday of this week he sent me another set of Excel

12  files, some of which we've printed out, the four boxes on the

13  table there, which is purportedly the Salesforce database.

14  Finally, after two years, were that actually true.  It's not the

15  Convio current database, it is a file, amazingly, that's dated

16  May 28, 2010, meaning NIAC had that in that format in their

17  office for nearly the last 10 months and has not produced that

18  in response to the specific request for membership information.

19  We've taken dozens of depositions, and some of the entries in

20  here, and I've only had a couple of hours to look at them --

21  question.

22      THE COURT:  The question is whether -- and this is

23  what I want you to focus on -- whether there's been a failure

24  going all the way up to today.  I understand that you may have

25  concerns about the past 10 months or otherwise.  But do you now

have, to the best of your assessment, a full and fair response

to the request for production of the Salesforce database?

Because that's what I'm interested in today.  Whatever you may

have in mind in terms of sanctions, that's not for today.

MR. KAPSHANDY:  Right.  No, in three regards.  The

database which they clarified that they produced on February 15

actually was the one that they had managed to download on

December 16 that they told the Court about, is the 196 meeting

notes.  In fact, it's about 172,000 entries and it covers a

four-year period from 2004 to 2010.

THE COURT:  171,000 entries of what?

MR. KAPSHANDY:  Good question.  Because the names are

all coded.  We need codes to identify who this relates to.

Instead of names, it has numbers.

THE COURT:  All right.  But assuming you had Jones,

Smith, Hassan, et cetera, in there, what's the rest of the

information?

MR. KAPSHANDY:  It's saying just like -- some of them

say, interestingly, "met with on secret diplomacy," would "like

to help with lobbying."  One of them called Trita a Rafsanjani

lobbyist.  But then at least I would have it.  I could have

asked him about this at his deposition had we had it.  But I

don't even know who those people are, because the names are all

coded.  That's on the, quote, meeting notes database.

The one that was produced two days ago that we've just

1   started going through also has a problem in that a lot of the

2   fields are coded, particularly for the persons who entered that

3   information.  So it's not entirely clear what is in there.  And

4   again, it's the May 28 --

5           THE COURT:  What is in there or who put it in there?

6           MR. KAPSHANDY:  Well, who put it in, who entered the

7   data.  There's codes for things such as, mostly who edited and

8   communicated with that person.  So we can't tell who had this

9   communication, called Trita a Rafsanjani lobbyist or who he met

10  with with regard to secret diplomacy.

11          THE COURT:  With that coded information provided, so

12  that you can break the codes or understand, would that be in

13  your judgment a full and fair response to the request for the

14  Salesforce database?

15          MR. KAPSHANDY:  For Salesforce, yes.  For the current

16  database, which is --

17          THE COURT:  Current database?  What's that?

18          MR. KAPSHANDY:  See, they migrated all of this

19  database to another database called Convio.  They haven't used

20  this database for nearly a year.  So unfortunately, if they're

21  claiming for damages we've lost members, we have new members, we

22  have more members, we have more money, less money, that's all in

23  a new database that was created sometime last year, and it's

24  called Convio or Common Ground.

25          Now, it's unclear -- their consultant says they migrated

1    it.  Whether that means they actually physically moved it or

2    overlaid this on the Salesforce database.  But recall, the

3    request is for all membership information, and they like to

4    redefine the request to just Salesforce or just Salesforce

5    meeting notes.  No.  To be clear, we asked for, we asked for

6    again on January 3, their entire membership information

7    database.  And it lists things like if they're an active member.

8    According to this, they have less than 1,100 active members.

9    But that was last year.  Trita Parsi's representing to lots of

10   people he's got 4,000 members.  If their current database has

11   4,000 members, then we're entitled to test that.  Their damages

12   expert says they only have 1,000 members.

13        So whether it's helpful or harmful, regardless, that's not

14   what Rule 26 is about.  Maybe they have an explanation, maybe

15   they don't, maybe it helps our case.  The current membership

16   database.

