Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLUMBIA
 3    ----------------------------------- )
 4    TRITA PARSI and                     )
 5    NATIONAL IRANIAN AMERICAN COUNCIL,  )
 6                   Plaintiffs,          ) CASE NUMBER
 7         v.                             ) 08 CV 00705
 8    DAIOLESLAM SEID HASSAN,             )   (JDB)
 9                   Defendant.           )
10    ----------------------------------- )
11
12        Deposition of DEBASHIS AIKAT, Ph.D., a witness
13    herein, called for examination by counsel for
14    Defendant in the above-entitled matter, pursuant to
15    notice, the witness being duly sworn by BESS A.
16    AVERY, RMR, a Notary Public in and for the State of
17    North Carolina, taken at The Umstead Hotel and Spa,
18    100 Woodland Pond Drive, Cary, North Carolina 27513,
19    commencing at 8:43 a.m., Wednesday, January 5,
20    2011, and the proceedings being taken down by
21    Stenotype by BESS A. AVERY, RMR, and transcribed
22    under her direction.
```



1    A    Yeah.

2    Q    And from whom and when?

3    A    It was from the attorneys, Pishevar &
4    Associates.

5    Q    Sometime, I take it, in May 2010 before
6    you wrote your report?

7    A    Yes.

8    Q    And what use, if any, did you make of that
9    Complaint in preparing your opinions in this case?

10   A    No use, because, as you can well recall,
11   that in May I was asked to file -- asked to review
12   these documents, and I really took a scholarly
13   approach to it, and so I just read the documents for
14   my reading pleasure, the Complaint for my reading
15   pleasure, because I had done my review even before
16   the Complaint -- I got to see the Complaint or I got
17   time to read it.

18   Q    Just, again, for completeness -- now, I
19   want to make sure we have got everything -- other
20   than the Complaint that you just mentioned, were you
21   provided any other materials either by the
22   Plaintiffs or their counsel in preparing your report

Page 46

1  articles on your methodology here for addressing,
2  you know, the question of the Defendant's conduct in
3  a defamation case before?
4      A    I not only have published articles
5  relating to this kind of method, I also used what is
6  the industry standard or journalistic standard in
7  doing this.  Please be aware that this method
8  involved reading and reviewing those documents as a
9  reader would, so there is -- the answer to your
10 question is, yes, that I used a well established
11 research method.  But the other answer to your
12 question is the well established research method is
13 as you and I would read it just like a lay reader
14 would, any document, because, as I understand, these
15 documents were written for the common people.
16     Q    I don't think you quite understood my
17 question.  I understand you've written in your
18 curriculum vitae a number of peer-reviewed articles.
19 Correct?
20     A    Yes, but I also have presented conference
21 papers.
22     Q    I'm simply asking about peer-reviewed

Page 50

1    A    Could you, please, repeat your question.

2    Q    Sure. My question is: Are you, Professor Aikat, as an expert witness, prepared to testify in this case to a reasonable degree of certainty on the question as to whether Trita Parsi and NIAC act as lobbyists for the Islamic Republic of Iran?

8    A    No.

9    Q    I just wanted to put that aside --

10   A    Yes.

11   Q    -- because that involves thousands of documents --

13   A    I'm glad you did.

14   Q    -- and I wanted to focus in on what you are opining on --

16   A    Yes.

17   Q    -- and I wanted to put that to the side.

18   A    Thank you.

19   Q    So that we're all clear, you are not prepared to express an opinion as to the truth or falsity of what the Defendant has written. Correct?

22   A    And I was not asked to.

1      Q    I understand that, if we read Exhibit 4,
2  that limits your mandate.  Correct?
3      A    Yeah, I was not asked to.
4      Q    Let me ask you this.  Are you familiar
5  with the New York Times versus Sullivan case that --
6      A    Yes.
7      Q    -- the Supreme Court issued in 1964, I
8  believe.  Correct?
9      A    Yes.
10     Q    And you understand that sets forth the
11 standard for a defendant in a defamation case under
12 the First Amendment to the United States
13 Constitution.  Correct?
14     A    Yes.
15     Q    And you understand that the United States
16 Supreme Court puts forth the standard in defamation
17 cases under the First Amendment involving public
18 figures known as "actual malice."  Correct?
19     A    Yes.
20     Q    And, again, I just, with regard to the
21 previous question, I want to make sure we understand
22 what you are addressing and what you are not

Page 54

1    referenced on his website?
2        A    I have read through some of the articles
3    and I went to some of the links, but I did not read
4    every element of his linked content because of the
5    limited time, but, you know -- yeah, that would be a
6    correct way to say that.
7        Q    How did you decide which ones to read and
8    which ones not to read, other than the Farsi ones,
9    obviously, which you couldn't read?
10       A    Well, I read all the English documents.
11   But you asked me in the earlier question whether I
12   read the linked documents.
13       Q    Right.
14       A    My answer to your question is I did not go
15   through and parse every linked document.  I read the
16   main article.  So just to clarify for your and my
17   benefit, the Defendant writes an article in which
18   the Defendant may refer to one or two links as
19   support or as to, say, that, Hey, this is why it's
20   happening, and I read through some of the important
21   links --
22       Q    Right, again --

1  either there or not there.  There is no error rate
2  in this method.
3      Q   Okay.  I'm glad you mentioned that
4  because, it's jumping ahead a little bit, but did
5  you happen to notice in looking at the Defendant's
6  website that there is an opportunity at the bottom
7  for anybody to post a comment?
8      A   In the period that I read and reviewed the
9  material on these two websites there is no feature
10 for comments in the parts, in the parts where he
11 writes about the articles and articles that I
12 reviewed.
13     Q   Are you not aware that, in fact, prior to
14 your issuing the report that not only was there an
15 opportunity but he did post comments by people,
16 including somebody by the name of Ali Mostashari.
17 Did you happen to notice that?
18     A   No, it wasn't there.  It may have been
19 hidden.  I did not see it.  And I behaved like an
20 average reader, and it was not there.
21     Q   Well, we'll come back to that.  Let me ask
22 you this.  Are you aware -- well, strike that.

Page 74

```
1       Q    I said other than that, because those
2    actually break down various journalistic standards.
3    My question for you is the term, "willful
4    blindness," is that something that you can point us
5    to specifically in either the Society for
6    Professional Journalists or any other published
7    standards out there?
8       A    Yeah, there are, there are various -- you
9    know, the journalism community has a lot of
10   scholarship on willful blindness.  And even if
11   you -- you do not even have to read the scholarship.
12   If you can understand those two words, one should be
13   able to evaluate it.  Journalism is all about
14   simplicity.  So when you say willful blindness it
15   means what it is.
16      Q    Well, here's our chance to find out where
17   you get this and what you are referring to and how
18   you are measuring it.  And my question is:  Can you
19   point to us any published standards from any
20   journalistic societies stating what that is and what
21   the standards are for complying with or not the
22   standard of willful blindness?
```

1   A   Yeah, it's -- the literature in journalism
2   is replete with discussions and research relating to
3   willful blindness, so it is like looking for a
4   citation that defines media law.  I mean, it is as
5   common as that, so the definition meaning scope of
6   willful blindness is agreed upon by most
7   journalists.
8   Q   My question, again, is:  Can you point us
9   to specific standards, references, articles that not
10  only refer to it but tell one how to determine if
11  somebody has complied with it or not?
12  A   Yeah, there are too many to cite, but --
13  Q   Well, unfortunately, we need to find this
14  out here today in order to learn what your opinions
15  are and how you are measuring the --
16  A   As I mentioned, I used industry standards
17  of willful blindness.  And, just to be fair, I
18  attached the SPJ Code, the Society of Professional
19  Journalists Code, that outlines everything including
20  willful blindness, although it doesn't mention
21  willful blindness by the phrase.  And so I used the
22  most popular and the common one to define, not only

1    A    Well, there could be a difference, but
2  both of them are related.
3    Q    And in that paragraph, since we are on it,
4  let's get into it, you mention, "Several of the
5  Defendant's writings provide statements that are not
6  supported by substantiated or adequate evidence."
7         And this is our chance to find out which
8  of those you are referring to.  So could you,
9  please, tell us which of the Defendant's statements
10 you believe are not supported or substantiated by
11 adequate evidence.
12   A    Mr. Kapshandy, in my research I read
13 through more than 60 articles and items that the
14 Defendant had written, and all of those articles did
15 not have, I'm sorry to say, were not supported or
16 substantiated by adequate evidence.  And I was doing
17 that in the spirit of scholarship, and I was struck
18 by how this person, who I do not know, was
19 criticizing another person without supporting it by
20 adequate evidence so it struck me.  And so I read
21 about 60 articles and it did not -- none of those --
22 in fact, I was looking for one -- none of them had

Page 112

1  to show that that's the first one that you are
2  addressing.  Correct?
3      A   Yes.
4      Q   And, you know, it seems to be a good one,
5  everyone could agree upon.  Seeking truth and
6  reporting it, there's nothing terribly controversial
7  about that.
8      A   The Defendant claims to do that.
9      Q   Well, and I think all journalists want to
10 do that.  Correct?
11     A   Yes.
12     Q   And it's certainly a noteworthy and noble
13 standard.  And underneath, then, you list, I take it
14 these are certain, shall we say, guidelines or
15 suggestions under seeking truth and reporting it?
16     A   Yes.
17     Q   And the first one is "Test the accuracy of
18 information from all sources and exercise care to
19 avoid inadvertent error.  Deliberate distortion is
20 never permissible."
21         Did I read that correctly?
22     A   Yes, sir.

Page 132

1  communication that NIAC officials like Trita Parsi
2  and other people had that the Defendant seemed to be
3  referring or reproducing or both in his web site
4  without mentioning the method of how that e-mail was
5  explained.  This has nothing to do with the NIAC
6  documents that he published or not published.  This
7  e-mail was different.
8      Q   Well, I was just going to mention to you
9  when the Defendant says, "Following a defamation
10 lawsuit brought by NIAC against me in 2008 and
11 during its discovery phase some of NIAC's internal
12 documents relating to its funding by NED had become
13 available," that doesn't tell the reader the method
14 for getting those e-mails?
15     A   That is not a document I'm referring to.
16 Please try to understand.  By putting together words
17 in my mouth, it won't help.
18     Q   Look --
19     A   Let me clarify, please.  What I'm trying
20 to refer to, that in some of the stories the
21 Defendant made references or cited sources like a
22 personal e-mail.  That should have been explained in

1  terms of the method of obtaining that e-mail.  It
2  has nothing to do with an internal document that you
3  just cited.
4      Q    Let's put those aside because I thought
5  you were talking about those.
6      A    I was wrong.
7      Q    My question again for you is:  Can you
8  cite to us a single e-mail that Defendant cites in
9  any of his articles which he obtained by
10 surreptitious methods and he doesn't explain where
11 he got it.  Because, frankly, Professor, this is new
12 to me and I --
13     A    I think this question -- I'm unable to
14 answer your question because whether you obtain your
15 document by undercover or surreptitious methods, it
16 is not something I can judge or I can sit in
17 judgment.  But, as I said, that it would have been
18 better for the Defendant to be transparent and
19 explain the use of such methods as part of the
20 story.  And I'm just referring to the code that it
21 specifies.  I'm not referring to the internal
22 documents because I get it that, you know, internal

1    review and evaluate in determining the reliability

2    of the statements and the sources that the Defendant

3    was utilizing in this case?

4         A    I don't think so.

5              MR. NELSON:  Objection.  Are you

6    representing that that was cited as a source of one

7    of his articles?

8              MR. KAPSHANDY:  No, the question was

9    simply:  Wouldn't it be important to have a document

10   like this in evaluating the reliability of the

11   Defendant's statements and the sources that he cited

12   in his reports?

13             MR. NELSON:  Well, he reviewed articles

14   and sources, and if that's not a source then it

15   wouldn't have been relevant for him to review it.

16             But you can answer the question if you are

17   able.

18             THE WITNESS:  I wanted to respectfully say

19   that just showing me a piece of letter is not

20   relevant to this discussion because I was assigned

21   to do something and here you have asked me very

22   focused questions about the scope and intent of my