# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

TRITA PARSI and NATIONAL :

IRANIAN AMERICAN COUNCIL :

                 Plaintiffs :

    v.                :    Civil No.:

DAIOLESLAM SEID HASSAN,   :    08 CV 00705 (JDB)

           Defendant :    Page 1 - 243


VOLUME III

- - -

Wednesday, May 11, 2011

- - -

Continued deposition, videotaped, of Dr. Trita Parsi,

was taken at the Law Offices of Sidley Austin, LLP,

1501 K Street, NW, Sixth Floor, Washington, DC 20005

commencing at 10:01 a.m. before Leslie A. Todd,

Registered Professional Court Reporter and Notary

Public, in and for the District of Columbia.

Page 2

```
 1    On behalf of the Plaintiffs:
 2      A. P. PISHEVAR, ESQUIRE
        Pishevar & Associates, P.C.
 3      Jefferson Plaza, Suite 316
        600 East Jefferson Street
 4      Rockville, Maryland 20852
        (301) 279-8773
 5      ap@pishevarlegal.com
 6
      On behalf of the Defendant:
 7
        TIMOTHY E. KAPSHANDY, ESQUIRE
 8      THOMAS E. ROSS, ESQUIRE
        ERIC GALVEZ, ESQUIRE
 9      TASHA MANORANJAN, ESQUIRE
        Sidley Austin, LLP
10      1501 K Street, Northwest
        Washington, D.C. 20005
11      (202) 736-8374
        tim.kapshandy@sidley.com
12
13    Also present:
14      DAIOLESLAM SEID HASSAN
        DANIEL HOLMSTOCK (Videographer)
15
16
17
18
19
20
21
22
```

Page 3

CONTENTS

```
 2    EXAMINATION BY:                          PAGE
 3      Counsel for Defendant          6
 4    PARSI DEPOSITION EXHIBITS  *       PAGE
 5    100  Mailing list printout
 6    101  A Message from the President        9
 7    102  Joel N. Morse, Ph.D. report       17
 8    103  Printout of Excel file "Contents"   31
 9    103A CD of Exhibit 103               31
10    104  December 2007 Membership List       52
11    105  Letter to Inquiry Form           63
12    106  Trita Parsi Resume               68
13    107  National Iranian American Counsel Annual
        Board of Directors Meeting, October 26,
14      2007                            72
15    108  Trita Parsi Resume               76
16    109  NIAC Profit & Loss January through
        December 2009                  86
17
      110  Printout of Salesforce "Accounts"    89
18
      111  CD of Exhibit 111A              98
19
      111A Printout of Salesforce "Contacts"    99
20
      112  Printout of Salesforce "Leads"      116
21
      112A CD of Exhibit 112              116
22
```

Page 4

CONTENTS (Continued)

```
 2    PARSI DEPOSITION EXHIBITS  *          PAGE
 3    113  Printout of Salesforce "Opportunities"  116
 4    113A CD of Exhibit 113              116
 5    114  Printout of Salesforce "Campaigns"    116
 6    114A CD of Exhibit 114              116
 7    115  Exhibit Number not used
 8    116  Printout of Salesforce Meeting Notes    117
 9    116A CD                           117
10    116B CD                           117
11    117  CD                           117
12    118  E-mail re Staff Reminder          120
13    119  Letter to Peter Jensen from Peter Wolk,
        dated April 29, 2011            140
14
      120  NIAC Expense Report            142
15
      121  E-mail string re Names for the Retreat   153
16
      122  Capitol Hill Meetings            168
17
      123  Memo to NIAC President and Board Members
18      From Shervin Boloorian           170
19    124  E-mail string re Question Dr. Navab    180
20    125  E-mail string re Congratulations      184
21    126  E-mail re to do list on 362         189
22    127  E-mail re Talking Points document re
```

Page 5

CONTENTS (Continued)

```
 2    PARSI DEPOSITION EXHIBITS  *          PAGE
 3    127A CD                          239
 4    127B E-mail string re Talking Points document re
        Attacks against NIAC            239
 5
 6    128  E-mail re Puneet - meeting and dinner   196
 7    129  Lobbying Disclosure Act Guidance     198
 8    130  H.Con.Res.1                   210
 9    131  Talebi production of documents      215
10    132  (retained by Defendant's counsel.)     215
11
      (* Exhibits attached to the transcript)
12
13
14
15
16
17
18
19
20
21
22
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 6

PROCEEDINGS

10:00:51    THE VIDEOGRAPHER: The time is 10:01 a.m.,
10:00:53    May 11, 2011. This is tape No. 1, Volume 3, of the
10:00:58    continued videotaped deposition of Mr. Trita Parsi.
10:01:02    Will the court reporter please swear in the
witness.
WHEREUPON,
DR. TRITA PARSI
called as a witness, and having been first duly sworn,
was examined and testified as follows:
10:01:14    EXAMINATION BY COUNSEL FOR DEFENDANT
10:01:14    BY MR. KAPSHANDY:
10:01:18    Q   Are you ready, Dr. Parsi?
10:01:20    A   Yes, I am.
10:01:21    Q   Okay. And as you know from our previous
10:01:23    two sessions, my name is Timothy Kapshandy on behalf
10:01:27    of the defendant in the case, and I will dispense
10:01:32    with the usual rules.
10:01:33    As you know, you are under oath, and the
10:01:35    same understanding and procedure we had in place as
10:01:37    from the previous two sessions applies. Okay?
10:01:40    A   (The witness nods.)

Page 7

10:01:40    Q   And one of those things that we discussed
10:01:42    was you have to answer verbally --
10:01:44    A   Yes.
10:01:44    Q   -- and I think you just nodded your head,
10:01:46    so although the videographer picks that up, the
10:01:50    court reporter can't, so...
10:01:51    A   Sorry about that.
10:01:52    Q   And maybe just as a reminder, also we need
10:01:57    to be careful to allow each other to finish and not
10:02:00    talk over each other so that she can make a complete
10:02:03    and accurate record of what the question and the
10:02:04    answer is. Okay?
10:02:04    A   Very good.
10:02:05    Q   And one additional thing here today. As
10:02:07    you probably know from your counsel, the Court has
10:02:11    given us an additional three-and-a-half hours of
10:02:14    time to complete some of the subjects, in particular
10:02:16    relating to materials produced after your last
10:02:18    deposition, and that's on-the-record time. So to
10:02:22    the extent we stay on the record, we will get
10:02:26    through sooner. To the extent, though, you need to
10:02:29    take a break or want to take a break or want to go

Page 8

10:02:33    off the record to refer to anything, you are welcome
10:02:35    to do so. Just let us know, but just so we're all
10:02:39    clear, the three-and-a-half hours' time is question
10:02:41    and answer in the deposition. Okay?
10:02:44    A   Sure.
10:02:44    Q   Any questions before we proceed?
10:02:46    A   Nope.
10:02:48    MR. KAPSHANDY: Counsel, any other comments
10:02:49    or statements?
10:02:50    MR. PISHEVAR: No, sir.
10:02:51    BY MR. KAPSHANDY:
10:02:52    Q   Now, Dr. Parsi, as you know, subsequent to
10:02:54    your last deposition, a number of different things
10:02:59    were produced that we're going to cover here today,
10:03:02    some Salesforce membership information, some e-mails
10:03:06    from Babak Talebi, some Convio membership database
10:03:10    information, and some lobbying documents in
10:03:14    particular.
10:03:16    You're familiar with that?
10:03:17    A   Somewhat.
10:03:19    Q   I mean were you involved in the production
10:03:23    and preparation of any of those materials that were

Page 9

10:03:26    given to us since your last deposition?
10:03:27    A   I was involved in some of that, but much
10:03:32    of it is of significant technical nature that I'm
10:03:36    not an expert on.
10:03:37    Q   Okay. Well, when we get to those, we'll
10:03:40    ask you about those specifically.
10:03:42    But to start off here, I want to talk
10:03:44    about the membership information, and sometimes
10:03:47    called Salesforce or Convio databases, and when we
10:03:51    get to those we'll mark those.
10:03:53    But generally I would like to first hand
10:03:56    you what we'll mark as your deposition Exhibit 101.
14:10:28    (Exhibit No. 101 was marked for
14:10:28    identification.)
14:10:28    BY MR. KAPSHANDY:
10:04:03    Q   Which for the record is a statement from
10:04:09    the President, Trita Parsi, December 6, 2010, that
10:04:14    was pulled off of NIAC's website last night. You
10:04:19    will see the -- the date that it was pulled off the
10:04:21    website was 5/10/2011.
10:04:24    And I would like to direct your attention
10:04:26    to the last -- second to the last paragraph on

3  (Pages 6 to 9)

Page 10

| | | |
|---|---|---|
| 10:04:28 | 1 | page 1, which states: "Currently standing at close |
| 10:04:33 | 2 | to 4,000 paid members and 40,000 -- 43,000-plus |
| 10:04:37 | 3 | active supporters nationwide, our grassroots network |
| 10:04:42 | 4 | provides 70 percent of our annual budget." |
| 10:04:45 | 5 | First of all, did I read that correctly? |
| 10:04:47 | 6 | A   Yes, you did. |
| 10:04:48 | 7 | Q   Now, my question for you:  Is any of that |
| 10:04:51 | 8 | true? |
| 10:04:52 | 9 | A   I believe it is. |
| 10:04:54 | 10 | Q   Okay.  And you're stating that here today |
| 10:04:58 | 11 | under oath that currently -- and this is as of |
| 10:05:01 | 12 | December 6, 2010 -- you had 4,000 paid members and |
| 10:05:07 | 13 | 43,000-plus active supporters, and the third part of |
| 10:05:12 | 14 | that is that that constitutes 70 percent of your |
| 10:05:14 | 15 | annual budget. |
| 10:05:16 | 16 | A   We have -- to the best of my knowledge, I |
| 10:05:19 | 17 | don't remember exactly what the number was at that |
| 10:05:21 | 18 | time -- close to 4,000 people that have supported |
| 10:05:25 | 19 | us.  Not all of them are necessarily current in |
| 10:05:28 | 20 | their memberships.  But that is a very natural |
| 10:05:32 | 21 | situation for nonprofits.  I know myself I'm a |
| 10:05:35 | 22 | member of organizations and I consider myself a |

Page 11

| | | |
|---|---|---|
| 10:05:38 | 1 | member even if I may have forgotten to renew my |
| 10:05:42 | 2 | membership. |
| 10:05:42 | 3 | Q   Well -- |
| 10:05:43 | 4 | When it comes to 43,000-plus, those are |
| 10:05:45 | 5 | the people on the mailing list, and I think the |
| 10:05:49 | 6 | 70 percent is an average that we calculated. |
| 10:05:55 | 7 | Q   Well, let's start with the 43,000-plus |
| 10:05:57 | 8 | active supporters you said are on the mailing lists. |
| 10:06:00 | 9 | Of all the mailing lists and membership lists that |
| 10:06:04 | 10 | were produced to us, either before or since your |
| 10:06:06 | 11 | last deposition, where can we find those 43,000 |
| 10:06:09 | 12 | names? |
| 10:06:09 | 13 | A   Those 43,000 -- hold on.  You guys were |
| 10:06:16 | 14 | asking for membership.  You asked for membership |
| 10:06:21 | 15 | database. |
| 10:06:22 | 16 | Q   Oh, so you have some other lists now that |
| 10:06:24 | 17 | we're just finding out about today -- |
| 10:06:24 | 18 | A   No. |
| 10:06:27 | 19 | Q   -- what you call active supporters, that |
| 10:06:29 | 20 | haven't been provided to us? |
| 10:06:31 | 21 | A   No.  We made it very clear to you that we |
| 10:06:33 | 22 | have a mailing list. |

Page 12

| | | |
|---|---|---|
| 10:06:34 | 1 | Q   Okay.  Where is that and when can we get |
| 10:06:36 | 2 | it? |
| 10:06:36 | 3 | A   You haven't asked for it. |
| 10:06:38 | 4 | Q   We have specifically asked for it in the |
| 10:06:40 | 5 | discovery responses.  Was that kept in Salesforce or |
| 10:06:43 | 6 | was that kept in Convio? |
| 10:06:44 | 7 | A   That was kept in Convio, I believe. |
| 10:06:47 | 8 | Q   Okay.  Well, we've been produced -- |
| 10:06:48 | 9 | A   I don't recall you asking for it.  I |
| 10:06:50 | 10 | recall you asking for membership. |
| 10:06:51 | 11 | Q   And all communications with, you know, |
| 10:06:53 | 12 | supporters, members -- you know, read the membership |
| 10:06:57 | 13 | interrogatory and discovery requests. |
| 10:06:59 | 14 | Now, you're telling us here today that you |
| 10:07:02 | 15 | have in Convio, and I'm going to ask for it to be |
| 10:07:05 | 16 | produced, a list of 43,000 supporters? |
| 10:07:08 | 17 | A   It's 43,000 people plus, I believe.  I |
| 10:07:12 | 18 | don't know exactly what the number is right now -- |
| 10:07:14 | 19 | Q   Let me tell you -- |
| 10:07:15 | 20 | A   -- on the mailing list. |
| 10:07:16 | 21 | Q   -- you did produce in 2010 a Salesforce |
| 10:07:19 | 22 | list known as "Leads." |

Page 13

| | | |
|---|---|---|
| 10:07:21 | 1 | Is that what you would consider your list |
| 10:07:23 | 2 | of active supporters? |
| 10:07:25 | 3 | A   Leads is -- is a different thing, I |
| 10:07:28 | 4 | believe. |
| 10:07:29 | 5 | Q   Okay.  Did you have in Salesforce |
| 10:07:31 | 6 | something other than members? |
| 10:07:34 | 7 | A   The reason why you are confusing these |
| 10:07:38 | 8 | issues is because Salesforce did not have a mailing |
| 10:07:39 | 9 | list capability, so the mailing list was not kept at |
| 10:07:44 | 10 | Salesforce. |
| 10:07:44 | 11 | Q   So you now are saying that you have a |
| 10:07:47 | 12 | mailing list of supporters of 43,000 plus in Convio. |
| 10:08:00 | 13 | Correct? |
| 10:08:00 | 14 | A   The number at the time in 2010, whenever |
| 10:08:04 | 15 | this was sent, was 43,000.  I don't know what the |
| 10:08:08 | 16 | exact number is today. |
| 10:08:09 | 17 | Q   Okay.  Well, we're going to ask -- |
| 10:08:11 | 18 | A   Those are people on our mailing list. |
| 10:08:12 | 19 | Q   We're going to ask that that be produced. |
| 10:08:15 | 20 | A   You can characterize that -- |
| 10:08:15 | 21 | MR. PISHEVAR:  Objection. |
| 10:08:15 | 22 | |

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 14

| | | |
|---|---|---|
| 10:08:15 | 1 | BY MR. KAPSHANDY: |
| 10:08:19 | 2 | Q   Now, the 70 percent of your annual budget |
| 10:08:21 | 3 | being supported by members, where does that come |
| 10:08:24 | 4 | from? |
| 10:08:24 | 5 | A   It's a calculation.  It's actually |
| 10:08:26 | 6 | 70 percent of our annual budget that is provided to |
| 10:08:32 | 7 | us by Iranian-Americans, whether that be through |
| 10:08:34 | 8 | support from Iranian-American foundations or |
| 10:08:37 | 9 | individuals. |
| 10:08:38 | 10 | Q   Oh, so you count foundations such as the |
| 10:08:41 | 11 | Parsa Foundation which gives you this year already, |
| 10:08:45 | 12 | what, a half million dollars as being a member and |
| 10:08:50 | 13 | not a foundational supporter? |
| 10:08:53 | 14 | A   Read the sentence.  It says: "Our |
| 10:08:55 | 15 | grassroots network provides 70 percent of our annual |
| 10:08:58 | 16 | budget." |
| 10:08:58 | 17 | Q   Right.  So my question is, you consider |
| 10:09:00 | 18 | the Parsa Foundation a grassroots member and not a |
| 10:09:04 | 19 | large foundation? |
| 10:09:05 | 20 | A   We count -- |
| 10:09:05 | 21 | MR. PISHEVAR:  Asked and answered. |
| 10:09:06 | 22 | THE WITNESS:  We count Parsa Foundation as |

Page 15

| | | |
|---|---|---|
| 10:09:08 | 1 | part of the Iranian-American support that we get |
| 10:09:11 | 2 | because it is an Iranian-American foundation |
| 10:09:14 | 3 | supported by Iranian-American philanthropists. |
| 10:09:17 | 4 | BY MR. KAPSHANDY: |
| 10:09:17 | 5 | Q   But just so we're clear, when you say |
| 10:09:19 | 6 | "grassroots network," that doesn't include |
| 10:09:22 | 7 | individual persons, it includes foundations also? |
| 10:09:24 | 8 | A   The language there is a message from the |
| 10:09:27 | 9 | president.  If you want to get technical, I'm sure |
| 10:09:30 | 10 | you can get, but we count Parsa Foundation as part |
| 10:09:33 | 11 | of Iranian-American support because it's seven or |
| 10:09:37 | 12 | eight Iranian-American philanthropists who got |
| 10:09:41 | 13 | together and put together a foundation. |
| 10:09:42 | 14 | Q   What about your other foundational support |
| 10:09:45 | 15 | such as Ploughshares and Tides and -- |
| 10:09:47 | 16 | A   Those are not included in the 70 percent. |
| 10:09:49 | 17 | Q   Those are not included in the 70 |
| 10:09:50 | 18 | percent -- |
| 10:09:50 | 19 | A   Because they are not Iranian-American. |
| 10:09:52 | 20 | Q   But Parsa Family Foundation is? |
| 10:09:54 | 21 | A   I don't know if it's called the Parsa |
| 10:09:57 | 22 | Family Foundation. |

Page 16

| | | |
|---|---|---|
| 10:09:57 | 1 | Q   It's Parsa Foundation, correct? |
| 10:09:59 | 2 | A   I think it's Parsa Community Foundation. |
| 10:10:01 | 3 | Q   Now, the 4,000 paid members, where does |
| 10:10:04 | 4 | that come from? |
| 10:10:05 | 5 | A   That comes from over the years a number of |
| 10:10:07 | 6 | people who have supported us. |
| 10:10:10 | 7 | Q   So when it says "currently standing at |
| 10:10:12 | 8 | close to 400 paid members," it means somebody that |
| 10:10:15 | 9 | has given you some money at any time in the past |
| 10:10:18 | 10 | years? |
| 10:10:18 | 11 | A   We don't count -- we don't want to be so |
| 10:10:22 | 12 | mean to our members to say that if someone forgot to |
| 10:10:25 | 13 | renew their membership, two days after they are not |
| 10:10:28 | 14 | considered to be a member. |
| 10:10:30 | 15 | Q   Well, what sort of -- |
| 10:10:32 | 16 | A   Over the years we have had, I believe, |
| 10:10:34 | 17 | 4,000 -- close to or more than 4,000 |
| 10:10:38 | 18 | Iranian-Americans who have or -- and many of them |
| 10:10:39 | 19 | continue to support us.  The reason why it's very |
| 10:10:43 | 20 | difficult to be able to give you an exact number for |
| 10:10:46 | 21 | any given time is because the way that the |
| 10:10:48 | 22 | membership works is that you -- your membership |

Page 17

| | | |
|---|---|---|
| 10:10:53 | 1 | expires technically a year after the day you signed |
| 10:10:56 | 2 | up. |
| 10:10:57 | 3 | Many other organizations don't do it this |
| 10:11:00 | 4 | way.  They say that if you signed up in the month of |
| 10:11:03 | 5 | July, then it will expire next month of July, and |
| 10:11:06 | 6 | then they have a batch of people who suddenly expire |
| 10:11:10 | 7 | on the first of that month.  So it's different ways |
| 10:11:12 | 8 | of doing these things. |
| 14:10:28 | 9 | (Exhibit No. 102 was marked for |
| 14:10:28 | 10 | identification.) |
| 10:11:13 | 11 | BY MR. KAPSHANDY: |
| 10:11:13 | 12 | Q   Let me hand you what we'll mark as your |
| 10:11:17 | 13 | deposition Exhibit 102, which was Exhibit A to the |
| 10:11:20 | 14 | deposition of your economic expert, Professor Morse. |
| 10:11:28 | 15 | My first question is, did you look at his |
| 10:11:31 | 16 | report at any time? |
| 10:11:33 | 17 | A   Long, long time ago.  When was this that |
| 10:11:41 | 18 | he provided this? |
| 10:11:42 | 19 | Q   Pardon? |
| 10:11:43 | 20 | A   When did he provide this?  This is -- |
| 10:11:44 | 21 | Q   It's dated -- |
| 10:11:44 | 22 | A   -- a year ago. |

5  (Pages 14 to 17)

Page 18

| | | |
|---|---|---|
| 10:11:46 | 1 | Q  -- May 9, 2010. |
| 10:11:48 | 2 | Did you have any involvement -- let me ask |
| 10:11:50 | 3 | you this: When did you see it? |
| 10:11:52 | 4 | A  Sometime around that time, I believe. |
| 10:11:54 | 5 | Q  Did you have any involvement in providing |
| 10:11:57 | 6 | to him the information that he relied upon in |
| 10:12:00 | 7 | preparing his report in this case? |
| 10:12:02 | 8 | A  He asked us to get access to various types |
| 10:12:05 | 9 | of information, and we did our best to provide him |
| 10:12:07 | 10 | with that access. |
| 10:12:09 | 11 | Q  Now, if you turn to page 4 of his report, |
| 10:12:16 | 12 | two-thirds of the way down, "membership statistics," |
| 10:12:20 | 13 | he states: "Typical membership roles of two to |
| 10:12:25 | 14 | 3,000 people dropped to 1200 current members." |
| 10:12:28 | 15 | Did I read that correctly? |
| 10:12:29 | 16 | A  Yes. |
| 10:12:29 | 17 | Q  Did I? |
| 10:12:30 | 18 | A  Yes. |
| 10:12:30 | 19 | Q  Did you have any involvement in providing |
| 10:12:32 | 20 | him that information? |
| 10:12:34 | 21 | A  I believe that he asked access to the |
| 10:12:37 | 22 | databases, and he looked into that, if I'm not |

Page 19

| | | |
|---|---|---|
| 10:12:40 | 1 | mistaken. I don't recall exactly. |
| 10:12:42 | 2 | Q  Well, if he has testified under oath that |
| 10:12:45 | 3 | that information was provided to him by Kevin Cowl |
| 10:12:48 | 4 | and he was not given any membership information, |
| 10:12:50 | 5 | would you have any reason to dispute that? |
| 10:12:53 | 6 | A  Sorry. Could you repeat the question? |
| 10:12:55 | 7 | MR. PISHEVAR: Objection. |
| 10:12:56 | 8 | BY MR. KAPSHANDY: |
| 10:12:57 | 9 | Q  If he testified that he was given these |
| 10:12:58 | 10 | data by Kevin Cowl and he was provided absolutely no |
| 10:13:01 | 11 | other membership information, would you have any |
| 10:13:04 | 12 | reason to dispute his testimony? |
| 10:13:06 | 13 | MR. PISHEVAR: Objection. |
| 10:13:08 | 14 | THE WITNESS: I don't recall exactly. |
| 10:13:09 | 15 | BY MR. KAPSHANDY: |
| 10:13:09 | 16 | Q  My question is, would you have any reason |
| 10:13:11 | 17 | to dispute his testimony that he was provided these |
| 10:13:15 | 18 | data by your COO, Kevin Cowl, and he was provided no |
| 10:13:20 | 19 | access to any other membership information. |
| 10:13:23 | 20 | MR. PISHEVAR: Same objection. |
| 10:13:26 | 21 | THE WITNESS: I would have to look at his |
| 10:13:27 | 22 | testimony. |

Page 20

| | | |
|---|---|---|
| 10:13:27 | 1 | BY MR. KAPSHANDY: |
| 10:13:28 | 2 | Q  That wasn't my question, Mr. Parsi. |
| 10:13:31 | 3 | A  That was my answer. |
| 10:13:32 | 4 | Q  Can you please answer the question? |
| 10:13:34 | 5 | MR. PISHEVAR: It calls for speculation and |
| 10:13:35 | 6 | this is a lay witness. |
| 10:13:37 | 7 | BY MR. KAPSHANDY: |
| 10:13:37 | 8 | Q  Can you answer the question, please? |
| 10:13:38 | 9 | A  I answered the question by saying I would |
| 10:13:40 | 10 | have to take a look at his testimony. |
| 10:13:57 | 11 | MR. KAPSHANDY: Could you read the question |
| 10:13:57 | 12 | back, please, ma'am. |
| 10:13:57 | 13 | (Whereupon, the requested record was |
| 10:13:57 | 14 | read.) |
| 10:14:00 | 15 | MR. PISHEVAR: Continuing objection. |
| 10:14:00 | 16 | BY MR. KAPSHANDY: |
| 10:14:01 | 17 | Q  Answer the question, please. |
| 10:14:02 | 18 | A  I already have. |
| 10:14:04 | 19 | Q  My question was, would you have any reason |
| 10:14:06 | 20 | to dispute his testimony that these data were |
| 10:14:09 | 21 | provided to him by your chief operating officer |
| 10:14:11 | 22 | Kevin Cowl? |

Page 21

| | | |
|---|---|---|
| 10:14:12 | 1 | MR. PISHEVAR: Asked and answered. |
| 10:14:13 | 2 | BY MR. KAPSHANDY: |
| 10:14:15 | 3 | Q  Can you answer the question, please? |
| 10:14:17 | 4 | A  I already answered the question. I need |
| 10:14:19 | 5 | to take a look at his testimony. |
| 10:14:21 | 6 | MR. PISHEVAR: Well, okay, we're going to |
| 10:14:23 | 7 | go off the record. That's going to come out of your |
| 10:14:25 | 8 | time. Let's go off the record, please, and you can |
| 10:14:28 | 9 | look at it, and if you want to play this game all |
| 10:14:30 | 10 | day -- it's a simple question to be answered |
| 10:14:32 | 11 | directly. If you want to look at the testimony, I |
| 10:14:34 | 12 | will invite you to do so, but that's not coming out |
| 10:14:38 | 13 | of the deposition time. We'll go off the record and |
| 10:14:38 | 14 | do that. |
| 10:14:39 | 15 | Do you want to do that? |
| 10:14:40 | 16 | THE WITNESS: All right. |
| 10:14:40 | 17 | MR. PISHEVAR: I don't agree to go off the |
| 10:14:42 | 18 | record or any of that about the timing of it. He |
| 10:14:45 | 19 | asked the -- he answered the question to the best |
| 10:14:47 | 20 | that he could. You asked the question, you had it |
| 10:14:49 | 21 | reread, and you are asking him to speculate now. I |
| 10:14:53 | 22 | don't think your question is an appropriate one, and |

6 (Pages 18 to 21)

Page 22

| 10:14:54 | 1 | then, in any event, it's been answered. |
| 10:14:54 | 2 | BY MR. KAPSHANDY: |
| 10:14:57 | 3 | Q  So as you sit here today, Dr. Parsi -- |
| 10:15:00 | 4 | MR. PISHEVAR:  So anything beyond that -- |
| 10:15:02 | 5 | BY MR. KAPSHANDY: |
| 10:15:02 | 6 | Q  -- you have no ability to -- strike that. |
| 10:15:18 | 7 | Did you have any involvement whatsoever in |
| 10:15:19 | 8 | the preparation or sending of any information or |
| 10:15:22 | 9 | materials to Professor Morse for his report? |
| 10:15:25 | 10 | A  Professor Morse interviewed me I believe |
| 10:15:28 | 11 | once, and he asked for some documents and material, |
| 10:15:32 | 12 | which was provided to him. |
| 10:15:35 | 13 | Q  Did you provide him the membership data |
| 10:15:38 | 14 | that he relates here in his report? |
| 10:15:39 | 15 | A  I don't recall exactly if it was me or if |
| 10:15:43 | 16 | it was someone else. |
| 10:15:43 | 17 | Q  Well, when you saw this information |
| 10:15:44 | 18 | shortly after it was prepared, as you say, did you |
| 10:15:47 | 19 | get back to him and say, The current membership data |
| 10:15:52 | 20 | that you have of 1200 is wrong, Professor Morse? |
| 10:15:55 | 21 | A  I didn't -- |
| 10:15:56 | 22 | MR. PISHEVAR:  Objection.  The question |

Page 23

| 10:15:58 | 1 | calls for -- has a false dichotomy. |
| 10:15:58 | 2 | BY MR. KAPSHANDY: |
| 10:16:04 | 3 | Q  Go ahead and answer, please. |
| 10:16:04 | 4 | THE REPORTER:  Has a false? |
| 10:16:05 | 5 | MR. PISHEVAR:  Dichotomy. |
| 10:16:05 | 6 | THE WITNESS:  I don't recall if I talked to |
| 10:16:06 | 7 | him about that issue. |
| 10:16:07 | 8 | BY MR. KAPSHANDY: |
| 10:16:09 | 9 | Q  Well, if you had read that when he sent |
| 10:16:14 | 10 | this to you in May of 2010 that NIAC's membership -- |
| 10:16:19 | 11 | current membership was only 1200, would you have |
| 10:16:24 | 12 | gotten back to him and told him that's false? |
| 10:16:26 | 13 | A  You are asking me to speculate. |
| 10:16:30 | 14 | Q  No.  I'm asking you if you had seen this |
| 10:16:34 | 15 | number, 1200 current members in December of 2010, |
| 10:16:38 | 16 | wouldn't you have had an obligation, because you |
| 10:16:41 | 17 | knew he was filing this report in federal court, to |
| 10:16:43 | 18 | tell him that that data is false? |
| 10:16:46 | 19 | A  Again, I don't recall whether I did have a |
| 10:16:48 | 20 | conversation with him about that. |
| 10:16:49 | 21 | Q  That wasn't the question. |
| 10:16:53 | 22 | A  As I said, I don't recall if I did have a |

Page 24

| 10:16:55 | 1 | conversation with him.  But you are seemingly |
| 10:17:00 | 2 | deliberately confusing two issues.  What he is |
| 10:17:03 | 3 | referring to there, I assume, when he says "current |
| 10:17:05 | 4 | members" are people's whose membership have not |
| 10:17:08 | 5 | expired, which means even if they expired the day |
| 10:17:13 | 6 | afterward they wouldn't be counted.  That's |
| 10:17:15 | 7 | different from what we talked about in the letter. |
| 10:17:15 | 8 | Q  Okay.  Well, let's talk about what you |
| 10:17:17 | 9 | consider a current member.  What sort of leeway |
| 10:17:19 | 10 | in terms of expiration do you use -- back to |
| 10:17:22 | 11 | Exhibit 101 -- when you consider somebody an active |
| 10:17:25 | 12 | member? |
| 10:17:25 | 13 | A  There are two different ways of looking at |
| 10:17:28 | 14 | it.  Someone's membership needs to get renewed. |
| 10:17:32 | 15 | That doesn't mean that I don't consider that person |
| 10:17:34 | 16 | a member. |
| 10:17:40 | 17 | We have that situation all the time, and |
| 10:17:42 | 18 | this is a very common issue for many membership |
| 10:17:45 | 19 | organizations, and we are following what I believe |
| 10:17:47 | 20 | is the standard there.  We have an event, for |
| 10:17:49 | 21 | instance, and we say you have to be a member.  That |
| 10:17:52 | 22 | invitation, nevertheless, goes out to people who |

Page 25

| 10:17:55 | 1 | have forgotten to renew. |
| 10:17:57 | 2 | Q  Do you remember the question? |
| 10:17:58 | 3 | A  Not exactly. |
| 10:18:00 | 4 | Q  The question is, what is the leeway period |
| 10:18:03 | 5 | that you give somebody when you remove them from |
| 10:18:07 | 6 | what you call somebody who has just forgotten to |
| 10:18:11 | 7 | renew their membership versus somebody who simply |
| 10:18:16 | 8 | doesn't want to be a member anymore? |
| 10:18:18 | 9 | A  Oh.  We have people who may come and say, |
| 10:18:22 | 10 | I don't want to renew my membership; don't -- for |
| 10:18:24 | 11 | whatever reason, and as a result, they are taken off |
| 10:18:27 | 12 | the list, and they're called former members. |
| 10:18:28 | 13 | Q  And where will we see that in any of the |
| 10:18:31 | 14 | lists, "former members," that term? |
| 10:18:33 | 15 | A  That should be included in the list, I |
| 10:18:35 | 16 | assume. |
| 10:18:35 | 17 | Q  Well, no, let me tell you that those |
| 10:18:37 | 18 | distinguished between active and expired, and |
| 10:18:39 | 19 | there's nothing known as a former member.  There is |
| 10:18:43 | 20 | no category or field. |
| 10:18:43 | 21 | MR. PISHEVAR:  Objection.  Counsel is -- |
| 10:18:43 | 22 | |

7  (Pages 22 to 25)

Page 26

```
10:18:43   1   BY MR. KAPSHANDY: :
10:18:44   2      Q   So the category that you just described,
10:18:47   3   where would we find those?
10:18:48   4      A   It should be in the same documents.
10:18:50   5      Q   Okay.  When we get to those, you can point
10:18:50   6   those out to us, okay?
10:18:51   7      MR. KAPSHANDY:  And, Counsel, for the
10:18:52   8   record, I'm wanting to know when we're going to get
10:18:55   9   the codes so that we can decode the Salesforce
10:19:00  10   membership databases.
10:19:02  11      MR. PISHEVAR:  Go ahead and ask your
10:19:03  12   questions.
10:19:04  13      MR. KAPSHANDY:  Yeah, when are we going to
10:19:06  14   be getting the codes to --
10:19:07  15      MR. PISHEVAR:  I'm not here to answer your
10:19:08  16   questions, okay?  Ask your questions so the witness
10:19:11  17   can answer the questions.
10:19:12  18      MR. KAPSHANDY:  I have a question for you
10:19:13  19   which we have repeatedly asked.
10:19:15  20      MR. PISHEVAR:  I'm not answering -- I'm not
10:19:16  21   here for a deposition, sir.
10:19:18  22      MR. KAPSHANDY:  Okay.  So your lack of
```

Page 27

```
10:19:19   1   cooperation will be noted.
10:19:20   2      MR. PISHEVAR:  It's not a lack of
10:19:21   3   cooperation.
10:19:21   4   BY MR. KAPSHANDY:
10:19:21   5      Q   Mr. Parsi --
10:19:22   6      MR. PISHEVAR:  You know the answer to your
10:19:23   7   own question.
10:19:24   8   BY MR. KAPSHANDY:
10:19:24   9      Q   Mr. Parsi, did you have any involvement in
10:19:25  10   the preparation of the Salesforce databases lists
10:19:27  11   that were provided to us in March and April of this
10:19:30  12   year?
10:19:30  13      A   I -- I was involved in it, yes.
10:19:35  14      Q   And what was your involvement?
10:19:37  15      A   My involvement was to figure out to the
10:19:39  16   best of our ability what exactly you were asking for
10:19:43  17   and what type of technical lack of capabilities that
10:19:46  18   your team had so that they were having problems with
10:19:50  19   the file and problems with reading the file.
10:19:53  20      Q   You understand there was a court order
10:19:56  21   requiring NIAC to produce Salesforce, Convio and all
10:20:01  22   membership databases in a readable form.  You
```

Page 28

```
10:20:05   1   understand that?
10:20:05   2      A   I do understand that, and we did provide
10:20:07   3   that.
10:20:08   4      Q   And you understand that many of the --
10:20:09   5      A   But I also have a recollection that you in
10:20:12   6   the past have opened up files with the wrong
10:20:15   7   program.
10:20:15   8      Q   Do you have any other comments about our
10:20:17   9   computer abilities that you'd like to get off your
10:20:20  10   chest right now?
10:20:21  11      MR. PISHEVAR:  Objection.  Don't answer
10:20:22  12   that.
10:20:23  13   BY MR. KAPSHANDY:
10:20:23  14      Q   My question was, you understand there was
10:20:25  15   a court order that required you, Dr. Parsi, and NIAC
10:20:29  16   to produce all membership databases and information
10:20:32  17   in a readable format.
10:20:32  18      MR. PISHEVAR:  Asked and answered.  Next
10:20:36  19   question, please.
10:20:36  20   BY MR. KAPSHANDY:
10:20:38  21      Q   Do you understand that?
10:20:38  22      A   I do understand that, and we complied with
```

Page 29

```
10:20:41   1   the order.
10:20:41   2      MR. PISHEVAR:  The order speaks for itself.
10:20:44   3   BY MR. KAPSHANDY:
10:20:45   4      Q   And you understand that many of the fields
10:20:47   5   were coded with a combination of letters and
10:20:50   6   characters that made no information whatsoever in
10:20:53   7   English per the Court's order?  You understand that?
10:20:55   8      A   When we first produced it, I don't recall
10:21:03   9   paying -- noticing that.  Later on when you
10:21:07  10   contacted us, or our counsel, and said that you had
10:21:11  11   problems opening those, our, at least initial,
10:21:14  12   understanding was that these are the coded fields
10:21:16  13   and categories that the computer program produces
10:21:20  14   that is actually not necessarily relevant in the
10:21:23  15   sense that that's part of the computer's way of
10:21:27  16   reading itself.
10:21:28  17      Then later on, David Elliott did a simple
10:21:32  18   Google search and found explanations of some of
10:21:34  19   these codes, which we didn't understand ourselves
10:21:37  20   either because we had not done this before.
10:21:41  21      MR. KAPSHANDY:  No, what David Elliott
10:21:43  22   provided to us, Counsel, was information -- it was a
```

8 (Pages 26 to 29)

Page 30

| | | |
|---|---|---|
| 10:21:48 | 1 | user's guide. That wasn't the problem we were |
| 10:21:50 | 2 | having. There were certain fields such as "entered |
| 10:21:54 | 3 | by," "modified by," "user ID," all of which were |
| 10:21:57 | 4 | coded, and you didn't provide to us decoding |
| 10:22:00 | 5 | information for those six fields for the meetings |
| 10:22:04 | 6 | contact list. That's what I'm asking you about. |
| 10:22:06 | 7 | MR. PISHEVAR: Objection to counsel's |
| 10:22:08 | 8 | characterization. |
| 10:22:08 | 9 | BY MR. KAPSHANDY: |
| 10:22:08 | 10 | Q Did you have any involvement in that? |
| 10:22:10 | 11 | A No. That was David who take -- took care |
| 10:22:12 | 12 | of that. |
| 10:22:12 | 13 | Q Okay. My question -- |
| 10:22:13 | 14 | A But I can explain to you, though, however, |
| 10:22:15 | 15 | that part of the problem was that it was very |
| 10:22:17 | 16 | difficult to understand exactly what your team had |
| 10:22:21 | 17 | difficulty with. So the question that we were asked |
| 10:22:23 | 18 | was -- was somewhat vague and unspecific, and that's |
| 10:22:26 | 19 | why we have had some challenges trying to figure out |
| 10:22:30 | 20 | exactly what the problem was. |
| 10:23:20 | 21 | Q Let me hand you what we'll mark as your |
| 10:23:23 | 22 | deposition Exhibit 103. |

Page 31

| | | |
|---|---|---|
| 10:23:26 | 1 | (Exhibit No. 103 was marked for |
| 10:23:26 | 2 | identification.) |
| 10:23:33 | 3 | MR. KAPSHANDY: And 103-A. |
| 10:23:53 | 4 | (Exhibit No. 103-A was marked for |
| 10:23:55 | 5 | identification.) |
| 10:23:55 | 6 | BY MR. KAPSHANDY: |
| 10:23:44 | 7 | Q 103-A being a CD of an Excel file that was |
| 10:23:58 | 8 | produced to us entitled "Contacts" produced on |
| 10:24:13 | 9 | April 21, 2010. Exhibit 103 is a hard copy of the |
| 10:24:19 | 10 | first several pages. Exhibit 103-A is an electronic |
| 10:24:24 | 11 | file produced by the plaintiffs. |
| 10:24:24 | 12 | So we all know what we're talking about, |
| 10:24:30 | 13 | Dr. Parsi -- |
| 10:24:32 | 14 | MR. ROSS: Tim, your microphone fell. |
| 10:24:32 | 15 | BY MR. KAPSHANDY: |
| 10:24:37 | 16 | Q So we all know what we're talking about, |
| 10:24:41 | 17 | the fields such as "Account ID," "Created by ID," |
| 10:24:49 | 18 | "Last modified by" -- |
| 10:24:55 | 19 | A Well, could you repeat the second one? |
| 10:24:57 | 20 | Account ID -- |
| 10:24:59 | 21 | Q "Owner ID." |
| 10:25:00 | 22 | A -- where is that? |

Page 32

| | | |
|---|---|---|
| 10:25:01 | 1 | Q Second page. "Created by ID," "Last |
| 10:25:06 | 2 | modified by ID." Could you read those to me in |
| 10:25:15 | 3 | English, please. |
| 10:25:16 | 4 | Just take the first person, whoever that |
| 10:25:18 | 5 | person is. |
| 10:25:18 | 6 | A "Account ID"? |
| 10:25:20 | 7 | Q Right. |
| 10:25:21 | 8 | A 0013000003 VWBYAAA. |
| 10:25:28 | 9 | Q And the name for that first person is |
| 10:25:35 | 10 | Shahram Yazdani, right? |
| 10:25:35 | 11 | A Uh-huh. |
| 10:25:36 | 12 | Q Now, turning to the second page where it |
| 10:25:41 | 13 | says "Created by ID," who created that entry? |
| 10:25:43 | 14 | A Account ID is a computer-generated code |
| 10:25:52 | 15 | that the computer uses for its own purposes. It's |
| 10:25:55 | 16 | not something we're using. |
| 10:25:58 | 17 | Q Well, actually before you misspeak, let me |
| 10:26:01 | 18 | tell you that you did convert that data for the |
| 10:26:04 | 19 | meeting notes at our request. All six of those |
| 10:26:08 | 20 | fields, your office, perhaps David Elliott, provided |
| 10:26:11 | 21 | to us the decoding information for the meeting notes |
| 10:26:17 | 22 | file which contains 17,000 entries, and he provided |

Page 33

| | | |
|---|---|---|
| 10:26:20 | 1 | that to us, and we'll mark that in a minute. |
| 10:26:23 | 2 | So my question is, when can we expect that |
| 10:26:25 | 3 | same information for the Salesforce lists entitled |
| 10:26:29 | 4 | "Accounts," "Campaigns," "Contacts," "Leads" and |
| 10:26:32 | 5 | "Opportunities"? |
| 10:26:32 | 6 | A Are you sure it's not the same decoding? |
| 10:26:37 | 7 | Q They don't match up in numbers. They |
| 10:26:39 | 8 | match up line by line to the number of entries in |
| 10:26:42 | 9 | the Excel file. |
| 10:26:43 | 10 | A And what exactly was that decoding, |
| 10:26:48 | 11 | because I -- I don't know what this -- |
| 10:26:48 | 12 | Q It converts that gibberish that you just |
| 10:26:51 | 13 | looked at to English, a name that one can read in |
| 10:26:54 | 14 | English. |
| 10:26:54 | 15 | MR. PISHEVAR: Does counsel have reason to |
| 10:26:56 | 16 | believe they have this code or are you just |
| 10:26:58 | 17 | speculating? |
| 10:26:58 | 18 | MR. KAPSHANDY: Well, you were able to |
| 10:27:00 | 19 | provide it for the meeting notes database which was |
| 10:27:02 | 20 | created on the very same date. |
| 10:27:04 | 21 | MR. PISHEVAR: Okay. |
| 10:27:05 | 22 | MR. KAPSHANDY: I would like that for these |

9 (Pages 30 to 33)

Page 34

| | | |
|---|---|---|
| 10:27:07 | 1 | other lists, and they are entitled "Accounts," |
| 10:27:11 | 2 | "Campaigns," "Contacts," "Leads" and "Opportunities." |
| 10:27:12 | 3 | MR. PISHEVAR: Anything else? Any other |
| 10:27:14 | 4 | reason why you think the code is in our possession? |
| 10:27:17 | 5 | MR. KAPSHANDY: Because you were able to |
| 10:27:18 | 6 | provide it for -- |
| 10:27:18 | 7 | MR. PISHEVAR: For something else? |
| 10:27:19 | 8 | MR. KAPSHANDY: -- one of the Excel files. |
| 10:27:21 | 9 | There shouldn't be any reason why you can't provide |
| 10:27:23 | 10 | it for the other six files. |
| 10:27:25 | 11 | THE WITNESS: Is this an Excel printout? |
| 10:27:27 | 12 | MR. PISHEVAR: This isn't -- |
| 10:27:27 | 13 | MR. KAPSHANDY: It is. |
| 10:27:28 | 14 | THE WITNESS: Are you sure? |
| 10:27:31 | 15 | MR. PISHEVAR: And do you dispute these -- |
| 10:27:33 | 16 | these were produced to you in the fashion in which |
| 10:27:35 | 17 | they are maintained by NIAC? Do you have any reason |
| 10:27:39 | 18 | to dispute that? |
| 10:27:40 | 19 | MR. KAPSHANDY: The order, Counsel, |
| 10:27:41 | 20 | required them to be produced so that they could be |
| 10:27:44 | 21 | read in English. You were able to do it for one. |
| 10:27:44 | 22 | MR. PISHEVAR: Well, they're read -- they |

Page 35

| | | |
|---|---|---|
| 10:27:44 | 1 | exist, right? |
| 10:27:48 | 2 | MR. KAPSHANDY: My question is, can you |
| 10:27:49 | 3 | please do it for the other six lists. |
| 10:27:51 | 4 | MR. PISHEVAR: This is the way they exist, |
| 10:27:53 | 5 | correct? Do you have any reason to dispute that? |
| 10:27:56 | 6 | MR. KAPSHANDY: I don't know. I'm not the |
| 10:27:57 | 7 | recordkeeper. |
| 10:27:58 | 8 | MR. PISHEVAR: Okay. You don't know. I'll |
| 10:27:59 | 9 | take that as your answer. |
| 10:27:59 | 10 | MR. KAPSHANDY: Are you refusing to provide |
| 10:28:01 | 11 | the decoded information for these files? |
| 10:28:02 | 12 | MR. PISHEVAR: We've given you everything |
| 10:28:04 | 13 | we have in our possession in the way they are |
| 10:28:06 | 14 | maintained. You seem to think there is something |
| 10:28:08 | 15 | that exists that apparently doesn't. |
| 10:28:10 | 16 | BY MR. KAPSHANDY: |
| 10:28:10 | 17 | Q  Mr. Parsi -- |
| 10:28:11 | 18 | A  Can I ask you a question? |
| 10:28:13 | 19 | Q  No, you have to -- |
| 10:28:14 | 20 | A  Account ID, you said that there was a |
| 10:28:16 | 21 | decoding for that? Are you sure that there's a |
| 10:28:20 | 22 | decoding for Account ID for the meeting notes? |

Page 36

| | | |
|---|---|---|
| 10:28:22 | 1 | Q  We will look at it when we get to the |
| 10:28:25 | 2 | meeting notes, okay? I have some more questions |
| 10:28:26 | 3 | about -- |
| 10:28:26 | 4 | A  Because this -- this does look to me as |
| 10:28:28 | 5 | what usually is a computer creates its own gibberish |
| 10:28:32 | 6 | to be able to -- like you have ID next to it as well |
| 10:28:36 | 7 | which is also gibberish. You may want to talk to |
| 10:28:40 | 8 | the computer to figure out what -- |
| 10:28:42 | 9 | Q  Do you have any explanation for how it is |
| 10:28:44 | 10 | that NIAC's office was able to provide the |
| 10:28:46 | 11 | decoding -- |
| 10:28:46 | 12 | A  Well, I'm asking you if it was a decoding |
| 10:28:48 | 13 | for account ID. |
| 10:28:49 | 14 | Q  Dr. Parsi, would you please let me finish |
| 10:28:52 | 15 | the question. |
| 10:28:53 | 16 | For those fields that I just mentioned to |
| 10:28:55 | 17 | you that are gibberish, do you have any explanation |
| 10:28:58 | 18 | for how it is that NIAC was able to provide the |
| 10:29:01 | 19 | decoding for those fields for the meeting notes |
| 10:29:05 | 20 | database of 17,000 entries but has not provided it |
| 10:29:09 | 21 | for these six databases entitled, "Accounts," |
| 10:29:14 | 22 | "Campaigns," "Contacts," "Leads" and |

Page 37

| | | |
|---|---|---|
| 10:29:14 | 1 | "Opportunities"? |
| 10:29:14 | 2 | A  Well, in the decoding -- first of all, |
| 10:29:18 | 3 | some decoding has been provided for you for this as |
| 10:29:22 | 4 | well, which we found online. |
| 10:29:22 | 5 | Q  Can you try and answer the question? |
| 10:29:24 | 6 | MR. PISHEVAR: I will object again. The |
| 10:29:26 | 7 | question contains -- |
| 10:29:28 | 8 | THE WITNESS: You are trying to simplify a |
| 10:29:28 | 9 | matter into something -- |
| 10:29:28 | 10 | MR. PISHEVAR: -- false facts. |
| 10:29:31 | 11 | THE WITNESS: I don't know what decoding |
| 10:29:32 | 12 | was needed for the meeting notes, so I don't know if |
| 10:29:35 | 13 | those are the same as you are pointing out here. So |
| 10:29:38 | 14 | I can't answer your question. |
| 10:29:40 | 15 | What I can see, though, is that the fields |
| 10:29:43 | 16 | that tend to have gibberish are the fields that are |
| 10:29:46 | 17 | used by the computer, not by us. I don't know if it |
| 10:29:50 | 18 | was the same on the meeting notes or not. You have |
| 10:29:52 | 19 | to show that to me. |
| 10:29:53 | 20 | BY MR. KAPSHANDY: |
| 10:29:54 | 21 | Q  When were the Salesforce databases that |
| 10:29:56 | 22 | you produced to us on April 21st of this year |

10  (Pages 34 to 37)

## Page 38

| | | |
|---|---|---|
| 10:30:05 | 1 | created? |
| 10:30:06 | 2 | A   I don't recall exactly. |
| 10:30:07 | 3 | Q   Well, let me suggest that the metadata on |
| 10:30:11 | 4 | this file that we've just marked as 103-A says that |
| 10:30:15 | 5 | it was created in May of 2010.  Does that sound |
| 10:30:19 | 6 | right? |
| 10:30:19 | 7 | A   I have no idea.  I do -- I do know that I |
| 10:30:22 | 8 | believe it was in May 2010 or 2009 that we shifted |
| 10:30:29 | 9 | from Salesforce to Convio. |
| 10:30:31 | 10 | Q   That was my next question. |
| 10:30:34 | 11 | Would these Excel files of the Salesforce |
| 10:30:37 | 12 | databases have been created on or about that time in |
| 10:30:40 | 13 | May of 2010? |
| 10:30:42 | 14 | A   Again, I don't recall.  I do recall it was |
| 10:30:46 | 15 | sometime in May, but I don't remember if it was '09 |
| 10:30:49 | 16 | or '10. |
| 10:30:50 | 17 | Q   And do the names "Accounts," "Campaigns," |
| 10:30:55 | 18 | "Contacts," "Lead" and "Opportunities," which are |
| 10:30:56 | 19 | the file names that were produced to us, refresh |
| 10:31:00 | 20 | your recollection as to the Salesforce data that was |
| 10:31:03 | 21 | transferred or backed up into Excel files at about |
| 10:31:06 | 22 | that time? |

## Page 39

| | | |
|---|---|---|
| 10:31:06 | 1 | A   I don't recall -- I don't understand your |
| 10:31:09 | 2 | question.  Could you repeat it? |
| 10:31:11 | 3 | Q   Well, you produced to us in April of this |
| 10:31:15 | 4 | year, April 21st, five files in Excel format |
| 10:31:20 | 5 | entitled, "Accounts," "Campaigns," "Contacts," |
| 10:31:20 | 6 | "Leads" and "Opportunities." |
| 10:31:25 | 7 | A   Uh-huh. |
| 10:31:25 | 8 | Q   Correct? |
| 10:31:26 | 9 | A   I believe so. |
| 10:31:27 | 10 | Q   Pursuant to an order that required you to |
| 10:31:30 | 11 | produce the Salesforce databases, correct? |
| 10:31:33 | 12 | A   I believe so. |
| 10:31:35 | 13 | Q   Are there any other Salesforce databases |
| 10:31:40 | 14 | other than those five and the meeting notes that |
| 10:31:42 | 15 | were produced to us in February or March? |
| 10:31:44 | 16 | A   No, I believe that was an exhaustive |
| 10:31:47 | 17 | emptying of sales data.  I believe so. |
| 10:31:50 | 18 | Q   Okay.  So that was my question.  There are |
| 10:31:52 | 19 | no other Salesforce databases in Excel format or any |
| 10:31:56 | 20 | other format that NIAC possesses? |
| 10:31:59 | 21 | A   No, that's not the question that you |
| 10:32:01 | 22 | asked.  What the order said was to provide the |

## Page 40

| | | |
|---|---|---|
| 10:32:04 | 1 | membership database that we're using, and that is |
| 10:32:10 | 2 | what we provided. |
| 10:32:16 | 3 | Q   Do I understand from your answer that |
| 10:32:18 | 4 | there are other Salesforce databases in some format, |
| 10:32:21 | 5 | Excel or otherwise, that NIAC has yet to produce? |
| 10:32:24 | 6 | A   I don't believe there is. |
| 10:32:26 | 7 | Q   Thank you. |
| 10:32:28 | 8 | Now, my question is, assuming that these |
| 10:32:31 | 9 | Excel files were created, as the metadata states, in |
| 10:32:37 | 10 | May of 2010 -- |
| 10:32:41 | 11 | A   There -- there is a problem with your |
| 10:32:42 | 12 | question. |
| 10:32:43 | 13 | Q   Can I finish the question, please? |
| 10:32:46 | 14 | A   Okay. |
| 10:32:48 | 15 | Q   Assuming that the metadata on these Excel |
| 10:32:51 | 16 | files of May 28th, 2010, is correct, and that your |
| 10:32:58 | 17 | recollection that at about that time you were |
| 10:33:01 | 18 | transferring the Salesforce database to Convio, do |
| 10:33:06 | 19 | you have any explanation for how it is that, |
| 10:33:10 | 20 | notwithstanding defendant's request for membership |
| 10:33:13 | 21 | lists, these databases were not produced for nearly |
| 10:33:18 | 22 | a year? |

## Page 41

| | | |
|---|---|---|
| 10:33:18 | 1 | MR. PISHEVAR:  Objection. |
| 10:33:21 | 2 | BY MR. KAPSHANDY: |
| 10:33:27 | 3 | Q   Go ahead and answer. |
| 10:33:29 | 4 | A   We have produced membership database |
| 10:33:31 | 5 | because you had access to all of our finances. |
| 10:33:33 | 6 | Q   Do you recall the question? |
| 10:33:34 | 7 | A   I do recall the question. |
| 10:33:35 | 8 | Q   The question is, how is it that these five |
| 10:33:38 | 9 | databases which NIAC had in its possession -- |
| 10:33:41 | 10 | A   These five databases are not membership. |
| 10:33:43 | 11 | Q   Can I please finish the question, |
| 10:33:43 | 12 | Dr. Parsi? |
| 10:33:45 | 13 | How is it that -- |
| 10:33:45 | 14 | MR. PISHEVAR:  The question contains a |
| 10:33:46 | 15 | false premise. |
| 10:33:46 | 16 | BY MR. KAPSHANDY: |
| 10:33:49 | 17 | Q   -- the five NIAC databases from Salesforce |
| 10:33:52 | 18 | in Excel format created at least as of May 28, 2010, |
| 10:33:56 | 19 | entitled, "Accounts," "Campaigns," "Contacts," |
| 10:34:01 | 20 | "Lead" and "Opportunities," were not produced |
| 10:34:03 | 21 | notwithstanding explicit discovery requests and |
| 10:34:07 | 22 | numerous requests for membership databases? |

11 (Pages 38 to 41)

Page 42

```
10:34:10   1       MR. PISHEVAR:  Objection.
10:34:12   2       THE WITNESS:  There are several latent
10:34:15   3   errors in your question.  Let me address them one by
10:34:19   4   one.
10:34:19   5       First of all, Salesforce is an online
10:34:22   6   database.  When we stopped using Salesforce, that's
10:34:28   7   when -- that's why the metadata says that it is from
10:34:32   8   2010.
10:34:34   9       After the conferences that we had and the
10:34:37  10   conversations we had with you, we went back to try to
10:34:40  11   see how we would be able to recreate these things.
10:34:43  12   So it's not that they were sitting on our computers.
10:34:47  13   It's that they were sitting on those computers that
10:34:49  14   Salesforce has.  That's why the metadata most likely
10:34:53  15   says what it says.  So that's one.
10:34:55  16       Secondly, you mentioned several different
10:34:58  17   Excel files.  To the best of my knowledge, only one
10:35:01  18   or two of them are actually membership.  Meeting
10:35:04  19   notes is not a membership database.
10:35:10  20   BY MR. KAPSHANDY:
10:35:10  21     Q  I was just asking about these five, okay?
10:35:12  22     A  Oh, you are asking about these five, and
```

Page 43

```
10:35:14   1   you are saying why didn't we produce membership.
10:35:16   2   First of all, we had already produced membership.
10:35:19   3   Secondly, these are not membership.  All of them are
10:35:23   4   not membership.
10:35:23   5     Q  Where exactly were these Excel files kept
10:35:27   6   in NIAC's offices during the year 2010?
10:35:30   7     A  They were not kept in NIAC's offices, to
10:35:33   8   the best of my understanding, because what we had to
10:35:35   9   do is to go back to Salesforce, see if they could
10:35:39  10   reopen the former account that we had there, and get
10:35:42  11   these files.
10:35:42  12     Q  Let me --
10:35:43  13     A  That's my understanding.
10:35:44  14     Q  Let me cut you off, because I think you're
10:35:47  15   talking about the meeting notes.
10:35:48  16       For the record, Dr. Parsi, the meeting
10:35:51  17   notes were generated and created on December 16th,
10:35:56  18   2010, right before the status hearing at which your
10:35:59  19   counsel stood up and represented, We have finally
10:36:02  20   been able to get Salesforce to recreate the meeting
10:36:05  21   notes.  And I would agree with you that those --
10:36:07  22   from that metadata and that file date would appear
```

Page 44

```
10:36:10   1   to have come from Salesforce itself.
10:36:13   2       These Excel --
10:36:14   3       MR. PISHEVAR:  Objection to counsel's
10:36:15   4   representations --
10:36:15   5   BY MR. KAPSHANDY:
10:36:16   6     Q  -- were created --
10:36:17   7       MR. PISHEVAR:  -- and testimony.
10:36:18   8   BY MR. KAPSHANDY:
10:36:19   9     Q  These files were created, the five
10:36:23  10   entitled "Accounts," "Campaigns," "Contacts," "Lead"
10:36:26  11   and "Opportunities," on May 28, 2010.
10:36:31  12       And my question for you is, are those five
10:36:34  13   Excel files -- did they come from NIAC's offices,
10:36:40  14   computers, servers, CPUs, whatever?
10:36:43  15     A  I don't know.  I -- it either came -- my
10:36:47  16   understanding is that it would come from Salesforce.
10:36:50  17     Q  Well, how is it that Salesforce had
10:36:52  18   these -- let's assume that they had them -- for the
10:36:56  19   last year, and notwithstanding every one of our
10:37:00  20   requests at several status conferences --
10:37:02  21       MR. PISHEVAR:  Objection.
10:37:02  22
```

Page 45

```
10:37:02   1   BY MR. KAPSHANDY:
10:37:03   2     Q  -- your counsel stood up and said, We're
10:37:06   3   not able to get these from Salesforce?
10:37:09   4       MR. PISHEVAR:  Objection.
10:37:09   5       Don't answer the question.
10:37:10   6       You're testifying.  You are arguing.  It's
10:37:12   7   a compound question.  Please ask a question that's
10:37:15   8   appropriate for a deposition.
10:37:16   9   BY MR. KAPSHANDY:
10:37:21  10     Q  Do you have any idea how it was that
10:37:23  11   Salesforce had these data for the last year, and we
10:37:27  12   weren't able to get them until about two weeks ago,
10:37:32  13   still coded?
10:37:36  14     A  It's Salesforce's job to keep these, but
10:37:39  15   to the best of my understanding, we got lucky
10:37:42  16   because when we contacted them they had not done
10:37:45  17   what they routinely do, which is once a client
10:37:49  18   closes an account, to get rid of it.
10:37:52  19       Now, as I mentioned earlier, we have
10:37:57  20   produced member databases to you.  We even have a
10:38:00  21   confidentiality agreement, I believe, with you
10:38:02  22   regarding those membership databases.
```

12  (Pages 42 to 45)

Page 46

| | | |
|---|---|---|
| 10:38:10 | 1 | Q   So it's your testimony here today under |
| 10:38:12 | 2 | oath that these Excel files that were produced to us |
| 10:38:16 | 3 | on April 21st of this year as the Salesforce |
| 10:38:22 | 4 | databases, NIAC did not have in its possession until |
| 10:38:26 | 5 | it got them from Salesforce? |
| 10:38:28 | 6 | A   I'm not 100 -- |
| 10:38:29 | 7 | MR. PISHEVAR:  Asked and answered. |
| 10:38:29 | 8 | BY MR. KAPSHANDY: |
| 10:38:30 | 9 | Q   No, I want you to answer that to the best |
| 10:38:32 | 10 | of your ability here under oath today. |
| 10:38:34 | 11 | A   I'm not 100 percent sure.  I do know that |
| 10:38:37 | 12 | we had to contact Salesforce to get a lot of |
| 10:38:40 | 13 | material. I don't recall if that was included in |
| 10:38:41 | 14 | that or not. |
| 10:38:42 | 15 | Q   Well, how are you going to find that out? |
| 10:38:45 | 16 | When did you contact Salesforce and when did NIAC |
| 10:38:48 | 17 | get those databases? |
| 10:38:49 | 18 | A   If my recollection is correct, it was |
| 10:38:52 | 19 | around December, wasn't it? |
| 10:38:55 | 20 | Q   Okay.  Then my question is, how is it that |
| 10:38:58 | 21 | for another four months they weren't produced to the |
| 10:39:01 | 22 | defendant? |

Page 47

| | | |
|---|---|---|
| 10:39:01 | 1 | A   They were produced.  You have them in your |
| 10:39:08 | 2 | possession. |
| 10:39:09 | 3 | Q   My question was, how is it that if you got |
| 10:39:11 | 4 | them in December they weren't produced until |
| 10:39:14 | 5 | April 21st? |
| 10:39:15 | 6 | A   I said I believe it was in December. |
| 10:39:17 | 7 | MR. PISHEVAR:  Objection. |
| 10:39:17 | 8 | BY MR. KAPSHANDY: |
| 10:39:18 | 9 | Q   Well, we know -- |
| 10:39:19 | 10 | A   The point -- and the second point is that |
| 10:39:21 | 11 | they were produced to you. |
| 10:39:22 | 12 | Part of the difficulty we have had is that |
| 10:39:25 | 13 | you have a tendency of changing your requests, being |
| 10:39:30 | 14 | very vague about your requests.  You are referring |
| 10:39:32 | 15 | to a campaign Excel list as a membership database, |
| 10:39:36 | 16 | which it is not.  We've done our utmost to try to |
| 10:39:39 | 17 | answer your questions, but the vagueness of your |
| 10:39:42 | 18 | questions at times seem to be deliberate to create |
| 10:39:46 | 19 | unnecessary misunderstandings. |
| 10:39:47 | 20 | Q   So the reason that you got these in |
| 10:39:49 | 21 | December but didn't produce to us until April -- |
| 10:39:49 | 22 | MR. PISHEVAR:  Objection. |

Page 48

| | | |
|---|---|---|
| 10:39:49 | 1 | BY MR. KAPSHANDY: |
| 10:39:52 | 2 | Q   -- is because we don't know how to ask a |
| 10:39:54 | 3 | question? |
| 10:39:54 | 4 | MR. PISHEVAR:  Objection. |
| 10:39:56 | 5 | Don't answer that.  You've already answered |
| 10:39:57 | 6 | that. |
| 10:39:57 | 7 | Asked and answered.  Move on to the next |
| 10:39:59 | 8 | question. |
| 10:39:59 | 9 | BY MR. KAPSHANDY: |
| 10:39:59 | 10 | Q   So you believe you got these for the first |
| 10:40:01 | 11 | time from Salesforce in December of 2010? |
| 10:40:03 | 12 | A   I believe that is the case.  I don't |
| 10:40:08 | 13 | recall hundred percent. |
| 10:40:09 | 14 | Q   Well, who was involved in that?  Were you |
| 10:40:11 | 15 | involved in the communications with Salesforce? |
| 10:40:12 | 16 | A   No.  I didn't communicate directly with |
| 10:40:15 | 17 | Salesforce. |
| 10:40:15 | 18 | Q   Who did at your office? |
| 10:40:17 | 19 | A   I believe it was David. |
| 10:40:20 | 20 | Q   Now, one of the lists that you mentioned |
| 10:40:54 | 21 | had been previously produced we marked at your last |
| 10:40:57 | 22 | deposition is Exhibit 100.  Do you recall that?  It |

Page 49

| | | |
|---|---|---|
| 10:41:00 | 1 | was a 2007 membership list. |
| 10:41:03 | 2 | A   I don't have that. |
| 10:41:04 | 3 | Q   We will get that for you and put it in |
| 10:41:06 | 4 | front of you. |
| 10:41:12 | 5 | A   When was this produced? |
| 10:41:14 | 6 | Q   It was produced by you prior to your last |
| 10:41:16 | 7 | deposition. |
| 10:41:16 | 8 | A   So you had a membership database from us. |
| 10:41:19 | 9 | Q   My question was, do you recall -- |
| 10:41:24 | 10 | A   You had a membership database from us, |
| 10:41:24 | 11 | correct? |
| 10:41:28 | 12 | Q   Are you asking questions now? |
| 10:41:30 | 13 | A   I am.  You had a membership database from |
| 10:41:32 | 14 | us, correct? |
| 10:41:32 | 15 | Q   Well, we marked it as an exhibit at your |
| 10:41:35 | 16 | deposition, Dr. Parsi.  My question is, do you |
| 10:41:37 | 17 | recall us marking that at your deposition, that 2007 |
| 10:41:42 | 18 | list of active members? |
| 10:41:43 | 19 | A   I don't recall. |
| 10:41:48 | 20 | Q   Now, my question for you is, how many |
| 10:41:56 | 21 | active members does that 2007 membership list that |
| 10:42:02 | 22 | you produced reflect? |

13  (Pages 46 to 49)

Page 50

| | | |
|---|---|---|
| 0:42:04 | 1 | A What do you mean by "active members"? |
| 0:42:07 | 2 | Q Well, you tell me. It's your list. |
| 0:42:10 | 3 | MR. PISHEVAR: It's your question. He |
| 0:42:13 | 4 | apparently needs clarification on your question. |
| 0:42:13 | 5 | BY MR. KAPSHANDY: |
| 0:42:17 | 6 | Q I mean you are the president of NIAC and |
| 0:42:19 | 7 | you produced this to us as a membership list, as you |
| 0:42:22 | 8 | pointed out to us several times, one of the few that |
| 0:42:25 | 9 | was produced to us in response to the defendant's |
| 0:42:29 | 10 | request for production list. |
| 0:42:29 | 11 | A So it was produced. |
| 0:42:29 | 12 | Q And I'm asking you -- |
| 0:42:29 | 13 | MR. PISHEVAR: Objection. |
| 0:42:32 | 14 | BY MR. KAPSHANDY: |
| 0:42:32 | 15 | Q -- as the president of NIAC as a list you |
| 0:42:36 | 16 | represented to be a NIAC business record how |
| 0:42:39 | 17 | many active members does this list show that NIAC |
| 0:42:41 | 18 | had in December 2007? |
| 0:42:44 | 19 | A I don't know your definition of "active," |
| 0:42:47 | 20 | but if you want to, I'll be happy to count all of |
| 0:42:50 | 21 | these because I don't see a count here. |
| 0:42:52 | 22 | Do you want me to count them? |

Page 51

| | | |
|---|---|---|
| 10:42:54 | 1 | Q Let me tell you it's 990. |
| 10:42:54 | 2 | A Mm-hmm. |
| 10:42:56 | 3 | Q If you want to count them on -- we will go |
| 10:42:59 | 4 | off the record and you can do that. But -- it's |
| 10:43:02 | 5 | your list. Does that sound right? |
| 10:43:03 | 6 | A I have no idea. |
| 10:43:05 | 7 | Q Let's assume someone counts them and it's 990. |
| 10:43:09 | 8 | A Mm-hmm. |
| 10:43:09 | 9 | Q Do you dispute the accuracy of that record |
| 10:43:12 | 10 | that NIAC produced as a list of active members in |
| 10:43:14 | 11 | December 2007? |
| 10:43:15 | 12 | A It depends on -- I don't remember exactly |
| 10:43:19 | 13 | how this was produced. And when you count -- and |
| 10:43:22 | 14 | you're referring to it as active members, I assume |
| 10:43:26 | 15 | you mean current members. And that would be a |
| 10:43:30 | 16 | definition in which we would say that the person's |
| 10:43:34 | 17 | membership is -- has not expired yet, but we don't |
| 10:43:38 | 18 | consider someone whose membership has expired to not |
| 10:43:41 | 19 | be a member necessarily because in fact I do believe |
| 10:43:44 | 20 | that I have forgotten to renew my own membership; I |
| 10:43:49 | 21 | would probably still be considered a NIAC member. |
| 10:43:49 | 22 | |

Page 52

| | | |
|---|---|---|
| 10:43:49 | 1 | BY MR. KAPSHANDY: |
| 10:43:58 | 2 | Q Let me hand you what we'll mark as your |
| 10:44:00 | 3 | deposition Exhibit No. 104. |
| 14:10:28 | 4 | (Exhibit No. 104 was marked for |
| 14:10:28 | 5 | identification.) |
| 14:10:28 | 6 | BY MR. KAPSHANDY: |
| 10:44:04 | 7 | Q Another December 2007 membership list that |
| 10:44:10 | 8 | was produced -- |
| 10:44:10 | 9 | A Awesome. So you've got two membership |
| 10:44:13 | 10 | lists. |
| 10:44:13 | 11 | Q Can I finish the question, please, |
| 10:44:16 | 12 | Dr. Parsi. |
| 10:44:21 | 13 | That was produced prior to your last |
| 10:44:23 | 14 | deposition on the very same date. It's also dated |
| 10:44:27 | 15 | December 11, 2007, and purports to be a list of |
| 10:44:31 | 16 | expired -- |
| 10:44:33 | 17 | A Can I take a quick timeout? |
| 10:44:37 | 18 | Q -- NIAC members. |
| 10:44:38 | 19 | A Can I confer with my counsel? |
| 10:44:41 | 20 | MR. KAPSHANDY: If you need to confer with |
| 10:44:43 | 21 | your counsel, that's fine. |
| 10:44:44 | 22 | THE VIDEOGRAPHER: The time is 10:45 a.m. |

Page 53

| | | |
|---|---|---|
| 10:44:48 | 1 | We're going off the record. |
| 10:46:43 | 2 | (Recess.) |
| 10:49:49 | 3 | THE VIDEOGRAPHER: The time is 10:49 a.m. |
| 10:49:52 | 4 | We're back on the record. |
| 10:49:54 | 5 | BY MR. KAPSHANDY: |
| 10:49:56 | 6 | Q Ready to proceed, Dr. Parsi? |
| 10:49:57 | 7 | A Uh-huh. Yes, I am. |
| 10:50:01 | 8 | Q Now, we've marked as Exhibit 104 an Excel |
| 10:50:05 | 9 | file that was produced at the same time as |
| 10:50:06 | 10 | Exhibit 100, which was dated the very same date, |
| 10:50:12 | 11 | also December 11, 2007. And the file is entitled |
| 10:50:18 | 12 | "List of Expired Members." |
| 10:50:20 | 13 | Have you seen that? |
| 10:50:22 | 14 | A I believe I have several years ago. |
| 10:50:28 | 15 | Q You would agree that this was a business |
| 10:50:28 | 16 | record that was produced by NIAC and used as part of |
| 10:50:34 | 17 | its membership tracking information, correct? |
| 10:50:36 | 18 | A Correct. You asked us for a membership |
| 10:50:40 | 19 | database, and I believe it seems like we provided |
| 10:50:42 | 20 | it. |
| 10:50:42 | 21 | Q Now, being that the file is entitled |
| 10:50:46 | 22 | "Expired Members," and this list actually has an |

14   (Pages 50 to 53)

Page 54

10:50:49  1   expiration date for each of these people, is it
10:50:52  2   reasonable to conclude that NIAC considered them
10:50:56  3   expired members as of December 2007?
10:50:58  4      A   That's -- there's no contradiction there.
10:51:02  5   They are still members but their memberships have
10:51:04  6   expired.
10:51:05  7      Q   Right.  And some of them they've been
10:51:08  8   expired for as long as two years.  You'll see some
10:51:11  9   of them, for example, Professor Mohammed Reza
10:51:17  10  Movahed expired December 2005, correct?
10:51:24  11     A   Which page are you looking on?
10:51:26  12     Q   The very first page, the one you're
10:51:28  13  looking at.  Just go down about seven lines.
10:51:31  14     A   Uh-huh.  Yeah.
10:51:32  15     Q   Now, even though he hasn't donated for
10:51:36  16  three years, and he's on your list of expired
10:51:39  17  members, my question is for you, in NIAC parlance
10:51:43  18  is he considered still a member or a former member
10:51:51  19  or what?
10:51:52  20     A   If he hasn't expressed an explicit desire
10:51:56  21  not to be a member, I don't think he would be
10:51:58  22  considered a former member.  We have had members who

Page 55

10:52:00  1   had not renewed their membership in four years
10:52:04  2   because our e-mails had gone to their spam accounts,
10:52:08  3   and then they let us know about that and say, Oh,
10:52:10  4   we're so sorry.  How can we renew?
10:52:13  5      Q   Well, that doesn't appear to be the case
10:52:14  6   with somebody like him who hasn't paid in three
10:52:16  7   years.
10:52:16  8      A   How do you know?  How do you know?
10:52:16  9      Q   Well, that's my question.
10:52:17  10     Do you have any other evidence of him as
10:52:19  11  of 2007 having renewed since he first donated in
10:52:23  12  2004?
10:52:23  13     A   I don't have anything in front of me to be
10:52:25  14  able to verify either way.
10:52:27  15     Q   Right.  And you understand --
10:52:27  16     A   But I do know --
10:52:28  17     Q   -- that these were the only membership
10:52:31  18  databases that were produced to us, and that's what
10:52:34  19  we have to go on too.  So we're just trying to
10:52:37  20  understand when you say you have a certain number of
10:52:40  21  members where you're getting the data, right?
10:52:41  22     A   I believe I have explained that to you.

Page 56

10:52:43  1      Q   Okay.  So in 2007, assuming this is an
10:52:46  2   accurate list, and for the record -- I don't know if
10:52:49  3   you want to count them -- but it shows 828 expired
10:52:52  4   members.  Does that seem fair?
10:52:53  5      A   I believe you probably can count.
10:52:58  6      THE VIDEOGRAPHER:  Mr. Parsi, do you have a
10:53:00  7   cell phone on?
10:53:00  8      THE WITNESS:  I do.  I thought I turned it
10:53:02  9   off.  I'm sorry.
10:53:02  10     MR. KAPSHANDY:  You want to put it over on
10:53:02  11  the chair.  Maybe it'll be far enough away.
10:53:05  12     THE WITNESS:  I'm turning it off.
10:53:16  13     Sorry, sir.
10:53:16  14  BY MR. KAPSHANDY:
10:53:17  15     Q   Now, anywhere in either of these lists,
10:53:19  16  expired lists or the active members list in December
10:53:24  17  2007, do you have a category for tracking where you
10:53:27  18  move people into former membership status?
10:53:30  19     A   Are they not included in these?
10:53:33  20     Q   I'm asking you.
10:53:36  21     A   I -- I cannot see it right here because
10:53:40  22  what you have provided me is only a list of names.

Page 57

10:53:42  1      Q   Well, this is what you provided the
10:53:43  2   defendant, Dr. Parsi.
10:53:44  3      So I'm asking you if you have a list now
10:53:47  4   that we have not yet seen of former members, could
10:53:50  5   we please have that produced?
10:53:52  6      A   I believe it should be included in the
10:53:54  7   database that was already sent to you.
10:53:55  8      Q   Well, maybe with the assistance of
10:53:57  9   counsel, and we'll put that kind of on your to-do
10:54:01  10  list, because we've not seen it, you can explain to
10:54:04  11  us how we can find former members amongst the
10:54:08  12  Salesforce or Convio or these databases.  But we'll
10:54:11  13  follow up on that later.
10:54:12  14     The question I have for you here is --
10:54:13  15     A   It may also be that when you're asking for
10:54:16  16  membership lists, there's a natural reason that they
10:54:19  17  are not included because they are not members any
10:54:21  18  longer.
10:54:23  19     Q   I see.  So it's our --
10:54:27  20     A   You didn't ask for --
10:54:28  21     Q   -- it's our error for not being specific
10:54:31  22  enough in asking for a list of former members, so

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

## Page 58

| | | |
|---|---|---|
| 10:54:34 | 1 | you are defining that out of the request for member |
| 10:54:36 | 2 | lists? |
| 10:54:36 | 3 | A   When you ask for a list of members, you |
| 10:54:38 | 4 | get a list of members. |
| 10:54:38 | 5 | Q   And you understood our request for |
| 10:54:40 | 6 | membership lists to be only current members.  That's |
| 10:54:43 | 7 | what your position is here now? |
| 10:54:45 | 8 | A   I don't recall you asking us for a list of |
| 10:54:47 | 9 | people who have left the organization, no. |
| 10:54:49 | 10 | Q   It was for all membership lists.  Do you |
| 10:54:52 | 11 | understand the word "all"?  Is that a difficult word |
| 10:54:52 | 12 | to understand? |
| 10:54:52 | 13 | MR. PISHEVAR:  Objection. |
| 10:54:54 | 14 | THE WITNESS:  I believe that was |
| 10:54:55 | 15 | produced -- |
| 10:54:55 | 16 | MR. PISHEVAR:  Don't get into an argument. |
| 10:54:56 | 17 | BY MR. KAPSHANDY: |
| 10:54:56 | 18 | Q   So you believe the list of former members |
| 10:54:58 | 19 | was produced? |
| 10:54:58 | 20 | A   I believe it was produced, yes. |
| 10:55:00 | 21 | Q   Okay.  We won't spend any more time on it |
| 10:55:03 | 22 | here, but I would ask that after the deposition you |

## Page 59

| | | |
|---|---|---|
| 10:55:05 | 1 | work, with the assistance of your counsel, to point |
| 10:55:08 | 2 | out which of these lists we understand to be the |
| 10:55:10 | 3 | list of former members. |
| 10:55:10 | 4 | MR. PISHEVAR:  Objection. |
| 10:55:10 | 5 | BY MR. KAPSHANDY: |
| 10:55:12 | 6 | Q   Okay?  Okay? |
| 10:55:12 | 7 | A   Could you repeat the question? |
| 10:55:14 | 8 | Q   Would you please work with your counsel to |
| 10:55:16 | 9 | identify amongst the membership lists that you |
| 10:55:18 | 10 | provided to the defendant that which is the list |
| 10:55:20 | 11 | that NIAC considers of former members. |
| 10:55:22 | 12 | MR. PISHEVAR:  Objection. |
| 10:55:23 | 13 | THE WITNESS:  I will do my best to look |
| 10:55:26 | 14 | into that. |
| 10:55:26 | 15 | BY MR. KAPSHANDY: |
| 10:55:27 | 16 | Q   Thank you. |
| 10:55:28 | 17 | Now, given that these two lists from |
| 10:55:30 | 18 | December of active and expired members totals 1,818, |
| 10:55:36 | 19 | 1,818, do you have any idea where Professor Morse |
| 10:55:41 | 20 | would have gotten the idea stated in his report, the |
| 10:55:45 | 21 | typical membership roles of two to 3,000 people |
| 10:55:50 | 22 | dropped to 1,200 current members? |

## Page 60

| | | |
|---|---|---|
| 10:55:52 | 1 | A   Where is that? |
| 10:55:53 | 2 | Q   Page 4 of his report. |
| 10:55:56 | 3 | A   When did he do this report? |
| 10:55:58 | 4 | Q   Again, May of 2010. |
| 10:56:00 | 5 | A   When was these -- these seem to be from |
| 10:56:03 | 6 | 2006. |
| 10:56:03 | 7 | Q   2007. |
| 10:56:06 | 8 | A   2006 -- okay.  So -- |
| 10:56:08 | 9 | Q   He in his report is, based upon the |
| 10:56:12 | 10 | information that NIAC's giving him, comparing NIAC's |
| 10:56:16 | 11 | membership in 2007, before the defendant started |
| 10:56:20 | 12 | writing about NIAC, to the current membership as of |
| 10:56:24 | 13 | May 2010.  You understand that's the data he is |
| 10:56:28 | 14 | using in his report to justify his opinion that the |
| 10:56:32 | 15 | defendant's statements have hurt NIAC? |
| 10:56:34 | 16 | A   To the best of my knowledge, Professor |
| 10:56:40 | 17 | Morse is the financial economic expert, not Trita |
| 10:56:44 | 18 | Parsi.  So you're asking me to give my layman view |
| 10:56:50 | 19 | of what I understand is a professor of economics, |
| 10:56:54 | 20 | and I'm not simply in a position to do that. |
| 10:56:57 | 21 | Q   No.  My question was simply, do you have |
| 10:56:58 | 22 | any idea given that NIAC's membership lists that it |

## Page 61

| | | |
|---|---|---|
| 10:57:02 | 1 | produced to defendant in this case is an authentic |
| 10:57:05 | 2 | membership list showing 1,818 members, do you have |
| 10:57:10 | 3 | any idea whatsoever where Professor Morse would have |
| 10:57:13 | 4 | gotten the idea that membership roles typically were |
| 10:57:16 | 5 | two to 3,000 members at about the time the defendant |
| 10:57:21 | 6 | started writing about NIAC in early 2007? |
| 10:57:24 | 7 | A   Sir, you really have to ask that question |
| 10:57:28 | 8 | to Professor Morse. |
| 10:57:28 | 9 | Q   Okay.  Let -- |
| 10:57:29 | 10 | A   I don't understand why you're asking me |
| 10:57:31 | 11 | the question. |
| 10:57:31 | 12 | Q   Then let's assume he testified under oath |
| 10:57:33 | 13 | that he got that information from NIAC. |
| 10:57:35 | 14 | MR. PISHEVAR:  Objection. |
| 10:57:35 | 15 | BY MR. KAPSHANDY: |
| 10:57:36 | 16 | Q   Do you have any idea where somebody at |
| 10:57:39 | 17 | NIAC having this only membership list that's been |
| 10:57:43 | 18 | produced to us from 2007 reflecting 1,800 members |
| 10:57:46 | 19 | would have gotten the idea that in 2007 membership |
| 10:57:49 | 20 | roles were typically two to 3,000 -- |
| 10:57:49 | 21 | A   Did he say -- |
| 10:57:52 | 22 | Q   -- even counting 828 expired members? |

16  (Pages 58 to 61)

## Page 62

| | | |
|---|---|---|
| 10:57:55 | 1 | MR. PISHEVAR: Objection. Objection. |
| 10:57:56 | 2 | THE WITNESS: He doesn't say in 2007. So |
| 10:58:01 | 3 | this is the problem. You are asking me the question |
| 10:58:03 | 4 | without giving me his testimony. So it's -- even if |
| 10:58:06 | 5 | I had his testimony, I'm not an expert on these |
| 10:58:10 | 6 | matters. He is running his mathematical models and |
| 10:58:13 | 7 | coming up with evidence and relationships that he's |
| 10:58:16 | 8 | an expert on, and I'm not. But you are also |
| 10:58:20 | 9 | misstating what he is saying because he doesn't say |
| 10:58:23 | 10 | 2007. |
| 10:58:24 | 11 | BY MR. KAPSHANDY: |
| 10:58:24 | 12 | Q   Well, perhaps you should read his |
| 10:58:25 | 13 | testimony and then if you -- |
| 10:58:26 | 14 | MR. PISHEVAR: Objection. Is this a |
| 10:58:27 | 15 | question? |
| 10:58:27 | 16 | BY MR. KAPSHANDY: |
| 10:58:28 | 17 | Q   Perhaps you should read his testimony. |
| 10:58:30 | 18 | Have you read his testimony? |
| 10:58:31 | 19 | A   I don't believe I have. |
| 10:58:45 | 20 | Q   Let me hand you what we'll mark as your |
| 10:58:47 | 21 | deposition Exhibit 105. |
| 14:10:28 | 22 | A   Thank you. |

## Page 63

| | | |
|---|---|---|
| 14:10:28 | 1 | (Exhibit No. 105 was marked for |
| 14:10:28 | 2 | identification.) |
| 10:58:59 | 3 | MR. KAPSHANDY: Which, for the record, is a |
| 10:59:01 | 4 | letter of inquiry form and a grant application form |
| 10:59:05 | 5 | provided to the defendant by the Parsa Foundation, |
| 10:59:14 | 6 | dated on or about September 1st, 2010. |
| 10:59:17 | 7 | MR. PISHEVAR: What is the exhibit number |
| 10:59:21 | 8 | on this? |
| 10:59:22 | 9 | MR. KAPSHANDY: 105. |
| 10:59:23 | 10 | BY MR. KAPSHANDY: |
| 10:59:38 | 11 | Q   Now, first of all, Dr. Parsi, are you |
| 10:59:41 | 12 | familiar with these documents, these applications |
| 10:59:45 | 13 | for a grant from the Parsa Foundation -- from NIAC |
| 10:59:48 | 14 | to the Parsa Foundation? |
| 10:59:49 | 15 | A   I believe I have seen it. |
| 10:59:56 | 16 | Q   And a lot of what -- |
| 11:00:00 | 17 | A   This is, yeah, 2010. |
| 11:00:01 | 18 | Q   And Parsa, as we discussed the last time, |
| 11:00:05 | 19 | is a large donor to the NIAC organization, correct? |
| 11:00:08 | 20 | A   We have been very fortunate to have the |
| 11:00:11 | 21 | most prominent Iranian-American foundation be such a |
| 11:00:15 | 22 | strong supporter of ours. |

## Page 64

| | | |
|---|---|---|
| 11:00:19 | 1 | Q   Now, if you turn to the second to last |
| 11:00:23 | 2 | page, which is dated -- or numbered 8 and has a |
| 11:00:27 | 3 | Bates number of 3366, do you see that? |
| 11:00:31 | 4 | A   Yeah. |
| 11:00:35 | 5 | Q   Halfway down the page, NIAC states in this |
| 11:00:38 | 6 | application: "Currently standing at nearly 4,000 |
| 11:00:42 | 7 | paid members and 35,000 active supporters |
| 11:00:46 | 8 | nationwide, our grassroots network provides |
| 11:00:49 | 9 | 70 percent of our annual budget, with the average |
| 11:00:52 | 10 | donation amount ranging between 112 and $160 per |
| 11:00:57 | 11 | person." |
| 11:00:57 | 12 | Did I read that correctly? |
| 11:00:58 | 13 | A   I believe you did. |
| 11:01:16 | 14 | Q   Now, how is it that in your December 2011 |
| 11:01:28 | 15 | letter you now have 43,000-plus active supporters, |
| 11:01:33 | 16 | whereas in September when you made this grant |
| 11:01:36 | 17 | application you only had 35,000 active supporters? |
| 11:01:45 | 18 | A   Is that a serious question? Mailing list |
| 11:01:50 | 19 | numbers change, people subscribe and unsubscribe. |
| 11:01:57 | 20 | Q   Okay. So what you're saying is that in |
| 11:02:02 | 21 | those three months you added another 8,000-plus |
| 11:02:05 | 22 | active supporters to your, quote, mailing list? |

## Page 65

| | | |
|---|---|---|
| 11:02:08 | 1 | A   Three months? I think you're talking |
| 11:02:10 | 2 | about six months. |
| 11:02:11 | 3 | Q   Well, the document here is dated -- the |
| 11:02:14 | 4 | cover page which apparently was done online |
| 11:02:17 | 5 | September 1st, 2010. Does that refresh your |
| 11:02:20 | 6 | recollection as to when you did this grant |
| 11:02:22 | 7 | application? |
| 11:02:22 | 8 | A   I thought I saw a June date here. |
| 11:02:25 | 9 | Q   There's two dates in there, but given that |
| 11:02:30 | 10 | it says "created June," but it also says start and |
| 11:02:35 | 11 | end date September 1, 2010. Is that the date of the |
| 11:02:40 | 12 | grant? |
| 11:02:40 | 13 | A   I don't know. |
| 11:02:42 | 14 | Q   I mean it's a one-day grant. I mean... |
| 11:02:59 | 15 | A   What page are you looking at? |
| 11:03:10 | 16 | Q   If you go to Bates No. 3277 -- |
| 11:03:10 | 17 | A   It says -- |
| 11:03:14 | 18 | Q   -- it states start date and end date is |
| 11:03:18 | 19 | September 1st, 2010. Maybe that's the date of the |
| 11:03:21 | 20 | grant. |
| 11:03:21 | 21 | A   And it says here -- I see a created date |
| 11:03:25 | 22 | June 14th, 2010, on page 7. |

17  (Pages 62 to 65)

## Page 66

| | | |
|---|---|---|
| 11:03:30 | 1 | Q   Right.  My question is when it says start |
| 11:03:32 | 2 | date and end date of September 1st, 2010, is that |
| 11:03:34 | 3 | the date of the grant?  Do you understand what that |
| 11:03:36 | 4 | date is? |
| 11:03:37 | 5 | A   What -- what page are you looking at? |
| 11:03:39 | 6 | Q   It's 3277. |
| 11:03:40 | 7 | A   Page 3277? |
| 11:03:43 | 8 | Q   It's page 6 of 7 -- |
| 11:03:43 | 9 | A   Oh, okay. |
| 11:03:44 | 10 | Q   -- of the online application, but I'm |
| 11:03:46 | 11 | giving you the Bates number. |
| 11:03:58 | 12 | A   Start date and end date.  I assume -- I |
| 11:04:11 | 13 | don't know what those dates are.  It could be the |
| 11:04:16 | 14 | dates -- if I remember correctly, this was our COO |
| 11:04:26 | 15 | working on this, we were notified that there was a |
| 11:04:29 | 16 | grant cycle.  We were informed of the -- how do you |
| 11:04:37 | 17 | call it -- the various things you can apply for, and |
| 11:04:41 | 18 | encouraged to prepare our applications, and then |
| 11:04:45 | 19 | there was a brief window of time in which you could |
| 11:04:48 | 20 | upload the application to the website.  And I assume |
| 11:04:51 | 21 | the start date and the end date as you're seeing |
| 11:04:55 | 22 | there has probably got something to do with that. |

## Page 67

| | | |
|---|---|---|
| 11:05:00 | 1 | Q   So you believe that this application was |
| 11:05:02 | 2 | prepared on or about June 14th, 2010? |
| 11:05:04 | 3 | A   I know it wasn't prepared right before it |
| 11:05:07 | 4 | was submitted. |
| 11:05:13 | 5 | Q   Well, you submitted to Parsa the attached |
| 11:05:16 | 6 | application which stated that you had 35,000 active |
| 11:05:18 | 7 | supporters nationwide, correct? |
| 11:05:21 | 8 | A   Correct.  That's the size of the mailing |
| 11:05:24 | 9 | list at that time. |
| 11:05:26 | 10 | Q   And what you're saying now is that your |
| 11:05:29 | 11 | mailing list is 43,000 plus? |
| 11:05:30 | 12 | A   No.  I'm saying that by December 2010, the |
| 11:05:33 | 13 | mailing list had grown, and I don't know where it |
| 11:05:36 | 14 | stands right now.  It changes by the minute.  If you |
| 11:05:39 | 15 | go and unsubscribe, it will change. |
| 11:05:43 | 16 | Q   And our question for you, and I asked this |
| 11:05:45 | 17 | earlier is -- and I will ask that this be provided |
| 11:05:48 | 18 | after the deposition -- could we please have the |
| 11:05:51 | 19 | mailing list that you now say has 43,000-plus |
| 11:05:56 | 20 | members or 35,000, whichever you're using to support |
| 11:06:00 | 21 | these data in these documents. |
| 11:06:02 | 22 | A   I will have to talk to my counsel about |

## Page 68

| | | |
|---|---|---|
| 11:06:05 | 1 | that.  You've not requested any of that information |
| 11:06:08 | 2 | in the past.  You requested membership database. |
| 11:06:13 | 3 | You have not requested our mailing list. |
| 11:06:17 | 4 | Q   Well, we've -- when you say "active |
| 11:06:19 | 5 | supporters," we've requested those data, your list |
| 11:06:22 | 6 | of active supporters.  And if you're calling that a |
| 11:06:25 | 7 | mailing list, call it whatever you want, but that's |
| 11:06:28 | 8 | been requested.  And if it's not been produced and |
| 11:06:30 | 9 | you are aware of that, we would ask that -- |
| 11:06:31 | 10 | A   You requested members.  You didn't request |
| 11:06:34 | 11 | active supporters.  You are making that up right |
| 11:06:36 | 12 | now.  You asked for membership, and as you have |
| 11:06:39 | 13 | proven here by bringing forward Exhibit 100 and 104, |
| 11:06:43 | 14 | you already had membership databases that we had |
| 11:06:46 | 15 | sent you a long time ago.  Obviously membership |
| 11:06:50 | 16 | changes, people join.  It's a living document.  But |
| 11:06:55 | 17 | you had been provided. |
| 11:07:18 | 18 | Q   Let me hand you what we'll mark as your |
| 11:07:21 | 19 | deposition Exhibit 106. |
| 14:10:28 | 20 | (Exhibit No. 106 was marked for |
| 14:10:28 | 21 | identification.) |
| 14:10:28 | 22 | |

## Page 69

| | | |
|---|---|---|
| 14:10:28 | 1 | BY MR. KAPSHANDY: |
| 11:07:34 | 2 | Q   A resume that was produced to the |
| 11:07:36 | 3 | defendant in this case, entitled "Trita Parsi." |
| 11:07:49 | 4 | Have you seen this document before? |
| 11:07:52 | 5 | A   Yes, it appears to be my resume from years |
| 11:07:57 | 6 | ago. |
| 11:07:57 | 7 | Q   Probably about 2006 judging from the |
| 11:08:00 | 8 | entries in it? |
| 11:08:00 | 9 | A   How do you know?  How do you know it's |
| 11:08:15 | 10 | 2006?  It says "expected 2005." |
| 11:08:19 | 11 | Q   So you think it's 2005? |
| 11:08:21 | 12 | A   I don't know. |
| 11:08:21 | 13 | Q   Well, you tell us.  You produced it.  It's |
| 11:08:25 | 14 | your resume. |
| 11:08:26 | 15 | A   We produced thousands of documents for |
| 11:08:28 | 16 | you, and I don't know exactly when this is from. |
| 11:08:30 | 17 | Q   Well, who better than Trita Parsi would |
| 11:08:33 | 18 | know roughly when this document was prepared? |
| 11:08:36 | 19 | A   I would probably be a better source than |
| 11:08:38 | 20 | you.  But that doesn't mean that I can give you an |
| 11:08:41 | 21 | answer that is accurate on the spot. |
| 11:08:43 | 22 | Q   Well, roughly, when would you have |

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 70

| | | |
|---|---|---|
| 11:08:45 | 1 | produced this resume? |
| 11:08:46 | 2 | A   Produced this resume? I produced this -- |
| 11:08:50 | 3 | Q   Prepared it. |
| 11:08:51 | 4 | A   Prepared it?  Sometime after August 2005. |
| 11:09:02 | 5 | Q   And it states in there that, regarding |
| 11:09:06 | 6 | NIAC, you increased membership to 10,000 in less |
| 11:09:10 | 7 | than one year, correct? |
| 11:09:12 | 8 | A   It does. |
| 11:09:12 | 9 | Q   Is that true? |
| 11:09:13 | 10 | A   It was at a time, as you know from our |
| 11:09:18 | 11 | board minutes, that we were getting different |
| 11:09:20 | 12 | information on how to define "membership." Several |
| 11:09:22 | 13 | organizations -- |
| 11:09:23 | 14 | MR. PISHEVAR: Is this -- I'm sorry.  But |
| 11:09:24 | 15 | is this something you had before the previous |
| 11:09:28 | 16 | deposition and you are just asking questions about it |
| 11:09:31 | 17 | now? Didn't you have this already? |
| 11:09:34 | 18 | MR. KAPSHANDY: Yes. |
| 11:09:34 | 19 | MR. PISHEVAR: So why are you asking |
| 11:09:36 | 20 | questions you forgot to ask before apparently? |
| 11:09:38 | 21 | MR. KAPSHANDY: I'm not, Counsel. |
| 11:09:39 | 22 | MR. PISHEVAR: This is not the purpose of |

Page 71

| | | |
|---|---|---|
| 11:09:41 | 1 | this deposition. |
| 11:09:41 | 2 | MR. KAPSHANDY: It's related to the |
| 11:09:43 | 3 | membership databases. |
| 11:09:44 | 4 | MR. PISHEVAR: I haven't seen anything |
| 11:09:45 | 5 | related to that so far. |
| 11:09:45 | 6 | BY MR. KAPSHANDY: |
| 11:09:47 | 7 | Q   Can you answer the question, after the |
| 11:09:48 | 8 | interruption by counsel? |
| 11:09:51 | 9 | A   Yes.  I believe I did. |
| 11:09:54 | 10 | Q   Okay.  My question was, is that |
| 11:09:56 | 11 | information truthful, that you, Trita Parsi, |
| 11:09:58 | 12 | increased membership to 2,000 (sic) in less than one |
| 11:10:03 | 13 | year sometime prior to approximately 2005? |
| 11:10:05 | 14 | A   This goes back to the issue that it was |
| 11:10:07 | 15 | unclear exactly how to categorize and define |
| 11:10:13 | 16 | "membership."  Until this day, this is an open |
| 11:10:16 | 17 | question.  A lot of different organizations.  For |
| 11:10:19 | 18 | instance, I believe J Street follows a model in |
| 11:10:22 | 19 | which they refer to their membership as their |
| 11:10:25 | 20 | mailing list.  There are other organizations that |
| 11:10:28 | 21 | refer to it in different ways. |
| 11:10:30 | 22 | But it is becoming increasingly common |

Page 72

| | | |
|---|---|---|
| 11:10:33 | 1 | that the number of people that you have on your |
| 11:10:35 | 2 | mailing list occasionally are loosely referred to as |
| 11:10:38 | 3 | supporters or members. |
| 11:10:39 | 4 | Q   Okay.  So when you referred to members |
| 11:10:42 | 5 | here, that means a mailing list, but when defendant |
| 11:10:46 | 6 | in his discovery requests asked for member lists, |
| 11:10:49 | 7 | you exclude mailing lists. |
| 11:10:52 | 8 | MR. PISHEVAR: Objection.  Argumentative. |
| 11:10:55 | 9 | BY MR. KAPSHANDY: |
| 11:10:55 | 10 | Q   Is that correct? |
| 11:10:56 | 11 | A   No, because you asked for paid membership. |
| 11:10:58 | 12 | Q   Okay.  So your understanding is that the |
| 11:11:00 | 13 | defendant's requests for lists and membership lists |
| 11:11:03 | 14 | is limited to paid members only and not former |
| 11:11:07 | 15 | members or mailing lists?  Just so we're clear. |
| 11:11:09 | 16 | A   That was our understanding -- |
| 11:11:10 | 17 | Q   Okay.  Thank you very much. |
| 11:11:11 | 18 | A   That was our understanding -- |
| 11:11:13 | 19 | Q   Let me hand you what we'll mark as your |
| 11:11:15 | 20 | deposition Exhibit 107, which is another resume of |
| 11:11:18 | 21 | Trita Parsi. |
| 14:10:28 | 22 | (Exhibit No. 107 was marked for |

Page 73

| | | |
|---|---|---|
| 14:10:28 | 1 | identification.) |
| 14:10:28 | 2 | BY MR. KAPSHANDY: |
| 11:11:25 | 3 | Q   Which I'd ask your help in giving us an |
| 11:11:28 | 4 | approximate date on. |
| 11:11:29 | 5 | MR. PISHEVAR: Same objection as before. |
| 11:11:49 | 6 | I'm going to move to strike all of this as questions |
| 11:11:52 | 7 | you could have asked in his previous deposition. |
| 11:11:54 | 8 | BY MR. KAPSHANDY: |
| 11:11:57 | 9 | Q   Have you seen that resume before? |
| 11:11:59 | 10 | A   I believe I have. |
| 11:12:00 | 11 | Q   Does it appear to be dated approximately |
| 11:12:04 | 12 | in June of 2006? |
| 11:12:05 | 13 | A   June -- yeah, sometime after June 2006. |
| 11:12:13 | 14 | Q   But it does relate to your book in 2007; |
| 11:12:17 | 15 | maybe it's still not been released as of that time. |
| 11:12:20 | 16 | A   Yeah, because it's also the title that was |
| 11:12:22 | 17 | the preliminary title. |
| 11:12:24 | 18 | Q   And, again, this resume from approximately |
| 11:12:28 | 19 | June of 2000 (sic) states regarding NIAC that you, |
| 11:12:33 | 20 | quote, increased membership to two -- to 10,000 in |
| 11:12:36 | 21 | less than one year, end quote.  Did I read that |
| 11:12:38 | 22 | correctly? |

19  (Pages 70 to 73)

<table>
<tr><td colspan="2">

Page 74

| | | |
|---|---|---|
| 11:12:39 | 1 | A  You read it correctly. |
| 11:12:46 | 2 | Q  Again, is that truthful? |
| 11:12:51 | 3 | A  Same question as you asked before.  The |
| 11:12:54 | 4 | term -- you are trying to claim that there's only |
| 11:12:57 | 5 | one definition of "membership," and there's several |
| 11:13:01 | 6 | different ones, and this is at a time in which we |
| 11:13:04 | 7 | hadn't come down to a final determination on exactly |
| 11:13:07 | 8 | what we are referring to as membership. |
| 11:13:07 | 9 | Q  So -- |
| 11:13:09 | 10 | A  We're looking at different models and |
| 11:13:11 | 11 | different other organizations and see how they did |
| 11:13:15 | 12 | it. |
| 11:13:15 | 13 | Q  So at this time in either 2006 or early |
| 11:13:19 | 14 | 2007 you're defining membership as a mailing list; |
| 11:13:23 | 15 | is that correct? |
| 11:13:23 | 16 | A  I think at that time we were defining it |
| 11:13:25 | 17 | in several different ways at the same time because |
| 11:13:28 | 18 | we hadn't come to the determination. |
| 11:13:28 | 19 | Q  Well, at least on your resume, which one |
| 11:13:31 | 20 | assumes is truthful, you're listing 10,000 people as |
| 11:13:35 | 21 | members, which I understand you include as a mailing |
| 11:13:42 | 22 | list. |

</td></tr>
</table>

Page 76

| | | |
|---|---|---|
| 11:15:36 | 1 | (Brief pause in the proceedings.) |
| 11:16:21 | 2 | THE VIDEOGRAPHER:  The time is 11:16 a.m. |
| 11:16:27 | 3 | We're back on the record. |
| 11:16:28 | 4 | BY MR. KAPSHANDY: |
| 11:16:31 | 5 | Q  Okay.  Dr. Parsi, you've asked to look at |
| 11:16:34 | 6 | the meetings from October 7, 2007 board of NIAC, and |
| 11:16:40 | 7 | I'll hand you what we'll mark as Exhibit 108, and |
| 11:16:43 | 8 | represent that those were the board meeting minutes |
| 11:16:47 | 9 | from October 2007 that you produced to the defendant |
| 11:16:50 | 10 | in this case, and ask you to confirm that those are |
| 11:16:55 | 11 | in fact the board meeting minutes from October 2007. |
| 14:10:28 | 12 | (Exhibit No. 108 was marked for |
| 14:10:28 | 13 | identification.) |
| 14:10:28 | 14 | BY MR. KAPSHANDY: |
| 11:17:15 | 15 | Q  Can you answer that question? |
| 11:17:17 | 16 | A  Sorry.  Can you repeat the question? |
| 11:17:19 | 17 | Q  The question was simply, are those the |
| 11:17:21 | 18 | October 2007 NIAC board meeting minutes that you |
| 11:17:25 | 19 | were asking to refer to? |
| 11:18:27 | 20 | A  Mm-hmm. |
| 11:18:27 | 21 | Q  Can I see that a second.  I want to make |
| 11:18:30 | 22 | sure that I've marked the correct copy. |

Page 75

| | | |
|---|---|---|
| 11:13:44 | 1 | A  As I explained, at the time we were using |
| 11:13:46 | 2 | several different definitions of "membership." |
| 11:13:56 | 3 | Q  Have you ever looked at the board meeting |
| 11:13:58 | 4 | minutes from, say, 2007 to see what it says about |
| 11:14:02 | 5 | membership information? |
| 11:14:03 | 6 | A  I don't recall.  Could you show me? |
| 11:14:12 | 7 | Q  Well, if I suggested to you that the |
| 11:14:14 | 8 | October 2007 -- |
| 11:14:16 | 9 | A  If you have the board minutes, I would |
| 11:14:17 | 10 | like to take a look at them. |
| 11:14:18 | 11 | Q  -- board member minutes stated, quote: |
| 11:14:20 | 12 | Trita reviewed membership trends:  1,034 in 2005, |
| 11:14:25 | 13 | increased to 1,307 in 2006, and 1,680 as of today, |
| 11:14:33 | 14 | citing these figures as absolutely unacceptable, end |
| 11:14:37 | 15 | quote, would that sound familiar to you as something |
| 11:14:40 | 16 | that you said to the NIAC board of directors in |
| 11:14:44 | 17 | October of 2007? |
| 11:14:45 | 18 | A  Can I take a look at the minutes? |
| 11:14:47 | 19 | Q  Certainly.  Let's go off the record, |
| 11:14:49 | 20 | please. |
| 11:14:50 | 21 | THE VIDEOGRAPHER:  The time is 11:14 a.m. |
| 11:14:52 | 22 | We're going off the record. |

Page 77

| | | |
|---|---|---|
| 11:18:50 | 1 | It is.  Can you answer the question, |
| 11:18:51 | 2 | please? |
| 11:18:51 | 3 | A  What was the question? |
| 11:18:53 | 4 | Q  Are these the October 26, 2007 NIAC board |
| 11:18:57 | 5 | meeting minutes? |
| 11:18:58 | 6 | A  They appear to be, yes, though there's |
| 11:19:01 | 7 | been some changes made to them, obviously. |
| 11:19:04 | 8 | MR. KAPSHANDY:  Yeah, I was going to |
| 11:19:06 | 9 | suggest to counsel it looks like there is some |
| 11:19:09 | 10 | highlighting on that one.  Would you be agreeable to |
| 11:19:12 | 11 | substituting a copy that isn't so marked? |
| 11:19:14 | 12 | MR. PISHEVAR:  No problem. |
| 11:19:15 | 13 | MR. KAPSHANDY:  I had highlighted the |
| 11:19:17 | 14 | information I had just quoted for him, but if -- |
| 11:19:20 | 15 | THE WITNESS:  Has there been any other |
| 11:19:21 | 16 | changes made to this? |
| 11:19:24 | 17 | MR. KAPSHANDY:  Is that okay?  We'll just |
| 11:19:26 | 18 | substitute a clean copy without highlighting for |
| 11:19:28 | 19 | Exhibit 108? |
| 11:19:30 | 20 | MR. PISHEVAR:  Yeah, as long as it's in the |
| 11:19:32 | 21 | original as -- |
| 11:19:34 | 22 | MR. KAPSHANDY:  It's exactly as produced by |

20  (Pages 74 to 77)

Page 78

| | | |
|---|---|---|
| 11:19:36 | 1 | NIAC. |
| 11:19:36 | 2 | MR. PISHEVAR: -- maintained and produced. |
| 11:19:36 | 3 | BY MR. KAPSHANDY: |
| 11:19:40 | 4 | Q  Dr. Parsi, if you will give me that, we'll |
| 11:19:43 | 5 | substitute a clean copy.  Although you're free to |
| 11:19:46 | 6 | refer to it, the next question had to do with the |
| 11:19:49 | 7 | highlighted section on the bottom of page 2 -- |
| 11:19:49 | 8 | A  Mm-hmm. |
| 11:19:52 | 9 | Q  -- which is what I had asked you about |
| 11:19:55 | 10 | when you asked to refer to these -- |
| 11:19:55 | 11 | A  Mm-hmm.  Mm-hmm. |
| 11:19:57 | 12 | Q  -- meeting minutes, correct? |
| 11:19:58 | 13 | A  Correct. |
| 11:19:59 | 14 | Q  And now having looked at it, my question |
| 11:20:02 | 15 | is, did you not in fact tell the board in October |
| 11:20:10 | 16 | 2007, if you refer to the bottom of page 2, quote: |
| 11:20:13 | 17 | Trita reviewed the membership trends:  1,034 in |
| 11:20:17 | 18 | 2005, increased to 1,307 in 2006, and 1,680 as of |
| 11:20:26 | 19 | today citing these figures as absolutely |
| 11:20:28 | 20 | unacceptable, end quote? |
| 11:20:30 | 21 | Did I read that correctly? |
| 11:20:31 | 22 | A  You've read it correctly.  I don't know if |

Page 79

| | | |
|---|---|---|
| 11:20:34 | 1 | it's correctly reflecting the language that I was |
| 11:20:37 | 2 | using at the board meeting. |
| 11:20:38 | 3 | Q  Well, typically these board meeting |
| 11:20:42 | 4 | minutes, and you are the president of the |
| 11:20:43 | 5 | organization, at the next meeting the minutes are |
| 11:20:47 | 6 | presented to the board to vote on and accept and |
| 11:20:50 | 7 | note any corrections, correct? |
| 11:20:52 | 8 | A  Correct. |
| 11:20:52 | 9 | Q  And correct me if I'm wrong, we've not |
| 11:20:56 | 10 | seen any subsequent corrections to these board |
| 11:20:58 | 11 | minutes.  Are you aware of any that haven't been |
| 11:21:01 | 12 | produced? |
| 11:21:01 | 13 | A  I'm not aware of any, but we are also not |
| 11:21:04 | 14 | nitpicking on things that I think internally at NIAC |
| 11:21:08 | 15 | we understand. |
| 11:21:08 | 16 | Q  Right.  We hate to do that. |
| 11:21:11 | 17 | Now, the next sentence states:  "Sean |
| 11:21:15 | 18 | asked whether or not NIAC's e-mail list had also |
| 11:21:18 | 19 | expanded, to which Trita replied in the |
| 11:21:22 | 20 | affirmative."  Parentheses, "Debra Kagan campaign |
| 11:21:27 | 21 | reflected an estimated 25,000 recipient list with |
| 11:21:30 | 22 | 4,000 open," end parentheses, end quote. |

Page 80

| | | |
|---|---|---|
| 11:21:34 | 1 | Did I read that correctly? |
| 11:21:35 | 2 | A  I believe you did. |
| 11:21:37 | 3 | Q  So the subject of the distinction between |
| 11:21:40 | 4 | members and mailing lists was one that was discussed |
| 11:21:43 | 5 | at this meeting, correct? |
| 11:21:45 | 6 | A  It seems like, and if you go further down, |
| 11:21:47 | 7 | I expressed the opinion that referring to mailing |
| 11:21:52 | 8 | lists and membership, I wasn't of the view that -- |
| 11:21:58 | 9 | that that is the distinction that we should make, |
| 11:22:01 | 10 | even though many other organizations did. |
| 11:22:03 | 11 | Q  Well, you state, and I was going to ask |
| 11:22:06 | 12 | you that, quote:  Trita stated that e-mails do not |
| 11:22:09 | 13 | equate to membership.  Parissa referenced the stingy |
| 11:22:14 | 14 | element in Chicago.  Sean stressed the need to |
| 11:22:17 | 15 | differentiate between paying and nonpaying members |
| 11:22:18 | 16 | and urged NIAC not to ignore the value of nonpaying |
| 11:22:22 | 17 | members. |
| 11:22:22 | 18 | Did I read that correctly? |
| 11:22:24 | 19 | A  Correct. |
| 11:22:25 | 20 | Q  And in there I think that's what you were |
| 11:22:27 | 21 | just saying, you specifically stated that an e-mail |
| 11:22:29 | 22 | list does not equate to a membership list, right? |

Page 81

| | | |
|---|---|---|
| 11:22:33 | 1 | A  This is about a year after these resumes |
| 11:22:36 | 2 | that you're talking about. |
| 11:22:39 | 3 | Q  So at some point in between the 2006 |
| 11:22:44 | 4 | resume and this 2007 board member meeting list, you |
| 11:22:49 | 5 | became of the view that a mailing list does not |
| 11:22:54 | 6 | equate to a membership list, right? |
| 11:22:56 | 7 | A  I made the arguments.  To the best of my |
| 11:22:59 | 8 | knowledge, there were -- as you see, there were |
| 11:23:01 | 9 | people who disagreed.  And to the best of my |
| 11:23:02 | 10 | knowledge, I don't think this was a time in which we |
| 11:23:04 | 11 | made any specific decision.  In fact, to this day I |
| 11:23:07 | 12 | don't think we really have made a decision on this. |
| 11:23:09 | 13 | Q  Ah.  So that was my next question. |
| 11:23:12 | 14 | You don't really distinguish between |
| 11:23:14 | 15 | mailing lists and member lists? |
| 11:23:15 | 16 | A  No, this is about in -- as to the question |
| 11:23:18 | 17 | of when people are asking, and several organizations |
| 11:23:22 | 18 | use their mailing list as the number of supporters, |
| 11:23:25 | 19 | and that makes their organizations appear very |
| 11:23:31 | 20 | large, and we have equally large mailing list, but |
| 11:23:35 | 21 | if we are constantly referring to members only at |
| 11:23:38 | 22 | that, would that put us at a perceptional |

21  (Pages 78 to 81)

## Page 82

11:23:43  1  disadvantage. That's what the conversation is

11:23:45  2  about.

11:23:45  3  Q  Right.  And in fact, the last sentence

11:23:46  4  there states:  "Alex," being Alex Patico, "felt it

11:23:50  5  would not be deceitful to mention NIAC as being

11:23:50  6  comprised of 25,000-plus members when dealing with

11:23:53  7  the media and other inquiries," end quote.

11:23:56  8      Did I read that correctly?

11:23:57  9  A  You read that correctly, and I believe

11:24:00  10  that was his view.

11:24:01  11  Q  Right.  So at least one board member was

11:24:03  12  of the view that a mailing list was a member list.

11:24:06  13  A  One board member, in the context of

11:24:09  14  dealing with the media and other inquiries because

11:24:11  15  he has experience in another organizations in which

11:24:14  16  that is the standard in which they are doing it,

11:24:17  17  expressed that view in the context of dealing with

11:24:20  18  media.

11:24:21  19  Q  And did I understand you to state that as

11:24:24  20  of this date, the board and NIAC have not resolved

11:24:27  21  how to count members?

11:24:28  22  A  I -- I can't recall -- you know, this is

## Page 83

11:24:30  1  an issue for some people who are trying to create

11:24:34  2  chickens out of feathers.

11:24:36  3      I don't believe to this date that there

11:24:39  4  has been a much deeper conversation about this.  We

11:24:40  5  deal with more important issues than this.

11:24:40  6  Q  Do you recall the question?

11:24:41  7  A  I do recall the question.

11:24:42  8  Q  The question was, as of this date has NIAC

11:24:45  9  and the board resolved the issue as to how members

11:24:49  10  are counted --

11:24:50  11      MR. PISHEVAR:  Objection.

11:24:50  12  BY MR. KAPSHANDY:

11:24:52  13  Q  -- a member or mailing list?

11:24:54  14      MR. PISHEVAR:  False premise.

11:24:54  15      THE WITNESS:  False premise.

11:24:56  16      MR. PISHEVAR:  Continuing objection.

11:24:56  17  BY MR. KAPSHANDY:

11:24:56  18  Q  Well, it was discussed at this board

11:24:58  19  meeting in minutes, and as of 2007 it was important

11:25:01  20  enough to discuss, but it hadn't been resolved.

11:25:04  21      My question for you is, as of to date has

11:25:06  22  the board resolved how to count members?

## Page 84

11:25:08  1      MR. PISHEVAR:  Same objection.

11:25:13  2      THE WITNESS:  You are trying to create

11:25:15  3  mutual exclusivity here.  When we are referring to

11:25:18  4  current members or expired members, that is

11:25:22  5  terminology that people on the board understand, and

11:25:24  6  there's no confusion about that.

11:25:26  7  BY MR. KAPSHANDY:

11:25:26  8  Q  But when you refer to people in the media

11:25:29  9  or people for grant applications or for members of

11:25:33  10  Congress, you use the mailing list numbers is what

11:25:36  11  you are saying?

11:25:36  12  A  No, my --

11:25:36  13      MR. PISHEVAR:  Objection.

11:25:36  14  BY MR. KAPSHANDY:

11:25:37  15  Q  And Alex believed that was not deceitful

11:25:40  16  is what he said at least.

11:25:42  17  A  Alex's view, if I remember correctly, is

11:25:42  18  based on his experience working at several other

11:25:47  19  major American organizations in which they referred

11:25:49  20  to the mailing list and membership interchangeably.

11:25:53  21  Q  Okay.  Let me ask you then --

11:25:53  22  A  And --

## Page 85

11:25:54  1  Q  -- do you believe it's deceitful to refer

11:25:56  2  to actual members as a mailing list when dealing

11:25:58  3  with members of Congress or the media?

11:26:00  4      MR. PISHEVAR:  Objection.

11:26:02  5      THE WITNESS:  Sir, I don't have a strong

11:26:05  6  opinion on that in either direction.  I do know that

11:26:08  7  several organizations counted that way and others

11:26:13  8  don't.

11:26:13  9  BY MR. KAPSHANDY:

11:26:15  10  Q  I'm not asking about other organizations.

11:26:18  11  I'm asking you --

11:26:18  12  A  I don't think the concept --

11:26:19  13  Q  -- Dr. Parsi, president of NIAC, do you

11:26:23  14  agree or disagree with Alex Patico's statement that

11:26:26  15  it would not be deceitful to refer to NIAC as having

11:26:29  16  25,000-plus members when dealing with the members of

11:26:32  17  the media or public?

11:26:33  18  A  I do not have a strong opinion of that.

11:26:37  19  However, I do believe that the way that we have

11:26:40  20  communicated this, particularly myself, has been

11:26:43  21  that we mention both numbers:  That we have X amount

11:26:48  22  of paid members and X amount of supporters.

22  (Pages 82 to 85)

## Page 86

| | | |
|---|---|---|
| 11:26:51 | 1 | Q   And the supporters is also another name, I |
| 11:26:56 | 2 | guess, for the mailing list. |
| 11:26:57 | 3 | A   Things are used interchangeably at times, |
| 11:27:02 | 4 | yes. |
| 11:27:51 | 5 | Q   Let me hand you what we'll mark as your |
| 11:27:55 | 6 | deposition Exhibit 109. |
| 11:28:11 | 7 | (Exhibit No. 109 was marked for |
| 11:28:11 | 8 | identification.) |
| 11:28:11 | 9 | BY MR. KAPSHANDY: |
| 11:28:12 | 10 | Q   Which is a summary of NIAC's 2009 |
| 11:28:16 | 11 | financials that was produced to us in this case. |
| 11:28:18 | 12 | Please take a look at that. |
| 11:28:18 | 13 | A   (Witness complies.) |
| 11:28:42 | 14 | Q   First of all, have you seen this before? |
| 11:28:44 | 15 | A   I believe so. |
| 11:28:50 | 16 | Q   And would this appear to be an authentic |
| 11:29:00 | 17 | copy of at least a summary of NIAC's financials from |
| 11:29:04 | 18 | 2009? |
| 11:29:05 | 19 | A   It appears to be correct. |
| 11:29:06 | 20 | Q   And under -- at the very top under income |
| 11:29:10 | 21 | and expenses, they list membership revenues, don't |
| 11:29:14 | 22 | they? |

## Page 87

| | | |
|---|---|---|
| 11:29:14 | 1 | A   Yes, they do. |
| 11:29:18 | 2 | Q   And for 2009, NIAC reports total |
| 11:29:22 | 3 | membership dues of $59,020, correct? |
| 11:29:28 | 4 | A   That is incorrect.  That is what it states |
| 11:29:31 | 5 | there. |
| 11:29:32 | 6 | Q   What is the correct number?  What is the |
| 11:29:36 | 7 | correct number? |
| 11:29:36 | 8 | A   I don't know the correct number, but the |
| 11:29:39 | 9 | way that our accountant was counting this was |
| 11:29:41 | 10 | different because she was using a system in which, |
| 11:29:45 | 11 | for instance, people coming to a fundraising event |
| 11:29:48 | 12 | and becoming members there she counted differently. |
| 11:29:51 | 13 | People who gave their membership fee from their |
| 11:29:56 | 14 | business she didn't count the same way.  So the way |
| 11:30:00 | 15 | she was counting in her accounting and the way we |
| 11:30:03 | 16 | were counting in our database was quite different. |
| 11:30:05 | 17 | Q   Okay.  So you have yet another set of ways |
| 11:30:08 | 18 | of counting members for the -- |
| 11:30:09 | 19 | A   No, we -- |
| 11:30:10 | 20 | Q   -- financial purposes? |
| 11:30:11 | 21 | A   No.  We thought that this was not the way |
| 11:30:13 | 22 | to do it, and I believe that it's been changed. |

## Page 88

| | | |
|---|---|---|
| 11:30:15 | 1 | Q   And your accountant is the one who uses |
| 11:30:17 | 2 | these to prepare your tax returns? |
| 11:30:19 | 3 | A   She did it in to the best -- no, actually, |
| 11:30:22 | 4 | she is not the one who is preparing our tax returns. |
| 11:30:25 | 5 | Her argument, I think was a valid one, was because |
| 11:30:28 | 6 | she didn't see on the specific checks necessarily |
| 11:30:31 | 7 | under what context that check had come in.  Whereas, |
| 11:30:36 | 8 | we when we treated it into the database knew that, |
| 11:30:39 | 9 | but she didn't when she saw the checks. |
| 11:30:46 | 10 | Q   So what you're saying is that the |
| 11:30:48 | 11 | unrestricted contributions up above which may have |
| 11:30:52 | 12 | come in at fundraisers, either from businesses or |
| 11:30:55 | 13 | individuals, also in your definition of "membership" |
| 11:30:57 | 14 | are included in members -- as members under the NIAC |
| 11:31:01 | 15 | definition? |
| 11:31:02 | 16 | A   These were almost exclusively people |
| 11:31:04 | 17 | giving donations in addition to their membership |
| 11:31:09 | 18 | fees or as -- as their membership fees or people who |
| 11:31:14 | 19 | were doing it at fundraising events, which also |
| 11:31:17 | 20 | counted towards membership, and she separated them |
| 11:31:18 | 21 | here. |
| 11:32:37 | 22 | Q   Dr. Parsi, I'm going to continue with the |

## Page 89

| | | |
|---|---|---|
| 11:32:40 | 1 | Salesforce membership databases, or whatever you |
| 11:32:42 | 2 | want to call them, that were produced to the |
| 11:32:44 | 3 | defendant on April 21st of this year. |
| 11:32:49 | 4 | And the first one we're going to mark as |
| 11:32:51 | 5 | Exhibit 110 and Exhibit 110-A, 110-A being the CD, |
| 11:33:03 | 6 | and 110 being the printed excerpt of the first few |
| 11:33:10 | 7 | pages, is the Excel file produced by NIAC entitled |
| 11:33:18 | 8 | "Accounts." |
| 11:33:19 | 9 | (Exhibit Nos. 110 and 110-A were |
| 11:33:20 | 10 | marked for identification.) |
| 11:33:20 | 11 | BY MR. KAPSHANDY: |
| 11:33:42 | 12 | Q   Do you see that? |
| 11:33:43 | 13 | A   I do. |
| 11:33:44 | 14 | Q   Now, could you explain to us, please, what |
| 11:33:46 | 15 | the file produced to us and labeled as "Accounts" |
| 11:33:50 | 16 | from Salesforce database comprises? |
| 11:33:54 | 17 | A   Salesforce is an online database that is |
| 11:33:58 | 18 | designed for companies to have a database for other |
| 11:34:08 | 19 | companies that they are dealing with, particularly |
| 11:34:09 | 20 | for the purpose of sales.  It is not designed for |
| 11:34:12 | 21 | nonprofits. |
| 11:34:13 | 22 | So the way Salesforce is designed, tailor |

23   (Pages 86 to 89)

Page 90

11:34:19  1   made for these companies, is such that if
11:34:23  2   computer -- Company A has a relationship with
11:34:29  3   Company B, Company A would enter Company B as an
11:34:37  4   account. Under the account they can then enter
11:34:42  5   several different contacts who are all part of the
11:34:47  6   same company. That is a very natural way to do it
11:34:57  7   for companies dealing with companies.
11:34:59  8        When you apply it to nonprofits, it
11:35:03  9   becomes a little bit more -- less fruitful because
11:35:11  10  you're then forced to for each individual not only
11:35:15  11  to create a contact but usually also create an
11:35:20  12  account for them.
11:35:25  13       Q  Well, NIAC used the Salesforce database,
11:35:28  14  as we know from your prior testimony and a number of
11:35:33  15  other NIAC employees, from at least 2006 to 2010 to
11:35:37  16  manage information about its members, contacts,
11:35:41  17  et cetera, correct?
11:35:43  18       A  No. Mainly contacts -- mainly members.
11:35:47  19  The mailing list was not --
11:35:49  20       Q  Okay. My question for you wasn't the
11:35:53  21  theoretical purposes behind Salesforce but how NIAC
11:35:57  22  was using it.

Page 91

11:35:58  1        Now, this database is entitled "Contacts,"
11:36:01  2   and there are some others, as we mentioned before,
11:36:02  3   that are labeled --
11:36:02  4        A  You told me that these were accounts.
11:36:04  5        Q  Accounts. Thank you. There's another one
11:36:07  6   labeled "Contacts" --
11:36:07  7        A  Mm-hmm.
11:36:08  8        Q  -- another one named "Opportunities,"
11:36:10  9   another one named "Leads," and I'm just simply
11:36:13  10  focusing on "Accounts."
11:36:15  11       What does the accounts list comprise?
11:36:21  12       A  I just explained that to you. You want me
11:36:23  13  to explain it again?
11:36:25  14       Q  How did NIAC use it?
11:36:26  15       A  I explained that as well. As a nonprofit,
11:36:30  16  because this is -- this database is not created in
11:36:32  17  such a manner in which you can have free-flowing
11:36:36  18  contacts in it. They constantly have to be
11:36:39  19  connected to an account. If a person became a
11:36:41  20  member, we had to create an account, as you see in
11:36:44  21  column D that says "Family," "Yazdani Shahram," and
11:36:50  22  then under the account there was then also a contact

Page 92

11:36:54  1   that was Shahram, Yazdani.
11:36:58  2        The way to understand it, and this is why
11:37:00  3   I explained it to you, Tim, is that this database is
11:37:04  4   defined for companies. So if Sidley Austin has a
11:37:08  5   relationship with another company, obviously its
11:37:13  6   relationship will not be to one individual alone;
11:37:17  7   usually, it will be several individuals. Those
11:37:18  8   would be several contacts under the account named
11:37:21  9   after the company.
11:37:22  10       Q  Okay.
11:37:23  11       A  What we did then is that on occasion, but
11:37:26  12  it became very messy, the account was the family,
11:37:31  13  and if there were three people in the family who
11:37:34  14  were NIAC members, then there were three contacts
11:37:39  15  connected to that account.
11:37:44  16       Q  How does one distinguish that from the
11:37:48  17  list known as "Contacts"? What is the difference?
11:37:50  18  How did NIAC use them?
11:37:51  19       A  There is no real difference. This is the
11:37:53  20  thing: We provided you with a membership database.
11:37:56  21  You asked for a full list, and now you are confused
11:37:59  22  of how it works.

Page 93

11:37:59  1        Q  No, don't worry about what we asked for.
11:38:00  2        A  We were trying to make things easier for
11:38:02  3   you.
11:38:02  4        Q  My question, Dr. Parsi, is for you,
11:38:03  5   president of NIAC, who used Salesforce from 2006 to
11:38:06  6   2010 for managing of member information, what is the
11:38:11  7   difference between the list you produced entitled
11:38:15  8   "Accounts" and the one produced list entitled
11:38:19  9   "Contacts"?
11:38:19  10       A  Again, I just explained, but I will be
11:38:25  11  happy to explain it to you again.
11:38:27  12       Because of the way that this computer
11:38:28  13  database is set up -- which is not ours; we just
11:38:30  14  used the service -- you have to have accounts
11:38:35  15  connected to contacts because the opportunities,
11:38:40  16  which in a sales opportunity, of course, in a
11:38:44  17  business world would be that you had an opportunity
11:38:46  18  to sell something, has to be connected, not to the
11:38:51  19  contact but primarily to the account or both, but it
11:38:54  20  cannot be connected alone to the contact.
11:38:57  21       So if you want to keep track of members,
11:38:59  22  you had to create an account, a contact that was

24  (Pages 90 to 93)

Page 94

11:39:03  1   connected to it, and underneath that you could have
11:39:06  2   those opportunities.
11:39:08  3      Q   Which do you consider did NIAC use as,
11:39:13  4   quote, a list of members?
11:39:14  5      A   The totality would become the entire --
11:39:19  6   you would have to have everything to be able to see,
11:39:22  7   but it would primarily be the contacts list, 1
11:39:27  8   believe.
11:39:41  9      Q   Now, the reason I ask is because there's a
11:39:44  10  field on the contacts database for which many
11:39:52  11  persons are described as, quote, no membership
11:39:55  12  history.  So I'm wondering from that list entitled
11:40:01  13  "Contacts," how do you determine how many members
11:40:03  14  NIAC had?
11:40:05  15     A   You have to specify that question.
11:40:10  16  I -- can you repeat the question and specify it?
11:40:13  17     Q   Sure.
11:40:13  18         If one looks at the contacts list, there
11:40:21  19  are a whole host of people that are described as "no
11:40:24  20  membership history," literally hundreds of them.
11:40:28  21     A   Mm-hmm.
11:40:28  22     Q   So how does one get from that that the

Page 95

11:40:34  1   contacts list is a list of members when some of the
11:40:36  2   people are described as having no membership
11:40:40  3   history?
11:40:40  4      A   The way you distinguish it is because
11:40:42  5   there's a field that says whether they are members
11:40:44  6   or not.  So we have a contact --
11:40:46  7      Q   I thought you just told us that the list
11:40:48  8   that's most accurately understood to be a membership
11:40:51  9   list is the contacts list and not these other lists
11:40:55  10  such as accounts or leads or opportunities.
11:40:57  11     A   Did I say that there are people in the
11:40:59  12  contact list that are not -- that if someone is on
11:41:03  13  the contact list they absolutely are a member?
11:41:05  14     Q   Look, Dr. Parsi, the question was to you,
11:41:09  15  of all of these Salesforce databases that you have
11:41:12  16  produced to us, which did NIAC use -- which do you
11:41:15  17  consider to be a list of members?
11:41:17  18     A   Well, what we provided you was our full
11:41:23  19  database, which then includes people that are also
11:41:26  20  not members.  If we had excluded people who were not
11:41:30  21  members, you would have found a pretext to complain
11:41:33  22  about that.

Page 96

11:41:34  1      Q   We're not asking about what I'm
11:41:36  2   complaining about.
11:41:37  3          My question for you is simply --
11:41:38  4      A   No, I'm explaining --
11:41:39  5      Q   -- within NIAC, operating NIAC on a
11:41:41  6   day-to-day basis, and generating information about
11:41:45  7   membership for the media, for the board members, for
11:41:49  8   members of Congress, for grant applications, now
11:41:53  9   that you have finally produced to us the list of the
11:41:56  10  Salesforce membership information, how does one get
11:42:01  11  from that database to a list of what you describe as
11:42:05  12  members, be it 43,000 supporters or 4,000 active,
11:42:12  13  current members?
11:42:13  14         MR. PISHEVAR:  Objection.  False premise.
11:42:17  15         THE WITNESS:  Again, you are confusing
11:42:19  16  several different things here.  You asked us
11:42:22  17  specifically to provide you the Salesforce database
11:42:27  18  unedited.  In order to comply with your request, we
11:42:35  19  did not edit the Salesforce database.  We dumped the
11:42:39  20  whole thing and gave it to you.  And in that
11:42:41  21  Salesforce database, there will be people who are
11:42:44  22  members; there will be people who are not members.

Page 97

11:42:46  1   Anyone who can read can also then see the column that
11:42:49  2   states whether they are current members or not.
11:42:51  3   BY MR. KAPSHANDY:
11:42:51  4      Q   And if it says that there is no membership
11:42:55  5   data or that they are expired, my question for you
11:42:59  6   is internally within NIAC, are these people who are
11:43:04  7   listed as no membership information or expired
11:43:07  8   considered members or not?
11:43:09  9      A   Two different questions there.  Expired
11:43:11  10  are considered members.  It's just that their
11:43:14  11  membership needs to be renewed.  And membership dues
11:43:17  12  have not come in.
11:43:18  13     Q   Even if they've been expired for two,
11:43:21  14  three, four years?
11:43:24  15     A   We have several people who came back and
11:43:27  16  say, I forgot, I didn't get your e-mail, I moved, I
11:43:30  17  stopped getting your letters, and we don't want to
11:43:32  18  second-guess them.
11:43:32  19     Q   Well, you would think after three or four
11:43:35  20  years, if they really wanted to be a member, they
11:43:35  21  could go to your website and figure out how to send
11:43:37  22  you money.

25  (Pages 94 to 97)

## Page 98

```
11:43:37   1        A   A lot of people think that they are member
11:43:40   2    just because they get our newsletter.  That's one of
11:43:43   3    our challenges, to try to make sure that we want to
11:43:46   4    encourage them to also become paid members.  We have
11:43:48   5    had several people who have actually become upset
11:43:50   6    finding out that they are not members.
11:43:54   7        MR. KAPSHANDY:  For the record, we are
11:43:55   8    going to mark as Exhibit 110, but we're having
11:43:58   9    burned, because I only have one copy of it right
11:44:00  10    now -- excuse me, 111 -- the contacts Excel database
11:44:06  11    that was produced by NIAC.
14:10:28  12        (Exhibit No. 111 was marked for
14:10:28  13        identification.)
11:44:11  14        THE WITNESS:  Is this the same -- is this
11:44:11  15    the same as this one?
11:44:13  16        MR. KAPSHANDY:  What we marked as 110 is
11:44:15  17    the accounts.
11:44:15  18        THE WITNESS:  Oh, okay.
11:44:15  19        MR. KAPSHANDY:  We're going to mark as 110
11:44:17  20    the contacts, and I'm not going to spend any time --
11:44:19  21        THE WITNESS:  111.
11:44:20  22        MR. KAPSHANDY:  111, thank you.  -- going
```

## Page 99

```
11:44:21   1    through it in detail.
11:44:23   2        MR. KAPSHANDY:  A.P., we'll get you a copy.
11:44:23   3        MR. PISHEVAR:  Thank you.
11:44:24   4        MR. KAPSHANDY:  And I just want to mark
11:44:25   5    those for the record.
11:44:27   6    BY MR. KAPSHANDY:
11:44:27   7        Q   I do have some questions, though, about a
11:44:33   8    few entries from the contacts database.  And what
11:44:42   9    we'll mark as Exhibit 111-A are I think six entries
11:44:57  10    from contacts.
11:44:57  11        So for ease of reference so we don't have
11:45:00  12    to print out, and I've already printed out the
11:45:03  13    entire contacts database, which is a full box -- it
11:45:06  14    would be a little bit hard to work with, but -- let
11:45:09  15    me hand you what we'll mark as Exhibit 111-A, and
11:45:13  16    it's actually five pages.  It's scrolled across.  So
11:45:18  17    if you want to spread it out there in front of you.
14:10:28  18        (Exhibit No. 111-A was marked for
14:10:28  19        identification.)
11:45:34  20        MR. KAPSHANDY:  And for the record, I will
11:45:35  21    represent that these are about a half a dozen entries
11:45:53  22    from the Salesforce contacts database.  And it
```

## Page 100

```
11:45:58   1    comprises actually three pages, but are five sheets
11:46:02   2    across, so it makes for a long printout.
11:46:02   3    BY MR. KAPSHANDY:
11:46:16   4        Q   But -- now, this is from the contacts
11:46:18   5    database.  If you look at the third entry down for
11:46:21   6    someone named Ms. Maliheh Mostoufi --
11:46:21   7        A   Mm-hmm.
11:46:31   8        Q   -- then you read across to the second
11:46:36   9    sheet, under "Description," do you see that under
11:46:45  10    column AF?  It's the second sheet --
11:46:45  11        A   Yes, I see that.
11:46:47  12        Q   -- across for the same person.  There's an
11:46:50  13    entry where you have descriptions, and I take it
11:46:52  14    this is a place -- a field you use to kind of keep
11:46:56  15    track of information on contacts, members, et
11:46:58  16    cetera.
11:46:58  17        A   This was sporadically used.
11:47:01  18        Q   Well, we'll see.  There's like 17,000 of
11:47:05  19    them, and I know you described that as sporadic, but
11:47:05  20    we'll get to the meeting notes.
11:47:08  21        A   Were there 17,000 entries in all of them?
11:47:11  22        Q   Yes, there were, but --
```

## Page 101

```
11:47:11   1        A   Consistent with --
11:47:12   2        Q   -- you can characterize it as sporadic.
11:47:13   3    My question is --
11:47:13   4        A   It is sporadic.
11:47:15   5        Q   We won't quibble over that.
11:47:17   6        In many of these fields under
11:47:20   7    "Description," there are many notes about the
11:47:21   8    member, things that they participated in, meetings
11:47:24   9    with members of Congress or fundraisers or what have
11:47:24  10    you.
11:47:24  11        A   -- not 17,000.
11:47:27  12        Q   But I'm going to ask you about six of them
11:47:30  13    here.  Okay?
11:47:31  14        And this one here says:  In response to
11:47:40  15    Iranian election feedback June 30, 2009.  The entry
11:47:40  16    states:  "Michelle Khanoom, you sent me the same
11:47:43  17    letter even after I responded to your organization.
11:47:45  18    I guess you have this strategy that by telling lies
11:47:50  19    and repeating them again and again, people" -- and
11:47:53  20    then it gets cut off.  Apparently there's a --
11:47:54  21        A   There is nothing else there.
11:47:56  22        Q   Apparently there is in the electronic
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 102

| | | |
|---|---|---|
| 11:47:59 | 1 | file. |
| 11:47:59 | 2 | A   All right.  What does the rest of the |
| 11:48:03 | 3 | electronic file say? |
| 11:48:06 | 4 | Q   My question for you is, when people -- |
| 11:48:08 | 5 | A   What does the rest of the electronic file |
| 11:48:11 | 6 | say? |
| 11:48:12 | 7 | Q   Can you wait for the question, please? |
| 11:48:13 | 8 | A   No, I'm very curious to know what the rest |
| 11:48:15 | 9 | of this says. |
| 11:48:16 | 10 | Q   Can you wait for the question, please? |
| 11:48:18 | 11 | The question for you is, when somebody |
| 11:48:20 | 12 | writes you something like this, and if you scroll |
| 11:48:23 | 13 | across to column BL, when it says "Expired - 1,606 |
| 11:48:29 | 14 | days ago," which is more than four years, you |
| 11:48:34 | 15 | continue to carry that person as an expired member |
| 11:48:39 | 16 | even though they've sent a letter which says |
| 11:48:42 | 17 | something like that? |
| 11:48:43 | 18 | A   I don't know what this letter says. |
| 11:48:46 | 19 | You're just showing me the first sentence. |
| 11:49:20 | 20 | Q   When a person says -- when the membership |
| 11:49:24 | 21 | has expired 1,606 days ago, you still carry them as |
| 11:49:29 | 22 | a current member -- |

Page 103

| | | |
|---|---|---|
| 11:49:29 | 1 | A   What does the letter say? |
| 11:49:31 | 2 | Q   -- albeit expired? |
| 11:49:32 | 3 | A   What does the letter say? |
| 11:49:33 | 4 | Q   Can you answer that question?  If |
| 11:49:36 | 5 | somebody's membership expired 1,606 days ago, can |
| 11:49:39 | 6 | you -- do you at NIAC still consider them to be a |
| 11:49:42 | 7 | member, albeit expired? |
| 11:49:44 | 8 | A   We have had people who after 1,600 days |
| 11:49:49 | 9 | have renewed their membership, yes.  And there are |
| 11:49:54 | 10 | people who e-mail us and say take us off and we take |
| 11:50:01 | 11 | them off.  Or people who had e-mailed and been |
| 11:50:07 | 12 | unhappy about a specific decision, and e-mailed a |
| 11:50:11 | 13 | month later and saying, Reinstate my membership. |
| 11:50:15 | 14 | Q   Well, if people express dissatisfaction, |
| 11:50:27 | 15 | do you take them off the list? |
| 11:50:28 | 16 | A   Dissatisfaction is different from |
| 11:50:32 | 17 | requesting to be taken off the list.  We have |
| 11:50:34 | 18 | members who all the time come and say, I really like |
| 11:50:38 | 19 | this, I'm not happy about this, I would like to see |
| 11:50:42 | 20 | this changed.  The minute someone expresses |
| 11:50:45 | 21 | dissatisfaction is not a reason to take them off the |
| 11:50:48 | 22 | membership list against their wishes unless they |

Page 104

| | | |
|---|---|---|
| 11:50:52 | 1 | specifically state so. |
| 11:51:39 | 2 | Q   Okay.  Dr. Parsi, in response to your |
| 11:51:41 | 3 | question, I'm going to pull up that entire entry so |
| 11:51:43 | 4 | you can read it. |
| 11:51:51 | 5 | And for the record, I will read it in case |
| 11:51:53 | 6 | the videographer can't get the entire response that |
| 11:51:56 | 7 | this person sent to NIAC. |
| 11:51:58 | 8 | It states: "You sent me the same letter |
| 11:52:00 | 9 | even after I responded to you and your organization. |
| 11:52:02 | 10 | I guess you have this strategy that by tell lies and |
| 11:52:06 | 11 | repeating them again and again, people are going to |
| 11:52:08 | 12 | believe that lies are truths.  But most people are |
| 11:52:11 | 13 | not that stupid.  I like you and your organization |
| 11:52:15 | 14 | know that.  I am a staunch supporter of the State of |
| 11:52:18 | 15 | Israel.  I support her Jewish nation and all the |
| 11:52:22 | 16 | Jewish people around the world.  I despise the |
| 11:52:26 | 17 | terrorist regime of Islamic republic in Iran who by |
| 11:52:31 | 18 | spending the wealth of Iranians supports the |
| 11:52:31 | 19 | terrorist Hamas and the terrorist Hezbollah in |
| 11:52:34 | 20 | Lebanon.  The same goes with Syria, who for more than |
| 11:52:39 | 21 | 30 years the Iranian oil was and is a free gift from |
| 11:52:42 | 22 | the terrorist regime in Iran, while many Iranian |

Page 105

| | | |
|---|---|---|
| 11:52:46 | 1 | families out of dire poverty had to sell their little |
| 11:52:50 | 2 | kids as prostitutes, many -- and many youths out of |
| 11:52:52 | 3 | sheer hopelessness committed suicide." |
| 11:52:55 | 4 | MR. PISHEVAR:  Objection.  Move to strike. |
| 11:53:07 | 5 | THE WITNESS:  Does it go further on? |
| 11:53:07 | 6 | BY MR. KAPSHANDY: |
| 11:53:09 | 7 | Q   No, it does not.  It goes to the next |
| 11:53:12 | 8 | entry. |
| 11:53:13 | 9 | So my question is, when somebody writes |
| 11:53:15 | 10 | NIAC back in response to a solicitation a letter of |
| 11:53:19 | 11 | this sort, do you still count them as a member, |
| 11:53:22 | 12 | albeit expired? |
| 11:53:23 | 13 | A   I don't know the full content of that |
| 11:53:25 | 14 | communication.  It seems like that communication was |
| 11:53:28 | 15 | with Michelle.  It could very well be that Michelle |
| 11:53:31 | 16 | has put in to that field part of the e-mail -- |
| 11:53:35 | 17 | Q   Who is Michelle? |
| 11:53:36 | 18 | A   Michelle is the former director of |
| 11:53:39 | 19 | community relations. |
| 11:53:40 | 20 | Q   And she got this e-mail, and as part of |
| 11:53:43 | 21 | her job, she entered it in the database on |
| 11:53:46 | 22 | people that you -- |

27  (Pages 102 to 105)

| | Page 106 |
|---|---|

```
11:53:47   1      A  Part of her job is to enter in important
11:53:49   2   information for us to know.  Now, what the
11:53:51   3   continuation of that contact was, I'm not aware of.
11:53:53   4   Whether that was something that resulted in her
11:53:56   5   claiming that she didn't want to be a member, if
11:53:58   6   there was a continuation of the conversation.  I
11:54:00   7   know that Michelle oftentimes spoke to a lot of
11:54:03   8   people and tried to make sure that they understood
11:54:05   9   the full content of everything that we were doing.
11:54:09  10   I don't know what the content of this was at the end
11:54:12  11   of it.  This is what seems to be a portion of an
11:54:15  12   e-mail.
11:54:16  13      Q  Well, it's what NIAC entered in this
11:54:19  14   database.
11:54:20  15      A  Yes.
11:54:20  16      Q  And as you sit here today, because she's
11:54:23  17   not listed as a former member but as an expired
11:54:27  18   member, you continue to count her as a NIAC member.
11:54:29  19      A  I don't know what she is counting as right
11:54:31  20   now, nor I don't know what the continuation of the
11:54:34  21   conversation was.  But if you are trying to imply
11:54:36  22   that because someone -- because they're a staunch
```

| | Page 107 |
|---|---|

```
11:54:39   1   supporter of the State of Israel cannot be a member
11:54:41   2   of NIAC, you're sadly mistaken.
11:54:44   3      Q  No, my question is simply for you, do you
11:54:46   4   consider that person an active supporter?
11:54:48   5      A  I don't -- I don't know, because I don't
11:54:48   6   know what the status is --
11:54:48   7      Q  Let's turn to another one then.
11:54:50   8      A  -- I don't know the continuation of that
11:54:51   9   conversation.
11:54:51  10      MR. PISHEVAR:  Objection.
11:54:52  11      THE WITNESS:  You are taking a tidbit of a
11:54:54  12   conversation and you are trying to say that it's
11:54:56  13   conclusive.  I don't know if --
11:54:56  14   BY MR. KAPSHANDY:
11:54:56  15      Q  Do you think it can get any better than
11:54:58  16   that?
11:54:59  17      A  I don't know what happened afterwards.  Do
11:55:01  18   you?
11:55:01  19      Q  Well, it's your business record,
11:55:04  20   Dr. Parsi.  That's why we are asking you.
11:55:06  21      A  No, I don't -- it wasn't my -- I wasn't
11:55:06  22   the one e-mailing with her.
```

| | Page 108 |
|---|---|

```
11:55:08   1      Q  Let's turn to some other ones.  Let's turn
11:55:12   2   to number 7.  It's on page 2.  So what you will need
11:55:15   3   to do is roll this over.
11:55:17   4      And there is a gentleman by the name of
11:55:23   5   Mohammed Sariy, S-A-R-I-Y.
11:55:40   6      Do you see that entry?
11:55:45   7      A  Mm-hmm, yeah.
11:55:52   8      Q  And if you get -- you read across to
11:55:54   9   column BL, there's listed no membership history for
11:55:57  10   him, correct?
11:55:58  11      A  Hm-hmm.
11:56:00  12      Q  And under column AF, which is on the
11:56:03  13   second sheet right there in front of you -- or third
11:56:06  14   sheet -- yeah, second sheet -- second sheet in front
11:56:08  15   of you --
11:56:08  16      A  I know.  I was looking --
11:56:13  17      Q  Oh, you want to look at BL.
11:56:14  18      Do you see column AF for Mr. Sariy?
11:56:14  19      A  Mm-hmm.
11:56:18  20      Q  And it states:  "Note:  This fellow called
11:56:20  21   us after hours, 6/25/09, at 5:21 p.m.  Spoke to
11:56:28  22   Artin and Michelle for about ten minutes.  Called
```

| | Page 109 |
|---|---|

```
11:56:35   1   Trita a paid Rafsanjani lobbyist.  Said Nayak was a
11:56:36   2   Rafsanjani lobby.  Accused us of changing our stance
11:56:38   3   from a nonpartisan organization," and it's cut off
11:56:40   4   so I will try and bring up the entire entry here.
11:57:41   5      Okay.  Now, I pulled it up on the screen,
11:57:43   6   Dr. Parsi.  If you want to look at the rest of
11:57:47   7   this -- rest of it together with me, I will pick up
11:57:47   8   again.
11:57:50   9      "Accused us of changing our stance from a
11:57:52  10   nonpartisan organization pushing for better
11:57:55  11   relations to being part of the reformist Mousavi
11:58:01  12   Rafsanjani camp.  Accused us of having a blog that
11:58:03  13   is pro-Mousavi and pro-Rafsanjani.  Accused us of
11:58:03  14   changing our mission to be nonpartisan without
11:58:12  15   consulting our members.  Said Trita had his salary
11:58:15  16   for the past four years by the Rafsanjani camp.
11:58:15  17   Threatened to expose us to the Iranian-American
11:58:18  18   community as a Rafsanjani lobby."
11:58:20  19      Now, did I read that entire entry
11:58:23  20   correctly?
11:58:23  21      A  Correct.
11:58:23  22      Q  And that's something either Michelle or
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

## Page 110

11:58:27  1  Artin, who are NIAC employees, entered into the
11:58:30  2  database after this individual's name, correct?
11:58:32  3  A  Correct.
11:58:32  4  Q  And he's also listed having no membership
11:58:36  5  history.
11:58:37  6  My question for you is, as president of
11:58:39  7  NIAC, would a person such as Mohammed Sariy, who had
11:58:42  8  sent that sort of e-mail and has no membership
11:58:45  9  history, be counted as -- in NIAC's contacts list
11:58:50  10  here as a member?
11:58:51  11  A  This clearly states that he has no
11:58:56  12  membership history, so he's not a member.
11:58:58  13  Q  Okay.  So all of these that say "no
11:59:00  14  membership history" are people -- even though that
11:59:03  15  you've said that the contacts list is the closest
11:59:06  16  thing to a Salesforce membership list, not to be
11:59:09  17  understood to contain all NIAC members?
11:59:12  18  A  No.  You switched it around.  What I said
11:59:16  19  is that the contact list includes people that are
11:59:20  20  not members.  But it does contain all of the members
11:59:25  21  at that specific time in which it was downloaded.
11:59:29  22  Q  If you could, let's turn to number 5 which

## Page 111

12:00:04  1  is also on that page, a person by the name of Reza
12:00:07  2  Shahrouzi.
12:00:07  3  A  Mm-hmm.
12:00:07  4  Q  Do you see that?
12:00:09  5  A  Mm-hmm.
12:00:10  6  Q  Now, under column AF, "Refused donation
12:00:14  7  outreach because of employment concerns," and under
12:00:18  8  BL he's listed as "expired 221 days ago."
12:00:27  9  Is a person like that carried as a
12:00:29  10  member --
12:00:30  11  A  He is --
12:00:31  12  MR. PISHEVAR:  Asked and answered.
12:00:31  13  BY MR. KAPSHANDY:
12:00:32  14  Q  -- when in response to an active request
12:00:34  15  for a donation refuses to donate?
12:00:39  16  A  He actually is a member because he donated
12:00:42  17  as soon as he got his job, but we're not going to
12:00:44  18  push out a guy because he is having unemployment
12:00:47  19  issues.  As soon as he got a job, he renewed his
12:00:53  20  membership if I remember it correct.  So I think --
12:00:54  21  Q  Well, it's not -- it's not reflected as of
12:00:57  22  May 2010.

## Page 112

12:00:58  1  A  Yeah, what date is it today?
12:01:01  2  Q  Oh, so you think in the Convio database
12:01:03  3  he'll be shown as having been renewed?  You know him
12:01:06  4  by name?
12:01:06  5  A  I know this person, yeah.  You are looking
12:01:09  6  at a database from a year ago.
12:01:22  7  THE VIDEOGRAPHER:  The time is 12:01 p.m.
12:01:29  8  (Lunch recess.)
12:49:05  9  THE VIDEOGRAPHER:  The time is 12:49 p.m.,
12:49:10  10  May 11, 2011.
12:49:12  11  On the record with video 2, Volume 3.
12:49:15  12  BY MR. KAPSHANDY:
12:49:16  13  Q  Ready to proceed, Dr. Parsi?
12:49:18  14  A  Yes, I am.
12:49:19  15  Q  And you understand that you are still
12:49:21  16  under oath, same rules apply?
12:49:23  17  A  Yes.
12:49:23  18  Q  In response to your testimony before the
12:49:26  19  break that Reza Shahrouzi you believe had renewed
12:49:29  20  his membership, for the record, we checked the
12:49:33  21  Convio database that you produced as of March 18th
12:49:36  22  of this year as Exhibit 117, and we'll mark that and

## Page 113

12:49:41  1  make it part of the record, and it does not show
12:49:43  2  that he has donated in the last three years.
12:49:46  3  So my question for you is, how is it that
12:49:48  4  you can testify from memory of this one having now
12:49:52  5  renewed his membership and you don't have any record
12:49:55  6  of it in your current membership information?
12:49:57  7  A  I believe he has renewed it just in the
12:50:00  8  last couple of weeks.
12:50:01  9  Q  Okay.  Well, can we get a record of that,
12:50:03  10  please?
12:50:03  11  A  I can look into it.
12:50:06  12  Q  Thank you.
12:50:07  13  And just to finish up on Exhibit -- I
12:50:09  14  think it's 111 that you have there in front of you,
12:50:12  15  I had a question on the last entry which is
12:50:16  16  number 8.  You're going to have to turn to the third
12:50:19  17  page, and I'll help you here with the -- I think all
12:50:25  18  you really need to do is focus on the first two
12:50:28  19  pages, although you are welcome to look at all of
12:50:30  20  it.  This relates to an individual by the name of
12:50:33  21  Merc Fox, correct?
12:50:35  22  A  (Witness nods head.)  Correct.

29  (Pages 110 to 113)

Page 114

| | | |
|---|---|---|
| 12:50:39 | 1 | Q   And under column AF, it says: "Met with |
| 12:50:42 | 2 | on secret diplomacy.  Emily's contact." |
| 12:50:46 | 3 | Do you see that? |
| 12:50:47 | 4 | A   Yes, I see. |
| 12:50:48 | 5 | Q   Any idea what that's about? |
| 12:50:50 | 6 | A   I have no idea.  Who is Merc Fox? |
| 12:50:50 | 7 | Q   Pardon? |
| 12:50:50 | 8 | A   Who is Merc Fox? |
| 12:50:54 | 9 | Q   That's my next question, who is Merc Fox? |
| 12:50:57 | 10 | A   Is there any indication here of who he is? |
| 12:51:00 | 11 | Q   You don't know who he is without looking? |
| 12:51:02 | 12 | A   I don't know who he is without looking, |
| 12:51:05 | 13 | no.  It doesn't ring a bell. |
| 12:51:06 | 14 | Q   Never heard of him? |
| 12:51:07 | 15 | A   Doesn't ring a bell. |
| 12:51:11 | 16 | Do you know who he is? |
| 12:51:12 | 17 | Q   The question for you is, is it a name |
| 12:51:16 | 18 | that's familiar to you? |
| 12:51:17 | 19 | A   Doesn't ring a bell. |
| 12:51:19 | 20 | Q   Any idea what "secret diplomacy" means? |
| 12:51:22 | 21 | A   Actually, no. |
| 12:51:23 | 22 | Q   Is there no secret diplomacy that you are |

Page 115

| | | |
|---|---|---|
| 12:51:27 | 1 | aware of? |
| 12:51:28 | 2 | A   When was this entered? |
| 12:51:30 | 3 | Q   Well, it's your record. |
| 12:51:32 | 4 | A   No, it's not my record.  This is Emily |
| 12:51:32 | 5 | Blout's record, so this is obviously from several |
| 12:51:36 | 6 | years ago. |
| 12:51:36 | 7 | Q   Well, does Emily Blout enter things about |
| 12:51:39 | 8 | people that are imaginary and about -- |
| 12:51:39 | 9 | A   I didn't say -- |
| 12:51:41 | 10 | Q   -- things that are secret diplomacy that |
| 12:51:43 | 11 | have no meaning whatsoever or business purpose for |
| 12:51:46 | 12 | NIAC? |
| 12:51:46 | 13 | A   I have not insinuated that she is |
| 12:51:49 | 14 | imagining anything.  I'm just saying that I'm not |
| 12:51:52 | 15 | aware of what this is. |
| 12:52:10 | 16 | This person is not a member, I see. |
| 12:52:13 | 17 | Q   Right.  That was my next question.  Thank |
| 12:52:16 | 18 | you. |
| 12:52:38 | 19 | Put that one aside and get that out of the |
| 12:52:40 | 20 | way.  It's kind of cumbersome. |
| 12:52:57 | 21 | What I would like to do now for the |
| 12:52:59 | 22 | record, and I've given to your counsel, are a series |

Page 116

| | | |
|---|---|---|
| 12:53:02 | 1 | of other documents which come from the Salesforce |
| 12:53:05 | 2 | database that NIAC produced in April of 2011. |
| 12:53:09 | 3 | For 112 and 112-A, we will mark a database |
| 12:53:14 | 4 | known as "Leads," 112-A being the CD, 112 simply |
| 12:53:20 | 5 | being the first several pages in hard copy. |
| 14:10:28 | 6 | (Exhibit Nos. 112 and 112-A were |
| 14:10:28 | 7 | marked for identification.) |
| 12:53:23 | 8 | MR. KAPSHANDY:  113-A will be a Salesforce |
| 12:53:27 | 9 | database on CD and 113 being the first few pages, |
| 12:53:33 | 10 | which NIAC has produced again on April 21, 2011, |
| 14:10:28 | 11 | entitled "Opportunities." |
| 14:10:28 | 12 | (Exhibit Nos. 113 and 113-A were |
| 14:10:28 | 13 | marked for identification.) |
| 12:53:42 | 14 | MR. KAPSHANDY:  114 and 114-A being a NIAC |
| 12:53:46 | 15 | Salesforce database entitled "Campaigns."  114-A |
| 12:53:49 | 16 | being the CD. 114 being the first few pages. |
| 14:10:28 | 17 | (Exhibit Nos. 114 and 114-A were |
| 14:10:28 | 18 | marked for identification.) |
| 12:53:59 | 19 | MR. KAPSHANDY:  116 being the Salesforce |
| 12:54:02 | 20 | meeting notes produced by NIAC in March of this year. |
| 12:54:08 | 21 | 116-A being the database as produced by NIAC. |
| 12:54:11 | 22 | Exhibit 116-B being the merged database using the |

Page 117

| | | |
|---|---|---|
| 12:54:16 | 1 | decoding information sent by NIAC recently to decode |
| 12:54:21 | 2 | about half a dozen of the fields. |
| 14:10:28 | 3 | (Exhibit Nos. 116, 116-A and 116-B |
| 14:10:28 | 4 | were marked for identification.) |
| 14:10:28 | 5 | BY MR. KAPSHANDY: |
| 12:54:29 | 6 | Q   I'm not going to have any more questions |
| 12:54:31 | 7 | specifically on these, Dr. Parsi, because we need to |
| 12:54:34 | 8 | move along. |
| 12:54:35 | 9 | I'm going to mark one more, though, and |
| 12:54:37 | 10 | that's, as I mentioned, Exhibit 117, which we |
| 12:54:40 | 11 | described a few minutes ago as being the Convio |
| 12:54:43 | 12 | database that NIAC produced as of March 13th, 2011, |
| 12:54:48 | 13 | this year, pursuant to the Court's order in CD |
| 12:54:51 | 14 | format only.  We won't print it out.  Because it |
| 12:54:55 | 15 | takes a number of pages. |
| 14:10:28 | 16 | (Exhibit No. 117 was marked for |
| 14:10:28 | 17 | identification.) |
| 14:10:28 | 18 | BY MR. KAPSHANDY: |
| 12:55:05 | 19 | Q   I stand corrected.  It was prepared from |
| 12:55:08 | 20 | Convio as of March 18 and produced by NIAC sometime |
| 12:55:13 | 21 | after that. |
| 12:55:15 | 22 | My question for you, Dr. Parsi, is were |

30  (Pages 114 to 117)

Page 118

| | | |
|---|---|---|
| 12:55:17 | 1 | you involved in the preparation of that Convio |
| 12:55:21 | 2 | database pursuant to the Court's order? |
| 12:55:23 | 3 | A  I was aware of it, and I talked to David |
| 12:55:28 | 4 | about it, but I wasn't personally involved in -- |
| 12:55:31 | 5 | Q  David being David Elliott? |
| 12:55:33 | 6 | A  Correct. |
| 12:55:42 | 7 | Q  Now, are you aware if there is a single |
| 12:55:44 | 8 | entry in any of these membership lists, mailing |
| 12:55:47 | 9 | lists, meeting notes lists, that have been produced |
| 12:55:54 | 10 | by NIAC in this case that reflect anywhere that a |
| 12:55:57 | 11 | single person has refused to become a member or to |
| 12:56:01 | 12 | donate to NIAC because of Hassan Daioleslam or his |
| 12:56:06 | 13 | writings? |
| 12:56:07 | 14 | A  I am not aware -- |
| 12:56:07 | 15 | Q  Thank you. |
| 12:56:10 | 16 | A  -- whether there are or whether there are |
| 12:56:12 | 17 | not. |
| 12:56:12 | 18 | Q  Well, I've not been able to find them, and |
| 12:56:15 | 19 | if you can find them, we welcome your suggestions as |
| 12:56:19 | 20 | to where we can find them, but I believe you are -- |
| 12:56:21 | 21 | A  These databases, as I mentioned numerous |
| 12:56:23 | 22 | times, is sporadically used when it comes to the |

Page 119

| | | |
|---|---|---|
| 12:56:25 | 1 | notes section, so there is no reason why one should |
| 12:56:27 | 2 | expect it to be there. |
| 12:56:27 | 3 | Q  Right.  It's used sporadically because |
| 12:56:30 | 4 | information on members is not of any importance to |
| 12:56:33 | 5 | you. |
| 12:56:33 | 6 | A  Well, in the sense that if someone -- the |
| 12:56:37 | 7 | discipline and the time that it took for us to put |
| 12:56:39 | 8 | down every conversation with members in the notes |
| 12:56:41 | 9 | section simply didn't exist. |
| 12:56:43 | 10 | Q  Well, and the record will reflect and the |
| 12:56:46 | 11 | Court will decide whether NIAC's representations |
| 12:56:48 | 12 | that the use of the meeting notes for four years to |
| 12:56:52 | 13 | the amount of 17,000 entries is sporadic. |
| 12:56:55 | 14 | A  Well, it's not 17,000.  You've taken |
| 12:56:58 | 15 | 17,000 records, most of which I assume are empty. |
| 12:57:01 | 16 | Q  Over a period of four years, and you can |
| 12:57:03 | 17 | characterize it as sporadic as you will.  I |
| 12:57:05 | 18 | understand you have -- |
| 12:57:06 | 19 | A  Well, the period of four years is because |
| 12:57:09 | 20 | that's how long we used the entire database.  That's |
| 12:57:12 | 21 | not how long that we used the note section. |
| 12:57:13 | 22 | Q  Well, the document that was produced to us |

Page 120

| | | |
|---|---|---|
| 12:57:15 | 1 | as Exhibit 116 by NIAC, represented in open court as |
| 12:57:21 | 2 | of December 16th what NIAC had managed to |
| 12:57:24 | 3 | recreate as the meeting notes, covers a period of |
| 12:57:27 | 4 | four years and 17,000 entries, and the record can |
| 12:57:31 | 5 | speak for itself.  If you want to call that |
| 12:57:35 | 6 | sporadic, that's fine. |
| 12:57:36 | 7 | A  I can because I'm pretty confident that we |
| 12:57:39 | 8 | didn't have 17,000 meetings during that period of |
| 12:57:41 | 9 | time. |
| 12:57:41 | 10 | Q  Let me hand you what we'll mark as your |
| 12:57:44 | 11 | deposition Exhibit 118.  And I want to talk to you |
| 12:57:50 | 12 | now about the discovery process and compliance, and |
| 12:57:59 | 13 | hand you what was produced to us after your last |
| 12:58:01 | 14 | deposition as all documents NIAC has been able to |
| 12:58:04 | 15 | locate relating to litigation hold. |
| 14:10:28 | 16 | (Exhibit No. 118 was marked for |
| 14:10:28 | 17 | identification.) |
| 14:10:28 | 18 | BY MR. KAPSHANDY: |
| 12:58:07 | 19 | Q  I take it you've seen this before? |
| 12:58:10 | 20 | A  Yes. |
| 12:58:15 | 21 | Q  And this is dated, the e-mail, |
| 12:58:18 | 22 | October 15th, 2009, correct? |

Page 121

| | | |
|---|---|---|
| 12:58:21 | 1 | A  Correct. |
| 12:58:22 | 2 | Q  To staff as a reminder, correct? |
| 12:58:26 | 3 | A  Yeah. |
| 12:58:26 | 4 | Q  And it appears it was reprinted on |
| 12:58:29 | 5 | December 16, 2010, right before the December status |
| 12:58:32 | 6 | conference and provided to your counsel.  I take it |
| 12:58:35 | 7 | that's why we see the December 16th date. |
| 12:58:40 | 8 | A  I believe they reprinted it.  They got it |
| 12:58:42 | 9 | in electronic format. |
| 12:58:44 | 10 | Q  How is it that they got it?  Did they have |
| 12:58:47 | 11 | a CD of all of the documents that you reviewed in |
| 12:58:50 | 12 | order to be produced?  I'm trying to understand the |
| 12:58:52 | 13 | discovery process now. |
| 12:58:54 | 14 | A  How is it that they have this e-mail? |
| 12:59:03 | 15 | Q  Right.  You said they reprinted it.  My |
| 12:59:03 | 16 | question is reprinted it from what?  Did they have a |
| 12:59:05 | 17 | disk or -- |
| 12:59:05 | 18 | A  No, I didn't say they reprinted it.  He |
| 12:59:08 | 19 | said they printed it. |
| 12:59:08 | 20 | Q  Okay.  You said they printed it.  My |
| 12:59:11 | 21 | question is from what? |
| 12:59:12 | 22 | A  From the e-mail. |

31 (Pages 118 to 121)

Page 122

12:59:15   1       Q   Right.  From what sort of media,
12:59:19   2   Dr. Parsi?
12:59:19   3       A   You have to ask them.
12:59:21   4       Q   Okay.  Did you send it to them on
12:59:23   5   December 16th?
12:59:24   6       A   That I don't know.
12:59:25   7       Q   Do they have -- did you at NIAC or anybody
12:59:28   8   under your direction or control as part of the
12:59:30   9   discovery process provide to counsel any sort of
12:59:33  10   media, be it a hard drive, a CPU, a computer, with
12:59:37  11   all of the discovery materials that your staff had
12:59:39  12   researched and reviewed as being responsive?
12:59:45  13       A   The discovery material was provided to our
12:59:47  14   counsel, yes.
12:59:48  15       Q   In what format is my question.
12:59:51  16       A   I believe it was in PSD formats.
12:59:54  17       Q   On a -- what sort of medium?
12:59:57  18       A   I believe it was a disk.
12:59:59  19       Q   A CD, a DVD?
13:00:02  20       A   I don't remember if it was a DVD or a CD.
13:00:06  21       Q   How was that prepared and from where?
13:00:08  22       A   These are questions that you asked me at

Page 123

13:00:10   1   the last deposition.
13:00:11   2       Q   Could you remind me of the answer, please?
13:00:13   3       A   I don't recall exactly.
13:00:17   4       Q   Did you recall then?
13:00:18   5       A   I don't recall if I recalled any of it.
13:00:20   6       Q   I don't believe you did.  That's why I'm
13:00:22   7   asking again.
13:00:23   8           So the question is, when were these
13:00:25   9   materials provided to counsel that would include,
13:00:27  10   say, this litigation hold document from October of
13:00:29  11   2009?
13:00:30  12       A   Well, the discovery production was in May
13:00:34  13   2009.  This e-mail seems to be a later e-mail.
13:00:40  14       Q   Ah, so what you are saying it's not
13:00:42  15   discoverable even though a litigation hold was
13:00:45  16   specifically requested and David Elliott had
13:00:49  17   testified that one had been instituted at the
13:00:52  18   institute -- at the institution of the lawsuit in
13:00:53  19   March of 2008.
13:00:54  20       A   No, what you said is not at all what I
13:00:56  21   said.
13:00:56  22       Q   Okay.  Are there any other litigation

Page 124

13:00:58   1   holds written, pasted on a notebook, board, written
13:01:05   2   in any format, electronic or otherwise, other than
13:01:08   3   this one, which is the only one that's been produced
13:01:10   4   in this case, Exhibit 118?
13:01:12   5       A   No, I don't believe so.
13:01:15   6       Q   Let's talk about the litigation hold that
13:01:17   7   was instituted then at the beginning of the lawsuit.
13:01:20   8   Tell me exactly what it constituted and what -- who
13:01:24   9   it was communicated to and what they were told to do
13:01:27  10   or not to do.
13:01:29  11       A   This is March or April 2008, correct?
13:01:32  12       Q   March of 2008.
13:01:34  13       A   March of 2008.  This is --
13:01:35  14       Q   Although when did the board decide to vote
13:01:38  15   on instituting the lawsuit?
13:01:40  16       A   I don't remember.  I think --
13:01:40  17       Q   It was January of 2008.  Does that sound
13:01:43  18   right?
13:01:43  19       A   You seem to be better right up on our
13:01:46  20   minutes from three years ago.
13:01:47  21       Q   Okay.  Well, assuming that's the case,
13:01:50  22   when, what, where and exactly what was communicated

Page 125

13:01:53   1   to all staff about this litigation hold that was
13:01:56   2   never written down?
13:01:57   3       A   It is written down.
13:02:00   4       Q   A year and a half later?
13:02:02   5       A   No.  It's written down and it says this is
13:02:04   6   a reminder.
13:02:05   7       Q   Right.  Where is the one that was
13:02:10   8   communicated in January or March of 2008?
13:02:13   9       A   That was communicated orally at a staff
13:02:16  10   meeting.
13:02:16  11       Q   Aha.  So, my question for you was exactly
13:02:20  12   what, when, how, where, specifics to whom?
13:02:23  13       A   I don't recall.
13:02:25  14       Q   Well, how do you expect them to recall in
13:02:28  15   the last year and a half, two years, to comply with
13:02:30  16   the litigation hold if you, the person who is
13:02:33  17   responsible for instituting it and implementing it,
13:02:35  18   can't tell us here today under oath specifically
13:02:38  19   what it entails?
13:02:40  20       A   No, I didn't say that I can't recall what
13:02:42  21   it entails.  You asked me --
13:02:43  22       Q   Okay.  Well, tell us specifically what it

32  (Pages 122 to 125)

Page 126

| | | |
|---|---|---|
| 13:02:44 | 1 | entailed. |
| 13:02:45 | 2 | A   You asked me 15 compounded questions. |
| 13:02:47 | 3 | When, what, where, all of that stuff. |
| 13:02:50 | 4 | I said that I don't recall a number |
| 13:02:53 | 5 | referring to the exact date on which this was |
| 13:02:56 | 6 | communicated the first time. |
| 13:02:57 | 7 | Q   What was communicated to them the first |
| 13:03:00 | 8 | time specifically? |
| 13:03:01 | 9 | A   What was communicated to them the first |
| 13:03:03 | 10 | time that as a result of a lawsuit, we are not |
| 13:03:05 | 11 | permitted to delete any files, any e-mails from the |
| 13:03:10 | 12 | computers, including physical files.  Later on -- |
| 13:03:18 | 13 | Q   And that was it? |
| 13:03:19 | 14 | A   Later on, we learnt to use the word |
| 13:03:25 | 15 | "litigation hold," which is because that's the |
| 13:03:27 | 16 | terminology that our counsel was using. |
| 13:03:29 | 17 | Q   What does that communicate to the average |
| 13:03:32 | 18 | person who is sitting at their computer about what |
| 13:03:35 | 19 | processes to do or not to do other than don't delete |
| 13:03:39 | 20 | files? |
| 13:03:39 | 21 | MR. PISHEVAR:  Objection.  He doesn't know |
| 13:03:41 | 22 | how -- what that communicates to the average person. |

Page 127

| | | |
|---|---|---|
| 13:03:41 | 1 | MR. KAPSHANDY:  Well, that's a real problem |
| 13:03:42 | 2 | since he is a responsible for implementing it, |
| 13:03:43 | 3 | Counsel. |
| 13:03:43 | 4 | MR. PISHEVAR:  But he can say what he said, |
| 13:03:44 | 5 | what he did.  He can't say what other people, how |
| 13:03:44 | 6 | they perceived -- |
| 13:03:46 | 7 | MR. KAPSHANDY:  That's our point exactly. |
| 13:03:48 | 8 | BY MR. KAPSHANDY: |
| 13:03:48 | 9 | Q   So your counsel -- |
| 13:03:48 | 10 | MR. PISHEVAR:  Objection. |
| 13:03:48 | 11 | BY MR. KAPSHANDY: |
| 13:03:49 | 12 | Q   -- makes a good point, Dr. Parsi.  How are |
| 13:03:52 | 13 | other people who maybe don't know what a litigation |
| 13:03:55 | 14 | hold is or have only been given the instruction "do |
| 13:03:57 | 15 | not delete files" to know what to do in terms of |
| 13:04:00 | 16 | what to preserve, what not to do, what not to |
| 13:04:03 | 17 | backup, what not to defragment?  Were any of |
| 13:04:06 | 18 | those concepts discussed? |
| 13:04:06 | 19 | MR. PISHEVAR:  Objection to what other |
| 13:04:07 | 20 | people thought or think.  He's not in a position to |
| 13:04:10 | 21 | say anything about -- |
| 13:04:10 | 22 | THE WITNESS:  First of all -- |

Page 128

| | | |
|---|---|---|
| 13:04:11 | 1 | MR. PISHEVAR:  It's not an appropriate |
| 13:04:12 | 2 | question. |
| 13:04:13 | 3 | THE WITNESS:  -- this is a reminder, and |
| 13:04:16 | 4 | there were numerous reminders at staff meetings, that |
| 13:04:19 | 5 | absolutely no deletion of any files. |
| 13:04:20 | 6 | BY MR. KAPSHANDY: |
| 13:04:20 | 7 | Q   And that's all that was communicated to |
| 13:04:22 | 8 | them? |
| 13:04:22 | 9 | A   Nothing can be thrown away, nothing can be |
| 13:04:25 | 10 | changed because we are in a legal process, and as a |
| 13:04:29 | 11 | result, this is what we have to -- the procedure |
| 13:04:31 | 12 | that we have to follow. |
| 13:04:33 | 13 | Q   Were they instructed to backup all |
| 13:04:36 | 14 | computers, files -- |
| 13:04:40 | 15 | A   We have -- we did purchase a system to be |
| 13:04:46 | 16 | able to backup the shared drive. |
| 13:04:51 | 17 | Q   In December of 2009, correct? |
| 13:04:53 | 18 | A   I don't remember.  No, I think there was |
| 13:04:55 | 19 | something else before.  I don't remember exactly. |
| 13:04:57 | 20 | Q   Okay.  Well, tell me exactly what the |
| 13:04:59 | 21 | backup procedures were for all NIAC files that were |
| 13:05:01 | 22 | subject to the litigation discovery requests and |

Page 129

| | | |
|---|---|---|
| 13:05:06 | 1 | hold. |
| 13:05:06 | 2 | A   I don't recall exactly what they were.  By |
| 13:05:09 | 3 | *not deleting any files*, you have a situation in |
| 13:05:12 | 4 | which that is complying with what -- my |
| 13:05:14 | 5 | understanding of the litigation hold. |
| 13:05:16 | 6 | Q   And how did you have that understanding |
| 13:05:19 | 7 | that complying with the litigation hold simply meant |
| 13:05:23 | 8 | don't delete files, not to worry about not backing |
| 13:05:26 | 9 | up machines? |
| 13:05:27 | 10 | MR. PISHEVAR:  Objection. |
| 13:05:28 | 11 | THE WITNESS:  No, we said keep absolutely |
| 13:05:30 | 12 | everything.  Don't delete anything, and that was |
| 13:05:30 | 13 | communicated to us by our counsel. |
| 13:05:32 | 14 | BY MR. KAPSHANDY: |
| 13:05:32 | 15 | Q   And you didn't implement any backing-up |
| 13:05:35 | 16 | procedures and data preservation procedures? |
| 13:05:37 | 17 | MR. PISHEVAR:  Objection. |
| 13:05:37 | 18 | THE WITNESS:  As I mentioned, we already |
| 13:05:39 | 19 | had to the best of my recollection. |
| 13:05:41 | 20 | BY MR. KAPSHANDY: |
| 13:05:41 | 21 | Q   Okay.  Well, tell us about the backups for |
| 13:05:44 | 22 | the three computers that were lost or stolen from |

33  (Pages 126 to 129)

Page 130

13:05:47 1 NIAC, including Mohmen Sari (phonetic), Babak Talebi
13:05:50 2 and your laptop.
13:05:50 3    A  Well, first of all, Mohmen Sari's computer
13:05:54 4 was his computer.  It was not our computer.  So
13:05:54 5 we're not going to go and backup someone else's
13:05:54 6 computer.
13:05:57 7    Q  He said it was paid for by NIAC's funds.
13:05:59 8 He testified to that under oath.
13:06:00 9    A  It was paid for by NIAC's funds, half of
13:06:00 10 it, I believe and --
13:06:03 11    Q  And he used it with NIAC business with
13:06:05 12 federal government --
13:06:05 13    A  Can I finish?
13:06:06 14    Q  -- and because of that, he didn't need to
13:06:08 15 back it up, you are saying?
13:06:09 16    A  No, I'm not saying that at all.
13:06:11 17    Q  Well, let's talk about your machine.
13:06:13 18    A  No, actually I would like to answer that
13:06:15 19 question if I'm permitted to.
13:06:16 20    Q  Let me rephrase the question.
13:06:18 21       How is it that after this litigation was
13:06:20 22 implemented in 2008 you had a laptop which was not

Page 131

13:06:27 1 and never backed up according to your testimony at
13:06:30 2 the last case?
13:06:31 3    A  Because it was my laptop.  As I explained
13:06:34 4 to you early on, it was a shared drive that was
13:06:37 5 being backed up.  I didn't back up my laptop.
13:06:39 6    Q  So your understanding is that with the
13:06:41 7 document preservation and litigation hold in place
13:06:43 8 and a laptop on which you had discoverable evidence,
13:06:46 9 that you had no obligation to back up that laptop?
13:06:50 10    A  I don't know if I had an obligation or
13:06:52 11 not.  I did not plan for someone to very
13:06:55 12 mysteriously break into my hotel room in Oslo and
13:06:59 13 steal it.
13:07:00 14    Q  Well, backing up machines, even
13:07:02 15 notwithstanding litigation holds, is a common basic
13:07:05 16 computer 101 given the fact that computers break,
13:07:08 17 crash, die, get stolen, et cetera.
13:07:11 18       MR. PISHEVAR: Objection. Next question,
13:07:13 19 please.
13:07:13 20       THE WITNESS: Some people clearly are
13:07:15 21 better at backing up things than others.
13:07:18 22

Page 132

13:07:18 1 BY MR. KAPSHANDY:
13:07:19 2    Q  Let's talk about your meeting notes that
13:07:21 3 are referenced in your book Treacherous Alliance
13:07:24 4 that came out in 2007.
13:07:27 5       Approximately how many meetings,
13:07:29 6 interviews with Iranian government officials do you
13:07:32 7 cite in this book?
13:07:33 8    A  I believe 30 or so.  This is not new
13:07:37 9 material, though, as I understand.
13:07:38 10    Q  The question was simply how many
13:07:40 11 different times do you cite --
13:07:40 12    A  No, but this is not --
13:07:42 13    Q  -- interviews with Iranian officials?
13:07:46 14       MR. PISHEVAR: I am going to object to
13:07:47 15 this.  This is not an appropriate question for this
13:07:49 16 deposition.
13:07:50 17 BY MR. KAPSHANDY:
13:07:50 18    Q  You say it's about 30?
13:07:51 19    A  Did you have my book at the previous
13:07:54 20 deposition?
13:07:54 21    Q  Can you answer the question, please.
13:07:55 22    A  Did you have the book at the previous

Page 133

13:07:57 1 deposition?
13:07:57 2    Q  I'm talking about the litigation hold and
13:07:59 3 the failure to comply with it.
13:08:01 4       And my question for you is, how many
13:08:03 5 interviews --
13:08:03 6    A  This book was written before the
13:08:04 7 litigation hold.
13:08:04 8    Q  Dr. Parsi, try and answer the question or
13:08:06 9 we're going to be here longer than two-and-a-half,
13:08:10 10 three-and-a-half hours.
13:08:11 11    A  This book was written before the
13:08:13 12 litigation hold.
13:08:14 13    Q  That's great.  My question for you is,
13:08:16 14 where did you keep all of the notes -- and there are
13:08:18 15 235 footnotes here that cite meetings with Iranian
13:08:23 16 governmental officials -- how were those
13:08:25 17 memorialized and where did you keep them?
13:08:27 18       MR. PISHEVAR: I'm sorry.  You could have
13:08:29 19 asked this question at the previous deposition.
13:08:29 20 BY MR. KAPSHANDY:
13:08:29 21    Q  Go ahead and answer, please.
13:08:30 22    A  I don't recall.  This is several years

34  (Pages 130 to 133)

## Page 134

13:08:31  1  ago. This is my dissertation. You had that
13:08:34  2  information for the previous deposition.
13:08:35  3      Q  Dr. Parsi, my question is, where did you
13:08:38  4  memorialize those notes from those meetings, the 235
13:08:42  5  footnotes of personal communications with Iranian
13:08:47  6  governmental officials?
13:08:48  7      A  I don't recall. This is -- this is based
13:08:50  8  on my dissertation that was written seven years ago,
13:08:53  9  eight years ago.
13:08:53  10      Q  My question isn't when. My question --
13:08:54  11      MR. PISHEVAR: Let the witness finish --
13:08:55  12      MR. KAPSHANDY: He doesn't want to answer
13:08:58  13  the question.
13:08:58  14      MR. PISHEVAR: I'm sorry, you're going to
13:08:59  15  need to let him talk.
13:08:59  16  BY MR. KAPSHANDY:
13:08:59  17      Q  Mr. Parsi, where did you memorialize
13:09:01  18  these?
13:09:01  19      A  I already -- I already answered your
13:09:02  20  question.
13:09:02  21      Q  You don't remember?
13:09:03  22      A  I don't remember. This is eight years

## Page 135

13:09:04  1  ago.
13:09:04  2      Q  You don't remember if you took notes?
13:09:04  3      A  This is eight years ago.
13:09:05  4      Q  Did you put them on your computer?
13:09:07  5      MR. PISHEVAR: Stop talking over the
13:09:09  6  witness, Mr. Kapshandy.
13:09:09  7  BY MR. KAPSHANDY:
13:09:09  8      Q  You don't remember if you wrote them down?
13:09:12  9      A  Sir, this is eight years ago, and this
13:09:14  10  means that it was probably on a computer that was
13:09:16  11  different from my laptop.
13:09:16  12      Q  And when you got rid of that computer,
13:09:18  13  these meeting notes of these 235 interviews weren't
13:09:22  14  of any value, so when you got rid of that computer
13:09:23  15  you didn't keep them.
13:09:23  16      A  I don't recall what the process was at the
13:09:25  17  time.
13:09:25  18      Q  In the calendar entries, there's a --
13:09:34  19      A  Which you also had access to in the
13:09:36  20  previous deposition.
13:09:37  21      Q  There is no question pending.
13:09:38  22      In the calendar entries, Dr. Parsi,

## Page 136

13:09:40  1  there's a reference under Kevin Cowl for October 28,
13:09:44  2  2009, to "shared drive cleanup."
13:09:46  3      My question for you is, didn't NIAC
13:09:50  4  institute a suspense on any cleanups, defragmenting
13:09:54  5  of any and all hard drives, computers, CPUs,
13:09:58  6  whatever you want to call them?
13:09:58  7      A  There's nothing that is being deleted.
13:10:03  8      Q  That wasn't the question. This isn't real
13:10:05  9  hard, Dr. Parsi.
13:10:06  10      As part of your litigation hold, did NIAC
13:10:09  11  implement a cessation of any disk cleaning up or
13:10:13  12  defragmenting?
13:10:13  13      MR. PISHEVAR: This is asked and answered,
13:10:15  14  I believe, in the previous deposition.
13:10:16  15      THE WITNESS: No one has done any
13:10:19  16  defragmentation, and what is referred to as cleanup,
13:10:21  17  I assume is that it was reorganized to be better --
13:10:24  18  better searchable. Nothing, to the best of my
13:10:27  19  knowledge, has been deleted because everyone in the
13:10:29  20  office knows that nothing can be deleted because of
13:10:32  21  the lawsuit.
13:10:33  22

## Page 137

13:10:33  1  BY MR. KAPSHANDY:
13:10:34  2      Q  So the answer is they did not cease
13:10:38  3  defragmenting --
13:10:38  4      A  I do not --
13:10:40  5      Q  -- or disk cleanup?
13:10:41  6      A  I do not believe anyone has done any
13:10:46  7  defragmentation. In fact, I don't think there's
13:10:49  8  many people in our office that even know what
13:10:50  9  fragmentation or defragmentation is.
13:10:50  10      Q  Well, you know many machines do it
13:10:52  11  automatically on a periodic basis.
13:10:55  12      MR. PISHEVAR: Objection.
13:10:55  13  BY MR. KAPSHANDY:
13:10:56  14      Q  And you didn't as part of your litigation
13:10:58  15  hold instruct people to suspend any such activities?
13:11:02  16      A  I don't believe that any of our computers
13:11:05  17  are defragmenting themselves, no.
13:11:21  18      Q  Tell us about something we asked at the
13:11:24  19  previous deposition that you were going to get back
13:11:25  20  to us on, and that is what became of the computer,
13:11:27  21  the desktop that you were using in 2008.
13:11:30  22      A  You have to refresh my memory on this.

35 (Pages 134 to 137)

Page 138

| | | |
|---|---|---|
| 13:11:35 | 1 | Q  Well, sure.  In response to our |
| 13:11:36 | 2 | interrogatories about the computer that was produced |
| 13:11:39 | 3 | as part of the imaging as Trita Parsi's computer, |
| 13:11:45 | 4 | and which wasn't connected to the NIAC network in |
| 13:11:51 | 5 | December of 2009 when Progressive Office did their |
| 13:11:54 | 6 | survey, we sent interrogatories to the plaintiffs, |
| 13:12:00 | 7 | which you, Trita Parsi, signed under oath, asking |
| 13:12:04 | 8 | what computer Trita Parsi used since the beginning |
| 13:12:08 | 9 | of this lawsuit in early 2008 and what became of it. |
| 13:12:13 | 10 | A  First of all, there's a couple of errors |
| 13:12:15 | 11 | in your questions. |
| 13:12:16 | 12 | Q  Please correct me. |
| 13:12:17 | 13 | A  Yes.  To the best of my understanding, |
| 13:12:20 | 14 | Progressive was never asked to do a survey of our |
| 13:12:23 | 15 | computers. |
| 13:12:23 | 16 | Q  That's not the question. |
| 13:12:24 | 17 | A  No, no, no, no. |
| 13:12:26 | 18 | Q  My question is -- |
| 13:12:26 | 19 | MR. PISHEVAR:  Let the witness finish his |
| 13:12:27 | 20 | statement.  Mr. Parsi -- Dr. Parsi, please proceed. |
| 13:12:31 | 21 | MR. KAPSHANDY:  Question withdrawn. |
| 13:12:31 | 22 | |

Page 139

| | | |
|---|---|---|
| 13:12:31 | 1 | BY MR. KAPSHANDY: |
| 13:12:32 | 2 | Q  What became of the computer you were using |
| 13:12:34 | 3 | in 2008? |
| 13:12:35 | 4 | A  What time in 2008? |
| 13:12:38 | 5 | Q  It starts with a month called January and |
| 13:12:40 | 6 | ends with one called December. |
| 13:12:42 | 7 | A  Was it only one computer that I was using |
| 13:12:45 | 8 | at that time? |
| 13:12:45 | 9 | Q  Well, let me ask this:  In your |
| 13:12:47 | 10 | interrogatory answers, you stated that the computer |
| 13:12:50 | 11 | that was produced for the imaging was one that you |
| 13:12:52 | 12 | had used since the beginning of roughly 2009. |
| 13:12:56 | 13 | So the question is, what became of the |
| 13:12:57 | 14 | computer that you were using all of 2008, during |
| 13:13:00 | 15 | which time there was a litigation hold and a lawsuit |
| 13:13:04 | 16 | pending? |
| 13:13:04 | 17 | A  My laptop.  That's my best understanding. |
| 13:13:07 | 18 | Q  That was the only computer that you used |
| 13:13:09 | 19 | and it wasn't being backed up and it was stolen? |
| 13:13:12 | 20 | MR. PISHEVAR:  Asked and answered. |
| 13:13:13 | 21 | THE WITNESS:  That's my best understanding, |
| 13:13:16 | 22 | yes. |

Page 140

| | | |
|---|---|---|
| 13:13:16 | 1 | BY MR. KAPSHANDY: |
| 13:13:39 | 2 | Q  Let me now turn your attention to the |
| 13:13:42 | 3 | Pugwash documents. |
| 13:13:43 | 4 | MR. KAPSHANDY:  Can we go off the record |
| 13:13:45 | 5 | just a second. |
| 13:13:45 | 6 | THE VIDEOGRAPHER:  Sure.  The time is |
| 13:13:45 | 7 | 1:13 p.m.  We're going off the record. |
| 13:15:25 | 8 | (Pause in the proceedings.) |
| 13:15:25 | 9 | THE VIDEOGRAPHER:  The time is 1:15 p.m. |
| 13:15:31 | 10 | We're back on the record. |
| 13:15:32 | 11 | BY MR. KAPSHANDY: |
| 13:15:33 | 12 | Q  Ready, Dr. Parsi? |
| 13:15:35 | 13 | A  Mm-hmm. |
| 13:15:35 | 14 | Q  Let me hand you what we will mark as your |
| 13:15:38 | 15 | deposition Exhibit 119.  There's a copy for your |
| 13:15:41 | 16 | counsel. |
| 14:10:28 | 17 | (Exhibit No. 119 was marked for |
| 14:10:28 | 18 | identification.) |
| 14:10:28 | 19 | BY MR. KAPSHANDY: |
| 13:15:42 | 20 | Q  Which, for the record, is a series of, I |
| 13:15:45 | 21 | believe, four documents produced pursuant to a |
| 13:15:48 | 22 | subpoena to Pugwash, with a transmittal letter from |

Page 141

| | | |
|---|---|---|
| 13:15:55 | 1 | counsel to Pugwash.  And it relates to two Pugwash |
| 13:16:05 | 2 | meetings in 2008:  The first on August 2nd and 3rd |
| 13:16:19 | 3 | at The Hague in the Netherlands and the other being |
| 13:16:22 | 4 | December 6-7 in Vienna, both of which you attended, |
| 13:16:27 | 5 | I believe. |
| 13:16:32 | 6 | A  I think so. |
| 13:16:39 | 7 | Q  Now, my first question is -- I take it |
| 13:16:49 | 8 | these minutes and these proceedings were provided to |
| 13:16:52 | 9 | you after the meetings. |
| 13:16:54 | 10 | A  No. |
| 13:16:54 | 11 | Q  You've never seen them before? |
| 13:16:56 | 12 | A  I've never seen this before.  Can I keep |
| 13:16:59 | 13 | this? |
| 13:17:00 | 14 | Q  Sure.  Let's go off the record and take |
| 13:17:01 | 15 | your time. |
| 13:17:01 | 16 | THE VIDEOGRAPHER:  The time is -- |
| 13:17:03 | 17 | THE WITNESS:  No, no.  I just want to make |
| 13:17:04 | 18 | sure I can keep this afterwards. |
| 13:17:07 | 19 | MR. KAPSHANDY:  Pardon? |
| 13:17:08 | 20 | THE WITNESS:  That I can keep this |
| 13:17:09 | 21 | afterwards. |
| 13:17:10 | 22 | MR. KAPSHANDY:  Yes, I provided a copy to |

36  (Pages 138 to 141)

Page 142

| | | |
|---|---|---|
| 13:17:11 | 1 | your counsel. |
| 13:17:11 | 2 | THE WITNESS: Oh, okay. |
| 13:17:12 | 3 | MR. KAPSHANDY: That's fine. |
| 13:17:17 | 4 | THE VIDEOGRAPHER: Do you still want to go |
| 13:17:19 | 5 | off the record, Counsel? |
| 13:17:20 | 6 | THE WITNESS: No. |
| 13:17:20 | 7 | BY MR. KAPSHANDY: |
| 13:17:21 | 8 | Q   So you've never seen these before? |
| 13:17:23 | 9 | A   This one I have not seen. |
| 13:17:26 | 10 | Q   Let me hand you what we marked as your |
| 13:17:30 | 11 | deposition Exhibit 120, which is a NIAC invoice |
| 13:17:35 | 12 | expense report, again produced by Pugwash, from |
| 13:17:41 | 13 | approximately July of 2008 relating to the |
| 13:17:47 | 14 | August 2008 Pugwash meeting. |
| 14:10:28 | 15 | (Exhibit No. 120 was marked for |
| 14:10:28 | 16 | identification.) |
| 14:10:28 | 17 | BY MR. KAPSHANDY: |
| 13:17:51 | 18 | Q   Have you ever seen this before? |
| 13:17:53 | 19 | A   Yeah. |
| 13:17:55 | 20 | Q   Why wasn't it produced? |
| 13:17:57 | 21 | A   This? |
| 13:17:58 | 22 | Q   Right. |

Page 143

| | | |
|---|---|---|
| 13:18:02 | 1 | A   It's a flight receipt. |
| 13:18:06 | 2 | Q   Pardon? |
| 13:18:07 | 3 | A   It's a flight receipt. |
| 13:18:09 | 4 | Q   It's not a document relating to your |
| 13:18:11 | 5 | meeting in The Hague with Iranian governmental |
| 13:18:15 | 6 | officials?  I mean it's reimbursement for your |
| 13:18:21 | 7 | flight to that meeting, which we discussed the last |
| 13:18:23 | 8 | time was attended by several Iranian governmental |
| 13:18:28 | 9 | officials, correct? |
| 13:18:29 | 10 | A   It's a flight receipt. |
| 13:18:31 | 11 | Q   I understand that.  My question, |
| 13:18:32 | 12 | Dr. Parsi, is why wasn't it produced in response to |
| 13:18:35 | 13 | all documents relating to your meetings with Iranian |
| 13:18:35 | 14 | governmental officials? |
| 13:18:36 | 15 | A   This is not my meeting with the |
| 13:18:38 | 16 | government-related officials.  I'm invited to a |
| 13:18:40 | 17 | session. |
| 13:18:41 | 18 | Q   Oh, so that's not a meeting.  There happen |
| 13:18:44 | 19 | to be five Iranian governmental officials -- |
| 13:18:45 | 20 | A   No, I just want to correct the |
| 13:18:47 | 21 | terminology.  I didn't fly there to meet anyone in |
| 13:18:49 | 22 | particular. |

Page 144

| | | |
|---|---|---|
| 13:18:50 | 1 | Q   They just happened to be there and you |
| 13:18:54 | 2 | were talking about Iran-U.S. relations and you |
| 13:18:57 | 3 | didn't think that was relevant to this lawsuit? |
| 13:18:58 | 4 | A   No, I'm just saying that part of the |
| 13:19:00 | 5 | reason why -- you know, just looking at this and |
| 13:19:02 | 6 | immediately seeing there is an expense report |
| 13:19:06 | 7 | probably didn't seem relevant. |
| 13:19:08 | 8 | Q   Did you have anything to do with setting |
| 13:19:10 | 9 | up these meetings? |
| 13:19:11 | 10 | A   These meetings were set up by Pugwash. |
| 13:19:13 | 11 | Are there any codes -- |
| 13:19:13 | 12 | Q   Dr. Parsi, the question was real simple. |
| 13:19:15 | 13 | Did you, Trita Parsi, have any involvement in the |
| 13:19:18 | 14 | setting up of these meetings? |
| 13:19:19 | 15 | A   No.  These meetings are set up by Pugwash. |
| 13:19:22 | 16 | I was asked, however, for suggestions of people who |
| 13:19:29 | 17 | could attend from the U.S. side.  I do recall that. |
| 13:19:35 | 18 | Q   For which meeting, both of them? |
| 13:19:37 | 19 | A   Are you sure I was at this meeting?  I'm |
| 13:19:39 | 20 | not seeing any quotes.  I mean did I say anything at |
| 13:19:43 | 21 | this meeting? |
| 13:19:43 | 22 | Q   You don't remember without looking at the |

Page 145

| | | |
|---|---|---|
| 13:19:46 | 1 | document? |
| 13:19:47 | 2 | A   I've been to too many -- to plenty of |
| 13:19:49 | 3 | meetings, but I'm not seeing a single reference to |
| 13:19:52 | 4 | me.  I know they were having meetings in which I was |
| 13:19:57 | 5 | not involved in as well, so that's why I'm asking. |
| 13:20:01 | 6 | Q   Well, first of all, let's stick with the |
| 13:20:03 | 7 | August 2008 meeting.  According to these minutes, it |
| 13:20:07 | 8 | was attended by five Iranian governmental officials, |
| 13:20:11 | 9 | a couple of which we talked about before: |
| 13:20:11 | 10 | Ambassador Samareh, also Ambassador Ziaran, |
| 13:20:17 | 11 | Dr. Mostafa Dolatyar, and Mr. Javed Hassanpour.  Do |
| 13:20:26 | 12 | you see that? |
| 13:20:27 | 13 | A   Mm-hmm. |
| 13:20:32 | 14 | Q   Now, if you turn to page 18 of that |
| 13:20:36 | 15 | document, which appears to be fairly detailed |
| 13:20:39 | 16 | summaries of various people's presentation, there is |
| 13:20:44 | 17 | a reference to you.  Do you see that? |
| 13:20:48 | 18 | A   Mm-hmm. |
| 13:20:48 | 19 | Q   Parsi. |
| 13:20:49 | 20 | A   There is a reference, yeah. |
| 13:20:52 | 21 | Q   "Regarding serious proposal by |
| 13:20:55 | 22 | administration to set up interest section in Iran. |

37 (Pages 142 to 145)

## Page 146

13:20:58  1   This is not opposed by anyone noteworthy in the U.S.
13:20:59  2   I understand it was not made through proper
13:21:02  3   channels. Is there a response? A time frame?"
13:21:05  4       Did I read that correctly?
13:21:05  5   A   Correct.
13:21:05  6   Q   Do you recall saying anything like "this
13:21:07  7   is not opposed by anyone noteworthy in the U.S."?
13:21:13  8   A   No.
13:21:13  9   Q   You don't recall saying that?
13:21:14  10  A   I don't recall saying that.
13:21:16  11  Q   Let me ask this: Did anybody from the
13:21:17  12  United States government, Executive Branch or
13:21:20  13  Legislative Branch, authorize you to make a
13:21:24  14  statement that an interest section in Tehran is not
13:21:28  15  opposed by anybody noteworthy in the U.S.?
13:21:31  16  A   As I said, I don't recall having said
13:21:33  17  that.
13:21:33  18  Q   Well, do you deny saying it?
13:21:34  19  A   I'm not denying saying it. I'm just
13:21:37  20  saying I'm not recalling saying that.
13:21:38  21  Q   So it's possible you may have said that?
13:21:40  22  A   I don't recall. I recall asking a

## Page 147

13:21:43  1   question: What happened with the proposal to set up
13:21:48  2   a meeting -- an interest section in Iran? What has
13:21:51  3   the Iranian response been to that question?
13:21:56  4   Q   Well, my question has to do with, did you
13:21:59  5   make a representation such as "this is not opposed
13:22:02  6   by anyone noteworthy in the U.S."?
13:22:05  7   A   And I'm saying I don't recall if I have
13:22:07  8   said that.
13:22:07  9   Q   Could you have said anything like that?
13:22:09  10  A   I frankly doubt that I would say something
13:22:12  11  like this because this was a heated -- this was a
13:22:15  12  heated issue.
13:22:15  13  Q   Well, now that you've seen this, do you
13:22:19  14  perhaps want to write Dr. Paolo and tell him that he
13:22:24  15  misrepresented what you said there?
13:22:25  16      MR. PISHEVAR: Objection.
13:22:26  17      THE WITNESS: Again, I never -- I've never
13:22:26  18  seen this document before.
13:22:27  19  BY MR. KAPSHANDY:
13:22:27  20  Q   Well, now that you have, my question is,
13:22:28  21  do you plan to tell him that needs to be corrected,
13:22:30  22  you didn't make that representation?

## Page 148

13:22:31  1   A   As I explained to you, I said that I find
13:22:33  2   it unlikely that I would say that because I do
13:22:35  3   remember that this was a heated issue. If I'm not
13:22:38  4   mistaken, this is at the time in which the Bush
13:22:41  5   administration came out in favor of it, but McCain
13:22:44  6   was against it.
13:22:44  7   Q   So if you said it, it wouldn't have been
13:22:49  8   correct, McCain apparently or somebody fairly
13:22:49  9   serious if --
13:22:51  10  A   Well, I may have taken down the notes
13:22:53  11  incorrectly. But, again, I don't recall exactly.
13:22:56  12  Q   Let's move on. Turn to the next one,
13:22:58  13  December 2008 meeting.
13:23:00  14  A   Where is that? Is it the same?
13:23:03  15  Q   It's all part of the same composite
13:23:06  16  document towards the back. It's the last --
13:23:06  17      MR. PISHEVAR: Do you have the page
13:23:08  18  numbers?
13:23:08  19      MR. KAPSHANDY: There is one that's pages 1
13:23:13  20  through 2. It's the third document.
13:23:13  21  BY MR. KAPSHANDY:
13:23:14  22  Q   "Pugwash Consultation on Iran's

## Page 149

13:23:16  1   Relationship With the West." And then the last
13:23:19  2   document is actually more detailed.
13:23:21  3   A   What is the page number you want me to
13:23:23  4   turn to?
13:23:25  5   Q   Two-page document that follows the
13:23:33  6   December meeting. It's the first one on the
13:23:33  7   December meeting. Do you see that?
13:23:33  8   A   Mm-hmm.
13:23:37  9   Q   And my question for you is, they don't
13:23:39  10  list the Iranian participants at this meeting, but
13:23:42  11  we know from your prior testimony that they were
13:23:46  12  there.
13:23:46  13      Who do you recall being at this meeting
13:23:48  14  from Iran?
13:23:49  15  A   Hold on. What meeting is this? Vienna.
13:24:13  16  If it was in Vienna -- your question is who was
13:24:24  17  there from the Iranian side?
13:24:27  18  Q   Right.
13:24:28  19  A   I would assume that it would have been
13:24:32  20  Soltanieh, yeah.
13:24:34  21  Q   And perhaps Samareh --
13:24:36  22  A   Samareh, yeah.

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 150

13:24:37  1      Q   If you look at the next document, there
13:24:40  2   are purported statements from them.
13:24:42  3      A   This -- which document is that?
13:24:43  4      Q   The ones you have right there.  It's a
13:24:46  5   seven-page more detailed summary of the remarks.
13:24:51  6      A   Yeah, this is more of a summary form.
13:24:53  7      Q   But you see in there that Soltanieh and
13:24:58  8   Samareh both made remarks, correct?
13:24:59  9      A   Oh, they did.
13:25:00  10     Q   Do you recall if there were any other
13:25:02  11  Iranian governmental officials there besides those
13:25:06  12  two?
13:25:06  13     A   I don't recall his name, but I do believe
13:25:09  14  that that guy popped off.  I don't know if he was
13:25:13  15  there throughout the session.  He's Iran's
13:25:19  16  ambassador to Austria, I think.
13:25:20  17     Q   To who, to where?
13:25:22  18     A   To Austria.  I think he was at this
13:25:24  19  meeting.
13:25:24  20     Q   Okay.  Well, if you look --
13:25:25  21     A   I don't know if he was there all the time,
13:25:26  22  so...

Page 151

13:25:26  1      Q   Well, if you look at the last document, on
13:25:29  2   page 1, the first large paragraph, Professor Paolo
13:25:38  3   Ramusini states:  Finally, we would like to thank in
13:25:42  4   particular Ambassador Ali Reza Ziaran, former
13:25:47  5   Iranian ambassador to The Hague, and now with the
13:25:48  6   CTBTO; Dr. Clifford Kupchan, Eurasia Group; and
13:25:54  7   Mr. Trita Parsi, National Iranian American Council,
13:25:56  8   for the valuable contributions given to the
13:25:58  9   organization of the meeting, and Ms. Sandra Ionno
13:26:05  10  Butcher, Pugwash office in London, for keeping
13:26:05  11  track of the most salient points discussed in the
13:26:05  12  meeting.
13:26:07  13          Did I read that correctly?
13:26:08  14     A   Yes, you did.
13:26:10  15     Q   Now, what were your contributions to the
13:26:12  16  organization of the meeting that Dr. Paolo Ramusini
13:26:16  17  was thanking you for?
13:26:18  18     A   If I recall it correctly, what this is,
13:26:23  19  is Paolo reached out to both me and Cliff Kupchan to
13:26:28  20  ask us what we thought would be important issues to
13:26:31  21  bring up at the meeting, people that would be
13:26:36  22  valuable to have there, et cetera, et cetera.

Page 152

13:26:38  1      Q   How did you have those communications?
13:26:40  2      A   Mostly by phone, I believe.
13:26:43  3      Q   You had no e-mails with Pugwash or
13:26:47  4   Dr. Ramusini in setting up or going to or
13:26:51  5   participating in any of these Pugwash meetings?
13:26:53  6      A   I don't recall if there was or if there
13:26:56  7   wasn't.  But I do -- Paolo is a phone guy.  He likes
13:27:02  8   to make phone calls.
13:27:03  9      Q   I mean it must be pretty hard to set up
13:27:05  10  all these meetings without any e-mail --
13:27:06  11     A   I didn't set up those meetings.
13:27:08  12     Q   -- without any logistics, the details?
13:27:10  13     A   I didn't set up those meetings.
13:27:11  14     Q   How do you know where to show up and when?
13:27:11  15  They just call you on the phone and say be there
13:27:14  16  without an e-mail?
13:27:16  17     A   No.
13:27:16  18     Q   There's no invitations, no written
13:27:18  19  communications to you to get you there?
13:27:19  20     A   There's invitations.
13:27:22  21     Q   Well, how is it that none of those have
13:27:24  22  been produced by NIAC in this case?

Page 153

13:27:26  1      A   That I'm not sure of.
13:27:27  2      Q   Okay.  Look into that -- let me ask you --
13:27:29  3      A   I mean this -- this material I've never
13:27:30  4   seen.
13:27:30  5      Q   We don't have a whole lot of time here,
13:27:31  6   Dr. Parsi.  Could you please look into and
13:27:33  7   double-check all of your discovery servers and CPUs
13:27:37  8   and see if you have any Pugwash communications with
13:27:42  9   regard to the setting up of these Track II meetings.
13:27:46  10     A   Yeah, I can tell you I've never seen these
13:27:49  11  documents before.
13:27:50  12     Q   That wasn't my question.  My question is,
13:27:52  13  since you believe that you had some sort of written
13:27:55  14  invitation, you would expect that you just don't
13:27:57  15  show up at a hotel in Vienna without knowing where
13:28:01  16  and when and how to get there, correct?  Yet none of
13:28:04  17  those have been produced by NIAC in this case.
13:28:23  18          Let me hand you what has been marked as
13:28:25  19  your deposition Exhibit 121.
13:28:22  20          (Exhibit No. 121 was marked for
13:28:22  21          identification.)
13:28:22  22

39  (Pages 150 to 153)

Page 154

| | | |
|---|---|---|
| 13:28:22 | 1 | BY MR. KAPSHANDY: |
| 13:28:54 | 2 | Q   Dr. Parsi, let me hand you what we'll mark |
| 13:28:56 | 3 | as your deposition Exhibit No. 121, which is a |
| 13:29:05 | 4 | December 26th, 2007 memo from you to Alex Patico |
| 13:29:12 | 5 | regarding names for the retreat. |
| 13:29:15 | 6 | Have you seen this before? |
| 13:29:18 | 7 | A   I -- I don't recall seeing this.  It's |
| 13:29:24 | 8 | four or five years ago, but -- |
| 13:29:26 | 9 | Q   Well, it's from a Trita Parsi e-mail that |
| 13:29:30 | 10 | you used to Alex Patico -- |
| 13:29:30 | 11 | A   Mm-hmm. |
| 13:29:32 | 12 | Q   -- who we deposed in this case, correct? |
| 13:29:36 | 13 | A   Mm-hmm. |
| 13:29:36 | 14 | Q   Now, in response to some previous e-mails |
| 13:29:40 | 15 | from Alex about this retreat, he asks you who should |
| 13:29:55 | 16 | be recommended for inclusion in the retreat that |
| 13:29:58 | 17 | Sanam is putting together.  Do you see that? |
| 13:30:01 | 18 | A   Mm-hmm. |
| 13:30:02 | 19 | Q   Who is Sanam? |
| 13:30:04 | 20 | A   I don't know who is he -- who he is |
| 13:30:06 | 21 | referring to.  Can I read this? |
| 13:30:06 | 22 | (Witness peruses document.) |

Page 155

| | | |
|---|---|---|
| 13:30:45 | 1 | Q   Did you get a chance to read it?  Who is |
| 13:30:49 | 2 | Sanam? |
| 13:30:49 | 3 | A   I don't know who Sanam is that he is |
| 13:30:51 | 4 | referring to.  We have not had any person work at |
| 13:30:54 | 5 | NIAC named Sanam, to the best of my knowledge, and I |
| 13:30:58 | 6 | don't think this is a reference to a NIAC conference |
| 13:31:00 | 7 | or event or anything like that.  This is |
| 13:31:01 | 8 | something -- |
| 13:31:01 | 9 | Q   No, I'm not asking is it a NIAC |
| 13:31:03 | 10 | conference. |
| 13:31:03 | 11 | A   No, I'm just explaining -- |
| 13:31:03 | 12 | Q   I'm asking you what is -- |
| 13:31:04 | 13 | A   -- to you why this is new to me in the |
| 13:31:06 | 14 | sense that this is -- |
| 13:31:06 | 15 | Q   The retreat that Alex is talking about |
| 13:31:10 | 16 | putting together or Sanam is putting together, and |
| 13:31:13 | 17 | he's asking you as to who you believe would be |
| 13:31:15 | 18 | appropriate.  You have no idea what retreat he's |
| 13:31:19 | 19 | talking about? |
| 13:31:20 | 20 | A   This is something that Alex was putting |
| 13:31:22 | 21 | together.  It had nothing to do with NIAC.  He's |
| 13:31:25 | 22 | asking for -- |

Page 156

| | | |
|---|---|---|
| 13:31:25 | 1 | Q   That wasn't my question, Dr. Parsi. |
| 13:31:25 | 2 | A   No, but that's part of -- |
| 13:31:26 | 3 | Q   My question is, do you have any idea what |
| 13:31:29 | 4 | he's talking about, because you got back to him? |
| 13:31:31 | 5 | A   Yeah, I got back to him, but I'm -- |
| 13:31:32 | 6 | Q   Well, let me quote for the record.  When |
| 13:31:34 | 7 | he asked you who else from the Iranian community, |
| 13:31:37 | 8 | you answered:  "No one that I can think of that is |
| 13:31:40 | 9 | acceptable to NIAC and to Tehran." |
| 13:31:42 | 10 | Very first line, do you see that? |
| 13:31:43 | 11 | A   Mm-hmm. |
| 13:31:44 | 12 | Q   You obviously knew what he was talking |
| 13:31:45 | 13 | about enough to answer that -- |
| 13:31:45 | 14 | A   Yeah, four years ago.  Yeah, four years |
| 13:31:47 | 15 | ago I knew exactly what he was talking about. |
| 13:31:49 | 16 | Q   And how is it that you knew what would be |
| 13:31:52 | 17 | acceptable to Tehran back in 2007? |
| 13:31:56 | 18 | A   Because I'm looking at what he's trying to |
| 13:31:58 | 19 | do, and he's trying to organize something in which |
| 13:32:00 | 20 | he can get people from all different sides to come |
| 13:32:04 | 21 | together.  And I assume that is the context of what |
| 13:32:08 | 22 | he's trying to do.  Did you ask Alex Patico about |

Page 157

| | | |
|---|---|---|
| 13:32:12 | 1 | this? |
| 13:32:12 | 2 | Q   Don't worry about how I conduct my |
| 13:32:14 | 3 | depositions, Dr. Parsi. |
| 13:32:18 | 4 | My question for you is, when you said you |
| 13:32:18 | 5 | can't think of anyone who is acceptable to Tehran, |
| 13:32:21 | 6 | the question is, how is it that you would know what |
| 13:32:24 | 7 | is acceptable to Tehran? |
| 13:32:25 | 8 | A   Let me remind you, I have a Ph.D. in |
| 13:32:29 | 9 | international relations, I work on Iranian foreign |
| 13:32:33 | 10 | policy, and I do have somewhat of a sense of what |
| 13:32:37 | 11 | kind of things the Iranians are thinking about, et |
| 13:32:41 | 12 | cetera, as I do when it comes to the Israelis |
| 13:32:44 | 13 | because I worked on the Israeli file as well. |
| 13:32:47 | 14 | That's probably why Alex is asking me.  He's doing |
| 13:32:51 | 15 | something he wants to bring people from all sides |
| 13:32:52 | 16 | together. |
| 13:32:52 | 17 | Q   Let's talk about the Pugwash meetings some |
| 13:32:55 | 18 | more, okay? |
| 13:32:55 | 19 | A   Mm-hmm. |
| 13:32:56 | 20 | Q   Did you tell NIAC members or board members |
| 13:32:59 | 21 | about your meetings with Iranian governmental |
| 13:33:02 | 22 | officials as either part of Pugwash or separate from |

40  (Pages 154 to 157)

| | | Page 158 |
|---|---|---|
| 13:33:05 | 1 | that including, Ambassador Zarief (phonetic), |
| 13:33:12 | 2 | Ambassador Khazaei? |
| 13:33:14 | 3 | A   The Pugwash meetings I believe most people |
| 13:33:17 | 4 | knew about, yes.  But there's also a certain thing, |
| 13:33:21 | 5 | you know, these Pugwash meetings -- the instruction |
| 13:33:23 | 6 | from Pugwash itself is that they try to, for the |
| 13:33:26 | 7 | sake of making sure that they can continue with the |
| 13:33:30 | 8 | track, to keep it as discreet as possible. |
| 13:33:36 | 9 | Q   Let me ask this:  When you go to these |
| 13:33:38 | 10 | Track II and Pugwash meetings, who are you |
| 13:33:40 | 11 | representing? |
| 13:33:41 | 12 | A   I'm representing myself and to a certain |
| 13:33:45 | 13 | extent also NIAC. |
| 13:33:46 | 14 | Q   Well, I was going to ask you, at -- in the |
| 13:33:49 | 15 | minutes, at least, you're always referred to as |
| 13:33:52 | 16 | president and founder of NIAC. |
| 13:33:53 | 17 | A   Because I am the president and founder of |
| 13:33:56 | 18 | NIAC. |
| 13:33:56 | 19 | Q   So are you representing NIAC when you are |
| 13:33:58 | 20 | at these meetings? |
| 13:33:59 | 21 | A   That's not a question that they've asked |
| 13:34:01 | 22 | me what capacity I want to be there or not.  I'm the |

| | | Page 159 |
|---|---|---|
| 13:34:04 | 1 | president of NIAC; they invite me -- they primarily |
| 13:34:07 | 2 | invite me because of my expertise on these issues. |
| 13:34:10 | 3 | Q   My question is, have you ever told NIAC in |
| 13:34:12 | 4 | writing that you are meeting with Iranian |
| 13:34:17 | 5 | governmental officials at these meetings? |
| 13:34:19 | 6 | A   I have had conversation with both staff as |
| 13:34:22 | 7 | well as board members reporting back to them -- |
| 13:34:26 | 8 | Q   My question -- |
| 13:34:26 | 9 | A   -- on some of these activities. |
| 13:34:28 | 10 | Q   My question, Dr. Parsi, is in writing have |
| 13:34:30 | 11 | you ever reported -- |
| 13:34:30 | 12 | A   I don't believe this would be -- |
| 13:34:31 | 13 | Q   Can I finish the question, please. |
| 13:34:33 | 14 |      In writing have you ever reported back to |
| 13:34:35 | 15 | NIAC board members that you are meeting with Iranian |
| 13:34:39 | 16 | governmental officials, who they were and what you |
| 13:34:42 | 17 | were discussing? |
| 13:34:42 | 18 | A   In writing, I don't believe that takes |
| 13:34:44 | 19 | place, and if you take a look at our communication, |
| 13:34:47 | 20 | most of our communication is through telephone |
| 13:34:49 | 21 | conferences.  Not in writing.  I don't write about |
| 13:34:53 | 22 | this stuff. |

| | | Page 160 |
|---|---|---|
| 13:34:53 | 1 | Q   I mean if you are representing the |
| 13:34:55 | 2 | Iranian-American community and participating in |
| 13:34:58 | 3 | civic affairs, wouldn't you want them to know what |
| 13:35:00 | 4 | you're doing -- |
| 13:35:00 | 5 | A   No, and you are completely |
| 13:35:01 | 6 | mischaracterizing the entire purpose of these |
| 13:35:03 | 7 | meetings.  First of all, this is a Track II meeting |
| 13:35:06 | 8 | organized by an organization that is a Nobel peace |
| 13:35:09 | 9 | prize winner trying to resolve problems.  I'm not |
| 13:35:13 | 10 | representing the Iranian-American community there. |
| 13:35:13 | 11 | In fact, if you take a look at this, I'm hardly |
| 13:35:18 | 12 | saying anything.  I'm trying to find, you know, what |
| 13:35:19 | 13 | are the reference of me saying anything.  I'm there |
| 13:35:23 | 14 | because Paolo Cotta-Ramusini really appreciates the |
| 13:35:27 | 15 | feedback and the ideas that I give him. |
| 13:35:29 | 16 | Q   Don't you think it would enhance your |
| 13:35:31 | 17 | reputation in the Iranian-American community for |
| 13:35:33 | 18 | them to know all this hard work that you are doing |
| 13:35:35 | 19 | in meeting with these Iranian governmental officials |
| 13:35:40 | 20 | from 2006, 2007, 2008, 2009? |
| 13:35:43 | 21 | A   You are acting as if this is somewhat |
| 13:35:45 | 22 | secret.  Anyone who actually reads, which apparently |

| | | Page 161 |
|---|---|---|
| 13:35:47 | 1 | doesn't include everyone, can go back and see that |
| 13:35:50 | 2 | in the footnotes of my book as well as in the text |
| 13:35:53 | 3 | of my book I explain very clearly that I have had |
| 13:35:56 | 4 | numerous conversations with these people in the |
| 13:35:58 | 5 | course of the work that I write. |
| 13:35:59 | 6 | Q   My question, Dr. Parsi, is if you are |
| 13:36:01 | 7 | doing such great work for the Iranian-American |
| 13:36:04 | 8 | community at these meetings in meeting with these |
| 13:36:05 | 9 | Iranian governmental officials -- |
| 13:36:05 | 10 | A   That's not what I said. |
| 13:36:06 | 11 | Q   -- wouldn't it be important for them to |
| 13:36:09 | 12 | know what a great job you are doing?  Wouldn't it |
| 13:36:11 | 13 | enhance your reputation in the Iranian-American |
| 13:36:14 | 14 | community for them to know what communications you |
| 13:36:17 | 15 | are having with these Iranian governmental |
| 13:36:20 | 16 | officials? |
| 13:36:20 | 17 | A   My work is to make sure that we get |
| 13:36:23 | 18 | results.  It's not about enhancing anyone's |
| 13:36:26 | 19 | reputation.  This is done for the purpose of making |
| 13:36:28 | 20 | sure that the wishes of the NIAC membership are |
| 13:36:31 | 21 | pursued as effectively as possible, which is to make |
| 13:36:34 | 22 | sure that there is no war between the United States |

41  (Pages 158 to 161)

Page 162

```
13:36:36   1   and Iran; that the human rights issue in Iran is not
13:36:41   2   neglected directed by the outside world; and that
13:36:44   3   the Iranian-American community has an ability to --
13:36:46   4   to be relevant in these decisions.
13:36:47   5       Q   Have you ever told the members of NIAC or
13:36:51   6   the Iranian-American community about your meetings
13:36:54   7   with these Iranian governmental officials and what
13:36:57   8   you have discussed with them?
13:36:59   9       A   There has been numerous occasions on which
13:37:02  10   members have asked me, and I tell them because as a
13:37:05  11   result of being able to go to these meetings, I have
13:37:08  12   a better understanding of what actually is taking
13:37:10  13   place. They rely on me on an analysis of what the
13:37:14  14   situation is, which direction the different
13:37:16  15   governments are moving in, and particularly the most
13:37:18  16   common question is, Has the risk of war reduced?
13:37:21  17       Q   Well, you understand under the United
13:37:25  18   States Constitution that authority to enter into
13:37:29  19   international negotiations is vested solely in the
13:37:33  20   Executive Branch, right?
13:37:33  21       MR. PISHEVAR: Objection. This is not an
13:37:35  22   appropriate question.
```

Page 163

```
13:37:35   1       THE WITNESS: This is not a negotiation. I
13:37:37   2   think you --
13:37:37   3       MR. PISHEVAR: Don't -- don't respond,
13:37:39   4   please.
13:37:39   5   BY MR. KAPSHANDY:
13:37:40   6       Q   Do you understand that? I know you are
13:37:42   7   not a U.S. citizen and this is very humorous, but my
13:37:46   8   question for you is --
13:37:47   9       MR. PISHEVAR: Objection. Counsel, please.
13:37:47  10   BY MR. KAPSHANDY:
13:37:48  11       Q   -- do you understand that it's the
13:37:50  12   Executive Branch's sole authority, not even the
13:37:53  13   Legislative Branch, to have negotiations and
13:37:54  14   communications with members of foreign governments?
13:37:58  15       A   Do you know what a Track II meeting is?
13:38:00  16       Q   Do you understand the question, first of
13:38:02  17   all?
13:38:02  18       A   I asked your question. Your question is
13:38:04  19   completely irrelevant. This is a Track II meeting.
13:38:07  20   There is no negotiation taking place.
13:38:09  21       Q   Do you understand the question?
13:38:10  22       A   I do understand the question. I'm
```

Page 164

```
13:38:11   1   answering you, there is no negotiation --
13:38:11   2       Q   Do you understand --
13:38:13   3       A   -- taking place here.
13:38:13   4       Q   Do you know what the Logan Act is?
13:38:15   5       A   The Logan Act, no, I don't think so.
13:38:16   6       MR. PISHEVAR: Objection.
13:38:16   7   BY MR. KAPSHANDY:
13:38:17   8       Q   You are not aware that there is federal
13:38:21   9   legislation that prohibits --
13:38:21  10       MR. PISHEVAR: Same objection.
13:38:21  11   BY MR. KAPSHANDY:
13:38:22  12       Q   -- private citizens from meeting with
13:38:24  13   foreign governmental officials?
13:38:26  14       MR. PISHEVAR: Objection. This is not an
13:38:28  15   expert on legal analysis or --
13:38:28  16       THE WITNESS: No.
13:38:29  17   BY MR. KAPSHANDY:
13:38:29  18       Q   So you never sought any legal advise as to
13:38:32  19   whether it is prohibited or not --
13:38:33  20       MR. PISHEVAR: Objection. Privileged and
13:38:35  21   confidential.
13:38:35  22
```

Page 165

```
13:38:35   1   BY MR. KAPSHANDY:
13:38:36   2       Q   -- to meet with foreign governmental
13:38:37   3   officials --
13:38:37   4       MR. PISHEVAR: Inappropriate question.
13:38:37   5   BY MR. KAPSHANDY:
13:38:37   6       Q   -- to discuss international --
13:38:38   7       MR. PISHEVAR: Don't answer that.
13:38:38   8   BY MR. KAPSHANDY:
13:38:40   9       Q   -- relations?
13:38:40  10       MR. PISHEVAR: Objection. Don't answer
13:38:42  11   that.
13:38:42  12   BY MR. KAPSHANDY:
13:38:45  13       Q   Can you -- have you ever sought legal
13:38:45  14   advice --
13:38:45  15       MR. PISHEVAR: Objection.
13:38:45  16   BY MR. KAPSHANDY:
13:38:46  17       Q   -- on whether that's permissible?
13:38:48  18       MR. PISHEVAR: Don't answer that. Next
13:38:53  19   question.
13:38:53  20   BY MR. KAPSHANDY:
13:38:54  21       Q   Can you answer the question?
13:38:55  22       MR. PISHEVAR: No. He's -- I'm instructing
```

42  (Pages 162 to 165)

| | | Page 166 |
|---|---|---|
| 13:38:56 | 1 | him not to answer that. |
| 13:38:58 | 2 | MR. KAPSHANDY: On what basis? |
| 13:38:59 | 3 | MR. PISHEVAR: It's -- you are asking him |
| 13:39:00 | 4 | about legal advice that is privileged and |
| 13:39:02 | 5 | confidential. |
| 13:39:02 | 6 | MR. KAPSHANDY: I'm asking him if he simply |
| 13:39:04 | 7 | sought the advice. |
| 13:39:04 | 8 | BY MR. KAPSHANDY: |
| 13:39:05 | 9 | Q   Without stating exactly what the advice |
| 13:39:07 | 10 | is, have you ever sought advice as to whether it |
| 13:39:07 | 11 | is -- |
| 13:39:07 | 12 | MR. PISHEVAR: Objection. |
| 13:39:07 | 13 | BY MR. KAPSHANDY: |
| 13:39:11 | 14 | Q   -- permissible for a private citizen to |
| 13:39:11 | 15 | have communications with foreign governmental |
| 13:39:13 | 16 | officials? |
| 13:39:13 | 17 | MR. PISHEVAR: It's irrelevant. It's |
| 13:39:15 | 18 | privileged. |
| 13:39:16 | 19 | Don't answer that. |
| 13:39:16 | 20 | MR. KAPSHANDY: Are you instructing him not |
| 13:39:18 | 21 | to answer? |
| 13:39:19 | 22 | MR. PISHEVAR: Call the Judge -- we can |

| | | Page 167 |
|---|---|---|
| 13:39:20 | 1 | call the Judge right now and see if you can ask that |
| 13:39:22 | 2 | question or not. |
| 13:39:23 | 3 | MR. KAPSHANDY: That's fine. Let's go off |
| 13:39:25 | 4 | the record. |
| 13:39:26 | 5 | THE VIDEOGRAPHER: The time is 1:39 p.m. |
| 13:39:30 | 6 | We're going off the record. |
| 13:39:30 | 7 | (Recess.) |
| 14:03:01 | 8 | THE VIDEOGRAPHER: The time is 2:02 p.m. |
| 14:03:03 | 9 | and we're back on the record. |
| 14:03:05 | 10 | BY MR. KAPSHANDY: |
| 14:03:08 | 11 | Q   Okay. Dr. Parsi, with agreement of |
| 14:03:11 | 12 | counsel, we'll raise that issue later with the Court |
| 14:03:14 | 13 | since we can't track the Judge down right now. |
| 14:03:18 | 14 | But one other question with regard to the |
| 14:03:22 | 15 | Logan Act. Have you ever heard of the Logan Act? |
| 14:03:26 | 16 | A   I can't recall right now, no. |
| 14:03:27 | 17 | Q   Let me hand you a document what we'll mark |
| 14:03:31 | 18 | as your deposition Exhibit 122, which is a summary |
| 14:03:34 | 19 | of Capitol Hill meetings prepared in 2006 by |
| 14:03:39 | 20 | Shervin Boloorian. Ask you have you ever seen this |
| 14:03:44 | 21 | before? |
| 14:04:03 | 22 | MR. PISHEVAR: Is there an exhibit number |

| | | Page 168 |
|---|---|---|
| 14:04:04 | 1 | for this? |
| 14:04:05 | 2 | MR. KAPSHANDY: 122. |
| 14:10:28 | 3 | (Exhibit No. 122 was marked for |
| 14:10:28 | 4 | identification.) |
| 14:04:08 | 5 | THE WITNESS: These are his meeting notes? |
| 14:04:08 | 6 | BY MR. KAPSHANDY: |
| 14:04:10 | 7 | Q   Well, they were produced by NIAC in this |
| 14:04:12 | 8 | case, to speed things up. My question is, is this |
| 14:04:17 | 9 | something that you've ever seen before? |
| 14:04:18 | 10 | A   I don't recall seeing it, no. |
| 14:04:19 | 11 | Q   Well, he was your legislative director and |
| 14:04:22 | 12 | you are the president of NIAC, correct? |
| 14:04:23 | 13 | A   Correct. |
| 14:04:24 | 14 | Q   When was he legislative director? |
| 14:04:26 | 15 | A   According to this, sometime in 2006. |
| 14:04:29 | 16 | Q   You don't remember without looking at a |
| 14:04:31 | 17 | document? |
| 14:04:31 | 18 | A   I don't remember the exact year that he |
| 14:04:35 | 19 | was -- |
| 14:04:36 | 20 | Q   Well, do you remember when he resigned? |
| 14:04:37 | 21 | A   No, I don't. |
| 14:04:38 | 22 | Q   Why did he resign? |

| | | Page 169 |
|---|---|---|
| 14:04:39 | 1 | A   He left because he got another job offer, |
| 14:04:41 | 2 | to the best of my knowledge. |
| 14:04:46 | 3 | Q   You don't recall -- turn to the fourth to |
| 14:04:51 | 4 | the last page -- ever discussing with him any |
| 14:04:56 | 5 | meeting he had with Jan Shinpoch, COS to |
| 14:05:03 | 6 | Representative McDermott of Washington? |
| 14:05:05 | 7 | A   Which page is that? |
| 14:05:06 | 8 | Q   Fourth page from the back under Jan |
| 14:05:14 | 9 | Shinpoch, S-H-I-N-P-O-C-H. Fifth page from the |
| 14:05:16 | 10 | back. |
| 14:05:16 | 11 | Do you see at the bottom Jan Shinpoch? |
| 14:05:24 | 12 | A   Yeah, I see that on here. |
| 14:05:25 | 13 | Q   And I'll just read one sentence he relates |
| 14:05:28 | 14 | there. Quote: The Logan Act is also likely to be |
| 14:05:31 | 15 | invoked, a law that prevents members of the |
| 14:05:31 | 16 | legislature from conducting foreign policy, end |
| 14:05:31 | 17 | quote. |
| 14:05:36 | 18 | Did I read that correctly? |
| 14:05:37 | 19 | A   Yeah, you did. |
| 14:05:38 | 20 | Q   And you've never heard of the Logan Act |
| 14:05:41 | 21 | either in that context or from any other source? |
| 14:05:44 | 22 | A   I don't recall seeing this document. |

43 (Pages 166 to 169)

Page 170

14:05:46  1  These are his meeting notes.

14:05:49  2      Q  You don't?

14:05:50  3      A  I don't recall seeing these or reading

14:05:52  4  through these.

14:05:53  5      Q  Let's put that aside.  Let me hand you

14:05:56  6  another document we'll mark as Exhibit 123 from

14:06:03  7  Shervin Boloorian dated April 27, 2007.

14:10:28  8      (Exhibit No. 123 was marked for

14:06:08  9       identification.)

14:06:08  10     MR. PISHEVAR: 123?

14:06:09  11     MR. KAPSHANDY:  123.

14:06:09  12  BY MR. KAPSHANDY:

14:06:14  13     Q  Have you ever seen this before?

14:06:16  14     A  I do believe I've seen this a long time

14:06:18  15  ago.  This is his memo.

14:06:27  16     Q  Pardon?

14:06:27  17     A  This is his memo, yeah.

14:06:29  18     Q  And it's kind of his parting memo as he's

14:06:32  19  leaving, correct?

14:06:36  20     A  It seems like it.

14:06:37  21     Q  And without getting into the details, the

14:06:40  22  only question I have for you about this is, how is

Page 171

14:06:43  1  it that this document wasn't produced by NIAC until

14:06:46  2  ordered by the Court in April of this year as part

14:06:50  3  of the Talebi documents?

14:06:52  4      A  I have no idea.  I don't think this would

14:06:57  5  be -- I mean if it was sent to me, it was sent in

14:07:01  6  April '07, a year before litigation hold.

14:07:05  7      Q  I mean you agree it's discoverable,

14:07:08  8  correct?

14:07:08  9      MR. PISHEVAR: Objection.  That's a legal

14:07:10  10  conclusion.

14:07:10  11     THE WITNESS:  I would have to read it

14:07:11  12  through.

14:07:11  13  BY MR. KAPSHANDY:

14:07:11  14     Q  Pardon?

14:07:12  15     A  I would have to read it through.

14:07:16  16     Q  You don't think this document was

14:07:18  17  responsive to discovery requests?

14:07:20  18     MR. PISHEVAR: That's a legal conclusion.

14:07:21  19     THE WITNESS:  Is that what I said?

14:07:21  20  BY MR. KAPSHANDY:

14:07:23  21     Q  You can't tell by -- let me ask you this:

14:07:26  22  When the people were reviewing the documents to

Page 172

14:07:28  1  determine what was discoverable and somehow missed

14:07:32  2  8,000 Babak Talebi e-mails, what criteria --

14:07:33  3      MR. PISHEVAR: Objection.

14:07:33  4  BY MR. KAPSHANDY:

14:07:34  5      Q  -- did they use in determining whether a

14:07:37  6  document was discoverable?

14:07:38  7      MR. PISHEVAR: Objection.

14:07:41  8      THE WITNESS: I don't think 8,000 e-mails

14:07:42  9  were missed.

14:07:43  10     BY MR. KAPSHANDY:

14:07:45  11     Q  Well, according to your counsel there

14:07:48  12  were.

14:07:48  13     MR. PISHEVAR: Objection.

14:07:48  14  BY MR. KAPSHANDY:

14:07:50  15     Q  Do you have any knowledge whatsoever --

14:07:52  16     A  There were 8,000 e-mails that -- it's not

14:07:55  17  whether they had been missed to be discoverable.

14:07:57  18  That's not the issue.  What counsel said is that

14:08:01  19  there were 8,000 e-mails that we found that we had

14:08:05  20  not earlier --

14:08:06  21     MR. PISHEVAR:  There is no need to argue

14:08:08  22  about this.  Please ask questions.

Page 173

14:08:09  1  BY MR. KAPSHANDY:

14:08:10  2      Q  You have any involve -- did you have any

14:08:10  3  involvement in the review and determination of which

14:08:12  4  of the 8,000 Babak Talebi e-mails should or should

14:08:17  5  not have been produced?

14:08:19  6      A  I -- no, there's two sets of Babak Talebi

14:08:28  7  e-mails.  I think I had something to do with the

14:08:32  8  first batch.

14:08:34  9      Q  The first 2500 that were produced.

14:08:38  10     A  No, no, no, no, I'm not talking about

14:08:38  11  those.  I'm talking about --

14:08:38  12     Q  The first 100 or so that were produced

14:08:42  13  just before his deposition last year.

14:08:47  14     A  I don't remember exact dates.  I do

14:08:49  15  remember that he provided you all with his password,

14:08:53  16  and you couldn't get the e-mails.

14:08:55  17     Q  No.  You know what I'm talking about,

14:08:58  18  Dr. Parsi.

14:08:58  19     A  No, I don't.

14:08:59  20     Q  We're talking about the 8,000 Babak Talebi

14:09:02  21  e-mails and documents that were ordered by the Court

14:09:05  22  to be produced in the last couple of weeks.

44  (Pages 170 to 173)

Page 174

| | | |
|---|---|---|
| 4:09:09 | 1 | My question for you is, what involvement |
| 4:09:11 | 2 | did you have, if any, in the review and |
| 4:09:15 | 3 | determination that those documents were not |
| 4:09:19 | 4 | discoverable prior to Talebi's deposition in August |
| 4:09:22 | 5 | of 2010 -- |
| 4:09:22 | 6 | A   No, my -- |
| 4:09:25 | 7 | Q   -- prior to the 2500 that were produced |
| 4:09:28 | 8 | earlier this year? |
| 4:09:30 | 9 | A   No, my recollection is different. |
| 4:09:33 | 10 | Q   You had no involvement in it? |
| 4:09:35 | 11 | A   No, I'm saying that what you are |
| 4:09:38 | 12 | describing, my recollection is different from that. |
| 4:09:39 | 13 | Q   What was your involvement in the |
| 4:09:41 | 14 | determination -- |
| 4:09:41 | 15 | A   When it comes to -- |
| 4:09:42 | 16 | Q   Please let me finish the question.  The |
| 4:09:42 | 17 | record is going to be very unclear.  And then you |
| 4:09:45 | 18 | say I don't know how to ask a question.  So if you |
| 4:09:48 | 19 | wait until I answer the -- ask the question, then |
| 4:09:49 | 20 | you will have a clear opportunity to answer, okay? |
| 4:09:49 | 21 | A   (The witness nods his head.) |
| 4:09:53 | 22 | Q   My question is very simple.  What |

Page 175

| | | |
|---|---|---|
| 4:09:55 | 1 | involvement did you have, if any, at any point in |
| 4:09:59 | 2 | time in the determination as to whether any of the |
| 4:10:03 | 3 | Babak Talebi 8,000 e-mails should or should not be |
| 4:10:08 | 4 | produced? |
| 4:10:08 | 5 | A   That's what I'm trying to answer, sir. |
| 4:10:10 | 6 | There were two batches of Babak Talebi e-mails if |
| 4:10:14 | 7 | I'm not mistaken. |
| 4:10:14 | 8 | Q   There were three, but tell us what you |
| 4:10:16 | 9 | recall. |
| 4:10:16 | 10 | A   Three.  Okay.  My recollection is were the |
| 4:10:18 | 11 | 8,000, those were reviewed by our counsel.  That's |
| 4:10:21 | 12 | my recollection. |
| 4:10:22 | 13 | Q   And -- okay.  That's helpful. |
| 4:10:25 | 14 | When were those located and on what |
| 4:10:28 | 15 | machine were those located? |
| 4:10:32 | 16 | A   I don't recall which machine specifically |
| 4:10:34 | 17 | they -- |
| 4:10:34 | 18 | Q   That was one of the items of homework that |
| 4:10:37 | 19 | we gave you at your last deposition, and we were |
| 4:10:39 | 20 | hoping to get that resolved here.  You had promised |
| 4:10:40 | 21 | to determine the CPU, the server, the computer, |
| 4:10:45 | 22 | whatever it was that it was found on because it was |

Page 176

| | | |
|---|---|---|
| 4:10:50 | 1 | 8,000 e-mails that had not been produced previously |
| 4:10:54 | 2 | in this case. |
| 4:10:54 | 3 | Do you have any idea on what device those |
| 4:10:57 | 4 | were found? |
| 4:10:58 | 5 | A   I actually don't recall that we had that |
| 4:11:02 | 6 | conversation, but we can definitely go and look into |
| 4:11:03 | 7 | that, but it was one of our computers at our office. |
| 4:11:06 | 8 | Q   Okay.  Well, we will put that on our |
| 4:11:08 | 9 | continued to-do list.  Which Talebi CPU, server -- |
| 4:11:08 | 10 | MR. PISHEVAR:  I don't recall this as being |
| 4:11:14 | 11 | on a to-do list. |
| 4:11:14 | 12 | MR. KAPSHANDY:  I can find it for you at a |
| 4:11:20 | 13 | break, Counsel, but I don't want to take the time |
| 4:11:20 | 14 | now. |
| 4:11:20 | 15 | THE WITNESS:  Can I get a pen so I can |
| 4:11:20 | 16 | write these things down. |
| 4:11:20 | 17 | BY MR. KAPSHANDY: |
| 4:11:24 | 18 | Q   In any event, it was found on a computer |
| 4:11:24 | 19 | there and it was described as a previously |
| 4:11:26 | 20 | overlooked CPU or database.  Do you recall that, |
| 4:11:30 | 21 | Dr. Parsi? |
| 4:11:33 | 22 | A   I believe it was something like that.  A |

Page 177

| | | |
|---|---|---|
| 4:11:38 | 1 | computer is probably the term we were using. |
| 4:11:42 | 2 | Q   No, you called it a CPU. |
| 4:11:42 | 3 | A   Called it a CPU? |
| 4:11:44 | 4 | Q   And then it was also described as a |
| 4:11:46 | 5 | database, so my question for you is, do you have a |
| 4:11:49 | 6 | database -- |
| 4:11:49 | 7 | A   No. |
| 4:11:51 | 8 | Q   -- where these would have been located? |
| 4:11:52 | 9 | A   Where e-mails would have been located? |
| 4:11:53 | 10 | Q   These 8,000 Talebi documents. |
| 4:11:56 | 11 | A   No, I don't believe so.  I very much doubt |
| 4:11:58 | 12 | that we would have e-mails in the database.  The |
| 4:12:04 | 13 | to-do list is to find out which computer, and you |
| 4:12:07 | 14 | want the serial number? |
| 4:12:08 | 15 | Q   That would be very helpful. |
| 4:12:24 | 16 | Now, my question again is, how was it that |
| 4:12:26 | 17 | it was determined prior to Talebi's deposition last |
| 4:12:28 | 18 | year that only a hundred of these Talebi e-mails |
| 4:12:36 | 19 | were responsive to defendant's discovery requests? |
| 4:12:39 | 20 | Were you involved in that? |
| 4:12:40 | 21 | A   As I just explained to you, my |
| 4:12:43 | 22 | recollection that I was involved was in a |

45  (Pages 174 to 177)

Page 178

14:12:46  1   different batch of Talebi e-mails.

14:12:48  2      Q  Okay. So you had no involvement with

14:12:50  3   these 8,000 e-mails that were found on an overlooked

14:12:54  4   CPU and determination as to whether any of them were

14:12:58  5   discoverable?

14:12:58  6      A  My recollection is that that batch was

14:13:01  7   reviewed twice by our counsel. That's my

14:13:04  8   recollection.

14:13:04  9      Q  Okay. That's fine, and that's I think

14:13:07  10  where we're headed.

14:13:10  11      And -- and when were those sent to your

14:13:12  12  counsel and in what format? Were they put on a CD

14:13:15  13  or a hard drive or something?

14:13:17  14      A  I don't remember the date, but --

14:13:18  15      MR. PISHEVAR:  Objection. This is also

14:13:20  16  containing attorney-client privileged communications.

14:13:22  17      MR. KAPSHANDY:  No, I'm simply asking when

14:13:24  18  material were sent to counsel for review.

14:13:25  19      THE WITNESS:  I don't recall exactly when

14:13:27  20  they were sent to him for review.

14:13:29  21  BY MR. KAPSHANDY:

14:13:32  22      Q  As part of the initial review done prior

Page 179

14:13:35  1   to June of 2009, was that CPU or that computer

14:13:39  2   subjected to the agreed search terms to determine if

14:13:44  3   it contained relevant information?

14:13:45  4      A  All the computers that we had were

14:13:50  5   reviewed by us. I assume that computer is included.

14:13:52  6      Q  Well, I brought many of the documents that

14:13:54  7   were produced in the last couple of weeks as part of

14:13:56  8   the third production of 5500 Talebi e-mails. And

14:14:01  9   let me tell you, Dr. Parsi, that they contained over

14:14:05  10  1,300 e-mails containing your name that had not been

14:14:10  11  produced previously.

14:14:11  12      So my question for you is, how is it that

14:14:14  13  those were not produced back in May of 2009 or prior

14:14:18  14  to Talebi's deposition or even as part of the second

14:14:24  15  production of 2500 Talebi e-mails?

14:14:27  16      A  I'm pretty confident that that review was

14:14:32  17  done by our counsel. I was not involved in that.

14:14:35  18      Q  Okay. Well, then we need not ask you

14:14:39  19  about those any further. I may have some questions

14:14:42  20  about some of the e-mails that were thankfully

14:14:46  21  produced to us recently.

14:14:56  22      I will just pull one out as an example.

Page 180

14:14:59  1   We'll mark it as deposition Exhibit 124.

14:15:03  2      (Exhibit No. 124 was marked for

14:15:03  3      identification.)

14:15:03  4   BY MR. KAPSHANDY:

14:15:24  5      Q  Which, for the record, purports to be a

14:15:27  6   July 18, 2008 e-mail from you to Babak Talebi and

14:15:35  7   Mohamad Navab, and we've marked as Exhibit 124. Do

14:15:38  8   you see that?

14:15:38  9      A  Mm-hmm.

14:15:39  10     Q  And given that this was produced recently

14:15:42  11  as part of the Talebi 5500 e-mails, I won't ask you

14:15:46  12  whether this appears to be an authentic NIAC

14:15:49  13  document, but ask you simply is this a document that

14:15:52  14  would appear to have been something generated and

14:15:57  15  created on or about July 2008 from you to Babak

14:16:04  16  Talebi in response to some other inquiries?

14:16:09  17     A  Yeah.

14:16:10  18     Q  Does it seem like it would be? And if you

14:16:12  19  go all the way to the beginning, it starts with an

14:16:15  20  e-mail from Babak Talebi to Mohamad Navab regarding

14:16:23  21  a July 30th event, again this is in 2008, with

14:16:32  22  Khodabandalou. Do you see that?

Page 181

14:16:33  1      A  Mm-hmm.

14:16:34  2      Q  Who is Khodabandalou?

14:16:37  3      A  I don't know anyone by the name of

14:16:42  4   Khodabandalou, no.

14:16:42  5      Q  Well, if you go back to the very

14:16:45  6   beginning, your 8:31 p.m. e-mail, in response to an

14:16:59  7   e-mail from Mohamad Navab or from Babak Talebi, you

14:17:06  8   respond -- and I think this is a typo, but correct

14:17:09  9   me if I'm wrong -- "Let's not have any communication

14:17:12  10  with him until we have identified him." "Not" makes

14:17:17  11  more sense than "now" in that context, but correct

14:17:20  12  me if I'm wrong. "No communication at all."

14:17:23  13      Did I read that correctly?

14:17:24  14     A  You read it correctly.

14:17:26  15     Q  But sitting here today, you have no idea

14:17:29  16  who Khodabandalou --

14:17:29  17     A  No, I --

14:17:31  18     Q  -- is that you don't want to have any

14:17:33  19  communications with until we have identified him?

14:17:35  20     A  No. If I understand it correctly, it's a

14:17:37  21  reference to Ali Mohammadiyan.

14:17:42  22     Q  Well, who is Khodabandalou, the event with

**46  (Pages 178 to 181)**

Page 182

| | | |
|---|---|---|
| 14:17:46 | 1 | Khodabandalou? |
| 14:17:49 | 2 | A  The event with Khodabandalou? |
| 14:17:55 | 3 | MR. PISHEVAR:  I believe that question's |
| 14:17:57 | 4 | asked and answered. |
| 14:17:57 | 5 | BY MR. KAPSHANDY: |
| 14:17:58 | 6 | Q  Would it refresh your recollection, |
| 14:17:59 | 7 | because we discussed this previously, that you had |
| 14:18:03 | 8 | been trying to organize an event with Ann Singleton |
| 14:18:08 | 9 | and her husband Khodabandu -- |
| 14:18:09 | 10 | A  No, his name is not Khodabandalou. |
| 14:18:09 | 11 | Q  Khodabandalou. |
| 14:18:13 | 12 | A  His name is Khodabandeh, I think. |
| 14:18:16 | 13 | Q  Well, there's a lot of typos in this, and |
| 14:18:18 | 14 | that's -- |
| 14:18:18 | 15 | A  Yeah. |
| 14:18:19 | 16 | Q  -- why I'm wondering since it's at the |
| 14:18:21 | 17 | same time and it relates to the same event that he |
| 14:18:24 | 18 | supposed to -- Khodabandeh was supposed to show up |
| 14:18:26 | 19 | at, could it have been? |
| 14:18:27 | 20 | A  Yeah, I know, now it makes sense -- |
| 14:18:27 | 21 | Q  Okay. |
| 14:18:30 | 22 | A  -- but it's not Khodabandalou. |

Page 183

| | | |
|---|---|---|
| 14:18:30 | 1 | Q  Okay.  Well, that helps.  That's all I had |
| 14:18:30 | 2 | on that.  Let's put that aside. |
| 14:18:37 | 3 | Back to the meetings with Iranian |
| 14:18:40 | 4 | governmental officials, did you not speak on "Voice |
| 14:18:44 | 5 | of America" in February of 2008 of this year and |
| 14:18:47 | 6 | state that you had not told NIAC members about your |
| 14:18:51 | 7 | meetings with Iranian governmental officials? |
| 14:18:58 | 8 | A  I don't recall exactly -- no.  I think he |
| 14:19:03 | 9 | asked me in what capacity I was there.  I don't have |
| 14:19:06 | 10 | any recollection that he asked about anything else |
| 14:19:08 | 11 | on that. |
| 14:19:09 | 12 | Q  You don't recall being asked specifically, |
| 14:19:13 | 13 | had you told NIAC members about these meetings with |
| 14:19:16 | 14 | Iranian governmental officials and you denying that? |
| 14:19:19 | 15 | A  I don't recall him asking about those |
| 14:19:21 | 16 | specific meetings, no.  I do recall that he asked me |
| 14:19:25 | 17 | if I was at those meetings, he asked me what those |
| 14:19:27 | 18 | meetings were about, but I don't recall that he |
| 14:19:29 | 19 | asked me anything else about them.  Also there were |
| 14:19:36 | 20 | elements of that interview that you tape but you |
| 14:19:42 | 21 | don't necessarily air. |
| 14:19:47 | 22 | Q  What does that mean? |

Page 184

| | | |
|---|---|---|
| 14:19:50 | 1 | A  It means that I think he taped 30 minutes |
| 14:19:52 | 2 | and he aired 20 minutes. |
| 14:19:53 | 3 | Q  Well, the interview will speak for itself, |
| 14:19:56 | 4 | so we won't belabor that any further. |
| 14:19:59 | 5 | Let me hand you what we'll mark as your |
| 14:20:02 | 6 | deposition Exhibit 125. |
| 14:20:04 | 7 | (Exhibit No. 125 was marked for |
| 14:20:05 | 8 | identification.) |
| 14:20:05 | 9 | BY MR. KAPSHANDY: |
| 14:20:06 | 10 | Q  Which is a March 17, 2006 e-mail from you |
| 14:20:10 | 11 | to Mohammad Mansouri.  And -- |
| 14:20:21 | 12 | A  This is -- you all had this for the |
| 14:20:24 | 13 | previous deposition. |
| 14:20:25 | 14 | Q  -- my question here is -- |
| 14:20:25 | 15 | MR. PISHEVAR:  Well, are you proffering |
| 14:20:26 | 16 | that this is a new document that you obtained and you |
| 14:20:29 | 17 | didn't have an opportunity to ask about -- |
| 14:20:31 | 18 | MR. PISHEVAR:  My question has to do with |
| 14:20:33 | 19 | all the meetings with the Iranian governmental |
| 14:20:33 | 20 | officials that weren't provided to us recently, and |
| 14:20:35 | 21 | it's a follow-up on that, so I'll tie it up, Counsel, |
| 14:20:37 | 22 | okay? |

Page 185

| | | |
|---|---|---|
| 14:20:39 | 1 | MR. PISHEVAR:  I'm not sure I |
| 14:20:40 | 2 | understand -- |
| 14:20:40 | 3 | BY MR. KAPSHANDY: |
| 14:20:41 | 4 | Q  My question for you, Dr. Parsi, again in |
| 14:20:43 | 5 | relationship to all of the dozens of meetings you've |
| 14:20:46 | 6 | had with Iranian governmental officials -- |
| 14:20:49 | 7 | MR. PISHEVAR:  Objection to the |
| 14:20:50 | 8 | characterization. |
| 14:20:50 | 9 | BY MR. KAPSHANDY: |
| 14:20:51 | 10 | Q  -- many of which we've only recently |
| 14:20:53 | 11 | gotten documentation on -- |
| 14:20:55 | 12 | MR. PISHEVAR:  Counsel is testifying. |
| 14:20:56 | 13 | BY MR. KAPSHANDY: |
| 14:20:57 | 14 | Q  When you stated in response to Mo |
| 14:20:59 | 15 | Mansouri's concerns about security when he was |
| 14:21:01 | 16 | visiting Iran, and I direct you to the last sentence |
| 14:21:06 | 17 | of your 3/17/06 response, quote:  I can tell you |
| 14:21:11 | 18 | that NIAC has a good name in Iran and your |
| 14:21:15 | 19 | association with it will not harm you.  In fact, I |
| 14:21:16 | 20 | believe two of our board members are in Iran as we |
| 14:21:21 | 21 | speak, end quote. |
| 14:21:21 | 22 | MR. PISHEVAR:  Are you still -- |

47  (Pages 182 to 185)

Page 186

| | | |
|---|---|---|
| 14:21:21 | 1 | BY MR. KAPSHANDY: |
| 14:21:21 | 2 | Q  Did I read that correctly? |
| 14:21:22 | 3 | MR. PISHEVAR:  Are you still reading from |
| 14:21:23 | 4 | this e-mail? |
| 14:21:23 | 5 | MR. KAPSHANDY:  Yes. |
| 14:21:24 | 6 | MR. PISHEVAR:  How is this a new thing? |
| 14:21:25 | 7 | You just asked a question about that e-mail. |
| 14:21:26 | 8 | MR. KAPSHANDY:  Your objection is noted. |
| 14:21:26 | 9 | BY MR. KAPSHANDY: |
| 14:21:27 | 10 | Q  Dr. Parsi, did I read that correctly? |
| 14:21:27 | 11 | MR. PISHEVAR:  No, I'm not -- I'm not going |
| 14:21:30 | 12 | to -- |
| 14:21:30 | 13 | MR. KAPSHANDY:  Let's go off the record |
| 14:21:31 | 14 | then because you're not going to further filibuster |
| 14:21:32 | 15 | and stall, Counsel.  Let's go off the record. |
| 14:21:33 | 16 | MR. PISHEVAR:  You are asking questions you |
| 14:21:35 | 17 | could have asked before.  You are not allowed to do |
| 14:21:37 | 18 | that.  And you are already beyond the time. |
| 14:21:37 | 19 | MR. KAPSHANDY:  The Judge didn't say I |
| 14:21:39 | 20 | couldn't allow to do that.  This follows upon |
| 14:21:40 | 21 | documents that you withheld regarding meetings with |
| 14:21:41 | 22 | the Iranian governmental officials. |

Page 187

| | | |
|---|---|---|
| 14:21:41 | 1 | MR. PISHEVAR:  How is this a new document? |
| 14:21:43 | 2 | Is this a new document? |
| 14:21:44 | 3 | BY MR. KAPSHANDY: |
| 14:21:45 | 4 | Q  I'm asking you, Dr. Parsi, about your |
| 14:21:47 | 5 | meetings with Iranian governmental officials. |
| 14:21:50 | 6 | My question, first of all, is did I read |
| 14:21:52 | 7 | that correctly? |
| 14:21:52 | 8 | MR. PISHEVAR:  Objection. |
| 14:21:53 | 9 | BY MR. KAPSHANDY: |
| 14:21:54 | 10 | Q  Can you answer that?  It's a real simple |
| 14:21:56 | 11 | question, Dr. Parsi:  Did I read it correctly? |
| 14:21:58 | 12 | A  Yes, you read it correctly. |
| 14:22:00 | 13 | Q  And did you in 2006 tell Mo Mansouri not |
| 14:22:04 | 14 | only that NIAC has a good name in Iran, but that in |
| 14:22:08 | 15 | fact two board members were in Iran as we speak? |
| 14:22:11 | 16 | Did you tell him that? |
| 14:22:11 | 17 | A  I believe that is correct, and there is a |
| 14:22:14 | 18 | reference to the fact that we got a lot of feedback |
| 14:22:14 | 19 | from ordinary people in Iran who are very |
| 14:22:14 | 20 | appreciative of the work that we were doing. |
| 14:22:18 | 21 | Q  Who are these people in Iran that are very |
| 14:22:20 | 22 | appreciative of your work that you're doing?  Would |

Page 188

| | | |
|---|---|---|
| 14:22:20 | 1 | any of them be governmental officials? |
| 14:22:23 | 2 | A  No. |
| 14:22:23 | 3 | Q  None of them were? |
| 14:22:24 | 4 | A  No.  I never had any conversation to my |
| 14:22:27 | 5 | recollection with government officials in which they |
| 14:22:30 | 6 | would have said something like that.  I do have a |
| 14:22:33 | 7 | recollection that we have members who go to Iran, |
| 14:22:36 | 8 | who come back and they say that people appreciate -- |
| 14:22:40 | 9 | Q  Well, if Mo Mansouri has some problems |
| 14:22:41 | 10 | with security, is it going to do any good to him if |
| 14:22:44 | 11 | nobody in the government has members sorts of feelings |
| 14:22:48 | 12 | about NIAC if it's just some citizen on the street? |
| 14:22:48 | 13 | A  Well, for the record, Mo Mansouri -- |
| 14:22:52 | 14 | Mohammad Mansouri was taken by the Iranian |
| 14:22:54 | 15 | government, and as a result, did not go back. |
| 14:22:57 | 16 | Q  In 2006? |
| 14:22:58 | 17 | A  I don't remember which year it was, but it |
| 14:23:01 | 18 | was in relation to this project.  He was taken by |
| 14:23:04 | 19 | the Iranian government, and he decided not to go |
| 14:23:07 | 20 | back. |
| 14:23:13 | 21 | Q  Let me hand you what we'll mark as your |
| 14:23:16 | 22 | deposition Exhibit 126. |

Page 189

| | | |
|---|---|---|
| 14:10:28 | 1 | (Exhibit No. 126 was marked for |
| 14:10:28 | 2 | identification.) |
| 14:10:28 | 3 | BY MR. KAPSHANDY: |
| 14:23:22 | 4 | Q  Which was produced recently as part of the |
| 14:23:24 | 5 | Talebi production.  Which is a September 30, 2008 |
| 14:23:36 | 6 | e-mail from Trita Parsi to a bunch of people |
| 14:23:39 | 7 | including Patrick Disney, Babak Talebi, Sara |
| 14:23:51 | 8 | Shokravi, Shabnam Sahandy, to-do list on 362.  Have |
| 14:23:52 | 9 | you seen this before? |
| 14:23:52 | 10 | A  I believe so. |
| 14:23:56 | 11 | Q  And what is 362?  It's H.CON.RES.362, |
| 14:24:01 | 12 | correct? |
| 14:24:02 | 13 | A  I believe so. |
| 14:24:02 | 14 | Q  Any idea how it was that this wasn't |
| 14:24:06 | 15 | produced before? |
| 14:24:07 | 16 | A  I'm not 100 percent sure, but I think it's |
| 14:24:09 | 17 | immediately obvious. |
| 14:24:10 | 18 | Q  Well, it relates to grassroots lobbying on |
| 14:24:16 | 19 | a house resolution, and it has your name on it, |
| 14:24:20 | 20 | Babak Talebi's name on it, Patrick Disney's name on |
| 14:24:25 | 21 | it. |
| 14:24:26 | 22 | A  No, this is not grassroots lobbying to the |

48  (Pages 186 to 189)

| | | Page 190 |
|---|---|---|
| 14:24:29 | 1 | best of my understanding.  This is making sure that |
| 14:24:31 | 2 | other people know what is going on.  I don't see any |
| 14:24:34 | 3 | reference there contacting Congress or anything like |
| 14:24:36 | 4 | that.  This is fundraising stuff and things of that |
| 14:24:40 | 5 | nature. |
| 14:24:40 | 6 | Q   What is item 10?  "A letter also needs to |
| 14:24:43 | 7 | go out to all the senders of the 362 e-mails (who |
| 14:24:48 | 8 | are not members) and asking them for membership." |
| 14:24:51 | 9 | A   Yes. |
| 14:24:51 | 10 | Q   So you had a list of the people that sent |
| 14:24:53 | 11 | e-mails on H.CON.RES.362 to their members, correct? |
| 14:24:56 | 12 | A   That is all part of what is in Salesforce. |
| 14:24:59 | 13 | Q   And why is it that one doesn't have the |
| 14:25:01 | 14 | list of 362 e-mails who were not members?  Why |
| 14:25:08 | 15 | wasn't that produced? |
| 14:25:09 | 16 | A   That probably was produced. |
| 14:25:11 | 17 | Q   Well, if you could point it out to us, we |
| 14:25:15 | 18 | would love to see it because we haven't seen it. |
| 14:25:16 | 19 | A   No, no, no, no, no.  I think you are -- |
| 14:25:18 | 20 | you are deliberately misleading things here.  When |
| 14:25:21 | 21 | you have -- first of all, that is a system in which |
| 14:25:24 | 22 | you can see through Salesforce if someone has taken |

| | | Page 191 |
|---|---|---|
| 14:25:28 | 1 | action or not, and then you can follow up with them. |
| 14:25:32 | 2 | But that database is a live database.  Every day it |
| 14:25:36 | 3 | keeps on changing.  It's not a static -- |
| 14:25:36 | 4 | Q   Are you saying it doesn't exist anymore |
| 14:25:40 | 5 | since you don't subscribe to Salesforce? |
| 14:25:43 | 6 | A   It's not -- look, it's not a static thing. |
| | 7 | You seem to think that everything is static and it's |
| | 8 | not. |
| | 9 | Q   Well, so you're saying that -- |
| | 10 | A   This is -- |
| | 11 | Q   -- that -- |
| 14:25:45 | 12 | A   This is in regards to fundraising. |
| 14:25:45 | 13 | Q   So you're saying it doesn't -- |
| 14:25:47 | 14 | A   It's not a lobbying document. |
| 14:25:49 | 15 | Q   I'm not suggesting it's a lobbying |
| 14:25:52 | 16 | document.  It will go a lot easier if you just |
| 14:25:55 | 17 | answer the questions that I'm asking. |
| 14:25:56 | 18 | I'm asking where is the letter that went |
| 14:25:58 | 19 | to all senators in the 362 e-mails who are not |
| 14:26:03 | 20 | members.  It's really simple.  It doesn't call for |
| 14:26:06 | 21 | commentary on the question or whether it's a |
| 14:26:09 | 22 | lobbying document or not.  Because, believe me, I've |

| | | Page 192 |
|---|---|---|
| 14:26:11 | 1 | not seen it.  If I missed it, I would be glad to be |
| 14:26:15 | 2 | corrected. |
| 14:26:16 | 3 | A   Well, the instruction says a letter also |
| 14:26:18 | 4 | needs to go out.  It doesn't say that it did go out. |
| 14:26:24 | 5 | Q   So maybe it didn't is your -- |
| 14:26:26 | 6 | A   I have no idea. |
| 14:26:26 | 7 | Q   Okay. |
| 14:26:28 | 8 | A   This is two or three years ago. |
| 14:26:30 | 9 | Q   Let me hand you what will be marked as |
| 14:26:33 | 10 | your deposition Exhibit 127, which again was part of |
| 14:26:36 | 11 | the recent Talebi production, an August 17, 2009 |
| 14:26:43 | 12 | e-mail to Trita Parsi, Kevin Cowl, Michelle |
| 14:26:43 | 13 | Moghtader from Goli Fassihian, who has a NIAC e-mail |
| 14:26:50 | 14 | address. |
| 14:26:50 | 15 | MR. PISHEVAR:  Can I ask you why these |
| 14:26:52 | 16 | e-mails, all of a sudden you are printing them out |
| 14:26:54 | 17 | without any date, where it was printed?  Why are they |
| 14:26:58 | 18 | being printed out this way? |
| 14:26:59 | 19 | MR. KAPSHANDY:  They were produced in all |
| 14:27:01 | 20 | sorts of various formats, Counsel.  Some of them were |
| 14:27:04 | 21 | text, some of them were PDF, some of them were doc |
| 14:27:04 | 22 | files, some of them -- |

| | | Page 193 |
|---|---|---|
| 14:27:04 | 1 | MR. PISHEVAR:  Or maybe you had these |
| 14:27:06 | 2 | already, and you don't want me to see when you had |
| 14:27:09 | 3 | printed them out, things like that? |
| 14:27:11 | 4 | MR. KAPSHANDY:  Counsel, if you want to |
| 14:27:12 | 5 | accuse me of doing something, I'd appreciate you |
| 14:27:15 | 6 | having some evidence for once. |
| 14:27:15 | 7 | MR. PISHEVAR:  Well, if you could just ask |
| 14:27:17 | 8 | him simple questions, that would be helpful. |
| 14:27:17 | 9 | BY MR. KAPSHANDY: |
| 14:27:20 | 10 | Q   My question is simply, why wasn't this |
| 14:27:22 | 11 | produced? |
| 14:27:23 | 12 | A   This is clearly something edited.  I want |
| 14:27:27 | 13 | to see the original e-mail.  This is from a Word |
| 14:27:29 | 14 | document. |
| 14:27:29 | 15 | MR. KAPSHANDY:  Okay.  We're going to go |
| 14:27:31 | 16 | off the record.  We're going to go and pull it up, |
| 14:27:34 | 17 | and we'll take this out of your time.  Let's go off |
| 14:27:34 | 18 | the record. |
| 14:27:34 | 19 | MR. PISHEVAR:  Actually, what is the time? |
| 14:27:43 | 20 | How much time have we been on video? |
| 14:27:43 | 21 | THE VIDEOGRAPHER:  You want this on the |
| 14:27:43 | 22 | record or off? |

49 (Pages 190 to 193)

Page 194

| | | |
|---|---|---|
| 14:27:43 | 1 | MR. KAPSHANDY: No, off the record. |
| 14:27:43 | 2 | THE VIDEOGRAPHER: The time is 2:27 p.m. |
| 14:27:45 | 3 | We're going off the record. |
| 14:27:45 | 4 | (A discussion was held off the |
| 14:30:02 | 5 | record.) |
| 14:30:02 | 6 | THE VIDEOGRAPHER: The time is 2:30 p.m. |
| 14:30:09 | 7 | We're back on the record. |
| 14:30:09 | 8 | BY MR. KAPSHANDY: |
| 14:30:10 | 9 | Q. Okay. Off the record, Dr. Parsi, I have |
| 14:30:13 | 10 | had a discussion with counsel, and I apologize, I |
| 14:30:16 | 11 | misstated, Exhibit 126 comes not from the Talebi |
| 14:30:19 | 12 | productions, but I believe from the Brown Lloyd |
| 14:30:24 | 13 | James production. We're double-checking that right |
| 14:30:28 | 14 | now because your counsel has asked to see a copy of |
| 14:30:31 | 15 | that. |
| 14:30:33 | 16 | In any event, if that was the case, it was |
| 14:30:36 | 17 | produced in response to a subpoena -- I'm sorry. Is |
| 14:30:41 | 18 | it 126 or 127? 127. 127 was produced in response |
| 14:30:45 | 19 | to a subpoena to an organization by the name of |
| 14:30:51 | 20 | Brown Lloyd James, and again not produced by NIAC. |
| 14:30:53 | 21 | So my question for you is, why was -- |
| 14:30:56 | 22 | MR. PISHEVAR: Objection to the |

Page 195

| | | |
|---|---|---|
| 14:30:57 | 1 | characterization "not produced." |
| 14:30:58 | 2 | BY MR. KAPSHANDY: |
| 14:30:59 | 3 | Q. Why would this document not have been |
| 14:31:01 | 4 | produced by NIAC but was produced by your consulting |
| 14:31:06 | 5 | firm? |
| 14:31:06 | 6 | A. First of all, taking a look at this |
| 14:31:09 | 7 | document, it does not appear to be an e-mail that |
| 14:31:12 | 8 | has not been edited, so I can't refer -- |
| 14:31:16 | 9 | reference that -- |
| 14:31:17 | 10 | Q. Let's assume it wasn't, okay? |
| 14:31:18 | 11 | A. Well, it's still very difficult because at |
| 14:31:21 | 12 | the end of the day I have no idea what you have done |
| 14:31:24 | 13 | to this e-mail. This does not look the way any |
| 14:31:27 | 14 | e-mail would be printed. |
| 14:31:31 | 15 | Q. Are you able to answer the question? |
| 14:31:32 | 16 | A. I -- it's plain to me, you know, this does |
| 14:31:37 | 17 | not look the way an e-mail would be printed, so I |
| 14:31:40 | 18 | have no idea if you have changed anything in it. |
| 14:31:40 | 19 | Q. Assuming that we haven't, do you have any |
| 14:31:42 | 20 | idea why this document from Goli Fassihian to all of |
| 14:31:47 | 21 | these people would not have been produced by NIAC |
| 14:31:51 | 22 | but was produced by your media consultant in |

Page 196

| | | |
|---|---|---|
| 14:31:55 | 1 | response to a subpoena? |
| 14:31:55 | 2 | A. I -- I do not know. But I do see that the |
| 14:31:58 | 3 | date of it is August 2009. |
| 14:32:03 | 4 | Q. Let me hand you what we'll mark as your |
| 14:32:06 | 5 | deposition 128. |
| 14:10:28 | 6 | (Exhibit No. 128 was marked for |
| 14:10:28 | 7 | identification.) |
| 14:10:28 | 8 | BY MR. KAPSHANDY: |
| 14:32:22 | 9 | Q. Which is an e-mail dated April 22nd, 2009, |
| 14:32:29 | 10 | from Trita Parsi to Puneet Talwar, which from the |
| 14:32:35 | 11 | Bates number below reflects was produced by the |
| 14:32:41 | 12 | Department of Justice in response to a subpoena to |
| 14:32:45 | 13 | Puneet Talwar. |
| 14:32:47 | 14 | My question for you again is, why was this |
| 14:32:51 | 15 | not produced as part of the NIAC productions, and the |
| 14:32:54 | 16 | date is before May of 2009? |
| 14:32:57 | 17 | A. I'm pretty confident that this was |
| 14:33:00 | 18 | produced because this is the one that we had a |
| 14:33:02 | 19 | conversation with you, and you agreed to make sure |
| 14:33:05 | 20 | that you would protect the identity of one of these |
| 14:33:08 | 21 | individuals in that e-mail because of the fact that |
| 14:33:10 | 22 | the Iranian government had imprisoned him. |

Page 197

| | | |
|---|---|---|
| 14:33:13 | 1 | Q. There were previous e-mails in that chain, |
| 14:33:16 | 2 | I would agree, Dr. Parsi. |
| 14:33:17 | 3 | My question was, why is this one, which |
| 14:33:20 | 4 | was not part of that chain, not produced by NIAC, in |
| 14:33:25 | 5 | particular, mentioning the Pugwash meetings in -- at |
| 14:33:29 | 6 | The Hague? |
| 14:33:29 | 7 | A. I -- I believe this was or it may be right |
| 14:33:31 | 8 | around the time that we were all collecting the |
| 14:33:33 | 9 | e-mails. |
| 14:33:33 | 10 | Q. Well, it was not, so the question was, I |
| 14:33:36 | 11 | guess -- |
| 14:33:36 | 12 | MR. PISHEVAR: Objection to your |
| 14:33:37 | 13 | characterization. |
| 14:33:37 | 14 | BY MR. KAPSHANDY: |
| 14:33:38 | 15 | Q. -- if it wasn't produced, you believe it |
| 14:33:42 | 16 | should have been? |
| 14:33:42 | 17 | MR. PISHEVAR: You may be wrong, as we've |
| 14:33:42 | 18 | seen in the past, and so please stop making |
| 14:33:44 | 19 | characterizations. |
| 14:33:44 | 20 | BY MR. KAPSHANDY: |
| 14:33:45 | 21 | Q. Do you have any idea why this wasn't |
| 14:33:48 | 22 | produced? |

50 (Pages 194 to 197)

Page 198

| | | |
|---|---|---|
| 14:33:48 | 1 | A   Again, I believe this was produced. |
| 14:33:50 | 2 | Q   The previous e-mails were.  Why were the |
| 14:33:53 | 3 | e-mail chain cut off and this wasn't produced? |
| 14:33:53 | 4 | MR. PISHEVAR:  Objection. |
| 14:33:54 | 5 | THE WITNESS:  Maybe because it's so close |
| 14:33:56 | 6 | to the production date and it took a long time for us |
| 14:33:59 | 7 | to collect everything.  It may very well be that.  I |
| 14:34:03 | 8 | don't know.  At least you managed to print it, so it |
| 14:34:04 | 9 | appears to be a real e-mail this time. |
| 14:34:07 | 10 | BY MR. KAPSHANDY: |
| 14:34:07 | 11 | Q   Pardon? |
| 14:34:08 | 12 | A   This one I do believe is a real e-mail, |
| 14:34:12 | 13 | unlike the previous one who has a date after the |
| 14:34:15 | 14 | cutoff date. |
| 14:34:15 | 15 | Q   I would like to hand you what we will now |
| 14:34:21 | 16 | mark as a composite exhibit, 129. |
| 14:34:24 | 17 | (Exhibit No. 129 was marked for |
| 14:34:25 | 18 | identification.) |
| 14:34:25 | 19 | BY MR. KAPSHANDY: |
| 14:34:36 | 20 | Q   Which I will represent for the record are |
| 14:34:39 | 21 | lobbying documents requested subsequent to Patrick |
| 14:34:42 | 22 | Disney's deposition and recently produced by NIAC |

Page 199

| | | |
|---|---|---|
| 14:34:47 | 1 | subsequent to court order. |
| 14:34:58 | 2 | I ask you, first of all, what involvement, |
| 14:35:00 | 3 | if any, did you have in the collection and |
| 14:35:03 | 4 | production of these documents? |
| 14:35:04 | 5 | A   I think this was done by Kevin, our CO. |
| 14:35:06 | 6 | Q   Kevin Cowl? |
| 14:35:09 | 7 | A   Yes. |
| 14:35:09 | 8 | Q   And how was it that these documents |
| 14:35:11 | 9 | weren't produced previously in response to lobbying |
| 14:35:16 | 10 | documents from NIAC? |
| 14:35:19 | 11 | A   My understanding that most of these |
| 14:35:22 | 12 | documents are post-production cutoff -- |
| 14:35:27 | 13 | Q   Most of them are from 2008, Dr. Parsi, so |
| 14:35:31 | 14 | why don't you look before you speak and answer |
| 14:35:33 | 15 | carefully. |
| 14:35:34 | 16 | The question is, why weren't these |
| 14:35:37 | 17 | produced?  They are all before that date. |
| 14:35:39 | 18 | A   Are these before? |
| 14:35:45 | 19 | Q   January 1, 2008, is that before -- |
| 14:35:45 | 20 | MR. PISHEVAR:  Assumes a fact. |
| 14:35:45 | 21 | BY MR. KAPSHANDY: |
| 14:35:45 | 22 | Q   -- 2009? |

Page 200

| | | |
|---|---|---|
| 14:35:47 | 1 | MR. PISHEVAR:  That's inaccurate. |
| 14:35:48 | 2 | BY MR. KAPSHANDY: |
| 14:35:49 | 3 | Q   October 24, 2008.  One of them is |
| 14:35:53 | 4 | January 1st, it's printed materials that were |
| 14:35:56 | 5 | revised February 3rd, 2009. |
| 14:35:58 | 6 | A   I do -- I do believe these were produced. |
| 14:36:00 | 7 | These were produced in physical format, most of |
| 14:36:02 | 8 | them, because we didn't have them in electronic |
| 14:36:05 | 9 | format. |
| 14:36:05 | 10 | Q   My question was, why weren't they produced |
| 14:36:08 | 11 | before they were ordered produced by the Court |
| 14:36:09 | 12 | recently? |
| 14:36:09 | 13 | A   No, I do believe these were produced. |
| 14:36:10 | 14 | These were some of the documents that were produced |
| 14:36:12 | 15 | in physical format because we didn't have them -- |
| 14:36:12 | 16 | Q   Dr. Parsi -- |
| 14:36:15 | 17 | A   -- in electronic format.  That's my |
| 14:36:16 | 18 | recollection. |
| 14:36:16 | 19 | Q   -- with the exception of the one called |
| 14:36:19 | 20 | "Lobbying Disclosure Act Guidelines," which we asked |
| 14:36:22 | 21 | Emily Blout and Patrick Disney about, and which you |
| 14:36:26 | 22 | did reproduce, none of these were produced prior -- |

Page 201

| | | |
|---|---|---|
| 14:36:28 | 1 | A   Which -- which exhibit is that? |
| 14:36:31 | 2 | Q   It's the second document that was produced |
| 14:36:32 | 3 | in native format. |
| 14:36:34 | 4 | MR. PISHEVAR:  Five minutes ago you |
| 14:36:36 | 5 | represented that none of these were produced.  Now |
| 14:36:38 | 6 | it's coming out some of it was produced, some of it |
| 14:36:41 | 7 | wasn't.  But you just keep asking these tricky |
| 14:36:44 | 8 | questions in the hope to get away -- |
| 14:36:44 | 9 | MR. KAPSHANDY:  Well, the version that was |
| 14:36:45 | 10 | produced this time, Counsel -- Counsel -- |
| 14:36:46 | 11 | MR. PISHEVAR:  Please stop this. |
| 14:36:47 | 12 | MR. KAPSHANDY:  The version that was |
| 14:36:49 | 13 | produced this time was different than the one that |
| 14:36:51 | 14 | was produced previously, so it is -- |
| 14:36:51 | 15 | THE WITNESS:  It was produced. |
| 14:36:52 | 16 | MR. PISHEVAR:  It was produced. |
| 14:36:53 | 17 | MR. KAPSHANDY:  Well, with different pages. |
| 14:36:55 | 18 | It's a complete copy this time. |
| 14:36:57 | 19 | BY MR. KAPSHANDY: |
| 14:37:04 | 20 | Q   See, Dr. Parsi, what I'm referring to, the |
| 14:37:05 | 21 | second document was previously produced and |
| 14:37:08 | 22 | discussed at Emily's deposition and Patrick's |

51 (Pages 198 to 201)

Page 202

```
14:37:11   1   deposition, "Lobbying Disclosure Act" guidance --
14:37:13   2       A   Which line?  Which one are you --
14:37:14   3       Q   -- doesn't have the second page, which you
14:37:17   4   have produced this time.  It's the one that's
14:37:18   5   produced in color.  "Lobbying Disclosure Act
14:37:21   6   Guidance."
14:37:24   7           I would agree with counsel that part of
14:37:25   8   that document was produced previously.  My question
14:37:30   9   was, how was it that the second page and all the
14:37:33  10   rest of these documents were not produced prior to
14:37:36  11   June of 2009?
14:37:37  12       A   So in a physical document, you missed the
14:37:42  13   page?  Is that what you are saying?
14:37:44  14       Q   Dr. Parsi, we got one of these pages.  You
14:37:47  15   can see from the stack that there are well over a
14:37:50  16   hundred, if not 200 pages.
14:37:52  17           So my question is --
14:37:53  18       A   This is -- I mean this is not one of our
14:37:56  19   documents.  This is just --
14:37:56  20       Q   So you are saying because it's not one of
14:37:59  21   your documents, it didn't have to be produced?
14:38:00  22       A   No, I'm not --
```

Page 203

```
14:38:00   1           MR. PISHEVAR:  First of all, that's not
14:38:01   2   what he said.
14:38:01   3   BY MR. KAPSHANDY:
14:38:02   4       Q   I didn't -- you know, listen to the
14:38:04   5   questions carefully.  My question wasn't is that
14:38:06   6   your document.
14:38:07   7           The question is, it's a document in your
14:38:09   8   files related to lobbying, why wasn't it produced?
14:38:12   9       A   This is a physical copy.  What do you know
14:38:15  10   whether this came to our possession in 2008 or 2009?
14:38:19  11           MR. PISHEVAR:  It's a bunch of printouts.
14:38:21  12           THE WITNESS:  The (inaudible) meeting I --
14:38:24  13   to the best of my recollection we had sometime in
14:38:24  14   2009, in the latter part of 2009.
14:38:27  15   BY MR. KAPSHANDY:
14:38:27  16       Q   Okay.  So some of them weren't produced
14:38:29  17   because you didn't get them until the latter part of
14:38:31  18   2009 is what you're saying.
14:38:32  19       A   It was after the cutoff date of discovery.
14:38:34  20       Q   And even though we repeatedly asked both
14:38:37  21   after Disney's deposition and after Blout's
14:38:40  22   deposition for all lobbying documents, you were
```

Page 204

```
14:38:43   1   withholding them because you thought there was a
14:38:46   2   discovery cutoff of May 2009?
14:38:48   3       A   That is not correct.
14:38:49   4           MR. PISHEVAR:  That's inaccurate --
14:38:53   5           MR. KAPSHANDY:  Okay.  Let's --
14:38:54   6           MR. PISHEVAR:  -- facts in your question.
14:38:56   7   BY MR. KAPSHANDY:
14:38:56   8       Q   Let's start with the first one, which is
14:38:57   9   from 2008.
14:38:57  10           THE REPORTER:  I'm sorry, I didn't get --
14:38:57  11           MR. PISHEVAR:  Inaccurate facts in your
14:38:57  12   question.
14:38:57  13   BY MR. KAPSHANDY:
14:38:59  14       Q   Let's start about with the 2008 document,
14:38:59  15   January 1st, 2008, revised July 6, 2008.
14:38:59  16           MR. PISHEVAR:  Counsel --
14:38:59  17   BY MR. KAPSHANDY:
14:39:03  18       Q   It also has somebody's handwriting all
14:39:03  19   over it.  Do you have any idea whose handwriting is
14:39:06  20   on it?
14:39:06  21       A   Can you show me the document because you
14:39:08  22   don't --
```

Page 205

```
14:39:09   1       Q   It's the very first one.
14:39:16   2           That's before the discovery cutoff.  Why
14:39:17   3   was that not produced?
14:39:18   4       A   That is a printout in which whoever wrote
14:39:23   5   this, which is not us, wrote it in January 2008.
14:39:29   6   That is not that we had it in our possession before
14:39:33   7   discovery cutoff date.  We're not the authors of
14:39:37   8   this.  This is someone writing, explaining the LDA
14:39:40   9   to the best of my understanding, and we're not the
14:39:42  10   one writing and explaining the LDA in --
14:39:46  11       Q   Let's try another one.  October 8,
14:39:49  12   2008, from Patrick Disney.  "Should we make the
14:39:53  13   H election?"
14:39:54  14           "To:  Trita Parsi," that would be you,
14:39:54  15   correct?
14:39:59  16       A   Mm-hmm.
14:40:00  17           MR. KAPSHANDY:  And the reason it's
14:40:01  18   produced this way, Counsel, is because it was
14:40:03  19   produced by you as a PDF and not as a native file,
14:40:08  20   which we've requested for the record.
14:40:08  21           MR. PISHEVAR:  That's --
14:40:08  22
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 206

```
14:40:08  1   BY MR. KAPSHANDY:
14:40:10  2       Q   But, in any event, Dr. Parsi, would this
14:40:13  3   appear to be an authentic NIAC document, an e-mail
14:40:16  4   from your acting --
14:40:16  5       A   Yes.
14:40:16  6       Q   -- legislative director to you, Trita
14:40:16  7   Parsi?
14:40:17  8       A   I believe so.  I believe so.
14:40:17  9       Q   And copied to Emily Blout.
14:40:21  10      Why was this not produced?
14:40:23  11      A   It was produced.  I'm very, very confident
14:40:25  12  that this was produced.
14:40:26  13      Q   Why was it not produced prior to the
14:40:29  14  June 2008 discovery or 2009 discovery?
14:40:33  15      A   I'm pretty confident that it was.  This
14:40:36  16  was in the big stack of physical documents that we
14:40:38  17  sent you guys.  I'm pretty confident of that.
14:40:41  18      MR. KAPSHANDY:  Well, Counsel, we can use
14:40:42  19  your help then, because we would like to see when and
14:40:45  20  where those were produced.
14:40:46  21      MR. PISHEVAR:  Okay.  We'll look into that
14:40:49  22  big stack of documents we produced to you a little
```

Page 207

```
14:40:52  1   more carefully because you've been inaccurate a few
14:40:56  2   times.
14:40:57  3       MR. KAPSHANDY:  Good, I'd appreciate that.
14:40:58  4       MR. PISHEVAR:  And then we can discuss it.
14:40:59  5   Okay?
14:40:59  6       MR. KAPSHANDY:  Yeah.  Because those have
14:41:01  7   been produced electronically, and we'll be able to
14:41:01  8   find it easily.
14:41:01  9       MR. PISHEVAR:  I'm sure --
14:41:01  10  BY MR. KAPSHANDY:
14:41:03  11      Q   We haven't found it, Dr. Parsi, which is
14:41:05  12  why I ask these questions.  I apologize if it seems
14:41:05  13  like --
14:41:07  14      A   I am pretty confident you do have it.  In
14:41:10  15  fact, I wouldn't be surprised if it's one of the
14:41:13  16  stuff that your client put on the web.
14:41:15  17      Q   Let's look at the next one.
14:41:17  18      A   Which one is that?
14:41:18  19      Q   Advocacy@AFJ.org, October 24, 2008, to
14:41:25  20  Patrick Disney.  Now, that clearly was created and
14:41:28  21  received in October of 2008, correct?
14:41:46  22      A   Is this the one you said that a page is
```

Page 208

```
14:41:48  1   missing?
14:41:49  2       Q   No.  None of them have a page missing now
14:41:53  3   because we've finally gotten complete copies of the
14:41:56  4   Disney memo.
14:41:58  5       A   There is an extra copy.  Is there a reason
14:42:00  6   for that?
14:42:01  7       Q   That's the way it was -- I think one of
14:42:03  8   them is a native file and one of them was the hard
14:42:05  9   copies is why they were produced that way.
14:42:44  10      If you want to take your time, we'll go
14:42:45  11  off the record.
14:42:45  12      A   Oh, I'm sorry?  You were at -- I didn't
14:42:46  13  know you were asking --
14:42:46  14      Q   The question was, why was that not
14:42:48  15  produced before?  It's clearly before June of 2009.
14:42:51  16      A   I don't know if it was or if it wasn't.
14:42:54  17  This is an e-mail that was essentially sent by
14:42:56  18  someone at AFJ -- I don't know what AFJ is -- to
14:43:01  19  Patrick Disney.
14:43:02  20      Q   Relating to lobbying laws.  You have no
14:43:06  21  idea why it wasn't produced?
14:43:07  22      A   It seems to be just a printout from the
```

Page 209

```
14:43:10  1   website.
14:43:10  2       Q   It's an e-mail, Dr. Parsi --
14:43:12  3       A   Mm-hmm.
14:43:14  4       Q   -- from somebody at AFJ, which stands for
14:43:17  5   Alliance For Justice, to Patrick Disney, and he
14:43:20  6   testified about it at his deposition.
14:43:21  7       A   Mm-hmm.  Oh, he did?  Oh, he did?
14:43:23  8       Q   Right.
14:43:24  9       A   So you guys had it then.
14:43:26  10      Q   No, he said he had these communications,
14:43:29  11  and the question was at that time was, why have they
14:43:31  12  not been produced, as it has been repeatedly since
14:43:35  13  then, and were not produced until ordered by the
14:43:38  14  Court just a month ago.
14:43:39  15      So my question was, why were those not --
14:43:40  16      MR. PISHEVAR:  Objection to your
14:43:40  17  characterization.
14:43:40  18  BY MR. KAPSHANDY:
14:43:40  19      Q   -- produced?
14:43:41  20      A   I believe this was produced.
14:43:42  21      Q   Okay.  Well, we will put that aside.
14:43:49  22      Let me hand you what we'll mark as your
```

53  (Pages 206 to 209)

Page 210

| | | |
|---|---|---|
| 14:43:51 | 1 | deposition Exhibit 130. |
| 14:43:48 | 2 | (Exhibit No. 130 was marked for |
| 14:43:48 | 3 | identification.) |
| 14:43:48 | 4 | BY MR. KAPSHANDY: |
| 14:44:01 | 5 | Q   Which is produced as part of the Babak |
| 14:44:03 | 6 | Talebi production, which is a markup of the |
| 14:44:13 | 7 | "Incidents At Sea" Resolution. |
| 14:44:19 | 8 | MR. PISHEVAR: Didn't you ask Babak Talebi |
| 14:44:20 | 9 | about this at his deposition? |
| 14:44:22 | 10 | MR. KAPSHANDY: Pardon? |
| 14:44:23 | 11 | MR. PISHEVAR: Didn't you ask him about |
| 14:44:24 | 12 | this at his deposition? |
| 14:44:25 | 13 | MR. KAPSHANDY: No, we didn't have it. |
| 14:44:27 | 14 | MR. PISHEVAR: So it wouldn't be an exhibit |
| 14:44:30 | 15 | to that depo then. |
| 14:44:31 | 16 | BY MR. KAPSHANDY: |
| 14:44:32 | 17 | Q   First of all, this is -- you know what a |
| 14:44:35 | 18 | markup is, a redlined copy of a document? That's |
| 14:44:38 | 19 | what this appears to be, correct? |
| 14:44:39 | 20 | A   Sorry, a markup? |
| 14:44:42 | 21 | Q   Somebody -- |
| 14:44:43 | 22 | A   Is editing something. |

Page 211

| | | |
|---|---|---|
| 14:44:45 | 1 | Q   -- DE has put comments in there and made |
| 14:44:49 | 2 | revisions to the document. It's known as redlining |
| 14:44:52 | 3 | or marking up a document. |
| 14:44:53 | 4 | In this case, in particular, a proposed |
| 14:44:54 | 5 | legislation regarding the "Incidents At Sea" Treaty. |
| 14:44:57 | 6 | Right? |
| 14:44:58 | 7 | A   Mm-hmm. |
| 14:44:59 | 8 | Q   Any idea why that wasn't produced? |
| 14:45:01 | 9 | A   Was this part of the Babak Talebi e-mails? |
| 14:45:05 | 10 | Q   Yes. |
| 14:45:06 | 11 | A   Well, you have to ask my counsel. As I |
| 14:45:06 | 12 | explained to you, I did not do that discovery. |
| 14:45:07 | 13 | Q   Well, do you think it was discoverable? |
| 14:45:09 | 14 | A   I don't know. |
| 14:45:09 | 15 | MR. PISHEVAR: Objection. Calls for a |
| 14:45:10 | 16 | legal conclusion. |
| | 17 | THE WITNESS: I'm just saying to you right |
| | 18 | now, you asked me why it wasn't produced, I said -- |
| | 19 | BY MR. KAPSHANDY: |
| | 20 | Q   Your counsel keeps -- |
| | 21 | A   -- I wasn't the one who did it. |
| 14:45:13 | 22 | Q   Your counsel keeps objecting that the |

Page 212

| | | |
|---|---|---|
| 14:45:15 | 1 | determination of discoverability -- |
| 14:45:15 | 2 | MR. PISHEVAR: That's not -- |
| 14:45:15 | 3 | BY MR. KAPSHANDY: |
| 14:45:18 | 4 | Q   -- is not something you are able to make. |
| 14:45:20 | 5 | But my question for you is, that being the case, how |
| 14:45:23 | 6 | is it that you and your employees made these initial |
| 14:45:25 | 7 | reviews of their computers and put documents on the |
| 14:45:28 | 8 | server to be reviewed for counsel if they didn't and |
| 14:45:31 | 9 | weren't in a position to determine what is |
| 14:45:33 | 10 | discoverable or not? |
| 14:45:34 | 11 | MR. PISHEVAR: Was this an attachment to |
| 14:45:36 | 12 | something? Do you have what it was attached to or -- |
| 14:45:37 | 13 | MR. KAPSHANDY: No, it was just produced |
| 14:45:39 | 14 | like that. It was a markup in a Word file. You |
| 14:45:43 | 15 | should look at them sometime. There are about 8,000 |
| 14:45:46 | 16 | of them, Counsel. |
| 14:45:47 | 17 | MR. PISHEVAR: Okay. Please don't insult |
| 14:45:49 | 18 | me. |
| 14:45:49 | 19 | THE WITNESS: Well, no, if it was part of |
| 14:45:50 | 20 | the e-mails, then it was not a -- |
| 14:45:50 | 21 | MR. PISHEVAR: Gratuitous. |
| 14:45:51 | 22 | THE WITNESS: -- standalone document, then |

Page 213

| | | |
|---|---|---|
| 14:45:52 | 1 | it must have been an attachment. Can I see the |
| 14:45:54 | 2 | e-mail? |
| 14:45:54 | 3 | BY MR. KAPSHANDY: |
| 14:45:54 | 4 | Q   You can't tell how they're attached? They |
| 14:45:54 | 5 | were just produced separately? |
| 14:45:54 | 6 | A   You can. You can. |
| 14:45:59 | 7 | Q   Well, we will appreciate your assistance |
| 14:46:00 | 8 | of counsel. |
| 14:46:00 | 9 | A   If there's an e-mail, let me see that |
| 14:46:01 | 10 | there's an attachment to it. |
| 14:46:02 | 11 | MR. KAPSHANDY: Counsel, if you could, we |
| 14:46:04 | 12 | would appreciate your assistance and help us |
| 14:46:06 | 13 | determine what that was an attachment to, it would be |
| 14:46:09 | 14 | much appreciated. |
| 14:46:10 | 15 | THE WITNESS: No, if you printed it out, |
| 14:46:12 | 16 | you must have clicked on the e-mail and then you |
| 14:46:12 | 17 | printed on the document, so you -- |
| 14:46:14 | 18 | BY MR. KAPSHANDY: |
| 14:46:14 | 19 | Q   Unfortunately, I would have appreciated |
| 14:46:16 | 20 | that too, Dr. Parsi, had the documents been so |
| 14:46:19 | 21 | linked in the format that they were produced. |
| 14:46:20 | 22 | A   It is, because it's a PSD file. |

54  (Pages 210 to 213)

## Page 214

| | | |
|---|---|---|
| 14:46:20 | 1 | Q Well, they weren't when they were produced |
| 14:46:22 | 2 | to us. |
| 14:46:23 | 3 | A No, no, no, you probably opened it up with |
| 14:46:25 | 4 | the wrong program again. |
| 14:46:25 | 5 | Q Don't worry. Better computer expertise -- |
| 14:46:27 | 6 | A It's a PSD file. You just import it into |
| 14:46:30 | 7 | your Outlook, and then you have everything in their |
| 14:46:32 | 8 | native format. |
| 14:46:33 | 9 | MR. KAPSHANDY: Can we go off the record a |
| 14:46:51 | 10 | second. |
| 14:46:52 | 11 | THE VIDEOGRAPHER: The time is 2:46 p.m. |
| 14:46:55 | 12 | We're going off the record. |
| 14:58:22 | 13 | (Recess.) |
| 14:58:22 | 14 | THE VIDEOGRAPHER: The time is 2:58 p.m. |
| 14:58:30 | 15 | We're back on the record. |
| 14:58:31 | 16 | BY MR. KAPSHANDY: |
| 14:58:31 | 17 | Q Okay. Dr. Parsi, I would like to wrap |
| 14:58:34 | 18 | things up here and move to a couple of other |
| 14:58:37 | 19 | subjects, but, first, I -- I think I know what the |
| 14:58:39 | 20 | answer to the question is, but for the record, what |
| 14:58:42 | 21 | I'm going to do is mark as Exhibit 131 a compilation |
| 14:58:47 | 22 | of materials produced as part of the recent Talebi |

## Page 215

| | | |
|---|---|---|
| 14:58:51 | 1 | production related simply to CNAPI, the Campaign for |
| 14:58:55 | 2 | New American Policy on Iran, and I take it your |
| 14:58:59 | 3 | answer for that will be the same, you had no |
| 14:59:01 | 4 | involvement in the determination as to whether and |
| 14:59:03 | 5 | when those should have been produced, correct? |
| 14:59:05 | 6 | A I believe so. |
| 14:10:28 | 7 | (Exhibit No. 131 was marked for |
| 14:10:28 | 8 | identification.) |
| 14:59:06 | 9 | BY MR. KAPSHANDY: |
| 14:59:06 | 10 | Q Let me hand you what we'll mark as your |
| 14:59:08 | 11 | deposition Exhibit 132, which, believe it or not, is |
| 14:59:15 | 12 | still only a small fraction of the Talebi e-mails |
| 14:59:18 | 13 | that were produced recently. |
| 14:10:28 | 14 | (Exhibit No. 132 was marked for |
| 14:10:28 | 15 | identification.) |
| 14:59:20 | 16 | MR. KAPSHANDY: We have a set for you too, |
| 14:59:20 | 17 | Counsel. |
| 14:59:20 | 18 | BY MR. KAPSHANDY: |
| 14:59:23 | 19 | Q And I won't spend any time going through |
| 14:59:27 | 20 | these in any detail, and what we will represent for |
| 14:59:29 | 21 | the record that it's not all 5,500 or 8,000 of them. |
| 14:59:33 | 22 | But I take it your answer is the same, is |

## Page 216

| | | |
|---|---|---|
| 4:59:36 | 1 | that you had no involvement in the determination as |
| 4:59:38 | 2 | to whether those were discoverable or not? |
| 4:59:40 | 3 | A No. |
| 4:59:45 | 4 | Q I would like to turn to the question now |
| 4:59:49 | 5 | of damages that we are also permitted by the Court |
| 4:59:52 | 6 | to examine you on, correct? |
| 4:59:54 | 7 | A I believe so. |
| 4:59:54 | 8 | Q You understand that? Are you prepared to |
| 4:59:56 | 9 | talk about that today? |
| 4:59:57 | 10 | A Yes. |
| 4:59:57 | 11 | Q Now, I understand you have not had an |
| 5:00:02 | 12 | economist, such as Professor Morse on behalf of |
| 5:00:05 | 13 | NIAC, do opinion or a professional report or |
| 5:00:10 | 14 | expertise on the amount of damages that Trita Parsi |
| 5:00:14 | 15 | has suffered economically, correct? |
| 5:00:16 | 16 | A Correct. |
| 5:00:18 | 17 | Q And, in fact, if we look at your income |
| 5:00:21 | 18 | tax returns from the time the Defendant Hassan |
| 5:00:26 | 19 | Daioleslam started writing about you in 2007 to |
| 5:00:28 | 20 | present, your income has increased every year since |
| 5:00:31 | 21 | then, correct? |
| 5:00:33 | 22 | A I don't recall the exact numbers of my tax |

## Page 217

| | | |
|---|---|---|
| 5:00:35 | 1 | returns, but -- |
| 5:00:37 | 2 | Q I'm not asking that. It's simply gone up |
| 5:00:39 | 3 | every year since then; has it not? |
| 5:00:41 | 4 | A I would have to remember the numbers to be |
| 5:00:44 | 5 | able to answer your question, but I do also know |
| 5:00:46 | 6 | that this is a period in which I stopped being a |
| 5:00:48 | 7 | graduate student and actually started working full |
| 5:00:51 | 8 | time, so obviously it would probably increase. |
| 5:00:54 | 9 | That, however, does not say whether it increased as |
| 5:00:55 | 10 | much as it could have had it not been for the |
| 5:01:00 | 11 | defamatory and the slanderous accusations and lies |
| 5:01:00 | 12 | that he has spread about me and my organization. |
| 5:01:03 | 13 | Q So the question asked you, and if you can |
| 5:01:06 | 14 | try and listen carefully and answer, is simply, has |
| 5:01:09 | 15 | your income not increased every year since 2007, |
| 5:01:13 | 16 | 2008, and includes 2009, 2010 and 2011, which isn't |
| 5:01:18 | 17 | completed, but the board has authorized, you know, a |
| 5:01:21 | 18 | salary for you, Trita Parsi -- |
| 5:01:22 | 19 | MR. PISHEVAR: Objection. Asked and |
| 5:01:22 | 20 | answered. |
| 5:01:22 | 21 | BY MR. KAPSHANDY: |
| 5:01:24 | 22 | Q -- in each of those years, your salary |

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 218

| | | |
|---|---|---|
| 15:01:26 | 1 | from NIAC and your income has gone up, has it not? |
| 15:01:30 | 2 | MR. PISHEVAR: Same objection. |
| 15:01:31 | 3 | THE WITNESS: My salary has not gone up |
| 15:01:33 | 4 | every year, no. |
| 15:01:34 | 5 | BY MR. KAPSHANDY: |
| 15:01:34 | 6 | Q   Your income has gone up and the salary |
| 15:01:36 | 7 | that at least you're reporting from NIAC on your tax |
| 15:01:38 | 8 | returns from those years -- |
| 15:01:38 | 9 | A   Not on a yearly basis to the best of my -- |
| 15:01:42 | 10 | Q   Pardon? |
| 15:01:42 | 11 | A   Not on a yearly basis to the best of my |
| 15:01:45 | 12 | recollection. |
| 15:01:45 | 13 | Q   Okay.  Well, the returns -- |
| 15:01:46 | 14 | A   And in fact, I think the tax returns -- |
| 15:01:46 | 15 | Q   Go ahead. |
| 15:01:48 | 16 | A   -- that you showed me, at some point my |
| 15:01:51 | 17 | income had decreased, but I don't remember exactly |
| 15:01:53 | 18 | which years those were. |
| 15:01:55 | 19 | Q   Well, the tax returns are marked at your |
| 15:01:59 | 20 | previous deposition and they speak for themselves, |
| 15:02:01 | 21 | but as you sit here, you are not able to say if your |
| 15:02:05 | 22 | income went up or down from any of those years? |

Page 219

| | | |
|---|---|---|
| 15:02:08 | 1 | A   I hope my income has gone up, but whether |
| 15:02:12 | 2 | they have consistently gone up every year, I don't |
| 15:02:16 | 3 | recall. |
| 15:02:16 | 4 | Q   Now, the other question that you weren't |
| 15:02:20 | 5 | prepared to answer at your previous deposition that |
| 15:02:22 | 6 | I want to ask you about now is, what amount are you |
| 15:02:24 | 7 | claiming for other noneconomic damages in this |
| 15:02:29 | 8 | lawsuit from the Defendant Hassan Daioleslam? |
| 15:02:34 | 9 | MR. PISHEVAR: Objection. |
| 15:02:34 | 10 | THE WITNESS: Sorry.  Could you repeat the |
| 15:02:36 | 11 | question?  What -- |
| 15:02:37 | 12 | MR. PISHEVAR: You want a dollar amount for |
| 15:02:39 | 13 | noneconomic?  Is that what you're asking? |
| 15:02:39 | 14 | MR. KAPSHANDY: Exactly. |
| 15:02:40 | 15 | MR. PISHEVAR: That's for the jury to |
| 15:02:43 | 16 | determine. |
| 15:02:43 | 17 | BY MR. KAPSHANDY: |
| 15:02:44 | 18 | Q   Are you not prepared to tell us here, as |
| 15:02:46 | 19 | you sit here today, and further to the Court's order |
| 15:02:49 | 20 | to be prepared to address the amount you are |
| 15:02:50 | 21 | claiming for damages, how much you are asking the |
| 15:02:52 | 22 | jury to award Hassan -- or you from Hassan |

Page 220

| | | |
|---|---|---|
| 15:02:56 | 1 | Daioleslam for the alleged defamatory articles he |
| 15:02:58 | 2 | has written? |
| 15:02:59 | 3 | A   Can you define what you mean when you say |
| 15:03:02 | 4 | "noneconomic"?  What does that mean? |
| 15:03:03 | 5 | Q   Other than those measured by lost income, |
| 15:03:05 | 6 | lost business opportunities. |
| 15:03:06 | 7 | A   So punitive damages then?  Is that what -- |
| 15:03:09 | 8 | Q   Any dollar amount, whether you want to |
| 15:03:11 | 9 | call it punitive or general damages or noneconomic |
| 15:03:14 | 10 | damages, for the mental anguish that you've alleged |
| 15:03:17 | 11 | in your complaint. |
| 15:03:17 | 12 | A   Mm-hmm.  Was that not included in one of |
| 15:03:21 | 13 | our interrogatories in February? |
| 15:03:23 | 14 | Q   No, and it wasn't answered at the last |
| 15:03:25 | 15 | deposition.  And you were ordered -- |
| 15:03:25 | 16 | A   No, but in February. |
| 15:03:26 | 17 | Q   -- to be prepared to address that. |
| 15:03:28 | 18 | So my question is, how much are you |
| 15:03:30 | 19 | claiming for these noneconomic damages other than |
| 15:03:32 | 20 | lost income which you have not supported with any |
| 15:03:35 | 21 | economic testimony? |
| 15:03:36 | 22 | A   In the February interrogatories, was that |

Page 221

| | | |
|---|---|---|
| 15:03:38 | 1 | not answered? |
| 15:03:39 | 2 | Q   No, it wasn't, and that's why we're |
| 15:03:41 | 3 | asking. |
| 15:03:41 | 4 | A   I thought that it was.  Can I confer with |
| 15:03:45 | 5 | my counsel briefly? |
| 15:03:47 | 6 | Q   Well, we're going to have to go off the |
| 15:03:49 | 7 | record and take some time -- |
| 15:03:49 | 8 | A   Well, you go off the record every time you |
| 15:03:51 | 9 | want to look at a piece of paper, so sure. |
| 15:03:54 | 10 | MR. KAPSHANDY: Let's go off the record. |
| 15:03:54 | 11 | THE VIDEOGRAPHER: The time is 3:03 p.m. |
| 15:03:56 | 12 | We're going off the record. |
| 15:03:56 | 13 | (A discussion was held off the |
| 15:04:40 | 14 | record.) |
| 15:04:40 | 15 | THE VIDEOGRAPHER: The time is 3:04 p.m. |
| 15:04:42 | 16 | We're back on the record. |
| 15:04:42 | 17 | BY MR. KAPSHANDY: |
| 15:04:44 | 18 | Q   Okay.  Having had a chance to confer with |
| 15:04:45 | 19 | your attorney for a minute or so, are you prepared |
| 15:04:47 | 20 | to answer? |
| 15:04:48 | 21 | A   Could you repeat the question? |
| 15:04:49 | 22 | Q   The question, is what amount are you |

56  (Pages 218 to 221)

Page 222

| | | |
|---|---|---|
| 15:04:51 | 1 | claiming from the defendant Hassan Daioleslam for |
| 15:04:54 | 2 | noneconomic damages? |
| 15:04:55 | 3 | A   Meaning punitive and damages of that kind? |
| 15:04:59 | 4 | Q   For the mental anguish -- |
| 15:04:59 | 5 | A   Mental anguish. |
| 15:05:00 | 6 | Q   -- that you alleged in your complaint, |
| 15:05:02 | 7 | anything other than lost income which is documented |
| 15:05:04 | 8 | by -- |
| 15:05:05 | 9 | A   I think it would be fair that it would be |
| 15:05:07 | 10 | somewhere in the amount of a hundred to $200,000. |
| 15:05:10 | 11 | Q   Okay.  And having given this a couple of |
| 15:05:13 | 12 | minutes of thought with your counsel, how is it that |
| 15:05:15 | 13 | you came up with that calculation? |
| 15:05:16 | 14 | A   Well, it's based on what I think is fair |
| 15:05:19 | 15 | based on the mental anguish, the hate e-mails that |
| 15:05:22 | 16 | we received with links to his articles, the death |
| 15:05:27 | 17 | threats that I have received, the death threats that |
| 15:05:29 | 18 | my children have received with people referencing |
| 15:05:33 | 19 | the defendant's articles, and as a result, feeling |
| 15:05:37 | 20 | prompted to issue death threats. |
| 15:05:39 | 21 | Q   And you believe the death threats are the |
| 15:05:41 | 22 | responsibility and the result of the defendant's |

Page 223

| | | |
|---|---|---|
| 15:05:43 | 1 | writings? |
| 15:05:44 | 2 | A   That's what the people making the death |
| 15:05:46 | 3 | threats have said. |
| 15:05:46 | 4 | Q   Well, did you look at all the exhibits to |
| 15:05:48 | 5 | the motion to exclude Professor Morse's testimony |
| 15:05:51 | 6 | where many people specifically cited other people |
| 15:05:54 | 7 | such as Claire Lopez, Timmerman, Ruben and many |
| 15:05:59 | 8 | other writers as far as back as 2000 have claimed |
| 15:06:02 | 9 | that Trita Parsi is an agent or a lobbyist for the |
| 15:06:05 | 10 | Islamic regime? |
| 15:06:05 | 11 | A   First of all, Claire Lopez has not done it |
| 15:06:09 | 12 | until sometime in 2008, 2009, and almost all of |
| 15:06:13 | 13 | her -- if I can even call it work, it was such a |
| 15:06:17 | 14 | ridiculous report that no one paid it much attention |
| 15:06:18 | 15 | to that specific report, but most of the footnotes |
| 15:06:22 | 16 | actually went back to the defendant's slanderous and |
| 15:06:26 | 17 | defamatory articles. |
| 15:06:26 | 18 | Q   Okay.  Let's talk about Timmerman who |
| 15:06:29 | 19 | wrote this as early as 2000. |
| 15:06:30 | 20 | A   He did not write this as early as 2000 -- |
| 15:06:31 | 21 | Q   He called you a lobbyist for the regime in |
| 15:06:34 | 22 | 2000. |

Page 224

| | | |
|---|---|---|
| 15:06:35 | 1 | A   I have no recollection of that. |
| 15:06:35 | 2 | Q   Okay.  Well, many of the e-mails -- |
| 15:06:37 | 3 | A   Can you show me that e-mail? |
| 15:06:38 | 4 | Q   Maybe of the e-mails that Professor Morse |
| 15:06:40 | 5 | was shown but weren't produced to us referenced |
| 15:06:43 | 6 | these other writers and independent evidence, and my |
| 15:06:47 | 7 | question for you is, there are many other people out |
| 15:06:51 | 8 | there calling Trita Parsi a lobbyist for the regime |
| 15:06:55 | 9 | besides Hassan Daioleslam. |
| 15:06:55 | 10 | MR. PISHEVAR:  Objection.  Argumentative. |
| 15:06:55 | 11 | BY MR. KAPSHANDY: |
| 15:06:56 | 12 | Q   And my question for you is, in coming up |
| 15:06:58 | 13 | with your damages calculation, how do you |
| 15:07:01 | 14 | distinguish when all these other people are calling |
| 15:07:03 | 15 | you a lobbyist for the regime from when Hassan |
| 15:07:08 | 16 | Daioleslam writes that? |
| 15:07:08 | 17 | A   First of all -- |
| 15:07:09 | 18 | MR. PISHEVAR:  Objection.  Asked and |
| 15:07:09 | 19 | answered? |
| 15:07:11 | 20 | THE WITNESS:  -- when someone makes a phone |
| 15:07:13 | 21 | call and leaves a message or yell and screams, and |
| 15:07:17 | 22 | you can hear one of these TV shows of Daioleslam in |

Page 225

| | | |
|---|---|---|
| 15:07:21 | 1 | the background and makes a reference to Daioleslam -- |
| 15:07:25 | 2 | I have never had a phone call by anyone saying, I |
| 15:07:30 | 3 | read Michael Ruben's attempt at writing articles or |
| 15:07:34 | 4 | Timmerman's attempt at writing articles and as a |
| 15:07:35 | 5 | result be prompted to issue death threats and to slit |
| 15:07:39 | 6 | the throat of my children in front of me. |
| 15:07:41 | 7 | But it seems like when Daioleslam is |
| 15:07:44 | 8 | writing slanderous and defamatory articles and when |
| 15:07:48 | 9 | he goes on TV and issues those lies, it seems to have |
| 15:07:53 | 10 | that effect. |
| 15:07:53 | 11 | BY MR. KAPSHANDY: |
| 15:07:53 | 12 | Q   So how many times have people called |
| 15:07:55 | 13 | you -- |
| 15:07:55 | 14 | MR. PISHEVAR:  For the record, you are over |
| 15:07:57 | 15 | your time. |
| 15:07:57 | 16 | MR. KAPSHANDY:  May I finish this line of |
| 15:07:58 | 17 | questioning, Counsel? |
| 15:07:59 | 18 | MR. PISHEVAR:  You may ask one more |
| 15:08:00 | 19 | question.  The videographer has indicated that you |
| 15:08:03 | 20 | are over your time. |
| 15:08:04 | 21 | MR. KAPSHANDY:  Well, I would like, in |
| 15:08:05 | 22 | light of the delays that occurred here today, to be |

57 (Pages 222 to 225)

Page 226

| | | |
|---|---|---|
| 15:08:07 | 1 | able to -- |
| 15:08:07 | 2 | MR. PISHEVAR: I don't think the delays -- |
| 15:08:08 | 3 | MR. KAPSHANDY: -- to be able to proceed |
| 15:08:09 | 4 | another five minutes. May I -- |
| 15:08:10 | 5 | THE WITNESS: No. No. I needed to go -- |
| 15:08:12 | 6 | MR. KAPSHANDY: May I proceed five minutes? |
| 15:08:12 | 7 | MR. PISHEVAR: I don't think that's |
| 15:08:14 | 8 | appropriate. |
| 15:08:14 | 9 | THE WITNESS: I needed to go 50 minutes |
| 15:08:16 | 10 | ago. |
| 15:08:16 | 11 | MR. PISHEVAR: You had your time. You |
| 15:08:18 | 12 | didn't manage it the way you should have, apparently, |
| 15:08:18 | 13 | and now you want extra time. |
| 15:08:18 | 14 | BY MR. KAPSHANDY: |
| 15:08:19 | 15 | Q   Okay. Are you prepared to answer a couple |
| 15:08:21 | 16 | more questions on -- |
| 15:08:22 | 17 | A   I'm not. I needed to go 50 minutes ago. |
| 15:08:25 | 18 | Q   Okay. Could I answer -- ask you five |
| 15:08:27 | 19 | minutes more worth of questions? |
| 15:08:28 | 20 | A   I'm really sorry, you are already 50 |
| 15:08:30 | 21 | minutes over your time. |
| 15:08:31 | 22 | Q   The videographer has been keeping track. |

Page 227

| | | |
|---|---|---|
| 15:08:35 | 1 | He said I'm exactly out of time now. |
| 15:08:37 | 2 | A   Okay. But we were supposed -- |
| 15:08:39 | 3 | MR. PISHEVAR: No. How much over -- |
| 15:08:39 | 4 | THE VIDEOGRAPHER: A few minutes ago. It's |
| 15:08:39 | 5 | three minutes over. |
| 15:08:39 | 6 | MR. KAPSHANDY: May I have five more |
| 15:08:40 | 7 | minutes? |
| 15:08:40 | 8 | THE WITNESS: Three minutes over. I'm |
| 15:08:42 | 9 | sorry, sir. |
| 15:08:42 | 10 | BY MR. KAPSHANDY: |
| 15:08:43 | 11 | Q   Okay. The question I have for you, |
| 15:08:45 | 12 | Dr. Parsi -- |
| 15:08:45 | 13 | A   No, I'm sorry, sir, no more. |
| 15:08:45 | 14 | Q   -- is how is it that you distinguish -- |
| 15:08:45 | 15 | strike that. |
| 15:08:50 | 16 | How many times is it and when was that |
| 15:08:52 | 17 | somebody called you with Daioleslam's television |
| 15:08:58 | 18 | program in the background and threatening you, and |
| 15:09:00 | 19 | when was that? |
| 15:09:01 | 20 | A   I don't recall the number of times that |
| 15:09:02 | 21 | that has happened, but I -- |
| 15:09:04 | 22 | Q   And when did that happen? |

Page 228

| | | |
|---|---|---|
| 15:09:05 | 1 | A   It's happened throughout the -- the last |
| 15:09:07 | 2 | couple of years. |
| 15:09:08 | 3 | Q   And every time these people have |
| 15:09:10 | 4 | Daioleslam's TV program playing in the background |
| 15:09:12 | 5 | and they are citing him for the reasons to wanting |
| 15:09:15 | 6 | to kill you? |
| 15:09:16 | 7 | A   It's the same person. |
| 15:09:18 | 8 | Q   Oh, one person. Have you had that phone |
| 15:09:21 | 9 | traced? |
| 15:09:21 | 10 | A   I've been in contact with the FBI about |
| 15:09:24 | 11 | this issue. |
| 15:09:24 | 12 | Q   Okay. When did you contact the FBI? |
| 15:09:27 | 13 | A   I don't recall exactly. |
| 15:09:28 | 14 | MR. PISHEVAR: This is five questions. |
| 15:09:29 | 15 | BY MR. KAPSHANDY: |
| 15:09:29 | 16 | Q   Well, there is an appointment on your |
| 15:09:31 | 17 | calendar from July 8, 2008, says:  "Katia, FBI," and |
| 15:09:36 | 18 | has a phone number in D.C.  Is that the |
| 15:09:36 | 19 | communication you are talking about? |
| 15:09:38 | 20 | A   Yeah, but by the time I knew her name was |
| 15:09:41 | 21 | Katia, we had already been in contact for a while. |
| 15:09:43 | 22 | Q   Okay. And how many times have you |

Page 229

| | | |
|---|---|---|
| 15:09:44 | 1 | contacted her? |
| 15:09:45 | 2 | A   I don't recall the number of times that I |
| 15:09:47 | 3 | have been in contact with them. |
| 15:09:47 | 4 | Q   And have you determined who this person |
| 15:09:49 | 5 | was who is making those threats? |
| 15:09:52 | 6 | A   I asked them for all the help that they |
| 15:09:54 | 7 | could provide me in doing so. |
| 15:09:55 | 8 | Q   And did they determine who it was? |
| 15:09:57 | 9 | A   I think they did, but they have not |
| 15:09:58 | 10 | informed me of it. |
| 15:09:58 | 11 | Q   So it's one person that's been making |
| 15:10:00 | 12 | these calls? |
| 15:10:00 | 13 | A   No, it's one person that have been |
| 15:10:03 | 14 | repeatedly made threats -- death threats and have |
| 15:10:05 | 15 | had referenced Daioleslam. There's others who have |
| 15:10:10 | 16 | made it as well, but he's the one who had the TV |
| 15:10:13 | 17 | show in the background. |
| 15:10:13 | 18 | Q   Now, how many -- |
| 15:10:15 | 19 | A   Actually, I need to go. |
| 15:10:15 | 20 | Q   -- times have you contacted the FBI agent? |
| 15:10:18 | 21 | A   I don't remember. |
| 15:10:20 | 22 | Q   Well, I mean these death threats seem |

58  (Pages 226 to 229)

Page 230

| | | |
|---|---|---|
| 15:10:23 | 1 | pretty serious. You only remember calling her once? |
| 15:10:26 | 2 | A  No. I didn't say I only remember calling |
| 15:10:28 | 3 | her once. |
| 15:10:28 | 4 | Q  Well, it would seem a matter as serious as |
| 15:10:31 | 5 | death threats you would recall how many times you |
| 15:10:32 | 6 | have reported it to the FBI. |
| 15:10:32 | 7 | A  I've gone to the police; I've gone to the |
| 15:10:35 | 8 | FBI. I don't remember how many times I spoke with |
| 15:10:36 | 9 | them. |
| 15:10:36 | 10 | Q  Well, how many times, roughly? You can't |
| 15:10:39 | 11 | recall? |
| 15:10:40 | 12 | A  I said I don't remember. |
| 15:10:41 | 13 | Q  It's so important and you are so fearful |
| 15:10:44 | 14 | of your children that you can't remember how many |
| 15:10:44 | 15 | times you've reported it to the FBI? |
| 15:10:46 | 16 | A  You asked me how many times -- |
| 15:10:46 | 17 | MR. PISHEVAR: Objection. False dichotomy. |
| 15:10:49 | 18 | THE WITNESS: -- I had conversations with |
| 15:10:50 | 19 | the FBI. |
| 15:10:50 | 20 | That's a different question. |
| 15:10:50 | 21 | BY MR. KAPSHANDY: |
| 15:10:50 | 22 | Q  How many times? |

Page 231

| | | |
|---|---|---|
| 15:10:52 | 1 | A  You've gone way over your time. Thank |
| 15:10:54 | 2 | you. |
| 15:10:54 | 3 | Q  Let me ask you this, Dr. Parsi -- |
| 15:10:56 | 4 | MR. PISHEVAR: Okay. Mr. Kapshandy, can we |
| 15:10:58 | 5 | agree -- this is your last question. |
| 15:11:00 | 6 | You wanted five minutes. You are over |
| 15:11:01 | 7 | that five minutes. Now you've asked about 20 |
| 15:11:04 | 8 | minutes -- |
| 15:11:04 | 9 | MR. KAPSHANDY: My position, Counsel, is we |
| 15:11:06 | 10 | are over this five minutes because of all the |
| | 11 | interruption and -- |
| | 12 | MR. PISHEVAR: I disagree with you. |
| | 13 | MR. KAPSHANDY: And filibuster. |
| | 14 | MR. PISHEVAR: I disagree with you. |
| | 15 | BY MR. KAPSHANDY: |
| 15:11:10 | 16 | Q  My question for you, Dr. Parsi, is I |
| 15:11:12 | 17 | understand -- |
| 15:11:12 | 18 | MR. PISHEVAR: You can ask one more |
| 15:11:12 | 19 | question. |
| 15:11:12 | 20 | BY MR. KAPSHANDY: |
| 15:11:12 | 21 | Q  -- that you are suing only as Trita Parsi, |
| 15:11:15 | 22 | president of NIAC, and not Trita Parsi, private |

Page 232

| | | |
|---|---|---|
| 15:11:18 | 1 | citizen, correct? |
| 15:11:19 | 2 | A  Sorry, could you repeat? |
| 15:11:20 | 3 | Q  Well, you said that at your last |
| 15:11:22 | 4 | deposition. |
| 15:11:22 | 5 | MR. PISHEVAR: Objection. |
| 15:11:22 | 6 | BY MR. KAPSHANDY: |
| 15:11:22 | 7 | Q  Do you recall that? |
| 15:11:23 | 8 | A  Could you repeat what you said? |
| 15:11:24 | 9 | Q  You are suing and claiming damages against |
| 15:11:28 | 10 | Hassan Daioleslam only as -- |
| 15:11:28 | 11 | A  The complaint states -- |
| 15:11:30 | 12 | Q  -- Trita Parsi, president of NIAC, and not |
| 15:11:32 | 13 | as Trita Parsi, private citizen, correct? |
| 15:11:35 | 14 | MR. PISHEVAR: The complaint speaks for |
| 15:11:36 | 15 | itself. He is not going to characterize legal issues |
| 15:11:39 | 16 | and -- |
| 15:11:39 | 17 | THE WITNESS: Again, I'm not a lawyer, so I |
| 15:11:39 | 18 | cannot -- |
| 15:11:41 | 19 | BY MR. KAPSHANDY: |
| 15:11:41 | 20 | Q  Well, at your last deposition, you said |
| 15:11:42 | 21 | that, and you are now, having been ordered to answer |
| 15:11:43 | 22 | questions -- |

Page 233

| | | |
|---|---|---|
| 15:11:43 | 1 | MR. PISHEVAR: The complaint speaks for |
| 15:11:44 | 2 | itself. |
| 15:11:44 | 3 | BY MR. KAPSHANDY: |
| 15:11:45 | 4 | Q  How is it -- how does that work exactly? |
| 15:11:48 | 5 | How do you have these damages for mental anguish |
| 15:11:51 | 6 | from the death threats that you, as president of |
| 15:11:54 | 7 | NIAC, but not as Trita Parsi, private citizen? How |
| 15:11:57 | 8 | does that work? |
| 15:11:57 | 9 | MR. PISHEVAR: How much are we over now? |
| 15:11:59 | 10 | THE VIDEOGRAPHER: Seven minutes. |
| 15:11:59 | 11 | BY MR. KAPSHANDY: |
| 15:12:01 | 12 | Q  How does that work? |
| 15:12:02 | 13 | A  Sir, you are asking about a legal question |
| 15:12:04 | 14 | that I cannot answer. |
| 15:12:05 | 15 | Q  Well, that's not a legal question. |
| 15:12:05 | 16 | A  Well, it is a legal question. |
| 15:12:07 | 17 | Q  How do you suffer mental anguish as the |
| 15:12:10 | 18 | president of NIAC but not as a private citizen that |
| 15:12:13 | 19 | you are claiming in this lawsuit? It's kind of an |
| 15:12:15 | 20 | unusual concept. |
| 15:12:15 | 21 | A  I don't -- I don't know the details of the |
| 15:12:17 | 22 | distinguishing in the eyes of the law of this issue. |

59  (Pages 230 to 233)

Page 234

15:12:18  1   So I'm not a legal expert.
15:12:18  2        Q   Well, are there different Trita Parsis
15:12:21  3   that have mental anguish only when they are
15:12:24  4   president of NIAC?
15:12:25  5        A   I -- you are asking about a legal
15:12:26  6   separation of these issues, which I'm not an expert
15:12:28  7   on.
15:12:28  8        Q   Okay.  And have you determined --
15:12:29  9        A   That is more than four extra questions.
15:12:34  10       Q   -- if you have an award of damages if you
15:12:36  11  are going to return it to NIAC?
15:12:36  12       A   Sorry, have I --
15:12:36  13       Q   Determined if you have an award of damages
15:12:37  14  if you are going to return it to NIAC?
15:12:37  15       MR. PISHEVAR:  Objection.  That's an
15:12:38  16  inappropriate question.
15:12:39  17       THE WITNESS:  I don't have to determine
15:12:41  18  anything at this stage to the best of my
15:12:42  19  understanding.
15:12:42  20  BY MR. KAPSHANDY:
15:12:42  21       Q   Well, you were ordered to answer questions
15:12:44  22  about your damages and be prepared.

Page 235

15:12:45  1        MR. PISHEVAR:  That's not about damages.
15:12:45  2        THE WITNESS:  But not --
15:12:45  3   BY MR. KAPSHANDY:
15:12:47  4        Q   The question I have for you is, since NIAC
15:12:49  5   is paying for your lawyers in this case, if Trita
15:12:52  6   Parsi is awarded an award of damages --
15:12:53  7        MR. PISHEVAR:  Objection.  False dichotomy.
15:12:53  8   BY MR. KAPSHANDY:
15:12:55  9        Q   -- are you going to keep that or return
15:12:56  10  that to NIAC?
15:12:58  11       A   I --
15:12:58  12       MR. PISHEVAR:  Objection.
15:12:58  13       THE WITNESS:  I don't understand why I
15:13:00  14  would have to give an answer to that question as
15:13:01  15  we're not at that stage yet.
15:13:03  16       MR. PISHEVAR:  And he answered it.
15:13:03  17  BY MR. KAPSHANDY:
15:13:05  18       Q   Well, when -- if and when it comes, my
15:13:07  19  question is, are you going to return that money to
15:13:09  20  NIAC or keep it?
15:13:10  21       MR. PISHEVAR:  Asked and answered.
15:13:10  22       THE WITNESS:  Same question asked.  You

Page 236

15:13:12  1   just rephrased it.  It's the same question.
15:13:14  2   BY MR. KAPSHANDY:
15:13:14  3        Q   You haven't answered it.  You haven't
15:13:15  4   answered it.  Are you --
15:13:15  5        A   No, I did.  I said I don't see any reason
15:13:18  6   why I have to make a determination of that at this
15:13:20  7   stage.
15:13:21  8        Q   Well, how about that the Court ordered you
15:13:22  9   to be prepared to answer your questions on your
15:13:24  10  damages.
15:13:24  11       MR. PISHEVAR:  He's answered -- stop
15:13:24  12  lecturing him.  He's answering your questions.  You
15:13:24  13  are over your time.  You estimated --
15:13:24  14  BY MR. KAPSHANDY:
15:13:27  15       Q   Are you refusing to answer that question?
15:13:28  16       MR. PISHEVAR:  -- you would be done an hour
15:13:30  17  ago.
15:13:30  18       THE WITNESS:  I answered it.
15:13:31  19  BY MR. KAPSHANDY:
15:13:31  20       Q   And at this stage you are not prepared to
15:13:33  21  say whether you're going to keep any award of
15:13:35  22  damages or return it to NIAC?

Page 237

15:13:36  1        A   My understanding is that once we are at
15:13:39  2   the stage in which the jury finds the defendant
15:13:43  3   guilty of all of these crimes and defamation, at
15:13:46  4   that point it's going to be a decision, but I don't
15:13:49  5   understand -- I have not been informed by anyone who
15:13:49  6   said that these decisions have to be made prior to
15:13:51  7   that.
15:13:51  8        MR. PISHEVAR:  He will do whatever is
15:13:53  9   legally and morally required.
15:13:55  10       MR. KAPSHANDY:  Thank you very much.
15:13:56  11       MR. PISHEVAR:  And we'll make that
15:13:57  12  determination at the appropriate time.
15:14:00  13       THE VIDEOGRAPHER:  The time is 3:13 p.m.,
15:14:02  14  May 11, 2011.  Going off the record of the videotaped
15:14:02  15  deposition.
15:14:02  16       (A discussion was held off
15:14:02  17  the record.)
15:14:03  18       THE REPORTER:  And will the witness read?
15:14:03  19       MR. PISHEVAR:  Yes, he will read.
15:14:13  20       THE REPORTER:  Do you need a copy of the
15:14:14  21  transcript?
15:14:15  22       MR. PISHEVAR:  Yes.

60  (Pages 234 to 237)

Page 238

| | | |
|---|---|---|
| 15:14:15 | 1 | (A discussion was held off |
| 15:14:15 | 2 | the record.) |
| 15:17:26 | 3 | MR. KAPSHANDY:  We have to go back on the |
| 15:17:26 | 4 | record and mark one thing. |
| 15:14:15 | 5 | MR. PISHEVAR:  Okay. |
| 15:14:15 | 6 | MR. KAPSHANDY:  While we were off the |
| 15:17:29 | 7 | record, at Counsel's request we, with regard to |
| 15:17:33 | 8 | Exhibit 127, have burned to a CD an electronic copy |
| 15:17:37 | 9 | of that e-mail as it was produced in HTML format by, |
| 15:17:46 | 10 | I believe it's, Brown Lloyd James. |
| 15:17:49 | 11 | And we'll also mark as Exhibit 127-B, |
| 15:17:53 | 12 | because that electronic file actually has another |
| 15:17:57 | 13 | e-mail that's part of the chain, so for one reason or |
| 15:18:00 | 14 | another, and they are three months apart, I don't |
| 15:18:02 | 15 | know if they were part of a chain but that is how |
| 15:18:05 | 16 | they were produced, so for completeness sake, 127-B |
| 15:18:08 | 17 | will be a printout of the HTML file of 127-A, and |
| 15:18:13 | 18 | we'll get counsel a copy of both, hard copy and |
| 15:18:16 | 19 | electronic, and then one can compare the version that |
| 15:18:18 | 20 | was printed out as 127 to see if it is the same or |
| 15:18:22 | 21 | different.  The font is different, I would agree, but |
| 15:18:26 | 22 | the content is the same. |

Page 239

| | | |
|---|---|---|
| 15:18:26 | 1 | (Exhibit Nos. 127, 127A and 127B were |
| 15:18:26 | 2 | marked for identification.) |
| 15:18:27 | 3 | MR. KAPSHANDY:  That's all I have.  Thank |
| 15:18:29 | 4 | you very much. |
| 15:18:31 | 5 | A.P., any comments? |
| 15:18:31 | 6 | MR. PISHEVAR:  No, sir. |
| | 7 | (Whereupon, at 3:18 p.m., the |
| | 8 | deposition of DR. TRITA PARSI was |
| | 9 | concluded.) |
| | 10 | |
| | 11 | * * * * * |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |

Page 240

| | |
|---|---|
| 1 | CERTIFICATE OF NOTARY PUBLIC |
| 2 | I, LESLIE A. TODD, the officer before whom |
| 3 | the foregoing deposition was taken, do hereby certify |
| 4 | that the witness whose testimony appears in the |
| 5 | foregoing deposition was duly sworn by me; that the |
| 6 | testimony of said witness was taken by me in stenotypy |
| 7 | and thereafter reduced to typewriting under my |
| 8 | direction; that said deposition is a true record of the |
| 9 | testimony given by said witness; that I am neither |
| 10 | counsel for, related to, nor employed by any of the |
| 11 | parties to the action in which this deposition was |
| 12 | taken; and, further, that I am not a relative or |
| 13 | employee of any counsel or attorney employed by the |
| 14 | parties hereto, nor financially or otherwise |
| 15 | interested in the outcome of this action. |
| 16 | |
| 17 | Dated this ____ day of _____ 2011. |
| 18 | |
| 19 | |
| | _____ |
| 20 | LESLIE A. TODD |
| | Notary Public in and for the |
| | District of Columbia |
| 21 | |
| 22 | My commission expires: |

Page 241

| | |
|---|---|
| 1 | A C K N O W L E D G E M E N T   O F   D E P O N E N T |
| 2 | |
| 3 | I, DR. TRITA PARSI, do hereby acknowledge I |
| 4 | have read and examined the foregoing pages of |
| 5 | testimony, and the same is a true, correct and |
| 6 | complete transcription of the testimony given by me, |
| 7 | and any changes or corrections, if any, appear |
| 8 | in the attached errata sheet signed by me. |
| 9 | |
| 10 | |
| 11 | _____   _____ |
| | DATE         DR. TRITA PARSI |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

61  (Pages 238 to 241)

Page 242

```
1              May 13, 2011
2
3
4      A. P. PISHEVAR, ESQUIRE
       Pishevar & Associates, P.C.
5      Jefferson Plaza, Suite 316
       600 East Jefferson Street
6      Rockville, Maryland 20852
7      IN RE:  TRITA PARSI, et al. v. DAIOLESLAM SEID HASSAN
8      Dear Mr. Pishevar:
9      Enclosed please find your copy of the deposition of
       DR. TRITA PARSI, along with the original signature
10     page.  As agreed, you will be responsible for
       contacting the witness regarding signature.
11
       Within 30 days of May 13, 2011, please forward the
12     errata sheet and the original signed signature page to
       counsel for Defendant, Timothy E. Kapshandy, Esquire.
13
       If you have any questions, please do not hesitate to
14     call.
15     Thank you.
16     Respectfully yours,
17
       Leslie A. Todd
18     Reporter/Notary
19
       cc:  Timothy E. Kapshandy, Esquire
20
21
22
```

Page 243

```
1              E R R A T A  S H E E T
2      Case Name:  TRITA PARSI, et al. v. DAIOLESLAM SEID
                    HASSAN
3
       Witness Name:  DR. TRITA PARSI
4
       Deposition Date:  Wednesday, May 11, 2011
5
       Page No.    Line No.      Change/Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21     _____   ___  _____
       DR. TRITA PARSI        DATE
22
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com