# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

TRITA PARSI and NATIONAL :

IRANIAN AMERICAN COUNCIL :

Plaintiffs :

v. : Civil No.:

DAIOLESLAM SEID HASSAN, : 08 CV 00705 (JDB)

Defendant : Page 1 - 243

VOLUME III

- - -

Wednesday, May 11, 2011

- - -

Continued deposition, videotaped, of Dr. Trita Parsi,

was taken at the Law Offices of Sidley Austin, LLP,

1501 K Street, NW, Sixth Floor, Washington, DC 20005

commencing at 10:01 a.m. before Leslie A. Todd,

Registered Professional Court Reporter and Notary

Public, in and for the District of Columbia.

```
 1    On behalf of the Plaintiffs:

 2         A. P. PISHEVAR, ESQUIRE
           Pishevar & Associates, P.C.
 3         Jefferson Plaza, Suite 316
           600 East Jefferson Street
 4         Rockville, Maryland 20852
           (301) 279-8773
 5         ap@pishevarlegal.com

 6
      On behalf of the Defendant:
 7
           TIMOTHY E. KAPSHANDY, ESQUIRE
 8         THOMAS E. ROSS, ESQUIRE
           ERIC GALVEZ, ESQUIRE
 9         TASHA MANORANJAN, ESQUIRE
           Sidley Austin, LLP
10         1501 K Street, Northwest
           Washington, D.C. 20005
11         (202) 736-8374
           tim.kapshandy@sidley.com
12

13    Also present:

14         DAIOLESLAM SEID HASSAN
           DANIEL HOLMSTOCK (Videographer)
15

16

17

18

19

20

21

22
```

10:11:46   1       Q     -- May 9, 2010.

10:11:48   2             Did you have any involvement -- let me ask

10:11:50   3    you this:  When did you see it?

10:11:52   4       A     Sometime around that time, I believe.

10:11:54   5       Q     Did you have any involvement in providing

10:11:57   6    to him the information that he relied upon in

10:12:00   7    preparing his report in this case?

10:12:02   8       A     He asked us to get access to various types

10:12:05   9    of information, and we did our best to provide him

10:12:07   10   with that access.

10:12:09   11      Q     Now, if you turn to page 4 of his report,

10:12:16   12   two-thirds of the way down, "membership statistics,"

10:12:20   13   he states:  "Typical membership roles of two to

10:12:25   14   3,000 people dropped to 1200 current members."

10:12:28   15            Did I read that correctly?

10:12:29   16      A     Yes.

10:12:29   17      Q     Did I?

10:12:30   18      A     Yes.

10:12:30   19      Q     Did you have any involvement in providing

10:12:32   20   him that information?

10:12:34   21      A     I believe that he asked access to the

10:12:37   22   databases, and he looked into that, if I'm not

Page 19

| | | |
|---|---|---|
| 10:12:40 | 1 | mistaken.  I don't recall exactly. |
| 10:12:42 | 2 | Q    Well, if he has testified under oath that |
| 10:12:45 | 3 | that information was provided to him by Kevin Cowl |
| 10:12:48 | 4 | and he was not given any membership information, |
| 10:12:50 | 5 | would you have any reason to dispute that? |
| 10:12:53 | 6 | A    Sorry.  Could you repeat the question? |
| 10:12:55 | 7 | MR. PISHEVAR:  Objection. |
| 10:12:56 | 8 | BY MR. KAPSHANDY: |
| 10:12:57 | 9 | Q    If he testified that he was given these |
| 10:12:58 | 10 | data by Kevin Cowl and he was provided absolutely no |
| 10:13:01 | 11 | other membership information, would you have any |
| 10:13:04 | 12 | reason to dispute his testimony? |
| 10:13:06 | 13 | MR. PISHEVAR:  Objection. |
| 10:13:08 | 14 | THE WITNESS:  I don't recall exactly. |
| 10:13:09 | 15 | BY MR. KAPSHANDY: |
| 10:13:09 | 16 | Q    My question is, would you have any reason |
| 10:13:11 | 17 | to dispute his testimony that he was provided these |
| 10:13:15 | 18 | data by your COO, Kevin Cowl, and he was provided no |
| 10:13:20 | 19 | access to any other membership information? |
| 10:13:23 | 20 | MR. PISHEVAR:  Same objection. |
| 10:13:26 | 21 | THE WITNESS:  I would have to look at his |
| 10:13:27 | 22 | testimony. |

Page 20

| | | |
|---|---|---|
| 10:13:27 | 1 | BY MR. KAPSHANDY: |
| 10:13:28 | 2 | Q   That wasn't my question, Mr. Parsi. |
| 10:13:31 | 3 | A   That was my answer. |
| 10:13:32 | 4 | Q   Can you please answer the question? |
| 10:13:34 | 5 | MR. PISHEVAR:  It calls for speculation and |
| 10:13:35 | 6 | this is a lay witness. |
| 10:13:35 | 7 | BY MR. KAPSHANDY: |
| 10:13:37 | 8 | Q   Can you answer the question, please? |
| 10:13:38 | 9 | A   I answered the question by saying I would |
| 10:13:40 | 10 | have to take a look at his testimony. |
| 10:13:42 | 11 | MR. KAPSHANDY:  Could you read the question |
| 10:13:57 | 12 | back, please, ma'am. |
| 10:13:57 | 13 | (Whereupon, the requested record was |
| 10:13:57 | 14 | read.) |
| 10:14:00 | 15 | MR. PISHEVAR:  Continuing objection. |
| 10:14:00 | 16 | BY MR. KAPSHANDY: |
| 10:14:01 | 17 | Q   Answer the question, please. |
| 10:14:02 | 18 | A   I already have. |
| 10:14:04 | 19 | Q   My question was, would you have any reason |
| 10:14:06 | 20 | to dispute his testimony that these data were |
| 10:14:09 | 21 | provided to him by your chief operating officer |
| 10:14:11 | 22 | Kevin Cowl? |

Page 21

| | | |
|---|---|---|
| 10:14:12 | 1 | MR. PISHEVAR:  Asked and answered. |
| 10:14:13 | 2 | BY MR. KAPSHANDY: |
| 10:14:15 | 3 | Q    Can you answer the question, please? |
| 10:14:17 | 4 | A    I already answered the question.  I need |
| 10:14:19 | 5 | to take a look at his testimony. |
| 10:14:21 | 6 | MR. KAPSHANDY:  Well, okay, we're going to |
| 10:14:23 | 7 | go off the record.  That's going to come out of your |
| 10:14:25 | 8 | time.  Let's go off the record, please, and you can |
| 10:14:28 | 9 | look at it, and if you want to play this game all |
| 10:14:30 | 10 | day -- it's a simple question to be answered |
| 10:14:32 | 11 | directly.  If you want to look at the testimony, I |
| 10:14:34 | 12 | will invite you to do so, but that's not coming out |
| 10:14:38 | 13 | of the deposition time.  We'll go off the record and |
| 10:14:38 | 14 | do that. |
| 10:14:39 | 15 | Do you want to do that? |
| 10:14:40 | 16 | THE WITNESS:  All right. |
| 10:14:40 | 17 | MR. PISHEVAR:  I don't agree to go off the |
| 10:14:42 | 18 | record or any of that about the timing of it.  He |
| 10:14:45 | 19 | asked the -- he answered the question to the best |
| 10:14:47 | 20 | that he could.  You asked the question, you had it |
| 10:14:49 | 21 | reread, and you are asking him to speculate now.  I |
| 10:14:53 | 22 | don't think your question is an appropriate one, and |

10:14:54   1    then, in any event, it's been answered.

10:14:54   2    BY MR. KAPSHANDY:

10:14:57   3        Q    So as you sit here today, Dr. Parsi --

10:15:00   4             MR. PISHEVAR:  So anything beyond that --

10:15:02   5    BY MR. KAPSHANDY:

10:15:02   6        Q    -- you have no ability to -- strike that.

10:15:18   7             Did you have any involvement whatsoever in

10:15:19   8    the preparation or sending of any information or

10:15:22   9    materials to Professor Morse for his report?

10:15:25  10        A    Professor Morse interviewed me I believe

10:15:28  11    once, and he asked for some documents and material,

10:15:32  12    which was provided to him.

10:15:35  13        Q    Did you provide him the membership data

10:15:38  14    that he relates here in his report?

10:15:39  15        A    I don't recall exactly if it was me or if

10:15:43  16    it was someone else.

10:15:43  17        Q    Well, when you saw this information

10:15:44  18    shortly after it was prepared, as you say, did you

10:15:47  19    get back to him and say, The current membership data

10:15:52  20    that you have of 1200 is wrong, Professor Morse?

10:15:55  21        A    I didn't --

10:15:56  22             MR. PISHEVAR:  Objection.  The question

Page 23

| | | |
|---|---|---|
| 10:15:58 | 1 | calls for -- has a false dichotomy. |
| 10:15:58 | 2 | BY MR. KAPSHANDY: |
| 10:16:04 | 3 | Q    Go ahead and answer, please. |
| 10:16:04 | 4 | THE REPORTER:  Has a false? |
| 10:16:05 | 5 | MR. PISHEVAR:  Dichotomy. |
| 10:16:05 | 6 | THE WITNESS:  I don't recall if I talked to |
| 10:16:06 | 7 | him about that issue. |
| 10:16:07 | 8 | BY MR. KAPSHANDY: |
| 10:16:09 | 9 | Q    Well, if you had read that when he sent |
| 10:16:14 | 10 | this to you in May of 2010 that NIAC's membership -- |
| 10:16:19 | 11 | current membership was only 1200, would you have |
| 10:16:24 | 12 | gotten back to him and told him that's false? |
| 10:16:26 | 13 | A    You are asking me to speculate. |
| 10:16:30 | 14 | Q    No.  I'm asking you if you had seen this |
| 10:16:34 | 15 | number, 1200 current members in December of 2010, |
| 10:16:38 | 16 | wouldn't you have had an obligation, because you |
| 10:16:41 | 17 | knew he was filing this report in federal court, to |
| 10:16:43 | 18 | tell him that that data is false? |
| 10:16:46 | 19 | A    Again, I don't recall whether I did have a |
| 10:16:48 | 20 | conversation with him about that. |
| 10:16:49 | 21 | Q    That wasn't the question. |
| 10:16:53 | 22 | A    As I said, I don't recall if I did have a |

Page 24

| | | |
|---|---|---|
| 10:16:55 | 1 | conversation with him.  But you are seemingly |
| 10:17:00 | 2 | deliberately confusing two issues.  What he is |
| 10:17:03 | 3 | referring to there, I assume, when he says "current |
| 10:17:05 | 4 | members" are people's whose membership have not |
| 10:17:08 | 5 | expired, which means even if they expired the day |
| 10:17:13 | 6 | afterward they wouldn't be counted.  That's |
| 10:17:15 | 7 | different from what we talked about in the letter. |
| 10:17:15 | 8 |     Q    Okay.  Well, let's talk about what you |
| 10:17:17 | 9 | consider is a current member.  What sort of leeway |
| 10:17:19 | 10 | in terms of expiration do you use -- back to |
| 10:17:22 | 11 | Exhibit 101 -- when you consider somebody an active |
| 10:17:25 | 12 | member? |
| 10:17:25 | 13 |     A    There are two different ways of looking at |
| 10:17:28 | 14 | it.  Someone's membership needs to get renewed. |
| 10:17:32 | 15 | That doesn't mean that I don't consider that person |
| 10:17:34 | 16 | a member. |
| 10:17:40 | 17 |         We have that situation all the time, and |
| 10:17:42 | 18 | this is a very common issue for many membership |
| 10:17:45 | 19 | organizations, and we are following what I believe |
| 10:17:47 | 20 | is the standard there.  We have an event, for |
| 10:17:49 | 21 | instance, and we say you have to be a member.  That |
| 10:17:52 | 22 | invitation, nevertheless, goes out to people who |

Page 25

| | | |
|---|---|---|
| 10:17:55 | 1 | have forgotten to renew. |
| 10:17:57 | 2 | Q    Do you remember the question? |
| 10:17:58 | 3 | A    Not exactly. |
| 10:18:00 | 4 | Q    The question is, what is the leeway period |
| 10:18:03 | 5 | that you give somebody when you remove them from |
| 10:18:07 | 6 | what you call somebody who has just forgotten to |
| 10:18:11 | 7 | renew their membership versus somebody who simply |
| 10:18:16 | 8 | doesn't want to be a member anymore? |
| 10:18:18 | 9 | A    Oh.  We have people who may come and say, |
| 10:18:22 | 10 | I don't want to renew my membership; don't -- for |
| 10:18:24 | 11 | whatever reason, and as a result, they are taken off |
| 10:18:27 | 12 | the list, and they're called former members. |
| 10:18:28 | 13 | Q    And where will we see that in any of the |
| 10:18:31 | 14 | lists, "former members," that term? |
| 10:18:33 | 15 | A    That should be included in the list, I |
| 10:18:35 | 16 | assume. |
| 10:18:35 | 17 | Q    Well, no, let me tell you that those |
| 10:18:37 | 18 | distinguished between active and expired, and |
| 10:18:39 | 19 | there's nothing known as a former member.  There is |
| 10:18:43 | 20 | no category or field. |
| 10:18:43 | 21 | MR. PISHEVAR:  Objection.  Counsel is -- |
| 10:18:43 | 22 | |

```
10:18:43   1   BY MR. KAPSHANDY: :

10:18:44   2       Q    So the category that you just described,

10:18:47   3   where would we find those?

10:18:48   4       A    It should be in the same documents.

10:18:50   5       Q    Okay.  When we get to those, you can point

10:18:50   6   those out to us, okay?

10:18:51   7           MR. KAPSHANDY:  And, Counsel, for the

10:18:52   8   record, I'm wanting to know when we're going to get

10:18:55   9   the codes so that we can decode the Salesforce

10:19:00  10   membership databases.

10:19:02  11           MR. PISHEVAR:  Go ahead and ask your

10:19:03  12   questions.

10:19:04  13           MR. KAPSHANDY:  Yeah, when are we going to

10:19:06  14   be getting the codes to --

10:19:07  15           MR. PISHEVAR:  I'm not here to answer your

10:19:08  16   questions, okay?  Ask your questions so the witness

10:19:11  17   can answer the questions.

10:19:12  18           MR. KAPSHANDY:  I have a question for you

10:19:13  19   which we have repeatedly asked.

10:19:15  20           MR. PISHEVAR:  I'm not answering -- I'm not

10:19:16  21   here for a deposition, sir.

10:19:18  22           MR. KAPSHANDY:  Okay.  So your lack of
```

Page 219

| | | |
|---|---|---|
| 15:02:08 | 1 | A    I hope my income has gone up, but whether |
| 15:02:12 | 2 | they have consistently gone up every year, I don't |
| 15:02:16 | 3 | recall. |
| 15:02:16 | 4 | Q    Now, the other question that you weren't |
| 15:02:20 | 5 | prepared to answer at your previous deposition that |
| 15:02:22 | 6 | I want to ask you about now is, what amount are you |
| 15:02:24 | 7 | claiming for other noneconomic damages in this |
| 15:02:29 | 8 | lawsuit from the Defendant Hassan Daioleslam? |
| 15:02:34 | 9 | MR. PISHEVAR:  Objection. |
| 15:02:34 | 10 | THE WITNESS:  Sorry.  Could you repeat the |
| 15:02:36 | 11 | question?  What -- |
| 15:02:37 | 12 | MR. PISHEVAR:  You want a dollar amount for |
| 15:02:39 | 13 | noneconomic?  Is that what you're asking? |
| 15:02:39 | 14 | MR. KAPSHANDY:  Exactly. |
| 15:02:40 | 15 | MR. PISHEVAR:  That's for the jury to |
| 15:02:43 | 16 | determine. |
| 15:02:43 | 17 | BY MR. KAPSHANDY: |
| 15:02:44 | 18 | Q    Are you not prepared to tell us here, as |
| 15:02:46 | 19 | you sit here today, and further to the Court's order |
| 15:02:49 | 20 | to be prepared to address the amount you are |
| 15:02:50 | 21 | claiming for damages, how much you are asking the |
| 15:02:52 | 22 | jury to award Hassan -- or you from Hassan |

Page 220

15:02:56  1    Daioleslam for the alleged defamatory articles he
15:02:58  2    has written?
15:02:59  3         A    Can you define what you mean when you say
15:03:02  4    "noneconomic"?  What does that mean?
15:03:03  5         Q    Other than those measured by lost income,
15:03:05  6    lost business opportunities.
15:03:06  7         A    So punitive damages then?  Is that what --
15:03:09  8         Q    Any dollar amount, whether you want to
15:03:11  9    call it punitive or general damages or noneconomic
15:03:14 10    damages, for the mental anguish that you've alleged
15:03:17 11    in your complaint.
15:03:18 12         A    Mm-hmm.  Was that not included in one of
15:03:21 13    our interrogatories in February?
15:03:23 14         Q    No, and it wasn't answered at the last
15:03:25 15    deposition.  And you were ordered --
15:03:25 16         A    No, but in February.
15:03:26 17         Q    -- to be prepared to address that.
15:03:28 18              So my question is, how much are you
15:03:30 19    claiming for these noneconomic damages other than
15:03:32 20    lost income which you have not supported with any
15:03:35 21    economic testimony?
15:03:36 22         A    In the February interrogatories, was that

Page 221

15:03:38  1    not answered?

15:03:39  2        Q    No, it wasn't, and that's why we're
15:03:41  3    asking.

15:03:41  4        A    I thought that it was.  Can I confer with
15:03:45  5    my counsel briefly?

15:03:47  6        Q    Well, we're going to have to go off the
15:03:49  7    record and take some time --

15:03:49  8        A    Well, you go off the record every time you
15:03:51  9    want to look at a piece of paper, so sure.

15:03:54 10            MR. KAPSHANDY:  Let's go off the record.

15:03:54 11            THE VIDEOGRAPHER:  The time is 3:03 p.m.
15:03:56 12    We're going off the record.

15:03:56 13            (A discussion was held off the
15:04:40 14            record.)

15:04:40 15            THE VIDEOGRAPHER:  The time is 3:04 p.m.
15:04:42 16    We're back on the record.

15:04:42 17    BY MR. KAPSHANDY:

15:04:43 18        Q    Okay.  Having had a chance to confer with
15:04:45 19    your attorney for a minute or so, are you prepared
15:04:47 20    to answer?

15:04:48 21        A    Could you repeat the question?

15:04:49 22        Q    The question, is what amount are you

| | | |
|---|---|---|
| 15:04:51 | 1 | claiming from the defendant Hassan Daioleslam for |
| 15:04:54 | 2 | noneconomic damages? |
| 15:04:55 | 3 | A    Meaning punitive and damages of that kind? |
| 15:04:59 | 4 | Q    For the mental anguish -- |
| 15:04:59 | 5 | A    Mental anguish. |
| 15:05:00 | 6 | Q    -- that you alleged in your complaint, |
| 15:05:02 | 7 | anything other than lost income which is documented |
| 15:05:04 | 8 | by -- |
| 15:05:05 | 9 | A    I think it would be fair that it would be |
| 15:05:07 | 10 | somewhere in the amount of a hundred to $200,000. |
| 15:05:10 | 11 | Q    Okay.  And having given this a couple of |
| 15:05:13 | 12 | minutes of thought with your counsel, how is it that |
| 15:05:15 | 13 | you came up with that calculation? |
| 15:05:16 | 14 | A    Well, it's based on what I think is fair |
| 15:05:19 | 15 | based on the mental anguish, the hate e-mails that |
| 15:05:22 | 16 | we received with links to his articles, the death |
| 15:05:27 | 17 | threats that I have received, the death threats that |
| 15:05:29 | 18 | my children have received with people referencing |
| 15:05:33 | 19 | the defendant's articles, and as a result, feeling |
| 15:05:37 | 20 | prompted to issue death threats. |
| 15:05:39 | 21 | Q    And you believe the death threats are the |
| 15:05:41 | 22 | responsibility and the result of the defendant's |

Page 223

15:05:43  1    writings?

15:05:44  2        A    That's what the people making the death

15:05:46  3    threats have said.

15:05:46  4        Q    Well, did you look at all the exhibits to

15:05:48  5    the motion to exclude Professor Morse's testimony

15:05:51  6    where many people specifically cited other people

15:05:54  7    such as Claire Lopez, Timmerman, Ruben and many

15:05:59  8    other writers as far as back as 2000 have claimed

15:06:02  9    that Trita Parsi is an agent or a lobbyist for the

15:06:05  10   Islamic regime?

15:06:05  11       A    First of all, Claire Lopez has not done it

15:06:09  12   until sometime in 2008, 2009, and almost all of

15:06:13  13   her -- if I can even call it work, it was such a

15:06:17  14   ridiculous report that no one paid it much attention

15:06:18  15   to that specific report, but most of the footnotes

15:06:22  16   actually went back to the defendant's slanderous and

15:06:26  17   defamatory articles.

15:06:26  18       Q    Okay.  Let's talk about Timmerman who

15:06:29  19   wrote this as early as 2000.

15:06:30  20       A    He did not write this as early as 2000 --

15:06:31  21       Q    He called you a lobbyist for the regime in

15:06:34  22   2000.

Page 224

| | | | |
|---|---|---|---|
| 15:06:35 | 1 | A | I have no recollection of that. |
| 15:06:35 | 2 | Q | Okay.  Well, many of the e-mails -- |
| 15:06:37 | 3 | A | Can you show me that e-mail? |
| 15:06:38 | 4 | Q | Maybe of the e-mails that Professor Morse |

15:06:40    5    was shown but weren't produced to us referenced

15:06:43    6    these other writers and independent evidence, and my

15:06:47    7    question for you is, there are many other people out

15:06:51    8    there calling Trita Parsi a lobbyist for the regime

15:06:55    9    besides Hassan Daioleslam.

15:06:55   10         MR. PISHEVAR:  Objection.  Argumentative.

15:06:55   11    BY MR. KAPSHANDY:

15:06:56   12         Q    And my question for you is, in coming up

15:06:58   13    with your damages calculation, how do you

15:07:01   14    distinguish when all these other people are calling

15:07:03   15    you a lobbyist for the regime from when Hassan

15:07:08   16    Daioleslam writes that?

15:07:08   17         A    First of all --

15:07:09   18         MR. PISHEVAR:  Objection.  Asked and

15:07:09   19    answered?

15:07:11   20         THE WITNESS:  -- when someone makes a phone

15:07:13   21    call and leaves a message or yell and screams, and

15:07:17   22    you can hear one of these TV shows of Daioleslam in

15:07:21  1    the background and makes a reference to Daioleslam --

15:07:25  2    I have never had a phone call by anyone saying, I

15:07:30  3    read Michael Ruben's attempt at writing articles or

15:07:34  4    Timmerman's attempt at writing articles, and as a

15:07:35  5    result be prompted to issue death threats and to slit

15:07:39  6    the throat of my children in front of me.

15:07:41  7         But it seems like when Daioleslam is

15:07:44  8    writing slanderous and defamatory articles and when

15:07:48  9    he goes on TV and issues those lies, it seems to have

15:07:53  10   that effect.

15:07:53  11   BY MR. KAPSHANDY:

15:07:53  12        Q    So how many times have people called

15:07:55  13   you --

15:07:55  14        MR. PISHEVAR:  For the record, you are over

15:07:56  15   your time.

15:07:57  16        MR. KAPSHANDY:  May I finish this line of

15:07:58  17   questioning, Counsel?

15:07:59  18        MR. PISHEVAR:  You may ask one more

15:08:00  19   question.  The videographer has indicated that you

15:08:03  20   are over your time.

15:08:04  21        MR. KAPSHANDY:  Well, I would like, in

15:08:05  22   light of the delays that occurred here today, to be

15:08:07   1    able to --

15:08:07   2              MR. PISHEVAR:  I don't think the delays --

15:08:08   3              MR. KAPSHANDY:  -- to be able to proceed

15:08:09   4    another five minutes.  May I --

15:08:10   5              THE WITNESS:  No.  No.  I needed to go --

15:08:12   6              MR. KAPSHANDY:  May I proceed five minutes?

15:08:12   7              MR. PISHEVAR:  I don't think that's

15:08:14   8    appropriate.

15:08:14   9              THE WITNESS:  I needed to go 50 minutes

15:08:16  10    ago.

15:08:16  11              MR. PISHEVAR:  You had your time.  You

15:08:18  12    didn't manage it the way you should have, apparently,

15:08:18  13    and now you want extra time.

15:08:18  14    BY MR. KAPSHANDY:

15:08:19  15         Q    Okay.  Are you prepared to answer a couple

15:08:21  16    more questions on --

15:08:22  17         A    I'm not.  I needed to go 50 minutes ago.

15:08:25  18         Q    Okay.  Could I answer -- ask you five

15:08:27  19    minutes more worth of questions?

15:08:28  20         A    I'm really sorry, you are already 50

15:08:30  21    minutes over your time.

15:08:31  22         Q    The videographer has been keeping track.

Page 227

15:08:35  1    He said I'm exactly out of time now.

15:08:37  2         A    Okay.  But we were supposed --

15:08:39  3              MR. PISHEVAR:  No.  How much over --

15:08:39  4              THE VIDEOGRAPHER:  A few minutes ago.  It's

15:08:39  5    three minutes over.

15:08:39  6              MR. KAPSHANDY:  May I have five more

15:08:40  7    minutes?

15:08:40  8              THE WITNESS:  Three minutes over.  I'm

15:08:42  9    sorry, sir.

15:08:42 10    BY MR. KAPSHANDY:

15:08:43 11         Q    Okay.  The question I have for you,

15:08:45 12    Dr. Parsi --

15:08:45 13         A    No, I'm sorry, sir, no more.

15:08:45 14         Q    -- is how is it that you distinguish --

15:08:45 15    strike that.

15:08:50 16              How many times is it and when was that

15:08:52 17    somebody called you with Daioleslam's television

15:08:58 18    program in the background and threatening you, and

15:09:00 19    when was that?

15:09:01 20         A    I don't recall the number of times that

15:09:02 21    that has happened, but I --

15:09:04 22         Q    And when did that happen?

Page 228

15:09:05  1        A      It's happened throughout the -- the last

15:09:07  2     couple of years.

15:09:08  3        Q      And every time these people have

15:09:10  4     Daioleslam's TV program playing in the background

15:09:12  5     and they are citing him for the reasons to wanting

15:09:15  6     to kill you?

15:09:16  7        A      It's the same person.

15:09:18  8        Q      Oh, one person.  Have you had that phone

15:09:21  9     traced?

15:09:21  10       A      I've been in contact with the FBI about

15:09:24  11    this issue.

15:09:24  12       Q      Okay.  When did you contact the FBI?

15:09:27  13       A      I don't recall exactly.

15:09:28  14              MR. PISHEVAR:  This is five questions.

15:09:29  15    BY MR. KAPSHANDY:

15:09:29  16       Q      Well, there is an appointment on your

15:09:31  17    calendar from July 8, 2008, says:  "Katia, FBI," and

15:09:36  18    has a phone number in D.C.  Is that the

15:09:36  19    communication you are talking about?

15:09:38  20       A      Yeah, but by the time I knew her name was

15:09:41  21    Katia, we had already been in contact for a while.

15:09:43  22       Q      Okay.  And how many times have you

Page 229

15:09:44  1    contacted her?

15:09:45  2        A    I don't recall the number of times that I

15:09:47  3    have been in contact with them.

15:09:47  4        Q    And have you determined who this person

15:09:49  5    was who is making those threats?

15:09:52  6        A    I asked them for all the help that they

15:09:54  7    could provide me in doing so.

15:09:55  8        Q    And did they determine who it was?

15:09:57  9        A    I think they did, but they have not

15:09:58 10    informed me of it.

15:09:58 11        Q    So it's one person that's been making

15:10:00 12    these calls?

15:10:00 13        A    No, it's one person that have been

15:10:03 14    repeatedly made threats -- death threats and have

15:10:05 15    had referenced Daioleslam.  There's others who have

15:10:10 16    made it as well, but he's the one who had the TV

15:10:13 17    show in the background.

15:10:13 18        Q    Now, how many --

15:10:15 19        A    Actually, I need to go.

15:10:15 20        Q    -- times have you contacted the FBI agent?

15:10:18 21        A    I don't remember.

15:10:20 22        Q    Well, I mean these death threats seem

15:10:23  1   pretty serious.  You only remember calling her once?

15:10:26  2       A   No.  I didn't say I only remember calling

15:10:28  3   her once.

15:10:28  4       Q   Well, it would seem a matter as serious as

15:10:31  5   death threats you would recall how many times you

15:10:32  6   have reported it to the FBI.

15:10:32  7       A   I've gone to the police; I've gone to the

15:10:35  8   FBI.  I don't remember how many times I spoke with

15:10:36  9   them.

15:10:36  10      Q   Well, how many times, roughly?  You can't

15:10:39  11  recall?

15:10:40  12      A   I said I don't remember.

15:10:41  13      Q   It's so important and you are so fearful

15:10:44  14  of your children that you can't remember how many

15:10:44  15  times you've reported it to the FBI?

15:10:46  16      A   You asked me how many times --

15:10:46  17          MR. PISHEVAR:  Objection.  False dichotomy.

15:10:49  18          THE WITNESS:  -- I had conversations with

15:10:50  19  the FBI.

15:10:50  20          That's a different question.

15:10:50  21  BY MR. KAPSHANDY:

15:10:50  22      Q   How many times?

```
15:11:43   1              MR. PISHEVAR:  The complaint speaks for
15:11:44   2    itself.
15:11:44   3    BY MR. KAPSHANDY:
15:11:45   4         Q    How is it -- how does that work exactly?
15:11:48   5    How do you have these damages for mental anguish
15:11:51   6    from the death threats that you, as president of
15:11:54   7    NIAC, but not as Trita Parsi, private citizen?  How
15:11:57   8    does that work?
15:11:57   9              MR. PISHEVAR:  How much are we over now?
15:11:59  10              THE VIDEOGRAPHER:  Seven minutes.
15:11:59  11    BY MR. KAPSHANDY:
15:12:01  12         Q    How does that work?
15:12:02  13         A    Sir, you are asking about a legal question
15:12:04  14    that I cannot answer.
15:12:05  15         Q    Well, that's not a legal question.
15:12:05  16         A    Well, it is a legal question.
15:12:07  17         Q    How do you suffer mental anguish as the
15:12:10  18    president of NIAC but not as a private citizen that
15:12:13  19    you are claiming in this lawsuit?  It's kind of an
15:12:15  20    unusual concept.
15:12:15  21         A    I don't -- I don't know the details of the
15:12:17  22    distinguishing in the eyes of the law of this issue.
```

| | | |
|---|---|---|
| 15:12:18 | 1 | So I'm not a legal expert. |
| 15:12:18 | 2 | Q    Well, are there different Trita Parsis |
| 15:12:21 | 3 | that have mental anguish only when they are |
| 15:12:24 | 4 | president of NIAC? |
| 15:12:25 | 5 | A    I -- you are asking about a legal |
| 15:12:26 | 6 | separation of these issues, which I'm not an expert |
| 15:12:28 | 7 | on. |
| 15:12:28 | 8 | Q    Okay.  And have you determined -- |
| 15:12:29 | 9 | A    That is more than four extra questions. |
| 15:12:34 | 10 | Q    -- if you have an award of damages if you |
| 15:12:36 | 11 | are going to return it to NIAC? |
| 15:12:36 | 12 | A    Sorry, have I -- |
| 15:12:36 | 13 | Q    Determined if you have an award of damages |
| 15:12:37 | 14 | if you are going to return it to NIAC? |
| 15:12:37 | 15 | MR. PISHEVAR:  Objection.  That's an |
| 15:12:38 | 16 | inappropriate question. |
| 15:12:39 | 17 | THE WITNESS:  I don't have to determine |
| 15:12:41 | 18 | anything at this stage to the best of my |
| 15:12:42 | 19 | understanding. |
| 15:12:42 | 20 | BY MR. KAPSHANDY: |
| 15:12:42 | 21 | Q    Well, you were ordered to answer questions |
| 15:12:44 | 22 | about your damages and be prepared. |

Page 240

CERTIFICATE OF NOTARY PUBLIC

1

2        I, LESLIE A. TODD, the officer before whom

3   the foregoing deposition was taken, do hereby certify

4   that the witness whose testimony appears in the

5   foregoing deposition was duly sworn by me; that the

6   testimony of said witness was taken by me in stenotypy

7   and thereafter reduced to typewriting under my

8   direction; that said deposition is a true record of the

9   testimony given by said witness; that I am neither

10  counsel for, related to, nor employed by any of the

11  parties to the action in which this deposition was

12  taken; and, further, that I am not a relative or

13  employee of any counsel or attorney employed by the

14  parties hereto, nor financially or otherwise

15  interested in the outcome of this action.

16

17  Dated this _____ day of _____ 2011.

18

19                        _____

                          LESLIE A. TODD
20                        Notary Public in and for the
                          District of Columbia
21

22  My commission expires: