IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRITA PARSI** ) | |
| and ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** ) | |
| Plaintiffs, ) | |
| v. ) | Civil No. 08 CV 00705 |
| **DAIOLESLAM SEID HASSAN,** ) | |
| Defendant ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
BOTH IN OPPOSITION TO KENNETH TIMMERMAN'S MOTION TO QUASH
OR, IN THE ALTERNATIVE, FOR PROTECTIVE ODER
AND IN REPLY TO KENNETH TIMMERMAN'S OPPOSITION TO
<u>PLAINTIFFS' MOTION TO COMPEL DEPOSITION OF KENNETH TIMMERMAN</u>**

COME NOW Plaintiffs, Dr. Trita Parsi and the National Iranian American Council ("NIAC") (collectively "NIAC"), by and through their counsel, Afshin Pishevar, Esquire, Adrian V. Nelson, II, Esquire, and Pishevar & Associates, P.C., both in opposition to Kenneth Timmerman's Motion to Quash or, in the Alternative, for Protective Order, and in Reply to Kenneth Timmerman's Opposition to Plaintiff's Motion to Compel, and states as follows:

### I. INTRODUCTION

In both his Motion to Quash or, in the Alternative, Motion for Protective Order and Opposition to Plaintiffs' Motion to Compel Deposition of Kenneth Timmerman, non-party, potential fact witness Kenneth Timmerman essentially makes the same arguments. Thus, for

purposes of judicial economy, Plaintiffs will simultaneously reply to both Timmerman's motion and reply arguments.

## II. BACKGROUND

As is set forth in Plaintiffs' Motion to Compel, Kenneth Timmerman is a neo-conservative author and columnist who writes a weekly column for Frontpage magazine. It is NIAC's contention herein that it has been the target of several erroneous, maliciously defamatory opinion pieces by the Defendant, which have been echoed by Timmerman in Frontpage magazine. The articles, NIAC contends, are riddled with inaccuracies, misquotations, incorrect links and references to figures that played no role in NIAC's inception, operations, or its development over the years.

Specifically in an April 23, 2007, article in Frontpage magazine, Timmerman accused Dr. Parsi of violating federal law by acting as an intermediary between Iran and the United States during a 2003 Iranian proposal to the United States for negotiation. Timmerman claims in that article that Dr. Parsi, during the time he was an advisor to former U.S. Congressman Robert Ney, was aware of the Congressman's role in passing the 2003 proposal from a Swiss diplomat to Karl Rove and the Bush administration.

Further, Timmerman casts a shadow of suspicion relating to NIAC's sources of funding, notwithstanding the fact that NIAC's financial records, as a 501(c) (3) non-profit, are available to the public. Further, Timmerman's innuendo regarding NIAC's sources of funding is notwithstanding the fact that its funding comes primarily from Iranian American donors and respected foundations such as the Ploughshares Fund, Tides Foundation, the Open Society Instituted and the National Endowment for Democracy, as well as the fact that NIAC does not accept any funding from any government agencies, including those in the U.S. or Iran.

Additionally, Timmerman has equated NIAC's position in opposition to a U.S.-Iran war as support for the Iranian government. Timmerman has gone so far as to equate the position of NIAC, which are consistent with the Iraq Study Group's recommendations, in opposition to such a war, and in favor of diplomacy, as constituting "lobbying for the Iranian government."

The defendant has echoed and/or telegraphed the defamatory writings of Timmerman. In fact, it is undisputed that even as it relates to this litigation that the defendant has continued his pattern and practice of sharing information with Timmerman, NIAC believes for the purpose of defaming NIAC. During his deposition, the defendant admitted that he provided discovery documents in this litigation to Timmerman. (Hassan dep., pp. 132:23-133:9)

Accordingly, Timmerman's testimony is vital in this case.

### III. PROCEDURAL HISTORY/FACTS

Since early 2010 NIAC has been diligently trying to depose Kenneth Timmerman, as well as obtain discovery documents from him. On January 5, 2010, NIAC successfully served a subpoena on Timmerman. (*See* Attached Exhibit "A," Affidavit of Service of Constantine Mckoy, dated January 8, 2010.) Upon information and belief, Timmerman retained counsel, Reed Rubinstein, Esquire, to object to the breadth of the document request associated with the subpoena, as well as the costs associated with both producing documents and providing deposition testimony. NIAC narrowed the scope of the requests for documents in a revised subpoena. However, Timmerman through counsel continued to object to the document request as overly broad. (*See* Attached Exhibit "B," Email chain between Patrick Parsa, Esquire and Reed Rubinstein, Esquire, respectively dated April 30, 2010 and May 10, 2010) Timmerman's counsel insisted that NIAC agree to pay for Timmerman to be represented at any deposition at a cost of $375.00 per hour, as well as the actual copying costs for making copies of documents

produced by Timmerman. However, the parties never reached an agreement about the payment of Timmerman's counsel fees nor the scope of the documents to be provided by Timmerman. As a result, neither the document production nor Timmerman's deposition took place at that time.[1]

Again, in early January 2011, NIAC made a number of attempts to serve Timmerman, who was now unrepresented and aware of NIAC's desire to depose him. (*See* Attached Exhibit "C," Affidavit of Due Diligence of Constantine Mckoy, dated January 25, 2011.) In his affidavit, Mr. Mckoy indicated that he attempted to serve Timmerman as follows: once on January 12, 21011; twice on January 13, 2011; twice on January 14, 2011; once on January 16, 2011; and once on January 18, 2011. He affirmed that he was unable to find Timmerman at home, either having gotten no response at his home or having been told that he was not at home. Mr. Mckoy also ran a skip trace in an effort to locate a business address for Timmerman. Ultimately, Mr. Mckoy was advised that the Connecticut Avenue business address that he obtained for Timmerman was no longer a valid business address for Timmerman.

Thereafter, on March 4, 2011, the parties participated in a discovery hearing designed to address a number of discovery disputes between the parties. In the order that followed, the court established that "Plaintiffs shall complete the initial depositions of Michael Rubin, Ken Timmerman, and Claire Lopez by not later than May 13, 2011, or they will be precluded from calling these witnesses at trial." (*See* Attached Exhibit "D," Order regarding discovery from Judge John D. Bates, dated March 29, 2011)

NIAC retained a different and more aggressive process server in the hope that it will yield a different result. On May 13, 2011, NIAC was finally successful in serving a subpoena

---

[1]Mr. Rubinstein later advised that he was no longer representing Timmerman.

*duces tecum* upon Timmerman at his home in Kensington, Maryland. (*See* Attached Exhibit "E," May 14, 2011, Affidavit of Service of Lynn Hill.) According to the process server at the time of service Mr. Timmerman was "angry" and pulled out a tape recorder to record the conversation that took place at the front door of his home relating to service of the subpoena.[2]

By letter dated May 27, 2011, Scott F. Craig, Esquire, Timmerman's new counsel, both advised NIAC's counsel that in his estimation "There are several legal deficiencies relating to the documents served on Mr. Timmerman . . ." and filed a Response to Notice of Taking Deposition of Kenneth Timmerman. (*See* Attached Exhibit "F," May 27, 2011, Letter from Scott F. Craig, Esquire and Response to Notice of Taking Deposition of Kenneth Timmerman.) One of Timmerman's complaints was that the mandatory witness fees and mileage expenses were not provided to him at the time the subpoena was served. That inadvertent oversight was corrected on June 2, 2011, when a witness fee check was tendered on Mr. Timmerman.[3] (*See* Attached Exhibit "G," June 2, 2011, Affidavit of Service of Michael A. Mills.) Timmerman also advised that he wasn't available on June 1, 2011, the date set forth in the subpoena for his deposition. Further, Timmerman took the position that the "categories of documents sought are grossly overbroad in scope and implicate a host of privacy issues relating to Mr. Timmerman, Daioleslam and potentially others."

---

[2] In his Opposition to Plaintiffs' Motion to Compel, Timmerman falsely states at p. 2 of his memorandum that NIAC claimed that Timmerman photographed the process server on May 11, 2011, when he was served. However, NIAC's claim, which is supported by the affidavit of the process server, is that Timmerman angrily tape recorded the service of process. (*See* Exhibit "E.")

[3] Plaintiff notes that it provided Timmerman with a witness fee check in January 2010 when he was first served. (*See* Exhibit "A.") The failure to provide Timmerman with a witness fee was simply an inadvertent oversight that in no way prejudiced Timmerman and was quickly cured by Plaintiffs. (*See* Exhibit "G.")

Timmerman filed both a Motion for Order Quashing Subpoena, or in the Alternative, for Protective Order, as well as an Opposition to Plaintiffs' Motion to Compel Deposition of Kenneth Timmerman.

## IV. AUTHORITY AND ARGUMENT

The nonparty seeking relief from subpoena compliance bears the burden of demonstrating that a subpoena should be modified or quashed. *See Linder v. Dep't of Defense,* 133 F. 3d 17, 24 (D.C. Cir. 1998); *In re Micron Technology Inc. Securities Lit.,* 264 F.R.D. 7, 9 (D.D.C. 2010); *Achte/Neunte,* 736 F. Supp. 2d 212, 215 (D.D.C. 2010). Quashing subpoenas "goes against courts' general preference for a broad scope of discovery, [but] limiting discovery is appropriate when the burden of providing the documents outweighs the need for it." *North Carolina Right to Life, Inc. v. Leake,* 231 F.R.D. 49, 51 (D.D.C. 2005) (internal citations omitted). When evaluating whether the burden of subpoena compliance is "undue," the court balances the burden imposed on the party subject to the subpoena by the discovery request, the relevance of the information sought to the claims or defenses at issue, the breadth of the discovery request, and the litigant's need for the information. *See id.* at 51; *Linder,* 133 F.3d at 24 ("Whether a burdensome subpoena is reasonable must be determined according to the facts of the case, such as the party's need for the documents and the nature and importance of the litigation.") (internal quotations omitted); *Achte/Neunte,* 736 F. Supp. 2d at 214. The court must limit discovery when the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). The 'undue burden' test also requires the court to be "generally sensitive to the costs imposed on third-parties." *In re Micron Tech.,* 264 F.R.D. at 9.

A.  **NIAC Has Been Diligent In Its Efforts to Obtain Service Of Process on Timmerman.**

**1.  The record bears out the attempts NIAC has made to serve Timmerman.**

Since January 2010, NIAC has made attempts to serve Timmerman.  (*See* Exhibit "A.") While successful in serving Timmerman in January 2010, Timmerman never consented to make himself available for deposition.  Through his first attorney, Timmerman maintained a continuous and unresolved objection to the scope of the document request associated with the subpoena.  (*See* Exhibit "B.")  Moreover, Timmerman insisted that NIAC agree to pay for Timmerman to be represented at any deposition at a cost of $375.00 per hour.  (*See* Exhibit "B.") The parties never reached an agreement about the payment of Timmerman's counsel fees nor the scope of the documents to be provided by Timmerman, and as a result NIAC was never permitted to depose Timmerman.

It appears that, thereafter, Timmerman was attempting to avoid service despite his claims to the contrary.  In early January 2011, NIAC made a number of attempts to serve Timmerman, who was now unrepresented and aware of NIAC's desire to depose him.  (*See* Exhibit "C.")  In his affidavit, Mr. Mckoy indicated that he attempted to serve Timmerman as follows: once on January 12, 21011; twice on January 13, 2011; twice on January 14, 2011; once on January 16, 2011; and once on January 18, 2011.  He affirmed that he was unable to find Timmerman at home, either having gotten no response at his home or having been told that he was not at home. Mr. Mckoy also ran a skip trace in an effort to locate a business address for Timmerman. Ultimately, Mr. Mckoy was advised that the Connecticut Avenue business address that he obtained for Timmerman was no longer a valid business address for Timmerman.

It is a red-herring for Timmerman to argue that in January 2011 Mr. Mckoy could have left the subpoena with Timmerman's wife on at least one occasion. This argument is disingenuous since had Mr. Mckoy done so Timmerman's prior and subsequent course of conduct would have been to object to the scope of the document request, demand that NIAC pay his attorney's fees (once he obtained a new attorney and he certainly would have prior to any deposition), and asserted procedural roadblocks as he has done herein to avoid having to produce documents and give testimony. The portrait of the cooperative Timmerman is undercut by the reality of Timmerman's angry receipt of the May 2011 subpoena and his effort to tape record the event.[4]

Timmerman must be viewed as a hostile fact witness in this matter.

**2. Special Knowledge of Timmerman's Whereabouts Purportedly Known By the Father of NIAC's Lead Counsel, Who Is Not a Part of NIAC's Legal Team, Cannot Be Imputed to NIAC.**

Timmerman makes the bizarre argument that because Abraham Pishevar, the father of NIAC lead counsel Afshin Pishevar, Esquire, purportedly worked on the U.S. Senate campaign of Timmerman, had purportedly been to Timmerman's home, and had purportedly taken pictures of Timmerman's home, that he claims Abraham Pishevar provided to the Iranian government, such purported special knowledge should be imputed to NIAC's legal team. Again, bizarre as well as unsubstantiated are the adjectives that best describe Timmerman's argument.

---

[4]In his self-serving declaration, Timmerman disingenuously claims that NIAC "could have served him at any time by simply contacting him by phone . . . and agreeing to hand him the documents."

B.   **NIAC MADE A GOOD-FAITH EFFORT TO SERVE A SUBPOENA AND WITNESS FEE ON TIMMERMAN AND TO DEPOSE TIMMERMAN BY MAY 13, 2011.**

   **1.  NIAC Cured Its Inadvertent Oversight to Tender a Witness Fee.**

Once advised of its inadvertent oversight of not providing Timmerman with a witness fee check, NIAC immediately tendered the fee to Timmerman.  (*See* Exhibit "G.")  This Court has acknowledged that "strict adherence to the literal interpretation of Rule 45(b)(1) may place form over substance, particularly when, as here, the subpoenaed party acknowledges that it received the subpoena at issue and has a history of multiple contacts over subpoena compliance with the sender of the subpoena."  *See Call of the Wild Moves, LLC v. DOES 1-1062, et al., \*42 (D.D.C. 2011*.  Therein, this Court recognized that even when invalidating the subpoena that the serving party should get the opportunity to reserve the subpoena, which was emailed and not personally served.

Herein, at most judicial economy warrants that the parties not go through the exercise of reserving a subpoena and witness fee when Timmerman has received both, but rather that the parties focus upon resolving outstanding issues relating to the scope of the document request and payment of Timmerman's legal fees by NIAC.  NIAC respectfully submits that to do otherwise would be to place "form over substance."

   **2.  NIAC Made a Good-Faith Effort to Comply With the Court's Discovery Order.**

Rightfully so, the Court has extended discovery deadlines in this case to allow the parties to complete discovery, especially in light of the numerous discovery disputes that had to be resolved in this case.  While the Court did impose a May 13, 2011, date by which to complete the depositions of Kenneth Timmerman and two other witnesses, the spirit of the Court's deadline anticipated NIAC's ability to secure the testimony of cooperative and not evasive witnesses.

NIAC did not disregard the Court's deadline for the completion of Timmerman's deposition. The reality is that NIAC made a good-faith effort to serve and depose Timmerman which effort was successful, ironically, on May 13, 2011.

Again, had NIAC been be able to serve Timmerman closer in time to the issuance of the March 29, 2011 Order, Timmerman's prior course of conduct herein informs that he would have retained counsel, as he did once served on May 13, 2011, filed objections to the scope of the discovery requests, as he did once served on May 13, 2011, and advised about his busy meeting schedule, as he did once served on May 13, 2011.

Lastly, Timmerman is not a party to the Court's Discovery Order and appears not to having standing to use the Order as a shield to avoid giving deposition testimony.

### C. Timmerman Has Failed to Demonstrate That a Protective Order Is Warranted.

Timmerman has failed to argue that he is seeking to be protected from an overly broad request for documents. Rather, the basis for Timmerman's request for a protective order is that he disagrees with the representations outlined by NIAC as to Timmerman's conduct and decries that NIAC cured its inadvertent oversight in not providing a witness fee with the subpoena he served.

Moreover, Timmerman has failed to demonstrate that a protective order is warranted. Fed. R. Civ. P. , Rule 26(c)(1) authorizes the issuance of a protective order to protect a party or person from "annoyance, embarrassment, oppression, or undue burden or expense." Timmerman is not claimed that he needs protection from NIAC's subpoena *duces tecum*, rather Timmerman is simply seeking to sanction NIAC for continuing to pursue his efforts to avoid having to give testimony in this case.

It bears repeating that it is Timmerman who beginning in January 2010 refused to cooperate with the subpoena properly served on him by NIAC, in January 2011 appears to have avoided service of a second subpoena from NIAC, and in May 2011, became angry when he was ultimately served with a second subpoena by NIAC.

## V.  CONCLUSION

Accordingly, for each of the reasons set forth above, Plaintiffs' Motion to Compel should be granted, Defendant's Motion to Quash or, in the Alternative, Motion for Protective Order should be denied, and Kenneth Timmerman should be compelled to appear for deposition and produce documents on a date mutually agreeable to Timmerman and the parties herein.

Respectfully submitted,

_____/S/_____
A.P. Pishevar (D.C. Bar No. 451015)
Adrian V. Nelson, II (*Pro Hac Vice*)
**PISHEVAR & ASSOCIATES, P.C.**
600 East Jefferson Street, Suite 316
Rockville, MD 20852
Phone: (301) 279 – 8773
Fax:    (301) 279 – 7347
Counsel for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TRITA PARSI, et al.** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08 CV 00705 (JDB) |
| **DAIOLESLAM SEID HASSAN,** | ) ) ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

    I certify that on July 15, 2011, I served, via email, Plaintiff's Memorandum of Points and Authorities in Opposition to Kenneth Timmerman's Motion to Quash or, in the Alternative, for Protective Order and Reply to Kenneth Timmerman's Opposition to Plaintiffs' Motion to Compel Deposition of Kenneth Timmerman to:

                                               Timothy E. Kapshandy, Esquire
                                               Peter G. Jensen, Esquire
                                               SIDLEY AUSTIN LLP
                                               1501 K Street, N.W.
                                               Washington, D.C. 20005
                                               (202) 736-8000
                                               tkapshandy@sidley.com

                                               Attorneys for Defendant
                                               Seid Hassan Daioleslam


                                               _____/s/_____
                                               Afshin Pishevar
                                               Adrian Nelson
                                               600 East Jefferson Street
                                               Suite 316
                                               Rockville, Maryland 20852
                                               (301) 279-8773
                                               ap@pishevarlegal.com
                                               anelson@pishevarlegal.com


                                               Attorneys for Plaintiff
                                               Trita Parsi

National Iranian American Council