IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRITA PARSI ) | |
| ) | |
| and ) | |
| ) | |
| NATIONAL IRANIAN AMERICAN ) | CASE NO. 08 CV 00705 (JDB) |
| COUNCIL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| DAIOLESLAM SEID HASSAN, ) | |
| ) | |
| Defendant. ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE EVIDENCE
OF PLAINTIFFS' LOBBYING ACTIVITIES

Throughout the course of this litigation, Plaintiffs have made numerous statements implicitly and explicitly claiming that their lobbying activities were in compliance with applicable lobbying laws. Plaintiffs allege that Defendant's statements "that Parsi is a member of a subversive and illegal Iranian lobby" and "that NIAC is . . . engaging in illegal and subversive lobbying on behalf of [Iran]" are false and defamatory and defamatory *per se*. (Complaint, Para. Nos. 13 and 34, Docket No. 1). NIAC's public website in the current "Myths vs. Facts" section on its website responds to the "myth" that "NIAC lobbies more than the legal limit allowed for nonprofit organizations under the law (20% of the

organizational budget)" by stating "NIAC and its staff are in full compliance with all regulations and laws." (Attached as Ex. A).

Plaintiffs have the burden of proving the falsity of the allegedly defamatory statements. In other words, they must prove that NIAC and Parsi are not engaged in any illegal lobbying and that they are not lobbying on behalf of the IRI. In short, two of the key issues in the case are:

1. Are plaintiffs engaged in lobbying?
2. If so, on behalf of whom?

Clearly, if Plaintiffs prevail on the first issue and are not engaged in ANY lobbying, then the case proceeds to the next major liability issue, actual malice. If, however, Plaintiffs cannot prove they are not engaged in lobbying, then they must prove that none of their lobbying is for the IRI.

Plaintiffs have requested the Court to exclude any evidence of their lobbying activities unless it is first established that the lobbying is for the IRI. (Docket No. 121). This request is unfounded, unworkable, and ignores that much of the evidence of Plaintiffs' lobbying is admissible for impeachment purposes.

Ironically, early in the discovery process, Defendant attempted to focus on the second issue by serving FRCP Rule 36 requests to admit, as the first issue seemed beyond dispute. (Defendant's First Requests for Admission, served June 2, 2010, attached as Ex. B). As dozens of NIAC's and Parsi's own documents referred to their activities as "lobbying", the only issue was: "On whose behalf is all this lobbying being done?" Defendant's requests to admit merely asked NIAC and Parsi to admit that "NIAC engages in lobbying." (*See*, Ex. B). Defendant further broke the requests down by year from 2001 to 2009 and by plaintiff. NIAC

and Parsi objected to the requests as ambiguous and susceptible to many definitions under various lobbying laws and also for calling for a legal conclusion. NIAC, but not Parsi, did admit that NIAC reported some lobbying activities on NIAC's 2008 and 2009 returns. (Plaintiffs' Response to Defendant's First Request for Admission, served July 1, 2010, attached at Ex. C). [1] So, what appeared to be a fairly straightforward issue is now in dispute according to Plaintiffs. Even after 2-1/2 years of discovery showing hundreds of contacts with members of Congress and staffers, in their motion Plaintiffs use the adjectives "purported" and "if any" to describe their lobbying activities. This is in spite of the fact that Plaintiffs' own expert on whether NIAC lobbies for the IRI, Col. Sam Gardiner, conceded that NIAC lobbies, the only question is for whom:

> Q    Let me ask you this. Do you believe
> that Trita Parsi is a lobbyist, first of all,
> without regard to who he lobbies for?
>          MR. NELSON: Objection; beyond the
> scope.
>          You may answer.
>           THE WITNESS: It's important to keep a
> distinction between being a lobbyist and being a
> representative of the government of Tehran.
> 192
>          BY MR. KAPSHANDY:
> Q    I appreciate that. That's my question.
> A    Yeah, I -- a lobbyist, I would accept
> that, and I accept what it says here, to promote
> Iranian American voice in the American political
> process.

---

[1] The response about the 2008 return is not entirely accurate and is the real source of NIAC's problem here. In its original 2008 return, sworn to under penalty of perjury by Trita Parsi, NIAC reported 0% lobbying and 0% grass roots advocacy. (NIAC original and amended 2008 returns attached as Ex. D). It was not until after the November 13, 2009 *Washington Times* article by Eli Lake questioning the legality of NIAC's lobbying (attached as Ex. E) that NIAC amended the 2008 return to admit to 10% lobbying. At that time, NIAC also filed for an IRC Sec. 501(h) election which permits 501(c)(3) entities to engage in 10-20% lobbying depending on their size and if they keep certain records detailing their lobbying activities. It was also at this time that NIAC sought legal advice from at least one law firm, Wiley Rein, about the legality of its lobbying activities. NIAC refuses to produce those documents claiming such are privileged.

(Dep. of Sam Gardiner, pp. 191-192, attached as Ex. F).  Accordingly, the parties and Court will now need to expend considerable resources to determine if NIAC even lobbies before getting to the ultimate issue as to whether the lobbying is for the IRI.  Plaintiffs propose to deal with that issue by simply asking the Court to ignore the issue.

## ARGUMENT

### A.  Plaintiffs' Proposal Is Unworkable and Unfounded

The biggest problem with Plaintiffs' request is that it will be impossible to administer. If the Court needs to determine if a particular piece of evidence of lobbying is for the IRI before it can be admitted, a minitrial on each such proffer on the ultimate issue in the case will have to be held.   As will be seen from a few examples (*see infra*, pp. 6 - 8), this is not an simple or obvious issue.  NIAC has had many contacts with members of Congress and/or their staffs and also with members of the executive branch over the last nine years.  Parsi's lobbying efforts even began before NIAC was formed in 2002, which leads to the obvious question as for whom was he lobbying when he did not even have an organization of Iranian-Americans to purportedly represent.  Attached as Exs. G-J are several articles and emails, as well as Parsi's own resume, describing his "lobbying" efforts to lift sanctions and establish U.S.-Iran dialogue as early as 1997 before he even came to live in the U.S.  In one he explicitly admits:  "We aim to protect Iranian interest."  ("IIC: An Iranian Lobby Group!" Google Discussion Group, soc.culture.iranian, Dec. 26, 1997, attached as Ex. H).  In Parsi's resume, he touted that he established " the first lobby group in the U.S. to support the normalization of ties between Iran and the U.S." (Parsi Dep, pp. 48-51 and Dep. Ex. 66, attached as Ex. G).  The website of his first lobby group stated: "Our main objective is to

4

safeguard Iran's and Iranian's interests." (FAQ from www.iic.org, Parsi Dep. Ex. 63, attached as Ex. I). In yet another weblog entry, Parsi stated:

> "Iranians for International Co-operation is a newly formed lobby group that seeks to protect the interest of the Iranian nation and promote friendship between nations."

("IIC: An Iranian Lobby Group!" Google Discussion Group, soc.culture.com, Dec. 26, 1997, attached as Ex. H). In an article Parsi penned for www.iranian.com in August 1997, he wrote:

> "I have reported my activities on Capitol Hill to the signatories of the petition, which has resulted in the formation of a small but active lobby group. About 80 members of Congress receive faxes and letters from us on a regular basis, and we are determined to continue to lobby for the interest and well being of our people and the nation. We Iranians need to show that we are a political force to be reckoned with.

(Parsi, "Hello Capitol Hill" www.iranian.com, Aug. 1997, Parsi Dep. Ex. 72, attached as Ex. J).

While it would severely impair the Defendant's ability to defend himself to preclude him from introducing evidence of NIAC's lobbying unless and until the lobbying was shown to be for the IRI, it is also hard to imagine how Plaintiffs will prove the falsity of Defendant's statements if they are not allowed to introduce evidence that none of NIAC's lobbying was for the IRI. Clearly, any such exclusionary rule must be mutual. Plaintiffs have the burden of proving that they were not lobbying and, if they were, it was not for the IRI. Clearly to do this, they must introduce evidence that any lobbying was not for the IRI. They must also establish that they were in compliance with all lobbying laws as they have alleged that Defendant has accused them of illegal lobbying. How Plaintiffs can carry their burden of proof on truth is unfathomable if they cannot introduce evidence of Plaintiffs' legal lobbying activities.[2]

---

[2] This raises another problem of proof that will be subject to Defendant's motion for summary judgment – Plaintiffs have no witnesses to establish that they are in compliance with all lobbying laws and, hence, cannot

5

Aside from being unworkable, Plaintiffs' proposal is also unfounded given the allegations of their complaint. Whether NIAC is engaged in illegal lobbying and whether or not it is for the IRI can only be determined by looking at that lobbying. One cannot define the problem away. Moreover, NIAC puts forth no reasons for this exclusionary rule. Plaintiffs' only argument is that Defendant, who is represented by a large law firm, asked many questions about "lobbying" and that such was a "fishing expedition" on irrelevant subjects. (Plaintiffs' Motion, pp. 5-7). Rule 26 does not limit discovery to relevant evidence and if Plaintiffs believed such questions about lobbying were impermissible, they should have raised those with the Court sometime in the last 2-1/2 years of discovery. They did not for the obvious reason that if discovery were limited to only those documents regarding illegal lobbying for the IRI, they would have produced nothing (for to have produced anything would have to admit that Defendants' statements were true).

A glimpse at just a few examples of NIAC's lobbying shows how difficult this rule would be to administer. Over the last five years, NIAC had communications with Congressmen/staffers on at least the following pieces of legislation:

1. HR 282 (2006)

2. HR 4939 (2006)

3. HR 1400 (2007)

4. HR 1585 (2007)

5. HR 2764 (2007)

---

prove that the statements about illegal lobbying are false. Plaintiffs have listed no expert witnesses able to testify that they are in compliance with all lobbying laws while all their factual witnesses, including Parsi have disclaimed expertise on lobbying laws. (*See*, attached as Exs. K - M, excerpts from the depositions of Parsi, Blout, and Disney.) In fact, Plaintiff's counsel objected to these factual witnesses testifying about lobbying laws as such called for legal expertise. (*Id.*)

    6. HR 3119 (2007)

    7. Unnumbered Bill regarding intelligence on Iran's nuclear program (2007)

    8. HR 1410 (2008)

    9. HR 2347 (2008)

    10. HR 7112 (2008)

    11. H. Res. 1169 (2008)

    12. H. Con. Res. 362 (2008)

    13. HR 334 (2009)

    14. H. Res. 267 (2009)

    15. H. Con. Res. 94- Incidents at Sea (2009)

    16. S 970 (2008)

    17. S 3227 (2008)

    18. S. Res. 580 (2008)

    19. Dodd Bill Similar to SA 5572 and S 3445 (2008)

    20. S. Res. 463 (2009)

    21. SA 634 (2009)

    22. Debra Cagan Incident (2007)

    23. Dennis Ross Appointment (2009)

These involved hundreds of emails and meetings with members of Congress and/or staffers. Some of these communications included detailed mark-ups by NIAC of the proposed legislation. (Selected examples of communications attached as Ex. N).

    House Concurrent Resolution 362 is an illustrative example. H. Con. Res. 362 was a concurrent resolution urging the President to take various measures to prevent the IRI from

acquiring nuclear weapons and which NIAC opposed. (H. Con. Res. 362, May 22, 2008, attached as Ex. O). In less than seven months, NIAC had more than 100 email communications and/or contacts with Congressmen/staffers on H. Con. Res. 362. (Selected emails/letters are attached as Ex. P). In the end, H. Con. Res. 362 was rejected and NIAC bragged that it defeated the much larger pro-Israel lobby group, AIPAC. (NIAC press release attached as Ex. Q). AIPAC, in contrast to NIAC, is a 501(c)(4) registered lobby group.

Another illustrative example is the "Incidents at Sea" agreement, H. Con. Res. 94 (April 2, 2009). The Incidents at Sea resolution addressed setting up an international protocol for communications between the U.S. Navy and Iranian Navy. (Copy of H. Con. Res. 94 attached as Ex. R). In less than four months, NIAC had over 100 email communications and/or contacts with Congressmen/staffers on the Incidents at Sea Resolution. (Selected emails are attached as Ex. S).

While NIAC's positions on these two lobbying efforts clearly served the interests of the IRI, it is not clear how either fell within NIAC's stated mission to "Promote Iranian-American Participation in American life." (*See*, NIAC 2007 Tax Return, attached as Ex. T). Likewise, it is not clear how these legislative efforts comported with its stated mission in its corporate charter:

> Public education relating to the history, language and culture of Iran.
>
> Development and conduct of programs designed to promote and foster the efforts of other organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1986 and provide public education relating to Iran.
>
> Educational and charitable activities focused on the Iranian community in the United States.

(*See*, NIAC's January 2002 Articles of Incorporation, attached as Ex. U). Determining for whose benefit particular lobbying was being done, the IRI or Iranian-Americans, is not necessarily self-evident from the face of the particular position NIAC is advocating although many of the efforts appear to be outside NIAC's professed mandate. Even less controversial issues, such as lifting of visa restrictions for Iranian students or SBA treatment for Iranian-American businesspersons, are not necessarily excluded from Plaintiffs' Iranian lobby strategy. Documents produced by Plaintiffs specifically set forth a strategy to initially undertake noncontroversial issues to gain credibility before taking on more controversial issues. NIAC's November 2001 board meeting minutes provided:

> ➢ 4th leg – linkage with Iran? Discussing yielded that as a strategy, it is wiser not to take on this issue at this point. In the long-term, consensus exist that focus shall shift towards Iran, but at this stage such a principle in the mission statement could be polarizing unless very cleverly formulated. Banafsheh and Trita will present proposal at next meeting.

(Nov. 2001 NIAC Board Meeting Minutes, attached as Ex. V). In an October 7, 2002 memo from Trita Parsi to lobbyists Roy Coffee and Ray DiStefano, Parsi wrote:

> "Although the mission of the proposed lobby should be to improve relations between the US and Iran and open up opportunities for trade, the initial targets should be less controversial issues such as visas and racial profiling/discrimination. Since the lobby will be spared from creating a grassroots network of its own, the initial focus on non-controversial issues will only serve to establish credibility within the community, and not massive support (which would necessitate the complete avoidance of issues such as US-Iran relations).
>
> Furthermore, it would be a wise strategy to mainly target Iranian-American businessmen for financial support. This group has both a higher propensity to support the lobby's mission and it is also in a better position to underwrite the expenses of the lobby. Nonetheless, despite its predominantly business oriented constituency, it is essential that the lobby creates a "human face" for its aims and goals. AIPAC successfully painted the opponents of the Iran Libya Sanctions Act as "greedy businessmen who had no scruples when it came to doing business with terrorist regimes." The oil companies failed to characterize their campaign with "human concern for the well-being of innocent Iranians stuck with a dictatorial regime" or

9

> "support for the poor mid-Western family father who lost his job due the sanctions." The human element is essential both when it comes to attracting support among Iranian-Americans and when it comes to winning the debate and the votes on the Hill."

(October 7, 2002 email from Parsi, attached as Ex. W).

Eventually, NIAC more openly advocated on positions such as engagement, sanctions, and regime change. Plaintiffs' own expert, Col. Sam Gardiner, stated in his report that on these three key issues NIAC's positions were in accord with what the IRI would want (while the Defendant's positions were the opposite). (May 7, 2010 Gardiner report attached as Ex. X). Throughout this time period, Parsi was exchanging emails and meeting with Iranian governmental officials in the U.S. as well as in Europe. (See, Parsi Dep. excerpts attached as Ex. Y; selected emails with Ambassador Zarif attached as Ex. Z). Parsi's own emails and weblogs shed light on whom he considered his master:

> "More than 1 million people died in an unjust war, but they still died for Iran. They died for You and me, They died for the fact that another beautiful Iranian child could be born and called Shirin and Darius. We should never forget this, especially we Iranians outside of Iran. Our brothers and sisters did not die for us so we could marry an American and call our child Betty-Sue or Joey, they did not die so we could speak English to our children. WE OWE IRAN OUR LIVES . . . ZENDE BAD IRAN!"

(Let's Not Leave Iran Alone" Google Discussion Group soc.culture.iranian, June 18, 1996, emphasis in original, attached as Ex. AA; "Zende bad Iran!" translates to "Long live Iran!"). Just a few weeks later, Parsi exchanged emails with his old handler at the Atieh Bahar consulting firm in Tehran, Baquer Namazi, who wrote to Parsi:

> "Thank you for you efforts, all designed to serve our dear country."

(August 31, 2006 email from Namazi to Parsi, Parsi Dep. Ex. 81, attached as Ex. BB). Iran is the only country whose citizenship Parsi and Namazi share lest there be any doubt about whose country Parsi is "serving."

Just these few examples leave little doubt whom Parsi served.  Moreover, requiring the Court to preliminarily first determine for each piece of evidence if the effort was for the IRI or some other client would neither be easy nor workable.  Such would put the Court in the position of having to determine the ultimate issue in the case (i.e., whether Plaintiffs are lobbying for the IRI) without the benefit of hearing all the evidence that the jury will need to itself hear to determine the very same issue.   This is a Catch-22 rather than a legitimate motion *in limine*.

**B.     Evidence of Plaintiffs' Lobbying Activities is Admissible for Impeachment Purposes**

Plaintiffs' proposal ignores that much of the evidence of their lobbying activities is also admissible for impeachment purposes.  Under Federal Rule of Evidence 613, prior inconsistent statements of a witness, whether under oath or not, may be used for impeachment purposes.  Under Federal Rule of Evidence 801(d)(2), admissions by a party are admissible as evidence, not just limited to impeachment.  Once Parsi takes the stand, his prior inconsistent statements about lobbying are permissible impeachment and also directly admissible to they extent they are admissions against interest.  If such statements were made under oath, such examples of a willingness to provide false statements under oath are obvious grounds for cross-examination.  One obvious example is Parsi's sworn statements on NIAC's 2008 original and amended tax returns that NIAC did not engage in any lobbying and later that it did engage in lobbying (providing figures based upon 10% of the salaries of Parsi, Blout, and another employee).  (*See,* Ex. D).  Under Plaintiffs' proposed exclusionary rule, such evidence of NIAC's lobbying would be excluded unless and until it were connected to the IRI.

Aside from trying to cut off impeachment, Plaintiffs real effort here is geared at avoiding the airing in a public forum of their compliance issues with various lobbying laws such as Lobbying Disclosure Act (LDA), Foreign Agent Registration Act (FARA), Internal Revenue Code (IRC), Logan Act, and Iran Libya Sanctions Act (ILSA).  As the Court is aware from Defendant's Motion to Compel Production Documents Concerning the Legality of Plaintiffs' Lobbying Activities Filed July 8, 2011 (Docket No. 119), Plaintiffs have tried to prevent Defendant from accessing such communications while simultaneously arguing that their activities are in compliance with all lobbying laws.  By this motion, they are trying to further preempt the issue by simply declaring that all evidence of NIAC's lobbying is irrelevant until it is determined that NIAC was lobbying for the IRI.   NIAC cannot really afford for its lobbying activities to be aired in a public forum as it has not registered under either the LDA or FARA.  NIAC's Assistant Legislative Director concluded that, "Under this expansive view of lobbying [LDA], I find it hard to believe Emily and I devote less than 20% of our time to lobbying."  (July 23, 2008 Disney email to Blout, Disney Dep. Ex. 14, attached as Ex. CC).  A photo essay on Iranian.com on NIAC in May 27, 2008 shows Legislative Director, Emily Blout, with the caption:  "Emily Blout is Legislative Director.  She's often on Capitol Hill trying to convince Legislators and their staff."  (http://www.iranian.com/main/image/29962, attached as Ex. DD).  An email from the office of Rep. Geoff Davis shows how Congressmen viewed NIAC and Parsi:  "Emily and Patrick, . . . I'm really appreciative of all the calls and lobbying you and Trita did to make this happen."  (March 6, 2009 email from Mike Darner to Patrick Disney and Emily Blout, attached as Ex. EE).  NIAC documents reflect that 80% of Disney's salary was funded by a grant from George Soros' Open Society Policy Center to run the Campaign for a New American Policy on Iran (CNAPI), a lobbying effort designed to

lessen sanctions, end democracy funding, and open a U.S. Interests section in Iran.  (See CNAPI documents attached as Ex. FF).  Also, until November 2009 when the *Washington Times* article ran (Ex. E), NIAC had never admitted to the IRS that it was doing any lobbying or grass roots advocacy.  Additionally, though it did file its 501(h) election late in 2009, it did not start keeping time records as required until November 30, 2009; in other words, NIAC employees generated their lobbying time records for the entire year of 2009 in November and December of 2009 after the *Washington Times* article.  (Time sheets attached as Ex. GG).[3]  Another problem for Parsi is that his bank records and deposition testimony reflect that he was paid for consulting work by a firm in Tehran, Atieh Bahar, which may present issues under both ILSA and FARA.  (Parsi Dep., pp. 325-343 including Dep. Exs. 22-23, attached as Ex. HH).  If Plaintiffs have to answer questions about their lobbying activities under oath in a public forum, they may well have to choose between admitting to conduct that may be violative of multiple federal laws or not testifying truthfully.  While certainly a difficult dilemma (albeit of Plaintiffs' own making), there is no basis for dealing with it by simply declaring all lobbying evidence inadmissible.

## CONCLUSION

Plaintiffs chose to bring this action in this forum and allege that Defendant's statements about their lobbying activities were defamatory.  Plaintiffs' request to exclude evidence of their lobbying activities unless first connected to the IRI is both unfounded and unworkable.  For the foregoing reasons, Defendant requests this Court to deny Plaintiffs' motion.

---

[3] The metadata for all five timesheets produced, reflect created dates of Nov. 30, 2009.  Parsi's timesheets reflect his time records were modified on Dec. 25, 2009, the same date a number of his calendar entries were modified. (*See*, Def's Resp. to Pl's. Mot. For Recon., July 22, 2010, Docket No. 76.)

Respectfully submitted,

Dated:   August 1, 2011                                    /s/
Timothy E. Kapshandy (Illinois Bar No. 6180926, admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
hrogers@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRITA PARSI** ) | |
| ) | |
| and ) | |
| ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil No. 08 CV 00705 (JDB) |
| ) | |
| **DAIOLESLAM SEID HASSAN,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## CERTIFICATE OF SERVICE

I certify that on August 1, 2011, I served, via email, Defendant's Response to Plaintiffs'

Motion to Exclude Evidence of Plaintiffs' Lobbying Activities on:

    Afshin Pishevar / Adrian Nelson
    600 East Jefferson Street
    Suite 316
    Rockville, Maryland 20852
    (301) 279-8773
    ap@pishevarlegal.com / anelson@pishevarlegal.com

    Scott F. Craig
    9107 Wilshire Boulevard, Ste 450
    Beverly Hills, California 90210
    (310) 867-5980

| | |
|---|---|
| Dated:  August 1, 2011 |               /s/              <br> Thomas E. Ross (D.C. Bar No. 994275) <br> Bradford A. Berenson (D.C. Bar No. 441981) <br> HL Rogers (D.C. Bar No. 974462) <br> Peter G. Jensen (D.C. Bar No. 982599) <br> SIDLEY AUSTIN LLP <br> 1501 K Street, N.W. <br> Washington, D.C.  20005 <br> (202) 736-8000 <br> tom.ross@sidley.com <br><br> Attorneys for Defendant <br> Seid Hassan Daioleslam |