# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

TRITA PARSI and NATIONAL       :

IRANIAN AMERICAN COUNCIL       :

      Plaintiffs            :

      V.                    :    Civil No.:

DAIOLESLAM SEID HASSAN,        :    08 CV 00705 (JDB)

      Defendant             :    Page 1-234

- - -

Tuesday, December 8, 2009

- - -

    Video deposition of Emily L. Blout was

taken at the Law Offices of Sidley Austin, LLP, 1501

K Street, NW, Sixth Floor, Washington, DC 20005

commencing at 11:09 a.m. before Sherry L. Brooks,

Professional Court Reporter and Notary Public, in and

for the District of Columbia.

      * * *

2

```
 1  APPEARANCES:

 2

 3  THOMPSON HINE, LLP
    BY:  DAVID A. WILSON, ESQUIRE
 4  1920 N Street, NW, Suite 800
    Washington, DC 20036-1600
 5  (202) 263-4161
    (202) 331-8330 (Fax)
 6  E-mail:  David.wilson@thompsonhine.com
    Representing Emily Blout
 7

 8  PISHEVAR & ASSOCIATES, PC
    BY:  A.P. PISHEVAR, ESQUIRE
 9       PATRICK PARSA, ESQUIRE
    Jefferson Plaza, Suite 316
10  600 East Jefferson Street
    Rockville, MD  20852
11  (301) 279-8773
    (301) 279-7347 (Fax)
12  E-mail:  Pparsa@pishevarlegal.com
    Representing the Plaintiffs
13

14  SIDLEY AUSTIN, LLP
    BY:  TIMOTHY E. KAPSHANDY, ESQUIRE
15  One South Dearborn
    Chicago, IL  60603
16  (312) 853-7643
    (312) 835-7036 (Fax)
17  E-mail:  Tkapshandy@sidley.com
    Representing the Defendant
18

19  ALSO PRESENT:

20      SIDLEY AUSTIN, LLP - Washington, DC Office

21          Eric Galvez, Esquire - Defendant

22          Peter G. Jensen, Esquire - Defendant

23          Elisa K. Jillson, Esquire - Defendant

24          Richard Bryan, Legal Assistant

25      Mia Marbury, Videographer
```

5

1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  Here

3    begins Tape 1, Volume 1 in the videotape deposition

4    of Ms. Emily taken in the matter of Trita Parsi and

5    National Iranian American Council versus Daioleslam

6    Seid Hassan in the United States District Court for

7    the District of Columbia, Case Number 08-CV-00705

8    (JDB).

9              Today's date is December 8th, 2009.  The

10   time on the video screen is 11:09 and 41 seconds.

11             This deposition is being held at Sidley

12   Austin at 1501 K Street, Northwest, Washington, DC,

13   20005.  It was noticed by counsel for the Defense.

14             The court reporter today is Sherry L.

15   Brooks.  The video camera operator is Mia Marbury.

16   Both are on behalf of Transperfect Deposition

17   Services.

18             Will counsel and others present please

19   introduce yourselves and state whom you represent?

20             MR. KAPSHANDY:  Timothy Kapshandy, Sidley

21   Austin, on behalf of the Defendant.

22             MR. WILSON:  David Wilson with Thompson

23   Hine on behalf of the witness.

24             MR. PISHEVAR:  A.P. Pishevar on behalf of

25   the Plaintiffs.

6

1          MR. PARSA:  Patrick Parsa on behalf of the

2   Plaintiffs.

3          MR. JENSEN:  Peter Jensen on behalf of the

4   Defendant.

5          MS. JILLSON:  Elisa Jillson on behalf of

6   the Defendant.

7          MR. GALVEZ:  Eric Galvez on behalf of the

8   Defendant.

9          THE VIDEOGRAPHER:  Thank you.  Will the

10  court reporter please swear in the witness, after

11  which, we can begin?

12              *      *      *      *      *

13              EMILY L. BLOUT

14  was called for examination by counsel and, after

15  having been duly sworn by the Notary, was examined

16  and testified as follows:

17         THE VIDEOGRAPHER:  Please begin.

18         MR. KAPSHANDY:  Great.  Anyone have any

19  statements for the record before we proceed, other

20  than render the Federal Rules of Civil Procedure?

21         MR. WILSON:  Do you have a copy of the

22  subpoena?  I don't recall that this was noticed as a

23  video deposition.

24         MR. KAPSHANDY:  I do have a copy of the

25  Notice and it was noticed as a video deposition.  Is

90

1    Q.    Emily, are you ready to proceed?

2    A.    Yes.

3    Q.    Before the break, we were asking you about

4  this issue that Patrick Disney raised about possible

5  issues under the Lobbying Disclosure Act.  Do you

6  recall that, first of all, before lunch?

7    A.    I recall -- I remember our conversation.

8  Yes.

9    Q.    And he came back to you with some sort of

10  response, and you told us that you were confused; is

11  that correct?

12    A.    He came back -- can you rephrase that?

13  I'm sorry.

14    Q.    I mean, is that a fair summary of your

15  reaction when he came back to you with some response

16  that may have been in writing and it may have been

17  verbal, but your reaction was you were confused?  Do

18  you recall that discussion before lunch?

19    A.    Yes.  I remember that discussion.

20    Q.    Okay.  What I'd like to ask you now is,

21  what is it that you were confused about in his

22  response?

23    A.    I think we were both not clear what the

24  requirements and the law said or what would

25  necessitate taking further action, so it was just in

91

1   terms of what the law said, if anything, if it

2   pertained to us.

3       Q.    Now, at that time did you understand him

4   to be talking about a law we now refer to as the

5   Lobbying Disclosure Act?

6           MR. PISHEVAR:   Continuing objection.   Same

7   as prior to lunch.

8           MR. KAPSHANDY:   That's fine.

9           BY MR. KAPSHANDY:

10      Q.    Okay.

11      A.    When I meant -- I want to clarify what I

12  meant by law, law in general, no specific law.   I

13  never even looked at any law, but just in terms of

14  the institution, law.   That's what I was referring

15  to.

16      Q.    Well, you understand there's more than one

17  law in this country, correct?  Lots of them, right?

18  My question was simply, did you have at this point in

19  time an understanding when he had looked at the law

20  that you had previously referred us to, something

21  that's known as the Lobbying Disclosure Act?

22      A.    I did not know that specific term.   I

23  don't recall -- I don't recall that term.

24      Q.    Let me ask this:  Did you recall that the

25  law involved the concept of lobbying?

92

1       A.     Yes, because that's the issue that we were

2    looking into, so I would -- in my general

3    recollection, I told him to go and investigate this

4    issue in regards to lobbying.  And so, yes, I would

5    assume that whatever conversation we had would

6    pertain to that.

7       **Q.     So some law regarding lobbying, but you**

8    **can't recall the exact name?**

9       A.     It could be a law or laws.  These were

10   regulations.

11      **Q.     That's fair.  It could have been more than**

12   **one law, correct?**

13      A.     Sure.

14      **Q.     But he came back and, as you told us**

15   **before lunch, you were confused?**

16      A.     We were both confused about the

17   interpretations.

18      **Q.     And from there, you took it where, to Dr.**

19   **Parsi?**

20      A.     To Dr. Parsi.

21      **Q.     And what, if anything, became of the issue**

22   **then in terms of whether NIAC or you personally were**

23   **in compliance with the law whether you know the name**

24   **or not?**

25      A.     I think I've already said this, but we

93

1  brought it to Trita's attention and we discussed it

2  and we decided there was enough ambiguity and it was

3  important enough for Trita and Patrick to investigate

4  further, after which, I stopped participating in the

5  whole issue.

6      **Q.   Well, I mean, you worked after this,**

7  **assuming it was July 23rd, 2008, as Mr. Disney says**

8  **in his memo, for another, what, nine, ten months at**

9  **NIAC?**

10     A.   But you're assuming that I -- we brought

11  this to his attention right then.

12     **Q.   Okay.  That's a fair point.  So after he**

13  **brought this to you and you were confused, you waited**

14  **a little while before you brought it to his**

15  **attention?**

16     A.   I don't know the time frame.  I don't

17  recollect the time frame, but I'm doubtful that --

18  since I have no recollection of it -- I mean, I can't

19  make speculation.  I'm sorry.

20     **Q.   You don't recall if you discussed it with**

21  **Dr. Parsi within a day or a week or six months?**

22     A.   Correct, because I just have a vague

23  memory of speaking with him and deciding this --

24  making the decision for them to investigate it

25  further, and I don't remember the time period of it.

94

1      Q.     And did Dr. Parsi ever get back to you

2   with any conclusions or outcome as to whether he had

3   determined whether NIAC or any of its employees were

4   violating any of these laws related to lobbying?

5      A.     I never heard that language that you just

6   brought up in terms of violating laws.  That was

7   never discussed.

8           What I -- the only thing I heard about the

9   subject moving forward after that subsequent

10  discussion with Trita is that later on he said he was

11  going to go to the Board and talk about it with the

12  Board, and ultimately they decided to make an H

13  Election or they were going to make an H Election.

14     Q.     Let me ask this:  At any point in time

15  after you had this discussion with Mr. Disney about

16  possible issues under various laws, including the

17  Lobbying Disclosure Act, did you consult counsel as

18  to whether you might, in fact, need to register as a

19  lobbyist?  And counsel means a lawyer or any legal

20  person.

21     A.     I never considered myself a lobbyist.  I

22  was never under the impression what I was doing was

23  lobbying, so, therefore, I would have no desire and I

24  did not consult counsel about it.

25     Q.     And that's because, as you told us, you

95

1  didn't even know the names of the laws that applied

2  to this, correct?

3          MR. WILSON:  Objection.  I think it

4  mischaracterizes the testimony.

5          THE WITNESS:  Can you rephrase that?

6          BY MR. KAPSHANDY:

7      Q.    Sure.  You said you never consulted with

8  counsel, but you had already told us you didn't even

9  know what laws applied to lobbying, correct, at least

10  by name?

11     A.    Correct.

12     Q.    Okay.  As you sit here today, do you have

13  any understanding as to the various laws that apply

14  to lobbying activity of people who either meet with

15  representatives or members of the Executive Branch in

16  this country?

17          MR. WILSON:  Do you mean by name or what

18  the --

19          MR. KAPSHANDY:  Name or substance.  She

20  already said she doesn't know the names.

21          THE WITNESS:  I can tell you what I know

22  today or I can tell you what I knew then.

23          BY MR. KAPSHANDY:

24     Q.    Let's do both.  Just so the record is

25  clear, tell us if you're talking about what you knew

96

1  then and what you know now.

2      A.    And I'm still very -- I mean, I'm not a

3  lawyer.  I can't make a legal --

4      Q.    That's fair.  I'm just simply asking you

5  as you sit here, the former legislative director,

6  what your understanding was when you worked there as

7  to what the laws were that governed lobbying activity

8  with members of the Legislative Branch and/or

9  communications with the Executive Branch?

10             MR. PISHEVAR:  Objection.  Calls for

11  speculation and also to make a legal conclusion by a

12  lay witness.

13             BY MR. KAPSHANDY:

14      Q.    Go ahead.  You can answer.

15      A.    Can you repeat it again?

16      Q.    Sure.  I just want to understand -- and

17  we'll break this into two parts -- what your

18  understanding was, you, Emily Blout, in your role as

19  a legislative director as to what lobbying laws

20  applied to you then as the legislative director for

21  the activities that you engaged in on, say, Capitol

22  Hill?  Let's keep it on the legislative side first.

23      A.    Well, since I didn't consider myself

24  lobbying, I didn't think about it in terms of what

25  laws pertained to me.  What came out of subsequent

97

1   conversations in the time when Trita and the Board

2   and (inaudible) made the decision to make the H

3   Election was that NIAC as an organization was allowed

4   to do specific activities up to a certain threshold.

5            And we were way below that threshold, so

6   those are my very vague understanding of what -- how

7   that law -- if it could -- or laws or anything or

8   regulations -- and I believe the regulations that

9   were -- yes, how this might apply to me or that term

10  you're referencing.

11       Q.    That was your understanding back then when

12  you were working as legislative director, correct?

13       A.    Right.

14       Q.    I just want to make sure we're clear on

15  the time period because I'm later going to ask you

16  about -- you said you might have a different

17  understanding now.  Let's stay with what your

18  understanding was back then when you were with NIAC

19  at any time from 2007 to 2009, okay?

20            MR. PISHEVAR:  Renew my objection.

21            BY MR. KAPSHANDY:

22       Q.    Now, you mentioned actually tax status and

23  something else that sounds kind of like the Lobbying

24  Disclosure Act.  My question is, do you understand

25  that there are different laws governing what a

98

1    501(c)(3) can do and another law known as

2    registration or Lobbying Disclosure Act?

3         A.    Well, since you showed me this piece of

4    paper that says all the laws, this is where -- I

5    mean, I'm --

6         Q.    Let's stick with what you were just

7    talking about, what your understanding was back then

8    in 2007.  I'm just trying to understand what laws, if

9    any, by name or substance you understood applied to

10   the activity that you were engaging in when meeting

11   with members of just the Legislative Branch is what

12   we're talking about now.

13        A.    That was in reference to the IRS code.

14        Q.    Okay.  And you're not aware back then at

15   least that the Lobbying Disclosure Act was something

16   entirely different from the amount of lobbying that

17   the IRS would permit a 501(c)(3) to do?  I mean, you

18   know or you don't know?

19        A.    I didn't think about it.

20        Q.    That's fine.  That's fair.  What about

21   communications with the Executive Branch?  At that

22   point in time when you were employed by NIAC, have

23   you ever heard of any law known as the Foreign Agent

24   Registration Act?

25        A.    I don't and I did not know of a law known

99

1  as the Foreign Agent --

2      Q.    So you answered both with regard to today

3  and back then with regard to the Foreign Agent

4  Registration Act, okay, just so we're clear?

5      A.    Yes.

6      Q.    Now, with regard to either the Lobbying

7  Disclosure Act or the Internal Revenue Code, did you

8  have a different understanding today since you said

9  you knew something different now than you knew then?

10     A.    Now I'm even more confused.

11     Q.    Is there a scale on what you measure

12  confusion?

13     A.    I guess so because, my God.

14     Q.    Pardon?  Pardon?

15     A.    Yes.  There must be because I didn't

16  realize there was an ability to be more confused by

17  all of this stuff that was going on, but I am now

18  more confused.

19     Q.    And when did you attain this advanced

20  state of confusion?  I don't mean to be facetious.

21  What was it that made you more confused than you were

22  back in 2008 when you were so confused you turned it

23  over to Dr. Parsi?

24     A.    I can't tell you specifically, but in

25  part, your line of questioning and you showing me

100

1   this document I've never seen.

2        Q.    Well, you mentioned The Washington Times

3   article where that document Exhibit 7 was quoted,

4   correct?  I mean, you raised that on your own today?

5        A.    I didn't know about this document.  I

6   remember when you read it out loud that it sounded

7   eerily familiar to the leaked materials on The

8   Washington Times -- in The Washington Times.

9        Q.    In any event, back when you were at NIAC

10  after you had this initial feeling of confusion about

11  the laws governing lobbying, you turned it over to

12  Dr. Parsi, and until he mentioned the 501 H Election,

13  that was the only further discussions you had with

14  him about it?

15       A.    Correct.

16       Q.    Now, did any of your confusion or

17  questions have to do with the notion of how much time

18  a person under whatever law it is or money could be

19  spent on lobbying activities without running afoul of

20  some law, regardless of what you're going to -- did

21  you ever get into that concept of time involved in

22  lobbying?

23       A.    I don't recall.

24       Q.    Well, I mean, what was the confusion

25  about?

101

1           MR. PISHEVAR:  Asked and answered.

2           THE WITNESS:  Confusion was about, among

3    other things, what the definition of lobbying is,

4    what -- if lobbying is an illegal act needing

5    registration, or if I as a citizen contact my

6    lawmaker and say, hey, I don't want you to go to war

7    with Iran; is that lobbying or if I'm asking, you

8    know, my parents to take me out to a really expensive

9    dinner because I'm really sad; is that lobbying.

10           It's still very unclear to me in having

11    the conversations that I did with Patrick, and even

12    now, it's even more unclear to me.

13           BY MR. KAPSHANDY:

14      Q.    Well, one question is whether an activity

15    is lobbying is what you're saying, correct?  That's

16    one issue?

17      A.    Right.

18      Q.    Now, did you understand from any of the

19    laws, be they the tax laws or the Lobbying Disclosure

20    Act, that there were time limits on the amount of

21    lobbying a person or an organization could do?

22      A.    I don't recall talking about time limits.

23    I remember a discussion about thresholds and

24    percentages.

25      Q.    Okay.  Well, what is a threshold?  What do

102

1   **you understand that to be?**

2       A.      My understanding under the IRS

3   interpretation was that an organization couldn't --

4   can only spend a certain amount of time during a

5   certain amount of activities up to a certain

6   percentage.

7       **Q.      Of time or money or what?**

8       A.      Exactly right.  I mean, of expenditure of

9   anything.  That's why I was very confused.

10      **Q.      But in any event, you understood that**

11  **under some of these laws, at least the IRS laws, that**

12  **there was a threshold below which an organization had**

13  **to keep its lobbying activities measured in**

14  **something?  You didn't really understand?**

15      A.      To be clear, the reason why I'm specifying

16  IRS is because I've never seen this before, Exhibit

17  7, and you were talking about other laws.

18      **Q.      Putting aside whether you've seen the**

19  **exhibit before -- go ahead.  I'm sorry.**

20      A.      You've been talking about other laws, and

21  so my understanding, the reason why I stopped really

22  paying attention to it was that, because I knew NIAC

23  as an organization wasn't doing anything remotely --

24      **Q.      Okay.  You mentioned that earlier, and I**

25  **wanted to ask you, when you said they were well**

103

1    within the threshold, what time records or financial

2    records are you referring to when you say they were

3    within the threshold, whatever it was?  I mean, you

4    obviously learned that from somewhere.

5         A.    A percentage.  My understanding was it was

6    a percentage of all of its activities.  I don't know

7    anything about timetables or money.

8         Q.    You can't say whether it's measured in

9    dollars or time, but whatever that threshold is they

10   were within it.  Is that what you're saying?

11        A.    No, it's not.  My understanding was that

12   it was all their activities.

13        Q.    Well, how do you measure activities?  I

14   mean, is there an activity number that you get is

15   what I'm asking?

16        A.    I don't know.  You're the lawyer.

17        Q.    No.  I'm asking you because you're the one

18   who said that NIAC's activities were within this

19   threshold, so I'm trying to understand how you

20   measure the activities.

21        A.    Is that a question?

22        Q.    Yes.

23        A.    Can you repeat it?

24        Q.    You just told us that NIAC's activities

25   were within the permissible threshold, and I'm asking

104

1  **you, is that dollars or time, and you're just saying**

2  **activities.  And I'm wanting to know how do you**

3  **measure an activity?  I don't know.  I'm asking you.**

4      A.    So in my mind now, based on the

5  calculation -- and this is similar thinking, I think,

6  at the time -- and I don't know.  I'm not a lawyer.

7  I can't make a legal interpretation, but if you're

8  asking me in layman's terms based on this definition

9  that it's a percentage of an organization's

10  activities, I made the deduction that, well, if --

11  let's say I was doing all of these activities or I

12  was doing them and another associate was doing them

13  -- all of them too, even at that point, it couldn't

14  be -- it would be below the threshold because there's

15  12 other staff or there's ten other staff doing --

16  working at NIAC doing services for its membership.

17      Q.    **And was it you that came to this**

18  **measurement or was this something Dr. Parsi told you?**

19  **Because you previously told us they were within this**

20  **threshold and I want to find out who it was that made**

21  **that determination.**

22      A.    I think that was gained knowledge or

23  gained understanding by -- from that discussion

24  subsequent.

25      Q.    **I'm sorry.  I didn't hear you or didn't**

105

1  understand that.  Can you repeat that?

2      A.    That understanding, I don't know how I

3  came up with that.  I'm sure it wasn't by my thinking

4  about it really hard, because honestly, I wasn't very

5  -- I didn't think about what I was doing as lobbying

6  or consider myself a lobbyist, so I didn't think it

7  applied to me, but somewhere in the process I gained

8  that information.

9      Q.    What information did you gain?

10     A.    That deduction.

11     Q.    We're talking pronouns.  My question is,

12 though, whether that deduction is that you were doing

13 some activity that is called lobbying or whether NIAC

14 is within the threshold.  I want to make sure we're

15 clear, because you used a pronoun "that deduction",

16 and I want to understand what you meant by that so

17 there's no confusion.

18           When you said that you came to "that

19 deduction", conclusion, is it --

20     A.    The threshold.  We were below the

21 threshold.

22     Q.    NIAC was below the threshold?

23     A.    Yes.

24     Q.    Now, the question ahead from what you just

25 said is, did there come a point in time when you

106

1   realized that some of the activity that you were

2   engaged in is considered lobbying?

3       A.    I don't consider what I was doing lobbying

4   and I don't consider myself or any of the activities

5   I was doing as lobbying.

6       Q.    Right.  When you did this deduction or

7   this calculation that was within this threshold, what

8   activities did you measure or count up that

9   calculated towards that threshold that were, quote,

10  lobbying?

11      A.    Again, I didn't consider what I was doing

12  lobbying.

13      Q.    I understand that you didn't consider what

14  you were doing lobbying.  I'm speaking about the

15  organization because you told us that it was

16  concluded that NIAC did not exceed the threshold.

17            And my question for you is:  What

18  activities, as you measure it on your activity scale,

19  did you consider as being lobbying?

20            MR. PISHEVAR:  I think the question was

21  asked and answered, if I understood the question

22  correctly.

23            THE WITNESS:  I didn't consider any of my

24  activities as lobbying.

25            BY MR. KAPSHANDY:

107

1      Q.    I understand that.  My question was, when

2  you said NIAC was within the threshold, that its

3  lobbying activities did not exceed this threshold --

4  what activities of what NIAC was doing did you

5  consider lobbying in making that deduction?

6            I mean, it's your statement.  I just want

7  to compare the threshold to what you called the

8  lobbying activity of NIAC.

9      A.    I don't believe that I characterized what

10 NIAC was doing as lobbying or that I considered it

11 that way, and I don't know the definition of

12 lobbying.

13     Q.    Well, then how did you come -- first of

14 all, let me ask you what is what you understand the

15 threshold is that you're comparing this lobbying

16 activity number to?

17     A.    If you're talking about the threshold of

18 activities that NIAC was doing beyond which would be

19 considered lobbying?

20     Q.    Right.

21     A.    That threshold I learned was once we --

22 once NIAC got the H Election was 20 percent.  Before

23 then, it was 10.

24     Q.    Okay.  Now, we have a number that --

25 yardstick that we're comparing it to.  So now that we

108

1    understand what your yardstick is, my question is,

2    how did you come to the conclusion that the NIAC

3    activity -- or lobbying activity was within either of

4    those thresholds, be it 10 percent, which you say is

5    for a 501(c)(3) or 20 percent, which is for a 501 H?

6              MR. PISHEVAR:  Objection.  She just

7    answered this question already.

8              THE WITNESS:  You're asking me how I came

9    to the conclusion?

10             BY MR. KAPSHANDY:

11       Q.    Right.  I mean, you've told us that you

12   don't consider yourself involved in lobbying, but did

13   you look around the office and come to some

14   conclusion that, Gee, so-and-so is doing something; I

15   think we count that as lobbying, so maybe that's 5 or

16   maybe it's 8 percent.

17             I'm just trying to see how you came to

18   that deduction as you described it here, that the

19   activity did not exceed the threshold.

20       A.    I feel like I'm repeating myself, but

21   again, I'm not -- I don't know what the legal

22   interpretation or what definition of lobbying is.

23             It's very confusing, but my reasoning was

24   that even if one or two staff were doing that or

25   doing activities beyond which could constitute or

109

1    fall into that term, it would still be beneath that

2    20 percent of all activities that NIAC was engaged

3    in.

4          Q.    That's what I'm trying to get at.  So who

5    were those individuals that were doing things that

6    might be considered lobbying and what were they doing

7    that you used in your calculation of what might be

8    lobbying?

9          A.    That was a hypothetical.  I never said

10   there was -- and I'm feeling -- I feel like you're

11   trying to make me define something legally that I

12   don't --

13         Q.    I don't want you to come to a legal

14   conclusion.  I just want to find the basis of your

15   statement that when you say that you looked around

16   and that the activity was below the threshold.  We

17   now understand what the threshold is.

18               Because you're the legislative director,

19   and on your resume, you say that you were in charge

20   of a couple of staff and a couple of interns.  You

21   certainly knew what they were doing?

22         A.    Right.

23         Q.    Was any of their activity anything that

24   you might consider to be lobbying?

25         A.    No, but I don't consider anything that

110

1   NIAC did or that I was doing as lobbying.  I don't

2   know if that's correct in the legal interpretation.

3   I'm very confused as to what that is.

4        **Q.    Let me ask it this way:  Since there's two**

5   **different thresholds for a 501(c)(3) and a 501 H, as**

6   **you understand as you just explained, why did Dr.**

7   **Parsi explain to you that they were going to make a**

8   **501 H Election if they weren't even doing zero**

9   **percent lobbying?**

10            MR. PISHEVAR:  Asked and answered.

11            THE WITNESS:  Again, I can tell you what I

12   knew and how I thought about what I was doing.  I

13   can't tell you what -- why Trita made the decisions

14   he did, and I was, frankly, not interested in it.

15            BY MR. KAPSHANDY:

16        **Q.    And we'll have a chance to ask him.  Let's**

17   **just kind of ask you a little bit about what you did**

18   **while you were there for those two years.**

19            MR. WILSON:  Before you ask a question,

20   it's really hot in here.  Can we take care of that?

21   We probably ought to be off the record.

22            MR. KAPSHANDY:  Yes.  Let's go off the

23   record.

24            THE VIDEOGRAPHER:  Going off the record.

25   The time on the video screen is 14:14 and nine

144

1  doing a lobbying activity and I'm unsure of the term

2  in general.

3      Q.    Okay.  So if, for example, you on behalf

4  of NIAC had initiated a communication with a

5  congressmen or staffer on a piece of legislation or

6  resolution such as H. Con. Res. 362, you do not

7  consider that lobbying activity?

8      A.    I feel I can't make a legal

9  interpretation.  I feel like I don't -- I can tell

10 you what I did.

11          I can tell you what my activities

12 constituted, but I can't tell you whether or not it

13 was under the legal definition or a definition or

14 verbiage of lobbying because I'm just extremely

15 confused and not a lawyer.

16     Q.    Okay.  Well, let's just go through a few

17 more just to get a flavor for what you were talking

18 to legislators about.

19          As you sit here today over the two-year

20 period, can you give us any idea how many meetings

21 you had with staffers or congressmen either on

22 Capitol Hill, NIAC's offices, anywhere over that

23 two-year period?

24          MR. WILSON:  You mean on any subject?

25          MR. KAPSHANDY:  Right.  We can break it

231

1                      CERTIFICATE

2          I hereby certify that the witness was duly

3   sworn by me and that the deposition is a true record

4   of the testimony given by the witness.

5

6          _____

7          Sherry L. Brooks, Court Reporter

8

9   (The foregoing certification of this transcript does

10  not apply to any reproduction of the same by any

11  means, unless under the direct control and/or

12  supervision of the certifying shorthand reporter.)

13

14

15

16

17

18

19

20

21

22

23

24

25