IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRITA PARSI** | )<br>)<br>) |
| and | )<br>) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | )<br>) |
| Plaintiffs, | )<br>) |
| v. | )  Civil No. 08 CV 00705 |
| **DAIOLESLAM SEID HASSAN,** | )<br>)<br>) |
| Defendant | )<br>) |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL PRODUCTION OF SERVER AND
COMPLIANCE WITH COURT'S ORDERS OF JULY 2, 2010 AND MARCH 29, 2011**

COME NOW Plaintiffs, Dr. Trita Parsi and the National Iranian American Council ("NIAC") (collectively "NIAC"), by and through their counsel, Afshin Pishevar, Esquire, Adrian V. Nelson, II, Esquire, and Pishevar & Associates, P.C., both in opposition to Defendant's Motion to Compel Production of Server and Compliance with Court's Orders of July 1, 2010 and March 29, 2011 ("Defendant's Motion to Compel Production of NIAC's Server"), and states as follows:

### I. INTRODUCTION

The disingenuous nature of the nefarious assertions made by the defendant are beyond the pale in Defendant's Motion to Compel Production of NIAC's Server. The defendant's conduct, through counsel, can best be characterized as having to deal with Dr. Jeckyl and Mr.

Hide. Defendant Mr. Hide is present whenever Judge Bates is present and Defendant Dr. Jeckyl shows up whenever Judge Bates is not present.

By way of example, the defendant claims that on June 6, 2011, "[w]hen asked whether NIAC still possessed the original server and on what basis it was being withheld, [Adrian V. Nelson, II, Esquire, counsel for NIAC] refused to answer and hung up." However, Mr. Nelson found it necessary to terminate the telephone call with Mr. Kapshandy based upon Mr. Kapshandy's repeated refusal to stop mischaracterizing Mr. Nelson's statements. (*See* Attached Exhibit "A," Email from Adrian V. Nelson, dated June 8, 2011.) In a very abusive, aggressive, and overly dominate way Mr. Kapshandy over and over again insisted upon attributing factual statements to Mr. Nelson that Mr. Nelson had never made about the location and viability NIAC's pre-December 2009 shared drive for forensic imaging.[1]

As is set forth below, the defendant's demand for a third bite at the apple, to now image NIAC's pre-December 2009, is a perfect example of the way in which Defendant continues to try, in a most disingenuous fashion, to "move the goal line."

## II. FACTS

As a small, grassroots organization, NIAC does not have an onsite Network Administrator. To that end, NIAC has contracted IT Services in the past with Progressive Office, Inc. (*See* Attached Exhibit "B," Real Analysis, LLC Computer Inventory and Data Map Report, dated July 31, 2011.)

---

[1] Telephonic communication with Mr. Kapshandy has been a repeated challenge in this litigation. Mr. Kapshandy, who admittedly has a hearing impairment, usually fails to recognize that he is talking over other people. This reality when coupled with Mr. Kapshandy's tendency to monopolize the conversation has made it next to impossible to communicate with the defendant's lead counsel telephonically.

At all times relevant herein, NIAC has not had a complex computer network. Presently, the network consists of desktop and laptop workstations connected to a centrally located file server currently identified as an Iomega Store Center NAS (serial no. 0JAK380013), which is 2TB in size. The Iomega Store Center was installed on or about December 4, 2009, to replace a Dell Dimension 4550 Desktop Computer (serial no. 42BVV21) that had been used as a file server. Upon information and belief, all data was migrated to the Iomega Store Center NAS on this date by Progressive Office. (*See* Exhibit "B.")

NIAC's desktop and laptop workstations utilize Microsoft Windows XP, Vista, and 7 Operating Systems.[2] The organization's email is hosted by Dreamhost. All emails are directly synced to the user's workstation via POP3/SMTP Protocol. <u>There is no email server at the NIAC location.</u> All emails are maintained on the user's workstation via Microsoft Outlook, or recently Apple Mail. (*See* Exhibit "B.")

For NIAC, all data storage is maintained onsite. There is no cloud provider or offsite data archives. Further, NIAC does not utilize a Blackberry Enterprise Server. Data from previous employees and interns is kept on the desktop or laptop computer. New user accounts are created for new employees/interns. (*See* Exhibit "B.")

The facts about NIAC's actual IT operations in no way resemble the picture painted by the defendant of NIAC's purported nefarious IT operations.

### III. PROCEDURAL HISTORY

In February 2011, the parties filed their respective status reports regarding the status of discovery in this case. In his report, the defendant reiterated his view that Plaintiff should allow

---

[2] In recent months, NIAC also has added two (2) Apple Mac Mini Desktop Computers that utilize the MAC OSX Operating System.

PwC to review user habit and registry information on the hard drives that had already been produced by NIAC for forensic imaging pursuant to the Court's July 1, 2010, Order.

At the parties' March 3, 2011, status conference before Judge Bates, as usual the defendant "moved the goal line" and asked the court that it be permitted to forensically image certain hard drives it had not imaged pursuant to the Court's July 1st Order. The Court agreed, in part, to the defendant's new demand, but refused to allow the defendant to go back and re-image those NIAC computers that had been previously imaged by PwC.

By Order dated March 29, 2011, the Court ordered NIAC to produce its server or, if no server existed, the five hard drives not previously imaged by PwC. On April 7, 2011, NIAC delivered to PwC the shared drive that had been in use in December 2009 when the calendar issue arose that prompted the Court to permit the defendant to engage in forensic imaging. On the day of the imaging, the defendant had led NIAC to believe that imaging would take place in the offices of Defendant's attorneys, where the first round of imaging had taken place. However, shortly upon providing the shared drive, the defendant and PwC "moved the goal line" by advising NIAC that PwC intended to do both "physical" and "logical" imaging, a never before discussed component of the imaging, and further claiming that the only way that PwC could safely accomplish the "logical" imaging was to transport NIAC's shared drive to PwC's Virginia lab for imaging. NIAC was left with the choice of risking damage to its shared drive by taking the position that the "logical" imaging be done at the offices of the defendant's attorneys or acquiescing to the defendant's demand, through PwC, that NIAC agree to let PwC "logically" image the shared drive overnight at PwC's Virginia lab.

In order to avoid a claim by the defendant that NIAC had failed to comply with the court's March 29th Order, NIAC agreed to let PwC image its shared drive at its Virginia lab.

However, on April 8, 2011, when NIAC's shared drive was returned, several hours beyond the agreed upon time for the shared drive to be returned, NIAC discovered that its shared drive was inoperable. NIAC had to negotiate with defendant's attorneys to get PwC to fix NIAC's shared drive. This further delay constituted an additional disruption to NIAC's business operations.

Notwithstanding the foregoing, the defendant is once again trying to "move the goal line." This time, the defendant is claiming that the April 7-8, 2011, imaging was insufficient because what the defendant really wanted to image was NIAC's shared drive that had been in use prior to December 4, 2009. Once again, the defendant is crying foul even though the alleged alterations to the NIAC Calendars purportedly occurred in, on or about December 24 (Christmas Eve), 2009, even though the Iomega Store Center was installed on or about December 4, 2009, to replace a Dell Dimension 4550 Desktop Computer (serial no. 42BVV21) that had been used as a shared drive, even though the data from the Dell Dimension 4550 was migrated to the Iomega Store Center in, on or about December 4, 2009, and even though the defendant had never requested to image the Dell Dimension 4550. (*See* Exhibit "B.")

The defendant is seeking a third bite at the imaging apple.

## IV. ARGUMENT

### A. THE DEFENDANT HAS RAISED ANY NUMBER OF RED HERRINGS THAT ARE NOT FACTUALLY SUPPORTED

Much of the nefarious conduct ascribed to NIAC by the defendant is based upon work performed by Progressive Office, one of NIAC's vendors. In his affidavit, Stu Kushner states: "At no time during this period did the audit and inventory of Progressive Office of NIAC's network reflect or detect a Dell Vostro 410 desktop with a serial number of BBWQH1 was connected to the NIAC Network." (*See* Exhibit "E" to Defendant's Motion to Compel Server.) First, there never has been a computer that existed with that serial number. (*See* Exhibit "B.")

The serial number that Kushner is referring to is BBFWQH1, which is the computer that was used by Dr. Parsi. More importantly, the defendant is making a "federal case" out of the fact that the December 2009 NIAC Network Care Machine Summary (which is Exhibit "C" to Defendant's Motion to Compel Server) did not show Dr. Parsi's computer connected to the network. It was for this very reason that Progressive Office was retained because after the installation of the Iomega Store Center on or about December 4, 2009, Dr. Parsi had problems with his computer as it was not connecting to the Iomega Store Center.

There are discrepancies between the NIAC Network Care Machine Summary (herein after "Defendant's Exhibit C"), prepared by Progressive Office, and NIAC's Computers and Users Summary (hereinafter "Defendant's Exhibit D") as it relates to the actual numbers of the physical computers. For example:

- Defendant's Exhibit C lists computer D5Z0KBG1 as having been used by Patrick Disney. However, there is no computer with this serial number. Moreover, Mr. Disney used the computer with serial number 5Z0KBG1.

- Defendant's Exhibit D lists computer 42BW21. Once again, there is no computer with this serial number. There is, however, a computer with the serial number 42BVV21.

- Defendant's Exhibit C lists computer DJJNC891. Again, there is no computer with this serial number. Instead, however, there is a computer with the serial number JJNC891.

- Defendant's Exhibit C lists computer LC30481. However, Defendant's Exhibit D identifies a computer with the serial number L3-C0481 7/12.

As is clear, the defendant used unreliable information to mischaracterize NIAC as having tried to intentionally undermine and derail the imaging ordered by the Court.

### B. THE CONDUCT OF PWC AND DEFENDANT DO NOT WARRANT THE RELIEF THAT DEFENDANT IS SEEKING.

This Court is well aware of the obligations contained in its March 29, 2011, Order, with respect to a second round of forensic imaging. Both the conduct of PWC and the defendant, through his counsel, do not warrant the additional forensic imaging that Defendant is seeking. (*See* Attached Exhibit "C," Report of Marc Hirshfeld, Esquire of Percision Legal Services.)

**1. PWC Grossly Exceeded the Scope Of the Ordered Imaging of Calendar Entries.**

The Court's March 29, 2011 order states that NIAC shall produce "this server (or shared drive) by not later than April 6, 2011.... PWC's forensic analysis shall be limited to NIAC's outlook calendar entries". The court's order states that imaging shall be performed for the limited purpose of analyzing NIAC's outlook calendar entries. A targeted acquisition of the calendar items from the logical partition would have satisfied the requirements of the Court Order. Instead PwC imaged all files and folders and the entire contents of each of the four hard drives contained with the shared drive. By copying NIAC's entire NAS, PWC now has access to all files and folders stored on the partition which it is not entitled to access. (*See* Exhibit C.)

**2. PWC Did Not Follow Industry Standards in Imaging NIAC's Shared Drive.**

NIAC's RAID configured shared drive should have been imaged logically rather than taking apart the drives and having its four drives imaged separately. In general, a hard drive cannot be used to store data until it is formatted and partitioned to accept data. Partitioning of a hard drive is the equivalent of creating space for the data to reside. For example, a hard drive containing 1 terabyte of space would be partitioned into two logical partitions labeled C and D. These partitions are often referred to as the C drive and the D drive. On an ordinary modern computer, a manufacturer will create a small partition for the D drive containing 10 gigabytes of space as a recovery partition that contains information to reinstall the operating system onto the

C partition. The remaining approximately 990 gigabytes would be allocated to the C partition. (*See* Exhibit C.)

NIAC's shared drive consists of a RAID configured network attached storage device ("NAS"). The device contains four hard drives that appear as one logical partition to any computer that attaches to the device over the network. In order for a partition to span more than one physical hard drive, a piece of hardware called a RAID controller is used to create the appearance of one large block of data. As such, a technician taking a forensic image of a RAID server can either image each of the individual hard drives or can image the partition which spans all four hard drives. (*See* Exhibit C.)

It is best practices and industry standards to image the logical partition in a RAID hard drive scenario because of the difficulty involved in replicating the RAID controller. The RAID controller will write part of a file onto one hard drive and another part of the file onto a second hard drive. Imaging individual hard drives in a RAID configuration will yield partial files on each hard drive instead of the complete file by performing a logical imaging. It is possible to rebuild the RAID configuration but it is a difficult and unnecessary step if the drives can be imaged logically. (*See* Exhibit C.)

In addition, removing the hard drives from the NAS and imaging them separately creates an unnecessary risk that data can be destroyed from the improper handling of components which PWC caused in not properly reinstalling the hard drives upon the completion of the imaging. (*See* Exhibit C.)

> **a. PWC delayed returning NIAC's shared drive in order to unnecessarily image the device a second time.**

It appears that PWC realized the mistake of imaging the RAID hard drives as individual drives instead of as a logical partition by its request to image the drive a second time. While the

logical imaging should have been performed in the first place instead of imaging the individual drives, an experienced technician should be able to recreate the logical partition by replicating the RAID controller. By requesting a second imaging PWC delayed NIAC from using the server unnecessarily. (*See* Exhibit C.)

### b.  It was unnecessary for PWC to remove the NAS to its lab in Virginia.

Industry standards would require a technician to bring the necessary hardware and software to the designated site of an imaging in order to avoid delay. PWC inexplicably requested and removed the NAS to its lab with no further explanation, further delaying NIAC from using its shared drive unnecessarily. (*See* Exhibit C.)

### c.  PWC improperly reinstalled the hard drives rendering it unusable.

By imaging the NAS's individual drives rather than imaging the NAS's logical partition, the PWC technician removed the hard drives from the device. When the technician replaced the drives in the NAS he installed them incorrectly and the device did not work. Because of the technician's mistake, the drives could have been shorted and the data residing on the drives could have been destroyed. (*See* Exhibit C.)

Thus, the combined conduct of the defendant and PWC do not warrant a third bite at the apple as it relates to imaging NIAC's shared drive.

### IV. CONCLUSION

Accordingly, for each of the reasons set forth above, Defendant's Motion to Compel Production of Server and Compliance with Court's Orders of July 1, 2010 and March 29, 2011 should be denied.

Respectfully submitted,

_____/S/_____
A.P. Pishevar (D.C. Bar No. 451015)
Adrian V. Nelson, II (*Pro Hac Vice*)
**PISHEVAR & ASSOCIATES, P.C.**
600 East Jefferson Street, Suite 316
Rockville, MD 20852
Phone: (301) 279 – 8773
Fax:    (301) 279 – 7347
Counsel for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRITA PARSI, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 08 CV 00705 (JDB) |
| | ) |
| DAIOLESLAM SEID HASSAN, | ) |
| | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I certify that on August 1, 2011, I served, via email, Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Compel Production of Server and Compliance with Court's Order of July 2, 2010 and March 29, 2011 to:

Timothy E. Kapshandy, Esquire
Peter G. Jensen, Esquire
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
tkapshandy@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam


            /s/
Afshin Pishevar
Adrian Nelson
600 East Jefferson Street
Suite 316
Rockville, Maryland 20852
(301) 279-8773
ap@pishevarlegal.com
anelson@pishevarlegal.com


Attorneys for Plaintiff
Trita Parsi
National Iranian American Council

- 11 -