# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

| | | |
|---|---|---|
| TRITA PARSI and NATIONAL | : | |
| IRANIAN AMERICAN COUNCIL | : | |
| Plaintiffs | : | |
| V. | : | Civil No.: |
| DAIOLESLAM SEID HASSAN, | : | 08 CV 00705 (JDB) |
| Defendant | : | Page 1-350 |

VOLUME I

- - -

Wednesday, December 1, 2010

- - -

Deposition of Dr. Trita Parsi was taken at
the Law Offices of Sidley Austin, LLP, 1501 K Street,
NW, Sixth Floor, Washington, DC 20005 commencing at
9:18 a.m. before Sherry L. Brooks, Professional Court
Reporter and Notary Public, in and for the District
of Columbia.

* * *

```
 1    APPEARANCES:

 2

 3    PISHEVAR & ASSOCIATES, PC
      BY:   ADRIAN V. NELSON, II, ESQUIRE
 4          A.P. PISHEVAR, ESQUIRE
            PATRICK PARSA, ESQUIRE
 5    Jefferson Plaza, Suite 316
      600 East Jefferson Street
 6    Rockville, MD  20852
      (301) 279-8773
 7    (301) 279-7347 (Fax)
      E-mail:  Anelson@pishevarlegal.com
 8    Representing the Plaintiffs

 9
      SIDLEY AUSTIN, LLP
10    BY:   TIMOTHY E. KAPSHANDY, ESQUIRE
            JOSHUA J. FOUGERE, ESQUIRE
11    One South Dearborn
      Chicago, IL  60603
12    (312) 853-7643
      (312) 835-7036 (Fax)
13    E-mail:  Tkapshandy@sidley.com
               Jfougere@sidley.com
14    Representing the Defendant

15    ALSO PRESENT:

16          Daioleslam Seid Hassan, Defendant
            Jeff Tisak, Legal Assistant
17

18

19

20

21

22
```

```
 1    reiterated this request.

 2              BY MR. KAPSHANDY:

 3         Q.   Now, let's turn to the December 9th

 4    clarification.  And apparently, that's what you used

 5    to govern the process by what you determined was

 6    responsive and produced on December 28th, correct?

 7         A.   Yes.

 8         Q.   Now, was there anything in that

 9    clarification that told you, Trita Parsi, to limit

10    the production to just the calendar year 2009?

11         A.   I don't recall why I was under that

12    impression.

13         Q.   But you would agree that in Exhibits 5 and

14    6 here all that you produced in the case of Trita

15    Parsi were about five dozen entries from 2009,

16    correct?

17         A.   Correct.

18         Q.   In fact, the transmittal letter from your

19    counsel -- well, strike that.

20         A.   But as a stated --

21         Q.   There's no question.

22         A.   -- on numerous occasions, discovery is an
```

```
 1    ongoing process.  So there was no indication that we

 2    wouldn't provide the other material, but this is the

 3    material we provided first.

 4         Q.    Well, the transmittal letter from counsel

 5    -- I don't recall seeing it.  Again, maybe if there's

 6    something out there -- was there any information

 7    making clear that this Exhibit 5 and this Exhibit 6

 8    were incomplete and that you would be supplementing

 9    this?

10         A.    I was not part of that conversation.

11         Q.    Well, I've not seen it.  So, again, I

12    would request you and your counsel to provide that to

13    me because that was news to us.

14         A.    I'm not a lawyer, but I assume it's

15    implied since discovery is ongoing.

16         Q.    Now, tell us about the process of

17    searching the calendars.  Did each person search

18    their own calendars or did you do that?

19         A.    No.  Since -- if I recall it correctly, it

20    was a request to have it done immediately after

21    Christmas Day.

22               I did not want to be forcing the staff in
```

Page 141

1    to do this, so I decided to do it myself and let them

2    enjoy Christmas Day.

3        Q.    And as we understand from looking at the

4    date modified field on these, if you turn to Exhibit

5    5, which is your calendar, some, but not all of

6    these, were in, fact, modified on either December 25,

7    26, or 27, correct?

8        A.    Whenever you open a calendar entry, it

9    registers it as modified.

10       Q.    Well, that's the next question I had

11   because that only applies to only about a third of

12   them.

13       A.    I have no idea.

14       Q.    Well, who is going to know why some of

15   these are modified and some of them weren't if your

16   explanation doesn't hold water?

17       A.    Well, as I've explained, I'm not a

18   technical expert.  My understanding is that the

19   minute you open a document it modifies it.

20       Q.    Okay.

21       A.    In the case here, one possible explanation

22   is that some of these calendars needed to be opened

Page 142

1    in order to be able to see properly what type of a

2    meeting it was and if it met the criteria that the

3    defendant had provided us.

4           In some of the cases, it did not need to

5    be opened because it was obvious by looking just at

6    the subject line that it did or did not qualify.

7       Q.    And one of them -- several that are quite

8    interesting show -- if you turn to the second page.

9       A.    What, on mine or --

10      Q.    The second page on yours.  Really, they're

11   just two long pages of Exhibit 5, if you open it up

12   and turn to the very end.

13      A.    I'm not sure what the second page means on

14   a thing like this.

15      Q.    Open it all the way up so you have four

16   sheets across, and then flip it back and you will be

17   on page 2, which reads all the way across four

18   separate sheets.

19      A.    I think this is it, but I'm not sure.

20      Q.    Yes.  And if you look at, frankly, the

21   last three, the subject --

22           MR. NELSON:  Can you give us some words so

1   we can make sure we're in the same place?

2           MR. KAPSHANDY:  Yes.  I'm about to get

3   there, Adrian.  Hang on.

4           BY MR. KAPSHANDY:

5       Q.    If you look at the last three entries on

6   page 2, the subject is Erik Belfrage, Puneet at NSC

7   and Puneet at NSC.  Do you see that?  It's on the

8   second frame of page 2.  I think you're still on page

9   1 because page 2 is only half a page.

10          Open it all the way up.  Now, you have it

11  upside down.  Fold back the first page.  The witness

12  and I are on the same page.

13          MR. KAPSHANDY:  Can we help you, A.P.?

14          BY MR. KAPSHANDY:

15      Q.    Now, do you see the last three entries

16  under subject:  Erik Belfrage, Puneet at NSC and

17  Puneet at NSC?  Do you see those?

18      A.    Um-hum.

19      Q.    And this is all that was produced to us in

20  the native format, and we've printed it all out.

21          Now, as we've discussed, the receive date

22  here and the modified date are the same for all of

1    those, roughly.  They're early in the morning on

2    Christmas morning, 2009, correct?

3              The one for Erik Belfrage shows received

4    and modified on December 25th, 6:17 a.m., correct?

5         A.    What is a calendar entry that is received?

6    Do you know?

7         Q.    Erik Belfrage.

8         A.    No.  I want to be sure that we're talking

9    about the same thing.

10        Q.    The subject is Erik Belfrage.

11        A.    And you're looking at the received --

12        Q.    Received and the date modified.  Let's do

13   them both at the same time because they're the same,

14   right?

15        A.    Okay.

16        Q.    Now, first of all, were you at the office

17   at 6:17 on December 25?

18        A.    I don't recall.  I was there on Christmas

19   Day or Christmas Eve.  I don't remember exactly which

20   day.  I don't remember exact times that I was there.

21        Q.    Well, did it seem pretty early for a

22   holiday to be at the office?

```
 1        A.     It seemed not particularly delightful to

 2   be there at the time, but then again, we were trying

 3   to make sure that the request from the defendant was

 4   responded to in a timely manner.

 5        Q.     Now, the last three all show received

 6   early Christmas morning and modified at exactly the

 7   same time, correct?

 8        A.     Um-hum.

 9        Q.     Yes?  You have to answer yes or no.

10        A.     Yes.

11        Q.     Thank you.  The first question I have is,

12   who is Erik Belfrage?

13        A.     Erik Belfrage is a Swedish -- he's the

14   head of an association in Sweden.  I forgot its name.

15        Q.     You've met with him in Sweden.

16        A      I've met with him in Sweden and I met him

17   once, I believe, in Washington.

18        Q.     What is his organization?

19        A.     His organization's name -- I don't recall,

20   but his organization is essentially, as I understand

21   it, an organization that represents various Swedish

22   companies in Sweden.
```

1      Q.    Doing business in Iran, correct, or

2   wanting to?

3      A.    Not necessarily.  He represents some of

4   the biggest companies in Sweden.  Some of them are in

5   Iran.  Some of them are not.

6      Q.    What were your discussions with him about?

7      A.    They invited me to give a briefing to some

8   of their clients in Sweden in 2009, an assessment of

9   the situation in Iran after the election fraud and

10  the human rights abuses.

11     Q.    And when was that?

12     A.    That must have been sometime in August

13  2009.

14     Q.    I mean, you see the problem we have when

15  we get these calendar entries is it doesn't tell us,

16  at least what we're looking at here, the actual time

17  of the event as we got later on.

18          You can understand that from looking at

19  Exhibit 5?

20     A.    No.  That's because you have opened it

21  incorrectly.  If you opened the PST files correctly,

22  you will actually see everything.

Page 147

1          Q.     Well, what's interesting about this is

2     that it shows that it was sent to you by Babak Talebi

3     from his G-mail account on Christmas morning 2009.

4     How did that happen?

5          A.     I have no idea and I don't believe that

6     that's necessarily true unless I can see evidence of

7     that.

8          Q.     You have to look at the metadata from the

9     PwC imaging.  It shows that somebody had access to

10    Babak Talebi's G-mail account because the entry was

11    sent from Babak Talebi's G-mail account on Christmas

12    morning 2009.

13              Do you have any idea how that could have

14    happened?

15         A.     So you're telling me -- just to make me

16    understand, you're asking me questions about meetings

17    that were not held which you agree to now, which is

18    not the position you held earlier on, but that

19    someone else sent me a calendar entry from their

20    G-mail account which then shows up on my calendar?

21              I cannot respond to your claim that this

22    is sent by Babak Talebi's G-mail account which sounds

1    very odd to me unless I'm able to see the evidence

2    for that.

3              MR. NELSON:  Do you need to confer with

4    counsel?

5              THE WITNESS:  Yes.

6              MR. NELSON:  Let's go off the record for a

7    second.

8              MR. KAPSHANDY:  We're still on the record.

9    Just so the record is clear, I understand the witness

10   wants to confer with counsel, and that's fine.  The

11   record will reflect that.

12             THE WITNESS:  Okay.  I just realized a

13   point that I wanted to make to him.

14             BY MR. KAPSHANDY:

15   Q.    Do you need to complete an answer or

16   correct an answer?

17   A.    No, not at all.

18   Q.    Okay.  What machine were you searching for

19   these calendar entries that you produced here as

20   Exhibit 5 for Trita Parsi?

21   A.    Each and every calendar PST file is found

22   locally on the machines of the different people who

1       A.    Or I burned it on a CD-RW from each

2   machine.   I don't recall exactly which the process

3   was.

4       Q.    Let me hand you what we'll mark as your

5   deposition Exhibit 7.

6             (Exhibit Number 7 was marked for

7   identification and was retained by counsel.)

8             BY MR. KAPSHANDY:

9       Q.    And I will represent for the record that

10  it is an extract from the PwC image of certain

11  calendar entries with all of the metadata that was

12  able to be recovered.

13            And on the first page, you'll see, and

14  second page, several references to Puneet at NSC and

15  Erik Belfrage with the same sort of sent, received,

16  and modified times as we see on Exhibit 5, so take a

17  second and look at that.

18            Have you had a chance to look at that?

19      A.    Yes.

20      Q.    Now, what's interesting, if you look at

21  the first line, is that it shows that Puneet at NSC

22  was sent from Babak Talebi's G-mail account and the

Page 157

1    date is again December 25th, 2009.

2          A.    Looking over this, it appears to me as a

3    non-expert that the forensic imaging has mixed up a

4    bunch of the files.

5          Q.    As a non-expert, that's your opinion?

6          A.    That is my opinion when I see that it

7    apparently claims that the calendar entry for meeting

8    with Puneet or with Erik Belfrage appears apparently

9    on every computer, and it's sent from Babak Talebi's

10   G-mail.

11               It gives me the impression that the

12   imaging has confused the origins of the files and

13   perhaps moved them around a little bit.

14         Q.    So it's your testimony that they didn't

15   know what they were doing, that their methodology is

16   somehow screwed up?

17         A.    No.  My testimony is that this is my

18   impression of what might have happened.

19         Q.    Based upon what?

20         A.    Based upon what it claims here, is that

21   the calendar entry for a meeting with Puneet appeared

22   on every computer and that it was sent from a G-mail

1   account by a person who doesn't work at that office.

2        Q.   Well, we weren't there on Christmas

3   morning, so the question I have for you is:  Do you

4   have any idea why even the entries and native file

5   that you produced on December 25th which hadn't yet

6   been touched by PwC show that they were sent to you

7   from Babak Talebi?

8            I mean, we weren't there.  This is the

9   only thing we can go on.  We have to ask you how that

10  happened.

11           MR. NELSON:  Well, you haven't presented

12  him with a document that confirms your supposition.

13           MR. KAPSHANDY:  His own production,

14  Exhibit 5.  That shows it was sent from Babak Talebi

15  on December 25th.

16           THE WITNESS:  The reality is that A) I'm

17  not convinced that this is done properly because it

18  sounds beyond odd to me.  Beyond that, anyone can

19  send you a calendar entry, so if Babak Talebi sent me

20  a calendar entry amount, what is the point of that?

21           BY MR. KAPSHANDY:

22       Q.   Well, here's the probable, Mr. Parsi,

Page 159

1    Babak Talebi has already testified he wasn't there

2    Christmas morning.  He was no longer an employee of

3    NIAC for at least a year, yet the record you produced

4    to us as Exhibit 5 supposedly is authentic native

5    NIAC PST calendar files showing that on December 25th

6    early in the morning Babak Talebi sent to you an

7    entry regarding Puneet at NSC and also Erik Belfrage.

8         A.    You started off your question by saying

9    that Babak Talebi did not go to our office on

10   Christmas Eve.

11        Q.    Was he there on Christmas?

12        A.    I don't remember if I was there on that

13   specific date, but I remember that when I was there,

14   he wasn't there, but that does not in any way, shape,

15   or form change the rest of your -- the reality in

16   what you are claiming, that it means that for someone

17   to send a calendar from their own personal G-mail

18   account they have to be at our office, so your

19   question is irrelevant.

20        Q.    Okay.  It shouldn't be too hard.  Was

21   Babak Talebi at the office with you Christmas morning

22   2009 helping you with this document production?

Page 160

1        A.     No, he was not.

2        Q.     Okay.  Second part, do you have any

3   explanation how that calendar entry that you produced

4   to us as an authentic NIAC native document could have

5   been sent from Babak Talebi's G-mail account on

6   Christmas morning 2009?

7        A.     I don't believe that it was.  It sounds

8   extremely odd to me.

9        Q.     I can't hear you.  I'm sorry.  What did

10  you say?

11       A.     I don't believe that it was.  It sounds

12  extremely odd to me.

13       Q.     Well, unfortunately, we can only go upon

14  what you produced and that's what the document says

15  on its face.

16       A.     That's not essentially what I produced.

17  This is what the forensic imaging claims.

18       Q.     No.  I'm talking about Exhibit 5.

19              MR. NELSON:  You switched, and that was my

20  point.  You started off talking about that and now

21  you've switched back to this.  Where are you showing

22  this witness that it shows that Babak Talebi sent the

1    E-mail on Exhibit 5? because I don't see it, so

2    please point it out.

3             MR. KAPSHANDY:   Sure.   Let me mark -- we

4    can put it on an individual page.   Let's mark this as

5    Exhibit 5A.

6             (Exhibit Number 5A was marked for

7    identification and was retained by counsel.)

8             BY MR. KAPSHANDY:

9        Q.   If you open up each of those calendar

10   entries, the five dozen or so that you produced on

11   December 25 for Trita Parsi, you will get a

12   single-page entry that I've just marked as Exhibit

13   5A.

14            And if you could take a look at that, and

15   this is from the native file that you produced.   When

16   you open it, it says from Babak Talebi, December 25.

17   On this clock it's time stamped 01:27:02.   Same

18   subject, Puneet at NSC?

19       A.   So is it sent 01:27 or is it sent 7:00 in

20   the morning?

21       Q.   Well, that's the question I have for you.

22       A.   Well, you have the forensic imaging.

Page 162

1       Q.      This is your native file that we opened.

2       A.      And it's showing two different sent times?

3       Q.      Exactly.

4       A.      Well, that is an indication that something

5    is a little bit odd with the forensic imaging, isn't

6    it?

7       Q.      No.   This is directly from you, Trita

8    Parsi, and NIAC on December 28th.

9       A.      And you're saying the same entry,

10   according to you, shows a different sent date on the

11   original PST file and a different sent date on the

12   so-called forensic imaging that was done?  Is that

13   what you're saying?

14      Q.      Right.  If you print it out, it comes out

15   as December 25 --

16      A.      You guys opened the PST file incorrectly

17   the first time.

18      Q.      So you're saying this is all our fault?

19      A.      I'm not saying it's your fault.  I'm just

20   saying this is clearly not your forte.

21      Q.      Okay.  And then when the forensic imaging

22   people opened the same file, they also show that it

Page 163

1    was sent on Christmas morning from Babak Talebi from

2    his G-mail account.

3         A.    But with a different sent date.

4         Q.    No.

5         A.    Yes.

6         Q.    It says sent on December 25th, 2009.  It

7    also shows creation time December 25, 2009.

8    Modification December 25, 2009, and it shows the

9    owner being Babak Talebi.

10        A.    Okay.  So it says that something was sent

11   1:00 in the morning and was received 7:00 in the

12   morning.  Do you know how people send calendar

13   entries? because I'll be happy to explain that.

14        Q.    I do.

15        A.    It means --

16        Q.    What we're trying to get at, Mr. Parsi --

17              MR. PISHEVAR:  Can you let him finish his

18   answer?

19              MR. KAPSHANDY:  He's not answering the

20   question.

21              MR. NELSON:  Your questions aren't

22   precise.  There's no foundation.  You shoved three

1                      CERTIFICATE

2              I hereby certify that the witness was duly

3      sworn by me and that the deposition is a true record

4      of the testimony given by the witness.

5

6              _____

7                  Sherry L. Brooks, Court Reporter

8

9      (The foregoing certification of this transcript does

10     not apply to any reproduction of the same by any

11     means, unless under the direct control and/or

12     supervision of the certifying shorthand reporter.)

13

14

15

16

17

18

19

20

21

22