# EXHIBIT F

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

TRITA PARSI and NATIONAL         :
IRANIAN AMERICAN COUNCIL         :
     Plaintiffs               :
     V.                       :   Civil No.:
DAIOLESLAM SEID HASSAN,          :   08 CV 00705 (JDB)
     Defendant                :   Page 1-331

VOLUME II

- - -
Thursday, December 2, 2010
- - -

Continued deposition, videotaped, of Dr. Trita Parsi, was taken at the Law Offices of Sidley Austin, LLP, 1501 K Street, NW, Sixth Floor, Washington, DC 20005 commencing at 9:03 a.m. before Sherry L. Brooks, Professional Court Reporter and Notary Public, in and for the District of Columbia.

* * *

```
 1   APPEARANCES:

 2

 3   PISHEVAR & ASSOCIATES, PC
     BY:  ADRIAN V. NELSON, II, ESQUIRE
 4        A.P. PISHEVAR, ESQUIRE
          PATRICK PARSA, ESQUIRE
 5   Jefferson Plaza, Suite 316
     600 East Jefferson Street
 6   Rockville, MD  20852
     (301) 279-8773
 7   (301) 279-7347 (Fax)
     E-mail:  Anelson@pishevarlegal.com
 8   Representing the Plaintiffs

 9
     SIDLEY AUSTIN, LLP
10   BY:  TIMOTHY E. KAPSHANDY, ESQUIRE
          JOSHUA J. FOUGERE, ESQUIRE
11        ERIC GALVEZ, ESQUIRE
     One South Dearborn
12   Chicago, IL  60603
     (312) 853-7643
13   (312) 835-7036 (Fax)
     E-mail:  Tkapshandy@sidley.com
14            Jfougere@sidley.com
              Megalvez@sidley.com
15   Representing the Defendant

16   ALSO PRESENT:

17        Daioleslam Seid Hassan, Defendant
          Jeff Tisak, Legal Assistant
18        Mia Marbury, Videographer

19

20

21

22
```

Page 8

1           P R O C E E D I N G S

2                *    *    *    *    *

3                   DR. TRITA PARSI

4  was recalled for further examination by counsel and,

5  after having been duly sworn by the Notary, was

6  examined and testified as follows:

7           EXAMINATION BY COUNSEL FOR DEFENDANT

8           BY MR. KAPSHANDY:

9       Q.   Good morning, Mr. Parsi.  How are you?

10      A.   Good morning.  How are you?

11      Q.   Just fine, thanks.  You understand, as the

12 reporter has just sworn you in this morning, that

13 you're still under oath and the same rules as

14 yesterday apply?

15      A.   I do.

16      Q.   And I appreciate your answering verbally,

17 and we'll both try not to talk over each other again

18 today.  That's sometimes hard for her.

19           But we do have a video today -- you may

20 have noticed -- and that may help with the record,

21 but, again, if you could just -- and I will, too --

22 try and honor the same rules as yesterday, I'd

Page 297

1  show you some sections.

2          I just want to ask you two things, and
3  here's the first one:  Patrick Disney in his
4  deposition testified that he used color codes to
5  distinguish various types of lobbying entries such as
6  lobbying, Lobbying Disclosure Act, lobbying,
7  nonlegislative lobbying, outreach, and grassroots.

8          My first question for you is:  When you
9  transferred all of his calendars to the document --
10 excuse me -- that we've marked as Exhibit 9 -- yours
11 is Exhibit 8 -- what became of those?

12    A.    Sorry.  When I did what?

13    Q.    Transferred -- because you did everybody's
14 calendars, as I understand -- transferred those
15 calendars from the native files in Outlook PST to the
16 Excel file that was produced to us in the case of Mr.
17 Disney as Exhibit 9.

18          What happened to the color codes in all of
19 the lobbying categories that he had put on his
20 calendar?

21    A.    As I mentioned --

22    Q.    Let me hand you Exhibit 9.  This is my

Page 298

```
 1   copy, but feel free to look at it.
 2        A.    Oh, so this is different from this one?
 3        Q.    Right.  Exhibit 8 is your calendar.
 4   Exhibit 9 is Patrick Disney's.
 5        A.    I see.  You wanted me to look for color
 6   codes here?
 7        Q.    Well, you're not going to find them, so I
 8   wouldn't waste your time, but when he testified that
 9   that's what he put in his calendar and then on April
10   21st, 2010 we received supposedly the complete
11   unedited copies of his calendar -- we don't see them.
12              And since you did it, this is our chance
13   to ask you what became of those.
14        A.    Well, as I mentioned yesterday, what I did
15   is that I exported the calendars.  And the calendar
16   doesn't export, and it offers you to choose different
17   formats.
18              Now, it seems like yesterday there was
19   some indications that when you export it to Excel
20   some of the categories apparently do not get
21   exported.  That may have been the same situation with
22   the color codes.
```

Page 299

1    Q.    Well, and, in fact --

2    A.    Do the color codes exist in any of the
3    other Excels?

4    Q.    Here's the next question -- Exhibit 62,
5    which we previously identified as the unproduced
6    calendar entries per the PwC imaging, contains dozens
7    and dozens of references in the category, many for
8    Patrick Disney, using the word "lobbying", which
9    appeared nowhere in Exhibit 9.

10          And my question for you, like the color
11   codes is:  What happened to that word "lobbying" --
12   I'll be glad to show you some -- in Exhibit 62 -- and
13   just be careful here -- many, many references --

14   A.    I need to know the categories.  First, can
15   you remind me, what is this?

16   Q.    Exhibit 62 is a printout from the Excel
17   file produced by PwC from their analysis of the
18   calendar entries that they did not find produced at
19   least matched exactly with the calendar entries
20   produced by NIAC on April 21st, 2009 in Excel format
21   and which we've marked as Exhibit 8 and 9.

22   A.    So this is forensic imaging?

Page 300

1   Q.   No.  It's a printout of the Excel file of
2   the files that they found that did not match those on
3   the April 21st version that you, NIAC, and Trita
4   Parsi produced?
5   A.   Forensic imaging?
6         MR. NELSON:  He's asking whether or not
7   this is a by-product of the forensic imaging process,
8   Exhibit 62.
9         BY MR. KAPSHANDY:
10  Q.   Yes.  It's an exhibit to the report --
11  A.   Forensic imaging tends to, by definition,
12  include information that is not visible in the file
13  on a regular basis.
14  Q.   My question for you is:  How is it that
15  the word "lobbying" under categories, which is a
16  field in the Outlook PST file, all of a sudden is
17  gone and we don't see it anywhere in Patrick Disney's
18  Excel file that you've produced under the same field
19  called categories?
20  A.   Can you give me a specific example of an
21  entry, a specific entry, that in the forensic imaging
22  does include it but doesn't include it over here?

Page 301

1          MR. PISHEVAR:  I'd also object because I
2    think you're asking this lay witness a technical IT
3    question.
4          MR. KAPSHANDY:  No, I'm not asking him an
5    IT question.
6          BY MR. KAPSHANDY:
7     Q.   As the person who exported the Outlook PST
8    files into Excel, I'm just asking you here if you
9    have any possible explanation as to how the category
10   field in the April 21st calendar that you've produced
11   as complete unedited calendar entries one sees in the
12   native restored PST files recovered by PwC has the
13   word "lobbying", whereas it's not in the version
14   produced by NIAC on April 21st, 2009?
15         MR. PISHEVAR:  Asked and answered.  He
16   asked for a specific instance for you to show him
17   what you're talking about.
18         BY MR. KAPSHANDY:
19    Q.   There's dozens of them.  Just pick one.
20    A.   Show me which one.  Dozens in a mountain
21   of what seems to be hundreds and, if not, thousands
22   of entries.

Page 302

1   Q.   Turn to 1/5/09 for Patrick Disney. And
2 there are a number of other people named, David
3 Elliott --
4   A.   1/5/09?  This doesn't seem to go in order.
5   Q.   Excuse me.  1/28/09.
6   A.   This doesn't seem to go in order.
7   Q.   No, that's because --
8   A.   This is not --
9   Q.   That is a creation time.  You need to look
10 at the --
11   A.   Start date.
12   Q.   -- ninth field over.
13   A.   And you want me to -- 1/28, you said?
14   Q.   Just take a look at 1/28/09.  And maybe if
15 I could look over your shoulder because there's a
16 number of entries for 1/28/09.
17   A.   1/28/09.
18   Q.   It appears many times.  And unfortunately,
19 with the imaging and the files being on multiple
20 machines, they recovered many copies of it.
21        If you look at the top row here, you'll
22 see for Patrick Disney 1/28/09.  And in the field

Page 303

1  categories, it says lobbying. Keep that page so you
2  can hold that, okay?
3         And if you look at the same entry in his
4  calendar, which we've marked as Exhibit 9, you will
5  not see the word "lobbying" in categories.
6     A.  This is the one --
7     Q.  Do you mind if I look over your shoulder?
8     A.  This is the one you're referring to?
9     Q.  And turn to the one here, Leg Rex
10 (phonetic) work group, it appears to be. Is the time
11 the same, 9:30 a.m., 11:00 a.m.?
12        MR. PISHEVAR: Counsel, the fields don't
13 seem to correlate.
14        MR. KAPSHANDY: They do. It's the same
15 time here.
16        BY MR. KAPSHANDY:
17     Q.  Now, how is it that the entry that you
18 produce as Exhibit 9 doesn't have the word "lobbying"
19 under the categories?
20        MR. NELSON: I'm going to object to this
21 question. Counsel, if you look at the exhibit,
22 Exhibit 62, as compared to Exhibit Number 9, if you

Page 304

1  look at the field categories on Exhibit Number 9,
2  they don't correlate at all to the field exhibits on
3  62. It's not just --
4           MR. KAPSHANDY:  I agree entirely.
5           THE REPORTER:  Excuse me.
6           MR. NELSON:  Let me finish my objection.
7  It is not only as it relates to the alleged category
8  of lobbying, but all of the fields are different.
9           There's nothing on Exhibit 62 that
10 includes the categories meeting organizers, required
11 attendees, optional attendees, meeting resources.
12          So if we follow your line of questioning,
13 then we can assume that PwC also manipulated their
14 report to remove these fields as well, so we object
15 to your question because it has an assumption that
16 you have not established.
17          MR. KAPSHANDY:  I would agree, counsel.
18 Thank you for that.
19          BY MR. KAPSHANDY:
20     Q.   Unfortunately, we're in this situation,
21 Mr. Parsi, because the files were not produced in the
22 native Outlook PST format, and many of the fields as

1  we discussed yesterday disappeared.

2              My only question for you is:  How is it
3  that the word "lobbying" totally disappeared from
4  Exhibit 9 when it was produced to us by NIAC?

5              MR. NELSON:  Objection.  That is a false
6  question.  The field does not exist.

7              BY MR. KAPSHANDY:

8       Q.   There is a field called categories on
9  Exhibit 9, is there not, Mr. Parsi?

10      A.   There is a field, but it seems to be a
11 completely different content of that field, not just
12 for these entries, but for other entries, so I think
13 that this is a question that perhaps needs to be
14 asked of PwC or someone who knows how forensic
15 imaging is done.

16      Q.   Well, let's assume they know a little bit
17 more about that than you, and they've done a correct
18 job and that the original PST files for the field of
19 category list lobbying in many, many dozens of
20 instances and not a single one shows up on the
21 Exhibit 9 that was produced for Patrick Disney's
22 calendar on April 21st, 2010.

1   Do you have any idea how that could have
2   happened, you being the person who did the exporting,
3   from Outlook into Excel?
4   A.   Well, it's just -- the exporting process
5   is that you just ask the computer to export it.  I
6   don't know exactly how the computer does it.
7   I do know that categories, apparently,
8   have been missing.  And of course, when you're
9   looking at forensic imaging, you can see many
10  different things, and it seems like there's a lot of
11  different things.
12  And you seem to be focusing on lobbying as
13  if that was the only thing missing, but when you
14  compare them, you see that there seems to be a lot of
15  differences.
16  Q.   I would agree, but I was just asking about
17  lobbying.  Let's put that aside because we just have
18  a few minutes and I want to wrap up.
19  Tell me what you know about any privilege
20  log that was prepared in this case?
21  A.   Sorry, any --
22  Q.   Privilege log of documents when the NIAC

Page 307

1   personnel who reviewed their files for privileged
2   materials -- we understand from Mr. Disney's
3   testimony that you instructed the team for the
4   protocol for reviewing their computers, and we talked
5   about that yesterday.
6          We also understand that there was a
7   discussion about what materials were to not be
8   produced as privileged.
9          And my question for you is:  Were there
10  any documents withheld from production on the basis
11  that they were privileged?
12         MR. NELSON:  Objection.  Calls for a legal
13  conclusion.
14         BY MR. KAPSHANDY:
15     Q.   Go ahead.
16     A.   First of all, that is a question that you
17  have to ask our counsel.
18         Our job was not to separate and exclude
19  them entirely.  Our job was -- our job was to see
20  that if it was something that we based on our
21  nonlegal expertise thought potentially was
22  privileged, we would provide that for extra review by

Page 328

1                    CERTIFICATE

2         I hereby certify that the witness was duly

3    sworn by me and that the deposition is a true record

4    of the testimony given by the witness.

5

6         _____

7            Sherry L. Brooks, Court Reporter

8

9    (The foregoing certification of this transcript does

10   not apply to any reproduction of the same by any

11   means, unless under the direct control and/or

12   supervision of the certifying shorthand reporter.)

13

14

15

16

17

18

19

20

21

22