# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL, | ) ) ) | Civil Action No. 08-705 (JDB) |
| Plaintiff, | ) ) | |
| vs. | ) ) | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| SEID HASSAN DAIOLESLAM, | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendant Seid Hassan Daioleslam hereby respectfully moves this Court for judgment as a matter of law. The reasons for this motion are set forth in defendant's Memorandum of Points and Authorities in Support of the Motion for Summary Judgment and Statement of Material Facts filed herewith.

Dated:  September 16, 2011.                    Respectfully submitted,


                                        _____/s/_____
                                        Timothy E. Kapshandy (Admitted Pro Hac Vice)
                                        Bradford A. Berenson (D.C. Bar No. 441981)
                                        HL Rogers (D.C. Bar No. 974462)
                                        Peter G. Jensen (D.C. Bar No. 982599)
                                        SIDLEY AUSTIN LLP
                                        1501 K Street, N.W.
                                        Washington, D.C.  20005
                                        (202) 736-8000
                                        hrogers@sidley.com

                                        Attorneys for Defendant
                                        Seid Hassan Daioleslam

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ) | |
| TRITA PARSI and NATIONAL IRANIAN ) | Civil Action No. 08 CV 00705 (JDB) |
| AMERICAN COUNCIL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | MEMORANDUM OF POINTS AND |
| vs. ) | AUTHORITIES IN SUPPORT OF |
| ) | DEFENDANT'S MOTION FOR |
| ) | SUMMARY JUDGMENT |
| SEID HASSAN DAIOLESLAM, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND STATEMENT OF MATERIAL FACTS**

**INTRODUCTION**

In 1982, Hassan Daioleslam ("Dai") escaped the Islamic Republic of Iran ("IRI") for

France, where he worked until 2001 when he came to the United States, so his wife could

conduct post-doctoral research in biochemical engineering at Arizona State University.   He had

always been interested in Iranian politics since his student days in Iran when he had been

imprisoned under the regime of the Shah for about six months for his political views.  His

interest in Iranian politics continued after his arrival in the United States, and he began

researching and writing on relations between the United States and the brutal IRI regime now

headed by Iran's President Ahmadinejad.  Over the next few years, he wrote over 80 articles in

such publications as www.FrontPageMagazine.com, www.AmericanChronicle.com,

www.Iranian-Americans.com, and on a website he published, www.iranianlobby.com.  About

half of these discussed NIAC or Parsi and their activities.  All of his research was based upon

1

publicly available sources and many of his articles are heavily footnoted with these references. None relied upon anonymous sources.[1]

In 1997, Trita Parsi, a dual Swedish-Iranian citizen formed the IIC (Iranians for International Cooperation), "the first lobby group in the U.S. to support the normalization of ties between the U.S. and Iran" (per his resume; Ex. A) and whose aim in Parsi's words was "to safeguard Iran's and Iranian's [sic] interest" (Ex. B).  In 1999, Parsi published a paper on how to set up an Iranian lobby in the U.S. using Iranian-Americans, based upon the AIPAC (American-Israeli Political Action Committee) model.  Ex. C.  He wrote this paper with Siamak Namazi of the Tehran consulting firm, Atieh Bahar, and presented it in Cyprus.  *Id*.  In 2002, after he came to the U.S. to study, Parsi formed NIAC.  He and his staff at NIAC had hundreds of meetings and communications with Congressmen and staffers over the next nine years.  Many of these involved three issues key to Iran: (1) engagement; (2) sanctions; and (3) regime change. *See* Docket No. 130.  Parsi had many meetings and communications with Iran's U.N. Ambassador Zarif, Iran's only ambassador in the U.S. since Iran has had no embassy in the United States since 1979.  *See, e.g.,* Ex. D, E, F, G, H, I.  In 2006, Parsi's contact at Hamyaran wrote him, "Thank you for your efforts, all designed to serve our dear country."  Ex. J.

At about this time, Dai's research on Iran-U.S. relations kept leading to the activities of Parsi and forced him to question why Parsi was taking such pro-regime positions supposedly at the behest of Iranian-Americans. In early 2007, Dai concluded that NIAC was lobbying for the IRI and wrote his first article about NIAC and Parsi.  The IRI's press immediately began attacking him.  *See, e.g.*, Ex. K.  Dai was not the first or only one to write such things about

---

[1] Some published after 2009 were based upon discovery materials produced in this case.

NIAC's and Parsi's lobbying activities.  As early as 2000, Middle East expert and writer for *Newsmax*, Kenneth Timmerman, wrote that Parsi's first lobby group, IIC, was a pro-regime advocacy group.  Ex. L.  In February 2007, before Defendant published his first English article, Timmerman wrote an article about NIAC entitled "The Mullah's Voice."  Ex. M.  In July 2008, Lord Corbett of Castle Vale and Chairman of the British Parliamentary Committee for Iran Freedom, along with dozens of other former and current MPs, wrote the U.S. Congress warning of Parsi's efforts to bring a couple of Iranian agents to speak with members of Congress, and calling Parsi a "well-known lobbyist for the Iranian regime."  Ex. N, p. 2-3. In February 2009, Clare Lopez, a former intelligence officer and a researcher at the Center for Security Policy, issued a report, "The Rise of the Iranian Lobby," featuring NIAC and Trita Parsi.  Ex. O.

In April 2008, Parsi and NIAC brought this defamation suit against Dai.  In February 2009, this Court ruled that NIAC and Parsi are limited public figures for the purposes of this defamation suit.  After 2-1/2 years of discovery, Plaintiffs have no evidence of actual malice, the requisite standard for public figures to prove defamation.  Accordingly, Defendant moves the Court for summary judgment as there is no material dispute on the issue of whether Dai acted with actual malice.  There is no evidence he knew his statements were false or subjectively harbored serious doubts about the truth of his articles.

## STATEMENT OF MATERIAL FACTS

1. Trita Parsi, a resident of Washington, DC, is the president of the National Iranian American Council ("NIAC"), a Washington, DC non-profit group.  Compl. ¶¶ 9-10.

2. Defendant Hassan Daioleslam (Hassan Dai) is a resident of Scottsdale, AZ.  Compl. ¶11.

3. Plaintiffs NIAC and Trita Parsi are public figures. Docket No. 13.

4. Plaintiffs have accused Defendant of writing defamatory statements with the sting of the charge being that Plaintiffs are lobbyists for Iran. Compl. ¶ 13, 34; Docket No. 13.

5. Plaintiffs have also alleged that Defendant has made defamatory statements suggesting that Plaintiffs have engaged in illegal activities and that these statements are defamatory per se. Compl. ¶ 14.

6. Plaintiffs claim that because of Defendant's defamatory statements, Parsi's character and reputation were harmed and that he suffered mental anguish and personal humiliation. Compl. ¶ 23. In the alternative, they claim that he has suffered special damages. Compl. ¶ 24.

7. Plaintiffs claim that because of Defendant's defamatory statements, NIAC's reputation and public estimation were damaged. Compl. ¶ 41. In the alternative, they claim that these statements have interfered with public support of NIAC and interfered with their activities. Compl ¶¶ 42-43.

8. Emily Blout, Patrick Disney, and Trita Parsi have disclaimed expertise on lobbying laws. Ex. P, Q, and R.

9. Plaintiffs will not seek to introduce evidence of or seek to rely upon legal advice they received to prove that they were not engaged in illegal lobbying activities. Docket No. 138.

10. In 1997, Trita Parsi founded the Iranians for International Cooperation (IIC), whose main objective was to safeguard Iran's and Iranians' interests and whose main agenda was to remove U.S. economic and political sanctions against Iran. It was "capable of orani[z]ing the grassroots and pressure US lawmakers to pose a more Iran friendly position." Ex. B, p. 1, 3; *see also* Ex. S, p. 1.

11. In his IIC role, Trita Parsi "established the first lobby group in the U.S. to support the normalization of ties between Iran and the U.S." and lobbied the U.S. Congress, EU, and Swedish Parliaments. Ex. A.

12. As policy advisor to Congressman Bob Ney, Trita Parsi authored three reports on U.S.-Iran relations which Ney used to alter his position on Iran. Ex. A.

13. In August 1997, Trita Parsi published in an article: "I have reported my activities on Capitol Hill to the signatories of the petition, which has resulted in the formation of a small but active Iranian lobby group. About 80 members of Congress receive faxes and letters from us on a regular basis, and we are determined to continue to lobby for the interests and well being of our people and nation. We Iranians need to show that we are a political force to be reckoned with." Ex. T.

14. In April 1998, Siamak Namazi of Atieh Bahar wrote, "Clearly Iran stands to gain substantially should its expatriate population hold decision-making power in foreign lands. Then, the Iranian government should be cognizant that the inevitable assimilation and naturalization of its expatriate population is in accordance with the long-term

interests of Iran." Ex. U.  In a Nov. 1998 article (where he thanks Hooshang Amirahmadi and Trita Parsi for reviewing and critiquing his article), he also wrote, "Clearly, the Islamic Republic has been reforming its behavior towards the 1.5 to 2 million strong Iranian population in exile. . . .  In fact, the new wave of relative liberalism brought on since the election of Mohammad Khatami in May 1997 brings new hope. . . .  To that end, we have to build stronger channels of communications with Iran. Specifically, we must increase our contact with the country by creating more opportunities for cultural exchanges.  People-to-people talks, as called for by the new government, need not be limited to exchanges between Americans and Iranians. . . .  What I suggest in this regard is a policy of engagement . . . [take] away from AIPAC's ability to spread misinformation about Iran. . . .  New organizations such as the Iranian-American Republican Council or the Iranians for International Cooperation are flourishing on our collective political map and adding their voice to the cacophony of Washington lobbies." Ex. V.

15. A November 1999 paper co-authored and presented by Trita Parsi and Siamak Namazi in Cyprus suggested the creation of a lobby group to balance against other Middle Eastern lobbies, the creation of specific lobbying seminars, and the use of Iranian-Americans to lobby against confrontation with Iran.  Ex. C.

16. In October 2000, Middle East expert Ken Timmerman called Parsi the "new unofficial spokesman in Washington" for Iran's ruling clerics and said that he and his group have been lobbying on behalf of President Khatami to lift US sanctions. Ex. L. He has also called NIAC and Parsi apologists for the regime, said that they have links with the regime, and said that NIAC has been portraying the regime as moderate, reasonable, and misunderstood.  Ex. W, X, and Y.

17. Middle East expert Clare Lopez has also called NIAC a known supporter of the regime and said that it acts on behalf of policies that favor Tehran.  Ex. O; see Clare Lopez interview with Secure Freedom Radio, http://www.youtube.com/watch?v=QP_zVenqgxg (last accessed on Sept. 9, 2011).

18. On June 23, 2001, Trita Parsi stated in e-mail correspondence, "I assume everyone has been busy, but it would be good if we could finish the minutes so we can follow Mr. Ba[qu]er Namazi's instructions and send it to Amb. Bill Miller."  Ex. Z (Exhibit 77 to Trita Parsi's Dec. 2010 Dep.).

19. In September 2002, Parsi received payment from Bijan Khajehpour, chairman and co-founder of Tehran-based Atieh Bahar, for consulting work. Parsi stated that his work for Atieh Bahar was one of approximately 10-15 consulting reports he had done.  Ex. AA (Parsi Dep., Dec. 1, 2010), p. 14-15, 30.

20. The January 2003 report by NIAC to the National Endowment for Democracy ("NED") stated that, "NIAC would negotiate with relevant officials from the Iranian government in order to receive authorization to implement the project.  This could take as long as three to four months.  However, due to NIAC's extensive contacts, it could take less time. With government approval, NIAC would partner with any NGO that it chooses and carry out the project." Ex.BB, p. 5.  It also boasted about its good relations with both Iran's

5

Ambassador Zarif (whom Parsi personally knew) and the Iranian Interest Section (which serves as Iran's unofficial embassy in Washington) including its head, Ali Jazini. Ex. BB, p. 5-6.  The July 2003 report by NIAC to NED stated that NIAC has access to parts of the Iranian government.  Ex. CC, p. 4.

21. Middle East expert Michael Rubin wrote that NIAC lobbies, and that NIAC has used its NED grant to train NGO's that are perhaps less threatening to Iran. Rubin raised questions about whether NIAC channeled NED funds to one of its own staff member's Iran-based organization.  Ex. DD, EE.  He has also called out NIAC advisory board member Farideh Farhi for hiding an affiliation with Iran's foreign ministry.  Ex. FF.

22. Since NIAC's founding in early 2002 to the present, Parsi and his staff at NIAC had hundreds of meetings and communications with Congressmen and staffers; many of these involving three key issues to Iran:  (1) engagement; (2) sanctions; and (3) regime change. *See* Docket No. 130.

23. A March 2005 article by the Student Movement Coordination Committee for Democracy in Iran (SMCCDI) accused Trita Parsi of having promoted Khatami and his corrupt gang both in Sweden and in the U.S. while a board member of the AIC. Ex. GG, p. 3-4.

24. Trita Parsi was a conduit for meetings between Iranian officials and U.S. Congressmen. *See, e.g.,* Ex. HH, G.

25. Trita Parsi has communicated with Ambassador Zarif regarding the case for dialogue with Iran.  Ex. D.

26. Trita Parsi has communicated with Ambassador Zarif regarding the Grand Bargain proposal from Iran.  Ex. E.  Zarif was the person who authorized Parsi to release the offer publicly in 2006 in an effort to alter Bush administration policy. Ex. II (Dai Dep., Dec. 1, 2010) at p. 224-225; Ex. JJ (Parsi Dep., Dec. 1, 2010), p. 281-284.

27. Parsi communicated with Ambassador Zarif regarding another proposal about which Parsi wrote, "Hope all is well and that you are back from Tehran.  Would love to get a chance to see the proposal or to understand what more it entails.  If it is substantial, then certainly members of Congress may find it a reasonable offer, even if the White House doesn't."  Ex. F.

28. Trita Parsi volunteered to help Ambassador Zarif with his goals, to which Ambassador Zarif stated, "Your help is always welcome."  Ex. G.

29. A March 2006 e-mail by Trita Parsi stated, "NIAC has a good name in [I]ran and your association with it will not harm you. In fact, I believe two of our board members are in Iran as we speak!" Ex. KK.

30. A May 2006 e-mail by Trita Parsi to Gareth Porter regarding his bio claims, "Few analysts in Washington have the access of Dr. Parsi to decision makers in Iran." Ex. TTT.

31. The 2006 public release of the secret Iranian "Grand Bargain" proposal in 2006 was done through Trita Parsi, in an effort to alter Bush Administration policy.  Ex. LL.

32. In August 2006, Parsi's contact at Hamyaran (Baquer Namazi who is Siamak Namazi's father) wrote Parsi: "Thank you for your efforts, all designed to serve our dear country." Ex. J.

33. In Sept. 2006, Trita Parsi relayed information he obtained to Amb. Zarif telling him that from what he hears U.N. envoy Bolton is not likely to get the U.S. Senate vote.  Ex. H.

34. Trita Parsi met with Ambassador Zarif in person several times between March 2006 and June 2007.  Ex. MM, I, Ex. NN (Parsi Dep., Dec. 2, 2010), p. 264-265.

35. Parsi communicated with Gholamhossein Mohammadnia, who worked under Zarif and his successor; Parsi also admitted to having met with him.  Ex. MM; Ex. I; Ex. NN (Parsi Dep., Dec. 2, 2010) p. 246-247, 262-264.

36. In September 2006, an article reported that the former head of the Iran Interest Section, Dr. Fathnejad, "stressed the importance of creating a relationship with organizations of Iranians outside the country . . . including the NIAC organization which is headed by a young Iranian named Trita Parsi."  Ex. OO, p. 4.

37. A December 2006 interview of Parsi with *Aftab*, an IRI-supported publication, refers to NIAC as "the Iranian Lobby in America."  Ex. PP, p. 4.  In that interview, Parsi stated that the west should "first" say that Iran has a "right" to gain access to "all aspects of a peaceful nuclear program and start negotiations . . . without setting preconditions." *Id.* at p. 5.

38. On April 21, 2007, Iran's Qudsdaily called NIAC, "the Iranian Lobby in America."  Ex. K.

39. Qudsdaily defended NIAC by labeling Defendant's claim as simply another attack by "neoconservative" political groups.  *Id.*

40. In January 2008, in a response to a question about why NIAC never takes a meaningful stand against human rights violations, Trita Parsi responded that NIAC is not a human rights organization and that it is not their expertise.  *See* Ex. O, p. 14-15.

41. In July 2008, NIAC attempted to sponsor a policy briefing luncheon (including members of the Department of State) to meet with Massoud Khodabandeh and Anne Singleton. Ex. QQ.  A sworn affidavit by Lord Corbett of Castle Vale states that he had appealed to Congresswoman Ileana Ros-Lehtinen to notify her that Iranian agents (Khodabandeh and Singleton) were invited by NIAC (whom he referred to as known lobbyists for the regime) and that Lord Corbett gave her a report documenting their links with Iran which then resulted in their being unable to come to the U.S. for the NIAC event.  Ex. N, p. 2-3; Ex. RR-a; Ex. RR-b; Ex. RR-c; Ex. RR-d; Ex. RR-e, p. 8-11.

42. In July 2008, NIAC's Assistant Legislative Director wrote in a memo: "Under this expansive view of lobbying [LDA], I find it hard to believe Emily and I devote less than 20% of our time to lobbying." Ex. SS, p. 2.

43. Parsi met with Iranian officials (incl. Motjaba Samareh Hashemi [special adviser to Pres. Ahmadinejad] and Amb. Soltanieh [Iran's ambassador to the International Atomic Energy Agency]) in Europe during Pugwash meetings. *See* Ex. NN (Parsi Dep., Dec. 2, 2010), p. 225-231.  Puneet Talwar, member of the National Security Council, who was deposed in this case, testified that he never authorized Parsi to meet these Iranian officials.  Ex. SSS (Talwar Dep., Feb. 1, 2011), p. 28-30.

44. Parsi has admitted to meeting with Mohammad Khazaee, Zarif's replacement as Ambassador to the U.N.  Ex. NN (Parsi Dep., Dec. 2, 2010), p. 253.

45. Parsi has met with Rahim Mashaei, Chief of Staff to Pres. Ahmadinejad and former Iranian Vice-President.  Ex. NN (Parsi Dep., Dec. 2, 2010), p. 216-218.

46. Mohsen Makhmalbaf (unofficial spokesman for Iran's Green Movement) has said that Parsi does not belong to the Green Movement but instead has been lobbying secretly for Iran.  Ex. TT.

47. From at least 2000 to the present, various articles by others have explicitly said of or referred to the Plaintiffs as:

   a.  being the mullah's voice (Ex. M)

   b.  being the "Islamic Republic's lobby group" (Ex. UU, p. 1)

   c.  bending the truth and serving the purpose of Iran's Ministry of Intelligence (VEVAK) (Ex. VV, p. 3)

   d.  representing itself as a non-political organization while hosting rulers of Iran and supporting "reformists" (Ex. WW)

   e.  posing as a group advancing Iranian-American interests even though it has spent the majority of its time promoting the interests of the IRI, resulting in NIAC having only few supporters (Ex. X)

   f.  being rejected by a majority of Iranians with so few of whom participating in their surveys and most of whom publicly denouncing NIAC's use of their name (Ex. XX, p. 1); *see also*, Ex. Z to Def's Omnibus Sanctions Motion.

   g.  being part of the Islamic Republic of Iran agents and lobby groups (Ex. YY)

   h.  being the second pillar in the U.S. Iran lobby (Ex. ZZ)

   i.  being the Iranian regime's man in Washington and doing a lot of legwork for the Iranian regime (Ex. AAA)

     j.   being a facilitator for the work of Iran's Ministry of Intelligence and Security (Ex. BBB)

     k.   being lobbyists for the Islamic Republic who only recently advocated for human rights to cover up true intentions (Ex. CCC)

     l.   having failed to advocate for human rights violations of Mullahs (Ex. DDD)

     m. being the lobby for Iran (Ex. EEE, p. 1)

     n.  being an agent of Iran (Ex. FFF, p. 28).

     o.  being a lobbyist and infamous apologist for the clerical regime (Ex. GGG)

     p.  serving the Islamic Republic and being an agent of Rafsanjani (Ex. PPP)

48. Defendant believed that his articles were true.  Dai Affidavit, Att. 1 to Docket No. 5.

49. Defendant entertained no serious doubts about the truth of his articles.  Dai Affidavit, Att. 1 to Docket No. 5.


## ARGUMENT

As public figures, Plaintiffs bear the burden of proving the falsity of a defamatory statement and actual malice. *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C. Cir. 1988). Summary judgment should be granted if the movant has shown, when the facts are viewed in the light most favorable to the nonmovant, that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). The actual malice standard is "subjective" and the Plaintiff must prove that the Defendant "actually entertained a serious doubt." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996). To defeat a summary judgment motion in a defamation action involving a

public figure, Plaintiffs are required to show that the evidence could support a reasonable jury finding that the Defendant acted with "actual malice" by clear and convincing evidence. *See Liberty Lobby v. Rees*, 852 F.2d at 598.  Summary judgment is appropriate where, as in this case, the evidence is "of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence."  *See Anderson v. Liberty Lobby, Inc.,*  477 US at 254.

I.      **Plaintiffs Cannot Meet the Burden of Proving by Clear and Convincing Evidence that Defendant Knew that His Statements Were False or Acted with Reckless Disregard for the Truth.**

To prevail in a defamation suit, a person, who is a public figure, must show by "clear and convincing evidence" that the defendant made the defamatory statement with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).  The "clear and convincing evidence" requirement is "significantly more onerous than the usual preponderance of the evidence standard." *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987).  "Actual malice" is knowledge or reckless disregard that the statement is false. *N.Y. Times*, 376 U.S. at 279-280. Public officials and public figures must prove actual malice because they (1) have voluntarily placed themselves at the "forefront" of a public controversy inviting "attention and comment" in order to "influence the resolution of the issues involved" in the controversy and (2) typically are able to access the media and rebut falsehoods. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–45 (1974).  As the Supreme Court has stated, there is a "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures. *N.Y. Times*, 376 U.S. at 270.  "Public figures" fall into one of two categories:  (1) general public figures and (2) limited public figures. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1291-1298 (D.C. Cir. 1980).  In an opinion, dated February 4, 2009, this Court held

that Parsi and NIAC are both limited public figures. Docket No. 13.  As limited public figures,

Plaintiffs must prove actual malice by clear and convincing evidence.  Plaintiffs must show that

the defendant made his statements with knowledge that they were false or with reckless disregard

of whether they were false or not. *See N.Y. Times*, 376 U.S. at 279–80.

"The standard of actual malice is a daunting one." *McFarlane v. Esquire Magazine*, 74

F.3d 1296, 1308 (D.C. Cir. 1996); *see also Lohrenz v. Donnelly,* 223 F.Supp.2d 25, 48-49

(D.D.C. 2002) (stating, "Because of the paramount importance of First Amendment protection

for the media, the showing that a public figure must make to hold a media defendant liable for

slander or libel is very high").  Judges in defamation cases have a constitutional duty to "exercise

independent judgment and determine whether the record establishes actual malice with

convincing clarity." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514

(1984). A mere failure to investigate does not constitute actual malice, but rather Plaintiffs must

demonstrate that "the defendant in fact entertained serious doubts as to the truth of his

publication." *St. Amant v. Thompson*, 390 U.S. 727, 731-733 (1968).  Unsurprisingly, "[f]ew

public figures have been able clearly and convincingly to prove that the scurrilous things said

about them were published by someone with 'serious doubts as to the truth of [the] publication."

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d at 1515 (quoting *St. Amant v. Thompson*, 390

U.S. at 731).

Summary judgment should be granted here where there is no evidence, let alone clear and

convincing evidence, that Defendant acted with reckless disregard as to the truth of his

statements.  Rather, there is ample evidence that Plaintiffs lobby for Iran and that Defendant

relied on and cited various public sources, including previous press reports.

A.     **Summary Judgment Is Appropriate Here Where There Is Not Clear and Convincing Evidence that Defendant Ever Had Serious Doubts About the Truth of His Writings.**

Plaintiffs have provided no evidence that Defendant had knowledge of or harbored serious doubts regarding the truth of his writings.  Despite the extensive amount of document production on the part of the Defendant, Plaintiffs have been unable to find and show any evidence that the Defendant knew that what he said is false or entertained serious doubts about his publications.  In fact, Defendant repeatedly expressed and explained his sincerely held views and the bases for those views.  *See, e.g.,* Ex HHH (Dai Dep., Dec. 14, 2010), p. 143-145, 207; Dai Affidavit, Att. 1 to Docket No. 5. Thus, Plaintiffs cannot meet the very high burden of malice in this case and summary judgment should be granted on this basis alone.

B.     **Summary Judgment Is Appropriate Here Where There Is Ample Evidence Supporting Defendant's Statements**.

A "substantially true" statement cannot give rise to a defamation action. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988). It makes no difference whether the true facts were unknown until trial.  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993); *see also Moldea v. NY Times Co.,* 15 F.3d 1137, 1142 (D.C. Cir. 1994) (stating that "truth is a complete defense to defamation); *see also* Restatement (Second) of torts § 581A, cmt. h (1977) ("[I]f the defamatory matter is true, it is immaterial that the person who publishes it believes it to be false; it is enough that it turns out to be true.").  There is no legally protected right to a reputation based on the concealment of the truth.  *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d at 1228.  In this case, there is ample evidence to show that not only did Defendant believe his claims but also that his claims are substantially true.  *See Philadelphia Newspapers Inc., v. Hepps*, 475 US 767, 778 (1986) ( "We recognize that requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so. Nonetheless, the Court's

previous decisions on the restrictions that the First Amendment places upon the common law of defamation firmly support our conclusion here with respect to the allocation of the burden of proof.")  Quite the opposite, the evidence showed strong support behind Defendant's claims.

       1.      **Ample Evidence Suggests that Plaintiffs May Not Be in Compliance with Various Lobbying Laws.**

As discussed in Defendant's Opposition to Plaintiffs' Motion in Limine (Docket No. 130), there has been an abundance of evidence suggesting potential violations with the Lobbying Disclosure Act (LDA), Foreign Agent Registration Act (FARA), Internal Revenue Code (IRC), Logan Act, and the Iran Libya Sanctions Act (ILSA).  For example, NIAC's Assistant Legislative Director has stated, "Under this expansive view of lobbying [LDA], I find it hard to believe Emily [Blout] and I devote less than 20% of our time to lobbying." Ex. SS.  Additionally, NIAC had never admitted to the IRS that it was doing any lobbying or grass roots advocacy until November 2009 when the *Washington Times* article exposing their activities ran.  Parsi's bank records and deposition testimony show payment for consulting work for a firm in Tehran, Atieh Bahar, in potential violation of both ILSA and FARA.  *See* Ex. AA (previously submitted as Ex. HH to Docket No. 130), pp. 3 14-15, 30.

Moreover, Plaintiffs have listed no expert witnesses able to testify on compliance with lobbying laws.  Lay witnesses--Emily Blout, Patrick Disney, and Trita Parsi--have all disclaimed expertise on lobbying laws. *See* Ex. P, Q, and R.[2]  At the August 30, 2011 status hearing, Plaintiff's counsel represented that they will not seek to introduce evidence of or seek to rely upon legal advice they received to prove that they were not engaged in illegal lobbying activities. *See* Docket No. 138.  Without experts on these lobbying laws or any other evidence to show that

---

[2] Plaintiff's counsel even objected to these factual witnesses testifying about these laws as it required legal expertise.

they were in compliance with *all* lobbying laws, Plaintiffs' defamation per se claim necessarily

fails. Without a defamation per se count, Plaintiffs no longer have presumed general damages

and thus must prove special damages.[3]

          **2.**     **Ample Evidence Supports Defendant's Conclusion that Plaintiffs Lobbied for Iran.**

      Overwhelming evidence supports Defendant's conclusion that Plaintiffs lobby for Iran.

Despite constant denials that they ever participated in lobbying activities, documents show that

Trita Parsi himself has admitted to having lobbied for Iran as far back as 1997 and has called for

additional lobbying efforts.

- Trita Parsi wrote, "I have reported my activities on Capitol Hill to the signatories of the petition, which has resulted in the formation of a small but active **Iranian lobby group**. About 80 members of Congress receive faxes and letters from us on a regular basis, and we are determined to continue to lobby for the interests and well being of our people and nation. We Iranians need to show that we are a political force to be reckoned with."  *See* Ex. T (emphasis added).

- The Iranians for International Cooperation (IIC), a lobby organization founded by Trita Parsi in 1997, described its "main objective" as "safeguard[ing] Iran's and Iranian's [sic] interests. Currently, our agenda is topped by the removal of U.S. economic and political sanctions against Iran, and the commencement of an Iran-U.S. dialogue." It described itself as being "capable of organi[z]ing the grassroots and pressure US lawmakers to pose a more Iran friendly position." Ex. B, p. 1, 3.

- Trita Parsi himself posted in 1997, "Iranians for International Co-operation is a newly formed lobby group that seeks to protect the interest of the Iranian nation and promote friendship between nations. Currently our main objectives are to start an Iran-U.S. dialo[gue] and lift the U.S. sanctions on Iran. We are active both in the US and in the EU."  Ex. S, p. 1.

- Trita Parsi's resume from 1999 touts that he "Established the first lobby group in the U.S. to support the normalization of ties between Iran and the U.S." and that

---

[3]  In this case, NIAC's special damages are dependent upon the admissibility of Joel Morse's opinion which is already subject to a Daubert motion. *See* Docket No. 92. Parsi's special damages are dependent upon his claim of lost consulting income which in turn is dependent upon:  (i) his turning over his Swedish bank account records (which he has not done as of the filing of this motion); and (ii) his addressing invalid foundational assumptions raised in Defendant's motion to strike damages (*see* Docket No. 134).  Unless they prevail in these, they have no evidence of special damages.

he "Authored three reports on U.S.-Iran relations which were used by Congressman Ney to alter his position vis-à-vis Iran." Ex. A, p. 1-2.

- Trita Parsi was a conduit for facilitating meetings between the Iranian government and U.S. officials. *See, e.g.,* Ex. HH, G.

- Since NIAC's founding in early 2002 to the present, Parsi and his staff at NIAC had hundreds of meetings and communications with Congressmen and staffers; many of these involving three issues key to Iran: (1) engagement; (2) sanctions; and (3) regime change. *See* Docket No. 130.

Parsi's agenda was coordinated with Siamak Namazi, former Managing Director of Atieh Bahar[4] and whose family[5] holds extensive sway and influence in Iran and its government.

- In an April 1998 paper, Namazi wrote, "Clearly Iran stands to gain substantially should its expatriate population hold decision-making power in foreign lands. Then, the Iranian government should be cognizant that the inevitable assimilation and naturalization of its expatriate population is in accordance with the long-term interests of Iran." Ex. U.

- Siamak Namazi in a November 1998 paper, which thanks Trita Parsi for reviewing and critiquing his article, stated that the Islamic Republic has been reforming its behavior and that the election of Khatami in May 1997 brings "new hope." It also called for building stronger channels for cultural exchanges and for "People-to-people talks, **as called for by the new government**" (emphasis added). It also stated that Iran should work to counter AIPAC's misinformation

---

[4] Atieh Bahar has numerous ties to the Iranian government especially through its leadership. The chairman and co-founder, whom Parsi knows personally and who has paid Parsi for his services, is Bijan Khajehpour who is also managing director of Qeshm Energy (which is a joint venture between Azar Energy and Qeshm Authority [Iranian government]). Atieh Bahar's Director and CFO is Albrecht Frischenschlager who is founder and managing director of FTZ Services, Ltd. (a joint venture with three governmental Free Zone Organizations of Iran) and who is also CEO of MES headed by Chairman Ahmad Hatami Yazd (who in turn has been chairman and managing director of Bank Saderat Iran—a bank cut off from the US financial system in 2006 and referred to by the US Treasury Department as "a conduit between the Government of Iran and Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command, and Palestinian Islamic Jihad."). *See* Ex. III, Ex. JJJ, Ex. KKK.

[5] Siamak's father is Baquer Namazi who had held high positions in Iran including governor of Kuzestan and until recently was Chairman of the Board of Directors of Hamyaran. Also on Hamyaran's Board of Directors was Dr. Hossein Malek-Afzali who had served as Iran's Deputy Minister for Research and Technology among other governmental positions for decades, including while he was on the board of Hamyaran. *See* Ex. LLL, p. 1, NN, p. 178. Hamyaran has worked with Iranian NGO's and the Iranian government which, according to Baquer Namazi, had encouraged it to reach out to Iranian experts in the diaspora and had generally welcomed NGOs networking with expatriate professional Iranians in Europe and in the US. *See* Ex. MMM, p. 4. Siamak's brother is Babak Namazi who is Managing Director of Atieh Associates, a Tehran-based firm that advises many oil companies. He was one of the few private sector participants called by Iran's Ministry of Economic Affairs and Finance and Organization for Investment, Economic, and Technical Assistance of Iran (OIETA) to be involved in the preparation of executive by-laws for Iran's Foreign Investment Promotion and Protection Act. Ex. NNN, p. 2.

about Iran and hailed the Iranians for International Cooperation (IIC) lobbying voice in Washington. Ex. V.

- A November 1999 paper co-authored and presented by Trita Parsi and Siamak Namazi not only concluded by suggesting that specific lobbying seminars be held and that Iranian-Americans "must be utilized" to lobby against confrontation against Iran, but also explicitly stated that, "Arguably an Iranian-American lobby (which is different from a lobby group purely pursuing the interests of the Islamic Republic of Iran) is needed in order to create a balance between the competing Middle Eastern lobbies. Without it, Iran-bashing may become popular in Congress again." Ex. C.

- On June 23, 2001, Trita Parsi stated, "I assume everyone has been busy, but it would be good if we could finish the minutes so we can follow Mr. Ba[qu]er Namazi's instructions and send it to Amb. Bill Miller."  Ex. Z (formerly Exhibit 77 in Trita Parsi's Dec. 2010 Dep.).

- On Sept. 2002, Parsi received payment from Bijan Khajehpour, chairman and co-founder of Tehran-based Atieh Bahar and Managing Director of Qeshm Energy, for consulting work. Parsi stated that his work for this was one of approximately 10-15 consulting reports he had done.  Ex. AA (previously submitted as Ex. HH to Docket No. 130), p. 14-15, 30.

- On August 2006, Parsi's contact at Hamyaran (Baquer Namazi who is Siamak Namazi's father and was Chairman of the Board of Directors for Hamyaran) wrote him, "Thank you for your efforts, all designed to serve our dear country." Ex. J.

NIAC's official reports to The National Endowment for Democracy (NED) openly

admitted its special access to Iranian government officials including Iran's Ambassador to the

U.N. and the head of the Iranian Interest Section, which serves as Iran's unofficial embassy in

Washington.

- The January 2003 report by NIAC to NED explicitly suggested it had special access to government officials, touting its "extensive" contacts that would allow it to do what it wants in Iran saying, "NIAC would negotiate with relevant officials from the Iranian government in order to receive authorization to implement the project.  This could take as long as three to four months.  However, due to NIAC's extensive contacts, it could take less time." Ex. BB, p. 5.

- It also admitted having good contacts with the Iranian Interest Section and its head Ali Jazini.  *Id*.

- NIAC touted the personal contacts between Parsi and the U.N. Ambassador to the United Nations, Javad Zarif, who had apparently expressed interest in their work. Ex. BB, p. 6.

- Its July 2003 report again mentioned "the parts of the [Iranian] government that NIAC has access to." Ex. CC, p. 4.

- A March 2006 e-mail by Trita Parsi stated, "NIAC has a good name in [I]ran and your association with it will not harm you. In fact, I believe two of our board members are in Iran as we speak!" Ex. KK.

- A May 2006 e-mail by Trita Parsi to Gareth Porter claims, "Few analysts in Washington have the access of Dr. Parsi to decision makers in Iran." Ex. TTT.

Iran's Ambassador Zarif, whom Trita Parsi had known since at least 2003, had continued correspondence, meetings, and coordination with Parsi, including:

- Parsi e-mailed Zarif about his work in establishing the case for dialogue with Iran. Ex. D.

- They had an exchange regarding the 2003 "Grand Bargain" proposal from Iran. Ex. E.

- Parsi assisted Iran's ambassador on the public release of the secret Iranian "Grand Bargain" proposal in 2006, which Zarif authorized Parsi to do, in an effort to alter Bush Administration policy.  Ex. LL; Ex. II (Dai Dep., Dec. 1, 2010) at p. 224-225; Ex. JJ (Parsi Dep., Dec. 1, 2010), p. 281-284.

- In one exchange with Zarif, Parsi writes, "Hope all is well and that you are back from Tehran.  Would love to get a chance to see the proposal or to understand what more it entails.  If it is substantial, then certainly members of Congress may find it a reasonable offer, even if the White House doesn't."  Ex. F.

- In another exchange, Parsi checks in regarding a specific resolution, and explains that he is pro-dialogue because it is needed to attain "regional and internal goals," and Iran's Ambassador Zarif says that Parsi's "help is always welcome." Ex. G.

- In Sept. 2006, Trita Parsi relayed information he obtained to Amb. Zarif telling him that from what he hears U.N. envoy Bolton is not likely to get the U.S. Senate vote.  Ex. H.

- Other evidence suggests continued correspondence and even meetings with Zarif. Ex. OOO, MM, I, NN (Parsi Dep., Dec. 2, 2010), p. 264-265.

- Parsi communicated with Gholamhossein Mohammadnia, who worked under Zarif and his successor, and Parsi admits to meeting with him.  Ex. MM; Ex. I; Ex. NN (Parsi Dep., Dec. 2, 2010), p. 246-247, 262-264.

- Parsi has admitted to meeting with Mohammad Khazaee, Zarif's replacement. Ex. NN (Parsi Dep., Dec. 2, 2010), p. 253, 264-265.

In addition to Iran's UN ambassador, NIAC and Parsi had good relations with other representatives of the IRI, some of whom even explicitly expressed support for Parsi and NIAC.

- NIAC admitted to having good contacts with the Iranian Interest Section and its head Ali Jazini as far back as 2003.  Ex. BB, p. 5.

- In 2006, the former head of the Iranian Interests Section in DC (Ambassador Faramarz Fathnejad) stressed the importance of creating relations with organizations outside Iran, praising NIAC and its young Iranian president, Trita Parsi. Ex. OO, p. 4.

- In an interview with Trita Parsi conducted by *Aftab*[6] in 2006, he states that the path to diplomacy is that "first," the West should say that Iran has a "right to gain access to all aspects of a peaceful nuclear program and start negotiations with [the United States] without setting preconditions." Ex. PP, p. 5.

- Most importantly, that same government article specifically refers to NIAC as "**the Iranian Lobby in America**." (emphasis added). Ex. PP, p. 4.

- Shortly after Defendant's first English article in April 2007, Iran's Qudsdaily, referred to NIAC as "the Iranian lobby in America" and defended NIAC, suggesting that these types of attacks are simply coming from "neoconservatives." *See* Ex. K; Ex. HHH (Dai Dep., Dec. 14, 2010), p. 143-145, 207.

- Parsi has admitted to meeting Rahim Mashaei, Chief of Staff to Pres. Ahmadinejad and former Iranian VP.  Ex. NN (Parsi Dep., Dec. 2, 2010), p. 216-218.

- Parsi met with Iranian officials (incl. Motjaba Samareh Hashemi [special adviser to Pres. Ahmadinejad] and Amb. Soltanieh, Iran's ambassador to the International Atomic Energy Agency) in Europe during Pugwash meetings. *See* Ex. NN (Parsi Dep., Dec. 2, 2010), p. 225-231).  Puneet Talwar, member of the National Security Council, who was deposed in this case, testified that he never authorized Parsi to meet these Iranian officials.  Ex. SSS (Talwar Dep., Feb. 1, 2011), p. 28-30 .

---

[6] *Aftab* is reportedly a newspaper published by those close to Ayatolla Rafsanjani's group.  *See* Ex. HHH (Dai Dep., Dec. 14, 2010), p. 207; Ex. X.

NIAC and Parsi attempted to have known Iranian agents meet with members of the

United States Congress.

- NIAC actively worked to have a policy briefing luncheon (including members of the Department of State) to meet with Massoud Khodabandeh and Anne Singleton who have been cited by reports by British parliamentarians as Iranian agents. *See* Ex. QQ.

- Lord Corbett of Castle Vale specifically appealed to Congresswoman Ileana Ros-Lehtinen notifying her that agents of Qods Force and MOIS in the United Kingdom (Khodabandeh and Singleton) were invited by well-known lobbyists for the regime (NIAC) to speak to members of Congress and sent her a copy of the governmental report documenting of the links to the regime. This then resulted in their being stopped from boarding their flight. Ex. N, p. 2-3.

- Former Parliamentarian Winston Griffiths explicitly noted the Khodabandeh and Singleton links to Iran. Ex. RR-a.

- Khodabandeh's own brother described him and his wife's links with the Iranian government. Ex. RR-b.

- A Brief on Paris Court Proceedings described Khodabandeh and Singleton and their ties to the Iranian Intelligence Ministry. Ex. RR-c.

- A letter from European Parliamentarian Paula Casaca to her colleagues called Khodabandeh and Singleton well-known operatives of Iran's Ministry of Intelligence and Security (MOIS). Ex. RR-d.

- A report prepared by the British Parliamentary Committee for Iran Freedom detailed Khodabandeh and Singleton's links to the Iranian government, including their work in publishing misinformation on behalf of the government through Iran Interlink. Ex. RR-e, p. 8-11.

Many authors have written about Plaintiffs' work for Iran from at least as far back as

2000:

- Ken Timmerman (Middle East expert and *Newsmax* columnist):

    - An October 2000 article by Ken Timmerman explicitly stated, "Another new pro-regime advocacy group, Iranians for International Cooperation, is run by a former U.S. Senate intern named Trita Parsi. Now living in Stockholm, **Parsi and his group have been lobbying the expatriate**

> **community on behalf of Iranian President Khatami and lobbying the U.S. government to lift the sanctions**." Ex. L (emphasis added).
>
> o He has also called Parsi the "new unofficial spokesman in Washington" for Iran's ruling clerics (Ex. M) and Plaintiffs as "apologists for the regime in Tehran" (Ex. W).
>
> o He cited various sources that link NIAC to Iran (Ex. X) and stated that "NIAC has . . . [been] brazenly portraying the Tehran regime as moderate, reasonable, and misunderstood" (Ex. Y).

- Clare Lopez (former intelligence officer and professor at the Centre for Counterintelligence and Security Studies):

  o She has called NIAC a known supporter of the Tehran regime and cited NIAC's denial that it had a human rights role. Ex. O.

  o She has said that NIAC acts on behalf of policies that favor the regime in Tehran. *See* Clare Lopez interview with Secure Freedom Radio, http://www.youtube.com/watch?v=QP_zVenqgxg (last accessed on Sept. 9, 2011).

- Michael Rubin (Middle East expert and Resident Scholar at the American Enterprise Institute for Public Policy Research):

  o In an article covering the recent political upheaval in Iran, he wrote how Mohsen Makhmalbaf (unofficial spokesman for Iran's Green Movement) said, "I think Trita Parsi does not belong to the Green Movement. I feel his lobbying has secretly been more for the Islamic Republic." Ex. TT.

  o He has also called out NIAC advisory board member, Farideh Farhi, for hiding an affiliation with Iran's foreign ministry. Ex. FF.

  o He has said that NIAC lobbies. Ex. DD.

  o He has raised questions about whether NIAC channeled NED funds to one of its own staff member's Iran-based organization. Ex. EE.

  o He has also noted that NIAC may have scammed NED. Ex. QQQ.

Many others have made similar statements:

- Rep. Mark Kirk, now a Senator, has called NIAC a regime sympathizer. Ex. RRR.

- A Student Movement Coordination Committee for Democracy in Iran (SMCCDI) article notes in 2003, "Once again, the Islamic republic's Lobby group in the US, is organizing events in order to buy time for the bankrupt and collapsing theocratic regime with the desire to influence the U.S. policy in reference to Iran.

Three meetings have been scheduled, in Northern and Southern California, and some U.S. policy makers have been invited as guests, by the so-called NIAC, in hope of staging a bogus U.S. Support for these middlemen."  Ex. UU.

- Michael Goldfarb of *The Weekly Standard* called Parsi "the Iranian regime's man in Washington."  Ex. AAA.

- Jeffrey Goldberg of *The Atlantic* accused Parsi of "Doing a lot of leg-work for the Iranian regime."  *Id.*

- Elham Ariana explicitly noted the mismatch between NIAC's claims and its actions in 2003, stating, "One of these offices is the NIAC organization (National Iranian American Council), which is run by "Trita Parsi," a Zoroastrian expatriate. This organization represents itself as a non-political organization on the one hand, and on the other hand is responsible for hosting the rulers of the Islamic Republic and supports the "reformists" through several articles." Ex. WW.

- A 2006 SMCCDI article stated, "[L]obbyist groups and infamous apologists of the clerical regime (such as Hooshang Amir-Ahmadi and Mehranguiz Kar of the self called "American Iranian Council" (AIC), [Trita] Parsi of the self proclaimed "National Iranian American Council" (NIAC)" Ex. GGG.

- Saeed Ganji, on behalf of the National Union for Democracy in Iran, said that NIAC poses as a group seeking to advance the interests of Iranian-Americans even though, "It has spent the great majority of its energy and time . . . on promoting the interests of the Islamic Republic. For this reason, only a small number of Iranians support NIAC or participate in its activities."  Ex. X.

- Rabbi, Professor, and Middle East expert Dan Zucker in his 2006 article on Iran's Ministry of Intelligence (VEVAK) wrote, "Trita Parsi is another individual that serves the purposes of VEVAK. . . . Parsi also bends the truth over Iranian acts of conciliation towards the US, attempting to make Tehran appear "misunderstood" by the current administration. Trita Parsi serves the regime's interests as a consistent advocate of a policy of appeasement.  That seems to be a strange attitude for a dissident to hold."  Ex. VV, p. 3.

- A March 2005 SMCCDI article accused Trita Parsi of having promoted Khatami and his corrupt gang both in Sweden and in the U.S. while a board member of the AIC. Ex. GG, p. 3-4.

- Well-known Iranian exile, Parviz Sayyad, wrote of in a 2006 article how Parsi is serving the Islamic Republic and being an agent aligned specifically with Rafsanjani (Ex. PPP)

- Mohammad Parvin wrote: "The founders of the National Iranian American Council (NIAC) made a fundamental mistake when they established an

organization to lobby for the Islamic Regime of Iran (IRI). . . . Currently, not a single trace of the term "human rights" can be detected in their goals and mandates. . . . The discredited NIAC has attempted a comeback by trying to correct its strategy, in words but not in deed. . . . Parsi is well aware of these facts, which explains why his reference to human rights is a deceitful act aimed to further cover up his true intentions. His goal is to put human rights on a table to make the digestion of a terrorizing system possible." Ex. CCC.

- In response to a question as to why NIAC never takes any meaningful stand against human rights violations in Iran, Parsi stated, "NIAC is not a human rights organization.  That is not our expertise." Ex. O.

Some have specifically written that NIAC does not represent the views of Iranian-Americans but rather has its own pre-ordained agenda:

- Lee Smith said: "Trita Parsi, the second pillar of the US Iran lobby, wants to be the public face of Iranian-Americans. . . . If the Islamic Republic could hire a lobbying firm, I couldn't imagine it doing a better job than NIAC . . . Compared to the size of Iranian-American community at large, NIAC membership is miniscule, with Parsi claiming 3,000 and other estimates ranging from 500 to 1,000, depending on how "membership" is defined."  Ex. ZZ.

- A 2003 article by SMCCDI stated, "[T]his organization is rejected by the majority of Iranians residing in the US due to their knowledge of its agenda and that less than 0.0001% of them have participated in the so-called survey. Over a million and [a] half Iranians are living in the US and most of them have access to Internet or the Los Angeles Iranian based Radio and TVs. Most of them are denouncing publicly the NIAC and anyone intending to use their name in order to buy time for the regime."  Ex. XX, p. 1; *see also*, Ex. Z to Def's Omnibus Sanctions Motion.

- Mohammad Parvin stated, "A widespread misinformation campaign that has been orchestrated by the IRI's agents and lobby groups has played a major role in [the] creation of such misconceptions. As an example, in a recent article in the *Nation* magazine, Trita Parsi, the president of National Iranian American Council (NIAC), flatly rejects the idea of a regime change by the Iranians without offering any logical argument or statistics." Ex. YY.

Thus, as these examples make clear, there is a multitude of support for the Defendant's writings making it impossible for Plaintiffs to show actual malice by clear and convincing evidence.

C.   **Summary Judgment Is Appropriate Here Where Defendant Relied on Credible Reports to Support His Conclusions**

Reliance on credible secondary sources, in the absence of subjective doubt regarding the accuracy of those sources, indicates absence of actual malice. *See Liberty Lobby v. Dow Jones & Co.,* 838 F.2d 1287, 1298 (D.C. Cir 1988) (indicating that reliance on reputable sources precludes "any finding of actual malice as a matter of law"); *Liberty Lobby v. Anderson*, 746 F.2d 1563, 1574 (D.C. Cir 1984) (saying that reliance on credible sources "unquestionably eliminates the necessary element of actual malice"); *Ryan v. Brooks*, 634 F.2d 726, 734 (4th Cir. 1980) ("As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, . . . the evidence of malice [is] insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error."). In fact, the DC Circuit has even held that reliance primarily on a single dubious source does not constitute actual malice. *See, e.g., McFarlane v. Esquire*, 74 F.3d at 1299, 1304-1305, 1308 (affirming summary judgment on the ground that plaintiff accused of espionage could not prove actual malice despite the defendant publishing "a breathless and kaleidoscopic account rivaling an Oliver Stone movie" with the allegedly defamatory issue in the case based on the word of a known liar); *see also Secord v. Cockburn*, 747 F.Supp. 779, 794 (D.D.C. 1990) ("use of convicted felons [as sources] cannot alone constitute a fact of actual malice" and plaintiff "must establish that even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt"). Actual malice cannot be found where, as here, the Defendant's allegations are supported by previous credible reports. *See Rosanova v. Playboy Enterprises*, 580 F.2d 859, 862 (5th Cir. 1978); *see also Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 599 (D.C. Cir. 1988) (citing with approval the *Rosanova* rule). Otherwise, courts would be forced to "retry[] the

23

truthfulness of previous reports made by independent publishers." *Id*; *see also Harte-Hanks*, 491 U.S. at 688 (stating that a failure to investigate does not constitute malice).

In *Rosanova*, *Playboy* magazine falsely accused the plaintiff of being a mobster. *Rosanova*, 580 F.2d at 862. The court found that because *Playboy* relied on previous reports of the plaintiff's mob ties, *Playboy* had not acted with actual malice, even though *Playboy* failed to verify the truth of the corroborative but incorrect reports. *Id.* To rule otherwise, the court noted, would be to require defamation defendants to defend the truthfulness of previous reports made by independent publishers and would lead to significant stifling of free speech. *Id.* Summary judgment was affirmed in favor of the Defendant. *Id.*

As described above, the Defendant here likewise grounded his conclusions in "previous reports," including the primary allegation that Plaintiffs lobby for Iran. Iranian governmental press itself referred to NIAC as the Iranian lobby in the U.S. and further supported this by their defense of NIAC and Parsi and sudden attacks on Dai after his first English article. *See, e.g.,* Ex. PP, Ex. K. Despite Defendant's repeated explanation of these publications as a primary source for his views, Plaintiffs failed to provide any evidence that Defendant had subjective doubt about these sources or his statements. *See* Ex. HHH (Dai Dep., Dec. 14, 2010), p. 143-145, 207; Dai Affidavit, Att. 1 to Docket No. 5. In addition to these sources, the Defendant conducted substantial research on the matter and found a mountain of corroborative evidence. *See, supra,* Sec. I.B. As in *Rosanova*, Plaintiffs have failed to show that Hassan acted with actual malice in relying on the previous reports of others, and thus, summary judgment should similarly be granted in favor the Defendant.

**<u>CONCLUSION</u>**

Considering the lack of any evidence that Dai entertained serious doubts about the truth of his publications, evidence of Plaintiff's ties with Iranian government officials, and numerous published reports about Parsi's and NIAC's role in lobbying for Iran, Plaintiffs cannot meet their evidentiary burden on the issue of actual malice and Dai is entitled to summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56.


Dated:   September 16, 2011                          _____/s/_____
                                                                          Timothy E. Kapshandy (Admitted Pro Hac Vice)
                                                                          Bradford A. Berenson (D.C. Bar No. 441981)
                                                                          HL Rogers (D.C. Bar No. 974462)
                                                                          Peter G. Jensen (D.C. Bar No. 982599)
                                                                          SIDLEY AUSTIN LLP
                                                                          1501 K Street, N.W.
                                                                          Washington, D.C.  20005
                                                                          (202) 736-8000
                                                                          hrogers@sidley.com

                                                                          Attorneys for Defendant
                                                                          Seid Hassan Daioleslam

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL, | ) ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | )   Civil Action No. 08-705 (JDB) |
|  | ) |
| SEID HASSAN DAIOLESLAM, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## CERTIFICATE OF SERVICE

I certify that on September 16, 2011, I served, via email, Defendant's Motion for Summary Judgment on:

Afshin Pishevar
Adrian Nelson
600 East Jefferson Street
Suite 316
Rockville, Maryland 20852
(301) 279-8773
ap@pishevarlegal.com
anelson@pishevarlegal.com

Dated:   September 16, 2011

                                                                   /s/
                                                Thomas E. Ross (D.C. Bar No. 994275)
                                                Bradford A. Berenson (D.C. Bar No. 441981)
                                                HL Rogers (D.C. Bar No. 974462)
                                                Peter G. Jensen (D.C. Bar No. 982599)
                                                SIDLEY AUSTIN LLP
                                                1501 K Street, N.W.
                                                Washington, D.C.  20005
                                                (202) 736-8000
                                                tom.ross@sidley.com

                                                Attorneys for Defendant
                                                Seid Hassan Daioleslam