# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRITA PARSI ) | |
| ) | |
| and ) | |
| ) | |
| NATIONAL IRANIAN AMERICAN ) | CASE NO. 08 CV 00705 (JDB) |
| COUNCIL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| DAIOLESLAM SEID HASSAN, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S OMNIBUS MOTION FOR SANCTIONS

**I.    Introduction**

Throughout the discovery phase of this case over the last 2-1/2 years, the Court has been called upon to compel Plaintiffs to produce documents or witnesses or computers for forensic imaging.  At least seven orders to compel have already been granted, several involving multiple issues and at least three involving repeated issues (*i.e.*, the Talebi emails, member lists, and the server imaging).  Three of the orders reserved the issue of costs and two awarded costs.  Defendant hereby submits this single omnibus motion for sanctions addressing the multiple areas of discovery misconduct.  As many of these issues have been briefed before, Defendant cites and incorporates his previous motions and exhibits by reference to the Court's official docket number.

II.     __Plaintiffs' Conduct__

The areas of discovery misconduct addressed by this motion are:

A.      Failure to produce, alteration, and deletion of calendar entries;

B.      Failure to produce server for imaging;

C.      Failure to produce the Talebi emails;

D.      Failure to produce other emails;

E.      Failure to produce Salesforce and membership databases;

F.      Parsi's stolen laptop and disappearing desktop;

G.      Redepositions of Parsi and Blout; and

H.      Editing of seven year-old IIC document before production.

A.      __Failure to Produce, Alteration, and Deletion of Calendar Entries__

For a detailed discussion of the conduct at issue regarding Plaintiffs' Outlook calendars, see Docket Nos. 52, 63, and 76.  Defendant's June 22, 2010 motion (Docket No. 76) provides the most detailed account regarding Plaintiffs' initial failure to produce these calendars, the limited production of about 400 calendar entries on December 29, 2009, alteration of 87 of those 400 entries on Christmas weekend 2009, the additional production (albeit in non-native, Excel files) of about 5000 calendar entries on April 21, 2010 as the "complete, unedited" NIAC calendars with the "date modified" field missing, the 5-month gap in the middle of Parsi's 2006 calendar, and the fact that some of the entries produced on December 29, 2009 were missing from the April 21, 2010 calendars that were supposedly complete and unedited.

On July 1, 2010, the Court ordered NIAC to produce its shared server for forensic imaging, and on August 6, 2010 denied NIAC's motion for reconsideration (Docket No. 78).

2

Six days before the August 18 date to complete the imaging, Plaintiffs' counsel informed

Defendant and PwC that instead of a server, they would be producing for imaging five or six

PCs as there were no pst files on the server.  (*See*, PwC Report of October 18, 2010, attached

as Ex. A).[1]  After further discussions the day of the imaging, NIAC produced another desktop

PC and a laptop for a total of eight computers.

PwC's forensic analysis of the eight NIAC-selected PCs showed:

1. 4,159 calendar entries were not produced in NIAC's first two calendar productions;[2]

2. 999 calendar entries had been deleted, but PwC was able to recover them;

3. 715 entries had been further purged (double-deleted), but PwC was able to recover them; and

4. 87 of the entries produced December 29, 2009 were edited December 25-27, 2009.

PwC was not able to determine who edited 87 of the calendar entries produced on

December 29, 2009.  Nonetheless, Trita Parsi admitted that only he was involved in the

production of the calendars and he was at NIAC's office Christmas weekend 2009.  (Parsi

Dep., Vol. I, pp. 139-148 and 156-163, attached as Ex. B).

Among the strangest of the alterations were three entries added to Parsi's calendar on

December 25, 2009 from Babak Talebi's Gmail account (one for Erik Belfrage, a Swedish

banker and diplomat, and two for Puneet Talwar, an NSC official).  (Parsi Dep. Ex. 14,

attached as Ex. C).  Talebi was not employed by NIAC in 2009, and he was not at the office

---

[1] The Exhibits to the PwC report except for Ex. A thereto are printed exemplars of the first page only.  The full analyses of each if printed would run into thousands of pages 36 inches wide.  Accordingly, the full PwC attachments as Excel files on a CD have been provided separately as a courtesy copy to Chambers of the District Court Judge.  Plaintiffs' counsel were provided the report and full attachments in Excel files on a CD in October 2010.

[2] Some of these were after the April 21, 2010 date of the Excel version NIAC produced, but the vast majority were entered before April 21, 2010.

Christmas morning.  Parsi had no explanation for the addition of information from Talebi's Gmail account to Parsi's calendar.  (Parsi Dep. Vol. I, pp. 273-279, *Ex.* D).  Either Talebi was also involved in the editing, or someone else had access to his Gmail account and sent calendar entries on December 25, 2009 at 7:00 AM.  PwC's analysis confirmed that these three calendar entries were the only ones created on December 25, 2009; in fact, only two other entries (created December 23) were created during the entire period December 23-27, 2009.  Plaintiffs have provided no information from Talebi or Gmail as to who was using Talebi's account that morning.

PwC was not able to determine who deleted calendar entries after the date of the event because the computers had multiple users and PwC was neither permitted access to user information on the computers nor provided backups to the server.  (*See*, Ex. A, p. 11).  As is now known from NIAC's response to Defendant's motion to compel production of the server (Docket No. 131, Ex. B thereto), NIAC in fact did back up its original server.  PwC explained (Ex. A, p. 11; August 15, 2011 PwC Report, Ex. C to Docket No. 137) that access to such back ups (made before Parsi's Christmas weekend alterations of the calendar records) could have been useful in answering questions about when deletions and edits were made.

What is clear, however, is that edits were made to a number of the lobbying references in the April 21, 2010 Excel production.  In the version of Disney's calendar that NIAC produced in April 2010 (Ex. 9 to Parsi's Dep., not attached due to size), at least 82 of the references to "lobbying" were changed to "legislative direct" from the pst version recovered by PwC (attached to Parsi Dep. as Ex. 62, not attached hereto).  All of these entries were modified on February 23, 2010 at 5:31-5:32 PM.  The PwC imaging documents Parsi's paper

4

trail.  While the April 21, 2010 Excel calendars use the term "legislative direct," the recovered

pst files show two entries for each of these – an original using the term "lobbying" and

another changed on February 23, 2010 to "legislative direct."  Furthermore, Disney testified

that his calendars contained color codes for the different types of lobbying he was tracking

such as legislative lobbying, non-legislative lobbying, and community outreach.  (Disney

Dep., pp. 62-72, attached as Ex. E).  Parsi had no explanation for the omission of the color

codes or the word changes in the Excel calendars that he prepared and produced other than

that the "computer" might have made the changes in the exporting process.  (Parsi Dep., Vol.

2, pp. 297-307, attached as Ex. F).

While there is not enough time to go through all the 1,714 deleted entries or 5,270

unproduced entries, several are notable:  Selected calendar entries PwC restored from deleted

files are attached as Ex. G-1 and selected entries PwC found were not produced are attached

as Ex. G-2 (extracted from Exc. C to PwC report, Ex. A hereto):

- The 1/21/09 CNAPI meeting is listed on the calendars of David Elliott, Jamal Abdi,
  and Patrick Disney.  On Elliott's and Abdi's calendars it is listed as "lobbying."
  Disney's calendar has it entered twice – once on the correct date of 1/21/09 and again
  on 1/28/09.  The latter does not have the meeting classified as "lobbying" and this
  entry was revised 12/23/09, eleven months after the event.  (Ex. G-2).

- Another entry edited on Christmas weekend (12/23/09 at 6:18 PM) was a Disney
  2/26/09 meeting at the Rayburn Building regarding the Incidents at Sea bill.  In other
  words, the entry was modified ten months after the event.  (Ex. G-2).

- An 8/26/09 Kevin Cowl entry states, "Shared drive clean up."  (Ex. G-1 and G-2).

- A 10/14/09 Cowl entry states, "Brief call about Convio and Common Ground."  (Ex.
  G-2).

- Numerous entries refer to meetings at J Street.  (Ex. G-1 and G-2).

- A 12/3/09 entry relates a Progressive Office visit to: "Finish up server and Backup."
  (Ex. G-1 and G-2).

- A 11/3/09 David Elliott entry references "CLIPPI Training"; CLIPPI was a group whose publications NIAC originally withheld under a claim of privilege after Patrick Disney testified about them.  (Ex. G-1).

- Many references to SWIPA ("Standing with the Iranian People Act") were not produced and/or were deleted.  (Ex. G-1 and Ex. G-2).

- Many other references to CNAPI, meetings with congressmen or staffers, and preparation of materials for them were also not produced and/or were deleted.  (Ex. G-1 and Ex. G-2).

- Of the 17,000 calendar entries PwC recovered, 1,445 were last modified on December 23-27, 2009.  In other words, while these five days in 2009 comprise about 0.25% of the total dates 2006-10, 8.5% of the entries were last modified on those five days in December 2009, 40 times the expected rate.

As for the five-month gap in Parsi's 2006 calendar, Plaintiffs' counsel offered the following: "Dr. Parsi was a fulltime student in 2006."  (Docket No. 77, p. 4).  This "explanation" does not explain how Parsi managed to save about 300 entries from the other seven months of the year before and after the gap, when he also was a student.  As Parsi's emails and other documents make clear, the summer of 2006 was very busy for Parsi:

- In a 6/17/06 email, Parsi and Siamak Namazi of the Tehran consulting firm Atieh Bahar discuss a real estate deal.

- In a 9/6/06 email, Parsi received an email from Clayton Swisher regarding a meeting between Iran's former President Khatami and George Soros: "Had dinner at Zarif's [Iran's UN Ambassador] with Khatami et al.  You should know that Steve Clemmons talked you up a good bit to George Soros."

- In an 8/31/06 email, Baquer Namazi, co-chair of Hamyaran,[3] writes Trita Parsi, "Thank you for your efforts, all designed to serve our dear country."

- In a 5/31/06 interview, Parsi admitted to having met with Mohammad Nahavandian, assistant to Ali Lavijani, Iran's National Security Advisor.

- In a 5/25/06 interview with Gareth Porter, Parsi admitted that he was the person who got a copy of Iran's 2003 "Grand Bargain" from an "Iranian official earlier this year but is not at liberty to reveal the source." [http://www.antiwar.com/orig/porter.php?articleid=9040].  At his deposition, Parsi

---

[3] Hamyaran was an organization set up by Iran to oversee NGOs.  *See* fn. 5 to Defendant's Motion for Summary Judgment.

admitted that the person who gave him the proposal was Iran's Ambassador Zarif. (Parsi Dep., Vol. I, pp. 281-284, attached as Ex. I).

- An 8/23/06 email to Iran's Ambassador Zarif confirms Parsi's involvement in an effort to undermine the Bush Administration's Iran policy: "Hope all is well and that you are back from Tehran. Would love to get a chance to see the proposal or to understand more what it entails. If it is substantial, then certainly members of Congress may find it reasonable even if the White House doesn't."

(Emails and articles attached as Ex. H). At his deposition, Parsi's offered a different explanation for the five-month gap than his counsel had offered. According to Parsi:

> This is from the period in which there was
> no litigation hold and there are clearly some -- a
> period in which the calendar seems to have not been
> used or there's nothing entered from it.

(Parsi Dep., Vol. 2, p. 273, Ex. J). To complicate matters further, Parsi's laptop, which he testified he used for emails before he started using the desktop that was produced as his PC, was stolen in Oslo in May 2010; this laptop had never been backed up. (Int. Ans. Sept. 20, 2010, Ex. R; Parsi Dep., Vol. I, pp. 210-213, attached as Ex. K; *see*, Sec. F, *infra*).

As is now known from NIAC's response to Defendant's latest motion to compel production of the server and compliance with the July 1, 2010 and March 29, 2011 orders (Docket No. 131), the device that was NIAC's first server was one of the desktops withheld from imaging on the ground that it was only an "intern's machine." (*See*, Docket No. 137). Contrary to the representations of NIAC's counsel on August 12, 2010, there *were* pst files on that server; once Outlook emails are created on a PC, pst files are created. The fact that there were pst files on the server was confirmed by the testimony of a number of NIAC witnesses:

- NIAC's Asst. Policy Director, David Elliott (also the person NIAC tendered as the person knowledgeable about the production of ESI), testified: "All of the electronic docs were stored on the *server* and then sent to the lawyer." (Elliott Dep, pp. 103-104, Ex. L)

- Patrick Disney, Asst. Legis. Director, confirmed that Outlook email files were put onto the *shared drive*.  (Disney Dep., pp. 197-200, Ex. M).  He also testified that all the desktops were connected via a shared server.  (Id., pp. 28, 204)

- Parsi testified that during the discovery process done before June 2009, pst files were put onto the shared drive.  (Parsi Dep., Vol. I, p. 95, Ex. O).

- Babak Talebi, NIAC co-founder and director of community outreach, testified that NIAC had a *proxy server* used to connect all the computers and share documents.  (Talebi Dep., p. 163, attached as Ex. P)  He also presumed his PC was backed up onto the server.  (*Id.* at p. 167)

Even NIAC's counsel admitted that emails (psts) were on the server.  At the June 3, 2010 status conference, NIAC's counsel specifically stated:  "The server that the defendant continues to try to say was recently discovered was already searched based on search terms that were agreed upon by the parties.  *E-mails were provided a long time ago from that server.*"  (June 3, 2010 Trans., p. 13, emph. added).  NIAC's counsel also admitted at the March 4, 2011 hearing that "NIAC has a shared drive system and that shared drive system was with respect to the calendars."  (March 4, 2011 Trans., p. 19).  Accordingly, Plaintiffs' statements that the server was not produced because there were no pst files on it cannot be true.  Plaintiffs' September 20, 2010 Interrogatory Answer that the shared "drive was searched for responsive documents and does not contain any calendar files" is also false.  (*See*, Ex. R, Int. Ans. No. 7).  That server certainly contained pst files.  (*See*, Section B, *infra*).

PwC's third imaging attempt in September 2011 of the server and Talebi's PC revealed that more than 300 Talebi calendar entries from 2007-08 had been withheld.  (Ex. XX).  Dozens involved meetings with congressmen.  One created 7/24/08 states, "Briefing w/Khodabandeh."  In July 2008, Masoud Khodabandeh was prevented from coming to the United States by Homeland Security after Lord Corbett of CastleVale, MP and Chairman of the British Parliamentary Freedom Committee, wrote the U.S. Congress warning it that

Kodabandeh and his wife were "agents" of the regime (and that Parsi was also a "well-known lobbyist for the Iranian Regime").  (*See*, Ex. N to Defendant's Motion for Summary Judgment).  An entry created 11/14/2008 is described as "meeting re Salesforce."  A 6/19/2008 meeting with Fariba Hastrudi is noteworthy as Ms. Hastrudi has been reported to have left the MEK and returned to Tehran.  *See*, www.nejatngo.org/en/topicv.aspx?id=60.

**B.     Failure to Produce Server for Imaging**

For a detailed history of the efforts to which Plaintiffs have gone to prevent the ordered forensic imaging of their original shared server and recently disclosed backups, s*ee* Docket Nos. 112 and 137.  For a list of the various computers that NIAC produced in August 2010 compared to those it admitted owning on December 17, 2010 and July 8, 2011 compared to those Progressive Office found during its audit in December 2009, *see* Ex. E to Docket No. 137.

In short, after NIAC failed to produce complete, unedited native Outlook calendar files on two separate occasions, the Court ordered NIAC and Parsi on July 1, 2010 to produce NIAC's shared  server for imaging.  As discussed above (Sec. A),  instead of producing the server, Plaintiffs produced eight PCs under the pretext, since admitted to be untrue, that there were no pst files on the server.

At the September 16, 2010 status conference, NIAC's counsel repeatedly denied that NIAC had a server.  (See Docket No. 112 and 237).  Now NIAC has admitted that at the time it informed the Court it had no server, it had *two* servers. (*See*, Docket No. 112).  As Defendant later learned from third-party discovery of NIAC's computer consultant, the PC NIAC produced as Parsi's was not even connected to NIAC's network in December 2009 (*see*

Docket No. 87).  On March 29, 2011, the Court again ordered NIAC to produce the server for imaging or, alternatively, to produce all of its unproduced PCs for imaging.  The latter part of this order put NIAC in a corner as the server was, in fact, a machine it had withheld from imaging as merely an intern machine (*see*, Docket No. 137).  In effect, the Court's order directed NIAC to "produce the server or produce the server."

In response to the Court's unequivocal direction, in April 2011, NIAC turned over to PwC for imaging a *new* server onto which files had been "migrated" from the old server. Unless the files from the old server were forensically imaged and transferred to the new server, deleted files would not have been migrated and the purpose of imaging the first server would have been successfully evaded.  (*See*, PwC August 15, 2011 PwC Report, Ex. C to Docket No. 137).  Before filing yet another motion to compel production of the original server, Defendant attempted to learn the basis on which NIAC had failed to produce the original server and was told that the original server "may not be operational."  (June 11 Nelson email, attached to Docket No. 112 as Ex. H).[4]  Accordingly, Defendant filed another motion to compel production of the server on July 1, 2011.  Plaintiffs' response (Docket Nos. 131-32) claimed nothing "irregular" in its failure to produce the original server, accused PwC of violating industry standards and the Court's order, and claimed that Defendant should not get a "third bite" at the imaging apple.

At the December 17, 2010 hearing, NIAC produced a complete list of computers in NIAC's offices:  "They can check it against what PwC gave them, they'll be able to determine that we gave them all the computers that would be relevant for the purposes of imaging." (December 17, 2010 Trans., p. 20; list attached as Ex. C to Docket No. 112).  In Plaintiffs'

---

[4] PwC's September 2011 imaging uncovered no operational problems with this server.  (*See.* Ex. XX).

July 1, 2011 Response to Defendant's motion to compel production of the server (Docket No. 131, Ex. B), Plaintiffs attached yet another list of NIAC computers that showed, in fact, NIAC had *eleven additional devices* that were omitted from the December 17, 2010 list.  (For a complete list comparing the PCs NIAC produced to PwC to those it claimed to possess on December 17, 2010 and July 1, 2011, *see* Ex. E to Docket No. 137.)

Again, on August 30, 2011, Plaintiffs were ordered to produce the original server and any other drives on which Outlook calendar files were located.  Costs of bringing that motion were assessed.

The PwC imaging of September 2011 (Ex. XX) revealed hundreds of calendar entries on the server and back-up drive.[5]  The server and back-up driver contained 72 pst files with calendars, 20 of which had not been produced before and which contained over 500 calendar entries.  (By comparison, the first eight machines imaged in August 2010 contained 87 pst files with calendar entries.)  Over 300 unproduced Talebi calendar entries from 2007-08 were discovered on the machine withheld as an "intern" machine.  (*See,* Ex. D to Ex. XX hereto).

The Parsi registry information (Ex. F to PwC report, attached as Ex. XX) was most revealing.  It showed that the desktop Parsi claimed to be using for his emails and calendar had not been used by him since August 5, 2010 (*i.e.*, two weeks before it was imaged).  Moreover, it showed he had not used it for Outlook calendars or email since June 5, 2010, exactly two days after the status conference in this case in which the Court ruled it would be ordering forensic imaging.  (*See* June 3, 2010 Trans.).  Since Parsi's laptop was stolen May 5, 2010 in Norway, this raises the question as to how Parsi did Outlook emails and calendars

---

[5] As with PwC's report of the first imaging, a courtesy copy of the September 16, 2011 report with the Excel analyses on CD has been provided to chambers of the District Court Judge.

after June 5, 2010, as his September 20, 2010 sworn interrogatory answers make it clear he did not use his new Apple MacBook purchased in Norway for such.  ("Parsi's current laptop was not provided to [PwC] as it does not contain any pst files and was procured several months after the period for which forensic imaging was ordered.")[6]  (*See*, Ex. R).  The registry imaging also makes clear that Parsi's sworn September 20, 2010 statement that, "Parsi does use a desktop computer for emails, calendars, and document process, which desktop computer was provided to [PwC] for imaging on August 18, 2010" cannot be true. He had not used that machine for Outlook emails and calendars for nearly four months when he made this statement under oath.  So, after June 5, 2010 Parsi was not using the desktop, stolen laptop, or new laptop for Outlook calendars.  But, since the interrogatories (Ex. R, hereto) asked him to identify all computers used for such and no others were identified, he either:  (1) did no Outlook emails/calendars after June 5, 2010; (2) used the Apple MacBook for such and thus attested falsely; (3) used the "stolen laptop" for such and thus attested falsely; or (4) used an unidentified machine for such and thus attested falsely.[7]

**C.**     **Failure to Produce the Talebi Emails**

The Talebi emails were the subject of numerous defense motions including Docket Nos. 52, 63, 76, and 87 as well as four Court orders (March 5, 2010, August 6, 2010, March 29, 2011, and April 5, 2011).  In the end, the Court found that NIAC had improperly withheld 5,500 emails by its former Director of Community Outreach and ordered all of his emails to be produced.  This was the second order compelling production of Talebi's emails.

---

[6] The court first ordered forensic imaging on June 3, 2010, one month *after* Parsi procured the new Apple MacBook.  Moreover, none of the Court's imaging orders limits calendar forensic imaging to *any* date.

[7] The August 18, 2010 imaging (Ex. C to PwC report, attached as Ex. A) shows a similar pattern regarding Parsi's Outlook calendar use on his desktop.  While PwC recovered over 5,500 calendar entries from 2006-10, only 253 were created after January 1, 2010.  In other words, either he dramatically reduced calendar usage by about 75% in 2010 or he was using Outlook calendars on another device.

On July 1, 2010, the Court previously held that Plaintiffs' withholding of the emails under Plaintiffs' "community work" exception was improper.  On August 24, 2010, Plaintiffs produced about 2,500 of the 8,000 emails.  The rest were withheld as, according to Plaintiffs' sworn interrogatory responses, they contained no search terms or were not responsive.  The Court's April 5, 2011 order found that to be untrue.  And, NIAC ultimately conceded that the machine on which these Talebi emails were located was yet another "intern machine" it had withheld from imaging.  (*See*, Docket No., 112, p. 2).[8]  On April 5, 2011, the Court held:

> Based on its review of plaintiffs' submission, the Court finds that NIAC has, in fact, withheld responsive e-mails relating to Talebi.  Such e-mails include, but are not limited to: (1) a July 2008 e-mail from Talebi explaining that NIAC, as a tax-exempt 501(c)(3) organization, "can 'advocate' but not 'lobby'"; (2) a NIAC "Phone Outreach" memorandum circulated in September 2008, discussing NIAC's sources of funding, whether NIAC supports the Iranian government, whether it is a lobbying group, and why it has chosen to sue defendant; (3) several e-mails that mention defendant's alleged defamation of NIAC; and (4) a June 4, 2005 NIAC presentation entitled "Demystifying Democracy: The Ingredients of Influence," which provides an overview of NIAC's "[s]even ingredients to influence" lawmakers.  Such e-mails are undoubtedly "responsive" to defendant's requests -- first made as early as February 2009 -- for the production

---

[8] This would also explain why, notwithstanding many requests for Talebi's Outlook calendars, none were ever produced.  Talebi is shown as having been copied on many of Parsi's and Blout's calendar entries, yet no separate calendar for Talebi was ever produced.  He was a co-founder of NIAC in 2002 and left in late 2008.  Had the "intern machine" with Serial No. jjnc891 been produced for imaging by PwC in August of 2010, Talebi's calendar entries likely would have been located and available for Defendant's depositions of Parsi and Talebi.  As discussed above, Talebi's PC, misdescribed as an "intern" machine, contained over 300 calendar entries.

of (1) all documents referring to NIAC's "lobbying, exercising political influence, taking positions on United States policies, or persuading United States political officials," <u>see</u> Def.'s Mem. [Docket Entry 52], Ex. 1, Def.'s First Request for Production ¶ 14; and (2) "[a]ll documents relating to Hassan," <u>id.</u> ¶ 2. Significantly, NIAC has not purported to withhold these e-mails on the grounds that they are privileged or subject to the work-product doctrine; rather, NIAC has only maintained that these e-mails are "non-responsive" or do not contain "search terms."

That is simply incorrect. Not only are the e-mails mentioned above responsive to defendant's requests for production, but the Court identified these e-mails by searching for obvious terms such as "lobbying," "Hassan," and "Iranian government." Although the Court did not conduct a comprehensive review of every e-mail submitted by NIAC, it is not this Court's responsibility to parse through thousands of e-mails to determine those that are responsive and those that are not. That was NIAC's job, which it has totally failed to complete in a satisfactory manner.

A quick review of several of the withheld emails confirms the Court's findings. (Attached at Ex. Q are just 16 of the 5,500 emails and attachments that were withheld until April 2011. An April 23, 2007 memo to Parsi and Talebi and NIAC's entire board from NIAC's outgoing Legislative Director on NIAC's lobbying strategy is enlightening:

### US-Iran Overall Strategy
Our input on the Hill and among the nonprofit DC community to present the Iranian American perspective and push for a prevention of war has been invaluable. The movement for peace has borne fruit with the growing number of US authorities denouncing war and favoring diplomacy. The release of the Iraq Study Group report further validated NIAC's analyses and positions on US-Iran relations since it called

for diplomatic action, something that NIAC advocated several months prior to the report's release.

The struggle to improve relations with Iran is consistently bogged down by hostile rhetoric and the advancement of sanctions and now such initiatives are moving at the state and local level.  Congress' acquiescence in the face of AIPAC driven sanctions is undermining the US-Iran diplomatic process and this message is not emphasized enough among the grassroots.   The peace movement is split on the issue of sanctions. This debate remains an opportunity to build stronger partnerships with business groups like USA Engage and the Chambers of Commerce.

**Recommendation**
NIAC should more forcefully lead the effort against sanctions and develop resources and information about their threat to diplomacy. Coordinating with local Iranian American leadership to track and establish a presence that can raise questions and counter state sanctions policies as frequently as possible—this may involve travel to testify at state-level hearings.  If these measures pass the state legislatures, our offices must be prepared to write to the Governors of the respective states (CA, MA, GA, MO, etc) to ask them to reflect before signing off on such legislation.  One measure's passage will set a terrible precedent.

**Capitol Hill Meetings**
After having engaged in roughly 100 meetings with Congressional staff, it is clear that NIAC's presence on the Hill is becoming a fixture.  We have made the most significant strides within the Progressive Caucus, where NIAC has participated in briefings and panels involving members and had the highest frequency of staff-to-staff and member to member contact.  NIAC along with the Center for Arms Control, OSI and others continues to play an integral role in Hill consultations with offices that are most interested in our work.  NIAC's influence was also a driving force behind the bipartisan Congressional Dialogue Caucus, led by our friends Reps. Wayne Gilchrest (R-MD) and Gregory Meeks (D-NY).  Centrist Republicans such as Sens. Chuck Hagel (R-NE), Dick Lugar (R-IN), and Arlen Specter (R-PA) are also supporters of our work.

Blue Dog Democrats and the Republican Rank and File have been our most difficult obstacles.  On the other hand, evidence indicates that our friends in the Progressive and moderate Republican community are far from unified on the topic of sanctions or regime change.  Sen. Gordon Smith (R-OR), a self-proclaimed friend of the Iranian American community, expressed his support for dialogue at one function, then introduced a harsh Iran sanctions measure in the Senate less than a month later.  One progressive caucus Democrat approached Trita Parsi and cautioned him on his support for diplomacy then called on him to back the MEK.  Also, Speaker Pelosi (D-CA) is reported to back at least some form sanctions legislation out of the House.

**Recommendations**
Because progressives and Republican doves remain divided on the issue of sanctions, dialogue and the nuclear program, NIAC should continue drumming up support from the progressives and moderate Republicans so that NIAC's leadership can shape a formal and lasting stance for these offices and affiliates. Our allies can benefit from much greater unity and leadership in the effort to achieve diplomacy and opposition to sanctions. Focusing on the US's economic incentives for normalizing relations with Iran to convince the Blue Dogs and Republican rank and file is another goal (although this may not yield results because of AIPAC's unwavering influence among these groups). Working to testify before a Congressional Committee about the Barriers to Dialogue is something that NIAC reps can also do to further improve our profile. Trita's forthcoming book will provide an opportunity for him to testify before Congress and mention the poll and the views of Iranian Americans.

(Ex. Q - 1).

In a February 15, 2008 email, "Sima T" requests of NIAC: "Please kindly remove my name from all future emails." (Ex. Q - 10). Talebi instructs his assistant: "Remove from SF." (*Id.*)

In a November 3, 2007 email regarding a fundraiser, Parsi suggests a congressional candidate be given 15-20 minutes to speak: "This is critical since she is a candidate that may replace a somewhat pro-war incumbent." (Ex. Q - 12). Another omitted document was a July 25, 2007 RSVP list of attendees at a NIAC function that included dozens of Congressmen and 10 staffers. (Ex. Q - 13).

A July 2, 2008 email from Parsi to Blout about Rep. Barney Frank entitled "VERY IMPORTANT" instructs Blout: "We should make sure he either eliminates Section 3 or gets off the bill." (Ex. Q - 14). What is interesting is that Rep. Frank's letter was in response to "one of [NIAC's] letters" sent by a Carol Coakley of Millis, Massachusetts, clearly part of a "grass roots" anti-sanctions lobbying effort orchestrated by NIAC.

So, over three years into the case and after more than a dozen depositions where such emails could have been used, NIAC finally produced the remaining 5,500 emails. (More than 1,300 of the emails were to or from Parsi and more than 500 to or from Blout.) Along the way, in their various attempts to derail this production, Plaintiffs made numerous statements that were simply untrue or baseless:

- o In July 2010, NIAC's counsel stated that these emails were found in "an overlooked database." (Docket No. 69, p. 6). As discussed above, these were found on Talebi's computer represented by Plaintiffs to have merely been an intern's computer.

- o On September 24, 2010, Plaintiffs stated in interrogatory answers that the Talebi emails contained no search terms or responsive documents. (Attached as Ex. S). They claimed that after "exhaustive reprocessing" of the 8,000 emails only 2,500 of the emails were discoverable. (*Id*.).

- o On March 4, 2011, NIAC's counsel stated in court that these emails were reviewed and a "good faith determination was made that they were not responsive to the discovery request[s]." (Trans., p. 55).

- o NIAC's threats when the Defendant initially asked about these emails: "We have addressed this issue ad nauseum and will be forced to take up the matter with the Court should it continue"; and "It is clear you are on a fishing expedition and unfortunately your expedition has turned into nothing more than a form of continuous harassment, something we will take up with the Court if necessary" were now clearly a smokescreen. (Parsa letter of February 4, 2010, attached as Ex. T).

- o At Parsi's May 11, 2011 redeposition, Parsi disclaimed any involvement in the determination to withhold the Talebi documents; rather, while not disputing the discoverability of the documents, he claimed that counsel made the decision not to produce these. (Parsi Dep., Vol. 3, pp. 175-179, 208-216, attached as Ex. U).

Unfortunately for Defendant, not only was the effort to obtain these ultimately responsive and highly relevant, non-privileged documents extremely burdensome, but Plaintiffs successfully delayed producing the documents until after the depositions of Talebi, Blout, Disney, and all three of Plaintiffs' experts.

**D.**      **Failure to Produce Other Emails**

Given these difficulties in getting responsive information from Plaintiffs for one reason or another, Defendant had to resort to subpoenaing third-parties for Plaintiffs' emails. Attached are examples of some of these:

1.  Campaign for a New American Policy on Iran ("CNAPI")  (Ex. V);

2.  Children of Persia (Ex. W);

3.  Puneet Talwar at the National Security Council (Ex. X);

4.  Hillary and Flynt Leverett (Ex. Y);

5.  Joel Morse (Ex. Z); and

6.  Col. (Ret.) Samuel Gardiner (Ex. AA).

The failure to produce any of the CNAPI emails is troubling in that 80% of Patrick Disney's salary was financed by George Soros's Open Society Institute to run CNAPI.  How is it that CNAPI's offices had these emails, many to and from Parsi and Disney at their NIAC email addresses in 2008-09, but NIAC and Parsi did not have them?

The Children of Persia emails are very enlightening.  They reflect Parsi's early efforts to establish a lobby strategy.  These contain a discussion on lobbying laws in June 2001 including the limits the IRS places on lobbying by 501(c)(3) entities.  These also include a June 23, 2001 email from Parsi which states:

> "I assume everyone has been busy, but it would be good if we could finish the minutes by Tuesday so that we can follow Mr. Baquer Namazi's instructions and send it to Amb. Bill Miller."

Namazi was the co-chair of Hamyaran and father of Siamak Namazi, principal in the Tehran consulting firm, Atieh Bahar.  Bijan Khajepour of Atieh Bahar transferred funds into Parsi's bank account.  (*See*, Ex. HH to docket No. 130).  Namazi sent Parsi an email on August 31,

2006 thanking Parsi for his "efforts all designed to serve our dear country."  (*See*, Ex. AA to Docket No. 130).

The emails with Puneet Talwar (at the NSC) are also interesting.  They reflect Parsi's efforts to set up a meeting with Talwar and Paolo Cotta of Pugwash regarding meetings in Europe where Parsi admitted meeting with Iranian officials.  (*See,* Parsi Dep., Vol. II, pp. 225-229, attached as Ex. BB).  Talwar, who was deposed in this case, testified that he never authorized Parsi to meet with Iranian officials.  (Talwar Dep., pp. 28-30, attached as Ex. CC).

Hillary and Flynt Leverett produced at least five emails on engagement and U.S-Iran relations not produced by Plaintiffs (Ex. Y).  The Leveretts and Patrick Disney actually met with Iran's President Ahmadinejad when he was in the United States in September 2009 at a meeting arranged by the Leveretts.  *See*, http://talkingwarheads.com/2010/09/26/the-paradox-of-talking-to-ahmadinejad/.

In response to a subpoena for the documents supporting his damages opinion, Plaintiffs' expert, Professor Joel Morse, produced 168 emails to NIAC from various Iranian-Americans purportedly showing unfavorable opinions of NIAC allegedly caused by Defendant.  Most, if not all, of these were never produced by NIAC.  Attached (Ex. Z) are selected examples.  One is a cartoon depicting Parsi as a puppet being manipulated by Ayatollah Khamenei.  A number of others are blog entries or emails to NIAC and Parsi accusing them of being representatives of the IRI and not speaking for the interests of Iranian-Americans, some even asking to be removed from NIAC's mailing list.  One, a February 18, 2008 email to Maz Jobrani from Zolal states about NIAC employee and board member, Dokhi Fasihian:  "I have known Dokhi Fasiahian and her mother for over 17 years, Dokhi's mother

was my Farsi teacher in the early 90s.  So you know, her mother was thrown out of our Farsi

school (headed by Mrs. Hajian) after nearly 10 years because her relations with Iran's

intelligence ministry were revealed, and it turned out she had gathered information from many

families and given it to the regime."   Several other emails reflect NIAC's efforts to counter

Defendant's publications.  A number of others from January/February 2008 reflect the efforts

of the Mission for the Establishment of Human Rights in Iran ("MEHR") to prevent Amnesty

International from having NIAC participate in a panel at UCLA in February 2008.  NIAC has

attempted to blame Defendant for disrupting this event.  (*See*, Plaintiffs' Responses to

Defendant's First Set of Interrogatories, July 17, 2009, No. 4(c), attached as Ex. N).

Similarly, Defendant subpoenaed another NIAC expert, Col. (Ret.) Samuel Gardiner,

who produced hundreds of pages of communications with NIAC (Ex. AA).  Among other

things, these discuss a NIAC event on the Hill, a meeting with Ambassador Zarif, a meeting

in Lichtenstein (attended by Gardiner, Parsi, and Iranian officials), and a meeting at the

Department of State attended by Disney where the end of the Democracy Funding Program

(that NIAC opposed) was discussed:  "Getting rid of the 'regime change slush fund' is a good

will gesture . . . ."  Only three of these were produced by NIAC.

It is not clear what efforts were made to search for documents on NIAC's internet

service provider ("ISP") email server.  David Elliott testified that emails were deleted from

the ISP email server after ten days.  (Elliott Dep., pp. 100-101, Ex. DD).  Plaintiffs' counsel

represented to the Court that "All emails are maintained on the user's workstation . . . There is

no cloud provider or offsite data archives."  (Docket No. 131, p. 3).  However, on March 11,

2010, the day before the deposition of Mohammad Mansouri (whose NIAC-supplied

computer "broke" and was discarded), NIAC managed to retrieve and produce dozens of emails from NIAC's external email server dating back three years.  (*See*, Ex. D to Docket No. 137).

Similarly, there are serious questions about the adequacy of any search for discoverable documents on the PCs of each staff member.  Patrick Disney testified that Parsi instructed them not to even turn over to counsel documents they considered "privileged." (Disney Dep., pp. 206-209, Ex. EE).  Each individual reviewed his own files for responsiveness and privilege; these determinations were not reviewed by counsel or others for consistency.  (*Id.*).  A March 19, 2009 calendar entry reflects that NIAC's staff met to discuss what documents were to be "considered privileged."  However, no privilege log was produced by NIAC until March 6, 2011; that log was produced pursuant to the Court's order and was limited to legal advice on lobbying laws.  Elliott testified that employees were instructed not to produce "nonlobbying" documents.  (Elliott Dep., p. 113, Ex. FF).  Given that Blout had no idea what lobbying was, it is not clear how employees could have made this determination. (Blout Dep., pp. 90-110, Ex. GG).  In fact, Blout testified, "I didn't consider what NIAC did or anything I was doing as lobbying."  (*Id.*, pp. 109-110).  As discovery in this case is not limited to lobbying documents, it is not clear on what basis NIAC produced and preserved various documents.  This certainly leads one to question how each staffer determined what was "privileged" or was not discoverable among the emails and other documents withheld.

To further put into perspective the inadequacy of NIAC's email productions, one need simply refer to the overall numbers.  Prior to NIAC's turning over more than 8,300 Talebi emails pursuant to two court orders, Plaintiffs had produced approximately 6,400 emails. This is for an organization in existence for over seven years and with somewhere between 13

21

and 24 computers and about ten employees.  How is it that one employee who left in 2008

produced more emails than the entire NIAC staff, including its founder and president of seven

years?  In comparison, Defendant produced approximately 4,400 emails and he only began

writing about NIAC and Parsi in 2007.

> **E.**      **Failure to Produce Salesforce and Membership Databases**

NIAC's membership databases have been the subject of at least three status

conferences (December 17, 2009, March 4, 2011 and June 2, 2011) and two Court orders

(March 29, 2011 and August 30, 2011).  For a detailed discussion relating to Defendant's

efforts to obtain membership information, *see* Docket Nos. 87, 113 and 136.

The efforts to obtain the Salesforce and other membership lists began when Defendant

noticed references to "SF" in the calendars NIAC had been withholding (*see*, Sec. A, above):

"How to freakin use SF" and "Meet with MM re SF."  (Attached as Ex. HH).  On July 22,

2010, Defendant mentioned this "SF" database in his response to Plaintiffs' motion to

reconsider the July 1, 2010 imaging order and Plaintiffs responded:  "NIAC has not employed

any such software and is therefore unable to comment about this unfounded claim by

defendant."  (Docket No. 77, fn. 1).  On August 4, Defense counsel wrote Plaintiffs' counsel

asking for any "'SF' software/records" and Plaintiffs' counsel responded:  "NIAC is not

aware of any 'SF' software."  (Email exchange attached as Ex. II).  As even Trita Parsi

referred to the Salesforce database as "SF", NIAC clearly was aware of and was using it –

whether called "SF" or "Salesforce" – for membership information.  (*See*, Parsi April 4, 2008

email to Babak Talebi, attached as Ex. JJ).

By the time of the September 16, 2010 hearing, Defendant had solved the "SF" acronym and asked NIAC specifically where the "Salesforce" database was and to produce it. NIAC then fell back on another explanation, claiming that it only used Salesforce for "a very short period of time we did experiment with this for a time." (September 16, 2010 Trans., p. 9). Plaintiffs' counsel later described the use of Salesforce as "sporadic" and "discontinued," even claiming "our client does not have access to that information as we understand it." (*Id.*, pp. 9-10). When Defendant pressed for the Salesforce data, Plaintiffs reiterated at the December 17, 2010 hearing that they did use the "meeting notes" feature of Salesforce for "only a short period of time." (December 17, 2010 Trans., pp. 20-21). However, they explained, working with the Salesforce technical representative they managed to download the information as of "late last night" and "it was approximately 196 entries. 190 entries. It was a very small number of entries because they did not use this tool very long." (*Id.*). Current and former NIAC employees contradicted these representations:

- o Patrick Disney, Assistant Legislative Director, testified that "everyone" in the office used it and NIAC had been using it since before he began in May 2008. (Disney Dep., pp. 14, 225- 226, attached as Ex. KK).

- o Babak Talebi, NIAC co-founder and Community Outreach Director, testified that NIAC used Salesforce extensively from 2007-08. (Talebi Dep., pp. 151-163, 183-184; Dep. Exs. 22-33, attached as Ex. LL). According to Talebi, NIAC used SF to track meetings with members of Congress, phone calls, and member outreach. (*Id.).*

- o Trita Parsi eventually testified that Salesforce had been in use even prior to 2006 (Parsi Dep., Vol. II, pp. 309-316, attached as Ex. MM) and that the membership data was migrated to a new product, Convio, in early 2010. (*Id.*).

NIAC's own emails, documents, and calendars show it used and relied upon Salesforce extensively from 2006-09 to track members and meetings with congressmen/staffers. (Attached as Ex. NN are eleven examples of such use). On February 15, 2011, NIAC finally

produced the "meeting notes" records from the Salesforce database and these contained over 171,000 entries from 2004-10.  (*See*, Ex. J to Docket No. 113).  As for the actual membership information from Salesforce, NIAC finally produced five Excel files for those on March 2, 2011 (although the metadata showed that these files had been created in May 2010).  (*See*, Docket No. 113, pp. 4-5).

As NIAC had ceased using Salesforce in 2010, NIAC was ordered to produce its entire, current membership data from the new database (known as "Convio") on March 29, 2011.  As of July 1, 2011, Plaintiffs had produced from Convio only a list of 116 former members and 9,000 transactions; they had not provided a current list of paid and/or expired members.  (*See*, Docket, Nos. 113 and 136).  Defendant moved to compel production of the complete list of current (including expired) members from Convio on July 1, 2011.  On August 30, 2011, the Court granted the motion including an award of costs.  Plaintiffs finally produced these two lists on September 6, 2011.[9]

### F.      Parsi's Stolen Laptop and Disappearing Desktop

As discussed above, instead of producing the shared server for imaging on August 18, 2010, NIAC showed up with several desktops.  Initially *no* laptops were produced.  When defense counsel asked why no laptops were produced, a *single* laptop was produced.  It was the laptop of Arsalan Barmand.  (*See*, Ex. A to PwC report, Ex. A hereto).  No laptop was produced for Trita Parsi.  When defense counsel showed NIAC's counsel a picture from an article on Iranian.com showing Parsi using a laptop, NIAC explained that the laptop had been

---

[9] The September 2011 list of active/paid members contained 1,213 names.  The 2007 list produced previously showed 845 members.  Two other lists produced after Defendant's articles started appearing showed 990 (December 2007) and 1,048 (April 2008) members.  The May 2010 Salesforce "contacts" list showed 1,069 members.  (*See*, Docket No. 136, p. 7).  Thus, NIAC's records show a steady increase in membership from before and through the period of Defendant's articles.

stolen at a hotel in Oslo without ever having been backed up.  (*See*, August 18 email exchange

attached as Ex. OO).  When defense counsel inquired about the desktop that NIAC produced

in lieu of Parsi's current laptop, NIAC responded:  "This is the desktop with Dr. Parsi's

Outlook calendars ordered by the Court to produce."  (8/20/10 Jensen email to Parsa, Ex. PP).

As discussed above (Sec. B), an audit by NIAC's own computer consultant showed that the

purported Parsi desktop was not connected to NIAC's network in December 2009, although

Parsi attested in November 2010 that he had been using this machine since the beginning of

2009.  (Parsi's Responses to Defendant's Interrogatories dated Sept. 24, 2010, attached as

Ex. R).  Parsi later testified that he had no desktop PC before 2009 and used the laptop for

NIAC emails in 2008.  (Parsi Dep., Vol. III, pp. 139, Ex. QQ).  As discussed above in Section

B, the PwC imaging of the registry of Parsi's desktop showed he stopped using this desktop

for Outlook emails/calendar on June 5, 2010, and stopped using it at all on August 5, 2010,

raising questions as to how he even sent/received Outlook emails (with his laptop stolen and

his new Apple MacBook not used for such) after June 5, 2010.

   Parsi claims that the stolen laptop was never backed up.  (Parsi Dep., Vol. I, pp.

210-213, Ex. RR; Int. Resp., Ex. R).   Parsi initially testified that he used another desktop

before the current one and that the files were transferred from the old one and then the old

desktop was given to an intern.  (*Id.*)  He then changed his testimony to say that he never used

a desktop before the one he used in 2009; he only had a laptop (which was stolen).  (*Id.*)

Defendant's requests to allow PwC to access registry information and user habit information

on Parsi's purported desktop in order to determine how and when those Outlook files were

used on the desktop were refused by NIAC and Parsi.  PwC's registry imaging revealed why –

the desktop had not been used for such since June 5, 2010, two days after forensic imaging was first ordered.  (*See*, June 3, 2010 Trans., pp. 15-16).

The theft of the laptop in Oslo in May 2010 also raises questions.  The laptop was reported stolen to the police on May 6 (having occurred at sometime after 6:40 PM on May 5 according to Parsi) and by 3:43 PM on May 6 the hotel had purchased a new laptop for Parsi including warranty and new Targus case.  (Records attached as Ex. SS).  Even more puzzling is that the hotel bought Parsi a new Apple MacBook, rather than a laptop with a Microsoft operating system as with his prior laptop and every other machine on the NIAC network. (*Id.*).  Plaintiffs refused to produce this laptop for imaging as it would not have contained any Outlook pst files.  (*See*, Ex. R).  However, this *assumes* calendar entries were not loaded onto it; the desktop he had been using since only January 2009 had entries from 2006-08 so calendar entries had to have been transferred onto it from somewhere else.  Why would Parsi not have done the same for a laptop he takes all over the world?  The survey of Real Analysis showed that as of July 2011, the Apple laptop purchased for Parsi was connected to NIAC's network (Ex. B to Docket No. 131) indicating that Parsi *did* use it for NIAC work.

### G. Redepositions of Parsi and Blout

On March 5, 2010, the Court ordered Plaintiffs to produce former Legislative Director, Emily Blout, for another deposition because Defendant did not have access to the calendar records that Blout revealed during her first deposition.  While she was redeposed September 1, 2010, Defendant still did not have access to the 8,000 Talebi emails or membership databases and Salesforce meeting notes produced in 2011.

Similarly, because relevant and responsive materials had not been produced prior to the first two days of Parsi's deposition in December 2010 (*see*, Docket No. 87), the Court on March 29, 2011, ordered Parsi to sit for a third day of deposition.  On May 11, 2011, Parsi sat for this deposition.  At that deposition, Parsi refused to answer,  a question as to whether he had ever sought any advice as to the legality of his numerous meetings with Iranian governmental officials (specifically excluding the substance of any conversation).  This was the subject of a motion to compel filed July 8, 2011 (Docket No. 121).[10]  As to the notes of the hundreds of meetings Parsi had with Iranian officials cited in his book, Parsi could not recall where he kept the notes or when they were discarded; he just knew he no longer had them.  (Parsi Dep, Vol. III, pp. 132-135, attached as Ex. TT).[11]

**H.       Editing of Seven Year-old IIC Document Before Production**

One last area needs mention.  In 1997, Trita Parsi, along with a couple of others later involved in NIAC (Babak Talebi and Alex Patico), formed IIC, a self-described lobby group: "We aim to protect Iranian interest."  (*See*, Docket No. 130, pp. 4-5).  IIC phased out of existence in 2002 when NIAC was created.  In the course of discovery, Parsi produced two "Frequently Asked Questions" ("FAQs") for IIC (attached as Exs. WW-1 and WW-2).

---

[10] This motion subsequently became moot when Plaintiffs represented to the Court that they would not introduce any evidence that they were not engaged in illegal lobbying.

[11] Trita Parsi's book has 235 citations to meetings with Iranian governmental officials, yet none have been produced in the litigation.  At his deposition, Parsi could not recall where he kept the notes of these meetings nor when he discarded them.  (Parsi Dep., Vol. 3, pp. 132-135, Ex. TT).  Given the obvious value of these and the fact that Parsi currently has another book on Iran-U.S. relations in press, one would have thought these had great value to him and he would have backed them up or at least recalled what became of them.  Parsi's failure to save these (and back up his machine) is not consistent with his practice.  In a May 2006  email he stated:  "I send it [to] you as I send it to myself since my Outlook is a news archive going back to 1997 and I save everything that has the potential to be useful down the road."  (Attached as Ex. UU).  He testified that he did not understand that his laptop was subject to the litigation preservation requirement as it was his personal laptop.  (Parsi Dep., Vol. III, pp. 130-131, attached as Ex. VV).  However, he also testified that he did not have a desktop at NIAC for his NIAC emails in 2008; rather, he used this laptop for his NIAC emails.  (Parsi Dep., Vol. III, p. 139, Ex. QQ).

Defendant located in internet archives sites similar FAQs for IIC dated November, 25, 2008 (attached as Ex. WW-3).

Ex. WW-1 refers to IIC as a "lobby" group.  Metadata for the file show it was created and last modified on June 12, 1999.  Ex. WW-3, the web archive version of the FAQs, also refers to IIC as a "lobby" group.  Ex. WW-2, which Parsi produced in discovery, however, refers to IIC as an "advocacy" group.  The metadata for that file (Ex. WW-2) shows it was created and last modified April 6, 2009, seven years after the organization ceased operating and a month before it was produced to Defendant.  It appears therefore that Plaintiffs altered Ex. WW-2 before producing it.  Unfortunately for Plaintiffs, the 1999 version slipped through (Ex. WW-1) and another contemporaneous version on the internet (WW-3) confirmed that IIC considered itself a "lobby" organization.

**III.     Legal Authorities Regarding Sanctions**

Plaintiff's discovery abuses regarding the above eight areas vary and fall into one or more of the following five levels of conduct:

  i.   Failure to preserve discoverable evidence after suit authorized/commenced;

  ii.  Failure to produce discoverable evidence;

  iii. Deletion/destruction of evidence;

  iv.  Editing/altering of evidence; and

  v.   Lack of candor with opposing counsel and court.

In most of the eight factual areas above several or, in some cases, all of these tactics were employed.  This section addresses legal authority for sanctions for each of these five levels of conduct.  The following section then discusses which levels of conduct were implicated in each of the areas of discovery abuse.

28

A. **The Court Has the Authority to Impose Sanctions**

A court's power to impose sanctions for discovery abuses is a bedrock legal principle enshrined in the Federal Rules of Civil Procedure and the well-tread case law of this and other federal circuits.  Not only has this power been recognized for centuries as inherent to a court's authority, *see, e.g., Shepherd v. ABC*, 62 F.3d 1469, 1474 (D.C. Cir. 1995); *United States v. Hudson*, 11 U.S. 32, 34 (1812), but Rule 37(b)(2) empowers courts to issue orders "as are just" to sanction parties that fail to obey an order to provide or permit discovery.  *See,* Fed. R. Civ. P. 37(b)(2).  The rule, in fact, provides that if a motion to compel is granted the "court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to permit discovery]." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).  Further sanctions may include, *inter alia*, entry of a default judgment or the imposition of a fine.  Fed. R. Civ. P. 37(b)(2); *see also, Shepherd,* 62 F.3d at 1475.

There is no question that the types of discovery abuses in this case are sanctionable. Federal courts – including, notably, this one – have long condemned such malfeasance.  For a detailed listing of cases involving discovery abuses, see the appendix to *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010).

i. **Failure to Preserve Discoverable Evidence After Suit Authorized/Commenced**

Parties are under a continuing obligation from the moment they *anticipate* litigation to preserve potentially discoverable evidence.  *Smith v. Cafe Asia*, 246 F.R.D. 19, 21 n.2 (D.D.C. 2007); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010).  This is "an obligation to preserve and also not to alter

documents it knew or reasonably should have known were relevant … if [the party] knew the destruction or alteration of those documents would prejudice [its opponent]." *Shepherd*, 62 F.3d at 1481 (internal quotations omitted).  It also entails the identification, location, and maintenance of information relevant to the potential litigation.  *See Pension Comm.*, 685 F. Supp. 2d at 464.

 The failure to preserve potentially discoverable evidence is sanctionable.  *D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-087, 2010 U.S. Dist. LEXIS 86711, at *13-14 (D.D.C. Aug. 24, 2010) ("fail[ing] to preserve [potentially relevant] evidence 'runs the risk of being justly accused of spoliation and … the subject of sanctions.'") (quoting *Cafe Asia*, 246 F.R.D. at 21 n.2).  The three-part test for determining whether the loss or destruction of discoverable evidence is sanctionable is set forth in *Victor Stanley*, 269 F.R.D. at 520-21, which considered whether (1) the party controlling the evidence had a duty to preserve it; (2) that party had a "culpable state of mind" (*i.e.*, bad faith) when the evidence was lost or destroyed; and (3) "a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it" (*i.e.*, prejudice).  Bad faith requires proof by clear and convincing evidence for "punitive sanctions" such as a default judgment or attorney's fees, *D'Onofrio*, 2010 U.S. Dist. LEXIS 86711, at *16-17, while prejudice may be presumed based on unreasonable delay even without a presentation of "specific evidence of the exact nature of the prejudice."  *See Shea v. Donohoe Construction Co., Inc.,* 795 F.2d 1071, 1075 (D.C. Cir.

1986).  The Court in *Victor Stanley,* 269 F.R.D. at 520-21, recommended sanctions including *imprisonment* for contempt of court upon finding that the standard was met. [12]

### ii.  <u>Failure to Produce Discoverable Evidence</u>

Parties to litigation are required, with few exceptions, to produce upon request "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1); *see also* D.C. *Rules of Professional Conduct*, Rule 3.4, cmt. [2] ("[T]he right of an opposing party … to obtain evidence through discovery … is an important procedural right … that can be frustrated if relevant material is altered, concealed, or destroyed.").  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Failure to produce discoverable evidence, particularly when ordered by the court, is sanctionable.  The cases so holding are legion.  *See, e.g., Weisberg v. Webster*, 749 F.2d 864, 874 (D.C. Cir. 1984) (upholding dismissal as sanction for failing to comply with discovery orders); *Webb v. District of Columbia*, 189 F.R.D. 180, 189 (D.D.C. 1999) (finding that "[t]he pervasive combination of illegal document destruction and *unreasonably reticent discovery practice*" warranted a default judgment) (emphasis added); *S. New England Telephone Co. v. Global Naps Inc.*, 624 F.3d 123, 147-48 (2d Cir. 2010) (willfully deleting and *lying about the existence and whereabouts of documents* constituted bad faith) (emphasis added).

---

[12] The District Court ultimately declined to impose imprisonment as a sanction, but did order the payment of $1,049,850.04 for the costs of unnecessary discovery flowing from Defendants' malfeasance.  *See* Court's Order of June 29, 2011 (Docket No. 478).

### iii. <u>Deletion/Destruction of Evidence</u>

Needless to say, the deletion or destruction of discoverable evidence is also sanctionable. Such instances are judged by the three-part test set forth in *Victor Stanley*, 69 F.R.D. at 520-21. Courts have not demonstrated even a modicum of tolerance for document deletion or destruction. *See, e.g.*, *Webb*, 189 F.R.D. at 18 (bad faith based, in part, on "illegal document destruction"); *S. New England Telephone Co.*, 624 F.3d at 147-48 (willfully deleting documents constituted bad faith); *PIC Group, Inc v. LandCoast Insulation, Inc.*, No. 1:09-CV-662, 2011 U.S. Dist. LEXIS 73342, at *24 (S.D. Miss. July 7, 2011) (finding bad faith and affirming the imposition of sanctions where a party intentionally deleted discoverable evidence); *Victor Stanley*, 69 F.R.D. at 531 (destruction of evidence despite a preservation request and court orders was in bad faith); *Arista Records, LLC v. Usenet.com. Inc.*, 633 F. Supp. 2d 124, 140-41 (S.D.N.Y. 2009) (holding that Defendants' wiping of hard drives was intentional and in bad faith).

### iv. <u>Editing/Altering of Evidence</u>

The editing or altering of discoverable evidence is another form of spoliation sanctionable under the *Victor Stanley* test. *See Victor Stanley*, 69 F.R.D. at 516 (spoliation includes the "material alteration of evidence") (citations omitted). Thus, a party to litigation is duty bound "*not to alter* documents it knew or reasonably should have known were relevant" to the opposing party. *Shepherd*, 62 F.3d at 1481 (emphasis added) (internal quotations omitted); *see also D'Onofrio*, 2010 U.S. Dist. Lexis, at *13 (same) (quoting *Shepherd*, 62 F.3d at 1481). That doing so is sanctionable "is settled beyond all question." *Ashford v. E. Coast Express Eviction*, No. 06-1561, U.S. Dist. LEXIS 78659, at *8 (D.D.C. Oct. 8, 2008) ("[I]t is settled beyond all question that at common law the destruction,

*alteration*, or failure to preserve evidence in pending or reasonably foreseeable litigation" is

sanctionable) (emphasis added).

### v.   Lack of Candor with Opposing Counsel and Court

Lastly, parties owe a duty of candor to opposing counsel and the court, and any breach

of that duty is sanctionable.  The duty of candor is central to the Federal Rules of Civil

Procedure, the Oath of Admission to this Court ("I will respect courts of justice and judicial

officers . . ."), as well as The District of Columbia Rules of Professional Conduct.  *See* Fed. R.

Civ. P. 11(b) (requirement that factual contentions be supportable or likely to be so); D.C.

Rule 3.3(a)(1) (A lawyer shall not knowingly "[m]ake a false statement of fact or law to a

tribunal."); D.C. Rule 4.1 (A lawyer shall not knowingly "[m]ake a false statement of material

fact or law or … [f]ail to disclose a material fact law to a third person," including opposing

counsel).  It is thus unsurprising that courts have spilled much ink excoriating – and, indeed,

sanctioning – parties for dishonesty.  *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51

(1991) (a party's "attempt[s] to perpetrate a fraud on the court" are sanctionable under the

court's inherent powers); *Methode Electronics, Inc. v. Adam Tech., Inc.*, 371 F.3d 923, 928

(7th Cir. 2004) (same); *Robertson v. District of Columbia*, No. 01-01405, 2006 U.S. Dist.

LEXIS 54201, at *12 (D.D.C. Aug. 4, 2006) ("Attorneys have an affirmative duty to ensure

that representations they make to courts are accurate and correct.") (citations omitted).

### b.   Permissible Sanctions Include Dismissal, Attorney's Fees, and Costs

Courts have considerable discretion in imposing sanctions so long as the sanction is

"just" and there is "proportionality between offense and sanction."  *Bonds v. District of

Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (quoting *Insurance Corp. v. Compagnie des

Bauxites de Guinee*, 456 U.S. 694, 707 (1982)).  Permissible sanctions include, *inter alia*,

dismissal, attorney's fees, and costs.  Fed. R. Civ. P. 37 (b)(2)(A), (C); *see also Bonds*, 93

F.3d at 808;  *Shepherd*, 62 F.3d at 1474; *Caldwell*, 228 F.R.D. at 46.  To dismiss a case as a

sanction, a court must satisfy itself that either (1) dismissal is necessary due to the prejudice

caused to the opposing party; (2) resort to a lesser sanction "would not mitigate the severe

burden that the misconduct has placed on the judicial system"; or (3) dismissal is warranted to

punish abuses of the system or serve as a deterrent to future misconduct.  *Shea*, 795 F.2d at

1074.  A Court may also exercise its inherent power to impose sanctions such as fines and

costs for abusive litigation practices undertaken in bad faith.  *See, Shepherd*, 62 F.3d at 1472,

1475 (listing fines and attorney's fees as "[o]ther inherent power sanctions available to

courts"); *D'Onofrio*, 2010 U.S. Dist. Lexis, at *14 ("The trial court … has a great deal of

discretion in exercising its inherent powers to fashion an appropriate sanction"); *Pension

Comm.*, 685 F. Supp. 2d at 467 (courts may impose "less severe sanctions" such as "cost-

shifting"); *Victor Stanley Inc. v. Creative Pipe, Inc.*, 269 F.R.D. (D. Md. 2010).

 The following section explains how Plaintiffs' myriad discovery abuses meet these

standards.

**IV. Sanctions are Appropriate Here**

 Aside from the fact that Plaintiffs have already been ordered thrice to produce their

server for imaging, twice been ordered to reproduce witnesses for depositions, and been

ordered to produce documents that had been wrongfully withheld on even more occasions,

Plaintiffs had previously been cautioned about making unfounded statements.  (September 16,

2010 Trans., pp. 10-11).  The Court has been more than patient in giving Plaintiffs every

opportunity to conform their conduct to the applicable standards during the course of this

litigation.  For the last 1- ½ years, however, Plaintiffs have persisted in a systematic course of

outrageous and improper conduct.  While the first two levels, "i" and "ii,"  can easily happen

via inadvertence, the latter three are always intentional.  The systemic pattern of

nonproduction exhibited here demonstrates that even the level "ii" conduct in this case was

often not inadvertent.  In the following subsections, evidence supporting sanctions for each

area of discovery abuse are presented according to each of the above five levels of conduct,

"i" through "v."

### A.    Failure to Produce, Alteration, Deletion of Calendar Entries

Categories Implicated:  i – v

Plaintiffs here invoked every tactic possible to avoid producing calendars they initially

withheld.  Then, before producing only a small fraction of calendar entries (about 400 of over

17,000 entries) a quarter of those produced were altered on a Christmas weekend by Trita

Parsi.  Getting a second chance to produce complete, unedited calendars, Plaintiffs still failed

to produce over 4,000 entries and produced no calendars for Babak Talebi.  Talebi's Outlook

files were located on a PC Plaintiffs had told the Court was merely an intern's machine.

When eventually imaged, over 300 calendar entries, many relating to congressional meetings,

were found hidden there.

When ordered to produce the shared server, Plaintiffs tried to avoid the Court's order

to produce by falsely claiming there were no pst files on the server.  PwC's September 2011

imaging revealed 72 pst files on the server containing hundreds of calendar entries.  Outlook

files eventually recovered on eight PCs produced in lieu of the server showed thousands of

omissions and deletions and edits (e.g., "lobbying" changed to "legislative direct").  There can

be no explanation as to how 82 entries were changed from "lobbying" to "legislative direct" at

5:31-5:32 PM on February 23, 2010, other than an intentional attempt to alter evidence.  Most

suspicious of all was the disappearance of *every* entry in the middle of 2006 of Parsi's calendar only, a period of five months when he was busy communicating with and meeting Iranian governmental officials.  How is it that 300 entries in Parsi's calendar were preserved before and after this gap?  Plaintiffs' alternative explanations were that Parsi was a "student," the entries were "from the period in which there was no litigation hold," and "the calendar seems to have not been used or there's nothing entered from it."  For their failure to produce hundreds, if not thousands, of relevant calendar entries, editing/deleting calendar entries, and false statements to evade production of the calendar entries, Defendant requests that he be awarded the fees and expenses associated with the forensic imaging by PwC  in accordance with the Court's July 1, 2010 and August 30, 2011 orders as well as those associated with bringing this motion.

      **B.**      **Failing to Produce Server for Imaging**

Categories Implicated:  i – v

While this area of misconduct arose from the attempts to avoid production of the calendar entries, the effort to avoid the Court's July 1, 2010 server imaging order merits separate discussion.  As part of a clearly intentional effort to avoid complying with the court-ordered imaging, Plaintiffs:

     i.   Produced eight PCs instead of the server;

     ii.   Denied, falsely, that pst files were on the server;

     iii.   Falsely stated in court that they had no server when they had two;

     iv.   Represented that the server was only an "intern's" PC;

     v.   Evaded the second order to produce the server by substituting a new server;

     vi.   Produced a machine as Parsi's that was not even connected to NIAC's network in December 2009;

    vii.   Presented in Court a list of "all computers that would be relevant" that omitted eleven devices and listed one as an "intern" machine that actually contained over 8,000 Talebi emails; and

    viii.   Falsely stated in interrogatory answers on September 24, 2010 that Parsi had been using the desktop for the last 18 months when, in reality, he stopped using it for Outlook on June 4, 2010 and last used it at all on August 4, 2010.

The conduct regarding the servers alone rivals anything in the *Victor Stanley* or *PIC Group* cases. At a minimum, Defendant requests that the costs incurred by PwC's forensic imaging be shifted to Plaintiffs per the Court's July 1, 2010 and August 30, 2011 orders.

## C.    <u>The Talebi Emails</u>

Categories Implicated: ii and v, possibly i

The Court has already determined that Plaintiffs' withholding of the 5,500 emails as "non-responsive" and not containing any of the agreed "search terms" was incorrect. More specifically, the Court held that NIAC "has totally failed to complete [the document review] in a satisfactory manner." Plaintiffs' conduct delayed production of the emails until after the depositions (except for the last half-day of Parsi's deposition) including Talebi's and all three of Plaintiffs' experts. His calendar entries were not uncovered until PwC's third imaging of an "intern" PC, after all depositions had been completed. As for the untrue statements made in the effort to stave off production of these emails, several were made in sworn discovery responses and in open court. This combination of delay and misrepresentation caused Defendant substantial additional expense. At a minimum, for the Talebi email conduct alone, Defendant requests that he be awarded the fees and expenses associated with the bringing of this motion, the obtaining of the March 29, 2011 order, and those associated with the taking of the deposition of Babak Talebi in Tampa, Florida.

**D.**     **Failure to Produce Other Emails**

Categories Implicated:  ii, v, and perhaps i

Hundreds of relevant and discoverable emails that Plaintiffs had at one time were only located and produced by third parties (who were not under a litigation hold).  Even two of Plaintiffs' own experts whom Defendant was able to subpoena produced hundreds of emails Plaintiffs had failed to produce.  This is evidence of  a systemic problem – be it sloppiness or intentional discovery abuse.  Accidental nonproduction happens all the time, especially in this day of ESI and proliferation of documents and places to find them.  The consistent pattern of nonproduction seen here indicates a systemic failure not consistent with FRCP 26 and 37.  Plaintiffs' statements to the Court that no emails were kept on offsite servers was clearly proven false by their ability to produce dozens of emails from their offsite ISP server the night before Mohammad Mansouri's deposition.  Accordingly, Defendant requests that he be awarded the fees and expenses of preparing and serving subpoenas on third parties and a presumption instruction that the offsite ISP server contained emails that support the Defendant's contention about the truth of his publications.

**E.**     **Salesforce and Membership Databases**

Categories Implicated:  ii and v, possibly iii and i

As with the Talebi emails, by engaging in various delay and obfuscation tactics, Plaintiffs managed to delay production of a list of current members (other than three old lists before April 2008) until September 6, 2011.  The Salesforce membership databases finally produced in March 2011 showed that these Excel files were created in May 2010.  Accordingly, NIAC's statements to the Court at the December 17, 2010 hearing that "our

client does not have access to that information" were simply untrue. Along the way, Plaintiffs also claimed not knowing what the "SF" database was, claimed in open court that they only used the meeting notes feature of Salesforce for a "very short time" (also, "sporadic," "they did not use this tool very long," and "approximately 196 entries"). In reality, when they finally produced the meeting notes on February 15, 2011, nearly three years into the case, they produced over 171,000 entries over a six-year period. These reflected many meetings and communications with congressmen and staffers.

As discussed in Defendant's motion to compel and reply brief (Docket Nos. 113 and 136), these membership lists both before and after the Defendant's articles are essential to testing NIAC's damages claims that membership declined from 2,000-3,000 to about 1,200. These are also essential to test Parsi's testimony and public statements about the number of members NIAC has. The current Convio member lists were withheld until September 6, 2011, and the Salesforce member lists from May 2010 were not produced until March 2011. As the current member data were withheld from production until September 6, 2011, after every deposition in the case, Defendant requests that he be awarded the fees and expenses of all 2-1/2 days of Parsi's depositions.

**F.    Parsi's Stolen Laptop and Disappearing Desktop**

Categories Implicated: i, ii, iii, and v

Trita Parsi used only his laptop, and no desktop PC, for NIAC email during 2008, a year after suit was authorized. He continued to use it after January 2009 when he supposedly began using the desktop PC that was produced as his at the August 2010 imaging. Parsi's laptop was never backed up and was mysteriously stolen from a hotel room in Olso, Norway

in May 2010 many months after Defendant began asking for a forensic image, and just three months before the first imaging in this case.  Even more mysteriously, the hotel (perhaps trying to win the world championship of hotel service) supposedly bought Parsi a new laptop within 20 hours of the theft of the machine.  However, the hotel bought him a brand new Apple MacBook, rather than a machine with a Microsoft operating system as he had before.

If that were not suspicious enough, the desktop NIAC produced for imaging as Parsi's was not even connected to NIAC's network in December 2009.  These suspicions were further aroused when NIAC's counsel would only state on the day of the imaging:  "This is the desktop with Dr. Parsi's Outlook calendars ordered produced by the Court to produce."  When PwC was given permission to access the registry information, it became clear that Parsi had not used that machine for Outlook since June 5, 2010, or at all since August 5, 2010, raising serious questions as to how he could do emails and calendars without a desktop or either laptop (one being stolen and the other not used for Outlook per sworn discovery responses).

For the failure to backup information on the laptop any time in the two years after suit was initiated, Defendant respectfully requests a presumption instruction that the jury may infer that the unproduced emails and calendar entries and documents on his laptop confirm Defendant's contentions regarding the truth of his articles.  For the untrue representations and interrogatory answers about Parsi's use of the desktop claimed to be the one he used from January 2009 until at least November 2010, Defendant requests that he be awarded the fees and expenses related to bringing this motion.

**G.**     **Redepositions of Parsi and Blout**

Category Implicated:  ii

Plaintiffs were ordered specifically to reproduce both Blout and Parsi for additional depositions in light of their failure to produce various records before their depositions. However, even at the redeposition of Blout, Defendant still did not have the 8,000 Talebi emails (which included over 500 to or from Blout), the membership databases or the Salesforce meeting notes produced in 2011.  Even at Parsi's redeposition, Defendant did not have access to the current Convio member database, the results of the server imaging or the imaging the Talebi computer.  Both of these redepositions could have been prevented by the timely disclosure of emails, calendars, and membership databases.  Accordingly, Defendant requests that he be reimbursed for the fees and expenses associated with these depositions.

**H.**     **Editing of Seven Year-old IIC Document Before Production**

Category Implicated:  iv

Parsi's editing of a seven year-old document a month before it was produced, changing the word "lobbying" to "advocacy" demonstrates palpable contempt for the rule of law and rules of procedure in United States federal courts.  Such conduct simply cannot be countenanced in federal district courts.

Each of the above-discussed areas of discovery abuse is sanctionable to varying degrees, and the Court has already awarded as sanctions the costs of bringing two motions to compel (server imaging and membership databases).  However, when all of these are viewed together, it is clear that Plaintiffs have intentionally pursued a course of conduct designed to avoid discovery obligations imposed on all parties under the Federal Rules of Civil Procedure.

The case law is replete with authorities supporting the most serious of sanctions for the type of conduct engaged in here.  The appendix in *Victor Stanley* is particularly illustrative.  Plaintiffs' conduct here clearly meets all the factors supporting the type of sanctions invoked in *Victor Stanley* and *PIC Group* and far exceeds that involved in *D'Onofrio* where this Court ordered Defendant to pay for the costs of attempting to restore deleted ESI amounting to over $1,000,000.

## V.    Conclusion

The ultimate result here is that, after 2-1/2 years of discovery and 3-1/2 years after suit was filed, Plaintiffs had not produced a current membership list, failed to produce bank accounts upon which Parsi's damages claims depended, required the Court to order them to produce a server for imaging three times, and invoked every tactic known to forestall discovery including false statements to the Court and false interrogatory answers.  As a result, not only has Defendant expended huge unnecessary sums defending himself, but his ability to defend the claims against him has been seriously compromised by Plaintiffs' discovery misconduct.  Accordingly, Defendant respectfully requests the Court to enter an order dismissing the case with prejudice and imposing as sanctions all fees and expenses associated with the defense of the case.

Respectfully submitted,


Dated:   September 16, 2011                     _____/s/_____

Timothy E. Kapshandy (Admitted Pro Hac Vice)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
hrogers@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **TRITA PARSI** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil No. 08 CV 00705 (JDB)** |
| | ) | |
| **DAIOLESLAM SEID HASSAN,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on September 16, 2011, I served, via email, Defendant's Omnibus Motion

for Sanctions on:

> Afshin Pishevar
> Adrian Nelson
> 600 East Jefferson Street
> Suite 316
> Rockville, Maryland 20852
> (301) 279-8773
> ap@pishevarlegal.com
> anelson@pishevarlegal.com

Dated:   September 16, 2011

                                              /s/
                              Thomas E. Ross (D.C. Bar No. 994275)
                              Bradford A. Berenson (D.C. Bar No. 441981)
                              HL Rogers (D.C. Bar No. 974462)
                              Peter G. Jensen (D.C. Bar No. 982599)
                              SIDLEY AUSTIN LLP
                              1501 K Street, N.W.
                              Washington, D.C.  20005
                              (202) 736-8000
                              tom.ross@sidley.com

                              Attorneys for Defendant
                              Seid Hassan Daioleslam