UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRITA PARSI <br><br> and <br><br> NATIONAL IRANIAN AMERICAN COUNCIL, <br>        Plaintiffs, <br><br> v. <br><br> DAIOLESLAM SEID HASSAN, <br>        Defendant. | CIVIL NO. 08 CV 00705 (JDB) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL EXCEPTIONS TO DEFENDANT'S REVISED BILL OF COSTS**

On September 23, 2011, Plaintiffs filed a document purportedly noting supplemental exceptions to Defendant's Bill of Costs filed September 6, 2011 (and amended September 13, 2011). In reality, it raised for the first time, 17 days after Defendant's bill of costs was filed and more than three weeks after the Court's order to compel of August 30, 2011, objections to the Court's August 30 order. More specifically, Plaintiffs claimed that the Court's assessment of costs under FRCP 37(a)(5) was in error in that Plaintiffs' failure to comply with discovery requests and multiple orders to compel was somehow "substantially justified."[1]

In particular, Plaintiffs said that they "reject any notion that they were 'resistant' to the discovery sought" and that the issues presented were "not free from doubt." (Pls' Supp. Exc., p. 3). About the only way that could be true is if one were totally oblivious to numerous Court orders and warnings over the last two years:

---

[1] Plaintiffs also re-raised two arguments that were made in their original exceptions to Defendant's bill of costs – that defense counsel's attorney and legal assistant time was excessive. Defendant responded to these in his response to Plaintiffs' original exceptions and incorporates those responses herein by reference. (*See*, Docket No. 147).

1. Plaintiffs were warned on June 3, 2011, that if the Court had to grant motions to compel, costs would be awarded. (June 3, 2011 Trans, pp. 20-21, 26).

2. Plaintiffs had been cautioned that requests for "all" membership information were not satisfied by producing "some" membership information. (Dec. 17, 2010 Trans., p. 23).

3. Plaintiffs had been warned about making unfounded statements. (Sept. 16, 2010 Trans., pp. 10-11).

4. Both the membership information and the forensic imaging of the server had been ordered to be produced multiple times before the August 30, 2011 order that awarded costs. (*See*, Def's Omnibus Motion for Sanctions, pp. 22-24, Docket No. 145).

Plaintiffs' current motion rehashes arguments rejected many times before, restates numerous unfounded statements, and blames Defendant and the Court for "ambiguities" engineered by the Plaintiffs for litigation advantage. Unfortunately, substantial judicial time and resources will be again required to address Plaintiffs' frivolous motion.

Perhaps the most outrageous assertion tossed out by Plaintiffs is: "What seems to have fallen on deaf ears is NIAC's repeated explanation that is does not have a 'server'." (Pls' Supp. Exc., p. 4). This statement is *per se* sanctionable. Many of Plaintiffs' witnesses, consultants, and counsel have stated that NIAC had a server:

- At the June 3, 2010 status conference NIAC's counsel stated: "The server that the defendant continues to try to say was recently discovered was already searched based on search terms that were agreed upon by the parties. E-mails were provided a long time ago from that server." (June 3, 2010 Trans., p. 13, emph. added).

- NIAC's Asst. Policy Director, David Elliott (also the person NIAC tendered as the person knowledgeable about the production of ESI), testified in October 2009, when NIAC only had one server: "All of the electronic docs were stored on the server and then sent to the lawyer." (Elliott Dep., pp. 103-104, Ex. A to Docket No. 112, emph. added).

- Babak Talebi, NIAC's cofounder and director of community outreach, testified that NIAC had a proxy server used to connect all the computers and share documents. (Talebi Dep., p. 163, Ex. P to Docket No. 143, emph. added).

- o In December 2009, NIAC's computer consultant, Progressive Office, audited NIAC's network, and as part of that work migrated the data from NIAC's existing <u>server</u> to a new server.  (Ex. E to Docket No. 87).

- o On March 11, 2010, the night before Mohammad Mansouri's deposition, Plaintiffs' counsel wrote:  "As discussed, the emails were recently discovered following a search of NIAC's external <u>server</u>."  (*See*, Ex. D to Docket No. 137, emph. added).

One can see from these examples where the Court and Defendant may have gotten the notion that NIAC had a server.  Moreover, *if* there is any ambiguity as to what the order to produce NIAC's server meant, this was engineered by NIAC and Trita Parsi.  At no time from the first request to image the server in January 2010 until the August 6, 2010 order denying Plaintiffs' motion to reconsider the July 1 order to produce the server for imaging did Plaintiffs or their counsel mention this fact to the Court.  During this period, there were four conferences with the Court and Plaintiffs filed at least four briefs on the issue.  Rather than have the Court and parties waste seven months and countless hours fretting over a "nonexistent" server, one would have thought that NIAC and Parsi would have at some time during this seven-month period advised the Court that they had no server.  This story, of course, was a fiction NIAC created just days before the August 18, 2010 imaging of the server in an effort to stave off the imaging.  (*See*, Def's Omnibus Motion for Sanctions, pp. 2-3).

Once committed to this course, Plaintiffs had to stay with it and, in fact, told the Court three times at the December 17, 2010 hearing that they had no server.  As is now known, at the time they made this representation to the Court, NIAC had not only one but *two* servers, the newest having been purchased in December 2009 from Progressive Office.  Progressive Office's records (which Defendant had to subpoena) reflected that it migrated data from NIAC's old server to its new server in December 2009.  (*See*, Ex. E to Docket No. 87).  Neither the Court nor Defendant are deaf to Plaintiffs' false contention that NIAC has no server.  The simple fact is

that NIAC had a server onto which discovery materials were placed in May 2009 and Plaintiffs ignored multiple orders to produce that server for imaging.

On March 29, 2011, the Court again ordered Plaintiffs to produce the server or alternatively all PCs on which Outlook calendar files existed.  As one of those PCs – which Plaintiffs had told the Court was merely an "intern's machine" – was, in fact, the server, Plaintiffs were in effect ordered to "produce the server or produce the server."  Plaintiffs maintain that the Court really meant for them to produce the new server and complain:  "It is unclear why NIAC was expected to know that the Court expected NIAC to produce the [original server]."  (Pls' Supp. Exc., p. 5).  The answer to that is simple:  "Because the Court was informed by NIAC's counsel that it had no server (three times on December 17, 2010), the Court could not have reasonably guessed that NIAC, in fact, had *two* servers."

Plaintiffs' excuse for not producing the Talebi PC for imaging in August 2010 was that they "inadvertently" "believed Talebi's former computer was one that had been used by one of NIAC's interns." (Pls' Supp. Exc., p. 4).  This is patently false.  The very same July 1, 2010 order that required the imaging of the server also ordered Plaintiffs to produce the 8,000 Talebi emails withheld under Plaintiffs' purported "community service" exception.  On August 24, 2010, six days after the imaging of the other eight PCs, Plaintiffs produced 2,500 Talebi emails from *that very PC*.  NIAC and Parsi clearly knew in August 2010 that that machine (Serial No. jjnc891) contained Talebi's Outlook emails and calendar entries and misstated the facts when saying that they did not realize Talebi's Outlook files were on that machine.  PwC's recent, and third, imaging in this case confirmed that the PC contained over 300 Talebi calendar entries, many relating to NIAC's meetings with Congressmen and staffers.  (*See*, Def's Omnibus Sanctions Motion, p. 11).

As for the membership information, Plaintiffs engaged in similar dissembling, stating, "NIAC has always maintained that is did not have immediate access to the [Salesforce] information." (Pls' Supp. Exc., p. 6). This is revisionist history. At the September 16, 2010 hearing, Plaintiffs' counsel told the Court, "our client does not have access to that information as we understand it." (Trans, pp. 9-10). This was *after* Plaintiffs first denied knowing what "SF" was and then claiming its use was "sporadic" and "limited." (*See*, Def's Omnibus Sanctions Motion, pp. 22-24). It is not a defense to a FRCP Rule 34 request to claim one does not have "immediate" access to a document; parties are required to produce documents or things which are under their custody or control. *See, e.g., Walls v. Paulson*, 250 F.R.D. 48, 50 (D.D.C. 2008) ("[F]ederal courts have consistently held that documents are deemed to be within the 'possession, custody or control' for purposes of Rule 34 if the party has *actual* possession, custody or control, or has the legal right to obtain the documents on demand.") (emphasis in original) (internal quotations and citations omitted); *Jones v. Prince George's County*, No. 00-2902, 2001 U.S. Dist. LEXIS 25733, at *8-10 (D.D.C. Oct. 26, 2001) ("'Control' [under Rule 34] has been interpreted as the legal right to obtain a document on demand.") (citation omitted). Plaintiffs have failed to explain where the May 2010 Excel files with all the Salesforce lists were located. Did Plaintiffs have them or did Salesforce? What efforts did Plaintiffs make to obtain and produce those at any time from May 2010 when they were created until March 2011 when they were produced? If their failure to procure these from Salesforce for 10 months was truly substantially justified, one would have thought Plaintiffs would have produced information from Salesforce detailing the difficulties and efforts made by Plaintiffs and Salesforce to produce these May 2010 lists. There is, of course, no explanation.

Plaintiffs state that, "defendant found it unfathomable that NIAC didn't have more current membership records [than the May 2008 list it produced]." (Pls' Supp. Exc., p. 6). Perhaps they should have checked their own Salesforce and Convio data first. The Convio transaction list contained more than 9,000 transactions from 2009-2010. Similarly, the Salesforce meeting notes database contained over 100,000 entries from 2009-2010.

Plaintiffs' argument that they provided two lists from December 2007 and April 2008 is a tired one that the Court had previously rejected. As the Court told them at the December 17, 2010 hearing, a request for all membership information is not met by producing some. (Dec. 17, 2010 Trans., p. 23). The reason for Plaintiffs' withholding of this information is clear – the lists from Convio and Salesforce show that membership increased throughout the period of the alleged defamation, contrary to the information they spoon-fed their damages expert, Joel Morse:

| | |
|---|---|
| 2004 | 845 members |
| December 2007 | 990 members |
| April 2008 | 1,048 members |
| May 2010 (SF) | 1,069 members |
| September 2011 (Convio) | 1,213 members |

(*See*, Def's Omnibus Sanctions Motion, fn. 9). Plaintiffs' contention that the real dispute is over what constitutes a "member" (pp. 7-8) misses the point. Whatever "members" are called, these records were producible and should have been produced long ago, before the depositions of Parsi and Morse. Morse was steered to say that NIAC's membership declined from 3,000 to 1,200 as a result of Defendant's articles that began in 2007. NIAC and Parsi clearly withheld these 2010-2011 data in an effort to mislead. Such conduct is never "justifiable" under Rule 37.

For the foregoing reasons Defendant respectfully requests that Plaintiffs' Supplemental Exceptions to Defendant's Bill of Costs be rejected, that costs and fees associated with his response be awarded, and that Plaintiffs be ordered to pay as a penalty a reasonable per diem for

every day after September 20, 2011 they have not paid Defendant's Bill of Costs as ordered on August 30, 2011.

Respectfully submitted,

Dated: September 28, 2011

                   /s/
Timothy E. Kapshandy (Illinois Bar No. 06180926, admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
Thomas E. Ross (D.C. Bar No. 994275)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tom.ross@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2011, I caused true and correct copies of the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL EXCEPTIONS TO DEFENDANT'S BILL OF COSTS** to be served by E-Mail upon:

>  Afshin Pishevar
>  Adrian Nelson
>  600 East Jefferson Street
>  Suite 316
>  Rockville, Maryland 20852
>  (301) 279-8773
>  ap@pishevarlegal.com
>  anelson@pishevarlegal.com

Dated: September 28, 2011

/s/
Timothy E. Kapshandy (Illinois Bar No. 06180926, admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
Thomas E. Ross (D.C. Bar No. 994275)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tom.ross@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam