# Exhibit J

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3                   FOR THE DISTRICT OF COLUMBIA

4       ------------------------------------------------------

5       TRITA PARSI and NATIONAL IRANIAN AMERICAN

6       COUNCIL,

7                                Plaintiffs,

8                vs.                   No. 08 CV 00705 (JDB)

9       DAIOLESLAM SEID HASSAN,

10                               Defendant.

11      ------------------------------------------------------

12

13

14              DEPOSITION OF DAIOLESLAM SEID HASSAN

15                      Chicago, Illinois

16                 Wednesday, December 15, 2010

17

18

19

20

21

22      Reported by:

23      Mary M. Flagg, RPR

24      JOB NO. 4776

ORIGINAL

Page 28

1    silence me, to intimidate me.

2        Q    I understand that, and what my question was is

3    what type of legal action did you think they might be

4    able to use to silence you.

5        A    Exactly the same that later was proven.  I was

6    feeling that maybe they will sent legal letters,

7    threatening letters to the newspapers and magazines and I

8    was telling that I am responsible for that.

9        Q    Did you have a concern that they might

10   challenge the truthfulness of some of the assertions that

11   were in your articles?

12       A    I did not believe that because the first

13   statement that -- so many statements I had seen from

14   Mr. Parsi and NIAC that they were misleading and not

15   correct, first of all.  I did not think that they go for

16   the truth because I was telling myself if they want to go

17   to expose the truth their lies will be exposed.  So I did

18   not really think that they will go to the end.

19       Q    Let's focus on the actual comments that are

20   contained in the attachment?

21       A    Yes.

22       Q    The first comment says, and it's referring to,

23   as you look at the printout, it's referring to a

24   statement that says "Conspicuously missing from this

61964f0c-997f-4bb2-a118-d38c112aa258

1    dossier of disservice to the country is Ney's masterful

2    creation of an active and disguised Washington-based

3    lobbying enterprise for the Iranian theocratic regime"?

4         A    Correct.

5         Q    And Mr. Timmerman says, "This is a key

6    allegation of this article.  Where is the proof?  If this

7    is an assumption then we have to phrase it much

8    differently and open the article differently.  There's no

9    point in opening with Ney if Ney is not directly involved

10   or involved in a way that you can establish with the

11   creation of NIAC"?

12        A    Correct, yes.

13        Q    At the time that he gave you these comments

14   were you able to establish that Mr. Ney was one of the

15   creators of NIAC?

16        A    Yes.  Based on the documents I had at the time

17   that I repeated several times Mr. Ney pushed for the

18   creation of a citizen lobby before the creation of NIAC.

19   Mr. Ney talked with two lobbyists, and those two

20   lobbyists were Mr. Parsi for nine months to create a PAC

21   to improve relation with Iran.  Mr. Ney organized

22   fundraising.  All those facts, they were facts posted on

23   NIAC's website and published by Mr. Roy Coffee in a

24   public newspaper.  All those facts made me to believe,

61964f0c-997f-4bb2-a118-d38c112aa258

Page 30

1    strongly believe that this is a fact.  That was my belief

2    and I repeat again I had not in my possession new

3    documents through discovery, not public documents.  The

4    hidden documents by NIAC that they never produced to the

5    public.

6             If I had not those public -- those documents,

7    hidden documents, secret documents, secret letter to

8    Mr. Roy Coffee.  I had not those, sitting today I would

9    repeat again the same conclusion.  Because I had four

10   facts, solid facts, public facts, letter, statement,

11   event, organizing and speech altogether made me believe

12   as a fact, solid fact, that Mr. Bob Ney, DiStefano and

13   Roy Coffee they acted, they help the foundation of NIAC,

14   they were participating in the foundation of NIAC.

15        Q    So Mr. Timmerman had a concern that that

16   statement was really your assumption.  You would disagree

17   with Mr. Timmerman's concern?

18        A    I did, yes.

19        Q    Let's go a little further down on the document

20   and it asks the question by Mr. Timmerman of you, "Are

21   these four named in NIAC incorporation documents and, if

22   not, who is"?  Do you see that comment?

23        A    Which one.

24        Q    It's comments KRT2?

1    communicate with people to explain it to them.  That is

2    the whole issue of discussion with Mr. Timmerman and

3    everyone else.  And is the whole subject of sometimes

4    correcting myself.

5        Q    Okay.

6        MR. NELSON:  Ask if you would mark this as

7    Exhibit 14.

8                          (Whereupon, Plaintiff's Exhibit

9                          Number 14 was marked

10                          for identification.)

11       Q    I'm handing you what's been marked as

12   Plaintiff's Exhibit 14 for identification.  It's an

13   e-mail from -- purports to be from you to a Jed Babbin,

14   B-a-b-b-i-n?

15       A    Yes, sir.

16       Q    Are you familiar with who Jed Babbin is?

17       A    Oh I remember that I sent him or her, I don't

18   know if it's a lady or -- I sent her something for

19   publication.  The first article he was not willing to

20   publish it but the second time he published.

21       Q    Do you know why he wasn't willing to publish or

22   she was not willing to publish the first time?

23       A    I think the first time as I remember he did not

24   find my arguments convincing and he did not establish the

Page 102

1   same kind of link between what I had, like fact with what

2   I believed to be.  So he did not willing to -- and I

3   didn't want to go to discussion over Internet for long

4   time for months to explain the whole case.  So I

5   submitted elsewhere that article.  I remember it was

6   accepted and published immediately.

7       Q    And what article was that that --

8       A    I think the article was about the Congressman

9   Kucinich relation with NIAC and Mr. Trita Parsi.

10      Q    And do you know which particular article is

11  being referenced in Exhibit Number 14?

12      A    Oh it could be the same, you know.  In July --

13  I think that human rights events.  It was human rights

14  event in the Congress organized by NIAC and some

15  organizations.

16      Q    Let's look at what response Jed wrote to you.

17  It says, "Dear Hassan.  Many thanks for the submission.

18  We will not be able to use it in the current form.

19  First, it's about three times the length we publish.

20  Second, there are a lot of accusations slash allegations

21  that could be libelous if not supported by credible

22  references.  I'll be glad to take another look at it if

23  you can cut and bolster.  Many thanks.  Best.  Jed."

24              Did you at any point resubmit this for

1   publication with him?

2        A    Not to her.  As I explained to her it was an

3   article that was urgent and I did not want to go through

4   the whole discussion about a broad and vast subject of

5   the Iranian regime's lobby in the U.S.  So I sent it to

6   another publication.  I remember we discussed about it.

7   So I did not go through explaining who was what, why was

8   that.  No, I did not.  I remember exchanged through

9   e-mail and I resubmitted to another outlet and it was

10  published immediately.

11       Q    And you believe that this is the article

12  relating to Congressman Kucinich?

13       A    I don't know.  Maybe Kucinich.  I don't

14  remember.

15       Q    Do you recall who published that on your

16  behalf?

17       A    Excuse me?

18       Q    Do you recall who published it ultimately?

19       A    Oh I think American Chronicle or Intellectual

20  Conservative.

21       Q    And when Jed made the statement that there are

22  a lot of accusations slash allegations that could be

23  libelous if not supported by credible references, did

24  that concern you?

61964f0c-997f-4bb2-a118-d38c112aa258

Page 104

1      A    Oh of course.  Of course that concerned me.

2  It's been always my concern.  First of all, to tell the

3  truth and, secondly, you know, not bringing allegations

4  or accusations against someone lightly.  Of course that

5  is.

6           And you know, for me more important than the

7  people send me the e-mails, oh thank you, what a great

8  article, for me more important are the people like Jed

9  Babbin who warn me, like Timmerman, he said this part

10  it's not supported.  This is not good.  I need these

11  people to correct me and to stop me from going so fast to

12  some conclusions.  I need these people and I'm more

13  grateful to these kind of people than those who support

14  me by sending, you know, bravo, thank you, great.

15          So I mean this is for me was great what she

16  wrote.  That makes me what I have done for the past four

17  years.  Every time I have questioned myself, reasoning

18  again, trying to if whenever I have a reasonable doubt to

19  not publish anything, and so I'm grateful to Jed Babbin.

20  It doesn't bother me.

21      Q    I'm going to hand you what is attachment 4 to

22  Plaintiff's Exhibit Number 2, which is the complaint.

23  That's a copy of the Kucinich article.

24          Do you believe that this is the final version

1    of the article that's being referenced in Exhibit

2    Number 14?

3        A    It could be, yeah.

4        Q    Do you know whether or not in between the time

5    that this article was submitted to Jed Babbin and the

6    time that it was ultimately published whether you made

7    any changes to the article?

8        A    Oh I don't remember, sir.

9        Q    Did you do anything to determine before it was

10   published whether or not it had any accusations or

11   allegations in it that might be considered libelous?

12       A    I do it every time, sir.  Every time I write

13   something regardless of what someone told me or not, that

14   is the warning that the people they give me any time to

15   be -- it's not only the fear of having lawsuit, no.  To

16   be truthful and to tell the truth.

17       Q    What I want to know is not about your general

18   practice, but I want to know as it relates to that

19   particular article what steps or actions did you take to

20   ensure that it did not contain any libelous information?

21       A    That is the general answer I told you and it

22   applies to this case too, that is every time for

23   everything I write down I try to be completely sure, to

24   be hundred percent sure and just not advance something

Page 106

1    that is a kind of opinion, accusation, allegation.

2        Q    Let me ask you the question a different way.

3    Do you have a specific recollection as to any actions

4    that you took to ensure that the article regarding

5    Congressman Kucinich did not contain any accusations or

6    allegations that might be libelous?

7        MR. KAPSHANDY:  Object to the form.  It's got

8    perhaps a double or triple negative in it.

9        A    I don't remember, sir.

10   BY MR. NELSON:

11       Q    You don't remember?

12       A    No.

13       MR. NELSON:  I'm going to ask if you would mark this

14   as Plaintiff's Exhibit Number 15, please.

15                       (Whereupon, Plaintiff's Exhibit

16                       Number 15 was marked

17                       for identification.)

18       Q    I'm handing you a document that's been marked

19   for identification Plaintiff's Exhibit Number 15, and I

20   want to ask you if you can tell me whether or not you

21   recognize this document?

22       A    I have a recollection of having this kind of

23   exchange with Ken.

24       Q    In the very first sentence of this document it

Page 126

1    think that takes care of housekeeping.  I don't know if

2    anybody has anything else.

3        MR. NELSON:  Is there something else you wanted to

4    say?

5        A    Yeah, I wanted to say the exact -- the exact

6    OIG that you asked me, it is Department of State and the

7    broadcasting Board of Governors.  That is the exact -- I

8    don't know.  I can find you the e-mail, but it was the

9    one.

10       MR. NELSON:  All right.  Thank you.  I'm going to

11   have marked as Exhibit Number 18, this document here.

12                       (Whereupon, Plaintiff's Exhibit

13                       Number 18 was marked

14                       for identification.)

15       Q    I'm handing you a document marked Exhibit 18,

16   e-mail between yourself and Ken Timmerman.  And I want

17   you to focus your attention on the top of this document.

18   There is an e-mail written by Mr. Timmerman, the second

19   paragraph says "The one thing I'd tone down in the

20   article below" -- and the article that is listed below is

21   Bob Ney syndrome, "is the anti-Semitism label.  He could

22   actually sue you on that and you don't establish

23   anti-Semitism in that section.  You establish a pattern

24   of anti-Israel acts and apologetics for Ahmadinejad's

61964f0c-997f-4bb2-a118-d38c112aa258

Page 127

1    call for the destruction of Israel.  I'd just cut any

2    reference to anti-Semitism and use anti-Israel instead."

3         Do you recall having any conversation about

4    Mr. Timmerman's concern in this regard?

5         A    I don't recall it but, you know, I don't

6    contest it.  I don't recall this e-mail precisely.

7         Q    Do you recall whether or not you made any

8    changes to the Bob Ney syndrome article to address his

9    concern about a quote "anti-Semitism label"?

10        A    Maybe I have done because first of all the

11   title was changed from Bob Ney syndrome to I think it was

12   changed to -- yeah, it was changed, the title was changed

13   from this Bob Ney syndrome was changed to Congressman

14   Kucinich should find a better role model than Bob Ney.

15        But I can't respond you precise when I have

16   published or printed copy of what was finally posted.

17   That's all.

18        Q    Yes, sir.

19        MR. NELSON:  Would you mark that as Exhibit 19,

20   please.

21                        (Whereupon, Plaintiff's Exhibit

22                        Number 19 was marked

23                        for identification.)

24        Q    I'm handing you what's been marked as

Page 130

1    unsupported?

2        A    She believed so.  It was her understanding or

3    what she got from my article was that it's not enough for

4    her.  At least that's the reason she's advancing it.

5        Q    And it's your testimony today that you provided

6    her with a copy of the plea agreement?

7        A    I remember that I sent her more documents.  I

8    had a few exchanges her.  I didn't go to the whole issue

9    of NIAC lobbying, who is Namazi family, what they done,

10   what is the road map, who is that.  You know, that is a

11   whole story.  I tried to publish articles about

12   explaining.  So I didn't want to go through all of that,

13   but just I wanted to mention her, you know, just give her

14   a hint that that is, that if I understand your fear or I

15   understand your concerns, but for Bob Ney I believe that

16   it is.

17       Q    Ask you to mark this as Exhibit Number 20

18   please.

19                         (Whereupon, Plaintiff's Exhibit

20                          Number 20 was marked

21                          for identification.)

22       Q    I'm handing you what's been marked as

23   Exhibit 20 which is a continuation of the e-mail string

24   that we were just discussing.  And if you look at the

61964f0c-997f-4bb2-a118-d38c112aa258

1  bottom part of the first page which purports to be a

2  response from you to Jed Babbin and you write "Regarding

3  Bob Ney, here is the information."  And you provide a

4  statement of the assistant attorney general Alice S.

5  Fisher of the Criminal Division regarding Congressman

6  Robert W. Ney, correct?

7        A    Correct.

8        Q    And you provide a reprint of what was listed on

9  this DoJ website.  Mr. Or Miss Babbin respond "I rest my

10  case on the Ney matter.  You say he was convicted of

11  conspiracy related to the sales of commercial aircraft

12  parts in Iran.  That's not what the charges were.  I am a

13  lawyer and I can read what it says.  Ney's convictions

14  had to do with Abramoff, not with the Iran matter."  Do

15  you see that statement?

16        A    Yes I see it.

17        Q    Do you disagree --

18        A    Yes, sir.

19        Q    -- that his conviction related to those things

20  identified in the statement from the assistant attorney

21  general Alice S. Fisher?

22        A    I don't agree with Jed Babbin's conclusion.

23        Q    The next paragraph says, "Second, I don't

24  contest the conclusion you reach about NIAC.  They take

Page 132

1    the Iran regime's line, but to say they are lobbying for

2    Iran is to accuse them of a crime without supporting

3    evidence."

4            Do you disagree with her conclusion or his

5    conclusion that you were accusing them of a crime without

6    supporting evidence?

7        A    One second, please.  Let me please, the first

8    question of why I disagreed with Jed Babbin about Bob

9    Ney, that only what he did or what convicted of was only

10   related to Jack Abramoff.  Let me read you this part that

11   I sent to her, and it is statement by assistant attorney

12   general of the United States.

13       Q    Tell me where you are reading, please?

14       A    The second page here, sir.  Here.

15       Q    Okay.

16       A    He says that, In addition --

17       Q    Let me find where you're reading.

18       A    It's in the middle of the second page.  "In

19   addition -- the one of the bullets, the last bullets,

20   three lines.

21       Q    Okay.

22       A    "In addition, as part of conspiracy to deprive

23   the public of its honest service and with the intent to

24   be influenced Congressman Ney took thousands of dollars

Page 169

1                    (Whereupon, Plaintiff's Exhibit

2                      Number 28 was marked

3                        for identification.)

4      Q    I'm handing you what's been marked as Exhibit

5   Number 28?

6      A    Yes, sir.

7      Q    And this is an e-mail from a Vahid Alaghband,

8   V-a-h-i-d A-l-a-g-h-b-a-n-d.  Do you know who this person

9   is?

10     A    Oh very well sir, yes.

11     Q    Who is this person?

12     A    This person is with his brothers in England.

13  They have a group, industrial group called Balli,

14  B-a-l-l-i.  Balli Group.  That they are selling steel,

15  iron.  That is one part of their business.  They have a

16  lot of businesses in Iran.  I did a -- I'm happy you

17  bring this e-mail because I had some investigation about

18  this group and what they do in Iran.  I sent it to

19  Mr. Timmerman and to Front Page.

20          They were so afraid, you know, the allegations

21  according to them about this group that is it true what

22  you are writing.  So as they were afraid to publish it,

23  to be sued after that by Mr. Alaghband because he is very

24  wealthy, very, very wealthy, very influential I remember

Page 170

1   Mr. Timmerman personally contacted this gentleman in

2   England.  He verified my information once.  The

3   information I had provided they were confirmed by

4   Mr. Alaghband.  My article was fully published, first.

5          Second, this gentleman he tried to do what Bob

6   Ney, Mr. Parsi's former boss, tried to do and to help to

7   do at least until 2003, that is, buying airplane and send

8   it to Iran.  He did it.  And he had bought three

9   airplanes and illegally sent it to Iran so the Treasury

10  Department here in the U.S., sir, sanctioned him.

11         Third, I discovered that the gentleman

12  represents two American businesses in Iran.  Caterpillar

13  and Xerox.  So that proved to be correct too.

14         So I don't remember Mr. Alaghband once he wrote

15  about it he had several more (unintelligible) later on.

16  That is.

17     Q    And in this particular e-mail he's concerned

18  about references in your articles about the Balli group,

19  correct?

20     A    I think he is because he has a business he's

21  concerned.

22     Q    And what he says in the middle of the first or

23  second paragraph is that your opinions should be based on

24  correct and researched facts and not on conjecture.

1    Isn't that what he says?

2        A    Where is it?

3        Q    Look at the second paragraph that begins with,

4    "We respect your right"?

5        A    Uh-huh.   Okay.

6        Q    Do you think that's funny?

7        A    No because he says that Mr. Parsi is the

8    subject of your wrath.   I have no wrath against Mr.

9    Parsi.

10       Q    That was my next question.   Obviously he was of

11   the opinion based on your writings that you have some

12   wrath toward Mr. Parsi, correct?

13       A    Yeah, I understand that he wanted to make it

14   personal.   I have nothing personal against Mr. Parsi.

15       Q    Well obviously other people think it's

16   personal, correct?

17       A    One of the people who was convicted of working

18   for the Iranian regime, yes.

19       Q    So whenever someone disagrees with you then you

20   slime them, correct?

21       MR. KAPSHANDY:   Object.   That's argumentative.   Go

22   ahead and answer.

23       A    Why do you say whenever someone.   No.   Jed

24   Babbin criticized me.   I never told, you know, I didn't

Page 172

1    criticize Jed Babbin.  This is disagreements.  For

2    someone, sir, who is working for the Iranian regime in

3    England and he is telling that I have a personal wrath

4    against Mr. Parsi makes me laugh.

5        Q    So you would disagree with their opinion that

6    you engage in a lot of conjecture in your article

7    writing?

8        A    First of all, Mr. Alaghband's opinion --

9        Q    My question is do you disagree with his

10   statement that you engage in a lot of conjecture in your

11   article writing?

12       A    Oh of course because, first of all, he lied

13   when he sold those three airplanes to Iran.  He lied to

14   U.S. authorities, sir.

15       Q    What does his lying have to do with his

16   conclusion that you engaged in conjecture?  My question

17   is about conjecture.

18       MR. KAPSHANDY:  You just asked him if his statement

19   was truthful.  He gave an example.

20       MR. NELSON:  I asked him what whether or not he

21   disagreed with his statement that he engaged in

22   conjecture.  That was my question.

23       A    What is the meaning of conjecture?

24       MR. NELSON:  Conjecture as it appears to be used by

1   the writer here is that it's something that does not

2   involve correct and researched facts.

3        A    First of all, sir, I disagree totally.  If you

4   want this answer I completely disagree with Mr. Alaghband

5   because first of all I had all facts.  First of all, it

6   was against him and of course I disagree with him.  He

7   said I accepted that he has the representation for two

8   American business that they were turning around the

9   sanctions and doing business in Iran would have been very

10  bad for him.  And don't forget, sir, he send me another

11  e-mail few months later, he told me that he sold one of

12  those businesses and he doesn't have that Caterpillar

13  business any more, so he wanted to make sure to me that

14  not only I was right but next article I write I will

15  mention that.

16       MR. NELSON:  Would you mark that as Exhibit

17  Number 29.

18                      (Whereupon, Plaintiff's Exhibit

19                       Number 29 was marked

20                       for identification.)

21       Q    I'm handing you what's been marked as Exhibit

22  Number 29.  And this is an e-mail exchange between

23  yourself and an amilimani@yahoo.com, A-m-i-l I-m-a-n-i?

24  Are you familiar with Amil Imani?

Page 193

1        A     By the way, I wanted to add something.  I think

2    it's the same Mr. Golchin who asked Mr. Parsi not to

3    mention my name as a MEK member supporter and he told him

4    that is not the right way.  And anyway, Mr. Parsi

5    continued to do so.

6        Q     You think that's the same person or you know

7    that's the same person?

8        A     I have the feeling, yes.

9        Q     I'm giving you an e-mail from Jamie Glazov,

10   G-l-a-z-o-v, to Hassan Dai?

11       A     Yes.

12       Q     And I want to ask you a few questions about

13   this e-mail.  Again, who is Jamie Glazov?

14       A     Jamie Glazov is the editor of Front Page

15   magazine.

16       Q     And it says, "Okay Hassan, this time I'm not

17   touching or taking down or removing anything until I hear

18   from you.  See below.  Keep this letter confidential

19   please.  The articles concerning Siamak Namazi fail even

20   remotely to reflect the truth about him.  The first clue

21   to the writer's lack of veracity is that for all his many

22   articles he has never contacted Siamak or any member of

23   his family for comment."  Is that true?

24       A     No.

Page 194

1       Q      Who have you contacted in Mr. Namazi's family

2   for comment?

3       A      If I have contacted anyone from the Namazi

4   family?

5       Q      Yes.

6       A      I remember a gentleman.  First of all, I know

7   that my friend that I mentioned to the journalist in Iran

8   they investigated Atieh Bahar.  I am very trusted -- I

9   trust a lot in what they did like investigation, first of

10  all.

11          Secondly, sir, all I have brought has been

12  public document from Atieh, A-t-i-e-h, website.

13  Secondly, sir, as sitting today here if you have time you

14  give me the opportunity I show in this letter sent that

15  later I understood but was sent by Mr. Ali Mostashari, it

16  was sent, and Mr. Glazov, Front Page editor, he didn't

17  disclose his name.

18          In this letter he sent to Glazov there are so

19  many lies, so many lies that if I expose it to you today

20  you will not ask me why I'm not okay with Mr. Mostashari.

21  Even so, I will still post Mr. Mostashari's letter on my

22  website.

23          More than that, sir, we have a proverb in Iran

24  says no man says my yogurt is bad tries to sell his

1    yogurt.  It's an expression.  It says every merchant

2    tries to sell his merchandise.  Mr. Mostashari who is

3    defending Mr. Namazi, they are partners.  Without giving

4    his name to me is defending Mr. Namazi, Tehran.  They are

5    partners.  They work together.  They work with Iranian

6    Ministry of Industry.  They work.  They have joint

7    collaboration with the Iranian ministry.

8        Q    Are you answering my question about whether

9    you've ever contacted anyone within Mr. Siamak's family?

10       A    I told no.

11       Q    That was my question, okay?

12       A    Okay.

13       Q    So you've never tried to contact anyone in Mr.

14   Namazi's family and you've never contacted him directly,

15   correct?

16       A    I did not do it directly, but my friend in Iran

17   they did it.  I wanted to be hundred percent sure about

18   what I write.  So they did a good job for me.

19       Q    Let's look at bullet number one.  It says in

20   this article -- I'm sorry.  Paragraph Number 1.  "In this

21   article the writer claims that Siamak's family is an

22   influential player in Iran's oil and financial mafia.

23   This is untrue.  Neither Siamak nor any member of his

24   family has ever laid eyes on an oil contract, much less

61964f0c-997f-4bb2-a118-d38c112aa258

Page 204

1    only for Iran, not for the American interests, and it's

2    something shared by more than hundred Congress members in

3    United States, none of them are member or supporters of

4    MEK.  It is a political view.

5           But when I tell that I immediately add that

6    even if you discard them, never support the MEK

7    separately, you know, go to them and support them.  You

8    should include them and pose condition on them.

9           Two, for example, to have alliance with other

10   groups, to be more democratic and so so so.  That is my

11   understanding that no part of the Iranian opposition

12   should be discarded.  But if you want to support any part

13   of it never support them individually.  Take them as a

14   whole and always pose your conditions, ask them to be

15   more democratic.  Ask them to behave differently.  Ask

16   them to change their views on so many thing.

17          That is the way to improve the Iranian

18   opposition, and I hope that one day comes monarchists,

19   MEK, liberals, seculars, everyone can vote together and

20   understand democratic movement.

21      Q    Now you've already testified that you've never

22   been a member of the MEK, correct?

23      A    Of course, yes.

24      Q    Do you consider yourself to be a supporter of

1    the MEK?

2         A    Not at all.

3         Q    Do you consider the MEK to be a terror group?

4         A    Terrorist group?

5         Q    Yes.

6         A    I think they have told as the European

7    countries at least they believe it, and they have

8    expressed it since 2000 or 2001 or 2, I don't know when,

9    they have renounced to use violence and no more they use

10   it.

11        Q    So you're saying that the MEK has taken the

12   position that they no longer use violence?

13        A    They have publicly expressed that and it was

14   the basis for all the European countries all together to

15   remove them from the terrorist list.

16        Q    Are they still listed as a terrorist

17   organization in the United States?

18        A    In the United States, yes.

19        Q    And you believe the expressed position of the

20   MEK that they no longer engage in terrorist activities?

21        A    I believe they have not done.  There is no

22   document showing that at least since 2003 a single

23   terrorist activity has been done by this group.

24        Q    If they are no longer a terrorist organization

61964f0c-997f-4bb2-a118-d38c112aa258

Page 206

1   why are you not a supporter of the MKO?

2       A    Why should I support any group that is not a

3   terrorist group?  There are thousands of groups around

4   the world that are not terrorists.  I have told as I have

5   expressed in this e-mail I don't share the political and

6   ideological views regardless of they're terrorist or not.

7       Q    You testified that one of the reasons why you

8   would not be a member of the MEK is because you are not

9   Muslim and you don't practice the tenets of the Muslim

10  faith, correct?

11      A    I told that is a minimum.

12      Q    What are other reasons why that you would not

13  be a supporter of the MEK?

14      A    As I explained here, I don't share the

15  political and ideological views.

16      Q    What aspects of their political or ideological

17  views could you not support?

18      A    For example, their internal practice.  For me

19  we cannot in the 21st Century function like a group of

20  1970s with very closed decision-making, very centralized

21  decision-making.

22          For me it is not democratic, first of all.  And

23  second, the view they have that society they want to have

24  it -- the role of the -- I believe the role of the

1  religion in the government I don't share that.  I believe

2  that the religion should be hundred percent separated

3  from the government.

4      Q    By your -- As I understood your testimony, you

5  felt that no group including the MEK should be left out

6  of the discussion, correct?

7      A    Oh of course not.  That is called democracy,

8  sir.

9      Q    And by your view that they should be allowed to

10 participate in the discussion do you believe that they

11 are therefore a legitimate group?

12     A    What do you mean by legitimate?

13     Q    One that has a proper mission and motive?

14     A    What is proper?

15     Q    Something that would not be illegal.

16     A    What is -- MEK is -- doesn't work here in

17 United States, sir.  It's working outside of United

18 States, so legal based on what?

19     Q    The MEK has never had any influence in the

20 United States?

21     A    Oh of course they have.

22     Q    So what you say they're not working in the

23 United States --

24     A    I mean when you are talking about legal.

61964f0c-997f-4bb2-a118-d38c112aa258

Page 208

1    Legitimate has nothing to do with legal.  Let me tell you

2    what is legitimacy.

3        Q    Sure.

4        A    Legitimacy if it's the government is by the

5    vote.  A government has legitimacy when the people vote

6    for it.  If the people they don't vote it doesn't have

7    legitimacy.  But if the people they vote for even if I

8    don't like it it is legitimate.  It is the government.

9            But when we go to the groups there is no way of

10   understanding who the people are going to vote for, so

11   their members vote for them.  The members.  They are

12   legitimate at least for their own members, for their own

13   views, but if you ask me that this group or another group

14   before going to power to be voted by the Iranian people

15   to see who is legitimate or not, that is another matter.

16           If they have the right to exist of course they

17   have the right to exist unless they are depriving other

18   groups to exist.  Democracy stops when activity -- The

19   freedom of activity of any group will start at a point

20   when the other groups cannot exist because of that group.

21       Q    Are you familiar with the group Hamas?

22       A    Hamas?

23       Q    Yes.

24       A    Yes.