IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TRITA PARSI** | ) | |
| **and** | ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil No. 08 CV 00705** |
| **DAIOLESLAM SEID HASSAN,** | ) | |
| **Defendant** | ) | |

## CORRECTED PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S OMNIBUS MOTION FOR SANCTIONS

COME NOW Plaintiffs, Dr. Trita Parsi and the National Iranian American Council ("NIAC") (collectively "NIAC"), by and through their counsel, Afshin Pishevar, Esquire, Adrian V. Nelson, II, Esquire, and Pishevar & Associates, P.C., in opposition to Defendant's Omnibus Motion for Sanctions, and states as follows:

### I. INTRODUCTION

As a small, grassroots organization, NIAC has made good faith attempts throughout this litigation to comply with the far-reaching and never-ending discovery requests of the defendant in light of the spirit of reasonable discovery enshrined in the Federal Rules of Civil Procedure. NIAC has had to be conservative in its responses to the wide-ranging amount of discovery material the defendant has requested while bearing in mind Plaintiffs' obligations under the Federal Rules of Civil Procedure.

NIAC's conservative disposition is a natural reaction to the defendant's conduct early in the case where he disclosed to the media discovery material produced by NIAC in this litigation. (See Exhibit A, Deposition of Daioleslam Seid Hassan, dated December 14, 2010, p. 125:9-18.) As the Court will recall, in 2009 the defendant leaked documents to Eli Lake, a reporter for the *Washington* Times, which Defendant had obtained through discovery in this case.  Not only did the defendant supply discovery documents to *Washington Times* reporter Eli Lake, but he also published them on his website Irianianlobby.com.  (See Exhibit A, p. 123:6-22.)  Additionally, Defendant provided discovery materials to Mr. Kaboli, who is the Executive Director of the Progressive American Iranian Committee.  (See Exhibit A, p. 132:7-22.)  Further, the Defendant sent discovery documents to journalists Michael Rubin and Ken Timmerman.  (See Exhibit A, p. 132:23-133:9.)

The intentional release of the discovery material in this case by the Defendant was a part of his professed plan "to destroy Dr. Parsi and NIAC."  As the defendant wrote in a 2008 email: "I strongly believe Trita Parsi is the weakest part of the Iranian web because he is related to Siamak Namazi and Bob Ney.  I believe that destroying him will be the start of attacking the whole web."  (See Attached Exhibit B, April 2, 2008 Email from Defendant to Kenneth Timmerman.)

Having been burned by the defendant during the initial phase of discovery, going forward NIAC took the posture that it must ensure that everything it produced, in response to a discovery request from the defendant, was required to be produced under the Federal Rules of Civil Procedure given  the strong possibility that NIAC's internal documents might be used by the defendant in extra-judicial ways to further his plan of destroying Dr. Parsi and NIAC.

Herein, the defendant has been successful in convincing the Court that NIAC's good faith discovery responses were really nefarious attempts at avoiding Plaintiffs' obligations to comply with the Federal Rules of Civil Procedure relating to discovery. Nothing could be further from the truth. Thus, in order for the defendant to obtain the sanctions he now claims to be entitled to, Defendant has misrepresented crucial facts relating to NIAC's conduct, misconstrued the findings contained in the forensic imaging report produced by PriceWaterhouse Coopers (PwC), and misstated his entitlement to sanctions in this case.

Plaintiffs are hopeful that the Court will reject Defendant's request for sanctions as unmerited, unsupported, and unfortunately simply a ruse intended to accomplish defendant's unequivocally stated objective – "to destroy Trita Parsi and NIAC."

## II.  LEGAL STANDARD

### A. Sanctions In This Case Are Inappropriate For A Number Of Reasons.

#### 1.  Sanctions are inappropriate because Plaintiffs' conduct has been neither willful nor grossly negligent.

"Under Fed. R. Civ. P. 37(b)(2)(c), a district court may sanction parties who fail to comply with its orders in a variety of ways, including dismissal of the lawsuit." Bass v. Jostens, Inc., 71 F.3d 237, 241 (6th Cir. 1995) (citing Bank One of Cleveland, N.A. v. Abbe, 916 F.2d 1067, 1073 (6th Cir. 1990)). This Circuit has held that "dismissal is a severe sanction, and should be resorted to only to the extent `necessary to induce future compliance and preserve the integrity of the system.'" Weisberg v. Webster, 749 F.2d 864, 869 (D.C. Cir. 1984) (citing Litton Sys., Inc. v. American Tel. & Tel. Co., 91 F. R. D. 574, 576 (S.D.N.Y. 1981), aff'd, 700 F.2d 785 (2d Cir. 1983)). This Circuit has further observed that "the district court has been delegated a good deal of discretion in making discovery orders and enforcing them with sanctions." In evaluating the exercise of that discretion, as the Supreme Court has stated in National Hockey

League v. Metropolitan Hockey Club, "[t]he question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing.   Weisberg, 749 F.2d at 870 (footnotes and internal citations omitted).

This Circuit has relied upon National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639 (1976), and Societe International pour Participations Industrielles et Commerciales v. Rogers, 357 U.S. 197 (1958), for its evaluation of the standard governing the determination of what conduct justifies dismissal:   Read together, National Hockey League and Societe Internationale require a minimum of "willfulness, bad faith, or [some] fault" to justify dismissal, although the clear import of Societe Internationale is that mere failure to respond to discovery is sufficient to justify less severe sanctions.   Subsequent interpretations continue to require that dismissal under Rule 37 be based on willfulness or at least gross negligence.   Weisberg, 749 F.2d at 871 (footnotes and internal citations omitted); see Valentine v. Museum of Modern Art, 29 F.3d 47, 49-50 (2d Cir. 1994).   A failure to comply with the court's discovery orders is willful "whenever there is a conscious and intentional failure to comply with the court order[s]."   Bass, 71 F.3d at 241.   Put another way, "[n]oncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's non-compliance is not due to factors beyond the party's control."   Baba v. Japan Travel Bureau Int'l, 165 F.R.D. 398, 402-03 (S.D.N.Y. 1996), aff'd, 111 F.3d 2 (2d Cir. 1997).

### 2. Sanctions are inappropriate because Plaintiffs made good faith attempts to respond to the broad and numerous amounts of discovery requests from the defendant.

While Plaintiff has struggled as a non-profit under the burden of Defendant's excessive discovery demands which have far exceeded the scope of the initial allegations stated in the

Complaint, Plaintiffs have never willfully or in a manner that would be considered grossly negligent ignored or failed to meet discovery demands. Instead, Plaintiffs have made every effort to meet the discovery as more fully described below. Plaintiffs have made good faith attempts to meet Defendant's discovery requests and when unable to meet them the factors causing such a inability were beyond the Plaintiffs' control.

### B. Should The Court Find That Defendant Is Entitled To Sanctions, Dismissal Is Not An Appropriate Sanction.

Thus, "[t]he central requirement of Rule 37 is that `any sanction must be just,' which requires in cases involving severe sanctions that the district court consider whether lesser sanctions would be more appropriate for the particular violation." Bonds v. District of Columbia, 93 F.3d 801, 808 (D.C. Cir. 1996), reh'g denied, 105 F.3d 674 (D.C. Cir. 1996), cert. denied, 520 U.S. 1274 (1997) (internal citation omitted). Accordingly, this Circuit has held that "`dismissal is a sanction of last resort to be applied only after less dire alternatives have been explored without success' or would obviously prove futile." Bonds, 93 F.3d at 808 (quoting Shea v. Donohoe Constr. Co., 795 F.2d 1071, 1075 (D.C. Cir. 1986)); see Capitol Chem. Indus. v. Community Mgmt. Corp., No. CIV. A.86-2944, 1988 WL 93136, at *1 (D.D.C. Aug. 29, 1988), aff'd, 887 F.2d 332 (D.C. Cir. 1989) (sanction of dismissal "should be used as a last resort, when less drastic sanctions will not be equally effective.").

When choosing among the available alternatives, "the most severe in the spectrum of sanctions must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." Nat'l Hockey League, 427 U.S. at 643 (1976) (per curiam). In appropriate circumstances, the district court "may dismiss an action . . . because of a party's failure to comply with court orders designed to ensure orderly

prosecution of the case." Bristol Petroleum, 901 F.2d at 167 (citing Link v. Wabash R.R. Co.,

370 U.S. 626, 633 (1962)). However, when the sanction selected is dismissal—or tantamount to

dismissal—the district court must undertake a more searching inquiry than may otherwise be

required. See Butera v. District of Columbia, 235 F.3d 637, 661 (D.C. Cir. 2001); Peterson v.

Archstone Communities LLC, 637 F.3d 416, 418 (D.C. Cir. 2011).

      The United States Court of Appeals for the District of Columbia Circuit "has identified

three justifications for the imposition of defaults or dismissals as sanctions for misconduct: (1)

prejudice to the other party, (2) prejudice to the judicial system requiring the district court to

modify its own docket and operations to accommodate the delay, and (3) the need to sanction

conduct that is disrespectful to the court and to deter similar conduct in the future." Butera, 235

F.3d at 661 (internal quotation marks omitted; citation omitted). Without a doubt, "dismissal is a

'drastic step, normally to be taken only after unfruitful resort to lesser sanction.'" Ripalda v. Am.

Operations Corp., 977 F.2d 1464, 1466 (D.C. Cir. 1992) (quoting Jackson v. Wash. Monthly Co.,

569 F.2d 119, 123 (D.C. Cir. 1977)). However, a district court is under no obligation to exhaust

the panoply of lesser sanctions before turning to the more severe sanction of dismissal, provided

it explains its reasons for issuing a more severe sanction. Webb, 146 F.3d at 971. The reason is

simple: "if district court judges are to discharge their heavy case processing responsibilities

effectively, their power to dismiss must be more than theoretical." Bristol Petroleum, 901 F.2d

at 167 (internal quotation marks and notations omitted; citation omitted).

### C. Parties to Litigation Are Entitled to Have the Merits of the Case Heard.

      A district court may order sanctions, including a default judgment, for misconduct either

pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, which authorizes a court to

assess a sanction for violation of a discovery order, or pursuant to the court's inherent power to

"protect [its] integrity and prevent abuses of the judicial process." <u>Shepherd</u>, 62 F.3d at 1474. The "central requirement of Rule 37 is that any sanction must be just," and the "choice of sanction should be guided by the concept of proportionality." <u>Bonds</u>, 93 F.3d at 808.

But "[w]hile the imposition of sanctions under Rule 37(b) lies within the trial court's discretion, it is not a discretion without bounds or limits." <u>Hathcock v. Navistar Int'l Transp. Corp.</u>, 53 F.3d 36, 40 (4th Cir. 1995) (quotation marks and brackets omitted). This is particularly so when a party requests the rather draconian penalty of dismissal or default. <u>Id</u>. Thus, a district court should consider four factors in determining what sanctions to impose under Rule 37: "(1) whether the non-complying party acted in bad faith; (2) the amount of prejudice that non-compliance caused the adversary; (3) the need for deterrence of the particular sort of non-compliance; and (4) whether less drastic sanctions would have been effective." <u>Belk v. Charlotte-Mecklenburg Bd. of Educ</u>, 269 F.3d 305, 348 (4th Cir. 2001).

<u>Bonds</u> instructs that before imposing a severe, litigation-ending sanction that approaches a default judgment or denies a party a fair trial on the merits, a district court must "consider whether lesser sanctions would be more appropriate for the particular violation" because the judicial system favors disposition of cases on the merits. <u>Bonds</u>, 93 F.3d at 808. In considering whether a severe sanction "rather than a milder disciplinary measure" is appropriate, a court should consider "the effect of a [party's] contumacious conduct on the court's docket, whether the [party's] behavior has prejudiced the [opposing party] and whether deterrence is necessary to protect the integrity of the judicial system." <u>Id</u>. Then, if imposing a severe sanction, the court should "either make a finding supported by the record that the more severe sanction is necessary to avoid prejudice to [the opposing party] or to the court's calendar ... or-if the sanction is based

only on deterring future discovery misconduct-the more severe sanction must be supported by a finding of flagrant or egregious misconduct by the" sanctioned party.  Id. at 809.

No such egregious or flagrant conduct has occurred in this case.  Rather Plaintiffs have made a good faith effort to comply with the expansive and far-reaching discovery requests made by Defendant.  The Defendant has demanded voluminous amounts of records and documents on what has become a fishing expedition on lobbying instead of focusing on the Defendant's defamatory statements.  The "sting of the charge" is not, as Defendant would have it, that Plaintiffs are lobbyists.  See Memorandum Opinion pp.11-12, February 4, 2009.  Rather, the sting of the charge is that the Plaintiffs are agents of the Iranian government.  Id. at 12.   The drastic imposition of dismissal is certainly not warranted in this situation.

The provisions of Rule 37 which are here involved must be read in light of the provisions of the Fifth Amendment that no person shall be deprived of property without due process of law, and more particularly against the opinions of this Court in Hovey v. Elliott, 167 U.S. 409, 417 (1897); Hammond Packing Co. v. State of Arkansas, 212 U.S. 322, 324 (1909); Societe Internationale Pour Participations Industrielles Et Commerciales, 357 U.S. at 209.   These decisions establish that there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.   The authors of Rule 37 were well aware of these constitutional considerations.  See Notes of Advisory Committee on Rules, Rule 37, 28 U.S.C. (1952 ed.) p. 4325, 28 U.S.C.A.

When calibrating the extent of the sanction, Rule 37's central requirement is that "any sanction must be just."  Bonds, 93 F.3d at 808.  "The choice of sanction should be guided by the concept of proportionality between offense and sanction."  Id.  "In determining whether a severe

sanction is justified, the district court may consider the resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter similar misconduct in the future." Id.

We first consider the burden of proof the district court must employ in determining whether predicate acts of fraudulent or bad-faith misconduct actually occurred.   We then consider the extent to which the district court must explain why the specific sanction it selects is an appropriate response to the particular misconduct.  Resolution of these issues requires us to balance the judicial system's need for an effective tool to discourage and punish misconduct with its need for appropriate restraint in imposing inherent power sanctions.  Moreover, because the overriding purpose of the inherent power is "to achieve the orderly and expeditious disposition of cases," Link, 370 U.S. at 630-31 (1962), the use of this power should reflect our judicial system's strong presumption in favor of adjudications on the merits, see e.g., Foman v. Davis, 371 U.S. 178, 181-82 (1962); Shea, 795 F.2d at 1075; Aoude, 892 F.2d at 1118; Kauffman v. Moss, 420 F.2d 1270, 1276 (3d Cir.), cert. denied, 400 U.S. 846 (1970).

### III. ARGUMENT

As a preliminary matter, before responding to Defendant's specific allegations in their Omnibus Motion for Sanctions Plaintiffs will address Defendant's and PwC's general allegation that documents were missing from NIAC's calendar productions.  PwC's complete failure to perform their analysis correctly resulted in their: 1) classifying documents as not having been produced that were in fact produced; 2) their inexplicable production of thousands of documents that were created after 12/23/09 and 4/21/10, (the dates of the two NIAC calendar productions); and 3) the intentional inclusion of thousands of deletions to appear as if NIAC spoliated documents despite direct evidence that the deletions were the  result of cancellations of meetings

or changes in time and date. (See generally Attached Exhibit C, Declaration of Marc Hirschfeld, Esquire.)

Despite the defendant's knowledge of the limitations of the PwC report, Defendant misrepresented the PwC report to the Court, alleging that they were prejudiced by the absence of documents that were never truly missing or that are irrelevant because the events never occurred. The end result of the botched analysis by Defendant and PwC is that the defendant is unable to provide any credible evidence that any responsive calendar event was missing from NIAC's calendars.

A detailed history of Defendant's allegations and a review of the Court orders addressing each allegation is necessary to set the record straight.   The last two orders indicate that Defendant was successful in hiding the basis for the original order and misleading the court with their misrepresentation of the PwC report.

On June 2, 2010 Defendant submitted their Second Memorandum Regarding Plaintiffs' Failure to Produce Lobbying Calendar and Time Records and Emails.  Defendant represented to the Court the following:

> [P]laintiffs created yet another new, modified, and incomplete Excel document instead of the complete, native and unedited files See, Ex. 12, which contrasts the original *native,* pst calendar files produced December 28 to the newly created Excel document. Additionally, the new document omits a meeting with a U.S. Senator, an NSC member, a State Department official, and a Swedish banker (two of those on Christmas Day)." (*See*, Ex. 6).

(See Docket Entry No. 63.)  Exhibit 6 to Defendant's June 2, 2010 motion lists the five calendar events that were allegedly not produced in the April 21, 2010 production, including the following:

> 1. Disney's "complete" calendar omits a 23 Jan 2009 meeting with Senator McConnell that was included in the first version of his calendar produced 28 Dec 2009;

- 10 -

2. Disney's new calendar contains no entries after 24 Sep 2009 while the first
   version contains dozens of entries after that;

   3. Parsi's "complete" calendar produced 21 April 2010 also is missing
      entries that were on the first version produced 28 Dec 2009. Omitted is a
      meeting with Puneet Talwar on 25 Dec 2009;

   4. Also omitted from the "complete" unedited calendar is a meeting with
      Erik Belfrage on 25 Dec 2009; and

   5. Also omitted from the "complete" unedited calendar is a 3 June 2009
      meeting with Jillian Burns at the State Department.

All five of Defendant's allegations as set forth above were incorrect. The Erik Belfrage

and Puneet Talwar events were not events that occurred on December 25 but rather in June and

mid December and they were not part of Trita's "unedited and complete calendars."  These

events were from Babak Talebi's calendar which will be discussed in detail below.  Further, the

23 Jan 2009 meeting with Senator McConnell was produced in the April 2010 productions as

acknowledged by an excerpt from PwC's report.  (See Exhibit D.)  Also, the meeting with Jillian

Burns was not scheduled for June 3, 2009 but rather for June 17, 2009. The event was produced

in both the December 28, 2009 and April 21, 2010 calendar productions as acknowledged PwC.

(See Exhibit D.)  In addition, Patrick Disney produced over 200 events after September 24, 2009

as acknowledged by PwC.  (See Attached Composite Exhibit D.)

In light of the foregoing, it is not surprising that three out of five of these allegations are

noticeably absent from Defendant's current motion for sanctions, clearly because the information

that Defendant represented to the Court was incorrect from the start. Despite having close to two

years to correct their misrepresentations, Defendant has made no effort to inform the Court or the

Plaintiffs of his mistake.

Also, it is clear that PwC either intentionally or negligently failed to perform the function envisioned by the Court. The Court's July 1, 2010 Order states that "NIAC shall, by no later than July 16, 2010 submit the server on which its outlook calendars are kept to forensic electronic experts at PwC for forensic imaging." After the imaging, PwC was to analyze the calendar productions for omissions and to answer several questions:

    a. Whether any calendar entries were omitted from the outlook calendar productions on December 28, 2009 and April 21, 2010 and if so the substance and date of such entries;

    b. Whether edits were made to the Outlook calendar files on December 25-27, 2009, and if so what were the specific edits and by whom were they made;

    c. Whether any calendar entries were deleted after the date of the event on the calendar and if so which entries were deleted by whom and when were they deleted; and

    d. Whether, after December 8, 2009 any outlook calendar events were edited or deleted by someone other than the calendar owner.

PwC's report lists thousands of documents as not having been produced; however, many of these documents were in fact produced. PwC also lists thousands of deleted calendar items that were legitimately deleted as well as thousands of duplicates and documents that were created after December 31, 2009 and April 21, 2010 that didn't even exist at the time of productions. Moreover, as required by the Court's Order, PwC failed to provide information regarding questions "a", "c" and "d" relating to the substance of the edits, dates of deletions and list of users which would have been helpful to Plaintiffs, despite three separate imaging events to determine this specific information. Plaintiff will provide a full discussion of these issues in its response to specific allegations listed below.

    Despite the limitations of the PwC report and Defendant's inability to prove its original allegations, Defendant convinced the Court to order the forensic imaging of Plaintiffs' shared

drive by misrepresenting the original July 1, 2010 order and overstating the significance of the PwC report.  On March 4, 2011 the Court ordered a second imaging limited to "the NIAC server containing Outlook calendar entries that <u>this Court ordered be produced in July 2010</u> for forensic imaging by PricewaterhouseCoopers ("PwC")."  When PwC referred to the term "server" in its report while discussing the July 2010 order, they were specifically requesting access to NIAC's *Exchange Server* where NIAC's active calendars should be stored.  As PwC states in its report

> "Plaintiff's counsel disclosed during this call that NIAC did not operate a Microsoft Exchange email server in-house. A third party service provider was responsible for the delivery of e-mail via Post Office Protocol (POP). All parties agreed to the imaging of desktop and laptop computers utilized by NIAC employees that contained Microsoft Outlook (.pst) files **in lieu of the originally planned Microsoft exchange server**".

(Emphasis Added, <u>Exhibit G</u>)

NIAC's complete and unedited calendars were stored on their active "pst" files on their PC's, not on a local Microsoft exchange server, backup drive, shared drive, backup server or an intern's computer that was once used as a backup server.  The Court's final order states that "this is now the third time that plaintiffs have been order to produce their server –a server that plaintiffs initially claimed did not exist – plaintiff shall pay the costs associated with defendant bringing the instant motion."

While NIAC consistently stated that they did not have a local Microsoft exchange server, Defendant twisted the meaning of the word "server" from what all three parties including PwC originally intended, NIAC's Exchange Server, to any "Server" that was used to store "pst" files whether those files contained active calendars or not.  The "servers" that PwC imaged in the second and third round of imaging were not Exchange servers, they were backup servers.  The calendar items that PwC found on these machines were backups from NIAC's PC's or found by

PwC in unused and inaccessible formats and locations which NIAC didn't know existed and were never obligated to provide as their "complete and unedited calendars".

Under Rule 26 Plaintiffs were not required to produce documents that were unreasonable or unduly burdensome or expensive to produce, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action. Performing such an analysis is usually difficult, but when the analysis is performed in retrospect, the analysis becomes simple. Was the value of the data that was not originally found by NIAC worth the expense and burden of the forensic data collection and analysis that PwC performed? The unequivocal answer to this question is: No. Consistent with Rule 26's limitation, the July 1, 2010 Court Order specifically required the Defendant to show that "discoverable calendar entries were omitted from previous productions or that inappropriate edits were made to such entries" in order for the "Defendant to seek to recover the costs of the forensic analysis from NIAC." Emphasis added. (See Docket Entry No. 68)

Defendant at pages 5 and 6 of his 44 page brief mentions only a few specific documents that contained allegedly discoverable material that were allegedly missing from the productions. While the Defendant states that "there is not enough time to go through all 1,714 deleted entries or 5,270 unproduced entries" they had over one year to review the data and should not be excused from providing Plaintiffs and the Court with documents that he claims prejudiced his defense. The extremely high amount of resources Defendant spent on PwC's botched forensic analysis did not produce any missing discoverable data as Plaintiffs will discuss in detail with regard to Defendant's specific allegations below. As such Plaintiffs should not be required to pay for Defendant's wasted effort.

Defendant's Omnibus motion is riddled with allegations, the majority of which are not supported by proper evidence, such as an affidavit from its experts as support.   An evidentiary hearing on these points should be very enlightening to the Court in flushing out the inaccuracies and limitations of PwC's report and Defendant's use thereof.[1]

### A. Clearly, NIAC's Alleged Conduct Relating to Calendar Entries at Issue Does Not Warrant Sanctions.

The defendant has raised a plethora of what he contends are sanctionable actions relating to Plaintiffs' conduct with respect to calendar entries.  Each of the defendant's complaints are without merit and do not warrant sanctions being imposed against Plaintiffs.

### 1.  NIAC's purported alteration of 87 documents on Christmas day 2009.

Defendant does not cite any evidence for the allegation in its brief that Plaintiffs altered 87 documents on Christmas 2009. Rather, Plaintiffs believe they have located the source of the defendant's unsupported and nefarious allegation in PwC's report, which simply states that

> "there were 87 appointments with modification dates in the date range 12/25/2009-12/27/2009". (Exhibit G).

PwC's report does not provide the substance of the changes as was required under the order, specifically "Whether edits were made to the Outlook calendar files on December 25-27, 2009, and if so what were the specific edits and by whom were they made."  PwC failed to mention that 11 common activities can cause a date modified field to change including: 1) changing the start or end time of the event; 2) changing the reminder; 3) snoozing the reminder; 4) dismissing the reminder; 5) changing the show as (out of office, busy etc.); 6) marking

---

[1]Pursuant to Local Rules LCvR 7, 72.2, and 72.3, Plaintiffs request that an evidentiary hearing relating to the allegations contained in Defendant's Omnibus Motion be granted and that such hearing be held before Magistrate Judge Facciola in light of his familiarity with e-discovery issues.

private, high, or low importance; 7) categorizing with a flag; 8) time zone information change; 9) adding notes to the body; 10) changing the subject of an event; and 11) exporting events from shared calendars.  (See Exhibit C.)

Performing substantive changes to the bodies of calendar entries, simultaneously, to multiple documents would be extremely unlikely.  Eighteen (18) events were modified at exactly the same time within Trita Parsi's exported "pst" on December 27, 2009 at 1:16 am. Twenty-two (22) documents were modified at exactly the same time within Patrick Disney's exported "pst" on December 26, 2009 at 3:17 a.m. Twelve (12) documents were modified at exactly the same time in David Elliot's exported "pst" file. Nine (9) documents were modified at exactly the same time in Emily Blout's exported "pst".  Plaintiffs' expert compared the source .pst files against the exported .pst files for a few of the "changed events" and they are substantively the same without the 12/25-12/27 date modified.  (See Exhibit E; see also Exhibit C.)

Some of these files contained the word "Copy:" in the subject lines that were not contained in the original "pst." This is because Outlook intentionally adds the word "Copy:" to the subject line upon export of shared calendar events to inform the user that the meeting has been copied off of the server and will therefore no longer receive updates to the event such as a change in time or place.  Microsoft 2007 Outlook release notes state with regard to bug fixes that: "A meeting that is copied from a shared calendar …. (Outlook 2007) SP2 adds "Copy:" to the subject line." (See Exhibit F, Microsoft 2007 Outlook Release Notes.)  Plaintiffs' expert verified this by opening the individual messages that contain the word Copy:. These documents state: "This meeting was copied to your calendar and will not receive updates".  (See Exhibit C.) These files were also compared against the PwC report which lists the same documents without

the word Copy: and without the December 23, 2010 modification dates and Plaintiffs expert confirmed that no substantive changes were made.

### 2.   NIAC's production of about 5000 calendar entries on April 21, 2010.

Defendant states in its motion, "The additional production (albeit in non-native, Excel files) of about 5000 calendar entries on April 21, 2010 as the "complete, unedited" NIAC calendars with the "date modified" field missing". (See Def.'s Omnibus Sanctions Mot.) Defendant intimates that Plaintiffs purposely removed the date modified field Excel  productions on April 21, 2010.  However, the defendant's claim is false.

Plaintiffs exported all available fields when it exported to Excel.  PwC confirms this in its report which states "the seven Microsoft Excel Workbooks containing 5,270 calendar appointments produced by NIAC on 4/21/2010 were provided in a manner that displayed all available metadata fields."  PwC acknowledged that Plaintiffs did not intentionally remove the "date modified" field.  This field simply was not available for production.

Defendant's complaint that NIAC's production was in Excel form instead of .pst form is also baseless.  Defendant relied exclusively on PwC's Excel reports in its Motion and failed to produce as evidence the native .pst (or msg or ics) files of the individual documents that it claims prejudiced its review.

### 3.   The purported five-month gap in the middle of Parsi's 2006 calendar.

Defendant makes a bald allegation that NIAC should be sanctioned due to a purported five-month void as it relates to Dr. Parsi's 2006 calendar.  Through forensic imaging, PwC should have been able to demonstrate that the purportedly missing 2006 calendar entries existed at one time, but were removed and/or deleted at some point.  The absence of any such finding by

PwC must inure to the benefit of Plaintiffs and result in a good-faith presumption that the calendar entries never existed.

### 4. Defendant's claim that some of the entries produced with the December 29, 2009, calendar production were missing from the April 21, 2010, calendar production.

Once again Defendant does not cite any evidence for its allegation that some entries produced with NIAC's December 29, 2009, calendar production were missing from NIAC's April 21, 2010, calendar production. Rather, Plaintiffs believe they have located the source of the defendant's unsupported and nefarious allegation in PwC's report, which states "181 of the 356 calendar appointments from the NIAC 12/28/2009 production were not found in the NIAC 4/21/2010 production." (See Exhibit G) PwC's report is very enlightening in terms of what it considers "Not Produced." Exhibit G to the report states with regard to 41 of these items "Subject begins with "copy" which was appended during production. The NIAC 4/21/10 production contains these calendar appointments without the "copy" prefix in the subject." (See Exhibit G) PwC admits that these documents were in fact produced but categorizes these documents as not having been produced because Outlook added the word "copy" to the subject line upon export to indicate to the user that the event was copied off of the server and will not receive any further updates. PwC incorrectly labeled these documents as not having been produced despite the fact that everything else about the event was completely the same including the date, time, location, body, attendees, and the remainder of the subject line. Moreover, seventy-seven (77) of the allegedly "not produced" events were national holiday notifications for 2011 and 2012 and PwC categorizes them as "Calendar entry exists with different year, 2009, in NIAC 4/21/10 production." (See Exhibit G) PwC also categorized 33 documents as "not produced" because "Calendar entry exists with different category, "Legislative Direct", in NIAC

- 18 -

4/21/10 production." (See Exhibit G)  These documents were in fact produced despite PwC's

incorrect and misleading statement in its report.

The aforementioned discrepancy regarding changes in "categories" will be addressed

more fully in allegation 11 below.

>    **5. Despite Defendant's complaints herein the parties clearly had an
>    understanding that NIAC would not be producing a server for forensic
>    imaging.**

Defendant demands sanctions based upon his claim that "Plaintiffs' counsel informed

Defendant and PwC that instead of a server, they would be producing for imaging five or six PCs

as there were no pst files on the server". (Def.'s Omnibus Sanctions Mot.)

The aforementioned amounts to Defendant misquoting from the PwC report. The actual

quote from the PwC's report is as follows:

> "<u>Plaintiff's counsel disclosed during this call that NIAC did not operate a
> Microsoft Exchange email server</u> in-house. A third party service provider was
> responsible for the delivery of e-mail via Post Office Protocol (POP). <u>All parties
> agreed</u> to the imaging of desktop and laptop computers utilized by NIAC
> employees that contained Microsoft Outlook (.pst) files in lieu of the original
> planned Microsoft Exchange server."

(Emphasis added) (<u>See</u> Exhibit G.)

PWC itself requested that Plaintiff provide the laptops and desktops because no local

Exchange Server existed. As Plaintiffs mentioned above in III, PwC was tasked with reviewing

NIAC's active calendars to locate documents that were allegedly not produced as a part of its

"complete and unedited calendar". Instead PwC broadened its search to "all calendar

appointments . . . regardless of where they were located within the Outlook .pst file" and

regardless of whether the "pst" files contain active calendars or not." (Exhibit G). Plaintiffs

provided the machines that contained the pst files that were utilized to create the excel

spreadsheets.  Plaintiffs were unaware of "pst" files on other machines and never agreed to

produce such pst files in lieu of the server because these files were beyond the scope of the investigation which was the alleged withholding of information from their current calendars. As mentioned previously in Section III above, Defendant's counsel twisted the meaning of the word "server" to include any server containing pst files whether Plaintiff knew of the files existence or not and whether such file contained Plaintiffs' active calendars. The Court Order in March 2011 and September 2011 were specifically focused on Plaintiff's alleged withholding of the Server originally ordered to be produced. Despite three imaging events, Defendant's have not provided any evidence that the originally contemplated Local Exchange Server existed; because it doesn't exist.

**6. Defendant's contention that 4,159 calendar entries were not produced in NIAC's first two calendar productions.**

Defendant does not point to any evidence in support of the aforementioned allegation in his brief.  However Plaintiffs located the source of the allegation in PwC's report which states "of the 17,357 calendar appointments recovered from the NIAC forensic images, 4,159 were not present in either of the two NIAC productions." (See Exhibit G.)

PwC's convoluted analysis was completely flawed and inaccurate.  Close to 1000 of these events were created after April 21, 2010 and didn't even exist when NIAC created its 4/21 exports.  Over 1000 of the allegedly not produced documents were duplicates.  Close to 1000 documents were deleted items which were cancelled or changed meetings that were no longer part of NIAC's calendars and should have never been produced.  These deleted items will be discussed in detail in section 7 below.  Over 600 documents were not events at all but rather notifications in one custodians' calendar that Trita or another custodian was busy or tentatively busy during the allotted time.  These events were produced by the proper custodians with all the pertinent information. Over 100 documents were blank events, many of which were found in

deleted folders containing absolutely no substance in the subject, body, or location.  In essence they were non-events that are created when a user inadvertently clicks on a date. (<u>See</u> Exhibit C.) Further, 110 documents were notifications about national holidays.  Thirty-three (33) documents contained the prefix "Copy:" in the subject line.  These documents were in fact produced without the word "Copy:" in the April 21 production as mentioned previously.  Exhibit H is a sample set of documents representing each one of PwC flawed analysis.  (<u>See</u> Exhibit H.)

However the most egregious part of PwC's analysis was the labeling of documents as not having been produced that were in fact produced.  Plaintiffs' expert's comparison of several documents attached as Exhibit I is demonstrative of PwC's failure to compare the documents correctly. More importantly, the few remaining allegedly unproduced documents came from inactive "pst" files which were inaccessible to NIAC's custodians and were never required to be produced under a Rule 26 analysis.

### 7.  Defendant's claim that 999 calendar entries were deleted and recovered.

Although not stated outright, Defendant's allegation appears to be a claim of spoliation. Defendant does not cite any evidence for this allegation in his brief.  However, Plaintiffs located the likely source of the allegation in PwC's report, which Defendant misquoted.  The report reads: "999 calendar appointments were found within the "Deleted Items" folders across all .pst files." (<u>See</u> Exhibit G.) Defendant confuses the deleted items with the recovered items. The fact that the documents were sitting in deleted folders and did not need recovery is actually an indication of the legitimacy of the deletion.  When an item is cancelled either by hitting the cancel button on the calendar item or by selecting the meeting and deleting it prior to its occurrence, the item gets moved to the deleted folder and does not need recovery.  When an individual changes the time of a meeting, Outlook similarly creates a second item in the deleted

folder with the old meeting information.   These deletions occur in the ordinary course of business and are not suspicious without additional evidence.  (See Exhibit C.)

PwC's inclusion of these items in the report was misleading as there is no indication that the deleted items were not legitimate.  In fact many of these documents contain direct evidence that they were in fact cancelled meetings as their subject lines state "Cancelled meeting."  A comparison against similar meetings taking place during the same time periods was also indicative of the legitimacy of the deletion, namely the change in time/or place. A sample of these documents are attached.  (See Exhibit J, Excerpt from Exhibit C to PwC Report Recovered Calendar Appointment Metadata.xlsx.)

In addition, Defendant's statement that 999 items were deleted and recovered was completely untrue.  These items were readily accessible the entire time but not produced because as stated earlier they were legitimately not a part of their calendars.

### 8.  Defendant's claim that 715 entries were double deleted but PwC was able to recover them.

Defendant does not cite any evidence for the above allegation in its brief but is presumably alleging that 1) NIAC double deleted the items recovered by PwC and 2) the double deletions are indicative of spoliation. Plaintiffs located the likely source of the allegation in PwC's report

> The third processing pass that utilized FTK identified Outlook calendar appointments that were purged from the .pst file and were still recoverable.   715 deleted calendar appointments were identified using FTK.

(See Exhibit G.)

 PwC's own report lists 619 of these items as produced in contrast to their assertion that the items were purged. This is because these events were archived to an Archive pst and produced from the archive. Of the remaining 96 documents, 10 contained no information other

than a busy or tentative status without any other substantive data. Samples of these events are provided as Exhibit K. The large number of documents that were "recovered" but still produced is strong evidence that no double deletions occurred and no spoliation occurred. (See Exhibit C). Without further evidence, which Defendant had ample time to provide, the fact that items were recovered is not indicative of anything suspicious.

### 9. Defendant's claim that Plaintiffs altered three calendar entries relating to Erik Belfrage and Puneet Talwar on December 25, 2009.

Among the strangest of the purported alterations attributed to NIAC were three entries added to Parsi's calendar on December 25, 2009 from Babak Talebi's Gmail account, including one for Erik Belfrage, a Swedish banker and diplomat, and two for Puneet Talwar, a NSC official. Defendant claims that Parsi had no explanation for the addition of information from Talebi's Gmail account to Parsi's calendar. "Either Talebi was also involved in the editing, or someone else had access to his Gmail account and sent calendar entries on December 25, 2009 at 7:00 AM." (See Def.'s Omnibus Sanctions Mot.)

Defendant does not state outright what the issue is with these three items but presumably the allegation is that Parsi's lack of knowledge was not credible because Parsi had to have known that Talebi was in the office creating documents on December 25 or that Parsi had access to Talebi's email account. Defendant provides no evidence to support its two bizarre conclusions. Despite the Court Order providing Defendant and PwC the opportunity to discover such information specifically for this scenario, "whether, after December 8, 2009 any outlook calendar events were edited or deleted by someone other than the calendar owner," PwC failed to provide any information regarding these events.

PwC's report has these files listed multiple times created at the same times in David Elliot's computer, Kevin Cowl's computer, and Dr. Parsi's computer. The events did not occur

on December 25, as Defendant originally alleged in his June 2, 2009 brief but rather in June and December 19.  Plaintiffs' expert was unable to provide an explanation for these events appearing in so many "pst" files without access to Mr. Talebi's gmail account.  However, Plaintiffs' expert has investigated Defendant's allegations and concluded that they are extremely unlikely.  The items could not have been manually edited and added at the same moment on all the computers as Defendant alleged, nor was it likely that Dr. Parsi accessed Mr. Talebi's gmail account through the complicated Outlook protocols necessary to download three past event items and add them to his calendar.  (See Exhibit C.)  Dr. Parsi had informed Defendant that he did not know why the documents were in his calendar because they are in fact an anomaly.  Defendant has not provided any expert opinions from PwC regarding its conclusions which are baseless.

### 10. PwC's claim that they were unable to determine who purportedly deleted certain calendar entries.

Defendant claims that it was not permitted access to user information on the computers nor provided backups to the server. Defendant states in his motion

> "As is now known from NIAC's response to Defendant's motion to compel production of the server, NIAC in fact did back up its original server. PwC explained that access to such back ups (made before Parsi's Christmas weekend alterations of the calendar records) could have been useful in answering questions about when deletions and edits were made." (Internal citations removed, See Def.'s Omnibus Sanctions Mot.)

Defendant's allegations on these issues are incomprehensible and outright false.  PwC was provided access to all of NIAC's computers including the shared drive which was used as a backup, as well as the "user information" for all machines in the last round of imaging.  In addition, PwC's report directly contradicts Defendant's stated reasons for not providing dates of deletions and users.  "The date the calendar appointment was deleted is not tracked by metadata within an Outlook .pst file and the employee responsible for making the modifications to the calendar entries is not determinable for the reasons mentioned on page four."  (See Exhibit G)

PwC states on page 4 of its report that "every pst file present on an individual computer is not necessarily specific to the same employee. There can be multiple employees using the same computer through a separate windows profiles. In addition .pst files can easily be copied across computers and used for referential purposes. Tracking ownership and the employee responsible for the edits to each .pst file identified on the eight computers was not determinable." (See Exhibit G.) PwC could not determine the date of a deletion because the information was not stored by Outlook. PwC was unable to determine the "users" for a variety of reasons none of which were because PwC had no access to user information or backups to the server. Defendant misrepresented his need for this information, which was the basis for one aspect of the third round of imaging. The July 1, 2010, order that Defendant drafted presumably with input from PwC, provided that PwC would be retrieving dates of deletions from Outlook calendars. The 8/30/11 Order for imaging specifically addressing this issue states "this forensic imaging shall be limited to … (2) user/habit/login information in order to determine the identities of the persons who the computers' Outlook calendar function." (See Docket Entry Number 138) Now that PwC had access to the backups and user information in the third round of imaging, why have they not provided the information about deletions that Defendant claimed would be useful?

### 11. Defendant's claims concerning modifications to Disney calendar entries.

Defendant states in his motion

"In the version of Disney's calendar that NIAC produced in April 2010, at least 82 of the references to "lobbying" were changed to "legislative direct" from the pst version recovered by PwC. All of these entries were modified on February 23, 2010 at 5:31-5:32 PM. While the April 21, 2010 Excel calendars use the term "legislative direct," the recovered pst files show two entries for each of these – an original using the term "lobbying" and another changed on February 23, 2010 to "legislative direct." (internal citations removed, See Def.'s Omnibus Sanctions Mot.)
Categories are created at the user level and can be changed at anytime by any of the

participants without changing the substance of the meeting. Plaintiffs' expert analyzed Patrick

Disney's calendar and determined that Disney did not have a category for lobbying at all. The

yellow category on Disney's calendar corresponds to legislative direct. See exhibit M. It appears

that Disney changed the entire yellow category to legislative direct intending to mark future

documents with the new category.   However the change also affected old events that were

previously marked lobbying to "legislative direct" without Patrick's knowledge. (See Exhibit C.)

### 12. Defendant's claims that Parsi was unable to explain certain omissions and changes in the Excel calendars.

Defendant complains that:

> "Parsi had no explanation for the omission of the color codes or the word changes in the Excel calendars that he prepared and produced other than that the "computer" might have made the changes in the exporting process. (See Def.'s Omnibus Sanctions Mot.)

Defendant does not provide any of these documents containing alleged color code

changes as evidence and Plaintiffs' expert was unable to locate the documents that Defendant

claims were changed.  (See Exhibit C.)  Also PwC concluded that "the seven Microsoft Excel

Workbooks containing 5,270 calendar appointments produced by NIAC on 4/21/2010 were

provided in a manner that displayed all available metadata fields."   (See Exhibit G). The

highlights within the files were not available for export just as Parsi testified.

### 13. Defendant's claims relating to a CNAPI meeting on the calendars of Elliott, Abide, and Disney.

Defendant raises concerns relating a January 21, 2009, CNAPI meeting on the calendars

of NIAC staffers David Elliot, Jamal Abdi, and Patrick Disney and states as follows:

> "On Elliot and Abdi's calendars (the meeting) is listed as "lobbying."  Disney's calendar has it entered twice –once on the correct date of 1/21/09 and again on 1/28/09. The latter does not have the meeting classified as lobbying and this entry was revised 12/23/09, eleven months after the event." (See Def.'s Omnibus Sanctions Mot.)

Defendant presents no evidence that the substance of the tentative meeting was changed on December 23, 2009. In fact, Patrick Disney created this <u>tentative</u> meeting in January 2009 to appear 11 times on his calendar for the *third* Wednesday of the month for the entire 2009 year. The subject of the meeting was "tent," which refers to "tentatively." All 11 events were produced in the April 21, 2010 production. A review of the actual CNAPI meeting events (not tentative events) which occurred in 2010 appear to have taken place on the *fourth* Wednesday of the month. Based on these facts, it appears likely that the tentative schedule changed from the *third* Wednesday of the month in 2009 to the *fourth* Wednesday of the month in 2010. (<u>See</u> Exhibit C.)

The January 21, 2009 event states in the recurrence section, "Occurs the third Wednesday of every 1 month effective 1/21/2009 from 12:30 PM to 2:00 PM". The January 28, 2009 event states, "Occurs the fourth Wednesday of every 1 month effective 1/28/2009 from 12:30 PM to 1:30 PM". It appears that Disney opened the December 16, 2009 event on December 23, 2009 and changed the recurrence cycle to the *fourth* Wednesday of the month but accidentally changed the previous years recurring date instead of the next year. It is for this reason that the January 21, 2009 event was changed to January 28, 2009 on December 23, 2009, when Disney was changing the December 23, 2009 event to reflect the new schedule for the next year. (<u>See</u> Exhibit C.)

As for the categorization, categories are created at the user level and can be changed at anytime by any of the participants without changing the substance of the meeting. Besides the fact that a tentative meeting agenda <u>about</u> legislation is <u>not</u> a lobbying event, Defendant's allegation that they were prejudiced by not knowing about the tentative meeting is unfounded. The information was produced in Patrick Disney's April 21, 2010 production 11 times. (<u>See</u> Exhibit N.)

**14. Defendant's complaints about a Rayburn building meeting entry.**

Defendant alleges the following:

"Another entry allegedly edited on Christmas weekend (12/23/09 at 6:18 PM) was a Patrick Disney 2/26/09 meeting at the Rayburn Building regarding the Incidents at Sea bill. In other words, Defendant's complaint is that the entry was modified ten months after the event." (See Def.'s Omnibus Sanctions Mot.)

First, Defendant misrepresents this document as not having been produced when it was in fact produced several times. The following is an excerpt from Exhibit C to PwC's October 2010 Report:

| Custodian | Start | End | Subject | Matched Production 1 or 2 |
|-----------|-------|-----|---------|---------------------------|
| Trita Parsi | 2/26/09 4:30 PM | 2/26/09 5:30 PM | Copy: Meeting with THORNBERRY w/eric ham regarding incident at sea | x |
| Kevin Cowl | 2/26/09 4:30 PM | 2/26/09 5:00 PM | Rep. Thornberry Meeting | x |
| Trita Parsi | 2/26/09 4:30 PM | 2/26/09 5:00 PM | Rep. Thornberry Meeting | x |

Likewise, Defendant's second allegation that the document was substantively changed on December 23, 2009 is also false. The calendar entry immediately preceding it in Defendant's Exhibit G to Defendant's Omnibus Sanctions Motion is the same meeting with all the same information and a last date modified of 6/3/09, but in a different custodian's calendar.  Unless both users edited the documents in the same way 6 months apart, the more likely explanation is that opening the calendar item during the review or the export process itself changed the date last modified.

There are eleven (11) common activities that can cause a date modified field to change including 1) Changing the start or end time of the vent, 2) Changing the reminder, 3) Snoozing the reminder, 4) Dismissing the reminder, 5) Changing the Show As (out of office, busy etc.) 6) Marking Private, high, or low importance, 7) Categorizing with a flag 8) Time Zone information

change 9) Adding notes to the body   10) changing the subject and 11) Exporting events from

shared calendars. The opening of the document during the review process and/or the export

process itself was the likely cause of the change in the date modified field.  (See Exhibit C.)

### 15. Regarding an August 26, 2009 Kevin Cowl entry.

As a concern, the defendant raises the following: "on August 26, 2009 Kevin Cowl entry

that states, 'Shared drive clean up.'" Def.'s Omnibus Sanctions Mot.)  Defendant is incorrect.

This calendar event was scheduled to occur on 8/28/09 not 8/26/09.  The event was a canceled

meeting that was found in the deleted items.  The item was also located in Espied Philosophies

deleted items but with the subject line containing "Canceled: Shared drive cleanup".  The

following is an excerpt from Exhibit C to PwC's October 2010 Report:

| Custodian | Outlook Folder | Creation Time | Start | End | Subject | From | TO |
|---|---|---|---|---|---|---|---|
| Sepideh Phalsaphie | Deleted Items | 8/26/09 2:37 PM | 8/28/09 10:00 AM | 8/28/09 11:00 AM | Canceled: Shared drive cleanup | Kevin Cowl kcowl@niacouncil.org | Kevin Cowl <kcowl@niacouncil.org>; 'Sepideh Phalsaphie' <sphalsaphie@niacouncil.org> |
| Kevin Cowl | Deleted Items | 8/26/09 2:36 PM | 8/28/09 10:00 AM | 8/28/09 11:00 AM | Shared drive cleanup | Kevin Cowl kcowl@niacouncil.org | Sepideh Phalsaphie <sphalsaphie@niacouncil.org> |

The item at issue clearly was canceled and not in NIAC's calendar when the productions

were made.  Defendant's baseless allegation that NIAC would clean up its shared drive on

August 26 2009 to spoliate evidence is also without merit.  Defendant presents no evidence that

anything was improperly deleted from the shared drive.

### 16. Defendant's claim regarding an October 14, 2009 call about Convio and Common Ground.

Defendant claims that the Convio calendar event was missing from the production.

However, the file was only created on 10/14/09 at 4:19PM, an hour after the alleged appointment

from 2:30pm to 3:00 pm occurred.   The file was located in a deleted folder because the

appointment for the 14th never happened.  The following is an excerpt from Exhibit C to PwC's

October 2010 Report:

| Custodian | Outlook Folder | Creation Time | Last Mod Time | Start | End | Subject | From | To |
|---|---|---|---|---|---|---|---|---|
| Kevin Cowl | Recovered | **10/14/09 4:19 PM** | 10/14/09 4:19 PM | **10/14/09 2:30 PM** | 10/14/09 3:00 PM | Brief call about Convio and Common Ground | Emma Zolbrod <ezolbrod@convio.com> | Emma Zolbrod, kcowl@niacouncil.org |

The meeting actually occurred on 10/15/09 and was in fact produced in the April calendar

production as a 10/15/2009 meeting from 2:30 to 3:00 pm.  The following is excerpted from the

4/21/10 Kevin Cowl.xlsx production:

| Kevin Cowl | Brief call about Convio and Common Ground | 10/15/2009 | 2:30:00 PM | 10/15/2009 | 3:00:00 PM |
|---|---|---|---|---|---|

This is an example of PwC not providing answers to the July 1, 2010 order requiring

them to provide the dates and substance of deletions. Defendant misused the information to make

it appear as if NIAC spoliated evidence, which it did not.

**17. Defendant's claims regarding entries referring to meetings at J Street.**

The three references to a 10/26/09 and 10/27/09 event with a subject of J Street in

Defendant's Exhibit G were all taken from deleted and recovered areas of Michelle Moghtader

"pst" files. The four events were all created within a few minutes of each other and deleted.  A

fourth and fifth document was in fact produced for an event on 10/26/09 and 10/28/09 with a

subject of "J Street" that was also created at the same time as the other documents.   These

meeting events are attached.  The following is excerpted from Exhibit C from PwC's October

2010 Report:

| Outlook Folder | Creation Time | Last Mod Time | Start | End | Subject | From | Matched to NIAC Production 1 or 2 |
|---|---|---|---|---|---|---|---|
| Deleted Items | 10/7/09 10:45 AM | 10/27/09 10:33 AM | 10/27/09 9:00 AM | 10/27/09 4:00 PM | J Street | Michelle Moghtader <mmoghtader@niacouncil.org> | |

| | | | | | | Michelle Moghtader <mmoghtader@niac ouncil.org> | |
|---|---|---|---|---|---|---|---|
| Recovered | 10/7/09 10:45 AM | 10/7/09 10:45 AM | 10/27/09 9:00 AM | 10/27/09 8:30 PM | J Street | Michelle Moghtader <mmoghtader@niac ouncil.org> | |
| Calendar | 10/7/09 10:46 AM | 10/29/09 9:46 AM | 10/28/09 9:00 AM | 10/28/09 4:30 PM | J Street | Michelle Moghtader <mmoghtader@niac ouncil.org> | X |
| Calendar | 10/7/09 10:45 AM | 10/26/09 10:48 AM | 10/26/09 9:00 AM | 10/26/09 3:30 PM | JStreet | Michelle Moghtader <mmoghtader@niac ouncil.org> | X |
| Recovered | 10/7/09 10:45 AM | 10/7/09 10:45 AM | 10/26/09 9:00 AM | 10/26/09 9:00 PM | JStreet | Michelle Moghtader <mmoghtader@niac ouncil.org> | |

It appears that Moghtader created the event for 10/27 and then deleted it on 10/27 when she did not attend the meeting for that day. (See Exhibit C.)  Without further evidence, the one deleted item and two recovered items from the calendars that had actually been produced from an archive are not indicative of spoliation but rather ordinary use.

With regard to Defendants presumed prejudice for not knowing about a J Street meeting on these dates, the allegation is completely unfounded. Dr. Parsi and Patrick Disney both produced meeting events for J street events on the same days.   These meeting events are attached. (See Exhibit O.)

**18. Defendant's claims regarding a 12/3/09 entry relating to an email to Progressive.**

Defendant raises concerns regarding a December 3, 2009 entry relating to an email to Progressive to "finish up server and Backup." This calendar event was produced in April 2011 and is attached. (See Attached Exhibit P.)

**19. Defendant's claim regarding a 11/3/09 Elliot entry about CLPI training.**

Defendant incorrectly states that the CLPI training event occurred on 11/3/09 when it actually took place on 11/19/09.  The item was located in a deleted folder; however, David Elliott produced a CLPI training event for the same day in the 4/21/10 production entitled: "Copy: CLPI training."  A user that has two events scheduled at the same time for the same purpose will often delete one of those items in the ordinary course of business.  (See Exhibit C)

Defendant's allegation that they did not know about the CLPI training for that time and date is ridiculous. The event appeared five times in various custodian's calendar in the 4/21 production:

| michelle moghtader | CLPI meeting | 11/19/2009 | 10:00:00 AM | 11/19/2009 | 12:00:00 PM |
|---|---|---|---|---|---|
| kevin cowl | CLPI training | 11/19/2009 | 10:00:00 AM | 11/19/2009 | 12:00:00 PM |
| kevin cowl | CLPI Training | 11/19/2009 | 9:00:00 AM | 11/19/2009 | 10:00:00 AM |
| patrick disney | CLPI training | 11/19/2009 | 9:00:00 AM | 11/19/2009 | 11:00:00 AM |
| david elliot | Copy: CLPI training | 11/19/2009 | 10:00:00 AM | 11/19/2009 | 12:00:00 PM |

20. **Defendant's claim that many references to SWIPA were deleted and/or not produced.**

Defendant claims that many references to SWIPA were deleted and/or not produced. Three (3) out of seven (7) references to SWIPA in Defendant's Exhibit G were in fact produced. (See Exhibit Q.)  The remaining documents were deleted or recovered.  The fact that an event is deleted is not an indication of spoliation without further evidence.  In fact, one of these deleted items was created 14 minutes after the alleged meeting occurred, an indication that it never happened.  (See Exhibit C.)  Defendants present no evidence that these documents should have been produced as a part of NIAC's calendars.

21. **Defendant's claim about other references to CNAPI meetings.**

Defendant complains about other references to CNAPI meetings with congressmen or staffers and preparation of materials for them.  The first CNAPI event on Defendant's list, a 9/23/09 event in David Elliot's calendar, was in fact produced.  The next five CNAPI documents were duplicates of the same 1/21/09 document that we discussed in allegation 13.  The next event, an 8/26/09 event in Patrick Disney's calendar for "CNAPI Lobbying", was in fact produced in April 21, 2010. (See Exhibit R.)

**22. Defendant's concern about the number of calendar entries purportedly modified between December 23 and 27, 2009.**

Once again, the defendant does not provide any evidence for its allegation that "of the 17,000 calendar entries recovered, 1445 were last modified on December 23-27, 2009, which is 40-times the expected rate." (See Def.'s Omnibus Sanctions Mot.)   Plaintiff's expert was able to locate 1445 records with a date modified between December 23 and 27, 2009, as set forth in Exhibit C to PwC's October 2010 report.  Over 1000 of these documents were duplicates that came from multiple copies of the same pst files that were extracted from different custodians' computers.  Prior to the December 28, 2009 production, each custodian received a copy of a zipped folder containing all custodians' pst files, which PwC improperly processed multiple times.

The remaining approximately 300 unique documents that contained a date modified of December 23-27, 2009, were the result of the export process itself creating a non-substantive change.   Plaintiffs' expert reviewed the original exports of these files from the original custodians against the exported copies and reviewed the date modified of a sample of the 300 events.  The date modified matches the date of creation of the entire pst file, meaning the export process itself changed the date last modified of these files.  As an example, Patrick Disney created the pst file cal pd 1 at 12/23/09 6:17 pm and cal pd at 12/23/09 6:18 pm.  Many of the events within the pst file had a modification date at exactly the same time that the pst was exported and created.  A sample of five (5) documents from each pst is demonstrative of this principle.  (See Exhibit S).

**B. NIAC's Conduct Relating to Producing Its Server for Imaging Does Not Warrant Sanctions.**

There is a reason that NIAC produced eight (8) PCs for imaging in lieu of its exchange server; NIAC does not have an exchange server, as NIAC has repeatedly attempted to make clear both to the defendant and the Court. From the outset of the forensic imaging process, PwC's report makes clear that NIAC "disclosed . . . that NIAC did not operate a Microsoft Exchange email server in-house. A third party service provider was responsible for the delivery of e-mail via Post Office Protocol (POP). All parties agreed to the imaging of desktop and laptop computers utilized by NIAC employees that contained Microsoft Outlook (.pst) files in lieu of the originally planned Microsoft exchange server".

At all times relevant herein, NIAC's "network" consisted of desktop and laptop workstations connected to a centrally located shared drive that was used to store files and backup pcs, but did not contain active calendars. This shared drive (Iomega Store Center NAS (serial no. 0JAK380013) was installed on or about December 4, 2009, to replace a Dell Dimension 4550 Desktop Computer (serial no. 42BVV21) that had been used as a shared drive for files. Upon information and belief, all data was migrated to the Iomega Store Center NAS on this date by Progressive Office. (See Exhibit T.) Even in its Omnibus motion, Defendant continues to misrepresent that the Dell Dimension 4550 Desktop and the Iomega Store Center NAS constitute NIAC's Exchange "servers"; they do not. They are simply NIAC's current and former file servers.

NIAC's desktop and laptop workstations utilize Microsoft Windows XP, Vista, and 7 Operating Systems.[2] The organization's email is presently hosted by Dreamhost. All emails are

---

[2]In recent months, NIAC also has added two (2) Apple Mac Mini Desktop Computers that utilize the MAC OSX Operating System.

directly synced to the user's workstation via POP3/SMTP Protocol. <u>There is no email Exchange Server at the NIAC location.</u> All emails are maintained on the user's workstation via Microsoft Outlook, or recently Apple Mail. (<u>See</u> Exhibit T.) For NIAC, all data storage is maintained onsite. Further, NIAC does not utilize a Blackberry Enterprise Server. Data from previous employees and interns is kept on the desktop or laptop computer.

NIAC's complete and unedited calendars were stored on their active "pst" files on their PC's, not on a local Microsoft exchange server, backup drive, shared drive, or a backup server or an intern's computer that was once used as a backup server. The Court's final order states that "this is now the third time that plaintiffs have been order to produce their server –a server that plaintiffs initially claimed did not exist – plaintiff shall pay the costs associated with defendant bringing the instant motion."

While NIAC consistently stated that they did not have a local Microsoft exchange server, Defendant twisted the meaning of the word "server" from what all three parties including PwC originally intended, NIAC's Exchange Server, to any "Server" that was used to store "pst" files whether those files contained active calendars or not. The "servers" that PwC imaged in the second and third round of imaging were not Exchange servers, they were backup drives. The calendar items that PwC found on these machines were backups from NIAC's PC's or found by PwC in unused and inaccessible formats which NIAC didn't know existed and were never obligated to provide as their "complete and unedited calendars".

Again, much of the defendant's basis for seeking sanctions stems from its view that a small organization, like NIAC, should have an IT professional who could have more accurately responded to the never-ending request for pc serial numbers and network information. NIAC did

not intentionally provide the defendant with inaccurate information to avoid discovery, to the extent any inaccurate information was provided it was inadvertent.

For these reasons, sanctions are not warranted.

### C. NIAC's Alleged Conduct Relating to Talebi's Emails Does Not Warrant Sanctions.

For a number of reasons, NIAC's alleged conduct relating to the Talebi emails does not warrant sanctions.

#### 1. NIAC acted in good faith when it followed the following procedures relating to the Talebi email production.

NIAC acted in good faith when it followed the following procedures relating to the Talebi email production. First, it appears that NIAC did an initial review of the Talebi emails and produced between approximately 300 and 400 emails, having determined that most of the emails were not responsive. It was later determined that Plaintiffs' counsel should re-review all the emails and re-produce any Counsel believed were responsive.

When this process was undertaken, all 8,005 Talebi emails were re-reviewed. To that end, Plaintiffs' took all of the Talebi emails and uploaded them to Outlook Express. Plaintiffs then filtered the emails by running the previously agreed upon search terms.[3]

After running the search terms, there were approximately 5,595 emails that contained one or more of the search terms. The remaining 2,410 emails with no search terms were not reviewed for responsiveness. The 5,595 emails that contained at least one search term were reviewed to determine whether any were responsive to the Defendant's Document Requests.

---

[3]As Plaintiffs were searching Babak Talebi's emails, the search term "Babak Talebi" was NOT used, as that would have made the filter unusable. It also appears that "NIAC" and "Nation Iranian American Council" was not used, as those terms showed up in almost every email.

On or about August 20, 2010, 2,915 emails were produced, out of the 5,595 that were reviewed. More specifically, 344 emails, the supplemental production, were produced, as well as 2,571 emails, the overproduction, which, though questionably responsive, were produced by NIAC out of an abundance of caution.

A second round of review of the 5,090 non-produced emails was conducted. On or about March 18, 2011, another 191 emails were produced, bringing the total emails produced to 3,106.

Although a total 3,106 emails were produced, Defendant filed a Motion to Compel. After an *in camera* review by the Court of 5,134 emails, which included the 191 subsequently produced, the Court determined that those emails did contain some emails that were responsive and therefore ordered all 8,005 emails to be produced. NIAC complied with the Court's ruling.

1. **Defendant has made a number of misrepresentations in support of sanctions as it relates to the Talebi email production.**

NIAC finds it necessary to correct a number of misrepresentations made by the defendant in support of sanctions as it relates to the Talebi email production. The defendant gloats that "NIAC ultimately conceded that the machine on which these Talebi emails were located was yet another "intern machine" it had withheld from imaging." The determination that a machine NIAC mistakenly believed was an "intern machine" was actually used by Talebi was relevant to the Outlook calendar production, not the Talebi email production. Further the defendant tries to score points by stating that "In the end, the Court found that NIAC had improperly withheld 5,500 emails by its former Director of Community Outreach and ordered all of his emails to be produced." To be accurate, the Court found that the 5,500 emails contained some emails that were responsive and as a result Order that all should be produced. To be clear, the Court did not find that all 5,500 emails were responsive. Further, the defendant crows that "On August 24, 2010, Plaintiffs produced about 2,500 of the 8,000 emails. The rest were withheld as, according

to Plaintiffs' sworn interrogatory responses, they contained no search terms or were not responsive." In actuality, Plaintiffs produced 2,915 emails. Those emails that were not produced were held back based upon the plaintiffs' good faith belief, after a thorough review, that certain emails were not responsive. In fact a large majority of those emails are not responsive even if a few responsive emails inadvertently were not produced.

Additionally, the defendant overstates his entitlement to sanctions by reaching some overblown conclusions from 16 cherry-picked emails out of a pool of over 5,000 emails. Defendant states: "So, over three years into the case and after more than a dozen depositions where such emails could have been used, NIAC finally produced the remaining 5,500 emails. (More than 1,300 of the emails were to or from Parsi and more than 500 to or from Blout.)"[4] However, many of the 5,500 emails they are referencing constitute spam.

Furthermore, as is set forth below most of the 16 emails focused on by the defendant did not come up during the plaintiffs' initial search because they did not contain any of the search terms. Rather, in each of the instances below an attachment to the email contained a search term; unbeknownst to plaintiffs, Outlook Express is unable to search the content of attachments, including in the below instances:

- "An April 23, 2007 memo to Parsi and Talebi and NIAC's entire board from NIAC's outgoing Legislative Director on NIAC's lobbying strategy is enlightening:"

- "Another omitted document was a July 25, 2007 RSVP list of attendees at a NIAC function that included dozens of Congressmen and 10 staffers. (Def.'s Ex. Q-13 to Def.'s Omnibus Mot.)."

Some anomalies occurred, which do not demonstrate bad faith by NIAC. For instance, the defendant contends that "In a November 3, 2007 email regarding a fundraiser, Parsi suggests

---

[4]It is understandable that Dr. Parsi, NIAC's president, and Emily Blout, as the Legislative Director, would have been cc'd on a large number of the work related emails.

a congressional candidate be given 15-20 minutes to speak: "This is critical since she is a candidate that may replace a somewhat pro-war incumbent." (Def.'s Ex. Q-12 to Def.'s Omnibus Mot.)." The record bears out that an early version of the string was provided. It should be noted that the string was fairly long, and that there were many duplicative emails.

In each instance, NIAC, through counsel, acted in good faith as it relates to its Talebi email responses.

### D. NIAC's Conduct Relating to Third-Party Emails Does Not Warrant Sanctions.

NIAC has not intentionally refused to provide any of the emails outlined by the defendant. The third-party emails obtained by the defendant do not contain any "smoking gun" information that NIAC would have been attempting to hide from the defendant. Moreover, the sanction sought by the defendant – an instruction that the offsite ISP server contained emails that support the defendant's contention about the truth of his publications – is absolutely unwarranted.

### E. NIAC's Alleged Conduct Relating to the Production of Salesforce and Membership Databases Does Not Warrant Sanctions.

It is undisputed that in March 2009 the defendant propounded a routine document production request for documents "relating to NIAC membership." (See Exhibit "F" to Defendant's Motion to Compel Membership Lists, Request for Production, No. 3.) In response to the defendant's document request, the parties negotiated and entered into a Confidentiality Agreement that resulted in NIAC producing membership information in May 2009, as has been admitted by the defendant.[5] (See Defendant's Motion to Compel Membership Lists, p. 2)

---

[5]However, notwithstanding the production of membership information by NIAC in May 2009, Defendant belittled the quality of the information that NIAC produced in May 2009. The sanctions requested result from the defendant's refusal to accept that NIAC is a small organization that doesn't have the resources of a firm the size of the defendant's counsel. To that end, the December 2004, December 2007, and April 2008 membership information which the defendant does not deny that NIAC produced was insufficient for the defendant. The complained of

In or about July 2010, NIAC's Salesforce database came to the defendant's attention due to references to "SF" in some NIAC calendar entries. Defendant mentioned the "SF" database to NIAC, but the defendant's use of the abbreviation "SF" for Salesforce did not initially ring a bell with any of NIAC's staff. As such, NIAC denied any knowledge as to what "SF" related, which was a genuine denial and not intended to avoid complying with any discovery request.

The defendant overstates Patrick Disney's testimony about Salesforce use within NIAC. Disney did not recall anyone being in charge of Salesforce for NIAC, and further stated that he only occasionally used Salesforce. (See Attached Exhibit U, Deposition of Patrick Disney, dated October 29, 2010, p. 226:3-8) Disney clearly stated: "I didn't use it very frequently, actually." (See Exhibit U, p. 226:22-24) Further, Disney stated: "I found [Salesforce] to be a difficult tool." (See Exhibit U, p. 227:3-4)

By September 2010, the defendant had determined and advised NIAC that "SF" related to Salesforce. What bears repeating is that Defendant's interest in "SF initially was only as it relates to the meeting notes section of the database, not as it related to any membership information. Further, NIAC stands by its position that its use of Salesforce both was inconsistent and infrequent, and that at the time Salesforce information was requested by the defendant NIAC was no longer using the subscription database service. NIAC made good-faith efforts to obtain access to the Salesforce data in light of the fact that NIAC no longer had a subscription with the Salesforce database.

Once the information was received, it was produced. The "meeting notes" entries were received first by NIAC and produced to the defendant. Later, the membership list was received

---

deficiency of the membership information provided by NIAC in May 2009 is based upon the defendant's clearly sarcastic view that NIAC may not have had any updated membership information to produce for the time period between April 2008 and May 2009. (See Defendant's Motion to Compel Membership Lists, p. 2.)

from Salesforce.  NIAC relied upon Salesforce to provide NIAC with the data requested by the defendant.  Upon information and belief, Salesforce created the membership list data around May 2010.  However, NIAC did not receive that data until the end of February or beginning of March 2011, at which point it was handed over to Defendant on March 2, 2011.

On March 2, 2011, NIAC produced five documents containing membership information categorized as "Opportunities," "Accounts," "Contacts," "Leads," and "Campaigns."  As before, the defendant was dissatisfied with the membership information provided by NIAC.   Trying to be responsive, on March 18, 2011, NIAC produced a list of 9000 transactions from Convio, which the defendant has characterized as predominately consisting of a list of donations over a six-year period.  This time, the defendant complained that the information provided on March 18, 2011, did not specifically list "expired members" or "former members" as had the information that was produced 16 days earlier, but was complained about at that time.  (See Defendant's Motion to Compel Membership Lists, p. 5)

With respect to Convio, Plaintiffs had to go through Convio to receive the information. Covio produced a list of approximately 9,000 transactions, which listed all the members.  As former members were not included in the transaction list, a separate list had to be produced.  As such, prior to being order to do so in September, 2011, Plaintiffs had already produced current, expired, and former member lists. This information, however, was simply not in the format that Defendant wanted it in.   When the Defendant received a file that contained solely former member information, he was not satisfied with the transaction list, because it was more difficult for Defendant to pull out the relevant information it was seeking.  As such, Defendant wanted Plaintiffs to format the information in such a way that it was easier for him to review.  Although it was possible for Plaintiffs to format the information, Plaintiffs had already provided everything

that Defendant was seeking.  After the Courts Order of September, 2011, Plaintiffs re-produced the information in the format that was sought.

Thereafter, the defendant began his quest for "former members" membership information or a stipulation by NIAC that it only has 118 former members as of May 2010.  NIAC was punished based upon the legitimate disparate view between the parties as to what constitutes a "former member."

NIAC acted in good faith when it first produced membership information prior to the "SF" period of confusion, when it responded as best it could to the defendant's vague "SF" meeting notes request, when it responded to the defendant's follow-up request that NIAC provide membership information from Salesforce, to which it no longer had a subscription, and when it provided Convio membership information in a format not satisfactory to the defendant. Sanctions are not warranted.

### F.   NIAC's Alleged Conduct Relating to Parsi's Stolen Laptop and "Unconnected" Desktop Does Not Warrant Sanctions.

The defendant is seeking sanctions based upon NIAC's inability to prove a negative, i.e. that NIAC had no involvement in Dr. Parsi's laptop being stolen in 2010.  Although NIAC provided the defendant with a police report demonstrating that Dr. Parsi's laptop was reported as having been stolen while in Norway, along with his green card and passport, Defendant still demands that NIAC be sanctioned by being subjected to jury instruction with a negative inference, i.e. that Dr. Parsi had some role in his laptop being stolen.  Such a sanction would require this Court to find that Dr. Parsi's plan also included the extreme inconvenience of faking the loss of his green card and passport, the loss of both of which jeopardized his ability to reenter the United States.

Further, the defendant finds nefarious that Dr. Parsi' laptop at times was not connected to the data network.  However, Dr. Parsi has testified that it was for this reason that NIAC hired a vendor to address this problem with Dr. Parsi' desktop.  Again, for NIAC to be sanctioned, the Court must conclude that this technological glitch was an effort to hide relevant discovery material in this case.  Such a finding would be preposterous.

### G. The Defendant Is Not Entitled Sanctions Relating to the Continued Depositions of Parsi and Blout.

The defendant deposed Dr. Parsi for two days, which was the limit imposed by the court with respect to both Dr. Parsi's deposition, as well as the defendant's deposition.  In fact, it was clear that the defendant ran out of time as it related to completing Dr. Parsi's deposition. Assuming, *arguenedo,* that defendant did not have all of the emails, calendars, and membership information it complains about herein, the defendant would not have had time to question Dr. Parsi about much, if any of this information, given his inefficient use of the two days that he had been afforded by the court to depose Dr. Parsi.  As such, sanctions are not warranted.

Further, if the September 1, 2010, second day of Emily Blout's deposition was so necessary to the defendant's defense, it is quite conspicuous that no information was used from the continuation of her deposition in support of the defendant's motion for summary judgment. Again, sanctions are not warranted.

### H. NIAC Should Not Be Sanctioned Relating to Defendant's Claim About the Purported Editing of an IIC Document Prior to Its Production.

Plaintiffs are not aware of any alterations and did become aware of these alleged alterations until Plaintiff Parsi's depositions.  Although Defendant purports that alterations were made, there is no evidence regarding who made the purported alterations or edits.  Plaintiffs were not even aware that alterations were made until Defendant raised it for the first time during

Plaintiff Parsi's deposition.   As such, Plaintiffs do not know who, if anyone, made those alterations.

It bears noting that these purportedly altered documents had nothing to Plaintiffs.  They were simply IIC documents.  Why Plaintiffs would alter those documents is unclear.  As already stated, Plaintiffs did not even know that alterations were made until Plaintiff Parsi was asked about them during his deposition.  In any event, sanctions are not warranted for a purported violation that Plaintiffs were not even aware of until Defendant pointed it out and which had nothing to do with NIAC or Parsi.

## IV. CONCLUSION

As is clear above, NIAC's conduct has neither been willful nor grossly negligent.  Rather, NIAC has conducted discovery in a good-faith way that in all respects satisfied the spirit of the Federal Rules of Civil Procedure.  To sanction NIAC in any of the extreme and dispositve ways demanded by the defendant would be to reward Defendant for its strategy of creating discovery disputes as a means of distracting from the claims herein and as a *modus operandi* for parties, with unlimited legal resources, to avoiding liability for their conduct.

More specifically, the defendant has failed to demonstrate that he is entitled to the following sanctions:

  a.  the fees and expenses associated with the PwC forensic imaging process;

  b.  the fees and expenses associated with brining the instant Omnibus motion;

  c.  the fees and expenses associated with taking the deposition of Babak Talebi in Tampa, Florida;

  d.  the fees and expenses associated with preparing and serving subpoenas to non-parties:

    1)  Campaign  for a New American Policy on Iran;
    2)  Children of Persia;
    3)  Puneet Talwar at the National Security Council;

4) Hillary and Flynt Leverett;
5) Joel Morse; and
6) Sam Gardiner.

e.  a presumptive instruction that the offsite ISP server contained emails that support the truth of the defendant's contentions;

f.  the fees and expenses of Dr. Parsi's 2.5 days of deposition;

g.  a presumptive instruction that the jury may infer that unproduced emails, calendar entries, and documents support the truth of the defendant's contentions;

h.  the fees and expenses associated with the continuation of the depositions of Dr. Parsi and Emily Blout; and

i.  any fees, expenses, and/or damages associated with the alleged alteration.


### REQUEST FOR HEARING AND REFERRAL TO MAGISTRTE JUDGE

Pursuant to Local Rules LCvR 7, 72.2, and 72.3, Plaintiffs request that an evidentiary hearing relating to the allegations contained in Defendant's Omnibus Motion be granted and that such hearing be held before Magistrate Judge Facciola in light of his familiarity with e-discovery issues.


Respectfully submitted,


_____/S/_____
A.P. Pishevar (D.C. Bar No. 451015)
Adrian V. Nelson, II (*Pro Hac Vice*)
PISHEVAR & ASSOCIATES, P.C.
600 East Jefferson Street, Suite 316
Rockville, MD 20852
Phone: (301) 279 – 8773
Fax:    (301) 279 – 7347
Counsel for the Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRITA PARSI, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 08 CV 00705 (JDB) |
| | ) |
| DAIOLESLAM SEID HASSAN, | ) |
| | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I certify that on October 31, 2011, I served, via email, Corrected Plaintiffs' Opposition to Defendant's Omnibus Motion for Sanctions to:

> Timothy E. Kapshandy, Esquire
> Peter G. Jensen, Esquire
> SIDLEY AUSTIN LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005
> (202) 736-8000
> tkapshandy@sidley.com
>
> Attorneys for Defendant
> Seid Hassan Daioleslam
>
>
> _____/s/_____
> Afshin Pishevar
> Adrian Nelson
> 600 East Jefferson Street
> Suite 316
> Rockville, Maryland 20852
> (301) 279-8773
> ap@pishevarlegal.com
> anelson@pishevarlegal.com
>
>
> Attorneys for Plaintiff
> Trita Parsi
> National Iranian American Council

- 46 -