UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL,

Plaintiffs,

v.

DAIOLESLAM SEID HASSAN,

Defendant.

CA No. 08-0705 (JDB)

Washington, D.C.
Monday, August 30, 2011
9:45 a.m.

MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | ADRIAN NELSON II, ESQ.<br>AFSHIN PISHEVAR, ESQ. |
| For the Defendant: | TIMOTHY KAPSHANDY, ESQ.<br>HAROLD L. ROGERS, ESQ.<br>ERIC GALVEZ, ESQ.<br>THOMAS E. ROSS, ESQ. |
| For Non-Party Petitioner: | SCOTT F. CRAIG, ESQ. |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR<br>Official Court Reporter<br>U.S. Courthouse, Room 6714<br>333 Constitution Avenue, NW<br>Washington, D.C. 20001<br>202-354-3186 |

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK: Your Honor, we have Civil Action 08-705, Trita Parsi, et al., versus Daioleslam Hassan. We have Mr. Adrian Nelson, Mr. Afshin Pishevar and Mr. Kevin Cowl representing the plaintiffs. We have Mr. Timothy Kapshandy, Mr. Harold Rogers, Mr. Thomas Ross and Mr. Eric Galvez representing the defendant, and we also have Mr. Scott Craig appearing by telephone, and he represents the non-party petitioner, Mr. Kenneth Timmerman.

THE COURT: Have we covered everyone?

MR. NELSON: Just to correct the record, Mr. Cowl is the chief operating officer for NIAC. He's not participating counsel.

THE COURT: All right. We have lots of motions pending. There's defendant's motion to compel production of the server, also defendant's motion to compel production of membership lists. We have defendant's motion to compel damages discovery and/or strike some aspects of the prayer for relief. There are motions -- do we have someone on the phone, did you say?

THE DEPUTY CLERK: Yes. Mr. Scott Craig.

THE COURT: There are motions pertaining to Mr. Timmerman's deposition, both a motion to quash on behalf of Mr. Timmerman, and a motion to compel by the plaintiffs. Then there's defendant's motion to compel production of documents

relating to the legality of plaintiffs' lobbying activities, and a corresponding motion by plaintiffs, a motion *in limine*, to exclude testimony and evidence related to purported lobbying activity by plaintiffs.

And then two motions *in limine* by defendant, one to exclude the testimony of Joel Morse, and the other to exclude the testimony of Debashis Aikat. Those last two motions are not purely speaking discovery motions; they are motions *in limine*. I do not intend to address those today.

The other motions we will deal with. Even though one of them is a motion *in limine*, it really is tied in with this question of discovery relating to lobbying activities.

I also don't intend to have argument on all these motions. I'll be candid with you. Some of these motions I've heard enough on. They relate to past discovery issues, issues that I have made rulings on, ordered production on, and quite frankly, some of the filings, particularly on behalf of plaintiffs, don't seem to me to address the issues at all. They talk about other, not totally unrelated, but other events that really have little bearing on the motions themselves.

So, with respect to the motion to compel production of the server and motion to compel production of membership lists, I'm going to grant those motions. I will issue an order later today, or at the latest by tomorrow, that sets out the particulars of that ruling.

I am disappointed, to say the least. I would say more appropriately I am somewhat outraged by the conduct with respect to those issues and the failure by plaintiffs to comply with orders and produce discovery on those two subjects.

Then with respect to the deposition of Mr. Timmerman, I also don't think I need to hear argument or ask questions, if you will, on that. It seems to me pretty straightforward that while there may have been every reason to take the deposition of Mr. Timmerman, the plaintiffs have simply failed to promptly notice that deposition and pursue that matter.

The record is pretty clear to me that this is plaintiffs' fault, not anyone else's fault, and that they had ample opportunity throughout the discovery process -- particularly if Mr. Timmerman is as important as plaintiffs contend that he is -- they had ample opportunity to depose him all the way up to the discovery deadline earlier this year. I then gave them additional time to deal with that matter and schedule and notice his deposition, allowing them up to, I think it was May 13.

And the failure to timely do so I place at plaintiffs' doorstep. They appear to have known the home address. He was previously served at that location. And once he was contacted by a publicly listed telephone number, Mr. Timmerman responded timely. It just doesn't seem to me that there's any legitimate excuse for the failure to get that taken care of and get Mr. Timmerman's deposition noticed and scheduled within the

timelines that the Court had set. And therefore I will be granting the motion by the nonparty Kenneth Timmerman to quash the subpoena and denying the motion to compel the deposition of Mr. Timmerman filed by plaintiffs.

That leaves us with two issues, if you will. One relates to the motion to compel regarding damages, and the other relates to the question of lobbying activities. Those issues I'd like to hear from the parties a little bit on and ask you a few questions.

So why don't we start with the -- and I'll do them separately. Why don't we start with the motion to compel regarding damages. And I'll hear from the movant on that.

MR. KAPSHANDY: Thank you, Your Honor. And as the Court noted, this is kind of a combination of a motion to compel and/or to strike, so there's several subissues, and the first one --

THE COURT: And it's a little unclear to me, quite frankly, to the extent that it is both. If we set aside the attorneys' -- well, I think we'll deal with the attorneys' fees issue first. I'll say this about the others. It's not exactly clear to me what discovery relating to either special damages or general damages you are alleging that has not been produced. Other than this one account, this one foreign account -- we'll talk about that specifically -- it's not really clear to me what it is you're alleging the plaintiffs have failed to produce. I

understand your argument on, well, they haven't shown enough, but quite frankly, that's a steep hill for you to climb at this point in the proceedings.

But let's deal with the attorneys' fees first. To begin with, setting aside punitive damages, am I missing something? How are attorneys' fees a part of recoverable damages? And I take it that we're talking about attorneys' fees incurred in connection with this litigation.

MR. KAPSHANDY: That's our point exactly, and perhaps that's a question that the plaintiffs --

THE COURT: We have something called the American rule, don't we? How is that a recoverable item of damages at all?

MR. KAPSHANDY: I don't believe we should even be here. I think when we said there's no basis for recovering this, and they insisted on listing them in their Rule 26 disclosure and claiming them as damages, we had no choice but to say, well, then let us see them.

THE COURT: Then you get into this waiver issue.

MR. KAPSHANDY: Then they said, well, we're afraid it might show up on the Internet. So it's not clear what their argument is for not producing them, but I would agree entirely with the Court; I don't think it's recoverable. That's where we morph into a motion to strike, but we can't be blindsided when we get to trial and they say --

THE COURT: I understand that. You do morph into a motion to strike on that. But that's not really the heart of your motion to strike. The heart of your motion to strike is special and general damages more particularly. But on the attorneys' fees, are attorneys' fees relevant for punitive damages? If they seek punitive damages from you, which they do, can they not put into evidence the attorneys' fees that they've expended as part of the basis for the jury's calculation of punitive damages?

MR. KAPSHANDY: The guidelines, assuming you meet the Sullivan standard, are pretty broad and nebulous, including all sorts of things. Assuming that Sullivan is met, in which case maybe the defendant's income is relevant also, and what is needed to punish him, and what damage has been caused to the plaintiff in terms of how it's disrupted their business or in terms of time --

THE COURT: I don't want to talk about all those other things, quite frankly. I want to talk about attorneys' fees.

MR. KAPSHANDY: I would think they have a good argument that they could introduce that as part of the calculation of punitive damages, in which case, since we don't have a bifurcated trial, I would say we're entitled to see what those are and test that claim.

THE COURT: So it seems to me that the first question -- and maybe I'm going to switch this a little bit and

get them up to the lectern. But the first questions are what exactly do we have at issue with respect to attorneys' fees? Are they being sought as a matter of compensatory damages, and, number two, will they be introduced in any way in trial to support a punitive damages claim? If the answer to both those questions is no, then the attorneys' fees issue is gone.

MR. KAPSHANDY: Right.

THE COURT: If the answer to either one of them is yes, then we'll need to talk about it some more. But let me find out where we are on that.

MR. NELSON: Adrian Nelson on behalf of NIAC.

THE COURT: Good morning, Mr. Nelson.

MR. NELSON: We believe that obviously the American rule is alive and well, and so the issue of attorneys' fees would not be relevant to the issue of compensatory damages.

THE COURT: All right. Let me get straight on the record. Plaintiffs are not seeking attorneys' fees as an element of compensatory damages for either Mr. Parsi or NIAC.

MR. NELSON: Correct.

THE COURT: Now with respect to punitive damages.

MR. NELSON: With respect to punitive damages, we do think that that is a viable claim. And our concern again is, with respect to the kind of history of this case, we would prefer that there be some kind of bifurcation on that issue.

THE COURT: What do you mean by bifurcation?

MR. NELSON: Well, we don't --

THE COURT: We're talking about discovery right now.

MR. NELSON: Yeah, we're talking about discovery, I understand, but the problem is that --

THE COURT: So whether trial is bifurcated or not, we're still doing the discovery now for both parts of the trial.

MR. NELSON: Right. Our hope was that we could delay production of the attorneys' fees documents to the point when it became clear that that issue of punitive damages was going to go forward. For instance, we understand that the opposing side plans to file at least one if not two dispositive motions. To us it doesn't make sense to have to turn over our attorneys' fees records if there's a chance that they could prevail on dispositive motions. Why not turn it over at that point when it's actually a viable claim?

THE COURT: That could be said for all of discovery, couldn't it, Mr. Nelson? If there's a chance that the defendants will prevail on dispositive motions, why have the discovery?

MR. NELSON: Well, I don't think that attorneys' fees are a material issue of fact, so that's not necessarily true of all discovery. Some discovery has to go forward in order for them to determine whether or not all disputed issues have been resolved. I don't think attorneys' fees fall into that category. But I do think that we need a certain degree of

protection --

THE COURT: And they're a damages issues as opposed to a liability issue.

MR. NELSON: Correct. So obviously our preference would be at the very earliest to turn it over after there's been a decision regarding dispositive motions. Otherwise, we have to make a decision as to whether or not we want to just waive that as a possible source of damages to protect ourselves.

THE COURT: Now, the briefing doesn't go where we're going now. You look at the briefing on this issue, and you really don't see this as the route to deal with and potentially resolve this issue. But that's where we are right now.

I will say that it is not totally out of the question, it is not indeed all that rare with respect to punitive damages to reserve some aspects of discovery on punitive damages until after dispositive motions, if there's some reasonable chance that punitive damages will not go forward. More often it's based on the question as to whether punitive damages are a viable form of recovery, which is really not the issue here, rather than whether a motion on liability by defendant will be successful.

But nonetheless it is true that in some instances some discovery with respect to punitive damages can be deferred. Why should I do it here?

MR. NELSON: Well, again --

THE COURT: You want that, but why should I do it?

MR. NELSON: I guess it's the history of the case in that --

THE COURT: You don't trust them, is the history of the case, right?

MR. NELSON: In terms of publication of our information, that's correct.

THE COURT: Both sides can make some points on that issue, can they not?

MR. NELSON: I believe so, but I think in our instance it's been more responsive than provocative, responding to recover from what's been put out there in the mainstream by the media.

THE COURT: But that's the basis upon which you think I should hold off on allowing them access to the attorneys' fees information. Because you now concede it's relevant only for punitive damages and punitive damages may not go forward because you may lose on the dispositive motions.

MR. NELSON: Well, we don't believe we'll lose, but there's a chance.

THE COURT: You may.

MR. NELSON: Yes.

THE COURT: All right. Is there anything else you want to say on this issue? We have this waiver issue that relates to the question of whether -- well, no, that's really in

the lobbying context. That's not really in this context. All right. Anything else you want to say on this?

MR. NELSON: Not on the issue of attorneys' fees.

THE COURT: All right. Let me have Mr. Kapshandy back up, and he can address this and also address the two other aspects of this motion.

MR. KAPSHANDY: As for the fear that this stuff might appear on the Internet, the way of dealing with that is a confidentiality order. And I do not believe -- and if that happens the Court can deal with the defendant putting stuff subject to a confidentiality order on the Internet. There are several of these in place and he has respected those.

THE COURT: All right. Anything else on attorneys' fees?

MR. KAPSHANDY: No. With regard to the rest of the motion, I would agree that it probably makes more sense to treat it like the Daubert motions, in that they are more of an issue-narrowing motion, but we lumped all the damages stuff in there.

THE COURT: What is the discovery that hasn't been produced? I understand there's this account, the Swedish bank account. Quite frankly, the Swedish bank account isn't directly evidence of income except to the marginal extent that there might have been interest earned. It's really the placement of money, not the source of money.

So maybe you can determine something with respect to income from what with respect to the account? Detailed records on all deposits and withdrawals in the account over a period of time? Is that what you're seeking? If you're just seeking how much money is in this account, it doesn't tell you anything about the source of the income.

MR. KAPSHANDY: Trita Parsi has testified that money he has made from his consulting, he calls it, and that's how he bases his damages calculation, is --

THE COURT: Has been diminished.

MR. KAPSHANDY: -- diminished. Unfortunately, we only have access to his U.S. tax returns, which don't report those figures, and his U.S. bank accounts. So if in fact the basis of his damages calculation --

THE COURT: You mean this is money earned elsewhere?

MR. KAPSHANDY: Outside of the United States.

THE COURT: It's earned outside of the United States and not reportable as U.S. earnings on any tax returns?

MR. KAPSHANDY: I'm not giving an opinion on the tax liability implications of that. I can just tell you that we don't have access to those because they're not on the tax returns. Maybe he has legal advice that that's not reportable. All we know is when it comes to calculating his damages, if it's based upon a diminution of the consulting income, we're entitled to see an account where he has testified he's put some

consulting income.

THE COURT: So what is it you're seeking in discovery with respect to that account? And be specific as to what's been sought in your discovery request. Is it just the general discovery requests that seek all documents relating to special damages and all documents relating to compensatory damages?

MR. KAPSHANDY: The request has been out there for a long time.

THE COURT: I know.

MR. KAPSHANDY: The question is why haven't we received those. And only recently did we get the calculation of the damages and it became apparent that that is essential. We have no power to subpoena the Swedish bank accounts, and he doesn't want to produce them for some reason.

So our request is twofold: Either strike that claim for consulting damages or order all of the records of the consulting income produced. That has been requested since March or January of 2009 when we sent out document requests for all evidence supporting --

THE COURT: And you put this Swedish bank account in the category of evidence of consulting income.

MR. KAPSHANDY: Because now he has claimed in his calculation that that is really his sole source of special damages. His consulting income has declined over a three-year period.

THE COURT: I know that, but you say the Swedish bank account is evidence of the consulting income.

MR. KAPSHANDY: Absolutely, by his own testimony.

THE COURT: Is there any other discovery with respect to consulting income that you're aware of, any other specific documents that have been withheld, or is it just that you haven't gotten anything and you want to get everything that there is?

MR. KAPSHANDY: Well, we want everything that supports his damages claim. His statement is the tax returns show a diminution of consulting income. If there's other consulting income records other than the Swedish bank account that we don't know about, that would be covered by the request. But who knows? We only accidentally found out about the Swedish bank account.

THE COURT: What about on general damages? Is there discovery there that hasn't been produced?

MR. KAPSHANDY: No. I would agree that that can be put in the category with the Daubert and other motions to limit the issues in the case. This one is kind of in between because it's an alternative form of relief. Either produce the documents or strike the special damages.

THE COURT: All right. Let me hear from Mr. Nelson on this.

MR. NELSON: If I understand the nature of the special

damages claim, if Mr. Parsi indicates that my income from speaking engagements has been reduced by $10,000 --

THE COURT: We'll call it consulting income.

MR. NELSON: Consulting. $10,000 in 2007, 2008, and 2009, he would therefore be claiming I've been damaged to the tune of $30,000.

THE COURT: Let's assume those are his claims, and let's assume you're going to put on evidence that says, either through his mouth or documents, that says here's what my consulting income previously was, here's what I think it would have been, but here's what it actually was, and that was caused by this defamation of me.

You've got to produce discovery with respect to that claim of special damages, that loss of consulting income. What's the basis for not producing discovery on that?

MR. NELSON: First, I don't know that we've ever been requested to provide information regarding the Swedish bank account.

THE COURT: Well, maybe not, but you have been requested to produce all documents relating to Parsi's allegation of special damages, including but not limited to all documents describing or evidencing any direct and/or quantifiable monetary losses suffered by Parsi.

It is true that if consulting income is deposited into that account, that would show, or be evidence of, consulting income,

and therefore the special damages that are claimed with respect to a loss of consulting income. I know it isn't a direct request for the Swedish bank account, but it is a request that I think covers that.

MR. NELSON: I guess our position is that, let's say that there's $30,000, which was the example I was using, for a three-year period, relating to bank accounts to which they do have access in the United States, if Mr. Parsi is not claiming that there was additional loss of money from another account --

THE COURT: That's ridiculous, Mr. Nelson, with all due respect. If Mr. Parsi is claiming that -- use your figures -- the 10,000 in each of three years, everything that he earned is relevant to determine whether he actually lost 10,000. You can't just look at one account, and if he chose to instead put all the money in another account, you can't just look at domestic earnings. If he chose instead to go overseas and do other things during that time period instead of domestic, you've gotta look at all the consulting income. You can't pick and choose. He can't do that.

MR. NELSON: There's been no intentional effort to hide any bank accounts.

THE COURT: I'm not saying intentional. I'm not there at the moment. What I'm saying is the discovery request covers this. You can't pick and choose. You can't say, well, I have a consulting income loss but I'm only going to present at trial

limited information on my consulting income, and I'm only going to give you discovery on that limited information, because this foreign consulting income I don't want to tell you about. That doesn't work. It doesn't work. And I don't see any argument that would make it work.

All right. So on the consulting income, I'm going to order the discovery. I'm not going to strike the claim at this point. And on the general damages, I'm not going to strike the claim at this point; we're going to let that play out. But fair warning: If you don't produce discovery on these damages claims, I'm not going to let you put on evidence on them.

You're not going to get it both ways. You're not going to be standing here in front of the jury putting on evidence of your consulting losses when you didn't produce that information in discovery. It just doesn't happen that way.

All right. And I'll give the attorneys' fees issue a moment's further thought before I issue an order. But the only issue there really comes down to am I going to require the discovery with respect to the attorneys' fees now, or am I going to defer that until after the dispositive motions.

If I defer it, Mr. Nelson, when I do order the discovery, which I will, I'm going to give you like three days to produce it. I'm not going to give you, you know, 45 days to produce that information. So you better be ready to produce it if we reach that point and I order it produced.

MR. NELSON: Yes, Your Honor.

THE COURT: All right. That takes us to lobbying. Another issue that's a little bit confusing. Let me make an observation to begin with. And there are motions by each side on this issue. My initial observation is I can't really -- I mean I don't fully agree with either side, but I can't really envision how this case will go forward without lobbying efforts relating to issues relevant to Iran. And I'm going to limit my discussion to that category: lobbying activities or efforts on Iran-related issues.

I'm not saying in support of the government of Iran, which is ultimately an issue perhaps in this case. But I'm just saying they're on issues relevant to Iran. They're not on issues that relate to clean energy in Switzerland. They're issues relating to Iran. I'm assuming that that's basically all the lobbying activities we're talking about; we don't have any other category, but that is the category.

I don't see how this case can proceed and go to trial without such lobbying efforts by plaintiffs, which we now, I think we'll all agree, did occur, there was some lobbying -- I don't see how that will fail to be at the heart of the case.

The defendant is going to try to show that certain lobbying was on behalf of the government of Iran, and the plaintiffs are going to try to show that that lobbying that the defendants are focusing on, and perhaps other lobbying, was not on behalf of

the government of Iran. And I assume the plaintiffs are going to introduce some of that lobbying efforts to show that they weren't doing it on behalf of the government of Iran.

I don't think that the case is necessarily limited, in terms of the evidence that will be presented, to lobbying that is actually proven already -- instead of for the jury to determine -- to be on behalf of the government of Iran. Both sides are going to introduce some evidence, and it's going to include some of the lobbying efforts, and I'm pretty sure that it's going to include lobbying efforts that one side or the other argues is not on behalf of the government of Iran.

Now, quite frankly, focusing more on the motion *in limine* for a moment, it does make some sense to say that the defendants will be limited pretty much to introducing evidence of lobbying that was on behalf of Iran, because that supports their case. But to order in advance that that's all they can produce it seems to me is a little premature, because we don't know what the plaintiffs' case is going to be. And if the plaintiffs put in evidence of lobbying efforts that they say were not on behalf of the government of Iran, the defendant has to be able to respond to that. And they may be putting on additional evidence along the same lines but fine-tuning and making arguments on it. And I can't decide at this point that it's only this slice of lobbying efforts that can come into evidence.

Now, I may decide, as we get into the trial, that some

evidence of lobbying efforts is not admissible. That's entirely possible. But at this point I'm not sure that I can do that.

So with those general observations, let me hear from you, and maybe I'll hear first from Mr. Kapshandy on his motion that is really a discovery motion, and then I'll hear from Mr. Nelson on his motion that is more a motion *in limine* to preclude evidence. But I've pretty much addressed that already by saying not that I'm going to deny it forever, but that I don't see how I can grant that motion at this time.

But, Mr. Kapshandy, let me hear from you on this lobbying activities set of issues.

MR. KAPSHANDY: Thank you, Your Honor. And I would agree entirely with the Court's assessment. That's kind of the way I see it coming in. Let's hope we can narrow down some of the lobbying evidence. As you saw from our --

THE COURT: I hope so.

MR. KAPSHANDY: -- selection of the attachment, there are hundreds of documents, and clearly it's in the defendant's interest to focus on this stuff that's more directly related to, shall we call it Iran-directed lobbying. But at this point in time, that's an ultimate issue, and you can't really make a determination that this is not relevant. Ultimately that's for the jury, and as a matter of proof and management of the trial --

THE COURT: Well, it may be for me in terms of

evidentiary objections.

MR. KAPSHANDY: Right. But that's all we have to say with regard to that.

With regard to the advice received from legal and other consultants, and that's in defendant's motion to compel, as the Court points out, part of this same effort to deal with the lobbying evidence by either keeping it out of evidence or not producing it. Now, the way that's going to come up is --

THE COURT: Most of that evidence that we're talking about, this legal advice evidence, is after the fact, is it not? Because as I understand it, the Wiley Rein retention and advice is 2009, 2010, after the events that gave rise to this case.

MR. KAPSHANDY: Right.

THE COURT: So how is that relevant at all?

MR. KAPSHANDY: Well, as the Court will recall perhaps from our last status conference and our papers, the plaintiffs have injected the issue of defamation per se, and accusing the defendant of accusing them of engaging in illegal lobbying. Now, illegal lobbying involves probably about five laws at least, and the plaintiffs, who have the burden of proof, need to prove that they were engaged in legal lobbying because of their defamation per se claim.

THE COURT: But would I admit and allow into evidence a 2009, 2010 legal opinion from retained counsel that the activities were legal? No, I wouldn't admit that. That's not

admissible. You can use an expert, put an expert on the stand to do that.

MR. KAPSHANDY: That's kind of the problem they have. First of all, they don't have anybody that can prove that their lobbying activities were legal, because everybody that they've listed as witnesses disclaimed expertise in that. But let's assume Trita Parsi gets up on the stand and they make the claim and still pursue this defamation per se cause of action. As soon as he's asked, isn't it a fact that there's --

THE COURT: Well, wait a minute. Is that a question from you or from Mr. Nelson?

MR. KAPSHANDY: On cross-exam.

THE COURT: From you.

MR. KAPSHANDY: No. They have the burden of proof, but of course we're not going to move to dismiss before I finish my cross-exam --

THE COURT: I know, but this question that you're talking about is a question from you?

MR. KAPSHANDY: It's going to come from us, assuming that perhaps on direct examination he doesn't say all of our activity was legal, all of our lobbying activity was legal, that involves, you know, ILSA and FARA and LDA and whatever --

THE COURT: He does report about every one of those. But go ahead.

MR. KAPSHANDY: Even if he doesn't open the door --

sorry about that -- if they have pending a defamation per se claim, as a matter of cross-examination, we have to get to the bottom of that issue, i.e., isn't it a fact that some of your lobbying activity was not legal? In fact, your own employee, Patrick Disney, questioned that. And then that opens the door, what did you do to make sure that all your lobbying activity was legal.

THE COURT: Okay. That doesn't allow testimony by him or introduction by you of legal advice that was obtained after the fact.

MR. KAPSHANDY: Well --

THE COURT: That's still not admissible.

MR. KAPSHANDY: Well, that's perhaps a way of dealing with it. If he is not permitted to, and they, NIAC, are not permitted to introduce evidence that they had legal advice supporting that their activity was legal --

THE COURT: If it was given contemporaneously or before they did something, okay, but it can't be that it was obtained two years later. We're talking about lobbying activities roughly in 2007, 2008, right?

MR. KAPSHANDY: Right. And we don't know what that advice is. I mean, we know they've changed their conduct. They've made this argument about retrospective remedial measures. The point is what they're left with if they're pursuing a defamation per se claim is, the only evidence in the

case so far is that their assistant legislative director said, hey, I don't think we're meeting the requirements of at least one of the lobbying laws, and if they're not permitted, which I would agree with the Court, to come in and say we have legal advice, we're not going to show it to you but it does support our opinion that our lobbying activities are all legal under all various forms of lobbying laws that might cover us, then, if they're not going to be able to --

THE COURT: Let's cut to the chase on this and let me hear from Mr. Nelson and see where we are on this. On the question of legal advice, it's really a question directed to the plaintiffs' side. Are you relying on legal advice at all in your -- it's not in your claim per se, but it's in your argument that the defamatory statement, illegal lobbying activities, was not true. Are you relying on legal advice? Is that something that Mr. Parsi is going to testify, I had legal advice?

MR. NELSON: I see it as impossible for him to testify that I had legal advice when the legal advice came after the lawsuit was filed. So it's the issue of this was legal advice that was obtained afterwards for going forward, not --

THE COURT: Is he going to rely on -- I mean, I'll use the term "rely on." Is he going to rely on legal advice obtained at any time? Is there legal advice back at the time of the lobbying activities? Other than the in-house discussions. I mean, Mr. Parsi and Mr. Disney, Ms. Blout, whoever were

talking, I understand that. None of them are lawyers. But we're really talking about is there legal advice that's going to be interjected into this case by the plaintiffs?

MR. NELSON: Not that I'm aware of, no.

THE COURT: Then why do I have to talk about this legal advice issue? I have a representation that there is not any legal advice defense or injection that the plaintiff is going to make into this case. With that, I'm not going to allow the discovery of the legal advice, because it's irrelevant to the case.

You're held to that. In other words, Mr. Parsi can't get on the stand and say I had legal advice that said this was okay, was legal lobbying activities, whether it be contemporaneous or after-the-fact legal advice. He can't say that; I won't allow him to say it. I'll strike it and I'll instruct the jury in no uncertain terms that that is improper, and I'll consider sanctions against the witness and counsel if I think that there's any kind of intentional misconduct.

But I think that takes care of that issue. All right? So let me turn back to Mr. Kapshandy on the rest of his motion on lobbying activities.

MR. KAPSHANDY: I think that takes care of it, because if they are held to the evidence as it was in 2008 and not the subsequent stuff that they've said, which is we subsequently clarified that all of our activities were legal --

THE COURT: But I thought we had an issue over whether you should get discovery with respect to lobbying activities -- have you gotten the discovery with respect to lobbying activity?

MR. KAPSHANDY: Right. We were just talking about these eight memos.

THE COURT: That's it?

MR. KAPSHANDY: Right. And I think with that representation, we've dealt with that. If they're cut off in 2008 and not able to say that we had after-the-fact advice that confirmed that our earlier activity was all perfectly legal, then we're fine.

THE COURT: All right. Mr. Nelson, anything further you want to say on the lobbying activities, or do you think that what I have said and what has transpired with counsel has pretty much got us where we need to get? Which is that there's no longer, based on your representations -- I'll give you a second.

(Plaintiff counsel conferring.)

That there's no longer an issue with respect to the defendant's motion to compel on lobbying activities because that really related to this legal advice in the set of eight documents, that's been taken care of by the representations made with respect to legal advice not being an issue in the case, and therefore their motion is resolved.

I've already indicated that -- well, you go ahead and speak further to your motion in terms of lobbying activities if you

want, although I've given some indications.

MR. NELSON: I just wanted to be clear. We can't see a way in which the defendant would open the door on the issue of this advice, but obviously we would want to reserve if they somehow bring that into the case.

THE COURT: There are twists and turns that happen in trials, and if somehow defendants interject that into the case, that will be at their own peril; I agree with you. I can't imagine how that will happen, but if it does, that will be at their peril.

MR. NELSON: Right. And I thought I understood the Court to say that on our motion *in limine* you were kind of inclined to reserve on that. If you are, then I need not say anything. If you are not, then there are a few points I would want to raise.

THE COURT: My strong inclination is to reserve and not try to draw a strict line now with respect to what category of lobbying activities can come into evidence from one side or the other, understanding that we're only talking about lobbying activities that are on Iran-related issues. Not the question of whether they're in support of the government of Iran or not, but they relate to Iran.

MR. NELSON: Correct. So you'll be making a ruling and giving an opportunity to argue on those issues as we get closer to trial?

THE COURT: As we get to trial, or indeed at trial as evidence is offered.

MR. NELSON: Thank you.

THE COURT: All right. With that, is there anything else -- given the parameters that I set out at the beginning with respect to a couple of the motions that I'm not going to address -- is there anything else that I need to hear now? I will issue an order that captures what has happened here today. Mr. Kapshandy, anything else?

MR. KAPSHANDY: Your Honor, I think the only thing left is a minor housekeeping matter. And that is we have another briefing schedule coming up that ends in November, so perhaps we should set our next date to get together for one of these status conferences.

THE COURT: The briefing schedule is the briefing schedule on --

MR. KAPSHANDY: Motion for summary judgment and motion for sanctions --

THE COURT: Sanctions-related.

MR. KAPSHANDY: -- filing it too, and I believe the plaintiffs have to respond in October. We'll be filing briefs on September 16. Our replies are due in November, so perhaps we should think ahead to either a status hearing or maybe the Court will entertain argument on that.

THE COURT: I think I probably will just set a hearing

date. Assuming we have no other issues that pop up, I'll set a hearing date. I'm not going to do that right here. Let me see from really -- it'll be determined pretty much by the initial filings, but maybe waiting until I see the oppositions as well, what might be involved in a hearing so that I can pick an appropriate time.

But my guess is that I will have a hearing on those motions unless I can look at them and see that they don't have any merit on their face. If there's some complexity to them, so long as it appears that there may be some merit to them, I would have a hearing. I would not be ruling in favor of the defendants without a hearing.

MR. KAPSHANDY: Great. Thank you, Your Honor.

MR. NELSON: Your Honor, I don't know whether you'd be inclined, but we would find it useful just to get a little clarification on the motion to compel the production of the server and to compel the membership list.

Specifically, when the last imaging took place, we became aware of the procedure, we felt, as it was happening. We were told that PWC needed to do both this logical as well as the other form of imaging. And I just simply would find it useful to have Mr. Kapshandy state on the record what his understanding is of what PWC is going to do with respect to this particular imaging, so there's no confusion.

The other issue is it would be helpful if Mr. Kapshandy can

articulate now what particular membership information he is looking for, because I would prefer for it to be discussed now in the presence of the Court than have a misunderstanding later. So if he's able to do that now, I'm not trying to put him on the spot, but it would help us to make sure that we are in compliance with what the Court's order is.

THE COURT: All right. I appreciate that, Mr. Nelson. Normally what I would say is, why don't counsel discuss that. That doesn't seem to be an avenue that has borne much fruit in this case.

So, Mr. Kapshandy, what's your reaction? I don't think Mr. Nelson's requests are frivolous. It seems to me that if they would advance the production by making it be what is expected and desired, that would be all for the good.

MR. KAPSHANDY: Not a problem, and gladly. Let me start with the membership list. Frankly, what we're down to is simply from the current Convio database -- well, shall we call it active or paid members? And another category that they call expired members. The third category, known as former members, counsel didn't point this out --

THE COURT: I thought it was active and current. In the order as I've drafted it at the moment, I don't use the term "paid," I use "active, current, expired and former."

MR. KAPSHANDY: And that's fine. That I think is the same thing we're talking about, except I would note for the

record they have produced, right before and maybe simultaneously with when we filed our motion, the former members. It was 116, they said 117. So we're really only talking about the paid and the expired. If you want to call it the paid, current or active, whatever, it's a term they've used throughout. So that's pretty straightforward from Convio.

With regard to the server, I welcome the opportunity to clarify because what we've asked for is, just so everybody knows, the server, which they've identified by number, which is now an intern machine, for forensic imaging.

THE COURT: It's the Dell Dimension 4550, which has a serial number, I think, of 42BVV21.

MR. KAPSHANDY: Right. With regard to the imaging and the logistics, we would, as we've asked for them to clarify before and the Court also to weigh in, that that imaging include an ability to determine when a profile was set up, who accessed -- it's called registry information or user habit information.

Similarly, this is mentioned in the motion, and I don't know if the Court noticed it and I'm glad counsel pointed this out, one of the intern machines that was not produced was, as it turns out, lo and behold, Babak Talebi's former machine. Now, we've never received any Outlook calendar entries for Babak Talebi. And perhaps those are on his old machine, but he testified he used the Outlook function of calendars.

So with regard to the imaging, we would like it to be a broad-based forensic imaging of certainly the calendars on both of those machines.

THE COURT: So that is another machine that is not the server.

MR. KAPSHANDY: Right.

THE COURT: But you think that's encompassed within your motion for production of the server.

MR. KAPSHANDY: We mentioned that in our reply brief, that we noticed for the first time when we got the number, which was mentioned in the real analysis report, in response from counsel of the serial number for Talebi's machine, we matched them up and saw for the first time that a machine that formerly they represented was merely an intern machine was Babak Talebi's machine. And we do have no calendar entries for him. And I don't know if they would be on the server. So that's one thing we mentioned in our reply that may need --

THE COURT: So you'd like this order to include not only the server but that Talebi machine?

MR. KAPSHANDY: Right. Now, the other issue that counsel mentioned that's come up before, and we should address it now, is does that include the ability to access things known as user habit information or registry information, because that tells you when profiles were put on that machine and who used it when. In the past their position has been that the Court's

order didn't cover that. Ours was that it did. But we would want to request clarification so nobody inadvertently violates any order.

The other things that we have mentioned in our form of order, and this is for the Court to determine obviously, is who pays for the cost of this imaging.

THE COURT: I understand that.

MR. KAPSHANDY: And the other thing, and please note, and our position is, and I don't know if they've responded to this, is with regard to that server, having had three chances to come up with that and to avoid these issues about how broad the imaging can be, is just do a traditional forensic image of every file that's on that computer.

Now, we may have to exclude things like Wiley Rein to make sure we don't inadvertently come across privileged materials, but we in our form of order have requested a broad-based forensic imaging of that server, because, frankly, you know, they've had enough opportunities to produce the calendars.

THE COURT: All right. Mr. Nelson.

MR. NELSON: Your Honor, I'm glad I asked the question, because I don't understand the need to do a broad-based forensic imaging when the original intent was to deal with the calendar issues. I don't see what a broad-based forensic imaging is going to do to clarify any issues relating to whether or not calendar entries were changed. Again, this

goes back to the issue --

THE COURT: You don't think it will give any information that might be relevant to whether or not calendar entries were changed, or you don't think that's a fair subject of inquiry?

MR. NELSON: I don't think either. How does obtaining profile user habit and registry information have anything to do with the calendar entries? This is narrowly tied to the issue of the calendars, and that is what this should be narrowly tailored in terms of the forensic imaging that takes place. So to say that we just should get a broad-based swipe at everything that's on these shared drives, et cetera, is the problem that we've had here.

And originally when the Court issued its order in this particular situation, what we argued to the Court was that if the defendant felt that the order authorized them to get this profile and user habit and registry information, they should have done it then. Obviously they weren't sure that the Court's order allowed for that. And we don't believe that it did.

So now to simply come back and say, well, you know, the plaintiff hasn't done what the plaintiff was supposed to do, so now we get a broad pass at everything. It still goes back to the original order which related to the issue of calendar entries.

THE COURT: All right. What about Mr. Talebi's

computer? The computer they've identified that they say was Mr. Talebi's?

MR. NELSON: This is the first I'm hearing of this issue. I don't believe it was briefed, and maybe I missed it. But the issue of Mr. Talebi's Outlook calendars, again, if Mr. Talebi's Outlook calendars were not provided, then that would be relevant to the original order. But just an opportunity to go and check out the computer that he was using because they have that capability, that doesn't seem appropriate. So if it's tied to the calendars --

THE COURT: But wait. You don't know if the Outlook calendars are on that computer, do you?

MR. NELSON: I cannot make that statement as I stand here. I can confer with my client --

THE COURT: Because it was your obligation to produce the Outlook calendars, so if you don't know, then somehow we have to find out.

MR. NELSON: Well, to be honest with you, I'm not even ready to say we didn't produce them. But I don't recall. There's a lot of paper in this case.

THE COURT: I'm very aware of that. Much of it has been given to me.

MR. NELSON: I can't sit here and say that was not produced. That surprised me to hear that.

THE COURT: All right. Any questions with respect to

the membership lists?

MR. NELSON: No. I think we understand.

THE COURT: Okay. Mr. Kapshandy? You're going to show me where in the reply brief --

MR. KAPSHANDY: I'm trying to find where they represented that the Talebi e-mails were found on the machine they now claim to be an intern machine. I'm not putting my hands on it right away. I believe it was a footnote. We did mention that one of the machines had disappeared in their current inventory. But I can't seem to put my hands on it right now, but if you were to give me a minute, I could probably find the actual serial number of the machine that they had represented was Babak Talebi's machine and is now an intern machine.

THE COURT: Well, I don't think they're saying that there is a machine that was Babak Talebi's machine that is now an intern machine. The question is whether the Outlook calendars are on it. That's what you're after.

MR. KAPSHANDY: Right. And if PWC follows the same protocol they did the last time -- he used the Outlook e-mail functions, and they're integrally related. They're products that are meant to go together. He said he used the Outlook function. And we do know from the materials that Trita Parsi produced in the first go-round with the calendars that Babak Talebi was entering Outlook calendar dates, or somebody using

Babak Talebi's e-mail account, into Trita Parsi's calendar. So there's a good chance there's Outlook calendar files separate from the e-mail files on the Talebi machine.

THE COURT: All right. By the end of the day today -- and you can have a further discussion with Mr. Nelson if you want -- you have to give me any references to existing filings and any specifics with respect to this computer that you're talking about. Because I can't issue an order in this case that just generally says, produce that computer without being very specific as to what the serial number and identification of the computer is.

All right?

MR. KAPSHANDY: Thank you.

THE COURT: Let's make it by not later than -- you said a minute, so you ought to be able to give me this by 3:00, right?

MR. KAPSHANDY: Easily.

THE COURT: By 3:00.

MR. NELSON: Your Honor, are you envisioning him sending you a letter with that information?

THE COURT: I'm envisioning anything he's sending me he has to tell you about.

MR. NELSON: So however he communicates that, we want to be aware of what the representation is. And then if we could have an hour to respond, if there's any response to send you --

THE COURT: That's fine. I'll change the course a little bit. Provide that information to me, Mr. Kapshandy, only after consultation with Mr. Nelson.

MR. KAPSHANDY: Sure.

THE COURT: And that means that you should show him or tell him in advance what it is that you're going to provide to me. And then you can, if you think there's anything you need to say -- I don't want argument on this; I just want the information. If there's anything you need to say, you can say it within an hour of when he provides it.

MR. NELSON: All right. Thank you.

THE COURT: All right. With that, I'll put all this into an order and get it out and try to be as specific and clear as possible. I'm going to chew on this profile registry and user habit information issue a little bit. But I'll try to be specific in the order as I issue it.

With that, I'm not going to set a further date because we have briefing coming up, and I will set the date based on what the briefing looks like.

Thank you all very much for your attention and consideration. Anyone who's here who expected to be speaking and didn't get a chance to, too bad. Thank you for coming anyway.

(Proceedings adjourned at 10:40 a.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

__________________
BRYAN A. WAYNE