IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRITA PARSI** | )<br>)<br>) |
| and | )<br>) |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | )<br>) |
| Plaintiffs, | )   Civil No. 08 CV 00705 (JDB)<br>) |
| v. | )<br>) |
| **DAIOLESLAM SEID HASSAN,** | )<br>) |
| Defendant. | )<br>) |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Seid Hassan Daioleslam respectfully submits this reply memorandum in response to Plaintiffs' opposition to Defendant's motion for summary judgment ("Plaintiffs' Opp. Memo."). Because Plaintiffs cannot demonstrate that Defendant knew that he spoke falsely when he stated that Plaintiffs lobby for Iran or that he entertained serious doubts about the truth of those statements, Defendant's motion for summary judgment should be granted.

<u>**ARGUMENT**</u>

Defendant supported his motion for summary judgment with numerous citations to uncontested facts that generally demonstrate: (1) that Plaintiffs maintain close ties to members of the Iranian government and to individuals with ties to the government; (2) that Plaintiffs frequently engage in lobbying efforts in the United States regarding American-Iranian

relations, including coordinating communications between Iranian and American officials; and (3) that numerous others have concluded that Plaintiffs lobby for Iran. These facts include:

- Parsi formed Iranians for International Cooperation ("IIC") in 1997, which, according to Parsi's resume, was "the first lobby group in the U.S. to support the normalization of ties between the U.S. and Iran." *See* Exs. A, B to Def's MSJ, Docket No. 144.

- Parsi co-authored a paper in 1999 with a well-connected Iranian consultant detailing how to set up an Iranian lobby in the U.S., modeled after the American-Israeli Political Action Committee ("AIPAC"). *See* Ex. C to Def's MSJ, Docket No. 144.

- Parsi formed NIAC in 2002, and in the ensuing years Parsi and NIAC staff engaged in hundreds of meetings and communications with members of Congress and their staff on issues benefitting Iran. *See* Exs. G, H, I, J, N to Def's Response to Pltf's Motion to Exclude Evidence of Lobbying, Docket No. 130.

- Parsi met and communicated with Iran's U.N. Ambassador Zarif on multiple occasions. *See* Exs. D, E, F, G, H, I to Def's MSJ, Docket No. 144.

- Parsi met and communicated with numerous other Iranian officials. *See* Exs. I, MM, NN to Def's MSJ, Docket No. 144.

- Parsi and NIAC attempted to bring to the U.S. for a policy briefing on Capitol Hill Massoud Khodabandeh and Anne Singleton Khodabandeh, who were referred to by former British member of Parliament, Lord Corbett of Castle Vale, as "Iranian agents" in a letter to Congresswoman Ileana Ros-Lehtinen and who were prevented from coming to the US. *See* Exs. N, RR-a, RR-b, RR-c, RR-d, RR-e to Def's MSJ, Docket No. 144.

- Other journalists and writers have not only criticized NIAC for failing to advocate for human rights issues until very recently (in what seems to be a half-hearted attempt to improve their reputation) (*see, e.g.*, Exs. O, CCC, DDD to Def's MSJ, Docket No. 144), but have also written that Plaintiffs lobbied for Iran. *See, e.g.,* Exs. K, L, M, O, W, X, Y, DD-FF, PP, TT-ZZ, AAA-GGG, QQQ to Def's MSJ, Docket No. 144.

From these and other facts outlined in the motion for summary judgment, Defendant concluded and corroborated his conclusion that Plaintiffs are lobbyists for Iran. He published his conclusions in a series of articles from early 2007 to the present.

In his motion for summary judgment, Defendant argued that Plaintiffs cannot establish by clear and convincing evidence that Defendant published his statements with "actual malice"

— that is, that he knew that his statements were false or that he acted with reckless disregard for the truth when he published them.  Defendant did not move for summary judgment based on the truth of his statements.  "[W]hen the factual dispute concerns actual malice," as opposed to truth, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986).

In their misguided response, Plaintiffs have not shown actual malice by clear and convincing evidence.  Far from showing evidence that Defendant knew his statements were false or acted with reckless disregard for the truth, Plaintiffs dedicated the bulk of their memorandum in opposition to the wrong issue — the truth of the question as to whether Plaintiffs lobby for Iran.  Plaintiffs repeatedly and vehemently disagree with Defendant's ultimate conclusion that Plaintiffs are lobbyists for Iran.  But in their vociferous denials of the truth of Defendant's allegations, Plaintiffs miss the key issue before the Court.  This Court's task is not to decide whether Defendant's allegations were false, but rather to decide whether Plaintiffs can show by clear and convincing evidence that Defendant spoke with actual malice.  Plaintiffs cannot meet that burden, and the Court should accordingly grant Defendant's motion for summary judgment.

Plaintiffs do not dispute Defendant's Material Facts 1-8, 12, 13, 20, 21, 25, 27, 29, 30, 33-35, 42-45, and 47a, b, d, e, f, h, i, k, l, m, n, o, and p.  Despite legalistic assertions to the contrary, Plaintiffs also do not dispute Material Facts 9 through 11, 14 through 18, 23, 32, 36, 37, 40, 46, and 47c, g, and j.  With respect to this second set of facts, Plaintiffs quarrel only with the Defendant's ultimate conclusion based on those facts — that is, that they demonstrate

that Plaintiffs did indeed lobby for the Iranian government.[1]  Again, the subject of this summary judgment motion is not the truth of Defendant's articles, but rather the question of actual malice. Plaintiffs' denial of *conclusions* based on uncontested facts has no bearing on that question.[2]

Plaintiffs' misunderstanding of summary judgment in this case affects not only their treatment of the material facts but also the argument section of their memorandum in opposition. Much of the argument section (pp. 43-44, 46-50) addresses the issue of truth. Because that issue is irrelevant to whether summary judgment is appropriate, Defendant does not address those arguments in this reply memorandum.

Instead, this memorandum addresses the relevant question before the Court — whether Plaintiffs can prove by clear and convincing evidence that Defendant published his statements with actual malice. To prevail, Plaintiffs (as public figures) must be able to show by "clear and convincing evidence" that Defendant made the allegedly defamatory statements with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "Actual malice" is knowledge or reckless disregard that the statement is false. *Id.*

Plaintiffs wage an uphill battle, for as the Supreme Court has stated, there is a "profound national commitment to the principle that debate on public issues should be

---

[1] For example, in disputing Material Fact 36, which is that a September 2006 article reported that the former head of the Iran Interest Section (Amb. Fathnejad) encouraged "creating a relationship with organizations of Iranians outside the country" and specifically mentioned NIAC and Trita Parsi, Plaintiffs insist that "[s]imply because an individual praises or defames Plaintiffs does not make [them] a lobbyist for the Iranian regime." Plaintiffs' Opp. Memo. at 25. Plaintiffs are correct in one sense: the positive mention of NIAC by an official of Iran does not in and of itself make Plaintiffs lobbyists for the Iranian regime. But it does lend some support for Defendant's conclusion given that it is by the former head of the Iranian Interest Section (which serves as Iran's unofficial embassy in Washington). In other words, Material Fact 36 lends credence to a conclusion that Defendant did not make his publications with reckless disregard for the truth.  Again, Defendant cited the article *only* for the proposition that it was published, not that it proved Plaintiffs were lobbyists for Iran.

[2] Plaintiffs also dispute several material facts: Material Facts 19, 22, 24, 26, 28, 31, 38, 39, 41, and 42.  Their objections are a combination of technical quibbles, arguments over assertions Defendant never made, unsupported or contrary to the facts.

uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures. *Id.* at 270. Because Plaintiffs have not shown and cannot show that Defendant "actually entertained a serious doubt" about his conclusions that Plaintiffs lobby for Iran, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996), and because the "clear and convincing evidence" requirement is "significantly more onerous than the usual preponderance of the evidence standard," *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987), this Court should grant Defendant's motion for summary judgment.

In the brief passages of their memorandum in opposition that seem to even remotely address the relevant question of actual malice, Plaintiffs press only three arguments. They contend: (1) Defendant was served with a cease and desist letter by Plaintiffs and therefore knew his statements were false, but continued to publish them anyway, Plaintiffs' Opp. Memo. at 3-4; (2) Defendant is a member of the Mujahideen-e Khalq ("MEK" or "MKO"), an arch-enemy of the Iranian government, and therefore possessed "political motivation and malice" to defame Plaintiffs*, id*. at 40; and (3) Defendant's ill will toward Plaintiffs drove him to disregard journalistic standards, which further demonstrates his reckless disregard for the truth, *id.* at 41. As demonstrated in the sections that follow, all three arguments are legally irrelevant to the question of actual malice, and none find basis in the facts.

Finally, in their response memorandum Plaintiffs repeatedly make a telling admission: "[t]here is a significant distinction between being an 'Iranian lobby group' and being the 'Iranian regime's lobby group.'" *Id.* at 11; *see also id.* at 10 ("Defendant likens 'Iran friendly' to 'Iranian regime friendly.'"). Parsi made similar statements in an affidavit, insisting that Defendant should have known that when he described IIC as a lobby whose main objective

5

was to "safeguard Iran's and Iranian's interests" he really meant "Iranian's interests" rather than "Iran's interests." *See* Ex. N to Plaintiffs' Opp. Memo. Plaintiffs' ability to establish by clear and convincing evidence that Defendant acted with reckless disregard for the truth cannot turn on Parsi's strained re-interpretation of *his own* statement about IIC's main objective, as it would then have read IIC's "main objective" was "protect[ing] Iranian's and Iranians' interests." Parsi insists on this fine distinction that although he may have been lobbying for Iranians (or "Iran" as he stated), IIC was not "formed to promote the interests of the Iranian *regime*." *Id.* (emphasis in original). So after nearly four years of litigation, this case boils down to whether Plaintiffs can prove by clear and convincing evidence that Defendant acted with actual malice in spite of Plaintiffs' admission that Parsi only lobbied for "Iran and Iranians" but not the current Iranian *regime*.

I. **PLAINTIFFS' CONTENTION THAT THEIR CEASE AND DESIST LETTER MADE DEFENDANT AWARE THAT HIS STATEMENTS WERE FALSE IS LEGALLY IRRELEVANT AND FACTUALLY UNSUPPORTED.**

Plaintiffs state that they placed Defendant on "actual notice of the falsity of his publications" by "serv[ing] him with a detailed *cease and desist* letter well in advance of taking legal action." Plaintiffs' Opp. Memo. at 3. According to Plaintiffs, their cease and desist letter made Defendant aware "that what he was publishing was false" and that he therefore possessed "actual knowledge of this falsity." *Id.* Plaintiffs therefore contend that Defendant published his articles "with even more of a blatant and reckless disregard for the truth." *Id.* at 3-4.

However, neither the law nor common sense support Plaintiffs' assertion that their cease and desist letter put Defendant on any sort of notice, actual or otherwise, that his conclusions were incorrect. "[P]ublishers need not accept 'denials, however vehement; such

6

denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (citing *Connaughton*, 491 U.S. at 691 n.37)); *see also Coliniatis v. Dimas*, 965 F.Supp. 511, 519 (S.D.N.Y. 1997) ("Emphatic denials are part of the landscape of journalism, and a decision to print a story in the face of such a denial, particularly where . . . it comes from an interested protagonist, does not establish clear and convincing evidence of malice."). Plaintiffs' cease and desist letter, or any other statement by Plaintiffs contesting the veracity of Defendant's claims, cannot as a matter of law satisfy the "clear and convincing" requirement.

Furthermore, Plaintiffs never "served" Defendant with a cease and desist letter, as they claim. *See* Plaintiffs' Opp. Memo. at 3-4. Plaintiffs' Exhibit D is a letter to Voice of America, complaining about two programs that featured presentations by Defendant and Kenneth Timmerman and threatening VOA. Plaintiffs never served Defendant with a cease and desist letter, and they have furnished no proof that they ever did.

## II.   PLAINTIFFS' CONTENTION THAT DEFENDANT IS A MEMBER OF MEK AND THEREFORE HARBORS ILL WILL TOWARD PLAINTIFFS IS LEGALLY IRRELEVANT AND FACTUALLY UNTRUE.

Throughout the case, Plaintiffs have misconstrued malice as malice in the ordinary sense and have tried hard to paint Defendant as a member or sympathizer of MEK in order to show such "malice." When asked in his deposition, Defendant denied sympathy with the MEK cause. Interestingly, Plaintiffs carefully omitted this from their quote and exhibits. *See* Plaintiffs' Opp. Memo. at 40. The entire quote in the email to Glazov reads: "They are the political branch of Modjahedins. Personally, I do not share their views (politically and ideologically). Meanwhile, it has been a great mistake to discard them. They should be

7

included in a general support of Iranian opposition as a whole (not seperately and unconditionally)." Ex. A (Glazov email re MEK). Furthermore, Defendant explicitly testified that he does not share the political views of the MEK and has never been a supporter. *See* Ex. B (Hassan Dep., Dec. 14, 2010) pp. 13-19; Ex. C (Hassan Dep., Dec. 15, 2010) pp. 201-208. Despite these facts, Plaintiffs contend that Defendant is a member of, or at least a sympathizer with, MEK, a "militant organization that advocates the overthrow of the Islamic Republic of Iran through violence."[3] Plaintiffs' Opp. Memo. at 39. According to Plaintiffs, Defendant's alleged association with MEK "motivates his malice toward Plaintiffs." *Id.* at 40.

Aside from being logically incoherent,[4] Plaintiffs' ill-will argument is legally irrelevant and factually baseless. Whether Defendant harbors malevolent feelings toward Plaintiffs is beside the point. The "actual malice" standard "has nothing to do with bad motive or ill will." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 n.7 (1989); *see also id.* at 666–67 & 667 n.7 ("The actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term . . . . Actual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on the part of the writer."

---

[3] While Plaintiffs are correct that MEK is currently designated as a terrorist organization, according to several prominent policy makers, it was so designated by the State Department during the Clinton Administration "as a purported goodwill gesture to the mullahs, in aid of furthering dialogue," was "[r]egrettably . . . kept on [the terrorist organization list] during the administration of George W. Bush, in part out of fear that Iran would provide IEDs to our enemies in Iraq," and those policy makers urge removing that designation (a resolution to do just that has been supported by over 100 members of Congress). Michael B. Mukasey, Tom Ridge, Rudolph W. Giuliani, Francis Fargo Townsend, *MEK Is Not a Terrorist Group*, National Review Online (Jan. 10, 2011), http://www.nationalreview.com/articles/256689/mek-not-terrorist-group-michael-b-mukasey-tom-ridge-and-frances-fragos-townsend.

Moreover, the U.S. Court of Appeals for the D.C. Circuit Court reversed the 2003 denial by the Department of State of MEK's petition to revoke its "terrorist" designation. *People's Mojahedin Org. of Iran v. U.S. Dept. of State*, 613F.3d 220 (D.C. Cir. 2010).

[4] Plaintiffs assert that MEK is a violent organization dedicated to the overthrow of the Iranian regime. They fail to mention how this fact would cause an MEK member or sympathizer ill will toward Plaintiffs (unless, of course, Plaintiffs were known allies of the regime). In fact, NIAC has published numerous statements opposing MEK and its removal from the Dept. of State terrorist list. *See* Ex. D.

8

(internal quotation marks omitted)); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52 n.18 (Brennan, J.) ("[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard."); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) ("[A]ctual malice is not ill will or personal spite; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true."). In determining whether Defendant's speech met the high bar of actual malice, this Court should therefore disregard Plaintiffs' unfounded accusation that Defendant made the allegedly defamatory statements out of MEK-inspired spite or ill will.

In *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003), the D.C. Circuit refused to find actual malice where a female Navy pilot alleged malice in part because the defendants "were on a mission to advance a preconceived storyline" — that women have no place in combat positions. *Id.* at 1283. A female pilot claimed that she had been defamed by the defendants' statements that she was unqualified to fly and that she had received undue preferential treatment from the Navy due to her gender. *Id.* at 1277. The D.C. Circuit affirmed summary judgment for the defendants, holding that the defendants' zealous desire to "reinstate the ban against women being assigned to combat positions in the military does not suffice to show actual malice." *Id.* at 1284. Such evidence "does not 'demonstrate with clear and convincing evidence that the defendants realized that their statement was false or that they subjectively entertained serious doubts as to the truth of their statement.'" *Id.* (quoting *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511 n.30 (1984)).

At any rate, Plaintiffs' MEK allegation is false. Not only has Defendant consistently testified that he is not affiliated with MEK (Exs. B, C), but Plaintiffs' own witnesses have confirmed his testimony. *See* Ex. E (Gardiner Dep., Aug. 20, 2010) pp. 214-216; Ex. F (Talebi

9

Dep., Nov. 12, 2010) pp. 300-302.  Plaintiffs' Iran expert, Col. Sam Gardiner testified, "I don't say he – I don't think I write to conclude that he could be a member." *See* Ex. E at 216:10-11. Moreover, Plaintiffs base their assertion on dubious sources.  One source, Vahid Alaghband, was recently fined $15 million for supplying Iran with Boeing 747-400 airplanes. *See* Ex. G. Coincidentally, Alaghband donated $50,000 to the Parsa Foundation just a few months after Parsa had donated $50,000 to NIAC.  *See* Exs. H and I (Parsa letters).  And the other source, Massoud Khodabandeh, is an Iranian agent according to Lord Corbett of Castle Vale. *See* Ex. N to Def's MSJ, Docket No. 144.   Khodabandeh's wife, also an Iranian agent according to Lord Corbett, has been paid by NIAC.  *See* Ex. J (Aug. 18, 2008 check to Anne Khodabandeh). Indeed, even leveling this allegation smacks of bad faith as there is evidence that as early as May 2008, Plaintiffs were cautioned by one of their board members (a lawyer) about saying that Defendant was a member or affiliated with MEK; Parsi's response was: "I have to be frank: I am not concerned at ALL that he would prove that ex-members have defamed him!" *See* Ex. K (emphasis in original) (Golchin email).  However, they have persisted in leveling this false accusation.

For these reasons, the Court should disregard Plaintiffs' legally irrelevant and factually baseless assertion that Defendant harbored MEK-inspired ill will toward the Plaintiffs and therefore acted with actual malice.

### III. PLAINTIFFS HAVE NOT ESTABLISHED THAT DEFENDANT VIOLATED ANY JOURNALISTIC STANDARD, AND, AT ANY RATE, VIOLATIONS OF JOURNALISTIC STANDARDS ALONE DO NOT DEMONSTRATE ACTUAL MALICE.

Finally, Plaintiffs contend that Defendant's "malice" revealed itself in his reckless disregard for journalistic standards. Plaintiffs' Opp. Memo. at 41-42.  Plaintiffs proffer three examples of Defendant's supposedly reckless journalistic practices: (1) "in reckless disregard

for the truth," Defendant "published an article in which he misstated that [Congressman Bob] Ney, [Roy] Coffee, and [David] DiStefano founded NIAC," *id.* at 41; (2) Defendant recklessly disregarded apparent challenges to the accuracy of *some of* his conclusions by three individuals, *id.* at 42; and (3) Defendant violated an *alleged* unwritten rule of American journalism by allegedly failing to afford Plaintiffs the opportunity to dispute his conclusions before he published them, *id.* None of these allegations suggests subpar journalistic standards. And even if they did, Plaintiffs have not met the high burden of showing that Defendant's practices were even worse than an "extreme departure from professional standards" which is required to find actual malice. *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001).

As public figures, Plaintiffs "must prove more than an extreme departure from professional [journalistic] standards." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 663–66 (1989). "Even a showing of extreme departure from normal journalistic standards and the duty to investigation are insufficient; there must be evidence, direct or circumstantial, that the defendant published with a high degree of awareness of probable falsity or entertained serious doubts as to the truth of the publication." *Foretich v. Advance Magazine Publishers, Inc.*, 765 F.Supp. 1099, 1109-10 (D.D.C. 1991). Plaintiffs have not alleged, much less shown, that Defendant's supposed departure from journalistic norms approaches the "extreme departure" that even then would require more to establish actual malice.

Moreover, each of Plaintiffs' claims that Defendant acted below journalistic standards is baseless. With respect to the incorrect statement that Ney, Coffee, and DiStefano were actual founders of NIAC — aside from the fact that none of those three individuals are Plaintiffs and that the accuracy of this statement has nothing to do with the sting of the charge — Plaintiffs have put forth no evidence that would show that Defendant acted in a reckless

11

manner. Factual mistakes that do not pertain to the sting of the charge do not amount to actual malice. A contrary rule would have a drastic chilling effect. Moreover, Defendant testified that once he became aware of the incorrectness of this specific part of his publication based on NIAC production materials, he published a clarification, included NIAC's position, and cited specifically to NIAC's website (*see* Ex. Q-2; Ex. L (Hassan Dep., Dec. 14, 2010) pp. 69-71, 184-190.

Second, Plaintiffs state that Defendant disregarded challenges to the accuracy of some of his conclusions by three individuals: Ken Timmerman, Jed Babbin, and Vahin Alaghband. Plaintiffs' Opp. Memo. at 41–42. According to Plaintiffs, those individuals cautioned him to be careful with his conclusions. But Plaintiffs provide no law or expert testimony that would classify Defendant's publication of his conclusions in the face of criticism as a violation of journalistic standards let alone as evidence of actual malice. It is self-evident that there are two sides to a story and that not every inch of every article one writes will be without critics. The journalist's job is to take the facts known to her and to draw conclusions. No court has held that publishing a story even though others may have some doubts about some specific allegations it amounts to actual malice, and the Court should decline to do so here.

Besides, Defendant testified that he responded to Babbin's and Timmerman's questions and suggestions. *See* Ex. M (Hassan Dep., Dec. 15, 2010) pp. 63-71, 101-106, 126-127; Ex. S (emails regarding Timmerman suggestions). If anything, seeking out and responding to suggestions from experts in the field is evidence of *good* journalistic standards. In fact, both Babbin and Timmerman have published articles by the Defendant. Far from disagreeing with the sting of the charge, Timmerman wrote before any of Defendant's articles were even published that, "Parsi and his group [IIC] have been lobbying the expatriate community on

12

behalf of Iranian President Khatami and lobbying the U.S. government to lift the sanctions." *See* Ex. L to Def's MSJ, Docket No. 144. The remaining alleged critic is again Vahid Alaghband, who as stated prior was convicted of supplying Iran with Boeing 747-400 airplanes and whose defense of NIAC would, if anything, only reinforce Defendant's views. *See* Ex. G (Alaghband articles). Plaintiffs have presented not one shred of proof that Defendant ever knew or said he was going to publish information that he knew was false or about which he had serious doubts.

Finally, Plaintiffs refer to an apparently unwritten rule of American journalism that "people who write articles that contain facts about others contact them for comment" and insist that Defendant did not afford this courtesy to them. Plaintiffs' Opp. Memo. at 42. Because of this apparent failure of journalistic decorum, according to Plaintiffs, "Jamie Glazov raised a concern about the defendant's journalistic integrity since he was writing negative things about a Mr. Namazi without contacting him or anyone in his family for comment." *Id.*

This argument falls flat as well. Plaintiffs identify no journalistic standard requiring a journalist to contact the subject of a news piece. And no court has held that failure to contact the subject of a news article constitutes substandard journalism, let alone establishes clear and convincing evidence of actual malice. Besides, the allegation lacks basis in fact. Glazov did not express "concerns about Defendant's journalistic integrity." Plaintiffs' Opp. Memo. at 42. Rather, Glazov merely forwarded a letter from NIAC supporter, Ali Mostashari, who had criticized Defendant. *See* Plaintiffs' Opp. Memo. at Ex. J (Dai Dep., pp. 193-195); Ex. N (Mostashari emails). Far from ignoring them, Daioleslam responded to Mostashari and Glazov (*see* Ex. O) and published Mostashari's first letter on his website (*see* Ex. P). Moreover, contrary to Plaintiffs' assertion, Defendant *did* seek comment from Plaintiffs. He offered

13

NIAC a chance to debate him on VOA, and in fact often linked to NIAC's website in his articles and on his website (*see* Ex. Q). Plaintiffs never availed themselves of the opportunity to respond and have continually refused to engage Defendant in a public debate. *See* Ex. R (Aikat Dep., Jan. 5, 2011) pp. 135-142. Accordingly, Plaintiffs' argument that Defendant failed to contact NIAC or Parsi is a red herring.

## **CONCLUSION**

Plaintiffs cannot establish by clear and convincing evidence that Defendant knew that his publications were false or that he acted in reckless disregard for the truth when he published them. Far from being reckless, Defendant has based his writing on a mountain of facts and reports, has made public his sources, and has been willing to engage his critics in meaningful debate. For these reasons and the reasons stated in Defendant's motion for summary judgment, Defendant requests this Court to grant summary judgment in favor of the Defendant.

Dated:  November 11, 2011                                       /s/  *Timothy Kapshandy*
Timothy E. Kapshandy (Illinois Bar No. 6180926, admitted *pro hac vice*)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tkapshandy@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 08-705 (JDB) ) |
| vs. | ) ) |
| SEID HASSAN DAIOLESLAM, | ) ) |
| Defendant. | ) ) ) |

**CERTIFICATE OF SERVICE**

I certify that on November 11, 2011, I served, via email, Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment on:

    Afshin Pishevar
    Adrian Nelson
    600 East Jefferson Street
    Suite 316
    Rockville, Maryland 20852
    (301) 279-8773
    ap@pishevarlegal.com
    anelson@pishevarlegal.com

Dated: November 11, 2011

        /s/ *Thomas Ross*
    Thomas E. Ross (D.C. Bar No. 994275)
    Bradford A. Berenson (D.C. Bar No. 441981)
    HL Rogers (D.C. Bar No. 974462)
    Peter G. Jensen (D.C. Bar No. 982599)
    SIDLEY AUSTIN LLP
    1501 K Street, N.W.
    Washington, D.C. 20005
    (202) 736-8000
    tom.ross@sidley.com
    Attorneys for Defendant
    Seid Hassan Daioleslam