# EXHIBIT M

1

2              IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF COLUMBIA

4    ----------------------------------------------------------

5    TRITA PARSI and NATIONAL IRANIAN AMERICAN

6    COUNCIL,

7                                  Plaintiffs,

8                    vs.              No. 08 CV 00705 (JDB)

9    DAIOLESLAM SEID HASSAN,

10                                 Defendant.

11   ----------------------------------------------------------

12

13

14           DEPOSITION OF DAIOLESLAM SEID HASSAN

15                   Chicago, Illinois

16             Wednesday, December 15, 2010

17

18

19

20

21

22   Reported by:

23   Mary M. Flagg, RPR

24   JOB NO. 4776

1               December 15, 2010

2                 9:00 a.m.

3

4

5          Deposition of DAIOLESLAM SEID HASSAN,

6    held at the offices of Sidley Austin, LLP, One South

7    Dearborn Street, Chicago, Illinois, pursuant to Notice

8    and Agreement, before Mary M. Flagg, a Notary Public of

9    the State of Illinois.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    A P P E A R A N C E S:

 2    PISHEVAR & ASSOCIATES, P.C.
      Attorneys for Plaintiffs
 3        Jefferson Plaza, Suite 316
          600 East Jefferson Street
 4        Rockville, MD 20852
      BY: ADRIAN V. NELSON, II, ESQ.
 5        A.P. PISHEVAR, ESQ.
          E-mail: Anelson@pishevarlegal.com
 6

 7    SIDLEY AUSTIN LLP
      Attorneys for Defendant
 8        One South Dearborn Street
          Chicago, Illinois 60603
 9    BY: TIMOTHY E. KAPSHANDY, ESQ.
          ERIC GALVEZ, ESQ.
10        Email: Tkapshandy@sidley.com
                 megalvez@sidley.com
11
      ALSO PRESENT:  DR. TRITA PARSI.
12

13

14

15

16

17

18

19

20

21

22

23

24
```

1      A     Yes, sir.

2      Q     I would like for you to look at the very last I

3    guess piece of this e-mail chain.  At the very beginning

4    it says, "Dear Kenneth.  Here is the difference between

5    me and you.  As a Iranian involved in politics, I reached

6    the conclusions which are more than evident for me.  You,

7    as a journalist and investigator, see the elements I have

8    ignored."  Do you recall writing that?

9      A     I remember exactly, yeah.

10     Q     What did you mean by the statement "I reached

11   the conclusions which are more than evident for me"?

12     A     There are two things, first of all.  The first

13   is that this is very important because as an Iranian who

14   has been in politics for more than 35 years you

15   understand many things that a outside observer cannot see

16   it from the first glance, from the first looking at it.

17   Because, for example, this regime, Iranian regime that's

18   so brutal that does not trust anyone, kills its own

19   friends that worked with them and you see that this same

20   government comes and trusts Mr. Parsi for a foreign

21   observer looking at the Iranian politics it doesn't seem

22   that strange that, you know, another Iranian government

23   they muscled it from Iran comes and give the secret

24   document to Mr. Parsi.  It is not that strange.

1          So being Iranian, living with the politics,

2    knowing better the Iranian regime, you can see many

3    things that these foreign journalists and experts maybe

4    cannot see in the beginning.  That is the first thing I

5    try to explain.

6          But as I was open always to -- because many

7    times you explain something you think that you are very

8    convincing, you have made your point, but even someone

9    like Mr. Timmerman that who is very acute observer of

10   Iran he cannot grasp it, so I don't insist, I don't want

11   to bring the things that a foreign reader cannot get it

12   in the beginning.  So I don't insist.  I don't want to

13   make my article or my report very confusing.  I think it

14   was the main point I tried to make.

15     Q    When you talk about reaching conclusions is it

16   your methodology when you write an article to start with

17   a conclusion and then try to supply the facts that would

18   support your conclusion?

19     A    If I had done so I would have written about

20   Mr. Parsi long before April 2007.  It is not true, sir.

21   As I explained, as I reached the conclusion about

22   Mr. Parsi's lobbying on behalf of the Iranian regime it

23   took me at least six, seven months of investigation.

24          First I was very confused.  I did not

1    understand.  There were so many elements, you know, I

2    couldn't -- and gradually, it was a gradual understanding

3    that I reached.  I talked to people.  I tried to explain

4    many elements I couldn't understand.

5            Not at all, sir.  I don't put the conclusion

6    first and go select and hand pick the facts to make your

7    conspiracy theory.  Not at all, sir.  If I had done so it

8    would make a joke for the people, not someone even like

9    Timmerman who publish it.

10    Q    You indicate in your next sentence, "You, as a

11    a journalist and investigator."  In writing that sentence

12    are you contending that you are not a journalist or an

13    investigator?

14    A    I am not contending that.  I said you, as a

15    journalist and investigator.  For my understanding was he

16    as someone living in United States?  Because one of my

17    points has been that writing in Farsi for me was very

18    easy because I understand the sensibilities of the

19    Iranian audience.  I know when you talk about, for

20    example, the regime they understanding much better

21    because they have been living with this regime.  They

22    know very little things about it.  The sensibilities are

23    different, but as a foreign journalist of course it's

24    different because of that all the time.  What I ask from

1    the people who try to edit my English, it was not only

2    the grammar because I am very weak in my English.  It

3    wasn't that.  It was especially those little things that

4    for us, the Iranians, are very comprehensible, but for

5    those foreigners are difficult to understand.  That was

6    my point that I tried to explain to Mr. Timmerman.

7         Q    So you considered Mr. Timmerman to be a

8    journalist?

9         A    Oh he is.

10        Q    Do you consider him to be an investigator?

11        A    He is an investigative journalist.  He has

12   published books, yeah.

13        Q    And in April of 2007 when you wrote this

14   sentence did you consider yourself to be a journalist?

15        A    Not yet, no.

16        Q    Do you consider yourself to be a journalist

17   now?

18        A    I mean I explained yesterday, technically,

19   professionally, being paid for what I write, no, but as I

20   told in the politics we say he's a journalist.  It means

21   that he writes in journals.  Yes, I write in journals.

22   If that is the meaning that I understand.  Many Iranians

23   you say he's a journalist, it means that someone he's

24   invited to T.V. programs as expert.  He's writing in the

1    journals.  So he writes articles.  He comments on the

2    news.  That is the understanding I have.

3         Q    Do you consider Mr. Timmerman to be a

4    professional journalist?

5         A    He is professional journalist.

6         Q    Do you consider yourself to be a professional

7    journalist?

8         A    No, I'm not.

9         Q    Did you consider Mr. Timmerman to be a

10   professional investigator?

11        A    Oh I don't know what is a professional.  I know

12   that he has taken subjects and he has investigated for

13   long time, so professional, he has written books about

14   these investigations and he has earned money.  So he's

15   professional.

16        Q    As you use the word here in Exhibit Number 7,

17   "investigator", how are you using that word?

18        A    Yes because I had read Mr. Timmerman's articles

19   and so I knew that for subjects he was -- he used to go

20   to investigate and go dig to a subject to see what is the

21   fact.

22        Q    And did you consider yourself to be an

23   investigator of the same type as Mr. Timmerman?

24        A    I don't know what type it is, but I knew that I

1    had investigated for long time on the subject that I sent

2    to Mr. Timmerman.  I don't know what kind of -- what's

3    the difference between the type.

4         Q    Would you look at the second page of this

5    exhibit.  And there is a section that says, "My questions

6    just on this graph."  Do you see that?

7         A    Oh, yeah.

8         Q    And the fourth bullet point down do you see

9    that?

10        A    Uh-huh.

11        Q    It says, "The footnoted reference to an AFP

12   story only establishes that Total is under investigation

13   for payin bribes", I believe that should be "paying",

14   "and may have been in business with Rafsanjani's son but

15   not with Atieh or Namazi."  Do you see that statement?

16        A    I do see it, yes.

17        Q    Do you agree with that particular statement

18   that was written by Mr. Timmerman?

19        A    What do you mean agree?

20        Q    Do you remember whether or not this particular

21   footnote did not support what you claimed it supported?

22        A    Sir, I was claiming and I was telling and I'm

23   telling today that --

24        Q    I'm not asking you about today.  I'm asking you

1   at the time that this was written.

2       A    What is the question?  That the AFP story did

3   not establish that Total was not Atieh Bahar customer?

4       Q    The statement in this particular concern raised

5   by Ken Timmerman was that the footnote referenced to an

6   AFP story only establishes that Total is under

7   investigation for paying bribes and may have been in

8   business with Rafsanjani's son?

9       MR. KAPSHANDY:  For the record, what footnote are we

10  referring to?

11      A    The fourth.

12      MR. NELSON:  I'm just reading his statement.

13      MR. KAPSHANDY:  Which footnote in the article?

14      MR. NELSON:  It's not relevant for my question.  If

15  he can understand my question then it's not relevant.

16      Q    And what I'm asking you is did you agree that

17  the footnote that you cited did not establish that they

18  were under investigation for paying bribes with Atieh or

19  Namazi?

20      MR. KAPSHANDY:  Objection.  Answer that question if

21  you can understand what footnote he's referring to.

22      A    I understand very well, sir, because you don't

23  understand the sentence because you don't bother yourself

24  to read it.  Because the AFP, the footnote 17 about Total

1    and so so so, sir, it talks about only giving bribes from

2    Total to Rafsanjani's son.  I never claim that sentence

3    as doing anything with Atieh Bahar, A-t-i-e-h B-a-h-a-r,

4    and if you see the sentence when it's finished the new

5    sentence says "Total is one of the major customers of

6    Namazi's Atieh enterprise" and so so so, so there is a

7    difference between what I was telling in the next

8    sentence.

9           Mr. Timmerman didn't get it when I brought the

10   number footnote 17 I was going to only talk about Total

11   paying bribes.  And the next sentence I talked about

12   Atieh Bahar.  Mr. Timmerman was confused.

13        MR. NELSON:  Thank you.  Mark that as Exhibit 8,

14   please.

15                        (Whereupon, Plaintiff's Exhibit

16                        Number 8 was marked

17                        for identification.)

18        Q    I'm handing you what's been marked as Exhibit 8

19   and ask if you would take a look at this and tell me

20   whether or not you recognize this document.

21        A    Maybe yeah.  I don't remember exactly, but it

22   is something.  I recall having this kind of conversation

23   at that time.

24        Q    Let's look at the e-mail that's from

1   Mr. Timmerman to Jamie Glazov dated April 10, 2007.  On

2   the second sentence written by Mr. Timmerman says "I

3   spent about ten hours going through it, checking sources

4   and cleaning it up."  Do you know what he's referring to

5   there when he says he was cleaning it up?

6        A    I don't know.  You should ask Mr. Timmerman.

7        Q    So you don't know?

8        A    I don't know.

9        Q    And then as the e-mail string continues

10  ultimately you are advised by Mr. Timmerman that your

11  article is going to be published, correct?

12       A    I think so, yes.

13       Q    Do you know which particular article it is?

14       A    Iran's Oil Mafia, the first article, the

15  article we have been talking about.

16       Q    Okay.  Who is Jamie Glazov?

17       A    Jamie Glazov as I understood was the editor of

18  Front Page magazine.

19       Q    Do you recall whether or not you had any

20  particular discussions with Jamie Glazov?

21       A    Oh later.  Later on.  Later on I have had

22  discussion, something I think set out by Mr. Parsi's

23  friend, a kind of debate over Internet and I didn't know

24  who was behind, and later I understood that was one of

1   communicate with people to explain it to them.  That is

2   the whole issue of discussion with Mr. Timmerman and

3   everyone else.  And is the whole subject of sometimes

4   correcting myself.

5        Q    Okay.

6        MR. NELSON:  Ask if you would mark this as

7   Exhibit 14.

8                         (Whereupon, Plaintiff's Exhibit

9                         Number 14 was marked

10                        for identification.)

11       Q    I'm handing you what's been marked as

12   Plaintiff's Exhibit 14 for identification.  It's an

13   e-mail from -- purports to be from you to a Jed Babbin,

14   B-a-b-b-i-n?

15       A    Yes, sir.

16       Q    Are you familiar with who Jed Babbin is?

17       A    Oh I remember that I sent him or her, I don't

18   know if it's a lady or -- I sent her something for

19   publication.  The first article he was not willing to

20   publish it but the second time he published.

21       Q    Do you know why he wasn't willing to publish or

22   she was not willing to publish the first time?

23       A    I think the first time as I remember he did not

24   find my arguments convincing and he did not establish the

1    same kind of link between what I had, like fact with what

2    I believed to be.  So he did not willing to -- and I

3    didn't want to go to discussion over Internet for long

4    time for months to explain the whole case.  So I

5    submitted elsewhere that article.  I remember it was

6    accepted and published immediately.

7        Q    And what article was that that --

8        A    I think the article was about the Congressman

9    Kucinich relation with NIAC and Mr. Trita Parsi.

10       Q    And do you know which particular article is

11   being referenced in Exhibit Number 14?

12       A    Oh it could be the same, you know.  In July --

13   I think that human rights events.  It was human rights

14   event in the Congress organized by NIAC and some

15   organizations.

16       Q    Let's look at what response Jed wrote to you.

17   It says, "Dear Hassan.  Many thanks for the submission.

18   We will not be able to use it in the current form.

19   First, it's about three times the length we publish.

20   Second, there are a lot of accusations slash allegations

21   that could be libelous if not supported by credible

22   references.  I'll be glad to take another look at it if

23   you can cut and bolster.  Many thanks.  Best.  Jed."

24            Did you at any point resubmit this for

1    publication with him?

2        A    Not to her.  As I explained to her it was an

3    article that was urgent and I did not want to go through

4    the whole discussion about a broad and vast subject of

5    the Iranian regime's lobby in the U.S.  So I sent it to

6    another publication.  I remember we discussed about it.

7    So I did not go through explaining who was what, why was

8    that.  No, I did not.  I remember exchanged through

9    e-mail and I resubmitted to another outlet and it was

10   published immediately.

11       Q    And you believe that this is the article

12   relating to Congressman Kucinich?

13       A    I don't know.  Maybe Kucinich.  I don't

14   remember.

15       Q    Do you recall who published that on your

16   behalf?

17       A    Excuse me?

18       Q    Do you recall who published it ultimately?

19       A    Oh I think American Chronicle or Intellectual

20   Conservative.

21       Q    And when Jed made the statement that there are

22   a lot of accusations slash allegations that could be

23   libelous if not supported by credible references, did

24   that concern you?

1       A    Oh of course.  Of course that concerned me.

2   It's been always my concern.  First of all, to tell the

3   truth and, secondly, you know, not bringing allegations

4   or accusations against someone lightly.  Of course that

5   is.

6           And you know, for me more important than the

7   people send me the e-mails, oh thank you, what a great

8   article, for me more important are the people like Jed

9   Babbin who warn me, like Timmerman, he said this part

10  it's not supported.  This is not good.  I need these

11  people to correct me and to stop me from going so fast to

12  some conclusions.  I need these people and I'm more

13  grateful to these kind of people than those who support

14  me by sending, you know, bravo, thank you, great.

15          So I mean this is for me was great what she

16  wrote.  That makes me what I have done for the past four

17  years.  Every time I have questioned myself, reasoning

18  again, trying to if whenever I have a reasonable doubt to

19  not publish anything, and so I'm grateful to Jed Babbin.

20  It doesn't bother me.

21      Q    I'm going to hand you what is attachment 4 to

22  Plaintiff's Exhibit Number 2, which is the complaint.

23  That's a copy of the Kucinich article.

24          Do you believe that this is the final version

1   of the article that's being referenced in Exhibit

2   Number 14?

3       A   It could be, yeah.

4       Q   Do you know whether or not in between the time

5   that this article was submitted to Jed Babbin and the

6   time that it was ultimately published whether you made

7   any changes to the article?

8       A   Oh I don't remember, sir.

9       Q   Did you do anything to determine before it was

10  published whether or not it had any accusations or

11  allegations in it that might be considered libelous?

12      A   I do it every time, sir.  Every time I write

13  something regardless of what someone told me or not, that

14  is the warning that the people they give me any time to

15  be -- it's not only the fear of having lawsuit, no.  To

16  be truthful and to tell the truth.

17      Q   What I want to know is not about your general

18  practice, but I want to know as it relates to that

19  particular article what steps or actions did you take to

20  ensure that it did not contain any libelous information?

21      A   That is the general answer I told you and it

22  applies to this case too, that is every time for

23  everything I write down I try to be completely sure, to

24  be hundred percent sure and just not advance something

1   that is a kind of opinion, accusation, allegation.

2      Q    Let me ask you the question a different way.

3   Do you have a specific recollection as to any actions

4   that you took to ensure that the article regarding

5   Congressman Kucinich did not contain any accusations or

6   allegations that might be libelous?

7      MR. KAPSHANDY:  Object to the form.  It's got

8   perhaps a double or triple negative in it.

9      A    I don't remember, sir.

10  BY MR. NELSON:

11     Q    You don't remember?

12     A    No.

13     MR. NELSON:  I'm going to ask if you would mark this

14  as Plaintiff's Exhibit Number 15, please.

15                          (Whereupon, Plaintiff's Exhibit

16                           Number 15 was marked

17                           for identification.)

18     Q    I'm handing you a document that's been marked

19  for identification Plaintiff's Exhibit Number 15, and I

20  want to ask you if you can tell me whether or not you

21  recognize this document?

22     A    I have a recollection of having this kind of

23  exchange with Ken.

24     Q    In the very first sentence of this document it

1    think that takes care of housekeeping.  I don't know if

2    anybody has anything else.

3          MR. NELSON:  Is there something else you wanted to

4    say?

5          A     Yeah, I wanted to say the exact -- the exact

6    OIG that you asked me, it is Department of State and the

7    broadcasting Board of Governors.  That is the exact -- I

8    don't know.  I can find you the e-mail, but it was the

9    one.

10         MR. NELSON:  All right.  Thank you.  I'm going to

11   have marked as Exhibit Number 18, this document here.

12                          (Whereupon, Plaintiff's Exhibit

13                           Number 18 was marked

14                           for identification.)

15         Q     I'm handing you a document marked Exhibit 18,

16   e-mail between yourself and Ken Timmerman.  And I want

17   you to focus your attention on the top of this document.

18   There is an e-mail written by Mr. Timmerman, the second

19   paragraph says "The one thing I'd tone down in the

20   article below" -- and the article that is listed below is

21   Bob Ney syndrome, "is the anti-Semitism label.  He could

22   actually sue you on that and you don't establish

23   anti-Semitism in that section.  You establish a pattern

24   of anti-Israel acts and apologetics for Ahmadinejad's

1    call for the destruction of Israel.  I'd just cut any

2    reference to anti-Semitism and use anti-Israel instead."

3            Do you recall having any conversation about

4    Mr. Timmerman's concern in this regard?

5        A    I don't recall it but, you know, I don't

6    contest it.  I don't recall this e-mail precisely.

7        Q    Do you recall whether or not you made any

8    changes to the Bob Ney syndrome article to address his

9    concern about a quote "anti-Semitism label"?

10       A    Maybe I have done because first of all the

11   title was changed from Bob Ney syndrome to I think it was

12   changed to -- yeah, it was changed, the title was changed

13   from this Bob Ney syndrome was changed to Congressman

14   Kucinich should find a better role model than Bob Ney.

15           But I can't respond you precise when I have

16   published or printed copy of what was finally posted.

17   That's all.

18       Q    Yes, sir.

19   MR. NELSON:  Would you mark that as Exhibit 19,

20   please.

21                        (Whereupon, Plaintiff's Exhibit

22                         Number 19 was marked

23                         for identification.)

24       Q    I'm handing you what's been marked as

Page 260

1    STATE OF ILLINOIS   )
                          )
2    COUNTY OF COOK      )

3

4            I, MARY M. FLAGG, a Registered Professional
     Reporter, within and for the State of Illinois, do hereby
5    certify:

6            That previous to the commencement of the
     examination of the witness, the witness was duly sworn to
7    testify the whole truth concerning the matters herein;

8            That the foregoing deposition was reported
     stenographically by me, was thereafter reduced to a
9    printed transcript by me, and constitutes a true record
     of the testimony given and the proceedings had;
10
             That the said deposition was taken before me
11   at the time and place specified;

12           That the signature of the witness was
     reserved.
13
             That I am not a relative or employee for
14   attorney or counsel, nor a relative or employee of such
     attorney or counsel for any of the parties hereto, nor
15   interested directly or indirectly in the outcome of this
     action.
16
             IN WITNESS WHEREOF, I do hereunto set my
17   hand at Chicago, Illinois this __ day of        2010.

18

19

20           _____
                 Registered Professional Reporter
21               License No. 084-001447

22

23

24