**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** | ) |
| | ) |
| **and** | ) |
| | ) |
| **NATIONAL IRANIAN AMERICAN** | )   **CASE NO. 08 CV 00705 (JDB)** |
| **COUNCIL,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **DAIOLESLAM SEID HASSAN,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF HIS OMNIBUS**
**MOTION FOR SANCTIONS**

### I.      Introduction

In Plaintiffs' Corrected Response to Defendant's Omnibus Motion for Sanctions ("Response") filed October 31, they attempt to excuse their conduct over the last 2-1/2 years by saying that they "had to be conservative in [their] responses" because the Defendant's requests have been "far-reaching and never-ending" and Defendant published and used discovery materials in his articles and shared discovery materials with other journalists. (Response, pp. 1-2).  First, the Federal Rules of Civil Procedure do not provide for a "conservative" approach to discovery responses, even if the respondent believes the requests are overly broad; FRCP 26(b)(2) provides the mechanism for relief – a protective order.

<u>Second</u>, Plaintiffs' "conservative" discovery responses – which simply initially hid thousands of discoverable records rather than produce them (e.g., the Talebi emails, all calendar records, membership records, Talebi's calendar records, etc.) – were provided in May and June 2009, *five months before* Defendant ever used any of the discovery materials in his articles or shared these with other writers.  This timing belies the validity of their latest excuse.

<u>Third</u>, Defendant's discovery requests which Plaintiffs characterize as "far-reaching and never-ending" were in fact merely one set of  interrogatories (with 12 questions) and two sets of document requests (23 categories) served in February/March 2009; later in August 2010 a third Rule 34 request (two requests for tax and financial records) was served (attached as Ex.  A).[1]  The only thing that has been far-reaching and never-ending is the lengths to which Plaintiffs have gone to avoid answering those *original* requests.  Had Plaintiffs retained their e-discovery expert, Mr. Hirschfeld, in early 2009, instead of after the fact to explain their lapses, most, if not all, of these issues could have been avoided.  <u>Fourth</u>, Plaintiffs' justification that they are a "small, grassroots organization" is nowhere supported in the Federal Rules.  They chose to bring this suit in federal court against an unemployed writer in Arizona who has had to expend tens of thousands of dollars to counter their discovery abuses. The Federal Rules of Civil Procedure do not have different standards based upon the wealth of the litigants and Defendant has never invoked his financial situation to avoid his discovery obligations.  <u>Fifth</u>, and lastly, as Plaintiffs were publishing Defendant's emails and sending

---

[1]  Defendant did serve two more sets of interrogatories in August 2010 regarding Parsi's stolen laptop, his desktop and the Talebi emails.  (Attached as Ex. B).  These, in fact, were mere follow-up requests to lapses in the original discovery responses.  Defendant also sent Rule 36 requests asking Plaintiffs to admit that they were engaged in lobbying.  (Responses attached as Ex. C).

them to journalists (*see* Docket Nos. 46, 50) they cannot use that as justification for avoiding their discovery obligations.  The Court denied Plaintiffs' requests for a protective order for all discovery materials.  (Docket No. 49).  While Plaintiffs may not have agreed with that order, that in no way justifies their habitual parsing and reinterpretation of discovery requests and Court orders to evade their obligations.[2]  A notable example raised for the first time in Plaintiffs' Response is that the July 1, 2010 imaging order only tasked PwC with imaging "active" calendar files and not "all calendar appointments."  (Response, p. 19).  Of course, the Court's July 1, 2010 order said no such thing and such would be the antithesis of forensic imaging, the purpose of which is to locate *all* files including deleted, edited, purged, and unproduced files.

Plaintiffs offer other excuses for their conduct which include the Defendant tricking the Court into issuing numerous orders to compel and two sanctions orders (Response, p. 3), PwC's failure to correctly perform its analysis (Response, pp. 9, 11-14), and their not being aware that documents they had produced had been edited until Parsi's deposition (Response, pp. 43-44).  Plaintiffs conclusorily state that their conduct has always been in good faith and never willful or grossly negligent.  (Response, pp. 3, 44).

As for specifics, however, Plaintiffs fail to respond to a number of Defendant's arguments (particularly those regarding specific misstatements to the Court) and they often respond to arguments that Defendant never made or conclusions that PwC never set forth.  Their response is particularly hard to follow as it often does not cite to the sections of

---

[2]  Ironically, as a publicly supported 501(c)(3) not-for-profit, NIAC touts its "transparency" on its website: "Also, we are taking a lead in the Iranian-American community to spread a culture of transparency . . ." http://www.niacouncil.org/site/PageServer?pagename=About_faq

Defendant's motion and does not track the eight areas of misconduct into which Defendant's motion is divided.  Many of their responses address not Defendant's September 16 motion but rather arguments raised in briefs filed over a year ago (and curiously give inconsistent responses to their initial story).  One particularly amusing example is their current explanation as to why the two meetings with Puneet Talwar and one with Eric Belfrage on Parsi's December 2009 calendar production were missing from his April 21, 2010 Excel calendar production: "These events were from Babak Talebi's calendar which will be discussed in detail below."  (Response, p. 11).   Just 16 months prior, Plaintiffs told the Court: "NIAC is not aware that any such meeting was ever listed on *any* NIAC calendar."  (Docket. No. 69, p. 8).  Now, they claim that these were located on the computers of Cowl, Elliott, and Parsi on some date in June and December 17.  (Response, p. 23).  This is not true; PwC uncovered 24 copies of each entry, none of which were produced in April 2010.  (*See* Sec. II (A) *infra*).  And, the new and improved explanation defies logic.  Why would the reason these entries were found in Parsi's December 2009 calendars but not his April 2010 calendars be that they were in Talebi's calendars (which they fail to point out were hidden until PwC's third imaging exercise)?  And, just to complete the circle of obfuscation, nowhere in the section on Talebi's emails (pp. 22-24, 36-39) do Plaintiffs explain how the three meetings got from Talebi's computer early on Christmas morning 2009 to Parsi's calendar.

## II.    Plaintiffs' Conduct

Three-quarters of Plaintiffs' response (pp. 9-33) is devoted to responding to the calendar issue and forensic imaging, typically by responding to accusations that were never made by PwC or Defendant.  Only ten pages (pp. 34-44) respond to the other seven discovery

abuse issues.  In all, they lash out at the Defendant, PwC, and/or the Court for their problems but fail to address *their* misrepresentations to the Court.  Instead, they conclusorily state that they acted in "good faith" although "some anomalies" occurred.  (Response, pp. 38-39).

**A.**     **Failure to Produce, Alteration, and Deletion of Calendar Entries**

Plaintiffs spent much of this section (Response, pp. 9-33) responding to arguments Defendant never made, misstating Defendant's motion and PwC's report,  positing possible explanations for alterations/nonproduction, providing excuses (e.g., that similar entries were produced from another person's calendar), failing to address a number of the points, and offering admissions (i.e,. the term "lobbying" in Disney's calendar was changed to "Legislative Direct").

As to the latter point, Plaintiffs' claim their expert determined that: "It appears that Disney changed the entire yellow category to legislative direct . . . . However, the change also affected old events that were previously marked lobbying to 'legislative direct' without Patrick's knowledge."  (Response, p. 26).  Metadata reflect that all of these alterations (130 in total) were made February 23, 2010.  (See Ex. D).  What Plaintiffs fail to address is why was he even trying to change future references to "lobbying" before they were to be produced in April 2010 as the promised "complete, unedited" NIAC calendars?  It was only because of the imaging that Defendant became aware of this alteration.  The use of the word "lobbying" in calendars to be produced may have been problematic for Plaintiffs in light of their telling the IRS they did *no* lobbying, but altering these before they were produced is impermissible. What is also interesting is the date that 130 "lobbying" entries were altered: February 23, 2010, the day before a conference with the Court where Defendant first asked for a forensic

image.[3]  Metadata for Disney's calendars show that 397 entries were last modified that day

(or 14% of all of his calendar entries).  This presents a telling timeline:

| 12/28/2009 | PL's produce <400 calendar entries in native, pst format |
|---|---|
| 2/12/2010 | Def requests forensic image of calendars (Ex. E hereto) |
| 2/19/2010 | Def requests conference with Court re imaging (Ex. F hereto) |
| 2/23/2010 | Disney accidentally changes "lobbying" to "legislative direct" in 130 entries; he modifies 397 entries in total this day |
| 2/24/2010 | Telephonic court hearing where NIAC staves off imaging by promising complete, unedited calendars |
| 4/21/2010 | NIAC produces 5,270 calendar entries in Excel, not native format, with some metadata missing ("date last modified" not included) |
| 5/6/2010 | Parsi's laptop, that was never backed up, disappears in Norway |
| 6/2/2010 | Def renews request for forensic image |
| 6/5/2010 | Parsi last uses his desktop computer |

An area Plaintiffs completely ignore is that PwC's third imaging uncovered over 300

Talebi calendar entries (Def's Motion, pp. 8-9) and uncovered that Parsi's desktop had not

been used by him since June 5, 2010, contrary to his interrogatory answers (*see* Sec. F, *infra*).

These two omissions and the Disney "lobbying" alterations alone justify the fee-shifting taken

under reserve by the Court's three imaging orders.

Plaintiffs make a number of misrepresentations and distortions in this section

attempting to justify their conduct:

1.  PwC was only "tasked with reviewing NIAC's active calendars"; pst files on "the server were beyond the scope of the investigation"; and Plaintiffs were only to provide "the machines that contained the pst files that were utilized to create the excel spreadsheets."  (Response pp. 19-20).  The Court's July 1, 2010 order said no such thing. Plaintiffs' strained interpretation of the order to exclude the server and Talebi computer from imaging was intended to game the results and cause delay.

2.  Defendant "was successful in hiding the basis of the original order" and obtained the March and September 2010 imaging orders by misleading the court with their misrepresentation of the PwC report."  (Response, p. 10).  The Court was never

---

[3] Attached as Ex. D is a chart reflecting each entry that was changed to "legislative direct" on 2/23/2010.

presented with the findings of the PwC report until September 16, 2011; those two orders were based simply upon Plaintiffs' failure to comply with the July 1, 2010 order.  The July 1, 2010 order could not possibly have been based upon "hidden" evidence; the basis for the order is clearly stated and recorded in the transcript of the June 3, 2010 hearing.

3.  "PwC's analysis was completely flawed and inaccurate.  Close to 1000 of these events [unproduced entries] were created <u>after</u> April 21, 2010 and didn't even exist when NIAC created its 4/21 exports."  (Response, p. 20).  Defendant's Motion made clear (fn. 2) that some of the unproduced entries, in fact, were created after April 21, 2010.  Moreover, the Court's July 1, 2010 imaging order did not so limit PwC's analysis.  PwC was to produce lists of unproduced and deleted entries without imputing motive.  That is what it did.  Most of Plaintiffs' response imputed claims of "spoliation" or "nefarious" conduct to PwC which it never made.  Nor did Defendant ever claim that all deletions or nonproduction was illegitimate.  Plaintiffs spend many pages rebutting claims that were never made.

4.  "PwC acknowledge that Plaintiffs did not intentionally remove the 'date modified' field.  This field was simply not available for production."  (Response, p. 17).  This is a complete distortion of what PwC reported.  PwC was describing *what PwC was providing in its report.*  Their exact and entire quote was: "The seven Microsoft Excel Workbooks containing 5,270 calendar appointments produced by NIAC on 4/21/2010 were provided in a manner that displayed all available metadata fields.  The NIAC production from 4/21/2010 did not contain all calendar appointment metadata fields that are natively stored within Microsoft Outlook."  (PwC Report, p. 8, Ex. A to Def' Motion, Docket No. 144).  PwC expressly points out that not all metadata was produced by NIAC.  Attached as Ex. G is an exemplar from Disney's Excel 4/21/2010 production showing all fields produced by NIAC; "Last Modification Time" is <u>not</u> included.  PwC had no problem locating that field and NIAC provides no explanation as to why it was "not available" to NIAC.

5.  "The double deletions are indicative of spoliation." (Response, p. 22).  Neither Defendant nor PwC ever said such.  In fact, PwC's charts expressly reflect that most of these entries were "Matched to NIAC Production 2" indicating those <u>were</u> produced.  NIAC's claim that 619 of these were "archived", if true, undercuts their argument that they were only to produce "active" files. Moreover, Plaintiffs fail to state that over 80 of the purged or double-deleted entries were *not produced*. (These are attached as Ex. H and most are clearly discoverable).

6.  Regarding how the Puneet Talwar and Eric Belfrage meetings were sent from Talebi's Gmail account (a year after he left NIAC) early Christmas morning 2009, Plaintiffs argue: "Defendant has not provided any expert opinions from PwC regarding its conclusions which are baseless."  (Response, p. 24).  First, if PwC had no opinions, those opinions cannot be baseless.  Second, neither Parsi nor their e-discovery consultant could explain this (Response, pp. 23-24) nor could they

explain why if these events truly did occur in June and on December 19 (a Saturday), why Talebi or anyone would be sending them to Parsi and Elliott and Cowl on December 25, 2009 well *after these events occurred*. They have had over 1-1/2 years since these anomalies were uncovered to explain these but have not.

7. "Defendant does not cite any evidence for its [sic] allegation that some entries produced with NIAC's December 29, 2009 calendar production were missing from NIAC's April 21, 2010 calendar production." (Response, p. 18). Yes, Defendant does. Both the Puneet Talwar and Eric Belfrage entries were omitted from the April 21, 2010 calendars. PwC located 24 copies of the June 16, 2009 Talwar entry, *none* of which were produced. (*See* Ex. I attached; when the analysis shows "Matched to NIAC Production 1" but not "Matched to NIAC Production 2" it means exactly that -- the entry was not produced in April 2010.) Not only were many of the 24 copies of this entry found in "purged" files, but all 24 were *created, sent, and modified on December 25, 2009 at 2:26-2:27AM*. Strangely, there is another Talwar meeting in the unproduced calendar entries for June 17, 2009. Again, PwC's analysis uncovered 24 copies that were not produced, all created/sent/modified on December 25 at 2:15-2:16AM and many found in "purged" or "double-deleted" files. (See Ex. J). The Belfrage entry is a similar story. First, there is no December 19 Belfrage entry as Plaintiffs claim (Response, p. 19). There is, however, one for December 17, 2009 which was not produced but for which PwC found 24 copies all created/modified/sent on December 25, 2009 at 1:17AM. (See Ex. K).

8. In their attempt to justify that none of the 4,159 unproduced entries were wrongfully withheld, Plaintiffs claim that about 1,000 were after 4/21/2010, over 1,000 were canceled or changed meetings, over 600 were busy notifications, over 100 were blank, 110 were holidays and 33 were copies. (Response, pp. 20-21). They then go on to state: "the few remaining allegedly unproduced documents came from inactive 'pst' files which were inaccessible to NIAC's custodians and were never required to be produced under a Rule 26 analysis." (*Id.*). Aside from the fact that they have not accounted for about 1,300 entries (scarcely a "few"), there is no basis for their claim that they were only to produce "active" entries nor any explanation as to where the "inaccessible" files were located.

Plaintiffs will need to do better than claim a "few" (i.e., 1,300) entries were "inaccessible" to avoid the fee-shifting of the Court's three imaging orders. After having first failed to produce these clearly discoverable calendars, and then producing only a subset two years into the case, Plaintiffs should have spent a "king's ransom" in April 2010 and brought in their e-discovery expert to ensure that all calendar entries were produced. *(See, D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-087, 2010 U.S. Dist. LEXIS 86711, at * 26 (D.D.C. Aug. 24, 2010).

**B.**    <u>**Failure to Produce Server for Imaging**</u>

Plaintiffs totally failed to address the most serious issue about what they now admit was a backup server: that device contained 72 pst files and hundreds of calendar entries while Plaintiffs had given false interrogatory answers that they had searched that device and found *none*:

> <u>ANSWER:</u> Without waiving the foregoing objections, nor assenting to the foundational assumption set forth in Interrogatory Number 7, the documents that are stored on any shared drive are primarily word documents, which drive was searched for responsive documents and does not contain any calendar files.

(Parsi's Response to Def's First Set of Int., Ex. R to Docket No. 144).[4]  Parsi's attestation is dated more than two months after the responses were served as he refused to respond to repeated requests for that verification.  It is now apparent why – besides the above false statement, he also attested falsely about  his desktop he supposedly used from January 2009 to November 2010:

> <u>ANSWER:</u> Without waiving the foregoing objections, Parsi does use a desktop computer for emails, calendars and document process, which desktop computer was provided to PricewaterhouseCoopers for imaging on August 18, 2010.  Said desktop has been used by Parsi for approximately 1.5 years.  Parsi's desktop computers were not backed-up.  Parsi used no other desktops during the relevant period ordered by the court for forensic imaging.

---

[4]   In their Response (pp. 13-14), Plaintiffs' latest excuse is that they did not know these calendars were on the server, they were not obligated to produce them, and the request was burdensome.  These are wholly inconsistent.  How could they possibly attest that there were no calendars on the server?  Their e-discovery designee testified that discovery materials (including Outlook pst emails) were placed on the server.  (See Docket No. 112, pp. 1-2).  How hard did they look before they determined it was too "burdensome"?  Why did they not move for a protective order instead of just attesting that there were not "any calendar files" on that server?

(*Id*.).  The registry information for that machine showed that he never used it after June 5, 2010 and NIAC's own computer consultant attested that it was not connected to NIAC's network in December 2009.  (*See* Ex. XX, Docket No 144: Ex. E, Docket No. 87).  The interrogatory answers also contain one other highly implausible response – that there were no pst files on Parsi's new laptop.  Parsi made that claim in an effort to stave off imaging of that device.  However, as his old laptop was supposedly stolen and he never used the desktop after June 5, 2010, it would appear that Parsi had no computer for his Outlook emails and calendar after June 5, 2010.  Perhaps he did stop email and calendar use on the only machine left to him – or perhaps he attested falsely, again.  Regardless, two false answers in one interrogatory set should be enough to warrant the most serious of discovery sanctions.

As they had no response for the interrogatory answers, Plaintiffs fell back on one of their old favorite strategies – blame someone else.  Now, they blame Defendant and PwC for agreeing to accept only the eight PCs produced for imaging on August 18, 2010.  (Response, p. 34).  While it is true that just a few days before the Court-ordered imaging NIAC did inform Defendant and PwC that they would be producing *some* PC's in lieu of the server, Plaintiffs failed to disclose that they: (1) hid the fact that NIAC had a backup server (which it is now known from the third imaging contained at least 72 pst files); (2) hid the fact that there were a dozen PCs or other devices they were not producing (including one now known from the third imaging to be the PC housing Talebi's calendars); and (3) falsely claimed that there were no data stored offsite on any ISP server (which they repeated to the Court on August 1, *see* 2011, Docket No. 130, p. 3).

Plaintiffs also failed to address why they never once in any of their filings with the Court from January-July 2010, when they were resisting imaging of the *server,* told the Court

that they had no server of any type, be it an exchange server, offsite ISP server, or backup server.  The reason is that the first explanation (no exchange server) would have resulted in the Court ordering them to produce all their PCs for imaging – which the Court eventually did order on March 29, 2011.  And, they could not state that they had no backup server or ISP offsite server as that would have been false.  However, when pressed by the Court and asked three times if they had *any* server (Sept 16, 2010 Hearing, pp. 6-7), Plaintiffs' counsel clearly stated that they had "no server."  And, when pressed about any offsite servers, Plaintiffs represented to the Court (Docket No. 130, p. 3) that they had no offsite data stored on any ISP server, a claim that had to be false given their production of dozens of Mansouri emails from such a server the night before his deposition.  (*See* Ex. D to Docket No. 137).

NIAC's blaming of PwC for any server confusion rings hollow.  They have no one to blame for their noncompliance with the July 1, 2010 server imaging order but themselves.  All Plaintiffs had to do to have avoided this would have been to be straightforward – they could have told the Court after the order was entered: "We do not have an exchange server but we do have a backup server, an ISP offsite email server where we can get emails going back at least three years, and about 20 PCs that have pst files on them (including Talebi's); which of these are we to produce?"  Instead, they resorted to every artifice imaginable to attempt to forestall production of the server at a huge cost in judicial time and resources.  And, they have still failed to explain how they retrieved dozens of emails from the ISP offsite server for Mansouri but no one else.

A particularly deceptive red herring argument that bears mention and shows the extent to which Plaintiffs will go is their statement:

> "Defendant continues to misrepresent that the Dell Dimension 4550 Desktop and the Iomega Store Center NAS constitute NIAC's Exchange 'servers'; they do not. They are simply NIAC's current and former file servers."

(Response, p. 34). This is a blatant attempt to mislead. Nowhere in Defendant's brief does he claim that NIAC had an "Exchange" server. Plaintiffs must have known this as they carefully did not put the word "Exchange" in quotation marks. Still, the intent was clear. They misstated Defendant's argument and then devoted many pages to refuting this red herring about a nonexistent "Exchange" server. Such distortions cannot be countenanced. *See, e.g., Perkinson v. Gilbert/Robinson, Inc.*, 821 F.3d 686, 690-91 (D.C. Cir. 1987) (upholding sanctions for misrepresentations to the court when "viewed in context, coming as they do at the end of a lengthy series of misdeeds (and made, paradoxically, in pleadings attempting to establish [the party's] good faith)"); *Cobell v. Sala*zar, No. 96-01285, 2011 U.S. Dist. LEXIS 1146, at *31-32 (D.D.C. Oct. 5, 2011) ("The Court cannot condone sweeping representations that either the D.C. Circuit or this District Court has established 'practices,' that the D.C. Circuit has construed rules in ways that it has not, or that this Court essentially can exercise carte blanch … when there plainly is no support for such a representation and the applicable precedent and rules in this jurisdiction provide otherwise."); *see also Monee Nursery v. Int'l Union*, 348 F.3d 671, 678 n. 4 (7th Cir. 2003) ("[A]n intentional misstatement of law before a court is a serious offense that violates … the Model Rules of Professional Conduct ("a lawyer shall not knowingly make a false statement of material fact or law to a tribunal") and can lead to sanctions.") (citation omitted).

Finally, as to their statement at the December 17, 2010 hearing regarding the "complete" list of computers they produced (which described the old server and Talebi PC as "intern machines" and omitted eleven other devices), Plaintiffs respond only that NIAC is a

"small organization" without an "IT professional who could have more accurately responded to the never-ending request for PC serial numbers and network information" and that they did not "intentionally provide defendant with the inaccurate information to avoid discovery." (Response, pp. 35-36).  Again, it is everyone else's fault but theirs.  At least they acknowledge that the information provided to Defendant and the Court was inaccurate.  But their conclusory pronouncement that their statements were not intentionally false ignores reality.  Recall that by this time, they had told the Court that the Talebi PC had been "exhaustively reprocessed" in August 2010.  (*See* Section C, *infra*).  How could they have so thoroughly searched Talebi's machine and extracted 2,500 emails from it in August 2010 yet "unintentionally" told the Court on December 17, 2010 that the Talebi machine was merely an "intern machine"?  There can be no explanation other than that they knew that "intern machine" was Talebi's former PC.  Also, how could they have forgotten to put *eleven* other devices on that list that they described in Court as "all the computers that would be relevant for imaging"?  (Dec. 17, 2010 Trans., p. 20).  As they often point out, NIAC is a small organization.  Presumably it would be difficult to overlook *half* of its total devices in their small office.  Gross negligence is a charitable description of this level of conduct.

###     C.     Failure to Produce the Talebi Emails

Plaintiffs blame Defendant for their predicament resulting in an order to compel them to produce 5,000 Talebi emails withheld for over a year: "Defendant made a number of misrepresentations in support of sanctions as it relates to the Talebi email production." (Response, p. 37).  They state that Defendant's claim that on August 24, 2010 they produced about 2,500 emails is in error: "In actuality, Plaintiffs produced 2,915 emails."  (Id., pp. 38-39).  However, the 2,500 figure comes from Parsi's own sworn interrogatory answers where

he states that NIAC produced 2,000-2,500 emails in August 2010.  (Ex. S to Def's Motion, Docket No. 144).

Plaintiffs, in trying to paint a false picture that they quickly corrected this deficiency, ignore two major points: (1) they were given at least four chances to review and produce these emails; and (2) they on numerous occasions falsely represented that the emails contained no search terms and were thoroughly reviewed (as part of a so-called "exhaustive reprocessing"). They finally admit for the first time (Response, fn 3) that they did not use the agreed upon search terms "NIAC",  "Talebi", or "Nation Iranian American Council" [sic].  Accordingly, their interrogatory answer that the emails contained "no search terms" was false.  (Ex. S to Def's Motion, Docket No. 144).  Moreover, as "Blout" and "Parsi" were also search terms and about 1,800 of the unproduced emails were to or from Parsi and/or Blout, footnote 3 of their Response is also inaccurate.  They must have also failed to run those search terms, again without telling the Court or Defendant and while falsely attesting that those terms were used. Moreover, Plaintiffs' new explanation that "[m]any of the 5,500 emails … constitute spam" (Response, p. 38) is not credible given the 1,800 emails to or from Blout and Parsi.

Plaintiffs' chronology is misleading in another important respect.  They claim that after having produced 300-400 emails initially (because such were produced by Parsi, Blout, etc., from their computers), they re-reviewed the 8,005 Talebi emails and produced 2,915 more.  (Response, pp. 36-37).  Plaintiffs omit, however, that when first pressed to produce these emails, they produced only 89 on April 21, 2010 and told Defendant and the Court that the rest did not contain agreed search terms or related to irrelevant "community work."  (*See* Def's June 2, 2010 Memorandum, Docket No. 63 and Exs. 4 and 7 thereto).   After having been ordered on July 1, 2010 to produce <u>all</u> discoverable Talebi emails including the

"community work" and releasing only another 2,500 (or 2,915) in August 2010, Plaintiffs

again "re-reviewed" the unproduced 5,000 emails and produced only another 191 on March

18, 2011 "out of an abundance of caution" but still withholding the majority.  (Letter of

March 18, 2011 from F. Mohammadi, attached as Ex. L).  Even after their third chance to

come clean, Plaintiffs professed in open court on March 4, 2011 that a "good faith

determination was made that [the rest] were not responsive to the discovery request[s]."

(Trans., p. 55).  So, by the time the Court was forced to review the 5,000 unproduced emails

in March 2011, Plaintiffs had been given at least four chances to produce the discoverable

emails.  To say that they had made a "good faith" and "thorough" review is simply not true.

Plaintiffs seek to justify their gross omissions by blaming "Outlook Express" and

claiming that *part* of *one* of the emails had been produced by another recipient (Response, pp.

38-39, although that other email was not provided in their Response).  Their response to

Defendant's point that these Talebi emails were located on one of the "intern machines" is

truly amazing: "[That] was relevant to the Outlook calendar production, not the Talebi email

production."  (Response, p. 37).  If NIAC is now claiming that Talebi's emails were located

on some other machine besides the one housing his calendars, then they need to disclose that

immediately as this means Talebi may have been using yet *another* computer that was not

produced for imaging.  If the emails were located on the same machine as his Outlook

calendars (likely, as these are two components of the same software product), then Plaintiffs

should stop wasting everyone's time with such frivolous arguments.

The Court's finding on April 5, 2011 that Plaintiffs "totally failed to complete [the

email review] in a satisfactory manner" was well-founded.  By the second or third chance to

review these emails, Plaintiffs could have well used their e-discovery consultant to conduct

this review in a proper manner and might have been able to support a finding that their conduct was merely negligent. *See D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-087, 2010 U.S. Dist. LEXIS 86711 (D.D.C. Aug. 24, 2010). Instead, they chose a "conservative" approach which apparently entails the following: (1) fail to produce discoverable ESI; (2) when pressed, produce just a few more; (3) when asked why the rest were withheld, falsely attest to the review process; and (4) when found to have failed to comply with discovery obligations, blame everyone else while describing your own conduct as "good faith", "an abundance of caution", and having engaged in "an exhaustive reprocessing." Whatever Plaintiffs choose to call it, this approach by itself merits the most severe sanctions, particularly because of the false interrogatory answers.

### D.      Failure to Produce Other Emails

Plaintiffs' lack of a response here is telling. While Defendant attached hundreds of discoverable documents produced by third-parties but not Plaintiffs, including two of Plaintiffs' experts, their only response is that none were "smoking gun[s]" (Response, p. 39) as if that were the scope of discovery under FRCP 26. Perhaps under Plaintiff's "conservative" approach to discovery the "smoking gun" standard is their criteria, but such is clearly not in compliance with the Federal Rules.

Most telling is Plaintiffs' silence with respect to their failure to produce *any* emails from the server of their internet service provider ("ISP") except for three dozen emails from Mohammad Mansouri produced in March 2010 and dating back three years, while at the same time telling the Court on August 1, 2011: "All emails are maintained on the user's workstation...There is no cloud or offsite data archives." (Docket No. 131, p. 3). There can

be no answer for this blatant inconsistency except that they did not search the offsite ISP server (other than for Mansouri emails) and that they mislead the Court in saying: "There is no offsite data archives."  In light of these egregious violations and having no response thereto, the requested presumption instruction is an extremely light sanction.

### E.  <u>Failure to Produce Salesforce and Membership Databases</u>

In response to Defendant's motion on the issue of the membership lists Plaintiffs merely rehash arguments made in their response (Docket No. 129) to Defendant's Motion to Compel Membership Lists (Docket No, 113).  Those arguments were addressed in Defendant's Reply (Docket No. 136) and rejected in the Court's Order of September 7, 2011.  Plaintiffs do not address , however, the points in Defendant's Omnibus motion that sanctions are warranted due to their making specific misrepresentations to the Court:

1.  Claiming to not know what the SF database was;

2.  Claiming to have used the meeting notes function of Salesforce for a "very short period of time", "sporadic" use,  and "approximately 196 entries"; and

3.  Claiming at the September 16, 2010 hearing that the SF meeting notes were no longer in NIAC's possession (Trans., pp. 9-10).

(*See also* Def's Motion, Docket No. 145, pp. 22-24, 38-39).  Plaintiffs provide no objective evidence in response and make new claims contradicting previous statements to the Court.

For example, regarding their efforts to obtain the SF data, they state: "NIAC made good faith efforts to obtain the access to Salesforce data in light of the fact that NIAC no longer had a subscription to the Salesforce database.  Once the information was received, it was produced."  (Response, p. 40).  This is false.  Plaintiffs ignore that on December 17,

2010, they told the Court that they downloaded the SF meeting notes "*late last night*" and "it was approximately 196 entries." (Trans., pp 20-21, emph. added). Instead of explaining all the efforts to which they went from May 2010 when this list was created until February 15, 2011 when they finally relinquished it (containing 171,000 entries over six years), they compounded their problems by falsely stating that the information was produced when received. The obvious reason Plaintiffs withheld the SF meeting notes for another two months before producing them is that these clearly show that they misled the Court when saying the use was sporadic, "very short," and there were "approximately 196 entries." Notably absent from their explanation is a list all the efforts to which they went to procure these from Salesforce from the minute these were first mentioned in Defendant's response to Plaintiffs' motion to reconsider the July 1, 2010 imaging order. How many times did they call or write or email Salesforce? When did Salesforce respond? What were all the difficulties? If the actual Excel file of meeting notes was created in May 2010, why could not Salesforce get it to NIAC before December 16? What was the problem that prevented NIAC from producing it December 17, 2010 when it received the notes instead of sitting on it for another two months? All of these answers could have gone a long way in establishing that their conduct was not intentional. But, they chose not to submit such evidence.

Plaintiffs' excuse for telling the Court on July 30, 2010 that "NIAC has not employed any such software and is therefore unable to comment about this unfounded claim by Defendant" (Docket No. 77, fn 1.) and repeating to Defendant on August 4, 2010 that "NIAC is unaware of any such 'SF' software" (Ex. II, Docket No. 144) is that "defendant's use of the abbreviation 'SF' for Salesforce did not initially ring a bell with *any* of NIAC's staff." (Response, p. 40, emph. added). Plaintiffs forget for whom the bell was tolling. It was *not*

18

*Defendant's* use of the "SF" abbreviation that led to this inquiry.  It was *Plaintiffs'* calendar entries such as: ""How to freakin use SF" and "Meet with MM re SF" that led Defendant to ask for the SF notes; at least three NIAC employees calendars referenced the "SF" database. (*See* Ex. HH to Def's Motion, Docket No. 144).  It was not until August 2010 when Plaintiffs were forced to cough up some of the 8,000 Talebi emails that Defendant was able to solve the "SF" acronym from to a weekly NIAC staff meeting agenda referencing both "SF" and "Salesforce":

   a.  Palo Alto Fundraiser 12/1/07
         i.  Send flowers to host committee
        ii.  Enter donations in SF
       iii.  Send thank you letters to all

   b.  Citi Fundraiser 10/26 and Seattle Fundraiser

         i.  Send thank you letters for Citi/Seattle by COB Monday
           (Shamie/Sara)

   d.  Tasks for Interns
         1.  Help Shamie with Palo Alto follow up
         2.  30-40 new membership entries
         3.  Enter Emily's meetings and notes into Salesforce
         4.  Enter Emily's contacts into Salesforce and Outlook via
           excel.
         5.  Returned packaged mailings
         6.  Update legislation on website with summaries (Johnny)

(Attached as Ex. M).

Plaintiffs amazingly respond that "NIAC stands by its position that its use of Salesforce was inconsistent and infrequent."  (Response, p. 40).  Defendant needs only state the facts to refute this: namely, when Plaintiffs finally produced the SF meeting notes database on February 15, 2011, it contained 171,000 entries and covered 2004-2010.  (*See* Ex. J to Def's Motion to Compel Member Lists, Docket No. 113, Excel version of the entire

database filed under seal).  Here, as many times before, Plaintiffs' contumacious adherence to unfounded positions has led to a tremendous waste of judicial time and resources.

Plaintiffs also completely ignore one simple point that could have avoided this entire diversion.  Defendant requested these membership records in March 2009, and Plaintiffs had the Salesforce data in *their possession* for over a year before the data were transferred into Convio in May 2010.  *They* chose  not to produce the data when requested in March 2009, *they* claimed not to know what the data were, *they* claimed not to have access to the data, and *they* sat on the data for two months before finally producing the data in February 2011.  Under no stretch of the imagination could this conduct which wasted two years of judicial time and resources be characterized as "good faith" or anything but intentional.

**F.     Parsi's Stolen Laptop and Disappearing Desktop**

Plaintiffs' response to Defendant's motion regarding Parsi's two computers misses the point and ignores the most serious issue.  (Response, pp. 42-43).  Plaintiffs argue that before a presumption instruction may be given, the Court must find that Parsi was involved in faking the laptop theft.  That is not the basis for Defendant's request nor the legal standard. Plaintiffs' misconduct here is their total failure to ever back up Parsi's machine for over two years after suit was filed and in spite of a "litigation hold."  *See, e.g., Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011) (holding that the destruction of interview notes relevant to the litigation supported a "negative evidentiary inference for the spoliation of records"); *Zhi Chen v. D.C.*, No. 08-0252, 2011 U.S. Dist. LEXIS 101474, at *11-12 (D.D.C. Sept. 9, 2011) (noting in the context of a failure to preserve claim that "[t]o justify the issuance of an adverse inference instruction, the spoliation of evidence need not be 'purposeful' … [N]egligent

spoliation may suffice.") (citation omitted); *Bolger v. D.C.*, 608 F. Supp. 2d 10, 59-60

(D.D.C. 2009) (finding that the defendant's negligence in allowing police tapes to be

destroyed, in light of its "poor track record in satisfying its discovery obligations" in the case,

was sufficient the establish its culpability for purposes of an adverse inference instruction);

*Mazloum v. D.C. Metro. Police Dept*, 530 F. Supp. 2d 282, 292 (D.D.C. 2008) ("[T]he

adverse inference doctrine embraces negligent (in addition to deliberate) destruction of

evidence.").   How is it that Parsi's laptop – with all of his emails and calendars and

presumably notes and work-product relating to both of his books – was *never* backed up in

spite of the obvious value of these assets and the fact that NIAC had a back up server?

Defendant did not ask Parsi to prove that he had no involvement in the theft of his old laptop

(and miraculous replacement by the hotel within hours with a nice, new MacBook), but

instead requested a presumption instruction in light of Plaintiffs' total failure to take minimal

measures for two years to preserve ESI on the singularly most important device in the case.

Plaintiffs set forth no reasons for not doing so, nor do they provide any evidence (e.g., from

their ESI expert) that such a major lapse in data preservation is industry practice.

    Plaintiffs also totally fail to address the issue of Parsi's desktop and the false

interrogatory answer provided.  (*See*, Def's Motion, Docket No. 145, pp. 25-26, 40).[5]  Parsi's

answer that he used that desktop from January 2009 until at least November 2010 was clearly

false.  According to the registry information Parsi did not use that computer after June 5,

---

[5]  Perhaps Plaintiffs meant "desktop" instead of "laptop" in their response at page 43.  However, they only
addressed the alleged issue of the desktop not being connected in December 2009 when Progressive Office did
its survey and  not the issue of the registry information showing that Parsi had not used that desktop since June 5,
2010.  As to the first issue, Plaintiffs' consultant, Progressive Office's Stuart Kushner, directly responded to this
already – no one ever told him about the problem of the desktop falling off the network.  (Affidavit of Stuart
Kushner, attached to Docket No. 87 as Ex. C).  Kushner is a disinterested third-party with no reason to fabricate
such testimony.  Parsi, on the other hand, has every reason to explain away why the desktop produced as the one
he had been using from January 2009 to November 2010 was not in reality even connected to NIAC's network.

2010, just two days after the Court ordered forensic imaging.  (*See* Ex. XX to Docket No. 144).  Nor was the computer even connected to NIAC's network in December 2009 when Progressive Office did a network survey for NIAC.  (Ex. C., Docket No. 87).

Plaintiffs failed to explain how Parsi could possibly do any emailing or use his Outlook calendar after he stopped using his desktop on June 5, 2010.  His laptop had been stolen with no backup.  And according to Parsi's sworn interrogatory answers, his new machine had no pst files on it.  (*See* Ex. R to Def's motion, Docket No. 144).  Either he had yet another, undisclosed PC or he was using his new MacBook for emails and calendar functions contrary to his sworn statement.

G.     <u>**Redepositions of Parsi and Blout**</u>

Plaintiffs argue that they should not have to pay for the Court-ordered redepositions of Blout and Parsi necessitated by their failure to produce requested discovery before their original depositions as follows: (1) Defendant was inefficient in his use of his time at the original deposition of Parsi (and would not have had time to cover the unproduced materials anyway); and (2) Defendant did not cite any of Blout's second deposition in support of his motion for summary judgment.  The latter argument is totally irrelevant to the fact that Defendant never had Blout's calendars when she was first deposed and was still deprived at the second deposition of the chance to ask her about 500 of her emails that were on Talebi's machine but which she did not produce.  Plaintiffs were ordered to reproduce Blout solely due to their misconduct and imposing the costs of her second deposition is not unreasonable.  As for the first point, Plaintiffs provide no evidence other than pure speculation that Defendant would not have been able to cover the late-produced materials at Parsi's first deposition.

22

Again, Plaintiffs decided to withhold the Talebi emails and membership databases and they are the ones who bear the burden of any extra depositions necessitated by *their* choice to withhold discoverable materials.

<h2 style="text-align:center">H.    <u>Editing of Seven Year-Old IIC Document Before Production</u></h2>

Plaintiffs' only argument (repeated three times in one-half page) is that they were not aware of the alterations to this 1999 document ("lobbying" changed to "advocacy" in April 2009, just days before they produced it to Defendant) until Parsi's deposition.  (Response, pp. 43-44).  One would have hoped in the last eleven months since Parsi's deposition, Plaintiffs would have looked high and low for the culprit.  Only Plaintiffs have access to the original and edited files with all metadata and know the source and custodian of the PC from which the original and altered document came.  They do not state at all the efforts to which they went to locate the person who altered the document.  They merely state: "Why Plaintiffs would alter those documents is unclear."  Two obvious reasons are: (1) it undermines their case that Parsi is not "lobbying" for Iran; and (2) they did not think they would get caught.  Tellingly, this section of their response is entitled "NIAC Should Not Be Sanctioned …" appropriately excluding Parsi from this argument.

## III.    <u>Legal Authorities Regarding Sanctions</u>

The parties do not dispute the applicable legal standard.  As Plaintiffs point out (Response, pp. 3-9), the Court has discretion to invoke a wide range of sanctions, including dismissal.  Noncompliance is considered willful when the orders have been clear, the party understood them, and non-compliance was not beyond their control.  (*Id*., p. 4).  And,

dismissal is appropriate where the conduct has prejudiced the opponent and the court (by having to accommodate the delay created) and to deter conduct that is disrespectful to the court.  (*Id.*, p. 6).

**IV.**   **Conclusion**

Unlike *D'Onofrio* where the defendant spent a "king's ransom" of approximately $1,000,000 to attempt to repair and correct ESI discovery deficiencies, Plaintiffs here have spent their king's ransom to employ every tactic known to forestall the production of ESI. The ultimate result is that after 2-1/2 years of discovery and 3-1/2 years after suit was filed, Plaintiffs had not produced a current membership list, failed to produce bank accounts upon which Parsi's damages claims depended, required the Court three times to order them to produce a server for imaging, had not produced thousands of emails and hundreds of calendar entries of one of NIAC's founders, had not searched their ISP provider server for emails (except for one witness), altered evidence, and invoked every tactic known to forestall discovery including false statements to the Court and false interrogatory answers.  As a result, not only has Defendant expended huge and unnecessary sums defending himself, but his ability to defend the claims against him has been seriously compromised due to lost evidence. Most importantly, this venture has needlessly wasted untold judicial time and resources and been a serious departure from the level of decorum expected of litigants in United States District Courts.  Such cannot be countenanced.  Accordingly, Defendant respectfully requests the Court to enter an order dismissing the case with prejudice and imposing as sanctions all fees and expenses associated with the defense of this case.

Respectfully submitted,


Dated:   November 14, 2011                   _____
                                                                        /s/
                                             Timothy E. Kapshandy (Admitted Pro Hac Vice)
                                             Bradford A. Berenson (D.C. Bar No. 441981)
                                             HL Rogers (D.C. Bar No. 974462)
                                             Peter G. Jensen (D.C. Bar No. 982599)
                                             SIDLEY AUSTIN LLP
                                             1501 K Street, N.W.
                                             Washington, D.C.  20005
                                             (202) 736-8000
                                             hrogers@sidley.com

                                             Attorneys for Defendant
                                             Seid Hassan Daioleslam

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **TRITA PARSI** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 08 CV 00705 (JDB)** |
| | ) | |
| **DAIOLESLAM SEID HASSAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 14, 2011, I served, via email, Defendant's Omnibus Motion for Sanctions on:

> Afshin Pishevar
> Adrian Nelson
> 600 East Jefferson Street
> Suite 316
> Rockville, Maryland 20852
> (301) 279-8773
> ap@pishevarlegal.com
> anelson@pishevarlegal.com

Dated:   November 14, 2011

/s/
_____
Thomas E. Ross (D.C. Bar No. 994275)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tom.ross@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

CH1 6338489v.1