```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2      -------------------------X
        TRITA PARSI, ET AL            Docket No. CA 08-705
 3                     Plaintiffs,

 4           v.                       Washington, D.C.
                                      June 3, 2011
 5                                    9:05 a.m.

 6      DAIOLESLAM SEID HASSAN,
                       Defendant.
 7      -------------------------X

 8                         STATUS HEARING
              BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
 9                  UNITED STATES DISTRICT JUDGE

10      APPEARANCES:

11      For the Plaintiffs:   PISHEVAR & ASSOCIATES, PC
                              By:  Mr. Afshin Pishevar
12                                 Mr. Adrian V. Nelson, II
                              600 East Jefferson Street
13                            Suite 316
                              Rockville, MD  20852
14                            301.279.8773
                              ap@pishevarlegal.com
15                            anelson@pishevarlegal.com

16      For the Defendant:    SIDLEY AUSTIN, LLP
                              By:  Mr. Timothy E. Kapshandy
17                                 Mr. Eric Galvez
                                   Mr. Peter G. Jensen
18                            1501 K Street, N.W.
                              Washington, D.C.  20005
19                            202.736.8533
                              tkapshandy@sidley.com
20                            megalvez@sidley.com
                              pjensen@sidley.com
21
        Court Reporter:       Catalina Kerr, RPR, CRR
22                            U.S. District Courthouse
                              Room 6509
23                            Washington, D.C.  20001
                              202.354.3258
24                            catykerr@msn.com

25      Proceedings recorded by mechanical stenography, transcript
        produced by computer.
```

```
 1                        P–R–O–C–E–E–D–I–N–G–S

 2            (9:05 A.M.; OPEN COURT.)

 3            THE DEPUTY CLERK:  Your Honor, we have Civil Action

 4   08–705, Trita Parsi, et al versus Daioleslam Hassan.  We have

 5   Mr. Afshin Pishevar and Mr. Adrian Nelson, II, representing

 6   the Plaintiffs.  And we have Mr. Peter Jensen, Mr. Timothy

 7   Kapshandy and Mr. Eric Galvez representing the Defendant.

 8            THE COURT:  All right.  Now, I don't quite know what

 9   to say to start off because I don't want to jinx anything, but

10   I haven't heard from you in the last month-and-a-half or two

11   months following some rulings on discovery disputes, so my

12   assumption is that everything is going swimmingly and that the

13   productions, sales force materials, membership lists, servers,

14   the *Pugwash* subpoena, the remaining depositions all have moved

15   forward and you haven't had need to seek court assistance and

16   still don't have such need.

17            Am I overly optimistic?  Fight it out.  Someone take

18   the podium.

19            MR. NELSON:  Your Honor, Adrian Nelson on behalf of

20   the Plaintiffs.  I would begin by saying that we've been

21   working together.  Everything is not completed.  However, I

22   think there are some outstanding issues that may require the

23   Court's involvement, and I'd be happy to begin to outline

24   those based upon correspondence that was sent to us by the

25   Defendant and to just give you an update.
```

1          THE COURT:  I'm happy to have an update.  The term I

2     think you used is may require the Court's involvement.  My

3     strong desire, as I think all of you know, is that the parties

4     work together, as you just said has been occurring, and that

5     things be resolved by the parties.  When you say may require

6     my involvement, are you at the point where it does require my

7     involvement?  Or not?

8          Please be specific when you go through items to

9     indicate whether you've come to the end of your amicable and

10     civil and constructive work on the matter and need to present

11     it to me or whether you're still working on it.

12          MR. NELSON:  Okay.  Well, let me be specific.  With

13     respect to depositions, I'll start there.  I think that's the

14     most easiest area to begin.  We have an outstanding

15     deposition, that being of Ken Timmerman.  According to the

16     order that was taken --

17          THE COURT:  Who's taking that deposition?  The

18     Plaintiff or the Defendant?

19          MR. NELSON:  The Plaintiff.  According to the order

20     that was entered, it indicated that all depositions needed to

21     be completed by May 13th.  As you are aware, we've been

22     attempting to serve Mr. Timmerman, who was a third party, with

23     a subpoena for quite some time.  The last time we appeared

24     here, I believe on March the 4th, we presented evidence of

25     several attempts by our process server to serve him.

1      We continued with those attempts after the status

2  conference and we were successful in serving a subpoena on him

3  on May the 13th, which was actually the very last day set by

4  your order.

5      THE COURT:  And it was a subpoena for a deposition

6  on what date?

7      MR. NELSON:  June the 1st.

8      THE COURT:  Well, that's two days ago.

9      MR. NELSON:  Yes.  The deposition did not take place

10  for several reasons.  First, Mr. Timmerman has retained

11  counsel who I believe is barred in the State of California and

12  who either has or --

13      THE COURT:  Where does Mr. Timmerman live?

14      MR. NELSON:  He lives in Kensington, Maryland.  His

15  attorney either has or intends to file a motion for *pro hac*

16  *vice* admission in this case, so I'm certain that even if he

17  has done that, it hasn't been ruled upon.

18      THE COURT:  I haven't seen it.

19      MR. NELSON:  He also raised several objections to

20  our notice of deposition, one being that, according to the

21  order, depositions needed to be completed by May the 13th

22  and therefore his client did not need to appear.  He also

23  challenged the fact that a witness fee check was not provided

24  to his client, and therefore the subpoena was jurisdictionally

25  deficient.

1          Since then we have provided his client with a

2   witness fee check, and so what remains outstanding is whether

3   or not, in the Court's view, the fact that we were able to

4   finally successfully serve him on May 13, would allow us to

5   now take his deposition.  And that's really --

6          THE COURT:  All right.  There's nothing before me on

7   that and there's nothing that I can do without something

8   formally before me because Mr. Timmerman is not a party in

9   this case.  I can't just reach out and say, "Do this,

10   Mr. Timmerman."  Something formal has to take place in order

11   to give me the basis and authority to do anything.

12          So this is a matter that does require some formality

13   since it's a third party matter and it's a matter that

14   certainly I'll be happy to assist the parties in acquiring

15   relevant discovery from a third party, but I can't just do

16   that without a formal structure.

17          MR. NELSON:  Thank you.  The other issue that I

18   think that I can address is the issue of the shared drive

19   and/or server, however it's being characterized.  We did

20   provide that document -- excuse me -- that piece of equipment

21   for forensic imaging consistent with the Court's order, and

22   that CPU was forensically imaged by Price Waterhouse Coopers.

23          After it was imaged, we were advised by the

24   Defendant that they felt they were entitled to also image a

25   shared drive that was in existence prior to December of 2009.

1   My understanding is that in early December 2009, NIAC switched

2   from one shared drive to another.

3        At the point in December of 2009, when we were

4   having calendars on that particular share drive, which were

5   the issue in your, I believe, July 1st order that caused the

6   imaging to take place because PST files needed to be removed

7   from that through the imaging process, that shared drive has

8   been provided.  We do not see why we should be required to

9   provide the prior share drive because the information that is

10  relevant is the information that's coming off of the

11  December 2009 share drive, and we have not satisfactorily

12  heard an argument as to why we should now be required to also

13  produce that for forensic imaging.

14       And we're especially leery, given the fact that on

15  this round of forensic imaging when our client's shared drive

16  was returned, it wasn't functioning and it had to be returned

17  again to PWC for them to do something to it to make it work.

18  And so we're concerned about having to provide another share

19  drive.

20       THE COURT:  But the prior share drive isn't

21  something that's still being utilized, is it?

22       MR. NELSON:  The prior share drive is not.

23       THE COURT:  That issue -- and I'm going to assume,

24  unless I hear otherwise, that it's an issue with respect to

25  PWC.  PWC just didn't do what it needed to do to make the

1   share drive functional for you when returned, but I'm -- I

2   don't see how that's relevant to the December -- the share

3   drive prior to December '09 because you're not still using it.

4           MR. NELSON:  That's correct.  We also have produced

5   a number of membership lists and also other lists that we

6   don't consider to be membership lists.  We have provided

7   several lists, which includes actual members, which includes

8   contacts, mailing lists, leads, et cetera, which make a whole

9   scope of information.  We were required to provide membership

10  lists but we provided in excess of the membership list.

11          And the issue that has now arisen is that during

12  Mr. Parsi -- Dr. Parsi's third day of deposition, he was

13  questioned about an e-mail where he made reference to 43,000

14  contacts, et cetera, and the opposing side has been asking us

15  to provide the additional 13,000, quote, contacts.  Those are

16  not members.  We've provided a listing of all members, and the

17  reason why there's a discrepancy between the 30,000 contacts

18  that we provided and the 43,000 contacts referenced in the

19  e-mail is because according to the Court's order, any

20  information we were to provide was to be provided at the time

21  that it was generated.

22          The 30,000 contact list was prepared in May of 2010.

23  It was provided to the opposing side, as I recall, in March of

24  2011.  That's what existed at that time, 30,000 contacts.

25  Between May of 2010 and the present, there have been

1  additional contacts that have been added which would explain

2  the discrepancy between the two numbers, but notwithstanding

3  that fact, contacts are not members, so we feel that we've

4  satisfied the request of the opposing side for a list of all

5  members.

6          THE COURT:  All right.  What else do you see as

7  remaining issues?

8          MR. NELSON:  The other issue, which we have not been

9  able to resolve is --

10          THE COURT:  This is really the last, when you say

11  "the other issue"?

12          MR. NELSON:  Well, an additional issue --

13          THE COURT:  Oh, it isn't.

14          (LAUGHTER.)

15          MR. NELSON:  -- that we have not been able to

16  resolve is the issue of legal bills.  The opposing side

17  requested copies of legal bills as it relates to our client's

18  damages claim.  We understand that those legal bills would be

19  relevant to the case.  We're not objecting to the relevancy.

20  What we're concerned about is the fact that there is not, at

21  this point, any type of confidentiality agreement in place,

22  and we're uncomfortable providing legal bills without the

23  existence of a confidentiality agreement.

24          If --

25          THE COURT:  So what's the problem?  Why can't the

1   parties get a confidentiality agreement in place?

2          MR. KAPSHANDY:  May I address that, Your Honor?

3          THE COURT:  Well, we'll get to it in a second.

4          MR. KAPSHANDY:  That's the first I heard about that.

5   That was the first time it was heard, this morning.

6          THE COURT:  I'll leave that question hanging.

7          MR. NELSON:  So that's the extent of the issue on

8   the legal bills that are outstanding.

9          There are also some concerns they have about a

10  privilege log that we've raised, and I'll allow Mr. Kapshandy

11  to address that issue, and I think those are the major

12  outstanding loose ends as we see them from our perspective.

13         THE COURT:  All right.  I'll hear from

14  Mr. Kapshandy.

15         MR. KAPSHANDY:  Thank you, Your Honor.  And I would

16  agree with both the Court and counsel that I think we've made

17  progress on the depositions, and perhaps I'm a little bit

18  overly optimistic.  I think we are ready to move to the next

19  stage where we do have the issues that relate to some of these

20  document and server issues.

21         The Defendant has completed all depositions he has

22  discussed that were raised at the last status conference.

23         We don't have a dog in the Timmerman race.  I would

24  note that --

25         THE COURT:  Who is Mr. Timmerman?

1          MR. KAPSHANDY:  He is a investigative reporter.  I

2    believe he ran for senate from the State of Maryland some

3    years ago.  He's middle-east- --

4          THE COURT:  Is there connection to anyone on the

5    Plaintiffs' side or the Defendant's side?

6          MR. KAPSHANDY:  He has written on this same issue

7    back in 2000.  He also wrote that NIAC was a lobby for the

8    Iranian regime.  Frankly, we have no objection to him being

9    deposed.

10          I do understand from his counsel, though, that the

11    first time that the Plaintiffs ever called him to attempt to

12    serve the subpoena was on March 11 and he agreed to accept

13    service, which was the date it had to be completed and called

14    for his appearance on the 1st.

15          THE COURT:  March 11th?

16          MR. KAPSHANDY:  Excuse me, May 11th for a service

17    on May 13th, and he arranged to be home and accepted service.

18    So, for the record, I would question the diligence, but again,

19    we have no objection.  That's between them and Mr. Timmerman.

20    That takes care of the depositions.

21          As far as moving to the next stage, as the Court

22    knows from previous status conferences and from the record,

23    the Defendant has filed two *Daubert* motions to exclude a

24    couple of experts.  The --

25          THE COURT:  One of them isn't even ripe.  I think

1    you still have an opportunity to reply.

2            MR. KAPSHANDY:  Well, their response is due on the

3    journalism expert today; is that correct, Adrian?

4            MR. NELSON:  Yes, but it was filed --

5            THE COURT:  It was filed yesterday.

6            MR. KAPSHANDY:  Okay.  I didn't get a copy,

7    unfortunately, but it will be --

8            THE COURT:  It was filed electronically, I think,

9    wasn't it?

10           MR. NELSON:  Yes, it was.

11           MR. KAPSHANDY:  Did we get notification?  Okay.

12   Yeah, it wasn't served on me, but in any event, we'll be

13   responding or doing a reply next week.

14           As far as other motions, as we discussed in the

15   past, I think we're ready to move to motion for summary

16   judgment, a motion for appropriate relief for failure to

17   comply with various of the Court's orders and probably a

18   motion to strike both the special and general damages for

19   Trita Parsi, not NIAC.  NIAC is covered by and does have an

20   expert supporting their claim for damages if it's admissible.

21           With regard to the documentary and server issues

22   that were raised, I think we've seen that movie many times and

23   rather than having NIAC parse Defendant requests and Court

24   orders, I think it's best to just wrap those up into some sort

25   of motion for relief.  With regard to the server, just to be

1   clear, what NIAC is essentially saying is after telling the

2   Court here last September 16th, and if you refer to page 9

3   through 10 of the transcript, three times that they did not

4   have a server, they are now telling the Court that they had

5   not one but two servers at that time and that the Defendant

6   and the Court ordered the wrong one to be produced.  The one

7   that the Defendant was always seeking was the one that in May

8   of 2009 they transported all of the PSG and other discoverable

9   files for review by counsel.

10          In December of last year, that data was -- or 2009,

11   excuse me -- migrated to a new server.  Now, as most people

12   know, when you migrate data, unless you do a forensic image

13   and actually copy all of that stuff onto the new server, the

14   deleted files were left behind, and I just am afraid that

15   obviously there was something that they don't want to be seen

16   on that server.  But we've thrown enough good money after bad

17   in doing imaging, and from the Court's first order for the

18   image of the servers where -- and the server where they

19   produce the eight computers, we would be filing the PWC and

20   report of that so the Court can see what was discovery just

21   from those computers.

22          Just one last thing related to the servers.

23   Yesterday, and I got this, unfortunately, last night and

24   wasn't able to respond to a number of these issues.  The

25   question that the Defendant has been repeatedly asking about,

1   the Talebi e-mails, where they were found, on what CPU or

2   server or computer, whatever one wanted to call it last night

3   was finally answered, and as the Court will recall, when we

4   were here in December, the Plaintiffs produced a complete list

5   of computers that they had in their office but claimed that

6   they weren't producing the intern computers because they were

7   just used by interns.

8        Well, lo and behold, last night we get the serial

9   number for Babak Talebi's computer and it was one of those

10  computers that was not produced.  It was supposedly not

11  produced because it was only used by an intern.

12       Rather than rehashing those and entering another

13  order, I think it just best to wrap those into some sort of

14  omnibus motion for relief, for, you know, various types of

15  remedies, including and perhaps dismissal.

16       With regard to the privilege issues that are raised,

17  and they come up a couple of ways, and the Court may have

18  heard that during Trita Parsi's deposition on May 11, we did

19  try to enlist the Court's assistance but had some troubles

20  with the telephone communication.

21       THE COURT:  I thought the troubles with the

22  telephone communication actually helped to resolve the matter.

23       MR. KAPSHANDY:  Well, we did manage to sit silently

24  in the room for awhile, and maybe that did help, but the issue

25  is fairly simple.  At the time we had asked Trita Parsi if he

1    had ever sought any advice as to whether under the *Logan Act*

2    all of his meetings with these Iranian governmental officials

3    was permissible.  I made clear that we didn't want to know the

4    content of those communications, just simply the fact of that,

5    had he sought any advice.

6          That's very similar to the issue that has been

7    raised in the privilege log, which I would agree with counsel,

8    is going to require some court involvement perhaps somewhere

9    in these next couple of months as we're working on these other

10   motions, because NIAC has, on their privilege log, in response

11   to the Defendant's request for memos on advice about whether

12   they're complying with various lobbying laws, withheld as

13   privilege maybe ten or so communications with a law firm and

14   also a consulting firm.

15         Now, the way this injects itself into the case is

16   related to the damages issue.  The Defendant has never written

17   that Trita Parsi or NIAC had violated lobbying laws or tax

18   laws or *Logan Act*; however, the Court will recall in their

19   response to the motion to dismiss and also in their response,

20   Eli Lake did write that in his November 2009 article.  NIAC

21   has responded that their conduct is in compliance with all

22   lobbying and tax laws and they do that because they need to

23   prove to get presumed damages that the Defendant has said

24   something defamatory, per se.

25         In their motion to dismiss, they say what the

1    Defendant is effectively saying is that they are violating

2    these laws.  Now, mind you, the Defendant hasn't said that,

3    but if they inject that and have to prove the falsity, of

4    course, then those communications and that advice becomes

5    relevant.  They can't come in here and say, "Trust us, we're

6    complying with the law," and the next question is going to be,

7    "Well, how do we know that?  What sort of advice did you seek?

8    What did those lawyers or those consultants tell you?"  Which

9    is kind of interesting because at that very time they then

10   amended their tax returns and elected a 501(h) election, so it

11   appeared that they didn't get a clean bill of health from this

12   law firm Riley Ryan.

13           So as the Court suggested the last time, they can't

14   have their cake and eat it, too.  You can't say we had advice

15   that we're complying with the law, but trust us, you can't

16   look at it.

17           THE COURT:  The rule is pretty clear that if you

18   rely on advice of counsel for a claim or defense in a lawsuit,

19   then that opens up the issue of the discussions.

20           MR. KAPSHANDY:  And frankly, telling the reporter

21   about that may have waived the privilege, but as the Court

22   also pointed out, this after-the-fact advice may not be

23   relevant, and frankly, as we said, the Defendant has never

24   made these accusations.  They have injected it because of the

25   defamatory per se claim that they are making, and the way

we've suggested we perhaps deal with that is just preclude

NIAC from making that or even raising that either as a defense

or introducing evidence that they are in compliance with

lobbying laws.

The problem, of course, that they have is that they

have produced a document from Patrick Disney under his own

analysis of both the IRS and the Lobbying Disclosure Act that

perhaps they weren't in compliance.  So there is that one

piece of evidence, and they're going to have to deal with

that, and that's, of course, why they want to use the legal

advice as a shield, although they don't want to produce it.

So that's an issue that may have to be briefed.

THE COURT:  For purposes of the case, everybody

should understand this.  If a discovery request has been made

for information relating to, I'll just use the term, "advice

of counsel," and it's objected to and the discovery is not

provided, you need to make a decision as to whether to bring

that to the Court and seek relief.  Not relief in terms of

sanctions, not relief in terms of preclusions of what can be

raised at trial, but relief in terms of we're entitled to this

information, discovery motion, and I certainly will listen to

that.

If we get to the point where the Plaintiff has

refused, after diligent request for it to produce such

information, then that may jeopardize the Plaintiff's ability

1   to rely on an advice-of-counsel defense, but there are certain

2   steps that have to take place between --

3          MR. KAPSHANDY:  Right.

4          THE COURT:  -- the beginning and the end.

5          MR. KAPSHANDY:  What I basically said, we made this

6   proposal.  It doesn't look like it's going to work, and I

7   think we're at the stage we'll have to file a motion to compel

8   and the Court will have to do an in-camera review, and I

9   expect that's something we can do fairly easily and fairly

10  soon.

11         On a related issue, although they don't make a claim

12  of privilege, is the -- and it was just raised last night, and

13  unfortunately the legal bills have been under a Rule 26

14  disclosure since the beginning of this case, their amended

15  Rule 26 disclosure a couple of months ago, they've been

16  requested, including all supporting documents for damages for

17  the last two-and-a-half years, and last night, we now find out

18  for the first time that they're reluctant to produce these

19  because the Defendant might publish it on his website and they

20  want a confidentiality order.

21         I would submit that that's just frankly too late.

22  That could have been raised a long, long time ago, and we

23  shouldn't be troubling the Court with that now.  I mean,

24  they're not disputing that it's privilege.  They just want to

25  negotiate here in the court on the confidentiality order.

1              Frankly, I think it's unrecoverable anyways.  I

2    don't know of any authority for the proposition that legal

3    bills, absent, you know, recoverable costs after a judgment

4    are an element of damages in the defamation case, but it may

5    be much ado about nothing, but I've suggested that that -- and

6    they withdraw that.

7              THE COURT:  That's a term that has some meaning in

8    this case.

9              MR. KAPSHANDY:  Which?

10             THE COURT:  The much ado about nothing.

11             MR. KAPSHANDY:  Fair comment.  So, our proposal has

12   been to just, you know, drop that claim, but they're not

13   willing to and now they want to negotiate a confidentiality

14   order.  I submit it's a bit late for that.  I would rather not

15   waste time on it.  I don't think it's recoverable.  If they

16   want to argue it, that's up to them.

17             THE COURT:  Having heard from Mr. Nelson and from

18   you to this point, it seems to me that we are, as you said, in

19   or almost in a motions phase.

20             MR. KAPSHANDY:  Right.

21             THE COURT:  But I think I want to break down the

22   motions that I've heard mention so far.  I've heard mention of

23   motions for summary judgment, in other words, ultimate relief

24   on the merits.  I've heard motions for sanctions mentioned,

25   which could include the ultimate sanction of dismissal.  I've

1    heard motions -- I've received already motions in limine, two

2    motions to strike experts or preclude expert testimony.  I've

3    heard -- I've heard mention of motions to strike certain

4    damages claims with at least -- at least with respect to one

5    of the Plaintiffs, and then I put forth another category that

6    I've heard as well, which I'll call motions for discovery.

7    And I mean by that not sanctions related motions but motions

8    to obtain information.

9             MR. KAPSHANDY:  Right.

10            THE COURT:  And it seems to me that those are still

11   the first flight of motions because some of that may impact on

12   some of the other motions.  And what I think I want to do now

13   is schedule motions practice, including the discovery motions

14   that remain, and each side can decide what they want to do.

15            And I understand some hesitancy that you have to

16   inject certain issues or make more out of certain issues than

17   you think may be worth, and I'm sure that the Plaintiffs' side

18   feels the same about some things, and those are decisions that

19   each side is going to have to make, but I think what I need to

20   do is say, "Okay, we're now at a point that any remaining

21   discovery issues that you think need the Court's resolution

22   need to be presented in motions."

23            I'm going to give you a little time before you do

24   that because I want you to keep working on some of these

25   issues and hopefully you can resolve some of them.  And I'm

1   going to say to you that we're at a point in this litigation,

2   given the problems -- and I use that term purposefully,

3   because I think there have been a lot of problems in this case

4   with respect to discovery and with respect to counsel being

5   able to work through issues.

6          Given that background, I'm prepared, with respect to

7   individual discovery motions, not getting into the sanctions

8   arena yet, but the individual discovery motions I'm prepared

9   to award costs and fees on.  In other words, if someone brings

10  a discovery motion, and I think, given the history, as it's

11  presented in the motion, and the resolution that I believe is

12  the proper resolution of the motion, if I feel that sanctions

13  are appropriate, I will award sanctions with respect to that

14  motion.

15         This doesn't go to the ultimate sanctions type

16  questions that you've been raising several times already.

17  That remains for another day.  But I think we're at a point

18  where I want the end of discovery to come about and it's going

19  to have to come about through a couple more motions in all

20  likelihood, unless you-all can work together constructively

21  and resolve these issues before the deadline for filing those

22  motions.

23         So what I'm going to do is I'm going to set a

24  schedule.  We're not going to resolve anything sitting here

25  because, quite frankly, I always wind up in a situation where

1    old issues with a new twist are being raised and I don't have

2    enough information to resolve the issue just based on what

3    you're saying.

4            So we're going to -- we're going to package this

5    into a schedule for first discovery motions, and then

6    following that, we'll have a schedule for other types of

7    motions.

8            So, you've already filed -- you've already filed,

9    the Defense has already filed two motions in limine with

10   regard to the experts, and those are pending, and I will look

11   at those as the time comes.

12           With respect to what I've called the discovery

13   motions, a motion seeking information, in other words, seeking

14   production, not seeking sanctions for failure to produce, what

15   do you think is a reasonable timeframe for me to say all those

16   issues need to be either resolved between the parties through

17   your further discussions and work or a motion filed?

18           MR. KAPSHANDY:  Probably 30 days.  The Defendant, I

19   can envision a couple of motions if they're not turning over

20   the privilege documents and we have the damages question which

21   is kind of --

22           THE COURT:  You may decide not to file anything on

23   the server issue, right?  On the other hand, you may want to

24   file something on the server issue.  You say 30 days.

25           From the Plaintiffs' perspective, having heard what

1  I just said, what do you think is the reasonable time for me

2  to say, "Okay, parties, work on this, and to the extent that

3  you haven't been able to resolve these discovery, i.e.,

4  production-related issues, motions have to be filed by what

5  date," what would you say?

6          MR. NELSON:  I would suggest July 8th, which is

7  about 30 days but takes in account the holiday.

8          THE COURT:  That sounds fine.  That's consistent

9  with what you're saying, isn't it?

10          MR. KAPSHANDY:  Right.  I think I'm going to be out

11  the first two weeks in July, which is why I suggest

12  June 30th, but I'm sure we can work on that.

13          THE COURT:  I'm going to set a date.  Work on it

14  now.

15          MR. KAPSHANDY:  I would prefer June 30th, but if

16  it's going to be in July, then mid July.

17          THE COURT:  Well, let's do this.  I can make the

18  date July 8.  You can file yours by June 30th or have them

19  ready and have someone else file them when you're out of town.

20          So we'll make July 8 that date for discovery

21  motions.  And how long to respond to those?  And this would

22  include third party, by the way.  So if there's anything with

23  respect to Mr. Timmerman, it's got to be filed by that date.

24          How long to file responses to any motions from your

25  perspective, Mr. Kapshandy?

1                    MR. KAPSHANDY:  July 31st.

2                    THE COURT:  How's that sound?

3                    MR. NELSON:  That's a Sunday.

4                    THE COURT:  How's August 1st sound?

5                    MR. NELSON:  That sounds great.

6                    THE COURT:  All right.  And then replies thereto two

7    weeks later?

8                    MR. KAPSHANDY:  Perfect.

9                    THE COURT:  Will that work?  Let's make it -- I've

10   already ruined one of your weekends.  Let's make it instead of

11   the 15th, we'll make it the 16th.  So that's our discovery

12   motions schedule.

13                   Now, with respect to these other categories of

14   motions, summary judgment or anything similar thereto,

15   sanctions, motions to strike damages, what would be your view

16   as to whether we should set a schedule now, and if so, what

17   that schedule should be?

18                   MR. KAPSHANDY:  I think it would be helpful to set a

19   schedule more than just one at a time.  We tend to, as we

20   learned from last night, have a flurry of activity the day

21   before, so having two deadlines.  And I was anticipating we

22   could perhaps have more substantive and dispositive motions

23   done by the first week in August, so really any time after the

24   15th, although we should probably schedule more time after

25   that, that may impact those a lot.

1        THE COURT:  All right.  Let's -- now, would this

2   include -- would you put the motion to strike damages and the

3   motions for sanctions into the same category and timeframe and

4   schedule as the summary judgment motions, or do you think --

5   since you're the one who's intimated that you're going to be

6   filing those different kinds of motions, do you think they

7   should be under different schedules?

8        MR. KAPSHANDY:  I would expect the motion for

9   summary judgment and an omnibus sanctions motion, which would

10  include dismissal, is a sanction to be grouped together at the

11  end.  I would consider a motion to strike certain damages

12  claim more of an issue narrowing thing that may be related to

13  discovery responses or conduct, or discovery -- lack of

14  discovery responses, it would come in the first wave, but I

15  haven't quite thought about that yet.

16       THE COURT:  All right.  Well, we'll just set two

17  deadlines.

18       Yes, sir.

19       MR. NELSON:  Your Honor, just looking at the

20  schedule you've already put in place, if the discovery motions

21  aren't finally briefed until August the 16th, then I would

22  suggest that we at least leave 30 days because there may be

23  something that has to take place as a result of your ruling,

24  so...

25       THE COURT:  I don't think that's inconsistent.

1          MR. KAPSHANDY:  Right, that's what I'm saying.

2          MR. NELSON:  So, September 16th, that's a Friday.

3          THE COURT:  Is that a comfortable day, or do you

4    want me to push it to the following Monday or Tuesday?

5          MR. KAPSHANDY:  That's fine.  September 16th is

6    fine.

7          THE COURT:  September 16th.  So that will be the

8    due date for all other motions, we'll just call it.

9          And then 30 days, or more than 30 days to respond to

10   those?  My guess is that the -- there'll be a fair amount for

11   the Plaintiffs to respond to.

12         MR. KAPSHANDY:  Right.  The summary judgment motion

13   would be basically a lack of evidence motion and it might be

14   harder for them to respond than for us to write that.

15         THE COURT:  Right.

16         MR. KAPSHANDY:  The sanctions motion might be more

17   difficult but the response would be difficult for both, so I

18   could see maybe 30 days being necessary to respond.

19         THE COURT:  What do you think, Mr. Nelson?

20         MR. NELSON:  With probably the voluminous motions

21   that have been filed previously in this case, I would suggest

22   45 days and I would suggest October 28th.

23         THE COURT:  That sounds all right.  October 28.  And

24   how long would you like, Mr. Kapshandy?

25         MR. KAPSHANDY:  14 days.

1          THE COURT:  14 days.  Mr. Nelson seems to be the one

2    with the calendar in hand.  14 days from the 28th is likely

3    to be the 11th of November?

4          MR. NELSON:  Correct.

5          THE COURT:  All right.  And that's our dispositive

6    motion schedule and/or all other motions, anything beyond the

7    discovery motions that I'm expecting to be initiated on

8    July 8.

9          So there's our motions schedule, and this will be a

10   lot of work for all of you.  It will likewise be a lot of work

11   for me, and I certainly expect that there will be some issues

12   that have to be resolved.

13         Hopefully you can spend a little bit of time over

14   the next month trying to narrow down the discovery issues that

15   remain and seeing if you can't reach resolution to avoid

16   having to present those through motions, and, as I indicated,

17   running the risk of sanctions being imposed, and by sanctions

18   I only mean costs and attorney's fees for those motions if I

19   believe that one side or the other has not been reasonable and

20   therefore should face such costs and attorney's fees.

21         Now, this leaves aside the question that we've

22   broached briefly, I think, on an earlier occasion, and that is

23   whether there's some utility to having you sit down with a

24   magistrate judge or other mediator to see if you can reach a

25   resolution of this matter.

1          Mr. Kapshandy, since you're standing at the podium,

2   what do you think about that?

3          MR. KAPSHANDY:  Well, I still think it's beneficial.

4   It's always worth a try.  We have an ambitious schedule here.

5   I'm not quite sure how it would fit in, and obviously, that

6   person, he or she would have to be fairly cognizant of the

7   facts because it's a fairly complicated case.  It would

8   involve pretty good involvement from a mediator.  It's not the

9   sort of case where somebody can just come in and divide the

10  baby.  It's more about, you know, issues and --

11         THE COURT:  I don't disagree with you.  I will

12  observe that it seems to me if the parties are going to make a

13  good faith effort at this and believe that there's some

14  possibility of success, it would make sense to try to do it

15  prior to September 16th.  It might not make sense to try to

16  do it prior to July 8th, but it might make sense to try to

17  do it prior to September 16th.

18         So what I could do is simply refer you to either the

19  court mediation program or a magistrate judge to work with you

20  on a schedule that you-all can work out with that individual

21  that only has to be completed prior to your filing on

22  September 16th, and that would give you a little more

23  flexibility because it's quite a long timeframe given the

24  issues that you've identified.  How does that sound?

25         MR. KAPSHANDY:  That makes sense.

1          THE COURT:  From the Plaintiffs' perspective?

2          MR. NELSON:  That's what we were saying on our side.

3          THE COURT:  Okay.  And that leaves the question of a

4   magistrate judge versus the court mediation program.  I think

5   you're all experienced and you know that each are pretty much

6   equally successful.  The magistrate judge -- our magistrate

7   judges have a lot of experience with trying to resolve

8   complicated as well as straightforward matters and do, of

9   course, bring some judicial authority to the process, which

10  sometimes is helpful in cases.

11         The mediators are likely equally experienced,

12  perhaps even with some subject matter expertise.  I don't know

13  whether defamation and related issues would be the expertise

14  here or whether something else would be the expertise, but I

15  can't tell you one's better than the other.  Views?

16         MR. KAPSHANDY:  I think our preference would be a

17  magistrate judge.  There are several here in this district

18  that have quite a bit of experience with, particularly in this

19  case, as the Court knows, E-discovery compliance issues.

20         THE COURT:  Right.

21         MR. KAPSHANDY:  And have written some very

22  thoughtful opinions on that, so that would be the Defendant's

23  preference.

24         MR. NELSON:  We would agree.

25         THE COURT:  All right.  I will refer you to either

1   magistrate -- one of our magistrate judges, I have one in

2   mind, and hopefully, given the flexible time schedule we have,

3   that will be doable.

4          With that resolved and a schedule set, what else for

5   this morning?

6          MR. KAPSHANDY:  In this schedule, I don't know if

7   the Court envisions, as much as you love having us back here,

8   anymore status conferences to report on the progress or

9   hearings on some of the interim motions or not.  That's

10  probably the last thing --

11         THE COURT:  Well, this is what I envision.  I

12  envision seeing what's filed on July 8th before I decide

13  whether to have a hearing on discovery motions.  If I decide

14  to have a hearing, I would have it relatively shortly after

15  August 16th.  So let's hear what your availability would be

16  in the last two weeks of August so I know whether --

17         MR. KAPSHANDY:  It's pretty clear for me.  Adrian?

18         MR. NELSON:  The very last week of August would be

19  preferrable to the third week of August.

20         THE COURT:  All right.  What's the Monday of the

21  very last week in August, Mr. Bradley?

22         THE DEPUTY CLERK:  It's the 29th, Your Honor.

23         THE COURT:  Is that the -- what do you mean by the

24  very last week, or do you mean the 22nd?

25         MR. NELSON:  No, the 29th.

1        THE COURT:  All right.  And that's a Monday.

2   Actually, how does my August 30th schedule look?

3        THE DEPUTY CLERK:  It's not showing anything.  I'm

4   assuming you don't have anything.

5        THE COURT:  If it's not showing anything, that means

6   I probably don't have anything.  Why don't we set a tentative

7   date for a hearing on the discovery motions on August 30th

8   at 9:30.  I will cancel that hearing if based on the motions

9   that are filed it does not seem that it would be worthwhile to

10  have a hearing, or certainly we'll cancel it if you work

11  everything out and there are no discovery motions filed, but

12  we'll set a hearing for August 30th at 9:30 a.m.

13       That will also satisfy any need for an interim

14  status call, I think, unless you think there's some utility to

15  getting together before July 8th.  Counsel, what do you

16  think?

17       MR. NELSON:  I don't see the need for that.

18       MR. KAPSHANDY:  I think that makes sense.

19       THE COURT:  All right.  So that will be our

20  schedule.  I'm not going to set a hearing date for the

21  substantive motions because we're not there yet.  We've got

22  two things to happen first.  The discovery and then also any

23  success on mediation, and I'll wait to see what's filed on

24  September 16th before we decide what kind of hearing to have

25  and when.

1        THE COURT:  All right.  And that's a Monday.

2   Actually, how does my August 30th schedule look?

3        THE DEPUTY CLERK:  It's not showing anything.  I'm

4   assuming you don't have anything.

5        THE COURT:  If it's not showing anything, that means

6   I probably don't have anything.  Why don't we set a tentative

7   date for a hearing on the discovery motions on August 30th

8   at 9:30.  I will cancel that hearing if based on the motions

9   that are filed it does not seem that it would be worthwhile to

10  have a hearing, or certainly we'll cancel it if you work

11  everything out and there are no discovery motions filed, but

12  we'll set a hearing for August 30th at 9:30 a.m.

13       That will also satisfy any need for an interim

14  status call, I think, unless you think there's some utility to

15  getting together before July 8th.  Counsel, what do you

16  think?

17       MR. NELSON:  I don't see the need for that.

18       MR. KAPSHANDY:  I think that makes sense.

19       THE COURT:  All right.  So that will be our

20  schedule.  I'm not going to set a hearing date for the

21  substantive motions because we're not there yet.  We've got

22  two things to happen first.  The discovery and then also any

23  success on mediation, and I'll wait to see what's filed on

24  September 16th before we decide what kind of hearing to have

25  and when.

1        With that, anything else?

2            MR. KAPSHANDY:  No, Your Honor.

3            MR. NELSON:  No, Your Honor.

4            THE COURT:  All right.  Thank you-all.  I hope that

5   you can make some further progress.  I'm pleased to hear the

6   terms "working together," but quite frankly, I don't think

7   there has been a great deal of success from the working

8   together from what has been described to me, so if you can

9   come up with some more success, all the better.

10           MR. NELSON:  Thank you.

11           THE COURT:  Thank you.

12           (PROCEEDINGS END AT 9:55 A.M.)

13                          *-*-*-*-*

14                 **CERTIFICATE OF REPORTER**

15        I, Catalina Kerr, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19

20   _____   _____
     Catalina Kerr                 Date
21

22

23

24

25