UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL, <br><br> Plaintiff, <br><br> vs. <br><br> SEID HASSAN DAIOLESLAM, <br><br> Defendant. | Civil Action No. 08-705 (JDB) <br><br> **DEFENDANT'S MOTION FOR AN ORDER REQUIRING PLAINTIFFS TO POST A BOND AND NOT WASTE ASSETS** |

### DEFENDANT'S MOTION FOR AN ORDER REQUIRING PLAINTIFFS TO POST A BOND AND NOT WASTE ASSETS

Defendant Seid Hassan Daioleslam, by and through undersigned counsel, moves the Court for an order requiring Plaintiffs the National Iranian American Council ("NIAC") and Trita Parsi ("Parsi") to post a bond in the amount of $300,000 to cover any future awards of costs and fees and directing Plaintiffs not to waste their assets. For the reasons set forth below, Defendant respectfully requests that the Court grant the motion.

### BACKGROUND

On August 30, 2011, this Court granted various of Defendant's motions to compel discovery. The Court ordered Plaintiffs to "pay the costs associated with defendant bringing" the motions.[1] The Court further stated that "[p]ayment shall be made to defendant within seven (7) days of defendant's submission of his bill of costs."[2] Defendant filed a bill of costs on September 14, 2011, totaling $24,845.00.[3] Plaintiffs have yet to pay these costs.[4] In addition, Defendant

---

[1] Order at 3, Parsi et al. v. Hassan, No. 08-705 (D.D.C. Aug. 30, 2011), ECF No. 138.

[2] *Id.*

[3] Errata to Defendant's Bill of Recoverable Costs Pursuant to the Court's Order of August 30, 2011, Parsi et al. v. Hassan, No. 08-705 (D.D.C. Sept. 14, 2011), ECF No. 140.

filed an omnibus motion for sanctions on September 16, 2011.[5] In that motion, Defendant depicted Plaintiffs' repeated discovery abuses in the course of this case. Defendant asked the Court "to enter an order dismissing the case with prejudice and imposing as sanctions all fees and expenses associated with the defense of the case."[6] If the Court grants the motion, Defendant stands to be awarded potentially hundreds of thousands of dollars in fees and expenses incurred over the past several years due to Plaintiffs' misconduct. Defendant also has incurred tens of thousands of dollars in recoverable costs if this Court alternatively grants Defendant's motion for summary judgment, also filed on September 16, 2011.[7]

Defendant has reason to believe, however, that Plaintiffs have acted and will continue to act in a manner that will prevent him from fully collecting on any award. During the course of discovery, Defendant uncovered evidence of highly concerning practices by Plaintiffs, including, but not limited to, Plaintiffs' defrauding of congressionally-funded grants and Plaintiffs' failure to employ reasonable auditing procedures. As a result, Defendant fears that absent Court intervention Plaintiffs will purposely render themselves financially unable (or at least fraudulently make it appear as if they are financially unable) to meet any future Court-imposed costs and fees obligations.

## ARGUMENT

Defendant's motion "lies in the sound discretion" of this Court. *Soo Hardwoods, Inc. v. Universal Oil Prods. Co.*, 493 F. Supp. 76, 77 (D.C. Mich. 1980). Although "[t]here is no

---

[4] Plaintiffs filed a Motion to Stay and Exceptions to Defendant's Bill of Costs on September 13, 2011, Parsi et al. v. Hassan, No. 08-705 (D.D.C. Sept. 13, 2011), ECF No. 140.

[5] Defendant's Omnibus Motion for Sanction, Parsi et al. v. Hassan, No. 08-705 (D.D.C. Sept. 16, 2011), ECF No. 143.

[6] *Id.* at 43.

[7] Defendant's Motion for Summary Judgment, Parsi et al. v. Hassan, No. 08-705 (D.D.C. Sept. 16, 2011), ECF No. 144.

specific provision in the Federal Rules of Civil Procedure relating to security" for costs and expenses, *Simulnet East Assocs. v. Ramada Hotel Operating Co.*, 37 F.3d 573, 574 (9th Cir. 1994), "[s]everal district courts have adopted rules specifically authorizing bonds covering the costs expected to accrue in those courts." *In re American President Lines, Inc.*, 779 F.2d 714, 716 n.18 (D.C. Cir. 1985) (citing *Leighton v. One William St. Fund*, 343 F.2d 565, 567 (2d Cir. 1965); *McClure v. Borne Chem. Co.*, 292 F.2d 824, 835 (3d Cir. 1961); *Leslie One-Stop in Pa. v. Audiofidelity*, 33 F.R.D. 16, 17 (S.D.N.Y. 1963); *Marshall v. Spang*, 321 F. Supp. 1310, 1311 (W.D. Pa. 1971)). And even in jurisdictions like the District of Columbia that have not adopted a local rule governing the granting of bonds for costs and fees, district courts have been held to have "inherent power to require plaintiffs to post security for costs." *Simulnet*, 37 F.3d at 574; *see also In re American President Lines, Inc.*, 779 F.2d at 716 n.18 (citing *Hawes v. Club Ecuestre El Comandante*, 535 F.2d 140, 143 (1st Cir. 1976); *McClure*, 292 F.2d at 835; *Soo Hardwoods*, 493 F. Supp. at 77). This inherent authority stems from Rule 83 of the Federal Rules of Civil Procedure which provides that "a district court . . . may adopt and amend rules governing its practice" so long as the local rule is "consistent with . . . federal statutes and rules." FED. R. CIV. P. 83(a)(1). Rule 83 further provides that in the absence of a local rule "[a] judge may regulate practice in any manner consistent with federal law, [federal] rules . . ., and the district's local rules." *Id.* 83(b); *see also In re American President Lines, Inc.*, 779 F.2d at 716 n.18.

In cases where a motion to require security for costs and fees is made, "the court should in its discretion consider whether or not the rights of the parties might be prejudiced by allowing a party to cause others to incur liability for large amounts of costs without being financially able to indemnify such parties for the amount thereof." *In re Clerk's Fees and Cost Bonds*, 49

3

F. Supp. 1011, 1011 (D.C. Tenn. 1943). Thus, where there is danger that the plaintiff might purposely render himself insolvent or at least partially unable to pay a future award that has been requested by the defendant, or where there is a risk that the plaintiff might seek to conceal his resources to evade satisfaction of a court award of costs and fees, a court should be inclined to grant the defendant's motion for the posting of security. *Id.*

Plaintiffs' history of highly concerning behavior justifies the relief requested. This history is well grounded in fact as revealed in discovery. Information gleaned during discovery indicates, for example, that Plaintiffs misappropriated funds from the National Endowment for Democracy (NED), a congressionally-funded organization established to promote democracy worldwide, and that they engaged in a concerted effort to cover their fraudulent behavior to prevent NED from recovering the misappropriated funds. Moreover, Plaintiffs do not follow reasonable accounting principles, and discovery documents suggest that Parsi has exploited his access to NIAC's checkbook to expend NIAC funds on items unrelated to NIAC's mission and for personal gain. These extraordinary circumstances supply this Court with ample justification for issuing an order requiring Plaintiffs to post a bond and preserve their assets.

**I.      Discovery Documents Indicate that Plaintiffs Misappropriated NED Funds**

In 2005, NIAC received a $64,000 grant from NED "to develop and launch a website"—to be known as the Online NGO Resource Center—"to strengthen organizational capacity of local groups in Iran and foster cooperation between Iranian NGOs, international NGOs and foreign funding institutions."[8] A year later, NIAC was granted another $107,000 to conduct outreach to Iranian NGOs through a Farsi-language website and also to organize a twelve day

---

[8] *See* Ex. 1, Letter from Herbert R. Brown to Trita Parsi (Apr. 14, 2005).

workshop for Iranian NGOs in Turkey.[9] Overall, more than $170,000 was paid to NIAC for work that never materialized. As shown below, NIAC did not return funds that were not expended in pursuit of grant-related goals. In fact, Plaintiffs fraudulently applied substantial portions of grant funds to office overhead and expenses that were entirely unrelated to the purpose for which the grants were given, and they did so in a deliberate attempt to prevent NED from seeking return of the funds.

NIAC appointed an individual named Mohammad Mansouri to administer and implement the NED grants. During his deposition, Mansouri testified that due to political problems in Iran[10] and a general lack of interest in NIAC's programs on the part of Iranian NGOs,[11] NIAC's efforts to implement the grants ceased by July or August of 2006.[12] By that time, NIAC had launched a Farsi website that existed only for a short period of time and gradually posted a book to the website that Mansouri had translated from English to Farsi. But NIAC cancelled the workshop in Turkey that would have expended a substantial portion of the funds.[13] Recognizing NIAC's inability to implement the grants fully and effectively, Parsi submitted doctored reports to NED to ensure that NED did not seek return of the grant funds, and the record indicates that he submitted fraudulent expense reports to NED to make it appear that NIAC had expended all of the funds on grant-related activities even though it had not.

---

[9] *See* Ex. 2, NED Grant 2006.

[10] *See* ex. 3, Deposition of Mohammad Mansouri Garakani at 18 (Mar. 12, 2010) ("[W]e couldn't do the [NGO workshop] project because of the political circumstances in Iran . . . .").

[11] *See id.* at 159 (admitting that "not so many NGOs registered" with NIAC's website).

[12] *See id.* at 19 (Mar. 12, 2010) (stating that efforts to conduct the NGO workshop in Turkey ceased in "late July or August of 2006").

[13] *See id.* at 17 (Mar. 12, 2010).

For example, NIAC charged NED for overhead and office expenses that were unrelated to its efforts to implement the grant funds. While Mansouri worked to carry out the projects in California,[14] NIAC charged NED for its Washington D.C. office rent[15] and for significant postage[16] and office supply[17] expenses that Mansouri never made.[18] After efforts to implement the grants had ended, NIAC allowed Mansouri to keep a computer[19] purchased with nearly $1,300 of NED funds,[20] NIAC continued to charge significant office related expenses to the

---

[14] In deposition testimony, Mansouri affirmed that at no time did he maintain office space at NIAC's Washington D.C. offices. *See id.* at 124 (Mar. 12, 2010) ("I have visited them during those two last years that I worked because I was coming for meetings. We had a short meeting in the office and going to, you know, our meeting to somewhere else, but I never ever had a place in their office.").

[15] *See* ex. 4, Detailed P&L Stmnt – NGO Resources Project at 5–6 (showing that NIAC expensed $31,500 against NED funds for rent between May 23, 2005, and June 25, 2007); *see also* ex. 5, Email from Trita Parsi to NIAC Board Members (Nov. 30, 2005) ("A proposal is also being written to renew our NED grant. They gave us 64k last year, and we hope to get more this year. This money has essentially covered our office expenses this year, and proved to be crucial for our survival."); ex. 3, Deposition of Mohammad Mansouri Garakani at 137–38 (Mar. 12, 2010) (explaining that NIAC did not have office space dedicated solely to implementing the NED grants).

[16] *See* ex. 4, Detailed P&L Stmnt – NGO Resources Project at 3 (showing postage expenses in the amount of $2,231.89, including expenses in the amount of $100, $100, $450, $200, $80, $80, $240, $240, and $200).

[17] *See id.* at 3 (showing office expenses in the amount of $819.93); *id.* at 6 (showing office supply expenses in the amount of $4,836.19);

[18] *See* ex. 3, Deposition of Mohammad Mansouri Garakani at 148–49 (Mar. 12, 2010) ("Q. If you could look on Page 3 under 'Postage and Delivery,' there are a lot of entries there in nice round even numbers for postage meter to 1214, postage meter to 199— A. Yes. Q. —$100, $100, postage meter to 26, that is in 2006 for $450. ***** A. Yes. Let me ask you this: Were you mailing anything to anybody in Iran? A. No. Q. Was NIAC mailing anything to anyone in Iran for this project? A. Not that I know of. Q. The payments are in nice round even numbers, which is kind of unusual for postage, and they are payable to NIAC. Do you see that? A. Yes, sir. Q. My question for you is: Do you have any idea what NIAC was mailing and charging to the NED account in 2006? A. Not at all.").

[19] *See id.* at 13–15 (Mar. 12, 2010).

[20] *See* ex. 4, Detailed P&L Stmnt – NGO Resources Project at 6 (showing purchase of laptop computer from NED funds for $1,293.33).

NED account,[21] and NIAC even used NED funds to purchase items that were wholly unrelated to the purposes for which NED provided grant funds to NIAC.[22]

These and other[23] irregularities surrounding the NED funds were not mere accounting mishaps; they resulted from a deliberate effort to misappropriate NED funds for NIAC's financial benefit. In fact, NIAC viewed these types of grants as a good "source of income."[24] Perhaps this view led Plaintiffs to seek ways to expropriate unused NED funds, or risk losing them. Mansouri wrote:

> I will gather my receipts of the last 8 months and send it over soon. There are something like $350 for the cell phone, less than $100 for calling Tehran and maybe another $250 for expenses such as internet connection, at the most. *You have to find other ways to take care of the rest of it. It won't be a good idea to pay some money back to NED from the last year's budget.*[25]

---

[21] *See, e.g.*, *id.* at 6 (showing, for example, telephone charges as late as December 18, 2007, and reimbursement for phone expenses in the amount of $839.97 and $270, both on June 25, 2007); *id.* (showing significant charges for office supplies in late 2007 and a charge for $460.83 in office supplies on February 7, 2008); *id.* (detailing rent charges as large as $8,100 as late as June 25, 2007); *id.* at 4–5 (showing hefty consulting charges as late as June 25, 2007).

[22] *See, e.g.*, ex. 6, NIAC/NGO Resources Account – Citibank 5111 at 4–5 (showing that NIAC spent $1,230 to buy flowers from ftd.com, an online flower store, for a NIAC anti-war fundraising event in California several months after the NED projects were officially terminated).

[23] Other irregular expenses charged against NED funds include an unusually large internet advertising expense on June 25, 2007, *see* ex. 4, Detailed P&L Stmnt – NGO Resources Project at 1 ($1,500, where usual advertising expense was $450); $330 in unspecified office expenses on February 3, 2008, *see id.* at 3; $150 printing expense on June 25, 2007, *see id.* at 3–4 (usual printing expense was between $1.10 and $16.51); numerous large consulting fees totaling over half of the NED funds ($71,744.50), *see id.* at 4–5; hotel reimbursement for Mansouri in the amount of $2,446.81 on August 21, 2007, *see id.* at 7; and airline fares as late as February 2008, *see id.* at 8.

[24] *See* ex. 7, Email from Mohammad Mansouri to Trita Parsi (July 14, 2007) ("[NED grants] can be a source of income for NIAC and maybe all of us.").

[25] Ex. 8, Email from Mohammad Mansouri to Trita Parsi (May 9, 2006) (emphasis added); *see also* ex. 3, Deposition of Mohammad Mansouri Garakani at 172 (Mar. 12, 2010) ("Q. Use it or lose it, right? A. That is the meaning of the budget.").

To that end, Mansouri suggested that NIAC could come up with "relevant costs," enabling them to "get the money out and then donate it to NIAC again, which is much more better than let it go back to NED."[26]

The record indicates that Plaintiffs followed through on Mansouri's suggestion. Parsi intentionally misled NED about NIAC's efforts to carry out the grants apparently in an attempt to ensure that NED would not seek the return of the remaining funds. NIAC filed inaccurate reports to NED, for example, regarding the (lack of) success of NIAC's outreach efforts to Iranian NGOs. Although Mansouri repeatedly informed Parsi that he had had little to no success securing participation from Iranian NGOs for the upcoming NGO summit in Turkey,[27] Parsi on multiple occasions misled NED to believe that Iranian NGOs were signing up in droves.[28]

In addition, Parsi misled NED to believe that NIAC had been working to produce a newsletter for Iranian NGOs. When NIAC first received the NED funds it agreed to publish a

---

[26] Ex. 8, Email from Mohammad Mansouri to Trita Parsi (May 9, 2006).

[27] *See* ex. 9, Email from Mohammad Mansouri to Trita Parsi (Nov. 18, 2005) (noting that "only 30 to 40 people" expressed interest in the website but "most of them have not mentioned the name of the NGO they are working for"); ex. 10, Email from Mohammad Mansouri to Trita Parsi (Nov. 21, 2005) ("Well, there are not many [NGOs]. Just few people who ever contacted me mentioned the name of a NGO. They were mostly those who wanted to establish one or didn't want to talk about their NGOs! The only few ones who mentioned the name of their NGO, were looking for possible funding. I don't think it is a good strategy to give out this list to NED."); ex. 11, Email from Mohammad Mansouri to Trita Parsi (Feb. 6, 2006) ("Unfortunately, not so many NGOs have been in touch with us through our website. At least, not as many as we anticipated. The total number of NGOs that either registered with us, sent emails, asked questions, and simple sent some simple notes are not more than 40 as I mentioned in my previous email.").

[28] *See, e.g.*, ex. 12, Periodic Report to National Endowment for Democracy Financial and Program Activities for Grant #2005-304 Online NGO Resource Center at 3 (Jan. 31, 2006) (claiming that "outreach to Iranian NGOs has continued at an increasing pace. . . . Overall, as the website has become more known among Iranian NGOs, the flow of inquiries and emails has increased noticeably. Dr. Mansouri has continued to advise and answer the questions sent to the Center by various Iranian NGOs.").

monthly newsletter to inform Iranian NGOs about grant opportunities and relevant news.[29] But as Mansouri admitted in his deposition, the newsletter "was not done" because too few Iranian NGOs showed interest in the project.[30] Accordingly, no newsletter was ever published. Despite this, Parsi falsely reported to NED that a monthly newsletter was under production.[31] Had NED been informed of the true nature of Iranian NGO disinterest in NIAC's efforts and NIAC's lackluster attempts to implement the grants, it would have been in a much better position to evaluate whether it should sever its relationship with NIAC and seek return of the funds.

Finally, financial records produced by NIAC suggest that NIAC followed through on Mansouri's idea to come up with "relevant costs" and "get the money out and then donate it to NIAC again."[32] Financial records indicate that a little over a month after Mansouri made this statement to Parsi, on June 25, 2007, NIAC charged numerous large and irregular expenses to the NED account.[33] Defendant is concerned that Plaintiffs will employ similar tactics to dilute and misdirect its assets and prevent him from collecting on current and future awards for fees and costs.

---

[29] *See* ex. 3, Deposition of Mohammad Mansouri Garakani at 104 (Mar. 12, 2010).

[30] *Id.* at 105 (Mar. 12, 2010); *see also id.* at 159 ("We never went through a newsletter, and the major reason was that they were not so many NGOs registered, so it is worth it to send a newsletter.").

[31] Ex. 13, Email from Trita Parsi to Anisa Afshar (Feb. 7, 2006) ("The following deliverables are currently being developed: . . . Monthly newsletter in Persian with updates on grant opportunities, new capacity building documents and upcoming seminars and workshops[.]").

[32] Ex. 8, Email from Mohammad Mansouri to Trita Parsi (May 9, 2006).

[33] *See, e.g.*, ex. 4, Detailed P&L Stmnt – NGO Resources Project at 1 ($1,500 charge for internet advertising where usual amount was around $450); *id.* at 3 ($240 for postage); *id.* at 3–4 ($150 for printing, where usual charge was between $1.10 and $16.51); *id.* at 4 ($210 for bookkeeping); *id.* at 5 ($4,062 for Mansouri's salary and $2,250 for consulting services by Parsi); *id.* at 6 ($4,050 for rent); *id.* ($662.56 for office supplies); *id.* at 7 ($839.97 and $270 for telephone expenses).

## II. Given NIAC's Lack of Basic Accounting Oversight, Plaintiffs May Likewise Attempt to Hide Assets and Thereby Prevent Defendant from Collecting on Future Costs and Fees Awards

Plaintiffs' defrauding of the NED grants is particularly troubling given NIAC's lack of basic accounting oversight. During discovery it became apparent that Parsi enjoys unfettered and apparently unmonitored access to NIAC's checkbook, and that NIAC does not employ reasonable financial auditing procedures.[34] NIAC's financial records indicate that NIAC funds frequently were spent on large, unidentified expenses,[35] that Parsi frequently reimbursed himself for unidentified expenses,[36] that he repeatedly paid himself hefty "consulting" fees out of NIAC's coffers,[37] and that he wasted NIAC funds on items wholly unrelated to NIAC's mission.[38] Unless this Court steps in to prevent it, Defendant fears that Parsi will exploit this lack

---

[34] Indeed, to Defendant's knowledge, NIAC's books have never been audited by an independent auditor.

[35] *See, e.g.*, ex. 14, NIAC Bank Statements 2009–10, at 7 ($601.75 at Pacific Market in Seattle, July 14, 2009); *id.* at 8 & ex. 15, NIAC/Parsi Checks 2009–10 ($6,690.00 at Ravagh Persian Grill, July 15, 2009); *id.* ($2,712.47 international wire out, July 22, 2009); ex. 14, NIAC Bank Statements 2009–10, at 22 ($460.00 at Moby Dick House of Kabob, October 6, 2009).

[36] *See, e.g.*, ex. 15, NIAC/Parsi Checks 2009–10 (check to Trita Parsi for $5,434.77, July 24, 2009; reimbursement check for $283.00, July 31, 2009; reimbursement check for $290.32, July 31, 2009; reimbursement check for $436.00, July 31, 2009; reimbursement check for $354.50, July 31, 2009; reimbursement check for $396.00, December 9, 2009; reimbursement check for $286.00, December 11, 2009; "bonus" check for $500, December 22, 2009; reimbursement check for $1,275.12, May 18, 2010).

[37] *See* ex. 16, NIAC/Parsi Checks 2005–06 ($400, April 22, 2005; $400, May 7, 2005; $875, May 7, 2005; $400, May 31, 2005; $400, May 31, 2005; $875, June 1, 2005; $800, July 1, 2005; $875, July 1, 2005; $800, August 26, 2005; $800, August 26, 2005; $875, August 28, 2005; $800, September 21, 2005; $875, September 26, 2005; $800, October 19, 2005; $1,600, October 26, 2005; $875, October 26, 2005; $1,600, November 26, 2005; $875, November 26, 2005; $1,600, December 26, 2005; $875, December 26, 2005; $875, January 26, 2006; $875, February 26, 2006; $3,200, March 17, 2006; $875, March 26, 2006; $1,600, May 3, 2006; $1,600, May 22, 2006; $3,500, July 20, 2006; $3,500, July 20, 2006; $3,000, July 20, 2006).

[38] *See, e.g.*, ex. 14, NIAC Bank Statements 2009–10, at 50 ($304.46 of NIAC funds at guitar store, April 19, 2010); *id.* at 37 ($5,000 loan to Hadi Semati, January 18, 2010); *id.* at 40 ($1,300.00 for tickets to Washington Wizards basketball game, February 2, 2010).

of accountability to dilute and misdirect NIAC's assets, preventing Defendant from collecting on any future award of sanctions or costs.

## CONCLUSION

Given NIAC's lack of financial oversight and its past misappropriation of congressional funds, Defendant respectfully requests the Court to enter an order requiring Plaintiffs to post a bond in the amount of $300,000 and directing Plaintiffs not to waste their assets in the event they must be used to satisfy any future Court-ordered liabilities.

Dated: February 3, 2012

/s/
Timothy E. Kapshandy (Admitted Pro Hac Vice)

/s/
Thomas E. Ross (D.C. Bar No. 994275)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tom.ross@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL, ) ) ) | |
| Plaintiff, ) | |
| vs. ) | Civil Action No. 08-705 (JDB) |
| SEID HASSAN DAIOLESLAM, ) ) | |
| Defendant. ) | |

## CERTIFICATE OF SERVICE

I certify that on February 3, 2012, I served, via email, Defendant's Motion for an Order Requiring Plaintiffs to Post a Bond and Not Waste Assets on:

> Afshin Pishevar
> Adrian Nelson
> 600 East Jefferson Street
> Suite 316
> Rockville, Maryland 20852
> (301) 279-8773
> ap@pishevarlegal.com
> anelson@pishevarlegal.com

Dated:   February 3, 2012                                  /s/
Thomas E. Ross (D.C. Bar No. 994275)
Bradford A. Berenson (D.C. Bar No. 441981)
HL Rogers (D.C. Bar No. 974462)
Peter G. Jensen (D.C. Bar No. 982599)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
tom.ross@sidley.com
Attorneys for Defendant
Seid Hassan Daioleslam