## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRITA PARSI | ) |
| | ) |
| and | ) |
| | ) |
| NATIONAL IRANIAN AMERICAN COUNCIL | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )   Civil No. 08-705 |
| | ) |
| SEID HASSAN DAIOLESLAM | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR AN ORDER REQUIRING PLAINTIFFS TO POST A BOND AND NOT WASTE ASSETS

COME NOW Plaintiffs, Dr. Trita Parsi and the National Iranian American Council ("NIAC") (collectively "NIAC"), by and through their counsel, Afshin Pishevar, Esquire and Pishevar & Associates, P.C., in opposition to Defendant's Motion For An Order Requiring Plaintiffs To Post A Bond And Not Waste Assets, and states as follows:

### INTRODUCTION

This case is a defamation suit that Defendant has turned into a weapon to exhaust and expense the Plaintiff into submission.  In his most recent endeavor, Defendant seeks to litigate Plaintiffs' expenses and spending habits on food, flowers, and tickets to a basketball game. Defendant has filed this Motion in furtherance of his stated intention to "destroy" the Plaintiffs and smear the names of the Plaintiffs in the eyes of the court.  Simply put, Defendant is making a mockery out of these proceedings.

Right off the bat Defendant seeks to mislead the court by stating that Plaintiffs have yet to pay costs that are due.  To avoid a complete mischaracterization, Defendant sneaks in, in a footnote, that Plaintiffs' filed a Motion to Stay and Exceptions to Defendant's Bill of Costs.  The Court has not yet ruled on this motion, which is why Plaintiffs' have yet to pay these costs.[1]

The standard Defendant would like the Court to adopt is: "*If* the Court grants the [sanctions] motion, Defendant stands to be awarded *potentially* hundreds of thousands of dollars…" (Def.'s Mot. at p. 2) (emphasis added).  Not only is this speculative on two levels, it is not supported by the rules or by the law.   In fact, this is akin to requiring Defendant to post a bond for the potential recovery of Plaintiffs' damages.   There is simply no basis, legal or factual, for an Order requiring Plaintiffs to post a bond.

## LEGAL STANDARD

As acknowledged by the Defendant, this Court has not adopted a local rule governing the granting of bonds for costs and fees and there is no authoritative caselaw in support of Defendant's request.  Several district courts have required plaintiffs to post security for costs, however, these cases are not remotely analogous to the present case, both factually and in the amount of the bond requested or rewarded by the court.

In *Soo Hardwoods, Inc. v. Universal Oil Prods. Co.,* 493 F. Supp. 76 (D.C. Mich. 1980), cited by the Defendant, the court stated that a court may require security for costs when the plaintiff's claim is of dubious merit, plaintiff lacks financial responsibility, and defendant will incur substantial expense.  Similarly, this Court addressed the inherent power to require a plaintiff with "no assets in the court's jurisdiction to post a bond before proceeding with what appears to be a frivolous suit." *In re American President Line, Inc.,* 779 F.2d 714, 716 (D.C. Cir.

---

[1] Plaintiffs have in fact deposited money into their attorney's trust account (IOLTA).  (*See* September 16, 2011 Deposit, attached as Exhibit 8.)  This directly controverts Defendant's allegation that Plaintiffs do not manage their finances.

1985).  None of these elements are present in this case.  In support of their motion, Defendant

does not even allege that this is a frivolous suit, one of the elements courts have required.

Instead, they argue, without any support, that NIAC and Dr. Parsi lack "financial responsibility."

Defendant illogically concludes that Plaintiffs lack financial responsibility because NIAC's

books have never been audited by an independent auditor.   As to the third element from *Soo*

*Hardwoods*, Defendant does not allege that they will incur substantial costs, but speculates that

this Court might issue a potentially large award of costs.  Clearly, the three elements from *Soo*

*Hardwoods* required to set a bond are not satisfied in the instant case.

Furthermore, the bond amounts are not remotely the same in scope in the cases cited by

Defendant.   In *Soo Hardwoods*, Defendant requested a bond of $56,000 and the court granted a

reduced bond of $2,500.  In another case cited by Defendant, on an appeal from this Court, a

bond was reduced from $10,000 to $450.  *In re American President Line, Inc.,* 779 F.2d 714

(D.C. Cir. 1985).  Finally, in *In re Clerk Fees*, the court denied the requested $250 cost bond.  *In*

*re Clerk Fees and Cost Bonds*, 49 F. Supp., 1011 (D.C. Tenn. 1943).  The $300,000.00 bond

requested by Defendant is not contemplated by the case law cited by Defendant.

## ARGUMENT

**I.   THERE IS NO EVIDENCE THAT PLAINTIFFS MIGHT PURPOSELY RENDER THEMSELVES INSOLVENT OR A RISK THAT PLAINTIFFS MIGHT CONCEAL THEIR RESOURCES.**

Defendant makes the claim that there is danger that Plaintiffs might purposely render

themselves insolvent and there exists a risk that Plaintiffs might seek to conceal their resources

to evade satisfaction of a court award of costs and fees, but fails to provide evidence or support

for this.

A.     **Defendant's Allegations That NIAC Has "Defrauded" Congressionally-Funded Grants Are False.**

The majority of Defendant's motion is based on the accusation and allegation that Plaintiffs have defrauded congressionally-funded grants and that Dr. Parsi submitted doctored reports to NED.  However the paltry evidence thrown together by Defendant does not in any way support this allegation.  Several times, Defendant makes his hackneyed and contrived allegations of "criminal" activity by Plaintiffs and fails to provide any citation or supporting documentation. Furthermore, Defendant asserts that Plaintiffs defrauded NED despite the fact that NED itself has denied these allegations in response to a June 19, 2008 article written by the Defendant. (*See* Statement on Grant Relationship between NED and NIAC, July 3, 2008, attached as Exhibit 1.)

1.     **Defendant's motion is unjustified and in bad faith as he is well aware that NED has already <u>denied</u> any fraudulent activity or misappropriation of its funds by NIAC.**

On June 19, 2008, Defendant, Hassan Daioleslam authored an article published in Front Page Magazine's website entitled, <u>The Fraud of the National Iranian American Council.</u>[2] (*See* <u>The Fraud of the National Iranian American Council, June 19, 2008,</u> attached as Exhibit 2.)  In this article, the Defendant alleges nefarious activity by NIAC in obtaining grants from NED. (*Id.*) He goes on to question the spending habits of NED funds by NIAC pursuant to the grant, the same allegations made in Defendant's Motion. (*Id.*)   These false accusations made by Defendant in both his 2008 article and in his current motion have already been responded to by NED, which stated, "the terms of the grant agreement were met." (*See* Exhibit 1)  The article, <u>Statement on Grant Relationship between NED and NIAC</u> is a direct response and correction to Defendant's numerous "false allegations" in his article, and furthered in his current motion. NED felt compelled to respond in an attempt to "set the record straight." (*Id.*)  With regards to

---

[2] This same articles also appears under a different name, <u>Did the NIAC Defraud the National Endowment for Democracy and Congress.</u>

the allegations in the current motion, NED has already made clear that they have "a number of controls in place to monitor how a particular grantee is using NED grant funds." (*Id.*)   These controls include "an audit department whose sole responsibility is to review the expenditures of NED grantees." (*Id.*)  Furthermore, NED itself is subject to multiple layers of oversight by the U.S. Congress, the Department of State, and independent financial audit.  (*See* NED website, http://www.ned.org/about, attached as Exhibit 3.)

If Defendant's allegations that NIAC took over $170,000 for work that never materialized were true, NED would be aware due to its scrutiny and oversight of projects and therefore would not have responded as it did.   Likewise, if Dr. Parsi submitted doctored and fraudulent expense reports to NED, NED would have been aware and would not have responded as it did.  Despite clear evidence to the contrary, directly from NED itself, Defendant baldy makes these false, criminal allegations.  Such has been the routine, overly burdensome practice of Defendant throughout this lawsuit – to make "much ado about nothing" and hope some of it sticks and thereby prejudice the court and at the same time exhaust the Plaintiffs into submission.

2.     **Defendant ignores discovery documents that directly controvert his allegations and mischaracterizes other documents – "purposeful avoidance"[3].**

The majority of Defendant's argument is that NIAC took grant money from NED, did little to no work related to the purpose of the grant, and then "doctored reports" to NED to defraud them.  Defendant ignores documents provided to him in discovery that contradict these allegations and mischaracterizes other documents in order to give life to his conspiracy theory.

a.     **Almost all NED project goals were met.**

Information provided in discovery to Defendant provides clear evidence that NIAC performed numerous tasks in furtherance of the project for which the grant was issued.

---

[3] This Court discussed "purposeful avoidance" in its order denying Defendant's Motion to Dismiss. (*See* February 4, 2009 Order denying the Defendant's Motion to Dismiss at p. 7.)

Defendant chooses to ignore documents that were turned over that do not support his conspiracy theory.  For example, in a 2007 quarterly report prepared by former NIAC employee Dr. Mohammed Mansouri, a summary of work that was completed and ongoing at that time is documented.  (*See* NIAC Report to NED, August 6, 2007, attached as Exhibit 4.)  This document, provided in discovery, describes the "more than 32 word document pages of content" added to the website created as part of this project.  (*Id.*)  The report goes on to detail the "regular telephone conversations" with about "50 nongovernmental groups and organizations." (*Id.*)  Furthermore, Iranian NGOs were interviewed over the phone regarding the NGO Resource Center.  (*Id.*)

NIAC was provided with three major grants from NED.  (*See* Declaration of Dr. Trita Parsi at ¶ 26, attached as Exhibit 5.)  The first was a workshop for NGOs in Iran on how to use visual media for their marketing, particularly for connecting with the outside world.  (*Id.* at ¶ 27.) The project was delayed on numerous occasions due to the volatile political situation in Iran but was eventually successfully executed.  (*Id.*)   The delays meant that the cost also increased, though no further funds were requested from NED. (*Id.*)

Due to the success of the first project, two additional grants were awarded to NIAC. (*Id.* at ¶ 28.)  The first dealt with creating an eBook and a NGO management portal in Farsi. (*Id.* at ¶ 29.)   NGO management literature was translated to Persian and adapted to the specific circumstances Iranian NGOs found themselves in. (*Id.*)   Connections were also made with Iranian NGOs to receive their feedback and provide specific consultations. (*Id.*)

The third project expanded on the eBook and also had an added component of bringing a few Iranian NGOs to Turkey to connect them to Turkish NGOs and train them. (*Id.* at ¶ 33.)  Due to the deteriorating political situation in Iran, this component of the project could not be

completed.  (*Id.*)  Instead greater focus was given to the eBook and the grant size was cut down

by $29,044.00. (*Id.; See also* National Endowment for Democracy Amendment of Grant

Obligation, attached as Exhibit 6.)

　　All of this is accounted for in the reports to NED which NED reviewed, scrutinized,

verified and approved.  (Exhibit 1; Exhibit 5 at ¶ 39.)  There is no basis for the unsubstantiated

accusations made by the Defendant.  Not only did NIAC not defraud NED, but instead was de-

obligated from part of the grant for the portions of the project that could not be completed and

therefore was not given the full grant.  (*See* Exhibit 6.)

**b.**　　**No doctored and fraudulent reports were submitted to NED.**

　　Defendant asserts that NIAC improperly charged NED for overhead and office expenses

that were unrelated to efforts to implement the grant funds.  (Def.'s Mot. at p. 5.) This argument

is obviously false because the entire NED project budget was designed in collaboration with

NED and approved by NED.  (*See* Exhibit  5 at ¶ 25.)  Overhead and office expenses were

provided for in the grant and were subsequently approved by NED, including rent, postage, and

supplies.  (*Id*. at ¶ 35.)  Defendant is further misguided in relying on the fact that Dr. Mansouri

stated that he did not make these charges.   Dr. Mansouri was not the only NIAC employee

working on these projects, and was not in charge of the budget. (*Id*. at ¶ 36.)   Consequently, he

would not be aware of the project expenses when it came to rent, postage, and office supplies.

(*Id*. at ¶ 36-7.)

　　A second misplaced argument is that there were accounting "irregularities" surrounding

the NED funds, including a large advertising expense, a large printing expense, and large

consulting fees. (Def.'s Mot. at p. 7.)  As previously stated, all of these expenses have been

reviewed and approved by NED's strict auditing controls.  (*See* Exhibit 1; *see also* Exhibit  5 at ¶

7

35, 39.)  Furthermore, Defendant assumes that all expenses for the project should be linear, when in fact they are not; bookkeeping expenses for a project tend to increase towards the end of a project when the final accounting is made.  Furthermore, it is not an "irregularity" to have certain outlier charges over the course of a year.

Defendant attempts to attribute the statements of one former NIAC employee, Dr. Mansouri, to the organization as a whole.  They improperly assert that "NIAC viewed these types of grants as a 'good source of income.'" (Def's. Mot. at p. 7.)  This is the opinion of Dr. Mansouri, not NIAC, as the defendants claim.  Dr. Mansouri suggested that NIAC apply for another NED grant, but this was never done. (*See* Exhibit  5 at ¶ 40.)  Technically, since these grants do pay the salary of the project employees, such as Dr. Mansouri, his statement makes sense and is not nefarious in any way.

In regard to Dr. Mansouri's efforts to cover expenses, the email Defendant relies on does not accurately reflect what took place.  Dr. Mansouri had not documented all of his many expenses and as a result there were efforts to make sure that his legitimate expenses for the project could be covered through valid receipts. (*See* Exhibit  5 at ¶ 38.)  Again, all of these expenses were later verified by NED before they approved the final grant report. (*See* Exhibit 5 at ¶ 35, 39.)

Defendant blatantly mischaracterizes communications between Dr. Parsi and NED so that they appear to be improper, although a common sense reading of them yields a different understanding of the communications.  (Def.'s Mot., n.27-8.)  The email Defendant cites in Footnote 27 does not say that Dr. Mansouri has failed to register interest among Iranian NGOs, as Defendant states it does.  Due to the sensitivity of the work, if the names were shared and leaked, the security of the NGOs would have been jeopardized. (*See* Exhibit  5 at ¶ 31, 32.)

This may not be clear from the email communication, but was clear in the oral communication. In fact, Dr. Mansouri's email simply states that a low number of NGOs have been in contact with him via the website.  That does not include the full list of NGOs that have been in contact with him – only the ones via the web.  (*See* Exhibit 5 at ¶ 30.)  Most of the contacts where through phone and skype – precisely because of the insecure nature of web communication due to the Iranian government's filters and surveillance.  (*See* Exhibit 5 at ¶ 30-32.)  This was also pointed out in the reports to NED:

> "1- Retaining Iranian NGOs in the Center's network through regular telephone conversations in which they are provided with consultations about managerial issues and asked to share their needs and interests in return. This way of communication ensures the safety of Iranian NGO leaders and makes them comfortable introducing their friends from other nongovernmental groups."  (*See*

NIAC Report to NED, August 6, 2007, attached as Exhibit 4.)

Although all of this could be verified by the Defendant had he asked about them in depositions, he deliberately chose not to ask these questions.  Instead, the Defendant is only relying on a limited number of emails that doesn't give anything near the full picture of the developments or deliberations.  This behavior is similar to the methodology Defendant uses when writing his defamatory articles regarding NIAC and Dr. Parsi.  Nevertheless, ultimately, all of the expenses charged to the NED account were directly related to the expenses of the NED project and verified by NED. (*See* Exhibit 1; *see also* Exhibit 5 at ¶¶ 35, 39.)

**B.     There is No Evidence that NIAC Lacks Financial Responsibility, Therefore Requiring Plaintiffs To Post A Bond Is Not Appropriate.**

The secondary accusation is that "NIAC does not employ reasonable financial auditing procedures" because "NIAC's books have never been audited by an independent auditor."

(Def.'s Mot. at p. 10.) There is no IRS requirement for a non-profit organization to hire an independent auditor. (*See* Declaration of Kevin Cowl at ¶ 2, attached as Exhibit 7.) This is the method that Defendant employs throughout their motion; make a strong or serious allegation, and then fail to provide any reasonable support for it.

> **1.     NIAC employs reasonable financial auditing procedures.**

Defendant jumps to the conclusion that because "NIAC's books have never been audited by an independent auditor…NIAC does not employ reasonable financial auditing procedures." (Def.'s Mot. at p. 10.) This conclusion is both illogical and untrue.

There is no IRS requirement for non-profit organizations to employ an external auditor, a fact that Defendant is undoubtedly aware of. (*See* Exhibit 7 at ¶ 2.) With that said, NIAC has discussed hiring an independent auditor several times at Board meetings, but due to its cost, this was not done. (*Id.*) For a small organization like NIAC, it is not the general practice to employ an independent auditor. NIAC does, however, comply with general practice, as the Board reviews NIAC's financial statements to ensure that the finances are in order and good health. (*Id.* at ¶ ¶ 3-5.)

The Defendant continuously tries to portray NIAC as a large organization, with a multi-million dollar budget, a fact that fits Defendant's lies that NIAC is a powerful lobby for Iran, but does not fit reality. The financial auditing procedures employed by NIAC are reasonable and on par with similar small, non-profit organizations. (*Id.*)

> **2.     There is no evidence that Plaintiffs might purposely render themselves insolvent or conceal their resources.**

Along with the other allegations in the frivolous Motion, *sub judice,* the allegations that Plaintiffs are seeking to render themselves insolvent or conceal resources lacks any evidenciary support whatsoever. In support of the request that NIAC be required to post a bond, Defendant

states, without any support, that there is evidence that NIAC might purposely render itself

insolvent, conceal its resources, and Parsi will dilute and misdirect NIAC's assets. (Def.'s Mot.

at pp. 4, 10.)

Defendant argues that "NIAC's financial records indicate that NIAC funds frequently were spent

on large, **unidentified** expenses...." (*Id.* at p. 10 (emphasis added).)  The support provided for

this statement comes from NIAC bank statements and checks indicating charges of $601.75 at

Pacific Market, $6,690.00 at Ravagh Persian Grill, $460.00 at Moby Dick House of Kabob, and

a $2,712.47 international wire.  (*Id.*)  To call these charges "unidentified" is simply not true, as

three out of the four charges are clearly identified and are catering expenses for various

fundraisers and meetings. (*See* Exhibit 5 at ¶¶ 9-10.)  The international wire charge went to

Francois Nicoullaud, the former French Ambassador to Iran.  (*See* Exhibit 7 at ¶ 6.)  It was wired

to an HSBC account in Paris, France reimburse Ambassador Nicoullaud for travel costs, as he

was flying in as a panelist at one of the NIAC conferences held in DC in June 2009.  (*Id.*)  This is

the only charge that in good faith could be called unidentified, but still does not in any way

support the idea that NIAC is likely to hide assets.  Once again the Defendant is "purposefully

avoiding the truth" when the truth does not suit his end purpose.

Defendant goes on to attack Dr. Parsi for being reimbursed for various expenses. (Def.'s

Mot. at p. 10.)  The reimbursement checks that Defendant calls into question are for Dr. Pari's

costs incurred while on NIAC related travel, for food, taxis, airfare, etc. (*See* Exhibit 5 at ¶ 17.)

The bonus check that Defendant calls into question is a Board approved, annual performance

bonus given to all staff, not just Dr. Parsi.  (*Id.* at ¶ 22.)  None of these support the relief

requested by the Defendant.

A further blatant misrepresentation is that "[Parsi] repeatedly paid himself hefty 'consulting' fee", in support of Defendant's position that NIAC lacks financial oversight and might waste assets.  (Def's. Mot. at p. 10.)  These consulting fees were payments of Dr. Parsi's salary as he was not a full time employee during the early years of NIAC.  (*See* Exhibit 5 at ¶ ¶ 13-4.)  Furthermore, Dr. Parsi has never been in a position to determine his own salary or consultant fees, which are set by the Board.  (*Id.* at ¶ ¶ 19-21.)  Defendant's argument obviously falls flat, and if Defendant had asked about this in his depositions of Dr. Parsi, rather than just loosely toss out accusations and conspiracy theories, he would not be reaching all of these unfounded conclusions.  It seems that for the Defendant, where the end justifies the means, willfully blinding himself and not seeing what is there to be seen is the standard operating procedure.

Defendant's final argument in support of his request for Plaintiffs to post a bond is that Dr. Parsi wasted NIAC funds on items unrelated to NIAC's mission.  (Def's. Mot. at p. 10.)  Defendant is in no position to question what relates to NIAC's mission since he has deliberately lied and made defamatory statements about what NIAC's mission actually is, which is the whole basis of this lawsuit.

In support of this illogical argument Defendant cites three charges from over a year of NIAC bank statements, a $304.46 charge at a guitar store, a $5,000.00 loan, and a $1,300 charge for professional basketball tickets. (*Id.*)  These are day-to-day business expenses and expenses related to promoting NIAC's mission. (Exhibit 5 at ¶ 5.)  Defendant is not in the position to question NIAC's business expenses and business decisions that are made in their day-to-day operations and which are also subject to review by the Board. (*Id.* at ¶ ¶ 6, 7.) Defendant may not

agree with the way NIAC spends its money, but this does not in any way support the conclusion that NIAC might purposely render itself insolvent or conceal its resources.

## II.    DEFENDANT IS ONCE AGAIN USING THE LEGAL SYSTEM TO DEFAME NIAC AND TO TRY AND DESTROY IT AND SHOULD NOT BE REWARDED.

As demonstrated in the previous sections, Defendant's allegations in his Motion to Post Bond are wholly unsupported by the facts and so attenuated to any actual legal requirements for a bond that it borders on being a frivolous motion.  Rather, the Defendant uses this Motion as yet another opportunity to attack Plaintiffs and to try and smear their reputation and to shift the burden of their wasted discovery costs.  This has been the Defendant's strategy throughout discovery and, in fact, through most of this litigation.  At some point such behavior rises above mere lawyering and approaches harassment.  Although the lawsuit shields the Defendant from any defamation causes of actions for matters asserted in the suit, it does not give the Defendant a carte blanche to say anything he wants to without providing evidence of the allegations.

### A.    This Motion Is Nothing More Than Another Attempt To Defame NIAC.

Defendant has wrongfully attacked NIAC and its award of grants from NED in his article The Fraud of the National Iranian American Council.  (*See* Exhibit 2.)  NED posted a response to Defendant's article in which NED stated that there was no wrongdoing by NIAC, that all funds were used properly, and that project goals were met by NIAC.  (*See* Exhibit 1.)  Yet, despite this publication, and despite discovery showing that there was no wrongdoing from NIAC, Defendant still choose to accuse Plaintiffs of "defrauding NED by misappropriating funds and doctoring reports to hide those misappropriations."  These are serious, unfounded allegations of criminal misconduct which are false and made with malicious intent.

The Motion at bar is yet another example of why this lawsuit was brought in the first place.  It shows that the Defendant will stop at almost nothing in order to destroy NIAC and Dr.

Parsi by any means necessary.  It goes hand in hand with Defendant's single minded effort to destroy NIAC and Dr. Parsi.  The Defendant has consistently mischaracterized and taken out of context Plaintiffs actions with respect to NED and NIAC's own internal expenses.  As has already been suggested, but is worth demonstrating again, this is exactly the type of allegations that Defendant has been engaged in when writing his defamatory articles that are subject to this lawsuit.[4]  A review of one such article is enlightening.

In Defendant's article, <u>The Fraud of the National Iranian American Council,</u> Defendant writes about NIAC's alleged misrepresentations and misappropriation of NED funds.  (*See* Exhibit 2.)  Defendant starts out by stating that NIAC has "spent these funds on trivial activities aimed at enhancing false-flag Iranian NGOs that were in fact managed and controlled by Iranian Deputy Ministers or high level officials- making a mockery of the term 'Non-Governmental.'" (*Id.*)  Defendant, however, does not cite to any proposition to support this allegations.  He goes on to state that, "[a]t the same time, NIAC and Trita Parsi have lobbied the congress to stop appropriating other funds meant for dissident democratic movements and NGOs in Iran through non NIAC channels." (*Id.*)   This statement is defamatory as, once again, no support is provided for it, as none exists.

Defendant goes on to state, "NIAC's actions with respect to the congressional appropriated funds are suspect of defrauding American taxpayers and deserve nothing short of a full congressional investigation." (*Id.*)  Again, no citation is provided and Defendant is asserting his judgment as a general fact.  When he does, however, provide a citation, it is to a hyperlink that no longer works (*Id.* n.1, http://www.ned.org/grants/02programs/grants-mena.html.)[5]  Defendant goes

---

[4] Defendant's defamation of the Plaintiffs and mischaracterization and misrepresentation of facts is systematic.  (*See e.g. generally* Opp. to Mot. for Summ. J.; *see also* Mot. for Leave to File Surreply to Mot. for Summ. J.)
[5] Out of the 10 citations in this "investigative article" approximately six are either dead hyperlinks or links to other unrelated websites.

on to accuse NIAC with spending these funds and working with Hamyaran, which is "not an NGO but a government initiated false flag agency incepted, initiated, founded and managed by the theocratic regime of Iran," according to Defendant.  (*Id.*)  Yet, once again, Defendant fails to provide any citation to support his allegations and simply makes a statement and asserts it as a fact.  A later citation that purports to be on the same subject is once again a dead hyperlink, (*Id.* n.4, http://www.hamyaran.org/productinformation.php?pid=8), and in fact, goes on to state that "according to Hamyaran's site, many of their daily activities such as their capacity building workshops are 'under the supervision of the Ministry of Interior as part of their nationwide capacity building plan for NGOs'."  Although Defendant purports to quote something from the website, there is once again no citation.  This is yet another example of "purposeful avoidance" and willful blindness of the truth.

Not only does Defendant make defamatory statements in this article without providing any support or proper citation, when he does provide citations, they are taken out of context and are mischaracterized.  For example, he quotes the following:

> 'Congress is adept at throwing money at a problem. Far better to continue doling out cash on a project than to admit it's not working. Or is it? After all, bridges are falling. We are facing major challenges in Iraq. Millions are without health insurance. In a time when the budget is increasingly stretched, Congress should reassess its spending — particularly on programs that have done more damage than good. The Iran democracy fund is a prime example of such a program. .... Come September, Congress will be looking for ways to fill in these budgetary potholes without increasing the budget. Where better to look for savings than in the bloated budget of the democracy program, which has hurt the very people it is aimed to assist? ... Not only would this help ensure that no more bridges fall in the American heartland, but it would also ease the burden on the most effective agent for change in Iran — the Iranian people.' [6]

> "The reality is that there are smart ways to help Iranian civil society and there are incredibly stupid ways. NIAC, through funding from NED, had chosen the former." [7]

(*Id.*) This quote encompasses approximately nine paragraphs but is put together by the Defendant in such a fashion as to suggest that it was all within one paragraph. Defendant simply took the portions that fit his argument and put them together so that it appears as though the article stated what he wanted it to state. Astoundingly, the Defendant goes on to insert another quote, from a different source within the same block quote, again making it appear as if these two all come from the same source. Twisting and avoiding the truth are the Defendant's tools of trade.

**B.      Defendant Is Merely Attempting To Shift His Costs Of Wasted And Excessive Discovery And His Fabrication Of Discovery Disputes.**

The Defendant Motion is also an attempt to hide his egregious misrepresentations and allegations in his previous motion for sanctions. Defendant creates new false allegations unrelated to the alleged sanctions to somehow justify the posting of a bond. It has become abundantly clear that the Defendant will stop a nothing to shift their wasted $300,000.00 E-discovery efforts to Plaintiffs instead of admitting his mistakes and misrepresentations. (*See generally* Pls.' Opp. to Def.'s Mot. for Sanctions.)

## CONCLUSION

Although the Plaintiffs are not seeking sanctions for Defendant's continued efforts to harass Plaintiffs through burdensome discovery, creation of self-serving discovery issues and continued defamation of the Plaintiffs' name through court filings, Plaintiffs believe that such tactics and such an approach to a serious and meritorious lawsuit should not be awarded. Defendant is throwing as much mud and creating as many issues as possible to try and make this suit go away by intentionally wasting and exhausting the Plaintiffs' resources. Defendant's entire motion rests on false, defamatory accusations of criminal activity, and numerous mischaracterizations of the facts. As has been the course throughout this lawsuit, Defendant has

absolutely no regard for the truth.  Defendant never sought to receive answers to these questions at Dr. Parsi's deposition or by issuing a subpoena for NED records.

  This matter should be judged on its merits and an award of a $300,000.00 bond would, at the very least, have the same effect as ruling against the Plaintiffs on the merits. Requiring a bond to be posted, in the middle of the lawsuit, will achieve Defendant's goal to "destroy NIAC" as requiring NIAC to post a bond of tens of thousands of dollars would cripple NIAC's ability to function.  For the foregoing reasons, the Defendant's Motion For An Order Requiring Plaintiffs To Post A Bond And Not Waste Assets should be denied.

**REQUEST FOR HEARING**

  Plaintiffs hereby request a hearing on the Defendant's Motion for an Order Requiring Plaintiffs to Post a Bond and Not Waste Assets.


        Respectfully submitted,


        _____/S/_____
        A.P. Pishevar (D.C. Bar No. 451015)
        **PISHEVAR & ASSOCIATES, P.C.**
        600 East Jefferson Street, Suite 316
        Rockville, MD 20852
        Phone: (301) 279 – 8773
        Fax:    (301) 279 – 7347
        Counsel for the Plaintiffs
        ap@pishevarlegal.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 08 CV 00705 (JDB)** |
| | ) |
| **SEID HASSAN DAIOLESLAM,** | ) |
| | ) |
| **Defendant.** | ) |

**CERTIFICATE OF SERVICE**

I hereby Certify that a copy of the foregoing was emailed on March 5, 2012, to counsel for Defendant, at:

Timothy E. Kapshandy, Esquire
Peter G. Jensen, Esquire
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
tkapshandy@sidley.com

Attorneys for Defendant
Seid Hassan Daioleslam

_____ /s/ _____
Afshin Pishevar
**PISHEVAR & ASSOCIATES, P.C.**
600 East Jefferson Street
Suite 316
Rockville, Maryland 20852
(301) 279-8773
ap@pishevarlegal.com

Counsel for Plaintiffs
Trita Parsi
National Iranian American Council