# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRITA PARSI

and

NATIONAL IRANIAN AMERICAN COUNCIL

           Plaintiffs,

v.                                                          Civil No. 08 CV 00705

DAIOLESLAM SEID HASSAN

           Defendant.

## DECLARATION OF DR. TRITA PARSI

I, Dr. Trita Parsi, am an adult competent to testify to the facts contained herein, upon personal knowledge and belief, swear according to law and under penalty of perjury and say:

1. The statements herein are made both as an individual and in my capacity as President of the National Iranian American Council (NIAC).

2. NIAC is a non-partisan, non-political, non-sectarian, and non-profit organization dedicated to promoting Iranian-American participation in American civic life.

3. NIAC started out as a very small NGO. Although it has grown over the years, it is still a very small NGO and therefore has a small staff.

4. NIAC, as a NGO, is not subject to any audit requirements. Although the Board has discussed conducting audits at various times, due to the high costs, NIAC has so far been unable to conduct any audits.

5. It is not at all standard for an organization of NIAC's size to conduct audits of their finances.

6. However, the NIAC board is charged with the responsibility of reviewing NIAC's financial statements during Board meetings, to ensure that the finances are in good health.

7. Examples of these expenses and expenditures, all designed to promote NIAC's mission include, but are not limited to, purchasing microphones from a guitar store to be used at various NIAC fundraisers, on one occasion a loan to an individual, an Iranian political dissident from the pro-democracy Green Movement, Dr. Hadi Semati, and basketball tickets purchased a Washington Wizards basketball game in support of an Iranian-American player who was discriminated against by Fox News Sportscasters. The heavily discounted tickets were given to NIAC members as a token of gratitude for their support of NIAC.

8. Other day-to-day expenses are related to NIAC fundraisers. For example, in July 2009, NIAC held both a fundraiser and a Board meeting in Seattle, Washington. These meetings entailed a variety of expenses, including catering, sound system expenses, rentals, hotels, travel, etc., all of which are accounted for.

9. Another example of a fundraiser is one that was held at the Asia Society in New York on May 30, 2009 with New York Times reporter Roger Cohen and others. The food for that event was catered by the Ravagh restaurant in Manhattan.

10. Similarly, NIAC often caters to events, such as from Moby Dick, a Persian restaurant.

11. NIAC also often times pays for travel expenses of panelist that are speaking at NIAC events, such as former IAEA official Bruno Pellaud and former French Ambassador Francois Nicoullaud.

12. Another further function of the Board is to determine the consultation fees due to consultants.

13. During the early years of NIAC, when NIAC was still a very small organization, I was not an actual employee of NIAC's, but rather worked for NIAC as an independent contractor. The reason for this was that the organization was a startup and could not afford to have me on its payroll.

14. As such, I did not receive a salary from NIAC or any employee benefits. Instead, I received regular consultation fees as compensation for the work I did as NIAC's President.

15. However, as I was also on the Board during the time I worked as a consultant for NIAC, I was not a participant in the discussions regarding my fees and did not get to set any of those fees.

16. Only later, as when the organization had grown, was I brought on as a full-time employee.

17. Additionally, as NIAC's President, I was reimbursed for travel related expenses such as meals, taxis, airfare, hotels, etc.

18. Often times, another member of the Board would sign these checks. However, there were periods in NIAC's history in which no one else in our small was authorized to sign checks, so I had to sign them myself. However, I have not had to sign checks to myself

in the last couple of years because NIAC has grown and it now has more senior employees.

19. Another function of the board is to set the salary of the President and the COO of the organization. However, as I am the President and on the board, I am not a participant in those discussions and do not vote on this topic.

20. In fact, on more than two occasions, after I became a full time employee, the Board suggested to me that my salary should be increased. However, I rejected those offers due to my concern that it would put too much financial pressure on NIAC.

21. Moreover, whereas I am entitled to request a raise once a year, I have requested a raise less than once every two years.

22. I also receive bonus checks from time to time, which are Board approved, annual year-end performance bonuses given to all staff.

23. As an NGO, NIAC depends on fundraising and grants in order to promote its goal. As such, NIAC applied for and received grants from the National Endowment for Democracy.

24. In order to receive the grants from NED, NIAC had to propose a plan and budget.

25. The entire NED project budget was designed in collaboration with NED and approved by NED.

26. NIAC received three major grants for three projects it performed for NED.

27. The first was a workshop for NGOs in Iran on how to use visual media for their marketing, particularly for connecting with the outside world. The project was delayed on numerous occasions due to the volatile political situation in Iran but was eventually

successfully executed. Although the delays increased the costs, no further funds were requested from NED.

28. Due to the success of the first project, two additional grants were awarded to NIAC for two more projects.

29. The second project dealt with creating an eBook and a NGO management portal in Persian. NGO management literature was translated to Persian and adapted to the specific circumstances Iranian NGOs found themselves in. Connections were also made with Iranian NGOs to receive their feedback and provide specific consultations.

30. The connections with the NGOs were made through a number of means, including through the website, Skype or telephonically.

31. These connections were sensitive in nature, as the Iranian government keeps strict surveillance over communications through the web. As such, NED instructed NIAC to keep the names confidential.

32. Furthermore, the sensitive nature of this information was also the reason why not as many connections were made through the website as NIAC initially thought, but rather were made through other means.

33. The third project expanded on the eBook and also had an added component of bringing a few Iranian NGO's to Turkey to connect them to Turkish NGOs and train them. Due to the deteriorating political situation in Iran, this component of the project could not be completed. Instead, greater focus was placed on the eBook and the grant size was reduced by $29,044.00.

34. This last project was supposed to be completed by March 31, 2007, but was extended to August 31, 2007.

35. As part of performing the projects, various charges and expenses were charged to the funds received from NED and were therefore subject to verification by NED. These expenses included rent, salaries, such as Dr. Mansouri's salary, postage, supplies, etc.

36. Although Dr. Mansouri worked on the NED projects, he was not in charge of the budget or the paper work relating to the expenses and therefore could not have been aware of all of the projects expenses, including, but not limited to postage, office supplies, etc.

37. As all these charges were documented, any mistakes were corrected and removed if they were not proper charges. One such expense was for flowers that were purchased in December 2007 for an event, which was charged to the NED account. However, this was later corrected in the internal accounting and NED also accounted for it by crediting and debiting the correct amounts.

38. All efforts were taken to ensure all proper expenses were charged to the NED account, by providing receipts for all of these expenses. These included, but were not limited to, Dr. Mansouri's expenses, all of which Dr. Mansouri provided receipts for.

39. Ultimately, all of these projects, expenses and actions by NIAC were accounted for in the reports to NED, which NED reviewed, scrutinized, verified and approved.

40. Although there were suggestions to apply for another NED grant, from Dr. Mansouri for example, no further grant applications were made.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FORGEOING IS TRUE AND CORRECT.

_____
Dr. Trita Parsi

March 5, 2012
Date