## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL,**

**Plaintiffs,**

**v.**

**SEID HASSAN DAIOLESLAM,**

**Defendant.**

**Civil Action No.  08-705 (JDB)**

## <u>MEMORANDUM OPINION</u>

This is a defamation case filed by plaintiffs Trita Parsi and the National Iranian American Council.  Plaintiffs allege that defendant Seid Hassan Daioleslam published numerous false and defamatory statements that characterize plaintiffs as agents of the Iranian government.  Plaintiffs have proffered two experts, Debashis Aikat and Joel Morse, to support their case.  Currently before the Court are [92] [97] defendant's motions to exclude the testimony of both Aikat and Morse.  For the reasons given below, both motions will be granted.

## BACKGROUND

Dr. Parsi is the president of the National Iranian American Council ("NIAC"), a Washington, D.C.-based non-profit group that is "dedicated to promoting Iranian American involvement in American civic life and relying on the public for financial and human resource support."  Compl. ¶¶ 9, 10.  Defendant is an Arizona resident who has published articles about Parsi and NIAC on websites including <iranianlobby.com>.  <u>Id.</u> ¶¶ 5, 11.  Plaintiffs' complaint seeks damages and injunctive relief against defendant for common law defamation and portrayal in a false light.  <u>Id.</u> ¶ 11.  The thrust of plaintiffs' complaint is that defendant "has published false and defamatory statements indicating that [plaintiffs are] member[s] of a subversive and illegal

Iranian lobby colluding with the Islamic Republic of Iran . . . ."  Id. ¶ 13.  Plaintiffs argue that these statements injured their reputations in the community, thereby hampering NIAC's effectiveness as an advocacy group and damaging its ability to raise funds.  Id. ¶¶ 23, 42-43. Defendant argues that the statements are protected by the First Amendment because defendant did not publish the statements with actual malice and, in addition, the statements are true.  See New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); see also Parsi v. Daioleslam, 595 F. Supp. 2d 99, 104-06 (D.D.C. 2009) (finding that "actual malice" standard applies to this case).

Plaintiffs produced the reports of two experts to support different aspects of their case. The first, Debashis Aikat, a journalism professor, opined that defendant's writings about plaintiffs did not meet the standard of care for journalists.  See Def.'s Mot. in Limine to Exclude Testimony of Debashis Aikat [Docket Entry 97] ("Def.'s Aikat Mot."), Ex. A ("Aikat Report"). Joel Morse, a financial economist, opined about the economic damages plaintiffs had sustained as a result of the alleged defamation.  See Def.'s Mot. in Limine to Exclude Testimony of Joel Morse [Docket Entry 92] ("Def.'s Morse Mot."), Ex. A ("Morse Report"). Defendant has moved to exclude the testimony of both Aikat and Morse because, defendant contends, neither expert's testimony meets the standards of Fed. R. Evid. 702.  The Court will address the testimony of each expert separately.

## STANDARD OF REVIEW

The admissibility of expert testimony that draws on the expert's "specialized knowledge" is governed by Fed. R. Evid. 702, which provides that a qualified expert may testify on any subject that "will assist the trier of fact to understand the evidence or to determine a fact in issue" if the testimony is sufficiently reliable.  Id.  Testimony is reliable if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of the case."  Id. This Court's role is to act as a "gatekeep[er]," excluding any expert testimony that is not sufficiently reliable or helpful to the jury.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

The Supreme Court has suggested several considerations for determining whether proposed expert testimony is admissible under Fed. R. Evid. 702: whether a theory or technique could be and has been tested, whether it has been subject to peer review and publication, what the known or potential error rate of the technique is, and whether the technique is "generally accepted."  Daubert, 509 U.S. at 594; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149-51 (1999) (noting that inquiry is flexible and may be tailored to apply to cases based on specialized, rather than scientific, knowledge).  The Supreme Court initially held that the focus of the Daubert inquiry was "solely on principles and methodology, not on the conclusions that they generate," Daubert, 509 U.S. at 595, but the Court modified that statement in General Electric Co. v. Joiner, 522 U.S. 136 (1997).  The Joiner Court explained that while a judge must focus primarily on methodology rather than conclusions, "conclusions and methodology are not entirely distinct from one another . . . [and] nothing requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  Id. at 146.

Even if proposed expert testimony comports with Fed. R. Evid. 702, it may nonetheless be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  United States v. Gatling, 96 F.3d 1511, 1523 (D.C. Cir. 1996).  Moreover, because "[e]xpert evidence can be both

powerful and quite misleading," a court has greater leeway in excluding expert testimony under Rule 403 than it does lay witness testimony.  Daubert, 509 U.S. at 595 (internal quotation marks and citation omitted).

## DISCUSSION

### I. Debashis Aikat

Debashis Aikat is a "Media Futurist and Associate Professor of Journalism and Mass Communication" at the University of North Carolina.  Def.'s Aikat Mot, Ex. B.  Aikat has never before served as a defense expert in defamation litigation.  Def.'s Aikat Mot., Ex. C ("Aikat Depo.") at 38.

Plaintiffs asked Aikat to opine on three topics: (1) "[t]he general standard of care and compliance within the journalism community/industry as it applies to those persons who hold themselves out as journalist[s], including any varying standards of care and compliance for those who hold themselves out as cyber-journalists," (2) "[w]hether, and to what extent, you see evidence of 'willful blindness' in the writings of defendant as it relates to his assertions against the plaintiffs," and (3) "[w]hether the defendant had a duty to allow the plaintiffs an opportunity to respond to his assertions against them."  Plfs.' Opp. to Def.'s Aikat Mot [Docket Entry 102] ("Plfs.' Aikat Opp."), Ex. C.  In order to do so, Aikat read some of defendant's English-language articles posted on <iranianlobby.com> and <iranian-americans.com>.  Aikat Report at 2-3. Aikat did not review any materials in Farsi, as he does not speak that language.  Id.  He also did not review any of the discovery produced in this litigation.  Id.; see also Aikat Depo. at 33-37.

After reading those articles, Aikat provided a terse report.  He opined that the standard of care for both print and online journalists was set out in a one-page "Code of Ethics" adopted in 1996 by the Society of Professional Journalists ("the Code").  The Code describes itself as "a

guide for ethical behavior . . . [that] is voluntarily embraced by thousands of journalists."  Plfs.'

Aikat Opp., Ex. A.  The Code is not "intended [to be] a set of 'rules.'"  Id.  According to Aikat,

"[r]egardless of place or platform, scholars, writers, editors and other news professionals follow

and abide by the SJP code."  Aikat Report at 3.  Aikat's report quoted the provisions of the Code

at length, but did not specify which, if any, he believed that defendant had violated.  See id. at 4-

5.

    After quoting the Code, Aikat opined that "there is ample evidence of 'willful blindness'

in the writings of the Defendant."  Id. at 6.  Specifically, he wrote:

> In their attempt to address controversial matters of public interest, several of the
> Defendant's writings provide definitive statements that are not supported or
> substantiated by adequate evidence . . . For good reason, the reading public cannot
> distinguish between misrepresented context and the truth.
>
> In the absence of properly substantiated facts, several writings of the Defendant,
> seem to misrepresent the issues and context.  For instance, the Defendant critiques
> the Plaintiff's professional identity and standing with unsubstantiated allegations.
> A significant number of the articles highlights events, actions and "evidence" that
> are out of context, and, therefore, misleading to the reader.

Id.  Beyond these generalized assertions, Aikat did not provide examples of or citations to any

unsubstantiated facts or misleading statements in defendant's writings.

    Aikat's report ended with the conclusion that defendant should have allowed plaintiffs to

respond to his articles.  Id. at 7.  Aikat did not cite any specific source for that conclusion, but

wrote that defendant's articles "do not expose their viewers to a diversity of viewpoints" and that

"[s]uch absence of contrasting viewpoints, limits the vigor and variety of public discourse."  Id.

Aikat pointed out that defendant's websites did not mention any attempts to contact the plaintiffs

for their responses, or provide comment forums in which readers could react.  Id.  Hence, Aikat

concluded, defendant's writings "degrade in the mind of the reader the character and identity of

Plaintiffs and their work."  Id.

During Aikat's deposition, defendant's counsel expended considerable effort trying to extract from Aikat any details about his research, his methodology, and the basis for his conclusions.  Aikat was not forthcoming.  He conceded that his task had not included evaluating the truth or falsity of defendant's articles, Aikat Depo. at 50, or applying the New York Times Co. v. Sullivan standard, id. at 51-53, but he was somewhat less clear on what his task had included.

Aikat indicated that he had read all of defendant's English-language articles relating to NIAC and Parsi posted on <iranianlobby.com>, although he was unable to identify any specific articles he had read.  Id. at 53-55, 82-89, 117.  When asked whether he had read the sources linked in defendant's articles, Aikat testified that he had read "some of the important links, but not all of them."  Id. at 53-55.  The linked sources were important because one of Aikat's major conclusions was that defendant had not properly substantiated his writings, and in order to draw that conclusion, Aikat would presumably have needed to read the linked source materials.  Aikat was unable to identify specific linked sources that he had read, and told defense counsel that "this is just something that you all have to decide because I went to the website just like, as a common person would" and reviewed the articles.  Id. at 83.  When asked whether he had taken any notes that would identify which articles and sources he had read, Aikat initially said that he had done so with an online note-taking system; then explained that his online notes were deleted as soon as he left the web page; then explained that he would take notes only to mark properly substantiated articles, so "since [he] did not find any," he did not take any notes.  Id. at 88.

Aikat's testimony on the methodology he used to determine whether defendant had met the standard of care for journalists was even more vague.  He described his methodology as follows:  "the method specifically is what you read, what defendant has to say.  And you will

appreciate that the sources and references or links are used to support or not to support that argument." Id. at 55; see also id. at 60 ("[t]he method is very simple. . . It is to read and view."). When asked about error rates for his methodology, Aikat responded that "[t]he only error rate, according to research, relates to if some illiterate person is reading something." Id. at 59. Aikat also testified that his methodology was "too specific" to write a peer-reviewed research article on it. Id. at 47.

Much of defense counsel's questioning focused on Aikat's conclusion that defendant had displayed "willful blindness" in his writings. Aikat initially testified that he thought the term "willful blindness" came from the SJP Code. Id. at 73. When he was told it did not, he claimed that "you know, the journalism community has a lot of scholarship on willful blindness," and that trying to cite a specific article would be "a pointless exercise." Id. at 75-76. In explaining what evidence he had relied on to draw the conclusion that defendant's writings exhibited willful blindness, Aikat explained that "in journalism, if you are not willfully blind, the literature suggests that you make an effort to allow the person you are critiquing an opportunity to respond." Id. at 78-79. When asked what the difference was between publishing an article without sufficient factual support and exhibiting willful blindness, Aikat said that "there could be a difference, but both of them are related." Id. at 81. He did not further elaborate.

Aikat did not cite any specific examples of willful blindness in defendant's writings. Id. Instead, he testified that he had read more than sixty of defendant's articles, and that "all of those articles did not have, I'm sorry to say, were not supported or substantiated by adequate evidence." Id. When asked how he could judge whether the articles were unsubstantiated without reading all of defendant's cited sources, Aikat equivocated. Id. at 91-93. Finally, Aikat

explained that in evaluating defendant's source materials, he assumed that any secondary sources were unreliable.  Id. at 191-92.

Defense counsel also questioned Aikat on the source of the "duty to respond," which Aikat had found that defendant violated.  See id. at 94.  Aikat could not cite to a specific source for the duty, explaining that "[y]ou just have to research the literature."  Id. at 102.  In explaining how he concluded that defendant had not fulfilled this duty, Aikat explained that "I really looked at [defendant's writings] in an independent way . . . [and] I was appalled at the absence of contrasting viewpoints, limits, and any ways where other people would contribute."  Id. at 98. Defendant's counsel then pointed out several instances in which defendant had solicited or posted responses from NIAC members in his articles; the record suggests, although it does not make completely clear, that those articles were posted on defendant's websites at the time of Aikat's review.  Id. at 139-51.  Aikat testified that he was unaware of these instances.  Id.  He went on to say, however, that defendant could not fulfill the "duty to respond" merely by giving the subjects of his articles an opportunity to state their views, because doing so was "not opening it up to an open exchange of views" in the same way that a comment forum would.  Id. at 141.  Aikat was then shown an article with a "post your comment" link, which defendant's counsel represented had been present at the time that Aikat reviewed defendant's articles.  Id. at 134-36.  Aikat testified, however, that he had tried to post a comment on one of the websites, and that the link was "deactivated."  Id. at 141.

With those facts in mind, the Court now turns to the two Daubert questions: whether Aikat's testimony is reliable and whether it will be helpful to the trier of facts in this case. Beginning with the first question, proposed expert opinion testimony is reliable if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  Here, all three prongs are problematic for plaintiffs.  First, the underlying facts or data were defendant's articles and some of the sources cited therein. Aikat's reliance on defendant's writings is perfectly sensible, given that his task was to evaluate how well those articles measured up to the professional standards for journalists.  But Aikat's decision to read only an apparently haphazard selection of defendant's sources – and no background materials – was less sensible.  Aikat was asked to opine on whether defendant's writings were properly substantiated, and the Court is unable to understand how he could do so without investigating defendant's source materials in any systematic way.  Contrary to Rule 702, the "facts and data" Aikat relied on were patently insufficient for the task he was given.

The more serious problem, however, is Aikat's putative methodology and his application of that methodology.  Aikat refused to give any description of his methodology beyond "read[ing] and view[ing]."  Aikat Depo. at 60.  Of course, reading defendant's works was a necessary component of evaluating them, but that does not mean that "reading," standing alone, is an acceptable methodology.  Cf. Joiner, 522 U.S. at 144 (rejecting plaintiff's attempt "to proceed as if the only issue was whether animal studies could ever be a proper foundation for an expert's opinion," instead of explaining why the animal studies at issue were a proper foundation for the expert opinion before the Court).  As another judge in this district wrote in a case involving a similarly generic methodology:

> When [the proposed expert was] asked about how she would determine whether "hard core" pornography has serious artistic value, Prof. Penley merely testified that she would look at "everything about the content, everything about the style, everything about the way the film was scripted, cast, performed, what is the shooting, the editing, the construction of the mise-en-scene, in other words, everything that is staged before the camera is even turned on."  Surprisingly, that is the entire sum of her explanation about the method she would use to judge artistic value. Prof. Penley's methodology – what little can be gleaned from it – is

> so nebulous, subjective, and lacking in rigor and detail as to cast serious doubt, not only on the reliability of her opinion testimony, but on its usefulness to the jury as well.

U.S. v. Stagliano, 729 F. Supp. 2d 222, 229 (D.D.C. 2010) (citation omitted).

Aikat's methodology might be described as identifying "applicable professional standards and the defendants' performance in light of those standards," which clearly is an acceptable area for expert testimony. Halcomb v. Wash. Metro. Area Transit Auth., 526 F. Supp. 2d 24, 27 (D.D.C. 2007) (alternations, internal quotation mark, and citations omitted). An expert proposing to testify about professional standards must, however, identify specific and objective standards, not rely on his personal opinions about what professional standards should be. Id. at 30; see also Butera v. District of Columbia, 235 F.3d 637, 658-59 (D.C. Cir. 2001). Here, Aikat did not give any convincing explanation for why he relied exclusively on the SPJ Code to define the pertinent professional standard. He wrote that "[r]egardless of place or platform, scholars, writers, editors and other news professionals follow and abide by the SJP code," Aikat Report at 3, but the Code itself only claims to be embraced by "thousands of journalists," not to be a universal mandate. Id. Moreover, the Code explicitly describes itself as a "resource for ethical decision-making," not a set of rules. Id. Even if the Code did define the standard for journalists, the specific duties Aikat claimed to have extracted from the Code – a duty to avoid "willful blindness" and a duty to allow responses – appear in plaintiffs' retainer letter to Aikat, not the Code. The Code does encourage journalists to test the accuracy of their information, but it is not clear how that duty compares to Aikat's "willful blindness" test. The Code also encourages journalists to "[d]iligently seek out subjects of news stories to give them the opportunity to respond to allegations of wrongdoing," but Aikat's "duty to respond" test apparently requires open comment forums. Aikat Depo. at 141. When asked to explain the source of these duties,

Aikat told defendant's counsel that "[y]ou just have to research the literature," id. at 102, and that it would be "pointless" to try to cite specific examples.  Id. at 75-76.  Researching the literature, however, was Aikat's job, and doing so would hardly have been "pointless."

Based on his report and deposition, the Court concludes that Aikat's view of the applicable standard was driven less by objective sources and more by his personal views.  See, e.g., Aikat Depo. at 98.  ("I really looked at [defendant's writings] in an independent way . . . [and] I was appalled at the absence of contrasting viewpoints, limits, and any ways where other people would contribute.");  see also Aikat Report at 7 ("[s]uch absence of contrasting viewpoints, limits the vigor and variety of public discourse").  This is not an acceptable methodology.  See Halcomb, 526 F. Supp. 2d at 30-31 ("Rule 702 also precludes [the expert] from offering opinion testimony based on personal opinions rather than on relevant objective standards.").

Finally, the Court observes that even to the extent Aikat identified an objective professional standard, he failed to reliably compare defendant's writings to that standard.  As previously noted, Aikat did not systematically review defendant's source materials (or any other background materials) to decide whether the writings were properly substantiated.  He decided that secondary materials were insufficient substantiation, an inexplicable and unexplained conclusion.  He opined that defendant had not allowed the subjects of his articles to respond, but it is not clear how he could have so concluded from the mere fact that the subjects were not quoted in the articles.  Indeed, the record suggests that Aikat ignored available evidence that subjects had sometimes been given the opportunity to respond.  See Def.'s Aikat Mot., Ex. J; see also Akait Depo. at 149-51.

Because none of the three prongs of FRE 702 are met, the Court holds that Aikat's expert testimony is not reliable and must be excluded.  Given that conclusion, the Court need not reach the question whether Aikat's testimony would be helpful to the jury.

## II. Joel Morse

Joel Morse is a financial economist and a professor of finance at the Merrick School of Business at the University of Baltimore, Maryland.  Plfs.' Opp. to Def.'s Morse Mot. [Docket Entry 99] ("Plfs.' Morse Opp."), Ex. A.  Morse has served as an expert witness on "valuation of assets, and/or the evaluation, forecasting, and discounting to present value of past and future cash flows."  Id. at 1; see also Def.'s Morse Mot., Ex B. ("Morse Depo.") at 17-45.

Plaintiffs asked Morse to evaluate revenue lost by NIAC "due to the events described in the Complaint."  Morse Report at 2.  In order to do so, Morse reviewed some 200 emails given to him by Parsi, apparently recounting the alleged defamation; NIAC's tax forms for 2002 to 2008; NIAC's financial statements for 2003 to 2009; two articles on charitable giving; several telephone interviews with NIAC donors identified by Parsi; and the Complaint.  Id. at 1-2; see also Morse Depo. at 69.  Morse then computed NIAC's lost "surplus" – the equivalent of lost profit for a non-profit, Morse Report at 2-3 – in the manner described below.  Morse's report's explanation of his methodology is not at all clear, but defendant has reconstructed Morse's underlying calculations in his motion, and the Court has independently verified defendant's reconstruction.  See Morse Report at 3 (describing parts of methodology), 6-7 (spreadsheet); Def.'s Morse Mot. at 5.

First, although the defendant began publishing his articles early in 2007, see Compl. ¶ 17, Morse Depo. at 74, Morse assumed that NIAC's annual surplus in 2007 represented the baseline figure for what NIAC's surplus would have been in the absence of the alleged defamation.  He

labeled this the "but-for" surplus.  Morse Depo. at 212.  To calculate the "but-for" surpluses for the years after 2007, Morse assumed that the 2007 surplus would have grown a certain percentage each year.  Choosing the percentage of growth was not a straightforward question, however, because NIAC's annual surpluses had fluctuated wildly between 2002 and 2007 (the first five years of its existence).  See Morse Report at 3, 6.  The overall average annual growth between 2002 and 2007 was 55%, but Morse believed that such "explosive success and growth" was unlikely to continue, because "in most start-up businesses, both for-profit businesses and those in the not-for-profit sector, the initial phase of growth is not sustainable."  Id. at 3.  Hence, he chose to create four separate "conservative" scenarios, in which he assumed that NIAC's annual surplus would grow by 5%, 10%, 15%, or 20% each year after 2007.  Id. at 3, 6.

　　　To determine the damages defendant's alleged defamation had caused, Morse subtracted NIAC's actual surplus for each year from the four sets of "but-for" surpluses he had calculated. Because actual surplus numbers were only available for 2002-2009 at the time of Morse's report, Morse assumed that the actual surplus for years after 2009 would equal the actual surplus in 2008, the first full year after defendant began publishing his writings.  See id. at 2 n.2.  By subtracting this "actual" (or, for years after 2009, assumed) surplus from his projections of "but-for" surplus, Morse was able to arrive at damages figures for each year.  In chart form, Morse's calculations showed the following damages for the 5% growth scenario

| 5% growth | But-for surplus | (minus) Actual surplus | = Damages |
|---|---|---|---|
| 2008 | $270,905 | $4,511 | $266,394 |
| 2009 | $284,451 | $230,061+$4,511 | $49,879 |
| 2010 | $298,673 | $0 | $298,673 |
| 2011 | $313,607 | $4,511 | $309,096 |

| 2012 | $329,287 | $4,511 | $324,776 |

As described above, in this scenario the but-for surplus was calculated by growing the 2007 surplus ($258,005) by 5% each year.  See Morse Report at 6.  The actual surplus was $4,511 in 2008 and $230,061 in 2009; the assumed surplus for 2010 and later was $4,511, although it appears that Morse mistakenly entered the $4,511 figure in 2009 instead of 2010 when he did his calculations.  See id. at 6.  In his deposition, Morse explained that the $4,511 figure in 2009 represented legal fees, but this seems implausible. Morse Depo. at 209-10. Nothing else in the record indicates that legal fees for that year were $4,511, and it would be a striking coincidence if legal fees happened to equal the 2008 surplus.  Moreover, that explanation does not show why the $4,511 figure was missing from the 2010 actual surplus.

Morse's second scenario, assuming 10% growth of the but-for surplus, was similar and included the same error with respect to the $4,511 figure:

| **10% growth** | But-for surplus – | Actual surplus | Damages |
|---|---|---|---|
| 2008 | $283,806 | $4,511 | $279,295 |
| 2009 | $312,186 | $230,061+$4,511 | $77,614 |
| 2010 | $343,405 | $0 | $343,405 |
| 2011 | $377,745 | $4,511 | $373,234 |
| 2012 | $415,520 | $4,511 | $411,009 |

Morse's third scenario assumed 15% growth of the but-for surplus.  In this chart, the $4,511 figure was mistakenly included in the 2009 actual surplus, but was also properly included in the 2010 actual surplus.

| 15% growth | But-for surplus – | Actual surplus | Damages |
|---|---|---|---|
| 2008 | $296,706 | $4,511 | $292,195 |
| 2009 | $341,212 | $230,061+$4,511 | $106,640 |
| 2010 | $392,393 | $4,511 | $387,882 |
| 2011 | $451,252 | $4,511 | $446,741 |
| 2012 | $518,940 | $4,511 | $514,429 |

Lastly, Morse's fourth scenario assumed 20% growth of the but-for surplus.  Like Morse's

third scenario, the $4,511 figure was improperly included in 2009 but properly included in 2010.

| 20% growth | But-for surplus – | Actual surplus | Damages |
|---|---|---|---|
| 2008 | $309,606 | $4,511 | $305,095 |
| 2009 | $371,527 | $230,061+$4,511 | $136,955 |
| 2010 | $445,833 | $4,511 | $441,322 |
| 2011 | $534,999 | $4,511 | $530,488 |
| 2012 | $641,999 | $4,511 | $637,488 |

Morse acknowledged that he did not know how long the damaging effects of the alleged

defamation would be expected to last.  Morse Report at 2.  Accordingly, for each of the four

scenarios, Morse calculated three, four, and five year damages estimates.  Id. at 6.  He did so

simply by adding the damages for 2008-2010, 2008-2011, and 2008-2012, respectively.

As explained previously, Morse's testimony is admissible if it is relevant and reliable

under Rule 702.  Reliable evidence is "based upon sufficient fact or data" and "the product of

reliable principles and methods" that have been reliably applied to the facts and data.  Fed. R.

Evid. 702.  Defendant attacks a host of potential problems with Morse's report.  This Court will discuss only four.

Perhaps the most troubling issue is Morse's consistent assumption that defendant's writings alone are responsible for NIAC's financial fate.  When questioned repeatedly at his deposition about potential confounding factors, Morse insisted that his "mandate" was to calculate damages based on the assumption that defendant's writings and actions had created a "cascade of events" that were the sole cause of NIAC's changed finances.  Morse Depo. at 123, 132.  But that assumption is not consistent even with the limited, NIAC-supplied data in Morse's report.  For instance, NIAC's surplus declined in 2008 partly because of increased expenses.  Additionally, Morse explicitly acknowledged that NIAC's 2009 expenses had increased because of certain long-term investments NIAC chose to make, including updating the website and hiring more staff, and those expenses obviously decreased the 2009 surplus.  Morse Report at 3, 6.  Yet Morse's damages calculations attribute the entire decrease in 2008 and 2009 surplus to defendant's writings, although no evidence suggests that the increased expenses were the result of those writings.  Id. at 6-7.

Morse's report also notes that "[a] natural question" is whether NIAC's declining revenues in 2008 were due to "national macroeconomic conditions," i.e., the recession that began in 2008.  Id. at 3.  Morse thought that question was important enough to research, and he therefore attached two articles finding that the recession had not significantly decreased charitable giving.  Id. at 8-13.  Morse evidently did not, however, ask Parsi how the recession had affected NIAC's finances; if he had, he might have been given NIAC board meeting minutes showing that 80% of members had refused to renew their membership, and "[t]he motivation given was overwhelmingly because of the financial downturn. . . . Many of our members have

lost their jobs." Plfs.' Morse Mot., Ex. E, at 2-3. Similarly, the defendant has provided, and plaintiffs have not disputed, evidence showing that some of NIAC's significant grants were not renewed for reasons entirely unrelated to defendant's actions or writings, but Morse evidently was not given and did not request that information. See Ex. D, Morse Depo. at 95-100; see also Def.'s Morse Mot. at 11.

The Court also has several concerns about Morse's calculations of the but-for surplus. Defendant began publishing his articles in 2007, see, e.g., Compl. ¶ 17, so one might have expected Morse to use the 2006 surplus as the "but-for" baseline, since it was the last annual surplus number unaffected by the alleged defamation. See Morse Depo. at 74. Morse, however, chose to use the 2007 surplus instead. Id. When asked why he had done so, he explained that the choice was made "for simplicity of exposition . . . I'm not a fan of partial-year analyses," in part because of the difficulty of locating monthly data. Id. But a skeptical observer would note that the 2007 surplus was more than twice the size of the 2006 surplus, so using the 2006 surplus as the baseline would have dramatically lowered Morse's damages estimates. Assuming 5% growth, the use of the 2007 rather than 2006 surplus increased Morse's five-year damages estimate by a full $839,543; assuming 20% growth, the five-year damages estimate increased by $1,287,657.[1] In view of these striking differences, the Court believes that an economist working for, say, a business – rather than one employed as a litigation expert – would have made some effort to learn when defendant's writings began and when those writings began to affect NIAC's finances. See Kumho Tire, 526 U.S. at 152 ("an expert, whether basing testimony upon professional studies or personal experience, [must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

---

[1] These calculations correct Morse's apparent error in failing to subtract a $4,511 "actual surplus" in 2010. The correction only matters for the 20% growth estimate, because Morse offset the error by subtracting an extra $4,511 in 2009 in his 5% growth estimate.

The Court also notes that Morse essentially selected numbers out of thin air in assuming

that the surplus would have grown at 5%, 10%, 15%, or 20% annually in the absence of

defendant's writings.  It is obviously difficult to predict growth rates for new organizations, but

Morse apparently made absolutely no effort to do so, either by researching literature on growth

of non-profits in general or investigating NIAC in particular.  In <u>In re Air Crash Disaster at New

Orleans, La.</u>, 795 F.2d 1230 (5th Cir. 1986), a case cited with approval by the D.C. Circuit, the

Fifth Circuit rejected proposed expert testimony in part due to similar flaws:

> The economist in this case testified that over the life of his employment with the
> Eymard companies, Ted experienced an average annual salary increase of 40%
> per year. While conceding that Ted's salary could not continue to grow at this rate
> indefinitely, the economist assumed that his salary would increase by 8%, in real
> terms, every year until the year 2021. Despite the testimony concerning Ted
> Eymard's business acumen, we find an assumed 8% annual salary increase
> continuing over almost 40 years to be unsupported by the record and completely
> incredible. In reaching this figure, the economist looked solely at Ted Eymard's
> income in prior years, and he failed to consider either the limits on future
> expansion that the Eymard companies would encounter as they continued to grow
> in an already competitive industry; or the depressed state of the marine industry at
> the time of trial and its cyclical nature in general; or the future personal choices
> Ted Eymard might make to avoid work-related health or stress problems later in
> his career.

<u>Id.</u> at 1234; <u>see also</u> <u>Joy v. Bell Helicopter Textron, Inc.</u>, 999 F.2d 549, 569-70 (D.C. Cir 1993)

(citing <u>Air Crash</u>).  While an expert may present multiple scenarios as a way of compensating for

uncertainty, doing so does not render expert testimony admissible if some or all of the scenarios

have no factual basis.  <u>See</u> <u>Joy</u>, 999 F.2d at 569.

Morse's choice to use 2007 numbers as the basis of the predicted but-for surplus and 2008

numbers as the basis of the predicted actual surplus had another plaintiff-friendly effect.  NIAC's

2008 surplus was dramatically smaller than its 2007 surplus; in fact, it was only 1.7% of the

2007 surplus, in part due to NIAC's increased expenses in 2008.  Morse Report at 6.  Using the

tiny 2008 figure for "actual surplus" in the years following 2008 made the overall damages

estimate much higher, since damages are equal to but-for surplus minus actual surplus.  If Morse

had used 2006 as the baseline for the but-for surplus and 2007 as the baseline for the actual

surplus, his final damages calculations would have been wildly different.  Assuming 5% growth,

the five-year damages caused by defendant would have been <u>negative</u> $351,207, i.e., defendant's

writings would have helped NIAC to the tune of more than $350,000.[2]  Again, a choice that so

significantly affected the final calculations should have been justified by more than "simplicity

of exposition," Morse Depo. at 74, because concerns about simplicity cannot overcome such

significant problems of accuracy.

      Morse's choice to use the 2008 figure for actual surpluses is perhaps less problematic

than some of his other choices, because the 2008 surplus figure is only a stand-in for actual

surplus numbers that may be available by the time Morse's report is presented to the factfinder.

Morse acknowledged in his report that "[n]eedless to say, since 2010 and 2011 [and 2012] results

are not yet available, my opinion is subject to supplementation, to the extent that surplus is

generated in those years."  Morse Report at 2.  Indeed, Morse did include the actual 2009 figure

in his report.  <u>Id.</u> at 6.  Still, Morse's choice to have the $4,511 from 2008 stand in for unknown

future actual surpluses troubles the Court.  In the Court's view, if Morse was not going to use the

2007 actual surplus as the baseline, it would have been more logical to use actual surplus figures

from 2009 – the most recent year available at the time of Morse's report – to predict future actual

surpluses, rather than the 2008 figure.  Morse did not do so, however, and did not explain why.

Again, an explanation may be found in the fact that doing so would have seriously decreased the

---

[2]  Again, this figure corrects Morse's apparently accidental addition of $4,511 to the 2009
surplus and use of 0 for the 2010 surplus.  It also uses the actual surplus numbers for 2008 and
2009.

final damages estimates.[3]  Individually, Morse's choices on which numbers to use may be

defensible, but taken together, they do not show the disinterestedness the Court expects from an

expert witness.

Finally, Morse did not discount any of his damages figures to their present value, even

though his CV states that one of his specialties is "discounting to present value of past and future

cash flows."  Because tort awards must be discounted to present value, his failure to do so is

inexplicable.  See generally Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523 (1983)

(discussing discounting methods); see also Schleier v. Kaiser Found. Health Plan of the Mid-

Atlantic States, Inc., 876 F.2d 174 (D.C. Cir. 1989) (noting that juries generally need expert

guidance on discounting to present value).

Given the multiple factual, arithmetical, and theoretical errors in Morse's calculations, the

Court finds that Morse's calculations are ultimately not reliable enough to put before the

factfinder.  When asked repeatedly about his factual and theoretical assumptions, Morse

explained that "I'm just trying to help the trier of fact or a jury who might say, Well, I've listened

to all of the testimony and they would have grown at 5 or 10 or 15 or 20.  Those are reasonable

growth rates to consider, and I've done the math."  Morse Depo. at 203.  But it is hard to see how

"d[oing] the math" could be of any help to the factfinder when the math is so untethered from the

reality of NIAC's finances.  To take just one example, Morse's own report shows that the 2008

and 2009 surpluses were lower in part because of NIAC's increased expenses, yet his model

attributes the change entirely to defendant's actions.   Allowing that math to go before the

factfinder would not assist in determining what damages were actually caused by defendant, and

it would "convey[] a delusive impression of exactness in an area where a jury's common sense is

---

[3]   Using Morse's but-for surplus numbers, assuming 5% growth, and correcting Morse's
arithmetic errors, Morse's five-year damages estimate would have decreased by $676,640 if he
had used the 2009 rather than the 2008 figure to estimate actual surplus for years after 2009.

less available than usual to protect it."  <u>See</u> <u>Herman Schwabe, Inc. v. United Shoe Machinery</u> <u>Corp.</u>, 297 F.2d 906, 912 (2d Cir. 1962).  The Court will therefore exclude Morse's testimony under Rules 702 and 403.

## CONCLUSION

For the reasons given above, both of defendant's motions in limine to exclude expert testimony will be granted.  A separate Order accompanies this opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Date:  <u>March 30, 2012</u>