—1—

```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLUMBIA

 3

 4   TRITA PARSI, et al.,          )    Civil Action No.
                                   )       08-00705
 5            Plaintiffs,          )
                                   )
 6        v.                       )
                                   )
 7   DAIOLESLAM SEID HASSAN,       )    July 6, 2012
                                   )    10:05 a.m.
 8            Defendant.           )
     -----------------------------
 9                                      Washington, D.C.

10

11

12

                    TRANSCRIPT OF MOTIONS HEARING
13

14            BEFORE THE HONORABLE JOHN D. BATES
                  UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22   COURT REPORTER:        PATRICIA A. KANESHIRO-MILLER, RMR
                            Certified Realtime Reporter
23                          Official Court Reporter
                            Room 4704B, U.S. Courthouse
24                          Washington, D.C. 20001
                            202-354-3243
25
```

2

1                              APPEARANCES

2

3    FOR THE PLAINTIFFS:
     A.P. PISHEVAR, ESQ.
4    JEFF HANDELSMAN, ESQ.
     FARROKH MOHAMMADI, ESQ.
5    Pishevar & Associates, P.C.
     224-226 North Adams Street
6    Rockville, Maryland 20850

7         -and-

8    MARC HIRSCHFIELD, ESQ.
     Precision Legal Services
9    1131 Kersey Road
     Silver Spring, MD 20902
10

11
     FOR THE DEFENDANT:
12   TIMOTHY E. KAPSHANDY, ESQ.
     PETER G. JENSEN, ESQ.
13   ERIC GALVEZ, ESQ.
     Sidley Austin LLP
14   1501 K Street, N.W.
     Washington, D.C. 20005
15

16

17

18

19

20

21

22

23

24

25

1           PROCEEDINGS

2           THE CLERK:  Your Honor, we have Civil Action 08-705,

3    Trita Parsi, et al., versus Daioleslam Seid Hassan.

4           I ask lead counsel for both sides to please approach

5    the lectern and identify the respective people at the table,

6    starting with plaintiff.

7           MR. PISHEVAR:  Good morning, Your Honor.  Afshin

8    Pishevar on behalf of the plaintiffs.  I will be addressing

9    the Court this morning, along with Mr. Farrokh Mohammadi and

10   Jeff Handelsman.

11          THE COURT:  Good morning to all of you.

12          (The Clerk conferred with the Court)

13          THE COURT:  Mr. Hirschfield is the other one he didn't

14   introduce.

15          MR. KAPSHANDY:  Good morning, Your Honor.  Timothy

16   Kapshandy of Sidley Austin, along with Peter Jensen and Mark

17   Galvez, representing the defendant.

18          THE COURT:  All right.  Good morning to all of you.

19          We've got a lot of paper filed in the case and a lot

20   of history in the case.  There are some incidental motions,

21   but I think what I'd like to do is concentrate on two motions,

22   and you can address those incidental motions along the way as

23   you please, the two motions being summary judgment and

24   sanctions.  I think it makes sense to hear from you on the

25   summary judgment motion first and then move on to the

—4—

1        sanctions-related motion.  We have some time available this

2        morning, but we don't have all day available, and you need to

3        make sure that you focus your arguments.  I have read all the

4        filings.  So let's start with the motion for summary judgment,

5        and I would hear first from the movant, from the defendants.

6        I would estimate that total time on this might be around

7        45 minutes, so I think 20 to 25 minutes for each side.

8               MR. KAPSHANDY:  Thank you, Your Honor.

9               THE COURT:  I hope I'm not messing up your anticipated

10       schedule or means of addressing these, but I sort of would

11       like to hear about the summary judgment distinct from the

12       sanctions-related motion.

13              MR. KAPSHANDY:  Certainly.  Frankly, your estimates

14       are generous, and I would anticipate the briefs fully express

15       the entire basis and arguments on which the motion is founded;

16       and the Court, throughout the history of the case, has

17       demonstrated thorough familiarity.  I would simply state that

18       I'm glad to entertain any particular questions the Court might

19       have.  Bottom line on this motion is that there is not a shred

20       of evidence that the defendant entertained any subjective

21       doubt about the truth or falsity of what he was writing.  In

22       fact, his deposition wasn't even taken until three days before

23       the discovery cut-off.

24              THE COURT:  Let me ask this because it is something

25       that is haunting me in this case:  Do you feel that from the

1     briefing I know what the particular statements are, the

2     specific statements, that are alleged to be defamatory?

3          MR. KAPSHANDY:  Well, that's a little bit of a problem

4     in the case, and we're going with the complaint, obviously.

5     That's what frames the issues in the case.

6          THE COURT:  I think both parties have sort of

7     acknowledged that there may be more beyond the complaint,

8     beyond what's listed in the complaint.

9          MR. KAPSHANDY:  Right.  Because as the Court is well

10    aware, in fact, some of the discovery materials are the bases

11    for subsequent statements, the statements which began in 2007,

12    the defendant has continued to publish about the plaintiffs,

13    so we're looking at a continuum; it is not one or two

14    particular articles, which as the Court points out has made it

15    a little bit difficult to figure out exactly what the

16    statements are.

17         THE COURT:  It is difficult to resolve the case

18    because most cases, when you look at their resolution, it

19    really turns on a pretty close examination of the particular

20    statements that are alleged to be defamatory under, in this

21    instance, the actual malice test, to see what kind of support,

22    for example, there is for the statement that was made.

23         MR. KAPSHANDY:  Right, but I think the one theme in

24    common with all of the articles, taking the plaintiffs'

25    characterization most favorable to the plaintiffs, is that the

1    defendant has written that the plaintiffs, both of them, are

2    lobbyists.

3           THE COURT:  Lobbyists or agents?  And isn't there a

4    difference?

5           MR. KAPSHANDY:  I'm not sure.  I would -- I think the

6    word he uses most often is "lobbyists."

7           THE COURT:  I mean, lawyers are lobbyists all the

8    time, hired to be that.  That doesn't necessarily make them

9    what we would call in the normal vernacular agents.

10          MR. KAPSHANDY:  Exactly.  "Agency" is a much broader

11   concept.  An employee, a contractor can be an agent for

12   purposes -- limited, general purposes.  And they've not

13   pointed out in any particular article where he has used that

14   term.  So in the context of the briefs we're taking their

15   allegations that he has claimed that they are lobbyists for

16   the regime to be the sting of the charges, as the Court has

17   mentioned, and assuming that that's how one would characterize

18   all of his writings, looked at not only the bases for that,

19   which in every article he cites footnotes with hot points to

20   the articles.  He is not relying upon unnamed sources.  It is

21   simply a question of whether, having that material at various

22   points in time, he has ever entertained any subjective doubts

23   about the truth of what he has written.  Has anybody ever come

24   to him and said, Hassan, that's just not true, you shouldn't

25   be writing that, and he acknowledges, yeah, you're right, but

1   I'm going to write it anyway?  There is no evidence of that in

2   this case from his deposition, from any of the gmails.  In

3   their response, they focus on totally irrelevant stuff such as

4   ill will or taking things out of context.  They argue,

5   frankly, the falsity of the allegations or distortions or

6   context, but that wasn't the basis of the motion at all.  The

7   basis of the motion was simply is there any evidence of

8   subjective harboring of doubts about the truth of what he has

9   written.

10        THE COURT:  Well, what do I do with this example,

11   which is one of the first articles attached to the complaint?

12   The defendant wrote the following:  "Ahmadinejad held the

13   Holocaust conference and declared that 'Israel should be wiped

14   off the map,' Trita Parsi and his cohorts not only did not

15   condemn this anti-Iranian and anti-humanity act but launched a

16   campaign directed by Siamak Namazi, Parsi's main partner in

17   Tehran, to blame the fault of 'neocon' media which

18   intentionally misinterpreted Ahmadinejad's declarations."

19        Now, there is one source cited for that.  It is

20   footnote 2, and it is an internet source, www.iht.com,

21   et cetera.  Looking at that, there isn't much in that article

22   about the specifics of this statement by the defendant.  So

23   how do I assess that?

24        MR. KAPSHANDY:  Well, two --

25        THE COURT:  That footnoted source does not really

1    support the statements that are made by the defendant.  What

2    do I do?  How do I assess that?  How do I make an actual

3    malice determination on the basis of that kind of information?

4         MR. KAPSHANDY:  Well, two response:  Of course, as the

5    Court points out, that the issue of the truth or falsity of

6    that is not before the Court on this motion.  In effect, he

7    could have made that statement without any citation.  So the

8    question is, having moved, the movant, the defendant, had the

9    plaintiffs come forward with any evidence that the defendant

10   harbored subjective doubts about the truth of that statement,

11   and the Court has read his deposition, he goes on at length to

12   describe how he came to these conclusions, and that's a

13   typical one, more specific than the general lobbying

14   statements that he has written but --

15        THE COURT:  But you wouldn't say that the fact that

16   the source cited doesn't support the statement is irrelevant

17   to my consideration of actual malice; would you?

18        MR. KAPSHANDY:  Like I say, he could have written that

19   statement without citing any source whatsoever, and the issue

20   is simply whether he entertained subjective doubts about --

21        THE COURT:  I know you said that twice now --

22        MR. KAPSHANDY:  Right.

23        THE COURT:  -- but you didn't answer my question.

24   Would you say that it's irrelevant, that the source doesn't

25   -- assume for a second that I'm right in my assessment --

1          MR. KAPSHANDY:  Right --

2          THE COURT:  -- of that, that the source doesn't

3     actually support the statements made.

4          MR. KAPSHANDY:  Assuming that that's the case and

5     assuming that there is something in the source which not only

6     totally contradicts what he is saying and is not a matter of

7     context or mere negligence but --

8          THE COURT:  Assume the source doesn't necessarily

9     contradict it but that it just doesn't support it.

10          MR. KAPSHANDY:  I would say that even if it directly

11     contradicts it, unless it says only a moron would make the

12     contrary statement, that you would say that's evidence of

13     subjective doubt, but frankly, the standard is subjective

14     doubt and the fact --

15          THE COURT:  That's objective doubt, you mean?  You

16     used subjective both times, I thought.

17          MR. KAPSHANDY:  Well, the malice standard, reckless

18     disregard, is whether the defendant subjectively entertained

19     doubts.  I don't know that there is anything in a source that

20     speaks about the defendant's state of mind.  So I would have

21     to say I can't think, as I stand here right now, of an example

22     of something in a source unless it refers to the defendant's

23     state of mind that had much relevance on the statement of

24     reckless disregard.

25          THE COURT:  And you think that I have enough

1    information before me with respect to the particular

2    statements that are alleged to be defamatory that I can

3    somehow from the papers that have been filed with me either

4    pull out a list of the allegedly defamatory writings, and I

5    mean not just an article, but I mean a particular statement

6    within that article, sentence, paragraph, whatever it may be,

7    or you would submit that I need not do that because I can

8    assess this in more of a generalized manner?

9         MR. KAPSHANDY:  More the latter because, under Rule

10   56, once the movant says there is no basis, no dispute of

11   material fact about the issue of reckless disregard for the

12   truth, then the non-moving party has the burden of coming

13   forward with some evidence.  I don't think we need to wade

14   into the weeds of whether he had subjective knowledge of the

15   falsity of any particular statement when they haven't come

16   forward with a single shred of evidence, even taking the

17   global sort of sting of the charges the Court characterized in

18   the motion to dismiss briefing of the summary sort of

19   allegation that they are lobbyists for Iran or for the regime

20   or for the mullahs, however they want to characterize it.

21        THE COURT:  And you think there is no real difference

22   between lobbyists or something more than lobbyists, be it

23   agent or some other term?

24        MR. KAPSHANDY:  I haven't seen them point to a

25   particular example of agency different from lobbyists.  Most

1    of what the defendant has written, he uses the word

2    "lobbyist," kind of in the generic sense, and they had this

3    argument over as to whether he is referring to specific

4    lobbying acts, which I don't think is really relevant.  I

5    wouldn't take it more broadly in the general term.  In either

6    case, they haven't come forward with any subjective evidence

7    of the defendant's state of mind, that any of those are false

8    or he had serious doubts about the falsity of any of those.

9         THE COURT:  Now, there's a lot, in the briefing,

10   throwing dirt by one side or the other on the other side.  Let

11   me ask you about your effort in that regard.  Why does the

12   evidence that the defendant -- I guess this is actually a

13   question for the plaintiff.

14        Let me ask you this question, let me switch to

15   defamation per se:  Do you think that there is a claim for

16   defamation per se here?  I know that that is still within the

17   actual malice framework, but is there a defamation per se

18   claim here?

19        MR. KAPSHANDY:  My recollection is, given the

20   plaintiff's stipulation that they will not be introducing

21   evidence of the legality of various sub-allegations of

22   violations of particular lobbying laws that they have no basis

23   for that claim.  There is no witness listed, there is no

24   evidence, particularly given their stipulation that their

25   activities were in compliance with, say, the Lobbying

1    Disclosure Act, Foreign Agent Registration Act, the Iran --

2          THE COURT:  Well, they make an argument in their

3    briefs about the Foreign Agent Registration Act, and I'm not

4    sure in your briefing that you fully responded to that.  What

5    is your response?

6          MR. KAPSHANDY:  Well, we responded to that in light of

7    their stipulation here in open court when they were resisting

8    producing the legal advice upon which they were relying that

9    that's no longer in issue.  Frankly, the defendant has never

10   made any specific reference to any particular lobbying acts.

11   They kind of read that into his general use of the term

12   "lobbying."  Now, others, such as a *Washington Times* reporter

13   by the name of Eli Lake has particularly suggested that they

14   were violating lobbying laws, perhaps the Lobbying Disclosure

15   Act, if not FARA, I haven't read it recently, but the

16   defendant has never made those sorts of allegations.  They

17   imply or infer those and then have no evidence to prove that

18   that's true.  So I think for both of those reasons those

19   allegations really aren't really in the case, defamation

20   per se.  And it doesn't, as the Court points out, get rid of

21   the actual malice standard.  That's the only issue before the

22   Court on this motion.

23         THE COURT:  And where are we on the damages discovery?

24         MR. KAPSHANDY:  Well, as the Court will recall, the

25   defendant at the last hearing moved to strike damages for both

—13—

1    plaintiffs, and the Court subsequently ruled with regard to

2    NAIC, the entity plaintiff, that their expert witness did not

3    meet the Daubert standard.  With regard to Trita Parsi, while

4    the defendant had moved to strike his testimony for failure to

5    comply with discovery, particularly disclosing Swedish income

6    that he had mentioned in the deposition but not produced

7    records for, the Court allowed him a chance to come forward

8    with that evidence.  In the last eight months, Parsi initially

9    took the position that Swedish banks don't keep those records.

10   A little bit of research proved that that was not true.  Their

11   next position was that it would cost $25 for each record and

12   the defendant had to pay that.  There were approximately four

13   or five hundred records.  The defendant and the plaintiff

14   agreed to focus on 42 of those records, for which they were

15   able to produce the underlying documentation for some of those

16   but not all, and my recollection was for eight of the records

17   they couldn't produce the underlying documentation, deposits

18   in the account, four of those because as time had dragged on

19   it went beyond the 10-year document retention period.  Had

20   they replied initially in 2009, they would have been

21   available.  Four others weren't produced for some

22   yet-to-be-expressed reason.  So about 20 percent of the

23   records, you know, deposits into his account in the amounts of

24   thousands of dollars, have not been produced.

25            THE COURT:  Is there anything before me with respect

—14—

1    to that discovery?

2           MR. KAPSHANDY:  Well, the motion to strike was raised

3    at the last hearing, and the Court gave him this additional

4    opportunity, so I presume the understanding was, if he

5    complied with that, then the motion to strike would be denied;

6    if he didn't comply, it may.  And we have a situation where he

7    has partially complied.

8           THE COURT:  No one has brought it forward to me, so

9    I'm not viewing it as being something that I could do anything

10   with.

11          MR. KAPSHANDY:  Well, we would still renew our motion

12   to strike.  It was the Court that added this --

13          THE COURT:  You would still?  You haven't but you

14   would now?

15          MR. KAPSHANDY:  We have, but I mean it is still

16   pending, it's not been ruled on.  The Court gave him a second

17   chance; and if the Court has determined that he has not

18   complied with that second chance, which we would argue he has

19   not, the motion --

20          THE COURT:  Other than what you just told me, do I

21   have that information with respect to compliance before me?

22          MR. KAPSHANDY:  No.

23          THE COURT:  Then how could I -- I mean, you're

24   certainly not saying I'm in a position to rule that based on

25   what you've just told me in response to a question that I've

1    asked.

2          MR. KAPSHANDY:  Right.  I would put this motion in the

3    category of the other two or three that are going to be

4    subsumed into the summary judgment and sanctions.  I don't

5    view it as being the main issue that needed to be dealt with

6    today.  I preferred to focus on the other motions.

7          THE COURT:  Let's talk about other journalists for a

8    second, and let's assume that other journalists accused

9    plaintiff of being -- and I will continue to use the term --

10   "agents of the Iranian regime" -- before the defendant did.

11   How does that show one way or another -- well, how does that

12   show that he had no actual -- that there was no actual malice?

13         MR. KAPSHANDY:  Well, again, you have a question of

14   the evidence and how that influenced his thinking.  And as we

15   were discussing earlier, one could envision a situation where

16   the evidence of falsity is so overwhelming that the defendant

17   must have subjectively harbored some doubts, if he just had an

18   IQ and read the stuff, must have been entertaining actual

19   malice.  Contrarily, if the evidence -- and there is some, a

20   lot, substantial overwhelming evidence to support his

21   conclusions, one could say it's reasonable to see how one came

22   to that conclusion.

23         THE COURT:  So if there is so much out there already,

24   even the additional specific details or statements that the

25   defendant might have made here just wouldn't be enough to show

1    actual malice with what already existed out there?

2           MR. KAPSHANDY:  Right.  I mean, given the

3    constitutional defense -- this isn't a two-way street.

4    Obviously, on many issues, people have different opinions and

5    argue both ways.  The fact that there is some or a lot or a

6    little evidence supporting the defendant's conclusion isn't

7    dispositive of actual malice as were saying all the evidence

8    points against it, but the fact that there is some or a modest

9    or moderate amount of evidence consistent with his opinion

10   certainly argues against, given the importance of the First

11   Amendment, the constitutional malice standard.

12          THE COURT:  What else do you want to tell me on this

13   issue?

14          MR. KAPSHANDY:  I think the brief states it all.

15   Absent any evidence of subjective doubts of falsity, it's an

16   appropriate matter for Rule 56 disposition.

17          THE COURT:  All right.  Thank you.

18          MR. KAPSHANDY:  Thank you, Your Honor.

19          THE COURT:  Mr. Mohammadi.

20          MR. MOHAMMADI:  Thank you, Your Honor.  Good morning.

21          THE COURT:  Good morning.

22          They say that there is no evidence of subjective doubt

23   and, absent that, there is no actual malice.

24          MR. MOHAMMADI:  That is simply not right, Your Honor.

25          THE COURT:  What is the evidence of subjective doubt

1    that you would refer me to?

2           MR. MOHAMMADI:  Well, the first and foremost -- and I

3    think this by itself is sufficient to find there is actual

4    malice -- is the defendant's own deposition statements.  It is

5    attached to our opposition as Exhibit E on page 35.  Defendant

6    is asked by counsel:

7           Do you consider him -- "him" being Dr. Parsi -- do you

8    consider him to be part of the Iranian regime?

9           And his answer is:  I believe that he has worked, he

10   has lobbied in favor of the Iranian regime.

11          The sting of the charge in this case has always been

12   that the defendant accuses the plaintiffs of lobbying for the

13   Iranian regime, for being agents of the Iranian regime.  In

14   his own deposition statement, he takes a step back and he

15   says, I'm not saying that they are lobbying for the Iranian

16   regime, I'm not saying they're agents of the Iranian regime,

17   I'm saying that their lobbying activities favor those of the

18   Iranian regime.

19          THE COURT:  You're defining "for" one way.  "For" can

20   be meaning that you're an agent of, or "for" can just mean in

21   favor of, so I don't know what distinction you're drawing

22   there.

23          MR. MOHAMMADI:  Here is the distinction:  We have

24   always said what he has been saying is that plaintiffs are

25   lobbying for, as in as agents, of the Iranian regime.  That

1   has always been what the defamatory statement has been.  So

2   he's taken a step back.

3          THE COURT:  Let's take a step back to a particular

4   statement.  What statement do you assert is defamatory that

5   you sue on the basis of where you -- refer me to the

6   particular statement and what it says.

7          MR. MOHAMMADI:  Your Honor, those are, I believe, laid

8   out both in the complaint and also in response to the motion

9   to dismiss.  There is the specific statements where he calls

10  them oil mafia, specifically statements where the defendant

11  calls the plaintiffs lobbyists for the Iranian regime.  I

12  don't have those citations in front of me as they were never

13  raised as part of the summary judgment.  Those were

14  briefed -- those were in the complaint as well as part of the

15  motion to dismiss.  Those were never raised in summary

16  judgment that these specific statements are --

17         THE COURT:  So how many writings are at issue here?

18  How many writings are the plaintiffs suing on and saying are

19  defamatory?  Are there two writings?  Are there 23 writings?

20  Are there 304 writings?  How many are there?

21         MR. MOHAMMADI:  There are certainly more than two

22  writings.  I'm not sure whether it amounts to 23 or not.

23         THE COURT:  How do I know which ones they are?

24         MR. MOHAMMADI:  They are --

25         THE COURT:  Looking at the complaint to begin with,

1    and there's some specific writings mentioned there.

2              MR. MOHAMMADI:  Correct.

3              THE COURT:  And then what else beyond that?  Where do

4    I get them from?

5              MR. MOHAMMADI:  In the motion to dismiss, I believe,

6    those additional writings were mentioned, and there you can

7    also see specific writings that were at issue.  We filed the

8    motion for surreply --

9              THE COURT:  There are two sources:  The complaint and

10   the opposition to the motion to dismiss.

11             MR. MOHAMMADI:  Correct.

12             THE COURT:  Any other place that writings, statements

13   that are the basis for this lawsuit can be found; or are those

14   the two places I should look?

15             MR. MOHAMMADI:  Those are the two main places that you

16   should --

17             THE COURT:  Don't tell me main and then tell me there

18   are 17 other places.  I want to know explicitly exactly what

19   we're dealing with.

20             MR. MOHAMMADI:  Certainly.  We did file a motion for

21   surreply, which was denied on this portion; but in that

22   motion, we also, in detail --

23             THE COURT:  The motion to dismiss, you mean?

24             MR. MOHAMMADI:  No.  On the motion for summary

25   judgment, there was a motion for leave to file surreply, and

1    attached to that motion was a detailed analysis of one of the

2    defendant's articles in which we are saying that there are

3    defamatory statements, and that article is looked at source by

4    source and shows exactly how his statements are completely

5    unsupported.

6              THE COURT:  So we have three places now:  We have the

7    complaint, we have the opposition to the motion to dismiss,

8    and we have the one article in the motion for surreply.  Is

9    that the universe?

10             MR. MOHAMMADI:  That is the extent of my awareness of

11   it.  Mr. Pishevar may be aware of more.  I can confer with

12   him, but as far as I know --

13             THE COURT:  Please confer with him because I want to

14   know exactly what the universe is because I've got a motion

15   for summary judgment before me and I want to know what I'm

16   dealing with.

17             MR. MOHAMMADI:  Certainly.

18             THE COURT:  Please.

19             MR. MOHAMMADI:  The Court's indulgence.

20        So Mr. Pishevar confirmed that what is on the record

21   is those three sources.  However, it bears noting that the

22   defendant is moving for summary judgment.  We are not seeking

23   summary judgment on this case.

24             THE COURT:  True.

25             MR. MOHAMMADI:  Therefore, we have not put everything

1    that we have gathered through discovery on the record as of

2    yet.  There are a ton of other articles, YouTube --

3         THE COURT:  Well, wait a minute.  This is an amazing

4    statement, in my view, that at this point in the case, after

5    all the discovery we have been through, after full briefing on

6    a motion to dismiss, after full briefing on a motion for

7    summary judgment, you're telling me that I don't know because

8    you haven't laid it out on the record, and perhaps even the

9    defendant doesn't know what statements the plaintiffs are

10   alleging are defamatory?

11        MR. MOHAMMADI:  No, that is not what I'm saying.

12        THE COURT:  Then where do we look to find what

13   statements the plaintiffs are alleging are defamatory beyond

14   the three places that you've identified?  You have now said

15   that there may be a lot of others.

16        MR. MOHAMMADI:  For purposes of summary judgment,

17   what's on the record, those three places are it, but that does

18   not mean at trial additional articles, YouTube interviews, so

19   on, cannot be introduced that were discovered during

20   discovery, that were part of the discovery process.  Like I

21   stated on the record, those three are it.

22        THE COURT:  Okay.  We'll see.

23        Now, with respect to actual malice, you've referred me

24   to one place, and you said page 35 of the deposition --

25        MR. MOHAMMADI:  That's correct.

1          THE COURT:  -- where you said there is evidence that

2     supports the view that there is actual malice here.  What else

3     would you refer me to as being support for your position that

4     there's been a showing of actual malice?

5          MR. MOHAMMADI:  Foremost, this deposition I think is

6     by itself sufficient for clear and convincing evidence --

7          THE COURT:  Right, I understand that.

8          MR. MOHAMMADI:  -- in terms of showing actual malice

9     and falsity he admits.  But then there is numerous other

10    sources that can be looked at.  The first is defendant's

11    agency being an operative of MEK.  That is by itself maybe not

12    sufficient, but it is certainly very important to look at in

13    determining whether there is actual malice.  And the

14    importance of defendant's association with this terrorist

15    organization --

16         THE COURT:  Why is that actual malice?  Why does that

17    show actual malice, the fact that he has MEK, as you would put

18    it, MEK relationships?

19         MR. MOHAMMADI:  By itself, looking at it by itself in

20    a vacuum, it may not be sufficient for actual malice, but it

21    is -- when looking at the totality of the evidence, it is

22    certainly one of the considerations and factors that should be

23    looked at.  It is direct proof of his motive, his ill will

24    towards the plaintiff to publish these defamatory statements.

25    The fact that he is part of MEK goes even further.  MEK is a

1    terrorist organization, and the FBI has designated -- it has

2    been designated as a terrorist organization.  The FBI

3    specifically says that this organization, the standard way of

4    dealing with defectors or decedents is by accusing them of

5    being agents of Iran, of the Iranian regime, which is what the

6    defendant is doing, defaming them, and by character

7    assassinations.  This is exactly what the defendant is doing

8    in this case.  So the fact that he has ties with MEK certainly

9    plays into the actual malice portion of this.

10             THE COURT:  All right.  What else?  You've referred me

11   to that alleged MEK relationship and the deposition as a

12   whole, but specifically a reference to what you've referred to

13   on page 35, what else would you say is evidence of actual

14   malice?

15             MR. MOHAMMADI:  Along with the motive portion of it

16   is, again, his own emails where he says he wants to destroy

17   Trita Parsi and NAIC and that he took discovery material and

18   sent it out for publication to various journalists.  Again,

19   that is circumstantial evidence, but it is certainly relevant

20   and certainly important to consider.

21             The other fact -- the other aspect to consider is his

22   complete lack for journalistic standards and the way he

23   writes, the methodology he uses in writing, he uses in writing

24   his articles.  The methodology -- those are kind of two

25   separate things.  His sources, as you pointed out initially,

1      are not credible, are not accurate.  He is citing to sources

2      that simply do not stand for the propositions that he's

3      asserting.  There is zero support in them.  Sometimes these

4      sources are actually saying the exact opposite of what he's

5      claiming is fact in his articles.

6              THE COURT:  Mr. Kapshandy would say that that's not

7      enough to show actual malice, what you've got to show is a

8      subjective view by the defendant that he didn't believe the

9      truth of what he was writing.

10             MR. MOHAMMADI:  Right.  Again, it may not be

11     sufficient by itself.  We're not looking at it in a vacuum,

12     though.  We are looking at everything together, the totality

13     of circumstances.  We got to look at everything that is out

14     there.  The fact -- this portion of the sources being

15     unreliable is important because it shows a complete disregard

16     for what the truth is.  The sources say one thing, and he's

17     reading these source and he's citing these sources, and he is

18     completely disregarding --

19             THE COURT:  Where do I look for the best examples of

20     sources that you think -- in the briefing -- sources or

21     examples where sources don't support what was said in some

22     written statement?

23             MR. MOHAMMADI:  Well, one of the best ones to look at

24     in terms of an analysis that was done on this issue is, again,

25     in the surreply, and it is called "Iran's 2003 Grand Bargain

1    Offer:  Secrets, Lies, and Manipulation."  In that article, we

2    go through what he is saying, look at the sources, and show

3    how they are not related.  If Your Honor would like me to, I

4    can actually go through one example --

5              THE COURT:  Give me one example.

6              MR. MOHAMMADI:  -- of how that applies.

7              The Court's indulgence.

8              So, in that article, and there's a quote related to

9    end note number 5, and that has several mischaracterizations

10   where he takes the quote and strings it together to say what

11   he wants.

12             THE COURT:  Is this found somewhere in the briefing?

13             MR. MOHAMMADI:  It is found in the briefing.  It is

14   attached as Exhibit A to our motion for surreply -- for leave

15   for surreply.

16             THE COURT:  All right.

17              MR. MOHAMMADI:  And the article itself is also

18   attached as Exhibit A1, I believe -- A2 -- excuse me.

19             It said -- there is a quote that begins, "In May

20   2003," and then dot, dot, dot, draw the conclusion.  The

21   defendant's dot, dot, dot encompasses -- this is an interview --

22   encompasses eight questions that he skips over that are asked in

23   between the first part of the quote and the second part of the

24   quote, eight questions and a commercial break before he ties them

25   together.  Simply just looking at that, he's quoting something

1    from one portion of an article to a completely different portion

2    of this interview, I should say, and links them as if it was all

3    part of one statement.  It is not.

4            Also, the sentence that begins, "And an argument

5    by" -- again, "And an argument by," that portion is from an

6    earlier part of the interview than the text asserts actually in

7    the quote.  So it doesn't refer to what he is quoting.  It refers

8    to a different part.  It is not even an accurate quotation of

9    that.  This analysis in the attachment is two pages long.  I'm not

10   going go -- I can if you would like me to --

11           THE COURT:  I will look at it further.

12           MR. MOHAMMADI:  Okay.

13           THE COURT:  Let's turn back to defamatory statements

14      here.  I take it that you're not asserting that merely -- if

15      the defendant merely has called the plaintiff or either

16      plaintiff a lobbyist for Iran, that is or is not defamatory in

17      your view?

18           MR. MOHAMMADI:  I would like to clarify.  If by "for"

19      you mean saying that he's an agent, then that is exactly what

20      they're saying.

21           THE COURT:  But it is only if the assertion is that

22      the plaintiff -- and I'll use the term "plaintiff" --

23      Mr. Parsi -- is a lobbyist for, meaning something more than

24      just in favor of.

25           MR. MOHAMMADI:  The sting of the charge is the agency,

1    but even saying in favor of, taking a step back and saying

2    that he's lobbying in favor of, that is also defamatory.

3              THE COURT:  Why is that defamatory?  Why do you assert

4    that that's defamatory?

5              MR. MOHAMMADI:  Because, again, it is false.  There is

6    no truth to it that they're lobbying in favor of the Iranian

7    regime.  In fact, they're not.  That statement is still

8    defamatory.  What the sting of the charge is that the

9    accusation that they're actual agents.

10             THE COURT:  All right.

11             MR. MOHAMMADI:  Another example of actual malice again

12   is this systematic disregard and systematic

13   mischaracterization in the motion to dismiss.  In the

14   memorandum opinion, you called it willful blindness.  This

15   Court called it willful blindness.  That is exactly his

16   approach.  He doesn't -- the defendant does not -- takes

17   articles and sources and does not cite them for what they

18   actually are.  He ignores portions that contradict him and

19   only cites to what would support his ultimate conclusion.

20   That is --

21             THE COURT:  As most writers do.

22             MR. MOHAMMADI:  That's correct, but he is ignoring

23   what the actual article says.  He is willfully blind to what

24   these sources are actually saying, and that by itself is also

25   evidence of actual malice.

1        THE COURT:  How would you define ultimately -- well,

2   do you think there is any disagreement between the parties on

3   what the standard is here and what has to be shown to

4   constitute actual malice?

5        MR. MOHAMMADI:  The standards -- the disagreement that

6   we would have is as follows:  It is not simply enough in a

7   motion for summary judgment to say there is no actual malice.

8   The defendant is the movant, so they have the initial burden

9   of establishing enough material facts that there is no genuine

10  disputes to, to get past and then have the plaintiffs prove by

11  clear and convincing evidence that a reasonable juror could

12  find --

13       THE COURT:  Well, I understand what you're saying in a

14  Rule 56 context, but there is a law in this circuit that says

15  that in a defamation case, public figure defamation case, the

16  Court has a little greater responsibility to make more of an

17  independent assessment of the record.  Would you encourage me

18  not to do that, not to follow *Dow Jones*, for example?

19       MR. MOHAMMADI:  What I am suggesting is that the party

20  moving for summary judgment bears the initial burden; and

21  that, yes, the standard is raised, it is clear and convincing

22  evidence, that is, it is not simply preponderance of the

23  evidence for actual malice, it is higher, it is a clear and

24  convincing evidence.  But it is not enough to get to that

25  point by simply saying there's no actual malice.  Something

1    more has to be presented.  There has to be more than just this

2    affidavit statement saying I did not believe I was lying, I

3    did not entertain serious doubts about the truth of what I was

4    writing.  That is not enough.  I believe in *Anderson v.*

5    *Liberty Lobby* --

6              THE COURT:  Right.

7              MR. MOHAMMADI:  -- in that case, what was

8    required -- the reason the Court got to the conclusion of

9    clear and convincing was that the defendant initially, in his

10   affidavit, not only set out, stated that he does not believe

11   his statements were false, but he analyzed the sources in

12   detail and went through them to show the credibility, show

13   their reliability, and that the Court found was sufficient to

14   then go and say, plaintiff, where is the clear and convincing

15   evidence.  So, at the outset, we do not believe the defendants

16   have even done that.  We do not believe their material

17   statements meet that requirement to even shift it to the

18   plaintiffs to produce enough for clear and convincing

19   evidence.

20             THE COURT:  Talk to me for a second about defamation

21   per se.  Are you asserting claims for defamation per se?

22             MR. MOHAMMADI:  We are, Your Honor.

23             THE COURT:  And what is it that you're relying on as

24   being defamation per se?

25             MR. MOHAMMADI:  Well, the Foreign Agents Registration

1    Act makes it a crime to not register and to lobby for an

2    agent, to sort of summarize.

3            THE COURT:  So if the defendant ever used the term

4    "agent" and ever said that the plaintiff or plaintiffs are

5    "agents of the Iranian regime," that would be defamation

6    per se because there's been no registration under the Foreign

7    Agents Registration Act and that would be potentially a

8    criminal violation?

9            MR. MOHAMMADI:  That is absolutely correct, Your

10   Honor.

11           I would like to point out that this argument was not

12   raised by the defendant, and we did brief it in our opposition

13   briefly, and it was never responded to in their reply.

14           THE COURT:  I understand that.  And is it -- do you

15   have specific instances that are found either in the articles

16   referred to in the complaint, in the opposition to the motion

17   to dismiss, or in the motion for a surreply of statements by

18   the defendant using the terms that the plaintiff is an agent

19   of the Iranian regime?

20           MR. MOHAMMADI:  I can't say for certain because I

21   don't have the complaint and the motion to dismiss in front of

22   me to determine whether --

23           THE COURT:  That's why you're here, with all due

24   respect --

25           MR. MOHAMMADI:  I understand.

—31—

1          THE COURT:  -- to be able to answer questions like

2     that.

3          MR. MOHAMMADI:  I understand.  I would say yes.

4          THE COURT:  You think there is a statement made by the

5     defendant using the exact language that either Parsi or NAIC

6     is an agent of the Iranian regime?

7          MR. MOHAMMADI:  I think I need to take a step back and

8     clarify this Foreign Registration Act.  I don't think there is

9     a requirement that says you have to use specific language;

10    that is, you don't have -- it doesn't say you have to say

11    somebody is an --

12         THE COURT:  But to be defamation per se, you have to

13    have something, and what is it that would be defamation

14    per se?  What language was used that you're arguing under this

15    Foreign Agents Registration Act construct is defamation

16    per se?

17         MR. MOHAMMADI:  Plaintiff lobbied for the Iranian

18    regime.

19         THE COURT:  You think that is defamation per se?

20         MR. MOHAMMADI:  I think it implies agency and,

21    therefore, it would be defamation per se, because agency,

22    being an agent would fall within the Foreign Registration Act.

23         THE COURT:  All right.  What else?

24         MR. MOHAMMADI:  Just that, Your Honor --

25         THE COURT:  Is there any evidence, by the way -- just

32

1    to stay on special damages for a second, is there any evidence

2    of special damages with respect to NAIC's claim now that that

3    expert has been excluded?

4         MR. MOHAMMADI:  I don't think an expert is necessary

5    to show special damages.  I think NAIC's membership, there are

6    emails specifically sent to NAIC saying we are no longer

7    renewing our membership because you are agents of the Iranian

8    regime.  So those sort of membership, that that is evidence of

9    special damages relating to NAIC.

10        THE COURT:  All right.  And to complete the circle

11   with respect to defamation per se, is there any crime other

12   than this Foreign Agents Registration circumstance that we

13   have just been discussing, is there any crime that you think

14   the plaintiffs have been accused of by the defendant that

15   would constitute defamation per se other than that one

16   instance?

17        MR. MOHAMMADI:  Well, in their motion on page 13,

18   defendant says the Lobbying Disclosure Act, Foreign Agent

19   Registration Act, Internal Revenue Code, Logan Act, and Iran

20   and Libya Sanctions Act, all of these are implicated that NAIC

21   is violating these specific acts.

22        THE COURT:  All with respect to this statement that

23   the plaintiffs are lobbyists for the Iranian regime?

24        MR. MOHAMMADI:  That's correct, that they're lobbyists

25   for the Iranian regime.

1        THE COURT:  All right.  What else?

2        MR. MOHAMMADI:  Your Honor, just to wrap up on this

3   issue on summary judgment, again, I think it bears noting that

4   the initial burden is on the movant and that all reasonable

5   inferences should be taken in the light most favorable to the

6   non-movant.

7        THE COURT:  Maybe.  *Dow Jones* doesn't necessarily

8   support that conclusion that all inferences are to be taken in

9   favor of a non-movant in this kind of public figure defamation

10  setting.

11       MR. MOHAMMADI:  Well, I would still suggest that there

12  is an initial burden that the defendant has as the movant in

13  this case and the defendant has not met that because there are

14  genuine disputes as to every what we would consider material

15  facts, and not everything that the defendant lists as a

16  material fact is, in fact, material when it comes to that

17  issue of actual malice.  They may be material when it comes to

18  the issue of truth, which is not an inquiry today, it is not

19  part of their motion, but they are not necessarily material

20  when it comes to the issue of actual malice.

21       THE COURT:  All right.  Thank you.

22       MR. MOHAMMADI:  Thank you.

23       THE COURT:  Mr. Kapshandy, briefly on this.

24       MR. KAPSHANDY:  Thank you, Your Honor.

25       Tellingly, in response to the Court's question as to

1    what specific evidence they had of actual malice, they

2    repeated from the deposition the mere allegation that the

3    plaintiffs lobby for Iran.  That's what the arguments say, and

4    the defendant admits that.  The question is did he act with

5    reckless disregard, did he have subjective knowledge that was

6    false.  They have thrown out a bunch of other things,

7    including a surreply which the Court did not allow them to

8    file and frankly which relies upon Professor Aikat, whose

9    methodology, the willful blindness methodology, was excluded

10   under the *Daubert* standard.  But when asked what articles are

11   we talking about here, we quickly tallied between the

12   complaint, their response, and the surreply, even if the Court

13   considers it, it is maybe five or six articles.  Frankly, in

14   none of which does the defendant ever say they are agents or

15   mention the Foreign Agent Registration Act.  To be clear, just

16   in response to counsel's last answers to the basis for those

17   statements as to which laws the defendant claims they're

18   violating, he has never claimed that.  On page 13 of the

19   brief, the defendant says, if they interpret the statements in

20   that manner in support of a defamation per se claim, there is

21   ample evidence for that, including admissions of their own

22   staff to support those where they stated that Patrick Disney,

23   that under this expansive view of lobbying, I find it hard to

24   believe that Emily and I devote less than 20 percent of our

25   time to lobbying, there referring to the Lobbying Disclosure

1    Act.

2           With regard to the MEK, which the defendant addresses

3    in his brief and, frankly, while he denies that and they have

4    no evidence of that, frankly, as the defendant pointed out in

5    his reply brief, when Trita Parsi was cautioned by one of

6    their board members, who is a lawyer, about saying that

7    defendant was a member or affiliated with the MEK, Parsi's

8    response was, quote, "I have to be frank, I am not at all

9    concerned that he would prove to me that ex-members had

10   defamed him."  Applying that same sort of standard to Trita

11   Parsi that they want to apply to the defendant would result in

12   the basis for this MEK accusation not only being without

13   foundation, but frankly actionable.

14           THE COURT:  This is sort of the throwing-mud issue

15   that I referred to earlier.  That's an example where they're

16   throwing mud, but perhaps I would ask you how the evidence

17   that you've brought forth about plaintiff's Iranian contacts

18   shows a lack of actual malice by the defendant.

19           MR. KAPSHANDY:  Well, as counsel pointed out, when it

20   comes to whether those are disputed or not, it is not an issue

21   of truth or falsity but simply these are materials the

22   defendant relied upon, be they other respected experts in the

23   field publishing this, original sources, and frankly no

24   unnamed anonymous sources that one can see using that

25   methodology, that he is certainly being diligent, and when he

1    has made mistakes, he's published retractions and corrections.

2    This is not somebody out there just making totally unfounded

3    accusations without reference whatsoever to what's in the

4    public record on NAIC or Trita Parsi.  So, I mean, I think

5    there is a big difference there; and frankly, just to complete

6    the MEK point, most recently, MEK has brought to their efforts

7    to have them removed from the State Department list of

8    terrorists such other people, according to the plaintiffs,

9    harboring actual malice I guess towards the unlikely group of

10   Howard Dean, Patrick Kennedy, Former Attorney General Mukasey,

11   Tom Ridge, Newt Gingrich, John Bolton.  I mean, the mere fact

12   that someone speaks on behalf of the MEK, frankly, is

13   irrelevant to anything, and that is the whole point of our MEK

14   section.  It's really, as with regard to the ill will or the

15   willful blindness, not at all relevant to the subjective

16   standard.

17        Finally, it is just interesting that plaintiff's

18   haven't mentioned it here today and the difficulty of getting

19   our hands around exactly what the defamatory statements are,

20   but, again, directing the Court to page 5 --

21        THE COURT:  Now it seems that I can get my hands

22   around it because we're limited to, as you put it, five or six

23   articles.

24        MR. KAPSHANDY:  Well, maybe even more specifically is

25   they said in their response, and we address this at page 5 of

1      6 of the defendant's reply, they make a distinction between

2      lobbying for Iran and lobbying for the regime for the first

3      time, which actually seems to be their wont to do, setting up

4      a paper target and always reinterpreting the defendant's

5      statements, but as it stands now, according to their papers,

6      their argument is the defendant -- there is nothing wrong with

7      saying that they lobbied for the regime.  They're saying it's

8      a big difference, though -- strike that.  It's a big

9      difference to say that they're lobbying for the regime versus

10     lobbying for Iran or Iranian people, which, frankly, Trita

11     Parsi's own writings have admitted that he lobbies for Iran,

12     whatever that is, whatever your definition is, whether it's

13     the government or the people or the diaspora.  He's just

14     saying, if one interprets these as lobbying for the regime as

15     opposed to lobbying for Iran, that it's defamatory, frankly, I

16     don't seem to have a problem being accused of lobbying for

17     Iran because I state that in my resume and have said that

18     about myself a number of times, which is what has made it so

19     difficult to get a handle on what the supposed defamatory

20     statements are.  Going by that, their admission that it is

21     maybe five or six articles, I think the sting of the charge

22     is, frankly, not what the defendant has written, it's that

23     they lobby only for the regime and not for Iran.

24          THE COURT:  All right.  Thank you.

25          Now we're going to move on to the sanctions motion,

1      and I don't know if that will be you, again, Mr. Kapshandy --

2              MR. KAPSHANDY:  Yes, it would.

3              Frankly, Your Honor, I won't belabor our limited time

4      here with any detailed recitation --

5              THE COURT:  If we get too much in the weeds here, this

6      could take several hours.

7              MR. KAPSHANDY:  Right.  And I think one has to only

8      start with the basics as set forth in the motion and the

9      reply.  We have numerous examples of false statements under

10     oath in efforts to avoid --

11             THE COURT:  Let's talk about false statements under

12     oath.  What are the false statements under oath that you

13     believe warrant sanctions, further sanctions beyond what has

14     already been imposed?

15             MR. KAPSHANDY:  Right.  Frankly, the Court has imposed

16     sanctions, at least costs for filing the motion for the server

17     and the membership list and left open a number of others,

18     including the depositions and the Talebi emails.  The Talebi

19     emails were subject to interrogatory responses attested to by

20     plaintiffs in September 2010, where they stated there are no

21     search terms or responsive documents in the Talebi emails,

22     which the Court examined in camera and quickly determined that

23     that was false.  That's simple and black and white and,

24     frankly, not just one of the instances of incorrect statements

25     under oath.

1          THE COURT:  All right.  So what does that wind up

2     meaning for the defendants?  Are there Talebi emails that were

3     not produced and then subsequently were produced that you

4     assert were intentionally withheld and turned out to be

5     favorable to and important for your case?

6          MR. KAPSHANDY:  Absolutely.  We put a listing of

7     those, and I think the plaintiffs complain that it is only

8     several dozen, but frankly, none of the 5,500 that were

9     produced per the Court's order and after the Court's in camera

10    inspection were available for the depositions of the

11    legislative director, of Trita Parsi, of Babak Talebi himself.

12    And all of that time and depositions in the last three years

13    was wasted.  That is something that clearly could have been

14    discovered.  They gave various explanations, not under oath,

15    but here in open court under their obligations as officers of

16    the court and various inconsistent explanations that these

17    were located on heretofore unknown database and what we now

18    know after the fact they were on a machine that they had

19    avoided producing for imaging because it was an intern's

20    machine.

21          Another statement, clearly false under oath in the

22    interrogatory answers, was that the desktop that was produced

23    in lieu of the server at the very first imaging was the

24    desktop that Trita Parsi had been using for the last year and

25    a half, meaning from the beginning of 2009 until the middle of

1    2010, August 2010, in particular, was produced for imaging.

2    That was proven to be incorrect by their own computer

3    consultants.  That computer was not connected to the machine

4    when their independent computer consultant did an inventory

5    survey and found that machine was not connected to the

6    network, and as a result of the third imaging found that Trita

7    Parsi had stopped using that computer for any Outlook emails

8    or calendars in June of 2010, keeping in mind he lost his

9    laptop through this unfortunate incident in Norway, which had

10   never been backed up, in May of 2009.  He has now represented

11   to the Court and under oath that he has been using that

12   computer when the forensic imaging and his own computer

13   consultant show that if he had used it for Outlook, email, and

14   calendars, it was very limited and not certainly for the four

15   months before it was produced before the imaging.

16          THE COURT:  Your request on that with respect to a

17   sanction is for the entire cost of the sanctions motion?

18          MR. KAPSHANDY:  Well, that is based upon the whole

19   course of conduct, which is detailed and broken into five

20   different levels.  I'm just starting --

21          THE COURT:  Let's assume --

22          MR. KAPSHANDY:  -- it's under oath, but frankly it

23   should be sufficient for very severe sanctions of the Court's

24   choosing, be it the cost of the motion, dismissal, cost of

25   doing all the depositions without having the benefit of the

1    stuff that had been withheld.

2         THE COURT:  So if that were the only violation that I

3    have found, what kind of sanction would be appropriate?

4         MR. KAPSHANDY:  Well, it is not.  And frankly, the

5    third of the September interrogatory answers, the plaintiffs

6    attested that no Outlook calendar files could be found on the

7    server.  As the Court knows from the final and third imaging

8    by PWC, there were lots of Outlook PST, hundreds of Outlook

9    PST calendar entries on that.  So it proves a course of

10   conduct, saying anything, not only under oath, but in open

11   court, to avoid discovery that should have been answered,

12   frankly, early on in 2009, and we could have avoided most of

13   what we have been doing here for the last three years.

14        THE COURT:  All right.  Go ahead.

15        While we're on Parsi's computers, talk to me a little

16   bit about the meeting notes in the first book and the second

17   book.

18        MR. KAPSHANDY:  Well, as the Court is aware, that's

19   perhaps one of the secondary category of motions which is

20   pending and may not be necessary depending on the other

21   rulings, but it could be subsumed into this sanctions motion

22   because it evinces the very same pattern of conduct:  First,

23   don't produce it.  Then, when pressed, come up with various

24   excuses.  In the case of the meeting notes, he gave

25   alternative explanations such as he got rid of them, he

1    doesn't know where he had them or when he got rid of them, he

2    knows he doesn't have them, at least for the first book.  When

3    in comes to the second book, there are alternative --

4         THE COURT:  I thought the claim was that they were

5    lost with the stolen laptop.

6         MR. KAPSHANDY:  Well, no.  In the deposition, he

7    didn't specifically say -- I had asked him that, were they on

8    the laptop, and all he would say is he didn't know where they

9    were, he just didn't have them anymore.  And then when the new

10   book came out and it refers to not only the meetings mentioned

11   in the first book but additional meetings --

12        THE COURT:  Does it refer to additional meetings or

13   notes?

14        MR. KAPSHANDY:  Yes, it does.

15        THE COURT:  Or are all the references to ones that

16   were cited in the first book?

17        MR. KAPSHANDY:  No, it necessarily refers to

18   additional and new meetings, some of which he discusses in his

19   deposition just by virtue of the time period.  The other book

20   was written in 2007.  So any of the meetings in 2008, 2009,

21   2010, obviously, were not available in 2007.  But for those he

22   has different excuses such as now that this new journalist

23   privilege that he is invoking, as well as additional reasons,

24   one I believe of which is that it's after the discovery

25   cut-off so he shouldn't have to produce them.

1          THE COURT:  Right.  You don't believe it is after the

2     discovery cut-off as the discovery cut-off was framed; do you?

3          MR. KAPSHANDY:  Frankly, I think most of the meeting

4     notes that we're talking about are before the discovery

5     cut-off.  There are a couple that are after the discovery

6     cut-off was agreed to by the parties --

7          THE COURT:  The discovery cut-off we're dealing with

8     is what, May 2009?

9          MR. KAPSHANDY:  No.  No.  That was extended numerous

10    times.  I believe it was -- the last one was in December of

11    2010, but then the Court allowed limited discovery related to

12    discovery issues up until, I believe, May of 2011.

13         THE COURT:  All right.  And you don't believe that the

14    privilege claim would be an appropriate privilege claim?

15         MR. KAPSHANDY:  No, for the reasons stated in our

16    motion.

17         THE COURT:  All right.

18         MR. KAPSHANDY:  Frankly, I mean, the problem is that

19    he had these and, first of all, didn't produce them and then

20    denied their existence; and then when the book came out and he

21    was caught with his hand in the cookie jar, comes up with this

22    privilege and never produces the privilege log.  Again, that's

23    the same pattern we see with everything, be it emails,

24    calendar entries.  It's first, don't produce; then, deny it;

25    and then, when you get caught, come up with excuses including,

1    well, the Court or the defendant weren't clear enough in their

2    request, and that's how we've spent the last three years.

3           If the Court has any questions, I will be glad to go

4    through --

5           THE COURT:  Let me see if I have specific questions

6    that I want to ask you about.

7           First of all, on the server production issue, you

8    wound up having to do the imaging in stages as it turned out.

9    Is there a cost difference for that?  In other words, did it

10   wind up costing the defendant, the defense, more because of

11   the three rounds of imaging as opposed to doing it all at

12   once?

13          MR. KAPSHANDY:  Absolutely, because there is the time,

14   the hard drives.  I mean there would have been maybe

15   additional hard drives would have had to have been purchased

16   had it all been done at once, say had both servers and all the

17   computers been produced, but each time there is the time and

18   the effort to bring people out to do the analyses.  They're

19   almost exactly the same amount, so it is done three times

20   instead of just once.

21          THE COURT:  All right.  I want to ask you a couple of

22   questions about the calendar entries.  It seems to me that

23   there are certain things that it would be useful to hear from

24   you on.  For example, does this question about deleted

25   calendar entries, why do you think there was a responsibility

 1       to produce deleted calendar entries?  What discovery request

 2       do you rely on as capturing deleted calendar entries?

 3              MR. KAPSHANDY:  First of all --

 4              THE COURT:  If you ask for production of calendar

 5       entries, that doesn't necessarily, one would think, include

 6       that which is not a calendar entry, i.e., something that was

 7       deleted.

 8              MR. KAPSHANDY:  Right.  There is no dispute that

 9       certainly calendar entries can be deleted for legitimate

10       reasons.  The Court will recall that this all started when,

11       again, they didn't produce calendar entries, and then they had

12       various excuses and finally produced about three hundred

13       calendar entries, and then when they were facing the threat of

14       imaging, promised to produce -- and here is the kind of

15       discovery requests we were facing -- in a conference call with

16       the Court promised to produce complete unedited Outlook

17       calendars.  Now, perhaps, they should have involved their

18       forensic computer expert earlier on in their discovery in

19       terms of coming up with an agreed protocol for what is going

20       to be preserved, what is not going to be overwritten, what is

21       going to be produced, but they didn't, and they got themselves

22       in this situation where they took it upon themselves then to

23       produce Outlook, not Outlook PST native files, but the summary

24       of Excel, which removed a whole bunch of things, which of

25       course then only led to more questions.  Then the Court's

1    order framed the next part of the exercise which was the first

2    imaging as following standard protocol.  PWC just grabbed

3    whatever PSTs that they could.  Now, again, certain calendar

4    entries can be deleted for legitimate reasons.  What,

5    obviously, was being looked for, given the first two efforts

6    to avoid producing calendars, which I think I would concede

7    that had they initially produced calendars and said here's all

8    of the calendar entries, defendant wouldn't have an argument

9    that deleted calendar entries --

10           THE COURT:  I understand deletions that might have

11   taken place after there should have been a litigation hold --

12           MR. KAPSHANDY:  Right.

13           THE COURT:  -- but if you asked for production of

14   calendar entries, does that include calendar entries that were

15   earlier deleted?

16           MR. KAPSHANDY:  Not before the litigation hold,

17   certainly, and all the ones that we're looking at here are

18   deleted after the litigation hold.  Nothing --

19           THE COURT:  So when we talk about these 4159 deleted

20   calendar entries --

21           MR. KAPSHANDY:  Right.

22           THE COURT:  -- you know what I'm referring to?  And

23   plaintiff has given an explanation for those.  How many do you

24   think they haven't come up with a sufficient explanation for?

25           MR. KAPSHANDY:  One does the math, and it is stated in

1    the response, there is still over a thousand that --

2            THE COURT:  Well, your view is 1,300, their view is

3    around 300, and it seems to me that that difference is

4    explained by a thousand that were, according to them, deleted

5    calendar entries.

6            MR. KAPSHANDY:  I don't believe so, but we state there

7    how we do the math; and unfortunately, because there aren't

8    back-up tapes and you don't have snapshots at different points

9    in time, one can't tell if these were deleted for legitimate

10   reasons.  And one of the reasons there are so many, as they

11   point out, there's double and triple counted because entries

12   are on several people's calendars, they moved machines, they

13   were moved for production, and that's why the numbers appear

14   so large.

15           THE COURT:  Right.  So with respect to calendar

16   entries, refer me, if you will, to the examples that you think

17   are the most powerful examples of any deletions done in bad

18   faith, deletions or non-productions that are in bad faith.  I

19   mean, we got all this Christmas 2009 stuff.  We've got deleted

20   calendar entries in general.  What is it that you think is or

21   are the best examples of bad faith by the plaintiffs?  And

22   I'll include in that, if you want to, the lack of calendar

23   entries in the middle portion of 2006 on any computer used by

24   Mr. Paris.

25           MR. KAPSHANDY:  Well, certainly, as the Court points

1    out, and the plaintiffs have no explanation for the mysterious

2    initial appearance and then disappearance of the Christmas

3    weekend 2009 entries from Eric Belfrage, Puneet Talwar on the

4    computers from Babak Talebi's gmail, personal gmail account.

5         THE COURT:  Well, some of that is the Belfrage and

6    Talwar entries that were added.  Why would they in bad faith

7    have added that?  That can't be something that was done in bad

8    faith; can it?  There would be no reason, there is no

9    advantage to them from that.

10        MR. KAPSHANDY:  Well, the fact that they're doing some

11   sort of editing to calendar entries before they're being

12   produced is the issue, the notion that one would even try to

13   do that other than simply -- with the assistance of a computer

14   consultant who is an expert in e-discovery say this is how you

15   do stuff so you don't face these allegations of editing,

16   altering, or deleting --

17        THE COURT:  So you think maybe adding a couple was

18   just to mask the fact that they were deleting others?  Some of

19   the deletions in that time period occurred all at the same

20   time.  There were 18 on Parsi's calendar at the same time.

21   There were 12 on Elliott's calendar at the same time, and then

22   9 on Blout's calendar at the same time.  That doesn't sound

23   like a bad faith specific decision making and action to delete

24   things; it sounds like something that would have been sort of

25   just much more automatic happening.  I don't understand why

1    you would point to that as being bad faith.  I don't see it.

2    I don't see the factual basis for that being a bad faith

3    exercise.  It may have been -- it may still be a little

4    mysterious.  It may certainly have been -- well, I'll not put

5    a characterization on it.  Why is it bad faith?

6          MR. KAPSHANDY:  Well, again, I think they're trying to

7    edit them, maybe they screwed it up, they were trying to get

8    rid of them and move them, but the fact --

9          THE COURT:  You know, just the way you describe it, it

10   comes up a little bit short of my being able to find bad faith

11   when you say maybe they were doing this, maybe they were doing

12   that.

13         MR. KAPSHANDY:  Well, but their explanation is, is

14   that by the process of producing these, they were all edited

15   on Christmas weekend 2009, but in fact only a third of them

16   was, so that explanation doesn't hold water.  Obviously, we

17   weren't there.  We don't know what happened.  They can't

18   explain it.  A similar effort we see with -- and they admit

19   this -- with the term "lobbying" on Patrick Disney's

20   calendars, those are changed to "legislative direct" after

21   they have been ordered to produce these.

22         THE COURT:  Well, they say that this most likely was

23   just Disney trying to change the category tag in the future

24   but somehow accidently it re-categorized past events also.

25         MR. KAPSHANDY:  Well, with a litigation hold, he

—50—

1    shouldn't have been doing any editing to the --

2           THE COURT:  Let's assume you're right that he

3    shouldn't have been, but how does it make the leap to being

4    bad faith?

5           MR. KAPSHANDY:  Well, we have a lawsuit where they're

6    accused of being lobbyists.  At that time, Patrick Disney has

7    written a memo saying I think we're violating the Lobbying

8    Disclosure Act.  Now, we've been ordered to turn over our

9    calendars, and they say, oh my goodness, there is this word

10   "lobbying" in our calendars.  They can say we were only trying

11   to change them prospectively, but that is not a good thing to

12   be doing when you have a litigation hold in place.

13          THE COURT:  So you raise the question whether Disney

14   was doing that to protect himself?

15          MR. KAPSHANDY:  I don't know who was involved.

16   Obviously, we weren't there.  They admit they were trying to

17   change the terminology before they produced these, and their

18   defense is we screwed up and we accidently changed some

19   retrospectively.  That's a not-very-good story to tell.

20   Whether it is true or not, how do we know now?

21          THE COURT:  So what is your explanation for the

22   April to September 2006 lack of calendar entries for

23   Mr. Parsi --

24          MR. KAPSHANDY:  Well, we don't know, and it's a

25   puzzling development that he has hundreds of calendar entries

1    before and after this five-month period when he is very

2    active.  We know he's communicating with the Iranian

3    ambassador.  He's involved in the second release of the "Grand

4    Bargain" publication or memo, which has apparently some

5    efforts to influence policy, and I mean it's suspicious.  All

6    they can say is -- they had alternative explanations -- he was

7    a busy student, but they have no explanation for it.

8            THE COURT:  What do you do with the fact that -- not

9    on that issue, but on most of these others -- that you

10   actually had through discovery, many -- indeed perhaps most --

11   of these entries from other people's calendars?

12           MR. KAPSHANDY:  Not from Trita Parsi from 2006.

13           THE COURT:  Setting that aside --

14           MR. KAPSHANDY:  Right.

15           THE COURT:  -- with respect to these other instances,

16   it was a pretty poor effort -- if you think it was an effort

17   to intentionally prevent you from obtaining that material, it

18   was a pretty poor effort since other calendars you were

19   getting were giving you those exact entries.

20           MR. KAPSHANDY:  Frankly, that's a terrible defense --

21           THE COURT:  It's not the best defense in the world,

22   but is it true?

23           MR. KAPSHANDY:  Not really because keep in mind it

24   wasn't until the third attempt to get these after they

25   produced the December 2009 calendars, the May 2010 calendars

1 that we get these through the imaging and then find out that,

2 you know, many of them may have been copied on say a second or

3 third machine or on somebody else's calendar.  But the point

4 is that's after all of the depositions except for one of Trita

5 Parsi's.  So we didn't have these when we were deposing the

6 legislative director twice; and if the effort was to stall and

7 prevent defendant from having these when he needed them, then

8 they were successful.  Whether their efforts were bumbled and

9 clumsy, it is not a terribly good defense to say, well, you

10 eventually got them through your own persistence and our

11 inability to completely cover our tracks.

12    THE COURT:  On Parsi's second deposition, did you use

13 documents that were not available to you at the time of the

14 first deposition?

15    MR. KAPSHANDY:  Yes, and there were

16 quite -- because that's --

17    THE COURT:  What kinds of documents --

18    MR. KAPSHANDY:  Well, that's where the questions were

19 asked about how lobbying got changed to legislative directed

20 and color codes, and for a lot of these, he said, well, it was

21 Excel's fault, when you exported it to Excel you lose that.

22 So we spent most of our time trying to understand the

23 questions about the methodology because he was the one who was

24 most responsible for the production.  For example --

25    THE COURT:  If I can use broad categories, that was

1    more questioning relating to the discovery and problems that

2    had occurred during the course of the discovery, and you had

3    additional documents that enabled you to ask those questions

4    than it was questions relating to the merits of the case, in

5    other words, the claims of defamation themselves.

6         MR. KAPSHANDY:  Right.  Unfortunately, the clock ran

7    out on us, and by the time we got into logging those things on

8    top of the emails we didn't have, so it is consistent with the

9    theme here, much of the time in his deposition and in our

10   discovery is related to trying to figure out what wasn't

11   produced and why not, which is an unfortunate diversion.

12        THE COURT:  All right.  Now, thinking of this in terms

13   of the ultimate sanction of dismissal that you request, tell

14   me what the best two or three arguments you have in favor of

15   dismissal are.  What is the prejudice that you rely on in

16   asking for dismissal?

17        MR. KAPSHANDY:  Well, aside from the level of the

18   conduct, which involves dishonesty under oath and in open

19   court, the consistent pattern has added tremendously to the

20   burden on the Court and the defendant in terms of the expense

21   of litigation, necessitating, one would have to agree,

22   imaging, which confirmed very important things, such as

23   hundreds of Talebi calendar entries, thousands of Talebi

24   emails were not produced until, in the case of Talebi's

25   emails, after every single deposition in this case, including

1    all three of their experts and except I think for the last

2    several hours of Trita Parsi's deposition.  That would have

3    totally changed the -- I mean, those depositions were a waste

4    of time.  Had we had those during those depositions when

5    people are taking these depositions, we could have confronted

6    them with actual documents because they frequently said, well,

7    I don't know or I don't remember --

8              THE COURT:  You've been precluded from doing that, you

9    haven't been able to retake those depositions?

10             MR. KAPSHANDY:  Right.

11             THE COURT:  So you have ultimately been precluded from

12   examining certain witnesses with respect to these documents.

13   And who are the witnesses?

14             MR. KAPSHANDY:  There are three experts:  Aikat,

15   Morse, and Colonel Gardiner, who --

16             THE COURT:  So you later acquired documents through

17   discovery that you didn't have earlier on?

18             MR. KAPSHANDY:  Many.  Calendar entries, Talebi

19   emails.

20             THE COURT:  And were unable to confront their experts

21   during depositions with those materials?

22             MR. KAPSHANDY:  Right.  And you have the legislative

23   director twice, Emily Blout.  Then you have Patrick Disney,

24   her successor --

25             THE COURT:  But you deposed her the second time, so

1    you were able to confront her with the materials the second

2    time.

3            MR. KAPSHANDY:  What we had the second time were the

4    limited Outlook Express April 2010 production, which then we

5    know from the PWC imaging included a lot of additional things

6    that we didn't have, including all the metadata that would

7    have been nice to examine her on, didn't have any of the --

8            THE COURT:  For purposes of the merits as opposed

9    to --

10           MR. KAPSHANDY:  The merits, absolutely.

11           THE COURT:  So you think that you were precluded from

12   examining her on merits-related issues?

13           MR. KAPSHANDY:  Right.  Because we spent a lot of time

14   at her deposition on the issue of lobbying, how much time she

15   was spending doing what.  We didn't have the details of the

16   calendar issues we got from the imaging.

17           THE COURT:  Did she deny that she was lobbying?

18           MR. KAPSHANDY:  Pardon?

19           THE COURT:  Did she deny that she was lobbying?

20           MR. KAPSHANDY:  She didn't know what lobbying was, but

21   whatever it was, she spent less than 20 percent of her time

22   doing it.  That was her answer repeatedly.  Therefore, it

23   would have been nice to confront her with the calendars and go

24   through and set forth how much time you spent on this, this,

25   and this activity with her emails, with Talebi's emails.

1       Interestingly, Talebi produced hundreds, I think nearly a

2       thousand emails, over a thousand, between himself and her,

3       Trita Parsi, that we didn't have for either of their

4       depositions and weren't produced by NAIC directly.

5               THE COURT:  All right.  Anything else in response to

6       that question?

7               MR. KAPSHANDY:  Well, in terms of the depositions, and

8       there were -- I think in total there were a dozen depositions

9       and there were other people, too, including David Elliott, one

10      of the board members, and then there was, of course, Babak

11      Talebi, who we had none of the emails for, Mohammad Mansouri,

12      who interestingly we haven't addressed it here, one of the

13      things that they told the Court in open court is that they had

14      no access to outside storage of email, but mysteriously they

15      produced three dozen of Mohammad Mansouri's emails from the

16      internet service provider's emails going back several years.

17      They have not done that.  They have not come up with an

18      explanation as to how they could do that for him but none of

19      their other employees when they denied anything such existed.

20      So, frankly, all of these depositions were totally undercut

21      and a complete waste of time.  For the last three and a half

22      years, unfortunately, we spent our time on these discovery

23      diversions, and I don't think at this point we say, okay,

24      we're going to start over fresh and have a do-over.  They have

25      had plenty of opportunities.  The Court has given them plenty

1    of opportunities.

2              THE COURT:  I'm not pointing to the starting over --

3              MR. KAPSHANDY:  No, and the prejudice is clear, so the

4    only alternative is a combination of monetary sanctions to

5    recompense the defendant for all of this unnecessary work

6    together with a motion to dismiss, although frankly on the

7    merits it doesn't sound like that's going to be much of a

8    prejudice to them anyways.  But the Court is the ultimate

9    arbiter of that.

10             Thank you.

11             THE COURT:  All right.  Thank you.

12             Mr. Pishevar.

13             MR. PISHEVAR:  Thank you, Your Honor.

14             Your Honor, with respect to the book notes issue,

15   Mr. Mohammadi is going to address that.  I'm going to address

16   the omnibus motion.

17             I would start with the standard here, the burden of

18   proof under Shepard and Your Honor's ruling in *D'Onofrio* that

19   was discussed in the briefs is that the defendant has the

20   burden of proof to prove by clear and convincing evidence that

21   there was bad faith and discovery misconduct.  There was no

22   bad faith in this case.  They cannot prove that.  They

23   submitted --

24             THE COURT:  You think it was just a plain ol'

25   sloppiness and the problems that occur with electronic

1    discovery in every case?

2              MR. PISHEVAR:  Your Honor, given what we were faced

3    with, thousands of emails, hundreds of subpoenas, at every

4    turn --

5              THE COURT:  Hundreds of subpoenas, did you say?

6              MR. PISHEVAR:  Hundreds of subpoenas.  They subpoenaed

7    everybody and their grandmother in this case, Your Honor,

8    everybody, in an effort to embarrass every contact, every

9    donor, membership.  I mean, this was at a level and at a tenor

10   that I haven't seen in twenty years of practice.

11             THE COURT:  To the extent that subpoenas were filed to

12   other parties, third parties, that wasn't a burden on you; was

13   it?

14             MR. PISHEVAR:  No, but we had to bird-dog getting what

15   they were getting and finding out what was going on and do we

16   have an objection, can we file a motion to quash.  At every

17   turn, they had us running and accusing us of dark motives at

18   every opportunity they had.

19             THE COURT:  What is the explanation, for example, for

20   the CNAPI emails or the Children of Persia emails or the

21   Monique Pelvor emails or the Hillary Mann Leverett emails, or

22   Joel Morse's emails or Samuel Gardiner's emails?  What's the

23   explanation for why they got emails from them involving Parsi

24   and NAIC but they didn't get those emails from Parsi and NAIC?

25   What is the explanation for that?

1          MR. PISHEVAR:  Well, Your Honor, we addressed it in

2     the brief.  There may be technical explanations for it.  They

3     have a --

4          THE COURT:  You say, "there may be," but do you have

5     any?

6          MR. PISHEVAR:  We spent thousands of attorney hours in

7     this case over the last four years, thousands.  This is a

8     small organization.  They spent thousands of staff hours

9     pursuing this discovery.  It was in good faith.  We did the

10    best we could, and I think it was reasonable under Rule 26.

11    One of the things that they say to the Court in one of their

12    briefs is -- well, first of all, they say that -- there's

13    nowhere in the rule, I read in one of the --

14         THE COURT:  With respect to the third-party emails

15    that I just mentioned, that litany of six or seven, is it your

16    position that those didn't exist in NAIC's and Parsi's

17    coffers?

18         MR. PISHEVAR:  What we could find based on our effort,

19    which was diligent, and that's what's required, reasonable

20    effort under the rules, we gave them, but there was more

21    sunshine, more rocks overturned in this case than you can

22    shake a stick at.

23         THE COURT:  That may be true.  That is not necessarily

24    a good analogy for you, but that may be true.

25         MR. PISHEVAR:  I understand that.

1    THE COURT:  And while we're on this kind of question,

2  what about this external server issue and Mohammad Mansouri's

3  emails?  Didn't they come -- I mean, you said that you located

4  some of those emails from the external server.  Why not other

5  emails, as well?

6    MR. PISHEVAR:  Well, there may be technical

7  explanations.  For example --

8    THE COURT:  Was there an external server that they

9  were located on?

10    MR. PISHEVAR:  There was discussion about server.

11  There was no Microsoft exchange server.  There was third-party

12  servers with respect to the sales force, the Convio, things

13  like that, but what we had control over -- and they

14  obtained -- all the third-party emails they have, and really

15  there's -- after all this --

16    THE COURT:  Well, they have, but either they got them

17  from the third parties, not from you, and third-party emails

18  means that they're emails between the plaintiffs and third

19  parties, they only got them from one side, from the third

20  party side; and with respect to the Mansouri emails that came

21  from this external server, I don't understand why other emails

22  wouldn't have been on there, as well, to be produced.  I

23  haven't heard any explanation.

24    MR. PISHEVAR:  We have an expert who can explain it

25  better than I can because I'm not computer savvy.

1          I'm handed a note.  The emails were --

2          THE COURT:  If you need a second to talk to Mr. Parsi,

3     please do so.

4          MR. PISHEVAR:  The Mansouri emails, Your Honor, they

5     were on a gmail.  They obtained what they could from the

6     service provider.  They have limited control over third

7     parties.  As I said, what we could get we did get.  And again,

8     the standard is bad faith.  They attach -- I would like to

9     draw the Court's attention to the PWC, PricewaterhouseCoopers'

10    reports under Exhibit A and Exhibit XX of their filings, and

11    it's basically a data dump, and they say themselves there's no

12    dates attributed, there is no explanations for what it is.

13         If I could just -- what I do understand is their cover

14    letter explaining it, which is not signed, there is no

15    affidavit, anything from Pricewaterhouse, but they say, "Our

16    services" -- I'm quoting -- "Our services were performed and

17    this report was developed in accordance with our engagement

18    letter."  So they're doing something in accordance with a

19    document that we don't have, it is not attached as an exhibit,

20    as far as I can see.

21         In the second paragraph, they say, "We are providing

22    no opinion, attestation, or other form of assurance with

23    respect to our work, and we do not verify and audit

24    information provided to us."  In the third paragraph,

25    "Accordingly, changes in circumstances after this date could

1    affect findings outlined in this report," and then finally in

2    the bottom of the fourth paragraph, "This information" --

3    talking about their own report that they have submitted to

4    Your Honor, and they're asking for extraordinary sanctions --

5    "This information may not be relied upon by anyone other than

6    Sidney Austin.

7            There is no -- they were required to have clear and

8    convincing evidence of bad faith.  This is not evidence.  It

9    is disclaiming itself from being evidence.  It is not an

10   attestation.  It is not signed.  And they're saying, we can't

11   verify our work, don't rely on it.  So that collapses just on

12   that basis.

13           We go back to one of the most egregious examples is

14   they -- on March 20th, they told the Court there were items

15   that were not produced.  We find out later they were produced.

16   And none of those items were subject to their motion.  So

17   who's doing the misrepresenting to get us to where we are?

18   They're not perfect.  They misrepresented to the Court its own

19   ruling in *D'Onofrio*.

20           THE COURT:  Is this an example of the best defense is

21   a good offense?

22           MR. PISHEVAR:  Your Honor, if they are expecting

23   perfection, then let's look at what they've done.  They sent

24   an email to my client -- that's not perfect -- saying send all

25   the discovery out to Eli Lake of *The Washington Times*.  That's

1     not perfection.  They misquote your order saying that you

2     imposed sanctions of a million dollars in the *D'Onofrio* case.

3     They say that at the end of their -- you didn't -- you would

4     know if you did that.  I did not see that.  Maybe I missed

5     that, but I did not see that.  I read the opinion.  They say

6     that Rule 26, in another place, does not take into

7     consideration the resources of the parties.  A poor person has

8     the same duty, has to go hire Pricewaterhouse, as a rich

9     person.  That is not true.  Rule 26, it is right there in the

10    rule, not to mention in *Zubulake* and other places.  But Rule

11    26(b)(2)(C)(iii), there's five items to consider, the

12    need -- these items they're requesting they didn't even use in

13    their motion for summary judgment, some of the things he was

14    discussing.  Other sources, well, talk about other sources, we

15    have testimony with respect to lobbying.  Even after I

16    challenged them to come up with a percentage, we have a tax

17    return that says we're allowed to do 20 percent or less

18    lobbying, it's legal.  They have been -- this litigation has

19    become how much lobbying that they want, percentage of

20    lobbying.  None of that appears anywhere.

21            THE COURT:  It seems to me you're trying to take me a

22    little bit off course with respect to what the motion is.  The

23    motion is a sanctions motion against the plaintiffs.  Now, you

24    may have a point that defense hasn't been perfect here.  You

25    may have a point that they have made some errors.  I'm not

1    sure that that is the basis upon which I can resolve the

2    sanctions motion against your client.  So let's talk about

3    some of the specifics that the defense relies on with respect

4    to calendar entries or these other things, and then give me

5    why you think they're not entitled to any kinds of sanctions,

6    be they just economic sanctions or something more severe in

7    terms of dismissal or presumptions.

8            MR. PISHEVAR:  We were given an order, a protocol, go

9    to Outlook -- this is what we understood -- go to Outlook,

10   export the calendar entries.  We did that.  PST files, as Your

11   Honor -- I remember you couldn't open the disk that we

12   provided at one point -- it is a PST file.  It's not

13   accessible.  Under Rule 26(b)(2), non-accessible files are not

14   required to be produced.

15           THE COURT:  What do you mean by inaccessible?

16           MR. PISHEVAR:  It needs the software.  You need to

17   connect it to something.  It is not connected.

18           THE COURT:  So you had calendar entries --

19           MR. PISHEVAR:  That we didn't know about.

20           THE COURT:  You had calendar entries that were on

21   these inactive PST files, and your position is you didn't know

22   about them and that's why they were produced late because they

23   were inaccessible to NAIC's custodians?

24           MR. PISHEVAR:  That's correct, and it is detailed in

25   Mr. Hirschfield's affidavit under oath that he did submit,

1    unlike PricewaterhouseCoopers', that explains itself.

2         THE COURT:  What does inaccessible mean?

3         MR. PISHEVAR:  Under Rule 26, it means you --

4         THE COURT:  What did you mean when you said they were

5    inaccessible?

6         MR. PISHEVAR:  He can explain it much better than I

7    can.  I read *Technology For Dummies*, and I still don't

8    understand this stuff.  It is not something where you go to

9    Outlook and you hit "export everything."  It's not there.

10   It's lurking somewhere underneath.  You need to connect it.

11   You need to hire Pricewaterhouse.  I mean, I don't know.  But

12   it is not something that is not unduly burdensome or right

13   there in front of you where you should see what's there to be

14   seen.  It's not.  We did what we had to.  We acted in good

15   faith.  We gave them more discovery than you can imagine.  I

16   mean tens of thousands is an understatement of things they

17   have.

18        THE COURT:  Well, let's --

19        MR. PISHEVAR:  And duty --

20        THE COURT:  Let's talk about a couple of other things.

21   You say at one point that -- I take that back.  PWC says that

22   there were 1,445 emails or entries out of these 17,000 entries

23   that were modified on Christmas Eve Day 2009.

24        MR. PISHEVAR:  Mr. Hirschfield provided an affidavit

25   that discusses -- for example, 11 innocuous things -- normal

1   things that happen in the ordinary course that can cause a

2   modification.  PWC also --

3           THE COURT:  One of the explanations given was that

4   over a thousand of the documents were duplicates that came

5   from multiple copies of the same PST files that were extracted

6   from different custodians' computers.  What does that mean?

7           MR. PISHEVAR:  Can Mr. Hirschfield answer that?  He

8   can explain that.  I can mimic what was said in the brief, but

9   it's detailed there, but Mr. Hirschfield can flesh out what

10  that means.

11          MR. KAPSHANDY:  I would have an objection to that,

12  Your Honor.  May I be heard?

13          THE COURT:  Sure, for two seconds.  I know what your

14  objection is, but go ahead.

15          MR. KAPSHANDY:  Well, I have a problem with a factual

16  and an expert witness now becoming counsel in the case, and he

17  is an attorney, he has not entered an appearance.  We have not

18  had a chance to cross-examine it.  He actually, supposedly,

19  crawled through their offices and determined what computers

20  they had and didn't have and gives contradictory testimony to

21  the list that counsel provided in Court.  He actually has

22  discovered that one of the computers that they said they had

23  is now missing.  I have all sorts of questions about that.  I

24  don't want to be put in the position of having to

25  cross-examine a lawyer in the case.

1          THE COURT:  I think I'm just going to hear from

2     counsel, the counsel in the case.  If you can't give me --

3          MR. PISHEVAR:  May I confer?

4          THE COURT:  Go ahead.

5          MR. PISHEVAR:  Most of that went over my head, but

6     apparently what I'm understanding is that the date modified

7     issue created by them asking us to export the items, so when

8     you export that, date modified field changes.  That's what I

9     understand.

10          THE COURT:  Let me ask you a couple of other questions

11     and see if you're in a position to answer them.  Very

12     specifically, there was a January 21st, 2009 event, a CNAPI

13     event that was not produced with respect to several

14     individuals, Elliott and Talebi, and Disney.  There may have

15     been some confusion over dates and other issues with respect

16     to Disney's calendar.  Do you have an explanation for why that

17     event wasn't produced for those three custodians?

18          MR. PISHEVAR:  Which particular item are you referring

19     to?

20          THE COURT:  The January 21st, 2009 CNAPI event.

21          I'll go on to another question.

22          MR. PISHEVAR:  Okay.

23          THE COURT:  When the search or the review of Talebi's

24     8,000 emails was done to determine which were responsive, do

25     you know what search terms were used?

1          MR. PISHEVAR:  We used the search term -- I know this

2   because my office basically came to a halt while we were doing

3   that for a couple of weeks, maybe 10 days.  We hired a doc

4   review person, Andres Casetto (phonetic), to come and help us

5   do the doc review of these numerous documents in our law firm.

6   We used a protocol that we've explained in the brief.  But we

7   used the search terms that were provided to us by the

8   defendant.

9          THE COURT:  Did you use Blout or Parsi?

10          MR. PISHEVAR:  I'm sorry?

11          THE COURT:  Did you use the search terms Blout or

12   Parsi?

13          MR. PISHEVAR:  I'm not sure the exact search terms.

14          THE COURT:  You've explained or attempted to explain

15   that you didn't use the search term Talebi or NAIC because

16   that would produce everything, basically.  But did you use the

17   search term Blout or Parsi?

18          MR. PISHEVAR:  Yes.

19          THE COURT:  You did?

20          MR. PISHEVAR:  Yes.

21          THE COURT:  Okay.  Let's see if that is something that

22   the defense agrees to, but I think that they are of the view

23   that you did not use those search terms.

24          MR. PISHEVAR:  We went through all the emails --

25          THE COURT:  When you --

1          MR. PISHEVAR:  -- one by one --

2          THE COURT:  -- went through the 5,500 emails, Talebi

3     emails, did you do any kind of an individual review to

4     determine if any of those were responsive?

5          MR. PISHEVAR:  We went tediously through and we --

6          THE COURT:  Because it didn't take me much time or

7     effort to determine that there were responsive emails in

8     there.

9          MR. PISHEVAR:  I understand that.

10          THE COURT:  Did you undertake that effort?

11          MR. PISHEVAR:  We used the search term -- I think he

12     used the defendant's name or something like that.  It was one

13     of the -- was not one of the search terms.  We used the search

14     terms, and then we went individually, compared the question.

15     The duty -- an omission infers a duty to produce.  A duty to

16     produce is based on what was requested.  So we were given a

17     protocol.  We followed that protocol.  We spent hours and

18     hours on it, three or four staff attorneys.  An extra person

19     was brought in, as I said.  Hundreds of hours were expended,

20     and we ultimately produced every one of those emails.  So they

21     got all 8,000 emails.  Was it perfect?  No.  Was it in bad

22     faith --

23          THE COURT:  Ultimately, it was only because of a

24     motion that was filed to compel you to do so.

25          MR. PISHEVAR:  But it was not because of our bad

1    faith.  We really worked diligently to produce what was

2    required.

3                THE COURT:  Now, let's switch to Mr. Parsi's

4    computers.  There's a laptop that you claim was stolen in

5    Norway.  Is your claim -- is it true that your claim is also

6    that that computer had never been -- the information on that

7    computer had never been backed up?

8                MR. PISHEVAR:  I believe that's true.  There's a

9    police report that it was stolen.  Not only was --

10               THE COURT:  I understand that.  I'm talking about any

11   backup having been done.

12               Now, there was a litigation hold in place, right --

13               MR. PISHEVAR:  Yes.

14               THE COURT:  -- at the time that that happened?

15               MR. PISHEVAR:  The lawsuit was filed, yes.

16               THE COURT:  But no instruction was ever given to

17   Mr. Parsi on the importance of preserving data on that

18   computer by backing it up or otherwise?

19               MR. PISHEVAR:  Absent third-party intentional theft,

20   it was available.  I mean, it was on the laptop, and it was

21   stolen, and he has no control over that.  It is certainly not

22   bad faith.

23               THE COURT:  All right.  What's your response -- I

24   guess I will save that for Mr. Mohammadi because you said he

25   was going to address the first book, second book notes issue.

1           Let me walk you through this.  There is some evidence

2      that has been presented that Mr. Parsi didn't use his NAIC

3      desktop after August 2010 and maybe not for some period before

4      then.  How do you explain the fact that the scan, the registry

5      scan by PWC, showed that Mr. Parsi stopped using the desktop

6      in August 2010 but he attested that he stopped using it in

7      November 2010?

8           MR. PISHEVAR:  They asked him at the deposition.  He

9      said somewhere around that time I stopped using it, he stopped

10     using the computer, and that's the only explanation there.  I

11     mean he stopped using it.  He gave an approximate time frame

12     for it.

13          THE COURT:  All right.  How do you explain the fact

14     that he claimed to be using a NAIC desktop back in 2009 but

15     that wasn't actually connected to the network?

16          MR. PISHEVAR:  Apparently the computer kept getting

17     disconnected.  That's why they had gotten a guy to come in to

18     try to fix the problem, but the computer apparently just

19     disconnected itself.

20          THE COURT:  This is even though NAIC IT consultant,

21     Mr. Kushner, has said under oath that at no time during the

22     project was his organization informed by NAIC that it was

23     experiencing any problems with Mr. Parsi's desktop falling off

24     the network or becoming disconnected?

25          MR. PISHEVAR:  Mr. Kushner never came to the office.

—72—

1    They sent a different person to come.  They looked at it and

2    said you've got to redo the whole network to fix the problem.

3    Maybe there was some miscommunication there, but that's what

4    occurred.

5         THE COURT:  All right.  After August 2010, what

6    computer was Mr. Parsi using for NAIC emails and calendar

7    entries?

8         MR. PISHEVAR:  After what date, Your Honor?

9         THE COURT:  August 2010.

10        MR. PISHEVAR:  The new laptop that he was --

11        THE COURT:  The new laptop, what does that mean?  The

12   stolen laptop?

13        MR. PISHEVAR:  It had to be replaced.

14        THE COURT:  The Mac?

15        MR. PARSI:  Can I speak?

16        THE COURT:  No.  You can talk through counsel.

17        There has been a statement made in this litigation

18   that he was not using the MacBook for those functions, for

19   NAIC emails and calendar entries, even though it was connected

20   to the NAIC network.  So is that what you're saying, or are

21   you saying something inconsistent with that?

22        MR. PISHEVAR:  There was a new Outlook thing that he

23   didn't understand or didn't like, so he was using his

24   Blackberry for the calendar functions.

25        THE COURT:  What about for emails?

—73—

1    MR. PISHEVAR:  He was using the laptop for emails,

2    also.

3    THE COURT:  He what?

4    MR. PISHEVAR:  He was using the laptop for emails.

5    THE COURT:  All right.  Let's talk about the IIC

6    documents.

7    MR. PISHEVAR:  IIC, Your Honor, is a separate

8    organization.

9    THE COURT:  It is the predecessor organization to

10   NAIC, right?

11   MR. PISHEVAR:  I incorporated it back in 1997.  They

12   attached four versions of a document.  All four were produced.

13   If you're going to try to trick someone, why produce every

14   version?  And what's more, there's no evidence there.  There's

15   no metadata that they attached as to what date the document

16   was --

17   THE COURT:  Well, what's the explanation for why this

18   April of 2009 modification occurred?

19   MR. PISHEVAR:  We don't know the date of when, if any,

20   modification occurred.  There is no evidence to that effect.

21   There is no proof of that.  It is just a bold proffer by

22   defendant.

23   There are different versions of it.  Words were

24   exchanged.  We don't know when.  It could have been back in

25   the '90s.  We don't have the metadata.  Show us the metadata.

1     Mr. Hirschfield could find when, perhaps, the modification was

2     made or change was made.  Maybe they're different versions of

3     the same document, but I don't know why they didn't attach the

4     metadata if they were so confident over the date, and there is

5     no affidavit to that effect, so it's not evidence.  They need

6     clear and convincing evidence of bad faith.  We have four

7     different versions of a document that we produced.

8              THE COURT:  All right.

9              MR. PISHEVAR:  We have a lot of allegations and

10    confusion and, you know, perhaps, maybe, but no clear and

11    convincing evidence of bad faith, Your Honor.

12             THE COURT:  What else do you want to tell me,

13    Mr. Pishevar?

14             MR. PISHEVAR:  That, Your Honor, there were tons of

15    documents that were produced, more than -- above and beyond

16    what's called for under the rules.

17             THE COURT:  Several tons of the tons of documents were

18    only produced after painstaking efforts that required motions

19    to be filed and extra effort to be taken to get those

20    documents produced.  Wouldn't you agree with that?

21             MR. PISHEVAR:  Perhaps but I wouldn't say tons.

22    There's a lot of duplicates.

23             THE COURT:  Well, I just used the expression that you

24    used, which was tons, and I said some of those tons.

25             MR. PISHEVAR:  We can go through the details if we

1    can -- I'm sorry -- for clear and convincing evidence of bad

2    faith and prejudice and proportionality, I think we

3    would -- we did ask for an evidentiary hearing where our

4    experts would testify.  Our expert did testify.  There is

5    nothing nefarious, nothing bad faith, under oath.  They don't

6    have a counter to that.  They have a blank signature of a

7    document saying this is not evidence, and they attached it.

8    So I think their motion falls of its own weight.  It does not

9    contain evidence, which is required under Shepard and Your

10   Honor's own ruling that required -- that denied sanctions

11   based on lack of evidentiary hearing needed to prove what

12   needs to be proved under the principles espoused by the courts

13   of this circuit.

14         THE COURT:  All right.  One last substantive area of

15   questioning:  With respect to Mr. Parsi's calendar entries, we

16   have this gap in the April to September 2006 time period.  Do

17   you know what computer he was using during that time period?

18         MR. PISHEVAR:  He wasn't using that computer.

19         THE COURT:  That is not an answer to my question.  On

20   what computer were the pre-April 2006 calendar entries for

21   Mr. Parsi found?

22         MR. PISHEVAR:  I think he said he was using a

23   Blackberry.

24         THE COURT:  No, this is different.  In 2006 we're

25   talking about now.

1          MR. PISHEVAR:  He has no clue what computer he was

2     using.

3          THE COURT:  What computer was he using before

4     April 2006?  Because we have calendar entries with respect to

5     Mr. Parsi then.  What computer was he using prior to

6     April 2006?

7          MR. PISHEVAR:  There's several laptops that he went

8     through.  It would break, he would use another one.  He would

9     use the Blackberry to sync to the computer, and that's the

10    explanation.

11         THE COURT:  And were all of those searched and

12    everything produced from them?

13         MR. PISHEVAR:  Everything was searched that we could

14    think of that was requested.

15         THE COURT:  But we just have this approximately

16    six-month period that there's nothing there.

17         MR. PISHEVAR:  He wasn't using that particular device.

18    As I said, he was syncing his Blackberry and using different

19    computers.

20         THE COURT:  I don't know that there's been -- is there

21    evidence in the record that he was using the Blackberry during

22    that period for calendar entries?

23         MR. PISHEVAR:  I'm not sure, but he did use a

24    Blackberry.

25         THE COURT:  All right.  What else would you like to

—77—

1    tell me?

2          MR. PISHEVAR:  That they have the burden of proving by

3    clear and convincing evidence that bad faith existed.  Nothing

4    could be further from the truth.  And if the degree of labor

5    intensive, burdensome discovery that they demanded is the

6    standard -- and I'll quote Judge Facciola -- "Only the super

7    rich and the super poor are going to have access to the

8    federal courts."

9          THE COURT:  Thank you.

10         MR. PISHEVAR:  Thank you.

11         THE COURT:  Mr. Mohammadi.

12         MR. MOHAMMADI:  Thank you, Your Honor.

13         On this issue of the book notes, Dr. Parsi is on

14   record saying, for this second book, he did not begin research

15   on it until May -- at the earliest, May 2010, and there is no

16   contrary evidence to that.  So there is no reason to go back

17   and produce those notes that were not in existence at the time

18   of the supplementation agreement.  These notes, further, are

19   privileged.  That is under *Zerilli*.

20         THE COURT:  You really think *Zerilli* applies here?

21         MR. MOHAMMADI:  I do think it does apply.  Dr. Parsi

22   is a journalist, so there's a journalistic privilege right

23   there.

24         THE COURT:  But he is a party to this case.

25         MR. MOHAMMADI:  That's correct, but *Zerilli* says you

1    have to be a party defendant shielding -- trying to shield

2    yourself from liability.

3            THE COURT:  I would think it's equally true, maybe

4    even more true, if the journalist is the plaintiff in the case

5    affirmatively seeking relief.  He can't hide behind a

6    privilege.  What case do you cite for that proposition that a

7    journalist can bring a lawsuit and then hide behind a

8    privilege and say that the evidence relating to the libel

9    claim can't be explored?  There is no case that stands for

10   that proposition that I'm aware of.

11           MR. MOHAMMADI:  I think Your Honor is right that there

12   is no case that is factually similar; but in *Zerilli*, the

13   Court did say it is the journalist defendant shielding to hide

14   behind it to avoid liability.  This is not Dr. Parsi being on

15   trial.

16           THE COURT:  But here it is a journalist hiding behind

17   it in order to get money.

18           MR. MOHAMMADI:  That's not the same thing as saying

19   he's hiding behind it to not give out money.

20           THE COURT:  You're right, it is not the same thing,

21   but why in the world this is a distinction that makes a

22   difference?  Why should a journalist be able to do one but not

23   the other?

24           MR. MOHAMMADI:  Because he is not in trial here.  He

25   is not in trial for what he is saying.  The defendant is in

1    trial for what he is saying.  The privilege cannot be used to

2    defend yourself from liability.  That is what the privilege

3    says; not if you're a journalist you don't have that privilege

4    as long as you're a party.  This is not Dr. Parsi's trial.

5    This is the defendant's trial.  And the privilege is to

6    stop -- the exception to the privilege -- excuse me -- is to

7    stop the defendant from hiding behind it and avoiding

8    liability.

9         There are -- besides the privilege --

10        THE COURT:  You'll concede that the material would be

11   relevant, relevant to a defense of truth; right?  But your

12   claim is that it is privileged?

13        MR. MOHAMMADI:  It may be relevant --

14        THE COURT:  That's enough under Rule 26, anyway.

15        MR. MOHAMMADI:  Right.  It may be discoverable.  I

16   will admit to that.  It may be discoverable.  But there are

17   other reasons besides the privilege why these documents should

18   not be produced.  We're talking about interviews with third

19   parties regarding sensitive national security issues.

20        THE COURT:  Well, if you're going to rely on

21   confidentiality, I can put in place a protective order that

22   takes care of that.  I'm not sure where that's going to go.

23        MR. MOHAMMADI:  If it is -- if the motion is granted

24   and Dr. Parsi is ordered to produce those interview notes, we

25   would ask for confidentiality.  However, I would like to point

1      out a confidentiality order does not protect the third

2      parties.  They are not part of this proceeding.  They are not

3      part of this court order.  They're not part of whatever

4      agreement we reach.  It is simply between this Court,

5      Dr. Parsi, and the defendant.  The danger is not necessarily

6      just to Dr. Parsi.  We do say it is due to economic harm and

7      such, but the real danger is to those third parties whose

8      names and identities will be revealed who have given Dr. Parsi

9      under confidence background information about what is going on

10     that he promised he would not reveal, and part of the

11     reason he would not reveal --

12          THE COURT:  It seems to me you're just arguing there

13     is a privilege again, and I don't see how that applies here.

14          MR. MOHAMMADI:  Okay.  But like I stated, the third

15     parties would be harmed if --

16          THE COURT:  Not if there is a protective order in

17     place, they won't be.

18          MR. MOHAMMADI:  But if a protective order is violated,

19     they have no recourse.

20          THE COURT:  They certainly would have recourse.

21          MR. MOHAMMADI:  Not from the protective order.  They

22     might be able to file suit, but that is not the same as saying

23     the protective order protects them.  They're not part of the

24     protective order.  They are separate --

25          THE COURT:  I don't think that there would be no means

1        to impose sanctions for a violation of the protective order.

2        I would figure that I would have the ability to address a

3        violation of a protective order that I put in place.

4                MR. MOHAMMADI:  The other argument, Your Honor, is

5        that these notes all arose after the supplementation

6        agreement, and there has been waiver to request them.  The

7        defendant was aware that these notes existed at the time of

8        Dr. Parsi's deposition.  They asked about his book.  They did

9        not ask about the notes, and they did not request them until I

10       believe it was September of 2011, almost a year later.

11               THE COURT:  You may be right that you aren't required

12       to do any systemic or systematic review of post-May 2009

13       documents, but that doesn't mean that documents that are

14       identified are not discoverable.  There is nothing in my

15       orders that would make that material not discoverable.

16       Indeed, the order, the March 29th order, actually says that

17       the parties may not object to specific requests for production

18       on the ground that the requests for materials were created

19       after May 2009.

20               MR. MOHAMMADI:  That's correct, but there is the

21       waiver argument that even though the defendant was aware of

22       these documents, never requested them until the book was, not

23       released, but it was announced, almost a year later.

24               THE COURT:  I don't -- all right.  I understand what

25       your waiver argument is.  That doesn't mean I agree with it.

1          MR. MOHAMMADI:  Okay.  The last, I guess, point I want

2     to address is during the reply and what they call

3     pre-publication copy of the book was attached, and they placed

4     reliance on that book to say that there were interview notes,

5     interviews conducted in 2009, I think in our motion for

6     surreply, to respond to that, and --

7          THE COURT:  This is another motion for surreply?

8          MR. MOHAMMADI:  This is a motion to strike and, in the

9     alternative, for surreply.  But essentially the problem is the

10    defendant is relying on an unedited advanced copy of the book

11    that is replete with errors.  I have a copy of the book here.

12    This is the advanced uncorrected page proof-not for sale,

13    which is what they had.  On the cover, when it makes reference

14    to Dr. Parsi's previous book, the name of the book is spelled

15    wrong.  This is replete with errors just from looking at the

16    cover.

17         THE COURT:  All we're talking about here is discovery,

18    so that can all get played out.  I don't understand why that's

19    a reason that discovery isn't appropriate that they can't get

20    this information.  Indeed, it would seem to be a reason that

21    would say it is even more appropriate to get the information.

22         MR. MOHAMMADI:  It is, and the reason that's important

23    is because it is being cited as questioning Dr. Parsi's sworn

24    statements under oath that he did not conduct interviews until

25    May 2010.  They're directly putting that statement in question

1    by citing to this and saying, look, there are interview notes

2    in 2009.  So it may not go directly to the issue of discovery,

3    whether those notes are discoverable, but it is important in

4    terms of the allegations that are made that Dr. Parsi is not

5    being truthful and that he is hiding something there.

6          THE COURT:  All right.

7          MR. MOHAMMADI:  We would ask, Your Honor, that if the

8    Court grants their motion to compel that there would be a

9    confidentiality order to protect those third parties and, in

10   the alternative, if Your Honor would like, we can provide

11   those notes for in camera review to see whether they're

12   relevant and should even be produced.

13         THE COURT:  All right.  Thank you.

14         Mr. Kapshandy.

15         MR. KAPSHANDY:  Thank you, Your Honor.

16         Just to start in reverse order with the meeting notes,

17   Mr. Mohammadi complains that the defendant didn't specifically

18   ask for the meeting notes and documents relating to these

19   meetings, and it was broader than just meeting notes, because

20   Trita Parsi denied that such existed.  I guess perhaps he is

21   saying we shouldn't have believed him, and I couldn't argue

22   with that, but that's a really feeble argument.  These were

23   requested.  He denied at the deposition that he had any

24   documents or notes related to the meetings.  Then, when his

25   new book pre-publication came out, it references meetings both

1    before 2007 and after 2007, and then his answer is, well, you

2    shouldn't believe what is in the book because it is a

3    pre-publication copy.  If you read his declaration in

4    response, the published version still has the same error in

5    it.  What he says is the online version now has it corrected.

6    So the final published version still refers to the meeting

7    notes in 2008 and 2009.  Even if one interprets, as the Court

8    points out is probably over interpreted, the discovery

9    supplementation of 2010 not being a cut-off, there are meeting

10   notes and documents relating to 2008, 2009 meetings which have

11   not been produced because Trita Parsi denied that they existed

12   and now is changing the dates on those, and one would

13   certainly, given their conduct in this case, say that we're

14   entitled to look at those and verify exactly when those did

15   occur, who he was meeting with, what and when.

16          With regard to the sanctions, let's put aside PWC for

17   the moment and just deal with some very simple things.  The

18   very first thing the Court asked Mr. Pishevar about is what

19   about --

20          THE COURT:  Let me ask you one last question on the

21   meeting notes.  Looking at the footnotes in the second book,

22   does that give you any reason to believe that the notes for

23   the first book still exist?

24          MR. KAPSHANDY:  Well, literally, Mr. Parsi cites

25   directly the meetings with these individuals.  He doesn't cite

1    his book.  So one literally reading those would think he is

2    referring to those meetings.  His story is he threw those out,

3    he doesn't know when or where, so he's therefore relying on

4    his citation to the earlier book and not the meetings

5    themselves.

6              THE COURT:  Okay.

7              MR. KAPSHANDY:  With regard to the third-party

8    subpoenas, and the Court asked Mr. Pishevar, and I believe he

9    said they did some sort of exhaustive search or they turned

10   the office upside-down or whatever, but, I mean, we simply

11   have to look at the fact that Professor Morris was provided

12   168 emails by NAIC which were not produced to the defendant to

13   show the damage that he had suffered.  How could they

14   have -- maybe he missed a couple, you can understand that, but

15   168.  The same thing with their expert Colonel Gardiner.  He

16   produced hundreds of pages in response to the subpoenas, which

17   are emails to and from various people, in his case to opine

18   whether or not Trita Parsi was a lobbyist for the regime.

19   There is no doubt that they had those and that they were

20   discoverable.  They have no explanation as to how -- whatever

21   process they applied, that they weren't produced.  Same thing

22   with Mr. Mansouri, Dr. Mansouri.  They have no answer to how

23   it is that only his emails could be retrieved from -- it was

24   the internet service provider's server.  This is not an

25   exchange server.  Everybody agrees they don't have an exchange

1    server.  They have back-up servers or drives.  But they

2    managed to get Mohammad Mansuri's emails off of the internet

3    service provider's email server going back years, and this is

4    for a gentleman who hadn't worked for them for a period of

5    time, and the reason they did that is because he also had an

6    unfortunate incident where he lost or broke his computer and

7    threw it out.

8         With regard to the PWC imaging, first of all, they

9    have all of that data.  They have more access to it than PWC

10   did.  They could have done -- the hallmark of scientific

11   evidence is reliability and reproducibility.  They could have

12   had their expert run tests and come in and say, for example,

13   Trita Parsi did use his computer, and it was June 5th, 2010

14   for Outlook emails and calendar, but he didn't.  He doesn't

15   dispute that.  They rely upon boilerplate disclaimers at the

16   conference for various reasons and third-party duties, as the

17   Court may be familiar.  They have all of these.  They have all

18   the hard data and drives back and could have done any analyses

19   that they wanted.

20        The particular comment which I think, frankly, is a

21   real distortion that they didn't produce the metadata for the

22   date modified because it was inaccessible is really a stretch.

23   Frankly, if you open up any PST file, which we did the first

24   time they produced the calendars, you open it up in Outlook,

25   that is clearly accessible.  They purposely transported that

1    to Excel to eliminate that metadata file, very important

2    metadata.  Lots of others were not transported also, but that

3    one was key, and they did that on purpose; and for them to say

4    that was inaccessible is a real stretch of Rule 26 and the ESI

5    standards, including the Sedona report.  Keep in mind that

6    they do not respond to the very simple, plain, black-and-white

7    issue that they stood here and three times told this Court

8    that they didn't have a server, not a Microsoft exchange

9    server, but they didn't have a server.  Most recently they've

10   said, no, they actually had two servers and the Court should

11   have been more clear in defining what server they were

12   supposed to produce.  This is not an accidental

13   misunderstanding.  There is an easy way to deal with that.

14   They could have called us up, they could have called the Court

15   and asked, gee, which server do you mean.  They have taken

16   every opportunity to parse, to mislead, and to do everything

17   they can to avoid producing discoverable evidence for the

18   reasons that things like the third-party subpoenas and the

19   imaging show.  There was lots of stuff out there that they had

20   that they were withholding.  From the very beginning, when the

21   defendant produced more emails from this organization that had

22   been in existence for a dozen years with ten employees, you

23   have to say to yourself, something is different in the

24   approach that they used.  The Talebi emails are telling.  I

25   think we've learned here for the first time now that they

1    didn't apply the search terms, certainly of Parsi and Blout,

2    and the Court discovered that.  In fact, they attested under

3    oath that they applied exhaustive reprocessing and didn't find

4    responsive documents or any of the search terms.  Maybe the

5    search terms were too broad and should have been modified, but

6    that is not something you unilaterally do and then say under

7    oath that you did comply with the originally agreed search

8    terms.  You don't do it in that sort of underhanded,

9    under-the-radar manner with an obvious intent, and that is to

10   keep from producing stuff that was clearly discoverable and

11   relevant.  As the Court points out, the failure to back up the

12   laptop, the most important document in the case probably, for

13   at least two years after the suit was instituted, whether they

14   had a litigation hold or not, one's not clear because they

15   couldn't find it, which is a bit ironic, is beyond negligence,

16   and I doubt that their computer forensic ESI expert ever

17   advises his clients to do that when a case is instituted or

18   litigation is anticipated, to stop backing up or not back up

19   machines.

20          Today we're hearing now for the first time, also, as I

21   think the Court has sensed, that because Trita Parsi didn't

22   have, after June of 2010, a desktop, a laptop, which had been

23   stolen, an ability to do calendaring and emailing, which we

24   point out in our brief and now we're learning for the first

25   time that, well, he was using his Blackberry for emails, but

1    then he syncs it.  What is he syncing it with?  All that

2    should be somewhere.  Of course, the calendar is all part of

3    that.  But we're learning for the first time that he was using

4    the Apple MacBook for calendar entries or emails -- I'm not

5    sure which, I don't follow -- but we're just finding that out

6    for the first time.  Keep in mind they avoided producing that

7    MacBook because they said there's no Outlook, emails, or

8    calendar entries on it.  It's bait-and-switch, it's the shell

9    game, it's every sort of excuse they can think of except for

10   standing up and saying, you know, we made a mistake, as in

11   *D'Onofrio*, pay a king's ransom to make this right, and I

12   believe the opinion does refer to the fact that the party in

13   that case did spend a million dollars to re-create and locate

14   and try and find the files that had been altered, destroyed,

15   accidently deleted, whatever the standard was.  They did none

16   of that in this case, and they have no basis whatsoever now

17   for asking to avoid the sort of sanctions that are proposed in

18   *D'Onofrio*, let alone the *Victor Stanley* case, which is much

19   more analogous to this.

20           Thank you, Your Honor.

21           THE COURT:  Thank you.  Thank you, all.

22           I have the same amount of paper that I had when I

23   started, and I will take it all into account, in addition to

24   the arguments presented here today, and you'll be hearing from

25   me.

—90—

1            Anything further?

2            All right.  Thank you, all.

3            (Proceedings in the above-entitled matter concluded at

4     12:24 p.m.)

5

6

7            CERTIFICATE OF OFFICIAL COURT REPORTER

8

9            I, Patricia A. Kaneshiro-Miller, certify that the

10    foregoing is a correct transcript from the record of proceedings

11    in the above-entitled matter.

12

13

14    ----------------------------------     -------------------------

15    PATRICIA A. KANESHIRO-MILLER                  DATE

16

17

18

19

20

21

22

23

24

25

**$**

$25 [1] - 13:11

**'**

'90s [1] - 73:25
'Israel [1] - 7:13
'neocon' [1] - 7:17

**1**

1,300 [1] - 47:2
1,445 [1] - 65:22
10 [1] - 68:3
10-year [1] - 13:19
11 [1] - 65:25
12 [1] - 48:21
12:24 [1] - 90:4
13 [2] - 32:17, 34:18
168 [2] - 85:12, 85:15
17 [1] - 19:18
17,000 [1] - 65:22
18 [1] - 48:20
1997 [1] - 73:11

**2**

2 [1] - 7:20
20 [5] - 4:7, 13:22,
34:24, 55:21, 63:17
2003 [2] - 24:25, 25:20
2006 [8] - 47:23,
50:22, 51:12, 75:16,
75:20, 75:24, 76:4,
76:6
2007 [5] - 5:11, 42:20,
42:21, 84:1
2008 [3] - 42:20, 84:7,
84:10
2009 [21] - 13:20,
39:25, 40:10, 41:12,
42:20, 43:8, 47:19,
48:3, 49:15, 51:25,
65:23, 67:12, 67:20,
71:14, 73:18, 81:12,
81:19, 82:5, 83:2,
84:7, 84:10
2010 [18] - 38:20, 40:1,
40:8, 42:21, 43:11,
51:25, 55:4, 71:3,
71:6, 71:7, 72:5,
72:9, 77:15, 82:25,
84:9, 86:13, 88:22
2011 [2] - 43:12, 81:10
20th [1] - 62:14
21st [2] - 67:12, 67:20

**23** [2] - 18:19, 18:22
25 [1] - 4:7
26 [6] - 59:10, 63:6,
63:9, 65:3, 79:14,
87:4
26(b)(2 [1] - 64:13
26(b)(2)(C)(iii [1] -
63:11
29th [1] - 81:16

**3**

300 [1] - 47:3
304 [1] - 18:20
35 [3] - 17:5, 21:24,
23:13

**4**

4159 [1] - 46:19
42 [1] - 13:14
45 [1] - 4:7

**5**

5 [3] - 25:9, 36:20,
36:25
5,500 [2] - 39:8, 69:2
56 [3] - 10:10, 16:16,
28:14
5th [1] - 86:13

**6**

6 [1] - 37:1

**8**

8,000 [2] - 67:24,
69:21

**9**

9 [1] - 48:22

**A**

A1 [1] - 25:18
A2 [1] - 25:18
ability [2] - 81:2, 88:23
able [7] - 13:15, 31:1,
49:10, 54:9, 55:1,
78:22, 80:22
above-entitled [2] -
90:3, 91:5

absent [3] - 16:15,
16:23, 70:19
absolutely [4] - 30:9,
39:6, 44:13, 55:10
access [3] - 56:14,
77:7, 86:9
accessible [3] - 64:13,
86:25
accidental [1] - 87:12
accidently [3] - 49:24,
50:18, 89:15
accordance [2] -
61:17, 61:18
according [3] - 36:8,
37:5, 47:4
accordingly [1] -
61:25
account [4] - 13:18,
13:23, 48:4, 89:23
accurate [2] - 24:1,
26:8
accusation [2] - 27:9,
35:12
accusations [1] - 36:3
accused [4] - 15:8,
32:14, 37:16, 50:6
accuses [1] - 17:12
accusing [2] - 23:4,
58:17
acknowledged [1] -
5:7
acknowledges [1] -
6:25
acquired [1] - 54:16
act [2] - 7:15, 34:4
Act [16] - 12:1, 12:3,
12:15, 30:1, 30:7,
31:8, 31:15, 31:22,
32:18, 32:19, 32:20,
34:15, 35:1, 50:8
acted [1] - 65:14
action [1] - 48:23
actionable [1] - 35:13
active [1] - 51:2
activities [2] - 11:25,
17:17
activity [1] - 55:25
acts [3] - 11:4, 12:10,
32:21
actual [37] - 5:21, 8:2,
8:17, 11:17, 12:21,
15:12, 15:18, 16:1,
16:7, 16:23, 17:3,
21:23, 22:2, 22:4,
22:8, 22:13, 22:16,
22:17, 22:20, 23:9,
23:13, 24:7, 27:9,
27:11, 27:23, 27:25,
28:4, 28:7, 28:23,
28:25, 33:17, 33:20,

34:1, 35:18, 36:9,
54:6
added [4] - 14:12,
48:6, 48:7, 53:19
adding [1] - 48:17
addition [1] - 89:23
additional [11] - 14:3,
15:24, 19:6, 21:18,
42:11, 42:12, 42:18,
42:23, 44:15, 53:3,
55:5
address [6] - 36:25,
57:15, 70:25, 81:2,
82:2
addressed [2] - 56:12,
59:1
addresses [1] - 35:2
addressing [1] - 4:10
admission [1] - 37:20
admissions [1] -
34:21
admit [3] - 49:18,
50:16, 79:16
admits [2] - 22:9, 34:4
admitted [1] - 37:11
advanced [2] - 82:10,
82:12
advantage [1] - 48:9
advice [1] - 12:8
advises [1] - 88:17
affect [1] - 62:1
affidavit [6] - 29:2,
29:10, 61:15, 64:25,
65:24, 74:5
affiliated [1] - 35:7
affirmatively [1] - 78:5
agency [6] - 6:10,
10:25, 22:11, 26:25,
31:20, 31:21
Agent [4] - 12:1, 12:3,
32:18, 34:15
agent [9] - 6:11,
10:23, 17:20, 26:19,
30:2, 30:4, 30:18,
31:6, 31:22
Agents [4] - 29:25,
30:7, 31:15, 32:12
agents [11] - 6:3, 6:9,
15:10, 17:13, 17:16,
17:25, 23:5, 27:9,
30:5, 32:7, 34:14
agree [1] - 53:21,
74:20, 81:25
agreed [4] - 13:14,
43:6, 45:19, 88:7
agreement [3] - 77:18,
80:4, 81:6
agrees [2] - 68:22,
85:25
ahead [3] - 41:14,

66:14, 67:4
Ahmadinejad [1] -
7:12
Ahmadinejad's [1] -
7:18
Aikat [2] - 34:8, 54:14
allegation [2] - 10:19,
34:2
allegations [8] - 6:15,
7:5, 11:21, 12:16,
12:19, 48:15, 74:9,
83:4
alleged [4] - 5:2, 5:20,
10:2, 23:11
allegedly [1] - 10:4
alleging [2] - 21:10,
21:13
allow [1] - 34:7
allowed [3] - 13:7,
43:11, 63:17
almost [3] - 44:19,
81:10, 81:23
alone [1] - 89:18
altered [1] - 89:14
altering [1] - 48:16
alternative [5] - 41:25,
42:3, 51:6, 57:4,
82:9, 83:10
amazing [1] - 21:3
ambassador [1] - 51:3
Amendment [1] -
16:11
amount [3] - 16:9,
44:19, 89:22
amounts [2] - 13:23,
18:22
ample [1] - 34:21
analogous [1] - 89:19
analogy [1] - 59:24
analyses [2] - 44:18,
86:18
analysis [3] - 20:1,
24:24, 26:9
analyzed [1] - 29:11
Anderson [1] - 29:4
Andres [1] - 68:4
announced [1] - 81:23
anonymous [1] -
35:24
answer [9] - 8:23,
17:9, 31:1, 55:22,
66:7, 67:11, 75:19,
84:1, 85:22
answered [1] - 41:11
answers [3] - 34:16,
39:22, 41:5
anti [2] - 7:15
anti-humanity [1] -
7:15
anti-Iranian [1] - 7:15

**anticipate** [1] - 4:14
**anticipated** [2] - 4:9, 88:18
**anyway** [2] - 7:1, 79:14
**anyways** [1] - 57:8
**appear** [1] - 47:13
**appearance** [2] - 48:2, 66:17
**Apple** [1] - 89:4
**applied** [2] - 85:21, 88:3
**applies** [3] - 25:6, 77:20, 80:13
**apply** [3] - 35:11, 77:21, 88:1
**applying** [1] - 35:10
**approach** [2] - 27:16, 87:24
**appropriate** [5] - 16:16, 41:3, 43:14, 82:19, 82:21
**approximate** [1] - 71:11
**April** [7] - 50:22, 55:4, 73:18, 75:16, 75:20, 76:4, 76:6
**arbiter** [1] - 57:9
**area** [1] - 75:14
**argue** [4] - 7:4, 14:18, 16:5, 83:21
**argues** [1] - 16:10
**arguing** [2] - 31:14, 80:12
**argument** [11] - 11:3, 12:2, 26:4, 26:5, 30:11, 37:6, 46:8, 81:4, 81:21, 81:25, 83:22
**arguments** [5] - 4:3, 4:15, 34:3, 53:14, 89:24
**arose** [1] - 81:5
**article** [12] - 6:13, 6:19, 7:21, 10:5, 10:6, 20:3, 20:8, 25:1, 25:8, 25:17, 26:1, 27:23
**articles** [15] - 5:14, 5:24, 6:20, 7:11, 20:2, 21:2, 21:18, 23:24, 24:5, 27:17, 30:15, 34:10, 34:13, 36:23, 37:21
**aside** [3] - 51:13, 53:17, 84:16
**aspect** [1] - 23:21
**assassinations** [1] - 23:7
**assert** [3] - 18:4, 27:3,

39:4
**asserting** [3] - 24:3, 26:14, 29:21
**assertion** [1] - 26:21
**asserts** [1] - 26:6
**assess** [3] - 7:23, 8:2, 10:8
**assessment** [2] - 8:25, 28:17
**assistance** [1] - 48:13
**association** [1] - 22:14
**assume** [6] - 8:25, 9:8, 15:8, 40:21, 50:2
**assuming** [3] - 6:17, 9:4, 9:5
**assurance** [1] - 61:22
**attach** [2] - 61:8, 74:3
**attached** [10] - 7:11, 17:5, 20:1, 25:14, 25:18, 61:19, 73:12, 73:15, 75:7, 82:3
**attachment** [1] - 26:9
**attempt** [1] - 51:24
**attempted** [1] - 68:14
**attention** [1] - 61:9
**attestation** [2] - 61:22, 62:10
**attested** [4] - 38:19, 41:6, 71:6, 88:2
**attorney** [2] - 59:6, 66:17
**Attorney** [1] - 36:10
**attorneys** [1] - 69:18
**attributed** [1] - 61:12
**audit** [1] - 61:23
**August** [5] - 40:1, 71:3, 71:6, 72:5, 72:9
**Austin** [1] - 62:6
**automatic** [1] - 48:25
**available** [7] - 4:1, 4:2, 13:21, 39:10, 42:21, 52:13, 70:20
**avoid** [6] - 38:10, 41:11, 46:6, 78:14, 87:17, 89:17
**avoided** [3] - 39:19, 41:12, 89:6
**avoiding** [1] - 79:7
**aware** [6] - 5:10, 20:11, 41:18, 78:10, 81:7, 81:21
**awareness** [1] - 20:10

**B**

**Babak** [3] - 39:11, 48:4, 56:10

**back-up** [2] - 47:8, 86:1
**backed** [2] - 40:10, 70:7
**background** [1] - 80:9
**backing** [2] - 70:18, 88:18
**backup** [1] - 70:11
**bad** [23] - 47:17, 47:18, 47:21, 48:6, 48:7, 48:23, 49:1, 49:2, 49:5, 49:10, 50:4, 57:21, 57:22, 61:8, 62:8, 69:21, 69:25, 70:22, 74:6, 74:11, 75:1, 75:5, 77:3
**bait** [1] - 89:8
**bait-and-switch** [1] - 89:8
**banks** [1] - 13:9
**Bargain** [2] - 24:25, 51:4
**based** [5] - 14:24, 40:18, 59:18, 69:16, 75:11
**bases** [2] - 5:10, 6:18
**basics** [1] - 38:8
**basis** [14] - 4:15, 7:6, 7:7, 8:3, 10:10, 11:22, 18:5, 19:13, 34:16, 35:12, 49:2, 62:12, 64:1, 89:16
**bears** [3] - 20:21, 28:20, 33:3
**become** [1] - 63:19
**becoming** [2] - 66:16, 71:24
**began** [1] - 5:11
**begin** [2] - 18:25, 77:14
**beginning** [2] - 39:25, 87:20
**begins** [2] - 25:19, 26:4
**behalf** [1] - 36:12
**behind** [6] - 78:5, 78:7, 78:14, 78:16, 78:19, 79:7
**belabor** [1] - 38:3
**Belfrage** [2] - 48:3, 48:5
**benefit** [1] - 40:25
**best** [7] - 24:19, 24:23, 47:21, 51:21, 53:14, 59:10, 62:20
**better** [2] - 60:25, 65:6
**between** [8] - 10:22, 25:23, 28:2, 34:11, 37:1, 56:2, 60:18,

80:4
**beyond** [8] - 5:7, 5:8, 13:19, 19:3, 21:13, 38:13, 74:15, 88:15
**big** [2] - 36:5, 37:8
**bird** [1] - 58:14
**bird-dog** [1] - 58:14
**bit** [7] - 5:3, 5:15, 13:10, 41:16, 49:10, 63:22, 88:15
**black** [2] - 38:23, 87:6
**black-and-white** [1] - 87:6
**Blackberry** [7] - 72:24, 75:23, 76:9, 76:18, 76:21, 76:24, 88:25
**blame** [1] - 7:17
**blank** [1] - 75:6
**blind** [1] - 27:23
**blindness** [4] - 27:14, 27:15, 34:9, 36:15
**Blout** [5] - 54:23, 68:9, 68:11, 68:17, 88:1
**Blout's** [1] - 48:22
**board** [2] - 35:6, 56:10
**boilerplate** [1] - 86:15
**bold** [1] - 73:21
**Bolton** [1] - 36:11
**book** [28] - 41:16, 41:17, 42:2, 42:3, 42:10, 42:11, 42:16, 42:19, 43:20, 57:14, 70:25, 77:13, 77:14, 81:8, 81:22, 82:3, 82:4, 82:10, 82:11, 82:14, 83:25, 84:2, 84:21, 84:23, 85:1, 85:4
**bottom** [2] - 4:19, 62:2
**break** [2] - 25:24, 76:8
**brief** [9] - 16:14, 30:12, 34:19, 35:3, 35:5, 59:2, 66:8, 68:6, 88:24
**briefed** [1] - 18:14
**briefing** [9] - 5:1, 10:18, 11:9, 12:4, 21:5, 21:6, 24:20, 25:12, 25:13
**briefly** [2] - 30:13, 33:23
**briefs** [5] - 4:14, 6:14, 12:3, 57:19, 59:12
**bring** [2] - 44:18, 78:7
**broad** [2] - 52:25, 88:5
**broader** [2] - 6:10, 83:19
**broadly** [1] - 11:5
**broke** [1] - 86:6
**broken** [1] - 40:19

80:4
**brought** [4] - 14:8, 35:17, 36:6, 69:19
**bumbled** [1] - 52:8
**bunch** [2] - 34:6, 45:24
**burden** [10] - 10:12, 28:8, 28:20, 33:4, 33:12, 53:20, 57:17, 57:20, 58:12, 77:2
**burdensome** [2] - 65:12, 77:5
**busy** [1] - 51:7

**C**

**calendar** [48] - 41:6, 41:9, 43:24, 44:22, 44:25, 45:1, 45:2, 45:4, 45:6, 45:9, 45:11, 45:13, 46:3, 46:8, 46:9, 46:14, 46:20, 47:5, 47:15, 47:20, 47:22, 48:11, 48:20, 48:21, 48:22, 50:22, 50:25, 52:3, 52:23, 54:18, 55:16, 64:4, 64:10, 64:18, 64:20, 67:16, 72:6, 72:19, 72:24, 75:15, 75:20, 76:4, 76:22, 86:14, 89:2, 89:4, 89:8
**calendaring** [1] - 88:23
**calendars** [15] - 40:8, 40:14, 45:17, 46:6, 46:7, 47:12, 49:20, 50:9, 50:10, 51:11, 51:18, 51:25, 55:23, 86:24
**camera** [3] - 38:22, 39:9, 83:11
**campaign** [1] - 7:16
**cannot** [3] - 21:19, 57:22, 79:1
**capturing** [1] - 45:2
**care** [1] - 79:22
**case** [43] - 4:16, 4:25, 5:4, 5:5, 5:17, 7:2, 9:4, 11:6, 12:19, 17:11, 20:23, 21:4, 23:8, 28:15, 29:7, 33:13, 39:5, 41:24, 53:4, 53:24, 53:25, 57:22, 58:1, 58:7, 59:7, 59:21, 63:2, 66:16, 66:25, 67:2, 77:24, 78:4, 78:6, 78:9, 78:12, 84:13, 85:17, 88:12, 88:17,

89:13, 89:16, 89:18
**cases** [1] - 5:18
**Casetto** [1] - 68:4
**categories** [1] - 52:25
**categorized** [1] -
49:24
**category** [3] - 15:3,
41:19, 49:23
**caught** [2] - 43:21,
43:25
**cautioned** [4] - 35:5
**certain** [4] - 30:20,
44:23, 46:3, 54:12
**certainly** [21] - 4:13,
14:24, 16:10, 18:21,
19:20, 20:17, 22:12,
22:22, 23:8, 23:19,
23:20, 35:25, 40:14,
45:9, 46:17, 47:25,
49:4, 70:21, 80:20,
84:13, 88:1
**CERTIFICATE** [1] -
91:1
**certify** [1] - 91:3
**cetera** [1] - 7:21
**challenged** [1] - 63:16
**chance** [4] - 13:7,
14:17, 14:18, 66:18
**change** [4] - 49:23,
50:11, 50:17, 74:2
**changed** [4] - 49:20,
50:18, 52:19, 54:3
**changes** [2] - 61:25,
67:8
**changing** [1] - 84:12
**character** [1] - 23:6
**characterization** [2] -
5:25, 49:5
**characterize** [2] -
6:17, 10:20
**characterized** [1] -
10:17
**charge** [4] - 17:11,
26:25, 27:8, 37:21
**charges** [2] - 6:16,
10:17
**Children** [1] - 58:20
**choosing** [1] - 40:24
**Christmas** [4] - 47:19,
48:2, 49:15, 65:23
**circle** [1] - 32:10
**circuit** [2] - 28:14,
75:13
**circumstance** [1] -
32:12
**circumstances** [2] -
24:13, 61:25
**circumstantial** [1] -
23:19
**citation** [2] - 8:7, 85:4

**citations** [1] - 18:12
**cite** [3] - 27:17, 78:6,
84:25
**cited** [4] - 7:19, 8:16,
42:16, 82:23
**cites** [3] - 6:19, 27:19,
84:24
**citing** [4] - 8:19, 24:1,
24:17, 83:1
**claim** [13] - 11:15,
11:18, 11:23, 32:2,
34:20, 42:4, 43:14,
70:4, 70:5, 78:9,
79:12
**claimed** [3] - 6:15,
34:18, 71:14
**claiming** [1] - 24:5
**claims** [3] - 29:21,
34:17, 53:5
**clarify** [2] - 26:18, 31:8
**clear** [18] - 22:6,
28:11, 28:21, 28:23,
29:9, 29:14, 29:18,
34:15, 44:1, 57:3,
57:20, 62:7, 74:6,
74:10, 75:1, 77:3,
87:11, 88:14
**clearly** [4] - 39:13,
39:21, 86:25, 88:10
**client** [2] - 62:24, 64:2
**clients** [1] - 88:17
**clock** [1] - 53:6
**close** [1] - 5:19
**clue** [1] - 76:1
**clumsy** [1] - 52:9
**CNAPI** [3] - 58:20,
67:12, 67:20
**Code** [1] - 32:19
**codes** [1] - 52:20
**coffers** [1] - 59:17
**cohorts** [1] - 7:14
**collapses** [1] - 62:11
**Colonel** [2] - 54:15,
85:15
**color** [1] - 52:20
**combination** [1] - 57:4
**coming** [2] - 10:12,
45:19
**comment** [1] - 86:20
**commercial** [1] -
25:24
**common** [1] - 5:24
**communicating** [1] -
51:2
**compared** [1] - 69:14
**compel** [2] - 69:24,
83:8
**complain** [1] - 39:7
**complains** [1] - 83:17
**complaint** [12] - 5:4,

5:7, 5:8, 7:11, 18:8,
18:14, 18:25, 19:9,
20:7, 30:16, 30:21,
34:12
**complete** [6] - 23:22,
24:15, 32:10, 36:5,
45:16, 56:21
**completely** [4] - 20:4,
24:18, 26:1, 52:11
**compliance** [2] -
11:25, 14:21
**complied** [3] - 14:5,
14:7, 14:18
**comply** [3] - 13:5,
14:6, 88:7
**computer** [27] - 40:2,
40:3, 40:4, 40:7,
40:12, 45:18, 47:23,
48:13, 60:25, 70:6,
70:7, 70:18, 71:10,
71:16, 71:18, 72:6,
75:17, 75:18, 75:20,
76:1, 76:3, 76:5,
76:9, 86:6, 86:13,
88:16
**computers** [8] - 41:15,
44:17, 48:4, 66:6,
66:19, 66:22, 70:4,
76:19
**concede** [2] - 46:6,
76:10
**concept** [1] - 6:11
**concerned** [1] - 35:9
**concluded** [1] - 90:3
**conclusion** [6] -
15:22, 16:6, 25:20,
27:19, 29:8, 33:8
**conclusions** [2] -
8:12, 15:21
**condemn** [1] - 7:15
**conduct** [6] - 40:19,
41:10, 41:22, 53:18,
82:24, 84:13
**conducted** [1] - 82:5
**confer** [3] - 20:11,
20:13, 67:3
**conference** [3] - 7:13,
45:15, 86:16
**confidence** [1] - 80:9
**confident** [1] - 74:4
**confidentiality** [4] -
79:21, 79:25, 80:1,
83:9
**confirmed** [2] - 20:20,
53:22
**confront** [3] - 54:20,
55:1, 55:23
**confronted** [1] - 54:5
**confusion** [2] - 67:15,
74:10

**connect** [2] - 64:17,
65:10
**connected** [5] - 40:3,
40:5, 64:17, 71:15,
72:19
**consider** [6] - 17:7,
17:8, 23:20, 23:21,
33:14, 63:11
**consideration** [2] -
8:17, 63:7
**considerations** [1] -
22:22
**considers** [1] - 34:13
**consistent** [3] - 16:9,
53:8, 53:19
**constitute** [2] - 28:4,
32:15
**constitutional** [2] -
16:3, 16:11
**construct** [1] - 31:15
**consultant** [4] - 40:4,
40:13, 48:14, 71:20
**consultants** [1] - 40:3
**contact** [1] - 58:8
**contacts** [1] - 35:17
**contain** [1] - 75:9
**context** [5] - 6:14, 7:4,
7:6, 9:7, 28:14
**continue** [1] - 15:9
**continued** [1] - 5:12
**continuum** [1] - 5:13
**contractor** [1] - 6:11
**contradict** [2] - 9:9,
27:18
**contradictory** [1] -
66:20
**contradicts** [2] - 9:6,
9:11
**contrarily** [1] - 15:19
**contrary** [2] - 9:12,
77:16
**control** [3] - 60:13,
61:6, 70:21
**convincing** [13] - 22:6,
28:11, 28:21, 28:24,
29:9, 29:14, 29:18,
57:20, 62:8, 74:6,
74:11, 75:1, 77:3
**Convio** [1] - 60:12
**cookie** [1] - 43:21
**copied** [1] - 52:2
**copies** [1] - 66:5
**copy** [4] - 82:3, 82:10,
82:11, 84:3
**correct** [10] - 19:2,
19:11, 21:25, 27:22,
30:9, 32:24, 64:24,
77:25, 81:20, 91:4
**corrected** [1] - 84:5
**corrections** [1] - 36:1

**cost** [5] - 13:11, 40:17,
40:24, 44:9
**costing** [1] - 44:10
**costs** [1] - 38:16
**counsel** [7] - 17:6,
35:19, 66:16, 66:21,
67:2, 72:16
**counsel's** [1] - 34:16
**counted** [1] - 47:11
**counter** [1] - 75:6
**couple** [1] - 43:5,
44:21, 48:17, 65:20,
67:10, 68:3, 85:14
**course** [9] - 8:4,
40:19, 41:9, 45:25,
53:2, 56:10, 63:22,
66:1, 89:2
**court** [7] - 12:7, 39:15,
39:16, 41:11, 53:19,
56:13, 80:3
**COURT** [226] - 4:9,
4:24, 5:6, 5:17, 6:3,
6:7, 7:10, 7:25, 8:15,
8:21, 8:23, 9:2, 9:8,
9:15, 9:25, 10:21,
11:9, 12:2, 12:23,
13:25, 14:8, 14:13,
14:20, 14:23, 15:7,
15:23, 16:12, 16:17,
16:19, 16:21, 16:25,
17:19, 18:3, 18:17,
18:23, 18:25, 19:3,
19:9, 19:12, 19:17,
19:23, 20:6, 20:13,
20:18, 20:24, 21:3,
21:12, 21:22, 22:1,
22:7, 22:16, 23:10,
24:6, 24:19, 25:5,
25:12, 25:16, 26:11,
26:13, 26:21, 27:3,
27:10, 27:21, 28:1,
28:13, 29:6, 29:20,
29:23, 30:3, 30:14,
30:23, 31:1, 31:4,
31:12, 31:19, 31:23,
31:25, 32:10, 32:22,
33:1, 33:7, 33:21,
33:23, 35:14, 36:21,
37:24, 38:5, 38:11,
39:1, 40:16, 40:21,
41:2, 41:14, 42:4,
42:12, 42:15, 43:1,
43:7, 43:13, 43:17,
44:5, 44:21, 45:4,
46:10, 46:13, 46:19,
46:22, 47:2, 47:15,
48:5, 48:17, 49:9,
49:22, 50:2, 50:13,
50:21, 51:8, 51:13,
51:15, 51:21, 52:12,

52:17, 52:25, 53:12, 54:8, 54:11, 54:16, 54:20, 54:25, 55:8, 55:11, 55:17, 55:19, 56:5, 57:2, 57:11, 57:24, 58:5, 58:11, 58:19, 59:4, 59:14, 59:23, 60:1, 60:8, 60:16, 61:2, 62:20, 63:21, 64:15, 64:18, 64:20, 65:2, 65:4, 65:18, 65:20, 66:3, 66:13, 67:1, 67:4, 67:10, 67:20, 67:23, 68:9, 68:11, 68:14, 68:19, 68:21, 68:25, 69:2, 69:6, 69:10, 69:23, 70:3, 70:10, 70:14, 70:16, 70:23, 71:13, 71:20, 72:5, 72:9, 72:11, 72:14, 72:16, 72:25, 73:3, 73:5, 73:9, 73:17, 74:8, 74:12, 74:17, 74:23, 75:14, 75:19, 75:24, 76:3, 76:11, 76:15, 76:20, 76:25, 77:9, 77:11, 77:20, 77:24, 78:3, 78:16, 78:20, 79:10, 79:14, 79:20, 80:12, 80:16, 80:20, 80:25, 81:11, 81:24, 82:7, 82:17, 83:6, 83:13, 84:20, 85:6, 89:21, 91:1

**Court** [57] - 4:16, 4:18, 5:9, 5:14, 6:16, 8:5, 8:6, 8:11, 10:17, 12:20, 12:22, 12:24, 13:1, 13:7, 14:3, 14:12, 14:16, 14:17, 27:15, 28:16, 29:8, 29:13, 34:7, 34:12, 36:20, 38:15, 38:22, 40:11, 41:7, 41:18, 43:11, 44:1, 44:3, 45:10, 45:16, 47:25, 53:20, 56:13, 56:25, 57:8, 59:11, 62:14, 62:18, 66:21, 78:13, 80:4, 83:8, 84:7, 84:18, 85:8, 86:17, 87:7, 87:10, 87:14, 88:2, 88:11, 88:21

**Court's** [8] - 20:19, 25:7, 33:25, 39:9, 40:23, 45:25, 61:9

**courts** [2] - 75:12, 77:8

**cover** [4] - 52:11, 61:13, 82:13, 82:16

**crawled** [1] - 66:19
**create** [1] - 89:13
**created** [2] - 67:7, 81:18
**credibility** [1] - 29:12
**credible** [1] - 24:1
**crime** [3] - 30:1, 32:11, 32:13
**criminal** [1] - 30:8
**cross** [2] - 66:18, 66:25
**cross-examine** [2] - 66:18, 66:25
**custodians** [2] - 64:23, 67:17
**custodians'** [1] - 66:6
**cut** [8] - 4:23, 42:25, 43:2, 43:5, 43:6, 43:7, 84:9
**cut-off** [8] - 4:23, 42:25, 43:2, 43:5, 43:6, 43:7, 84:9

## D

**D'Onofrio** [5] - 57:18, 62:19, 63:2, 89:11, 89:18
**damage** [1] - 85:13
**damages** [6] - 12:23, 12:25, 32:1, 32:2, 32:5, 32:9
**danger** [2] - 80:5, 80:7
**dark** [1] - 58:17
**data** [4] - 61:11, 70:17, 86:9, 86:18
**database** [1] - 39:17
**date** [8] - 61:25, 67:6, 67:8, 72:8, 73:15, 73:19, 74:4, 86:22
**DATE** [1] - 91:9
**dates** [3] - 61:12, 67:15, 84:12
**Daubert** [2] - 13:3, 34:10
**David** [1] - 56:9
**days** [2] - 4:22, 68:3
**deal** [2] - 84:17, 87:13
**dealing** [4] - 19:19, 20:16, 23:4, 43:7
**dealt** [1] - 15:5
**Dean** [1] - 36:10
**decedents** [1] - 23:4
**December** [2] - 43:10, 51:25
**decision** [1] - 48:23
**declaration** [1] - 84:3
**declarations** [1] - 7:18
**declared** [1] - 7:13

**defamation** [20] - 11:15, 11:16, 11:17, 12:19, 28:15, 29:20, 29:21, 29:24, 30:5, 31:12, 31:13, 31:15, 31:19, 31:21, 32:11, 32:15, 33:9, 34:20, 53:5
**defamatory** [20] - 5:2, 5:20, 10:2, 10:4, 18:1, 18:4, 18:19, 20:3, 21:10, 21:13, 22:24, 26:13, 26:16, 27:2, 27:3, 27:4, 27:8, 36:19, 37:15, 37:25
**defamed** [1] - 35:10
**defaming** [1] - 23:6
**defectors** [1] - 23:4
**defend** [1] - 79:2
**defendant** [73] - 4:20, 5:12, 6:1, 7:12, 7:22, 8:1, 8:8, 8:9, 9:18, 11:1, 11:12, 12:9, 13:12, 13:13, 15:10, 15:16, 15:25, 17:5, 17:12, 18:10, 20:22, 21:9, 23:6, 23:7, 24:8, 26:15, 27:16, 28:8, 29:9, 30:3, 30:12, 30:18, 31:5, 32:14, 32:18, 33:12, 33:13, 33:15, 34:4, 34:14, 34:17, 34:19, 35:2, 35:4, 35:7, 35:11, 35:18, 35:22, 37:6, 37:22, 44:1, 44:10, 46:8, 52:7, 53:20, 57:5, 57:19, 68:8, 73:22, 78:1, 78:13, 78:25, 79:7, 80:5, 81:7, 81:21, 82:10, 83:17, 85:12, 87:21
**defendant's** [13] - 9:20, 9:22, 11:7, 16:6, 17:4, 20:2, 22:10, 22:14, 25:21, 37:1, 37:4, 69:12, 79:5
**defendants** [3] - 4:5, 29:15, 39:2
**defense** [11] - 16:3, 44:10, 50:18, 51:20, 51:21, 52:9, 62:20, 63:24, 64:3, 68:22, 79:11
**define** [1] - 28:1
**defining** [2] - 17:19,

87:11
**definition** [1] - 37:12
**degree** [1] - 77:4
**delete** [1] - 48:23
**deleted** [14] - 44:24, 45:1, 45:2, 45:7, 45:9, 46:4, 46:9, 46:15, 46:18, 46:19, 47:4, 47:9, 47:19, 89:15
**deleting** [2] - 48:16, 48:18
**deletions** [4] - 46:10, 47:17, 47:18, 48:19
**demanded** [1] - 77:5
**demonstrated** [1] - 4:17
**denied** [8] - 14:5, 19:21, 43:20, 56:19, 75:10, 83:20, 83:23, 84:11
**denies** [1] - 35:3
**deny** [3] - 43:24, 55:17, 55:19
**Department** [1] - 36:7
**deposed** [1] - 54:25
**deposing** [1] - 52:5
**deposition** [21] - 4:22, 7:2, 8:11, 13:6, 17:4, 17:14, 21:24, 22:5, 23:11, 34:2, 42:6, 42:19, 52:12, 52:14, 53:9, 53:25, 54:2, 55:14, 71:8, 81:8, 83:23
**depositions** [14] - 38:18, 39:10, 39:12, 40:25, 52:4, 54:3, 54:4, 54:5, 54:9, 54:21, 56:4, 56:7, 56:8, 56:20
**deposits** [2] - 13:17, 13:23
**describe** [2] - 8:12, 49:9
**designated** [2] - 23:1, 23:2
**desktop** [7] - 39:22, 39:24, 71:3, 71:5, 71:14, 71:23, 88:22
**destroy** [1] - 23:16
**destroyed** [1] - 89:14
**detail** [2] - 19:22, 29:12
**detailed** [5] - 20:1, 38:4, 40:19, 64:24, 66:9
**details** [3] - 15:24, 55:15, 74:25
**determination** [1] -

8:3
**determine** [4] - 30:22, 67:24, 69:4, 69:7
**determined** [3] - 14:17, 38:22, 66:19
**determining** [1] - 22:13
**developed** [1] - 61:17
**development** [1] - 50:25
**device** [1] - 76:17
**devote** [1] - 34:24
**diaspora** [1] - 37:13
**difference** [8] - 6:4, 10:21, 36:5, 37:8, 37:9, 44:9, 47:3, 78:22
**different** [15] - 10:25, 16:4, 26:1, 26:8, 40:20, 42:22, 47:8, 66:6, 72:1, 73:23, 74:2, 74:7, 75:24, 76:18, 87:23
**difficult** [3] - 5:15, 5:17, 37:19
**difficulty** [1] - 36:18
**diligent** [2] - 35:25, 59:19
**diligently** [1] - 70:1
**direct** [2] - 22:23, 49:20
**directed** [2] - 7:16, 52:19
**directing** [1] - 36:20
**directly** [5] - 9:10, 56:4, 82:25, 83:2, 84:25
**director** [3] - 39:11, 52:6, 54:23
**dirt** [1] - 11:10
**disagreement** [2] - 28:2, 28:5
**disappearance** [1] - 48:2
**disclaimers** [1] - 86:15
**disclaiming** [1] - 62:9
**disclosing** [1] - 13:5
**Disclosure** [5] - 12:1, 12:14, 32:18, 34:25, 50:8
**disconnected** [3] - 71:17, 71:19, 71:24
**discoverable** [8] - 79:15, 79:16, 81:14, 81:15, 83:3, 85:20, 87:17, 88:10
**discovered** [4] - 21:19, 39:14, 66:22, 88:2

**discovery** [39] - 4:23, 5:10, 12:23, 13:5, 14:1, 21:1, 21:5, 21:20, 23:17, 41:11, 42:24, 43:2, 43:4, 43:5, 43:7, 43:11, 43:12, 45:1, 45:15, 45:18, 48:14, 51:10, 53:1, 53:2, 53:10, 54:17, 56:22, 57:21, 58:1, 59:9, 62:25, 65:15, 77:5, 82:17, 82:19, 83:2, 84:8
**discussed** [1] - 57:19
**discusses** [2] - 42:18, 65:25
**discussing** [3] - 15:15, 32:13, 63:14
**discussion** [1] - 60:10
**dishonesty** [1] - 53:18
**disk** [1] - 64:11
**dismiss** [12] - 10:18, 18:9, 18:15, 19:5, 19:10, 19:23, 20:7, 21:6, 27:13, 30:17, 30:21, 57:6
**dismissal** [5] - 40:24, 53:13, 53:15, 53:16, 64:7
**Disney** [6] - 34:22, 49:23, 50:6, 50:13, 54:23, 67:14
**Disney's** [2] - 49:19, 67:16
**disposition** [1] - 16:16
**dispositive** [1] - 16:7
**dispute** [3] - 10:10, 45:8, 86:15
**disputed** [1] - 35:20
**disputes** [2] - 28:10, 33:14
**disregard** [6] - 9:18, 9:24, 10:11, 24:15, 27:12, 34:5
**disregarding** [1] - 24:18
**distinct** [1] - 4:11
**distinction** [4] - 17:21, 17:23, 37:1, 78:21
**distortion** [1] - 86:21
**distortions** [1] - 7:5
**diversion** [1] - 53:11
**diversions** [1] - 56:23
**do-over** [1] - 56:24
**doc** [2] - 68:3, 68:5
**document** [8] - 13:19, 61:19, 73:12, 73:15, 74:3, 74:7, 75:7, 88:12
**documentation** [2] -

13:15, 13:17
**documents** [21] - 38:21, 52:13, 52:17, 53:3, 54:6, 54:12, 54:16, 66:4, 68:5, 73:6, 74:15, 74:17, 74:20, 79:17, 81:13, 81:22, 83:18, 83:24, 84:10, 88:4
**dog** [1] - 58:14
**dollars** [3] - 13:24, 63:2, 89:13
**done** [12] - 24:24, 29:16, 44:16, 44:19, 47:17, 48:7, 56:17, 62:23, 67:24, 70:11, 86:10, 86:18
**donor** [1] - 58:9
**dot** [6] - 25:20, 25:21
**double** [1] - 47:11
**doubt** [8] - 4:21, 9:13, 9:14, 9:15, 16:22, 16:25, 85:19, 88:16
**doubts** [9] - 6:22, 7:8, 8:10, 8:20, 9:19, 11:8, 15:17, 16:15, 29:3
**Dow** [2] - 28:18, 33:7
**down** [1] - 85:10
**dozen** [4] - 39:8, 56:8, 56:15, 87:22
**Dr** [14] - 17:7, 77:13, 77:21, 78:14, 79:4, 79:24, 80:5, 80:6, 80:8, 81:8, 82:14, 82:23, 83:4, 85:22
**dragged** [1] - 13:18
**draw** [2] - 25:20, 61:9
**drawing** [1] - 17:21
**drives** [4] - 44:14, 44:15, 86:1, 86:18
**due** [2] - 30:23, 80:6
**Dummies** [1] - 65:7
**dump** [1] - 61:11
**duplicates** [2] - 66:4, 74:22
**during** [8] - 21:19, 53:2, 54:4, 54:21, 71:21, 75:17, 76:21, 82:2
**duties** [1] - 86:16
**duty** [5] - 63:8, 65:19, 69:15

## E

**e-discovery** [1] - 48:14
**earliest** [1] - 77:15

**early** [1] - 41:12
**easy** [1] - 87:13
**economic** [2] - 64:6, 80:6
**edit** [1] - 49:7
**edited** [1] - 49:14
**editing** [3] - 48:11, 48:15, 50:1
**effect** [3] - 8:6, 73:20, 74:5
**effort** [13] - 11:11, 44:18, 49:18, 51:16, 51:18, 52:6, 58:8, 59:18, 59:20, 69:7, 69:10, 74:19
**efforts** [6] - 36:6, 38:10, 46:5, 51:5, 52:8, 74:18
**egregious** [1] - 62:13
**eight** [4] - 13:8, 13:16, 25:22, 25:24
**either** [7] - 10:3, 11:5, 26:15, 30:15, 31:5, 56:3, 60:16
**electronic** [1] - 57:25
**Eli** [2] - 12:13, 62:25
**eliminate** [1] - 87:1
**Elliott** [2] - 56:9, 67:14
**Elliott's** [1] - 48:21
**email** [4] - 40:13, 56:14, 62:24, 86:3
**emailing** [1] - 88:23
**emails** [61] - 23:16, 32:6, 38:18, 38:19, 38:21, 39:2, 40:7, 43:23, 53:8, 53:24, 53:25, 54:19, 55:25, 56:2, 56:11, 56:15, 56:16, 58:3, 58:20, 58:21, 58:22, 58:23, 58:24, 59:14, 60:3, 60:4, 60:5, 60:14, 60:17, 60:18, 60:20, 60:21, 61:1, 61:4, 65:22, 67:24, 68:24, 69:2, 69:3, 69:7, 69:20, 69:21, 72:6, 72:19, 72:25, 73:1, 73:4, 85:12, 85:17, 85:23, 86:2, 86:14, 87:21, 87:24, 88:25, 89:4, 89:7
**embarrass** [1] - 58:8
**Emily** [2] - 34:24, 54:23
**employee** [1] - 6:11
**employees** [2] - 56:19, 87:22
**enabled** [1] - 53:3
**encompasses** [2] -

25:21, 25:22
**encourage** [1] - 28:17
**end** [2] - 25:9, 63:3
**engagement** [1] - 61:17
**entered** [1] - 66:17
**entertain** [2] - 4:18, 29:3
**entertained** [4] - 4:20, 6:22, 8:20, 9:18
**entertaining** [1] - 15:18
**entire** [2] - 4:15, 40:17
**entitled** [4] - 64:5, 84:14, 90:3, 91:5
**entity** [1] - 13:2
**entries** [44] - 41:9, 43:24, 44:22, 44:25, 45:1, 45:2, 45:5, 45:9, 45:11, 45:13, 46:4, 46:8, 46:9, 46:14, 46:20, 47:5, 47:11, 47:16, 47:20, 47:23, 48:3, 48:6, 48:11, 50:22, 50:25, 51:11, 51:19, 53:23, 54:18, 64:4, 64:10, 64:18, 64:20, 65:22, 72:7, 72:19, 75:15, 75:20, 76:4, 76:22, 89:4, 89:8
**entry** [1] - 45:6
**envision** [1] - 15:15
**equally** [1] - 78:3
**Eric** [1] - 48:3
**error** [1] - 84:4
**errors** [3] - 63:25, 63:25, 82:15
**ESI** [2] - 87:4, 88:16
**espoused** [1] - 75:12
**essentially** [1] - 82:9
**establishing** [1] - 28:9
**estimate** [1] - 4:6
**estimates** [1] - 4:13
**et** [1] - 7:21
**Eve** [1] - 65:23
**event** [4] - 67:12, 67:13, 67:17, 67:20
**events** [1] - 49:24
**eventually** [1] - 52:10
**evidence** [61] - 4:20, 7:1, 7:7, 8:9, 9:12, 10:13, 10:16, 11:6, 11:12, 11:21, 11:24, 12:17, 13:8, 15:14, 15:16, 15:19, 15:20, 16:6, 16:7, 16:9, 16:15, 16:22, 16:25, 22:1, 22:6, 22:21, 23:13, 23:19, 27:25,

28:11, 28:22, 28:23, 28:24, 29:15, 29:19, 31:25, 32:1, 32:8, 34:1, 34:21, 35:4, 35:16, 57:20, 62:8, 62:9, 71:1, 73:14, 73:20, 74:5, 74:6, 74:11, 75:1, 75:7, 75:9, 76:21, 77:3, 77:16, 78:8, 86:11, 87:17
**evidentiary** [2] - 75:3, 75:11
**evinces** [1] - 41:22
**ex** [1] - 35:9
**ex-members** [1] - 35:9
**exact** [4] - 24:4, 31:5, 51:19, 68:13
**exactly** [5] - 5:15, 6:10, 19:18, 20:4, 20:14, 23:7, 26:19, 27:15, 36:19, 44:19, 84:14
**examination** [1] - 5:19
**examine** [3] - 55:7, 66:18, 66:25
**examined** [1] - 38:22
**examining** [2] - 54:12, 55:12
**example** [16] - 5:22, 7:10, 9:21, 10:25, 25:4, 25:5, 27:11, 28:18, 35:15, 44:24, 52:24, 58:19, 60:7, 62:20, 65:25, 86:12
**examples** [7] - 24:19, 24:21, 38:9, 47:16, 47:17, 47:21, 62:13
**Excel** [3] - 45:24, 52:21, 87:1
**Excel's** [1] - 52:21
**except** [3] - 52:4, 54:1, 89:9
**exception** [1] - 79:6
**exchange** [4] - 60:11, 85:25, 87:8
**exchanged** [1] - 73:24
**excluded** [2] - 32:3, 34:9
**excuse** [3] - 25:18, 79:6, 89:9
**excuses** [4] - 41:24, 42:22, 43:25, 45:12
**exercise** [2] - 46:1, 49:3
**exhaustive** [2] - 85:9, 88:3
**Exhibit** [5] - 17:5, 25:14, 25:18, 61:10
**exhibit** [1] - 61:19

exist [2] - 59:16, 84:23
existed [6] - 16:1, 56:19, 77:3, 81:7, 83:20, 84:11
existence [3] - 43:20, 77:17, 87:22
expansive [1] - 34:23
expecting [1] - 62:22
expended [1] - 69:19
expense [1] - 53:20
experiencing [1] - 71:23
expert [11] - 13:2, 32:3, 32:4, 45:18, 48:14, 60:24, 66:16, 75:4, 85:15, 86:12, 88:16
experts [5] - 35:22, 54:1, 54:14, 54:20, 75:4
explain [7] - 49:18, 60:24, 65:6, 66:8, 68:14, 71:4, 71:13
explained [3] - 47:4, 68:6, 68:14
explaining [1] - 61:14
explains [1] - 65:1
explanation [17] - 46:23, 46:24, 48:1, 49:13, 49:16, 50:21, 51:7, 56:18, 58:19, 58:23, 58:25, 60:23, 67:16, 71:10, 73:17, 76:10, 85:20
explanations [8] - 39:14, 39:16, 41:25, 51:6, 59:2, 60:7, 61:12, 66:3
explicitly [1] - 19:18
explored [1] - 78:9
export [2] - 64:10, 65:9, 67:7, 67:8
exported [1] - 52:21
express [1] - 4:14
Express [1] - 55:4
expressed [1] - 13:22
expression [1] - 74:23
extended [1] - 43:9
extent [2] - 20:10, 58:11
external [4] - 60:2, 60:4, 60:8, 60:21
extra [2] - 69:18, 74:19
extracted [1] - 66:5
extraordinary [1] - 62:4

**F**

Facciola [1] - 77:6
face [1] - 48:15
faced [1] - 58:2
facing [2] - 45:13, 45:15
fact [28] - 4:22, 5:10, 8:15, 9:14, 10:11, 16:5, 16:8, 22:17, 22:25, 23:8, 23:21, 24:5, 24:14, 27:7, 33:16, 36:11, 39:18, 48:10, 48:18, 49:8, 49:15, 51:8, 71:4, 71:13, 85:11, 88:2, 89:12
factors [1] - 22:22
facts [2] - 28:9, 33:15
factual [2] - 49:2, 66:15
factually [1] - 78:12
failure [2] - 13:4, 88:11
faith [25] - 47:18, 47:21, 48:6, 48:8, 48:23, 49:1, 49:2, 49:5, 49:10, 50:4, 57:21, 57:22, 59:9, 61:8, 62:8, 65:15, 69:22, 70:1, 70:22, 74:6, 74:11, 75:2, 75:5, 77:3
fall [1] - 31:22
falling [1] - 71:23
falls [1] - 75:8
false [9] - 11:7, 27:5, 29:11, 34:6, 38:9, 38:11, 38:12, 38:23, 39:21
falsity [9] - 4:21, 7:5, 8:5, 10:15, 11:8, 15:16, 16:15, 22:9, 35:21
familiar [1] - 86:17
familiarity [1] - 4:17
far [2] - 20:12, 61:20
FARA [1] - 12:15
fault [2] - 7:17, 52:21
favor [9] - 17:10, 17:17, 17:21, 26:24, 27:1, 27:2, 27:6, 33:9, 53:14
favorable [3] - 5:25, 33:5, 39:5
FBI [2] - 23:1, 23:2
federal [1] - 77:8
feeble [1] - 83:22
field [2] - 35:23, 67:8

figure [5] - 5:15, 28:15, 33:9, 53:10, 81:2
file [8] - 19:20, 19:25, 34:8, 58:16, 64:12, 80:22, 86:23, 87:1
filed [6] - 10:3, 19:7, 58:11, 69:24, 70:15, 74:19
files [7] - 41:6, 45:23, 64:10, 64:13, 64:21, 66:5, 89:14
filing [1] - 38:16
filings [2] - 4:4, 61:10
final [2] - 41:7, 84:6
finally [3] - 36:17, 45:12, 62:1
findings [1] - 62:1
firm [1] - 68:5
First [1] - 16:10
first [30] - 4:5, 7:11, 17:2, 22:10, 25:23, 37:2, 39:23, 41:16, 41:22, 42:2, 42:11, 42:16, 43:19, 43:24, 44:7, 45:3, 46:1, 46:5, 52:14, 59:12, 70:25, 84:18, 84:23, 86:8, 86:23, 87:25, 88:20, 88:24, 89:3, 89:6
five [7] - 13:13, 34:13, 36:22, 37:21, 40:19, 51:1, 63:11
five-month [1] - 51:1
fix [2] - 71:18, 72:2
flesh [1] - 66:9
focus [4] - 4:3, 7:3, 13:14, 15:6
follow [2] - 28:18, 89:5
followed [1] - 69:17
following [2] - 7:12, 46:2
follows [1] - 28:6
footnote [1] - 7:20
footnoted [1] - 7:25
footnotes [2] - 6:19, 84:21
force [1] - 60:12
foregoing [1] - 91:4
Foreign [10] - 12:1, 12:3, 29:25, 30:6, 31:8, 31:15, 31:22, 32:12, 32:18, 34:15
foremost [1] - 17:2, 22:5
forensic [3] - 40:12, 45:18, 88:16
form [1] - 61:22
Former [1] - 36:10

forth [3] - 35:17, 38:8, 55:24
forward [6] - 8:9, 10:13, 10:16, 11:6, 13:7, 14:8
foundation [1] - 35:13
founded [1] - 4:15
four [9] - 13:12, 13:18, 13:21, 40:14, 59:7, 69:18, 73:12, 74:6
fourth [1] - 62:2
frame [1] - 71:11
framed [2] - 43:2, 46:1
frames [1] - 5:5
framework [1] - 11:17
frank [1] - 35:8
frankly [29] - 4:13, 7:5, 9:13, 12:9, 34:8, 34:13, 35:3, 35:4, 35:13, 35:23, 36:5, 36:12, 37:10, 37:15, 37:22, 38:3, 38:15, 38:24, 39:8, 40:22, 41:4, 41:12, 43:3, 43:18, 51:20, 56:20, 57:6, 86:20, 86:23
frequently [1] - 54:6
fresh [1] - 56:24
front [3] - 18:12, 30:21, 65:13
full [2] - 21:5, 21:6
fully [2] - 4:14, 12:4
functions [2] - 72:18, 72:24
future [1] - 49:23

**G**

game [1] - 89:9
gap [1] - 75:16
Gardiner [2] - 54:15, 85:15
Gardiner's [1] - 58:22
gathered [1] - 21:1
gee [1] - 87:15
general [5] - 6:12, 8:13, 11:5, 12:11, 47:20
General [1] - 36:10
generalized [1] - 10:8
generic [1] - 11:2
generous [1] - 4:14
gentleman [1] - 86:4
genuine [2] - 28:9, 33:14
Gingrich [1] - 36:11
given [14] - 11:19, 11:24, 16:2, 16:10, 46:5, 46:23, 56:25,

58:2, 64:8, 66:3, 69:16, 70:16, 80:8, 84:13
glad [2] - 4:18, 44:3
global [1] - 10:17
gmail [2] - 48:4, 61:5
gmails [1] - 7:2
goodness [1] - 50:9
government [1] - 37:13
grabbed [1] - 46:2
Grand [2] - 24:25, 51:3
grandmother [1] - 58:7
granted [1] - 79:23
grants [1] - 83:8
greater [1] - 28:16
ground [1] - 81:18
group [1] - 36:9
guess [5] - 11:12, 36:9, 70:24, 82:1, 83:20
guy [1] - 71:17

**H**

half [2] - 39:25, 56:21
hallmark [1] - 86:10
halt [1] - 68:2
hand [1] - 43:21
handed [1] - 61:1
handle [1] - 37:19
hands [2] - 36:19, 36:21
harbored [2] - 8:10, 15:17
harboring [2] - 7:8, 36:9
hard [4] - 34:23, 44:14, 44:15, 86:18
harm [1] - 80:6
harmed [1] - 80:15
Hassan [1] - 6:24
haunting [1] - 4:25
head [1] - 67:5
hear [4] - 4:5, 4:11, 44:23, 67:1
heard [2] - 60:23, 66:12
hearing [6] - 12:25, 14:3, 75:3, 75:11, 88:20, 89:24
held [1] - 7:12
help [1] - 68:4
heretofore [1] - 39:17
hide [3] - 78:5, 78:7, 78:13
hiding [4] - 78:16,

78:19, 79:7, 83:5
**higher** [1] - 28:23
**Hillary** [1] - 58:21
**himself** [3] - 39:11, 50:14, 56:2
**hire** [2] - 63:8, 65:11
**hired** [2] - 6:8, 68:3
**Hirschfield** [4] - 65:24, 66:7, 66:9, 74:1
**Hirschfield's** [1] - 64:25
**history** [1] - 4:16
**hit** [1] - 65:9
**hold** [8] - 46:11, 46:16, 46:18, 49:16, 49:25, 50:12, 70:12, 88:14
**Holocaust** [1] - 7:13
**Honor** [33] - 4:8, 16:18, 16:20, 16:24, 18:7, 25:3, 29:22, 30:10, 31:24, 33:2, 33:24, 38:3, 57:13, 57:14, 58:2, 58:7, 59:1, 61:4, 62:4, 62:22, 64:11, 66:12, 72:8, 73:7, 74:11, 74:14, 77:12, 78:11, 81:4, 83:7, 83:10, 83:15, 89:20
**Honor's** [2] - 57:18, 75:10
**hope** [1] - 4:9
**hot** [1] - 6:19
**hours** [7] - 38:6, 54:2, 59:6, 59:8, 69:17, 69:18, 69:19
**Howard** [1] - 36:10
**humanity** [1] - 7:15
**hundred** [2] - 13:13, 45:12
**hundreds** [9] - 41:8, 50:25, 53:23, 56:1, 58:3, 58:5, 58:6, 69:19, 85:16

**I**

**i.e** [1] - 45:6
**identified** [2] - 21:14, 81:14
**identities** [1] - 80:8
**ignores** [1] - 27:18
**ignoring** [1] - 27:22
**IIC** [2] - 73:5, 73:7
**ill** [3] - 7:4, 22:23, 36:14
**imagine** [1] - 65:15

**imaging** [17] - 39:19, 39:23, 40:1, 40:6, 40:12, 40:15, 41:7, 44:8, 44:11, 45:14, 46:2, 52:1, 53:22, 55:5, 55:16, 86:8, 87:19
**implicated** [1] - 32:20
**implies** [1] - 31:20
**imply** [1] - 12:17
**importance** [3] - 16:10, 22:14, 70:17
**important** [9] - 22:12, 23:20, 24:15, 39:5, 53:22, 82:22, 83:3, 87:1, 88:12
**impose** [1] - 8:1
**imposed** [3] - 38:14, 38:15, 63:2
**inability** [1] - 52:11
**inaccessible** [6] - 64:15, 64:23, 65:2, 65:5, 86:22, 87:4
**inactive** [1] - 64:21
**incident** [2] - 40:9, 86:6
**include** [3] - 45:5, 46:14, 47:22
**included** [1] - 55:5
**including** [8] - 34:7, 34:21, 38:18, 43:25, 53:25, 55:6, 56:9, 87:5
**income** [1] - 13:5
**inconsistent** [2] - 39:16, 72:21
**incorporated** [1] - 73:11
**incorrect** [2] - 38:24, 40:2
**indeed** [3] - 51:10, 81:16, 82:20
**independent** [2] - 28:17, 40:4
**individual** [1] - 69:3
**individually** [1] - 69:14
**individuals** [2] - 67:14, 84:25
**indulgence** [2] - 20:19, 25:7
**infer** [1] - 12:17
**inferences** [2] - 33:5, 33:8
**infers** [1] - 69:15
**influence** [1] - 51:5
**influenced** [1] - 15:14
**information** [6] - 8:3, 10:1, 14:21, 61:24, 62:2, 62:5, 70:6,

80:9, 82:20, 82:21
**informed** [1] - 71:22
**initial** [5] - 28:8, 28:20, 33:4, 33:12, 48:2
**innocuous** [1] - 65:25
**inquiry** [1] - 33:18
**inspection** [1] - 39:10
**instance** [2] - 5:21, 32:16
**instances** [3] - 30:15, 38:24, 51:15
**instead** [1] - 44:20
**instituted** [2] - 88:13, 88:17
**instruction** [1] - 70:16
**intensive** [1] - 77:5
**intent** [1] - 88:9
**intentional** [1] - 70:19
**intentionally** [3] - 7:18, 39:4, 51:17
**interesting** [1] - 36:17
**interestingly** [2] - 56:1, 56:12
**intern's** [1] - 39:19
**Internal** [1] - 32:19
**internet** [4] - 7:20, 56:16, 85:24, 86:2
**interpret** [1] - 34:19
**interpreted** [1] - 84:8
**interprets** [2] - 37:14, 84:7
**interrogatory** [3] - 38:19, 39:22, 41:5
**interview** [6] - 25:21, 26:2, 26:6, 79:24, 82:4, 83:1
**interviews** [4] - 21:18, 79:18, 82:5, 82:24
**introduced** [1] - 21:19
**introducing** [1] - 11:20
**inventory** [1] - 40:4
**invoking** [1] - 42:23
**involved** [3] - 45:17, 50:15, 51:3
**involves** [1] - 53:18
**involving** [1] - 58:23
**IQ** [1] - 15:18
**Iran** [12] - 10:19, 12:1, 23:5, 26:16, 32:19, 34:3, 37:2, 37:10, 37:11, 37:15, 37:17, 37:23
**Iran's** [1] - 24:25
**Iranian** [23] - 7:15, 15:10, 17:8, 17:10, 17:13, 17:15, 17:16, 17:18, 17:25, 18:11, 23:5, 27:6, 30:5, 30:19, 31:6, 31:17,

32:7, 32:23, 32:25, 35:17, 37:10, 51:2
**ironic** [1] - 88:15
**irrelevant** [4] - 7:3, 8:16, 8:24, 36:13
**issue** [27] - 8:5, 8:19, 10:11, 12:9, 12:21, 15:5, 16:13, 18:17, 19:7, 24:24, 33:3, 33:17, 33:18, 33:20, 35:14, 35:20, 44:7, 48:12, 51:9, 55:14, 57:14, 60:2, 67:7, 70:25, 77:13, 83:2, 87:7
**issues** [7] - 5:5, 16:4, 43:12, 55:12, 55:16, 67:15, 79:19
**IT** [1] - 71:20
**item** [1] - 67:18
**items** [5] - 62:14, 62:16, 63:11, 63:12, 67:7
**itself** [11] - 17:3, 22:6, 22:11, 22:19, 24:11, 25:17, 27:24, 62:9, 65:1, 71:19

**J**

**January** [2] - 67:12, 67:20
**jar** [1] - 43:21
**Joel** [1] - 58:22
**John** [1] - 36:11
**Jones** [2] - 28:18, 33:7
**journalist** [8] - 42:22, 77:22, 78:4, 78:7, 78:13, 78:16, 78:22, 79:3
**journalistic** [2] - 23:22, 77:22
**journalists** [3] - 15:7, 15:8, 23:18
**Judge** [1] - 77:6
**judgment** [15] - 4:4, 4:11, 15:4, 18:13, 18:16, 19:25, 20:15, 20:22, 20:23, 21:7, 21:16, 28:7, 28:20, 33:3, 63:13
**June** [3] - 40:8, 86:13, 88:22
**juror** [1] - 28:11

**K**

**Kaneshiro** [1] - 91:3
**KANESHIRO** [1] - 91:9

**Kaneshiro-Miller** [1] - 91:3
**KANESHIRO-MILLER** [1] - 91:9
**Kapshandy** [4] - 24:6, 33:23, 38:1, 83:14
**KAPSHANDY** [87] - 4:8, 4:13, 5:3, 5:9, 5:23, 6:5, 6:10, 7:24, 8:4, 8:18, 8:22, 9:1, 9:4, 9:10, 9:17, 10:9, 10:24, 11:19, 12:6, 12:24, 14:2, 14:11, 14:15, 14:22, 15:2, 15:13, 16:2, 16:14, 16:18, 33:24, 35:19, 36:24, 38:2, 38:7, 38:15, 39:6, 40:18, 40:22, 41:4, 41:18, 42:6, 42:14, 42:17, 43:3, 43:9, 43:15, 43:18, 44:13, 45:3, 45:8, 46:12, 46:16, 46:21, 46:25, 47:6, 47:25, 48:10, 49:6, 49:13, 49:25, 50:5, 50:15, 50:24, 51:12, 51:14, 51:20, 51:23, 52:15, 52:18, 53:6, 53:17, 54:10, 54:14, 54:18, 54:22, 55:3, 55:10, 55:13, 55:18, 55:20, 56:7, 57:3, 66:11, 66:15, 83:15, 84:24, 85:7
**keep** [5] - 13:9, 51:23, 87:5, 88:10, 89:6
**keeping** [1] - 40:8
**Kennedy** [1] - 71:16
**kept** [1] - 71:16
**key** [1] - 87:3
**kind** [10] - 5:21, 8:3, 11:2, 12:11, 23:24, 33:9, 41:3, 45:14, 60:1, 69:3
**kinds** [2] - 52:17, 64:5
**king's** [1] - 89:11
**knowledge** [2] - 10:14, 34:5
**knows** [2] - 41:7, 42:2
**Kushner** [2] - 71:21, 71:25

**L**

**labor** [1] - 77:4
**lack** [5] - 23:22, 35:18, 47:22, 50:22, 75:11
**laid** [2] - 18:7, 21:8

**Lake** [2] - 12:13, 62:25
**language** [3] - 31:5, 31:9, 31:14
**laptop** [12] - 40:9, 42:5, 42:8, 70:4, 70:20, 72:10, 72:11, 72:12, 73:1, 73:4, 88:12, 88:22
**laptops** [1] - 76:7
**large** [1] - 47:14
**last** [15] - 12:25, 13:8, 14:3, 34:16, 39:12, 39:24, 41:13, 43:10, 44:2, 54:1, 56:21, 59:7, 75:14, 82:1, 84:20
**late** [1] - 64:22
**latter** [1] - 10:9
**launched** [1] - 7:15
**law** [2] - 28:14, 68:5
**laws** [3] - 11:22, 12:14, 34:17
**lawsuit** [4] - 19:13, 50:5, 70:15, 78:7
**lawyer** [2] - 35:6, 66:25
**lawyers** [1] - 6:7
**leap** [1] - 50:3
**learned** [1] - 87:25
**learning** [2] - 88:24, 89:3
**least** [3] - 38:16, 42:2, 88:13
**leave** [2] - 19:25, 25:14
**led** [1] - 45:25
**left** [1] - 38:17
**legal** [2] - 12:8, 63:18
**legality** [1] - 11:21
**legislative** [5] - 39:11, 49:20, 52:6, 52:19, 54:22
**legitimate** [3] - 45:9, 46:4, 47:9
**length** [1] - 8:11
**less** [3] - 34:24, 55:21, 63:17
**letter** [2] - 61:14, 61:18
**level** [2] - 53:17, 58:9
**levels** [1] - 40:20
**Leverett** [1] - 58:21
**liability** [4] - 78:2, 78:14, 79:2, 79:8
**libel** [1] - 78:8
**Liberty** [1] - 29:5
**Libya** [1] - 32:20
**Lies** [1] - 25:1
**lieu** [1] - 39:23
**light** [2] - 12:6, 33:5

**likely** [1] - 49:22
**limited** [7] - 6:12, 36:22, 38:3, 40:14, 43:11, 55:4, 61:6
**line** [1] - 4:19
**links** [1] - 26:2
**list** [4] - 10:4, 36:7, 38:17, 66:21
**listed** [2] - 5:8, 11:23
**listing** [1] - 39:6
**lists** [1] - 33:15
**litany** [1] - 59:15
**literally** [2] - 84:24, 85:1
**litigation** [11] - 46:11, 46:16, 46:18, 49:25, 50:12, 53:21, 63:18, 70:12, 72:17, 88:14, 88:18
**lobbied** [3] - 17:10, 31:17, 37:7
**lobbies** [1] - 37:11
**lobby** [3] - 30:1, 34:3, 37:23
**Lobby** [1] - 29:5
**Lobbying** [5] - 11:25, 12:14, 32:18, 34:25, 50:7
**lobbying** [32] - 8:13, 11:4, 11:22, 12:10, 12:12, 12:14, 17:12, 17:15, 17:17, 17:25, 27:2, 27:6, 34:23, 34:25, 37:2, 37:9, 37:10, 37:14, 37:15, 37:16, 49:19, 50:10, 52:19, 55:14, 55:17, 55:19, 55:20, 63:15, 63:18, 63:19, 63:20
**lobbyist** [4] - 11:2, 26:16, 26:23, 85:18
**lobbyists** [13] - 6:2, 6:3, 6:6, 6:7, 6:15, 10:19, 10:22, 10:25, 18:11, 32:23, 32:24, 32:25
**locate** [1] - 89:13
**located** [3] - 39:17, 60:3, 60:9
**log** [1] - 43:22
**Logan** [1] - 32:19
**logging** [1] - 53:7
**look** [13] - 5:18, 19:14, 21:12, 22:12, 24:13, 24:19, 24:23, 25:2, 26:11, 62:23, 83:1, 84:14, 85:11
**looked** [6] - 6:18, 20:3, 22:10, 22:23, 46:5, 72:1

**looking** [11] - 5:13, 7:21, 18:25, 22:19, 22:21, 24:11, 24:12, 25:25, 46:17, 82:15, 84:21
**lose** [1] - 52:21
**lost** [3] - 40:8, 42:5, 86:6
**lurking** [1] - 65:10
**lying** [1] - 29:2

## M

**Mac** [1] - 72:14
**MacBook** [3] - 72:18, 89:4, 89:7
**machine** [5] - 39:18, 39:20, 40:3, 40:5, 52:3
**machines** [2] - 47:12, 88:19
**mafia** [1] - 18:10
**main** [4] - 7:16, 15:5, 19:15, 19:17
**malice** [35] - 5:21, 8:3, 8:17, 9:17, 11:17, 12:21, 15:12, 15:19, 16:1, 16:7, 16:11, 16:23, 17:4, 21:23, 22:2, 22:4, 22:8, 22:13, 22:16, 22:17, 22:20, 23:9, 23:14, 24:7, 27:11, 27:25, 28:4, 28:7, 28:23, 28:25, 33:17, 33:20, 34:1, 35:18, 36:9
**managed** [1] - 86:2
**Manipulation** [1] - 25:1
**Mann** [1] - 58:21
**manner** [3] - 10:8, 34:20, 88:9
**Mansouri** [2] - 56:11, 60:20, 61:4, 85:22
**Mansouri's** [2] - 56:15, 60:2
**Mansuri's** [1] - 86:2
**map** [1] - 7:14
**March** [2] - 62:14, 81:16
**mask** [1] - 48:18
**material** [6] - 6:21, 10:11, 23:17, 28:9, 29:16, 33:14, 33:16, 33:17, 33:19, 51:17, 79:10, 81:15
**materials** [5] - 5:10, 35:21, 54:21, 55:1, 81:18

**math** [2] - 46:25, 47:7
**matter** [4] - 9:6, 16:16, 90:3, 91:5
**mean** [33] - 6:7, 9:15, 10:5, 14:15, 14:23, 16:2, 17:20, 19:23, 21:18, 26:19, 36:4, 36:11, 43:18, 44:14, 47:19, 51:5, 54:3, 58:9, 60:3, 64:15, 65:2, 65:4, 65:11, 65:16, 66:6, 70:20, 71:11, 72:11, 81:13, 81:25, 85:10, 87:15
**meaning** [4] - 17:20, 26:23, 39:2, 39:25
**means** [5] - 4:10, 60:18, 65:3, 66:10, 80:25
**media** [1] - 7:17
**meet** [3] - 13:3, 29:17
**meeting** [10] - 41:16, 41:24, 43:3, 83:16, 83:18, 83:19, 84:6, 84:9, 84:15, 84:21
**meetings** [12] - 42:10, 42:11, 42:12, 42:18, 42:20, 83:19, 83:24, 83:25, 84:10, 84:25, 85:2, 85:4
**MEK** [14] - 22:11, 22:17, 22:18, 22:25, 23:8, 23:11, 35:2, 35:7, 35:12, 36:6, 36:12, 36:13
**member** [1] - 35:7
**members** [3] - 35:6, 35:9, 56:10
**membership** [5] - 32:5, 32:7, 32:8, 38:17, 58:9
**memo** [2] - 50:7, 51:4
**memorandum** [1] - 27:14
**mention** [2] - 34:15, 63:10
**mentioned** [7] - 6:17, 13:6, 19:1, 19:6, 36:18, 42:10, 59:15
**mere** [3] - 9:7, 34:2, 36:11
**merely** [2] - 26:14, 26:15
**merits** [5] - 53:4, 55:8, 55:10, 55:12, 57:7
**merits-related** [1] - 55:12
**messing** [1] - 4:9
**met** [1] - 33:13
**metadata** [8] - 55:6,

73:15, 73:25, 74:4, 86:21, 87:1, 87:2
**methodology** [6] - 23:23, 23:24, 34:9, 35:25, 52:23
**Microsoft** [2] - 60:11, 87:8
**middle** [2] - 39:25, 47:23
**might** [5] - 4:6, 4:18, 15:25, 46:10, 80:22
**Miller** [1] - 91:3
**MILLER** [1] - 91:9
**million** [2] - 63:2, 89:13
**mimic** [1] - 66:8
**mind** [7] - 9:20, 9:23, 11:7, 40:8, 51:23, 87:5, 89:6
**minute** [1] - 21:3
**minutes** [2] - 4:7
**mischaracterization** [1] - 27:13
**mischaracterizations** [1] - 25:9
**miscommunication** [1] - 72:3
**misconduct** [1] - 57:21
**misinterpreted** [1] - 7:18
**mislead** [1] - 87:16
**misquote** [1] - 63:1
**misrepresented** [1] - 62:18
**misrepresenting** [1] - 62:17
**missed** [2] - 63:4, 85:14
**missing** [1] - 66:23
**mistake** [1] - 89:10
**mistakes** [1] - 36:1
**misunderstanding** [1] - 87:13
**moderate** [1] - 16:9
**modest** [1] - 16:8
**modification** [4] - 66:2, 73:18, 73:20, 74:1
**modified** [5] - 65:23, 67:6, 67:8, 86:22, 88:5
**Mohammad** [4] - 56:11, 56:15, 60:2, 86:2
**Mohammadi** [5] - 16:19, 57:15, 70:24, 77:11, 83:17
**MOHAMMADI** [72] - 16:20, 16:24, 17:2,

17:23, 18:7, 18:21, 18:24, 19:2, 19:5, 19:11, 19:15, 19:20, 19:24, 20:10, 20:17, 20:19, 20:25, 21:11, 21:16, 21:25, 22:5, 22:8, 22:19, 23:15, 24:10, 24:23, 25:6, 25:13, 25:17, 26:12, 26:18, 26:25, 27:5, 27:11, 27:22, 28:5, 28:19, 29:7, 29:22, 29:25, 30:9, 30:20, 30:25, 31:3, 31:7, 31:17, 31:20, 31:24, 32:4, 32:17, 32:24, 33:2, 33:11, 33:22, 77:12, 77:21, 77:25, 78:11, 78:18, 78:24, 79:13, 79:15, 79:23, 80:14, 80:18, 80:21, 81:4, 81:20, 82:1, 82:8, 82:22, 83:7

**moment** [1] - 84:17

**monetary** [1] - 57:4

**money** [2] - 78:17, 78:19

**Monique** [1] - 58:21

**month** [2] - 51:1, 76:16

**months** [2] - 13:8, 40:15

**morning** [3] - 4:2, 16:20, 16:21

**moron** [1] - 9:11

**Morris** [1] - 85:11

**Morse** [1] - 54:15

**Morse's** [1] - 58:22

**most** [19] - 5:18, 5:25, 6:6, 10:25, 27:21, 33:5, 36:6, 41:12, 43:3, 47:17, 49:22, 51:9, 51:10, 52:22, 52:24, 62:13, 67:5, 87:9, 88:12

**motion** [62] - 4:1, 4:4, 4:12, 4:15, 4:19, 7:6, 7:7, 8:6, 10:18, 12:22, 14:2, 14:5, 14:11, 14:19, 15:2, 18:8, 18:15, 19:5, 19:8, 19:10, 19:20, 19:22, 19:23, 19:24, 19:25, 20:1, 20:7, 20:8, 20:14, 21:6, 25:14, 27:13, 28:7, 30:16, 30:17, 30:21, 32:17, 33:19, 37:25, 38:8, 38:16, 40:17, 40:24, 41:21, 43:16,

57:6, 57:16, 58:16, 62:16, 63:13, 63:22, 63:23, 64:2, 69:24, 75:8, 79:23, 82:5, 82:7, 82:8, 83:8

**motions** [3] - 15:6, 41:19, 74:18

**motive** [2] - 22:23, 23:15

**motives** [1] - 58:17

**movant** [8] - 4:5, 8:8, 10:10, 28:8, 33:4, 33:6, 33:9, 33:22

**move** [2] - 37:25, 49:8

**moved** [5] - 8:8, 12:25, 13:4, 47:12, 47:13

**moving** [3] - 10:12, 20:22, 28:20

**MR** [226] - 4:8, 4:13, 5:3, 5:9, 5:23, 6:5, 6:10, 7:24, 8:4, 8:18, 8:22, 9:1, 9:4, 9:10, 9:17, 10:9, 10:24, 11:19, 12:6, 12:24, 14:2, 14:11, 14:15, 14:22, 15:2, 15:13, 16:2, 16:14, 16:18, 16:20, 16:24, 17:2, 17:23, 18:7, 18:21, 18:24, 19:2, 19:5, 19:11, 19:15, 19:20, 19:24, 20:10, 20:17, 20:19, 20:25, 21:11, 21:16, 21:25, 22:5, 22:8, 22:19, 23:15, 24:10, 24:23, 25:6, 25:13, 25:17, 26:12, 26:18, 26:25, 27:5, 27:11, 27:22, 28:5, 28:19, 29:7, 29:22, 29:25, 30:9, 30:20, 30:25, 31:3, 31:7, 31:17, 31:20, 31:24, 32:4, 32:17, 32:24, 33:2, 33:11, 33:22, 33:24, 35:19, 36:24, 38:2, 38:7, 38:15, 39:6, 40:18, 40:22, 41:4, 41:18, 42:6, 42:14, 42:17, 43:3, 43:9, 43:15, 43:18, 44:13, 45:3, 45:8, 46:12, 46:16, 46:21, 46:25, 47:6, 47:25, 48:10, 49:6, 49:13, 49:25, 50:5, 50:15, 50:24, 51:12, 51:14, 51:20, 51:23, 52:15, 52:18, 53:6, 53:17,

54:10, 54:14, 54:18, 54:22, 55:3, 55:10, 55:13, 55:18, 55:20, 56:7, 57:3, 57:13, 58:2, 58:6, 58:14, 59:1, 59:6, 59:18, 59:25, 60:6, 60:10, 60:24, 61:4, 62:22, 64:8, 64:16, 64:19, 64:24, 65:3, 65:6, 65:19, 65:24, 66:7, 66:11, 66:15, 67:3, 67:5, 67:18, 67:22, 68:1, 68:10, 68:13, 68:18, 68:20, 68:24, 69:1, 69:5, 69:9, 69:11, 69:25, 70:8, 70:13, 70:15, 70:19, 71:8, 71:16, 71:25, 72:8, 72:10, 72:13, 72:15, 72:22, 73:1, 73:4, 73:7, 73:11, 73:19, 74:9, 74:14, 74:21, 74:25, 75:18, 75:22, 76:1, 76:7, 76:13, 76:17, 76:23, 77:2, 77:10, 77:12, 77:21, 77:25, 78:11, 78:18, 78:24, 79:13, 79:15, 79:23, 80:14, 80:18, 80:21, 81:4, 81:20, 82:1, 82:8, 82:22, 83:7, 83:15, 84:24, 85:7

**mud** [2] - 35:14, 35:16

**Mukasey** [1] - 36:10

**mullahs** [1] - 10:20

**multiple** [1] - 66:5

**must** [2] - 15:17, 15:18

**mysterious** [2] - 48:1, 49:4

**mysteriously** [1] - 56:14

**N**

**NAIC** [20] - 13:2, 23:17, 31:5, 32:6, 32:9, 32:20, 36:4, 56:4, 58:24, 68:15, 71:2, 71:14, 71:20, 71:22, 72:6, 72:19, 72:20, 73:10, 85:12

**NAIC's** [4] - 32:2, 32:5, 59:16, 64:23

**Namazi** [1] - 7:16

**name** [3] - 12:13, 69:12, 82:14

**names** [1] - 80:8

**national** [1] - 79:19

**native** [1] - 45:23

**nearly** [1] - 56:1

**necessarily** [8] - 6:8, 9:8, 33:7, 33:19, 42:17, 45:5, 59:23, 80:5

**necessary** [2] - 32:4, 41:20

**necessitating** [1] - 53:21

**need** [10] - 4:2, 10:7, 10:13, 31:7, 61:2, 63:12, 64:16, 65:10, 65:11, 74:5

**needed** [3] - 15:5, 52:7, 75:11

**needs** [2] - 64:16, 75:12

**nefarious** [1] - 75:5

**negligence** [2] - 9:7, 88:15

**network** [5] - 40:6, 71:15, 71:24, 72:2, 72:20

**never** [12] - 12:9, 12:16, 18:12, 18:15, 30:13, 34:18, 40:10, 43:22, 70:6, 70:7, 71:25, 81:22

**new** [7] - 42:9, 42:18, 42:22, 72:10, 72:11, 72:22, 83:25

**Newt** [1] - 36:11

**next** [2] - 13:11, 46:1

**nice** [2] - 55:7, 55:23

**non** [5] - 10:12, 33:6, 33:9, 47:18, 64:13

**non-accessible** [1] - 64:13

**non-movant** [2] - 33:6, 33:9

**non-moving** [1] - 10:12

**non-productions** [1] - 47:18

**none** [7] - 34:14, 39:8, 56:11, 56:18, 62:16, 63:20, 89:15

**normal** [2] - 6:9, 65:25

**Norway** [2] - 40:9, 70:5

**not-very-good** [1] - 50:19

**note** [2] - 25:9, 61:1

**notes** [25] - 41:16, 41:24, 42:13, 43:4, 57:14, 70:25, 77:13, 77:17, 77:18, 79:24, 81:5, 81:7, 81:9,

82:4, 83:1, 83:3, 83:11, 83:16, 83:18, 83:20, 83:24, 84:7, 84:10, 84:21, 84:22

**nothing** [7] - 37:6, 46:18, 75:5, 76:16, 77:3, 81:14

**noting** [2] - 20:21, 33:3

**notion** [1] - 48:12

**November** [1] - 71:7

**nowhere** [1] - 59:13

**number** [2] - 25:9, 37:18, 38:17

**numbers** [1] - 47:13

**numerous** [4] - 22:9, 38:9, 43:9, 68:5

**O**

**oath** [16] - 38:10, 38:12, 38:25, 39:14, 39:21, 40:11, 40:22, 41:10, 53:18, 64:25, 71:21, 75:5, 82:24, 88:3, 88:7

**object** [1] - 81:17

**objection** [2] - 58:16, 66:11, 66:14

**objective** [1] - 9:15

**obligations** [1] - 39:15

**obtained** [2] - 60:14, 61:5

**obtaining** [1] - 51:17

**obvious** [1] - 88:9

**obviously** [6] - 5:4, 16:4, 42:21, 46:5, 49:16, 50:16

**occur** [2] - 57:25, 84:15

**occurred** [5] - 48:19, 53:2, 72:4, 73:18, 73:20

**OF** [1] - 91:1

**offense** [1] - 62:21

**Offer** [1] - 25:1

**office** [3] - 68:2, 71:25, 85:10

**officers** [1] - 39:15

**offices** [1] - 66:19

**OFFICIAL** [1] - 91:1

**often** [1] - 6:6

**oil** [1] - 18:10

**ol'** [1] - 57:24

**omission** [1] - 69:15

**omnibus** [1] - 57:16

**once** [4] - 10:10, 44:12, 44:16, 44:20

**one** [64] - 5:13, 5:23,

6:17, 7:11, 7:19,
8:13, 11:10, 14:8,
15:11, 15:15, 15:21,
17:19, 20:1, 20:8,
21:24, 22:22, 24:16,
24:23, 25:4, 25:5,
26:1, 26:3, 32:15,
35:5, 35:24, 37:14,
38:7, 38:24, 41:19,
42:24, 43:10, 45:5,
46:25, 47:9, 47:10,
48:12, 52:4, 52:23,
53:21, 56:9, 56:12,
59:11, 59:13, 60:19,
62:13, 64:12, 65:21,
66:3, 66:22, 69:1,
69:12, 69:13, 69:20,
75:14, 76:8, 78:22,
84:7, 84:12, 84:20,
85:1, 87:3
**one's** [1] - 88:14
**ones** [4] - 18:23,
24:23, 42:15, 46:17
**online** [1] - 84:5
**open** [9] - 12:7, 38:17,
39:15, 41:10, 53:18,
56:13, 64:11, 86:23,
86:24
**operative** [1] - 22:11
**opine** [1] - 85:17
**opinion** [5] - 16:9,
27:14, 61:22, 63:5,
89:12
**opinions** [1] - 16:4
**opportunities** [2] -
56:25, 57:1
**opportunity** [3] - 14:4,
58:18, 87:16
**opposed** [3] - 37:15,
44:11, 55:8
**opposite** [1] - 24:4
**opposition** [5] - 17:5,
19:10, 20:7, 30:12,
30:16
**order** [19] - 39:9, 46:1,
63:1, 64:8, 78:17,
79:21, 80:1, 80:3,
80:16, 80:18, 80:21,
80:23, 80:24, 81:1,
81:3, 81:16, 83:9,
83:16
**ordered** [3] - 49:21,
50:8, 79:24
**orders** [1] - 81:15
**ordinary** [1] - 66:1
**organization** [9] -
22:15, 23:1, 23:2,
23:3, 59:8, 71:22,
73:8, 73:9, 87:21
**original** [1] - 35:23

**originally** [1] - 88:7
**otherwise** [1] - 70:18
**outlined** [1] - 62:1
**Outlook** [16] - 40:7,
40:13, 41:6, 41:8,
45:16, 45:23, 55:4,
64:9, 65:9, 72:22,
86:14, 86:24, 89:7
**outset** [1] - 29:15
**outside** [1] - 56:14
**overturned** [1] - 59:21
**overwhelming** [2] -
15:16, 15:20
**overwritten** [1] - 45:20
**own** [12] - 17:4, 17:14,
23:16, 34:21, 37:11,
40:2, 40:12, 52:10,
62:3, 62:18, 75:8,
75:10

# P

**p.m** [1] - 90:4
**page** [8] - 17:5, 21:24,
23:13, 32:17, 34:18,
36:20, 36:25, 82:12
**pages** [2] - 89:9, 85:16
**painstaking** [1] -
74:18
**paper** [2] - 37:4, 89:22
**papers** [2] - 10:3, 37:5
**paragraph** [4] - 10:6,
61:21, 61:24, 62:2
**pardon** [1] - 55:18
**Paris** [1] - 47:24
**parse** [1] - 87:16
**Parsi** [43] - 7:14, 13:3,
13:8, 17:7, 23:17,
26:23, 31:5, 35:5,
35:11, 36:4, 39:11,
39:24, 40:7, 50:23,
51:12, 56:3, 58:23,
58:24, 61:2, 68:9,
68:12, 68:17, 70:17,
71:2, 71:5, 72:6,
75:21, 76:5, 77:13,
77:21, 78:14, 79:24,
80:5, 80:6, 80:8,
83:4, 83:20, 84:11,
84:24, 85:18, 86:13,
88:1, 88:21
**PARSI** [1] - 72:15
**Parsi's** [16] - 7:16,
35:7, 37:11, 41:15,
48:20, 52:5, 52:12,
54:2, 59:16, 70:3,
71:23, 75:15, 79:4,
81:8, 82:14, 82:23
**part** [18] - 17:8, 18:13,

18:14, 21:20, 22:25,
25:23, 26:3, 26:6,
26:8, 33:19, 46:1,
80:2, 80:3, 80:10,
80:23, 89:2
**partially** [1] - 14:7
**particular** [17] - 4:18,
5:1, 5:14, 5:19, 6:13,
10:1, 10:5, 10:15,
10:25, 11:22, 12:10,
18:3, 18:6, 40:1,
67:18, 76:17, 86:20
**particularly** [3] -
11:24, 12:13, 13:5
**parties** [15] - 5:6, 28:2,
43:6, 58:12, 60:17,
60:19, 61:7, 63:7,
79:19, 80:2, 80:7,
80:15, 81:17, 83:9
**partner** [1] - 7:16
**party** [15] - 10:12,
28:19, 59:14, 60:11,
60:14, 60:17, 60:20,
70:19, 77:24, 78:1,
79:4, 85:7, 86:16,
87:18, 89:12
**past** [2] - 28:10, 49:24
**Patricia** [1] - 91:3
**PATRICIA** [1] - 91:9
**Patrick** [5] - 34:22,
36:10, 49:19, 50:6,
54:23
**pattern** [3] - 41:22,
42:23, 53:19
**pay** [2] - 13:12, 89:11
**Pelvor** [1] - 58:21
**pending** [2] - 14:16,
41:20
**people** [8] - 16:4,
36:8, 37:10, 37:13,
44:18, 54:5, 56:9,
85:17
**people's** [2] - 47:12,
51:11
**per** [17] - 11:15, 11:16,
11:17, 12:20, 29:21,
29:24, 30:6, 31:12,
31:14, 31:16, 31:19,
31:21, 32:11, 32:15,
34:20, 39:9
**percent** [4] - 13:22,
34:24, 55:21, 63:17
**percentage** [2] -
63:16, 63:19
**perfect** [4] - 62:18,
62:24, 63:24, 69:21
**perfection** [2] - 62:23,
63:1
**performed** [1] - 61:16
**perhaps** [10] - 12:14,

21:8, 35:16, 41:19,
45:17, 51:10, 74:1,
74:10, 74:21, 83:20
**period** [10] - 13:19,
42:19, 48:19, 51:1,
71:3, 75:16, 75:17,
76:16, 76:22, 86:4
**Persia** [1] - 58:20
**persistence** [1] -
52:10
**person** [5] - 63:7,
63:9, 68:4, 69:18,
72:1
**personal** [1] - 48:4
**phonetic** [1] - 68:4
**Pishevar** [6] - 20:11,
20:20, 57:12, 74:13,
84:18, 85:8
**PISHEVAR** [66] -
57:13, 58:2, 58:6,
58:14, 59:1, 59:6,
59:18, 59:25, 60:6,
60:10, 60:24, 61:4,
62:22, 64:8, 64:16,
64:19, 64:24, 65:3,
65:6, 65:19, 65:24,
66:7, 67:3, 67:5,
67:18, 67:22, 68:1,
68:10, 68:13, 68:18,
68:20, 68:24, 69:1,
69:5, 69:9, 69:11,
69:25, 70:8, 70:13,
70:15, 70:19, 71:8,
71:16, 71:25, 72:8,
72:10, 72:13, 72:22,
73:1, 73:4, 73:7,
73:11, 73:19, 74:9,
74:14, 74:21, 74:25,
75:18, 75:22, 76:1,
76:7, 76:13, 76:17,
76:23, 77:2, 77:10
**place** [9] - 19:12,
21:24, 46:11, 50:12,
63:6, 70:12, 79:21,
80:17, 81:3
**placed** [1] - 82:3
**places** [7] - 19:14,
19:15, 19:18, 20:6,
21:14, 21:17, 63:10
**plain** [2] - 57:24, 87:6
**plaintiff** [15] - 11:13,
13:2, 13:13, 15:9,
22:24, 26:15, 26:16,
26:22, 29:14, 30:4,
30:18, 31:17, 46:23,
78:4
**plaintiff's** [3] - 11:20,
35:17, 36:17
**plaintiffs** [25] - 5:12,
5:25, 6:1, 8:9, 13:1,

17:12, 17:24, 18:11,
18:18, 21:9, 21:13,
28:10, 29:18, 30:4,
32:14, 32:23, 34:3,
36:8, 38:20, 39:7,
41:5, 47:21, 48:1,
60:18, 63:23
**plaintiffs'** [1] - 5:24
**played** [1] - 82:18
**plays** [1] - 23:9
**plenty** [2] - 56:25
**point** [17] - 10:24,
21:4, 28:25, 30:11,
36:6, 36:13, 47:11,
49:1, 52:3, 56:23,
63:24, 63:25, 64:12,
65:21, 79:25, 82:1,
88:24
**pointed** [4] - 6:13,
23:25, 35:4, 35:19
**pointing** [1] - 57:2
**points** [10] - 5:14,
6:19, 6:22, 8:5,
12:20, 16:8, 47:8,
47:25, 84:8, 88:11
**police** [1] - 70:9
**policy** [1] - 51:5
**poor** [4] - 51:16,
51:18, 63:7, 77:7
**portion** [8] - 19:21,
23:9, 23:15, 24:14,
26:1, 26:5, 47:23
**portions** [1] - 27:18
**position** [8] - 13:9,
13:11, 14:24, 22:3,
59:16, 64:21, 66:24,
67:11
**post** [1] - 81:12
**post-May** [1] - 81:12
**potentially** [1] - 30:7
**powerful** [1] - 47:17
**practice** [1] - 58:10
**pre** [4] - 75:20, 82:3,
83:25, 84:3
**pre-April** [1] - 75:20
**pre-publication** [3] -
82:3, 83:25, 84:3
**precluded** [3] - 54:8,
54:11, 55:11
**predecessor** [1] - 73:9
**preferred** [1] - 15:6
**prejudice** [4] - 53:15,
57:3, 57:8, 75:2
**preponderance** [1] -
28:22
**presented** [3] - 29:1,
71:2, 89:24
**preserved** [1] - 45:20
**preserving** [1] - 70:17
**pressed** [1] - 41:23

**presume** [1] - 14:4

**presumptions** [1] - 64:7

**pretty** [3] - 5:19, 51:16, 51:18

**prevent** [2] - 51:17, 52:7

**previous** [1] - 82:14

**Pricewaterhouse** [3] - 61:15, 63:8, 65:11

**PricewaterhouseCoopers'** [2] - 61:9, 65:1

**principles** [1] - 75:12

**privilege** [16] - 42:23, 43:14, 43:22, 77:22, 78:6, 78:8, 79:1, 79:2, 79:3, 79:5, 79:6, 79:9, 79:17, 80:13

**privileged** [2] - 77:19, 79:12

**problem** [7] - 5:3, 37:16, 43:18, 66:15, 71:18, 72:2, 82:9

**problems** [3] - 53:1, 57:25, 71:23

**proceeding** [1] - 80:2

**Proceedings** [1] - 90:3

**proceedings** [1] - 91:4

**process** [3] - 21:20, 49:14, 85:21

**produce** [22] - 13:15, 13:17, 29:18, 41:23, 42:25, 43:19, 43:24, 45:1, 45:11, 45:14, 45:16, 45:23, 49:21, 68:16, 69:15, 69:16, 70:1, 73:13, 77:17, 79:24, 86:21, 87:12

**produced** [43] - 13:6, 13:21, 13:24, 39:3, 39:9, 39:22, 40:1, 40:15, 44:17, 45:12, 45:21, 46:7, 48:12, 50:17, 51:25, 53:11, 53:24, 56:1, 56:4, 56:15, 60:22, 62:15, 64:14, 64:22, 67:13, 67:17, 69:20, 73:12, 74:7, 74:15, 74:18, 74:20, 76:12, 79:18, 83:12, 84:11, 85:12, 85:16, 85:21, 86:24, 87:21

**produces** [1] - 43:22

**producing** [7] - 12:8, 39:19, 46:6, 49:14, 87:17, 88:10, 89:6

**production** [7] - 44:7, 45:4, 46:13, 47:13, 52:24, 55:4, 81:17

**productions** [1] - 47:18

**Professor** [2] - 34:8, 85:11

**proffer** [1] - 73:21

**project** [1] - 71:22

**promised** [3] - 45:14, 45:16, 80:10

**proof** [5] - 22:23, 57:18, 57:20, 73:21, 82:12

**proof-not** [1] - 82:12

**proportionality** [1] - 75:2

**proposed** [1] - 89:17

**proposition** [2] - 78:6, 78:10

**propositions** [1] - 24:2

**prospectively** [1] - 50:11

**protect** [3] - 50:14, 80:1, 83:9

**protective** [8] - 79:21, 80:16, 80:18, 80:21, 80:23, 80:24, 81:1, 81:3

**protects** [1] - 80:23

**protocol** [6] - 45:19, 46:2, 64:8, 68:6, 69:17

**prove** [6] - 12:17, 28:10, 35:9, 57:20, 57:22, 75:11

**proved** [2] - 13:10, 75:12

**proven** [1] - 40:2

**proves** [1] - 41:9

**provide** [1] - 83:10

**provided** [6] - 61:24, 64:12, 65:24, 66:21, 68:7, 85:11

**provider** [1] - 61:6

**provider's** [3] - 56:16, 85:24, 86:3

**providing** [1] - 61:21

**proving** [1] - 77:2

**PST** [8] - 41:8, 41:9, 45:23, 64:10, 64:12, 64:21, 66:5, 86:23

**PSTs** [1] - 46:3

**public** [3] - 28:15, 33:9, 36:4

**publication** [5] - 23:18, 51:4, 82:3, 83:25, 84:3

**publish** [2] - 5:12,

22:24

**published** [3] - 36:1, 84:4, 84:6

**publishing** [1] - 35:23

**pull** [1] - 10:4

**Puneet** [1] - 48:3

**purchased** [1] - 44:15

**purpose** [1] - 87:3

**purposely** [1] - 86:25

**purposes** [4] - 6:12, 21:16, 55:8

**pursuing** [1] - 59:9

**put** [10] - 15:2, 20:25, 22:17, 36:22, 39:6, 49:4, 66:24, 79:21, 81:3, 84:16

**putting** [1] - 82:25

**puzzling** [1] - 50:25

**PWC** [10] - 41:8, 46:2, 55:5, 61:9, 65:21, 66:2, 71:5, 84:16, 86:8, 86:9

---

## Q

**quash** [1] - 58:16

**questioning** [3] - 53:1, 75:15, 82:23

**questions** [14] - 4:18, 25:22, 25:24, 31:1, 44:3, 44:5, 44:22, 45:25, 52:18, 52:23, 53:3, 53:4, 66:23, 67:10

**quickly** [2] - 34:11, 38:22

**quite** [1] - 52:16

**quotation** [1] - 26:8

**quote** [8] - 25:8, 25:10, 25:19, 25:23, 25:24, 26:7, 35:8, 77:6

**quoting** [3] - 25:25, 26:7, 61:16

---

## R

**radar** [1] - 88:9

**raise** [1] - 50:13

**raised** [5] - 14:2, 18:13, 18:15, 28:21, 30:12

**ran** [1] - 53:6

**ransom** [1] - 89:11

**re** [2] - 49:24, 89:13

**re-categorized** [1] - 49:24

**re-create** [1] - 89:13

**reach** [1] - 80:4

**read** [9] - 4:3, 8:11, 12:11, 12:15, 15:18, 59:13, 63:5, 65:7, 84:3

**reading** [2] - 24:17, 85:1

**real** [4] - 10:21, 80:7, 86:21, 87:4

**really** [12] - 5:19, 7:25, 11:4, 12:19, 36:14, 51:23, 60:14, 70:1, 77:20, 83:22, 86:22

**reason** [10] - 13:22, 29:8, 48:8, 77:16, 80:11, 82:19, 82:20, 82:22, 84:22, 86:5

**reasonable** [5] - 15:21, 28:11, 33:4, 59:10, 59:19

**reasons** [10] - 12:18, 42:23, 43:15, 45:10, 46:4, 47:10, 79:17, 86:16, 87:18

**recently** [3] - 12:15, 36:6, 87:9

**recitation** [1] - 38:4

**reckless** [4] - 9:17, 9:24, 10:11, 34:5

**recollection** [2] - 11:19, 13:16

**recompense** [1] - 57:5

**record** [11] - 13:11, 20:20, 21:1, 21:8, 21:17, 21:21, 28:17, 36:4, 76:21, 77:14, 91:4

**records** [6] - 13:7, 13:9, 13:13, 13:14, 13:16, 13:23

**recourse** [2] - 80:19, 80:20

**redo** [1] - 72:2

**refer** [7] - 17:1, 18:5, 22:3, 26:7, 42:12, 47:16, 89:12

**reference** [4] - 12:10, 23:12, 36:3, 82:13

**references** [2] - 42:15, 83:25

**referred** [5] - 21:23, 23:10, 23:12, 30:16, 35:15

**referring** [5] - 11:3, 34:25, 46:22, 67:18, 85:2

**refers** [5] - 9:22, 26:7, 42:10, 42:17, 84:6

**regard** [8] - 11:11, 13:1, 13:3, 35:2,

36:14, 84:16, 85:7, 86:8

**regarding** [1] - 79:19

**regime** [27] - 6:16, 10:19, 15:10, 17:8, 17:10, 17:13, 17:16, 17:18, 17:25, 18:11, 23:5, 27:7, 30:5, 30:19, 31:6, 31:18, 32:8, 32:23, 32:25, 37:2, 37:7, 37:9, 37:14, 37:23, 85:18

**register** [1] - 30:1

**Registration** [10] - 12:1, 12:3, 29:25, 30:7, 31:8, 31:15, 31:22, 32:12, 32:19, 34:15

**registration** [1] - 30:6

**registry** [1] - 71:4

**reinterpreting** [1] - 37:4

**related** [8] - 4:1, 4:12, 25:3, 25:8, 43:11, 53:10, 55:12, 83:24

**relating** [4] - 32:9, 53:1, 53:4, 78:8, 83:18, 84:10

**relationship** [1] - 23:11

**relationships** [1] - 22:18

**release** [1] - 51:3

**released** [1] - 81:23

**relevance** [1] - 9:23

**relevant** [8] - 11:4, 23:19, 36:15, 79:11, 79:13, 83:12, 88:11

**reliability** [2] - 29:13, 86:11

**reliance** [1] - 82:4

**relied** [2] - 35:22, 62:5

**relief** [1] - 78:5

**relies** [2] - 34:8, 64:3

**rely** [5] - 45:2, 53:15, 62:11, 79:20, 86:15

**relying** [5] - 6:20, 12:8, 29:23, 82:10, 85:3

**remember** [2] - 54:7, 64:11

**removed** [1] - 36:7, 45:24

**renew** [1] - 14:11

**renewing** [1] - 32:7

**repeated** [1] - 34:2

**repeatedly** [1] - 55:22

**replaced** [1] - 72:13

**replete** [2] - 82:11, 82:15

**replied** [1] - 13:20
**reply** [5] - 30:13, 35:5, 37:1, 38:9, 82:2
**report** [5] - 61:17, 62:1, 62:3, 70:9, 87:5
**REPORTER** [1] - 91:1
**reporter** [1] - 12:12
**reports** [1] - 61:10
**represented** [1] - 40:10
**reprocessing** [1] - 88:3
**reproducibility** [1] - 86:11
**request** [6] - 40:16, 44:2, 45:1, 53:13, 81:6, 81:9
**requested** [4] - 69:16, 76:14, 81:22, 83:23
**requesting** [1] - 63:12
**requests** [3] - 45:15, 81:17, 81:18
**required** [9] - 29:8, 59:19, 62:7, 64:14, 70:2, 74:18, 75:9, 75:10, 81:11
**requirement** [2] - 29:17, 31:9
**research** [2] - 13:10, 77:14
**resisting** [1] - 12:7
**resolution** [1] - 5:18
**resolve** [2] - 5:17, 64:1
**resources** [1] - 63:7
**respect** [24] - 10:1, 13:25, 14:21, 21:23, 30:24, 32:2, 32:11, 32:22, 40:16, 47:15, 51:15, 54:12, 57:14, 59:14, 60:12, 60:20, 61:23, 63:15, 63:22, 64:3, 67:13, 67:15, 75:15, 76:4
**respected** [1] - 35:22
**respond** [2] - 82:6, 87:6
**responded** [3] - 12:4, 12:6, 30:13
**response** [15] - 7:3, 8:4, 12:5, 14:25, 18:8, 33:25, 34:12, 34:16, 35:8, 36:25, 47:1, 56:5, 70:23, 84:4, 85:16
**responses** [1] - 38:19
**responsibility** [2] - 28:16, 44:25
**responsible** [1] - 52:24

**responsive** [5] - 38:21, 67:24, 69:4, 69:7, 88:4
**result** [2] - 35:11, 40:6
**resume** [1] - 37:17
**retake** [1] - 54:9
**retention** [1] - 13:19
**retractions** [1] - 36:1
**retrieved** [1] - 85:23
**retrospectively** [1] - 50:19
**return** [1] - 63:17
**reveal** [2] - 80:10, 80:11
**revealed** [1] - 80:8
**Revenue** [1] - 81:19
**reverse** [1] - 83:16
**review** [6] - 67:23, 68:4, 68:5, 69:3, 81:12, 83:11
**rich** [2] - 63:8, 77:7
**rid** [4] - 12:20, 41:25, 42:1, 49:8
**Ridge** [1] - 36:11
**rocks** [1] - 59:21
**rounds** [1] - 44:11
**rule** [3] - 14:24, 59:13, 63:10
**Rule** [11] - 10:9, 16:16, 28:14, 59:10, 63:6, 63:9, 63:10, 64:13, 65:3, 79:14, 87:4
**ruled** [2] - 13:1, 14:16
**rules** [2] - 59:20, 74:16
**ruling** [3] - 57:18, 62:19, 75:10
**rulings** [1] - 41:21
**run** [1] - 86:12
**running** [1] - 58:17

## S

**sale** [1] - 82:12
**sales** [1] - 60:12
**Samuel** [1] - 58:22
**sanction** [3] - 40:17, 41:3, 53:13
**sanctions** [21] - 4:1, 4:12, 15:4, 37:25, 38:13, 38:16, 40:17, 40:23, 41:21, 57:4, 62:4, 63:2, 63:23, 64:2, 64:5, 64:6, 75:10, 81:1, 84:16, 89:17
**Sanctions** [1] - 32:20
**sanctions-related** [2] - 4:1, 4:12

**save** [1] - 70:24
**savvy** [1] - 60:25
**scan** [2] - 71:4, 71:5
**schedule** [1] - 4:10
**scientific** [1] - 86:10
**screwed** [2] - 49:7, 50:18
**se** [16] - 11:15, 11:16, 11:17, 12:20, 29:21, 29:24, 30:6, 31:12, 31:14, 31:16, 31:19, 31:21, 32:11, 32:15, 34:20
**search** [18] - 38:21, 67:23, 67:25, 68:1, 68:7, 68:11, 68:13, 68:15, 68:17, 68:23, 69:11, 69:13, 85:9, 88:1, 88:4, 88:5, 88:7
**searched** [2] - 76:11, 76:13
**second** [20] - 8:25, 14:16, 14:18, 15:8, 25:23, 29:20, 32:1, 41:16, 42:3, 51:3, 52:2, 52:12, 54:25, 55:1, 55:3, 61:2, 61:21, 70:25, 77:14, 84:21
**secondary** [1] - 41:19
**seconds** [1] - 66:13
**Secrets** [1] - 25:1
**section** [1] - 36:14
**security** [1] - 79:19
**Sedona** [1] - 87:5
**see** [18] - 5:21, 15:21, 19:7, 21:22, 35:24, 43:23, 44:5, 49:1, 49:2, 49:18, 61:20, 63:4, 63:5, 65:13, 67:11, 68:21, 80:13, 83:11
**seeking** [2] - 20:22, 78:5
**seem** [2] - 37:16, 82:20
**send** [1] - 62:24
**sense** [1] - 11:2
**sensed** [1] - 88:21
**sensitive** [1] - 79:19
**sent** [4] - 23:18, 32:6, 62:23, 72:1
**sentence** [2] - 10:6, 26:4
**separate** [3] - 23:25, 73:7, 80:24
**September** [5] - 38:20, 41:5, 50:22, 75:16, 81:10

**serious** [2] - 11:8, 29:3
**server** [19] - 38:16, 39:23, 41:7, 44:7, 60:2, 60:4, 60:8, 60:10, 60:11, 60:21, 85:24, 85:25, 86:1, 86:3, 87:8, 87:9, 87:11, 87:15
**servers** [4] - 44:16, 60:12, 86:1, 87:10
**service** [4] - 56:16, 61:6, 85:24, 86:3
**services** [2] - 61:16
**set** [3] - 29:10, 38:8, 55:24
**setting** [3] - 33:10, 37:3, 51:13
**seven** [1] - 59:15
**several** [9] - 25:9, 38:6, 39:8, 47:12, 54:2, 56:16, 67:13, 74:17, 76:7
**severe** [2] - 40:23, 64:6
**shake** [1] - 59:22
**shell** [1] - 89:8
**Shepard** [2] - 57:18, 75:9
**shield** [1] - 78:1
**shielding** [2] - 78:1, 78:13
**shift** [1] - 29:17
**short** [1] - 49:10
**show** [14] - 15:11, 15:12, 15:25, 22:17, 24:7, 25:2, 29:12, 32:5, 40:13, 73:25, 85:13, 87:19
**showed** [1] - 71:5
**showing** [2] - 22:4, 22:8
**shown** [1] - 28:3
**shows** [3] - 20:4, 24:15, 35:18
**shred** [2] - 4:19, 10:16
**Siamak** [1] - 7:16
**side** [5] - 4:7, 11:10, 60:19, 60:20
**Sidney** [1] - 62:6
**signature** [1] - 75:6
**signed** [2] - 61:14, 62:10
**similar** [2] - 49:18, 78:12
**simple** [3] - 38:23, 84:17, 87:6
**simply** [14] - 4:17, 6:21, 7:7, 8:20, 16:24, 24:2, 25:25,

28:6, 28:22, 28:25, 35:21, 48:13, 80:4, 85:10
**single** [2] - 10:16, 53:25
**situation** [3] - 14:6, 15:15, 45:22
**six** [5] - 34:13, 36:22, 37:21, 59:15, 76:16
**six-month** [1] - 76:16
**skips** [1] - 25:22
**sloppiness** [1] - 57:25
**small** [1] - 59:8
**snapshots** [1] - 47:8
**software** [1] - 64:16
**someone** [2] - 36:12, 73:13
**sometimes** [1] - 24:3
**somewhere** [4] - 25:12, 65:10, 71:9, 89:2
**sorry** [2] - 68:10, 75:1
**sort** [14] - 4:10, 5:6, 10:17, 10:18, 30:2, 32:8, 35:10, 35:14, 48:11, 48:24, 85:9, 88:8, 89:9, 89:17
**sorts** [2] - 12:16, 66:23
**sound** [2] - 48:22, 57:7
**sounds** [1] - 48:24
**source** [14] - 7:19, 7:20, 7:25, 8:16, 8:19, 8:24, 9:2, 9:5, 9:8, 9:19, 9:22, 20:3, 20:4, 24:17
**sources** [21] - 6:20, 19:9, 20:21, 22:10, 23:25, 24:1, 24:4, 24:14, 24:16, 24:17, 24:20, 24:21, 25:2, 27:17, 27:24, 29:11, 35:23, 35:24, 63:14
**speaks** [2] - 9:20, 36:12
**special** [4] - 32:1, 32:2, 32:5, 32:9
**specific** [16] - 5:2, 8:13, 11:3, 12:10, 15:24, 18:9, 18:16, 19:1, 19:7, 30:15, 31:9, 32:21, 34:1, 44:5, 48:23, 81:17
**specifically** [8] - 18:10, 23:3, 23:12, 32:6, 36:24, 42:7, 67:12, 83:17
**specifics** [2] - 7:22, 64:3

spelled [1] - 82:14
spend [1] - 89:13
spending [1] - 55:15
spent [9] - 44:2,
  52:22, 55:13, 55:21,
  55:24, 56:22, 59:6,
  59:8, 69:17
staff [3] - 34:22, 59:8,
  69:18
stages [1] - 44:8
stall [1] - 52:6
stand [2] - 9:21, 24:2
standard [16] - 9:13,
  9:17, 12:21, 13:3,
  16:11, 23:3, 28:3,
  28:21, 34:10, 35:10,
  36:16, 46:2, 57:17,
  61:8, 77:6, 89:15
standards [3] - 23:22,
  28:5, 87:5
standing [1] - 89:10
stands [2] - 37:5, 78:9
Stanley [1] - 89:18
start [5] - 4:4, 38:8,
  56:24, 57:17, 83:16
started [2] - 45:10,
  89:23
starting [2] - 40:20,
  57:2
state [6] - 4:17, 9:20,
  9:23, 11:7, 37:17,
  47:6
State [1] - 36:7
statement [25] - 5:22,
  7:22, 8:7, 8:10, 8:16,
  8:19, 9:12, 9:23,
  10:5, 10:15, 17:14,
  18:1, 18:4, 18:6,
  21:4, 24:22, 26:3,
  27:7, 29:2, 31:4,
  32:22, 39:21, 72:17,
  82:25
statements [35] - 5:1,
  5:2, 5:11, 5:16, 5:20,
  8:1, 8:14, 9:3, 10:2,
  15:24, 17:4, 18:9,
  18:10, 18:16, 19:12,
  20:3, 20:4, 21:9,
  21:13, 22:24, 26:13,
  29:11, 29:17, 30:17,
  34:17, 34:19, 36:19,
  37:5, 37:20, 38:9,
  38:11, 38:12, 38:24,
  82:24
states [1] - 16:14
stay [1] - 32:1
step [5] - 17:14, 18:2,
  18:3, 27:1, 31:7
stick [1] - 59:22
still [12] - 11:16,

14:11, 14:13, 14:15,
  27:7, 33:11, 47:1,
  49:3, 65:7, 84:4,
  84:6, 84:23
sting [6] - 6:16, 10:17,
  17:11, 26:25, 27:8,
  37:21
stipulation [3] - 11:20,
  11:24, 12:7
stolen [6] - 42:5, 70:4,
  70:9, 70:21, 72:12,
  88:23
stood [1] - 87:7
stop [3] - 79:6, 79:7,
  88:18
stopped [6] - 40:7,
  71:5, 71:6, 71:9,
  71:11
storage [1] - 56:14
story [2] - 50:19, 85:2
street [1] - 16:3
stretch [2] - 86:22,
  87:4
strike [7] - 12:25,
  13:4, 14:2, 14:5,
  14:12, 37:8, 82:8
strings [1] - 25:10
student [1] - 51:7
stuff [8] - 7:3, 15:18,
  41:1, 47:19, 48:15,
  65:8, 87:19, 88:10
sub [1] - 11:21
sub-allegations [1] -
  11:21
subject [2] - 38:19,
  62:16
subjective [16] - 4:20,
  6:22, 7:8, 8:10, 8:20,
  9:13, 9:16, 10:14,
  11:6, 16:15, 16:22,
  16:25, 24:8, 34:5,
  36:15
subjectively [2] - 9:18,
  15:17
submit [2] - 10:7,
  64:25
submitted [1] - 57:23,
  62:3
subpoenaed [1] - 58:6
subpoenas [7] - 58:3,
  58:5, 58:6, 58:11,
  85:8, 85:16, 87:18
subsequent [1] - 5:11
subsequently [2] -
  13:1, 39:3
substantial [1] - 15:20
substantive [1] -
  75:14
subsumed [2] - 15:4,
  41:21

successful [1] - 52:8
successor [1] - 54:24
sue [1] - 18:5
suffered [1] - 85:13
sufficient [8] - 17:3,
  22:6, 22:12, 22:20,
  24:11, 29:13, 40:23,
  46:24
suggest [1] - 33:11
suggested [1] - 12:13
suggesting [1] - 28:19
suing [1] - 18:18
suit [2] - 80:22, 88:13
summarize [1] - 30:2
summary [17] - 4:4,
  4:11, 10:18, 15:4,
  18:13, 18:15, 19:24,
  20:15, 20:22, 20:23,
  21:7, 21:16, 28:7,
  28:20, 33:3, 45:23,
  63:13
sunshine [1] - 59:21
super [2] - 77:6, 77:7
supplementation [3] -
  77:18, 81:5, 84:9
support [13] - 5:21,
  8:1, 8:16, 9:3, 9:9,
  15:20, 22:3, 24:3,
  24:21, 27:19, 33:8,
  34:20, 34:22
supporting [1] - 16:6
supports [1] - 22:2
supposed [2] - 37:19,
  87:12
supposedly [1] -
  66:18
surreply [13] - 19:8,
  19:21, 19:25, 20:8,
  24:25, 25:14, 25:15,
  30:17, 34:7, 34:12,
  82:6, 82:7, 82:9
survey [1] - 40:5
suspicious [1] - 51:5
Swedish [2] - 13:5,
  13:9
switch [3] - 11:14,
  70:3, 89:8
sworn [1] - 82:23
sync [1] - 76:9
syncing [2] - 76:18,
  89:1
syncs [1] - 89:1
systematic [3] - 27:12,
  81:12
systemic [1] - 81:12

T

tag [1] - 49:23

Talebi [14] - 38:18,
  38:21, 39:2, 39:11,
  53:23, 54:18, 56:1,
  56:11, 67:14, 68:15,
  69:2, 87:24
Talebi's [4] - 48:4,
  53:24, 55:25, 67:23
tallied [1] - 34:11
Talwar [2] - 48:3, 48:6
tapes [1] - 47:8
target [1] - 37:4
tax [1] - 63:16
technical [2] - 59:2,
  60:6
Technology [1] - 65:7
tediously [1] - 69:5
Tehran [1] - 7:17
tellingly [1] - 33:25
ten [1] - 87:22
tenor [1] - 58:9
tens [1] - 65:16
term [12] - 6:14, 10:23,
  11:5, 12:11, 15:9,
  26:22, 30:3, 49:19,
  68:1, 68:15, 68:17,
  69:11
terminology [1] -
  50:17
terms [21] - 22:8,
  24:24, 30:18, 38:21,
  45:19, 53:12, 53:20,
  56:7, 64:7, 67:25,
  68:7, 68:11, 68:13,
  68:23, 69:13, 69:14,
  83:4, 88:1, 88:4,
  88:5, 88:8
terrible [1] - 51:20
terribly [1] - 52:9
terrorist [3] - 22:14,
  23:1, 23:2
terrorists [1] - 36:8
test [1] - 5:21
testify [2] - 75:4
testimony [3] - 13:4,
  63:15, 66:20
tests [1] - 86:12
text [1] - 26:6
THE [225] - 4:9, 4:24,
  5:6, 5:17, 6:3, 6:7,
  7:10, 7:25, 8:15,
  8:21, 8:23, 9:2, 9:8,
  9:15, 9:25, 10:21,
  11:9, 12:2, 12:23,
  13:25, 14:8, 14:13,
  14:20, 14:23, 15:7,
  15:23, 16:12, 16:17,
  16:19, 16:21, 16:25,
  17:19, 18:3, 18:17,
  18:23, 18:25, 19:3,
  19:9, 19:12, 19:17,

19:23, 20:6, 20:13,
  20:18, 20:24, 21:3,
  21:12, 21:22, 22:1,
  22:7, 22:16, 23:10,
  24:6, 24:19, 25:5,
  25:12, 25:16, 26:11,
  26:13, 26:21, 27:3,
  27:10, 27:21, 28:1,
  28:13, 29:6, 29:20,
  29:23, 30:3, 30:14,
  30:23, 31:1, 31:4,
  31:12, 31:19, 31:23,
  31:25, 32:10, 32:22,
  33:1, 33:7, 33:21,
  33:23, 35:14, 36:21,
  37:24, 38:5, 38:11,
  39:1, 40:16, 40:21,
  41:2, 41:14, 42:4,
  42:12, 42:15, 43:1,
  43:7, 43:13, 43:17,
  44:5, 44:21, 45:4,
  46:10, 46:13, 46:19,
  46:22, 47:2, 47:15,
  48:5, 48:17, 49:9,
  49:22, 50:2, 50:13,
  50:21, 51:8, 51:13,
  51:15, 51:21, 52:12,
  52:17, 52:25, 53:12,
  54:8, 54:11, 54:16,
  54:20, 54:25, 55:8,
  55:11, 55:17, 55:19,
  56:5, 57:2, 57:11,
  57:24, 58:5, 58:11,
  58:19, 59:4, 59:14,
  59:23, 60:1, 60:8,
  60:16, 61:2, 62:20,
  63:21, 64:15, 64:18,
  64:20, 65:2, 65:4,
  65:18, 65:20, 66:3,
  66:13, 67:1, 67:4,
  67:10, 67:20, 67:23,
  68:9, 68:11, 68:14,
  68:19, 68:21, 68:25,
  69:2, 69:6, 69:10,
  69:23, 70:3, 70:10,
  70:14, 70:16, 70:23,
  71:13, 71:20, 72:5,
  72:9, 72:11, 72:14,
  72:16, 72:25, 73:3,
  73:5, 73:9, 73:17,
  74:8, 74:12, 74:17,
  74:23, 75:14, 75:19,
  75:24, 76:3, 76:11,
  76:15, 76:20, 76:25,
  77:9, 77:11, 77:20,
  77:24, 78:3, 78:16,
  78:20, 79:10, 79:14,
  79:20, 80:12, 80:16,
  80:20, 80:25, 81:11,
  81:24, 82:7, 82:17,
  83:6, 83:13, 84:20,

85:6, 89:21
**theft** [1] - 70:19
**theme** [2] - 5:23, 53:9
**themselves** [5] -
45:21, 45:22, 53:5,
61:11, 85:5
**therefore** [4] - 20:25,
31:21, 55:22, 85:3
**they've** [3] - 6:12,
62:23, 87:9
**thinking** [2] - 15:14,
53:12
**third** [25] - 40:6, 41:5,
41:7, 49:15, 51:24,
52:3, 58:12, 59:14,
60:11, 60:14, 60:17,
60:18, 60:19, 61:6,
61:24, 70:19, 79:18,
80:1, 80:7, 80:14,
83:9, 85:7, 86:16,
87:18
**third-party** [8] - 59:14,
60:11, 60:14, 60:17,
70:19, 85:7, 86:16,
87:18
**thorough** [1] - 4:17
**thousand** [5] - 47:1,
47:4, 56:2, 66:4
**thousands** [7] - 13:24,
53:23, 58:3, 59:6,
59:7, 59:8, 65:16
**threat** [1] - 45:13
**three** [21] - 4:22, 15:3,
20:6, 20:21, 21:14,
21:17, 21:21, 39:12,
41:13, 44:2, 44:11,
44:19, 45:12, 53:14,
54:1, 54:14, 56:15,
56:21, 67:17, 69:18,
87:7
**threw** [2] - 85:2, 86:7
**throughout** [1] - 4:16
**throwing** [3] - 11:10,
35:14, 35:16
**throwing-mud** [1] -
35:14
**thrown** [1] - 34:6
**ties** [2] - 23:8, 25:24
**today** [5] - 15:6, 33:18,
36:18, 88:20, 89:24
**together** [4] - 24:12,
25:10, 25:25, 57:6
**Tom** [1] - 36:11
**ton** [1] - 21:2
**tons** [6] - 74:14,
74:17, 74:21, 74:24
**took** [3] - 13:9, 23:17,
45:22
**top** [1] - 53:8
**total** [2] - 4:6, 56:8

**totality** [2] - 22:21,
24:12
**totally** [5] - 7:3, 9:6,
36:2, 54:3, 56:20
**towards** [2] - 22:24,
36:9
**tracks** [1] - 52:11
**transcript** [1] - 91:4
**transported** [2] -
86:25, 87:2
**tremendously** [1] -
53:19
**trial** [7] - 21:18, 78:15,
78:24, 78:25, 79:1,
79:4, 79:5
**trick** [1] - 73:13
**triple** [1] - 47:11
**Trita** [19] - 7:14, 13:3,
23:17, 35:5, 35:10,
36:4, 37:10, 39:11,
39:24, 40:6, 51:12,
52:4, 54:2, 56:3,
83:20, 84:11, 85:18,
86:13, 88:21
**true** [13] - 6:24, 12:18,
13:10, 20:24, 50:20,
51:22, 59:23, 59:24,
63:9, 70:5, 70:8,
78:3, 78:4
**truth** [14] - 4:21, 6:23,
7:8, 8:5, 8:10, 10:12,
24:9, 24:16, 27:6,
29:3, 33:18, 35:21,
77:4, 79:11
**truthful** [1] - 83:5
**try** [4] - 48:12, 71:18,
73:13, 89:14
**trying** [9] - 49:6, 49:7,
49:23, 50:10, 50:16,
52:22, 53:10, 63:21,
78:1
**turn** [4] - 26:13, 50:8,
58:4, 58:17
**turned** [3] - 39:4, 44:8,
85:9
**turns** [1] - 5:19
**twenty** [1] - 58:10
**twice** [3] - 8:21, 52:6,
54:23
**two** [17] - 5:13, 7:24,
8:4, 15:3, 16:3,
18:19, 18:21, 19:9,
19:14, 19:15, 23:24,
26:9, 46:5, 53:14,
66:13, 87:10, 88:13
**two-way** [1] - 16:3
**typical** [1] - 8:13

## U

**ultimate** [3] - 27:19,
53:13, 57:8
**ultimately** [4] - 28:1,
54:11, 69:20, 69:23
**unable** [1] - 54:20
**uncorrected** [1] -
82:12
**under** [36] - 5:20, 10:9,
30:6, 31:14, 34:10,
34:23, 38:9, 38:11,
38:12, 38:25, 39:14,
39:15, 39:21, 40:11,
40:22, 41:10, 53:18,
57:18, 59:10, 59:20,
61:10, 64:13, 64:25,
65:3, 71:21, 74:16,
75:5, 75:9, 75:12,
77:19, 79:14, 80:9,
82:24, 88:2, 88:6,
88:9
**under-the-radar** [1] -
88:9
**undercut** [1] - 56:20
**underhanded** [1] -
88:8
**underlying** [2] - 13:15,
13:17
**underneath** [1] -
65:10
**understatement** [1] -
65:16
**understood** [1] - 64:9
**undertake** [1] - 69:10
**unduly** [1] - 65:12
**unedited** [2] - 45:16,
82:10
**unfortunate** [2] - 40:9,
53:11, 86:6
**unfortunately** [3] -
47:7, 53:6, 56:22
**unfounded** [1] - 36:2
**unilaterally** [1] - 88:6
**universe** [2] - 20:9,
20:14
**unknown** [1] - 39:17
**unless** [2] - 9:11, 9:22
**unlike** [1] - 65:1
**unlikely** [1] - 36:9
**unnamed** [2] - 6:20,
35:24
**unnecessary** [1] -
57:5
**unreliable** [1] - 24:15
**unsupported** [1] -
20:5
**up** [29] - 4:9, 33:2,
37:3, 39:1, 40:10,

41:23, 43:12, 43:21,
43:25, 44:8, 44:10,
45:19, 46:24, 47:8,
49:7, 49:10, 50:18,
56:17, 63:16, 70:7,
70:18, 86:1, 86:23,
86:24, 87:14, 88:11,
88:18, 89:10
**upside** [1] - 85:10
**upside-down** [1] -
85:10
**useful** [1] - 44:23
**uses** [4] - 6:6, 11:1,
23:23

## V

**vacuum** [2] - 22:20,
24:11
**various** [9] - 6:21,
11:21, 23:18, 39:14,
39:16, 41:23, 45:12,
85:17, 86:16
**verify** [3] - 61:23,
62:11, 84:14
**vernacular** [1] - 6:9
**version** [4] - 73:14,
84:4, 84:5, 84:6
**versions** [4] - 73:12,
73:23, 74:2, 74:7
**versus** [1] - 37:9
**Victor** [1] - 89:18
**view** [9] - 15:5, 21:4,
22:2, 24:8, 26:17,
34:23, 47:2, 68:22
**viewing** [1] - 14:9
**violated** [1] - 80:18
**violating** [4] - 12:14,
32:21, 34:18, 50:7
**violation** [4] - 30:8,
41:2, 81:1, 81:3
**violations** [1] - 11:22
**virtue** [1] - 42:19

## W

**wade** [1] - 10:13
**wait** [1] - 21:3
**waiver** [3] - 81:6,
81:21, 81:25
**walk** [1] - 71:1
**wants** [2] - 23:16,
25:11
**warrant** [1] - 38:13
**Washington** [2] -
12:12, 62:25
**waste** [2] - 54:3, 56:21
**wasted** [1] - 39:13

**water** [1] - 49:16
**ways** [1] - 16:5
**weeds** [2] - 10:14,
38:5
**weekend** [2] - 48:3,
49:15
**weeks** [1] - 68:3
**weight** [1] - 75:8
**whatsoever** [3] - 8:19,
36:3, 89:16
**white** [2] - 38:23, 87:6
**whole** [5] - 23:12,
36:13, 40:18, 45:24,
72:2
**willful** [4] - 27:14,
27:15, 34:9, 36:15
**willfully** [1] - 27:23
**wind** [2] - 39:1, 44:10
**wiped** [1] - 7:13
**withheld** [2] - 39:4,
41:1
**withholding** [1] -
87:20
**witness** [3] - 11:23,
13:2, 66:16
**witnesses** [2] - 54:12,
54:13
**word** [2] - 6:6, 11:1,
50:9
**words** [3] - 44:9, 53:5,
73:23
**world** [2] - 51:21,
78:21
**wound** [1] - 44:8
**wrap** [1] - 33:2
**write** [1] - 7:1
**writers** [1] - 27:21
**writes** [1] - 23:23
**writing** [4] - 4:21,
6:25, 23:23, 24:9,
29:4
**writings** [13] - 6:18,
10:4, 18:17, 18:18,
18:19, 18:20, 18:22,
19:1, 19:6, 19:7,
19:12, 37:11
**written** [10] - 6:1, 6:23,
7:9, 8:14, 8:18, 11:1,
24:22, 37:22, 42:20,
50:7
**wrote** [1] - 7:12
**www.iht.com** [1] -
7:20

## X

**XX** [1] - 61:10

**Y**

**year** [3] - 39:24, 81:10,
  81:23
**years** [10] - 39:12,
  41:13, 44:2, 56:16,
  56:22, 58:10, 59:7,
  86:3, 87:22, 88:13
**yet-to-be-expressed**
  [1] - 13:22
**yourself** [3] - 78:2,
  79:2, 87:23
**YouTube** [2] - 21:2,
  21:18

**Z**

**Zerilli** [4] - 77:19,
  77:20, 77:25, 78:12
**zero** [1] - 24:3
**Zubulake** [1] - 63:10