## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TRITA PARSI and NATIONAL**
**IRANIAN AMERICAN COUNCIL,**

**Plaintiffs,**

**v.**

**SEID HASSAN DAIOLESLAM,**

**Defendant.**

**Civil Action No.  08-705 (JDB)**

## MEMORANDUM OPINION

This is a defamation case filed by Trita Parsi and the National Iranian American Council (collectively, "plaintiffs").  Plaintiffs allege that Seid Hassan Daioleslam ("defendant") published numerous false and defamatory statements that characterize plaintiffs as agents of the Iranian government.  Now before the Court is [144] defendant's motion for summary judgment.  For the reasons discussed below, the motion will be granted.

## BACKGROUND

As explained in this Court's prior opinions, Dr. Parsi is the president of the National Iranian American Council ("NIAC"), a Washington, D.C.-based non-profit group that is "dedicated to promoting Iranian American involvement in American civic life and relying on the public for financial and human resource support." Compl. ¶¶ 9, 10. Defendant is an Arizona resident who has published articles about Parsi and NIAC on various websites. Id. ¶¶ 5, 11. Plaintiffs' complaint seeks damages and injunctive relief against defendant for common law defamation and portrayal in a false light. Id. ¶ 11. The thrust of plaintiffs' complaint is that

defendant "has published false and defamatory statements indicating that [plaintiffs are] member[s] of a subversive and illegal Iranian lobby colluding with the Islamic Republic of Iran . . . ." Id. ¶ 13. Plaintiffs argue that these statements injured their reputations in the community, thereby hampering NIAC's effectiveness as an advocacy group and damaging its ability to raise funds. Id. ¶¶ 23, 42-43.  Following contentious discovery, defendant filed [144] the instant motion for summary judgment, arguing that there is no evidence that his statements were published with actual malice.

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the record evidence "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Summary procedures are of special importance in libel suits brought with respect to reports on the activities of public figures and public officials. . . . For the stake here, if harassment succeeds, is free debate." Secord v. Cockburn, 747 F. Supp. 779, 786 (D.D.C. 1990) (citations omitted).

This Court has previously held that NIAC and Parsi are limited public figures.  See Parsi v. Daioleslam, 595 F. Supp. 2d 99, 104-06 (D.D.C. 2009).  As such, they must show by clear and convincing evidence that defendant's statements were made with "actual malice" in order to prevail on their claims.  Id.; New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964).  "The standard of actual malice is a daunting one." McFarlane v. Esquire Magazine, 74 F.3d 1296, 1308 (D.C. Cir. 1996)  To establish actual malice, plaintiffs must show that defendant either

knew that the challenged publication was false, or that he "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968).  Subjective ill-will does not establish actual malice, nor does a malevolent motive for publication.  Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 665 (1989).  Even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" does not establish actual malice.  Id. at 666.  But a plaintiff can show actual malice if he can demonstrate by clear and convincing evidence that defendant was "subjectively aware that it was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that appellees had obvious reasons to doubt."  Lohrenz v. Donnelly, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (citations omitted).

In the summary judgment context, the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party opposing the motion for summary judgment, however, "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial."  Tate v. Dist. of Colum., 627 F.3d 904, 908-09 (D.C. Cir. 2010) (citations omitted); Fed. R. Civ. P. 56(e).  In the public figure defamation context, this means that the defendant's "burden in a motion for summary judgment is simply showing – pointing out to this Court – that there is an absence of evidence to support the element of actual malice in the plaintiff's [defamation] case."  Secord, 747 F. Supp. at 787.  Hence, even though defendant has moved for summary judgment

here, the Court will focus on plaintiffs' evidence of actual malice.

## ANALYSIS

One preliminary problem is that plaintiffs have failed to define the universe of allegedly defamatory statements.  Plaintiffs have attached several articles to their complaint and to other pleadings, but they have for the most part failed to identify which statements they perceive as defamatory and to put forth specific evidence of actual malice relating to those statements.  Moreover, plaintiffs implied at the motions hearing that the summary judgment record did not contain all articles, videos, or other documents that might support their case.  Tr. of Mot. Hrg. (July 6, 2012) at 20-21 ("However, it bears noting that the defendant is moving for summary judgment. We are not seeking summary judgment on this case.  Therefore, we have not put everything that we have gathered through discovery on the record as of yet. There are a ton of other articles, YouTube [videos] . . . ").  But defendant has filed a proper summary judgment motion, so plaintiffs' choice to withhold articles or evidence of actual malice was made at their own peril.  Even a cursory review of defamation caselaw in the Supreme Court and this Circuit shows that such cases are often resolved on a defendant's motion for summary judgment, and that the resolution usually involves an extremely detailed analysis of specific defamatory statements and the support for those statements.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 245 (1986) (plaintiffs alleged that "some 28 statements and 2 illustrations in the 3 articles were false and derogatory"); Esquire Magazine, 74 F.3d at 1299 (focusing on support for three paragraphs).

Only in one instance have plaintiffs offered the kind of granular analysis that is normally necessary to prevail in this type of action.  In a surreply in opposition to plaintiffs' motion for

summary judgment, plaintiffs argue that "a careful review of just one of defendant's publications . . . provides clear indicia of his actual malice towards Plaintiffs, which is evident given the number of misrepresentations, unsupported statements, and even falsifications the defendant makes." Plaintiffs scrutinize a 2008 article entitled "Iran's 2003 Grand Bargain Offer: Secrets, Lies, and Manipulation" to support their statement.[1]  Mot. for Leave to File Surreply to Def.'s MSJ [ECF 164-1] ("Pls.' Surreply") at 3.[2]  The gist of the article is that the Iranian government, through Trita Parsi, presented a top-secret offer to open negotiations to high-ranking U.S. officials in 2003.  According to the article, the Iranian government never actually intended to conduct fruitful negotiations with the United States; in actuality, they only wanted to be able to loudly criticize the United States for its anticipated refusal to agree to negotiate. The article is several pages long and contains 25 endnotes.

Plaintiffs make several objections to the article that can be dismissed easily.  First, plaintiffs note that endnotes 13 and 16 (mistakenly referred to as 17) contain no link to the cited source.  Pls.' Surreply at 4-5.  It appears, however, that endnotes 13 and 16 are not online sources, so defendant could not be expected to provide a link to them.  Second, plaintiffs point out that endnotes 14, 15, 16, and 17 are in Farsi and no English translation is provided.  Id.  But if the original source material is in Farsi and there is no English translation available, defendant

---

[1]  The article is available at http://english.iranianlobby.com/page1.php?id=10&bakhsh=ARTICLES.

[2]  Although the Court initially denied leave to file a surreply, see 11/30/2011 Minute Order, the Court concludes that the information contained in the proposed surreply is sufficiently important that the Court must consider it in order to arrive at a fair decision.  This conclusion, however, is not meant to imply that plaintiffs had any justification for filing a surreply; they could and should have included all of the information in the surreply in their original opposition to defendant's summary judgment motion.

can hardly be faulted for citing the original sources.  Indeed, he would be expected to do so.

Despite the fact that Parsi presumably speaks Farsi, plaintiffs have pointed to no substantive

problems with the underlying Farsi sources.  Third, plaintiffs argue that defendant cites his own

articles as sources in endnotes 19 and 22.  Id. at 5.  But there is nothing untoward about this.  In

both cases, defendant is simply summarizing a few facts from his earlier work and then referring

readers to that earlier work for more detailed analysis.  Additionally, both of the underlying

articles are extensively cited.  Fourth, plaintiffs state that endnote 23 "is simply an event

website."  Id.  That is not true: endnote 23 cites both an event website and the text of the speech

given at the event, which is the source material for defendant's article.  Finally, plaintiffs point

out that "the source that supports endnote 20 is missing."  Id.  The URL given in the endnote

does now redirect to an unrelated website, but a search of the Internet Archive shows that the

cited website did exist at the time defendant originally published his article and did support his

statement.[3]  See http://web.archive.org/web/20080511180832/http://www.downsizedc.org/blog/

2007/mar/08/no_war_with_iran_coalition.

Plaintiffs also point to several issues with endnotes that can be dismissed as simple

errors.  Plaintiffs write that "the block quote relating to endnote 5" consists of several sentences

that are strung together from different portions of the underlying source in an allegedly

misleading way.  Pls.' Surreply at 4.  The three paragraphs in the block quotation do indeed come

from different portions of the underlying source.  This is indicated with an ellipses between the

---

[3]  Defendant did misquote the underlying source.  The original letter, signed by Parsi and others, has a paragraph that begins "Given 26 years of US refusal to start a dialogue with Iran [a different diplomatic strategy is needed]."  Defendant's article says that "After denouncing US policy toward Iran, [Parsi and his friends] declared: 'The US has refused to start a dialogue with Iran for the past 26 years.'"  As discussed below, this mistake is careless but does not show actual malice.

first and second paragraphs, but there is no ellipses between the second and third paragraphs. Nonetheless, having carefully reviewed the underlying article, the Court is confident that the pieced-together block quote does not in any way misconstrue or misrepresent the underlying source.  Excerpting from a source can be a way to mislead the reader, but it can also simply be a way to condense relevant information, and there is no problem with doing the latter.  See Esquire Magazine, 74 F.3d at 1306 ("Nonetheless, we think the explanation by Esquire – that they deleted the clause because of space considerations and because of its ambiguity – altogether plausible.").  And while there should be an ellipses between the second and third paragraphs of the block quote, the lack of one hardly indicates that defendant "in fact entertained serious doubts as to the truth of his publication."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

As will become clear in the discussion below, defendant was often sloppy in his reporting, either omitting ellipses, slightly misquoting the underlying source, or failing to put a citation in the appropriate place.  But none of the errors misrepresent the substance of the source material or mislead the reader.  As many courts considering public figure defamation cases have concluded, sloppiness is not evidence of actual malice.  Esquire Magazine, 74 F.3d at 1306 ("this . . . seems as consistent with linguistic muddle as with reckless disregard, and in context not enough, even in conjunction with other evidence, to show actual malice by Esquire editors"); McFarlane v. Sheridan Square Press, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("the conflict is so narrow that it appears to reflect only sloppiness and a slight over-generalization, not deceit, on the part of Schaap"); Lohrenz v. Donnelly, 223 F. Supp. 2d 25, 55 (D.D.C. 2002), aff'd 350 F.3d 1272 (D.C. Cir. 2003) ("The Court will not impose liability for mere factual error – an everyday occurrence in journalism – unless those errors rise to the level of circumstantial evidence of

'actual malice.'").  Here, for the reasons explained below, none of defendant's errors "rise to the level of circumstantial evidence of 'actual malice.'"

Plaintiffs also contend that the block quote that begins "Kharazi told me . . . " is unsupported by any citation.  Pls.' Surreply at 4.  The preceding paragraph, however, also contains a block quote and a citation to a document published in the Washington Post.  The "Kharazi told me . . . " block quote comes from that same document.[4]  Hence, defendant merely failed to insert an "Id." citation after the second block quote.  But he did not invent the quotation out of thin air, rely on an unverifiable anonymous source, or misleadingly doctor an underlying source.  Hence, the lack of an "id." does not indicate actual malice.  Similarly, plaintiffs argue that the sentence "Then, [in 2006], the Iranian regime gave a fresh copy of the offer to Trita Parsi" is not cited.  Pls.' Surreply at 5.  But that statement merely repeats an earlier sentence in the article, and the earlier sentence is properly cited.  Indeed, defendant actually quotes the source article in support of the earlier sentence.  Not repeating the citation a second time may be careless, but it is not evidence of actual malice.

Plaintiffs' remaining issues are more substantive, but no more persuasive.  Their first substantive objection runs as follows:

[T]he defendant states that in a 1999 joint paper, Dr. Parsi and Siamak Namazi set

---

[4]  Defendant does misquote and leave out portions of the underlying the document, but not in a way that alters the meaning.  The original document said: "On May 2, I met with [Kharazi] again for three hours.  He told me that he had two long discussions with the Leader on the roadmap.  In these meetings, which both lasted almost two hours, only President Khatami and FM Kharrazi [sic] were present; 'we both went through every word of the this [sic] paper'. (He additionally had a series of separat [sic] meetings with both). -- The question is dealt with in high secrecy, therefore no one else has been informed."  Defendant's article says: "Kharazi told me that he had two long discussions with the leader on the roadmap. In those meetings which both lasted two hours, only president Khatami and foreign minister Kamal Kharazi were present. The question is dealt with in high secrecy. Therefore no one else has been informed."

> forth their strategy to "beat up" the U.S. administration as a way to prevent harsh
> policy toward the Iranian regime.  The defendant is saying that NIAC was created
> to bash U.S. policy, while the quote that immediately follows, which begins 'An
> Iranian-American lobby is indeed,' is saying a very different thing – that an
> Iranian-American lobby is needed to prevent bashing of Iran.

Pls.' Surreply at 5.  Plaintiffs appear to miss the point of this passage from defendant's article (in addition to slightly mischaracterizing it).  Defendant is arguing that Parsi is among those who believe that pressuring the United States on foreign policy issues is a way to ensure better treatment of Iran. In other words, to use plaintiffs' phrasing, defendant's article argues that "NIAC was created to bash U.S. policy" as a means of "prevent[ing] bashing of Iran."  Plaintiffs draw a false distinction between  (1) "bash[ing] U.S. policy" and (2) "prevent[ing] bashing of Iran," but defendant contends that these two concepts are, in fact, directly related.  This is a reasonable reading of the underlying source document, not a willful effort to distort Parsi's words.

Plaintiffs next take issue with this sentence:  "Why did Iran decide to ask Bob Ney and Trita Parsi to 'manage this issue' (as Parsi stated) and send the proposal to the White House?"  Pls.' Surreply at 4.  Plaintiffs argue that the thrust of this statement – that the Iranian regime directly put Ney and Parsi in charge of conveying the proposal to the appropriate U.S. officials – is unsupported by defendant's own source, which says that the Swiss ambassador to Iran, not "Iran," asked Ney and Parsi to send the proposal to the White House.  Id.  Plaintiffs also point out that defendant's source says that Parsi stated that he was "managing the issue" for Ney, but not that the Iranian government asked him to do so.  Id.

While this discrepancy is troubling at first glance, it is much less so in context. Defendant's article first explains that Foreign Minister Kharazi gave a copy of the "Grand

Bargain" proposal to the Swiss ambassador to Iran and asked him to "present the enclosed roadmap very confidentially to someone high in the DoS in order to know the US reaction to it." This sentence is appropriately cited.  The Swiss ambassador gave the proposal to then-Representative Ney and Parsi, then his staffer.  These facts are also cited.  The article then says:

> Obviously, the Swiss ambassador did not intend to put at risk such a historical event by turning to Bob Ney's group. He was surely instructed by his Iranian contacts to do so. . . .
> It is hard to explain why Iran did not use its usual channel of diplomacy, which was leading the negotiation with the US to send the grand bargain offer. . . . Why did Iran decide to ask Bob Ney and Trita Parsi to "manage this issue" (as Parsi stated) and send the proposal to the White House? What could this team achieve that the Iranian Foreign minister and other diplomats were unable to do? Put simply, couldn't the Swiss ambassador deliver the message directly to the White House without asking for Ney and Parsi's help?

There are no citations in this paragraph.  As the Court reads the article, however, defendant is simply drawing an inference, based on his own long experience with Iranian and American politics, that the Swiss ambassador must have received instructions from Iran to present the proposal to Parsi.  In other words, defendant is making a logical argument – namely, that it would have made no sense for the Swiss ambassador to make an independent decision to introduce Ney and Parsi as intermediaries – not a strict factual assertion.  Given both the phrasing of the paragraph that begins "Obviously . . . " and the fact that it is not cited (in a heavily cited article), it would be clear to any reasonable reader that the first paragraph, from which the next paragraph flows, offers the author's conclusion rather than a fact that has been established independently.

If defendant had simply written that "the Swiss ambassador was instructed to give the proposal to Bob Ney and Trita Parsi and did so," plaintiffs would have an argument that he willfully misrepresented the facts.  But as it stands, the "Obviously . . . " paragraph is effectively

a statement of opinion, and there is no reason to suspect that defendant did not sincerely believe it.  Defamation law cannot be used to prevent an author from drawing any inferences or making any arguments, especially when the author makes clear to the reader that he is doing so.

Plaintiffs' final argument is that the last sentence in the article is unsubstantiated.  Pls.' Surreply at 5.  But that sentence merely sums up the rest of the article, and the Court has found no serious problems in the underlying factual support for the rest of the article.  In the end, then, plaintiffs' close examination of one article – presumably the one that they felt best supported their case – indicates no problems that would allow a jury to find actual malice by clear and convincing evidence.

Setting aside the dissection of this article, plaintiffs advance several more general arguments on actual malice.  First, they argue that defendant made various statements implying that plaintiffs were agents for the Iranian regime – calling Parsi and NIAC "the Mullahs' lobby," "the Ayatollahs' Lobby," "key players in the lobby enterprise of Tehran's ayatollahs in the United States," and "an active and disguised Washington-based lobbying enterprise for the Iranian theocratic regime" – but ignored Parsi's many statements that criticized the regime.  Pls.' Opp. to Def.'s Mot. for Summ. J. [ECF 153] ("Pls.' Opp.") at 43. Examples of such statements are listed in an affidavit filed by Parsi.  Id., Ex. N ("Parsi Aff.") ¶ 15.  There are several problems with this argument.  Most importantly, with one exception, there is no evidence that defendant was aware of any of the statements cited in Parsi's affidavit.  Although defendant is obviously familiar with much of Parsi's work, there is no requirement that he track down every interview given, op-ed written, or conference attended before writing about Parsi.  Hence, the existence of these scattered statements cannot prove actual malice.

Moreover, many of the statements listed in Parsi's affidavit are not strongly anti-regime. The one statement plaintiffs do allege that defendant was aware of, for instance, reads: "Diplomacy is falling victim to an endless cycle of provocations right now and those provocations obviously come from both sides.  I think from the Iranian side it's been extremely provocative to [hold] this conference regarding the Holocaust in Tehran." Parsi Aff. ¶ 15(a) (alteration in original).  That Parsi occasionally made statements reflecting a balanced, shared-blame approach is not inconsistent with the idea that he was first and foremost an advocate for the regime.  Given the other evidence defendant amassed to support his views, the Court sees no "actual malice" in defendant's decision to disregard occasional contrary statements and assume that they were made largely to burnish Parsi and NIAC's image in the United States.  After all, any moderately intelligent agent for the Iranian regime would not want to be seen as unremittingly pro-regime, given the regime's reputation in the United States.

Similarly, plaintiffs protest that defendant accused NIAC and Parsi of refusing to speak up on human rights abuses in Iran despite evidence that plaintiffs had in fact done so.  Pls.' Opp. at 45.  For the most part, again, plaintiffs have put forth no evidence that defendant ever saw the statements related to human rights that are cited in Parsi's affidavit.  Plaintiffs' best argument relies on defendant's article "Ayatollahs' Lobby in Iran Offering Human Rights as a Negotiating Item."[5]  There, defendant severely criticized one of Parsi's publications for "paint[ing] a rosy picture of the human rights situation in Iran" and for condemning UCLA students who had protested Foreign Minister Kharazi's talk at UCLA.  Id. ("For Mr. Parsi, 'noisy opposition' at the speech of the envoy of an oppressive regime is a 'quite disturbing' violation of 'fundamental

---

[5]  The article is available at
http://english.iranianlobby.com/page1.php?id=2&bakhsh=ARTICLES.

human rights' which 'undermines the very idea' of human rights.  He refrains from offering similar condemnation of the torture, mass executions, rapes of women in prison, and stoning that is consistently carried out by Tehran's mullahs.")  Plaintiffs argue that Parsi condemns Iran's human rights violations in the very article on which defendant relies, and that defendant's refusal to acknowledge this suggests willful blindness.  Pls.' Opp. at 45.

The Court disagrees.  While Parsi does criticize Iran's human rights record in the underlying article, his criticisms are tepid.  A representative example is the following statement: "Even in long isolated Iran, a country known for its less than flattering Human Rights record, there is a trend toward the improvement of the human rights situation, although it remains far from being satisfactory."[6]  In this article Parsi does not come close to specifically condemning – or even mentioning – the "torture, mass executions, rapes of women in prison, and stoning" that defendant accuses him of ignoring.  Moreover, the vast majority of the article is devoted to Parsi expressing his disappointment with the UCLA students who protested Kharazi's speech, not to discussing the regime's abuses.  Hence, while defendant's article is certainly a strongly-worded and one-sided take on Parsi's underlying publication, it is not a distortion of the underlying publication that amounts to willful blindness or actual malice.

Plaintiffs' next argument is that defendant ignored several editors and others who questioned the factual bases for his articles.  Pls.' Opp. at 40-42.  Here again, the Court is required to examine the record closely to determine whether plaintiffs' allegation is supported. This effort is hampered by the fact that the parties have provided only incomplete excerpts of defendant's deposition.  See Pls.' Opp. Exs. E, J; Def.'s Reply in Supp. of Mot. for Summ. J.

---

[6] Parsi's article is available at http://www.iranian.com/News/2000/September/rights.html.

[ECF 158] ("Def.'s Reply") Exs. A, L, M.  It is often difficult to tell which article is being discussed, and the Court rarely has access to defendant's complete testimony about any given article.  Nonetheless, virtually nothing in the truncated record relied on by the parties supports the proposition that defendant avoided his editors' questions and willfully avoided learning the truth.  To the contrary, the record suggests that defendant and his editors were careful to substantiate his articles and that defendant engaged with those who questioned him.

Plaintiffs' first charge is that defendant published an article claiming that Bob Ney, Roy Coffee, and David DiStefano were the founders of NIAC even though defendant "wasn't sure at the time" whether this was true.  Pls.' Opp. at 41.  Plaintiffs point to an email by Ken Timmerman (whom plaintiffs mistakenly refer to as Tim Timmerman), who eventually published defendant's article, asking for proof of defendant's allegations against Ney, Coffee, and DiStefano.  Id. While the Court does not have the complete correspondence between Timmerman and defendant, the available excerpts refute any notion that Timmerman disbelieved defendant's argument or that defendant willfully ignored Timmerman's questions.  Timmerman asked a number of probing questions to ensure that there was sufficient factual support for specific assertions in the article, but he also noted that the article was a "[t]errific, terrific piece of work."  Def.'s Reply, Ex. S-1.  When defendant indicated that he could simply take out allegations against Bob Ney to make the article immediately publishable, Timmerman pushed him to instead muster more factual support for his allegations and suggested several avenues of research that might turn up such factual support.  Id.  The Court does not have either defendant's final emails to Timmerman about the article or a copy of the final article, but the natural conclusion from the earlier correspondence is that defendant was able to come up with sufficient

14

factual support to convince both himself and Timmerman the article should be published.  In other words, Timmerman asked precisely the sorts of questions that an editor should, and defendant apparently responded to them appropriately.

Moreover, contrary to plaintiffs' suggestion, defendant unequivocally rejected the idea that he had any subjective doubt about his story at the time he published it.  During his deposition, defendant explained that he received and reviewed some of the discovery documents in this case after the article was published, and those documents caused him to question the article's conclusions.  Def.'s Reply, Ex. L at 69-71, 185.  But defendant reaffirmed several times that he would have stood by his 2007 conclusions based on the material available to him in 2007. Id. at 186 ("Oh I can tell you that having in my possession what I had in 2006 and 7 I would have – I will write it again in the same manner[.]"); id. at 70 (same).  See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984) (a plaintiff must show defendant "realized the inaccuracy at the time of publication") (emphasis added).  Moreover, after receiving the discovery documents, defendant posted NIAC's response to his original article on his website and  "shared his doubts" about his original conclusions with his readers.  Def.'s Reply, Ex. L at 185-86.  This openness is inconsistent with actual malice.  See Esquire Magazine, 74 F.3d at 1304 ("[F]ull (or pretty full) publication of the grounds for doubting a source tends to rebut a claim of malice, not to establish one.").

Plaintiffs' next argument is similar.  They point to an email from Timmerman to defendant suggesting that "one thing I'd tone down in the article below . . . is the anti-Semitism label. [The subject] could actually sue you on that and you don't establish anti-Semitism in that section.  You establish a pattern of anti-Israel acts[.]" Pls.' Opp, Ex. J at 126-27.  The problem is

that plaintiffs offer no evidence about whether defendant heeded Timmerman's warning or ignored it. This is a relatively easy matter to establish; it requires only comparing the article draft to the article ultimately published, but plaintiffs never do so. Defendant was not certain at his deposition whether he had made any edits in response to Timmerman's suggestion, but thought that he might have done so as part of larger edits to the article. Id. at 127. That an editor made a suggestion to defendant, without any proof of what the response to that suggestion was, certainly cannot establish actual malice.

The next issue plaintiffs raise concerns the reaction of another editor, Jed Babbin, to defendant's article. This is a somewhat closer case than the Timmerman edits. Defendant submitted an article to Babbin and received a reply noting that it was far too long for Babbin's magazine and that the allegations needed to be "supported by credible references." Babbin added that he would "be glad to take another look at if you can cut and bolster." Pls.' Opp., Ex. J at 102. Because the article was "urgent" and defendant "did not want to go through the whole discussion about a broad and vast subject of the Iranian regime's lobby in the U.S.," he submitted the article to another publication that accepted it. Id. at 103. Defendant could not remember whether he had made any specific changes to the article in response to Babbin's concerns, but he did testify that he always took steps to ensure that his publications were supported and not libelous. Id. at 105.

Later in the deposition, defendant testified further about Babbin's critiques of his work. Id. at 130-32. Although it is a little difficult to tell whether the later testimony relates to the same article as the earlier testimony, it appears that it does.[7] Specifically, the defendant testified

---

[7] In the earlier discussion, defendant testified that he believed the article he sent to Babbin was "about the Congressman Kucinich relationship with NIAC and Mr. Trita Parsi."

that he sent Babbin a copy of Ney's plea deal as support for some of his allegations.  Babin

rejected defendant's understanding of the plea deal, writing that: "You say he was convicted of

conspiracy related to the sales of commercial aircraft parts in Iran.  That's not what the charges

were.  I am a lawyer and I can read what it says.  Ney's convictions had to do with Abramoff, not

with the Iran matter."  Id. at 131.  But in a part of the deposition that is unfortunately cut off,

defendant appears to point out that the plea deal, in fact, also contains a paragraph stating that

Ney "took thousands of dollars in free gambling chips from a foreign businessman [who] was

seeking an exemption to the U.S. export laws prohibiting the sale of his goods to a foreign

country, and a visa to the United States."[8]  Other publications have identified the foreign

businessman as one who was seeking to "sell U.S.-made airliners parts to the Iranian

government."[9]  In other words, assuming the same article is under discussion, defendant did in

fact have support for allegations that Babbin thought were unsubstantiated.  Even if the second

discussion relates to a different article, the mere fact that Babbin and defendant disagreed to

some extent about the factual support for the article does not indicate actual malice.

---

Pls.' Opp., Ex. J at 102.  The only article that fits this description is "Congressman Kucinich
Must Find a Better Role Model than Bob Ney," which is available at
http://english.iranianlobby.com/page1.php?id=5& bakhsh=ARTICLES.  The later discussion
focuses on Ney's plea agreement, which is the subject of the first paragraph of the article about
Congressman Kucinich.  Hence, it appears that although defendant ultimately did not publish the
article with Jed Babbin, he did send Babbin some factual information to show that the article was
not unsubstantiated.

   [8] See Statement of Assistant Attorney General Alice S. Fisher of the Criminal Division
Regarding Congressman Robert W. Ney, Sept. 15, 2006, available at
http://www.justice.gov/opa/pr/2006/September/06_crm_626.html.

   [9] See Mark Hosenball, Holly Bailey, & Michael Isikoff, Ney's Gambles, NEWSWEEK,
Sept. 20, 2006, available at http://www.thedailybeast.com/newsweek/2006/09/20/
ney-s-gambles.html

Plaintiffs' next two critiques can be lumped together.  First, they write that "Vahin Alaghband told the defendant that his writing should be based on facts not conjecture."  Pls.' Opp. at 42.  Alaghband was the subject of the article he criticized.  See Pls.' Opp., Ex. J at 169-70.  That Alaghband would criticize an article criticizing him is hardly surprising, and does not prove actual malice.  See Lohrenz, 350 F.3d at 1285 ("[P]ublishers need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'") (quoting Harte-Hanks Commn'cs, Inc. v. Connaughton, 491 U.S. 657, 691 n.37 (1989)).  Defendant testified at his deposition about the factual basis for that article, which plaintiffs do not question here.  Pls.' Opp., Ex. J at 169-70, 173.  Plaintiffs also write that "Jamie Glazor raised a concern about the defendant's journalistic integrity since he was writing negative things about a Mr. Namazi without contacting him or anyone in his family for comment." Pls.' Opp. at 42.  First, failure to contact one of the subjects of an article does not establish actual malice.  Secord, 747 F. Supp. at 788.  More importantly, Glazor, the editor of Front Page magazine, see Pls.' Opp., Ex. J at 193, did not remotely question defendant's "journalistic integrity."  Rather, Glazor merely forwarded two emails from Ali Mostashari – the subject of one of defendant's articles – and wrote "Ok Hassan, this time I am not touching or taking down or removing anything until I hear from you :-)."  Def.'s Reply, Ex. N-2.  Mostashari did vigorously question defendant's journalistic integrity, id., but again, protests from the subject of an article do not prove actual malice.  Moreover, defendant actually sent Mostashari a lengthy, point-by-point response to one of his emails, and he published both Mostashari's email and his own response on his website.  Def.'s Reply, Exs. O, P.  This is the opposite of evidence of actual malice.  See

Esquire Magazine, 74 F.3d at 1304.

Plaintiffs' weakest complaint is that defendant criticized another journalist, Sohrab Sobhani, for claiming that defendant was a member of MEK/MKO (a militant organization) without contacting him for comment.  Pls.' Opp. at 42.  Plaintiffs infer that defendant knows that it is imperative to contact the subject of the story, and that his failure to contact NIAC and Parsi for comment on every story concerning them indicates actual malice.  But the deposition excerpts plaintiffs provide contain no support for the proposition that defendant believes it is customary or required to contact subjects of stories.  Pls.' Opp., Ex. E at 31.  ("Q: Do you think it was wrong for [Sobhani] not to contact you before publishing that information?  A.  I didn't expect him – I don't know if it's wrong or right.  I didn't expect him to contact me[.]")  Moreover, whatever defendant believed about the appropriateness of contacting the subject of a story for comment, "if caselaw is clear on any point it is that an author is under no duty to . . . provide the subject an opportunity to reply."  Secord, 747 F. Supp. at 788.

In sum, none of the communications from editors or other journalists provide any evidence that defendant had subjective doubts about his articles or willfully avoided the truth.  Defendant's next argument is that actual malice exists because defendant is biased against Parsi due to his own ideological sympathies.  Plaintiffs contend that defendant is a member of the MEK/MKO, "a militant organization that advocates the overthrow of the Islamic Republic of Iran through violence," Pls.' Opp. at 39.  Hence, plaintiffs argue, defendant's anti-regime views motivate him to falsely attack Parsi.  Id.  Defendant vigorously denies that he is a member of MEK/MKO.  See Def.'s Reply at 7-8.  But even if he were, caselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice.  Harte-Hanks, 491

U.S. at 665 ("Petitioner is plainly correct in recognizing that . . . a newspaper's motive in

publishing a story – whether to promote an opponent's candidacy or to increase its circulation –

canot provide a sufficient basis for finding actual malice"); <u>Lohrenz</u>, 350 F.3d at 1284

("Evidence that the publishers of the allegedly defamatory statements were on a mission to

reinstate the ban against women being assigned to combat positions in the military does not

suffice to show actual malice" in their publication of articles claiming that a female pilot was

unqualified).  This rule makes sense: authors will often want to write about those who they

strongly ideologically oppose, but such ideological opposition does not <u>ipso facto</u> make their

writings untrustworthy.  If ideological opposition alone showed actual malice, valuable

investigative journalism would be threatened by defamation laws, a result completely contrary to

<u>New York Times</u> and its progeny.

     Plaintiffs bolster their motive argument by pointing to one of defendant's emails, which

reads:  "I strongly believe that Trita Parsi is the weakest part of the Iranian web because he is

related to Siamak Namazi and Bob Ney.  I believe that destroying him will be the start of

attacking the whole web."  Pls.' Opp., Ex. K.  Plaintiffs argue that this email shows that

defendant just wants to "destroy[]" Parsi, regardless of whether he really is advocating for or on

behalf of the Iranian regime.  Pls.' Opp. at 40.  What plaintiffs have overlooked is the possibility

that defendant wants to discredit Parsi and "attack[] the whole web" because he genuinely

believes that Parsi and his associates are advocating for or on behalf of a regime that he strongly

opposes.  That possibility is, in the Court's view, much more plausible than the idea that

defendant's personal dislike of Parsi has motivated him to concoct dozens of elaborate articles

discussing Parsi and the Iranian regime.  This email, then, is not enough to bring the case before

a jury that must find actual malice by clear and convincing evidence.

Plaintiffs' next argument is that defendant conceded in his deposition that he did not

subjectively believe that Parsi was an agent for the Iranian regime.  See, e.g., Pls.' Opp. at 10.

The deposition testimony on which plaintiffs focus is the italicized part of the following

exchange:

> Q: Do you consider Dr. Parsi to be a political activist?
> A.  I think so.
> *Q: Do you consider him to be part of the Iranian regime?*
> *A: I believe that he has worked, he has lobbied in favor of the Iranian regime.*
> Q: So based upon your prior testimony it would be fair to say that you believe
> because he is a part of the Iranian regime that you have no obligation to verify the
> truth of the statement that you make about him?
> A: My belief is that of course I would prefer to go to Mr. Parsi and NIAC and ask
> for help and clarification about what I thought in 2006 when I was working to
> investigate about them for many questions I had.  The thing is that honestly I did
> not expect the truth from them.  Mostly because I thought the first aspect of their
> work was deception and lie. . . . I mean that mistrust was so that I believed and I
> still believe for the relation and trust that existed between Mr. Parsi and the inner
> circle of the Iranian regime.

Pls.' Opp., Ex. E at 35-36.

Plaintiffs conclude that by testifying that he believed that Parsi "had lobbied in favor of

the Iranian regime," defendant was conceding that he did not believe Parsi was actually an agent

of the regime.  That is a serious overreading of a cautious answer at a deposition.  Indeed, Parsi's

attorney's next question assumes that defendant believed Parsi was "a part of the Iranian

regime," and defendant's answer fully supports that assumption.  Plaintiffs cannot hang their case

on one sentence that is, at best, ambiguous.

Plaintiffs' final argument is that defendant ignored a cease and desist letter that put him

on notice his stories were false.  Again, an author's knowledge of "denials, however vehement"

does not show actual malice.  Harte-Hanks, 491 U.S. at 691 n.37.  Moreover, the letter in

question is not one that could prove actual malice.  See Pls.' Opp., Ex. D.  This letter is addressed to employees of the Voice of America radio program and concerns a broadcast on which defendant and several others were guests.  Id.  Defendant, along with others, is listed in the "cc" field.  Id.  The letter focuses on Voice of America's alleged violations of its own Journalistic Code, but it offers virtually no facts that would suggest anything said during the program was inaccurate.  Id.  In other words, it is a textbook substance-free vehement denial.  Assuming defendant actually received a copy of the letter, nothing in it could have alerted him to any factual inaccuracies in his writings about NIAC and Parsi.

Because plaintiffs have mustered no evidence that defendant actually harbored any doubts about the correctness of his writings, or willfully blinded himself to the truth, their defamation claim must fail.  Their false light claim must also fail.  "[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion."  Moldea v. New York Times Co., 22 F.3d 310, 319 (D.C. Cir. 1994).  A false light claim involving a public figure, like a defamation claim, requires proof of actual malice. See Time, Inc. v. Hill, 385 U.S. 374, 387-88 (1967); Lohrenz, 223 F. Supp. 2d at 40.[10]  Hence, plaintiffs' failure to prove actual malice disposes of all counts in their complaint.[11]

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted, and

---

[10]  In the District of Columbia, "whether the defendant is properly characterized as a member of the media" is irrelevant to the analysis.  Ayala v. Washington, 679 A.2d 1057, 1063 n.2 (D.C. 1996)

[11]  Nothing in this opinion should be construed as a finding that defendant's articles were true.  Defendant did not move for summary judgment on that ground, and it has not been addressed here.

all counts of plaintiffs' complaint will be dismissed.  Given this disposition of the case, several

other pending motions will be denied as moot.  A separate order accompanies this opinion.


                                         /s/ John D. Bates
                                       JOHN D. BATES
                                  United States District Judge

Dated: September 13, 2012