## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TRITA PARSI and NATIONAL
IRANIAN AMERICAN COUNCIL,**

**Plaintiffs,**

**v.**                                                      **Civil Action No.  08-705 (JDB)**

**SEID HASSAN DAIOLESLAM,**

**Defendant.**

## MEMORANDUM OPINION

This is a defamation case filed by Trita Parsi and the National Iranian American Council

(collectively, "plaintiffs").  Plaintiffs allege that Seid Hassan Daioleslam ("defendant") published

numerous false and defamatory statements that characterize plaintiffs as agents of the Iranian

government.  The parties engaged in lengthy, contentious discovery, which has resulted in [143]

defendant's instant omnibus sanctions motion.  For the reasons given below, the motion will be

granted in part and denied in part.

### I.  Legal standards

The Court may assess sanctions, if warranted, under either Federal Rule of Civil

Procedure 37 or the Court's inherent authority.  Rule 37 authorizes the issuance of sanctions

when a party disobeys a discovery order.  Sanctions available under Rule 37 include "directing

that the matters embraced in the order or other designated facts be taken as established for

purposes of the action," prohibiting the disobedient party from introducing evidence on an issue,

striking pleadings, dismissing the action, and rendering a default judgment.  Fed. R. Civ. P.

37(b)(2)(A).  Rule 37 imposes no bad faith or willfulness requirement; it simply allows a court to issue any "just orders" necessary to punish past discovery abuses or deter future abuses.

Under Rule 37(a)(5)(A), a party who prevails on a motion to compel must be awarded "reasonable expenses incurred in making the motion, including attorney's fees," unless the non-movant's opposition to the motion was "substantially justified."  Rule 37(a)(5)(A)(ii).  A party is "substantially justified" in opposing a motion if reasonable people could differ in their views on the motion.  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  When a motion is granted in part and denied in part, the Court should apportion expenses, including attorney's fees, accordingly.  Fed. R. Civ. P. 37(a)(5)(C).

In situations where a party has committed discovery abuses but Rule 37 does not apply, a court may instead issue appropriate sanctions under its inherent power.  Shepherd v. Am. Broadcasting Cos., Inc., 62 F.3d 1469, 1474 (D.C. Cir. 1995).  Inherent power sanctions include "fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence."  Id.  A court may impose "issue-related" sanctions "whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue," but a court must find misconduct by clear and convincing evidence in order to impose the sanction of dismissal.  Id. at 1478.  Whatever sanction the Court selects, it must "properly calibrate the scales to ensure that the gravity of an inherent power sanction corresponds to the misconduct."  Id. at 1479 (citations omitted).

## II.  Analysis

As explained in this Court's prior opinions, Dr. Parsi is the president of the National

Iranian American Council ("NIAC"), a Washington, D.C.-based non-profit group that is "dedicated to promoting Iranian American involvement in American civic life and relying on the public for financial and human resource support."  Compl. ¶¶ 9, 10.  Defendant is an Arizona resident who has published articles about Parsi and NIAC on various websites.  Id. ¶¶ 5, 11.  Plaintiffs' complaint sought damages and injunctive relief against defendant for common law defamation and portrayal in a false light. Id. ¶ 11.

After the Court denied defendant's first motion for summary judgment, see Feb. 4, 2009 Mem. Op. [ECF 13], the parties conducted more than two years of discovery.  During that time, the Court granted several of defendant's motions to compel.  See Sept. 16, 2009 Order [ECF 32]; July 1, 2010 Order [ECF 68]; March 29, 2011 Order [ECF 93]; Aug. 30, 2011 Order [ECF 138]. In September 2011, defendant simultaneously filed a second motion for summary judgment and an omnibus motion for sanctions, including the sanction of dismissal.  See Def.'s Mot. for Summ. J. [ECF 144]; Def.'s Mot. for Sanctions (Omnibus) [ECF 143] ("Def.'s Sanctions Mot.").  In a separate opinion, the Court will grant defendant's motion for summary judgment on all claims. Nonetheless, because defendant's sanctions motion requests various monetary awards, it is still necessary to resolve the motion.

Defendant's motion focuses on the following areas: (1) plaintiffs' delayed production of NIAC's computers and servers for forensic imaging, (2) plaintiffs' allegedly intentional alteration of NIAC employees' calendar entries, (3) plaintiffs' tardy production of Babak Talebi's emails, (4) plaintiffs' failure to produce certain emails sent to third parties, (5) plaintiffs' belated production of NIAC's Salesforce data, (6) the necessity of redeposing Parsi and NIAC employee Emily Blout, (7) various issues relating to Parsi's computers, and (8) plaintiffs' alleged

intentional alteration of a document relating to Iranians for International Cooperation, a group

cofounded by Trita Parsi.  The Court will discuss each issue in turn.

     1.  Server production

     As discussed at more length below, defendant expended significant time and energy

attempting to obtain NIAC employees' Outlook calendar entries.  Once it became clear that

plaintiffs could or would not produce all of the calendar entries voluntarily, the Court ordered

plaintiffs to produce NIAC's server for forensic imaging by PricewaterhouseCoopers ("PwC").

July 1, 2010 Order [ECF 68] at 4-5.  The term "server" was not defined by the Court or the

parties, but the natural meaning, in context, was a Microsoft exchange server.  Shortly before the

imaging was to take place, however, plaintiffs' counsel revealed during a conference call with

PwC that NIAC did not operate a Microsoft exchange server.  See Def.'s Sanctions Mot., Ex. A

("PwC Report") at 4.  Instead,  NIAC outsourced the management of its emails and calendar

entries to a third-party provider and stored them locally on the computers of NIAC employees.

Id.  Since there was no exchange server where all of the calendar entries were stored, plaintiffs

instead offered to produce for forensic imaging several computers where calendar entries were

stored locally.  Defendant accepted that solution, and imaging was conducted.  Id.  It later

became apparent, however, that plaintiffs had omitted relevant computers and a shared-drive

server from the production.  Ultimately, PwC conducted three rounds of imaging, and in the third

round, PwC discovered several hundred unproduced calendar entries.  Def.'s Sanctions Mot. at 8-

9; id., Ex. XX at 4 (PwC's third imaging report).

     Defendant initially paid for the imaging, but the Court's July 1, 2010 order specified that

"[i]f defendant believes that forensic analysis shows that discoverable calendar entries were

omitted from previous productions, or that inappropriate edits were made to such entries, he may seek to recover the costs of the forensic analysis from NIAC." July 1, 2010 Order [ECF 68] at 5. Defendant now seeks to recover those costs, arguing both that discoverable entries were omitted and that inappropriate edits were made to entries.  As discussed below, the Court is not persuaded that plaintiffs intentionally edited calendar entries, so fee-shifting is not appropriate on that basis.  It is clear that some discoverable entries were not produced, but, as is also discussed below, it does not appear that there was any wholesale effort to wrongfully withhold entries from production.  Hence, in the Court's view, shifting of all fees is not warranted on that basis either.  Nonetheless, the Court concludes that some lesser amount of fee-shifting is justified.  As noted, three rounds of imaging were conducted due to plaintiffs' belated production of the relevant computers and shared-drive servers.  Defendant explained at the motions hearing that conducting three separate imaging sessions cost far more than conducting one larger imaging session.  Tr. of Mot. Hrg. (July 6, 2012) at 44.  Plaintiffs cannot be blamed for having no exchange server where all calendar entries could be found, but lacking such a server, plaintiffs had a responsibility to produce every device on which relevant data might be stored. They failed to fulfill that responsibility during PwC's first imaging session, and they should be responsible for the costs of that failure.  Therefore, plaintiffs must reimburse defendant for the costs of the last two rounds of imaging.

The remaining issue is whether plaintiffs must reimburse defendant for (1) his expenditures in bringing his earlier motion to compel server production and (2) his expenditures in bringing the instant sanctions motion.  The Court has already ordered plaintiff to pay all of the expenses associated with [112] the defendant's July 1, 2011 Motion to Compel Production of

Server, and sees no reason to revisit that ruling here.  That payment has not yet been made, however, because plaintiffs requested and were granted permission to withhold payment until the Court ruled on their objections to defendant's bill of costs.  See Pls.' Mot to Stay and Exceptions to Bill of Costs [ECF 140]; September 20, 2011 Minute Order.  Because the instant Order will result in several additional submissions of expenses by defendant, the Court will not at this time rule on [140] plaintiffs' objections.  Rather, a separate Order will lay out a schedule for filings on all expenses issues, and all of plaintiffs' objections will be resolved together.

As for the expenses associated with the instant motion, the Court holds that plaintiffs should be responsible for such expenses to the extent that defendant succeeds in obtaining the requested sanction.  Here, for instance, defendant has succeeded in obtaining partial fee-shifting for the PwC imaging.  This fee-shifting is based on plaintiffs' discovery abuses, and defendant should not have to bear the costs of bringing those abuses to the attention of the Court.  Hence, the Court will award defendant reasonable expenses associated with bringing this portion of the sanctions motion.  But when plaintiffs' request for a sanction is denied, as in the next section, defendant must bear his own costs.

2.  Calendar entries

The calendar entries are, by far, the most complicated dispute.  Defendant became aware in late 2009 that NIAC employees kept track of their appointments on Outlook calendars, although plaintiffs had previously denied this.  Def.'s Resp. to Pls.' Mot. for Reconsid. [ECF 76] ("Def.'s Reconsid. Opp.") at 5.  On December 9, 2009, defendant requested that plaintiffs produce all employees' Outlook calendar entries.  Pls.' Mot. for. Reconsid. [ECF 69], Ex. A.  On December 29, 2009, plaintiffs produced approximately 400 calendar entries in native .pst format.

The "date modified" field of these entries showed that 87 of the entries, including 42 of Parsi's

63 entries, had been altered between December 25 and December 27 of that year.  Def.'s

Reconsid. Opp. at 5.  In early March 2010, defendant requested forensic imaging of NIAC's

server to locate additional calendar entries and to determine the substance of the 87 alterations.

Id.  Plaintiffs told the Court on March 5, 2010 that they would produce "complete, unaltered"

records of NIAC employees' calendar entries forthwith, so the Court declined to order forensic

imaging.  Id.  On April 21, 2010, plaintiffs produced approximately 5000 calendar entries.  Def.'s

Sanctions Mot. at 2.  There were two issues with this production.  First, although defendant had

requested the entries in native .pst format, they were instead produced in an Excel spreadsheet.

Def.'s Reconsid. Opp. at 7.  The spreadsheet inexplicably did not include the "last modified"

field, so it was impossible to tell when the records had been modified.  Id.

Defendant brought some of the issues with the April 21, 2010 production to the Court's

attention, and on July 1, 2010, the Court ordered that "NIAC shall . . . submit the server on

which its Outlook calendars are kept" for forensic imaging by PwC.  July 1, 2010 Order at 4.

The Court's Order specifically provided that PWC was to produce a report explaining whether

calendar entries had been altered or deleted, who had done the altering or deleting, and the

substance of the alterations and deletions.  Id. at 5.  Unfortunately, PwC was not able to

completely respond to the Court's order.  PwC Report at 10-12.  It was unable to determine who

was responsible for edits to calendar entries because multiple employees used the same

computers, and it could not determine the substance of the Christmas weekend edits because it

did not have copies of the calendar entries from before the edits were made.  Id.

Notwithstanding these limitations, PwC's analysis turned up many unproduced calendar entries

and several other issues.  Four categories of problems will be discussed here.

A.  Unproduced entries

PwC located 4,159 calendar entries that had not been previously produced, including 999 entries that had been deleted and 715 entries that had been double-deleted.  Def.'s Sanctions Mot. at 3.  PwC's analysis also confirmed that some entries had been edited near Christmas 2009, an issue that will be discussed further below.  Id. at 3, 6.  Defendant argues that PwC's analysis shows that plaintiffs failed to produce discoverable calendar entries and made inappropriate edits to entries, and that all imaging fees should therefore be shifted per the Court's July 1, 2010 Order.  Plaintiffs' basic position is that all of the alterations and unproduced documents are the sorts of meaningless electronic quirks that show up in massive e-discovery productions.  See generally Corrected Pls.' Mem. in Opp. to Def.'s Sanctions Mot. [ECF 154] ("Pls.' Opp.") at 10-33.  For instance, plaintiffs argue that the mere process of exporting calendar entries for production created substantively identical copies of many entries, and PwC identified these copies as unproduced entries.  Id. at 16.

The evidence here is quite confusing, and neither party has been able to fully or clearly explain the technical issues.  Nonetheless, the Court ultimately concludes that defendant has not shown by a preponderance of the evidence that plaintiffs inappropriately altered or deleted calendar entries.  The Court bases its conclusion on the fact that defendant, despite obviously putting a significant amount of effort into his motion, has not identified alterations or deletions that actually help plaintiffs' case.  In other words, there is simply no reason to believe that plaintiffs would have made the alterations or deletions at issue for tactical reasons.  Given that, and given plaintiffs' arguments about the technical issues surrounding e-discovery, the Court will

not make a finding of such serious misbehavior.

The Court need not discuss each disputed calendar entry, but it will outline the issues. PwC concluded that 4,159 of the 17,000 calendar entries that it located had not previously been produced.[1]  Approximately 1000 of these were created after plaintiffs' second production, so they were not intentionally withheld from production.  Pls.' Opp. at 20-21.  Plaintiffs argue that approximately 1000 more were simply duplicates of previously produced entries, 600 were calendar notifications, 100 were blank, and 110 were holiday notifications.  Id.  Approximately 1000 were deleted entries, which, as explained below, plaintiffs persuasively argue that they did not need to produce.  Id.  The additional three hundred entries are unaccounted for; plaintiffs make a reference to "inactive 'pst' files which were inaccessible to NIAC's custodians," but they were unable to clearly explain at the hearing what they meant by this.  Id.; Hrg. Tr. at 64-65. In sum, assuming plaintiffs' numbers are basically correct – and they are largely undisputed by defendant – the number of meaningful entries that were not produced is much smaller than it initially appears.

Moreover, as indicated above, defendant has been unsuccessful in attempting to find incriminating entries that were not produced.  The unproduced entries relate to meetings on the Campaign for New American Policy on Iran, meetings on the Standing with the Iranian People Act, a 2009 CLIPPI or CLPI  meeting (neither party defines the acronym), a "J Street" meeting, an October 2009 "call about Convio and Common ground," and a meeting on the Incidents at Sea bill.  See Def.'s Mot. at 5-6.  Plaintiffs offer specific suggestions about why each of these

---

[1]  There is an obvious problem with the math here: plaintiffs produced only 5000 entries before forensic imaging began, yet PwC concluded that only 4,159 of 17,000 entries had not been produced.  Neither party explains this issue, so the Court is left to assume that a huge number of these 17,000 entries were merely duplicates.

entries might not have been produced; the Court will not repeat each argument, but they are generally persuasive.  Pls.' Opp. at 25-32.  Generally speaking, in each of these cases, plaintiffs contend that either the user produced a substantively identical copy of the disputed entry (sometimes with the word "Copy:" inserted in the subject line, an apparent artifact of the exporting process), or that other NIAC employees produced calendar entries for the same meeting.  See id.  In other words, PwC's analysis did not uncover the existence of any meetings or other events that plaintiffs had completely hidden in their original production.  Plaintiffs argue that this shows that they did not delete or alter entries intentionally, because it would have made no sense to delete employee A's entry for a meeting if employee B was going to produce a calendar entry for the same meeting.  Because defendant has not suggested any reason that NIAC might have wanted to hide only a particular employee's participation in the meeting (rather than the meeting itself), the Court agrees with plaintiffs that there is little evidence of tactical manipulation of entries.

The only alteration that gives this Court pause is that Patrick Disney, a NIAC employee, changed at least 82 references to "lobbying" in his calendar entries to say "legislative direct" in February 2010.  See Def.'s Sanction Mot. at 4-5.  Plaintiffs explain that Disney had category tags for calendar entries, and that he was simply trying to change the "lobbying" tag to "legislative direct" for future entries.  Pls.' Opp. at 25-26.  According to plaintiffs, Disney retroactively changed past entries in the process of renaming the tag; according to defendant, Disney was trying to hide any evidence of lobbying activities.  Id.  The timing of these changes makes defendant's theory less plausible: Disney made these changes in February 2010, but plaintiffs did not agree to produce a revised set of calendar entries until March 2010, and they did not

10

ultimately do so until late April 2010.  Def.'s Sanctions Mot. at 4; Def.'s Reconsid. Opp. at 3.  In

other words, if Disney was trying to change the entries to avoid producing anything suspicious,

he was both prescient and expeditious in doing so.  In addition to this circumstantial evidence

against defendant's theory, the Court simply finds plaintiffs' explanation more believable.  There

are many reasons unrelated to this case that Disney might have wanted to rename his "lobbying"

tag, and doing so might well change past as well as future entries.  This simply does not seem

suspicious enough to show intentional alteration by a preponderance of the evidence.

B.  Deleted entries

As noted above, PwC recovered 999 entries that had been deleted and 715 entries that

had been double-deleted.  There is no disagreement that the vast majority of these entries, if not

all of them, were deleted in the ordinary course of business.  Plaintiffs argue that their failure to

produce deleted calendar entries cannot be seen as spoliation or intentional disobedience of a

discovery order, because they claim that no discovery order or discovery request covered entries

deleted in the ordinary course of business.  Pls.' Opp. at 21-23.  Defendant, of course, assumes

that deleted entries were within the scope of his discovery requests.  The relevant discovery

request, which was sent by email, reads:

> Outlook/Calendar records of meetings with government officials (and any foreign
> persons) - Ms. Blout revealed at her deposition that her Outlook calendar reflects
> such meetings. We had previously specifically asked you about such when not a
> single calendar/diary of NIAC employees was produced and was informed there
> were none.  Someone is not leveling on this.  We ask that you immediately review
> all diaries, calendars for such and produce them immediately.

Pls.' Mot. for. Reconsid. [ECF 69], Ex. A.  No other Court order governing this issue was in

effect.  In the Court's view, defendant's request does not clearly cover deleted entries.  Deleted

entries typically reflect meetings that were canceled.  They are therefore not "records of

meetings with government officials (and any foreign persons)," because the meetings never occurred. Perhaps plaintiffs should have produced such entries in an abundance of caution, or at least sought clarification on the issue, but the failure to do so is not sanctionable.

C. Christmas weekend 2009 alterations

Eighty-seven of the approximately 400 entries that were produced on December 29, 2012 were altered between December 25, 2009 and December 27, 2009. Def.'s Sanctions Mot. at 3. As explained above, PwC could not respond to the part of the Court's Order that asked them to identify the substance of these alterations. Plaintiffs point out, however, that the timing of the edits makes it unlikely that they were substantive. Eighteen events in Parsi's calender were modified at exactly 1:16 a.m.; twelve were modified at the same time in David Elliot's calendar; 9 were modified at the same time in Blout's calendar. Pls.' Opp. at 16. Plaintiffs also note that some of the calendar entries modified on Christmas weekend contained the word "Copy:" in the subject line, which Outlook apparently added to some calendar entries during the exporting process. Id. That would change the date modified of an entry, but not the substance. PwC's analysis showed that 1,445 of the 17,000 entries it ultimately recovered were modified on Christmas weekend 2009, but again, it could not determine the substance of the modifications. Def.'s Sanctions Mot. at 6. Plaintiffs claim, and defendant has not disputed, that over 1000 of the documents were duplicates, and that "the remaining 300 unique documents . . . were the result of the export process itself creating a non-substantive change." Pls.' Opp. at 33.

This is a particularly thorny issue, because it is obviously difficult for defendant to look at an innocuous calendar entry and show that some previous version of the entry was altered in bad faith. Nonetheless, the fact that entries were edited in batches persuades the Court that it is

more likely than not that the changes were not substantive.  Altering the text of calendar entries

to hide some piece of information would presumably require individualized, case-by-case

editing, not the multiple simultaneous changes at issue here.  This evidence is hardly definitive,

but particularly in light of the fact that the Court has found no other intentional deletion or

manipulation of calendar entries, defendant has not carried his burden as to the Christmas

weekend alterations.

The Court's view is supported by one specific set of edits the parties have identified.

Both parties agree that "[a]mong the strangest" of the Christmas weekend alterations were three

entries sent from the gmail account of Babak Talebi, a one-time NIAC employee, and added to

the calendars of NIAC employees Parsi, Elliott, and Kevin Cowl.  Def.'s Sanctions Mot. at 3;

Pls.' Opp at 23-24. One appointment was with Erik Belfrage, a Swedish banker and diplomat,

and the other two were with Puneet Talwar, an NSC official.  Id.  Talebi no longer worked at

NIAC when these entries were added.  Def.'s Sanctions Mot. at 3-4.  Neither party has any

explanation for the appearance of these three entries.  Whatever technological oddity lies behind

this event, defendant has not suggested any reason that plaintiffs would have added calendar

entries in bad faith – indeed, one would expect deletion of entries in bad faith.  Furthermore,

defendant has pointed to nothing incriminating or even interesting about these particular entries.

While mysterious, these entries suggest technological problems rather than bad faith on the part

of plaintiffs.

D.  Parsi's 2006 calendar entries

Defendant puts great emphasis on the fact that there are no calendar entries at all for Parsi

for five months in mid-2006, despite the fact that defendant has independent evidence showing

that Parsi met with several United States and Iranian officials during that time.  Def.'s Sanctions Mot. at 6-7.  Plaintiffs have offered various explanations for this gap, including that "Dr. Parsi was a fulltime student in 2006" and that the litigation hold was not in effect in 2006.  Pls.' Reply in Supp. of Mot. to Reconsid. [ECF 77] at 4.  PwC recovered no calendar entries for Trita Parsi for that period in 2006, including among the deleted entries.  PwC Report at 11.  So the entries either never existed, were never stored on the machines PwC imaged, or were deleted in such a way that PwC was unable to recover them.

While it seems very likely that the calendar entries existed at some point – or, put differently, it seems unlikely that Parsi completely stopped using Outlook for five months and then resumed using it again, see Def.'s Sanctions Mot. at 6 – there is simply no evidence that entries were deleted intentionally or for tactical reasons relating to this litigation.  As plaintiffs point out, they were under no obligation to preserve evidence in 2006.  Pls.' Reply in Supp. of Mot. to Reconsid. [ECF 77] at 4.  Parsi was apparently juggling several different electronic devices at that time, and somehow failed to preserve any calendar entries he may have created.  Hrg. Tr. at 75-77.  Defendant's frustration is understandable, but this loss of information – very possibly before the litigation even began – is not sanctionable, at least without hard evidence of bad faith.

E.  Summary

Because the Court cannot find by a preponderance of the evidence that plaintiffs intentionally altered or deleted calendar entries, it will not shift the whole cost of the forensic imaging to plaintiffs.  In addition, the Court will not order plaintiffs to reimburse defendant for the cost of bringing this portion of the sanctions motion.

3.  Talebi's emails

In response to defendant's request for emails of several NIAC employees, plaintiffs produced a small number of emails to and from Babak Talebi, NIAC's cofounder and erstwhile director of community outreach.  Def.'s Reconsid. Opp. at 3-4.  In August 2010, plaintiffs discovered and reviewed 8000 more of Talebi's emails and decided that an additional 2500 would be produced.  April 5, 2011 Order [ECF 95] at 2.  Plaintiffs claimed that the remaining 5500 emails did not include any of the parties' agreed-upon search terms or were nonresponsive. Id.  The Court decided to conduct an in camera review of the remaining 5500 emails and found that many were clearly responsive, so plaintiffs were ordered to turn over all 5500 remaining emails.  Id. at 2-3.

Plaintiffs have only essayed a half-hearted defense of their actions.  They acknowledge that they did not use the agreed-upon search term "Talebi," but point out that using the email custodian's name renders the idea of a "search term" meaningless, since it would result in the production of every email from that custodian.  Pls.' Opp. at 36 n.3.  For similar reasons, they did not use the "NIAC" search term.  Id.  But even if plaintiffs' argument is reasonable, plaintiffs were not necessarily entitled to make a unilateral decision about which search terms to use, and they certainly were not entitled to represent that they had used all of the agreed-upon search terms when that was not true.  In addition, defendant points out that plaintiffs obviously failed to use the "Parsi" or "Blout" search terms, which is less defensible than the decision not to use "Talebi" or "NIAC."  Pls.' Reply in Supp. of Sanctions Mot. [ECF 159] ("Pls.' Reply") at 14.

Setting aside specific search terms, it is clear that plaintiffs missed a large number of responsive Talebi emails.  Their only excuse is that they did not realize that Outlook's search

function did not search attachments, and most (but apparently not all) of the key documents defendant cites in his brief are attachments to emails.  Pls.' Opp. at 38-39.  But even if this is true, this was not a massive production, and plaintiffs should have at least spot-checked the 5500 unproduced documents to ensure that they were not missing responsive documents.  Certainly, it would have made sense for plaintiffs to do this type of review before the Court was compelled to undertake it.  Given that the Court was able to locate responsive documents easily within the 5500 unproduced documents, plaintiffs' failure to do so is inexcusable.  See April 5, 2011 Order [ECF 95] at 3 ("[T]he Court identified these e-mails by searching for obvious terms such as 'lobbying,' 'Hassan,' and 'Iranian government.' Although the Court did not conduct a comprehensive review of every e-mail submitted by NIAC, it is not this Court's responsibility to parse through thousands of e-mails to determine those that are responsive and those that are not. That was NIAC's job, which it has totally failed to complete in a satisfactory manner.").

Defendant has requested reimbursement for the expenses associated with obtaining [93] the March 29, 2011 order directing plaintiffs to produce 5500 emails to the Court for in camera review.  Because defendant succeeded on that motion and plaintiffs' opposition to the motion was not "substantially justified" for the reasons explained above, this request will be granted. See Fed. R. Civ. P. 37(a)(5)(A)(ii).

Defendant also requests reimbursement for the expenses associated with Talebi's deposition, arguing that the deposition was taken before defendant received Talebi's emails and hence was much less useful.  The Court finds that granting the expenses of the full day of deposition would be excessive.  There were many areas unrelated to the emails on which Talebi could be questioned; indeed, defendant evidently believed it was worthwhile to schedule Talebi's

deposition even though he did not have the emails that were later produced.  On the other hand, the literally thousands of emails produced in an unjustifiably tardy fashion would likely have been an important addition to the deposition, allowing defendant to delve more deeply into his questioning or to explore entirely new lines of examination.  Accordingly, the Court will award defendant half of the expenses associated with Talebi's deposition. In addition, the Court will award defendant the expenses associated with bringing this portion of the sanctions motion.

  4.  Third-party emails

  Defendant has subpoenaed emails to or from NIAC employees from a number of third parties.  Most of these emails are to or from NIAC employees in 2008 or 2009, and none were produced by NIAC.  Def.'s Sanctions Mot. at 19-23.  Defendant argues that plaintiffs should pay for the cost of issuing these subpoenas, since defendant would not have had to issue them if plaintiffs' production had been more complete.  Id. at 39.  Defendant also asks for a jury instruction that there are more unproduced emails that would support defendant's contentions, but given the resolution of the summary judgment motion, the Court need not decide whether such an instruction is appropriate.  Id.

  The emails defendant has recovered include (1) 2008 and 2009 emails to and from Parsi and Disney to CNAPI employees, (2) 2001 and 2003 emails from Parsi to a "Children of Persia" group, including some from Parsi's email account at a predecessor organization to NIAC, (3) emails between Parsi and Puneet Talwar, an official at the National Security Council, from April 2009, (4) emails between Parsi and Hillary and Flynt Leverett from 2008 and 2009, (5) emails subpoenaed from plaintiffs' damages expert, Joel Morse, mostly from members of the public commenting on defendant's publications, and (6) emails subpoenaed from Col. (Ret.) Samuel

Gardiner, another NIAC expert, mostly to or from Parsi in 2008 and 2009.  See Def.'s Sanctions

Mot. at 19-23.

It is understandable that Parsi might no longer have copies of the Children of Persia

emails, which were sent long before this litigation began.  But plaintiffs' failure to produce the

other five categories of emails is indefensible, and plaintiffs made no coherent attempt to explain

either in their briefing or at the motions hearing why all of these emails would not have been

produced.  Hrg. Tr. at 59.  Most disturbingly, plaintiffs apparently gathered emails for their

experts that they failed to produce to defendant, which clearly shows that plaintiffs' statement at

the motions hearing that "[t]here may be technical explanations" for the failure to produce these

documents is untrue.  Hrg. Tr. at 59.  Given plaintiffs' inexplicable and unexplained behavior, it

is appropriate to require them to pay the cost of serving the subpoenas (other than the subpoena

to the Children of Persia employees) and the costs of bringing this portion of the instant motion.

    5.  Salesforce data

The Court has already awarded sanctions for [113] defendant's motion to compel on this

issue, so it will be summarized only briefly here.  Defendant went to great lengths to obtain

membership lists and meeting notes stored in plaintiffs' Salesforce software, but plaintiffs gave a

variety of excuses for why they could not produce these records.  Def.'s Sanctions Mot. at 23-25.

Ultimately, defendant had to file a motion to compel, and the Court granted the motion and

awarded defendant the costs of bringing it.  See August 30, 2011 Order [ECF 138] at 2-3.

Defendant now also seeks reimbursement of its expenses for the two and a half days it spent

deposing Parsi, arguing that the deposition was less useful than it should have been because

defendant did not have access to this data.  Def.'s Sanctions Mot. at 40.

Plaintiffs' failure to produce the Salesforce data was undoubtedly serious, but the Court concludes that awarding expenses for all two and a half days of Parsi's deposition – in addition to the expenses already awarded – is excessive.  Parsi's original deposition was scheduled for two days, and another half day was later added to account for various documents that plaintiffs produced belatedly.  Def.'s Sanctions Mot. at 28.  There are two ways of thinking about this scheduling.  First, there may have been so much material to cover that defendant would have had to depose Parsi for two and a half days no matter when plaintiffs finished their production.  If that is true, defendant incurred no extra costs (or incurred only minimal extra costs) due to plaintiffs' belated production.  Alternatively, however, defendant might have been able to carefully structure his questioning such that he could have fit everything into the original two days if all materials had been timely produced.  In that scenario, the extra half day was an unnecessary expense caused by plaintiffs' belated production.  Not knowing which of these scenarios is true, the Court will split the difference.  The Court will not award expenses for the two originally scheduled deposition days, which would have been necessary regardless of any belated production issues.  For the extra partial day of deposition, the Court will award defendant only half of his expenses.  The Court will also award the expenses of bringing this portion of the sanctions motion.

6.  Blout redeposition

Emily Blout, NIAC's former Legislative Director, also had to be redeposed because defendant did not have her calendar entries at the time she was initially deposed.  Def.'s Sanctions Mot. at 27, 42.  As discussed above, the Court has not found that plaintiffs deleted calendar entries in bad faith, or substantively altered those that it produced.  Still, there is no

19

question that plaintiffs were very slow in producing any calendar entries at all.  Because plaintiffs' tardiness in producing any of the calendar entries made the second deposition necessary, it is appropriate for plaintiffs to pay some of the reasonable expenses of that deposition.  For the reasons explained in the previous section, however, the Court will order plaintiffs to reimburse defendant for only half of the expenses of the redeposition.  The Court will also order plaintiffs to reimburse defendant for the expenses associated with this portion of the sanctions motion.

    7.  Parsi's computers

    Defendant raises two issues relating to Parsi's computer usage.  The first concerns the loss of data stored on one of Parsi's laptops.  Def.'s Sanctions Mot. at 41.  Parsi apparently began using the laptop at issue in January 2009; he claims that it was stolen at a hotel in Norway in May 2010 without ever having been backed up.  Defendant sees two problems with this.  First, defendant argues that failure to back up a laptop for a year and a half is negligent and sanctionable.  Second, defendant argues that the tale of theft is suspicious.  According to hotel and police records, the hotel – "perhaps trying to win the world championship of hotel service," in defendant's phrasing – immediately bought Parsi a brand new, different kind of laptop.  Id. The Court agrees that is somewhat startling; on the other hand, the police reports and the receipt for the laptop do appear to back up Parsi's story.

    The second computer usage issue concerns the desktop Parsi used at NIAC in 2009 and 2010.  According to Parsi's interrogatory responses, he had been using his current desktop computer at NIAC for "approximately 1.5 years" when he signed the interrogatories in November 2010.  Def.'s Sanctions Mot., Ex R; see also Def.'s Sanctions Mot. at 26.  When

plaintiffs' IT consultants surveyed the office in late 2009, however, they noted that the desktop Parsi was supposed to be using was not connected to the network, making it unlikely that he was actually using it.  Def.'s Status Report Re. Disc. [ECF 87], Ex. E, ¶ 7; see also id. ¶¶ 6-7 ("Exhibits B and C were made in the course of a network audit and survey, as well as other computer work Progressive Office was retained to do for NIAC from November 4, 2009 to April 10, 2010. . . . At no time during this period did the audit and inventory of Progressive Office of NIAC's network reflect or detect that [Parsi's computer] was connected to the NIAC network."). Plaintiffs argue that this was a technical glitch that they raised with their IT consultants, but an affidavit from the consultants says otherwise.  Id. ¶ 8 ("At no time during this project, was Progressive Office informed by NIAC that it was experiencing problems with Trita Parsi's desktop falling off the network or becoming disconnected.").  Although plaintiffs claimed at the motions hearing that they told someone from Progressive Office that there were problems with Parsi's computer, they provided no evidence to back up this vague allegation.  Hrg. Tr. at 71-72. Furthermore, PwC's registry imaging showed that Parsi stopped using Outlook's email and calendar functions on the desktop on June 5, 2010, and stopped using the desktop altogether on August 5, 2010, not the November 2010 date in his interrogatory responses.  Def.'s Sanctions Mot., Ex. XX at 8.  The sum of all this information, defendant argues, is that there is simply no way to tell what computer Parsi was using during much of 2009 and 2010.  Defendant concludes that Parsi is trying to hide information that was stored on some unproduced computer.

For plaintiffs' failure to back up the information on the laptop, defendant requests a negative inference instruction, i.e., an instruction to the jury that they may presume that documents on the laptop would have supported defendant's case.  Such an instruction is now

irrelevant, given the disposition of the summary judgment motion, but the Court must decide whether it would have given such an instruction for purposes of this sanctions motion. The Court concludes that it would not have done so. Although the Court agrees that Parsi's story about the laptop is somewhat implausible and that his failure to ever back the laptop up was extraordinarily careless, defendant has not shown that a negative inference instruction is appropriate here. To justify an adverse inference instruction, the movant must show that (1) the party from whom discovery is sought had a duty to preserve the information; (2) the party is culpable in the loss or destruction of the information; and (3) the Court can conclude that the lost or destroyed information would have helped the movant. Bolger v. District of Columbia, 608 F. Supp. 2d 10, 31 (D.D.C. 2009). The duty is clear here, but the other two factors are not. Setting aside the difficult question whether a failure to back up a computer is sufficiently "culpable" to warrant an adverse inference instruction, defendant has not established with sufficient clarity that any information lost on the laptop would have supported his case. Defendant has not been particularly precise about what he would likely have found on the laptop, only generally mentioning emails and calendar entries. Moreover, the Court is not convinced that the other emails and calendar entries defendant has gathered have been very helpful in proving his case. Accordingly, the Court would deny the request for an adverse inference instruction.

The desktop is a different matter. Defendant requests that he be awarded the costs of bringing the instant sanctions motion due to plaintiffs' misrepresentations about Parsi's use of the NIAC desktop from early 2009 to November 2010. Plaintiffs devoted little attention to this issue in their briefing or at the motions hearing, and the Court is troubled by the fact that it may be awarding sanctions based on conduct for which there is an innocent explanation that plaintiffs

have simply failed to give.  But plaintiffs have had more than sufficient opportunity to oppose the very clear claims in defendant's sanctions motion, and the Court cannot perpetually excuse their failure to do so.  Because it seems quite clear that Parsi's interrogatory responses misrepresented when he had used the desktop – and because Parsi has never managed to explain what computer he <u>was</u> using during that time – some sanction is warranted.

The oddity here is that defendant's only requested sanction is the cost of the sanctions motion itself, not some independent award. If the Court grants defendant's request, then, defendant will be in the same position he would have been in if he had never brought the sanctions motion at all.  Nonetheless, the Court believes that awarding the cost of this portion of the sanctions motion is appropriate here.  In awarding sanctions, the Court is mindful not just of the need to compensate defendant, but also of the need to deter plaintiffs from future discovery abuses.  <u>See</u> <u>Shepherd</u>, 62 F.3d at 1472.  Plaintiffs' interrogatory misrepresentations are the sort of behavior that warrants deterrence measures, and an award of expenses will act as a deterrent. Hence, the Court will award defendant his reasonable expenses for this portion of the discovery motion.

8.  IIC documents

In response to defendant's discovery requests, Parsi produced two copies of an FAQ for Iranians for International Cooperation, an organization with which he was involved before NIAC.  Def.'s Sanctions Mot. at 28-29.  One copy described IIC as a "lobby" group; the file for that copy was last modified in 1999.  <u>Id.</u>  The other copy described IIC as an "advocacy" group; the file for that copy was last modified April 6, 2009, seven years after the IIC had become defunct and a month before the document was produced.  <u>Id.</u>  A search of the Internet Archive shows that a copy of the document located online in 2008 described IIC as a "lobby" group.  <u>Id.</u>

23

Defendant's theory is that plaintiffs intentionally altered the document in bad faith in 2009, but accidentally let an unaltered copy of the document slip into their production.  Plaintiffs say in their briefing that they have no idea how the 2009 modification happened, although they argue that they would not have intentionally altered the document and then produced the unaltered document.  Pls.' Opp. at 43-44.  At the motions hearing, plaintiffs also attacked defendant for not attaching to their sanctions motion the metadata for each file.  Hrg. Tr. at 73.  But plaintiffs presumably have access to each file's metadata, since they produced the file, and plaintiffs have not suggested that defendant is wrong about one file last being modified in 2009.  Thus, it does appear that something very odd is going on with this file.

Defendant has not requested a specific sanction related to the IIC documents; he merely cites them as part of his argument that plaintiffs' cumulative discovery abuses warrant the sanction of dismissal.  The Court would not be prepared to find by clear and convincing evidence that plaintiffs intentionally altered this file, as would be required to impose the sanction of dismissal.  But given defendant's rather damning account of the metadata and plaintiffs' failure to rebut it, the Court is prepared to find by a preponderance of the evidence that plaintiffs intentionally altered the document.  As discussed in the last section, an award of expenses is appropriate to deter such behavior.  Hence, the Court will award the defendant the expenses of bringing this portion of its sanctions motion.

9.  Fees for litigation of this case

At the close of his sanctions motion, defendant requests that the Court "impos[e] as sanctions all fees and expenses associated with the defense of this case."   The Court declines to do so.  There is no question that plaintiffs have repeatedly tried to evade their discovery obligations, but the Court is ultimately persuaded that plaintiffs' many discovery failures are

usually a product of lack of resources and carelessness more than bad faith.  The Court is also

disinclined to grant defendant all the fees it expended in this case because defendant's

expenditures in litigating this case have not been proportionate with the likely value of the case.

Cf. Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598, 613 n.8 (S.D. Tex.

2010) ("Electronic discovery burdens should be proportional to the amount in controversy and

the nature of the case. Otherwise, transaction costs due to electronic discovery will overwhelm

the ability to resolve disputes fairly in litigation.") (citations omitted). Indeed, little of the

material that was so fiercely contested was relevant to the actual disposition of the case.  Hence,

the numerous issue-specific sanctions awards that the Court has made are all that is appropriate

here.

    10.  Summary

    Defendant sought sanctions based on eight separate areas of discovery; it has prevailed in

seven of those areas.  But it did not prevail on its requests for sanctions relating to the calendar

entries, which was the largest part of its motion.  Hence, it does not make sense to award

defendant seven-eighths of the costs of bringing this motion.  The Court will instead use the

following unscientific but roughly fair formula.  Defendant's discussion of the calendar entries

consumed 8 of the 27 pages he spent outlining plaintiffs' discovery abuses; in other words,

discussion of the calendar entries was about 30% of defendant's motion.  Hence, plaintiffs

succeeded on approximately 70% of their motion.  Because the defendant only partially

succeeded on some of its requests, however, the Court will take an additional 10% off the

amount plaintiffs must reimburse defendant.  In sum, then, plaintiffs must pay 60% of the

expenses associated with bringing the instant motion.  In addition, plaintiffs must pay for the last

two rounds of PwC imaging; the expenses involved in bringing [112] defendant's motion to

compel production of NIAC's server; one-half of the expenses of Talebi's deposition; the expenses associated with obtaining [93] the March 29, 2011 order relating to the Talebi emails; the expenses of serving the third-party subpoenas; the expenses involved in bringing [113] defendant's motion to compel production of Salesforce data and membership lists; one-half of the expenses of the last half day of Parsi's deposition; and one-half of the expenses of the second day of Blout's deposition.

## CONCLUSION

For the foregoing reasons, defendant's omnibus sanctions motion will be granted in part and denied in part.  A separate Order accompanies this opinion.


<u>        /s/ John D. Bates        </u>
JOHN D. BATES
United States District Judge


Dated: <u>September 13, 2012</u>