# EXHIBIT A

| SUMMARY OF $183,480 COSTS / SANCTIONS AWARDED | | | |
|---|---|---|---|
| **SANCTION** | **AWARD** | **REQUESTED** | **CHALLENGED / COMMENTS** |
| 50% of the Costs to Re-Depose Talebi | $6,721 | $7,599 | No |
| Costs of Third Order to Produce 5,000 Talebi Emails | $8,606 | $17,943 | No |
| Costs of Second Order to Produce Member Records | $10,419 | $12,514 | No* |
| Rule 54(d) Costs to Prevailing Party | $29,027 | $29,024 | No |
| | | | |
| **TOTAL UNCHALLENGED** | **$54,772** | **$67,080** | |
| | | | |
| Costs of Third Motion to Compel Server | $10,419 | $12,514 | Yes* |
| Costs of 2nd and 3rd Imaging | $71,624 | $144,794 | Yes |
| Costs of 50% of Parsi's Third Deposition | $8,439 | $12,809 | Yes |
| Costs of 50% of Blout's Second Deposition | $3,181 | $3,755 | Yes |
| Costs of Third-Party Subpoenas | $9,803 | $9,802 | Yes (but recoverable under Rule 54(d)) |
| Costs of Omnibus Sanctions Motion | $25,242 | $33,467 | In part, but as plaintiffs are not challenging at least four of the awards, at least half of the cost of the Sanctions Motion is not being appealed ($12,621). |
| | | | |
| **TOTAL CHALLENGED** | **$128,708** | **$217,141** | **Reducing this by 50% for the unchallenged portion of the Sanctions Motion and counting the Subpoena costs as Rule 54(d) costs, only $106,288 is effectively being challenged.** |
| | | | |

*The Second Motion to Compel Member Records and Third Motion to Compel the Server were the subject of one order [#138] and treated together in the court's ruling on costs [#211, pp. 11-14], which awarded $20,838.00. These are apportioned 50/50 in this summary.

# EXHIBIT B

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued October 15, 2014      Decided February 10, 2015

No. 12-7111

TRITA PARSI AND NATIONAL IRANIAN AMERICAN COUNCIL,
APPELLANTS

v.

SEID HASSAN DAIOLESLAM,
APPELLEE

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00705)

————

*David A. Schlesinger* argued the cause for appellants. With him on the briefs was *A.P. Pishevar*.

*HL Rogers* argued the cause for appellee. With him on the brief were *Peter G. Jensen* and *Timothy E. Kapshandy*.

Before: ROGERS and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Following an acrimonious, three-year discovery process, the District Court awarded $183,480.09 in monetary sanctions to Appellee Seid Hassan

2

Daioleslam[1] for attorney's fees and expenses he accrued in defending a defamation action brought by Appellants the National Iranian American Council and Trita Parsi. Throughout discovery, the Appellants engaged in a disturbing pattern of delay and intransigence.  Seemingly at every turn, NIAC and Parsi deferred producing relevant documents, withheld them, or denied their existence altogether.  Many of these documents went to the heart of Daioleslam's defense.  The Appellants' failure to produce documents in a timely manner forced Daioleslam—whom *they* had haled into court—to waste resources and time deposing multiple witnesses and subpoenaing third parties for emails the Appellants should have turned over.   Even worse, the Appellants also misrepresented to the District Court that they did not possess key documents Daioleslam sought.   Most troublingly, they flouted multiple court orders.

Although we discuss these penalties individually below, all implicate an enduring issue:  the power of a district court to sanction those who disobey its instructions and interfere with its proceedings.  We have previously recognized a trial judge's authority to punish and deter abuses of the discovery process, and we do so again today.   A court without the authority to sanction conduct that so plainly abuses the judicial process cannot function.  We affirm the bulk of the District Court's sanctions as the wages of Appellants' dilatory, dishonest, and intransigent conduct, though in a couple of minor respects, we reverse and remand for reconsideration under the proper standard.

---

[1] Daioleslam's filings below and his brief before this Court indicate that his given name is "Seid Hassan Daioleslam" or "Hassan Daioleslam," not "Daioleslam Seid Hassan," as the complaint initially alleged.  J.A. 66 n.1; Appellee's Br. at 1.

3

**I.**

This appeal is brought by plaintiffs below, the National Iranian American Council ("NIAC"), a Washington-based nonprofit "dedicated to promoting Iranian American involvement in American civic life," and its president and co-founder Trita Parsi, an expert in United States-Iran relations who has published extensively on the subject.  J.A. 20-21, 73, 77-78, 102.  Daioleslam, the defendant below, is a resident of Arizona who publishes a website called Iranianlobby.com. J.A. 20-21.

In April 2008, the Appellants filed a complaint alleging Daioleslam defamed them in a series of articles and blog posts claiming that they had secretly lobbied on behalf of the Iranian regime in the United States.  *See* J.A. 19-28.[2]  The Appellants alleged that Daioleslam's conduct had damaged their reputations and harmed public support for NIAC.  J.A. 25, 27.  In February 2009, the District Court denied Daioleslam's motion to dismiss, but concluded that NIAC and Parsi were limited public figures and would be required to prove Daioleslam acted with actual malice, which the Appellants could demonstrate through evidence of what Daioleslam knew at the time he authored the statements about them.  *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 104-08

---

[2] Daioleslam alleged that NIAC and Parsi were "key players in the lobby enterprise of Tehran's ayatollahs in the United States," that the organization had "strong connections to the inner circles of power in Tehran" and "the specific role of lobbying the US Congress by utilizing unwary ordinary Iranian Americans concerned about their inborn land," that the Appellants were "effective nodes of Tehran's efforts to manipulate US policy toward self-serving ends," and that NIAC was "an active and disguised Washington-based lobbying enterprise for the Iranian theocratic regime."  J.A. 21-23, 26.

4

(D.D.C. 2009).  The court also held that Daioleslam had offered insufficient evidence to show his assertions were substantially true, which would constitute a complete defense to the Appellants' defamation claim.  *Id.* at 108-09.  It therefore determined that additional discovery was required "to develop [these] aspects of [the case]."  *Id.* at 103.

Shortly thereafter, Daioleslam served NIAC with his first request for production, seeking various documents, including those "relating to United States political officials" and "referring to NIAC's activities as lobbying, exercising political influence, taking positions on United States policies, or persuading United States political officials."  J.A. 935-36. In a second request for production, served in March 2009, Daioleslam sought all documents "relating to NIAC membership, including all communications with . . . members, and membership and email lists," and "[a]ll calendars, diaries, or other documents relating to the time-keeping records of NIAC and its employees."  J.A. 999-1000. Both requests defined "document" to include "agendas, minutes or notes of conferences [and] meetings, . . . calendars, diaries, and appointment books . . . [and] electronic mail." J.A. 931, 996.

During discovery, the parties traded recriminations over NIAC's apparent failure to produce documents responsive to several of Daioleslam's requests for production.  Between July 2010 and August 2011, the District Court issued three orders compelling NIAC to produce certain documents and parts of its computer network.    In September 2011, Daioleslam moved for sanctions against the Appellants and for summary judgment.    The court subsequently entered summary judgment in Daioleslam's favor.    *Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012).  The

5

Appellants do not appeal the disposal of the merits of their case on summary judgment.

On the same day it granted summary judgment on the merits, the District Court imposed sanctions against the Appellants for their discovery abuses. *See Parsi v. Daioleslam*, 286 F.R.D. 73 (D.D.C. 2012) (the "Sanctions Order"). On April 9, 2013, the court entered a final judgment in favor of Daioleslam, plus judgment in the amount of $183,480.09 for the sanctions, with post-judgment interest running from the date of the Sanctions Order, which had been entered September 13, 2012. J.A. 926; *see also Parsi v. Daioleslam*, 937 F. Supp. 2d 44 (D.D.C. 2013) (the "Final Order"). In awarding sanctions, the District Court invoked both Rule 37 of the Federal Rules of Civil Procedure and its inherent authority. *Parsi*, 286 F.R.D. at 77. It noted that Rule 37(a) embraces monetary sanctions for the prevailing party on a motion to compel, and cited to Rule 37(b), which penalizes disobedience of a court order. *Id.* (citing FED. R. CIV. P. 37(a), (b)(2)(A)). The court concluded that, under our precedent, it could impose "'issue-related' sanctions" under its inherent authority based on a finding that a party engaged in misconduct by a preponderance of the evidence, rather than the higher clear and convincing evidence standard. *Id.* (quoting *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995)). Before reviewing the legal merit of the Appellants' arguments, we summarize the conduct for which the District Court imposed sanctions.

## A.

Although it used Microsoft Outlook as its email client, NIAC failed for ten months to produce Outlook calendar records for any of its employees in response to Daioleslam's production requests. In early December 2009, Daioleslam

6

deposed NIAC's former legislative policy director Emily
Blout, who testified that she had not understood his discovery
requests to include calendar entries from Outlook.  J.A. 957.
The next day, Daioleslam requested that NIAC review its
calendars and produce entries responsive to his requests.  J.A.
1050.  Only at the end of that month did NIAC produce about
400 Outlook calendar entries for three of its employees.
Although it claimed to have put a litigation hold in place,
NIAC produced no calendar entries from before 2009.  Of the
entries it produced, 78 had been altered shortly before
production, including two-thirds of those in Parsi's calendar.[3]

    In early March 2010, Daioleslam asked the District Court
to order NIAC to produce its Outlook calendar records for a
forensic imaging to determine when they were modified,
arguing that the multiple alterations shortly before production
raised questions about the sufficiency of NIAC's compliance
with its discovery obligations.  J.A. 133-36.  NIAC responded
that it had not modified the Outlook entries, and promised the
court that it would produce "complete, unaltered" calendar
entries for its employees.  *Parsi*, 286 F.R.D. at 79; *see* J.A.
142.  The court therefore did not order the requested forensic
imaging.  *Parsi*, 286 F.R.D. at 79.  Yet when NIAC made a

---

[3] The list of produced calendar entries Daioleslam attached as an
exhibit to his motion to compel lists only 345 documents, 81 of
them modified over the weekend between Christmas and December
27, 2009. *See* J.A. 135, 963-985.  Daioleslam later represented that
NIAC had produced 412 documents, of which 78 were altered
during that period, and the District Court appears to have accepted
this figure but mistakenly transcribed the number of altered
documents as "87."  J.A. 188; *see Parsi*, 286 F.R.D. at 79.  NIAC
never disputed the totals that Daioleslam alleged, and even if the
earlier numbers were accurate, they still demonstrate that a large
proportion of the documents were modified shortly before
production.

7

second production, in April 2010, it consisted solely of
Outlook calendar entries copied onto a spreadsheet and did
not include a field stating when the entries had last been
modified.  J.A. 190.

Seeking resolution of the issue, the District Court issued
an order on July 1, 2010 (the "July 2010 Order") directing
NIAC to "submit the server on which its Outlook calendars
are kept to PricewaterhouseCoopers ["PwC"] for forensic
imaging" by July 16.  J.A. 168.  It ordered PwC to produce
the Outlook calendar entries "complete and unedited to the
extent possible" to Daioleslam, J.A. 168, and to prepare a
report describing any calendar entries found on the forensic
image and omitted from NIAC's prior productions, as well as
details of any edits or deletions to the entries.  J.A. 169.[4]

Instead of producing a server, however, NIAC produced
eight desktop computers and a laptop and told the District
Court, for the first time, that it did not have a server.  J.A.
236, 239.[5]  PwC's forensic analysis subsequently revealed the
existence of four additional computers in NIAC's network
that it had not produced.  J.A. 261-62.  The Appellants
claimed that these computers were used only by interns.  J.A.
271-72.  Daioleslam then subpoenaed NIAC's "computer
consultant," Progressive Office, which produced an inventory

---

[4] The court ordered Daioleslam to pay for PwC's analysis, but
stated that he could file a motion to recover his expenses if the
report showed that "discoverable calendar entries were omitted
from previous productions, or that inappropriate edits were made to
such entries."  J.A. 169.
[5] In fact, David Elliott, NIAC's employee responsible for e-
discovery, had testified in an October 2009 deposition that the
organization collected electronic documents for discovery on an
"electronic server."  JA 435-36, 1227-28.

8

it had created during its late 2009 audit of NIAC's network.[6]
*See* J.A. 297, 1113-39.  The inventory showed that one of the
computers NIAC had withheld as an "intern computer" was
actually used by Blout, whose Outlook calendar entries NIAC
had produced.  J.A. 297, 369.  *Compare* J.A. 1059 (inventory
listing "Intern Computer"), *with* J.A. 1125-26 (same computer
listed as "Computer Name: niac-emily").[7]  Another one of the
"intern" computers was actually used by NIAC's co-founder
and former outreach director, Babak Talebi.  *Compare* J.A.
1245 (listing "Intern Computer") *with* J.A. 1248 (NIAC letter
acknowledging identical serial number corresponded to
Talebi's computer).

   Progressive Office's network inventory also raised
questions about Parsi's honesty regarding his laptop and
desktop computers.   The desktop computer that NIAC
produced that Parsi represented to the District Court he had
used from April 2009 until November 2010 was not
connected to NIAC's network at all when Progressive Office

---

[6] NIAC denied that Progressive Office had performed work on its
network apart from addressing a printing malfunction, and claimed
it had produced an inaccurate list of NIAC's computer serial
numbers because it lacked sufficient knowledge of the network.
J.A. 311-12.  However, Progressive Office CEO Stuart Kushner
submitted an affidavit and supplied email traffic between
Progressive Office and NIAC revealing that Progressive Office did
extensive work for NIAC, including a "network audit and survey,"
between November 2009 and April 2010.  J.A. 1061.  Kushner also
stated that he had installed NIAC's "new, larger *server*" and
migrated data from its "old, existing server." *Id.* (emphasis added);
*see* J.A. 1093-94, 1109.

[7] Later, NIAC dismissed the concern that Blout may have used one
of the computers it failed to produce, arguing that as a small
organization, NIAC's employees often shared computers, but the
District Court rejoined that any computer used by Blout, NIAC's
legislative director, was relevant to the imaging.  *See* J.A. 373.

9

worked on NIAC's network between November 2009 and
April 2010. *Parsi*, 286 F.R.D. at 85-86; J.A. 261-63, 1061.
PwC's analysis also showed that Parsi had stopped using
Outlook in June 2010 and stopped using the desktop
altogether in August of that year. *Parsi*, 286 F.R.D. at 86.
Parsi also represented that his laptop computer had been
stolen in Norway in early 2010, and he had not backed up the
hard drive beforehand, despite being subject to a litigation
hold. J.A. 239-40, 436.

In a March 29, 2011 order (the "March 2011 Order"), the
District Court again ordered NIAC and Parsi to produce the
"server (or 'shared drive')" that contained "NIAC's Outlook
calendar entries that this Court ordered be produced in July
2010" for forensic imaging. J.A. 330. For the avoidance of
doubt, the court stated that if NIAC did not produce a server
or "shared drive" by that date, it must instead turn over the
four computers it had previously failed to produce and the
desktop computer Parsi used in 2008. *Id.* The court
instructed PwC to forensically image Outlook calendar entries
on whatever machines NIAC produced, should Daioleslam
choose to proceed with another imaging.

In April 2011, NIAC produced a new server containing
four hard drives that it had installed in December 2009, but
refused to produce the original server in use at the time it had
uploaded discovery materials. J.A. 437. Daioleslam
expressed his concern that NIAC might not have migrated all
the data from its old server to the new one. J.A. 415. He
again moved to compel NIAC to produce its old server and
Talebi's previously withheld computer, J.A. 435-38, 585-88,
and NIAC reacted angrily to what it termed a "third bite at the
imaging apple." J.A. 499.

10

At an August 30, 2011 hearing, the District Court expressed its frustration with the Appellants' continued defiance of its orders. J.A. 557-58. It then issued a third order (the "August 2011 Order") requiring that the Appellants produce "*all* of the servers/shared-drives on which NIAC's Outlook calendar entries have been kept from 2007 to the present," including its old server. J.A. 595. PwC was instructed, at Daioleslam's election, to conduct a third forensic imaging, limited to Outlook calendar information and "user/habit/login information in order to determine the identities of the persons who used the computers' Outlook calendar function." J.A. 596. The court ordered NIAC to pay Daioleslam's expenses associated with bringing his third motion to compel, as it was "the third time that plaintiffs have been ordered to produce their server[,] a server that plaintiffs initially claimed did not exist." J.A. 596. PwC's forensic imaging of NIAC's old server revealed hundreds of previously unproduced calendar entries. *Parsi*, 286 F.R.D. at 78.

In its Sanctions Order, the District Court concluded that NIAC had violated its July 2010 and March 2011 Orders. Even if it did not possess a "server," the court pointed out, NIAC was obligated to produce all the computers on which it stored relevant data for the *first* forensic imaging. *Id.* at 78-79. Since its disobedience to the court's July 2010 Order had necessitated two additional rounds of imaging, NIAC must pay for those later rounds. *Id.* The court also ordered NIAC to pay Daioleslam's reasonable expenses in bringing that part of his motion for sanctions.

The court did not find that NIAC had inappropriately altered Outlook calendar entries. *Id.* at 79-83. However, it ordered NIAC to pay half the cost of re-deposing Blout, since at the time Daioleslam first deposed her in December 2009,

11

NIAC had produced none of her calendar entries, which were key to questioning her about meetings with legislative and executive officials. *Id.* at 85.

With respect to Parsi's computers, the District Court awarded sanctions for the part of Daioleslam's sanctions motion related to Parsi's misrepresentation in an interrogatory response about his use of a desktop computer on NIAC's network. *Id.* at 86-87. The court noted, however, that the Appellants had not discussed the issue at all in their briefing, and there was a risk the court might be "awarding sanctions based on conduct for which there is an innocent explanation." *Id.* at 86.[8]

---

[8] Another episode resulted in sanctions that NIAC and Parsi do not appeal. NIAC produced virtually no documents from Talebi's NIAC email address in response to Daioleslam's production requests prior to late December 2009, even though Talebi had been involved with the organization since 2002; the Appellants claimed the email records "no longer exist[ed]." J.A. 144. After the court ordered NIAC to search its servers, NIAC located about 8,000 of his emails, but produced only 89 as relevant, and withheld the rest as not relevant. J.A. 151-52. Daioleslam argued it was difficult to believe that such a small proportion of NIAC's former outreach director's emails were relevant, given that his production request called for all emails to NIAC members. The District Court ordered NIAC to turn over Talebi's emails "consistent with its discovery obligations." J.A. 212. NIAC then produced about 2,500 additional Talebi emails, withholding the remaining 5,500 as nonresponsive. J.A. 334.

Given the still-low rate of emails NIAC produced, in March 2011 the District Court agreed to review the emails itself *in camera*. J.A. 331-32. After review, the court held in an April 5, 2011 order that NIAC had "totally failed" to assess the Talebi emails for responsiveness. J.A. 333-35. The court observed that many were plainly responsive to Daioleslam's requests for lobbying-related documents, including an email from Talebi explaining that NIAC

12

**B.**

References to "SF" in NIAC's belated April 2010 production of some of its Outlook calendar entries tipped off Daioleslam that it had also withheld meeting notes and membership lists it kept in a program called Salesforce.[9]  *See* Exhibit HH to Motion for Sanctions at 2, *Parsi v. Daioleslam*, No. 1:08-cv-00705 (D.D.C. Sept. 16, 2011), ECF No. 143 (listing a September 2008 Outlook meeting invitation from Parsi to Blout and NIAC assistant legislative director Patrick Disney entitled "How to freakin [sic] use SF," and the body of which stated "Need to go over how you all should enter in your meeting notes").   When Daioleslam drew the District Court's attention to the possibility that NIAC had withheld its system for tracking meetings with legislators, NIAC responded that it "ha[d] not employed any such software or

_____

"can 'advocate' but not 'lobby'" and an explanation of NIAC's "seven ingredients to influence lawmakers."   J.A. 334.   When Daioleslam finally received the remainder of Talebi's emails, he noted they included Congress-related communications that he could have used in his depositions of NIAC's employees.  J.A. 614-17.

The court ordered NIAC to pay Daioleslam's reasonable expenses in moving to compel production of the emails, finding NIAC was not "substantially justified" in opposing the motion, since it failed to conduct even a cursory relevance review of the emails it withheld.  *Parsi*, 286 F.R.D. at 83.

[9] NIAC produced member lists from December 2007 and April 2008 in May 2009, which Daioleslam considered insufficient to comply with his request for "communications with potential, former, or current members" as of his March 2009 discovery request.   J.A. 999.   Daioleslam argued NIAC's more recent membership data was relevant in view of its allegation that his articles "interfered [sic] or damaged the public support of NIAC by affecting NIAC's public estimation and reputation" and its damages expert's plan to testify that the articles led to a drop in current membership numbers.  J.A. 27, 442-43.

13

system and is therefore unable to comment about this
unfounded claim." J.A. 207.

By September 2010, Daioleslam realized that "SF"
probably referred to a software program called "Salesforce,"
and again asked NIAC to produce its membership data; this
time, NIAC told the District Court that it had only
experimented briefly with Salesforce. J.A. 237-38, 242-43.
However, Parsi conceded in his first deposition two months
later that NIAC had used Salesforce "to keep track on
members and donations" since before 2006 and that, "for a
few years, we used it as the database in which we kept our
membership information." Exhibit MM to Motion for
Sanctions at 5, *Parsi*, ECF No. 143. He testified that NIAC
migrated its membership database to a program called Convio
in early 2010. *See id.* at 6-7.

Yet by December 2010, NIAC had still not produced any
Salesforce or Convio data. J.A. 258-61. NIAC by that time
acknowledged that it had also used the program to track
meeting notes, which it promised to turn over, but refused to
produce membership information, which it referred to as both
"proprietary" and "duplicative." J.A. 272-75. On December
22, 2010, the District Court ordered the parties to preserve
electronically stored information "possessed by the parties or
under their control since the commencement of the litigation
until final resolution." J.A. 251.

NIAC finally produced its Salesforce meeting notes in
February 2011, and a month later produced some Microsoft
Excel spreadsheets showing its Salesforce "membership
information"; the Excel files' metadata showed they were
nearly a year old and many of the fields were coded and
unreadable. J.A. 445, 624. The District Court's March 2011
Order required NIAC to produce its entire current Convio

14

membership list and codes for the Salesforce data.  J.A. 331.
The court also permitted Daioleslam to re-depose Parsi.
Much of Parsi's second deposition that May focused on his
conflicting statements about NIAC's membership numbers
and unwillingness to turn over NIAC's mailing list, which he
testified ran to over 43,000 members.  Exhibit A to Motion to
Compel Production of Membership Lists at 5, *Parsi*, No.
1:08-cv-00705 (D.D.C. July 1, 2011), ECF No. 113.  Again,
NIAC failed to comply meaningfully with the court's order,
producing only a list of 9,000 Convio "transactions"—mostly
donations—from which a complete list of members was
impossible to divine.  J.A. 446-47.

In July 2011, Daioleslam once more moved to compel
NIAC to produce its complete list of active paid and former
members.  J.A. 451.  In its August 2011 Order, the District
Court again ordered NIAC to produce its complete Convio list
of both active and expired members, "current as of the date
that it is produced," and ordered the Appellants to pay
Daioleslam's costs in bringing that part of his motion to
compel, because it was the second time he had sought the
documents.  J.A. 596-97.  At long last, in September 2011—
two-and-a-half years after Daioleslam's request for
production of documents related to NIAC's membership—
NIAC produced all its member lists.  J.A. 624.

Given that NIAC withheld its complete membership data
until months after Parsi's second deposition, Daioleslam
moved for an award of his expenses in deposing Parsi over
two-and-a-half days in December 2009 and May 2011.  J.A.
639.  In its Sanctions Order, the District Court awarded
Daioleslam half his expenses for the final, partial day of
Parsi's deposition only, since he would have had to depose
Parsi anyway and the court could not determine whether the
length of the final day's deposition resulted from NIAC's

15

belated production or would have taken that long in any event.  *Parsi*, 286 F.R.D. at 85.   The court awarded Daioleslam the expense of bringing that part of the motion. *Id.*

## C.

Because of Appellants' failure to produce relevant documents in response to his requests for production, Daioleslam also subpoenaed a series of third parties for documents in their custody.   These subpoenas turned up multiple relevant documents NIAC had failed to produce, including a discussion of legal restrictions on lobbying by nonprofits, emails Parsi wrote to a National Security Council director, emails coordinating a congressional briefing, communications NIAC exchanged with its expert about NIAC events on Capitol Hill and meetings with foreign officials, and 168 emails NIAC received from Iranian-Americans expressing negative views of the organization.  J.A. 618-20. The Appellants made no attempt to defend their failure to produce these documents other than to say Daioleslam had found no "smoking gun" among them.  J.A. 711.

The District Court awarded Daioleslam his expenses in subpoenaing nearly all of these third parties, calling NIAC's suppression of documents "inexplicable and unexplained" and "indefensible."   *Parsi*, 286 F.R.D. at 84.    "Most disturbingly," the court found, the Appellants had misrepresented in a hearing that "technical" reasons prevented them from producing the critical emails from Iranian-Americans, but Appellants were able to gather them for their own damages expert.  *Id.*

Finally, Daioleslam sought sanctions for Parsi's alteration of a document he produced in discovery.  The document, a list

16

of frequently asked questions ("FAQ") compiled by Iranians for International Cooperation ("IIC") (a group with which Parsi was affiliated before launching NIAC), originally described IIC as a "lobby" group. *Id.* at 87. One version of the FAQ that Parsi produced—the metadata of which showed it was last modified in 1999—retained this description. The second version he produced replaced the word "lobby" with "advocacy," and had last been modified in April 2009. *Id.* Parsi responded only that he was unaware of the alteration. J.A. 715-16. The court indicated it "would not be prepared to find by clear and convincing evidence that plaintiffs intentionally altered this file," but was prepared to do so by a preponderance of the evidence. *Parsi*, 286 F.R.D. at 87. Accordingly, it awarded as sanction Daioleslam's expenses in preparing the corresponding part of his sanctions motion.

## D.

Daioleslam thereafter submitted a final bill of costs totaling $280,786.36 for the court-ordered expense reimbursements. J.A. 898-901. On April 8, 2013, the court issued an opinion awarding him $183,480.09, after rejecting some of his attorneys' and their non-legal employees' vague billing descriptions, J.A. 908-12, 917-23, and subtracting certain forensic imaging charges not attributable to NIAC's dilatory tactics. J.A. 912-17. The court also awarded costs to Daioleslam as the prevailing party under Rule 54(d). J.A. 923-24. In its Final Order issued April 9, 2013, the court entered post-judgment interest on the full award to run from September 13, 2012, the date it had ordered sanctions. J.A. 926. NIAC and Parsi timely filed this appeal.

NIAC and Parsi appeal several of the District Court's sanctions: (i) Daioleslam's expenses in preparing his third motion to compel forensic imaging; (ii) the cost of the second

17

and third forensic imagings; (iii) the cost of re-deposing Parsi and Blout; (iv) the expense of subpoenaing third parties; (v) the cost of preparing the parts of Daioleslam's sanctions motion related to Parsi's alteration of the IIC document and Parsi's purportedly false interrogatory responses; and (vi) the court's award of sanctions to run from the date of the District Court's Sanctions Order rather than final judgment.

## II.

District courts have "considerable discretion" in managing discovery, *United States v. Philip Morris Inc.*, 347 F.3d 951, 955 (D.C. Cir. 2003), and possess broad discretion to impose sanctions for discovery violations under Rule 37. *Bonds v. District of Columbia*, 93 F.3d 801, 807 (D.C. Cir. 1996) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-43 (1976) (per curiam)). Consequently, we review discovery-related orders for abuse of discretion, a "narrowly circumscribed" scope of review. *Lee v. Dep't of Justice*, 413 F.3d 53, 59 (D.C. Cir. 2005); *see also Bonds*, 93 F.3d at 807 (reviewing court may reverse discovery sanctions only if "clearly unreasonable, arbitrary, or fanciful") (quoting *Hull v. Eaton Corp.*, 825 F.2d 448, 452 (D.C. Cir. 1987) (per curiam)).

We review for clear error the District Court's finding that Appellants acted in bad faith sufficient to justify an award of attorney's fees under the court's inherent power. *Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton*, 187 F.3d 655, 660 (D.C. Cir. 1999); *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 222 (D.C. Cir. 1991). This is a "highly deferential" standard. *Shepherd*, 62 F.3d at 1475-76.

Ordinarily, a court of appeals can affirm a district court judgment on any basis supported by the record, even if

18

different from the grounds the district court cited. *Queen v. Schultz*, 747 F.3d 879, 884 (D.C. Cir. 2014). However, in *Manion v. American Airlines*, we declined to affirm sanctions on any basis other than that articulated by the district court. 395 F.3d 428, 431-32 (D.C. Cir. 2004).[10] Here, the District Court expressly anchored its sanctions in two sources of judicial power—Rule 37 and the inherent power of courts— and we will only affirm if it correctly exercised these powers, notwithstanding Daioleslam's invitation to consider other bases of authority. *See* Appellee's Br. at 52-54.

As relevant here, two subdivisions of Rule 37 of the Federal Rules of Civil Procedure permit a district court to award monetary sanctions for a party's reasonable expenses caused by its opponent's resistance to discovery. We conclude the District Court was well within its discretion in sanctioning the Appellants under Rule 37.

### A.

First, Appellants contend the District Court abused its discretion by awarding Daioleslam's expenses in bringing

---

[10] In *Manion*, since the district court had explicitly entered sanctions under 28 U.S.C. § 1927, this Court refused to consider whether it could have done so under its inherent authority, and suggested that, since district courts possess extensive discretion over sanctions, we could only "invoke an alternative basis to affirm [if] . . . it would have been an abuse of discretion for the trial court to rule otherwise." 395 F.3d at 431 (quoting *Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003)) (internal quotation marks omitted). Daioleslam misreads this exception: the Court can affirm sanctions on another basis if it would have been an abuse of discretion for the District Court *not* to order sanctions, not if "it would not have been an abuse of discretion to sanction" a party for its behavior. *See* Appellee's Br. at 54 n.22.

19

three motions to compel NIAC to produce its server, asserting that their opposition to those motions was "substantially justified." In fact, however, the court only shifted the cost of Daioleslam's *third* motion to compel. This cost-shifting was proper under Rule 37(a)(5)(A).

Under Rule 37(a), a party can move for an order to compel disclosure or discovery after first attempting in good faith to confer with its opponent. FED. R. CIV. P. 37(a)(1). Upon granting a motion to compel discovery, a court must order the opposing party to pay the moving party's "reasonable expenses incurred in making the motion, including attorney's fees," unless the opposing party was "substantially justified" in its resistance to discovery, the prevailing party did not attempt to obtain discovery in good faith before moving to compel, or an expense award would be otherwise unjust. FED. R. CIV. P. 37(a)(5)(A).[11] If a court grants in part and denies in part a motion to compel, it may apportion reasonable expenses among the parties accordingly. FED. R. CIV. P. 37(a)(5)(C).

A party is "substantially justified" in opposing discovery or disobeying an order "if there is a 'genuine dispute,' or 'if reasonable people could differ as to the appropriateness of the contested action.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal citations and brackets omitted); *see, e.g.*, *Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 853 (11th Cir. 1997) (party was substantially justified in opposing motion to compel production where it believed case law

---

[11] The Advisory Committee Notes explain that the command that a court "must" award expenses "does not significantly narrow the discretion of the court," but is intended to encourage use of this "most important available sanction to deter abusive resort to the judiciary." FED. R. CIV. P. 37 advisory committee's note to 1970 amendment.

20

supported its position).[12]   The substantial justification
requirement serves to prevent sanctions that "'chill' legitimate
efforts at discovery." *Reygo Pac. Corp. v. Johnston Pump
Co.*, 680 F.2d 647, 649 (9th Cir. 1982).

Reasonable people cannot differ about whether a party is
entitled to withhold relevant documents without articulating
any claim of privilege.  NIAC's calendar entries were relevant
to proving Daioleslam's defense, in that they might reveal
meetings with officials that suggested the truth of his
allegedly defamatory statements. *See* FED. R. CIV. P. 26(b)(1)
("Parties may obtain discovery regarding any nonprivileged
matter that is relevant to any party's claim or defense . . . .").
The Appellants argue that the District Court's ultimate
conclusion that they had not deleted emails in bad faith
demonstrates the reasonableness of their position, *see*
Appellants' Br. at 60, but this Court cannot ground its review
in hindsight.   Evidence that suggested some entries were

---

[12] The 1970 Amendment Advisory Committee Notes to Rule 37
explain the rationale behind this exemption from mandatory
sanctions:

> On many occasions, to be sure, the dispute over
> discovery between the parties is genuine, though
> ultimately resolved one way or the other by the
> court. In such cases, the losing party is substantially
> justified in carrying the matter to court. But the
> rules should deter the abuse implicit in carrying or
> forcing a discovery dispute to court when no
> genuine dispute exists. And the potential or actual
> imposition of expenses is virtually the sole formal
> sanction in the rules to deter a party from pressing
> to a court hearing frivolous . . . objections to
> discovery.

FED. R. CIV. P. 37 advisory committee's note to 1970 amendment.

21

modified or deleted before production justified the District Court's order that NIAC submit its server for imaging.

The Appellants also argue their opposition to producing their server was justified by Daioleslam's "leaks" of NIAC documents to media outlets. *See* Appellants' Br. at 58. If the Appellants were concerned Daioleslam would misappropriate their calendar data, they could have filed for a protective order. *See* FED. R. CIV. P. 26(c). They acknowledge none was in place at the time of their refusal to allow PwC to image NIAC's server. And if they feared that the court's order would "allow Daioleslam to image [NIAC's] CPUs and shared drives," bearing all their internal records for him to see, Appellant's Br. at 58-59, the appropriate remedy was to require the third-party that conducted the imaging to employ certain safeguards. This is precisely what the District Court did; its first order designated PwC to conduct the imaging and produce only calendar entries to Daioleslam, specifically protecting NIAC from "metadata mining" of its server. J.A. 169. NIAC's position was therefore unreasonable at the time the court issued its first, July 2010 Order.

We need not even decide, however, whether the Appellants were substantially justified in opposing the July 2010 Order, since the District Court did not shift the cost of obtaining that order to the Appellants. In fact, as Daioleslam notes, the court did not even shift the cost of obtaining the second motion to compel NIAC's server, contrary to the Appellants' claim. *See* Appellee's Br. at 37. Instead, it only shifted the cost of the *third* motion to compel. After the court rejected their arguments and ordered discovery of the calendar data, the Appellants were not entitled to continue to oppose production. The Appellants' brief proceeds from the assumption that Daioleslam's second and third motions to compel each gave them an additional opportunity to contest

22

whether NIAC's Outlook calendar data was subject to imaging. Not so. Once the court resolved the discoverability of that data, no genuine dispute remained and NIAC was not at liberty to continue to litigate the issue. Whatever the merits of NIAC's opposition to the first motion to compel, its mere obstinacy became contumacy when it failed to obey two subsequent direct court orders.

**B.**

**1.**

The largest component of the sanctions award consisted of Daioleslam's expenses for the second and third imaging of NIAC's hard drive. Once more, the District Court properly exercised its discretion, because the cost of these forensic imagings directly resulted from NIAC's disobedience of the court's initial, July 2010 Order.

Rule 37(b) provides that a district court may issue "just orders" entering sanctions against a party that "fails to obey an order to provide or permit discovery," including an order granting a motion to compel. FED. R. CIV. P. 37(b)(2)(A). Sanctions can include (but are not limited to) directing that matters addressed by the order violated be taken as established, prohibiting the disobedient party from introducing evidence, striking pleadings, staying the action pending obedience, dismissing the action, entering default judgment, or holding the disobedient party in contempt. FED. R. CIV. P. 37(b)(2)(A). In addition, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure" to obey a discovery order, unless the party's disobedience was substantially justified or the circumstances would otherwise render an expense award unjust. FED. R.

23

CIV. P. 37(b)(2)(C).[13]   As Rule 37(b)'s text suggests, "[a]
production order is generally needed to trigger" sanctions.
*Shepherd*, 62 F.3d at 1474 (alteration in original) (quoting
*Att'y Gen. v. The Irish People, Inc.*, 684 F.2d 928, 951 n.129
(D.C. Cir. 1982)).

The cost of the imagings was "caused by [NIAC's]
failure" to obey the July 2010 Order by producing all the
computers on which it stored calendar records.  *See* FED. R.
CIV. P. 37(b)(2)(C).  NIAC elevates semantics over substance,
arguing it could not comply with the command that it produce
a "server" because it used only a "shared hard drive" to store
data, not a central exchange server.[14]  Appellants' Br. at 4, 25,
35, 52-53, 61.  The context of the District Court's July 2010
Order is key, however.  That order required NIAC to "submit
*the server on which its Outlook calendars are kept* to . . .

---

[13] The 1970 Advisory Committee Notes observe that awarding
reasonable expenses caused by the failure to obey a discovery order
"places the burden on the disobedient party to avoid expenses by
showing that his failure is justified or that special circumstances
make an award of expenses unjust.  Allocating the burden in this
way . . . is particularly appropriate when a court order is
disobeyed."  FED. R. CIV. P. 37 advisory committee's note to 1970
amendment.

[14] Even were we to credit the Appellants' argument that NIAC
could not comply because it did not have a server, its behavior is
inconsistent with that assertion.    At no point in opposing
Daioleslam's first motion to compel or in moving for
reconsideration of the court's July 2010 Order did the Appellants
inform the court that NIAC lacked a server.  Instead, they referred
several times to its "server" or "shared server."  J.A. 143, 173, 182.
In responding directly to Daioleslam's proposed order, which
would have required the Appellants to produce "the server on
which NIAC's Outlook calendars are kept," they objected only to
the omission of any prohibition on "metadata mining," not to the
reference to a server.  J.A. 157, 163.

24

PricewaterhouseCoopers for forensic imaging" so that PwC could obtain "*Outlook calendar records, complete and unedited* to the extent possible," from NIAC's network. J.A. 168 (emphasis added).  The court ordered PwC to prepare a report describing edits and deletions to the calendar entries, including who made the alterations.  J.A. 169.  Even if it did not have a server, then, NIAC knew that the purpose of the imaging was to obtain and review its "complete and unedited" calendar records.  It was obligated to produce any computers or shared drives on which that data was stored, including the computer its legislative director used and its old shared drive. Appellants contend that the fact the District Court had to explain in its second, March 2011 Order that, in the absence of a server or "shared drive," NIAC must instead produce the computers it had previously withheld, demonstrates that the first order was ambiguous.  *See* Appellants' Br. at 52.  On the contrary, NIAC's refusal to comply with the clear import of the first order is what necessitated this clarification.   Its resolute failure to produce *all* relevant drives until over a year after it was first ordered to do so is inexcusable.

**2.**

Similarly, Daioleslam's expenses in redeposing Parsi and Blout resulted from the Appellants' disobedience of the District Court's orders and were a legitimate subject of Rule 37(b) sanctions.  The Appellants, arguing that they violated no court order in failing to produce the documents Daioleslam needed to conduct these follow-up depositions, ask the Court to reverse the sanctions.  Appellants' Br. at 56.  We disagree.

Daioleslam's February 2009 production requests sought all documents related to U.S. political officials, including meeting notes and calendars.   Daioleslam specifically requested lobbying time records after he deposed NIAC's

25

employee responsible for e-discovery in early October 2009, noting it was important that he receive them in time to prepare for Blout's deposition on December 8, 2009. J.A. 133. Given NIAC's admission that its employees "used their Microsoft Outlook calendars to note meetings of any kind," including "meetings with government officials," J.A. 206, it surely was aware that its response to Daioleslam's request was materially incomplete if it omitted any Outlook entries. Similarly, NIAC and Parsi were aware of their use of Salesforce to record meeting notes. J.A. 622. Yet they produced no Outlook entries at all until December 28, 2009, after Daioleslam had first deposed Blout, and no Salesforce entries until much later.

In a March 4, 2010 filing, Daioleslam asked the District Court to order Blout's redeposition, observing that because of the Appellants' withholding of key documents he had not been able to question Blout about NIAC's "lobbying time records . . . [and] Outlook records." J.A. 134, 136. Responding to Daioleslam's concerns, it issued a minute order the next day, ordering that "[Daioleslam] may take an additional deposition of Emily Blount, although the Court reserves judgment as to which party shall bear any expenses. . . . [T]he parties are instructed to discuss further the production of Outlook calendars, including those predating 2009." Minute Order, *Parsi v. Daioleslam*, No. 1:08-cv-00705 (D.D.C. Mar. 5, 2010). Thus, the court's order that Blout be redeposed expressly contemplated that NIAC would "further" produce the remaining Outlook entries it had withheld, and NIAC did make a further production of those entries before Blout was redeposed in September 2010. But the Appellants knew of the existence of NIAC meeting notes in Salesforce that were just as directly relevant to Blout's redeposition as the Outlook entries, and of which the court was not yet aware, and therefore could not have included in its minute order. The Appellants would not produce these documents until

26

February 2011, five months after Daioleslam deposed Blout
for the second time. J.A. 623-24. Just as surely as the
Appellants' withholding of NIAC's server disobeyed a series
of written orders, their failure to produce meeting notes before
Daioleslam redeposed Blout frustrated the purpose of the
court's March 5, 2010 minute order and caused significant
needless expense to Daioleslam.

In the same vein, we agree with the District Court that
NIAC's "belated" production of its Salesforce data, in
violation of the court's March 2011 Order, caused Daioleslam
to bear unnecessary expense by redeposing Parsi in May
2011. *Parsi*, 286 F.R.D. at 85. That order required the
Appellants to coordinate with Daioleslam to schedule Parsi's
second deposition by April 6, 2011. In the same paragraph,
the court ordered the Appellants to "produce all documents to
be used during [Parsi's] follow-up deposition at least three (3)
business days prior to" the scheduled deposition. J.A. 329.
Later in the same order, the court made clear that NIAC was
to produce any codes necessary to translate all of its
previously produced Salesforce data as well as its "entire
membership list in Convio (and all incorporated data fields) . .
. current as of the date that it is produced." J.A. 331. When
Daioleslam redeposed Parsi in May 2011, however, NIAC
had not complied with the March 2011 Order. The only
additional production it had made was a list of Convio
"transactions" that mostly listed donations, rather than a
complete list of current members, as the court had ordered.
J.A. 446-47. It was not until after the court's August 2011
Order—and months after Parsi's wasted second deposition—
that NIAC complied.

The Appellants' failure to obey the court's orders caused
part of Daioleslam's deposition expenses. The District Court
acted within its discretion in ordering the Appellants to pay

27

for part of Parsi and Blout's redepositions and for the cost of preparing the corresponding sections of Daioleslam's sanctions motion.

### III.

In addition to sanctions contemplated by the Federal Rules of Civil Procedure, courts have an inherent power at common law, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), to "protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary, including even dismissals and default judgments." *Shepherd*, 62 F.3d at 1472. These powers inhere in the very nature of courts as an institution, and are "necessary to the exercise of all others." *United States v. Hudson*, 11 U.S. 32, 34 (1812). Courts have discretion to determine a fitting sanction for conduct that abuses judicial proceedings, including assessing attorney's fees. This authority is an exception to the background American Rule limiting cost-shifting generally. *Chambers*, 501 U.S. at 45.

Apart from two other narrow exceptions not relevant here, a finding of bad faith is required for an award of attorney's fees under the court's inherent power. *Id.* at 45-46; *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765-66 (1980); *see Tucker v. Williams*, 682 F.3d 654, 662 (7th Cir. 2012) (the "inherent power . . . is not a grant of authority to do good, rectify shortcomings of the common law . . . or undermine the American rule on the award of attorneys' fees") (second alteration in original) (internal quotation marks omitted). We have held that exercise of a court's power to impose "inherent power sanctions that are fundamentally penal" requires that it find bad faith by clear and convincing evidence. *Shepherd*,

28

62 F.3d at 1478; *see also id.* at 1474-78; *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (requiring clear and convincing evidence of bad faith to impose inherent power dismissal for a fraud on the court).  In contrast, "issue-related sanctions [that] are fundamentally remedial rather than punitive and do not preclude a trial on the merits"—such as barring admission of evidence or considering an issue established for the purpose of the action—can be imposed on a showing that the sanctioned party resisted discovery by a preponderance of the evidence.  *Shepherd*, 62 F.3d at 1478.  The clear and convincing standard "generally requires the trier of fact, in viewing each party's pile of evidence, to reach a firm conviction of the truth on the evidence about which he or she is certain." *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994).

The District Court read *Shepherd* to require clear and convincing evidence of bad faith only to impose the sanction of dismissal, *see Parsi*, 286 F.R.D. at 77, but we emphasized in *Shepherd* that "for those inherent power sanctions that are fundamentally penal—dismissals and default judgments, as well as contempt orders, *awards of attorneys' fees, and the imposition of fines*—the district court must find clear and convincing evidence of the predicate misconduct." 62 F.3d at 1478 (emphasis added).   Since the sanctions the District Court imposed consisted entirely of litigation expenses and fees, we will affirm them only if the court found by clear and convincing evidence that NIAC acted in bad faith.

### A.

The Appellants claim that the District Court did not purport to make a finding of bad faith under the proper standard of proof when it awarded expenses for their failure to produce emails with third parties.  Appellants' Br. at 54.

29

While the District Court might not have articulated the *Shepherd* standard in the most clear and explicit manner, however, we have no difficulty concluding it made the proper finding.

We have made clear in the context of sanctions that the term "bad faith" is not a "talisman[] required for affirmance." *LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 906 (D.C. Cir. 1998).  Nor do we require a district court to employ the magic words "clear and convincing" to uphold its finding under that standard of proof; we look instead to the circumstances of the court's factfinding.  *United States v. Sobin*, 56 F.3d 1423, 1428-29 (D.C. Cir. 1995); *see also United States v. Walsh*, 119 F.3d 115, 121-22 (2d Cir. 1997) ("Even though the district judge did not explicitly identify the standard of proof by which he found [the defendant] had committed perjury, because the evidence clearly supports that finding and because the tenor of the judge's ruling reflects his firm convictions on that score, we have no doubt that the judge's finding passed the clear-and-convincing standard.").

Here, the District Court described the Appellants' withholding of relevant emails as "indefensible."  *Parsi*, 286 F.R.D. at 84.  It noted that NIAC and Parsi made no attempt to explain the omission, which in any event it described as "inexplicable."  *Id.*  The court also condemned NIAC and Parsi for misrepresenting during a hearing that technical reasons precluded them from producing almost 170 angry emails from Iranian-Americans, when Daioleslam's subpoena to NIAC's damages expert revealed the organization had managed to compile the emails in order to demonstrate it had suffered membership losses due to Daioleslam's allegedly defamatory statements.  The court's reproach for the Appellants' conduct, in other words, was evident, and was based on a firm conviction that they had abused the discovery

30

process.  In *Shepherd*, by contrast, we reversed because the district court expressly applied the preponderance of the evidence standard and rejected the argument that it should use the clear and convincing evidence standard in imposing inherent authority sanctions.  62 F.3d at 1475.  Given the District Court's unmistakable conviction, supported amply by the evidence, that the Appellants withheld numerous emails with third parties they should have known were relevant, "it would be an empty formalism to find an abuse of discretion simply because the [D]istrict [C]ourt failed to invoke the magic words 'bad faith'"—or "clear and convincing." *LaPrade*, 146 F.3d at 906.

In view of the Appellants' failure to explain their withholding of so many relevant documents, some of which they misrepresented to the District Court that they could not locate, we cannot conclude it was clearly erroneous to find the Appellants acted in bad faith.  *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 525 (6th Cir. 2002) (finding bad faith where plaintiff withheld document that it knew undermined its cause of action); *cf. Bonds*, 93 F.3d at 812-13 (rejecting evidentiary sanction equivalent to default, partly because "[t]here is no evidence that the [defendant] withheld anything in discovery").

**B.**

However, we cannot similarly conclude that the District Court found misconduct by clear and convincing evidence sufficient to uphold sanctions for Parsi's purported alteration of the IIC document.  The District Court explicitly stated it could *not* find by clear and convincing evidence that Parsi altered the document in bad faith.  *Parsi*, 286 F.R.D. at 87.

31

Likewise, we cannot affirm the court's award of expenses for Parsi's false interrogatory response that he had used a desktop computer that Progressive Office indicated was not connected to the network.  Here, the District Court explicitly averted to the possibility that, since the Appellants "devoted little attention to this issue in their briefing or at the motions hearing, . . . [the court] may be awarding sanctions based on conduct for which there is an innocent explanation that plaintiffs have simply failed to give."  *Id.* at 86.

The District Court awarded $25,242.17 for Daioleslam's expenses in preparing his sanctions motion.  J.A. 912.  It appears that the sections on Parsi's interrogatory response and the IIC document represent only a minor part of this motion, but that is for the District Court to determine in the first instance.  We reverse this part of the sanctions award, and remand for re-determination by the District Court under the proper standard we have articulated.

**IV.**

Finally, we reverse the District Court's award of post-judgment interest to run from the date of its summary judgment opinion on September 13, 2012 instead of from its Final Order on April 9, 2013.  Daioleslam does not contest this determination.  *See* Appellee's Br. at 31 n.10.  Interest runs "from the date of the entry of the judgment," 28 U.S.C. § 1961(a), which requires the court to enter final judgment under Rule 54(b).  *Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 166 F.3d 1257, 1268 (D.C. Cir. 1999); *see also* FED. R. CIV. P. 54(b) (absent an express finding by district court that there is no just reason for delay, final judgment requires adjudication of "all the claims and all the parties' rights and liabilities").  Since the District Court did not resolve Daioleslam's final bill of recoverable costs until

32

April 9, 2013, post-judgment interest can only run from that date.

## V.

For the foregoing reasons, we affirm in part the District Court's award of sanctions, and reverse the award of Daioleslam's expenses in preparing the portions of his sanctions motion related to NIAC's alteration of a document and Parsi's interrogatory responses, as well as the award of post-judgment interest to run from September 13, 2012. We remand to the District Court for reconsideration of those aspects of its judgment under the proper standard.

*So ordered.*

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRITA PARSI** ) | |
| ) | |
| **and** ) | |
| ) | |
| **NATIONAL IRANIAN AMERICAN COUNCIL,** ) | |
| **Plaintiffs,** ) | **CIVIL NO. 08 CV 00705 (JDB)** |
| ) | |
| **v.** ) | |
| ) | |
| **DAIOLESLAM SEID HASSAN,** ) | |
| **Defendant.** ) | |
| ) | |

**ORDER GRANTING MOTION TO ENFORCE SUPERSEDEAS BOND**

On September 13, 2012, this Court entered an Order [191] granting in part, and denying in part, Defendant's Omnibus Sanctions Motion, and on April 9, 2013, entered judgment [215] imposing on Plaintiffs $183,480.09 in sanctions, plus interest. After Plaintiffs appealed [193, 216] this Court's Order awarding sanctions, the U.S. Court of Appeals for the District of Columbia affirmed the "bulk" of the sanctions, and reversed and remanded "a couple of minor" aspects of this Court's Order. *Parsi v. Daioleslam*, 778 F.3d 116, 118, 132 (D.C. Cir. 2015). Upon consideration of Defendant's *Motion to Enforce Supersedeas Bond Relating to Issues Decided on Appeal* [___], Plaintiffs' Opposition thereto [___], and Defendant's Reply [___], it is hereby **ORDERED** that:

1. The Clerk of Court for the U.S. District Court for the District of Columbia shall release to Defendant, from the Supersedeas Bond posted by Plaintiffs in this case [214] on April 23,

2013, a total of $158,238, plus post-judgment interest running from April 9, 2013, through the date of this Order.

2.  The Clerk of Court shall continue to hold the remaining portion of the Supersedeas Bond pending this Court's resolution of the issues remanded from the Court of Appeals, to be set forth in a separate Order.

**SO ORDERED.**


_____
JOHN D. BATES
United States District Judge

Dated: _____