17            THE COURT:  Yeah, and quite frankly, it's not unusual

18   at a trial to hear conflicting evidence on subjects presented.

19   That may be.  I can't resolve all those potential conflicts in

20   the course of dealing with discovery.  All I can do is require

21   production of responsive materials.  But you believe there is

22   something not produced.  And what is it that isn't produced?

23        Thus far, I think I've heard the following.  First of all,

24   what has been produced, focusing more on the most recent

25   production of what we'll call the Salesforce database, you're

concerned about the coding because it makes it difficult to

understand what exactly is in there.  Secondly, you're concerned

that that isn't really the relevant Salesforce database, that

the relevant membership database, if you will, is something else

that is more current.

MR. KAPSHANDY:  Right.  If we take out the adjective

"Salesforce," which was never in our original discovery request,

I would ask that they be ordered to produce their membership

database, their current membership database.  Or, as I

thought --

THE COURT:  But, of course, as of the time that you

requested it, was this that you've now received the then-current

membership database?

MR. KAPSHANDY:  No.  This --

THE COURT:  When did this quote-unquote migration,

overlay or whatever it was take place?

MR. KAPSHANDY:  The database was requested in March of

2009.  This Excel file that was produced to us Wednesday was

created May 28, 2010, for one reason or another.  Probably, I

don't know, in the course of the migration.  I can only

speculate.  And then now we understand everything is on Convio,

the current membership database.  And when we were here in

December I thought what they were offering was to provide us a

user name and login, so that we could just access it directly

through Convio.  We requested many times after that hearing that

1    that be provided.

2            THE COURT:  All right.  Let me hear from Mr. Nelson so

3    we can get to the bottom of this factually, and then it may

4    become an easy issue.

5            MR. NELSON:  Your Honor, let me try to address the

6    Convio issue first.  I just consulted with my client.

7    Obviously, the current membership database is relevant to

8    damages.  We have no objection to providing that.

9            THE COURT:  And where is it?  Is it the Convio

10   database?

11           MR. NELSON:  What we've been calling the Convio

12   database.  So that's relevant to damages.  Let's set a deadline,

13   we'll produce it.  Because we don't have a quarrel here.

14           THE COURT:  Once that's done, is the membership

15   database issue, in terms of discovery production, not past

16   history and sanctions, is the membership database issue

17   completed?

18           MR. KAPSHANDY:  Assuming we get the information and

19   it's not coded and we can actually --

20           THE COURT:  Right.

21           MR. NELSON:  I think the other kind of related issue

22   is, we don't know how defendant is opening these documents.

23   When we look at the documents --

24           THE COURT:  That's fine.  If the two sides would talk,

25   then maybe some of these issues wouldn't be so mysterious,

1    either to you all or as you're coming in before me.

2            MR. NELSON:  But, Your Honor, we do want to note for

3    the record that when the original discovery request was made,

4    NIAC provided all of its then-current membership information.

5    We've sent them membership information back when discovery first

6    took place in the 2009 time period.

7        Now, this again kind of touches on that supplementation

8    issue, that if they chose from an operations standpoint to, as

9    they claim, migrate from Salesforce to Convio, then the question

10   becomes whether or not that's really discoverable because of

11   what we discussed about supplementation.  We're obviously saying

12   that it has relevance to damages, so we're going to produce it.

13           THE COURT:  And for present purposes, I think that's

14   all that I need.  So, it will be what's been referred to as the

15   Convio membership database, and it will be current as of what

16   date?  First, Mr. Kapshandy -- well, no.  For your purposes,

17   Mr. Nelson, since you will be more likely affirmatively using

18   this for a damages case, it should be current as of what date?

19           MR. NELSON:  I need it to be current as of --

20           THE COURT:  March 1?

21           MR. NELSON:  -- when the expert prepared his opinion?

22           THE COURT:  I can't do that.  It has to be some date

23   that is a specific date, not when someone does something.  And

24   it has to be something that can be produced in the next couple

25   of weeks, because that's what I'm going to order you to do.

1          MR. NELSON:  May I confer with my co-counsel?

2          THE COURT:  You may.

3      (Plaintiff counsel conferring.)

4          MR. NELSON:  What I'm being told by my client is that

5   the database will be current as of the date that it's produced.

6   In other words, they can't go back in time and say this was the

7   database as it existed at this particular time, et cetera.

8          THE COURT:  When can you produce it?

9          MR. NELSON:  Two weeks from today.

10         THE COURT:  All right.  Two weeks from today would be

11  March 18.  So that'll be the date that it should be produced.

12  So it may be March 17 or March 18, but something close to that

13  date will be its date.  Indeed, as long as it's anytime -- if

14  you print it out the day after tomorrow and then have to review

15  it and don't produce it until the 18th, that will still be

16  acceptable so long as it's dated sometime between March 4 and

17  March 18 and has to be produced on March 18.

18      All right.  As far as I'm concerned, for present purposes,

19  that's the end of the membership database issue.  I don't need

20  to deal with anything else, because other things that you've

21  produced may or may not be useful either to the plaintiffs or to

22  the defendants, but they're not something that I need to spend

23  time with at this moment.  So let's just recap where we are.

24      We've addressed -- I won't use the term "resolved," but

25  we've addressed the server and the computers issue, the

membership database, the PWC report, the Pugwash subpoena, the

discovery supplementation date, new witnesses has been resolved

of its own accord.  And that leaves us for any further

discussion -- and there may not be much that is necessary -- the

Talebi e-mails and issues related to depositions and deposition

taking and follow-up.

MR. KAPSHANDY:  With regard to the membership

database, if we could just make sure in the order that it's

stated that all fields and all data are included.  This is, what

I'm holding in my hand here, the 2000 membership database that

they did produce.  And compared to, as one can see, the four

boxes of the 2010 list, when one exports it to Excel, there's

some picking and choosing that can go on.

THE COURT:  What are the kinds of fields that are

involved that you might have concern would be picked or chosen

not to produce?

MR. KAPSHANDY:  Well, in particular lifetime

donations, communications with that person, if they're an active

member or not.

THE COURT:  How are communications with that person

relevant for this case?  I can understand how whether they're

active is relevant.  Perhaps, in a discovery context, using the

term loosely, lifetime donations might be relevant in terms of

assessing whether the loss of this member really was damaging in

any way.

1        MR. KAPSHANDY:  As I mentioned, just going in the few

2   hours I had to go through the ones that were produced Wednesday,

3   some of the people had responded -- the database includes

4   current members, active members, expired members, potential

5   members, and some people would say stop sending these lies or

6   ask for a refund.  Some people say I would like to help you in

7   your lobbying.  Those are communications with members that were

8   specifically requested in March of 2008 that they tracked.

9   Obviously, it's important to them.

10        THE COURT:  The order will include a requirement that

11   it be the complete, with all fields, unless a specific privilege

12   claim is made with respect to anything.  And that privilege

13   claim will have to be made so that I can then resolve it.

14        MR. KAPSHANDY:  With regard to the Talebi e-mails, as

15   the Court will recall --

16        THE COURT:  8,025 were produced.

17        MR. KAPSHANDY:  Discovered on a CPU.  And they

18   maintain that a CPU is a computer.  We maintain that a CPU is a

19   processing unit, that e-mails are stored on a hard drive.

20   Regardless of whether you call it a yellow submarine or a

21   Volkswagen or a computer, we sent a discovery request, and Trita

22   Parsi promised at his deposition to let us know on which of

23   those machines that was found.

24        We also sent an interrogatory which we would like ordered

25   answered, on what basis they withheld the other 5,500 Talebi

1   e-mails.  This is his NIAC e-mail account.  It's not his

2   personal e-mail account.

3         THE COURT:  Do you think there's any dispute as to

4   whether 5,500 e-mails have been withheld?  Is there any dispute

5   in your mind as to whether the universe is 8,000?

6         MR. KAPSHANDY:  I'm taking the 8,000 from them.  The

7   2,500 that I counted that they produced, or 3,500, now doing

8   math, at first they said that didn't contain any search terms,

9   one of which is "Talebi," which is a little bit hard to believe.

10  The other is that they're just simply not discoverable.  And I

11  would simply ask for an order, turn over the 5,500 e-mails and

12  then we can determine -- and if they want a claw-back provision,

13  for some reason, if Mr. Talebi is communicating with counsel, we

14  didn't see that, there could be a claw-back.  I would ask that

15  they be ordered to answer the interrogatory answer and produce

16  those e-mails.

17        THE COURT:  And the interrogatory question again is

18  exactly what?

19        MR. KAPSHANDY:  There were two questions.  One is on

20  what basis were they withheld, and where were they found.

21        THE COURT:  Okay.

22        MR. KAPSHANDY:  Or the simple matter might just be to

23  order them all produced, and then we can decide if there was

24  some sort of either sanctionable conduct for their failure to

25  produce those originally.

1            THE COURT:  That's for the future.

2            MR. KAPSHANDY:  But it would probably be easiest just

3    to say produce the 5,500 Talebi e-mails.

4            THE COURT:  All right.  And --

5            MR. KAPSHANDY:  Follow-up depositions?

6            THE COURT:  Yes.

7            MR. KAPSHANDY:  I think we're pretty much done except

8    for two things on our side.  Again, we're waiting for 30 minutes

9    from Colonel Gardiner on the after-produced list of congressmen

10   he couldn't remember.  Maybe it will be 15 minutes and by

11   telephone.  That's easy.

12           THE COURT:  But that needs to be scheduled, right?

13           MR. KAPSHANDY:  That needs to be scheduled.  And I'm

14   sure we can work that out.

15           THE COURT:  And Safavi is done?

16           MR. KAPSHANDY:  Safavi was done last week.

17           THE COURT:  Okay.  Go ahead.

18           MR. KAPSHANDY:  That simply leaves Trita Parsi on the

19   after-produced stuff, which includes things like membership

20   information that they're not refusing to produce --

21           THE COURT:  You say it simply leaves the Trita Parsi

22   follow-up.  There's no Morse follow-up?

23           MR. KAPSHANDY:  Well, that's a minor thing.  They've

24   promised to produce three things from his deposition, like I

25   think a list of cases.  Minor things that are required under

1   Rule 26.  I didn't want to trouble the Court with that.  I

2   presume we can get that, it's not a big deal.

3          THE COURT:  Okay.  Fine.  So focus on --

4          MR. KAPSHANDY:  The bigger problem is going to be

5   Trita Parsi's deposition when we eventually get this stuff.

6   Obviously we couldn't ask him about it and the stuff that we got

7   this week, as well as some of the things he had promised at his

8   deposition.  Most importantly -- and we are going to have to

9   figure out how to deal with this issue sooner rather than

10  later -- and that is his failure to state what special damages

11  he is claiming.

12         Now, we're moving to strike, assuming Morse's testimony is

13  thrown out, NIAC's claim for special damages.  We don't even

14  know what his is.  He won't tell us, and again, he won't tell us

15  whether he is going to return that money to NIAC or keep it --

16         THE COURT:  But you're assuming there's going to be a

17  follow-up deposition or some additional time with Mr. Parsi.

18         MR. KAPSHANDY:  Right.  Well, I had originally stated

19  that they were refusing to produce him, misinterpreting their

20  not getting back to me.  Mr. Nelson clarified that they are not

21  refusing, but they're actually limiting his deposition to one

22  hour.  And I don't know that that can be done.  It took 14 hours

23  to barely cover what we need to cover --

24         THE COURT:  On that damages issue, what you're going

25  to find most likely is that I'm going to go ahead and order that

1    he be produced for the further deposition.  I may not limit it

2    to an hour, but I probably will limit it to some time period.

3    And that that will be the last chance to answer the questions

4    with respect to special damages.  I will not allow them to fail

5    to answer questions and then to put on a case before a jury that

6    seeks damages that they failed to specify during a deposition

7    more than two years after the case was filed.

8              MR. KAPSHANDY:  That's all I have.  Thank you.

9              THE COURT:  All right.  And if I put a time limit on

10   it, how long do you think that time limit should be, if not one

11   hour?

12             MR. KAPSHANDY:  Four hours should do it.

13             THE COURT:  All right.  Mr. Nelson, on these remaining

14   issues, and some issues that he hasn't addressed that I think

15   you may have.

16             MR. NELSON:  I guess I'm a little bit confused on the

17   issue regarding the Talebi e-mails.  My recollection is that

18   there were interrogatories that were sent to us that our client

19   did answer and did verify.  So I want to be clear.  Are you

20   saying that he did not provide responses to those

21   interrogatories?

22             MR. KAPSHANDY:  No.  You answered them.  The answer

23   was that there's not discoverable information in them.  And one

24   of the answers was that it didn't contain any search terms.  I

25   suggested the easy way to answer that is just produce them and

```
 1      then we can decide.  We won't have to fight over the
 2      interrogatory answer.
 3               MR. NELSON:  So I just wanted the record to be clear
 4      that there was a response.  They were dissatisfied with the
 5      response.
 6               MR. KAPSHANDY:  That's correct.
 7               MR. NELSON:  With respect to the 5,500 e-mails, that
 8      is troublesome to us that we would be required to turn over
 9      5,500 e-mails whether or not we feel that those e-mails are
10      responsive --
11               THE COURT:  So your position is, as you hope was
12      expressed in these responses to interrogatories, your position
13      is that the 5,500 e-mails -- let's assume that that's an
14      accurate number -- were reviewed on the plaintiff's side,
15      whether by the plaintiffs or their lawyers, and a determination
16      was made, a good-faith determination was made that they were not
17      responsive to the discovery request.
18               MR. NELSON:  That's correct.
19               THE COURT:  They didn't contain responsive
20      information, and therefore you should not have to produce them.
21               MR. NELSON:  That's correct.  And in the interest of
22      good faith, we'd certainly be willing to undertake another
23      review of those e-mails just to make sure nothing was withheld
24      that should not have been withheld.  But that's really
25      problematic that we just turn over 5,500 e-mails and let them be
```

1     the arbiter of whether or not they are relevant, et cetera,

2     claw-back provision or not.

3          I think we are on the same page with respect to Colonel

4     Gardiner and Professor Morse in terms of their follow-up

5     depositions, of limited duration and subject matter.  With

6     respect to Dr. Parsi, obviously the damages issue has to be

7     addressed.  We believe the Court can figure out what a

8     reasonable time would be for that deposition, but we certainly

9     don't think that more than three hours would be necessary for

10    that.

11         We do want the Court to note, however, that Dr. Parsi's

12    wife is expecting a baby any time now.  They do have two small

13    children.  And so we just want the other side to be reasonable

14    in terms of scheduling his follow-up because of what's coming in

15    terms of his family situation.

16         While I'm standing here, I do have a question so that I can

17    be clear on how the Court may rule with respect to the Pugwash

18    issue.  It's my understanding that the Court is ordering --

19    would be ordering NIAC to agree to enter into a confidentiality

20    agreement.  Because that's the issue here, that the responding

21    party to the subpoena is saying we have to have a

22    confidentiality agreement in place in order for us to produce.

23    And it sounds like we are going to be ordered to have to enter

24    into that agreement.

25              THE COURT:  Well, see, I view this as a situation

1   where -- I'm going to assume for the moment that the scope of

2   the subpoena is permissible under Rule 45 and the other relevant

3   discovery rules of the Federal Rules of Civil Procedure, that

4   it's not seeking, I'll use the term irrelevant information.  I'm

5   going to assume that for the moment, because no one's really

6   made an argument on that issue.  So I'm going to assume that

7   it's all within the permissible scope of what can be discovered

8   in this case.

9       I view this then -- tell me why I should not view this as

10  a -- it's almost a catch-22, but a situation where the

11  defendant, seeking that information, is faced with the subpoena

12  recipient saying, well, we're only going to produce it if

13  there's a confidentiality agreement, and then one side on that

14  confidentiality agreement saying, well, we cannot agree to a

15  confidentiality agreement for that whole thing because we'd

16  rather they didn't get part of that, so we won't agree to the

17  confidentiality agreement.

18      Well, that's sort of an awkward situation.  So I think what

19  you're going to see from me is, in all likelihood, unless

20  someone is going to make an argument to me that that's

21  impermissible under Rule 45 or the other discovery rules, to

22  seek that information from Pugwash -- and no one has made that

23  argument to me yet -- I'll order Pugwash to produce it subject

24  to whatever confidentiality agreement the parties can agree to.

25  If you can't agree to a confidentiality agreement that covers it

1    all, then so be it.

2              MR. NELSON:  Okay.

3              THE COURT:  I'll just order it produced.  As long as

4    it's within the proper scope of Rule 45, why shouldn't I?

5              MR. NELSON:  I think I understood what the Court said.

6              THE COURT:  But I probably won't order that you sign a

7    particular confidentiality agreement.  I don't think that that's

8    something that I'm really in a position to do.  Of course, you

9    should stop and think about what you're facing, and that is if

10   you don't sign the confidentiality agreement, and no one's

11   argued to me that this is impermissible in terms of the scope of

12   discovery, then it's going to be produced without a

13   confidentiality agreement.  Which way are your clients better

14   off?  Do they want the confidentiality attached to it or do they

15   not?  That's up to you to decide.

16             MR. NELSON:  Just wanted some clarification on that.

17   Thank you.

18             THE COURT:  All right.  Thank you.  Mr. Kapshandy.

19             MR. KAPSHANDY:  Just one brief response on the Talebi

20   e-mails.  That is, now counsel is saying they reviewed these and

21   they were found to be not responsive.  In their interrogatory

22   answer they said they were withheld based upon the fact that

23   they did not contain search terms and were nonresponsive.  So

24   it's not quite clear what they did.  And rather than --

25             THE COURT:  Well, if "and" means what "and" is

1    supposed to mean, then it means that they did determine they're

2    not responsive.  If it were an "or" -- if I accept the use of

3    the English language as they used it, it would mean that they

4    did determine that they were nonresponsive.

5            MR. KAPSHANDY:  And rather than waste more time and go

6    back for further review -- I mean, the fact, as I mentioned, it

7    didn't contain the search term.  "Talebi" is a search term.  I

8    think we've had enough of this.  We've requested these for over

9    a year.

10           THE COURT:  I understand that.

11           MR. KAPSHANDY:  Let's just order them produced.

12           THE COURT:  I know you say that, and I understand that

13   the history is part of what propels you to say that.  But if we

14   were at the start of discovery in another case, without the

15   difficult relationship that exists here -- and that is an

16   understatement -- and you asked for all Talebi e-mails, and they

17   said here -- there are 8,000 of them, we've looked at them, here

18   are the 2,500 that contain anything relevant to this lawsuit.

19   We've reviewed the rest of them and that they do not contain

20   anything relevant.  You probably wouldn't be entitled to just

21   say, oh, no, we want them all.

22           MR. KAPSHANDY:  Right.  The reason we're in that

23   situation is they initially withheld them claiming he only does

24   community work and that's not relevant.  Then when we get the

25   2,500, we see that it's for coordinating of the lobbying effort

known as the CNAPI campaign, and there's another one, which he
did for a number of months, and getting grassroots people to
meet with senators.  And whether, you know, you call that
lobbying or community outreach or not, the initial basis for
withholding was clearly, to be generous, a bit of
overinterpretation of the request.  And that's what's led us to
this skepticism, when they'll now go back and say, well, give us
one more chance, we'll review them for responsiveness, just to
make sure we didn't miss them, like they didn't miss them the
first time.  We can't wait much longer.  We just need to get
this moving.

          THE COURT:  All right.  I have one question for you,
Mr. Nelson.  And then I'm going to tell you what we're going to
do.  And my question is on the Talebi e-mails.  Since the
representation and the discovery materials is that they have
been reviewed to determine whether they're responsive, I assume
that they're quote-unquote collected somewhere.

          MR. NELSON:  My best recollection is that they are.

          THE COURT:  So what I would like you -- the message
from me is, and how this is going to come out in an order you're
going to hear in a second, but the message from me is that they
ought to be assessed again to make sure, not on this search term
basis, but rather on the basis of containing relevant material,
they ought to be assessed again to make sure they don't contain
relevant material, and everything that does contain relevant

material should be produced.

And then, since they're collected, and therefore easily dealt with, I'm probably going to require that you produce them to the Court, just so I can glance at them and make sure that they don't have relevant material.  So do a reexamination, produce everything that you think is -- all the e-mails that contain anything arguably relevant to the case, all aspects of the case, and then I'll have the rest of them produced to me so that I can just take a quick look at them.

MR. NELSON:  And what's the procedure you'd like us to follow for producing them to you?

THE COURT:  Well, let me tell you the procedure that we're going to follow in general here.  What I'm going to do is ask each side, based on the discussion that we've had, the clarification on some issues and the positions of the parties, which don't always mirror exactly what was said before in written materials -- and I'm not criticizing for that, that this is a process -- I'm going to ask each side to produce a proposed order.  I want you to just produce to me what you think the proper resolution of all these issues -- I think we have the list of issues pretty well defined based on our discussion here today and your materials that you produced.

So I want a proposed order from each side.  No memorandum arguing anything.  Nothing in terms of why provisions are in the proposed order.  I just want you to submit to me a proposed

order.  That will help me, because it gives me sort of the outside limits on some things and will keep me from doing something, one hopes, but that's a big hope, stupid.  So I'm going to ask for those proposed orders.

And you can, based on what I just said about the Talebi e-mails, provide to me what you think is the right way to do what I just described.  So I'll hear from you first on that in terms of your proposal in terms of the proposed order.

I'd like those fairly soon.  I don't want you to exchange them, because I think that would not be productive.  I want you just to submit them.  How long do you think you need, Mr. Nelson, in order to submit that proposed order?  Which I anticipate would be a three or four-page document, probably no more than that.

MR. NELSON:  Could we have 10 business days?

THE COURT:  And Mr. Kapshandy, how long do you need?

MR. KAPSHANDY:  Next Friday.  How long did you say?

THE COURT:  He said 10 business days, which would be two weeks, and you're saying one week.

MR. KAPSHANDY:  Seven to 10 days is fine.

THE COURT:  What's the Wednesday not of next week but of the following week?

THE DEPUTY CLERK:  That's the 16th.

THE COURT:  So we'll make it March 16.  And that has to be produced by 5:00 on March 16.  Just submit it to me with a

```
 1    notice of filing, electronically.  And then by 4:00 on Friday,
 2    the 18th, each side can submit any modification to their
 3    proposed order based on the opportunity to review the other
 4    side's proposed order.  And then on the basis of that, I will
 5    issue an order based on my examination of these issues and what
 6    I have heard here.
 7         Now, if there's not something covered in your proposed
 8    order, I'm not going to cover it, even though it might have been
 9    discussed in your status reports.  For instance, subpoenaing
10    Rubin and Timmerman and Lopez, I'm not going to do anything with
11    that because, as I understand it, you're not asking me now to do
12    anything with respect to that.  So anything that you think I
13    need to address, limited to the universe of things in your
14    reports and this discussion here today, make sure you include in
15    the proposed order, because if you don't include it, then I
16    probably won't issue anything on it.
17         All right.  Anything further, Mr. Nelson?
18              MR. NELSON:  No, Your Honor.
19              THE COURT:  Mr. Kapshandy?
20              MR. KAPSHANDY:  No, Your Honor.  Thank you.
21              THE COURT:  All right.  Thank you both and all for
22    your attention to this.  I'm not going to thank you for the mess
23    of discovery that I've been dealing with, and I put "dealing
24    with" mildly, because for the most part you all have been
25    dealing with it, not me.  It should not be -- we should not take
```

1    great pride in having this kind of difficult discovery history

2    in this case.

3        Now, where we're going is -- and you ought to be mindful of

4    dates.  If there are scheduling issues with respect to

5    depositions, have the discussion before a week from Wednesday so

6    that you can include those dates in your proposed orders.  Don't

7    leave something out there uncertain if you can nail it down.  I

8    say to both sides.

9        And once we have that -- and there will be dates in terms

10   of compliance with whatever's in the orders -- once we run that

11   course, my view, based on our past discussions, is, okay, I'm

12   going to be receiving some motions, Daubert-related motions

13   concerning experts, and ultimately there's certainly the threat

14   and likelihood of sanctions motions, but based on our past

15   discussions, the hope was that when the discovery was completed

16   we'd be seeing you all or helping you all to get to a setting

17   where, with the help of a mediator, you could discuss the issues

18   in the case.  That still is the hope, Mr. Nelson?

19            MR. NELSON:  Yes, Your Honor.

20            THE COURT:  And Mr. Kapshandy?

21            MR. KAPSHANDY:  Absolutely.

22            THE COURT:  All right.  And what we would be using, I

23   can't remember, correct me if I'm wrong, is the court mediation

24   program, and hopefully someone who had some, I'll use the term

25   very loosely and broadly, expertise in the subject matter of

1   this case?  Agreed, Mr. Nelson?

2            MR. NELSON:  Yes.

3            THE COURT:  And Mr. Kapshandy?

4            MR. KAPSHANDY:  Yes.

5            THE COURT:  So I'll have that in mind.  And it may be

6   that in the order I issue I say something on that.  But

7   certainly there are going to be some things that have to happen

8   before that actually takes place.

9            MR. NELSON:  Your Honor, one thing that came to my

10  mind when you were talking, it seems as though the defendant is

11  prepared to at least file one of their motions in this case

12  already.  Given all that we have to do in the case, I would ask

13  that they be allowed to not file that until after we actually

14  get your order, because I don't know that we can handle having

15  to respond to their motion and do all of this at the same time.

16           THE COURT:  I'll say this on that.  I sound like a

17  former high official.  I think it would be wise to sort of let

18  everybody focus on these issues over the next 10 days and get

19  that in.  There's no time limit that the Court has imposed with

20  respect to filing these Daubert-related motions or similar

21  matters.  So I think that would be wise.

22       If they choose to go ahead and file now, I certainly would

23  be prepared to provide enough time for a response to that that

24  would allow these matters to run their course first.

25           MR. NELSON:  Thank you.

 1            THE COURT:  So it's probably wise if you hold off, and

 2    that'll just make it easier.  But I'm not going to order you to

 3    hold off, I'm just going to say that I'll deal with any question

 4    of timing of a response, taking into account what you're working

 5    on currently.

 6        All right?  Thank you all.  Good day.

 7        (Proceedings adjourned at 11:43 a.m.)

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE